IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| NUCLEAR DEVELOPMENT, LLC, § § Plaintiff, § § vs. § § TENNESSEE VALLEY AUTHORITY, § § Defendant. § | CIVIL ACTION CASE NUMBER: _____ |

# COMPLAINT

Plaintiff Nuclear Development, LLC ("Nuclear Development") brings this Complaint for specific performance of a contract to purchase real estate in Jackson County, Alabama and for other relief against Tennessee Valley Authority ("TVA"), as follows:

## The Parties

1. Nuclear Development is a Delaware limited liability company with its principal place of business in the State of Maryland.

2. TVA is a corporation agency of the United States that provides electricity for business customers and local power companies in parts of seven southeastern states, including portions of the territory comprising the United States District Court for the Northern District of Alabama. In Alabama, TVA operates

three hydroelectric dams, a nuclear power plant at Browns Ferry, solar and natural gas-fueled facilities, and other properties.

3.  TVA is authorized and empowered by Congress to sue and be sued in its corporate name, to make contracts, to purchase and hold real and personal property, and to sell and convey surplus property within its custody and control. 16 U.S.C. §§ 831-831ee.

## Jurisdiction and Venue

4.  This Court has exclusive federal question jurisdiction over claims and actions against TVA pursuant to 28 U.S.C. §§ 1331 and 1337. The United States Court of Federal Claims has no jurisdiction over claims against TVA. 28 U.S.C. § 1491(c). Venue in this Court is appropriate under 28 U.S.C. § 1391(b). Additionally, in the Contract made the subject of this action and described below, TVA irrevocably agreed to submit to the sole and exclusive jurisdiction of this Court regarding any action arising out of, based upon, or relating to the Contract. Contract, § 17.

## The Contract

5.  TVA has custody and control of the Bellefonte Nuclear Plant Site, including the infrastructure and other assets located thereon, in Jackson County, Alabama (the "BLN Property"). The BLN Property is an unfinished nuclear power plant located in Hollywood, Alabama that is currently being maintained by TVA in

deferred plant status pursuant to regulations of the Nuclear Regulatory Commission ("NRC").

6. In 2016, TVA declared the BLN Property to be surplus property and decided to sell the unfinished plant and property at auction. Nuclear Development submitted the winning bid and, on November 14, 2016, entered into a purchase and sales agreement with TVA captioned "Bellefonte Nuclear Plant Site Purchase and Sales Agreement" (the "Contract"). A copy of the Contract is attached hereto as Exhibit A.

7. The Contract provides that TVA will sell and Nuclear Development will purchase approximately 1,400 acres of the BLN Property as described in the Contract (the "Bellefonte Site"). The sale and purchase was originally agreed to close on November 14, 2018, but the parties amended the Contract to extend the closing date to November 30, 2018.

8. In Section 7(a) of the Contract, TVA represented and warranted the following, among other things:

> (ii) TVA has the authority to execute this Agreement and to transfer the Site to Buyer. This Agreement has been duly and validly executed and TVA has the authority to execute and deliver to Buyer the deed transferring ownership of the Site to Buyer.
>
> (iii) At its regularly scheduled meeting on May 5, 2016, the TVA Board of Directors declared the Site surplus and authorized the TVA CEO to sell the Site in whole or in part.

3

>> No other authorization or approval is needed for the actions contemplated by this Agreement.
>
> * * *
>
> (vii)  TVA has full right, power and authority to execute and deliver this Agreement and to consummate the purchase and sale transaction provided for herein, and *no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required* for the execution and delivery by the TVA of this Agreement or the consummation by the TVA of the transactions contemplated hereby. (emphasis added)

9.     Upon execution of the Contract, Nuclear Development paid TVA $22,200,000 as a 20% down payment toward the purchase price of $111,000,000, with the $88,800,000 balance of the purchase price to be paid at closing.  Nuclear Development also paid TVA upon the execution of the Contract an additional $750,000 to compensate TVA for certain sales and administrative costs.

<u>The Parties' Post-Contract Conduct</u>

10.    Pursuant to Section 12(e) of the Contract, Nuclear Development has paid TVA $875,000 every three months from the date of the Contract through November 30, 2018 (the amended contractual date for closing) – such payments totaling $7,144,231 – for TVA's continued maintenance of the Bellefonte Site assets that support completion and operation of two unfinished nuclear units in a manner meeting NRC quality control requirements.

11. On August 21, 2018, TVA acknowledged in a letter to Nuclear Development that Nuclear Development would complete the closing of the transaction in November and confirmed that TVA would draft the transaction documents and begin relocating its employees in anticipation of the sale. A copy of the August 21, 2018 letter is attached hereto as Exhibit B.

12. On August 29, 2018, Nuclear Development requested an extension of the closing date to May 14, 2019, "in order to complete certain activities for an orderly closing." TVA did not agree to this request and continued to insist upon closing the sale and purchase on November 14, 2018, the contracted closing date.

13. Notwithstanding the foregoing sequence of events, on November 8, 2018, TVA raised a potential obstacle to closing for the first time – two years after the Contract date and only six days before the closing date. In order to gain time to investigate this purported obstacle under the Atomic Energy Act, TVA proposed a 16-day extension of the closing date to November 30, 2018. Nuclear Development accepted the extension, and the parties entered into the First Amendment to the Contract, a copy of which is attached hereto as Exhibit C. The First Amendment to the Contract also confirmed Nuclear Development's agreement to pay TVA at the closing the additional sum of $1,193,130 for certain steam generators under Section 3(f) of the Contract.

14. Although not required to do so prior to the closing, on November 13, 2018, Nuclear Development applied to the NRC for approval of the transfer to Nuclear Development of two deferred construction permits CPPR-122 and -123 (the "NRC Permits") previously issued by the NRC to TVA authorizing TVA to finish constructing the nuclear facility at the Bellefonte Site.

15. After the First Amendment to the Contract was signed, TVA opined that under Section 101 of the Atomic Energy Act, 42 U.S.C. § 2131, the NRC must approve the transfer of the NRC Permits to Nuclear Development before TVA may transfer the Bellefonte Site to Nuclear Development. By this point, however, Nuclear Development had already paid TVA $30,094,231 under the Contract and expended additional millions of dollars in engineering, consulting, and regulatory fees, all in reliance upon closing the transaction as contracted.

16. TVA's interpretation of the Atomic Energy Act's application to the Contract is erroneous. The transfer of the Bellefonte Site and its improvements in their current condition to Nuclear Development does not violate the NRC Permits, the NRC regulations, or the Atomic Energy Act. Moreover, the transfer of the NRC Permits is not a prerequisite to closing under the Contract.

17. In contrast with its last-minute contention, TVA represented and warranted in 2016 under Section 7(a) of the Contract that it had full authority to transfer the Bellefonte Site to Nuclear Development and that "no authorization,

6

consent or approval or other order or action" of any Governmental Authority was necessary to consummate the transaction. Contract, § 7(a). TVA also made representations to the same effect on August 21, 2018, when it advised Nuclear Development that it was proceeding with documentation for the closing. TVA has known of the provisions of the Atomic Energy Act for decades, and until six days before the originally scheduled closing date never once contended that the Act required the NRC to approve the transfer of the NRC Permits to Nuclear Development before the closing of the sale of the Bellefonte Site could occur.

## The Closing

18. On multiple occasions and as recently as the week of closing, Nuclear Development reiterated its request that TVA agree to delay the closing date to eliminate the permit transfer issue, but TVA refused.

19. Despite its representations in the Contract that it had full authority to consummate the sale without the need for any governmental approval, on November 29, 2018, TVA advised Nuclear Development that it did not intend to close on November 30, 2018 because the NRC had not yet approved Nuclear Development's NRC Permit transfer approval applications. A copy of the November 29, 2018 letter is attached hereto as Exhibit D.

20. As of November 30, 2018, the closing date under the First Amendment to the Contract, Nuclear Development stood ready, willing, and able

to tender the full balance of the purchase price in the amount of $91,643,130 to TVA subject only to TVA's execution and delivery of the transaction documents. Nuclear Development fulfilled all terms and conditions of the Contract, but TVA refused to deliver the transaction documents and make the conveyance as required by the Contract as amended.

21. Upon execution and delivery of the transaction documents by TVA on the closing date, Nuclear Development stood ready, willing, and able to pay the full balance of the purchase price and consummate the closing.

22. Nuclear Development relied to its material detriment on the intentional representations and warranties made by TVA in the Contract and in communications occurring between the Contract date and the closing that it "has full right, power and authority . . . to consummate the purchase and sale transactions . . . and no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required . . . ." Contract, § 7(a). TVA is equitably estopped from taking a position inconsistent with those representations and warranties.

Count One
Breach of Contract Seeking Specific Performance

23. Nuclear Development adopts and incorporates within Count One all prior allegations of the Complaint.

24. The Contract requiring TVA to sell and Nuclear Development to purchase the Bellefonte Site is unique and calls for the transfer of specific property that obviously cannot be found elsewhere. By refusing to transfer the property as required by the Contract, TVA has breached the Contract, and Nuclear Development has no adequate remedy at law.

25. The Contract is reasonable and valid, and the obligations thereunder are clear. Nuclear Development has provided valuable consideration and performed its obligations, and it is entitled to specific performance of the Contract.

26. The Contract itself recognizes that specific performance is appropriate in the event of TVA's breach and authorizes specific performance as a remedy. Contract, § 35. Specifically, the Contract states that each party agrees that damages "may be difficult or impossible to calculate or otherwise inadequate to protect its interests and that irreparable damage may occur in the event that provisions of this Agreement are not performed . . . . Any Party may seek to require the performance of any other Party's obligations . . . through an order of specific performance rendered by the United States District Court for the Northern District of Alabama." Contract, § 35 (capitalization omitted).

WHEREFORE, Nuclear Development prays that the Court exercise its equitable powers to compel TVA to specifically perform its obligations under the Contract by accepting Nuclear Development's payment of the balance of the

purchase price for the Bellefonte Site and by executing and delivering to Nuclear Development the "TVA Transaction Documents" described in the Contract. In conjunction with such order of specific performance, Nuclear Development further prays the Court to award it all court costs, attorneys' fees, and prejudgment interest at the rate of 6% per annum calculated on the full purchase price from the date of TVA's breach through the date it specifically performs its obligations as provided in the Contract.

Count Two
Preliminary Injunction

27. Nuclear Development adopts and incorporates within Count Two all prior allegations of the Complaint.

28. Nuclear Development has no adequate remedy at law, and it will suffer imminent and irreparable injury if TVA's contractual obligations are not immediately performed. Time is of the essence, as agreed by both parties in Section 37 of the Contract. Contract, § 37.

29. In order to maintain the status quo prior to final judgment, and to protect Nuclear Development from irreparable injury, Nuclear Development prays that the Court will enter a preliminary injunction maintaining the status quo and requiring TVA, among other things, to continue to maintain and provide security for the BLN Property assets in a manner sufficient to meet NRC quality control requirements so that the NRC Permits will not lapse or be terminated.

30. TVA will not suffer any prejudice as a result of the preliminary injunction because it is required under the Contract to provide maintenance and security of the assets, and Nuclear Development has already paid TVA in full for those costs by paying $7,144,231 through the closing date as provided by the Contract. On the other hand, if the preliminary injunction is not granted and TVA allows or causes the NRC Permits to lapse or be terminated, the resulting prejudice to Nuclear Development will be catastrophic. The prejudice to Nuclear Development if the preliminary injunction is denied clearly outweighs any prejudice to TVA, to the extent any exists at all, if the preliminary injunction is granted.

31. Nuclear Development will seek the preliminary injunction by motion under the Federal Rules of Civil Procedure and any applicable local rules.

Count Three
Alternative Claim for Breach of Contract Seeking Damages

32. Nuclear Development adopts and incorporates within Count Three the allegations of paragraphs 1 - 22, above.

33. TVA breached the Contract by refusing to consummate the sale and purchase transaction as required by the Contract. Because of the unique nature of the Contract and the assets to be conveyed thereunder, Nuclear Development can never be fully compensated through recovery of damages for TVA's breach, but Nuclear Development nevertheless seeks such damages in the alternative if

equitable relief is not afforded. Nuclear Development's damages paid to TVA exceed $30,000,000, and its total out-of-pocket damages substantially exceed that number.

34. In the event that full and complete equitable relief is not afforded to Nuclear Development under Counts One and Two above, Nuclear Development seeks recovery against TVA for all damages arising out of TVA's breach of the Contract.

WHEREFORE, Nuclear Development prays the Court to enter judgment in favor of Nuclear Development and against TVA for all damages arising out of TVA's breach, including without limitation, (i) a full refund of the down payment sum of $22,200,000, (ii) a full refund of $750,000 in Compensated Costs paid under Section 5(c) of the Contract, (iii) a full refund of $7,144,231 in maintenance and security costs paid under Section 12(c) of the Contract, (iv) reimbursement of millions of dollars in engineering, consulting, and regulatory costs paid by Nuclear Development in reliance on closing the transaction, (v) court costs and attorneys' fees, (vi) pre-judgment and post-judgment interest at the rate of 6% per annum, and (vii) all other damages recoverable at law.

Respectfully submitted on this 30th day of November, 2018.

*/s/ Caine O'Rear III*
CAINE O'REAR III        (OREAC6985)
HAND ARENDALL HARRISON SALE LLC
P. O. Box 123
Mobile, AL  36601
(251) 432-5511
Fax:  (251) 694-6375
corear@handarendall.com


*/s/ E. Shane Black*
E. SHANE BLACK        (BLACE7644)
HAND ARENDALL HARRISON SALE LLC
102 S. Jefferson Street
Athens, AL  35611
(256) 232-0202
Fax: (256) 216-1480
sblack@handarendall.com


*/s/ Larry D. Blust*
Larry D. Blust        (*to be admitted pro hac vice*)
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 60602
(312) 604-2672
Fax: (312) 604-2673
lblust@hsplegal.com

**ATTORNEYS FOR PLAINTIFF**

**DEFENDANT WILL BE SERVED BY CERTIFIED MAIL IN ACCORDANCE WITH RULE 4 OF THE FEDERAL RULES OF CIVIL PROCEDURE INCORPORATING RULE 4 OF THE ALABAMA RULES OF CIVIL PROCEDURE ON THE FOLLOWING:**

Tennessee Valley Authority
Attn: Aaron B. Nix, Senior Manager, Realty Services and GIS
1101 Market Street
Chattanooga, TN  37402

U.S. Department of Justice
Attn: Jay E. Town, United States Attorney for the Northern District of Alabama
400 Meridian Street, Suite 304
Huntsville, Alabama 35801

U.S. Department of Justice
Attn: Matthew G. Whitaker
Acting Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001