FILED

2019 Feb-04  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 5:18-CV-01983-LCB |
| | ) | |
| TENNESSEE VALLEY | ) | **ORAL ARGUMENT** |
| AUTHORITY, | ) | **REQUESTED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DEFENDANT'S BRIEF IN SUPPORT OF MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION .................................................................................1

FACTUAL BACKGROUND ....................................................................1

ARGUMENT .......................................................................................4

I.    Plaintiff's claim for specific performance in Count One should be dismissed...................................................................................4

      A.    Consummation of the Agreement would violate controlling federal law. .................................................................................5

      B.    One of the closing conditions under the Agreement was not satisfied.............................................................................10

      C.    A court cannot order TVA to undertake an illegal act. .......................12

      D.    Equitable estoppel cannot save ND from dismissal. ..........................13

            1.    Equitable estoppel can never be employed to require a party to undertake an illegal act. ...............................................14

            2.    ND cannot establish that it should not have known the true facts. ......................................................................15

            3.    ND cannot establish that it reasonably and detrimentally relied on TVA's representation.................................................16

            4.    Equitable estoppel cannot be applied against the Government because ND failed to allege egregious misconduct. .............................................................18

II.    Plaintiff's claim for preliminary injunction in Count Two should be dismissed.................................................................................19

      A.    There is no cause of action for a preliminary injunction. ...................19

B.      As a matter of law, ND cannot establish any of the requirements for a preliminary injunction. ....................................................................20

      1.      ND cannot demonstrate that it has a substantial likelihood of success on the merits. ............................................................21

      2.      ND cannot demonstrate that it will suffer irreparable injury unless the preliminary injunction issues. ...................................21

      3.      ND cannot establish that the threatened injury to it outweighs the damage that the proposed injunction may cause to TVA, which means that the injunction would be adverse to the public interest.....................................................22

III.    Plaintiff's claim for damages in Count Three should be dismissed...............23

CONCLUSION ...........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashwander v. TVA*,
  297 U.S. 288 (1936)...............................................................................1

*Barnhart v. Walton*,
  535 U.S. 212 (2002)...............................................................................8

*In re BCP Mgmt., Inc.*,
  320 B.R. 265 (Bankr. D. Del. 2005)...................................................17

*Belize Telecom, Ltd. v. Gov't of Belize*,
  528 F.3d 1298 (11th Cir. 2008).........................................................10

*Brown v. Allied Home Mortg. Capital Corp.*,
  2011 WL 3351532 (D. Md. 2011).......................................................11

*Crenshaw v. Lister*,
  556 F.3d 1283 (11th Cir. 2009)...........................................................2

*Dawkins v. Fulton Cnty. Gov't*,
  733 F.3d 1084 (11th Cir. 2013)............................................14, 15, 16

*Domond v. Peoplenetwork APS*,
  2018 WL 4520238 (11th Cir. Sept. 20, 2018).....................................6

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014)............................................................20

*Fed. Crop Ins. Corp. v. Merrill*,
  332 U.S. 380 (1947)...........................................................15, 16, 18

*First Classics, Inc. v. Jack Lake Prods., Inc.*,
  2018 WL 1427125 (N.D. Ill. 2018).....................................................19

*Fomby-Denson v. Dep't of Army*,
  247 F.3d 1366 (Fed. Cir. 2001)...................................................12, 13

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*,
   320 F.3d 1205 (11th Cir. 2003) ....................................................20, 22

*Griffin Indus., Inc. v. Irvin*,
   496 F.3d 1189 (11th Cir. 2007) ....................................................2

*Harbor Commc'ns., LLC v. S. Light, LLC*,
   2015 WL 419854 (S.D. Ala. Feb. 2, 2015) ......................................19

*Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984)............................................................17

*Hilson v. Beaury*,
   2014 WL 4457132 (N.D.N.Y. Sep. 10, 2014)..................................19

*Hurd v. Hodge*,
   334 U.S. 24 (1948)............................................................13

*Jennings v. United States*,
   126 Fed. Cl. 764 (Fed. Cl. 2016) ...............................................13

*Martin v. Social Security Admin., Comm'r*,
   903 F.3d 1154 (11th Cir. 2018) ..................................................8

*Nken v. Holder*,
   556 U.S. 418 (2009)...........................................................20

*Office of Personnel Management v. Richmond*,
   496 U.S. 414 (1990)...........................................................14

*Olen Real Estate & Inv. Co. v. L.A. Zieman & Co.*,
   110 So. 2d 890 (Ala. 1959)....................................................12

*Orazi v. BAC Home Loans Servicing, LP*,
   2018 WL 4266071 (D. Md. Sep. 6, 2018).......................................11

*Orkin Exterminating Co., Inc. v. FTC*,
   849 F.2d 1354 (11th Cir. 1988) .................................................10

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima
    Reservation v. California,*
    813 F.3d 1155 (9th Cir. 2015) ............................................................11

*In the Matter of Power Auth. of the State of N.Y.,*
    52 N.R.C. 266 (2000)............................................................................7

*In the Matter of Pub. Serv. Co. of Ind., Inc.,*
    7 NRC 179 (1978).................................................................................8

*In the Matter of Pub. Serv. Co. of N.H. v. NRC,*
    7 N.R.C. 1 (1978), The NRC ...............................................................7

*Ramirez v. U.S. Immigration and Customs Enforcement,*
    310 F. Supp. 3d 7 (D.D.C. 2018).......................................................20

*RSB Ventures, Inc. v. F.D.I.C.,*
    514 Fed. App'x 853 (11th Cir. 2013) ..................................................6

*Said v. Nat'l R.R. Passenger Corp.,*
    317 F. Supp. 3d 304 (D.D.C. 2018).....................................................6

*Sanz v. U.S. Sec. Ins. Co.,*
    328 F.3d 1314 (11th Cir. 2003) .........................................................18

*Satellite Broad. Cable, Inc. v. Telefonica de Espana,*
    786 F. Supp. 1089 (D.P.R. 1992) ......................................................11

*State Highway Dept. v. Headrick Outdoor Advertising, Inc.,*
    594 So. 2d 1202 (Ala. 1992)...............................................................15

*Thurber v. W. Conf. of Teamsters Pension Plan,*
    542 F.2d 1106 (9th Cir. 1976) ...........................................................14

*TVA v. Hill,*
    437 U.S. 153 (1978).............................................................................1

*U.S. Commodity Futures Trading Comm'n v. Southern Trust Metals,
    Inc.,*
    894 F.3d 1313 (11th Cir. 2018) .........................................................18

*United States v. Certain Parcels of Land*,
    131 F. Supp. 65 (S.D. Cal. 1955)......................................................15

*United States v. Miss. Valley Generating Co.*,
    364 U.S. 520 (1961)........................................................................13

*United States v. Noel*,
    893 F.3d 1294 (11th Cir. 2018) .........................................................5

*United States v. Vonderau*,
    837 F.2d 1540 (11th Cir. 1988) .......................................................16

*ViroPharma, Inc. v. Hamburg*,
    898 F. Supp. 2d 1 (D.D.C. 2012).......................................................8

*In the Matter of Vt. Yankee Nuclear Power Corp.*,
    52 N.R.C. 79 (2000)..........................................................................7

*Woodward-Parker Corp. v. New Guar. Fed. Sav. & Loan Ass'n*,
    947 F.2d 947, 1991 WL 224082 (6th Cir. 1991) ................................11

**Statutes**

16 U.S.C. § 831 ...................................................................................1

16 U.S.C. § 831r (2006)........................................................................1

42 U.S.C. § 2011 .........................................................................*passim*

42 U.S.C. § 2131 .........................................................................*passim*

42 U.S.C. § 2133..............................................................................5, 6

42 U.S.C. § 2272 .................................................................................9

42 U.S.C. § 2273 .................................................................................9

42 U.S.C. § 2282 .................................................................................9

42 U.S.C. § 5814(a)-(f) ........................................................................2

42 U.S.C. § 5841(f)..............................................................................2

**Letter Rulings**

AEC Letter to J.E. Watson, 12/24/1974,
    https://adamswebsearch2. nrc.gov/webSearch2/main.jsp?
    AccessionNumber=ML111110111................................................................6

NRC Letter to Dr. R.G. Asperger, 3/7/1978,
    https://www. nrc.gov/docs/ML1216/ML12167A216.pdf ...................................8

NRC Letter to L.C. Dail, 10/19/1978,
    https:// adamswebsearch2. nrc.gov/webSearch2/main.jsp?
    AccessionNumber=ML013100139..........................................................7

NRC Letter to W.C. Tallman, 8/6/1980,
    https:// adamswebsearch2. nrc.gov/webSearch2/main.jsp?
    AccessionNumber=ML011790530..........................................................7

**Other Authorities**

10 C.F.R. § 2.205 ........................................................................................9

10 C.F.R. § 50.10(c)................................................................................5, 6

10 C.F.R. § 50.80 ......................................................................................9

10 C.F.R. § 50.80(a)..................................................................................9

10 C.F.R. § 50.80(b) .................................................................................9

Fed. R. Civ. P. 10(c)..................................................................................2

Fed. R. Civ. P. 12(b)(6).............................................................................1

Defendant Tennessee Valley Authority ("TVA") submits this brief in support of its motion to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

TVA could not close on the sale of the Bellefonte Nuclear Plant Site ("Bellefonte Site") to Nuclear Development LLC ("ND") because the sale would have been illegal under the Atomic Energy Act of 1954 (the "Act") and associated regulations.  As a direct result of that insurmountable legal hurdle, each of the three counts in ND's complaint must be dismissed.

## FACTUAL BACKGROUND

1.     TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831 *et. seq.  See* Doc. 1, ¶¶ 2-3; *TVA v. Hill*, 437 U.S. 153, 157 (1978) (TVA is a "wholly owned public corporation of the United States"); *Ashwander v. TVA*, 297 U.S. 288 (1936) (TVA is "an agency of the federal government"); 16 U.S.C. § 831r (2006) (denoting TVA to be "an instrumentality and agency of the Government of the United States").

2.     TVA owns the Bellefonte Site in Jackson County, Alabama.  (Doc. 1, ¶ 5).  The Bellefonte Site contains a partially finished nuclear plant.  (Doc. 1, ¶ 5).

3.     The Atomic Energy Commission ("AEC") issued to TVA two construction permits to construct the nuclear plant (the "Construction Permits") at

1

the Bellefonte Site.[1]   (Doc. 1, ¶ 14).   The Construction Permits are currently in deferred status.  (Doc. 1, ¶ 14).

4.      In November 2016, TVA and ND entered into a Purchase and Sale Agreement (the "Agreement") for the Bellefonte Site.  (Doc. 1, ¶ 6; Doc. 1-1).[2] Under the Agreement, TVA was obligated to transfer to ND not only the real property, buildings, and equipment on the site, but also, to the extent feasible and permitted by applicable law, the Construction Permits.  (Doc. 1-1, §§ 1(a), 1(b), 1(e)).

5.      Under the Agreement, the parties were given two years to satisfy various closing conditions, so that the closing would "occur on November 14, 2018."  (Doc. 1-1, §§ 5-6).  The parties later agreed to extend that deadline to November 30, 2018.  (Doc. 1, ¶ 7).

6.      Among other conditions, the sale of the Bellefonte Site could not close unless the following condition was fulfilled:

> **There shall not be in effect at the Closing any law, statute, rule, regulation**, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined [in the PSA]) restraining, enjoining   or   otherwise   prohibiting   or   **making   illegal   the**

---

[1] Pursuant to the Energy Reorganization Act of 1974, Congress abolished the Atomic Energy Commission and transferred its licensing and regulatory functions to the Nuclear Regulatory Commission ("NRC").  42 U.S.C. §§ 5814(a)–(f), 5841(f).

[2] Under Fed. R. Civ. P. 10(c), exhibits attached to the complaint "are part of the pleading 'for all purposes.'" *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007).  And when reviewing a motion to dismiss, the court may consider documents attached to the complaint where the plaintiff relies upon the document to form the basis for a claim or part of a claim. *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009).

**consummation of the transactions contemplated by the Agreement**[.]

(Doc. 1-1, § 6(a)(v) (emphasis added)).

7.     On November 13, 2018, two years after entering into the Agreement and just 17 days before the deadline for the closing, ND filed a license transfer application (the "Application") with the NRC seeking the NRC's approval to transfer the Construction Permits from TVA to ND.  (Doc. 1, ¶ 14).

8.      On November 29, 2018, TVA sent a letter to ND stating that, if the NRC did not approve the transfer of the Construction Permits prior to the Agreement's extended closing date of November 30, 2018, then "Section 101 of the Atomic Energy Act of 1954, 42 USC § 2131 . . . prohibits ND's acquisition of the [Bellefonte] Site."  (Doc. 1-5, p. 1).

9.     The NRC did not approve transfer of the Construction Permits to ND by the November 30, 2018 closing date (Doc. 1, ¶ 19), so TVA refused to close on the sale of the Bellefonte Site to ND.  (Doc. 1, ¶ 20).

10.     Because the closing did not occur by the date required under the Agreement, the Agreement expired by its own terms.  (Doc. 1-1, §§ 6, 11(b)).

11.     In the Agreement, the parties gave reciprocal warranties concerning the need for any government approvals for the sale of the Property.   TVA warranted:

> [N]o authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the TVA of this Agreement or the consummation by the TVA of the transactions contemplated hereby.

(Doc. 1-1, § 7(a)(vii)). Likewise, ND warranted:

> No authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the Buyer of this Agreement or the consummation by the Buyer of the transactions contemplated hereby.

(Doc. 1-1, § 8(a)(vi)).

12.    The parties to the Agreement agreed that "federal law shall at all times govern the validity, interpretation, and enforceability of th[e] Agreement," with Alabama law providing a backup in the event that there is no applicable body of federal law on a particular legal or procedural point.  (Doc. 1-1, § 31).

## ARGUMENT

## I.    Plaintiff's claim for specific performance in Count One should be dismissed.

ND's claim for specific performance of the Agreement in Count One fails as a matter of law.  ND cannot obtain specific performance of the Agreement because consummation of the closing under the Agreement would have violated the Atomic Energy Act of 1954 (the "Act").  Due to that, one of the closing conditions was not satisfied by the closing date.  Thus, TVA was under no obligation to proceed with the closing, and specific performance of the contract cannot be ordered.  In addition, specific performance cannot be ordered because this Court lacks authority

to order TVA to undertake an illegal act.  For both of those reasons, ND's claim in Count One for specific performance fails as a matter of law and must be dismissed.

### A. Consummation of the Agreement would violate controlling federal law.

The Act (42 U.S.C. § 2011 *et seq*.), along with the regulations issued in connection with it, prohibits TVA from selling or transferring the Bellefonte site or the Construction Permits to a third party, such as ND, without prior NRC approval.

"When construing the language of a statute, [courts] begin . . . with the language of the statute itself, and [courts] give effect to the plain terms of the statute." *United States v. Noel*, 893 F.3d 1294, 1297 (11th Cir. 2018) (internal quotations omitted).  The Act's plain language establishes that the NRC must approve the transfer of any nuclear facility such as the Bellefonte Site.

Section 101 of the Act, 42 U.S.C. § 2131, provides:

> "[i]t **shall be unlawful** . . . for any person within the United States to transfer or receive in interstate commerce, manufacture, produce, **transfer, acquire, possess**, use, import, or export **any utilization or production facility except under and in accordance with a license issued by the Commission pursuant to section 103** or section 104 [of the Act]"

(emphasis added); *see also* 10 C.F.R. § 50.10(c) (implementing regulation for Section 101).

Section 103 of the Act authorizes the NRC to issue licenses for utilization or production facilities for commercial purposes.  *See* 42 U.S.C. § 2133.   NRC

5

regulations implementing these sections of the Act mandate that a person seeking to build a commercial utilization or production facility obtain a construction permit (or an equivalent license) from the NRC prior to beginning construction. 10 C.F.R. § 50.10(c).

Each of the Construction Permits expressly states that it was issued pursuant to Section 103 and that the license so issued was for the construction of "a utilization facility." AEC Letter to J.E. Watson enclosing Construction Permits No. CPPR-122 and CPPR-123, 12/24/1974, at pp. 5, 10 of 15, https://adams websearch2. nrc.gov/webSearch2/main.jsp? AccessionNumber=ML111110111, (copy attached as Ex. A).[3] Thus, the facilities subject to the Construction Permits plainly fall within the meaning of "any utilization or production facility" under Section 101. That necessarily means that the Act precludes TVA from transferring ownership of the Bellefonte Site from TVA to ND if ND does not first acquire the licenses (*i.e.*, the Construction Permits) issued by the NRC.

The NRC made crystal clear more than forty years ago that it must give its approval prior to transfer of ownership of a nuclear plant subject to a construction permit. In 1978, in a case involving transfer of ownership interests in a nuclear

---

[3] "At the motion to dismiss stage, a district court may take judicial notice of public records." *Domond v. Peoplenetwork APS*, 2018 WL 4520238, at *1 (11th Cir. Sept. 20, 2018). As relevant to this case, the Court may take judicial notice of federal agency records available on government websites. *See, e.g., RSB Ventures, Inc. v. F.D.I.C.*, 514 Fed. App'x 853, 856 n. 2 (11th Cir. 2013); *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 335 n. 20 (D.D.C. 2018).

plant that was subject to a construction permit, the NRC stated unequivocally, "[a]ny transfer of ownership would require Commission approval." *In the Matter of Pub. Serv. Co. of N.H. v. NRC*, 7 N.R.C. 1, 15 (1978).[4]  Indeed, in instances where a party proposes a change in partial ownership of a nuclear plant that is subject to a construction permit, NRC approval must be obtained before the ownership change occurs. *See, e.g.,* NRC Letter to W.C. Tallman, 8/6/1980, at 1-2 & 6, https:// adamswebsearch2. nrc.gov/webSearch2/main.jsp?AccessionNumber =ML011790530, (copy attached as Ex. B); NRC Letter to L.C. Dail, 10/19/1978, at 1 & 4-5, https:// adamswebsearch2. nrc.gov/webSearch2/main.jsp? Accession Number=ML013100139, (copy attached as Ex. C).[5]

In 1978, the NRC addressed a situation where an entity sought to sell a 20% stake in an under-construction nuclear plant.  The entity that sought to sell the interest argued that the approval requirements of Section 101 are not triggered until construction of a nuclear plant is complete.  The NRC rejected that argument,

---

[4] The NRC has indicated that a transfer of a license or ownership may occur if NRC staff approves it, but such a transfer would be have to be unwound if the NRC itself later disapproved it.  *See In the Matter of Power Auth. of the State of N.Y.*, 52 N.R.C. 266, 286 n.1 (2000); *In the Matter of Vt. Yankee Nuclear Power Corp.*, 52 N.R.C. 79, 82-83 (2000).  In this case, there is no allegation that ND obtained any NRC staff approval prior to the closing date.  TVA has not been able to locate any precedent where the NRC has allowed a nuclear site subject to a construction permit to be sold or acquired without prior approval by NRC or its staff of the transfer of the construction permit to the acquiring party.

[5] These letters constitute legal authority and are thus properly considered by the Court on the motion to dismiss.  But, even if the Court were to deem the letter to be extrinsic evidence, they can still be considered because these are public records available on the NRC's website. *See supra* at 6 n. 2.

noting that "it has been the long standing practice of the Commission to consider a utilization facility under construction to be a utilization facility." NRC Letter to Dr. R.G. Asperger, 3/7/1978 at p. 4, n.*, https://www. nrc.gov/docs/ML1216/ML12167A216.pdf, (copy attached as Ex. D). The NRC concluded that "[s]ection 101 of the Act . . . requires Commission approval before and not after an ownership interest is acquired." *Id.* at 3-4.[6]

This conclusion comports not only with the plain language of the Act, but also with common sense. In rejecting the argument that an entity can own a nuclear plant without a license, the Atomic Safety and Licensing Appeal Board stated that there is "no reason why Congress would want to exempt owners of nuclear power plants from [NRC] regulation." *In the Matter of Pub. Serv. Co. of Ind., Inc.*, 7 NRC 179, 200 (1978). In the post-9/11 world, that reasoning resonates with great force due to the importance of the NRC maintaining oversight of public health and safety issues related to the construction and operation of nuclear plants.

---

[6] The legal interpretations of the NRC reflected in this letter ruling, along with the legal interpretations reflected in the other NRC letter rulings cited in this brief, are entitled to *Chevron* deference due to the importance of the question to the administration of the statute, the complexity of that administration, and the careful consideration that the NRC has given to the question over a long period of time. *See ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 17 (D.D.C. 2012) (citing *Barnhart v. Walton*, 535 U.S. 212, 221 (2002)); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 468 U.S. 837 (1984). Under the *Chevron* framework, the NRC's interpretation must be given controlling weight because it is not manifestly contrary to the statute. *ViroPharma*, 898 F. Supp. 2d at 17.

Alternatively, even if the letter rulings were not entitled to *Chevron* deference (and they are), they still would be entitled to *Skidmore* deference because of the thoroughness evident in the NRC's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and the inherent power in the letters to persuade. *See Martin v. Social Security Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018).

8

The fact that ND initiated an application for transfer of the Construction Permits just before the Agreement's closing date does not save ND from the deficiency under the Act. The transfer of the Construction Permits cannot occur without prior NRC approval. According to 10 C.F.R. § 50.80:

> **No license for a production or utilization facility** (including, but not limited to, permits under this part and part 52 of this chapter, and licenses under parts 50 and 52 of this chapter), or any right thereunder, **shall be transferred, assigned, or in any manner disposed of**, either voluntarily or involuntarily, directly or indirectly, **through transfer of control of the licenses to any person, unless the Commission gives its consent in writin**g.

10 C.F.R. § 50.80(a); *see also* 10 C.F.R. § 50.80(b) (applying the license transfer requirements to construction permits).

These requirements of prior approval are no mere technicality. If TVA were to transfer the Bellefonte Site without prior NRC approval, it would put TVA in violation of its permits. The permits expressly state that TVA owns the Bellefonte Site, (Ex A, pp. 5, 10 of 15), so TVA would, until the permits are revised or transferred, be in violation if ownership were transferred to ND. That could result in substantial monetary fines to TVA, *see* 42 U.S.C. § 2282; 10 C.F.R. § 2.205, and perhaps even criminal penalties, *see id.* §§ 2272, 2273.

ND concedes in its complaint that it did not obtain by the closing date approval from the NRC either for transfer of ownership of the Bellefonte Site or

the Construction Permits to it.  As a result, the consummation of the closing under the Agreement would have been in violation of the Act and applicable regulations.

**B.    One of the closing conditions under the Agreement was not satisfied.**

Because one of the five contractual conditions for closing was not satisfied, TVA committed no breach in refusing to close on the sale of the Bellefonte Site, and ND is not entitled to specific performance.  Thus, ND's claim for specific performance fails as a matter of law.

"Under federal law, the plain meaning of a contract's language governs its interpretation."  *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008).  Furthermore, "where the language of the contract is unambiguous, the legal effect of that language is a question of law" that "may be resolved summarily."  *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1360 (11th Cir. 1988).

The Agreement contained this unambiguous condition precedent to performance of the closing under the Agreement:

> **There shall not be in effect at the Closing any law, statute, rule, regulation**, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined [in the PSA]) restraining, enjoining or otherwise prohibiting or **making illegal the consummation of the transactions contemplated by the Agreement**.

(Doc. 1-1, § 6(a)(v) (emphasis added)).

10

Because the Act and the regulations discussed above made it illegal for the closing to occur, this contractual condition precedent was not satisfied by the time of closing, and TVA committed no breach of the Agreement by refusing to close. "Specific performance is a remedy associated with breach of contract," so there can be no order of specific performance here in the absence of breach. *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1167 (9th Cir. 2015) (applying federal law).

In addition to the fact that the absence of a breach precludes an order of specific performance, it is a settled proposition of law that a court cannot order specific performance when a condition precedent to performance has not been satisfied. *See, e.g., Woodward-Parker Corp. v. New Guar. Fed. Sav. & Loan Ass'n*, 947 F.2d 947 (Table), 1991 WL 224082, at *2 (6th Cir. 1991) ("A plaintiff in a breach of contract action is only entitled to specific performance, as a matter of law, where he shows: (1) he performed all conditions precedent to the requested performance[.]"); *Orazi v. BAC Home Loans Servicing, LP*, 2018 WL 4266071, at *5 (D. Md. Sep. 6, 2018) ("[C]onditions precedent must be fulfilled before specific performance can be granted."); *Brown v. Allied Home Mortg. Capital Corp.*, 2011 WL 3351532, at *3 (D. Md. 2011) ("Indeed, '[t]he performance of all conditions precedent is generally required before specific performance will be granted.'"); *Satellite Broad. Cable, Inc. v. Telefonica de Espana*, 786 F. Supp. 1089, 1104

11

(D.P.R. 1992) (noting that it is "well settled law" that "[i]n the case of a contract subject to a condition precedent, an order for specific performance does not proceed until such time as the condition is fulfilled."); *Olen Real Estate & Inv. Co. v. L.A. Zieman & Co.*, 110 So. 2d 890, 892 (Ala. 1959) ("[S]pecific performance of a contract may be had in equity even though the contract contains a condition precedent, *provided such condition precedent has been fulfilled.*") (emphasis added).

Because the contractual condition to closing was not satisfied by the agreed closing date, ND cannot obtain specific performance, and there can be no order of specific performance.  Accordingly, ND's claim for specific performance in Count One must be dismissed.

## C.   A court cannot order TVA to undertake an illegal act.

ND's claim for specific performance fails as a matter of law for a separate and independent reason:  the Court cannot order TVA to commit an illegal act, which is what specific performance would entail.  "It is . . . well-settled in the principles of general contract law that courts may not enforce contracts that are contrary to public policy," and that "enforcement is [therefore] denied when such enforcement would be contrary to the 'public policy of the United States as manifested in the Constitution, treaties, federal statutes and applicable legal precedents.'" *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366, 1373-1374 (Fed.

12

Cir. 2001) (citing *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948)). This principle has been applied by the Supreme Court "to declare unenforceable United States government contracts." *Id.* at 1373; *accord Jennings v. United States*, 126 Fed. Cl. 764, 769 (Fed. Cl. 2016) (citing *Fomby*, 247 F.3d at 1373-1374); *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961) (approving cancellation of government contract for violation of federal conflict-of-interest statute because "the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied" in that statute).

In this case, ordering specific performance of the Agreement would be contrary to public policy as manifested in the Act and the applicable regulations discussed above.  For this additional reason, this Court cannot order specific performance, which means that Count One must be dismissed.

### D.     Equitable estoppel cannot save ND from dismissal.

ND's invocation of the doctrine of equitable estoppel (Doc. 1, ¶ 22) cannot rescue it from dismissal of Count One because the doctrine does not apply here as a matter of law for multiple separate and independent reasons.

The elements of equitable estoppel are clear in the Eleventh Circuit:

> the elements of federal common law equitable estoppel in this circuit are: (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel

> did not know, nor should it have known, the true facts; and (5)
> the party asserting the estoppel reasonably and detrimentally
> relied on the misrepresentation.

*Dawkins v. Fulton Cnty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013).

### 1. Equitable estoppel can never be employed to require a party to undertake an illegal act.

Equitable estoppel can never be employed to require a party to undertake an illegal act, but that is exactly what ND is trying to do in this case.

ND bases its equitable-estoppel argument on its allegation that TVA falsely represented in the Agreement that no approval of any governmental authority would be needed to consummate the transactions contemplated by the Agreement. (Doc. 1, ¶ 22 (citing Doc. 1-1, ¶ 7(a)(vii)).  ND thus contends that TVA should be precluded from now taking the position that it would be illegal to consummate the sale of the Bellefonte Site under the Agreement without NRC approval.  (Doc. 1, ¶ 22).  In other words, ND is arguing that Congress's decision in the Act to require NRC approval of the transfer of a nuclear plant can be disregarded based on TVA's representation in the Agreement.

It is settled law, however, that equitable estoppel cannot be invoked to compel a party to take an illegal act.  *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 426 (1990) ("[J]udicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized."); *Thurber v. W. Conf. of Teamsters Pension Plan*, 542 F.2d 1106,

1109 (9th Cir. 1976) ("We agree with the district court that the doctrine of estoppel may not be invoked to compel an illegal act."); *United States v. Certain Parcels of Land*, 131 F. Supp. 65, 73 (S.D. Cal. 1955) ("Public policy demands that the mandate of the law should override any doctrine of estoppel; so no amount of misrepresentation can prevent a party, whether citizen or Government, from asserting as illegal that which the law declares to be such."); *see also State Highway Dept. v. Headrick Outdoor Advertising, Inc.*, 594 So. 2d 1202, 1205 (Ala. 1992) ("[T]he doctrine of estoppel may not authorize a city do to that which the city had no authority to do[.]").  In light of these authorities, ND cannot employ the doctrine of equitable estoppel to force TVA to proceed with the closing under the Agreement in violation of the Act.

### 2.     ND cannot establish that it should not have known the true facts.

ND's attempt to invoke equitable estoppel also fails for the reason that ND cannot establish the fourth *Dawkins* element for the doctrine, namely that ND should not have known the true facts about the requirements of the Act.  As discussed above, the requirements of the Act and its associated regulations are clear.  The Supreme Court held more than 70 years ago that a party cannot rely on the representations of a government agent when those representations are inconsistent with applicable laws and regulations.  *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947).  The Supreme Court based its conclusion on the

15

fundamental premise that "everyone is charged with knowledge of the United States Statutes at Large" and with knowledge of the "rules and regulations in the Federal Register."   *Id.* at 384-85.   According to the Supreme Court, "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."   *Id.* at 384; *see also United States v. Vonderau*, 837 F.2d 1540, 1541 (11th Cir. 1988) ("The government cannot be estopped by the action of its agent when that agent acts without authority or contrary to law.").

In light of this settled precedent, ND as a matter of law cannot establish that it should not have known the true facts about the legal requirement for approval from the NRC in order to consummate the transfer of the Bellefonte Site under the Agreement, especially given that ND had two years to satisfy all conditions precedent.   As a result, ND cannot invoke the doctrine of equitable estoppel for this additional reason.

### 3.   ND cannot establish that it reasonably and detrimentally relied on TVA's representation.

ND also cannot establish the fifth *Dawkins* element for application of equitable estoppel—that ND reasonably and detrimentally relief on TVA's representation.  The Supreme Court has held that "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse[,]" and "that reliance must have been reasonable in that the

party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984) (internal quotations omitted).

ND cannot establish that it actually relied on TVA's representation. ND omits a critical fact from its complaint, namely that it gave a representation in the Agreement substantively identical to the one given by TVA about which ND complains. Specifically, in Section 8(a)(vi) of the Agreement, ND represented, "No authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the Buyer of this Agreement or the consummation by the Buyer of the transactions contemplated hereby." Because ND made the same substantive representation to the one made by TVA, ND as a matter of law cannot establish that it relied on TVA's representation. *See In re BCP Mgmt., Inc.*, 320 B.R. 265, 279 (Bankr. D. Del. 2005) (rejecting defendant PwC's estoppel theory because "PwC has not demonstrated any reliance on representations of BCPM because PwC made the same representations to this Court.").

Even if ND could establish that it relied on TVA's representation (and it cannot), ND cannot establish that any such reliance was reasonable. Reliance on TVA's representation would not have been reasonable because, as discussed above, a party cannot rely on a Government agent's statement about what the law

17

is; instead, everyone is charged with knowledge of federal laws and regulations. *See Merrill*, 332 U.S. at 384-85. Because ND should have known about the provisions of the Act, any reliance on TVA's alleged misstatement about the law is *per se* unreasonable, so ND cannot establish this essential element for invocation of the doctrine of equitable estoppel.

    **4.      Equitable estoppel cannot be applied against the Government because ND failed to allege egregious misconduct.**

Even if the doctrine of equitable estoppel could ever be invoked against the Government,[7] it would be "warranted only if affirmative and egregious misconduct by government agents exists." *Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314, 1320 (11th Cir. 2003). Misconduct reaching that level must be alleged in the complaint. *Id.* ND's complaint does not allege any such misconduct, so the doctrine of equitable estoppel does not apply for this additional reason.

* * *

For each of the four separate and independent reasons discussed above, ND's attempt to invoke equitable estoppel to avoid application of the Act comes up short. Thus, Count One should be dismissed.

---

[7] As the Eleventh Circuit recently held, "[t]he Supreme Court has never established that the doctrine of equitable estoppel can be applied against the government and, in fact, has implied that it can not be." *U.S. Commodity Futures Trading Comm'n v. Southern Trust Metals, Inc.*, 894 F.3d 1313, 1323 (11th Cir. 2018). TVA asserts that estoppel can never be asserted against it or any other governmental entity.

## II.  Plaintiff's claim for preliminary injunction in Count Two should be dismissed.

ND's claim for a preliminary injunction in Count Two also fails as a matter of law for multiple separate and independent reasons.

### A.  There is no cause of action for a preliminary injunction.

First, ND's Count Two must be dismissed because there is no viable cause of action for a preliminary injunction.  "A motion for preliminary injunction is not a cause of action. It is a procedural mechanism by which a party may obtain relief." *Harbor Commc'ns., LLC v. S. Light, LLC*, 2015 WL 419854, at *3 (S.D. Ala. Feb. 2, 2015); *accord Hilson v. Beaury*, 2014 WL 4457132, at *7 (N.D.N.Y. Sep. 10, 2014) ("A request for a temporary restraining order or preliminary injunction, however, is not an independently cognizable cause of action, but instead a form of interim relief.").  "While it is appropriate to ask for a preliminary injunction as a form of relief, *a request for a preliminary injunction is not appropriately pled as a substantive cause of action in a complaint*." *First Classics, Inc. v. Jack Lake Prods., Inc.*, 2018 WL 1427125, at *3 (N.D. Ill. 2018) (emphasis added) (internal quotations omitted).

Because it is not permissible to plead a cause of action for a preliminary injunction, ND's Count Two must be dismissed.

19

**B.**     **As a matter of law, ND cannot establish any of the requirements for a preliminary injunction.**

Second, ND cannot establish any of the requirements for a preliminary injunction, and that provides an independent basis for dismissal of Count Two.

Under settled Eleventh Circuit law, "[a] district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). The third and fourth factors "merge into one factor when the government is the non-movant." *Ramirez v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *accord Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Far from a common feature of federal civil litigation, a preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Four Seasons Hotels and Resorts*, 320 F.3d at 1210.

20

If ND cannot establish any one of the requirements, then the claim for a preliminary injunction must be dismissed.  In this case, as a matter of law, ND cannot establish any of the requirements.

### 1.    ND cannot demonstrate that it has a substantial likelihood of success on the merits.

ND cannot demonstrate that there is a substantial likelihood of success on the merits.  ND seeks the preliminary injunction solely to preserve the status quo while its claim for specific performance is being litigated.  (Doc. 1, ¶¶ 28-31).  But, as discussed above, ND's claim for specific performance fails as a matter of law.  Because that claim fails, it follows necessarily that there is no substantial likelihood of success on the merits of the claim.  Thus, ND cannot establish that requirement for a preliminary injunction as a matter of law.

### 2.    ND cannot demonstrate that it will suffer irreparable injury unless the preliminary injunction issues.

ND also cannot establish that it will suffer irreparable injury if the preliminary injunction does not issue.  Indeed, the argument that ND makes in claiming irreparable harm has been rendered moot due to the parties' stipulation.  (Doc. 17).

ND alleged in its complaint that a preliminary injunction is needed "to maintain[] the status quo and require[] TVA, among other things, to continue to maintain and provide security for the [Bellefonte Site] assets in a manner sufficient

21

to meet NRC quality control requirements so that the [Construction Permits] will not lapse or be terminated." (Doc. 1, ¶ 29). But the stipulation entered into by the parties has mooted that argument. (Doc. 17). TVA has agreed that it will maintain the NRC's quality control requirements unless and until the Construction Permits are revised or terminated. (*Id*). Also, TVA has agreed to give ND five business days' notice if it decides to initiate the process to terminate the Construction Permits. (Doc. 17). As a result, ND cannot establish that "irreparable injury will be suffered unless the injunction issues." *Four Seasons Hotels and Resorts*, 320 F.3d 1205 at 1210.

> ### 3. ND cannot establish that the threatened injury to it outweighs the damage that the proposed injunction may cause to TVA, which means that the injunction would be adverse to the public interest.

ND cannot demonstrate that the threatened injury to it outweighs the damage that the proposed injunction may cause to TVA. The proposed injunction will impair TVA's ability to determine how it wants to utilize the property that it owns. TVA would be precluded from entering into an agreement to sell its property, pending a license transfer, or from beginning the process to terminate the Construction Permits. By contrast, there is no threatened injury to ND. Because it would be illegal for the Court to order specific performance (as explained above), ND cannot obtain the relief it seeks to protect with the preliminary injunction. As a result, ND will not suffer any injury if the injunction is not entered as compared

to what TVA will suffer if it is.  And it is certainly not in the public interest to enter an injunction in order to retain the ability to require a government entity to commit an illegal act.

* * *

Because, as a matter of law, ND cannot establish all of the requirements for entry of a preliminary injunction, Count Two must be dismissed.

### III.    Plaintiff's claim for damages in Count Three should be dismissed.

ND's damages claim for breach of contract in Count Three must be dismissed because its allegation of breach fails as a matter of law.  ND alleges that "TVA breached the [Agreement] by refusing to consummate the sale and purchase transaction as required by the [Agreement]."  (Doc. 1, ¶ 33).  But, as discussed above, a necessary condition to closing was not satisfied because it would have been illegal for the closing to occur.  *See supra* at 9-11.  Thus, under the plain language of the Agreement, TVA was not obligated to close, so there was no breach.

<b>CONCLUSION</b>

For the foregoing reasons, each count of ND's complaint is due to be dismissed.

23

Respectfully submitted,


       *s/ Matthew H. Lembke*
Matthew H. Lembke
Attorney for Defendant

OF COUNSEL

Matthew H. Lembke
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

David D. Ayliffe
Steven C. Chin
OFFICE OF THE GENERAL COUNSEL
Tennessee Valley Authority
400 West Summit Hill Drive, WT6
Knoxville, Tennessee 37902
Telephone: (865) 632-3052
ddayliffe@tva.gov
scchin@tva.gov

24

## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 4, 2019, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record:

                    Caine O'Rear, III
                    HAND ARENDALL HARRISON SALE, LLC
                    Post Office Box 123
                    Mobile, Alabama  36601
                    corear@handarendall.com

                    Edward Shane Black
                    HAND ARENDALL LLC
                    102 South Jefferson Street
                    Athens, Alabama  35611
                    sblack@handarendall.com

                    Larry David Blust
                    HUGHES SOCOL PIERS RESNICK DYM, LTD.
                    70 West Madison Street, Suite 4000
                    Chicago, Illinois  60602
                    lblust@hsplegal.com

                                  *s/ Matthew H. Lembke*
                                  OF COUNSEL

25