FILED
2019 May-15 PM 01:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| NUCLEAR DEVELOPMENT, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 5:18-cv-1983-LCB |
| TENNESSEE VALLEY AUTHORITY, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Tennessee Valley Authority ("TVA") has filed a Motion to Dismiss (doc. 22). Plaintiff Nuclear Development LLC ("ND") has filed a response (doc. 28), and TVA has filed a reply (doc. 31). The Court also held a hearing on May 13, 2019. Therefore, the Motion to Dismiss is ready for review. For the reasons stated below, the Court denies the Motion to Dismiss.

### I. BACKGROUND

The Bellefonte Nuclear Plant Site is an unfinished nuclear power plant site located in Jackson County, Alabama. (Doc. 1, p. 2). TVA currently owns the Bellefonte Nuclear Plant Site and has custody and control of it. (*Id.*). The Bellefonte Nuclear Plant Site is currently in deferred plant status pursuant to regulations promulgated by the Nuclear Regulatory Commission ("NRC"). (*Id.* at 3). In 2016, TVA declared the Bellefonte Nuclear Plant Site to be surplus

property. (*Id.*). On November 14, 2016, TVA entered into an agreement for the sale of most of the Bellefonte Nuclear Plant Site, including the infrastructure and other assets located thereon, to ND. (*Id.*). The Court will refer to the portion of the Bellefonte Nuclear Plant Site subject to the agreement as "Bellefonte." The purchase and sales agreement (otherwise referred to as the "Agreement" or the "Contract") is attached as an exhibit to ND's complaint.

Section 1 of the Agreement states, in part:

> At the Closing (as defined in Section 5 below), TVA shall sell, transfer, convey, assign and deliver title and possession to [ND], and [ND] shall purchase and pay for, all of TVA's right, title and interest in each of the following . . .
>
> (e) To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e) (the "Permits"); *provided*, *however*, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this Section 1(e) shall not require TVA to certify that [ND] is qualified and fit to complete construction of and operate those reactors and, if [ND] informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this Section 1(e) by Closing, TVA's obligations under this Section 1(e) shall cease.

2

(Doc. 1, p. 4). Listed in Schedule 1(e) to the Agreement are certain facility permits, including the NRC Permits, CPPR-122 (Unit 1) and CPPR-123 (Unit 2) (the "NRC Permits"), both issued on December 24, 1974, and listed as "[r]einstated, currently deferred." (Doc. 1-2, p. 47; Doc. 23-2).[1]

Section 6(a)(v) addresses conditions to closing, stating that

> [t]he obligations of TVA and [ND] to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or before Closing, of each of the following conditions . . .
>
> (v) There shall not be in effect at the Closing any law, statute, rule, regulation, permit certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below) restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement . . . .

(Doc. 1-1, p. 7).

Section 7(a) of the Contract addresses TVA's representations and warranties. In particular, Section 7(a)(vii) states

> TVA has full right, power and authority to execute and deliver this Agreement and to consummate the purchase and sale transactions provided for herein, and no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the TVA of

---

[1] Pursuant to the Energy Reorganization Act of 1974, Congress abolished the Atomic Energy Commission and transferred its licensing and regulatory functions to the Nuclear Regulatory Commission ("NRC"). 42 U.S.C. §§ 5814(a)–(f), 5841(f).

> this Agreement or the consummation by the TVA of the transactions contemplated hereby.

(Doc. 1-1, p. 9).

Section 8(a) addresses ND's representations and warranties. Section 8(a)(vi) states that, to induce TVA to enter into the Agreement, ND represents and warrants to TVA, among other things, that "[n]o authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by [ND] of this Agreement or the consummation by [ND] of the transactions contemplated hereby." (*Id*. at 10). Additionally, Section 15(c)(i) states that ND, "either alone or together with its representatives and agents, has knowledge and experience in transactions of this type and is therefore capable of evaluating the risks and merits of acquiring [Bellefonte]." (*Id*. at 15).

Section 11(a) addresses the termination of the Agreement. Section 11(a)(iv) states that the Agreement may be terminated "[b]y either Party, upon written notice to the other Party, if . . . the closing conditions set forth in Section 6(a)(i) or 6(a)(v) [stating that nothing makes the consummation of the transactions illegal] are unfulfilled as of the Closing Date . . . ." (*Id*. at 13). Section 11(b) states, "Upon any termination of expiration or [sic] this Agreement, TVA shall be entitled to retain the Down Payment and any Compensated Costs paid by Buyer on or before termination or expiration, unless termination is under Section 11(a)(ii) or Section 11(a)(iv), in which event TVA shall return the Down Payment and any

4

Compensated Costs paid by Buyer to Buyer within 30 days by check or electronically as directed by Buyer." (*Id.*).

Upon execution of the Agreement, ND paid TVA $22,200,000.00 as a 20% down payment toward the purchase price of 111 million, with the $88,800,000.00 balance to be paid at closing. (Doc. 1, p. 4; Doc. 1-1, p. 7). In addition, ND also paid TVA an additional $750,000 upon execution of the contract to compensate TVA for certain sales and administrative costs. (*Id.*). Pursuant to the Agreement, ND has paid TVA $875,000 every three months from the date of the Agreement through November 30, 2018, for TVA's continued maintenance of Bellefonte. (Doc. 1, p. 4).

The Agreement originally provided for a November 14, 2018, closing date. (*Id.*; Doc. 1-1, p. 6). According to ND, it requested an extension of the closing date to May 14, 2019, "in order to complete certain activities for an orderly closing." (Doc. 1, p. 5). TVA did not agree to this request. (*Id.*). ND alleges that on November 8, 2018, TVA raised, for the first time, a potential obstacle to closing. (*Id.*). Specifically, TVA advised ND that it would not, or could not, consummate the sale of Bellefonte without approval from the NRC for the transfer of the NRC Permits to ND. (*Id.* at 6). The parties agreed, in the First Amendment to the Agreement, to an extension of the closing date to November 30, 2018. (*Id.*

5

at 3; Doc. 1-4, p. 2). ND also paid TVA an additional $1,193,130.00 for the purchase of some steam generators. (Doc. 1, p. 5; Doc. 1-4, p. 2).

ND asserts that, although it was not required to do so prior to closing, on November 13, 2018, it applied to the NRC for approval of the transfer of the NRC Permits. (Doc. 1, p. 6). After the First Amendment to the Agreement was signed, TVA opined that, under Section 101 of the Atomic Energy Act, 42 U.S.C. § 2131, the NRC must approve the transfer of the NRC Permits from TVA to ND *before* Bellefonte could be transferred to ND. (*Id.*; Doc. 1-5, p. 2). ND asserts that, at this point, it had already paid to TVA $30,094,231.00 under the Agreement and expended additional millions of dollars in engineering, consulting, and regulatory fees in reliance upon the closing occurring as contemplated in the Agreement. (Doc. 1, p. 6). Although ND requested that TVA delay the closing date further, TVA refused. (*Id.* at 7). On November 29, 2018, TVA advised ND that it did not intend to close on November 30, 2018, because the NRC had not yet approved the transfer of the NRC Permits to ND. (*Id.*; Doc. 1-5). The closing did not occur.

Consequently, ND brought this action against TVA for (1) breach of contract claim seeking specific performance; (2) a preliminary injunction; and (3) alternative breach of contract claim seeking damages. (Doc. 1). In particular, ND alleges that TVA breached the Agreement by refusing to transfer Bellefonte, a specific property that cannot be found elsewhere, and that it is entitled to specific

6

performance of the Agreement. ND also requests a preliminary injunction to maintain the status quo and to require TVA to, among other things, continue to maintain and provide security for Bellefonte, and assets located thereon, in a manner sufficient to meet NRC quality control requirements, so that the NRC Permits will not lapse or be terminated. Finally, in the event that equitable relief is not afforded or available to ND, it requests money damages.

In response, TVA filed the pending Motion to Dismiss (doc. 22), seeking dismissal of all three counts in the complaint.

## II. STANDARD OF REVIEW

Rule 12(b)(6) permits a party to move to dismiss a complaint for, among other things, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss, the Court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (quoting *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1336 (11th Cir. 2006)).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id*. at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting, in part, Fed. R. Civ. P. 8(a)(2)). Thus, the Supreme Court has "suggested that courts considering motions to dismiss adopt a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 567 (2007)).

## III. DISCUSSION

At the heart of this dispute is a breach of contract claim. And, at this stage in the proceedings, the Court must determine whether ND's well-pled factual allegations plausibly entitle it to relief. The elements of a breach of contract claim are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 106 (Ala. 2002). The Court finds that ND has

sufficiently pled the allegations, which on their face demonstrate a breach of contract. There appears to be no dispute that a valid contract exists. ND alleges that it performed pursuant to the terms of the Agreement by tendering the monies required under the Agreement. ND cites facts in support of this allegation. ND further alleges that TVA refused to close on November 30, 2018, causing it damage.

The Court recognizes that TVA disagrees that it breached the contract; however, the Court finds that, at this stage, ND has sufficiently stated a claim for breach of contract. As a result of this alleged breach, ND first requests specific performance, and, to the extent specific performance is not available, money damages.

The crux of the Motion to Dismiss is TVA's assertion that the sale of Bellefonte, without NRC approval of the transfer of the NRC permits to ND, would violate federal law. Citing Section 6(a)(v) of the Agreement, TVA thus argues that a condition precedent has not been satisfied – namely that there shall be no law, statute, rule, regulation or permit that prohibits or makes illegal the consummation of the Agreement. As a result, TVA argues that it committed no breach, and the complaint should be dismissed. Additionally and, for the same reason, TVA argues the remedy of specific performance is not authorized and/or available to ND. TVA also argues that plaintiff's "claim" for preliminary

injunction, along with the breach of contract claim requesting damages, should be dismissed.

### A.     Breach of Contract Claim Seeking Specific Perfomance

As the Court has stated, the crux of TVA's argument is that the sale of Bellefonte to ND without NRC approval of the transfer of the NRC Permits would violate federal law.  This also ties into TVA's argument that it did not breach the contract because a condition precedent – namely that no law, statute, or regulation prohibit the consummation of the Agreement – was not satisfied.

In particular, TVA argues that consummation of the sale of Bellefonte would violate the Atomic Energy Act of 1954, 42 U.S.C. § 2011, *et seq.* Section 2131 of that Atomic Energy Act states:

> *It shall be unlawful*, except as provided in section 2121 of this title, for *any person within the United States* to transfer or receive in interstate commerce, manufacture, produce, *transfer*, *acquire, possess*, use, import, or export *any utilization* or production *facility except under and in accordance with a license* issued by the Commission pursuant to section 2133 or 2134 of this title.

42 U.S.C. § 2131 (emphasis added).[2]

Relatedly, 10 C.F.R. § 50.10 states, in part:

---

[2] 42 U.S.C. § 2121 addresses (a) research and development, weapons production, hazardous wastes, transfers of technologies; (b) material for Department of Defense use; and (c) sale, lease, or loan to other nations of materials for military applications and appears to have no application to this action.

> (b) Requirement for license. Except as provided in § 50.11 of this chapter, *no person within the United States shall transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, or use any* production or *utilization facility except as authorized by a license issued by the Commission.*
>
> (c) Requirement for construction permit, early site permit authorizing limited work authorization activities, combined license, or limited work authorization. *No person may begin the construction of a production or utilization facility on a site on which the facility is to be operated until that person has been issued either a construction permit under this part, a combined license under part 52 of this chapter, an early site permit authorizing the activities under paragraph (d) of this section, or a limited work authorization under paragraph (d) of this section.*

10 C.F.R. § 50.10 (emphasis added).

Section 2133 of the Atomic Energy Act addresses issuance of licenses and states that

> The Commission *is authorized to issue licenses to persons applying therefor* to transfer or receive in interstate commerce, manufacture, produce, *transfer, acquire, possess, use*, import, or export under the terms of an agreement for cooperation arranged pursuant to section 2153 of this title, *utilization or production facilities for industrial or commercial purposes.* Such licenses shall be issued in accordance with the provisions of subchapter XV and subject to such conditions as the Commission may by rule or regulation establish to effectuate the purposes and provisions of this chapter.

42 U.S.C. § 2133.

10 C.F.R. § 50.80(a) addresses transfer of licenses and states

> *No license* for a production or *utilization facility* (including, but not limited to, permits under this part and part 52 of this chapter, and licenses under parts 50 and 52 of this chapter), *or any right thereunder, shall be transferred, assigned, or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of the license to any person, unless the Commission gives its consent in writing*.

10 C.F.R. § 50.80(a) (emphasis added).

42 U.S.C. § 2014 defines utilization facility as

> (1) any equipment or device, except an atomic weapon, *determined by rule of the Commission to be capable of making use of special nuclear material in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public, or peculiarly adapted for making use of atomic energy in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public*; or (2) any important component part especially designed for such equipment or device as determined by the Commission.

42 U.S.C. 2014 (emphasis added).

Both NRC Permits state that they were issued pursuant to Section 103 of the Atomic Energy Act of 1954, as amended. (Doc. 23-1, pp. 6, 11).[3] Both NRC

---

[3] The NRC Permits are attached to TVA's brief supporting its Motion to Dismiss as Exhibit A (doc. 23-1) and will be considered by the Court. Although ND argues that the Court should not consider Exhibits B-D (doc. 23-2, 23-3, 23-4) because they constitute extrinsic evidence, ND does not make the same argument with respect to Exhibit A. Moreover, the Court finds that it may consider the NRC Permits attached as Exhibit A because they are central to ND's breach of claim, and their authenticity has not been challenged. *See Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010)

Permits also state that the permits were issued to the applicant "for a utilization facility." (*Id.*). Furthermore, the NRC Permits both state that they "shall expire on the latest completion date indicated in paragraph 3.A above." (*Id.* at 9, 14). The latest date of completion for CPPR-122 was December 1, 1979 (*id.* at 6); the latest date of completion for CPPT-123 was September 1, 1980 (*id.* at 11).

TVA asserts that the law is crystal clear that the NRC must approve transfer of the NRC Permits before it may consummate the sale. In support of its argument, TVA cites to the statutes and regulations recited by the Court; TVA also cites to decisions of the Atomic Safety and Licensing Appeal Board and NRC, among other things. *See, e.g.*, *In the Matter of Pub. Serv. Co. of Indiana, Inc. (Marble Hill Nuclear Generating Station, Units 1 & 2)*, 7 N.R.C. 179, 200 (Feb. 16, 1978) ("Given the safety considerations with which Congress was primarily concerned in the Atomic Energy Act, it takes much more than bare assertion and imaginative statutory construction to convince us that those who would own a nuclear power plant do not need to apply for a license from the Commission."); *In the Matter of Public Service Co. of New Hampshire, et al.*, 7 N.R.C. 1, 15 (January

---

(finding that, if matters outside the pleadings are presented by the parties and considered by the court, a Rule 12(b)(6) motion must be converted into a Rule 56 motion for summary judgment; however, in ruling upon a motion to dismiss, the court "may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged") (quoting *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC,* 600 F.3d 1334, 1337 (11th Cir.2010)). The Court declines, however, to consider, at this stage in the proceedings, Exhibits B-D (docs. 23-2, 23-3, 23-4) to the Motion to Dismiss, as well as the exhibits (doc. 41-1, 41-2, 41-3) admitted at the May 13, 2019, hearing.

6, 1978) ("Any transfer of ownership would require Commission approval."). On the other hand, ND argues, in part, that Bellefonte is not a "utilization facility" and is not under construction; thus, ND argues that Section 2131 is not applicable. ND further asserts that Bellefonte is an unfinished nuclear plant that is in deferred plant status. ND also argues that, before it can begin any *construction* on Bellefonte, it must obtain an NRC permit. Thus, ND argues, the transfer of the NRC Permits is not required before closing.

At this stage in the proceedings, the Court must accept facts alleged in the complaint as true and construe them in the light most favorable to ND. After reviewing the complaint, parties' briefs, and hearing oral argument, the Court finds that the law cited by TVA is not as crystal clear as it asserts. This matter involves a 2018 agreement to sell an unfinished nuclear plant ostensibly subject to NRC Permits issued in 1974 that are "[r]einstated, currently deferred." (Doc. 1-2, p. 47). In other words, the alleged facts do not square precisely with the law cited by TVA. There also appears to be a question with respect to whether Bellefonte is a utilization facility, as that term is defined by federal law. In short, while the TVA may ultimately be able to show that federal law prevented consummation of the sale of Bellefonte, TVA has not provided the Court with a proper road map of how to get there at this stage in the proceedings. Thus, the Court declines to, at the motion to dismiss stage, find that a condition precedent was not met.

Moreover, "[i]t is has long been established that specific performance is an appropriate remedy only "when[] it is made to appear that an action at law for damages would be an inadequate or impracticable remedy.'" *Hanover Ins. Co. v. Hudak & Dawson Const.*, 946 F. Supp. 2d 1208, 1222 (N.D. Ala. 2013) (quoting, in part *Gen. Secs. Corp. v. Welton,* 223 Ala. 299, 135 So. 329, 331 (1931)). "The decision to grant specific performance rests largely in the discretion of the trial judge." *Id*. "And, 'whether relief shall be granted depends upon an equitable consideration of the specific circumstances of each case.'" *Id*. (quoting, in part, *Stringfellow Materials, Inc. v. Lee*, 438 So.2d 1387, 1390 (Ala. 1983)). In addition to the fact that, at this stage, the law is not as crystal clear as TVA asserts, the Court finds that it is not clear that specific performance is not available to ND should TVA be found in breach of the Agreement.

The Court understands TVA's argument that, at a minimum, the Court should dismiss ND's request for specific performance because it would require TVA to undertake an illegal or unauthorized action. However, the Court declines to dismiss ND's request for specific performance at this stage in the proceedings. The Court finds that ND has sufficiently stated a claim for breach of contract, and it simply does not have enough information before it to determine the question of whether the remedy of specific performance would violate federal law. In so holding, the Court is not preventing TVA from raising and/or refining its

arguments in the future and is certainly not foreclosing the possibility that TVA may be able to demonstrate that ordering specific performance would violate federal law. Rather, the Court declines to make this finding on the arguments before it and at the motion to dismiss stage. The Court also declines to address the parties' arguments regarding equitable estoppel through a decision on the Motion to Dismiss. Therefore, the Court will deny the Motion to Dismiss with respect to the breach of contract claim requesting specific performance.

### B. Breach of Contract Claim for Damages and Request for Preliminary Injunction

Additionally, at this stage in the proceedings, the Court finds that ND's breach of contract claim requesting damages should survive a motion to dismiss. Although TVA disputes that it breached the contract, the Court finds that ND has sufficiently pled its breach of contract claim, so its request for damages survives a motion to dismiss. Therefore, the Court will deny the Motion to Dismiss insofar as it requests dismissal of the breach of contract claim requesting damages.

Furthermore, the Court declines to, at this juncture, address what it construes as ND's request for a preliminary injunction. The parties have entered into a stipulation (doc. 17) for TVA to maintain quality assurance and other requirements in accordance with the NRC Permits, unless and until those permits are amended or terminate. Therefore, the Court will deny as premature the Motion to Dismiss insofar as it requests dismissal of ND's request for preliminary injunction.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that the Motion to Dismiss (doc. 22) is DENIED.

IT IS FURTHER ORDERED that TVA shall answer the complaint on or before **May 29, 2019**.

**DONE** and **ORDERED** this May 15, 2019.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE