FILED

2020 Oct-06  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 5 (Part 1)

## Deposition of William McCollum
## Dated 11/12-13/2019
## Deposition Exhibits
## 10, 37, 42, 43, 45, 48, 49, 60, 65, 67, 73-82

## Page 1

1    IN THE UNITED STATES DISTRICT COURT NORTHERN

2    DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

3

4    CIVIL ACTION NO. 5:18-CV-01983-LCB

5

6    NUCLEAR DEVELOPMENT, LLC,

7         Plaintiff,

8    vs.

9    TENNESSEE VALLEY AUTHORITY,

10        Defendant.

11

12   VIDEO DEPOSITION OF WILLIAM R. MCCOLLUM, JR.

13   Bradley Arant Boult Cummings, LLP

14   One Federal Place

15   1819 Fifth Avenue North

16   Birmingham, Alabama 35203

17   November 12, 2019

18

19   REPORTED BY:

20   Gail B. Pritchett

21   Certified Realtime Reporter,

22   Registered Professional

23   Reporter and Notary Public

## Page 2

1         A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    Mr. Caine O'Rear III

5    Attorney at Law

6    Hand Arendall, LLC

7    RSA Tower

8    11 North Water Street

9    Suite 30200

10   Mobile, Alabama 36602

11   251.432.5511

12   corear@handarendall.com

13        - and -

14   Mr. Larry David Blust

15   Attorney at Law

16   Hughes Socol Piers Resnick Dym, LTD

17   70 West Madison Street, Suite 4000

18   Chicago, Illinois 60602

19   312.580.0100

20   lblust@hsplegal.com

21

22

23

## Page 3

1         A P P E A R A N C E S (continuing)

2

3    FOR THE DEFENDANT:

4    Mr. Matthew H. Lembke

5    Attorney at Law

6    Bradley Arant Boult Cummings, LLP

7    One Federal Place

8    1819 Fifth Avenue North

9    Birmingham, Alabama 35203

10   205.251.8000

11   mlembke@bradley.com

12        - and -

13   Messrs. David D. Ayliffe

14    and Steven C. Chin

15   Office of the General Counsel

16   Tennessee Valley Authority

17   400 West Summit Hill Drive, WT6

18   Knoxville, Tennessee 37902

19   865.632.3052

20   ddayliffe@tva.gov

21   scchin@tva.gov

22

23

## Page 4

1         A P P E A R A N C E S (continuing)

2

3    THE VIDEOGRAPHER:

4    Ms. Shannon Campbell

5    Courtroom Technologies, Inc.

6    brad@crtrialtech.com

7    205.790.5841

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**William McCollum**                                                    **11/12/2019**

---

Page 5

1    INDEX OF EXAMINATION

2                                    Page:

3    EXAMINATION BY MR. LEMBKE          9

4

5

6         INDEX OF EXHIBITS

7                                    Page:

8    Exhibit Number 73 - Resume        11

9

10

11    INDEX OF PREVIOUSLY MARKED EXHIBITS

12                                    Page:

13    Exhibit Number 42 - 8/18/16 email    60

14    from L. Blust to C. O'Neill, ND4966-

15    ND4967

16    Exhibit Number 43 - 9/9/16 email    75

17    with Indicative Bid, ND5048-ND5056

18    Exhibit Number 45 - 10/2016 email    76

19    thread, Subject: P&S Contract Draft,

20    ND5152-ND5154

21

22

23

---

Page 7

1         I, Gail B. Pritchett, a Certified

2    Realtime Reporter and Registered Professional

3    Reporter of Birmingham, Alabama, and a Notary

4    Public for the State of Alabama at Large,

5    acting as Commissioner, certify that on this

6    date, as provided by the Federal Rules of Civil

7    Procedure of the United States District Court,

8    and the foregoing stipulation of counsel, there

9    came before me at the offices of Bradley Arant

10    Boult Cummings, LLP, One Federal Place,

11    1819 Fifth Avenue North, Birmingham, Alabama

12    35203, on the 12th day of November, 2019,

13    commencing at 3:35 p.m., WILLIAM R. MCCOLLUM,

14    JR., witness in the above cause, for oral

15    examination, whereupon the following

16    proceedings were had:

17

18         THE VIDEOGRAPHER:  This marks the

19    beginning of the videotape deposition of

20    William R. McCollum in the matter of Nuclear

21    Development, LLC, plaintiff, versus Tennessee

22    Valley Authority, defendant, filed in the

23    United States District Court for the Northern

---

Page 6

1         S T I P U L A T I O N

2         IT IS STIPULATED AND AGREED, by

3    and between the parties, through their

4    respective counsel, that the deposition of

5    WILLIAM R. MCCOLLUM, JR. may be taken before

6    Gail B. Pritchett, Commissioner, Certified

7    Realtime Reporter, Registered Professional

8    Reporter and Notary Public;

9         That the signature to and reading

10    of the deposition by the witness is waived, the

11    deposition to have the same force and effect as

12    if full compliance had been had with all laws

13    and rules of Court relating to the taking of

14    depositions;

15         That it shall not be necessary for

16    any objections to be made by counsel to any

17    questions, except as to form or leading

18    questions, and that counsel for the parties may

19    make objections and assign grounds at the time

20    of trial, or at the time said deposition is

21    offered in evidence, or prior thereto.

22

23

---

Page 8

1    District of Alabama, Northeastern Division,

2    Case Number 5:18-cv-01983-LCB.  Today's date is

3    November the 12th, 2019.  The time is now 3:35

4    p.m.

5         Will counsel please state who you

6    are and who you represent.

7         MR. LEMBKE:  Matt Lembke for

8    defendant TVA.

9         MR. AYLIFFE:  David Ayliffe for

10    defendant TVA.

11         MR. CHIN:  Steve Chin for

12    defendant TVA.

13         MR. O'REAR:  Caine O'Rear for

14    plaintiff Nuclear Development.

15         MR. BLUST:  Larry Blust for

16    plaintiff Nuclear Development.

17

18         WILLIAM R. MCCOLLUM, JR.

19    having been first duly sworn, was examined and

20    testified as follows:

21

22         THE COURT REPORTER:  Usual

23    stipulations?

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**                                           11/12/2019

---

Page 9

1    MR. O'REAR:  That's fine.

2    MR. LEMBKE:  Fine.

3

4    EXAMINATION BY MR. LEMBKE:

5    Q.   Will you state your name for the

6    record?

7    A.   William Ralph McCollum, Jr.

8    Q.   Mr. McCollum, my name is Matt

9    Lembke, we were introduced a few minutes ago,

10   and I represent TVA in this lawsuit brought by

11   it in Huntsville, Alabama in Federal Court by

12   Nuclear Development.

13        Have you ever given a deposition

14   before?

15   A.   Yes.

16   Q.   All right.  So you know I am going

17   to ask you a series of questions and you have

18   been placed under oath, so you need to answer

19   them to the best of your ability.  If at any

20   time you don't understand a question or need me

21   to repeat it, just let me know and I will be

22   happy to do it; otherwise I will assume you

23   understand the question, okay?

---

Page 10

1    A.   Okay.

2    Q.   If at any point you need to take a

3    break, as soon as we resolve the pending

4    question, I will be happy to let you have as

5    many breaks as you need.  And if -- as you

6    know, the court reporter is taking down

7    everything you say.  So if you say uh-huh or

8    uh-uh, I am apt to say is that a yes or is that

9    a no, not to be rude or difficult, but just

10   because we need to make sure it is clear on the

11   record, okay?

12   A.   Okay.

13   Q.   All right.  What is your home

14   address?

15   A.   44 Beekeeper Trail, Swannanoa,

16   North Carolina 28778.

17   Q.   And what part of North Carolina is

18   that in?

19   A.   It's just to the east of Ashville.

20   Q.   And do you have a business address

21   different from that?

22   A.   No.

23   Q.   And let me show you what I am

---

Page 11

1    going to mark as Exhibit 73.

2        (Exhibit Number 73 was marked for

3        identification.)

4    A.   (Reviewing document.)

5    Q.   Do you recognize this document,

6    Mr. McCollum?

7    A.   Yes.

8    Q.   What is it?

9    A.   It's a resume.

10   Q.   All right.  And I will represent

11   this resume was attached to the application

12   that was submitted to the NRC last November of

13   2018 by Nuclear Development.

14        This says you have got a BS in

15   electrical engineering at Georgia Tech, is that

16   right?

17   A.   That's correct.

18   Q.   What year was that?

19   A.   1973.

20   Q.   And then you obtained an MS in

21   nuclear engineering from Georgia Tech?

22   A.   Yes.

23   Q.   And what year was that?

---

Page 12

1    A.   1974.

2    Q.   All right.  And then you obtained

3    an MBA from UNC Charlotte?

4    A.   Yes.

5    Q.   What year was that?

6    A.   1983.

7    Q.   All right.  Beginning with your

8    graduation from college, where have you worked?

9    A.   After I graduated from college, I

10   took a job with Duke Power Company at the

11   Oconee Nuclear Station, and I worked for Duke

12   Power Company in varying roles from September

13   1974 until I retired from Duke in April 2007.

14   Q.   All right.  And on your resume you

15   list between September of '74 and March of '87

16   that you held various roles in engineering

17   operations and project management with the

18   nuclear generation function of Duke Power

19   Company, is that right?

20   A.   That's correct.

21   Q.   All right.  And in that role --

22   well, let's go, then, through -- then from

23   March of '87 to 1/1/89, you were superintendent

---

**William McCollum**                                    **11/12/2019**

Page 13

1    of station services at the Catawba Nuclear
2    Station for Duke Power?
3        A.   That's correct.
4        Q.   And what did you do in that role?
5        A.   I was responsible for human
6    resources, nuclear security, nuclear training,
7    and several other support functions --
8        Q.   All right.
9        A.   -- in the station.
10       Q.   Then from January of '89 to
11   November of '91, you were maintenance
12   superintendent at that same location?
13       A.   That's correct.
14       Q.   And what did you do in that role?
15       A.   I was responsible for all of the
16   maintenance resources, maintenance planning,
17   and maintenance support engineering functions
18   for the station.
19       Q.   All right.  And then from November
20   of '91 through August of '95, you were station
21   manager at the same location?
22       A.   That's correct.
23       Q.   And what did you do in that role?

Page 14

1        A.   I was responsible for the total
2    operation of the station, including operations,
3    maintenance, outages and outage support, as
4    well as other support functions.
5        Q.   When you say outage support, what
6    does that mean?
7        A.   So with this type of nuclear
8    plant, you have a refueling outage
9    approximately every eighteen months to two
10   years on each unit where you change out nuclear
11   fuel and perform an intensive regime of
12   maintenance work.  So that's referred -- the
13   station is not producing power during that
14   period of time -- excuse me, the unit is not
15   producing power during that period of time, and
16   it's referred to as an outage.
17       Q.   Okay.  From August of '95 to
18   December of '97, you were the site vice
19   president at that same location?
20       A.   That's correct.
21       Q.   And how did that role differ from
22   being station manager?
23       A.   The station manager reported to

Page 15

1    the site vice president.  So in addition to the
2    station manager as a direct report, I had the
3    engineering manager and business manager,
4    several other direct reports in the
5    organization.  So the site vice president is
6    the top position at the site.
7        Q.   Then from December of '97 to
8    October of '02, you were -- held the same role
9    at the Oconee Nuclear Station?
10       A.   Yes.
11       Q.   And was there any difference in
12   your function there as opposed to the Catawba
13   Nuclear Station?
14       A.   No.  It's just a three-unit
15   nuclear site as opposed to a two-unit nuclear
16   site, so it was a larger operation.
17       Q.   Then from November of '02 to
18   December of '04, you were vice president of
19   nuclear support at Duke Power?
20       A.   Yes.
21       Q.   And what did you do in that role?
22       A.   So in that role I was responsible
23   for all of the corporate office support

Page 16

1    functions for the entire nuclear group which at
2    that time had three operating nuclear powers.
3    So I was in Charlotte, the corporate
4    headquarters, and had responsibility for all of
5    the support functions that I have listed here.
6        Q.   And it was from that position that
7    you retired from Duke Power?
8        A.   No.
9        Q.   Okay.  What was your next role at
10   Duke Power?
11       A.   I moved to the vice president of
12   strategic planning and business development for
13   Duke Power Company.  So as opposed to just the
14   nuclear function within Duke Power, I was
15   responsible for all strategic planning,
16   integrated resource planning, and business
17   development activities; business development in
18   this case meaning I advised management on
19   merger and acquisition activity and potential
20   purchase of other nuclear units.
21       Q.   What is integrated resource
22   planning?
23       A.   Integrated resource planning is an

**William McCollum**

11/12/2019

Pages 17 to 20

Page 17

1  effort that is for regulated utilities such as
2  Duke Power. It is required by the state
3  regulatory commission, and at some periodicity,
4  it varies state to state. The utility is
5  required to go through an extensive planning
6  and modeling process of looking at the future,
7  testing out different scenarios of generation
8  development and resources, mix of resources to
9  find -- the goal would be to find the optimum
10 mix of resources that has the lowest cost and
11 best benefit to the customer.
12       Q.   After that role, what was your
13 next position at Duke Power?
14       A.   Then I was placed over the
15 regulated fossil/hydro generation. So Duke had
16 gone through a -- was going through a merger
17 with Synergy Corporation, and that meant that
18 the size of the fossil/hydro fleet was going to
19 expand dramatically from just those units
20 within North and South Carolina to also include
21 units within Howe, Indiana and northern
22 Kentucky. And so I was placed in
23 responsibility over that combined hydro/fossil

Page 18

1  fleet.
2       Q.   And you did that for about six
3  months?
4       A.   That's correct.
5       Q.   And then --
6       A.   Then there was a reorganization
7  and my position was changed. And in addition
8  to regulated fossil/hydro generation, I also
9  took on engineering and technical services,
10 procurement for the entire corporation, bulk
11 power marketing, which is buying and selling of
12 power outside of the utility fleet, and then
13 new generation construction.
14       Q.   All right. And were there any
15 nuclear plants under construction in the
16 company at that time?
17       A.   Not under active construction. We
18 had a site at -- near Gaffney, South Carolina,
19 but construction had been stopped at that time.
20       Q.   In any of your roles with Duke
21 Power, did you ever oversee construction of a
22 nuclear plant?
23       A.   No.

Page 19

1        Q.   All right. In any of your roles
2  with Duke Power, did you ever oversee an
3  application for transfer of a construction
4  permit for a nuclear facility?
5        A.   No.
6        Q.   In any of your roles at Duke
7  Power, did you ever see -- ever oversee any
8  licensing applications to the NRC for a nuclear
9  plant?
10       A.   Yes.
11       Q.   Tell me about that.
12       A.   So when I was vice president of
13 nuclear support for Duke Power Company, we made
14 a number of licensing applications related to
15 -- some related to the Cherokee Nuclear Plant
16 which was a plant we were planning to develop
17 and construct, as well as some other
18 applications for our three existing stations.
19       Q.   Did the Cherokee Nuclear Plant
20 ever get off of the ground?
21       A.   No. It never operated.
22       Q.   Is that the one near Gaffney,
23 South Carolina?

Page 20

1        A.   That's correct.
2        Q.   Okay. Now, was it from the
3  executive vice president and chief regulated
4  generation officer role that you retired from
5  Duke Energy?
6        A.   That's correct.
7        Q.   All right. And you retired but
8  you didn't stay retired long; is that fair?
9        A.   That's correct.
10       Q.   All right. And what did you do
11 next?
12       A.   I became chief operating officer
13 of the Tennessee Valley Authority.
14       Q.   All right. And what did you --
15 what was your -- what was your -- how would you
16 generally describe your duties as chief
17 operating officer at TVA?
18       A.   I was responsible for all the
19 generation, transmission, operation,
20 construction, and river operations, functions.
21       Q.   All right. And did you oversee in
22 that role the construction of the Watts Bar
23 Unit 2 project for TVA?

**William McCollum**                                    **11/12/2019**

Page 21

1    A.   Yes.
2         Q.   And so you were certainly aware
3    that that project went way over budget, right?
4         A.   Yes.
5         Q.   And you are aware that that
6    project went way over the scheduled time of
7    construction, right?
8         A.   Yes.
9         Q.   And you are certainly aware that
10   in the nuclear industry, cost overruns for
11   nuclear plant construction are very common?
12        A.   Well, they have certainly occurred
13   a number of times.
14        Q.   And you are aware -- are you aware
15   of a nuclear plant ever being constructed in
16   conformity with its original construction
17   schedule, meaning completed as initially
18   planned?
19        A.   So when I was at the Catawba
20   Nuclear Station, my first role there was
21   manager in charge of the pre-operational
22   testing and start-up program.  So I
23   participated in the construction completion at

Page 22

1    Catawba and was responsible for putting Unit 1
2    into operation.  I can't speak to what the
3    original schedule was for Catawba, because that
4    was a little before my time, but we completed
5    two units at Catawba which are comparable in
6    size to the two unit plants at TVA and a number
7    of others around the country.  We completed
8    both of those units for a total of 3.25 billion
9    dollars.  During the same time frame, the
10   Vogtle Units 1 and 2 in Georgia were completed
11   about a year behind the Catawba station at a
12   cost of over eight billion dollars for the two
13   units.
14        Q.   What was the -- when you oversaw
15   the construction of Watts Bar 2, what did it
16   end up costing for that one unit?
17        A.   It was completed after I left, so
18   I don't have the final figure on that.
19        Q.   Well, at the time you left, what
20   was the projected total cost?
21        A.   I don't recall.
22        Q.   All right.  You left TVA in June
23   30th of 2012, correct?

Page 23

1    A.   That's correct.
2         Q.   What were the circumstances for
3    your -- pertaining to your departure?
4         A.   I retired from TVA.
5         Q.   And was that a totally voluntary
6    retirement?
7         A.   Yes.
8         Q.   No one suggested it would be in
9    your interest to retire?
10        A.   Not in my interest, no.
11        Q.   All right.  Did anyone from -- did
12   anyone in senior management at TVA suggest to
13   you it would be a good time to retire?
14        A.   We discussed a number of different
15   scenarios around the organization and I decided
16   it would be a good time for me to retire.
17        Q.   Had you received negative feedback
18   from senior management at TVA about your
19   performance as chief operating officer?
20        A.   Not that I recall.
21        Q.   None?
22        A.   About the results?  About some
23   results, but you said about my performance, and

Page 24

1    I don't recall that.
2         Q.   All right.  Well, there -- you
3    certainly recall there being negative comments
4    about the results that you were overseeing in
5    your role, correct?
6         A.   Correct.
7         Q.   And did that -- did that negative
8    feedback about the results contribute to your
9    decision to retire?
10        A.   Not really.  My decision to retire
11   revolved mostly around my personal and family
12   considerations.
13        Q.   And would you say you left TVA on
14   good terms?
15        A.   I think so.
16        Q.   Now, as soon as you retired, you
17   indicate on your resume that you became owner
18   of McCollum Holdings, LLC?
19        A.   Right.
20        Q.   What is McCollum Holdings, LLC?
21        A.   It is an LLC that I formed to do
22   consulting.
23        Q.   All right.  And I notice on your

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**

Page 25

1  work experience you don't list any work for
2  Nuclear Development, is that right?
3       A.   Right.  Under the time frame from
4  July 2012 to present, I list my consulting
5  business, but I don't list specific clients.
6       Q.   All right.  Well, aren't you the
7  CEO of Nuclear Development?
8       A.   Yes, I hold that title.
9       Q.   And aren't you the chief nuclear
10  officer of Nuclear Development?
11       A.   Yes.
12       Q.   But you are not an employee of
13  Nuclear Development?
14       A.   That's correct.  I am a
15  consultant.
16       Q.   All right.  When did you first
17  begin doing work for Nuclear Development?
18       A.   It was around November 2012.
19       Q.   And you worked for Nuclear
20  Development consistently since then?
21       A.   I work varying amounts, depending
22  on what I am requested to do each month.
23       Q.   All right.  And who gives you --

Page 26

1  who do you report to as the CEO and CNO of
2  Nuclear Development?
3       A.   Franklin Haney.
4       Q.   Sr.?
5       A.   Franklin Haney, yes.  Frank Haney
6  is president of Nuclear Development and
7  Franklin is the owner/manager.
8       Q.   All right.  And who is the
9  secretary of Nuclear Development?
10       A.   I think it's Larry Blust, but I'm
11  not certain about that.
12       Q.   And when did you become CEO of
13  Nuclear Development?
14       A.   I don't remember the specific day.
15       Q.   What is your best estimate?
16       A.   I just don't recall.
17       Q.   All right.  Well, is it more than
18  three years ago?
19       A.   No.
20       Q.   Is it since the contract was
21  signed with TVA for Nuclear Development to
22  purchase the Bellefonte site?
23       A.   Probably.

Page 27

1       Q.   All right.  Did you hold any
2  office in Nuclear Development prior to being
3  named CEO and CNO?
4       A.   I don't think so.
5       Q.   And do you have any written list
6  of job responsibilities as CEO of Nuclear
7  Development?
8       A.   No.
9       Q.   Do you have any written list of
10  job responsibilities as CNO?
11       A.   No.
12       Q.   Does anyone report to you as CEO
13  of Nuclear Development?
14       A.   No employees do.
15       Q.   Does anyone report to you?
16       A.   Well, I am responsible for
17  coordinating work with some of our other
18  contractors.
19       Q.   Okay.  What would be your best
20  estimate of your percentage of time that you
21  have spent working on Nuclear Development work
22  in 2019?
23       A.   Help me understand percentage

Page 28

1  of --
2            MR. O'REAR:  As compared to what?
3       Q.   (BY MR. LEMBKE:)  Well, as the
4  percentage of the total amount of work you do
5  at McCollum Holdings, in 2019 what percentage
6  would you say has Nuclear Development work
7  occupied?
8       A.   About sixty percent.
9       Q.   Okay.  And what would -- would
10  2018 be about the same?
11       A.   2018 would probably be about the
12  same.
13       Q.   Has it ever been higher than sixty
14  percent in any given year?
15       A.   Yeah, I don't recall.  It
16  fluctuates, but I don't recall being higher
17  than that.
18       Q.   And has it been less than that?
19       A.   Yes.
20       Q.   Since -- what would you -- 2017,
21  what would be your best estimate?
22       A.   Oh, I don't recall exactly.
23       Q.   Okay.  Well, that was the year --

**William McCollum**                                         **11/12/2019**

Page 29

1   the first full calendar year after the contract
2   was signed with TVA; you don't recall roughly
3   how much of your time you spent that year?
4       A.   No, I don't.
5       Q.   Okay.  And how are you compensated
6   by Nuclear Development?
7       A.   I have a consulting contract.  I
8   submit invoices monthly for the hours that I
9   work and I am compensated at a hourly rate.
10      Q.   What is the hourly rate?
11      A.   It's three hundred dollars an
12  hour.
13      Q.   And this is a written consulting
14  contract?
15      A.   Yes.
16      Q.   How many other entities does
17  McCollum Holdings do work for?
18      A.   At present, two others.
19      Q.   And are either of them potential
20  competitors of Nuclear Development?
21      A.   No.
22      Q.   Since you began doing any
23  consulting work for Nuclear Development, have

Page 30

1   you ever worked for a potential competitor of
2   Nuclear Development?
3       A.   No.  But I was doing work for a
4   company that it later turned out Nuclear
5   Development might use as a contractor, so I
6   terminated my business relationship with that
7   company.
8       Q.   Who was that?
9       A.   BWXT in Canada.
10      Q.   And -- between January of 2017 and
11  June of 2019, does it sound right that you have
12  been paid over 1.25 million dollars by Nuclear
13  Development?
14      A.   I don't know the exact figure.  My
15  -- I submitted the invoices monthly, so the
16  amounts are what they are.
17      Q.   Give me just a second.
18           And so there have been months in
19  which you have billed TVA -- excuse me, Nuclear
20  Development for as many as two hundred fifty
21  hours worked in a month.
22      A.   Uh-huh.
23      Q.   Is that a yes?

Page 31

1       A.   Yes, that's a yes.
2       Q.   Okay.  And to whom do you submit
3   your invoices?
4       A.   Larry Blust.
5       Q.   Now, who are the other officers of
6   Nuclear Development?
7       A.   Frank Haney is the president and
8   Franklin Haney is the owner/manager.
9       Q.   Anyone else?
10      A.   Not that I know of.
11      Q.   As the CEO, you don't know who all
12  of the other officers are?
13      A.   I might not.
14      Q.   Okay.  Have you ever personally
15  been a plaintiff or a defendant in civil
16  litigation?
17      A.   No, not that I recall.
18      Q.   How many prior depositions have
19  you given before today?
20      A.   I couldn't give you an exact
21  number.  Less than a dozen.
22      Q.   And when was the last one?
23      A.   Last deposition?

Page 32

1       Q.   Yes, sir.
2       A.   It would have been several years
3   ago.
4       Q.   All right.  And were all of the
5   depositions in conjunction with your work for
6   Duke Power or TVA?
7       A.   Yes.
8       Q.   And did you give any while you
9   were working at TVA in conjunction with your
10  work for TVA?
11      A.   I testified in front of a
12  congressional committee, and I may have given a
13  recorded deposition.
14      Q.   What does a recorded deposition
15  mean?
16      A.   It means something like this.
17      Q.   Oh, okay.  Do you recall was it
18  involving litigation?
19      A.   I don't remember.  I just seem to
20  have a vague memory that I might have given a
21  deposition early on related to something.
22      Q.   Okay.  How did you prepare for
23  today's deposition?

**William McCollum**                                    **11/12/2019**
                                              Pages 33 to 36

---

Page 33

1    A.   I read some earlier depositions.
2    Q.   All right.  Did you read Bill
3  Johnson's deposition?
4    A.   Yes.
5    Q.   Okay.  Did you see any reference
6  to yourself in there that you disagreed with?
7         MR. O'REAR:  Objection.  It's a
8  really broad question without specificity.
9    Q.   (BY MR. LEMBKE:)  You can answer.
10   A.   Can you state the question again?
11   Q.   Certainly.  Did Mr. Johnson say
12 anything about you or conversations with you or
13 anything related to you that you disagreed with
14 in that deposition?
15   A.   There were -- he made comments
16 about things that he said that I had said to
17 people in Memphis that were not accurate.
18   Q.   Okay.  Anything else?
19   A.   That's all that I can recall.
20   Q.   All right.  Did you read Ms.
21 Quirk's deposition?
22   A.   Yes.
23   Q.   And did you see any mention of you

---

Page 34

1  or conversations with you in her deposition
2  with which you disagreed?
3    A.   Not that I recall.
4    Q.   All right.  Did you read Mr.
5  Chandler's deposition?
6    A.   I think so.
7    Q.   All right.  Do you recall seeing
8  anything about you or conversations with you
9  that he said with which you disagreed?
10   A.   I don't recall.
11   Q.   Did you read Mr. Beach's
12 deposition?
13   A.   Yes.
14   Q.   And did you see any comments in
15 that deposition about you or conversations with
16 you that you -- with which you disagreed?
17        MR. O'REAR:  Same objection I made
18 previously.
19   A.   I don't recall.
20   Q.   (BY MR. LEMBKE:)  What else did
21 you do to prepare?
22   A.   I --
23   Q.   I just remembered there was one

---

Page 35

1  other deposition.  Did you read Mr. Shea's
2  deposition?
3    A.   I did.
4    Q.   And did you see any comments about
5  you or conversations with you with which you
6  disagreed in Mr. Shea's deposition?
7    A.   Not comments about me, no.
8    Q.   Okay.  Was there something in it
9  that you disagreed with?
10   A.   His recollection of our
11 conversations regarding the application to
12 transfer the construction permits differed from
13 my recollection.
14   Q.   All right.  Now let me get back to
15 the question I had asked when I stopped and
16 asked about Mr. Shea's deposition.
17        What else did you do to prepare
18 for today's deposition?
19   A.   I had conversations with our
20 counsel.
21   Q.   All right.  When did those
22 conversations occur?
23   A.   Yesterday.

---

Page 36

1    Q.   What about today?
2    A.   And today.
3    Q.   All right.  How many hours did you
4  spend, best estimate, between yesterday and
5  today?
6    A.   Six.
7    Q.   And was anyone present other than
8  Mr. O'Rear, Mr. Blust, and Frank Haney?
9    A.   Yes.
10   Q.   Who else was present?
11   A.   Roger Bates.
12   Q.   Who is Roger Bates?
13   A.   My understanding is he is an
14 attorney with the same firm as Mr. O'Rear.
15   Q.   Okay.  Did you review any
16 documents before today's deposition other than
17 those depositions you have previously
18 mentioned?
19   A.   I refreshed my memory on some
20 documents.
21   Q.   And have -- has -- have you
22 provided to Nuclear Development's counsel any
23 emails or hard-copy documents related to this

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**                                    **11/12/2019**

---

Page 37

1   case?
2          MR. O'REAR:  Let me object to
3   that.  I mean, that involves attorney work
4   product.
5          MR. LEMBKE:  I haven't asked what.
6   I just asked a yes or no.
7          MR. O'REAR:  Okay.  I'll let him
8   answer it.  You can answer yes or no.
9      A.   Yes.
10         MR. O'REAR:  Limit your answer to
11  that.
12     Q.   (BY MR. LEMBKE:)  Did you keep any
13  handwritten notes pertaining to your work for
14  Nuclear Development?
15     A.   No.
16     Q.   None?
17     A.   (Shaking head negatively.)
18     Q.   Did you keep any typewritten
19  notes?
20     A.   No.
21     Q.   Okay.  So you don't keep notes?
22     A.   No.
23     Q.   Who keeps the corporate records of

---

Page 38

1   Nuclear Development?
2      A.   I don't know.
3      Q.   You don't know?
4      A.   I don't know.
5      Q.   Now, earlier you told me that you
6   first got involved with Nuclear Development, I
7   believe you said, in November of 2012?
8      A.   Yes.
9      Q.   All right.  Who contacted you
10  first?
11     A.   Larry Blust.
12     Q.   And what did -- what was the --
13  was there a request to you for what services
14  you would provide?
15     A.   Just that there was interest in
16  potentially developing a nuclear plant project
17  as a merchant plant and would I be interested
18  in consulting with him.
19     Q.   And did you know it was
20  Bellefonte?
21     A.   I don't remember if we
22  specifically talked about Bellefonte during the
23  initial conversations or I found out about that

---

Page 39

1   shortly afterwards.
2      Q.   All right.  And did you understand
3   you had any restrictions on what you could do
4   as a consultant for Bellefonte as a TVA
5   retiree?
6      A.   Well, I understood that there were
7   ethics restrictions on what I could do as a
8   retired executive from TVA.
9      Q.   And did that constrain you in what
10  you were able to do for Nuclear Development?
11     A.   No.  I contacted the chief ethics
12  officer who at that time was Ralph Rogers at
13  Tennessee Valley Authority to clarify what the
14  restrictions would be and what the ethics rules
15  would allow and not allow.  And based on that,
16  I didn't feel that there were any restrictions
17  in terms of what Nuclear Development wanted me
18  to do.
19     Q.   Okay.  And what was it that
20  Nuclear Development wanted you to do?
21     A.   Basically provide them technical
22  help and advice in developing this project.
23     Q.   Now, in 2012, at the time you were

---

Page 40

1   retained to provide this technical advice, what
2   was your understanding of the status of the
3   project at TVA?
4          MR. O'REAR:  Which project?
5          MR. LEMBKE:  The Bellefonte
6   project.
7      A.   Prior to my leaving TVA, the board
8   of TVA had made a decision to complete
9   Bellefonte Unit 1, and that was the status at
10  the time I left.  Other than that, you know,
11  anything else at that point in time in late
12  2012 would have just been rumors.
13     Q.   (BY MR. LEMBKE:)  All right.
14  Well, what did you understand Nuclear
15  Development wanted to do at that time with
16  regard to Bellefonte?
17         MR. O'REAR:  At what time now are
18  you referring?
19         MR. LEMBKE:  Late 2012 when he
20  first became a consultant.
21     A.   It was fairly general, but find --
22  find a way to work out some sort of arrangement
23  to be able to complete -- complete the plant

---

**William McCollum**

11/12/2019

Page 41

1  and put it into operation either with TVA or,
2  you know, in some sort of business arrangement.
3  So it was a little -- the business structure
4  part of it was a little bit vague to me at that
5  point in time.
6      Q.   (BY MR. LEMBKE:)  You had overseen
7  the Bellefonte project while you were at -- in
8  your role of chief operating officer at TVA,
9  correct?
10     A.   That's correct.
11     Q.   And so you certainly had
12  confidential business information pertaining to
13  Bellefonte at that time, correct?
14          MR. O'REAR:  Objection.  What are
15  you referring to as confidential business
16  information?
17     Q.   (BY MR. LEMBKE:)  You can a
18  answer.
19          MR. O'REAR:  To the extent you
20  understand the question, you can answer.
21     A.   Yeah, I -- I'm not sure what
22  business information you are talking about.
23     Q.   (BY MR. LEMBKE:)  Well, did you

Page 42

1  have any confidential business information
2  pertaining to Bellefonte having served as chief
3  operating officer of TVA?
4          MR. O'REAR:  Same objection.
5      A.   Well, I knew a -- I knew a certain
6  amount of information about Bellefonte, but I'm
7  not -- I don't know that I can say exactly what
8  TVA would or would not have considered
9  confidential business information.
10     Q.   (BY MR. LEMBKE:)  Well, you have
11  been the chief operating officer at TVA; would
12  you have regarded it as confidential
13  proprietary business information?
14          MR. O'REAR:  We are --
15          MR. BLUST:  We --
16          MR. LEMBKE:  We're going to need
17  -- we have got one lawyer --
18          MR. O'REAR:  I understand that.
19          MR. LEMBKE:  -- not two lawyers,
20  one lawyer.
21          MR. O'REAR:  I understand.  That's
22  fine.  And -- but I said the same thing, so --
23  I don't understand the question.

Page 43

1      Q.   (BY MR. LEMBKE:)  Let me strike --
2  let me restate the question.
3          MR. O'REAR:  Restate.
4      Q.   (BY MR. LEMBKE:)  As chief
5  operating officer of TVA, did you believe you
6  were in the possession of any information
7  pertaining to Bellefonte that would be deemed
8  confidential proprietary business information?
9      A.   So that's not a term related to
10 TVA that I am aware that we used very much.  So
11 in terms of what might have been released to
12 the public through a FOIA request, I would have
13 probably been aware of certain contract details
14 that wouldn't have been subject to public
15 release.
16     Q.   Anything else you can think of
17 that you were aware of about -- pertaining to
18 Bellefonte that you would have thought would
19 not have been subject to public release?
20     A.   I -- I don't know -- I don't know
21 of anything else that I would be confident
22 about answering on that.
23     Q.   Okay.  Did you talk to the chief

Page 44

1  ethics officer at TVA about your knowledge of
2  that information?
3      A.   I talked about the ethics
4  restrictions that I would be under given my
5  former position and my role at the agency and
6  the work that I was undertaking with Nuclear
7  Development and made sure that there was
8  nothing in that that would violate federal
9  ethics regulations.
10     Q.   Did you expressly make the chief
11 ethics officer aware that you possessed
12 non-public information pertaining to
13 Bellefonte?
14     A.   Ralph certainly was aware of the
15 work that I had done and what things -- what
16 sort of things I had been involved in.  But the
17 ethics regulations, as Ralph explained them to
18 me, did not prohibit me from having knowledge.
19     Q.   Well, my question wasn't what he
20 certainly knew but what you told him.  Did you
21 tell him that you had non-public information
22 about Bellefonte?
23     A.   I expressed to him the questions

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**                                        **11/12/2019**

Page 45

1   around given that I have done this work with
2   Bellefonte and with TVA and with TVA Nuclear
3   and so forth, does any of that create a
4   problem.  We didn't go through lists -- as I
5   recall, we didn't go through lists of specific
6   information.
7        Q.   So is it fair to say in answer to
8   my question you did not expressly state to him
9   that you had knowledge of non-public
10  information about Bellefonte?
11            MR. O'REAR:  Object to the form.
12  Incorrect summarization of his testimony.
13       A.   Yeah, I don't recall -- I don't
14  recall that at all.  I think our -- the
15  discussions I had with Ralph were -- were
16  complete and comprehensive in terms of making
17  sure there wouldn't be any violations of ethics
18  rules.
19       Q.   (BY MR. LEMBKE:)  Now, when you
20  say that you were a little bit unclear on the
21  business model at the time you were retained by
22  Nuclear Development --
23       A.   Uh-huh.

Page 46

1        Q.   Was that a yes?
2        A.   That was yes.
3        Q.   -- what do you mean by that?
4        A.   So there are several -- there are
5   several different ways you can develop a plant,
6   with a -- with a single liner, with multiple
7   liners, with partnerships.  And so the exact
8   structure that would ultimately be used for the
9   ownership and financing of the project wasn't
10  clear to me at that time, but that wasn't my
11  role either.
12       Q.   And your role at that time was
13  what?
14       A.   Providing technical input as
15  requested.
16       Q.   And what sort of technical input
17  were they requesting?
18       A.   What are -- you know, such things
19  as what are typical nuclear plant operating
20  costs, what are -- what are the other sort of
21  costs that you get into when you operate a
22  nuclear plant, what -- the history of
23  pressurized water reactor technology use in the

Page 47

1   United States and how does that inform the
2   ability to complete the Bellefonte project, you
3   know, a variety of technical questions.
4        Q.   And over what period of time were
5   you providing -- was your role limited to
6   providing those sorts of -- that sort of
7   technical input?
8        A.   I'd -- I would say that my role
9   evolved over time.  There weren't definite
10  milestones, but over time I provided technical
11  input, some general cost analyses, cost
12  comparisons, for example, with cost of new
13  gas-fired generation.  Those sorts of things.
14       Q.   Well, ultimately your role evolved
15  to be CEO.
16       A.   Uh-huh.
17       Q.   Is that a yes?
18       A.   That's a yes.
19            MR. O'REAR:  Let him -- let him
20  finish his question before you respond.
21       A.   Sorry.
22       Q.   (BY MR. LEMBKE:)  Ultimately your
23  role evolved to be CEO.  What other things did

Page 48

1   your role expand into before you got to the
2   point of being named a CEO beyond what you have
3   already told me?
4        A.   Participation in project
5   development in terms of discussions with
6   potential power purchasers, potential financing
7   entities, and some of those sort of
8   discussions.
9        Q.   Anything else you can remember?
10       A.   No.
11       Q.   Were you ever involved with Bud
12  Cramer's lobbying efforts?
13       A.   I have met Bud Cramer, but I'm not
14  aware of ever participating in anything that
15  would be a lobbying activity.
16       Q.   Well, were you ever involved in
17  discussing what Mr. Cramer was going to do with
18  his lobbying activity?
19       A.   Not that I recall.
20       Q.   Okay.  Now, you said you had
21  discussions with potential power purchasers?
22       A.   Uh-huh.
23       Q.   Is that a yes?

**William McCollum**                                    **11/12/2019**

Page 49

1      A.   That is a yes.
2      Q.   And when do you first recall
3  having discussions with potential power
4  purchasers?
5      A.   I don't remember.
6      Q.   Well, do you think it was before
7  or after the TVA Board decided to declare
8  Bellefonte as surplus property?  Which I will
9  represent to you was in the first half of 2016.
10     A.   I don't recall any prior to that
11  time.
12     Q.   Okay.  And who do you recall the
13  first potential power purchaser having a
14  discussion with?
15     A.   I don't recall the exact sequence.
16     Q.   All right.  Well, I know you have
17  had discussions with Memphis Light, Gas &
18  Water, correct?
19     A.   Correct.
20     Q.   Have you had discussions with
21  Chattanooga?
22     A.   Yes.
23     Q.   What about with Huntsville?

Page 50

1      A.   I don't recall any discussions
2  that I have had with Huntsville.
3      Q.   What about with Nashville?
4      A.   No, I have not.
5      Q.   All right.  Other than Memphis and
6  Chattanooga, what potential power purchasers
7  have you had discussions with?
8      A.   With Joe Wheeler Cooperative and
9  Volunteer Electric Cooperative.
10     Q.   The Joe Wheeler Cooperative is in
11  Alabama?
12     A.   That's correct.
13     Q.   And the Volunteer is in Tennessee?
14     A.   That's correct.
15     Q.   Other than Memphis, Chattanooga,
16  the Joe Wheeler Cooperative and the Volunteer
17  Electric Cooperative, any others you remember
18  having discussions with?
19     A.   Yes.
20     Q.   Who?
21     A.   Discussions with -- I probably
22  won't get the name right, but it's PowerSouth
23  Cooperative in Alabama and Santee Cooper in

Page 51

1  South Carolina.
2      Q.   Any others?
3      A.   That's all I recall right now.
4      Q.   Now, I understand --
5      A.   Oh, I'm sorry.
6      Q.   Go ahead.
7      A.   Entergy Corporation.
8      Q.   Other than whatever Letter of
9  Intent that Memphis signed, did any of the
10  others that you talked to sign any kind of
11  Letter of Intent?
12     A.   Not that I am aware.
13     Q.   But you are aware that Memphis
14  signed a Letter of Intent at one point,
15  correct?
16     A.   Correct.
17     Q.   Now, what was the nature of your
18  discussions with those entities that you just
19  mentioned, the seven groups you mentioned?
20     MR. O'REAR:  I'm going to object,
21  compound question.
22     Q.   (BY MR. LEMBKE:)  All right.  What
23  was the nature of your discussions with

Page 52

1  Memphis?
2      A.   As a potential purchaser of power
3  from the Bellefonte plant.
4      Q.   All right.  And did the nature of
5  the discussions differ with any of the other
6  six?
7      A.   Well, there -- there were
8  different potential arrangements, but in
9  general the idea was to find purchasers for the
10  power for Bellefonte.
11     Q.   As I understand it, the idea was
12  that Memphis would buy all of the output from
13  Unit 1, correct?
14     A.   That was a proposal we made.
15     Q.   All right.  Did you propose to any
16  of the other six that they would purchase all
17  of the output from Unit 1?
18     A.   Yes.
19     Q.   Who?
20     A.   Santee Cooper, PowerSouth
21  Cooperative, and Entergy.
22     Q.   And are -- other than Entergy, are
23  all of those entities current TVA customers --

**William McCollum**                                    **11/12/2019**

Page 53

1      A.   No.
2      Q.   -- purchasers?  Memphis is,
3  correct?
4      A.   That's correct.
5      Q.   Chattanooga is, correct?
6      A.   Yes.
7      Q.   Joe Wheeler Cooperative?
8      A.   Yes.
9      Q.   Volunteer Electric?
10     A.   Yes.
11     Q.   Santee Cooper?
12     A.   No.
13     Q.   PowerSouth?
14     A.   No.
15     Q.   Okay.  Now, when you were at TVA,
16  had you been involved in the relationship
17  between TVA and Memphis?
18     A.   No.
19     Q.   Had no involvement whatsoever?
20     A.   No.
21     Q.   As chief operating officer, didn't
22  the people who oversaw the Memphis relationship
23  report to you?

Page 54

1      A.   No, they did not.
2      Q.   Okay.  So you never had any role
3  in the sale of power by TVA to its customers?
4      A.   That's correct.
5      Q.   And your -- Nuclear Development's
6  discussions with Memphis are ongoing, correct?
7      A.   That's correct.
8      Q.   Are the discussions with any of
9  the other six ongoing?
10     A.   Yes.
11     Q.   Which ones?
12     A.   Chattanooga and Volunteer Electric
13  and Joe Wheeler.
14     Q.   Now, you also said you had
15  discussions with potential financing entities?
16     A.   (Nodding head affirmatively.)
17     Q.   Is that a yes?
18     A.   Yes.
19     Q.   And what financing entities have
20  you been involved in discussions with?
21     A.   Credit Suisse, and I participated
22  in rating agency discussions with Moody's.
23     Q.   Tell me about the nature of your

Page 55

1  discussion with Credit Suisse.
2      A.   I was providing them information
3  about the plant -- the potential power
4  production, pricing -- information about
5  pricing, market pricing, current market pricing
6  for electricity, and that sort of background
7  information.
8      Q.   And what was the nature of your
9  discussions with Moody's?
10     A.   It was in support of getting a
11  shadow rating.  And so I helped provide similar
12  kind of information where I just talked about
13  background information on the plant, the
14  project, what it would take to finish the plant
15  and so forth.
16     Q.   And what is a shadow rating?
17     A.   Now you are getting beyond my
18  expertise.
19     Q.   Did you -- okay.  Were you ever
20  involved in any discussions with officials of
21  the Department of Energy?
22     A.   Yes.
23     Q.   All right.  And wasn't that a

Page 56

1  potential financing entity?
2      A.   Through the Loan Program Office,
3  yes.
4      Q.   All right.  Tell me about the
5  nature of your involvement in discussions with
6  the Department of Energy.
7      A.   I attended some meetings with
8  Department of Energy staff where we had
9  discussions about the project.  Again, it was
10  my role was to talk about the status of the
11  units, what it would take to complete the units
12  and put them in operation, the estimates for
13  completing the units and that sort of
14  information about the power plants themselves.
15     Q.   And what is your best estimate of
16  the number of face-to-face meetings you have
17  had with Department of Energy officials?
18     A.   I couldn't say exactly, but I
19  would say on the order of maybe half a dozen.
20     Q.   And when was the last such meeting
21  that you recall?
22     A.   I don't know.  That was a number
23  of months ago.

**William McCollum**

Page 57

1    Q.   In 2019?
2    A.   20 -- either late 2018 or 2019.
3    Q.   And in addition to face-to-face
4    meetings, have you been on phone calls with
5    Department of Energy officials?
6    A.   Once or twice.
7    Q.   And was your role on those calls
8    the same as in the face-to-face meetings?
9    A.   No.  On those phone calls, it was
10   really just status information about the
11   Nuclear Development submittal loan application.
12   Q.   What's the current status of the
13   loan application?
14   A.   It's in the final stages of review
15   at the Loan Program Office, that's my
16   understanding.
17   Q.   Has there been any indication from
18   the Department of Energy as to when that final
19   stage of review will be completed?
20   A.   There is not a definitive date
21   that I am aware of.
22   Q.   What about an estimate?
23   A.   Not that I am aware of.

Page 58

1    Q.   We have talked about your role as
2    a technical adviser; and then other than what
3    you have talked about as to how it evolved so
4    far, do you recall any other areas of work that
5    you performed for Nuclear Development prior to
6    the time you became the CEO?
7    A.   Other than what we have already
8    discussed --
9    Q.   Yes.
10   A.   -- I can't think of anything.
11   Q.   Now, after you became the CEO, did
12   the nature of your work for Nuclear Development
13   change in any way?
14   A.   No, not really.
15   Q.   Were there any new areas of work
16   that you performed beyond what we have already
17   discussed?
18   A.   Well, we continued to do different
19   things over time.  So the way I view it, my
20   fundamental areas of work for Nuclear
21   Development remain the same, but there are
22   various different tasks that we get into and
23   undertake over time.

Page 59

1    Q.   In the last six months, what tasks
2    have you been working on for Nuclear
3    Development, other than preparing for this
4    deposition?
5    A.   I have been working on developing
6    the ongoing construction estimates and
7    schedules, the application for the transfer of
8    the construction permits, the ongoing work
9    regarding development of potential purchases --
10   purchasers of power, and various discussions
11   with other entities that might be involved with
12   us to provide services to Nuclear Development
13   if the project goes forward -- further.
14   MR. LEMBKE:  Let's take a short
15   break.
16   THE VIDEOGRAPHER:  We are off the
17   record at 4:33 p.m.
18   (Whereupon, a break was had from
19   4:33 p.m. until 4:44 p.m.)
20   THE VIDEOGRAPHER:  We are back on
21   the record at 4:44 p.m.
22   Q.   (BY MR. LEMBKE:)  Mr. McCollum,
23   were you involved in the decision by Nuclear

Page 60

1    Development to submit a bid in connection with
2    the auction being held by TVA for the sale of
3    the Bellefonte property?
4    A.   No.
5    Q.   Let me show you -- if you look in
6    this stack for Exhibit 42, which is probably
7    going to be at the bottom -- they are in
8    reverse numerical order.  That's it, yes, sir.
9    (Whereupon, Exhibit Number 42,
10   having been previously marked for
11   identification, was referenced in
12   this deposition.)
13   Q.   This is an email from Larry Blust
14   to C. O'Neill at CE Advisors on August 18, 2016
15   that you received a copy of, correct?
16   A.   Yes.
17   Q.   All right.  And do you recall that
18   Carrie O'Neill at Concentric Advisors was
19   working with TVA in connection with the
20   Bellefonte auction?
21   A.   I recall the name, yes.
22   Q.   Okay.  Let me let you take a
23   moment to review numbered paragraph number one.

**William McCollum**

Page 61

1      A.   (Reviewing document.) I have read
2  paragraph one.
3      Q.   All right.  Do you see on the end
4  of the third line the sentence:  As part of
5  this process, ND has contacted various
6  interested governmental officials and
7  legislators and met with DOE, NRC, IRS, and
8  other governmental agencies and customers and
9  suppliers of TVA about the feasibility and
10 financing the project?  Do you see that?
11     A.   I do.
12     Q.   All right.  You have told me about
13 your meeting with -- your meetings with DOE,
14 correct?
15     A.   Yes.
16     Q.   Were you involved in meetings with
17 interested government officials about this?
18         MR. O'REAR:  At this point in
19 time?
20     Q.   (BY MR. LEMBKE:)  At any point
21 prior to August 18, 2016.
22     A.   I have been -- I've been involved
23 in a few meetings with government officials.  I

Page 62

1  can't recall whether they were before or after
2  this time frame.
3      Q.   All right.  What government
4  officials do you recall being involved in
5  meeting with?
6      A.   Give me just a moment, his name
7  escapes me.  I'm sorry, the previous Senate
8  Majority Leader for Democrat --
9      Q.   Harry Reid?
10     A.   Harry Reid, yes, thank you.
11     Q.   Tell me about what meeting you
12 were involved in with Harry Reid about Nuclear
13 Development.
14     A.   I went with Franklin Haney to a
15 short meeting with Senator Reid where Franklin
16 discussed with him the interest in developing
17 the project and potentially getting a DOE loan
18 guarantee.
19     Q.   What was your understanding of why
20 Mr. Haney was talking to Harry Reid about that?
21     A.   My understanding was that Harry
22 Reid and Franklin Haney attended law school
23 together and had known each other for a long

Page 63

1  time and maintained a relationship over the
2  years and that the -- Franklin was interested
3  in Senator Reid being aware of this potential
4  project because obviously the funding for DOE
5  in the Loan Program Office passes through the
6  Legislature at some point.
7      Q.   And did you have a speaking role
8  in that meeting?
9      A.   No, other than to be introduced to
10 the senator.
11     Q.   All right.  What other
12 governmental officials and legislators do you
13 recall meeting with in connection with Nuclear
14 Development?
15     A.   Prior to this time, right?
16     Q.   Yes, sir.
17     A.   We met with Governor Bentley of
18 Alabama.  And I'm -- and again, I'm not -- I
19 don't have a precise recollection about whether
20 it was before or after 8/18/2016.
21     Q.   And was this the meeting where
22 representatives of TVA, Southern Company,
23 Nuclear Development, and the governor's office

Page 64

1  were present?
2      A.   Yes.
3      Q.   All right.  And what do you recall
4  occurring at that meeting?
5      A.   Not much occurred.  There was
6  introductions, pleasantries, and discussion
7  about the potential project.  And Mr. Johnson,
8  Bill Johnson of TVA, and Mr. Crosswhite of
9  Alabama Power said that they didn't -- they
10 didn't really see a need for the project
11 because they didn't need power.  And the -- and
12 there was some discussion of whether it would
13 be beneficial to proceed with the project and
14 whether there might be other ways to do that.
15 And I think that's all I recall of the
16 discussion in that meeting.
17     Q.   Was there any action item coming
18 out of that meeting, as you recall?
19     A.   You know, it's not the way I would
20 assign an action item, but there was a -- as I
21 recall, there was a general request made by
22 Governor Bentley that, you know, you guys talk
23 about this and see if you can figure out some

**William McCollum**

**11/12/2019**
Pages 65 to 68

---

Page 65

1   way that this could happen sort of thing.
2        Q.   And did anything come of Governor
3   Bentley's request?
4        A.   I don't know.  I wasn't involved
5   in any further discussions about that.
6        Q.   All right.  Other than the
7   meetings with Senator Reid and Governor Bentley
8   prior to this time, do you recall any other
9   meetings you attended with government officials
10  and legislators -- or legislators about Nuclear
11  Development?
12       A.   Not -- no, not prior to this time.
13       Q.   What about since that time?
14       A.   Yes, we have had -- I have been at
15  some other meetings with legislators or
16  government officials.
17       Q.   All right.  Tell me the first of
18  those that you recall.
19       A.   Representative Steve Cohen --
20  excuse me, Congressman Steve Cohen from the --
21  I'm sorry, I can't recall the number of his
22  congressional district, but it is in west
23  Tennessee.

---

Page 66

1        Q.   And what was the purpose of that
2   meeting?
3        A.   Just to talk about the potential
4   development of the Bellefonte project and the
5   possibility of the sale of power to Memphis.
6        Q.   When did that occur, do you
7   recall?
8        A.   No, not -- not precisely, but it
9   was -- it would have been sometime maybe late
10  '17, early '18, as best I can recall.
11       Q.   All right.  What other meetings
12  with government officials and legislators since
13  August 18, 2016 do you recall being a part of?
14       A.   Well, we had additional -- we had
15  additional meetings -- we have had additional
16  meetings with the NRC.  I mentioned meetings
17  with Department of Energy.  As part of the
18  development of the Bellefonte site, we held an
19  open house event down at the Bellefonte site,
20  two or three state legislators attended that.
21  I got to meet them and talk with them.  Mo
22  Brooks attended that event, I got to speak with
23  him.  And that's all I can recall.

---

Page 67

1        Q.   Any other meetings since August
2   2016 with government officials or legislators
3   that you took part in that you can recall?
4        A.   I think that's all I recall.
5        Q.   All right.  The sentence we were
6   looking at also refers to meetings with the NRC
7   prior to August 18, 2016.  Were you part of any
8   meeting for Nuclear Development with the NRC
9   prior to this date?
10       A.   Yeah, I don't recall the specific
11  date, but we had -- we being myself and Frank
12  Haney and Franklin Haney and Larry Blust, met
13  with the person who was at the time the
14  executive director of operations of the NRC,
15  Victor McCree, and his staff to talk about the
16  potential development of the Bellefonte
17  project.
18       Q.   And you said you don't recall
19  whether that -- how many meetings with Victor
20  McCree did you take part in?
21       A.   One face-to-face meeting.
22       Q.   Okay.  I am going to show you a
23  document, I think, that will indicate that that

---

Page 68

1   was after this date.
2        Q.   Do you recall any meetings with
3   the NRC prior to this date that you attended
4   about Nuclear Development?
5        A.   Well, we did commission drop-ins,
6   but that was after the meeting with Victor
7   McCree, so no.
8        Q.   Okay.  This also references
9   meetings with the IRS.  At any point have you
10  ever attended a meeting with the IRS pertaining
11  to Nuclear Development?
12       A.   No.
13       Q.   All right.  And have you told me
14  about all of the other governmental agencies
15  that you can recall meeting with at any point
16  pertaining to Nuclear Development?
17       A.   We had a meeting with the Alabama
18  Department of Environmental Management to
19  discuss the potential transfer of the
20  environmental permits that TVA had obtained for
21  the Bellefonte site from TVA to Nuclear
22  Development.  That occurred in Montgomery, I
23  don't know the exact time frame.

---

**William McCollum**

**11/12/2019**

---

Page 69

1    Q.   Any others that you recall?

2    A.   No, not that I can recall.

3    Q.   And you have already told me about

4    your meetings with customers and suppliers of

5    TVA about the feasibility and financing of the

6    project?

7    A.   Yes.

8    Q.   Okay.

9    A.   We had a meeting at a point in

10   time, I don't remember exactly when, in

11   Chattanooga with the members of the board of

12   the Seven States Power Corporation, and those

13   members are all people who are the managers or

14   CEOs or in some way work for different

15   customers of TVA that participate in that

16   organization.  So there would have been a

17   number of -- and I made a presentation about

18   the status of the Bellefonte site and what it

19   would take to complete the units and put them

20   online and so forth, put them into operation.

21   And there would have been people in the room

22   there who were associated with customers other

23   than the ones I named before.

---

Page 70

1    Q.   Okay.  And when, to the best of

2    your recollection, did that occur?

3    A.   I really can't recall.

4    Q.   Okay.  So other than what you have

5    already told me, do you believe you have

6    already told me about all of the meetings with

7    -- that are referenced in this sentence we have

8    been looking at in Exhibit 42 that you took

9    part in?

10   A.   I think I have told you about all

11   of the meetings that I can recall that had to

12   do with Nuclear Development that involved

13   government officials, legislators, DOE, NRC,

14   governmental agencies and customers.

15   Q.   And suppliers?

16   A.   No other meetings with suppliers

17   -- potential suppliers that we haven't

18   discussed.

19   Q.   All right.  Well, prior to August

20   18, 2016, do you remember a meeting with

21   suppliers of TVA about the feasibility and

22   financing of the Bellefonte project?

23   A.   Yes.

---

Page 71

1    Q.   All right.  Who do you recall

2    meeting with?

3    A.   So I should preface the answer by

4    saying in the -- in the nuclear industry, there

5    is a small universe of suppliers who can

6    provide nuclear grade products and services.

7    And so if you are going to talk to anybody

8    about who might have the capability to provide

9    -- be a supplier of products or services in the

10   furtherance of completing the Bellefonte

11   project, you are almost always going to be

12   talking to someone who has done business in one

13   way or another with TVA.

14        So we -- we had discussions with

15   AREVA whose name later changed because of a

16   corporate restructuring to Framatome.  We had

17   discussions with AECOM, Bechtel, Fluor

18   Corporation, Sargent & Lundy, SNC-Lavalin,

19   Connectrix, Incorporated, Austin, General

20   Electric, Westinghouse, BWXT, which used to be

21   Babcock & Wilcox Canada.  Those are the ones I

22   can recall right now.

23   Q.   Nuclear Development ultimately

---

Page 72

1    entered into a contract with SNC-Lavalin,

2    correct?

3    A.   Correct.

4    Q.   Did Nuclear Development ultimately

5    enter into contracts with any of the other

6    entities that you have just listed?

7    A.   We have had contract arrangements

8    with AECOM and AREVA/Framatome.

9    Q.   What did they --

10   A.   Those are the only other ones --

11   the only ones I am aware of that we had

12   contracts with.

13   Q.   And what does AECOM do?

14   A.   They are a architect, engineering,

15   construction company.

16   Q.   What does AREVA/ -- is it

17   Framatome?

18   A.   Framatome, uh-huh.

19   Q.   What does it do?

20   A.   Well, they do many, many things.

21   But relevant to the Bellefonte project, they

22   are the legacy owner of the nuclear steam

23   supply system designed for the Bellefonte

---

**William McCollum**                                      **11/12/2019**

Page 73

1    units.
2        Q.   And what was the contact with
3    SNC-Lavalin concerning?
4        A.   It was concerning the construction
5    completion of Bellefonte units.
6        Q.   What role was SNC-Lavalin going to
7    play?
8        A.   Basically the lead construction
9    coordinating entity.
10       Q.   When you submit your bills to
11   Nuclear Development, do you list your time
12   expended on the daily -- day-by-day basis?
13       A.   Yes.
14       Q.   And do you provide a description
15   of what you did on that day?
16       A.   I have five or six categories of
17   work that I group the hours into, but I don't
18   provide unique descriptions associated with the
19   hours.
20       Q.   So if you spent six hours on one
21   day, would you list what categories you were
22   working in on that day?
23       A.   Yes.

Page 74

1        Q.   Okay.  And would you break it
2    down --
3        A.   When you say list, the -- rather
4    than showing six hours, the invoice would show
5    two hours spent in one category, three hours
6    spent in another category, so forth, for that
7    day.
8        MR. LEMBKE:  Have those been
9    withheld on a claim of privilege?
10       MR. O'REAR:  I will be honest with
11   you, I don't recall with respect to that
12   exactly what has been produced.  But no --
13       MR. LEMBKE:  Nothing has been
14   produced.
15       MR. O'REAR:  No invoice for
16   McCollum?
17       MR. LEMBKE:  Not -- not detailed
18   like that.
19       MR. O'REAR:  I will have to look
20   at that and see.
21       MR. LEMBKE:  I think we are
22   entitled to those.
23       MR. O'REAR:  Well, there may be

Page 75

1    some privilege information.  I will just have
2    to look at that.
3        MR. LEMBKE:  If it's a categorical
4    listing, it's hard to see how it is privileged,
5    but one would think anything privileged could
6    be easily redacted.
7        MR. O'REAR:  Well, I can take a
8    look at that.
9        Q.   (BY MR. LEMBKE:)  All right.  If
10   you would look at Exhibit 43, it has been
11   previously marked.
12       (Whereupon, Exhibit Number 43,
13       having been previously marked for
14       identification, was referenced in
15       this deposition.)
16       Q.   Mr. McCollum, this is an email
17   from Mr. Blust to Ms. O'Neill, copying you,
18   dated September 9, 2016; do you see that?
19       A.   I see that.
20       Q.   And this appears to be the
21   transmittal of Nuclear Development's Indicative
22   Bid, correct?
23       A.   That's what it says.

Page 76

1        Q.   All right.  And were you involved
2    in preparation of Nuclear Development's
3    Indicative Bid?
4        A.   No.
5        Q.   Did you review it before it was
6    submitted?
7        A.   No.
8        Q.   Okay.  Have you ever reviewed it?
9        A.   Well, I would say most likely when
10   I got the email, I probably skimmed through it.
11       Q.   All right.  But you have had no
12   input into its content?
13       A.   There may have been information
14   that I had provided to one of the Haneys or Mr.
15   Blust that found its way into the bid, but I
16   didn't participate in putting the bid together.
17       Q.   All right.  Now, would you look at
18   what has previously been marked as Exhibit 45?
19       (Whereupon, Exhibit Number 45,
20       having been previously marked for
21       identification, was referenced in
22       this deposition.)
23       Q.   In particular --

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**

---

Page 77

1    Well, first let me ask, this
2  appears to be a series of emails on which you
3  are copied from early October of 2016 about the
4  draft purchase and sale contract, is that
5  right?
6      A.  (Reviewing document.)  Yes, that's
7  what it says.
8      Q.  Okay.  And if you look at the
9  bottom of the first page, the email that
10 continues on the second and third pages, did
11 you have any input into the comments that were
12 offered on behalf of Nuclear Development by Mr.
13 Blust?
14     A.  (Reviewing document.)
15         MR. O'REAR:  Let me caution you
16 that is a yes or no answer, and you are not to
17 reveal any attorney-client communications.
18     A.  Okay.  My answer is yes.
19     Q.  (BY MR. LEMBKE:)  What did you
20 have input on?
21         MR. O'REAR:  Objection.  Instruct
22 the witness not to answer which would reveal
23 confidential attorney-client communications.

---

Page 78

1      Q.  (BY MR. LEMBKE:)  Well, do you
2  recall with whom you communicated whatever
3  input you had into this email?
4      A.  Larry Blust.
5      Q.  And was it a phone call or an
6  email, do you know?
7      A.  My recollection is there were
8  phone calls.
9      Q.  Did you have any involvement in
10 Nuclear Development's -- in the development of
11 Nuclear Involvement's (sic) position that it
12 wanted approval of the transfer of the
13 construction permits to be a condition to
14 closing?
15         MR. O'REAR:  Objection, same
16 instruction.  If answering that question
17 requires you to reveal confidential
18 attorney-client communications, I instruct you
19 not to answer.
20         MR. LEMBKE:  Whether he had any
21 involvement.
22         MR. O'REAR:  That's not what I
23 heard from your question.

---

Page 79

1          MR. LEMBKE:  That was the
2  question, did he have any --
3          MR. O'REAR:  Well, read the
4  question.
5          MR. LEMBKE:  Would you read back
6  the question?
7          (Record read.)
8          MR. O'REAR:  Okay.  That's a
9  garbled question.
10     Q.  (BY MR. LEMBKE:)  Did you have any
11 involvement in the development of Nuclear
12 Development's position that it wanted approval
13 of the -- by the NRC of the transfer of the
14 Bellefonte construction permits to be a
15 condition for closing?
16         MR. O'REAR:  And I will instruct
17 you not to answer if answering requires you to
18 reveal attorney-client communications.
19     A.  No.
20     Q.  (BY MR. LEMBKE:)  Who is Jim
21 Chardos?
22     A.  Jim Chardos is the TVA/Bellefonte
23 site manager and the lead manager for TVA for

---

Page 80

1  the transition following the sales agreement --
2  purchase and sales agreement.
3      Q.  Did you ever have any interaction
4  with Mr. Chardos while you were the chief
5  operating officer at TVA?
6      A.  Yes.
7      Q.  What was the nature of that
8  interaction?
9      A.  Jim was the manager of the
10 Bellefonte site at that time also, and we
11 had -- I have been to the site a number of
12 times while I was chief operating officer,
13 toured the site.  Jim, best of my recollection,
14 always led us around the site on those tours
15 and accompanied us, among other reasons,
16 because from a personnel safety standpoint, Jim
17 understood the site and where the hazards were
18 and could keep visitors away from those.
19         We also had a -- at one point we
20 had a meeting of the TVA Board operating
21 committee -- nuclear and operating committee --
22 subcommittee down at the site.  Jim Chardos
23 hosted that and led us on a tour at that time.

---

**William McCollum**                                    **11/12/2019**

Page 81

1    So I had numerous contacts with him, all of
2    them related to visiting the site.
3        Q.    Once you left TVA and became a
4    consultant for Nuclear Development, what do you
5    recall as your first interaction with Mr.
6    Chardos?
7        A.    Following the -- following the
8    auction, at some point following the auction I
9    contacted Mr. Chardos to talk about getting
10   onto the site, taking a look at the current
11   condition of the site, and -- and that sort of
12   thing.
13       Q.    And I am assuming he made those
14   arrangements?
15       A.    At some point in time, yeah.  Not
16   immediately, but later on, yes.
17       Q.    All right.  What other
18   interactions did you have with Mr. Chardos in
19   the post-auction time period?
20       A.    Emails and telephone conversations
21   about things going on at the site, work they
22   were doing, visits that we were planning.
23   There was a point in time when one of the

Page 82

1    containment tendons, which is a large steel
2    rope that post tensions the concrete in the
3    reactor containment building, one of those on
4    site failed.  I had a number of discussions
5    with him about what happened there and what
6    steps TVA was taking to ascertain why the
7    failure occurred.  So a lot of conversations
8    about just things that were going on at the
9    site, what the current status was, and then any
10   visits that we were planning down at the site.
11       Q.    And does that describe, to the
12   best of your recollection, the nature of all of
13   your interactions with Mr. Chardos in the
14   post-auction time period?
15       A.    When -- once the SNC-Lavalin
16   people got on site and were reviewing the
17   condition of the site, trying to validate
18   construction estimates and that sort of thing,
19   there were a number of conversations I had with
20   Mr. Chardos about his coordination with the
21   SNC-Lavalin people, information that they
22   needed, schedules, and his -- what his
23   understanding was of the schedules and the

Page 83

1    information that they were able to provide to
2    SNC-Lavalin and their people.
3        Q.    Anything else?
4        A.    I think that characterizes my
5    discussions with him.
6        Q.    When is the last time you recall
7    having a phone conversation with Mr. Chardos?
8        A.    It would have been the early part
9    of this year regarding the ability to visit the
10   Bellefonte site.
11       Q.    And what -- was there a request
12   made to visit it?
13       A.    Yes.  We had made -- we had made a
14   couple of requests to get on site and tour the
15   facility with other people.
16       Q.    This is after the lawsuit had
17   begun?
18       A.    (No response.)
19       Q.    I'll represent to you the lawsuit
20   was filed on or about November 30th, 2018, last
21   year.
22       A.    Uh-huh, yes, after the lawsuit was
23   filed.

Page 84

1        Q.    And there was no lawyer for TVA on
2    the call when you contacted Mr. Chardos, is
3    that correct?
4        A.    Not that I am aware.
5        Q.    And to your knowledge, did Nuclear
6    Development obtain advance permission from TVA
7    or its lawyers to contact Mr. Chardos directly
8    with a request of that nature?
9        A.    Not that I am aware.
10       Q.    And what did Mr. Chardos tell you?
11       A.    That we weren't allowed to come on
12   site and we weren't going to have any contact
13   with the site.
14       Q.    And you made that call in your
15   capacity as CEO of Nuclear Development,
16   correct?
17       A.    On behalf of Nuclear Development,
18   yes.
19       Q.    And did you tell any lawyer for
20   Nuclear Development that you were going to make
21   that call before you did it?
22       A.    No.
23       Q.    Have you had any email

**William McCollum**

**11/12/2019**

Pages 85 to 88

---

Page 85

1    communications with Mr. Chardos since that
2    time?
3        A.   Not that I recall.
4        Q.   At any point did you have any
5    discussion with Mr. Chardos about him playing
6    any role for Nuclear Development after a
7    closing?
8        A.   No.
9        Q.   Have you had any discussions with
10   anyone else from TVA since the initiation of
11   the litigation?
12       A.   Anyone who's currently employed
13   with TVA?
14       Q.   Yes, sir.
15       A.   No.
16       Q.   Now, you drew a distinction
17   currently employed; have you had conversations
18   with people formerly employed?
19       A.   Yes.
20       Q.   Who?
21       A.   Preston Swafford who was a former
22   chief nuclear officer of TVA who then worked
23   for SNC-Lavalin and who is now retired.

---

Page 86

1        Q.   And did you have a discussion with
2    him about Bellefonte?
3        A.   Yeah, yes.
4        Q.   And what was the nature of that
5    conversation?
6        A.   The fact that we were in the
7    lawsuit and that the work with SNC-Lavalin was
8    suspended for now.
9        Q.   Any other former TVA employees
10   that you have had discussions about Bellefonte
11   with post initiation of the litigation?
12       A.   Not that I can recall.
13            MR. LEMBKE:  Let's go off the
14   record for a second.
15            THE VIDEOGRAPHER:  We are off the
16   record at 5:18 p.m.
17            (Whereupon, a break was had from
18            5:18 p.m. until 5:19 p.m.)
19            THE VIDEOGRAPHER:  Back on the
20   record at 5:19 p.m.
21            MR. LEMBKE:  It is now 5:19 p.m.,
22   and we are going to adjourn the deposition
23   until tomorrow morning at 9 a.m.

---

Page 87

1            MR. O'REAR:  That's fine.
2            THE VIDEOGRAPHER:  This deposition
3    is adjourned at 5:19 p.m.
4
5            (Deposition was adjourned at 5:19 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 88

1            C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    JEFFERSON COUNTY
5
6            I hereby certify that the above
7    and foregoing deposition was taken down by me
8    in stenotypy, and the questions and answers
9    thereto were reduced to typewriting under my
10   supervision, and that the foregoing represents
11   a true and correct transcript of the deposition
12   given by said witness upon said hearing.
13           I further certify that I am
14   neither of counsel nor of kin to the parties to
15   the action, nor am I in anywise interested in
16   the result of said cause.
17
18
19
20           /s/ Gail B. Pritchett
21           COMMISSIONER-NOTARY PUBLIC
22           ACCR LICENSE NO. 116, Exp. 9/30/2020
23           Transcript Certified On 11/24/2019

---

**A**

a.m 86:23
ability 9:19 47:2
  83:9
able 39:10 40:23
  83:1
accompanied
  80:15
ACCR 88:22
accurate 33:17
acquisition
  16:19
acting 7:5
action 1:4 64:17
  64:20 88:15
active 18:17
activities 16:17
activity 16:19
  48:15,18
addition 15:1
  18:7 57:3
additional 66:14
  66:15,15
address 10:14
  10:20
adjourn 86:22
adjourned 87:3
  87:5
advance 84:6
advice 39:22
  40:1
advised 16:18
adviser 58:2
Advisors 60:14
  60:18
AECOM 71:17
  72:8,13
affirmatively
  54:16
agencies 61:8
  68:14 70:14
agency 44:5
  54:22
ago 9:9 26:18
  32:3 56:23
AGREED 6:2

agreement 80:1
  80:2
ahead 51:6
Alabama 1:2,16
  2:10 3:9 7:3,4
  7:11 8:1 9:11
  50:11,23 63:18
  64:9 68:17
  88:3
allow 39:15,15
allowed 84:11
amount 28:4
  42:6
amounts 25:21
  30:16
analyses 47:11
answer 9:18
  33:9 37:8,8,10
  41:18,20 45:7
  71:3 77:16,18
  77:22 78:19
  79:17
answering 43:22
  78:16 79:17
answers 88:8
anybody 71:7
anywise 88:15
appears 75:20
  77:2
application
  11:11 19:3
  35:11 57:11,13
  59:7
applications
  19:8,14,18
approval 78:12
  79:12
approximately
  14:9
April 12:13
apt 10:8
Arant 1:13 3:6
  7:9
architect 72:14
areas 58:4,15,20
Arendall 2:6

AREVA 71:15
AREVA/ 72:16
AREVA/Fra...
  72:8
arrangement
  40:22 41:2
arrangements
  52:8 72:7
  81:14
ascertain 82:6
Ashville 10:19
asked 35:15,16
  37:5,6
assign 6:19
  64:20
associated 69:22
  73:18
assume 9:22
assuming 81:13
attached 11:11
attended 56:7
  62:22 65:9
  66:20,22 68:3
  68:10
attorney 2:5,15
  3:5 36:14 37:3
attorney-client
  77:17,23 78:18
  79:18
auction 60:2,20
  81:8,8
August 13:20
  14:17 60:14
  61:21 66:13
  67:1,7 70:19
Austin 71:19
Authority 1:9
  3:16 7:22
  20:13 39:13
Avenue 1:15 3:8
  7:11
aware 21:2,5,9
  21:14,14 43:10
  43:13,17 44:11
  44:14 48:14
  51:12,13 57:21

57:23 63:3
  72:11 84:4,9
Ayliffe 3:13 8:9
  8:9

**B**

B 1:20 6:6 7:1
  88:20
Babcock 71:21
back 35:14
  59:20 79:5
  86:19
background
  55:6,13
Bar 20:22 22:15
based 39:15
Basically 39:21
  73:8
basis 73:12
Bates 36:11,12
Beach's 34:11
Bechtel 71:17
Beekeeper
  10:15
began 29:22
beginning 7:19
  12:7
begun 83:17
behalf 77:12
  84:17
believe 38:7
  43:5 70:5
Bellefonte 26:22
  38:20,22 39:4
  40:5,9,16 41:7
  41:13 42:2,6
  43:7,18 44:13
  44:22 45:2,10
  47:2 49:8 52:3
  52:10 60:3,20
  66:4,18,19
  67:16 68:21
  69:18 70:22
  71:10 72:21,23
  73:5 79:14
  80:10 83:10

86:2,10
beneficial 64:13
benefit 17:11
Bentley 63:17
  64:22 65:7
Bentley's 65:3
best 9:19 17:11
  26:15 27:19
  28:21 36:4
  56:15 66:10
  70:1 80:13
  82:12
beyond 48:2
  55:17 58:16
bid 5:17 60:1
  75:22 76:3,15
  76:16
Bill 33:2 64:8
billed 30:19
billion 22:8,12
bills 73:10
Birmingham
  1:16 3:9 7:3,11
bit 41:4 45:20
Blust 2:14 5:14
  8:15,15 26:10
  31:4 36:8
  38:11 42:15
  60:13 67:12
  75:17 76:15
  77:13 78:4
board 40:7 49:7
  69:11 80:20
bottom 60:7
  77:9
Boult 1:13 3:6
  7:10
brad@crtrialt...
  4:6
Bradley 1:13 3:6
  7:9
break 10:3
  59:15,18 74:1
  86:17
breaks 10:5
broad 33:8

Brooks 66:22
brought 9:10
BS 11:14
Bud 48:11,13
budget 21:3
building 82:3
bulk 18:10
business 10:20
  15:3 16:12,16
  16:17 25:5
  30:6 41:2,3,12
  41:15,22 42:1
  42:9,13 43:8
  45:21 71:12
buy 52:12
buying 18:11
BWXT 30:9
  71:20

**C**

C 2:1 3:1,14 4:1
  5:14 60:14
  88:1,1
Caine 2:4 8:13
calendar 29:1
call 78:5 84:2,14
  84:21
calls 57:4,7,9
  78:8
Campbell 4:4
Canada 30:9
  71:21
capability 71:8
capacity 84:15
Carolina 10:16
  10:17 17:20
  18:18 19:23
  51:1
Carrie 60:18
case 8:2 16:18
  37:1
Catawba 13:1
  15:12 21:19
  22:1,3,5,11
categorical 75:3
categories 73:16

73:21
category 74:5,6
cause 7:14 88:16
caution 77:15
CE 60:14
CEO 25:7 26:1
  26:12 27:3,6
  27:12 31:11
  47:15,23 48:2
  58:6,11 84:15
CEOs 69:14
certain 26:11
  42:5 43:13
certainly 21:2,9
  21:12 24:3
  33:11 41:11
  44:14,20
Certified 1:21
  6:6 7:1 88:23
certify 7:5 88:6
  88:13
Chandler's 34:5
change 14:10
  58:13
changed 18:7
  71:15
characterizes
  83:4
Chardos 79:21
  79:22 80:4,22
  81:6,9,18
  82:13,20 83:7
  84:2,7,10 85:1
  85:5
charge 21:21
Charlotte 12:3
  16:3
Chattanooga
  49:21 50:6,15
  53:5 54:12
  69:11
Cherokee 19:15
  19:19
Chicago 2:18
chief 20:3,12,16
  23:19 25:9

39:11 41:8
  42:2,11 43:4
  43:23 44:10
  53:21 80:4,12
  85:22
Chin 3:14 8:11
  8:11
circumstances
  23:2
civil 1:4 7:6
  31:15
claim 74:9
clarify 39:13
clear 10:10
  46:10
clients 25:5
closing 78:14
  79:15 85:7
CNO 26:1 27:3
  27:10
Cohen 65:19,20
college 12:8,9
combined 17:23
come 65:2 84:11
coming 64:17
commencing
  7:13
comments 24:3
  33:15 34:14
  35:4,7 77:11
commission
  17:3 68:5
Commissioner
  6:6 7:5
COMMISSIO...
  88:21
committee
  32:12 80:21,21
common 21:11
communicated
  78:2
communicatio...
  77:17,23 78:18
  79:18 85:1
company 12:10
  12:12,19 16:13

18:16 19:13
  30:4,7 63:22
  72:15
comparable
  22:5
compared 28:2
comparisons
  47:12
compensated
  29:5,9
competitor 30:1
competitors
  29:20
complete 40:8
  40:23,23 45:16
  47:2 56:11
  69:19
completed 21:17
  22:4,7,10,17
  57:19
completing
  56:13 71:10
completion
  21:23 73:5
compliance 6:12
compound
  51:21
comprehensive
  45:16
Concentric
  60:18
concerning 73:3
  73:4
concrete 82:2
condition 78:13
  79:15 81:11
  82:17
confident 43:21
confidential
  41:12,15 42:1
  42:9,12 43:8
  77:23 78:17
conformity
  21:16
congressional
  32:12 65:22

Congressman
  65:20
conjunction
  32:5,9
connection 60:1
  60:19 63:13
Connectrix
  71:19
considerations
  24:12
considered 42:8
consistently
  25:20
constrain 39:9
construct 19:17
constructed
  21:15
construction
  18:13,15,17,19
  18:21 19:3
  20:20,22 21:7
  21:11,16,23
  22:15 35:12
  59:6,8 72:15
  73:4,8 78:13
  79:14 82:18
consultant
  25:15 39:4
  40:20 81:4
consulting 24:22
  25:4 29:7,13
  29:23 38:18
contact 73:2
  84:7,12
contacted 38:9
  39:11 61:5
  81:9 84:2
contacts 81:1
containment
  82:1,3
content 76:12
continued 58:18
continues 77:10
continuing 3:1
  4:1
contract 5:19

26:20 29:1,7
29:14 43:13
72:1,7 77:4
**contractor** 30:5
**contractors**
27:18
**contracts** 72:5
72:12
**contribute** 24:8
**conversation**
83:7 86:5
**conversations**
33:12 34:1,8
34:15 35:5,11
35:19,22 38:23
81:20 82:7,19
85:17
**Cooper** 50:23
52:20 53:11
**Cooperative**
50:8,9,10,16
50:17,23 52:21
53:7
**coordinating**
27:17 73:9
**coordination**
82:20
**copied** 77:3
**copy** 60:15
**copying** 75:17
**corear@hand...**
2:12
**corporate** 15:23
16:3 37:23
71:16
**corporation**
17:17 18:10
51:7 69:12
71:18
**correct** 11:17
12:20 13:3,13
13:22 14:20
18:4 20:1,6,9
22:23 23:1
24:5,6 25:14
41:9,10,13

49:18,19 50:12
50:14 51:15,16
52:13 53:3,4,5
54:4,6,7 60:15
61:14 72:2,3
75:22 84:3,16
88:11
**cost** 17:10 21:10
22:12,20 47:11
47:11,12
**costing** 22:16
**costs** 46:20,21
**counsel** 3:15 6:4
6:16,18 7:8 8:5
35:20 36:22
88:14
**country** 22:7
**COUNTY** 88:4
**couple** 83:14
**court** 1:1 6:13
7:7,23 8:22
9:11 10:6
**Courtroom** 4:5
**Cramer** 48:13
48:17
**Cramer's** 48:12
**create** 45:3
**Credit** 54:21
55:1
**Crosswhite** 64:8
**Cummings** 1:13
3:6 7:10
**current** 52:23
55:5 57:12
81:10 82:9
**currently** 85:12
85:17
**customer** 17:11
**customers** 52:23
54:3 61:8 69:4
69:15,22 70:14

_____
**D**
**D** 3:13
**daily** 73:12
**date** 7:6 8:2

57:20 67:9,11
68:1,3
**dated** 75:18
**David** 2:14 3:13
8:9
**day** 7:12 26:14
73:15,21,22
74:7
**day-by-day**
73:12
**ddayliffe@tva...**
3:20
**December** 14:18
15:7,18
**decided** 23:15
49:7
**decision** 24:9,10
40:8 59:23
**declare** 49:7
**deemed** 43:7
**defendant** 1:10
3:3 7:22 8:8,10
8:12 31:15
**definite** 47:9
**definitive** 57:20
**Democrat** 62:8
**Department**
55:21 56:6,8
56:17 57:5,18
66:17 68:18
**departure** 23:3
**depending**
25:21
**deposition** 1:12
6:4,10,11,20
7:19 9:13
31:23 32:13,14
32:21,23 33:3
33:14,21 34:1
34:5,12,15
35:1,2,6,16,18
36:16 59:4
60:12 75:15
76:22 86:22
87:2,5 88:7,11
**depositions** 6:14

31:18 32:5
33:1 36:17
**describe** 20:16
82:11
**description**
73:14
**descriptions**
73:18
**designed** 72:23
**detailed** 74:17
**details** 43:13
**develop** 19:16
46:5
**developing**
38:16 39:22
59:5 62:16
**development**
1:6 7:21 8:14
8:16 9:12
11:13 16:12,17
16:17 17:8
25:2,7,10,13
25:17,20 26:2
26:6,9,13,21
27:2,7,13,21
28:6 29:6,20
29:23 30:2,5
30:13,20 31:6
37:14 38:1,6
39:10,17,20
40:15 44:7
45:22 48:5
57:11 58:5,12
58:21 59:3,9
59:12 60:1
62:13 63:14,23
65:11 66:4,18
67:8,16 68:4
68:11,16,22
70:12 71:23
72:4 73:11
77:12 78:10
79:11 81:4
84:6,15,17,20
85:6
**Development's**

36:22 54:5
75:21 76:2
78:10 79:12
**differ** 14:21 52:5
**differed** 35:12
**difference** 15:11
**different** 10:21
17:7 23:14
46:5 52:8
58:18,22 69:14
**difficult** 19:16
**direct** 15:2,4
**directly** 84:7
**director** 67:14
**disagreed** 33:6
33:13 34:2,9
34:16 35:6,9
**discuss** 68:19
**discussed** 23:14
58:8,17 62:16
70:18
**discussing** 48:17
**discussion** 49:14
55:1 64:6,12
64:16 85:5
86:1
**discussions**
45:15 48:5,8
48:21 49:3,17
49:20 50:1,7
50:18,21 51:18
51:23 52:5
54:6,8,15,20
54:22 55:9,20
56:5,9 59:10
65:5 71:14,17
82:4 83:5 85:9
86:10
**distinction**
85:16
**district** 1:1,2 7:7
7:23 8:1 65:22
**Division** 1:2 8:1
**document** 11:4
11:5 61:1
67:23 77:6,14

Case 5:18-cv-01983-LCB   Document 84-8   Filed 10/06/20   Page 27 of 231

**documents** 36:16,20,23
**DOE** 61:7,13 62:17 63:4 70:13
**doing** 25:17 29:22 30:3 81:22
**dollars** 22:9,12 29:11 30:12
**dozen** 31:21 56:19
**draft** 5:19 77:4
**dramatically** 17:19
**drew** 85:16
**Drive** 3:17
**drop-ins** 68:5
**Duke** 12:10,11 12:13,18 13:2 15:19 16:7,10 16:13,14 17:2 17:13,15 18:20 19:2,6,13 20:5 32:6
**duly** 8:19
**duties** 20:16
**Dym** 2:16

___

**E**

**E** 2:1,1 3:1,1 4:1 4:1 88:1,1
**earlier** 33:1 38:5
**early** 32:21 66:10 77:3 83:8
**easily** 75:6
**east** 10:19
**effect** 6:11
**effort** 17:1
**efforts** 48:12
**eight** 22:12
**eighteen** 14:9
**either** 29:19 41:1 46:11 57:2

**Electric** 50:9,17 53:9 54:12 71:20
**electrical** 11:15
**electricity** 55:6
**email** 5:13,16,18 60:13 75:16 76:10 77:9 78:3,6 84:23
**emails** 36:23 77:2 81:20
**employed** 85:12 85:17,18
**employee** 25:12
**employees** 27:14 86:9
**Energy** 20:5 55:21 56:6,8 56:17 57:5,18 66:17
**engineering** 11:15,21 12:16 13:17 15:3 18:9 72:14
**enter** 72:5
**entered** 72:1
**Entergy** 51:7 52:21,22
**entire** 16:1 18:10
**entities** 29:16 48:7 51:18 52:23 54:15,19 59:11 72:6
**entitled** 74:22
**entity** 56:1 73:9
**environmental** 68:18,20
**escapes** 62:7
**estimate** 26:15 27:20 28:21 36:4 56:15 57:22
**estimates** 56:12 59:6 82:18
**ethics** 39:7,11

39:14 44:1,3,9 44:11,17 45:17
**event** 66:19,22
**evidence** 6:21
**evolved** 47:9,14 47:23 58:3
**exact** 30:14 31:20 46:7 49:15 68:23
**exactly** 28:22 42:7 56:18 69:10 74:12
**examination** 5:1 5:3 7:15 9:4
**examined** 8:19
**example** 47:12
**excuse** 14:14 30:19 65:20
**executive** 20:3 39:8 67:14
**Exhibit** 5:8,13 5:16,18 11:1,2 60:6,9 70:8 75:10,12 76:18 76:19
**EXHIBITS** 5:6 5:11
**existing** 19:18
**Exp** 88:22
**expand** 17:19 48:1
**expended** 73:12
**experience** 25:1
**expertise** 55:18
**explained** 44:17
**expressed** 44:23
**expressly** 44:10 45:8
**extensive** 17:5
**extent** 41:19

___

**F**

**F** 88:1
**face-to-face** 56:16 57:3,8 67:21

**facility** 19:4 83:15
**fact** 86:6
**failed** 82:4
**failure** 82:7
**fair** 20:8 45:7
**fairly** 40:21
**family** 24:11
**far** 58:4
**feasibility** 61:9 69:5 70:21
**federal** 1:14 3:7 7:6,10 9:11 44:8
**feedback** 23:17 24:8
**feel** 39:16
**Fifth** 1:15 3:8 7:11
**fifty** 30:20
**figure** 22:18 30:14 64:23
**filed** 7:22 83:20 83:23
**final** 22:18 57:14,18
**financing** 46:9 48:6 54:15,19 56:1 61:10 69:5 70:22
**find** 17:9,9 40:21,22 52:9
**fine** 9:1,2 42:22 87:1
**finish** 47:20 55:14
**firm** 36:14
**first** 8:19 21:20 25:16 29:1 38:6,10 40:20 49:2,9,13 65:17 77:1,9 81:5
**five** 73:16
**fleet** 17:18 18:1 18:12

**fluctuates** 28:16
**Fluor** 71:17
**FOIA** 43:12
**following** 7:15 80:1 81:7,7,8
**follows** 8:20
**force** 6:11
**foregoing** 7:8 88:7,10
**form** 6:17 45:11
**formed** 24:21
**former** 44:5 85:21 86:9
**formerly** 85:18
**forth** 45:3 55:15 69:20 74:6
**forward** 59:13
**fossil/hydro** 17:15,18 18:8
**found** 38:23 76:15
**Framatome** 71:16 72:17,18
**frame** 22:9 25:3 62:2 68:23
**Frank** 26:5 31:7 36:8 67:11
**Franklin** 26:3,5 26:7 31:8 62:14,15,22 63:2 67:12
**front** 32:11
**fuel** 14:11
**full** 6:12 29:1
**function** 12:18 15:12 16:14
**functions** 13:7 13:17 14:4 16:1,5 20:20
**fundamental** 58:20
**funding** 63:4
**further** 59:13 65:5 88:13
**furtherance** 71:10

future 17:6

**G**

Gaffney 18:18
  19:22
Gail 1:20 6:6 7:1
  88:20
garbled 79:9
Gas 49:17
gas-fired 47:13
general 3:15
  40:21 47:11
  52:9 64:21
  71:19
generally 20:16
generation
  12:18 17:7,15
  18:8,13 20:4
  20:19 47:13
Georgia 11:15
  11:21 22:10
getting 55:10,17
  62:17 81:9
give 30:17 31:20
  32:8 62:6
given 9:13 28:14
  31:19 32:12,20
  44:4 45:1
  88:12
gives 25:23
go 12:22 17:5
  45:4,5 51:6
  86:13
goal 17:9
goes 59:13
going 9:16 11:11
  17:16,18 42:16
  48:17 51:20
  60:7 67:22
  71:7,11 73:6
  81:21 82:8
  84:12,20 86:22
good 23:13,16
  24:14
government
  61:17,23 62:3

65:9,16 66:12
  67:2 70:13
governmental
  61:6,8 63:12
  68:14 70:14
Governor 63:17
  64:22 65:2,7
governor's
  63:23
grade 71:6
graduated 12:9
graduation 12:8
ground 19:20
grounds 6:19
group 16:1
  73:17
groups 51:19
guarantee 62:18
guys 64:22

**H**

H 3:4
half 49:9 56:19
Hand 2:6
handwritten
  37:13
Haney 26:3,5,5
  31:7,8 36:8
  62:14,20,22
  67:12,12
Haneys 76:14
happen 65:1
happened 82:5
happy 9:22 10:4
hard 75:4
hard-copy 36:23
Harry 62:9,10
  62:12,20,21
hazards 80:17
head 37:17
  54:16
headquarters
  16:4
heard 78:23
hearing 88:12
held 12:16 15:8

60:2 66:18
help 27:23 39:22
helped 55:11
higher 28:13,16
Hill 3:17
history 46:22
hold 25:8 27:1
Holdings 24:18
  24:20 28:5
  29:17
home 10:13
honest 74:10
hosted 80:23
hour 29:12
hourly 29:9,10
hours 29:8
  30:21 36:3
  73:17,19,20
  74:4,5,5
house 66:19
Howe 17:21
Hughes 2:16
human 13:5
hundred 29:11
  30:20
Huntsville 9:11
  49:23 50:2
hydro/fossil
  17:23

**I**

idea 52:9,11
identification
  11:3 60:11
  75:14 76:21
III 2:4
Illinois 2:18
immediately
  81:16
include 17:20
including 14:2
Incorporated
  71:19
Incorrect 45:12
INDEX 5:1,6,11
Indiana 17:21

indicate 24:17
  67:23
indication 57:17
Indicative 5:17
  75:21 76:3
industry 21:10
  71:4
inform 47:1
information
  41:12,16,22
  42:1,6,9,13
  43:6,8 44:2,12
  44:21 45:6,10
  55:2,4,7,12,13
  56:14 57:10
  75:1 76:13
  82:21 83:1
initial 38:23
initially 21:17
initiation 85:10
  86:11
input 46:14,16
  47:7,11 76:12
  77:11,20 78:3
instruct 77:21
  78:18 79:16
instruction
  78:16
integrated 16:16
  16:21,23
intensive 14:11
Intent 51:9,11
  51:14
interaction 80:3
  80:8 81:5
interactions
  81:18 82:13
interest 23:9,10
  38:15 62:16
interested 38:17
  61:6,17 63:2
  88:15
introduced 9:9
  63:9
introductions
  64:6

invoice 74:4,15
invoices 29:8
  30:15 31:3
involved 38:6
  44:16 48:11,16
  53:16 54:20
  55:20 59:11,23
  61:16,22 62:4
  62:12 65:4
  70:12 76:1
involvement
  53:19 56:5
  78:9,21 79:11
Involvement's
  78:11
involves 37:3
involving 32:18
IRS 61:7 68:9
  68:10
item 64:17,20

**J**

January 13:10
  30:10
JEFFERSON
  88:4
Jim 79:20,22
  80:9,13,16,22
job 12:10 27:6
  27:10
Joe 50:8,10,16
  53:7 54:13
Johnson 33:11
  64:7,8
Johnson's 33:3
Jr 1:12 6:5 7:14
  8:18 9:7
July 25:4
June 22:22
  30:11

**K**

keep 37:12,18
  37:21 80:18
keeps 37:23
Kentucky 17:22

**William McCollum**

kin 88:14
kind 51:10
 55:12
knew 42:5,5
 44:20
know 9:16,21
 10:6 30:14
 31:10,11 38:2
 38:3,4,19
 40:10 41:2
 42:7 43:20,20
 46:18 47:3
 49:16 56:22
 64:19,22 65:4
 68:23 78:6
knowledge 44:1
 44:18 45:9
 84:5
known 62:23
Knoxville 3:18

―――――― L ――――――

L 5:14 6:1
large 7:4 82:1
larger 15:16
Larry 2:14 8:15
 26:10 31:4
 38:11 60:13
 67:12 78:4
late 40:11,19
 57:2 66:9
law 2:5,15 3:5
 62:22
laws 6:12
lawsuit 9:10
 83:16,19,22
 86:7
lawyer 42:17,20
 84:1,19
lawyers 42:19
 84:7
lblust@hspleg...
 2:20
lead 73:8 79:23
Leader 62:8
leading 6:17

leaving 40:7
led 80:14,23
left 22:17,19,22
 24:13 40:10
 81:3
legacy 72:22
legislators 61:7
 63:12 65:10,10
 65:15 66:12,20
 67:2 70:13
Legislature 63:6
Lembke 3:4 5:3
 8:7,7 9:2,4,9
 28:3 33:9
 34:20 37:5,12
 40:5,13,19
 41:6,17,23
 42:10,16,19
 43:1,4 45:19
 47:22 51:22
 59:14,22 61:20
 74:8,13,17,21
 75:3,9 77:19
 78:1,20 79:1,5
 79:10,20 86:13
 86:21
let's 12:22 59:14
 86:13
Letter 51:8,11
 51:14
LICENSE 88:22
licensing 19:8
 19:14
Light 49:17
Limit 37:10
limited 47:5
line 61:4
liner 46:6
liners 46:7
list 12:15 25:1,4
 25:5 27:5,9
 73:11,21 74:3
listed 16:5 72:6
listing 75:4
lists 45:4,5
litigation 31:16

32:18 85:11
 86:11
little 22:4 41:3,4
 45:20
LLC 1:6 2:6
 7:21 24:18,20
 24:21
LLP 1:13 3:6
 7:10
loan 56:2 57:11
 57:13,15 62:17
 63:5
lobbying 48:12
 48:15,18
location 13:12
 13:21 14:19
long 20:8 62:23
look 60:5 74:19
 75:2,8,10
 76:17 77:8
 81:10
looking 17:6
 67:6 70:8
lot 82:7
lowest 17:10
Lundy 71:18

―――――― M ――――――

Madison 2:17
maintained 63:1
maintenance
 13:11,16,16,17
 14:3,12
Majority 62:8
making 45:16
management
 12:17 16:18
 23:12,18 68:18
manager 13:21
 14:22,23 15:2
 15:3,3 21:21
 79:23,23 80:9
managers 69:13
March 12:15,23
mark 11:1
marked 5:11

11:2 60:10
 75:11,13 76:18
 76:20
market 55:5,5
marketing
 18:11
marks 7:18
Matt 8:7 9:8
matter 7:20
Matthew 3:4
MBA 12:3
McCollum 1:12
 6:5 7:13,20
 8:18 9:7,8 11:6
 24:18,20 28:5
 29:17 59:22
 74:16 75:16
McCree 67:15
 67:20 68:7
mean 14:6 32:15
 37:3 46:3
meaning 16:18
 21:17
means 32:16
meant 17:17
meet 66:21
meeting 56:20
 61:13 62:5,11
 62:15 63:8,13
 63:21 64:4,16
 64:18 66:2
 67:8,21 68:6
 68:10,15,17
 69:9 70:20
 71:2 80:20
meetings 56:7
 56:16 57:4,8
 61:13,16,23
 65:7,9,15
 66:11,15,16,16
 67:1,6,19 68:2
 68:9 69:4 70:6
 70:11,16
members 69:11
 69:13
memory 32:20

36:19
Memphis 33:17
 49:17 50:5,15
 51:9,13 52:1
 52:12 53:2,17
 53:22 54:6
 66:5
mention 33:23
mentioned
 36:18 51:19,19
 66:16
merchant 38:17
merger 16:19
 17:16
Messrs 3:13
met 48:13 61:7
 63:17 67:12
milestones
 47:10
million 30:12
minutes 9:9
mix 17:8,10
mlembke@br...
 3:11
Mo 66:21
Mobile 2:10
model 45:21
modeling 17:6
moment 60:23
 62:6
Montgomery
 68:22
month 25:22
 30:21
monthly 29:8
 30:15
months 14:9
 18:3 30:18
 56:23 59:1
Moody's 54:22
 55:9
morning 86:23
moved 16:11
multiple 46:6

―――――― N ――――――

N 2:1 3:1 4:1 6:1
name 9:5,8
  50:22 60:21
  62:6 71:15
named 27:3 48:2
  69:23
Nashville 50:3
nature 51:17,23
  52:4 54:23
  55:8 56:5
  58:12 80:7
  82:12 84:8
  86:4
ND 61:5
ND4966- 5:14
ND4967 5:15
ND5048-ND5...
  5:17
ND5152-ND5...
  5:20
near 18:18
  19:22
necessary 6:15
need 9:18,20
  10:2,5,10
  42:16 64:10,11
needed 82:22
negative 23:17
  24:3,7
negatively 37:17
neither 88:14
never 19:21 54:2
new 18:13 47:12
  58:15
Nodding 54:16
non-public
  44:12,21 45:9
North 1:15 2:8
  3:8 7:11 10:16
  10:17 17:20
Northeastern
  1:2 8:1
northern 1:1
  7:23 17:21
Notary 1:23 6:8
  7:3

notes 37:13,19
  37:21
notice 24:23
November 1:17
  7:12 8:3 11:12
  13:11,19 15:17
  25:18 38:7
  83:20
NRC 11:12 19:8
  61:7 66:16
  67:6,8,14 68:3
  70:13 79:13
nuclear 1:6 7:20
  8:14,16 9:12
  11:13,21 12:11
  12:18 13:1,6,6
  14:7,10 15:9
  15:13,15,15,19
  16:1,2,14,20
  18:15,22 19:4
  19:8,13,15,19
  21:10,11,15,20
  25:2,7,9,10,13
  25:17,19 26:2
  26:6,9,13,21
  27:2,6,13,21
  28:6 29:6,20
  29:23 30:2,4
  30:12,19 31:6
  36:22 37:14
  38:1,6,16
  39:10,17,20
  40:14 44:6
  45:2,22 46:19
  46:22 54:5
  57:11 58:5,12
  58:20 59:2,12
  59:23 62:12
  63:13,23 65:10
  67:8 68:4,11
  68:16,21 70:12
  71:4,6,23 72:4
  72:22 73:11
  75:21 76:2
  77:12 78:10,11
  79:11 80:21

  81:4 84:5,15
  84:17,20 85:6
  85:22
number 5:8,13
  5:16,18 8:2
  11:2 19:14
  21:13 22:6
  23:14 31:21
  56:16,22 60:9
  60:23 65:21
  69:17 75:12
  76:19 80:11
  82:4,19
numbered 60:23
numerical 60:8
numerous 81:1

---

**O**

O 6:1
O'Neill 5:14
  60:14,18 75:17
O'Rear 2:4 8:13
  8:13 9:1 28:2
  33:7 34:17
  36:8,14 37:2,7
  37:10 40:4,17
  41:14,19 42:4
  42:14,18,21
  43:3 45:11
  47:19 51:20
  61:18 74:10,15
  74:19,23 75:7
  77:15,21 78:15
  78:22 79:3,8
  79:16 87:1
oath 9:18
object 37:2
  45:11 51:20
objection 33:7
  34:17 41:14
  42:4 77:21
  78:15
objections 6:16
  6:19
obtain 84:6
obtained 11:20

  12:2 68:20
obviously 63:4
occupied 28:7
occur 35:22 66:6
  70:2
occurred 21:12
  64:5 68:22
  82:7
occurring 64:4
Oconee 12:11
  15:9
October 15:8
  77:3
offered 6:21
  77:12
office 3:15 15:23
  27:2 56:2
  57:15 63:5,23
officer 20:4,12
  20:17 23:19
  25:10 39:12
  41:8 42:3,11
  43:5 44:1,11
  53:21 80:5,12
  85:22
officers 31:5,12
offices 7:9
officials 55:20
  56:17 57:5
  61:6,17,23
  62:4 63:12
  65:9,16 66:12
  67:2 70:13
Oh 28:22 32:17
  51:5
okay 9:23 10:1
  10:11,12 14:17
  16:9 20:2
  27:19 28:9,23
  29:5 31:2,14
  32:17,22 33:5
  33:18 35:8
  36:15 37:7,21
  39:19 43:23
  48:20 49:12
  53:15 54:2

  55:19 60:22
  67:22 68:8
  69:8 70:1,4
  74:1 76:8 77:8
  77:18 79:8
once 57:6 81:3
  82:15
ones 54:11 69:23
  71:21 72:10,11
ongoing 54:6,9
  59:6,8
online 69:20
open 66:19
operate 46:21
operated 19:21
operating 16:2
  20:12,17 23:19
  41:8 42:3,11
  43:5 46:19
  53:21 80:5,12
  80:20,21
operation 14:2
  15:16 20:19
  22:2 41:1
  56:12 69:20
operations
  12:17 14:2
  20:20 67:14
opposed 15:12
  15:15 16:13
optimum 17:9
oral 7:14
order 56:19 60:8
organization
  15:5 23:15
  69:16
original 21:16
  22:3
outage 14:3,5,8
  14:16
outages 14:3
output 52:12,17
outside 18:12
overruns 21:10
oversaw 22:14
  53:22

oversee 18:21
19:2,7 20:21
overseeing 24:4
overseen 41:6
owner 24:17
72:22
owner/manager
26:7 31:8
ownership 46:9

**P**

P 2:1,1 3:1,1 4:1
4:1 6:1
P&S 5:19
p.m 7:13 8:4
59:17,19,19,21
86:16,18,18,20
86:21 87:3,5
page 5:2,7,12
77:9
pages 77:10
paid 30:12
paragraph
60:23 61:2
part 10:17 41:4
61:4 66:13,17
67:3,7,20 70:9
83:8
participate
69:15 76:16
participated
21:23 54:21
participating
48:14
Participation
48:4
particular 76:23
parties 6:3,18
88:14
partnerships
46:7
passes 63:5
pending 10:3
people 33:17
53:22 69:13,21
82:16,21 83:2

83:15 85:18
percent 28:8,14
percentage
27:20,23 28:4
28:5
perform 14:11
performance
23:19,23
performed 58:5
58:16
period 14:14,15
47:4 81:19
82:14
periodicity 17:3
permission 84:6
permit 19:4
permits 35:12
59:8 68:20
78:13 79:14
person 67:13
personal 24:11
personally
31:14
personnel 80:16
pertaining 23:3
37:13 41:12
42:2 43:7,17
44:12 68:10,16
phone 57:4,9
78:5,8 83:7
Piers 2:16
Place 1:14 3:7
7:10
placed 9:18
17:14,22
plaintiff 1:7 2:3
7:21 8:14,16
31:15
planned 21:18
planning 13:16
16:12,15,16,22
16:23 17:5
19:16 81:22
82:10
plant 14:8 18:22
19:9,15,16,19

21:11,15 38:16
38:17 40:23
46:5,19,22
52:3 55:3,13
55:14
plants 18:15
22:6 56:14
play 73:7
playing 85:5
pleasantries
64:6
please 8:5
point 10:2 40:11
41:5 48:2
51:14 61:18,20
63:6 68:9,15
69:9 80:19
81:8,15,23
85:4
position 15:6
16:6 17:13
18:7 44:5
78:11 79:12
possessed 44:11
possession 43:6
possibility 66:5
post 82:2 86:11
post-auction
81:19 82:14
potential 16:19
29:19 30:1
48:6,6,21 49:3
49:13 50:6
52:2,8 54:15
55:3 56:1 59:9
63:3 64:7 66:3
67:16 68:19
70:17
potentially
38:16 62:17
power 12:10,12
12:18 13:2
14:13,15 15:19
16:7,10,13,14
17:2,13 18:11
18:12,21 19:2

19:7,13 32:6
48:6,21 49:3
49:13 50:6
52:2,10 54:3
55:3 56:14
59:10 64:9,11
66:5 69:12
powers 16:2
PowerSouth
50:22 52:20
53:13
pre-operational
21:21
precise 63:19
precisely 66:8
preface 71:3
preparation
76:2
prepare 32:22
34:21 35:17
preparing 59:3
present 25:4
29:18 36:7,10
64:1
presentation
69:17
president 14:19
15:1,5,18
16:11 19:12
20:3 26:6 31:7
pressurized
46:23
Preston 85:21
previous 62:7
previously 5:11
34:18 36:17
60:10 75:11,13
76:18,20
pricing 55:4,5,5
55:5
prior 6:21 27:2
31:18 40:7
49:10 58:5
61:21 63:15
65:8,12 67:7,9
68:3 70:19

Pritchett 1:20
6:6 7:1 88:20
privilege 74:9
75:1
privileged 75:4
75:5
probably 26:23
28:11 43:13
50:21 60:6
76:10
problem 45:4
Procedure 7:7
proceed 64:13
proceedings
7:16
process 17:6
61:5
procurement
18:10
produced 74:12
74:14
producing 14:13
14:15
product 37:4
production 55:4
products 71:6,9
Professional
1:22 6:7 7:2
program 21:22
56:2 57:15
63:5
prohibit 44:18
project 12:17
20:23 21:3,6
38:16 39:22
40:3,4,6 41:7
46:9 47:2 48:4
55:14 56:9
59:13 61:10
62:17 63:4
64:7,10,13
66:4 67:17
69:6 70:22
71:11 72:21
projected 22:20
property 49:8

60:3
proposal 52:14
propose 52:15
proprietary
  42:13 43:8
provide 38:14
  39:21 40:1
  55:11 59:12
  71:6,8 73:14
  73:18 83:1
provided 7:6
  36:22 47:10
  76:14
providing 46:14
  47:5,6 55:2
public 1:23 6:8
  7:4 43:12,14
  43:19 88:21
purchase 16:20
  26:22 52:16
  77:4 80:2
purchaser 49:13
  52:2
purchasers 48:6
  48:21 49:4
  50:6 52:9 53:2
  59:10
purchases 59:9
purpose 66:1
put 41:1 56:12
  69:19,20
putting 22:1
  76:16

**Q**

question 9:20,23
  10:4 33:8,10
  35:15 41:20
  42:23 43:2
  44:19 45:8
  47:20 51:21
  78:16,23 79:2
  79:4,6,9
questions 6:17
  6:18 9:17
  44:23 47:3

88:8
**Quirk's** 33:21

**R**

**R** 1:12 2:1 3:1
  4:1 6:5 7:13,20
  8:18 88:1
**Ralph** 9:7 39:12
  44:14,17 45:15
rate 29:9,10
rating 54:22
  55:11,16
reactor 46:23
  82:3
read 33:1,2,20
  34:4,11 35:1
  61:1 79:3,5,7
reading 6:9
really 24:10
  33:8 57:10
  58:14 64:10
  70:3
**Realtime** 1:21
  6:7 7:2
reasons 80:15
recall 22:21
  23:20 24:1,3
  26:16 28:15,16
  28:22 29:2
  31:17 32:17
  33:19 34:3,7
  34:10,19 45:5
  45:13,14 48:19
  49:2,10,12,15
  50:1 51:3
  56:21 58:4
  60:17,21 62:1
  62:4 63:13
  64:3,15,18,21
  65:8,18,21
  66:7,10,13,23
  67:3,4,10,18
  68:2,15 69:1,2
  70:3,11 71:1
  71:22 74:11
  78:2 81:5 83:6

85:3 86:12
received 23:17
  60:15
recognize 11:5
recollection
  35:10,13 63:19
  70:2 78:7
  80:13 82:12
record 9:6 10:11
  59:17,21 79:7
  86:14,16,20
recorded 32:13
  32:14
records 37:23
redacted 75:6
reduced 88:9
reference 33:5
referenced
  60:11 70:7
  75:14 76:21
references 68:8
referred 14:12
  14:16
referring 40:18
  41:15
refers 67:6
refreshed 36:19
refueling 14:8
regard 40:16
regarded 42:12
regarding 35:11
  59:9 83:9
regime 14:11
**Registered** 1:22
  6:7 7:2
regulated 17:1
  17:15 18:8
  20:3
regulations 44:9
  44:17
regulatory 17:3
**Reid** 62:9,10,12
  62:15,20,22
  63:3 65:7
related 19:14,15
  32:21 33:13

36:23 43:9
  81:2
relating 6:13
relationship
  30:6 53:16,22
  63:1
release 43:15,19
released 43:11
relevant 72:21
remain 58:21
remember
  26:14 32:19
  38:21 48:9
  49:5 50:17
  69:10 70:20
remembered
  34:23
reorganization
  18:6
repeat 9:21
report 15:2 26:1
  27:12,15 53:23
reported 1:19
  14:23
reporter 1:21,23
  6:7,8 7:2,3
  8:22 10:6
reports 15:4
represent 8:6
  9:10 11:10
  49:9 83:19
**Representative**
  65:19
representatives
  63:22
represents
  88:10
request 38:13
  43:12 64:21
  65:3 83:11
  84:8
requested 25:22
  46:15
requesting
  46:17
requests 83:14

required 17:2,5
requires 78:17
  79:17
**Resnick** 2:16
resolve 10:3
resource 16:16
  16:21,23
resources 13:6
  13:16 17:8,8
  17:10
respect 74:11
respective 6:4
respond 47:20
response 83:18
responsibilities
  27:6,10
responsibility
  16:4 17:23
responsible 13:5
  13:15 14:1
  15:22 16:15
  20:18 22:1
  27:16
restate 43:2,3
restrictions 39:3
  39:7,14,16
  44:4
restructuring
  71:16
result 88:16
results 23:22,23
  24:4,8
resume 5:8 11:9
  11:11 12:14
  24:17
retained 40:1
  45:21
retire 23:9,13,16
  24:9,10
retired 12:13
  16:7 20:4,7,8
  23:4 24:16
  39:8 85:23
retiree 39:5
retirement 23:6
reveal 77:17,22

78:17 79:18
**reverse** 60:8
**review** 36:15
  57:14,19 60:23
  76:5
**reviewed** 76:8
**reviewing** 11:4
  61:1 77:6,14
  82:16
**revolved** 24:11
**right** 9:16 10:13
  11:10,16 12:2
  12:7,14,19,21
  13:8,19 18:14
  19:1 20:7,10
  20:14,21 21:3
  21:7 22:22
  23:11 24:2,19
  24:23 25:2,3,6
  25:16,23 26:8
  26:17 27:1
  30:11 32:4
  33:2,20 34:4,7
  35:14,21 36:3
  38:9 39:2
  40:13 49:16
  50:5,22 51:3
  51:22 52:4,15
  55:23 56:4
  60:17 61:3,12
  62:3 63:11,15
  64:3 65:6,17
  66:11 67:5
  68:13 70:19
  71:1,22 75:9
  76:1,11,17
  77:5 81:17
**river** 20:20
**Roger** 36:11,12
**Rogers** 39:12
**role** 12:21 13:4
  13:14,23 14:21
  15:8,21,22
  16:9 17:12
  20:4,22 21:20
  24:5 41:8 44:5

46:11,12 47:5
  47:8,14,23
  48:1 54:2
  56:10 57:7
  58:1 63:7 73:6
  85:6
**roles** 12:12,16
  18:20 19:1,6
**room** 69:21
**rope** 82:2
**roughly** 29:2
**RSA** 2:7
**rude** 10:9
**rules** 6:13 7:6
  39:14 45:18
**rumors** 40:12

**S**

**S** 2:1 3:1 4:1 6:1
**s/** 88:20
**safety** 80:16
**sale** 54:3 60:2
  66:5 77:4
**sales** 80:1,2
**Santee** 50:23
  52:20 53:11
**Sargent** 71:18
**saying** 71:4
**says** 11:14 75:23
  77:7
**scchin@tva.gov**
  3:21
**scenarios** 17:7
  23:15
**schedule** 21:17
  22:3
**scheduled** 21:6
**schedules** 59:7
  82:22,23
**school** 62:22
**second** 30:17
  77:10 86:14
**secretary** 26:9
**security** 13:6
**see** 19:7 33:5,23
  34:14 35:4

61:3,10 64:10
  64:23 74:20
  75:4,18,19
**seeing** 34:7
**selling** 18:11
**Senate** 62:7
**senator** 62:15
  63:3,10 65:7
**senior** 23:12,18
**sentence** 61:4
  67:5 70:7
**September**
  12:12,15 75:18
**sequence** 49:15
**series** 9:17 77:2
**served** 42:2
**services** 13:1
  18:9 38:13
  59:12 71:6,9
**seven** 51:19
  69:12
**shadow** 55:11
  55:16
**Shaking** 37:17
**Shannon** 4:4
**Shea's** 35:1,6,16
**short** 59:14
  62:15
**shortly** 39:1
**show** 10:23 60:5
  67:22 74:4
**showing** 74:4
**sic** 78:11
**sign** 51:10
**signature** 6:9
**signed** 26:21
  29:2 51:9,14
**similar** 55:11
**single** 46:6
**sir** 32:1 60:8
  63:16 85:14
**site** 14:18 15:1,5
  15:6,15,16
  18:18 26:22
  66:18,19 68:21
  69:18 79:23

80:10,11,13,14
  80:17,22 81:2
  81:10,11,21
  82:4,9,10,16
  82:17 83:10,14
  84:12,13
**six** 18:2 36:6
  52:6,16 54:9
  59:1 73:16,20
  74:4
**sixty** 28:8,13
**size** 17:18 22:6
**skimmed** 76:10
**small** 71:5
**SNC-Lavalin**
  71:18 72:1
  73:3,6 82:15
  82:21 83:2
  85:23 86:7
**Socol** 2:16
**soon** 10:3 24:16
**sorry** 47:21 51:5
  62:7 65:21
**sort** 40:22 41:2
  44:16 46:16,20
  47:6 48:7 55:6
  56:13 65:1
  81:11 82:18
**sorts** 47:6,13
**sound** 30:11
**South** 17:20
  18:18 19:23
  51:1
**Southern** 63:22
**speak** 22:2
  66:22
**speaking** 63:7
**specific** 25:5
  26:14 45:5
  67:10
**specifically**
  38:22
**specificity** 33:8
**spend** 36:4
**spent** 27:21 29:3
  73:20 74:5,6

**Sr** 26:4
**stack** 60:6
**staff** 56:8 67:15
**stage** 57:19
**stages** 57:14
**standpoint**
  80:16
**start-up** 21:22
**state** 7:4 8:5 9:5
  17:2,4,4 33:10
  45:8 66:20
  88:3
**States** 1:1 7:7,23
  47:1 69:12
**station** 12:11
  13:1,2,9,18,20
  14:2,13,22,23
  15:2,9,13
  21:20 22:11
**stations** 19:18
**status** 40:2,9
  56:10 57:10,12
  69:18 82:9
**stay** 20:8
**steam** 72:22
**steel** 82:1
**stenotypy** 88:8
**steps** 82:6
**Steve** 8:11 65:19
  65:20
**Steven** 3:14
**STIPULATED**
  6:2
**stipulation** 7:8
**stipulations**
  8:23
**stopped** 18:19
  35:15
**strategic** 16:12
  16:15
**Street** 2:8,17
**strike** 43:1
**structure** 41:3
  46:8
**subcommittee**
  80:22

subject 5:19
43:14,19
submit 29:8
31:2 60:1
73:10
submittal 57:11
submitted 11:12
30:15 76:6
suggest 23:12
suggested 23:8
Suisse 54:21
55:1
Suite 2:9,17
summarization
45:12
Summit 3:17
superintendent
12:23 13:12
supervision
88:10
supplier 71:9
suppliers 61:9
69:4 70:15,16
70:17,21 71:5
supply 72:23
support 13:7,17
14:3,4,5 15:19
15:23 16:5
19:13 55:10
sure 10:10 41:21
44:7 45:17
surplus 49:8
suspended 86:8
Swafford 85:21
Swannanoa
10:15
sworn 8:19
Synergy 17:17
system 72:23

**T**

T 6:1,1 88:1,1
take 10:2 55:14
56:11 59:14
60:22 67:20
69:19 75:7

taken 6:5 88:7
talk 43:23 56:10
64:22 66:3,21
67:15 71:7
81:9
talked 38:22
44:3 51:10
55:12 58:1,3
talking 41:22
62:20 71:12
tasks 58:22 59:1
Tech 11:15,21
technical 18:9
39:21 40:1
46:14,16 47:3
47:7,10 58:2
Technologies
4:5
technology
46:23
telephone 81:20
tell 19:11 44:21
54:23 56:4
62:11 65:17
84:10,19
tendons 82:1
Tennessee 1:9
3:16,18 7:21
20:13 39:13
50:13 65:23
tensions 82:2
term 43:9
terminated 30:6
terms 24:14
39:17 43:11
45:16 48:5
testified 8:20
32:11
testimony 45:12
testing 17:7
21:22
thank 62:10
thereto 6:21
88:9
thing 42:22 65:1
81:12 82:18

things 33:16
44:15,16 46:18
47:13,23 58:19
72:20 81:21
82:8
think 24:15
26:10 27:4
34:6 43:16
45:14 49:6
58:10 64:15
67:4,23 70:10
74:21 75:5
83:4
third 61:4 77:10
thought 43:18
thread 5:19
three 16:2 19:18
26:18 29:11
66:20 74:5
three-unit 15:14
time 6:19,20 8:3
9:20 14:14,15
16:2 18:16,19
21:6 22:4,9,19
23:13,16 25:3
27:20 29:3
39:12,23 40:10
40:11,15,17
41:5,13 45:21
46:10,12 47:4
47:9,10 49:11
58:6,19,23
61:19 62:2
63:1,15 65:8
65:12,13 67:13
68:23 69:10
73:11 80:10,23
81:15,19,23
82:14 83:6
85:2
times 21:13
80:12
title 25:8
today 31:19 36:1
36:2,5
today's 8:2

32:23 35:18
36:16
told 38:5 44:20
48:3 61:12
68:13 69:3
70:5,6,10
tomorrow 86:23
top 15:6
total 14:1 22:8
22:20 28:4
totally 23:5
tour 80:23 83:14
toured 80:13
tours 80:14
Tower 2:7
Trail 10:15
training 13:6
transcript 88:11
88:23
transfer 19:3
35:12 59:7
68:19 78:12
79:13
transition 80:1
transmission
20:19
transmittal
75:21
trial 6:20
true 88:11
trying 82:17
turned 30:4
TVA 8:8,10,12
9:10 20:17,23
22:6,22 23:4
23:12,18 24:13
26:21 29:2
30:19 32:6,9
32:10 39:4,8
40:3,7,8 41:1,8
42:3,8,11 43:5
43:10 44:1
45:2,2 49:7
52:23 53:15,17
54:3 60:2,19
61:9 63:22

64:8 68:20,21
69:5,15 70:21
71:13 79:23
80:5,20 81:3
82:6 84:1,6
85:10,13,22
86:9
TVA/Bellefonte
79:22
twice 57:6
two 14:9 22:5,6
22:12 29:18
30:20 42:19
66:20 74:5
two-unit 15:15
type 14:7
typewriting
88:9
typewritten
37:18
typical 46:19

**U**

U 6:1
uh-huh 10:7
30:22 45:23
47:16 48:22
72:18 83:22
uh-uh 10:8
ultimately 46:8
47:14,22 71:23
72:4
UNC 12:3
unclear 45:20
understand 9:20
9:23 27:23
39:2 40:14
41:20 42:18,21
42:23 51:4
52:11
understanding
36:13 40:2
57:16 62:19,21
82:23
understood 39:6
80:17

undertake 58:23
undertaking
44:6
unique 73:18
unit 14:10,14
  20:23 22:1,6
  22:16 40:9
  52:13,17
United 1:1 7:7
  7:23 47:1
units 16:20
  17:19,21 22:5
  22:8,10,13
  56:11,11,13
  69:19 73:1,5
universe 71:5
use 30:5 46:23
Usual 8:22
utilities 17:1
utility 17:4
  18:12

          V
vague 32:20
  41:4
validate 82:17
Valley 1:9 3:16
  7:22 20:13
  39:13
varies 17:4
variety 47:3
various 12:16
  58:22 59:10
  61:5
varying 12:12
  25:21
versus 7:21
vice 14:18 15:1
  15:5,18 16:11
  19:12 20:3
Victor 67:15,19
  68:6
VIDEO 1:12
VIDEOGRAP...
  4:3 7:18 59:16
  59:20 86:15,19

87:2
videotape 7:19
view 58:19
violate 44:8
violations 45:17
visit 83:9,12
visiting 81:2
visitors 80:18
visits 81:22
  82:10
Vogtle 22:10
voluntary 23:5
Volunteer 50:9
  50:13,16 53:9
  54:12
vs 1:8

          W
waived 6:10
wanted 39:17,20
  40:15 78:12
  79:12
wasn't 44:19
  46:9,10 55:23
  65:4
water 2:8 46:23
  49:18
Watts 20:22
  22:15
way 21:3,6
  40:22 58:13,19
  64:19 65:1
  69:14 71:13
  76:15
ways 46:5 64:14
We're 42:16
went 21:3,6
  62:14
weren't 47:9
  84:11,12
west 2:17 3:17
  65:22
Westinghouse
  71:20
whatsoever
  53:19

Wheeler 50:8,10
  50:16 53:7
  54:13
Wilcox 71:21
William 1:12
  6:5 7:13,20
  8:18 9:7
withheld 74:9
witness 6:10
  7:14 77:22
  88:12
work 14:12 25:1
  25:1,17,21
  27:17,21 28:4
  28:6 29:9,17
  29:23 30:3
  32:5,10 37:3
  37:13 40:22
  44:6,15 45:1
  58:4,12,15,20
  59:8 69:14
  73:17 81:21
  86:7
worked 12:8,11
  25:19 30:1,21
  85:22
working 27:21
  32:9 59:2,5
  60:19 73:22
wouldn't 43:14
  45:17
written 27:5,9
  29:13
WT6 3:17

          X

          Y
yeah 28:15
  41:21 45:13
  67:10 81:15
  86:3
year 11:18,23
  12:5 22:11
  28:14,23 29:1
  29:3 83:9,21

years 14:10
  26:18 32:2
  63:2
yesterday 35:23
  36:4

          Z

          0
02 15:8,17
04 15:18

          1
1 22:1,10 40:9
  52:13,17
1.25 30:12
1/1/89 12:23
10/2016 5:18
11 2:8 5:8
11/24/2019
  88:23
116 88:22
12 1:17
12th 7:12 8:3
17 66:10
18 60:14 61:21
  66:10,13 67:7
  70:20
1819 1:15 3:8
  7:11
1973 11:19
1974 12:1,13
1983 12:6

          2
2 20:23 22:10,15
20 57:2
2007 12:13
2012 22:23 25:4
  25:18 38:7
  39:23 40:12,19
2016 49:9 60:14
  61:21 66:13
  67:2,7 70:20
  75:18 77:3
2017 28:20
  30:10

2018 11:13
  28:10,11 57:2
  83:20
2019 1:17 7:12
  8:3 27:22 28:5
  30:11 57:1,2
205.251.8000
  3:10
205.790.5841
  4:7
251.432.5511
  2:11
28778 10:16

          3
3.25 22:8
3:35 7:13 8:3
30200 2:9
30th 22:23 83:20
312.580.0100
  2:19
35203 1:16 3:9
  7:12
36602 2:10
37902 3:18

          4
4:33 59:17,19
4:44 59:19,21
400 3:17
4000 2:17
42 5:13 60:6,9
  70:8
43 5:16 75:10,12
44 10:15
45 5:18 76:18,19

          5
5:18 86:16,18
5:18-CV-0198...
  1:4 8:2
5:19 86:18,20,21
  87:3,5

          6
60 5:13
60602 2:18

**7**

**70** 2:17
**73** 5:8 11:1,2
**74** 12:15
**75** 5:16
**76** 5:18

**8**

**8/18/16** 5:13
**8/18/2016** 63:20
**865.632.3052**
  3:19
**87** 12:15,23
**89** 13:10

**9**

**9** 5:3 75:18
  86:23
**9/30/2020** 88:22
**9/9/16** 5:16
**91** 13:11,20
**95** 13:20 14:17
**97** 14:18 15:7

**William McCollum**

**11/13/2019**

Pages 89 to 92

---

Page 89

1    IN THE UNITED STATES DISTRICT COURT NORTHERN

2    DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

3

4    CIVIL ACTION NO. 5:18-CV-01983-LCB

5

6    NUCLEAR DEVELOPMENT, LLC,

7         Plaintiff,

8    vs.

9    TENNESSEE VALLEY AUTHORITY,

10        Defendant.

11        VOLUME II

12    VIDEO DEPOSITION OF WILLIAM MCCOLLUM

13    Bradley Arant Boult Cummings, LLP

14        One Federal Place

15      1819 Fifth Avenue North

16     Birmingham, Alabama 35203

17       November 13, 2019

18

19    REPORTED BY:

20      Gail B. Pritchett

21      Certified Realtime Reporter,

22      Registered Professional

23      Reporter and Notary Public

---

Page 90

1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4      Mr. Caine O'Rear III

5      Attorney at Law

6      Hand Arendall, LLC

7      RSA Tower

8      11 North Water Street

9      Suite 30200

10     Mobile, Alabama 36602

11     251.432.5511

12     corear@handarendall.com

13        - and -

14     Mr. Larry David Blust

15     Attorney at Law

16     Hughes Socol Piers Resnick Dym, LTD

17     70 West Madison Street, Suite 4000

18     Chicago, Illinois 60602

19     312.580.0100

20     lblust@hsplegal.com

21

22

23

---

Page 91

1              A P P E A R A N C E S (continuing)

2

3    FOR THE DEFENDANT:

4      Mr. Matthew H. Lembke

5      Attorney at Law

6      Bradley Arant Boult Cummings, LLP

7      One Federal Place

8      1819 Fifth Avenue North

9      Birmingham, Alabama 35203

10     205.251.8000

11     mlembke@bradley.com

12        - and -

13     Messrs. David D. Ayliffe

14      and Steven C. Chin

15     Office of the General Counsel

16     Tennessee Valley Authority

17     400 West Summit Hill Drive, WT6

18     Knoxville, Tennessee 37902

19     865.632.3052

20     ddayliffe@tva.gov

21     scchin@tva.gov

22

23

---

Page 92

1              A P P E A R A N C E S (continuing)

2

3    THE VIDEOGRAPHER:

4      Ms. Shannon Campbell

5      Courtroom Technologies, Inc.

6      brad@crtrialtech.com

7      205.790.5841

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

**William McCollum**                                                      **11/13/2019**

---

Page 93

1          INDEX OF EXAMINATION
2                    Page:
3    EXAMINATION BY MR. LEMBKE        96
4    (continuing)
5
6          INDEX OF EXHIBITS
7                    Page:
8    Exhibit Number 74 - 1/5/17 email,    133
9    Subj: NRC Meeting, ND1664
10   Exhibit Number 75 - 3/14/17 email,    146
11   Subj: Bellefonte CP Transfer Path
12   Forward, ND2937-ND2938
13   Exhibit Number 76 - 1/27/17 email,    156
14   Subj: NRC Commission Mtgs, ND1830
15   Exhibit Number 77 - 2/1/17 email,    164
16   Subj: Bellefonte Nuclear Station,
17   ND1866-ND1868
18   Exhibit Number 78 - 2/6/17 email,    183
19   Subj: ND efforts for Bellefonte 1&2,
20   ND 1884
21   Exhibit Number 79 - 6/7/17 email,    186
22   Subj: Bellefonte Units 1&2,
23   ND3287-ND3288

---

Page 94

1    Exhibit Number 80 - 9/14/17 email,    191
2    Subj: Req. for Business Plan for
3    Bellefonte Units 1&2, ND3466-ND3469
4    Exhibit Number 81 - 9/19/17 email,    194
5    Subj: NRC Guidance on License
6    Transfers ND3474-ND3498
7    Exhibit Number 82 - 11/13/18 email,    230
8    Subj: ND Bellefonte CP Transfer
9    Request, ND4760-ND4918
10   Exhibit Number 83 - NRC 10CFR Part    234
11   50 - Commission Policy Statement on
12   Deferred Plants
13   Exhibit Number 84 - 4/5/19 NRC    263
14   letter
15   Exhibit Number 85 - 11/5/19 NRC    267
16   Letter
17   Exhibit Number 86 - 11/8/17 email,    272
18   Subj: Information on NRC Policies &
19   Procedures, ND3543-ND3544
20
21
22
23

---

Page 95

1      INDEX OF PREVIOUSLY MARKED EXHIBITS
2                    Page:
3    Exhibit Number 10 - email reporting    203
4    on the NRC public meeting from Mr.
5    Bell of NEI
6    Exhibit Number 37 - emails Joe Shea    143
7    on January 29th & January 30th, 2017
8    Exhibit Number 48 - 12/20/16 email,    113
9    Subj: Process to Transfer Bellefonte
10   Construction Permit, ND5686-ND5690
11   Exhibit Number 49 - 12/2016 email,    120
12   Subj: Process to Transfer Bellefonte
13   Construction Permit, ND5691
14   Exhibit Number 60 - emails    204
15   w/attachment: Items Necessary before
16   Submitting NRC Application,
17   TVABLN7572 - TVABLN7584
18   Exhibit Number 65 - 7/31/18 email,    292
19   Subj: Final-Release, Press Package,
20   Media Targets, ND4012-4016
21   Exhibit Number 67 - 4/7/2017 email,    268
22   from Frank Haney to J. Chardos,
23   TVABLN0328

---

Page 96

1    November 13, 2019              9:02 A.M.
2
3          WILLIAM MCCOLLUM,
4    having been previously duly sworn, was examined
5    and testified as further follows:
6
7          THE VIDEOGRAPHER:  This is the
8    continuation of the deposition of William R.
9    McCollum.  Today's date is November 12th (sic),
10   2019, and we are back on the record at 9:02
11   a.m.
12        (Off-the-record discussion.)
13
14   EXAMINATION BY MR. LEMBKE (continuing):
15        Q.   Good morning, Mr. McCollum.
16        A.   Good morning.
17        Q.   We are resuming after an overnight
18   break.  Did you do anything to prepare for
19   today's deposition after we broke yesterday?
20        A.   No.
21        Q.   Would you describe for me your
22   involvement in the process that led to Nuclear
23   Development submitting an application to the

---

Page 97

1   NRC for approval of transfer of the Bellefonte
2   construction permits?
3       A.   Yes.  So I basically led that
4   process.  We engaged Morgan Lewis law firm to
5   be our licensing counsel, and Tim Matthews was
6   the lead attorney at Morgan Lewis that we
7   worked with.  So he did all of the work
8   associated with putting together the
9   application form and format, that sort of
10  thing.  And then to put in the application,
11  submit the application, you are required to
12  provide information regarding financial
13  capability, technical capability and other
14  things.  And so I worked with contractors and
15  other people to put that information together
16  in support of submitting the application.
17      Q.   When do you recall Mr. Matthews
18  and Morgan Lewis first being engaged by Nuclear
19  Development to work on the application?
20      A.   I don't recall the date.
21      Q.   Were you the one who contacted Mr.
22  Matthews to undertake that work?
23      A.   No.  Frank Haney initially

Page 98

1   contacted.
2       Q.   Do you know if that contact was
3   made before the auction?
4       A.   I don't believe it was.
5       Q.   All right.  Do you have a best
6   judgment as to when it occurred?
7       A.   A few months after, I believe.
8       Q.   Now, you said you were working
9   with contractors and other people to put
10  together the information that was needed for
11  the application?
12      A.   Correct.
13      Q.   All right.  And virtually all of
14  the information that was needed for the
15  application had to come from Nuclear
16  Development, right?
17      A.   I wouldn't say virtually all.  We
18  had to submit information related to our plans
19  for quality assurance, technical and financial
20  qualifications.
21      Q.   All right.  What -- what was
22  needed for the application that wasn't coming
23  from Nuclear Development?

Page 99

1       A.   Well, you have to -- you have to
2   submit the application in regard to the
3   existing construction permits, their status,
4   status of the property and so forth.
5       Q.   And where did you get that
6   information?
7       A.   From Tennessee Valley Authority.
8       Q.   And did you have any trouble
9   getting that information?
10      A.   It took -- it took some time to
11  get that information.  Following the auction,
12  Jim Chardos was designated as the transition
13  lead or transition manager, whatever they
14  called him within TVA, but he was the point of
15  contact, and so we worked through Jim Chardos
16  to get information and it took some time.  A
17  lot of the information that Tennessee Valley
18  Authority had on the Bellefonte project was in
19  the form of computer data that was stored on
20  servers, and so Jim had to work with -- or with
21  and through other people within TVA to make
22  arrangements to get access to that information,
23  figure out where it was, figure out which part

Page 100

1   of it they were going to allow us to have and
2   so forth, so it took a little time.
3       Q.   When did you first ask for it?
4       A.   Shortly after the -- well, shortly
5   after I learned that the sales agreement had
6   been signed.
7       Q.   All right.  And when did you get
8   the information?
9       A.   We didn't get it all at one time.
10  We gained access to the information over a
11  period of months following the auction.
12      Q.   And so do you believe you had what
13  you needed from TVA by the end of 2017?
14      A.   We had quite a bit of the
15  information that we needed.  As you -- as you
16  pull together the information in support of the
17  application, it is normal that you would see --
18  have other questions and see other things that
19  you would need.  But we had a lot of
20  information by the beginning of 2018.
21      Q.   And when did you get the last of
22  the information you needed from TVA?
23      A.   We continued to have contact with

**William McCollum**                                    **11/13/2019**

---

Page 101

1   TVA and get information related to the
2   application pretty much right up until the time
3   we filed.
4        Q.   Did TVA in any way delay Nuclear
5   Development's ability to file the application?
6        A.   Well, I would say the one -- well,
7   as I said, the information came out over a
8   period of time, and so we wouldn't have been
9   able to file the application until we gained
10  all of that information, which took some time.
11  But the one area where we struggled was in
12  trying to get Tennessee Valley Authority to
13  cooperate in providing some statement of
14  consent to the transfer of the construction
15  permits.
16       Q.   Other than that, though, you
17  weren't waiting on TVA to provide anything
18  before you filed the -- your application,
19  correct?
20            MR. O'REAR:  Excuse me.  If you
21  could clarify that.  You mean when it was
22  filed?
23            MR. LEMBKE:  Yes.

---

Page 102

1        A.   Yes, at the time that we filed the
2   application, we felt that we had the
3   information that we needed to provide in
4   support of the application for the NRC.
5        Q.   (BY MR. LEMBKE:)  Did you ever
6   tell TVA that you had everything you needed
7   except something from them to file?
8        A.   I'm not aware that we did.
9        Q.   Now, you say you were trying to
10  get some indication of consent from TVA?
11       A.   Yes.
12       Q.   Tell me who you -- were you
13  personally involved in seeking that?
14       A.   I was at times, yes.
15       Q.   All right.  Well, tell me the
16  history of your involvement in that effort.
17       A.   So I had an initial conversation
18  with Joe Shea sometime soon after the auction
19  at which time my understanding from the
20  conversation was that TVA would work to put the
21  application together and we would provide all
22  the information from our side in support of the
23  application.

---

Page 103

1        I had a later conversation with
2   Joe Shea at which time he indicated that TVA
3   was not going to do any work or do anything in
4   support of the application.  And then Joe Shea
5   and I had a face-to-face meeting because we
6   were both up in Bethesda, Maryland attending an
7   NRC conference at which time he made it clear
8   that they weren't going to do anything at all
9   to support the application process.
10       Q.   Well, that didn't prove to be
11  true, correct?
12       A.   I think from Joe's standpoint, it
13  did turn out to be true.  I am not aware that
14  he did anything to support the application --
15  or his licensing group did anything to support
16  that process.
17       Q.   Well, didn't you just get done
18  telling me that you asked for information from
19  TVA and it was provided?
20       A.   Technical information that was --
21  that we were -- that we had access to based on
22  the sales agreement that TVA was obligated to
23  provide that we got through Jim Chardos.

---

Page 104

1        Q.   All right.  Well, what is it that
2   you asked TVA to do that it didn't do with
3   regard to what you are saying relating to Mr.
4   Shea?
5        A.   The licensing group did -- did no
6   work to help put together the information for
7   the application itself or any write-ups in
8   support of the application and would not
9   provide any statement of support for the
10  application for the NRC.
11       Q.   All right.  Well, let's do that in
12  two parts.
13       First you saw they wouldn't
14  provide write-ups; you wanted TVA to actually
15  write the application?
16       A.   Yes.
17       Q.   And did you ask them to do that?
18       A.   Yes.  That was my initial
19  conversation with Joe Shea was I said I
20  understand that you guys are going to take the
21  lead, you are going to put the format of the
22  application together, we'll supply the
23  information on quality assurance, technical and

---

**William McCollum**

Page 105

1   financial qualifications.
2        Q.   And what was the basis for your
3   understanding that TVA was going to put
4   together that application?
5        A.   That was just simply what I
6   thought that I understood and had heard and
7   seemed to be the normal way you would think to
8   do these kind of things if the partners in a
9   transaction are working together.
10        Q.   All right.  Well, you say you had
11   heard it and it was your understanding; who had
12   you heard it from?
13        A.   Yeah, I can't tell you -- I can't
14   tell you how I got that impression, but I did
15   have the impression that TVA was going to take
16   the lead on the application, and that's why I
17   initially said that to Joe Shea.
18        Q.   But you can't tell me today any
19   basis whatsoever for that understanding on your
20   part?
21        A.   Correct.
22        Q.   All right.  And then you said -- I
23   thought yesterday you told me you had never

Page 106

1   been involved in a license transfer
2   application?
3        A.   I believe yesterday your question
4   was whether I had been involved in an
5   application to transfer construction permits.
6        Q.   Okay.  Have you ever -- have you
7   ever been involved in an application to
8   transfer any license?
9        A.   I have been involved in numerous
10   applications with the NRC to change and revise
11   and move licenses at various NRC regulated
12   licenses.
13        Q.   Well, I am not sure that answered
14   my question.  My question was much more
15   specific.
16        A.   Okay.
17        Q.   Have you ever been involved in an
18   application to transfer a license prior to
19   this?
20        A.   Okay.  If you can specify what
21   sort of transfer you are referring to, I think
22   that will help me.
23        Q.   I mean a transfer from one

Page 107

1   licensee to a new licensee.
2        A.   No.
3        Q.   Now, you say it is the normal
4   course if there's a --
5             Well, let me ask this:  Did you
6   testify a moment ago that it's the normal
7   course when there is a transfer of a license to
8   one licensee to another for the old licensee to
9   prepare the application?
10        A.   I believe what I was saying is
11   that it's my experience in licensing
12   transactions where you have multiple parties
13   involved or where there's mergers of multiple
14   companies involved, it has been my experience
15   that the companies would work together and both
16   participate in putting together the
17   application, as opposed to one party saying
18   they are not going to do any work at all
19   regarding the application.
20        Q.   Well, this is not a merger,
21   correct?
22        A.   Correct.
23        Q.   All right.  And so it's your view

Page 108

1   that it would have been normal for the
2   Tennessee -- Tennessee Valley Authority as the
3   selling entity to take the lead in the transfer
4   of the application to the purchasing entity?
5        A.   It would be consistent with my
6   experience to believe that Tennessee Valley as
7   the current holder of the construction permits
8   and the party that had the best knowledge of
9   the current condition of the facility to take
10   the lead in preparing the application.
11        Q.   All right.  And the basis for your
12   understanding of that being the normal course
13   is what?
14        A.   Well, I think I answered your
15   question a minute ago to say that that was just
16   my impression and my belief based on my
17   experience.
18        Q.   All right.  Yet you have never had
19   any experience in transferring construction
20   permits in a comparable situation?
21        A.   Not in this same situation, that's
22   correct.
23        Q.   Okay.  And so -- all right.  Now,

**William McCollum**                                    **11/13/2019**

---

Page 109

1   with the exception of the consent issue, you
2   got all of the information you asked for from
3   TVA, correct?
4        A.  By the time we filed the
5   application for transfer of the construction
6   permits, we had the technical information that
7   we needed in support of the application.
8        Q.  Well, that wasn't my question.
9        A.  Okay.
10       Q.  My question was -- and I hope --
11  we will go faster if you answer my questions.
12            My question is, with the exception
13  of the consent issue you are talking about, any
14  information you requested from TVA that you
15  needed for preparation of the application you
16  received, correct?
17       A.  Yeah, my problem is the form of
18  the question.  So I can't testify that we
19  received everything that we ever requested from
20  TVA to support the application.  But I can say
21  that at the time we submitted the application,
22  we felt that we had the information that we
23  needed to support the technical qualifications.

---

Page 110

1        Q.  Well, sitting here today, can you
2   identify, with the exception of the consent
3   issue, which we are going to get to, something
4   you asked for that you did not get?
5        A.  I cannot.
6        Q.  All right.  Now, you mentioned you
7   asked for consent from TVA; what are you
8   talking about?
9        A.  I am talking about some statement
10  that as the current holder of the construction
11  permits, they consented to the transfer to
12  Nuclear Development, they didn't object to the
13  transfer to Nuclear Development, they supported
14  the transfer to Nuclear Development or some
15  statement like that.
16       Q.  All right.  Did you personally
17  have a conversation with anyone at TVA
18  requesting that?
19       A.  Yeah, I talked to Joe Shea about
20  that.
21       Q.  When?
22       A.  I can't tell you exactly when,
23  sometime in 2017.

---

Page 111

1        Q.  All right.  And what did Mr. Shea
2   say?
3        A.  He gave me an ambiguous answer.
4   It was not a yes or no.
5        Q.  And did you ever follow up with
6   him on that?
7        A.  Yes.
8        Q.  When?
9        A.  Later that same year.
10       Q.  All right.  And tell me about that
11  conversation.
12       A.  My understanding from that
13  conversation was that essentially any decision
14  to provide that sort of supporting statement,
15  that decision would not be made by Joe and it
16  would be made above his level somewhere.
17       Q.  All right.  And that was in 2017?
18       A.  Yes.
19       Q.  In late 2017?  What's your best
20  judgment?
21       A.  Best judgment would be later on in
22  2017.
23       Q.  Okay.  And did you personally have

---

Page 112

1   any further conversations with anyone at TVA
2   seeking the sort of consent you are talking
3   about?
4        A.  No.  After that -- after I
5   understood from Joe that the licensing -- the
6   nuclear licensing group would not be involved
7   and it wasn't any use talking to Joe or anybody
8   in his group anymore about that, then Tim
9   Matthews followed up on that issue with TVA
10  legal.
11       Q.  All right.  And were you ever on a
12  conversation that Mr. Matthews had with TVA
13  legal about that topic?
14       A.  Not that I recall.
15       Q.  So you can't speak to the
16  specifics of what Mr. Matthews said in those
17  conversations, correct?
18       A.  That's correct.
19       Q.  Is it fair to say that after your
20  conversation with Joe Shea, you never
21  personally made any request to TVA for that?
22       A.  That's correct, to the best of my
23  recollection.

---

William McCollum                                          11/13/2019

---

Page 113

1     Q.   Now, did you ever have a
2  discussion with Mr. Chardos about the need to
3  get the transfer of the construction permits
4  approved by NRC prior to closing?
5     A.   No, not that I recall.
6     Q.   Did you ever have any discussions
7  with Mr. Chardos about the transfer of the
8  construction permits, other than the
9  information request you told me about a minute
10 ago?
11    A.   No, not that I recall.  Our
12 conversations -- anytime the transfer of the
13 construction permits was mentioned, it was just
14 in terms of getting the information together to
15 support those.
16         (Whereupon, Exhibit Number 48,
17         having been previously marked for
18         identification, was referenced in
19         this deposition.)
20    Q.   If you will look in your file at
21 Exhibit 48, it was marked previously.  Do you
22 recognize this document?
23    A.   It appears to be an email from

---

Page 114

1  Gary Mignogna to Franklin Haney.
2     Q.   That you were copied on, correct?
3     A.   Yes.
4     Q.   And you have no reason to doubt
5  you received it, correct?
6     A.   I don't.
7     Q.   Did you read it when you got it?
8     A.   I am sure I would have.
9     Q.   And what is this so-called White
10 Paper that is attached to the first page of
11 Exhibit 48?
12    A.   It's AREVA's -- it's AREVA's input
13 into how -- their view of how you would pursue
14 the process to transfer the Bellefonte
15 construction permits.
16    Q.   All right.  And do you recall
17 reading this at the time that it came in?
18    A.   Yes.
19    Q.   And do you recall if there was
20 anything in it with which you disagreed at the
21 time it came in?
22    A.   Yes.
23    Q.   But what -- with what did you

---

Page 115

1  disagree?
2     A.   So there's a number of statements
3  in here that I don't agree with.  So in the
4  first paragraph, the statement that there is no
5  precedent for this type of transfer, you know,
6  the licensing -- licensing actions -- changes
7  and transfers to licenses and permits, while
8  you can always say that every licensing
9  transaction is unique, if you get down to
10 absolute specifics, I believe there has been
11 plenty of licensing action in the NRC in the
12 past that would provide precedence for what we
13 were asking for, you know, even though you
14 could say that this specific transfer from
15 these specific parties under this circumstance,
16 you know, there has not been another one
17 exactly like it.  So I didn't agree with that
18 statement.
19    Q.   Let me stop you there.
20    A.   Uh-huh.
21    Q.   And so you would agree -- or --
22 let me strike that and start over.
23         In your experience, it's

---

Page 116

1  appropriate to look back to see what the NRC
2  has said about comparable circumstances as
3  guidance for how to proceed?
4     A.   No, that wasn't what I was saying.
5  That would be a legal matter.
6     Q.   No, well, my question is, in your
7  experience -- I didn't say that's what you were
8  saying.  My question was, in your experience
9  you viewed it as appropriate to look back at
10 what the NRC has done in the past and what they
11 have said about comparable circumstances to
12 assess how to handle a situation before you?
13    A.   No.
14    Q.   No.
15    A.   No.
16    Q.   Why do you say no?
17    A.   I say no because what I am
18 disagreeing with in item number two in the
19 first paragraph is that there's plenty of
20 experience within the NRC staff for dealing
21 with applications of this type.  I'm not
22 referring to legal or regulatory precedent
23 issues.

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**

**11/13/2019**

Page 117

1    Q.   Well, have you ever had occasion
2  -- and, again, Mr. McCollum, every question is
3  a separate question.  And I didn't refer back
4  to what you said about this document in my
5  previous question.  So my question is based on
6  in your experience in the nuclear power
7  industry over four decades, when you have been
8  evaluating a situation before you, have you
9  deemed it appropriate to look at what the NRC
10 has said and done in comparable circumstances
11 in the past?
12    A.   I might look at it, I might look
13 at other things that have gone on at NRC for
14 information.
15    Q.   Okay.  Now, what else in the White
16 Paper that's part of Exhibit 48 did you
17 disagree with when you read it?
18    A.   Item number three in paragraph one
19 under problem statement says:  The Bellefonte
20 Unit 2 construction permit has expired but an
21 extension request has not been acted on by NRC.
22        So I disagreed with that in that
23 it is my belief that the Unit 2 construction

Page 118

1  permit has not expired, that the previous date
2  authorized by the NRC staff had passed but a
3  timely request had been submitted to the NRC
4  and that based upon the timely submittal of
5  that request, the Unit 2 construction permit
6  remained valid.
7     Q.   And your understanding in that
8  regard was based on your experience with how
9  NRC -- the NRC had hired -- or had handled past
10 expirations?
11    A.   No, it was based on an evaluation
12 of this situation by Tennessee Valley Authority
13 licensing and legal personnel when I was at
14 TVA, when I was working at TVA, and advice of
15 legal counsel from Morgan Lewis while I was at
16 Nuclear Development.
17    Q.   Okay.  Was there anything else in
18 this White Paper with which you disagreed when
19 you received it?
20    A.   I'm sorry, I just need to read
21 through --
22    Q.   Certainly.
23    A.   -- the document and refresh my --

Page 119

1  (reviewing document).
2        On page two under the heading TVA
3  Interface for Construction Permit Transfer to
4  NCFR 50.80 -- I'm sorry, in re-reading that,
5  that is not a statement I disagree with.
6     Q.   All right.
7     A.   (Reviewing document.)  On page
8  three under the first paragraph under the
9  heading Financial Qualifications Per 10 CFR
10 50.33 New Rulemaking, the first paragraph
11 represents AREVA's opinion about some pending
12 rulemaking.  And so when I first read that,
13 that's their opinion about rulemaking that
14 hasn't occurred and hasn't been dispositioned
15 at the NRC.  So they offer an opinion which,
16 you know -- with which I don't necessarily
17 agree or disagree at the time that this
18 document was sent to us because it just
19 represented an opinion about something that was
20 unknown in terms of how NRC would act on
21 rulemaking.
22        (Reviewing document.)  I think
23 that's all of the statements on which I

Page 120

1  disagreed at the time.
2     Q.   All right.  Do you know why
3  Nuclear Development did not obtain this White
4  Paper prior to closing -- or excuse me, prior
5  to the auction?
6     A.   No, I don't know of any reason
7  that we would have needed to do that prior to
8  the auction.
9     Q.   Do you know -- do you know why --
10 do you know when Mr. Haney first requested this
11 White Paper?
12    A.   I do not.
13    Q.   Did you know it was coming before
14 it was received?
15    A.   I did not.
16        (Whereupon, Exhibit 49, having
17        been previously marked for
18        identification, was referenced in
19        this deposition.)
20    Q.   Let me show you -- or would you
21 pull out what has been previously marked as
22 Exhibit 49?
23    A.   (Reviewing document.)

William McCollum                                          11/13/2019

Page 121

1        Q.   Do you recall receiving a copy of
2   this email from Mr. Mignogna to Frank Haney --
3   excuse me, from Frank Haney to Mr. Mignogna on
4   December 21st, 2016?
5        A.   Yes.
6        Q.   And had you had any discussions
7   with Frank Haney about this prior to him
8   sending it?
9        A.   No.
10       Q.   Did you have any discussions with
11  him after he sent it?
12       A.   Yes.
13       Q.   All right.  Tell me about those
14  discussions.
15       A.   So I asked him about the email,
16  and he and I agreed that the White Paper -- the
17  sense of the White Paper from -- let me stop
18  and back up.
19            There's another context here for
20  this email beyond the White Paper.  We were
21  also at the time scheduling meetings with the
22  NRC to continue to engage with them on the
23  future licensing activities.  And we had -- we

Page 122

1   were setting up meetings with the appropriate
2   personnel in the NRC.  And AREVA was injecting
3   themselves into those meetings.  Gary Mignogna
4   and some of his staff took it upon themselves
5   to contact NRC directly, work on setting up
6   meetings and discussions and -- and so that was
7   going on at the same period of time.  And so
8   when Frank Haney in the email says as such, we
9   don't need slides or for y'all to attend the
10  23rd NRC meeting, that's what he is referring
11  to.
12            So AREVA was attempting to inject
13  themselves into these meetings and, in our
14  view, creating a situation where they would
15  bill for more hours for attending meetings with
16  us that we didn't necessarily feel that they
17  needed to attend with the NRC.  And the sense
18  in the White Paper also supports the notion
19  that they, AREVA, wanted to inject themselves
20  into -- into this effort and be in a position
21  -- thereby be in a position to charge us more
22  money for things that we didn't need to spend
23  money on at that point in time.  So that was --

Page 123

1   that was my sense of the reason for the email.
2        Q.   Did Mr. Haney tell you that --
3   well, strike that.
4            So that's all you remember Mr.
5   Haney saying about the reason for the email?
6        A.   Yes, that's all I recall.
7        Q.   Did you discuss the first sentence
8   of the email?
9        A.   Not specifically -- I didn't
10  specifically ask him about the first sentence,
11  but during this period of time we were having
12  very frequent conversations about our efforts
13  regarding the DOE loan application, the loan
14  guarantee program.
15       Q.   When did Nuclear Development stop
16  its sole focus on the DOE loan guarantee and
17  answering any questions relating to it?
18       A.   Well, Mr. Haney, Frank Haney, may
19  have felt that he was focused solely on the DOE
20  loan guarantee application at this time.  And
21  as I say, he and I had frequent conversations
22  about the loan guarantee application and the
23  information that we were supplying the DOE

Page 124

1   under their request.  But at the same time I
2   was working to build the project capabilities
3   and plans that -- to support the loan guarantee
4   application, you had to demonstrate in a
5   similar manner to what you would demonstrate to
6   the NRC, you had to demonstrate your technical
7   capabilities, construction plans and schedules,
8   and those sort of things.  So there was some
9   overlap between the information being compiled
10  and provided to DOE and the information that
11  would support a CP transfer application.  And I
12  was continuing to work on building the
13  information that would support not only the DOE
14  application but the CP transfer application and
15  also just the general prosecution of the
16  project getting ready to actually get underway
17  with the project at Bellefonte.
18       Q.   Well, you mentioned you had to
19  gather information for purposes of the
20  application to the NRC about technical
21  capability.
22       A.   That's one of the topics, yes.
23       Q.   All right.  And tell me what you

**William McCollum**                                                11/13/2019

---

Page 125

1    mean by technical capability.
2        A.   The ability of Nuclear
3    Development, in conjunction with our contract
4    partners, to do the engineering and
5    construction work necessary to refurbish and
6    complete the Bellefonte facility in accordance
7    with NRC regulations and requirements.
8        Q.   And you were working on gathering
9    that information needed about Nuclear
10   Development's technical capability in December
11   2016?
12       A.   Yeah, we were beginning to -- we
13   were beginning to work -- or I was beginning to
14   work toward having that together.  And that
15   happens in -- so -- so I would say this:  There
16   is no organization, regardless of the size or
17   scope, TVA, Southern, that would go into a
18   nuclear project like this with everything on
19   the ground day one and all of the resources in
20   place that we will ultimately need.  You build
21   those capabilities and put them in place over
22   time, and that's what I was working on doing
23   was building those capabilities through

Page 126

1    discussions with potential contract partners
2    and the resources that we would need to
3    complete the project.
4        Q.   And when did you obtain -- or
5    complete your gathering of the information
6    about technical capability that was needed to
7    send in the application?
8        A.   It was a continual -- it was a
9    continual process of building those
10   capabilities and putting those things in place
11   from -- you know, from the time of the auction,
12   once we won the auction, through the time that
13   we submitted the application for transfer of
14   the construction permits.
15       Q.   Well, the application was
16   submitted in November 2018.  Was the
17   information on technical capability not ready
18   until then?
19       A.   I would say the information on
20   technical capabilities -- so I have to pause
21   because of the wording of your question.  So we
22   had information on technical capabilities which
23   would need to be supported by the -- having

Page 127

1    contract partners in place and arrangements in
2    place and that sort of thing.  And so we worked
3    -- we worked through that continually through
4    that period of time as well as developing the
5    information of the quality assurance program
6    and financial qualifications.
7        Q.   Well, I'm not sure you remembered
8    my question.  My question was when was the
9    information on technical capability complete to
10   the point where you felt like what you needed
11   for the application you had?
12       A.   I would say the technical portion
13   was complete to my satisfaction in the summer
14   of 2018.
15       Q.   All right.  You mentioned the
16   information about a quality assurance program
17   that had to be put together.
18       A.   Yes.
19       Q.   When was that complete so that it
20   was ready to be -- and you had what you needed
21   to submit the application to the NRC?
22       A.   Late summer of 2018.
23       Q.   So August?

Page 128

1        A.   Around first of August.
2        Q.   So your testimony is around the
3    first of August, you had everything you needed
4    for the QA program in order to submit it --
5    what you needed for the transfer application?
6        A.   We had -- we had all the
7    background information, yes.
8        Q.   Well, did you have whatever you
9    needed in terms of written product or
10   otherwise, did you have it ready at the first
11   of August for the submission of the
12   application?
13           MR. O'REAR:  Objection.  Are you
14   referring to the quality assurance information?
15           MR. LEMBKE:  Yes.  Yes, sir.
16       A.   We didn't have -- we didn't have
17   the write-ups in the form that they were ready
18   to submit to the NRC at that time.
19       Q.   (BY MR. LEMBKE:)  When did you
20   have those?
21       A.   Immediately prior to submission of
22   the application.
23       Q.   And who was responsible for

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

William McCollum

11/13/2019
Pages 129 to 132

Page 129

1  preparing those?
2       A.   Tim Matthews with my support.
3       Q.   Wasn't SNC-Lavalin involved in
4  drafting those too?
5       A.   They were involved primarily in
6  drafting the quality assurance information.
7       Q.   That's what we are talking about
8  right now, the QA information.
9       A.   SNC-Lavalin was involved in
10 drafting the proposed quality assurance program
11 information.
12      Q.   So they didn't get it to you --
13 what they needed to get to you until just
14 before the submission of the application?
15      A.   Well, again, it was a process of
16 they wrote things, we had comments, there were
17 rewrites.  And so -- and so, yes, it wasn't in
18 its final form for submittal until very soon
19 before we submitted the application.
20      Q.   In November 2018?
21      A.   We submitted the application in
22 November of 2018.
23      Q.   All right.  When was what you

Page 130

1  needed in terms of written product concerning
2  technical capability that had to go into the
3  application ready to go?
4       A.   Best of my recollection, around
5  the end of July 2018.
6       Q.   All right.  You said you also
7  needed to gather information on construction
8  plans and schedules to go into the transfer
9  application?
10      A.   Uh-huh, yes, I did.
11      Q.   All right.  When was that
12 information gathered and written up in a form
13 that you believed it was essentially ready to
14 be included in the application?
15      A.   Well, I would say all of the
16 information was -- we basically had all of the
17 information together around first to middle of
18 August, but then, you know, writing up the
19 final form to submit with the application took
20 until late October 2018.
21      Q.   So it essentially took somewhere
22 two to three months from having all of the
23 information to getting it written up in final

Page 131

1  form?
2       A.   The submittal written up, yes.
3       Q.   All right.  What about were you
4  involved in gathering -- let me start over.
5            You understood that there was also
6  information about financial capability of
7  Nuclear Development that had to be included in
8  the application for the transfer of the
9  construction permits, correct?
10      A.   That is correct.
11      Q.   Were you involved in gathering
12 that?
13      A.   That was primarily Frank Haney's
14 responsibility and he furnished most of that
15 information.  Once he furnished the
16 information, I commented on it, as did Tim
17 Matthews.  And so there was some back-and-forth
18 with Frank Haney about getting the information
19 and getting it in a form that we thought was
20 suitable for the application.
21      Q.   All right.  When did you recall
22 having all of the information on financial
23 capability?

Page 132

1       A.   Best of my recollection, somewhere
2  around the June 2018 time frame.
3       Q.   And when do you recall the written
4  product being ready, that component of it
5  concerning financial capability for the
6  application?
7       A.   I would say it was roughly right
8  by July, first of August time frame.
9       Q.   Other than the QA program, the
10 technical capability, the construction plans
11 and schedules and the financial capability, was
12 there any other area of information that you
13 were involved in gathering for the application?
14      A.   As I mentioned before, we were
15 concerned about wanting to get some statement
16 of consent or support from Tennessee Valley
17 Authority, so I continued to have conversations
18 with Tim Matthews regarding his attempts to get
19 that basically up until the time we filed the
20 application.
21      Q.   Well, what did he tell you?
22      MR. O'REAR:  Objection.
23 Attorney-client privilege.  Instruct you not to

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

**William McCollum**                                    **11/13/2019**

---

Page 133

1  answer.
2           MR. LEMBKE:  All right.
3      Q.   (BY MR. LEMBKE:)  But you were
4  not -- just to be clear, after your late 2017
5  conversation with Joe Shea, you were not
6  personally involved in any such communication
7  with TVA about consent, correct?
8      A.   Consent to the construction permit
9  transfer --
10     Q.   Yes.
11     A.   -- correct.
12     Q.   Let me show you what I am going to
13 mark as Exhibit 74.
14          (Exhibit Number 74 was marked for
15          identification.)
16     Q.   This is email to you from Mr.
17 Mignogna dated January 5, 2017, correct?
18     A.   That's correct.
19     Q.   And did you respond to Mr.
20 Mignogna concerning this email?
21          MR. O'REAR:  Did you say December
22 5?  I'm sorry.
23          MR. LEMBKE:  I said January 5.

---

Page 134

1           MR. O'REAR:  I'm sorry.
2           MR. LEMBKE:  If I said December, I
3  meant January.
4           MR. O'REAR:  You may have, and I
5  just --
6      A.   I'm sorry, what was the question
7  again?
8      Q.   (BY MR. LEMBKE:)  The question is,
9  do you recall responding to Mr. Mignogna
10 pertaining to this email?
11     A.   I recall a phone conversation that
12 I had with Gary Mignogna.
13     Q.   All right.  And what do you recall
14 about that conversation?
15     A.   Well, as I mentioned before, we
16 were having meetings with the Nuclear
17 Regulatory Commission staff to engage regarding
18 the Bellefonte project.  And so we had a
19 meeting coming up and -- AREVA, which is now
20 called Framatome, is the owner of the design of
21 the reactors at Bellefonte; and as such, as a
22 practical matter, we have to work with them to
23 be able to complete the project.  They would

---

Page 135

1  need to support -- in terms of getting an
2  operating license from the Nuclear Regulatory
3  Commission for the plant, AREVA would need to
4  support safety analysis, fuel analysis, and a
5  number of things that have to be done there.
6  So it is a situation where we know that we have
7  to work and maintain a gook working
8  relationship with AREVA on this project.
9           At the same time, as I indicated
10 before, they were trying to inject themselves a
11 little too early in these interfaces and trying
12 to essentially take the lead on these
13 interfaces with NRC.  And so my conversation
14 with Gary on this was, look, I understand that
15 you guys are concerned and you want to be
16 involved and you want to help Bellefonte
17 succeed and so forth, but there's really not
18 any need for you to inject yourself to this
19 degree or take the lead on these meetings, I
20 will be okay, Frank will be okay, you know, we
21 can handle this.
22          And we ended up agreeing for them
23 to attend this particular meeting in a support

---

Page 136

1  role, but what I was tactfully trying to
2  suggest to Gary was we know we are going to
3  have to work together on the project, but how
4  about you let us have the lead on the project
5  right now.
6      Q.   And was there a January 2017
7  meeting with the NRC?
8      A.   I believe so.
9      Q.   And was that your first meeting
10 with the NRC about Bellefonte?
11     A.   I don't recall.  We had a number
12 of interfaces, so this may have been our first
13 face-to-face meeting, but I don't recall for
14 certain.
15     Q.   And you and Mr. Haney, meaning
16 Frank Haney, and Mr. Mignogna were present?
17     A.   Uh-huh.
18     Q.   Is that right?
19     A.   That's correct.
20     Q.   Was there anyone else on the
21 Nuclear Development side of the table at the
22 meeting?
23     A.   I don't recall anyone else.

---

William McCollum                                          11/13/2019

Page 137

1     Q.   All right.  And who do you recall
2  being there for NRC?
3     A.   Oh, gosh.  I don't -- I don't
4  recall everyone who was there.  There were --
5  there were a number of people.  I would have
6  to -- I would have to refresh my recollection
7  on that particular meeting.
8     Q.   Was Victor McCree there?
9     A.   If this is the meeting where we
10  met with Victor McCree and his staff, we had a
11  face-to-face meeting, Victor McCree at the time
12  was the executive director of operations for
13  the NRC, so he was the person -- the top person
14  with responsibility for day-to-day operations
15  within the NRC.  And we had a face-to-face
16  meeting where we met with Victor, a number of
17  his direct reports, some people from the
18  project management function within the NRC, the
19  office general counsel, and a number of others.
20  The room was fairly full.
21     Q.   To the best of your recollection,
22  was that the meeting in January 2017?
23     A.   It may have been.  Again, I would

Page 138

1  have to consult information or refresh my
2  memory before I could tell you for certain.
3     Q.   All right.  What do you recall
4  being discussed at the January 2017 meeting?
5     A.   Well, again, assuming this was the
6  meeting with Victor McCree and his staff, we
7  talked about our intent to purchase, complete,
8  and put into operation the two nuclear units at
9  Bellefonte and that we would be submitting a
10  request for transfer of the construction
11  permits which would require some staff time for
12  NRC there.  At the time, Victor's main concern
13  that he expressed in the meeting and the
14  interest expressed by other members of his
15  staff was in understanding what's going to be
16  the impact on NRC resources as you go forward.
17     So transferring the construction
18  permits engages -- requires some level of staff
19  resource at NRC to review.  In addition, we
20  talked about our intent once we had the site
21  and had the construction permits in hand and
22  deferred plant status that we would intend to
23  send them a letter expressing our intent to

Page 139

1  resume active construction that -- some people
2  refer to that as the hundred-and-twenty-day
3  letter or the hundred-and-eighty-day letter,
4  but we would -- we expressed to them that we
5  would intend to send them such a letter and
6  tell them that -- give them advance notice,
7  because you are required to give them advanced
8  notice because it engages resources from NRC
9  Region II to actually come to the site and
10  perform various inspection protocols that they
11  have in support of moving the status of the
12  construction permits from deferred plant status
13  to active construction status.
14     And then we also talked about our
15  intent then to move into the operating license.
16  TVA had previously submitted operating license
17  applications for the Bellefonte units.  Those
18  had obviously been put in abeyance when TVA
19  stopped work on Bellefonte.  And we discussed
20  with Victor and his staff our intent to
21  supplement and revise the existing operating
22  license applications and move those into active
23  consideration by NRC staff at a point in time

Page 140

1  as we moved forward.  So those were the major
2  topics that we discussed.
3     Q.   All right.  I am not going to mark
4  this, but I am going to let you see if that
5  refreshes your recollection that the meeting in
6  January 2017 was, in fact, the meeting that
7  Victor McCree and his staff attended.
8     A.   Yes.
9     Q.   All right.  Now, you mention that
10  there -- you told them about your intent to
11  submit a request for transfer of the
12  construction permits?
13     A.   Yes.
14     Q.   Do you recall the specific -- any
15  specifics of that discussion?
16     A.   What I recall is I said we would
17  intend to submit an application to transfer the
18  construction permits, and they said that that
19  will require some resources on our part to
20  review that application and it will take at
21  least several months for us to process such an
22  application.
23     Q.   Did you give any indication or

**William McCollum**

Page 141

1  anyone at Nuclear Development or there on
2  behalf of Nuclear Development give any
3  indication as to when Nuclear Development
4  intended to submit the application for the
5  approval of the transfer of the construction
6  permits?
7       A.   At the time of that meeting, we
8  were hoping to move ahead quickly on the
9  project.  And so we told them that we would
10 submit the transfer application when we were
11 ready, but it might be within the next several
12 months or sometime along there, but that that,
13 in our view, was -- you know, that was part of
14 the overall progressing of the project as we
15 went forward.
16      Q.   Did you tell them when the
17 contractual closing date was for the transfer
18 -- or for the acquisition of the Bellefonte
19 site?
20      A.   I don't recall that specifically,
21 but I believe we probably did.
22      Q.   And was there any discussion about
23 whether the transfer of the construction

Page 142

1  permits needed to be approved by the NRC before
2  closing on the sale transaction occurred?
3       A.   No.
4       Q.   No discussion one way or the other
5  on that, right?
6       A.   That's correct.
7       Q.   Did NRC officials give any
8  indication -- well, strike.
9            They said it would take months to
10 review, is that what you said, the application
11 for transfer of the construction permits?
12      A.   They said that we should plan on
13 the processing of the application for transfer
14 of the construction permits to take three to
15 six months was the time frame they threw out.
16 And then they quickly followed that with the
17 caveat that NRC always uses, which is that they
18 can't commit to definite time frames, their
19 reviews take whatever time they take.
20      Q.   Other than what you have told me,
21 do you recall anything else that was discussed
22 about an application for transfer of the
23 construction permits during that meeting in

Page 143

1  January 2017?
2       A.   Not that I can recall.
3       Q.   Did you take any notes during that
4  meeting?
5       A.   So my normal practice in those
6  sort of meetings is I will typically jot down a
7  few notes as I go through the meeting just to
8  help get things into my memory and then I throw
9  the notes away when I get home.
10      Q.   Have you looked to see if you have
11 any notes about Bellefonte still in your
12 possession?
13      A.   I don't.
14      Q.   You don't have them or you didn't
15 look?
16      A.   I do not -- I do not have them.
17      Q.   Okay.  All right, let me show you
18 what has been pre -- if you will look for
19 Exhibit 37.
20           (Whereupon, Exhibit Number 37,
21           having been previously marked for
22           identification, was referenced in
23           this deposition.)

Page 144

1       MR. O'REAR:  Is this --
2       MR. LEMBKE:  It is the same 37 --
3  it was not yesterday.
4       MR. O'REAR:  Okay.  Does he have
5  it?  You said if you would look for it.
6       Q.   (BY MR. LEMBKE:)  Oh, excuse me.
7  I'm sorry, Mr. McCollum.  There you go, there
8  is a copy of 37.
9       A.   Thank you.  (Reviewing document.)
10      Q.   All right.  This is a series of
11 emails you exchanged with Joe Shea of TVA on
12 January 29th and January 30th, 2017, correct?
13      A.   Correct.
14      Q.   And this refers to a conversation
15 that you were going to have with Mr. Shea.  Was
16 that the conversation you testified to earlier?
17      A.   Yes.
18      Q.   Okay.  And do you remember
19 anything else about it other than what you
20 testified to earlier?
21      A.   About the conversation?
22      Q.   Yes, sir.
23      MR. O'REAR:  Let me just object.

**William McCollum**                                    **11/13/2019**

Page 145

1  I think you discussed multiple conversations
2  with Mr. Shea.
3      Q.   (BY MR. LEMBKE:)  Well, do you
4  remember having a conversation with Mr. Shea in
5  late January of 2017?
6      A.   Yes.
7      Q.   And you told me about that
8  conversation earlier today, correct?
9      A.   Yes, and also a conversation in
10  March of 2017.
11      Q.   All right.  As to the one in
12  January, is there anything about that
13  conversation that you recall that you have not
14  already told me?
15      A.   No.  However, now that I see the
16  email chain, my email to Joe indicates that I
17  got an understanding about TVA's support of the
18  Bellefonte construction permit transfer from
19  talking to Frank.  So I had indicated before
20  that I wasn't for sure how I formed that
21  notion.  There may have been some conversation
22  with Frank that led me to believe that TVA was
23  going to play a role in that.

Page 146

1      Q.   You don't recall the specifics of
2  that conversation with Frank, do you?
3      A.   I don't recall the conversation at
4  all.
5      Q.   Okay.  After talking to Mr. Shea,
6  did you have a conversation with Frank about
7  any of this in January of 2017 or early
8  February?
9      A.   No.
10      Q.   All right.  Let me show you what I
11  am going to mark as Exhibit 75.
12          (Exhibit Number 75 was marked for
13          identification.)
14      Q.   Before we do that -- so was it
15  clear -- following your discussion with Mr.
16  Shea in January of 2017, was it clear to you
17  after receiving -- looking at the emails we
18  just looked at in 37 and having the
19  conversation in that same time frame, that TVA
20  was looking to Nuclear Development to take the
21  lead on preparing the application for the
22  construction permit transfer?
23      A.   Well, not entirely.  My experience

Page 147

1  from working at TVA is it's a large and
2  bureaucratic organization and there are times
3  that one group doesn't know what other groups
4  are doing.  So it was clear to me that Joe Shea
5  had a particular understanding, and in his
6  email he indicates that I spoke with the
7  transition team and they don't have anything
8  going on regarding that.  So that indicated to
9  me that Joe was -- that perhaps there were
10  other people within the NRC --
11      Q.   Do you mean TVA?
12      A.   Excuse me, yes, thank you.  That
13  there were perhaps other people or other groups
14  within TVA who might support this effort.  And
15  so what was clear to me is Joe either -- Joe
16  wasn't planning to do anything and didn't think
17  they were going to do anything, but didn't seem
18  to be the only one who had fingers in this.
19      Q.   All right.  Well, let's look back
20  at Exhibit 37.
21      A.   Yes.
22      Q.   Okay.  I think you just referenced
23  the very top email on the first page where Mr.

Page 148

1  Shea says to you:  I confirmed with our
2  transition team this morning that we do not
3  have any activity ongoing regarding developing
4  a permit transfer application, right?
5      A.   Right.
6      Q.   And are you saying you took from
7  that that some other area of TVA other than TVA
8  licensing might be going to take the lead on
9  it?
10      A.   I thought that was a possibility,
11  because I was surprised that the head of
12  licensing for the nuclear function for TVA
13  would be talking with somebody else about
14  whether or not they were developing a permit
15  transfer application.
16      Q.   Well, and the reason you were
17  surprised is because if anyone was going to do
18  it at TVA, you would have expected it to be TVA
19  licensing?
20      A.   You would think that -- you would
21  think that the nuclear licensing group within
22  TVA would be involved in developing a permit
23  transfer application.

Page 149

1      Q.   In your phone conversation in this
2    time frame, January 2017, with Mr. Shea, did
3    you ask him is anyone other than TVA licensing
4    at TVA going to be taking the lead on this?
5      A.   I think I -- best of my
6    recollection, the way I phrased the question to
7    Joe Shea was are any of you guys at TVA going
8    to work to get the transfer application going.
9    And his response was something like I have been
10   told not to work on or do anything with the
11   permit transfer application.
12          Again, my experience in TVA is
13   that it is not unheard of for one group to
14   think something is going on and not understand
15   that some other place within TVA there is some
16   going on.  So that left open in my mind the
17   possibility that perhaps Joe had been told not
18   to do anything but that somewhere else in TVA
19   someone might believe they were going to work
20   on it.
21     Q.   You were familiar with the TVA
22   transition team, correct?
23     A.   No.  I was told that Jim Chardos

Page 150

1    was our contact for the TVA transition team,
2    but I wasn't told who the transition team
3    really was.
4      Q.   All right.  Well, with Mr. Shea
5    having told you he wasn't working -- his group
6    wasn't working on it and having been told that
7    he had confirmed with the transition team that
8    they didn't have any activity ongoing regarding
9    doing it, did you following that conversation
10   with Mr. Shea contact anyone else at TVA to
11   find out if anyone was working on it?
12     A.   I did not.  Following the
13   face-to-face conversation that we had that's
14   indicated in Exhibit 75 --
15     Q.   I'm not there yet.  I'm at -- I am
16   still at the end of January 2017.
17     A.   Okay.
18     Q.   And you said you thought there was
19   a possibility that someone else was working on
20   it, notwithstanding what Mr. Shea had told you
21   verbally and in writing.
22          And my question is, at or about
23   that time did you follow up with anyone else at

Page 151

1    TVA to ask if anyone else, in fact, was working
2    on it?
3      A.   I did not.  I was continuing to
4    have conversations with Joe Shea at that time.
5      Q.   All right.  And Mr. Shea never
6    changed what he told you in January that his
7    group wasn't working on it, correct?
8      A.   Correct.
9      Q.   All right.
10          MR. O'REAR:  Can we take a break
11   now?
12          MR. LEMBKE:  Certainly.
13          THE VIDEOGRAPHER:  We are off the
14   record at 10:11 a.m.
15          (Whereupon, a break was had from
16          10:11 a.m. until 10:25 a.m.)
17          THE VIDEOGRAPHER:  We are back on
18   the record at 10:25 a.m.
19     Q.   (BY MR. LEMBKE:)  Mr. McCollum,
20   before we broke, we were talking about a
21   conversation you had with Mr. Shea around the
22   end of January 2017.
23     A.   Correct.

Page 152

1      Q.   And then you previously referenced
2    a conversation you had with him in March in
3    conjunction with a meeting you were attending
4    in Maryland, right?
5      A.   Right.
6      Q.   Did you have any conversations
7    with Mr. Shea between those two conversations
8    about the topic of preparation of the
9    application for transfer of the construction
10   permits?
11     A.   Not that I recall.
12     Q.   Okay.  And between those two dates
13   did you have any conversations with Mr. Shea --
14   excuse me, with anyone else at TVA about the
15   topic of preparation of the application for
16   transfer of the construction permits?
17     A.   I think I may have had a
18   conversation with Jim Chardos about my
19   conversation with Joe Shea and, you know, my
20   interest in finding out if someone at TVA was
21   going to work on this, but that didn't lead to
22   anything.
23     Q.   Well, what did Mr. Chardos say?

---

Page 153

1    A.   Basically that he didn't know
2  anything about it.
3    Q.   Okay.  And other than that
4  conversation with Mr. Chardos, there was no one
5  else at TVA you spoke to between the two Shea
6  conversations in January and March of 2017?
7    A.   Not that I recall.
8    Q.   Okay.  Now, before you is Exhibit
9  75; and this is an exchange of emails where you
10 were setting up your meeting with Mr. Shea, it
11 looks like, on March 14th, 2017?
12   A.   Yes.
13   Q.   All right.  And tell me what you
14 recall about that conversation.
15   A.   We were both at the -- attending
16 the NRC regulatory information conference in
17 Bethesda.  And so Joe had suggested it would be
18 good to get together and talk while we were
19 there, and we set up a face-to-face discussion.
20 We just talked for a short time about the
21 transfer of the construction permits.  Joe
22 reiterated that his understanding was that they
23 weren't going to do anything regarding

---

Page 154

1  preparing the application for the transfer of
2  the construction permits.  And I told him I
3  thought that was -- that was a shame, because
4  they obviously had the background information,
5  it would have been relatively easy for them to
6  put together the application format.  And
7  that's basically what we discussed.
8    Q.   So did you ask him is there anyone
9  else at TVA who is working on this, going to
10 work with us, or words to that effect?
11   A.   Not that I recall.
12   Q.   Okay.  So as of March 14th, 2017,
13 it was crystal clear to you that TVA was not
14 going to take the lead in preparing the
15 application, correct?
16   A.   It was -- it was crystal clear to
17 me that Joe Shea and the nuclear licensing
18 group weren't going to take any role in
19 preparing the transfer application.
20   Q.   All right.  Well, after -- after
21 that date did you ask anyone else at TVA if
22 anyone else was going to be involved in
23 preparing the application?

---

Page 155

1    A.   No.
2    Q.   Did you tell Mr. Shea in that
3  meeting in March that Nuclear Development was
4  going to take the lead?
5    A.   I don't recall telling him that.
6    Q.   Now, yesterday in your deposition
7  you said there were some things in Mr. Shea's
8  deposition about those conversations with which
9  you disagreed.
10   A.   Uh-huh.
11   Q.   Is that correct?
12   A.   That is correct.
13   Q.   All right.  What did he say about
14 your conversations with which you disagree?
15       MR. O'REAR:  In his deposition?
16       MR. LEMBKE:  In his deposition.
17   A.   Yeah, as I recall, in his
18 deposition he made -- he made some statement
19 that he told everyone from the beginning that
20 TVA wasn't going to work on preparing the
21 license application.  And I recall our initial
22 -- my initial conversation with Joe Shea on
23 that topic a little differently in that he --

---

Page 156

1  my recollection of it was he was not as
2  definitive about they weren't going to do it in
3  that initial conversation.
4    Q.   (BY MR. LEMBKE:)  All right.  But
5  you've already asked me today everything you can
6  remember about that conversation in late
7  January, correct?
8    A.   That's correct.
9    Q.   Let me show you what I am going to
10 mark as Exhibit 76.
11       (Exhibit Number 76 was marked for
12 identification.)
13   A.   (Reviewing document.)
14       MR. O'REAR:  This is a new
15 exhibit?
16       MR. LEMBKE:  Yes.
17   Q.   (BY MR. LEMBKE:)  Mr. McCollum, I
18 asked if you had raised the issue with anyone
19 at TVA about who was going to prepare the
20 application after your March 2017 meeting.  To
21 your knowledge, did anyone at Nuclear
22 Development raise that issue with anyone at TVA
23 after your meeting on -- in mid-March of 2017

---

**William McCollum**                                    **11/13/2019**

Page 157

1   with Mr. Shea?
2       A.  I'm sorry, I'm a little confused
3   by the question.
4       Q.  Sure.  You talked just a moment
5   ago about your meeting with Mr. Shea in March
6   of 2017.
7       A.  Yes.
8       Q.  And I asked if you had ever talked
9   to anyone else at TVA about that issue who
10  would be preparing the application after that
11  meeting, and you told me no.
12      A.  (Nodding head affirmatively.)
13      Q.  My question is, to your knowledge,
14  did anyone associated with Nuclear Development
15  discuss that issue with anyone at TVA after
16  your meeting on -- in mid-March?
17      A.  I think that Tim Matthews may have
18  broached that topic with TVA OGC.
19      Q.  All right.  And when did Mr.
20  Matthews broach that topic with TVA OGC?
21      A.  I don't have specific knowledge
22  about -- about that.  I know Tim Matthews and I
23  had conversations about it and I think he

Page 158

1   have raised that issue in his conversations
2   with OGC, but I don't have knowledge of a
3   specific conversation.
4       Q.  Well, do you recall that Mr.
5   Matthews told you that he had raised it with
6   TVA OGC?
7           MR. O'REAR:  Objection, that calls
8   for attorney-client --
9           MR. LEMBKE:  He has opened the
10  door to that.
11          MR. O'REAR:  What did --
12          MR. LEMBKE:  He testified that Mr.
13  Matthews told him that.  He can't -- you can't
14  now instruct him not to answer.
15          MR. O'REAR:  He just said he was
16  aware of it.  He didn't say what Mr. Matthews
17  said.
18          MR. LEMBKE:  He said Mr. Matthews
19  told him that.
20          MR. O'REAR:  Okay.
21          MR. LEMBKE:  Are you instructing
22  him not to answer that question?
23          MR. O'REAR:  Yeah, I am

Page 159

1   instructing him not to answer any more
2   questions about that.  I don't think he opened
3   the door to anything.  But he's -- I am
4   instructing him not to answer any direct
5   communications he had with Tim Matthews and
6   what was said in those communications.
7           MR. LEMBKE:  Mr. O'Rear, your
8   witness cannot come in here and say yes, I
9   believe Tim Matthews talked about that with OGC
10  and then you instruct him not to then say what
11  Tim Matthews told him about the conversations
12  with OGC.
13          MR. O'REAR:  He said he was --
14  that's just his awareness of a conversation.
15  He just said he was not privy to a conversation.
16  He doesn't know what was said in the conversation,
17  so --
18          MR. LEMBKE:  Well --
19          MR. O'REAR:  You asked him about
20  an issue, and I am -- I am instructing him not
21  to answer about specific conversations that he
22  had with his counsel.
23      Q.  (BY MR. LEMBKE:)  And are you

Page 160

1   going to follow that instruction?
2       A.  Yes.
3           MR. LEMBKE:  Let me note on the
4   record that we are going to reserve the right
5   to reopen this deposition based upon this
6   instruction.
7       Q.  (BY MR. LEMBKE:)  Other than the
8   conversation that -- to be clear, you are not
9   sure that Mr. Matthews ever had a conversation
10  with OGC about this issue, correct?
11      A.  Correct.
12      Q.  And you are not -- you are not
13  aware with certainty of any conversation that
14  anyone representing Nuclear Development had
15  with anyone at TVA about this issue after your
16  mid-March 2017 meeting with Mr. Shea, correct?
17      A.  Correct.
18      Q.  All right.  I'd put before you
19  Exhibit 76, which is an email to you and others
20  from Patrick Whitten at AREVA dated January 27,
21  2017; do you see that?
22      A.  I do.
23      Q.  And it says:  From your meeting

**William McCollum**                                    **11/13/2019**

Page 161

1   with the NRC on January 23rd, a follow-up
2   meeting with each commissioner was agreed.
3       Do you see that?
4       A.  Yes.
5       Q.  Was, in fact, a follow-up meeting
6   with each commissioner agreed at that January
7   23rd meeting you attended with NRC?
8       A.  We discussed in the January 23rd
9   meeting that we intended to follow up with
10  drop-ins to speak with the NRC commissioners,
11  and Victor McCree indicated that he thought
12  that that be a very good idea for us to
13  do that.
14      Q.  All right.  And did anyone
15  representing NRC have such drop-ins with the
16  NRC commissioners -- excuse me, let me strike
17  that.  Excuse me.
18      Did anyone representing Nuclear
19  Development follow up and have drop-in meetings
20  with each commissioner?
21      A.  Yes.
22      Q.  When did those occur?
23      A.  Well, best of my recollection,

Page 162

1   they were in April 2017.
2       Q.  Did you attend each one?
3       A.  Yes -- well, all of the meetings
4   -- all of the meetings occurred on one day, and
5   I attended those meetings.
6       Q.  And how many NRC commissioners are
7   there?
8       A.  It varies.  It varies from time to
9   time depending on open slots.
10      Q.  How many do you recall meeting
11  with in April 2017?
12      A.  At least four.
13      Q.  And what was discussed during
14  those meetings?
15      A.  It was a general discussion about
16  our intent to purchase the Bellefonte site,
17  refurbish the units and obtain operating
18  licenses and put them into service.
19      Q.  Do you recall there being any
20  discussion with any of the commissioners about
21  the application to transfer the construction
22  permits?
23      A.  Not -- not beyond just simply

Page 163

1   mentioning that we would transfer the
2   construction permits.
3       Q.  But no specifics?
4       A.  No.
5       Q.  Mr. McCollum, let me show what I
6   am going to mark as Exhibit 77.
7       MR. LEMBKE:  Well, I will have to
8   go off the record and make another copy.
9       THE VIDEOGRAPHER:  We are off the
10  record at 10:38 a.m.
11      (Whereupon, a break was had from
12      10:38 a.m. until 10:41 a.m.)
13      THE VIDEOGRAPHER:  We are back on
14  the record at 10:41 a.m.
15      A.  Before you ask another question,
16  can I revise my answer to a previous question?
17      Q.  (BY MR. LEMBKE:)  Certainly.
18      A.  So initially I had said I thought
19  we met with four NRC commissioners.  My best
20  recollection now after thinking about it for a
21  couple of minutes is that we met with three
22  commissioners at those drop-ins.
23      Q.  Okay.  And -- but your testimony

Page 164

1   about what you remember about the content of
2   the conversations has not changed, correct?
3       A.  No, it has not.
4       Q.  Okay.
5       (Exhibit Number 77 was marked for
6       identification.)
7       Q.  Let me show you what I have marked
8   as Exhibit 77.  And this is an email with
9   attachments that you sent on February 1st, 2017
10  to Victor McCree and three others at the NRC,
11  correct?
12      A.  That's correct.
13      Q.  All right.  And you say --
14      MR. LEMBKE:  Caine, let me see
15  your copy back.  I think I have got a
16  highlighted page -- okay.
17      Q.  (BY MR. LEMBKE:)  Let me see your
18  copy and make sure -- okay.  Good, I wanted to
19  make sure.
20      All right.  In this you begin --
21  you address it to Victor, correct?
22      A.  Correct.
23      Q.  And you express appreciation for

**William McCollum**                                      **11/13/2019**

---

Page 165

1   the meeting on January 23rd, and you say: I
2   appreciate you and your staff members meeting
3   with us on January 23rd to discuss the
4   Bellefonte nuclear project, the purchase of the
5   Bellefonte nuclear site by Nuclear Development,
6   LLC (ND), and our plans to apply for transfer
7   of the construction permits from TVA to ND.
8           Is that what it says?
9       A.   That's what it says.
10      Q.   All right. And then in the second
11  paragraph, it begins: Per your request,
12  attached are two documents relating to the
13  project schedule and resource plans. It says:
14  The first is a timeline of major project
15  milestones, the second is a bar graph
16  indicating our plans for ramping up
17  construction resources to complete Units 1 and
18  2.
19          Is that right?
20      A.   That's correct.
21      Q.   Now, if you look at the third page
22  of the exhibit, that is the project schedule
23  that you sent to Mr. McCree and the others at

---

Page 166

1   the NRC, correct?
2       A.   Correct.
3       Q.   And did you prepare this schedule?
4       A.   I did.
5       Q.   Okay. And you were sending this
6   in February of 2017, correct?
7       A.   That's correct.
8       Q.   Now, you were indicating here that
9   in activity number one, transfer Bellefonte to
10  Nuclear Development and begin mobilization,
11  that you thought the transfer of the site would
12  be complete ownership of it by December 2017?
13      A.   Yes, activity one refers to the
14  transfer of the property to Nuclear
15  Development.
16      Q.   All right. And what was the basis
17  for your belief in February of 2017 that in
18  eleven months' time, the closing would have
19  occurred?
20      A.   We were -- we were working on the
21  basis that we might try to close on the sale of
22  the property earlier than the two-year period.
23  Assuming we could get our financing in place

---

Page 167

1   and be ready to move ahead, there was a desire
2   to have the closing sooner and get started on
3   construction.
4       Q.   In this schedule nowhere do you --
5   well, in this schedule numbered -- item number
6   nine, you have transfer construction permit and
7   obtain o-p-e-r -- I take it that is operating?
8       A.   Correct.
9       Q.   -- operating license for Unit 1,
10  begin July 2017, end March 2024. Do you see
11  that?
12      A.   Yes.
13      Q.   And so what did you intend for the
14  July 2017 date for Unit 1 and transfer the
15  construction permit to indicate?
16      A.   To indicate the submittal of the
17  application for transfer of the construction
18  permits.
19      Q.   Okay. And why did you have a
20  different date for Unit 2 as the start date?
21      A.   Because there was -- there was
22  some thought -- we were thinking about the
23  possibility of taking longer for the

---

Page 168

1   application for Unit 2 because of needing to
2   resolve, in our minds, the issues around the
3   status of the construction permit on Unit 2
4   being different and the date having been passed
5   and the issue of the timely submittal to NRC.
6   So there was a thought that we might separate
7   the applications and take a little longer to
8   develop the application for Unit 2 because of
9   those construction permit status issues.
10      Q.   All right. And so as of February
11  1st, 2017, you had not -- you were only
12  beginning the gathering of the various
13  categories of information that was needed for
14  the construction transfer -- construction
15  permit transfer application, correct?
16      A.   Yes.
17      Q.   And you believed that that was
18  going to be completed, not only gathering but
19  the entire application put together, by July,
20  correct?
21      A.   Assuming that we -- yes, that's
22  correct, assuming that we had everything else
23  in place to begin mobilization and begin moving

---

**William McCollum**

---

Page 169

1  forward with the engineering and work on the
2  project.
3      Q.   What does that have to do with the
4  construction permit transfer application?
5      A.   Well, because, as I talked about
6  earlier, getting together all of the technical
7  support and the contractor resources that you
8  need to move the project forward is part of the
9  information that you submit on technical
10  capabilities for the application.
11      Q.   Why did you miss your estimate so
12  badly?
13          MR. O'REAR:  Objection.
14  Argumentative.
15      A.   Well, the entire schedule changed
16  and moved out as we worked through -- tried to
17  work through the process of securing financing
18  for the project.
19      Q.   (BY MR. LEMBKE:)  And so your
20  preparation of the information or gathering of
21  the information that you needed for the
22  construction permit application was affected by
23  the effort to obtain financing?

---

Page 170

1      A.   Well, it was affected by the
2  realization that we would not try to begin
3  active engineering and completion activities as
4  early as we had thought in this schedule.  And
5  so -- so if you are not going to begin all of
6  that work, you don't put the resources in place
7  and spend the money as if you were beginning
8  the work earlier, because that is just spending
9  money before you need to.
10      Q.   And why was that engineering work
11  not going to be done as soon as was reflected
12  in this schedule?
13      A.   We weren't going to have the
14  financing in place.
15      Q.   Okay.  And did -- when did that
16  work with regard to the engineering actually
17  begin?
18      A.   The work reflected on this
19  schedule, activities two, three and four, have
20  not yet begun.
21      Q.   Well, then, if they haven't yet
22  begun and the construction permit transfer
23  application was submitted in November, I'm not

---

Page 171

1  sure I understand how they are linked.
2      A.   Again, all of the activities in
3  the schedule are linked in terms of the timing
4  of when you gather and expend money on
5  resources to prosecute the project.
6      Q.   And so is it fair to say that
7  Nuclear Development decided not to spend the
8  money in the first half of 2017 to gather the
9  information and resources needed to complete
10  the construction permit transfer application?
11      A.   I think that it's fair to say that
12  we decided to manage the spending on the
13  project appropriately given when we thought the
14  major construction work on the project could
15  begin and when we might actually take control
16  of the property.
17      Q.   Well, I'm not sure that was my
18  question -- or that was an answer to my
19  question.
20          My question was, did Nuclear
21  Development make the decision not to expend the
22  resources in the first half of 2017 that would
23  have been required to meet the schedule you

---

Page 172

1  proposed here to submit the construction permit
2  transfer application?
3      A.   We -- we did decide not to expend
4  the money on that and the other activities when
5  we realized that the beginning dates on this
6  schedule would not be met.
7      Q.   All right.  When -- when did
8  Nuclear Development decide that it was time to
9  start spending the money needed to put together
10  the construction permit transfer application?
11      A.   As I indicated before, I was
12  working along to gather and put together
13  information all along during the time frame
14  between the early part of 2017 and the time
15  that we submitted the transfer application,
16  just at a slower pace than would have been
17  necessary if we were moving on the schedule
18  indicated here.
19      Q.   All right.  Well -- but setting
20  your involvement aside, when did Nuclear
21  Development decide to spend the funds that it
22  was not willing to spend in August -- or in the
23  first half of 2017 that were needed to get the

---

**William McCollum**                                          **11/13/2019**

---

**Page 173**

1    information put together for the construction
2    permit transfer application?
3              MR. O'REAR:  Objection, asked and
4    answered.
5         Q.   (BY MR. LEMBKE:)  You can answer.
6         A.   We -- we spent the money to
7    develop the information and submit the transfer
8    application all during the time frame between
9    early 2017 and when we submitted the
10   application.  We just didn't spend the money on
11   the accelerated basis that we would have needed
12   to had we been working on a -- start of
13   construction indicated here.
14        Q.   Well, you were given -- were you
15   given some sort of budget or indication of how
16   fast you should spend that money needed to
17   obtain the information to complete the
18   construction permit transfer application, given
19   some instruction on that by someone at Nuclear
20   Development?
21        A.   No, as -- no.  The answer is no.
22   As this schedule indicates, it was always the
23   intention and I conveyed to Victor in this

---

**Page 174**

1    letter our intention to submit an application
2    for transfer of the construction permits
3    roughly at the time frame that we gained
4    control of the property at Bellefonte.  And so
5    we just worked along to that schedule as the
6    schedule evolved.
7         Q.   Well, when did you tell Mr. McCree
8    that, that you intended to submit an
9    application roughly at the time you obtained
10   ownership of the site at Bellefonte?
11        A.   At the time of the meeting on the
12   23rd, I told Victor McCree that we would give
13   them -- that we intended to submit an
14   application and follow on with work on the
15   operating license application.  And we
16   committed to -- I committed, excuse me, to
17   provide more information.  And that's what I
18   did with this document that shows transfer of
19   the Bellefonte property and beginning
20   mobilization July 2017 and transfer
21   construction permit and obtain operating
22   license activity beginning July 2017.
23        Q.   Well, in fact, Mr. McCollum, what

---

**Page 175**

1    this indicates is that you would finish the
2    transfer of the Bellefonte site in December
3    2017, correct?
4         A.   Uh-huh.
5         Q.   Is that a yes?
6         A.   Sorry, that is a yes.
7         Q.   And it also indicates that you
8    would submit the application in July -- the
9    construction permit transfer application in
10   July of 2017, right?
11        A.   Okay.  So -- so let's take a look
12   at the document.  Activity one is --
13        Q.   That was a yes or no question.
14             MR. O'REAR:  Now you are being
15   argumentative now.  It's not a yes or no.
16             MR. LEMBKE:  Yes, it is a yes or
17   no question.  Isn't that what it says?
18             MR. O'REAR:  He doesn't have to
19   answer yes or no when he needs to explain an
20   answer.
21             MR. LEMBKE:  Well, Mr. McCollum is
22   doing a good job of answering questions I
23   didn't ask today.

---

**Page 176**

1              MR. O'REAR:  Objection --
2         Q.   (BY MR. LEMBKE:)  So how about
3    answering my question, Mr. McCollum?
4              MR. O'REAR:  It's argumentative.
5    Move to strike.  That was unnecessary.
6         A.   I'm sorry, what was the question?
7         Q.   (BY MR. LEMBKE:)  The question is,
8    am I correct that item one shows that the
9    transfer of the ownership of the Bellefonte
10   site was expected to be completed December
11   2017?
12             MR. O'REAR:  Objection.  Asked and
13   answered.
14        A.   No, that's not correct.
15        Q.   (BY MR. LEMBKE:)  All right.
16   Well, what does activity one indicate?
17        A.   So, activity one is transfer of
18   the property and begin mobilization of the
19   resources on site.  So my intent of this item
20   when I wrote it is that the transfer of the
21   property at Bellefonte would occur July 2017
22   and the mobilization activity for Units 1 and 2
23   would be completed in December 2017.

---

**William McCollum**

Page 177

1    Q.   So your testimony is you believed
2  in February of 2017 that the closing would
3  occur in July of 2017?
4    A.   That's what we were hoping to
5  achieve by accelerating the closing, getting
6  financing in place.
7    Q.   All right.  Have you ever seen any
8  document where that -- other than this, where
9  that closing date was ever discussed with --
10  well, strike that.
11        Was that closing date ever
12  discussed with TVA, July of 2017?
13    A.   I don't have any knowledge of
14  that.
15    Q.   All right.  When you had your
16  conversation with Mr. McCree in January of
17  2023, did you expressly discuss a linkage
18  between when the construction permit transfer
19  application would be submitted and when the
20  closing would occur on the sale of the site?
21    A.   You said 2023.  I think you --
22    Q.   Excuse me, I meant 2017.
23    A.   No.

Page 178

1    Q.   I meant January 23rd.  You did
2  not.
3    A.   I did not expressly discuss
4  linkage between those two.
5    Q.   Okay.  Now, am I reading this
6  correctly that you believe that construction of
7  Unit 1 would have been complete in January of
8  2022?
9    A.   Which item are we referring to?
10    Q.   Eleven.
11    A.   Yes, active construction, meaning
12  the refurbishment, replacement of components in
13  the plant.
14    Q.   And you believed that it was
15  realistic as of February 1st, 2017 that active
16  construction would be approved and ready to
17  begin in Unit 1 in January of 2018, less than a
18  year later?
19        MR. O'REAR:  Objection.  You said
20  active construction would be complete and then
21  ready to begin.  I don't understand that.
22        MR. LEMBKE:  Let me rephrase it.
23    Q.   (BY MR. LEMBKE:)  You believed as

Page 179

1  of February 1st, 2017 that active construction
2  would be ready to begin with all necessary
3  approvals in January 2018, less than a year
4  later?
5    A.   Yes.
6    Q.   Did you ever inform NRC that these
7  dates had changed?
8    A.   Yes.
9    Q.   When?
10    A.   Various times in various
11  conversations with NRC project management after
12  this 2/1/2017 email.
13    Q.   All right.  Well, when was the
14  first one you were -- was it all verbal?
15        MR. O'REAR:  You mean oral or
16  written?  Verbal would be either.
17        MR. LEMBKE:  Verbal.  Verbal is
18  written?
19        MR. O'REAR:  Verbal is written and
20  oral.  So -- but go ahead, it's your question.
21    A.   So mostly -- mostly telephone
22  conversations with NRC project managers.  But I
23  believe, to the best of my recollection, that I

Page 180

1  also submitted a written update to this later.
2  I don't recall the exact date.
3    Q.   (BY MR. LEMBKE:)  Well --
4    A.   But as I said, mostly the updates
5  I gave them were telephone conversations
6  between me and the NRC project managers.
7    Q.   Are you certain you gave them a
8  written update?
9    A.   I'm not certain on that.
10    Q.   All right.  And do you recall
11  having a conversation with anyone at the NRC
12  after submission of this as to how the expected
13  date for submission of the construction permit
14  transfer application was going to change?
15    A.   Well, yes, I mean, that was part
16  of the verbal updates that I gave project
17  managers was that we were -- we were working on
18  and would have at some point an application for
19  transfer of the construction permits.
20    Q.   Well, did you tell them when they
21  would -- the application would be coming?
22    A.   Not until roughly summer of 2018.
23    Q.   And what did you tell them then?

**William McCollum**                                              **11/13/2019**

Page 181

1    A.   That we hoped to submit within a
2  few months.
3    Q.   And who did you tell that to?
4    A.   Billy Gleaves.
5    Q.   At any point did you -- at any
6  point did anyone at the NRC tell you it would
7  be okay for Nuclear Development to obtain
8  ownership of the property prior to approval of
9  the transfer of the construction permits?
10    A.   No.  I consistently told -- in my
11  communications with the project managers told
12  them that we would submit the application for
13  the construction project on or a little before
14  the closing on the property.  And there was --
15  there was no discussion where they specifically
16  stated that was okay or was not okay.
17    Q.   And with whom did you have those
18  conversations where you linked the submission
19  of the construction permit transfer application
20  to closing on the property?
21    A.   So I didn't -- I didn't link in a
22  regulatory fashion.  I simply said this is when
23  the closing date is and we would intend to send

Page 182

1  the application in on or shortly before that
2  time.  And those were conversations with Billy
3  Gleaves at NRC.
4    Q.   When?
5    A.   Huh?
6    Q.   When?
7    A.   During the summer of 2019 --
8  excuse me, 2018.
9    Q.   Did you also tell him, though,
10  that you had asked for an extension of the
11  closing date?
12    A.   Did not.
13    Q.   You never told anyone at the NRC
14  that?
15    A.   Not that I'm aware of.
16    Q.   Sure of that?
17    A.   I don't remember having that
18  conversation with anyone with NRC.
19    Q.   What about at a public meeting,
20  did you ever say that there?
21    A.   I don't recall.
22    Q.   So when you submitted this
23  schedule in February of 2017, based on your

Page 183

1  experience in the industry, you believed every
2  date on here was a realistic date?
3    A.   I believed this was an aggressive
4  schedule that could be met.
5    Q.   I am going to show you what I am
6  going to mark as Exhibit 78.
7        (Exhibit Number 78 was marked for
8         identification.)
9    A.   (Reviewing document.)
10    Q.   This is an email to you from Frank
11  Akstulewicz at the NRC from February 6, 2017,
12  correct?
13    A.   Correct.
14    Q.   And did you know Mr. Akstulewicz
15  prior to receiving this email?
16    A.   I did not.
17    Q.   And in it he says:  I believe that
18  we could benefit from a phone call to exchange
19  contact information and to learn more about how
20  your project is structured, if all your project
21  organization is settled and ready to interface
22  with NRC, how and when we implement our fee
23  billing procedures, and when might be a good

Page 184

1  time for a working group meeting so that our
2  project managers and your staff can meet face
3  to face to discuss the project timelines.
4        Do you see that?
5    A.   I do.
6    Q.   And did you have a phone call with
7  Mr. Akstulewicz after receiving this email?
8    A.   Yes.
9    Q.   Tell me what you remember about
10  that phone call.
11    A.   I called Frank, introduced myself,
12  and we exchanged email and telephone number
13  information.  He talked to me about the NRC
14  organizational changes, there would be some
15  other people coming on board in their
16  organization, new reactor licensing, and that
17  he was interested in learning more about the
18  Bellefonte project.  I explained to him
19  generally that we were working toward
20  finalizing the financing and at some point
21  closing on the property and that as the -- as
22  things moved forward and the schedules firmed
23  up, I would get him more information.  So it

**William McCollum**                                                **11/13/2019**

Page 185

1   was a very -- it was a very general phone call
2   about the project.
3            Q.   Do you recall discussing the
4   application for transfer of the construction
5   permits during that call?
6            A.   I do not.
7            Q.   And in this email he also refers
8   to a potential working group meeting between
9   NRC project managers and Nuclear Development
10  staff to discuss project timelines.  Was there
11  ever such a working group meeting?
12           A.   No.
13           Q.   Why not?
14           A.   I just didn't feel that it was
15  necessary given where we were with the project
16  at that time.  Given that I was the management
17  point of contact and the licensing point of
18  contact, I didn't -- I didn't feel that we
19  needed a working group meeting.
20           Q.   Did you tell him that during that
21  phone call?
22           A.   I did tell him that I was the
23  management point of contact and the licensing

Page 186

1   point of contact for him.
2            Q.   Let me show you what I am going to
3   mark as Exhibit 79.
4            (Exhibit Number 79 was marked for
5            identification.)
6            A.   (Reviewing document.)
7            Q.   If you look at the bottom of 79 --
8   excuse me, on the second page of Exhibit 79, it
9   seems to begin with an email to you from Gary
10  Peters of AREVA, correct?
11           A.   I don't see that.
12           Q.   On the bottom -- on the second
13  page, it says on February 20th, 2017 at 3:20,
14  Gary Peters wrote; and it says, Bill, can you
15  please contact Frank Akstulewicz?
16           Do you see that?
17           A.   Yes.
18           Q.   And that's you, right?
19           A.   Yes, it appears so.
20           Q.   All right.  And then if you look
21  at the bottom of the first page, there is an
22  email from Mr. Akstulewicz to Frank Haney that
23  you are copied on dated April 18th; do you see

Page 187

1   that?
2            A.   Yes.
3            Q.   And in it Mr. Akstulewicz says
4   that Vonna Ordaz would like to set up a phone
5   call with Nuclear Development folks relating to
6   activities ongoing with respect to license
7   transfer and future construction and licensing;
8   do you see that?
9            A.   I do.
10           Q.   All right.  Was such a phone call
11  held with Ms. Ordaz?
12           A.   Yes, with Ms. Ordaz and Frank
13  Akstulewicz.
14           Q.   All right.  What do you remember
15  about that?
16           A.   Ms. Ordaz had just been -- just
17  recently been named in the position, was
18  interested in having an introductory phone call
19  and doing introductions with me and also just
20  talking about a general where are you guys with
21  the project and that sort of thing.
22           Q.   What do you recall being discussed
23  during that phone call about submission of an

Page 188

1   application for transfer of the construction
2   permits?
3            A.   That we were getting together the
4   project, project resources, and that we would
5   at some point submit an application for
6   transfer of the construction permits.
7            Q.   Nothing more specific about a
8   timeline for that?
9            A.   Not that I recall.
10           Q.   Okay.  Now, just above -- well,
11  sort of in the middle of the first page of
12  Exhibit 79 is a -- an email from you to Mr.
13  Akstulewicz in which you tell him your position
14  at Nuclear Development is vice president
15  nuclear operations?
16           A.   Yes.
17           Q.   So my question is, when did you
18  become CEO if you were the vice president of
19  nuclear operations in April of 2017?
20           A.   It was -- it was later, but I
21  don't know the exact date.  My recollection is
22  it was sometime in 2018.
23           Q.   What were the circumstances that

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**                                              **11/13/2019**

Page 189

1    led to the change in position?
2         A.   Basically that we were -- we were
3    moving forward with more discussions with NRC
4    and other stakeholders and it was time to --
5    time to make a change to the title structure.
6         Q.   Was there any substantive change
7    in what you were doing for Nuclear Development
8    when you changed titles?
9         A.   The only significant change was
10   that I took a stronger role in the work that we
11   were doing with Memphis as a potential customer
12   for the power from Bellefonte.
13        Q.   And what do you mean by a stronger
14   role?
15        A.   I basically in that time assumed
16   the lead for meeting with people in Memphis and
17   discussing the Bellefonte project, trying to
18   educate stakeholders in Memphis about the
19   project and the potential benefits for Memphis.
20        Q.   The top of the first page of
21   Exhibit 79 is an email to you from Mr.
22   Akstulewicz on June 7th, 2017; do you see that?
23        A.   I do.

Page 190

1         Q.   And he is asking to -- for an
2    update on the Bellefonte project from you in
3    which he says he would like to hear about
4    several topics including progress and
5    developing the license transfer application and
6    schedule; do you see that?
7         A.   I do.
8         Q.   And did you, in fact, have a call
9    with him in that time frame about -- that
10   included that topic?
11        A.   Yes.
12        Q.   And what do you recall being
13   discussed with Mr. Akstulewicz then?
14        A.   I told him that we had our
15   application for loan guarantee in with the DOE
16   Loan Program Office, that we had been through
17   several rounds of information requests and
18   discussions with DOE, and I felt that that
19   process was moving along and that we would at
20   some point develop and submit the license
21   transfer application and that following the
22   closing on the property, we would start to ramp
23   up resources and begin to do final engineering

Page 191

1    and begin putting resources in place for
2    construction completion.
3         Q.   So it sounds from that that you
4    did not give him any definitive indication as
5    to when the construction permit transfer
6    application would be submitted; is that fair?
7         A.   Not to my recollection.
8         Q.   Okay.
9              (Exhibit Number 80 was marked for
10             identification.)
11        Q.   Let me show you what I am going to
12   mark as Exhibit 80.  And this is an email to
13   you from Mr. Gleaves on September 14th, 2017,
14   correct?
15        A.   Yes.
16        Q.   All right.  In the first
17   paragraph, he sent you a copy of the schedule
18   that you had previously submitted that we
19   looked at earlier, correct?
20        A.   (Reviewing document.)  Yes.
21        Q.   And he says:  I have attached the
22   business model you have sent previously.
23   Please mark it up to reflect your plans going

Page 192

1    forward to ensure that NRC budgets
2    appropriately to best support your plans.
3         Do you see that?  The end of the
4    first paragraph?
5         A.   Yes.
6         Q.   All right.  Did you mark it up and
7    send it back to him?
8         A.   I believe that I did.
9         Q.   All right.  Well, did you keep a
10   copy of that?
11        A.   I should have.
12        Q.   Because I will represent we don't
13   believe Nuclear Development has produced that
14   to us in this case.  So are you sure you sent
15   it to him?
16        A.   I'm not certain.  I would have to
17   go look.
18        Q.   All right.  Do you recall in the
19   fall of 2017 what you were projecting as the
20   timetable for submission of the construction
21   permit transfer application?
22        A.   I do not.
23        Q.   In the second paragraph, he

**William McCollum**                                        **11/13/2019**

Page 193

1    suggested after you marked up the business
2    model and returned it to him, We would then
3    appreciate a meeting either in person or by
4    conference call to discuss and finalize our
5    budget cycle plan; do you see that?
6        A.   Yes.
7        Q.   And he goes on to say the goal is
8    to hold that meeting before the end of
9    September; do you see that?
10       A.   I see that.
11       Q.   Do you know if such a call
12   occurred or a meeting?
13       A.   I believe it did.  I believe we
14   had a telephone call.
15       Q.   All right.  And what do you recall
16   being discussed in that call?
17       A.   That I gave them revised schedule
18   information and that Ms. Dixon-Herrity was
19   interested in ensuring that they adequately
20   reflected in their future budget for year after
21   next, because they were working two years
22   ahead, adequately reflected the need for NRC
23   resources to support Bellefonte.

Page 194

1        Q.   And do you recall what you told
2    them during that call in terms of a schedule
3    for submission of a construction permit
4    transfer application?
5        A.   Again, I would have to look and
6    refresh my memory on that.
7        Q.   By September of 2017, you
8    certainly knew it would not be coming during
9    calendar year 2017, correct?
10       A.   The application for transfer of
11   the construction permit?
12       Q.   Yes, sir.
13       A.   Correct.
14       Q.   Okay.  Do you recall any specific
15   discussion of the construction permit transfer
16   application during this call in late September
17   2017?
18       A.   No.
19       Q.   All right.  Now let me show you
20   what I am going to mark as Exhibit 81.
21            (Exhibit Number 81 was marked for
22            identification.)
23       Q.   This is an email to you from Billy

Page 195

1    Gleaves dated September 19th, 2017, correct?
2        A.   Correct.
3        Q.   And he was sending you an NRC
4    publication entitled Procedures For Handling
5    License Transfers, correct?
6        A.   Correct.
7        Q.   Did you read this document that he
8    sent you when you received it?
9        A.   I did.
10       Q.   And after reading it, did you
11   contact him or anyone else at NRC with any
12   questions or concerns about it?
13       A.   Not to my recollection.
14       Q.   When you read it, do you recall
15   learning anything new?
16       A.   Not to my recollection.
17       Q.   After you read it, do you recall
18   having a discussion about anything in it with
19   anyone associated with Nuclear Development?
20       A.   Yes.
21       Q.   All right.  With whom did you have
22   a conversation?
23       A.   Our licensing counsel.

Page 196

1        Q.   Tim Matthews?
2        A.   Yes.
3        Q.   And was there a particular
4    provision in this document that you discussed
5    with Mr. Matthews?
6            MR. O'REAR:  Objection.  Instruct
7    the witness not to answer.  It would be of
8    content of attorney-client communications.
9        Q.   (BY MR. LEMBKE:)  I am not asking
10   you about the specifics of the -- only the
11   general area of the policy statement, not the
12   specific question he asked.
13           MR. O'REAR:  Well, you have asked
14   him about a specific subject, and I am
15   instructing him not to answer that question.
16       Q.   (BY MR. LEMBKE:)  Are you going to
17   follow that?
18       A.   Yes.
19           MR. LEMBKE:  Let me note for the
20   record we are going to reserve the right to
21   reopen this deposition based upon that
22   instruction.
23       Q.   (BY MR. LEMBKE:)  Now, if you

**William McCollum**                                      **11/13/2019**

Page 197

1    turn -- and I am going to go by the page
2    numbers in the lower right-hand corner, the
3    last four digits --
4        A.   Uh-huh.
5        Q.   -- page 3477.
6        A.   Yes.
7        Q.   And section one is entitled
8    Policy, right?
9        A.   Yes.
10       Q.   And the first sentence of section
11   one reads:  The provisions of Section 184 of
12   the Atomic Energy Act of 1954 as amended and
13   the Nuclear Regulatory Commission's (NRC's)
14   regulations at Title 10 of the Code of Federal
15   Regulations (10 CFR) 50.80, quote, Transfer of
16   licenses, end quote, stipulate that NRC
17   approval is required for transfer of control of
18   the ownership and/or operating authority
19   responsibilities within the facility operating
20   license.
21           Do you see that?
22       A.   I do.
23       Q.   And when you read that, you did

Page 198

1    not have any discussions about what that says
2    with anyone at NRC, correct?
3        A.   Correct.
4        Q.   Do you know what a conforming
5    amendment is?
6        A.   I do not.
7        Q.   All right.  Let me get you to go
8    to page 3488.
9        A.   (Reviewing document.)  3488?
10       Q.   Yes, sir.
11       A.   (Reviewing document.)  Okay.
12       Q.   All right.  The last paragraph on
13   3488 says:  Typically, there are licensing
14   requests made by the previous licensing holder
15   that are pending at the time that the
16   conforming amendment is issued.
17           Do you see that?
18       A.   I do.
19       Q.   And you don't understand what a
20   conforming amendment is, am I right about that?
21       A.   I don't know -- I don't know that
22   I understand all what that term implies, no.
23       Q.   Okay.  And it goes on to say:  If

Page 199

1    the new license holder wants the staff to
2    continue work on those licensing requests, the
3    new license holder must submit a letter on the
4    docket on the date of issuance of the
5    conforming amendment or shortly thereafter.
6    The letter must state that the new licensee
7    adopts and endorses all outstanding items of
8    the docket including, but not limited to,
9    requests for license amendments, exemptions,
10   relief requests, et cetera.  The letter needs
11   to be submitted under oath or affirmation.
12           Do you see that?
13       A.   I do.
14       Q.   Did Nuclear Development adopt and
15   endorse any licensing requests made by TVA in
16   connection with Bellefonte Unit 1 or Unit 2 at
17   the time that it submitted its application for
18   transfer of the construction permits?
19       A.   We did not.
20       Q.   Did not?
21       A.   Did not.
22       Q.   Are you sure of that?
23       A.   That's my recollection.

Page 200

1        Q.   Okay.  All right.  Page 3497, at
2    paragraph -- at number nine.
3        A.   (Reviewing document.)  Yes.
4        Q.   Do you see where it asks the
5    question:  Did the licensee/applicant send a
6    letter to the NRC to indicate the date the
7    transaction would be consummated?  Did I read
8    that right?
9        A.   I see.
10       Q.   And then it says:  The conforming
11   amendment is to be issued on that day, not
12   before, and not after; do you see that?
13       A.   I do.
14       Q.   And you did not know what that
15   meant when you read it, is that right?
16       A.   That's correct.
17       Q.   But you didn't ask anyone any
18   questions about what that meant, correct?
19       A.   Not specifically about this item,
20   no.
21       Q.   Okay.  If you look then on the
22   next page, the first full paragraph at the top
23   of the page seven --

**William McCollum**

Page 201

1    A.   Uh-huh.
2    Q.   -- do you see where it says:  The
3  conforming amendment, the amended or new
4  indemnity agreement, the amended ISFSI license,
5  if applicable, and biweekly notice of issuance
6  are issued on the day the license transfer
7  transaction is consummated and after receipt of
8  notification from the licensee confirming the
9  transaction.  This is necessary because if it
10  is issued before, the new licensee name may
11  invalidate the operating license for the
12  current and existing licensee; and if it is
13  issued afterwards, the new licensee would have
14  no authorization to operate under the old
15  license.
16       Do you see that?
17    A.   I do.
18    Q.   And when you read that, you didn't
19  fully understand what that meant either,
20  correct?
21    A.   Well, as I have -- as I've said, I
22  don't -- I'm not certain that I know all that
23  is implied by the term conforming amendment.

Page 202

1  But in reading this paragraph, it appears to me
2  that it relates to an operating license which
3  we don't have.
4    Q.   All right.
5    A.   And TVA doesn't have.
6    Q.   And you just assumed that the
7  application of the conforming amendment to --
8  that this would have no application outside the
9  operating license context, that was your
10  assumption?
11    A.   I don't know that I made an
12  assumption about this.  I relied on licensing
13  counsel.
14    Q.   And you don't know one way or the
15  other whether the -- whether this concept has
16  any application to transfer a construction
17  permit or not; is that fair?
18    A.   Yeah, I don't -- I don't have a
19  legal opinion on that.
20    Q.   Okay.  Now, do you recall making a
21  presentation at a public meeting in Alabama
22  with NRC staff in August 2018?
23       MR. O'REAR:  In Alabama?

Page 203

1    Q.   (BY MR. LEMBKE:)  Where was the
2  August 2018 public meeting?  Was that in
3  Washington, was it Maryland, or was it in
4  Alabama?
5    A.   If it is the one I am recalling,
6  it was at the NRC office in Bethesda, Maryland.
7    Q.   Okay.
8       (Whereupon, Exhibit Number 10,
9       having been previously marked for
10       identification, was referenced in
11       this deposition.)
12    Q.   Let me show you what has been
13  previously marked as Exhibit 10.  Have you ever
14  seen this document before?
15    A.   (Reviewing document.)  Yes.
16    Q.   Okay.  Now, at the bottom of page
17  one of Exhibit 10, this is an email reporting
18  on the NRC public meeting from Mr. Bell of NEI;
19  do you see that?
20    A.   Yes.
21    Q.   And it says here -- let me ask, he
22  said that you described Unit 1 at the public
23  meeting as at ninety percent complete and Unit

Page 204

1  2 as substantially complete; do you see that?
2    A.   I see that.
3    Q.   Do you recall saying that at the
4  meeting?
5    A.   No, that's not what I said.
6    Q.   What did you say?
7    A.   What I said was that at a point in
8  time previously when Unit 1 and 2 were under
9  construction at TVA, they reached a point where
10  Unit 1 was ninety percent complete and Unit 2
11  was substantially complete.
12    Q.   Okay.
13       (Whereupon, Exhibit Number 60,
14       having been previously marked for
15       identification, was referenced in
16       this deposition.)
17    Q.   Let me show you what has been
18  previously marked as Exhibit 60, and that will
19  be in your pile, Mr. McCollum.
20    A.   (Reviewing document.)
21    Q.   You have seen this document
22  before, right?
23    A.   Yes.

**William McCollum**

---

Page 205

1    Q.   In fact, you looked at it
2  yesterday, didn't you?
3      A.   I don't recall.
4      Q.   All right.  Again, I am going to
5  refer to pages -- why don't you just take a
6  moment, if you need to, to refresh yourself
7  with the chain of emails that begins at 7577
8  and then works backward in terms of chronology;
9  do you understand what I'm saying?
10     A.   Yes.
11         MR. O'REAR:  We adopt the same
12  objection and reservation I made yesterday on
13  the record with respect to the questions about
14  Exhibit 60.  Would be a continuing objection
15  and reservation for the following questions, if
16  any, regarding Exhibit 60.
17         MR. LEMBKE:  I acknowledge it, but
18  as we stated yesterday, any claim of privilege
19  was plainly waived when Ms. Gilman provided
20  this chain of emails to Mr. Chardos more than a
21  year ago.
22     A.   (Reviewing document.)
23         MR. O'REAR:  Is there a pending

Page 206

1  question?
2         MR. LEMBKE:  I was giving him an
3  opportunity to review the chain of emails.  If
4  he's ready --
5         MR. O'REAR:  Which pages were you
6  directing him to?
7         MR. LEMBKE:  I told him to begin
8  with the email at 7577 and then work backwards,
9  moving toward the front of the document.
10         MR. BLUST:  Toward the front of
11  the document.
12         MR. LEMBKE:  Which is the -- they
13  are in reverse chronological order in the
14  document.
15         MR. O'REAR:  Yeah.
16     Q.   (BY MR. LEMBKE:)  All right.  Mr.
17  McCollum, if you look at page 7577, first you
18  see there was a report from Mr. Matthews on
19  August 14th about what had occurred at the
20  meeting, correct?
21     A.   Yes.
22     Q.   The NRC public meeting?
23     A.   Yes.

Page 207

1    Q.   At the end of that email, Mr.
2  Matthews says:  Following the meeting, a few of
3  the NRC staffers stopped to thank us for the
4  visit and offer suggestions related to our
5  treatment of QA, decommissioning funding
6  assurance, and several deferred responses to
7  NRC information demands (for example, Fukushima
8  modifications) that will need to be addressed
9  going forward.
10         Do you see that?
11     A.   I do.
12     Q.   What do you recall NRC staffers
13  talking about treatment of QA?
14     A.   The only thing I recall -- the
15  only thing I recall there was that to the
16  extent that -- the extent that we could ensure
17  that our treatment of the QA program preserved
18  the work that had been ongoing in maintain the
19  Bellefonte site, that would be a good idea.
20     Q.   And what did you say in response
21  to that, if any?
22     A.   I don't recall any response other
23  than thanking them for their comment.

Page 208

1    Q.   All right.  Then you see shortly
2  after Mr. Matthews sent this letter, Frank
3  Haney responded with the statement:  Sounds
4  awesome.  So when will they sign off, question
5  mark.  Next steps, question mark.
6         Do you see that?
7     A.   I do.
8     Q.   Prior to this, had you told Mr.
9  Haney, Frank Haney, what the process would be
10  for approval by the NRC of the various steps
11  that would be required to get from where you
12  were then to an operating license?
13     A.   An operating license?  Yes.
14     Q.   And had you told them how long it
15  would likely take for the NRC to consider the
16  approval of transfer of the construction
17  permits?
18     A.   Yes.
19     Q.   Did it surprise you that he asked
20  the question when will they sign off?
21     A.   It didn't surprise me that he
22  asked the question.
23     Q.   Okay.  You then responded to that,

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**

---

### Page 209

1    correct, the next day?
2         A.  Yes.
3         Q.  And you said Frank, the four of us
4    should get together on a call and discuss the
5    path forward so that we are clear on details,
6    right?
7         A.  Yes.
8         Q.  Do you know if you got on such a
9    call?
10        A.  Yes.
11        Q.  When did that call occur?
12        A.  Let's see.  This was August 15th.
13   It was -- it was within one or two days after
14   the email.
15        Q.  Then you go on in this email to
16   say:  The next step is for us to submit a
17   formal application for transfer of the CPs from
18   TVA to ND.  We need to get at least a minimum
19   credible QA program in place and do a few other
20   things.
21             Do you see that?
22        A.  Yes.
23        Q.  Now -- so is it fair to say that

---

### Page 210

1    as of the time you wrote that, you did not have
2    your QA program ready to go?
3         A.  We -- ready to go in terms of
4    implementation and full submittal is correct.
5         Q.  All right.  So when you told me
6    earlier that you thought it was around the
7    first of August that the QA program was
8    complete, does this now refresh your
9    recollection that it wasn't complete at the
10   first of August?
11        A.  Yes.
12        Q.  Okay.  And having seen this, do
13   you have now a different view of -- or
14   recollection of when the QA program was
15   complete?
16        A.  Not specifically, no.
17        Q.  All right.  But it would have been
18   a matter of weeks after this?
19        A.  Yes.
20        Q.  Okay.  Would it have been more
21   than a month after this?
22        A.  Possibly.
23        Q.  Okay.  Now, then you go on to say:

---

### Page 211

1    Once we submit a request to transfer the CPs,
2    which we have not done yet, NRC will go through
3    a months' long process of review involving many
4    meetings with the staff and responding to
5    questions from them before making a decision.
6             Did I read that right?
7         A.  Yes.
8         Q.  All right.  And then you say:  NRC
9    has been very clear since the first time we met
10   with Vic McCree and his staff that this review
11   and hopefully approval will not go quickly.
12             Did I read that right?
13        A.  Yes.
14        Q.  I don't think there is any reason
15   to believe we won't be successful in getting
16   approval, but it won't happen without going
17   through the process, and that will take time.
18             Do you see that?
19        A.  I do.
20        Q.  So is it fair to say you were
21   emphasizing to Mr. Frank Haney that this
22   process was going to take a period of months to
23   complete?

---

### Page 212

1         A.  Yes.  In fact, he had heard that
2    at the meeting at Vic McCree's, so I was
3    attempting to refresh his memory.
4         Q.  Okay.  All right.  Then Mr. Haney
5    responded to you saying I think the only -- and
6    I think it is supposed to be thing -- we lack
7    is an owner QA program.
8             Was that correct as of August
9    15th, that the only thing that was lacked for
10   submittal of the application for transfer of
11   the construction permits was the owner QA
12   program?
13        A.  No, it was not.
14        Q.  Okay.  It goes on to say:  SNC
15   said they would formulate or we could use TVA's
16   or Westinghouse said they could help or maybe
17   Exelon would help.  We just need to decide and
18   move forward.  Thoughts?
19             That's what he said, right?
20        A.  Correct.
21        Q.  And then you responded on the same
22   date, August 15th, and said, Frank, Marie is
23   working on the SNC QA program; do you see that?

---

**William McCollum**

**11/13/2019**

Page 213

1    A.   Yes.

2    Q.   And that's Marie Gilman, right?

3    A.   That's correct.

4    Q.   We can only use Exelon's if they

5 sign up, which they have not agreed to yet; do

6 you see that?

7    A.   Yes.

8    Q.   And Exelon was the potential

9 operator that had not yet committed to

10 participate in the project, correct?

11    A.   Yes.

12    Q.   All right.  And then you say:  I

13 agree we do need to move forward with the

14 application ASAP.

15         Now, when you said that to Mr.

16 Haney, what did you have in mind as an ASAP

17 time frame for submittal of the application?

18    A.   I didn't have a specific date in

19 mind.

20    Q.   Okay.  And then you go on to say:

21 My only point to try to answer your question

22 about NRC signing off was to say that once we

23 submit the transfer request, approval from NRC

Page 214

1 will take months, not days or weeks.  Right?

2    A.   Yes.

3    Q.   Okay.  Then the next email in the

4 chain is an email to you from Mr. Matthews

5 saying:  I have prepared a punch list of what I

6 think are the decision steps and information we

7 need before we can submit.  Do you see that?

8    A.   I do.

9    Q.   And then he says:  I have asked

10 Steven to take a look at it.  Once he has, I

11 will forward for your review and comment before

12 sending it on.

13         Did I read that right?

14    A.   I believe so.

15    Q.   Okay.  All right.  Then your

16 response to that was:  Thanks.  Once you have

17 the punch list together, I would like for you,

18 Steven, Marie Gilman and I to get together on a

19 call and discuss the punch list and earlier

20 note on transferring the CPs.

21         Do you see that?

22    A.   I do.

23    Q.   What are you referring to with the

Page 215

1 earlier note on transferring the CPs?

2    A.   I'm not certain.  I think that I

3 was referring to one of these earlier emails.

4    Q.   Okay.  You then go on to say:  My

5 goal is to make sure Marie and the rest of us

6 are aligned on what we need to do and how and

7 also to identify if there are any things we

8 need someone else to do for us; do you see

9 that?

10    A.   Yes.

11    Q.   Had there been any previous

12 efforts to make sure that Marie and the Morgan

13 Lewis lawyers and you were aligned on what

14 needed to be done?

15    A.   Yes.

16    Q.   But you felt like there needed to

17 be further discussion about that, correct?

18    A.   Yes.

19    Q.   All right.  Then you say:  At the

20 present time, Marie is confused by some of what

21 she has heard, which is not surprising since

22 she has been talking to Frank, me, and you guys

23 separately.

Page 216

1         What did you understand Marie was

2 confused about?

3    A.   The fact that Frank had an overly

4 simplified view of what material we needed to

5 submit with the application.

6    Q.   And what do you mean when you say

7 Frank had an overly simplified view?  Of what?

8    A.   Well, of the supporting technical

9 and QA information for the application and that

10 he tended to think that Marie could write up a

11 couple of pages of information and we could

12 throw it in the application and that would be

13 that.

14    Q.   Had you tried to talk to Frank to

15 explain to him that it wasn't that simple?

16    A.   Yes.

17    Q.   All right.  And was it not

18 registering?

19    A.   I can't speak to Frank --

20    Q.   What was your perception?  Was he

21 still taking the simplified view even after you

22 had explained it?

23    A.   Well, we had a number of -- we had

**William McCollum**                                    **11/13/2019**

Page 217

1    a number of conversations around that issue.
2         Q.   And the simplified view persisted?
3         A.   For some period of time.
4         Q.   Now, in the next email, Mr.
5    Matthews says:  Attached is our draft of the
6    punch list.  We fully agree with your
7    suggestion on coordination and are anxious to
8    participate.
9              Do you see that?
10        A.   I do.
11        Q.   Then he says:  If we could
12   schedule a recurring alignment meeting, that
13   would be helpful too.
14             Do you see that?
15        A.   I do.
16        Q.   In fact, were there recurring
17   alignment meetings after this?
18        A.   There were a series of telephone
19   calls, yes.
20        Q.   Okay.  Now, let's turn to page
21   7581 in Exhibit 60.
22        A.   Yes.
23        Q.   And this is the punch list that

Page 218

1    Mr. Matthews transmitted to you -- this and the
2    succeeding pages in the exhibit is the punch
3    list that he transmitted to you in August 2018,
4    correct?
5         A.   Yes.
6         Q.   All right.  And did you review it
7    at the time?
8         A.   Yes.
9         Q.   All right.  And did you agree that
10   it captured the punch list items?
11        A.   Yes.
12        Q.   All right.  And as far as you were
13   concerned, were any of these punch list items
14   complete as of August 16th, 2018?
15        A.   Yes, with the exception of giving
16   the information to Morgan Lewis.
17        Q.   Okay.  So none of -- none of
18   what's on here had been transmitted yet to
19   Morgan Lewis; is that fair?
20        A.   I believe that's correct.
21        Q.   Okay.  All right.  In Roman
22   numeral I of the punch list, it talks about
23   identification of the applicant.

Page 219

1         A.   Uh-huh.
2         Q.   Is that a yes?
3         A.   I'm sorry, that's a yes.
4         Q.   And you were responsible for that,
5    correct?
6         A.   Yes.
7         Q.   And as of August 16th, 2018, had
8    you already gathered that information?
9         A.   Just a second.  We had all of that
10   information available, I just needed to confirm
11   that the information I had was up to date
12   before sending it to Morgan Lewis.
13        Q.   Was this the first time that
14   anyone had put together a punch list for the
15   application for transfer of the construction
16   permits?
17        A.   In this form, yes.
18        Q.   Well, were there punch lists in
19   other forms?
20        A.   We had discussions of people
21   performing actions similar to some of the
22   things that you see listed here, but it was not
23   a punch list.

Page 220

1         Q.   All right.  Was it in any written
2    form that you can recall?
3         A.   Not that I recall.
4         Q.   All right.  Now, in I.C it said:
5    Decide whether to remain with current structure
6    or follow EXC's recent suggestion of creating
7    ND OpCo to conduct activities on behalf of the
8    owner.  Both would be NRC licensees.
9              Do you see that?
10        A.   I do.
11        Q.   Had that decision been made as of
12   August 16th, 2018?
13        A.   Yes.
14        Q.   And what was the decision, to
15   stick with the current structure?
16        A.   Yes.
17        Q.   All right.  Then Roman numeral II
18   is Estimated (Latest) Date For Completion of
19   Construction; do you see that?
20        A.   I do.
21        Q.   And it says:  Suggest we pick a
22   late date rather than an aggressive
23   construction schedule so that the permit life

William McCollum                                           11/13/2019

Page 221

1    is not at risk without additional regulatory
2    action.
3              Do you see that?
4         A.   I do.
5         Q.   Had that issue been completed as
6    of August 16th, 2018?
7         A.   Yes.  I just needed to confirm my
8    selection of the date was okay with Franklin
9    and Frank Haney.
10        Q.   And what was the date?
11        A.   I don't recall right now.
12        Q.   What is your best estimate of what
13   that date was?  How many years out?
14        A.   Completion of construction was
15   roughly 20 -- latter part of 2024.
16        Q.   Okay.  And that was for Unit 1?
17        A.   Yes.
18        Q.   What about Unit 2?
19        A.   It would have been about a year
20   behind that.
21        Q.   So basically six years down the
22   road for Unit 1?
23        A.   Yes.

Page 222

1         Q.   Then Roman numeral III on the
2    punch list was Technical Qualifications; and
3    again, you were responsible for that, right?
4         A.   Yes.
5         Q.   And had the information required
6    under III.A been completed as of August 16,
7    2018?
8         A.   No.
9         Q.   Okay.  When was it completed?
10        A.   It was completed by November.
11        Q.   For the information that you had
12   mentioned that was completed as of August 16,
13   2018 on this list, why had it not already been
14   transmitted to Morgan Lewis?
15        A.   Because there just wasn't a need
16   to send it to them before we were ready to
17   submit the entire application.
18        Q.   Okay.  Under Roman numeral III-b,
19   had that information already been completed as
20   of August 16th, 2018?
21        A.   (Reviewing document.)  Just one
22   second.  Okay.  So just to clarify --
23        Q.   Yes, sir.

Page 223

1         A.   -- there is Roman numeral III
2    capital A and then lower case b; is that what
3    you are referring to?
4         Q.   I am referring to lower case b,
5    yes, sir, at the first item on page two of the
6    punch list titled Manager Regulatory
7    Affairs/Licensing; are we together?
8         A.   We are.
9              MR. O'REAR:  It would actually be
10   III.A 1-b.
11        A.   You are right, sorry.  And the
12   question was, was that in place?
13        Q.   (BY MR. LEMBKE:)  Was that
14   complete or to be completed as of that date?
15        A.   It was essentially complete.  This
16   punch list reflects Morgan Lewis' notion of how
17   this would be done.  We were going to do it a
18   little bit differently and rely on licensing
19   help from Framatome.  So it was essentially
20   complete, but not exactly the way they indicate
21   here.
22        Q.   All right.  C is plant manager; do
23   you see that?

Page 224

1         A.   Deferred plant, yes.
2         Q.   Yes, sir.  And it says essentially
3    what Chardos is doing now, Chardos would be a
4    good candidate if available; do you see that?
5         A.   I do.
6         Q.   Had you ever had discussions with
7    either Franklin or Frank Haney about the
8    possibility of Jim Chardos becoming a Nuclear
9    Development employee after the closing?
10        A.   No, I was advised that the
11   Purchase and Sale Agreement prohibited us from
12   soliciting TVA employees, so we didn't do that.
13        Q.   I didn't ask that.  That wasn't my
14   question.
15             My question was had you had a
16   conversation with Franklin Haney or Frank Haney
17   about the possibility of after the closing
18   hiring Jim Chardos?
19        A.   No.
20        Q.   Had you had a discussion with
21   anyone associated with Nuclear Development
22   about that?
23        A.   No.

**William McCollum**                                    **11/13/2019**

---

Page 225

1    Q.   Again on the second page of the
2  punch list, D -- well, let me ask, I'm not sure
3  I asked the question on C.
4          Had that been determined as of
5  August 2018?
6    A.   No.
7    Q.   D is Director Construction
8  Planning; had that been determined as of August
9  16, 2018?
10   A.   We -- yes, it had been.
11   Q.   E says:  Also need to describe
12 source of additional workers who will support
13 these managers.  Had that been determined as of
14 August 16, 2018?
15   A.   Yes.
16   Q.   All right.  Then if we flip the
17 page to the third page of the punch list, the
18 first section on the third page is entitled
19 Construction Phase, and the person responsible
20 is Marie; do you see that?
21   A.   I do.
22   Q.   Had the items listed under the
23 Construction Phase been completed as of August

---

Page 226

1  16, 2018?
2    A.   No.
3    Q.   Then Roman numeral B at the bottom
4  of the third page of the punch list also
5  assigned to Marie is Quality Assurance Program
6  Description; do you see that?
7    A.   No.  On page three, Roman numeral
8  III?
9    Q.   Page three of the punch list, B --
10   A.   Oh, B.
11   Q.   -- Quality Assurance Program
12 Description; do you see that?
13   A.   I do.
14   Q.   And that had not been completed as
15 of this date, August 16, 2018, correct?
16   A.   It had not.
17   Q.   All right.  Then on page four,
18 Marie is assigned C, which is Qualifications of
19 the Constructor; do you see that?
20   A.   I do.
21   Q.   Had that been completed as of
22 August 16, 2018?
23   A.   No.

---

Page 227

1    Q.   All right.  Next is Financial
2  Qualification, and A is Newly Formed Entity
3  Information, and that's assigned to you
4  indicating will discuss with Larry Blust, Frank
5  and Franklin; do you see that?
6    A.   I do.
7    Q.   Had that been completed as of
8  August 16, 2018?
9    A.   My understanding was that
10 everything was in place, but we hadn't given
11 this information to Morgan Lewis.
12   Q.   Okay.  And IV.B, Project
13 Financing, was that information complete as of
14 August 16, 2018?
15   A.   We had all the information, but it
16 hadn't been transmitted to Morgan Lewis.
17   Q.   All right.  Then Roman numeral V
18 says:  Other.  While not formally a part of the
19 application, NRC will want to see our plan for
20 transition turnover of the responsibilities
21 from TVA.  They won't want TVA to just walk
22 away; rather they will want to see a plan for
23 turnover of function by function from one

---

Page 228

1  company to the next.
2          Do you see that?
3    A.   I do.
4    Q.   That was assigned to Marie, right?
5    A.   That's correct.
6    Q.   Had that been completed?
7    A.   No.
8    Q.   And was that ever a part of the
9  application submitted?
10   A.   Not in the way that Morgan Lewis
11 proposed it.
12   Q.   All right.  Was anything akin to
13 that included in the application?
14   A.   Well, there was -- it was alluded
15 to in a general way, but not the way that they
16 indicate here.
17   Q.   How was it alluded to in a general
18 way?
19   A.   That we would have an orderly
20 transition from the TVA staff to Nuclear
21 Development on site.
22   Q.   But other than that high level
23 discussion, no plan was submitted?

---

William McCollum                                                11/13/2019

Page 229

1    A.   No details.
2    Q.   Okay.
3         MR. O'REAR:  We are at noon now.
4    Are you through with that document?
5         MR. LEMBKE:  I am almost done with
6    the document.
7    Q.   (BY MR. LEMBKE:)  The -- and was
8    this punch list maintained?  I mean, was it a
9    reference point over the course of the next
10   three months from the time it was created until
11   the application was submitted?
12   A.   Yes.
13   Q.   Were there any items ever added to
14   it?
15   A.   Not that I recall.
16   Q.   All right.
17        MR. LEMBKE:  Let's go off the
18   record.
19        THE VIDEOGRAPHER:  We are off the
20   record at 12:00 p.m.
21        (Whereupon, the lunch recess was
22        taken at 12:00 p.m. until 1:08
23        p.m.)

Page 230

1         THE VIDEOGRAPHER:  We are back on
2    the record at 1:08 p.m.
3    Q.   (BY MR. LEMBKE:)  Mr. McCollum, do
4    you recall that on August 29th, 2018, Nuclear
5    Development requested a six-month extension of
6    the closing date on the Purchase and Sale
7    Agreement for the Bellefonte site?
8    A.   I was aware of that, yes.
9    Q.   Okay.  And do you know why Nuclear
10   Development asked for that at that time?
11   A.   I don't.
12   Q.   Let me show you what I am going to
13   mark as Exhibit 82.
14        (Exhibit Number 82 was marked for
15        identification.)
16   Q.   And, Mr. McCollum, the first page
17   of this is an email from Tim Matthews to Chris
18   Chandler at TVA with a copy to you dated
19   November 13th, 2018, right?
20   A.   I see that, yes.
21   Q.   And it is attaching a copy of the
22   application submitted by Nuclear Development to
23   the NRC for approval of the transfer of the

Page 231

1    Bellefonte construction permits along with your
2    cover letter transmitting that application,
3    correct?
4    A.   Yes.
5    Q.   All right.  And you signed the
6    cover letter, correct?  It's at page 4765 --
7    A.   (Reviewing document.)  Yes.
8    Q.   -- Exhibit 82.
9         And you believed every word in
10   that cover letter was true, correct?
11   A.   I did believe it was true and
12   correct, yes.
13   Q.   And you, in fact, believed that
14   every word in the entire application was true
15   and correct, true?
16   A.   Yes.
17   Q.   And at page 4766 you gave an
18   affirmation that everything in the letter and
19   the license application was true and correct to
20   the best of your knowledge, information and
21   belief, correct?
22   A.   I did affirm, yes.
23   Q.   Okay.

Page 232

1         MR. O'REAR:  Let me state that to
2    the extent there are proprietary inclusions and
3    information in this letter, we designate them
4    as confidential.  I notice that they are not
5    stamped confidential on this exhibit, but --
6         MR. LEMBKE:  Isn't this a public
7    document?
8         MR. O'REAR:  Part of it is public
9    and part of it is not public, but I am not sure
10   exactly which -- which is which.  But I just
11   reserve that right to mark that confidential.
12        MR. LEMBKE:  Okay.
13   Q.   (BY MR. LEMBKE:)  Now, Mr.
14   McCollum, when you sent this letter, you
15   understood that the permits, the construction
16   permits for Bellefonte, could not be maintained
17   in deferred plant status and Nuclear
18   Development proceed to closing, correct?
19        MR. O'REAR:  Objection.  Present a
20   specific provision in a very lengthy exhibit
21   you are referring to.
22        MR. LEMBKE:  I am not referring to
23   anything.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Page 233

1    MR. O'REAR:  I thought you were.
2    MR. LEMBKE:  No.
3    Q.   (BY MR. LEMBKE:)  You understood
4  that when you submitted your letter and the
5  application that the Bellefonte construction
6  permits could not be maintained in deferred
7  plant status and the closing take place,
8  correct?
9    MR. O'REAR:  Same objection.
10    A.   I did not understand that.
11    Q.   (BY MR. LEMBKE:)  All right.
12  Well, let's look at page -- the first page of
13  your cover letter which is Bates number 4761.
14    A.   Yes.
15    Q.   In the end of the first paragraph,
16  you say:  To the extent that NRC does not have
17  sufficient time to decide substantively on the
18  matters requested in the application prior to
19  closing of the asset transfer, Nuclear
20  Development requests that the NRC hold the
21  permits in terminated plant but unexpired and
22  not withdrawn status, consistent with the
23  Section III.B of the Deferred Plants Policy

Page 234

1  until such time as the Commission has reached
2  its determination on these requests.
3    That's what you said, right?
4    A.   Yes.
5    Q.   Well -- so you were asking for the
6  permits to be switched from deferred plant
7  status to terminated plant status if the NRC
8  could not act on this application prior to
9  closing, correct?
10    MR. O'REAR:  Object to the form.
11  Mistaken summary of what is stated here.
12    A.   I'm not sure that I understand it
13  the way you state it.  I would have to refer to
14  the Deferred Plants Policy.
15    Q.   (BY MR. LEMBKE:)  Well, guess what
16  I have got for you.
17    A.   Good.
18    Q.   Let me let the court reporter mark
19  this as Exhibit 83.
20    (Exhibit Number 83 was marked for
21    identification.)
22    Q.   But before you get there, it is
23  true that you are asking the NRC if it did not

Page 235

1  rule on the transfer application prior to the
2  closing of the sale of Bellefonte to Nuclear
3  Development, you were asking that the permits
4  be switched from deferred plant status to
5  terminated plant status until that NRC action
6  could be undertaken, correct?
7    MR. O'REAR:  Same objection,
8  misstates the record.
9    A.   Yeah, I don't see the term
10  switched in the letter.
11    Q.   (BY MR. LEMBKE:)  Well, you
12  understood that the permits -- I take your
13  point, but you understood that the permits were
14  not being held by TVA in terminated plant
15  status, correct?
16    A.   Yes, I'm not clear on the
17  distinction between deferred plant and
18  terminated plant.
19    Q.   You wrote the letter, right?
20    A.   I understand.
21    Q.   But you weren't clear of what you
22  were saying in the letter?
23    A.   I'm clear of what the letter says.

Page 236

1  I'm not clear about what you are saying.
2    Q.   Well, you were asking -- you
3  understood that TVA -- that the two Bellefonte
4  construction permits were in deferred plant
5  status as TVA held them, correct?
6    A.   Yes.
7    Q.   And you understand that terminated
8  plant status is different from deferred plant
9  status, correct?
10    A.   In this instance, I'm not sure.
11    Q.   So just based on your years of
12  experience in the nuclear power industry, you
13  don't know whether deferred plant status is
14  different from terminated plant status, is that
15  what you are saying?
16    A.   Not this specific case.
17    MR. O'REAR:  Objection, asking for
18  a question of law.
19    Q.   (BY MR. LEMBKE:)  Well, when you
20  wrote this -- you were making a request to NRC,
21  correct?
22    A.   Correct.
23    Q.   And isn't it a fair inference you

**William McCollum**

Page 237

1    are asking them to ask that they be held in
2    some different status during the pending
3    determination on the transfer application?
4        A.   It's accurate to say that the
5    letter asked that they be held in terminated
6    plant status.
7        Q.   Right.  Why did you ask for that
8    permission to hold them in terminated plant
9    status?
10       A.   On advice of counsel.
11       Q.   Okay.  Did you believe that
12   Nuclear Development could hold the plants --
13   excuse me, let me start over.
14            If the closing occurred on the
15   sale of Bellefonte to Nuclear Development
16   before the NRC ruled on the transfer
17   application, did you understand that it was
18   permissible for Nuclear Development to hold the
19   permits in the same manner as TVA held the
20   permits?
21            MR. O'REAR:  Objection.  Could you
22   restate the question?  Sorry.
23            MR. LEMBKE:  Will you read it

Page 238

1    back, Gail?
2            (Record read.)
3            MR. O'REAR:  I object.  To me,
4    that's unintelligible.  I'm not sure you meant
5    to ask that question.
6            MR. LEMBKE:  That's exactly what I
7    intended to ask.
8        A.   Okay.  Can you read it back one
9    more time for me, please?
10           (Record read.)
11           MR. O'REAR:  Referring to the
12   construction permits?
13           MR. LEMBKE:  Yes.
14           MR. O'REAR:  You are asking him if
15   it was permissible for Nuclear Development
16   to --
17           MR. LEMBKE:  You have made your
18   objection.
19           MR. O'REAR:  I know.  I don't
20   understand your question; I don't know if the
21   witness does.
22       A.   So to the extent that I understand
23   what you are asking, I think my answer is yes,

Page 239

1    that was my understanding at the time.
2        Q.   (BY MR. LEMBKE:)  Well, if it was
3    permissible for the permits to remain in
4    deferred plant status, then why were you asking
5    for them to be held by NRC in terminated plant
6    status?
7        A.   Well, because that was done on
8    advice of counsel.
9        Q.   All right.  I put before you
10   Exhibit 83 which is the -- do you recognize
11   this as the Nuclear Regulatory Commission
12   Policy Statement on Deferred Plants dated
13   October 14, 1987?
14       A.   That's what the document says.
15       Q.   And this is what you were
16   referring to when you referenced the Deferred
17   Plants Policy in your letter of November 13,
18   2018 to the NRC, correct?
19       A.   Give me just one second.
20   (Reviewing document.)  Yes.
21       Q.   Now, in the sentence we have been
22   looking at on the second page of Exhibit 82,
23   which is the first paragraph of your letter to

Page 240

1    the NRC transmitting the permit transfer
2    application, you say -- you request that NRC
3    hold the permits in terminated plants but
4    unexpired and not withdrawn status consistent
5    with the Section III.B of the Deferred Plants
6    Policy; do you see that?
7        A.   I do see that.
8        Q.   And Section III.B of the Deferred
9    Plants Policy is on page six of Exhibit 83; do
10   you see that?
11       A.   I do.
12       Q.   What were you referring to in
13   Section III.B when you made that statement?
14       A.   That was included on advice of
15   counsel, and I don't have a specific
16   understanding of which item under III.B was
17   referenced.
18       Q.   So when you made an affirmation
19   that the statements in your letter were true
20   and correct to the best of your knowledge,
21   information and belief, you didn't really have
22   an understanding of what you meant when you
23   said consistent with the Section III.B of the

**William McCollum**                                    **11/13/2019**

Page 241

1  Deferred Plants Policy, is that correct?
2      A.   I believe that my affirmation was
3  correct and that I believe that this
4  information was correct to the best of my
5  knowledge and understanding based upon advice
6  of counsel.
7      Q.   All right.  So is it fair to say
8  you signed it because Nuclear Development's
9  counsel told you to sign that part of it?
10         MR. O'REAR:  Objection.
11     A.   That's not correct.
12     Q.   (BY MR. LEMBKE:)  All right.
13  Well, do you sitting here today have an
14  understanding of what you meant when you said
15  consistent with the Section III.B of the
16  Deferred Plants Policy?
17     A.   I can't offer legal explanations
18  about those references, no.
19     Q.   I am not asking for any legal
20  explanation.  I am asking for you as the author
21  of the letter what you understood you were
22  saying to the NRC when you said that?
23     A.   I can't offer you an explanation

Page 242

1  other than what I have already said.
2      Q.   Okay.  In looking at Section III.B
3  of Exhibit 83, the first sentence says:  A
4  licensee should inform the director of NRR when
5  a plant is placed in a terminated status;
6  right?
7      A.   That's what it says.
8      Q.   And the licensee here is TVA, not
9  Nuclear Development, correct?
10     A.   That's correct.
11     Q.   All right.  And I don't -- I don't
12  see anything in Section III.B that talks about
13  any action that could be taken by a prospective
14  transferee of the license; do you?
15     A.   No.
16     Q.   And I don't see any reference in
17  Section III.B to the NRC holding issued permits
18  in a terminated plant status while it considers
19  a transfer application; do you?
20     A.   No.
21     Q.   All right.  If you look at the
22  second page of your letter, which is Bates
23  number 4762 in Exhibit 82 --

Page 243

1          Well, before we do that, did you
2  read the Deferred Plant Policy before you
3  signed this letter?
4      A.   I did not.
5      Q.   Did you ever ask TVA to consent to
6  switching the permits to terminated status?
7      A.   I did not.
8      Q.   Are you aware of anyone
9  representing Nuclear Development doing that?
10     A.   I'm not.
11     Q.   All right.  On page two in the
12  third paragraph, the paragraph begins both
13  Bellefonte units are currently in deferred
14  plant status.  Do you see that?
15     A.   I do.
16     Q.   And then it says:  In 2014, TVA
17  requested an extension of the completion date
18  for Unit 2.  Do you see that?
19     A.   I do.
20     Q.   And then you wrote:  On March
21  31st, 2017, TVA provided an update on that
22  extension request noting the continuing timely
23  renewal status of that application under 10 CFR

Page 244

1  Section 2.109 and informing NRC of the planned
2  sale of the Bellefonte unit to Nuclear
3  Development.
4          Do you see that?
5      A.   I do.
6      Q.   And then you wrote:  This update
7  also deferred action regarding a revised
8  construction completion date to interaction
9  between NRC and Nuclear Development.
10         Do you see that?
11     A.   Yes.
12     Q.   And then you concluded:  Thus,
13  Unit 2 remains in timely renewal status;
14  correct?
15     A.   Yes.
16     Q.   And that's what you believed to be
17  true and correct?
18     A.   That's correct.
19     Q.   And that was Nuclear Development's
20  position, correct?
21     A.   That's correct.
22     Q.   Okay.  All right.  In the next
23  paragraph, about five lines from the bottom, do

**William McCollum**                                    **11/13/2019**

---

Page 245

1  you see the sentence that begins once the
2  permits have been transferred?
3      A.   Yes.
4      Q.   All right.  Am I right that you
5  wrote:  Once the permits have been transferred,
6  Nuclear Development plans to continue only the
7  status quo physical preservation, security and
8  safety activities now being conducted by TVA?
9          Do you see that?
10     A.   I do.
11     Q.   What was going to happen with the
12 status quo physical preservation, security and
13 safety activities prior to transfer of the
14 permits?
15     A.   The intent was that all of the
16 activities would continue as they had been.
17     Q.   By whom?
18     A.   By TVA or Nuclear Development.
19     Q.   Well, which one?
20         MR. O'REAR:  At what point in
21 time?
22     Q.   (BY MR. LEMBKE:)  Well, this is
23 referring to -- let me make my time period.

---

Page 246

1          If the closing had occurred but
2  the permits had not yet been transferred, who
3  was going to be responsible for the physical
4  preservation, security and safety activities
5  that had been conducted by TVA prior to the
6  closing?
7      A.   The application describes the
8  activities that would be undertaken once the
9  permits have been transferred.
10     Q.   Right.  But I am talking about
11 what was contemplated by Nuclear Development if
12 there was a period after the closing but before
13 the permits were transferred?  What was going
14 to happen with regard to those activities?
15     A.   That we would arrange for a way
16 for those activities to continue.
17     Q.   You didn't say that anywhere in
18 here, did you?
19     A.   This is describing the activity we
20 will undertake -- this is an application for
21 transfer of the construction permits, so it
22 describes the activities that we will undertake
23 upon transfer of the construction permits.

---

Page 247

1      Q.   Right.  But I am asking did you
2  ever communicate with NRC about what was going
3  to happen with regard --
4          Well, let me start with this:  You
5  understand that NRC imposes obligations
6  relating to physical preservation, security and
7  safety activities at nuclear plants in deferred
8  plant status, right?
9      A.   Yes.
10     Q.   All right.  And you understood
11 that TVA was obligated under its permits to
12 perform those activities -- or comply with
13 those obligations, correct?
14     A.   Yes.
15     Q.   All right.  Now, in this letter
16 you contemplated that the Bellefonte site would
17 be transferred to Nuclear Development prior to
18 approval of transfer of the construction
19 permits to Nuclear Development, correct?
20     A.   As a possibility, yes.
21     Q.   All right.  And my question is,
22 did Nuclear Development ever address with the
23 NRC if that possibility came to pass how the

---

Page 248

1  obligations of the licensee under the permits
2  would be satisfied with regard to physical
3  preservation, security and safety activities?
4      A.   We didn't get to that point, no.
5      Q.   Okay.  Did you ever have a
6  discussion with TVA about how that was going to
7  be handled?
8      A.   I had discussions with the
9  transition executive when I contact Jim Chardos
10 in general terms that we might need to work
11 together.
12     Q.   All right.  Are you aware that TVA
13 had any contractual obligation post-closing to
14 perform any of those activities at the site?
15     A.   I'm not.
16     Q.   But you understand that if TVA was
17 still the licensee that TVA would have the
18 obligation in the eyes of the NRC to carry out
19 those activities, right?
20     A.   During the period between the
21 Purchase and Sale Agreement and the intended
22 closing date, TVA had those obligations and was
23 performing activities in response to those

---

**William McCollum**

Page 249

1    obligations for which they were being
2    reimbursed by Nuclear Development.
3        Q.   But TVA had --
4        A.   So that is an arrangement that
5    certainly could have continued.
6        Q.   But there was no contractual
7    agreement by TVA to continue that, correct?
8        A.   I don't know that to be a fact,
9    no.
10       Q.   You don't know of any, do you?
11       A.   I do not.
12       Q.   All right.  Nor are you aware of
13   Nuclear Development ever committing to pay TVA
14   to continue those activities, correct?
15       A.   That's correct.
16       Q.   All right.  Now if you will turn
17   to page 4763, which is page three of your
18   letter to the NRC transmitting the construction
19   permit transfer application, in the very bottom
20   paragraph that begins Nuclear Development is
21   pursuing a project finance model.  Do you see
22   that?
23       A.   Oh, I'm sorry, hang on.

Page 250

1        Q.   The very last paragraph on the
2    page.
3        A.   (Reviewing document.)  Yes, okay.
4        Q.   All right.  And do you see the
5    last sentence on the last line begins:  It is
6    negotiating with the Department of Energy Loan
7    Program Office for a loan guarantee under the
8    Energy Policy Act of 2005 and expects to
9    receive a conditional commitment.  Do you see
10   that?
11       A.   I do.
12       Q.   What was the basis for your
13   statement that Nuclear Development expected to
14   receive a conditional commitment?
15       A.   The fact that we pursued the
16   application process with the Department of
17   Energy through phase one into phase two and had
18   submitted all of the information that
19   Department of Energy had requested under their
20   phase two process and had not received any
21   further requests for information and felt
22   confident that the information we provided
23   should allow the Loan Program Office to issue a

Page 251

1    conditional commitment.
2        Q.   Had anyone at the Loan Program
3    Office told Nuclear Development, to your
4    knowledge, that it could expect to receive a
5    conditional commitment?
6        A.   No, that would be against DOE
7    policy.
8        Q.   Okay.  Continuing on page four of
9    your letter, which is Bates number 4764, about
10   two-thirds of the way down the page, do you see
11   the paragraph that begins pursuant to 10 CFR
12   50.90?
13       A.   I do.
14       Q.   That sentence continues:  Nuclear
15   Development also requests NRC approval of
16   certain administrative amendments to conform
17   the permits to reflect a proposed transfer.
18   The changes are shown in Attachments 2 and 4 to
19   this letter.
20            Do you see that?
21       A.   I do.
22       Q.   Why were amendments to the permits
23   needed?  And I can direct you to the pages that

Page 252

1    I suspect you are looking for.  Attachment 2 is
2    at Bates number 4908 -- actually 4907 is the
3    start of Attachment 2, and 4913 is the start of
4    Attachment 4.
5        MR. O'REAR:  Could you read back
6    the question on the table?
7        MR. LEMBKE:  My question is why
8    were the amendments to the permits needed.
9        A.   In order to change the names on
10   the construction permits, the construction
11   completion dates.
12       Q.   (BY MR. LEMBKE:)  And if you look
13   at page 4908 which is the Unit 1 permit.  Do
14   you see that?
15       A.   I do.
16       Q.   The proposal was, in paragraph B,
17   under the existing permit the Tennessee Valley
18   Authority was defined to be the applicant,
19   correct?
20       A.   That's correct.
21       Q.   And so you understood that to mean
22   wherever the term applicant was used, that
23   referred to the Tennessee Valley Authority,

**William McCollum**                                           **11/13/2019**

---

Page 253

1   correct?
2       A.   Wherever it was used in the
3   original construction permit, is that --
4       Q.   Yes, sir.
5       A.   Yes, the applicant at that time
6   was Tennessee Valley Authority.
7       Q.   And so you understood it to be
8   necessary to change the name in Section 1-B of
9   the permit to Nuclear Development so everywhere
10  the term the applicant used going forward --
11  was used in the permit going forward, that
12  would mean Nuclear Development, correct?
13      A.   Yes.
14      Q.   And that was -- a parallel change
15  was suggested for the Unit 2 construction
16  permit in Section 1-B of that permit, correct?
17      A.   Yes.
18      Q.   All right.  Let's go back to page
19  4764.
20      A.   Okay.
21      Q.   At the bottom of that page, the
22  second to last paragraph begins in summary; do
23  you see that?

---

Page 254

1       A.   Yes.
2       Q.   And then it says:  In summary, the
3   proposed transfer of the permits will not be
4   inimical to the common defense and security or
5   result in any undue risk to public health and
6   safety.  And the transfer will be consistent
7   with the requirements of the Atomic Energy Act
8   and the NRC regulations.
9            Do you see that?
10      A.   I do.
11      Q.   And what, if any, research did you
12  do to determine whether the transfer would be
13  consistent with the requirements of the Atomic
14  Energy Act and the NRC regulations?
15      A.   I relied on investigation
16  performed by counsel.
17      Q.   Okay.  Let's turn to page 4769,
18  which is page one of fourteen in the actual
19  application; do you see that?
20      A.   I do.
21      Q.   All right.  And I want to direct
22  your attention, Mr. McCollum, to paragraph one
23  of the introduction.  And about midway through

---

Page 255

1   the paragraph, do you see the sentence that
2   begins Nuclear Development also requests that?
3       A.   Yes.
4       Q.   And that sentence says:  Nuclear
5   Development also requests that the NRC issue
6   conforming administrative amendments to reflect
7   the transfer and amend the permits to reflect
8   revised construction completion dates discussed
9   herein.  Did I read that correct?
10      A.   Yes.
11      Q.   Correctly, I mean.  And so does
12  this refresh your recollection that a
13  conforming amendment would include what you
14  were suggesting happened with regard to the
15  permits for Units 1 and 2?
16          MR. O'REAR:  Let me object to the
17  question if you are referring to another
18  document.  I think the question is misleading
19  in terms of your use of the word conforming
20  amendments.
21      Q.   (BY MR. LEMBKE:)  Well, earlier
22  today you told me you didn't know what a
23  conforming amendment was, right?

---

Page 256

1       A.   I think -- I think what I tried to
2   say earlier was the term conforming amendment
3   or conforming administrative amendments, I
4   might not understand all of the implications or
5   meanings of that term.  I do understand that we
6   were asking in this application that the NRC
7   change the permits to put in the name of
8   Nuclear Development, LLC and revised
9   construction dates.
10      Q.   And you understood that to be a
11  conforming amendment as that term is used by
12  the NRC?
13      A.   In terms of this sentence, that
14  appears to be so.
15      Q.   All right.  Now let me ask you to
16  turn to page twelve of the application, which
17  is Bates number 4780.
18      A.   Okay.
19      Q.   And you see the section QA
20  Program?
21      A.   Yes.
22      Q.   And the first sentence says:  Upon
23  consummation of the transfer, Nuclear

---

**William McCollum**

Page 257

1   Development will assume responsibility for the
2   overall QA program requirements associated with
3   maintaining ownership of permits as specified
4   for the Bellefonte units in the TVA nuclear
5   quality assurance program description QA PD
6   Revision 33 or later revision, if effective.
7   And then it goes on to say:  TVA will transfer
8   responsibility for the QA program requirements
9   at Bellefonte to Nuclear Development.
10         Do you see that?
11      A.  I do.
12      Q.  And am I correct that this is only
13   referring to what will happen when the NRC
14   approves transfer of the permits, correct?
15      A.  That is my understanding.
16      Q.  All right.  Then the next section
17   refers to a QV Program; do you see that?
18      A.  I do.
19      Q.  What does QV stand for?
20      A.  Quality verification.
21      Q.  All right.  And, again, what is
22   described here only relates to the time period
23   once the NRC approves transfer of the permits,

Page 258

1   correct?
2      A.  That's my understanding.
3      Q.  Okay.  And then if you turn to the
4   next page, which is page thirteen of the
5   application, Bates number 4781 in Exhibit 82,
6   in Section 8, that is entitled Requested Review
7   Schedule and Other Required Approvals; do you
8   see that?
9      A.  Yes.
10      Q.  And so if you look at the second
11   sentence, you say:  In any event, Nuclear
12   Development requests issuance of an order in
13   conforming license amendments by May 1st, 2019.
14         Do you see that?
15      A.  I do.
16      Q.  And, Mr. McCollum, you understood
17   when you submitted this that there was no
18   realistic possibility that the NRC would be
19   able -- if you were submitting this on November
20   13th, would be able to complete their review of
21   it and issue an order by the end of November,
22   correct?
23         MR. O'REAR:  By the end of

Page 259

1   November?
2      Q.  (BY MR. LEMBKE:)  By the end of
3   November 2018.
4      A.  Okay --
5      Q.  Let's break it down.  You
6   submitted this application on November 13th,
7   2018, correct?
8      A.  Yes.
9      Q.  You understood at the time you
10   submitted it that there was no realistic
11   possibility that the NRC would complete review
12   and issue an order in connection with the
13   application by seventeen days later, which
14   would have been November 30th, 2018, correct?
15      A.  Yes.
16      Q.  And so you expected that there
17   would be a gap where Bellefonte -- where the
18   Bellefonte site would be owned by Nuclear
19   Development, but the construction permits would
20   be held by TVA --
21         MR. O'REAR:  Object to the form --
22      Q.  (BY MR. LEMBKE:)  -- is that
23   right?

Page 260

1         MR. O'REAR:  -- use of the term
2   gap.
3      A.  Possibly, yes.
4      Q.  (BY MR. LEMBKE:)  Well, why do you
5   say possibly?
6      A.  Well, only because I don't ever
7   claim to know exactly what's going to happen in
8   the future.
9      Q.  All right.  But you had no -- you
10   certainly had no expectation that the NRC would
11   approve the transfer before the end of the
12   month of November of 2018, right?
13      A.  Correct.
14      Q.  And notwithstanding that, there
15   were no arrangements in place with TVA as to
16   how the QA obligations would be handled after
17   any closing that occurred on November 30th,
18   2018, correct?
19      A.  That's correct.
20      Q.  All right.  Now if you will turn
21   to page 4836 of Exhibit 82 --
22      A.  (Reviewing document.)  Okay.
23      Q.  -- this is the quality assurance

**William McCollum**                              **11/13/2019**

---

Page 261

1   plan prepared by SNC-Lavalin for Bellefonte for
2   Nuclear Development, right?
3        A.   Correct.
4        Q.   All right.  And this indicates
5   that it is a document of at least seventy-three
6   pages, correct?
7        A.   Yes.
8        Q.   All right.  And if you look at
9   page 4840 Section 1.3, in the section entitled
10  Scope of This QA Plan, the first paragraph
11  indicates that the plan would be in effect
12  during the period of deferral of the
13  construction period, right?
14       A.   Yes.
15       Q.   And this plan was not meant to
16  apply to a terminated plant status, correct?
17       A.   Our intent was that the plan would
18  apply during the period of time prior to
19  resuming active construction.
20       Q.   All right.  But would not begin to
21  apply until the NRC had approved transfer of
22  the permits, right?
23       A.   Correct.

---

Page 262

1        Q.   The amendments that you were
2   suggesting be made to the permits, at least the
3   one changing the name of the applicant, was
4   needed because you knew the applicant could not
5   continue to be shown as TVA if Nuclear
6   Development held the permit, right?
7        A.   Yes.
8        Q.   Now, you are aware, Mr. McCollum,
9   that the NRC deemed the application that was
10  submitted to be deficient, correct?
11       A.   They requested additional
12  information.
13       Q.   Is it fair to say the NRC was not
14  willing to proceed with review until Nuclear
15  Development provided more information?
16       A.   I think they stated that they
17  would need additional information to make a
18  decision on acceptance for review.
19       Q.   Okay.  And do you think that's not
20  a fair characterization to say it was deficient
21  to enable review by the NRC?
22       A.   No.
23       Q.   No.  Well, do you think it's fair

---

Page 263

1   to say the NRC was not satisfied with its
2   completeness?
3        A.   I think it's fair to say that the
4   NRC asked for additional information in making
5   their determination and had the right, if they
6   had chosen to, to use words like deficient.
7        Q.   Would you agree that the NRC
8   determined that the application was -- the
9   information provided was not sufficient?
10       A.   Yes.
11       Q.   And do you not regard not
12  sufficient and deficient as synonymous?
13       A.   I do not.
14       MR. O'REAR:  Objection.
15       Q.   (BY MR. LEMBKE:)  You do not?
16       A.   I do not.
17       Q.   Okay.
18       MR. O'REAR:  Agree with that.
19       MR. LEMBKE:  Move to strike.
20       MR. O'REAR:  I apologize.
21       (Exhibit Number 84 was marked for
22  identification.)
23       Q.   (BY MR. LEMBKE:)  I have given you

---

Page 264

1   what I have marked as Exhibit 84, Mr. McCollum.
2   And this is the letter of April 5, 2019 to you
3   from the NRC, correct?
4        A.   April 5th, 2019, yes.
5        Q.   And in it at the bottom of the
6   first page, they told you that the NRC staff
7   has reviewed your application and concluded
8   that the supplemental information delineated in
9   the enclosure to this letter is necessary to
10  enable the staff to make an independent
11  assessment regarding the acceptability of the
12  proposed license transfer application in terms
13  of regulatory requirements and the protection
14  of public health and safety and the
15  environment; do you see that?
16       A.   I do.
17       Q.   And they went on to tell you that
18  if you did not respond within three months that
19  the NRC would cease its review activities
20  associated with the application, correct?
21       A.   Yes.
22       Q.   And then attached to the letter
23  was a statement of the supplemental information

---

Page 265

1    that was needed, correct?
2        A.   Yes.
3        Q.   And under the Part 2, which begins
4    on page two, the last paragraph of Part 2 which
5    is on page three of the application -- excuse
6    me, the letter, Exhibit 84, they concluded:
7    Based on a review of the application, the staff
8    has concluded that ND has not provided
9    sufficient information addressing its technical
10   qualifications to perform the design and
11   construction activities authorized by the CP,
12   correct?
13       A.   Yes.
14           MR. O'REAR:  Could you direct me
15   to where you were reading?  I'm sorry, I
16   couldn't find it.
17           MR. LEMBKE:  It's the last
18   paragraph of Part 2 on page three of the
19   attachment to the letter.  Begins based on the
20   review, just above Part 3.
21           MR. O'REAR:  I see it.
22       Q.   (BY MR. LEMBKE:)  And you said I
23   read that correctly?

Page 266

1        A.   Yes.
2        Q.   Okay.
3        A.   And the paragraph closes by
4    stating:  To address this issue, ND may provide
5    additional information, et cetera.
6        Q.   All right.  How long did it take
7    ND to put together the supplemental information
8    requested by the NRC?
9        A.   I don't know the exact period of
10   time.
11       Q.   It was about ninety days, wasn't
12   it?
13       A.   Perhaps.
14       Q.   Well, is it your best recollection
15   it was around the first of July when you sent
16   in the supplemental information?
17       A.   Yes.  We requested time to put
18   together the information that they had asked
19   for.
20       Q.   And did you request an extension
21   beyond the ninety days that they allowed?
22       A.   Yes.
23       Q.   All right.  So Nuclear Development

Page 267

1    took more than ninety days to -- so it would
2    have been beyond early July, correct?
3        A.   That's my recollection, yes.
4        Q.   Okay.  And then let me show you
5    what I am going to mark as Exhibit 85.
6            (Exhibit Number 85 was marked for
7            identification.)
8        A.   (Reviewing document.)
9        Q.   And this is the letter of November
10   5, 2019 when Mr. McCollum -- Nuclear Regulatory
11   Commission advised you that it was going to
12   proceed with its review of the application,
13   correct?
14       A.   Yes.
15       Q.   And at the bottom of page one,
16   they indicate they expect to complete the
17   review by September 2020, correct?
18       A.   That's what they state.
19       Q.   So they are estimating essentially
20   a ten-month period for review, right?
21       A.   That's what they say.
22       Q.   In light of the fact that the
23   review of the construction permit transfer

Page 268

1    application is expected to be completed by
2    September 2020, what is the current expected
3    construction completion date for Unit 1?
4        A.   I haven't issued a revised
5    construction schedule, but if we received the
6    permit and the property and issued a
7    hundred-and-twenty-day letter, then I would
8    expect the construction completion to occur in
9    2027.
10       Q.   Is the hundred-and-twenty-day
11   letter ready to go?
12       A.   Hasn't been written yet, but it is
13   a short letter.
14           (Whereupon, Exhibit Number 67,
15           having been previously marked for
16           identification, was referenced in
17           this deposition.)
18       Q.   I'll ask you to pull out of your
19   stack Exhibit 67.
20       A.   Okay.
21       Q.   All right.  This is an email from
22   Frank Haney to you and Jim Chardos, Franklin
23   Haney and Larry Blust dated April 7th, 2017,

**William McCollum**

Page 269

1    right?
2         A.    April 7, 2017, correct.
3         Q.    All right.  And in it Frank Haney
4    says:  Jim and Bill, should we ask TVA and
5    Southern Company to do transition study or a
6    preliminary one to make sure we can wield the
7    power to whatever area we want on existing
8    lines?  We want to confirm we can actually sell
9    the power to whomever wants to buy it.
10   Thoughts?
11        That's what he said, right?
12        A.    That's correct.
13        Q.    Did you respond to this email?
14        A.    Yes.
15        Q.    And how did you respond?
16        A.    So I responded verbally telling
17   Frank that what he meant in here was not a
18   transition study, that he was referring to a
19   transmission study to obtain firm transmission
20   rights.  And I told him that to request firm
21   transmission rights, we would need to specify a
22   source and a sync for the power and so it would
23   be -- we shouldn't try to request a firm

Page 270

1    transmission rights until we had a definite
2    off-taker for the power.
3         Q.    And by off-taker, you mean someone
4    to buy it?
5         A.    Someone to purchase the power.
6         Q.    All right.  And it's true, is it
7    not, that TVA as a matter of law has no
8    obligation to transmit Nuclear Development's
9    power from Bellefonte over TVA lines?
10        MR. O'REAR:  Objection to the
11   extent it calls for legal conclusion.
12        Q.    (BY MR. LEMBKE:)  You can answer.
13        A.    I don't --
14        MR. O'REAR:  You can answer
15   whatever your understanding is.
16        A.    I don't believe that to be
17   correct.
18        Q.    (BY MR. LEMBKE:)  Do you -- so it
19   is your understanding that TVA is obligated to
20   transmit Nuclear Development power from
21   Bellefonte over TVA lines?
22        MR. O'REAR:  Same objection.
23        A.    Yes, that is my understanding.

Page 271

1         Q.    (BY MR. LEMBKE:)  All right.  What
2    is the basis of that understanding?
3         A.    That TVA accepts FERC jurisdiction
4    and FERC's open access policy requirements.
5    And so if Nuclear Development were to request
6    firm transmission rights across TVA lines to
7    take the power outside of TVA territory, they
8    would be legally required to perform a study
9    and give us firm transmission rights subject to
10   the payment of the costs incurred.
11        Q.    Did you ever research whether
12   there is any federal statute that expressly
13   addresses TVA's obligation in this regard?
14        MR. O'REAR:  Same objections I
15   made earlier about legal conclusion.
16        MR. LEMBKE:  This question was has
17   he ever done any research.
18        A.    Yes.
19        Q.    (BY MR. LEMBKE:)  Personally?
20        A.    Yes.
21        Q.    And what did you research?
22        A.    So I read the TVA Act as amended,
23   the Federal Power Act, and some previous legal

Page 272

1    cases involving TVA transmission rights.
2         Q.    And do you recall what any of
3    those legal cases were?
4         A.    Not at this time.
5         Q.    And when did you do this research?
6         A.    Early 2018, late 2017, somewhere
7    in that time frame.
8         Q.    When you were the chief operating
9    officer of TVA, did you have any responsibility
10   for transmission of power?
11        A.    I was responsible for the
12   operation and maintenance of the TVA
13   transmission system.
14        Q.    Let me show you what I am going to
15   mark as Exhibit 86.
16        (Exhibit Number 86 was marked for
17        identification.)
18        Q.    This is an exchange of emails
19   between you and Billy Gleaves in November 2017,
20   correct?
21        A.    Yes.
22        Q.    And what is -- Mr. Gleaves' email
23   to you of November 8, 2017 refers to SRI and

**William McCollum**

Page 273

1    SGI information; do you see that?
2        A.   Yes.
3        Q.   What is SRI information?
4        A.   I can't recall those acronyms
5    right now.
6        Q.   Do you know what SGI information
7    is?
8        A.   I believe it refers to safeguards
9    information, and my guess would be that SRI
10   refers to security related information.
11       Q.   Okay.  And Mr. Gleaves was talking
12   to you -- he said he was following up on a
13   discussion about setting up a system for
14   storing, handling and transmitting sensitive,
15   unclassified security-related and safeguards
16   information; do you see that?
17       A.   I do.
18       Q.   Do you recall that conversation?
19       A.   I do.
20       Q.   And what do you recall about it?
21       A.   Well, he was interested in
22   beginning to discuss how this would be taken
23   care of.  And it was pretty early for us to get

Page 274

1    started on this because the requirements for
2    nuclear security -- meeting nuclear security
3    regulations would not really come into play
4    until toward the end of construction when you
5    get ready to bring special nuclear materials on
6    to the property.  But Billy was interested in
7    getting started and talking about how you would
8    set up those procedures, requirements, places
9    for storing, and particularly encrypted
10   transfer of the electronic information.
11       Q.   And you responded to him on the
12   same day saying, I will review and discuss more
13   with you.  Right?
14       A.   Yes.
15       Q.   Did you have further discussions
16   with him about it?
17       A.   Yes, that's what I was just
18   referring to is the discussions I had with him
19   after this email exchange.
20       Q.   All right.  And when was the last
21   time you had a discussion with him about this
22   topic?
23       A.   About this topic?  It has been

Page 275

1    early this year.
2        Q.   And you also said in your
3    response:  Obviously something totally new for
4    us and a long process to get started on here.
5    Right?
6        A.   Correct.
7        Q.   And you had had no experience in
8    working with this type of information in the
9    past?
10       A.   Oh, yes, I had responsibilities
11   for working with this information when I was
12   with Duke Energy and also at TVA.
13       Q.   So when you said totally new for
14   us, you meant for Nuclear Development, not for
15   you?
16       A.   Correct.
17       Q.   All right.  What has been your
18   involvement in the efforts to obtain the DOE
19   loan?
20       A.   I have helped to put together
21   technical information on the project that went
22   in the application and participated in some
23   meetings with DOE staff where the application

Page 276

1    was discussed.  My role in those meetings was
2    to answer any questions about construction,
3    construction completion of the facility.
4        Q.   When was the last time you met
5    with DOE officials relating to the loan
6    application?
7        A.   Related to the loan application,
8    it has been quite some time ago.
9        Q.   When was the last time you met
10   with DOE officials related in any way to
11   Nuclear Development?
12       A.   That would have been earlier this
13   year.
14       Q.   And what was the topic?
15       A.   Well, the topic -- the topic was
16   generally the transitions that were occurring,
17   that have occurred within the DOE organization,
18   and what impact that might have in the Loan
19   Program Office.
20       Q.   Have you ever attended a meeting
21   with Bill Johnson relating to Nuclear
22   Development?
23       A.   I have attended meetings where

**William McCollum**                              **11/13/2019**

Page 277

1   Bill Johnson was present and I was present and
2   I was there on behalf of Nuclear Development.
3        Q.   Well, what sort of meetings are
4   you talking about?
5        A.   First one that comes to mind is
6   there was a meeting held in Knoxville,
7   Tennessee where the Tennessee senators at the
8   time were there and there was discussion about
9   the Bellefonte project.  Mr. Johnson and the
10  Chief Financial Officer of TVA were there, I
11  was there, as were a number of other people.
12       Q.   When was that?
13       A.   You are really testing my memory.
14  It has been a long time ago, I can't remember
15  exactly when.
16       Q.   It was before TVA's Board decided
17  to declare Bellefonte as surplus property,
18  right?
19       A.   I believe that's correct.
20       Q.   All right.  Do you remember what
21  Mr. Johnson said at that meeting?
22       A.   No, I don't recall all that he
23  said.

Page 278

1        Q.   Do you recall anything that he
2   said?
3        A.   Not really.
4        Q.   And have you been in attendance at
5   any other meeting pertaining to Bellefonte or
6   Nuclear Development at which Mr. Johnson was in
7   attendance?
8        A.   Not recently that I can recall.
9        Q.   Well, other than that one time, do
10  you ever recall such a meeting?
11       A.   We had another meeting in
12  Knoxville with TVA personnel.  It has been some
13  time ago, and I don't believe Mr. Johnson was
14  in attendance.
15       Q.   All right.  Have you ever attended
16  a meeting with Sherry -- about Bellefonte or
17  Nuclear Development where Sherry Quirk was in
18  attendance?
19       A.   Yes, in the office of Governor
20  Bentley in Alabama.
21       Q.   Other than that?
22       A.   I don't recall any.
23       Q.   Do you recall any phone calls that

Page 279

1   you were on with -- in which Bill Johnson was a
2   participant pertaining to Nuclear Development
3   or Bellefonte?
4        A.   Not that I was on.
5        Q.   What about phone calls that Ms.
6   Quirk was on pertaining to Nuclear Development
7   or Bellefonte?
8        A.   I don't recall any that I was on.
9        Q.   Did you ever attend any meetings
10  where Cliff Beach of TVA was in attendance
11  related to Bellefonte or Nuclear Development?
12       A.   My memory is fuzzy on this meeting
13  in Knoxville that I referred to with TVA
14  personnel because it happened a long time ago.
15  Cliff may have been in attendance at that
16  meeting, I'm not certain.
17       Q.   What was that meeting about?
18       A.   It was just to discuss -- it was
19  just to discuss in general Bellefonte and the
20  potential for what might be done with
21  Bellefonte.
22       Q.   Was it before or after the
23  Tennessee Valley Authority Board had declared

Page 280

1   Bellefonte to be surplus property?
2        A.   My best --
3            MR. O'REAR:  Objection.  Asked and
4   answered.
5        A.   My best recollection, it was
6   before.
7        Q.   (BY MR. LEMBKE:)  Okay.  Have you
8   ever been on any phone calls relating to
9   Bellefonte or Nuclear Development that Mr.
10  Beach participated in that you can recall?
11       A.   Not that I recall.
12       Q.   Have you ever been in any meetings
13  with Chris Chandler of TVA relating to
14  Bellefonte or Nuclear Development?
15       A.   Not that I'm aware.
16       Q.   What about phone calls with Mr.
17  Chandler on the same topics?
18       A.   Not that I recall.
19           MR. LEMBKE:  Let's take a short
20  break.
21           MR. O'REAR:  Okay.
22           THE VIDEOGRAPHER:  We are off the
23  record at 2:14 p.m.

**William McCollum**

Page 281

1    (Whereupon, a break was had from
2    2:14 p.m. until 2:21 p.m.)
3    THE VIDEOGRAPHER:  We are back on
4  the record at 2:21 p.m.
5    Q.  (BY MR. LEMBKE:)  Mr. McCollum,
6  did you participate in any discussions with TVA
7  personnel about potential legal problems with
8  closing the transaction?
9    A.  Not that I can recall.
10    Q.  And when did you first learn that
11  there were potential legal issues related --
12  being raised by TVA related to closing the sale
13  of Bellefonte?
14    A.  Sometime mid to late November of
15  2018.
16    Q.  At any point did you participate
17  in any discussions with NRC personnel about
18  whether the closing could occur without the NRC
19  having approved transfer of the construction
20  permits?
21    A.  I did not.
22    Q.  Now, do you recall a presentation
23  you made to a committee of the Memphis City

Page 282

1  Council in October 2018?
2    A.  I do.
3    Q.  And do you recall telling that
4  committee that the Unit 1 at Bellefonte would
5  be constructed in five years?
6    A.  Yes.
7    Q.  And you knew at the time you said
8  that that that was not likely to happen,
9  correct?
10    A.  That's not correct.  I believed at
11  the time that I said that that the construction
12  -- active construction work could be completed
13  in a five-year period of time.
14    Q.  Well, earlier today we looked at
15  the punch list and you said -- from August of
16  2018, and you testified that at that time you
17  believed that the construction target date was
18  six years from then; do you recall that?
19    A.  Yes, those are two different
20  things.  So in the schedule that we looked at,
21  the active construction period is five years.
22  From the end of active construction going
23  through the start-up phase -- testing and

Page 283

1  start-up phase to get the unit into an
2  operation is an additional year, for a total of
3  six years.
4    Q.  I see.  And you believed when you
5  said that that that was realistic?
6    A.  I believed it was aggressive but
7  realistic.
8    Q.  Did you tell the Memphis City
9  Council committee that it was aggressive?
10    A.  No, I don't believe I used that
11  word.
12    Q.  And you were certainly aware when
13  you made that representation that many nuclear
14  plant projects in recent years have encountered
15  significant delays, correct?
16    A.  Yes.
17    Q.  Now, you met with the Memphis City
18  Council or committee thereof last week, didn't
19  you?
20    A.  Yes.
21    Q.  And did you tell them when the
22  plant would be -- Unit 1 would be constructed?
23    A.  I'm sorry.  The group that I met

Page 284

1  with last week was a Power Supply Advisory Team
2  that has been put together by the mayor of the
3  City of Memphis, not -- there is a county
4  council member on that group and maybe a city
5  council member, but it was not a part of the
6  city council.
7    Q.  Before I get to that, let me ask
8  you, since your presentation to the Memphis
9  City Council in October 2018 when you told them
10  that Unit 1 would be constructed in five
11  years --
12    First, let me say, weren't you
13  indicating to them that that's when the power
14  would be available, in five years?
15    A.  I didn't believe that's what I was
16  indicating to them.
17    Q.  You certainly didn't make clear to
18  them that the -- well, so you are saying when
19  you told them it would be built in five years,
20  you were not meaning to indicate to them that
21  the power would be available in five years?
22    A.  I don't believe so.
23    Q.  Have you gone back and watched the

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**                                    **11/13/2019**

---

Page 285

1    videotape of your presentation from October of
2    2018 to the Memphis City Council?
3         A.   No.
4         Q.   Isn't it fair to say that what you
5    were telling them is you would have power
6    available to them and they could begin
7    receiving it in five years time from Nuclear
8    Development?
9         A.   What I was attempting to convey to
10   them was that by the end of a five-year notice
11   period, which Memphis has not provided to TVA,
12   that when they would get to the point of
13   providing notice and then at the end of the
14   subsequent five-year period that I believe they
15   would be able to get power.
16        Q.   Do you recall making that sort of
17   nuance representation about what your five-year
18   period statement meant?
19        A.   No, because the purpose in the
20   presentation that you are referring to was for
21   me to explain the results of the ICF study that
22   had been performed to look at the potential
23   savings for Memphis, and so that was the main

Page 286

1    topic I was trying to address.
2         Q.   What is the ICF study?
3         A.   ICF is a consulting firm.
4         Q.   Hired by Nuclear Development?
5         A.   Uh-huh, yes, to perform a study
6    related to our loan application at the
7    Department of Energy.
8         Q.   Now, at any point since you made
9    the statement about the five-year period of
10   construction to the committee of the Memphis
11   City Council in October of 2018 have you
12   informed anyone associated with Memphis or MLGW
13   that it is going to be longer than that now?
14        A.   No.
15        Q.   But you would agree it will be
16   longer than that now, right?
17        A.   Well, longer than what?
18        Q.   The five-year period.  I mean --
19   you were indicating -- weren't you indicating
20   last year, in October of 2018, that the plant
21   would be constructed in 2023?
22        A.   2024.
23        Q.   2024.  That's no longer realistic,

Page 287

1    correct?
2         A.   Well, at this time today, that
3    would be in doubt.
4         Q.   In fact, you testified a few
5    minutes ago that you thought the likely
6    completion date, if the construction permits
7    are authorized for transfer in September 2020,
8    would be 2027, right?
9         A.   Yes.
10        Q.   Have you told anyone associated
11   with Memphis that date?
12        A.   No.
13        Q.   And you didn't tell them that last
14   week, did you, the group you spoke to in
15   Memphis?
16        A.   No.  And, again, that wasn't my
17   purpose for being there.
18        Q.   What was the group you spoke to
19   last week in Memphis?
20        A.   The Power Supply Advisory Team --
21        Q.   And what is that?
22        A.   -- if I recall.  It's a team that
23   the mayor of Memphis has assembled of

Page 288

1    stakeholders from the Memphis and Shelby County
2    area to consider whether they would recommend
3    that Memphis leave TVA and pursue getting power
4    from somewhere else.
5         Q.   And did you speak at the meeting
6    last week?
7         A.   Yes.
8         Q.   And what did you say?
9         A.   I went over -- there was a
10   representative from ICF there, he covered in
11   brief the results of their study and the
12   financial potential savings for the City of
13   Memphis.  And I wrapped up the presentation
14   after he spoke about their report to just hit
15   the high points of why it would be beneficial
16   for Memphis to consider making a change.
17        Q.   And what were those high points
18   that you hit?
19        A.   That they have ready access to the
20   Midcontinent Independent System Operator grid,
21   that the transmission studies have shown that
22   access to that grid is feasible and connections
23   can be strengthened and made at a reasonable

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

William McCollum                                         11/13/2019

Page 289

1    cost, and that the power prices within the MISO
2    system are significantly lower than the prices
3    being charged to Memphis by TVA, and that the
4    potential savings on their current one billion
5    dollar a year power bill amount to several
6    hundred million dollars a year.
7        Q.   And what -- when you say that,
8    what rate do you believe MISO is charging on a
9    per megawatt hour basis?
10       A.   It's publicly available
11   information.  You can go to MISOEnergy.org, go
12   to their realtime power displays, and you can
13   see the realtime power prices up at Arkansas
14   hub which is the closest one to Memphis.  Most
15   of the times that I have looked at that, they
16   run in the mid to upper twenty dollar per
17   megawatt hour range as opposed to the
18   seventy-four to seventy-five dollars that
19   Memphis pays today.
20       Q.   Well, you know, you keep saying --
21   you have said that to Memphis publicly the
22   seventy-five dollar per megawatt hour.  What is
23   the basis for your statement that TVA is

Page 290

1    charging Memphis seventy-five dollars per
2    megawatt hour?
3        A.   Because we have been told by
4    people associated with several of the TVA
5    distributors that that's approximately what TVA
6    charges when you count the all-in costs.  Plus,
7    if you go to TVA's 10-K that is filed with the
8    SEC, which is certified to be true and correct
9    information, if you take the amount of power
10   that is sold by TVA and you divide that into
11   the revenue from power sales, you get a figure
12   of approximately seventy-four dollars a
13   megawatt hour.
14       Q.   Now, who are these people who told
15   you that it's seventy-five dollars per megawatt
16   hour?
17       A.   People associated with some of the
18   various distributors that we discussed
19   yesterday.
20       Q.   And what are their names?
21       A.   Rody Blevins with Volunteer
22   Electric Co-op.  You are going to have to give
23   me a second to remember the names.  George

Page 291

1    Kitchens with Joe Wheeler Cooperative.  And I
2    cannot remember the name of the fellow at the
3    Chattanooga Electric Power Board right now.
4        Q.   Did you ever ask anyone at MLGW
5    what they are paying TVA?
6        A.   Yes.
7        Q.   Who did you ask?
8        A.   J. T. Young and, at a different
9    point in time, Alonzo Weaver.
10       Q.   And what did they tell you?
11       A.   They declined to provide
12   specifics.  However, after Bill Johnson spoke
13   to the city council and represented that TVA
14   was charging around sixty-five dollars or 6.5
15   cents a kilowatt hour, representatives from
16   MLGW clarified to the Memphis Press the
17   following day that the cost was closer to
18   seventy dollars a megawatt hour.
19       Q.   Now, in October of 2018, you told
20   Memphis that Nuclear Development would sell
21   them power at thirty-nine dollars per megawatt
22   hour?
23       A.   That's the offer we made, yes.

Page 292

1        Q.   Was that going to be a firm price?
2        A.   It was going to be firm subject to
3    the -- any potential later increases in
4    operating and maintenance -- plant operating
5    and maintenance or transmission costs.
6            (Whereupon, Exhibit Number 65,
7            having been previously marked for
8            identification, was referenced in
9            this deposition.)
10       Q.   Would you pull out what has been
11   previously marked as Exhibit 65?
12           Before we get to that, in your
13   presentation to the Memphis City Council in
14   October of 2018 you didn't tell them that it
15   was subject -- the price was subject to
16   increases due to -- if there were -- the price
17   was subject to change subject to increases in
18   operating and maintenance costs, did you?
19       A.   I don't recall whether I did or
20   didn't tell them that.
21       Q.   All right.  Now, let me give you a
22   moment to look at 65.  You may want to start at
23   the back and work your way forward through the

**William McCollum**

Page 293

1    chain of emails.
2         A.   (Reviewing document.)
3         Q.   This is a chain of emails that
4    ultimately you were added to, it looks like on
5    the second page the email of July 31st from
6    Franklin Haney where he was adding you to this
7    email group; do you see that?
8         A.   I do.
9         Q.   And did you read the emails that
10   had gone before it when you got this?
11        A.   Yes.
12        Q.   All right.  And so the email at
13   the bottom of the second page of Exhibit 65 is
14   an email from Frank Haney dated July 31st,
15   correct?
16        A.   Yes.
17        Q.   And in it on the next page of the
18   exhibit, he has a breakdown for the budget for
19   the thirty-nine dollars per megawatt hour
20   price, correct?
21        A.   Yes.
22        Q.   And after that he says:  I
23   understand that this is not a detailed budget,

Page 294

1    but the overall numbers are what Credit Suisse
2    came up with when we went to the credit
3    agencies way back when.  Do you see that?
4         A.   I do.
5         Q.   Do you have any basis to disagree
6    with that statement?
7         A.   The statement that the overall
8    numbers are what Credit Suisse came up with, so
9    forth?
10        Q.   That this is not a detailed budget
11   but the overall numbers are what Credit Suisse
12   came up with when Nuclear Development went to
13   the rating agencies way back when.
14        A.   I don't disagree with that
15   statement.
16        Q.   All right.  And then it says:  The
17   PPA we have structured is important because it
18   as a triple net lease.  Do you know what that
19   meant?
20        A.   I'm not certain what he meant by
21   that.
22        Q.   And then he says:  Meaning
23   whatever the O&M charge is on any given year,

Page 295

1    the PPA increases to cover all costs including
2    capital and operating above floor set above.
3    Do you see that?
4         A.   I do see that sentence.
5         Q.   And you did not disagree with
6    that, did you?
7         A.   What he says there is not my
8    understanding of the offer that we were making.
9    My understanding was that it would include
10   operating and maintenance expenses above what's
11   assumed in the offer but not capital.
12        Q.   And by that do you mean that if
13   the operating expenses part of this budget were
14   to go up, then the price would go up, correct?
15        A.   If it went up above what we built
16   into the thirty-nine dollar price, correct.
17        Q.   And is this what was built into
18   the thirty-nine dollar price?
19        A.   Yes.
20        Q.   Okay.  And you represented to
21   Memphis that there would be a four hundred and
22   eighty-seven million dollar per year savings on
23   average over time if they entered into a

Page 296

1    purchase agreement with Nuclear Development,
2    right?
3         A.   Again, I was presenting the
4    results of the ICF study, so that's correct.
5         Q.   And the four hundred and
6    eighty-seven million dollar per year savings
7    figure was based on an assumption that the
8    thirty-nine dollar price would not change over
9    time, correct?
10        A.   I'm not sure.  I would have to go
11   back to the ICF study to look at the details of
12   the assumptions they made.
13        Q.   Do you recall them building in any
14   inflation factor?
15        A.   I recall that they built in
16   assumed escalation factors for a number of the
17   things in their financial analysis.  I just
18   don't recall whether that was one of them.
19        Q.   All right.  Are you aware of any
20   electricity provider in the country the size of
21   MLGW that relies on one plant for eighty
22   percent of its needs?
23             MR. O'REAR:  Wait a minute.  You

**William McCollum**                                    **11/13/2019**

Page 297

1    -- withdraw.
2            MR. BLUST:  Any?  Did you say any?
3    I couldn't understand what you said.
4            MR. O'REAR:  You said provider?
5            MR. LEMBKE:  Yes.
6            MR. O'REAR:  Referring to Memphis?
7            MR. LEMBKE:  Yes.
8            MR. BLUST:  But you said any
9    provider?
10           Q.   (BY MR. LEMBKE:)  I said are you
11   aware of any service provider in the country
12   the size of MLGW --
13           MR. BLUST:  Oh, size.  Okay.
14           Q.   (BY MR. LEMBKE:)  -- that relies
15   on one plant for eighty percent of its needs?
16           A.   No, but I haven't done an
17   extensive review of all of the municipal
18   utilities.
19           Q.   And the four hundred and
20   eighty-seven million dollar per year savings
21   figure that you presented to Memphis was an
22   estimate, not a guarantee, correct?
23           A.   Again, I was presenting the

Page 298

1    results of the ICF study.  So the figures that
2    I gave were the figures from their study, not
3    -- those were not guaranteed numbers.
4            Q.   Do you recall making clear to the
5    committee of the Memphis City Council that all
6    you were doing was reporting the results of the
7    ICF study?
8            A.   I referenced the ICF study
9    numerous times.
10           Q.   Now, during your presentation to
11   Memphis City Council in October of '18, you
12   were urging them to execute -- were you urging
13   that MLGW execute a new Letter of Intent,
14   correct?
15           A.   Oh, yes.  Yes.
16           Q.   And you stated to the Memphis City
17   Council in October of 2018 that it was
18   important that MLGW do that because without it,
19   the DOE would not make a loan commitment,
20   right?
21           A.   That was based on communications
22   that we had had with DOE staff indicating that
23   they wanted an updated Letter of Intent.

Page 299

1            Q.   And you also told the Memphis City
2    Council that there was a risk that Congress
3    would not appropriate the funds for the program
4    if Memphis waited too long to send the letter,
5    correct?
6            A.   Yes, there is always a risk that
7    Congress could delete those funds from the
8    budget.
9            Q.   But that hasn't happened, has it?
10           A.   It has not.
11           Q.   And did Memphis -- or did MLGW
12   ever send an updated Letter of Intent?
13           A.   No.
14           Q.   But if that's true and DOE
15   indicated they wanted it, why are you
16   optimistic that DOE is going to approve the
17   loan application?
18           A.   Well, because subsequent to that
19   they -- the DOE staff has seemed not as
20   concerned about that as they were at one point
21   in time.
22           Q.   Did you inform Memphis that those
23   circumstances had changed?

Page 300

1            A.   No, because we haven't had any
2    further discussions about a Letter of Intent.
3            Q.   All right.  So after your
4    presentation at the committee meeting of the
5    Memphis City Council in October 2018, you have
6    had no further communications with anyone
7    associated with Memphis asking -- or urging
8    them to provide an updated Letter of Intent?
9            A.   Not that I can recall.
10           Q.   Since October of 2018, have you
11   had further communications with representatives
12   of Memphis?
13           A.   Yes.
14           Q.   And the topic of the updated
15   Letter of Intent just never came up?
16           A.   Correct.
17           Q.   Do you recall the head of MLGW
18   after you spoke in October of '18 said that the
19   amount of power output that was contemplated
20   for Bellefonte could be achieved for much less
21   in terms of capital investment at other types
22   of plants, do you recall him saying that?
23           A.   Yes.

**William McCollum**                                    **11/13/2019**

Page 301

1    Q.   Do you agree with that statement?
2    A.   Yes.
3         MR. LEMBKE:  I don't have any
4    further questions at this time.
5         MR. O'REAR:  No questions.
6         MR. LEMBKE:  Thank you, Mr.
7    McCollum.
8    A.   Thank you.
9         THE VIDEOGRAPHER:  This marks the
10   end of deposition of William R. McCollum.  We
11   are off the record at 2:46 p.m.
12
13        (Deposition concluded at 2:46 p.m.)
14
15        FURTHER THE DEPONENT SAITH NOT
16
17
18
19
20
21
22
23

Page 302

1         C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    JEFFERSON COUNTY
5
6         I hereby certify that the above
7    and foregoing deposition was taken down by me
8    in stenotypy, and the questions and answers
9    thereto were reduced to typewriting under my
10   supervision, and that the foregoing represents
11   a true and correct transcript of the deposition
12   given by said witness upon said hearing.
13        I further certify that I am
14   neither of counsel nor of kin to the parties to
15   the action, nor am I in anywise interested in
16   the result of said cause.
17
18
19
20   /s/ Gail B. Pritchett
21   COMMISSIONER-NOTARY PUBLIC
22   ACCR LICENSE NO. 116, Exp. 9/30/2020
23   Transcript Certified On 11/25/2019

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**William McCollum**

| A |
|---|

**a.m** 96:1,11
151:14,16,16
151:18 163:10
163:12,12,14
**abeyance**
139:18
**ability** 101:5
125:2
**able** 101:9
134:23 258:19
258:20 285:15
**absolute** 115:10
**accelerated**
173:11
**accelerating**
177:5
**acceptability**
264:11
**acceptance**
262:18
**accepts** 271:3
**access** 99:22
100:10 103:21
271:4 288:19
288:22
**ACCR** 302:22
**accurate** 237:4
**achieve** 177:5
**achieved** 300:20
**acknowledge**
205:17
**acquisition**
141:18
**acronyms** 273:4
**act** 119:20
197:12 234:8
250:8 254:7,14
271:22,23
**acted** 117:21
**action** 89:4
115:11 221:2
235:5 242:13
244:7 302:15
**actions** 115:6
219:21

**active** 139:1,13
139:22 170:3
178:11,15,20
179:1 261:19
282:12,21,22
**activities** 121:23
170:3,19 171:2
172:4 187:6
220:7 245:8,13
245:16 246:4,8
246:14,16,22
247:7,12 248:3
248:14,19,23
249:14 264:19
265:11
**activity** 148:3
150:8 166:9,13
174:22 175:12
176:16,17,22
246:19
**actual** 254:18
**added** 229:13
293:4
**adding** 293:6
**addition** 138:19
**additional** 221:1
225:12 262:11
262:17 263:4
266:5 283:2
**address** 164:21
247:22 266:4
286:1
**addressed** 207:8
**addresses**
271:13
**addressing**
265:9
**adequately**
193:19,22
**administrative**
251:16 255:6
256:3
**adopt** 199:14
205:11
**adopts** 199:7
**advance** 139:6

**advanced** 139:7
**advice** 118:14
237:10 239:8
240:14 241:5
**advised** 224:10
267:11
**Advisory** 284:1
287:20
**Affairs/Licens...**
223:7
**affirm** 231:22
**affirmation**
199:11 231:18
240:18 241:2
**affirmatively**
157:12
**agencies** 294:3
294:13
**aggressive** 183:3
220:22 283:6,9
**ago** 107:6
108:15 113:10
157:5 205:21
276:8 277:14
278:13 279:14
287:5
**agree** 115:3,17
115:21 119:17
213:13 217:6
218:9 263:7,18
286:15 301:1
**agreed** 121:16
161:2,6 213:5
**agreeing** 135:22
**agreement**
100:5 103:22
201:4 224:11
230:7 248:21
249:7 296:1
**ahead** 141:8
167:1 179:20
193:22
**akin** 228:12
**Akstulewicz**
183:11,14
184:7 186:15

186:22 187:3
187:13 188:13
189:22 190:13
**Alabama** 89:2
89:16 90:10
91:9 202:21,23
203:4 278:20
302:3
**aligned** 215:6,13
**alignment**
217:12,17
**all-in** 290:6
**allow** 100:1
250:23
**allowed** 266:21
**alluded** 228:14
228:17
**Alonzo** 291:9
**ambiguous**
111:3
**amend** 255:7
**amended** 197:12
201:3,4 271:22
**amendment**
198:5,16,20
199:5 200:11
201:3,23 202:7
255:13,23
256:2,11
**amendments**
199:9 251:16
251:22 252:8
255:6,20 256:3
258:13 262:1
**amount** 289:5
290:9 300:19
**analysis** 135:4,4
296:17
**and/or** 197:18
**answer** 109:11
111:3 133:1
158:14,22
159:1,4,21
163:16 171:18
173:5,21
175:19,20

196:7,15
213:21 238:23
270:12,14
276:2
**answered**
106:13 108:14
173:4 176:13
280:4
**answering**
123:17 175:22
176:3
**answers** 302:8
**anxious** 217:7
**anybody** 112:7
**anymore** 112:8
**anytime** 113:12
**anywise** 302:15
**apologize**
263:20
**appears** 113:23
186:19 202:1
256:14
**applicable** 201:5
**applicant**
218:23 252:18
252:22 253:5
253:10 262:3,4
**application**
95:16 96:23
97:9,10,11,16
97:19 98:11,15
98:22 99:2
100:17 101:2,5
101:9,18 102:2
102:4,21,23
103:4,9,14
104:7,8,10,15
104:22 105:4
105:16 106:2,5
106:7,18 107:9
107:17,19
108:4,10 109:5
109:7,15,20,21
123:13,20,22
124:4,11,14,14
124:20 126:7

126:13,15
127:11,21
128:5,12,22
129:14,19,21
130:3,9,14,19
131:8,20 132:6
132:13,20
140:17,20,22
141:4,10
142:10,13,22
146:21 148:4
148:15,23
149:8,11 152:9
152:15 154:1,6
154:15,19,23
155:21 156:20
157:10 162:21
167:17 168:1,8
168:15,19
169:4,10,22
170:23 171:10
172:2,10,15
173:2,8,10,18
174:1,9,14,15
175:8,9 177:19
180:14,18,21
181:12,19
182:1 185:4
188:1,5 190:5
190:15,21
191:6 192:21
194:4,10,16
199:17 202:7,8
202:16 209:17
212:10 213:14
213:17 216:5,9
216:12 219:15
222:17 227:19
228:9,13
229:11 230:22
231:2,14,19
233:5,18 234:8
235:1 237:3,17
240:2 242:19
243:23 246:7
246:20 249:19

250:16 254:19
256:6,16 258:5
259:6,13 262:9
263:8 264:7,12
264:20 265:5,7
267:12 268:1
275:22,23
276:6,7 286:6
299:17
**applications**
106:10 116:21
139:17,22
168:7
**apply** 165:6
261:16,18,21
**appreciate**
165:2 193:3
**appreciation**
164:23
**appropriate**
116:1,9 117:9
122:1 299:3
**appropriately**
171:13 192:2
**approval** 97:1
141:5 181:8
197:17 208:10
208:16 211:11
211:16 213:23
230:23 247:18
251:15
**approvals** 179:3
258:7
**approve** 260:11
299:16
**approved** 113:4
142:1 178:16
261:21 281:19
**approves** 257:14
257:23
**approximately**
290:5,12
**April** 162:1,11
186:23 188:19
264:2,4 268:23
269:2

**Arant** 89:13
91:6
**area** 101:11
132:12 148:7
196:11 269:7
288:2
**Arendall** 90:6
**AREVA** 122:2
122:12,19
134:19 135:3,8
160:20 186:10
**AREVA's**
114:12,12
119:11
**argumentative**
169:14 175:15
176:4
**Arkansas**
289:13
**arrange** 246:15
**arrangement**
249:4
**arrangements**
99:22 127:1
260:15
**ASAP** 213:14,16
**aside** 172:20
**asked** 103:18
104:2 109:2
110:4,7 121:15
156:18 157:8
159:19 173:3
176:12 182:10
196:12,13
208:19,22
214:9 225:3
230:10 237:5
263:4 266:18
280:3
**asking** 115:13
190:1 196:9
234:5,23 235:3
236:2,17 237:1
238:14,23
239:4 241:19
241:20 247:1

256:6 300:7
**asks** 200:4
**assembled**
287:23
**assess** 116:12
**assessment**
264:11
**asset** 233:19
**assigned** 226:5
226:18 227:3
228:4
**associated** 97:8
157:14 195:19
224:21 257:2
264:20 286:12
287:10 290:4
290:17 300:7
**assume** 257:1
**assumed** 189:15
202:6 295:11
296:16
**assuming** 138:5
166:23 168:21
168:22
**assumption**
202:10,12
296:7
**assumptions**
296:12
**assurance** 98:19
104:23 127:5
127:16 128:14
129:6,10 207:6
226:5,11 257:5
260:23
**Atomic** 197:12
254:7,13
**attached** 114:10
165:12 191:21
217:5 264:22
**attaching**
230:21
**attachment**
252:1,3,4
265:19
**attachments**

164:9 251:18
**attempting**
122:12 212:3
285:9
**attempts** 132:18
**attend** 122:9,17
135:23 162:2
279:9
**attendance**
278:4,7,14,18
279:10,15
**attended** 140:7
161:7 162:5
276:20,23
278:15
**attending** 103:6
122:15 152:3
153:15
**attention** 254:22
**attorney** 90:5,15
91:5 97:6
**attorney-client**
132:23 158:8
196:8
**auction** 98:3
99:11 100:11
102:18 120:5,8
126:11,12
**August** 127:23
128:1,3,11
130:18 132:8
172:22 202:22
203:2 206:19
209:12 210:7
210:10 212:8
212:22 218:3
218:14 219:7
220:12 221:6
222:6,12,20
225:5,8,14,23
226:15,22
227:8,14 230:4
282:15
**author** 241:20
**authority** 89:9
91:16 99:7,18

William McCollum

101:12 108:2
118:12 132:17
197:18 252:18
252:23 253:6
279:23
**authorization**
201:14
**authorized**
118:2 265:11
287:7
**available** 219:10
224:4 284:14
284:21 285:6
289:10
**Avenue** 89:15
91:8
**average** 295:23
**aware** 102:8
103:13 158:16
160:13 182:15
230:8 243:8
248:12 249:12
262:8 280:15
283:12 296:19
297:11
**awareness**
159:14
**awesome** 208:4
**Ayliffe** 91:13

——————
**B**
**b** 89:20 223:2,4
226:3,9,10
252:16 302:20
**back** 96:10
116:1,9 117:3
121:18 147:19
151:17 163:13
164:15 192:7
230:1 238:1,8
252:5 253:18
281:3 284:23
292:23 294:3
294:13 296:11
**back-and-forth**
131:17

**background**
128:7 154:4
**backward** 205:8
**backwards**
206:8
**badly** 169:12
**bar** 165:15
**based** 103:21
108:16 117:5
118:4,8,11
160:5 182:23
196:21 236:11
241:5 265:7,19
296:7 298:21
**basically** 97:3
130:16 132:19
153:1 154:7
189:2,15
221:21
**basis** 105:2,19
108:11 166:16
166:21 173:11
250:12 271:2
289:9,23 294:5
**Bates** 233:13
242:22 251:9
252:2 256:17
258:5
**Beach** 279:10
280:10
**becoming** 224:8
**beginning**
100:20 125:12
125:13,13
155:19 168:12
170:7 172:5
174:19,22
273:22
**begins** 165:11
205:7 243:12
245:1 249:20
250:5 251:11
253:22 255:2
265:3,19
**begun** 170:20,22
**behalf** 141:2

220:7 277:2
**belief** 108:16
117:23 166:17
231:21 240:21
**believe** 98:4,7
100:12 106:3
107:10 108:6
115:10 136:8
141:21 145:22
149:19 159:9
178:6 179:23
183:17 192:8
192:13 193:13
193:13 211:15
214:14 218:20
231:11 237:11
241:2,3 270:16
273:8 277:19
278:13 283:10
284:15,22
285:14 289:8
**believed** 130:13
168:17 177:1
178:14,23
183:1,3 231:9
231:13 244:16
282:10,17
283:4,6
**Bell** 95:5 203:18
**Bellefonte** 93:11
93:16,19,22
94:3,8 95:9,12
97:1 99:18
114:14 117:19
124:17 125:6
134:18,21
135:16 136:10
138:9 139:17
139:19 141:18
143:11 145:18
162:16 165:4,5
166:9 174:4,10
174:19 175:2
176:9,21
184:18 189:12
189:17 190:2

193:23 199:16
207:19 230:7
231:1 232:16
233:5 235:2
236:3 237:15
243:13 244:2
247:16 257:4,9
259:17,18
261:1 270:9,21
277:9,17 278:5
278:16 279:3,7
279:11,19,21
280:1,9,14
281:13 282:4
300:20
**beneficial**
288:15
**benefit** 183:18
**benefits** 189:19
**Bentley** 278:20
**best** 98:5 108:8
111:19,21
112:22 130:4
132:1 137:21
149:5 161:23
163:19 179:23
192:2 221:12
231:20 240:20
241:4 266:14
280:2,5
**Bethesda** 103:6
153:17 203:6
**beyond** 121:20
162:23 266:21
267:2
**bill** 122:15
186:14 269:4
276:21 277:1
279:1 289:5
291:12
**billing** 183:23
**billion** 289:4
**Billy** 181:4
182:2 194:23
272:19 274:6
**Birmingham**

89:16 91:9
**bit** 100:14
223:18
**biweekly** 201:5
**Blevins** 290:21
**Blust** 90:14
206:10 227:4
268:23 297:2,8
297:13
**board** 184:15
277:16 279:23
291:3
**bottom** 186:7,12
186:21 203:16
226:3 244:23
249:19 253:21
264:5 267:15
293:13
**Boult** 89:13 91:6
**brad@crtrialt...**
92:6
**Bradley** 89:13
91:6
**break** 96:18
151:10,15
163:11 259:5
280:20 281:1
**breakdown**
293:18
**brief** 288:11
**bring** 274:5
**broach** 157:20
**broached**
157:18
**broke** 96:19
151:20
**budget** 173:15
193:5,20
293:18,23
294:10 295:13
299:8
**budgets** 192:1
**build** 124:2
125:20
**building** 124:12
125:23 126:9

**William McCollum**

11/13/2019

Page 306

296:13
**built** 284:19
   295:15,17
   296:15
**bureaucratic**
   147:2
**business** 94:2
   191:22 193:1
**buy** 269:9 270:4

**C**

**C** 90:1 91:1,14
   92:1 223:22
   225:3 226:18
   302:1,1
**Caine** 90:4
   164:14
**calendar** 194:9
**call** 183:18
   184:6,10 185:1
   185:5,21 187:5
   187:10,18,23
   190:8 193:4,11
   193:14,16
   194:2,16 209:4
   209:9,11
   214:19
**called** 99:14
   134:20 184:11
**calls** 158:7
   217:19 270:11
   278:23 279:5
   280:8,16
**Campbell** 92:4
**candidate** 224:4
**capabilities**
   124:2,7 125:21
   125:23 126:10
   126:20,22
   169:10
**capability** 97:13
   97:13 124:21
   125:1,10 126:6
   126:17 127:9
   130:2 131:6,23
   132:5,10,11

**capital** 223:2
   295:2,11
   300:21
**captured** 218:10
**care** 273:23
**carry** 248:18
**case** 192:14
   223:2,4 236:16
**cases** 272:1,3
**categories**
   168:13
**cause** 302:16
**caveat** 142:17
**cease** 264:19
**cents** 291:15
**CEO** 188:18
**certain** 136:14
   138:2 180:7,9
   192:16 201:22
   215:2 251:16
   279:16 294:20
**certainly** 118:22
   151:12 163:17
   194:8 249:5
   260:10 283:12
   284:17
**certainty** 160:13
**certified** 89:21
   290:8 302:23
**certify** 302:6,13
**cetera** 199:10
   266:5
**CFR** 119:9
   197:15 243:23
   251:11
**chain** 145:16
   205:7,20 206:3
   214:4 293:1,3
**Chandler**
   230:18 280:13
   280:17
**change** 106:10
   180:14 189:1,5
   189:6,9 252:9
   253:8,14 256:7
   288:16 292:17

296:8
**changed** 151:6
   164:2 169:15
   179:7 189:8
   299:23
**changes** 115:6
   184:14 251:18
**changing** 262:3
**characterizati...**
   262:20
**Chardos** 95:22
   99:12,15
   103:23 113:2,7
   149:23 152:18
   152:23 153:4
   205:20 224:3,3
   224:8,18 248:9
   268:22
**charge** 122:21
   294:23
**charged** 289:3
**charges** 290:6
**charging** 289:8
   290:1 291:14
**Chattanooga**
   291:3
**Chicago** 90:18
**chief** 272:8
   277:10
**Chin** 91:14
**chosen** 263:6
**Chris** 230:17
   280:13
**chronological**
   206:13
**chronology**
   205:8
**circumstance**
   115:15
**circumstances**
   116:2,11
   117:10 188:23
   299:23
**city** 281:23
   283:8,17 284:3
   284:4,6,9

285:2 286:11
   288:12 291:13
   292:13 298:5
   298:11,16
   299:1 300:5
**CIVIL** 89:4
**claim** 205:18
   260:7
**clarified** 291:16
**clarify** 101:21
   222:22
**clear** 103:7
   133:4 146:15
   146:16 147:4
   147:15 154:13
   154:16 160:8
   209:5 211:9
   235:16,21,23
   236:1 284:17
   298:4
**Cliff** 279:10,15
**close** 166:21
**closer** 291:17
**closes** 266:3
**closest** 289:14
**closing** 113:4
   120:4 141:17
   142:2 166:18
   167:2 177:2,5
   177:9,11,20
   181:14,20,23
   182:11 184:21
   190:22 224:9
   224:17 230:6
   232:18 233:7
   233:19 234:9
   235:2 237:14
   246:1,6,12
   248:22 260:17
   281:8,12,18
**Co-op** 290:22
**Code** 197:14
**come** 98:15
   139:9 159:8
   274:3
**comes** 277:5

**coming** 98:22
   120:13 134:19
   180:21 184:15
   194:8
**comment**
   207:23 214:11
**commented**
   131:16
**comments**
   129:16
**Commission**
   93:14 94:11
   134:17 135:3
   234:1 239:11
   267:11
**Commission's**
   197:13
**commissioner**
   161:2,6,20
**COMMISSIO...**
   302:21
**commissioners**
   161:10,16
   162:6,20
   163:19,22
**commit** 142:18
**commitment**
   250:9,14 251:1
   251:5 298:19
**committed**
   174:16,16
   213:9
**committee**
   281:23 282:4
   283:9,18
   286:10 298:5
   300:4
**committing**
   249:13
**common** 254:4
**communicate**
   247:2
**communication**
   133:6
**communicatio...**
   159:5,6 181:11

William McCollum

196:8 298:21
300:6,11
**companies**
107:14,15
**company** 228:1
269:5
**comparable**
108:20 116:2
116:11 117:10
**compiled** 124:9
**complete** 125:6
126:3,5 127:9
127:13,19
134:23 138:7
165:17 166:12
171:9 173:17
178:7,20
203:23 204:1
204:10,11
210:8,9,15
211:23 218:14
223:14,15,20
227:13 258:20
259:11 267:16
**completed**
168:18 176:10
176:23 221:5
222:6,9,10,12
222:19 223:14
225:23 226:14
226:21 227:7
228:6 268:1
282:12
**completeness**
263:2
**completion**
170:3 191:2
220:18 221:14
243:17 244:8
252:11 255:8
268:3,8 276:3
287:6
**comply** 247:12
**component**
132:4
**components**

178:12
**computer** 99:19
**concept** 202:15
**concern** 138:12
**concerned**
132:15 135:15
218:13 299:20
**concerning**
130:1 132:5
133:20
**concerns** 195:12
**concluded**
244:12 264:7
265:6,8 301:13
**conclusion**
270:11 271:15
**condition** 108:9
**conditional**
250:9,14 251:1
251:5
**conduct** 220:7
**conducted** 245:8
246:5
**conference**
103:7 153:16
193:4
**confident**
250:22
**confidential**
232:4,5,11
**confirm** 219:10
221:7 269:8
**confirmed** 148:1
150:7
**confirming**
201:8
**conform** 251:16
**conforming**
198:4,16,20
199:5 200:10
201:3,23 202:7
255:6,13,19,23
256:2,3,11
258:13
**confused** 157:2
215:20 216:2

**Congress** 299:2
299:7
**conjunction**
125:3 152:3
**connection**
199:16 259:12
**connections**
288:22
**consent** 101:14
102:10 109:1
109:13 110:2,7
112:2 132:16
133:7,8 243:5
**consented**
110:11
**consider** 208:15
288:2,16
**consideration**
139:23
**considers**
242:18
**consistent** 108:5
233:22 240:4
240:23 241:15
254:6,13
**consistently**
181:10
**constructed**
282:5 283:22
284:10 286:21
**construction**
95:10,13 97:2
99:3 101:14
106:5 108:7,19
109:5 110:10
113:3,8,13
114:15 117:20
117:23 118:5
119:3 124:7
125:5 126:14
130:7 131:9
132:10 133:8
138:10,17,21
139:1,12,13
140:12,18
141:5,23

142:11,14,23
145:18 146:22
152:9,16
153:21 154:2
162:21 163:2
165:7,17 167:3
167:6,15,17
168:3,9,14,14
169:4,22
170:22 171:10
171:14 172:1
172:10 173:1
173:13,18
174:2,21 175:9
177:18 178:6
178:11,16,20
179:1 180:13
180:19 181:9
181:13,19
185:4 187:7
188:1,6 191:2
191:5 192:20
194:3,11,15
199:18 202:16
204:9 208:16
212:11 219:15
220:19,23
221:14 225:7
225:19,23
231:1 232:15
233:5 236:4
238:12 244:8
246:21,23
247:18 249:18
252:10,10
253:3,15 255:8
256:9 259:19
261:13,19
265:11 267:23
268:3,5,8
274:4 276:2,3
281:19 282:11
282:12,17,21
282:22 286:10
287:6
**Constructor**

226:19
**consult** 138:1
**consulting** 286:3
**consummated**
200:7 201:7
**consummation**
256:23
**contact** 98:2
99:15 100:23
122:5 150:1,10
183:19 185:17
185:18,23
186:1,15
195:11 248:9
**contacted** 97:21
98:1
**contemplated**
246:11 247:16
300:19
**content** 164:1
196:8
**context** 121:19
202:9
**continual** 126:8
126:9
**continually**
127:3
**continuation**
96:8
**continue** 121:22
199:2 245:6,16
246:16 249:7
249:14 262:5
**continued**
100:23 132:17
249:5
**continues**
251:14
**continuing** 91:1
92:1 93:4
96:14 124:12
151:3 205:14
243:22 251:8
**contract** 125:3
126:1 127:1
**contractor**

169:7
**contractors**
97:14 98:9
**contractual**
141:17 248:13
249:6
**control** 171:15
174:4 197:17
**conversation**
102:17,20
103:1 104:19
110:17 111:11
111:13 112:12
112:20 133:5
134:11,14
135:13 144:14
144:16,21
145:4,8,9,13
145:21 146:2,3
146:6,19 149:1
150:9,13
151:21 152:2
152:18,19
153:4,14
155:22 156:3,6
158:3 159:14
159:16 160:8,9
160:13 177:16
180:11 182:18
195:22 224:16
273:18
**conversations**
112:1,17
113:12 123:12
123:21 132:17
145:1 151:4
152:6,7,13
153:6 155:8,14
157:23 158:1
159:11,21
164:2 179:11
179:22 180:5
181:18 182:2
217:1
**convey** 285:9
**conveyed**

173:23
**cooperate**
101:13
**Cooperative**
291:1
**coordination**
217:7
**copied** 114:2
186:23
**copy** 121:1
144:8 163:8
164:15,18
191:17 192:10
230:18,21
**corear@hand...**
90:12
**corner** 197:2
**correct** 98:12
101:19 103:11
105:21 107:21
107:22 108:22
109:3,16
112:17,18,22
114:2,5 131:9
131:10 133:7
133:11,17,18
136:19 142:6
144:12,13
145:8 149:22
151:7,8,23
154:15 155:11
155:12 156:7,8
160:10,11,16
160:17 164:2
164:11,12,21
164:22 165:20
166:1,2,6,7
167:8 168:15
168:20,22
175:3 176:8,14
183:12,13
186:10 191:14
191:19 194:9
194:13 195:1,2
195:5,6 198:2
198:3 200:16

200:18 201:20
206:20 209:1
210:4 212:8,20
213:3,10
215:17 218:4
218:20 219:5
226:15 228:5
231:3,6,10,12
231:15,19,21
232:18 233:8
234:9 235:6,15
236:5,9,21,22
239:18 240:20
241:1,3,4,11
242:9,10
244:14,17,18
244:20,21
247:13,19
249:7,14,15
252:19,20
253:1,12,16
255:9 257:12
257:14 258:1
258:22 259:7
259:14 260:13
260:18,19
261:3,6,16,23
262:10 264:3
264:20 265:1
265:12 267:2
267:13,17
269:2,12
270:17 272:20
275:6,16
277:19 282:9
282:10 283:15
287:1 290:8
293:15,20
295:14,16
296:4,9 297:22
298:14 299:5
300:16 302:11
**correctly** 178:6
255:11 265:23
**cost** 289:1
291:17

**costs** 271:10
290:6 292:5,18
295:1
**council** 282:1
283:9,18 284:4
284:5,6,9
285:2 286:11
291:13 292:13
298:5,11,17
299:2 300:5
**counsel** 91:15
97:5 118:15
137:19 159:22
195:23 202:13
237:10 239:8
240:15 241:6,9
254:16 302:14
**count** 290:6
**country** 296:20
297:11
**county** 284:3
288:1 302:4
**couple** 163:21
216:11
**course** 107:4,7
108:12 229:9
**court** 89:1
234:18
**Courtroom** 92:5
**cover** 231:2,6,10
233:13 295:1
**covered** 288:10
**CP** 93:11 94:8
124:11,14
265:11
**CPs** 209:17
211:1 214:20
215:1
**created** 229:10
**creating** 122:14
220:6
**credible** 209:19
**credit** 294:1,2,8
294:11
**crystal** 154:13
154:16

**Cummings**
89:13 91:6
**current** 108:7,9
110:10 201:12
220:5,15 268:2
289:4
**currently**
243:13
**customer**
189:11
**cycle** 193:5

**D**
**D** 91:13 225:2,7
**data** 99:19
**date** 96:9 97:20
118:1 141:17
154:21 167:14
167:20,20
168:4 177:9,11
180:2,13
181:23 182:11
183:2,2 188:21
199:4 200:6
212:22 213:18
219:11 220:18
220:22 221:8
221:10,13
223:14 226:15
230:6 243:17
244:8 248:22
268:3 282:17
287:6,11
**dated** 133:17
160:20 186:23
195:1 230:18
239:12 268:23
293:14
**dates** 152:12
172:5 179:7
252:11 255:8
256:9
**David** 90:14
91:13
**day** 125:19
162:4 200:11

William McCollum

274:12 291:17
**day-to-day**
137:14
**days** 209:13
214:1 259:13
266:11,21
267:1
**ddayliffe@tva...**
91:20
**dealing** 116:20
**decades** 117:7
**December** 121:4
125:10 133:21
134:2 166:12
175:2 176:10
176:23
**decide** 172:3,8
172:21 212:17
220:5 233:17
**decided** 171:7
171:12 277:16
**decision** 111:13
111:15 171:21
211:5 214:6
220:11,14
262:18
**declare** 277:17
**declared** 279:23
**declined** 291:11
**decommission...**
207:5
**deemed** 117:9
262:9
**Defendant**
89:10 91:3
**defense** 254:4
**deferral** 261:12
**deferred** 94:12
138:22 139:12
207:6 224:1
232:17 233:6
233:23 234:6
234:14 235:4
235:17 236:4,8
236:13 239:4
239:12,16

240:5,8 241:1
241:16 243:2
243:13 244:7
247:7
**deficient** 262:10
262:20 263:6
263:12
**defined** 252:18
**definite** 142:18
270:1
**definitive** 156:2
191:4
**degree** 135:19
**delay** 101:4
**delays** 283:15
**delete** 299:7
**delineated** 264:8
**demands** 207:7
**demonstrate**
124:4,5,6
**Department**
250:6,16,19
286:7
**depending**
162:9
**DEPONENT**
301:15
**deposition** 89:12
96:8,19 113:19
120:19 143:23
155:6,8,15,16
155:18 160:5
196:21 203:11
204:16 268:17
292:9 301:10
301:13 302:7
302:11
**describe** 96:21
225:11
**described**
203:22 257:22
**describes** 246:7
246:22
**describing**
246:19
**description**

226:6,12 257:5
**design** 134:20
265:10
**designate** 232:3
**designated**
99:12
**desire** 167:1
**detailed** 293:23
294:10
**details** 209:5
229:1 296:11
**determination**
234:2 237:3
263:5
**determine**
254:12
**determined**
225:4,8,13
263:8
**develop** 168:8
173:7 190:20
**developing**
127:4 148:3,14
148:22 190:5
**Development**
89:6 96:23
97:19 98:16,23
110:12,13,14
118:16 120:3
123:15 125:3
131:7 136:21
141:1,2,3
146:20 155:3
156:22 157:14
160:14 161:19
165:5 166:10
166:15 171:7
171:21 172:8
172:21 173:20
181:7 185:9
187:5 188:14
189:7 192:13
195:19 199:14
224:9,21
228:21 230:5
230:10,22

232:18 233:20
235:3 237:12
237:15,18
238:15 242:9
243:9 244:3,9
245:6,18
246:11 247:17
247:19,22
249:2,13,20
250:13 251:3
251:15 253:9
253:12 255:2,5
256:8 257:1,9
258:12 259:19
261:2 262:6,15
266:23 270:20
271:5 275:14
276:11,22
277:2 278:6,17
279:2,6,11
280:9,14 285:8
286:4 291:20
294:12 296:1
**Development's**
101:5 125:10
241:8 244:19
270:8
**different** 167:20
168:4 210:13
236:8,14 237:2
282:19 291:8
**differently**
155:23 223:18
**digits** 197:3
**direct** 137:17
159:4 251:23
254:21 265:14
**directing** 206:6
**directly** 122:5
**director** 137:12
225:7 242:4
**disagree** 115:1
117:17 119:5
119:17 155:14
294:5,14 295:5
**disagreed**

114:20 117:22
118:18 120:1
155:9
**disagreeing**
116:18
**discuss** 123:7
157:15 165:3
177:17 178:3
184:3 185:10
193:4 209:4
214:19 227:4
273:22 274:12
279:18,19
**discussed** 138:4
139:19 140:2
142:21 145:1
154:7 161:8
162:13 177:9
177:12 187:22
190:13 193:16
196:4 255:8
276:1 290:18
**discussing** 185:3
189:17
**discussion** 96:12
113:2 140:15
141:22 142:4
146:15 153:19
162:15,20
181:15 194:15
195:18 215:17
224:20 228:23
248:6 273:13
274:21 277:8
**discussions**
113:6 121:6,10
121:14 122:6
126:1 189:3
190:18 198:1
219:20 224:6
248:8 274:15
274:18 281:6
281:17 300:2
**displays** 289:12
**dispositioned**
119:14

distinction 235:17
distributors 290:5,18
DISTRICT 89:1 89:2
divide 290:10
DIVISION 89:2
Dixon-Herrity 193:18
docket 199:4,8
document 113:22 117:4 118:23 119:1,7 119:18,22 120:23 144:9 156:13 174:18 175:12 177:8 183:9 186:6 191:20 195:7 196:4 198:9,11 200:3 203:14 203:15 204:20 204:21 205:22 206:9,11,14 222:21 229:4,6 231:7 232:7 239:14,20 250:3 255:18 260:22 261:5 267:8 293:2
documents 165:12
DOE 123:13,16 123:19,23 124:10,13 190:15,18 251:6 275:18 275:23 276:5 276:10,17 298:19,22 299:14,16,19
doing 125:22 147:4 150:9 175:22 187:19 189:7,11 224:3

243:9 298:6
dollar 289:5,16 289:22 295:16 295:18,22 296:6,8 297:20
dollars 289:6,18 290:1,12,15 291:14,18,21 293:19
door 158:10 159:3
doubt 114:4 287:3
draft 217:5
drafting 129:4,6 129:10
Drive 91:17
drop-in 161:19
drop-ins 161:10 161:15 163:22
due 292:16
Duke 275:12
duly 96:4
Dym 90:16

**E**

E 90:1,1 91:1,1 92:1,1 225:11 302:1,1
earlier 144:16 144:20 145:8 166:22 169:6 170:8 191:19 210:6 214:19 215:1,3 255:21 256:2 271:15 276:12 282:14
early 135:11 146:7 170:4 172:14 173:9 267:2 272:6 273:23 275:1
easy 154:5
educate 189:18
effect 154:10 261:11

effective 257:6
effort 102:16 122:20 147:14 169:23
efforts 93:19 123:12 215:12 275:18
eighty 296:21 297:15
eighty-seven 295:22 296:6 297:20
either 147:15 179:16 193:3 201:19 224:7
Electric 290:22 291:3
electricity 296:20
electronic 274:10
eleven 166:18 178:10
email 93:8,10,13 93:15,18,21 94:1,4,7,17 95:3,8,11,18 95:21 113:23 121:2,15,20 122:8 123:1,5 123:8 133:16 133:20 134:10 145:16,16 147:6,23 160:19 164:8 179:12 183:10 183:15 184:7 184:12 185:7 186:9,22 188:12 189:21 191:12 194:23 203:17 206:8 207:1 209:14 209:15 214:3,4 217:4 230:17 268:21 269:13

272:22 274:19 293:5,7,12,14
emails 95:6,14 144:11 146:17 153:9 205:7,20 206:3 215:3 272:18 293:1,3 293:9
emphasizing 211:21
employee 224:9
employees 224:12
enable 262:21 264:10
enclosure 264:9
encountered 283:14
encrypted 274:9
ended 135:22
endorse 199:15
endorses 199:7
Energy 197:12 250:6,8,17,19 254:7,14 275:12 286:7
engage 121:22 134:17
engaged 97:4,18
engages 138:18 139:8
engineering 125:4 169:1 170:3,10,16 190:23
ensure 192:1 207:16
ensuring 193:19
entered 295:23
entire 168:19 169:15 222:17 231:14
entirely 146:23
entitled 195:4 197:7 225:18 258:6 261:9

entity 108:3,4 227:2
environment 264:15
escalation 296:16
essentially 111:13 130:13 130:21 135:12 223:15,19 224:2 267:19
estimate 169:11 221:12 297:22
Estimated 220:18
estimating 267:19
et 199:10 266:5
evaluating 117:8
evaluation 118:11
event 258:11
evolved 174:6
exact 180:2 188:21 266:9
exactly 110:22 115:17 223:20 232:10 238:6 260:7 277:15
EXAMINATI... 93:1,3 96:14
examined 96:4
example 207:7
EXC's 220:6
exception 109:1 109:12 110:2 218:15
exchange 153:9 183:18 272:18 274:19
exchanged 144:11 184:12
excuse 101:20 120:4 121:3 144:6 147:12

152:14 161:16
161:17 174:16
177:22 182:8
186:8 237:13
265:5
**execute** 298:12
298:13
**executive**
137:12 248:9
**Exelon** 212:17
213:8
**Exelon's** 213:4
**exemptions**
199:9
**exhibit** 93:8,10
93:13,15,18,21
94:1,4,7,10,13
94:15,17 95:3
95:6,8,11,14
95:18,21
113:16,21
114:11 117:16
120:16,22
133:13,14
143:19,20
146:11,12
147:20 150:14
153:8 156:10
156:11,15
160:19 163:6
164:5,8 165:22
183:6,7 186:3
186:4,8 188:12
189:21 191:9
191:12 194:20
194:21 203:8
203:13,17
204:13,18
205:14,16
217:21 218:2
230:13,14
231:8 232:5,20
234:19,20
239:10,22
240:9 242:3,23
258:5 260:21

263:21 264:1
265:6 267:5,6
268:14,19
272:15,16
292:6,11
293:13,18
**EXHIBITS** 93:6
95:1
**existing** 99:3
139:21 201:12
252:17 269:7
**Exp** 302:22
**expect** 251:4
267:16 268:8
**expectation**
260:10
**expected** 148:18
176:10 180:12
250:13 259:16
268:1,2
**expects** 250:8
**expend** 171:4,21
172:3
**expenses** 295:10
295:13
**experience**
107:11,14
108:6,17,19
115:23 116:7,8
116:20 117:6
118:8 146:23
149:12 183:1
236:12 275:7
**expirations**
118:10
**expired** 117:20
118:1
**explain** 175:19
216:15 285:21
**explained**
184:18 216:22
**explanation**
241:20,23
**explanations**
241:17
**express** 164:23

**expressed**
138:13,14
139:4
**expressing**
138:23
**expressly**
177:17 178:3
271:12
**extension**
117:21 182:10
230:5 243:17
243:22 266:20
**extensive** 297:17
**extent** 207:16,16
232:2 233:16
238:22 270:11
**eyes** 248:18

**F**

**F** 302:1
**face** 184:2,3
**face-to-face**
103:5 136:13
137:11,15
150:13 153:19
**facility** 108:9
125:6 197:19
276:3
**fact** 140:6 151:1
161:5 174:23
190:8 205:1
212:1 216:3
217:16 231:13
249:8 250:15
267:22 287:4
**factor** 296:14
**factors** 296:16
**fair** 112:19
171:6,11 191:6
202:17 209:23
211:20 218:19
236:23 241:7
262:13,20,23
263:3 285:4
**fairly** 137:20
**fall** 192:19

**familiar** 149:21
**far** 218:12
**fashion** 181:22
**fast** 173:16
**faster** 109:11
**feasible** 288:22
**February** 146:8
164:9 166:6,17
168:10 177:2
178:15 179:1
182:23 183:11
186:13
**federal** 89:14
91:7 197:14
271:12,23
**fee** 183:22
**feel** 122:16
185:14,18
**fellow** 291:2
**felt** 102:2 109:22
123:19 127:10
190:18 215:16
250:21
**FERC** 271:3
**FERC's** 271:4
**Fifth** 89:15 91:8
**figure** 99:23,23
290:11 296:7
297:21
**figures** 298:1,2
**file** 101:5,9
102:7 113:20
**filed** 101:3,18,22
102:1 109:4
132:19 290:7
**final** 129:18
130:19,23
190:23
**Final-Release**
95:19
**finalize** 193:4
**finalizing**
184:20
**finance** 249:21
**financial** 97:12
98:19 105:1

119:9 127:6
131:6,22 132:5
132:11 227:1
277:10 288:12
296:17
**financing**
166:23 169:17
169:23 170:14
177:6 184:20
227:13
**find** 150:11
265:16
**finding** 152:20
**fingers** 147:18
**finish** 175:1
**firm** 97:4 269:19
269:20,23
271:6,9 286:3
292:1,2
**firmed** 184:22
**first** 97:18 100:3
104:13 114:10
115:4 116:19
119:8,10,12
120:10 123:7
123:10 128:1,3
128:10 130:17
132:8 136:9,12
147:23 165:14
171:8,22
172:23 179:14
186:21 188:11
189:20 191:16
192:4 197:10
200:22 206:17
210:7,10 211:9
219:13 223:5
225:18 230:16
233:12,15
239:23 242:3
256:22 261:10
264:6 266:15
277:5 281:10
284:12
**five** 244:23
282:5,21

284:10,14,19
284:21 285:7
**five-year** 282:13
285:10,14,17
286:9,18
**flip** 225:16
**floor** 295:2
**focus** 123:16
**focused** 123:19
**folks** 187:5
**follow** 111:5
150:23 160:1
161:9,19
174:14 196:17
220:6
**follow-up** 161:1
161:5
**followed** 112:9
142:16
**following** 99:11
100:11 146:15
150:9,12
190:21 205:15
207:2 273:12
291:17
**follows** 96:5
**foregoing** 302:7
302:10
**form** 97:9 99:19
109:17 128:17
129:18 130:12
130:19 131:1
131:19 219:17
220:2 234:10
259:21
**formal** 209:17
**formally** 227:18
**format** 97:9
104:21 154:6
**formed** 145:20
227:2
**forms** 219:19
**formulate**
212:15
**forth** 99:4 100:2
135:17 294:9

**forward** 93:12
138:16 140:1
141:15 169:1,8
184:22 189:3
192:1 207:9
209:5 212:18
213:13 214:11
253:10,11
292:23
**four** 117:7
162:12 163:19
170:19 197:3
209:3 226:17
251:8 295:21
296:5 297:19
**fourteen** 254:18
**Framatome**
134:20 223:19
**frame** 132:2,8
142:15 146:19
149:2 172:13
173:8 174:3
190:9 213:17
272:7
**frames** 142:18
**Frank** 95:22
97:23 121:2,3
121:7 122:8
123:18 131:13
131:18 135:20
136:16 145:19
145:22 146:2,6
183:10 184:11
186:15,22
187:12 208:2,9
209:3 211:21
212:22 215:22
216:3,7,14,19
221:9 224:7,16
227:4 268:22
269:3,17
293:14
**Franklin** 114:1
221:8 224:7,16
227:5 268:22
293:6

**frequent** 123:12
123:21
**front** 206:9,10
**fuel** 135:4
**Fukushima**
207:7
**full** 137:20
200:22 210:4
**fully** 201:19
217:6
**function** 137:18
148:12 227:23
227:23
**funding** 207:5
**funds** 172:21
299:3,7
**furnished**
131:14,15
**further** 96:5
112:1 215:17
250:21 274:15
300:2,6,11
301:4,15
302:13
**future** 121:23
187:7 193:20
260:8
**fuzzy** 279:12

————————
**G**
————————
**Gail** 89:20 238:1
302:20
**gained** 100:10
101:9 174:3
**gap** 259:17
260:2
**Gary** 114:1
122:3 134:12
135:14 136:2
186:9,14
**gather** 124:19
130:7 171:4,8
172:12
**gathered** 130:12
219:8
**gathering** 125:8

126:5 131:4,11
132:13 168:12
168:18 169:20
**general** 91:15
124:15 137:19
162:15 185:1
187:20 196:11
228:15,17
248:10 279:19
**generally**
184:19 276:16
**George** 290:23
**getting** 99:9
113:14 124:16
130:23 131:18
131:19 135:1
169:6 177:5
188:3 211:15
274:7 288:3
**Gilman** 205:19
213:2 214:18
**give** 139:6,7
140:23 141:2
142:7 174:12
191:4 239:19
271:9 290:22
292:21
**given** 171:13
173:14,15,18
185:15,16
227:10 263:23
294:23 302:12
**giving** 206:2
218:15
**Gleaves** 181:4
182:3 191:13
195:1 272:19
273:11
**Gleaves'** 272:22
**go** 109:11
125:17 130:2,3
130:8 138:16
143:7 144:7
163:8 179:20
192:17 197:1
198:7 209:15

210:2,3,23
211:2,11
213:20 215:4
229:17 253:18
268:11 289:11
289:11 290:7
295:14,14
296:10
**goal** 193:7 215:5
**goes** 193:7
198:23 212:14
257:7
**going** 100:1
103:3,8 104:20
104:21 105:3
105:15 107:18
110:3 122:7
133:12 136:2
138:15 140:3,4
144:15 145:23
146:11 147:8
147:17 148:8
148:17 149:4,7
149:8,14,16,19
152:21 153:23
154:9,14,18,22
155:4,20 156:2
156:9,19 160:1
160:4 163:6
168:18 170:5
170:11,13
180:14 183:5,6
186:2 191:11
191:23 194:20
196:16,20
197:1 205:4
207:9 211:16
211:22 223:17
230:12 245:11
246:3,13 247:2
248:6 253:10
253:11 260:7
267:5,11
272:14 282:22
286:13 290:22
292:1,2 299:16

**William McCollum**

**11/13/2019**

Page 313

good 96:15,16
153:18 161:12
164:18 175:22
183:23 207:19
224:4 234:17
gook 135:7
gosh 137:3
**Governor**
278:19
graph 165:15
grid 288:20,22
ground 125:19
group 103:15
104:5 112:6,8
147:3 148:21
149:13 150:5
151:7 154:18
184:1 185:8,11
185:19 283:23
284:4 287:14
287:18 293:7
groups 147:3,13
**guarantee**
123:14,16,20
123:22 124:3
190:15 250:7
297:22
**guaranteed**
298:3
guess 234:15
273:9
guidance 94:5
116:3
guys 104:20
135:15 149:7
187:20 215:22

———————
**H**
———————
**H** 91:4
half 171:8,22
172:23
hand 90:6
138:21
handle 116:12
135:21
handled 118:9

248:7 260:16
**handling** 195:4
273:14
**Haney** 95:22
97:23 114:1
120:10 121:2,3
121:7 122:8
123:2,5,18,18
131:18 136:15
136:16 186:22
208:3,9,9
211:21 212:4
213:16 221:9
224:7,16,16
268:22,23
269:3 293:6,14
**Haney's** 131:13
hang 249:23
happen 211:16
245:11 246:14
247:3 257:13
260:7 282:8
**happened**
255:14 279:14
299:9
happens 125:15
head 148:11
157:12 300:17
heading 119:2,9
health 254:5
264:14
hear 190:3
heard 105:6,11
105:12 212:1
215:21
hearing 302:12
held 187:11
235:14 236:5
237:1,5,19
239:5 259:20
262:6 277:6
help 104:6
106:22 135:16
143:8 212:16
212:17 223:19
helped 275:20

helpful 217:13
high 228:22
288:15,17
highlighted
164:16
**Hill** 91:17
hired 118:9
286:4
hiring 224:18
history 102:16
hit 288:14,18
hold 193:8
233:20 237:8
237:12,18
240:3
holder 108:7
110:10 198:14
199:1,3
holding 242:17
home 143:9
hope 109:10
hoped 181:1
hopefully
211:11
hoping 141:8
177:4
hour 289:9,17
289:22 290:2
290:13,16
291:15,18,22
293:19
hours 122:15
hub 289:14
**Hughes** 90:16
**Huh** 182:5
hundred 289:6
295:21 296:5
297:19
hundred-and-...
139:3
hundred-and-...
139:2 268:7,10

———————
**I**
———————
**I.C** 220:4
**ICF** 285:21

286:2,3 288:10
296:4,11 298:1
298:7,8
idea 161:12
207:19
identification
113:18 120:18
133:15 143:22
146:13 156:12
164:6 183:8
186:5 191:10
194:22 203:10
204:15 218:23
230:15 234:21
263:22 267:7
268:16 272:17
292:8
identify 110:2
215:7
**II** 89:11 139:9
220:17
**III** 90:4 222:1
223:1 226:8
**III-b** 222:18
**III.A** 222:6
223:10
**III.B** 233:23
240:5,8,13,16
240:23 241:15
242:2,12,17
**Illinois** 90:18
**Immediately**
128:21
impact 138:16
276:18
implement
183:22
implementation
210:4
implications
256:4
implied 201:23
implies 198:22
important
294:17 298:18
imposes 247:5

impression
105:14,15
108:16
include 255:13
295:9
included 130:14
131:7 190:10
228:13 240:14
including 190:4
199:8 295:1
inclusions 232:2
increases 292:3
292:16,17
295:1
incurred 271:10
indemnity 201:4
independent
264:10 288:20
**INDEX** 93:1,6
95:1
indicate 167:15
167:16 176:16
200:6 223:20
228:16 267:16
284:20
indicated 103:2
135:9 145:19
147:8 150:14
161:11 172:11
172:18 173:13
299:15
indicates 145:16
147:6 173:22
175:1,7 261:4
261:11
indicating
165:16 166:8
227:4 284:13
284:16 286:19
286:19 298:22
indication
102:10 140:23
141:3 142:8
173:15 191:4
industry 117:7
183:1 236:12

inference 236:23
inflation 296:14
inform 179:6
242:4 299:22
information
94:18 97:12,15
98:10,14,18
99:6,9,11,16
99:17,22 100:8
100:10,15,16
100:20,22
101:1,7,10
102:3,22
103:18,20
104:6,23 109:2
109:6,14,22
113:9,14
117:14 123:23
124:9,10,13,19
125:9 126:5,17
126:19,22
127:5,9,16
128:7,14 129:6
129:8,11 130:7
130:12,16,17
130:23 131:6
131:15,16,18
131:22 132:12
138:1 153:16
154:4 168:13
169:9,20,21
171:9 172:13
173:1,7,17
174:17 183:19
184:13,23
190:17 193:18
207:7 214:6
216:9,11
218:16 219:8
219:10,11
222:5,11,19
227:3,11,13,15
231:20 232:3
240:21 241:4
250:18,21,22

262:12,15,17
263:4,9 264:8
264:23 265:9
266:5,7,16,18
273:1,3,6,9,10
273:16 274:10
275:8,11,21
289:11 290:9
informed
286:12
informing 244:1
inimical 254:4
initial 102:17
104:18 155:21
155:22 156:3
initially 97:23
105:17 163:18
inject 122:12,19
135:10,18
injecting 122:2
input 114:12
inspection
139:10
instance 236:10
instruct 132:23
158:14 159:10
196:6
instructing
158:21 159:1,4
159:20 196:15
instruction
160:1,6 173:19
196:22
intend 138:22
139:5 140:17
167:13 181:23
intended 141:4
161:9 174:8,13
238:7 248:21
intent 138:7,20
138:23 139:15
139:20 140:10
162:16 176:19
245:15 261:17
298:13,23
299:12 300:2,8

300:15
intention 173:23
174:1
interaction
244:8
interest 138:14
152:20
interested
184:17 187:18
193:19 273:21
274:6 302:15
interface 119:3
183:21
interfaces
135:11,13
136:12
introduced
184:11
introduction
254:23
introductions
187:19
introductory
187:18
invalidate
201:11
investigation
254:15
investment
300:21
involved 102:13
106:1,4,7,9,17
107:13,14
112:6 129:3,5
129:9 131:4,11
132:13 133:6
135:16 148:22
154:22
involvement
96:22 102:16
172:20 275:18
involving 211:3
272:1
ISFSI 201:4
issuance 199:4
201:5 258:12

issue 109:1,13
110:3 112:9
156:18,22
157:9,15 158:1
159:20 160:10
160:15 168:5
217:1 221:5
250:23 255:5
258:21 259:12
266:4
issued 198:16
200:11 201:6
201:10,13
242:17 268:4,6
issues 116:23
168:2,9 281:11
item 116:18
117:18 167:5
176:8,19 178:9
200:19 223:5
240:16
items 95:15
199:7 218:10
218:13 225:22
229:13
IV.B 227:12

——————

**J**

J 95:22 291:8
January 95:7,7
133:17,23
134:3 136:6
137:22 138:4
140:6 143:1
144:12,12
145:5,12 146:7
146:16 149:2
150:16 151:6
151:22 153:6
156:7 160:20
161:1,6,8
165:1,3 177:16
178:1,7,17
179:3
JEFFERSON
302:4

Jim 99:12,15,20
103:23 149:23
152:18 224:8
224:18 248:9
268:22 269:4
job 175:22
Joe 95:6 102:18
103:2,4 104:19
105:17 110:19
111:15 112:5,7
112:20 133:5
144:11 145:16
147:4,9,15,15
149:7,17 151:4
152:19 153:17
153:21 154:17
155:22 291:1
Joe's 103:12
Johnson 276:21
277:1,9,21
278:6,13 279:1
291:12
jot 143:6
judgment 98:6
111:20,21
July 130:5 132:8
167:10,14
168:19 174:20
174:22 175:8
175:10 176:21
177:3,12
266:15 267:2
293:5,14
June 132:2
189:22
jurisdiction
271:3

——————

**K**

keep 192:9
289:20
kilowatt 291:15
kin 302:14
kind 105:8
Kitchens 291:1
knew 194:8

262:4 282:7
**know** 98:2 115:5
115:13,16
119:16 120:2,6
120:9,9,10,13
126:11 130:18
135:6,20 136:2
141:13 147:3
152:19 153:1
157:22 159:16
183:14 188:21
193:11 198:4
198:21,21
200:14 201:22
202:11,14
209:8 230:9
236:13 238:19
238:20 249:8
249:10 255:22
260:7 266:9
273:6 289:20
294:18
**knowledge**
108:8 156:21
157:13,21
158:2 177:13
231:20 240:20
241:5 251:4
**Knoxville** 91:18
277:6 278:12
279:13

_____
**L**
**lack** 212:6
**lacked** 212:9
**large** 147:1
**Larry** 90:14
227:4 268:23
**late** 111:19
127:22 130:20
133:4 145:5
156:6 194:16
220:22 272:6
281:14
**Latest** 220:18
**law** 90:5,15 91:5

97:4 236:18
270:7
**lawyers** 215:13
**lblust@hspleg...**
90:20
**lead** 97:6 99:13
104:21 105:16
108:3,10
135:12,19
136:4 146:21
148:8 149:4
152:21 154:14
155:4 189:16
**learn** 183:19
281:10
**learned** 100:5
**learning** 184:17
195:15
**lease** 294:18
**leave** 288:3
**led** 96:22 97:3
145:22 189:1
**left** 149:16
**legal** 112:10,13
116:5,22
118:13,15
202:19 241:17
241:19 270:11
271:15,23
272:3 281:7,11
**legally** 271:8
**Lembke** 91:4
93:3 96:14
101:23 102:5
128:15,19
133:2,3,23
134:2,8 144:2
144:6 145:3
151:12,19
155:16 156:4
156:16,17
158:9,12,18,21
159:7,18,23
160:3,7 163:7
163:17 164:14
164:17 169:19

173:5 175:16
175:21 176:2,7
176:15 178:22
178:23 179:17
180:3 196:9,16
196:19,23
203:1 205:17
206:2,7,12,16
223:13 229:5,7
229:17 230:3
232:6,12,13,22
233:2,3,11
234:15 235:11
236:19 237:23
238:6,13,17
239:2 241:12
245:22 252:7
252:12 255:21
259:2,22 260:4
263:15,19,23
265:17,22
270:12,18
271:1,16,19
280:7,19 281:5
297:5,7,10,14
301:3,6
**lengthy** 232:20
**let's** 104:11
147:19 175:11
209:12 217:20
229:17 233:12
253:18 254:17
259:5 280:19
**letter** 94:14,16
138:23 139:3,3
139:5 174:1
199:3,6,10
200:6 208:2
231:2,6,10,18
232:3,14 233:4
233:13 235:10
235:19,22,23
237:5 239:17
239:23 240:19
241:21 242:22
243:3 247:15

249:18 251:9
251:19 264:2,9
264:22 265:6
265:19 267:9
268:7,11,13
298:13,23
299:4,12 300:2
300:8,15
**level** 111:16
138:18 228:22
**Lewis** 97:4,6,18
118:15 215:13
218:16,19
219:12 222:14
227:11,16
228:10
**Lewis'** 223:16
**license** 94:5
106:1,8,18
107:7 135:2
139:15,16,22
155:21 167:9
174:15,22
187:6 190:5,20
195:5 197:20
199:1,3,9
201:4,6,11,15
202:2,9 208:12
208:13 231:19
242:14 258:13
264:12 302:22
**licensee** 107:1,1
107:8,8 199:6
201:8,10,12,13
242:4,8 248:1
248:17
**licensee/appli...**
200:5
**licensees** 220:8
**licenses** 106:11
106:12 115:7
162:18 197:16
**licensing** 97:5
103:15 104:5
107:11 112:5,6
115:6,6,8,11

118:13 121:23
148:8,12,19,21
149:3 154:17
184:16 185:17
185:23 187:7
195:23 198:13
198:14 199:2
199:15 202:12
223:18
**life** 220:23
**light** 267:22
**limited** 199:8
**line** 250:5
**lines** 244:23
269:8 270:9,21
271:6
**link** 181:21
**linkage** 177:17
178:4
**linked** 171:1,3
181:18
**list** 214:5,17,19
217:6,23 218:3
218:10,13,22
219:14,23
222:2,13 223:6
223:16 225:2
225:17 226:4,9
229:8 282:15
**listed** 219:22
225:22
**lists** 219:18
**little** 100:2
135:11 155:23
157:2 168:7
181:13 223:18
**LLC** 89:6 90:6
165:6 256:8
**LLP** 89:13 91:6
**loan** 123:13,13
123:16,20,22
124:3 190:15
190:16 250:6,7
250:23 251:2
275:19 276:5,7
276:18 286:6

298:19 299:17
**long** 208:14
211:3 266:6
275:4 277:14
279:14 299:4
**longer** 167:23
168:7 286:13
286:16,17,23
**look** 113:20
116:1,9 117:9
117:12,12
135:14 143:15
143:18 144:5
147:19 165:21
175:11 186:7
186:20 192:17
194:5 200:21
206:17 214:10
233:12 242:21
252:12 258:10
261:8 285:22
292:22 296:11
**looked** 143:10
146:18 191:19
205:1 282:14
282:20 289:15
**looking** 146:17
146:20 239:22
242:2 252:1
**looks** 153:11
293:4
**lot** 99:17 100:19
**lower** 197:2
223:2,4 289:2
**lunch** 229:21

**M**

**Madison** 90:17
**main** 138:12
285:23
**maintain** 135:7
207:18
**maintained**
229:8 232:16
233:6
**maintaining**

257:3
**maintenance**
272:12 292:4,5
292:18 295:10
**major** 140:1
165:14 171:14
**making** 202:20
211:5 236:20
263:4 285:16
288:16 295:8
298:4
**manage** 171:12
**management**
137:18 179:11
185:16,23
**manager** 99:13
223:6,22
**managers**
179:22 180:6
180:17 181:11
184:2 185:9
225:13
**manner** 124:5
237:19
**March** 145:10
152:2 153:6,11
154:12 155:3
156:20 157:5
167:10 243:20
**Marie** 212:22
213:2 214:18
215:5,12,20
216:1,10
225:20 226:5
226:18 228:4
**mark** 133:13
140:3 146:11
156:10 163:6
183:6 186:3
191:12,23
192:6 194:20
208:5,5 230:13
232:11 234:18
267:5 272:15
**marked** 95:1
113:17,21

120:17,21
133:14 143:21
146:12 156:11
164:5,7 183:7
186:4 191:9
193:1 194:21
203:9,13
204:14,18
230:14 234:20
263:21 264:1
267:6 268:15
272:16 292:7
292:11
**marks** 301:9
**Maryland** 103:6
152:4 203:3,6
**material** 216:4
**materials** 274:5
**matter** 116:5
134:22 210:18
270:7
**matters** 233:18
**Matthew** 91:4
**Matthews** 97:5
97:17,22 112:9
112:12,16
129:2 131:17
132:18 157:17
157:20,22
158:5,13,16,18
159:5,9,11
160:9 196:1,5
206:18 207:2
208:2 214:4
217:5 218:1
230:17
**mayor** 284:2
287:23
**McCollum**
89:12 96:3,9
96:15 117:2
144:7 151:19
156:17 163:5
174:23 175:21
176:3 204:19
206:17 230:3

230:16 232:14
254:22 258:16
262:8 264:1
267:10 281:5
301:7,10
**McCree** 137:8
137:10,11
138:6 140:7
161:11 164:10
165:23 174:7
174:12 177:16
211:10
**McCree's** 212:2
**mean** 101:21
106:23 125:1
147:11 179:15
180:15 189:13
216:6 229:8
252:21 253:12
255:11 270:3
286:18 295:10
**meaning** 136:15
178:11 284:20
294:22
**meanings** 256:5
**meant** 134:3
177:22 178:1
200:15,18
201:19 238:4
240:22 241:14
261:15 269:17
275:14 285:18
294:19,20
**Media** 95:20
**meet** 171:23
184:2
**meeting** 93:9
95:4 103:5
122:10 134:19
135:23 136:7,9
136:13,22
137:7,9,11,16
137:22 138:4,6
138:13 140:5,6
141:7 142:23
143:4,7 152:3

153:10 155:3
156:20,23
157:5,11,16
160:16,23
161:2,5,7,9
162:10 165:1,2
174:11 182:19
184:1 185:8,11
185:19 189:16
193:3,8,12
202:21 203:2
203:18,23
204:4 206:20
206:22 207:2
212:2 217:12
274:2 276:20
277:6,21 278:5
278:10,11,16
279:12,16,17
288:5 300:4
**meetings** 121:21
122:1,3,6,13
122:15 134:16
135:19 143:6
161:19 162:3,4
162:5,14 211:4
217:17 275:23
276:1,23 277:3
279:9 280:12
**megawatt** 289:9
289:17,22
290:2,13,15
291:18,21
293:19
**member** 284:4,5
**members**
138:14 165:2
**memory** 138:2
143:8 194:6
212:3 277:13
279:12
**Memphis**
189:11,16,18
189:19 281:23
283:8,17 284:3
284:8 285:2,11

285:23 286:10
286:12 287:11
287:15,19,23
288:1,3,13,16
289:3,14,19,21
290:1 291:16
291:20 292:13
295:21 297:6
297:21 298:5
298:11,16
299:1,4,11,22
300:5,7,12
**mention** 140:9
**mentioned**
110:6 113:13
124:18 127:15
132:14 134:15
222:12
**mentioning**
163:1
**merger** 107:20
**mergers** 107:13
**Messrs** 91:13
**met** 137:10,16
163:19,21
172:6 183:4
211:9 276:4,9
283:17,23
**mid** 281:14
289:16
**mid-March**
156:23 157:16
160:16
**Midcontinent**
288:20
**middle** 130:17
188:11
**midway** 254:23
**Mignogna** 114:1
121:2,3 122:3
133:17,20
134:9,12
136:16
**milestones**
165:15
**million** 289:6

295:22 296:6
297:20
**mind** 149:16
213:16,19
277:5
**minds** 168:2
**minimum**
209:18
**minute** 108:15
113:9 296:23
**minutes** 163:21
287:5
**misleading**
255:18
**MISO** 289:1,8
**MISOEnergy....**
289:11
**misstates** 235:8
**Mistaken**
234:11
**mlembke@br...**
91:11
**MLGW** 286:12
291:4,16
296:21 297:12
298:13,18
299:11 300:17
**Mobile** 90:10
**mobilization**
166:10 168:23
174:20 176:18
176:22
**model** 191:22
193:2 249:21
**modifications**
207:8
**moment** 107:6
157:4 205:6
292:22
**money** 122:22
122:23 170:7,9
171:4,8 172:4
172:9 173:6,10
173:16
**month** 210:21
260:12

**months** 98:7
100:11 130:22
140:21 141:12
142:9,15 181:2
211:22 214:1
229:10 264:18
**months'** 166:18
211:3
**Morgan** 97:4,6
97:18 118:15
215:12 218:16
218:19 219:12
222:14 223:16
227:11,16
228:10
**morning** 96:15
96:16 148:2
**move** 106:11
139:15,22
141:8 167:1
169:8 176:5
212:18 213:13
263:19
**moved** 140:1
169:16 184:22
**moving** 139:11
168:23 172:17
189:3 190:19
206:9
**Mtgs** 93:14
**multiple** 107:12
107:13 145:1
**municipal**
297:17

_____
**N**
**N** 90:1 91:1 92:1
**name** 201:10
253:8 256:7
262:3 291:2
**named** 187:17
**names** 252:9
290:20,23
**NCFR** 119:4
**ND** 93:19,20
94:8 165:6,7

209:18 220:7
265:8 266:4,7
**ND1664** 93:9
**ND1830** 93:14
**ND1866-ND1...**
93:17
**ND2937-ND2...**
93:12
**ND3287-ND3...**
93:23
**ND3466-ND3...**
94:3
**ND3474-ND3...**
94:6
**ND3543-ND3...**
94:19
**ND4012-4016**
95:20
**ND4760-ND4...**
94:9
**ND5686-ND5...**
95:10
**ND5691** 95:13
**necessarily**
119:16 122:16
**necessary** 95:15
125:5 172:17
179:2 185:15
201:9 253:8
264:9
**need** 100:19
113:2 118:20
122:9,22
125:20 126:2
126:23 135:1,3
135:18 169:8
170:9 193:22
205:6 207:8
209:18 212:17
213:13 214:7
215:6,8 222:15
225:11 248:10
262:17 269:21
**needed** 98:10,14
98:22 100:13
100:15,22

102:3,6 109:7
109:15,23
120:7 122:17
125:9 126:6
127:10,20
128:3,5,9
129:13 130:1,7
142:1 168:13
169:21 171:9
172:9,23
173:11,16
185:19 215:14
215:16 216:4
219:10 221:7
251:23 252:8
262:4 265:1
**needing** 168:1
**needs** 175:19
199:10 296:22
297:15
**negotiating**
250:6
**NEI** 95:5 203:18
**neither** 302:14
**net** 294:18
**never** 105:23
108:18 112:20
151:5 182:13
300:15
**new** 107:1
119:10 156:14
184:16 195:15
199:1,3,6
201:3,10,13
275:3,13
298:13
**Newly** 227:2
**nine** 167:6 200:2
**ninety** 203:23
204:10 266:11
266:21 267:1
**Nodding** 157:12
**noon** 229:3
**normal** 100:17
105:7 107:3,6
108:1,12 143:5

North 89:15
90:8 91:8
NORTHEAS...
89:2
NORTHERN
89:1
Notary 89:23
note 160:3
196:19 214:20
215:1
notes 143:3,7,9
143:11
notice 139:6,8
201:5 232:4
285:10,13
notification
201:8
noting 243:22
notion 122:18
145:21 223:16
notwithstandi...
150:20 260:14
November
89:17 96:1,9
126:16 129:20
129:22 170:23
222:10 230:19
239:17 258:19
258:21 259:1,3
259:6,14
260:12,17
267:9 272:19
272:23 281:14
NRC 93:9,14
94:5,10,13,15
94:18 95:4,16
97:1 102:4
103:7 104:10
106:10,11
113:4 115:11
116:1,10,20
117:9,13,21
118:2,3,9,9
119:15,20
121:22 122:2,5
122:10,17

124:6,20 125:7
127:21 128:18
135:13 136:7
136:10 137:2
137:13,15,18
138:12,16,19
139:8,23 142:1
142:7,17
147:10 153:16
161:1,7,10,15
161:16 162:6
163:19 164:10
166:1 168:5
179:6,11,22
180:6,11 181:6
182:3,13,18
183:11,22
184:13 185:9
189:3 192:1
193:22 195:3
195:11 197:16
198:2 200:6
202:22 203:6
203:18 206:22
207:3,7,12
208:10,15
211:2,8 213:22
213:23 220:8
227:19 230:23
233:16,20
234:7,23 235:5
236:20 237:16
239:5,18 240:1
240:2 241:22
242:17 244:1,9
247:2,5,23
248:18 249:18
251:15 254:8
254:14 255:5
256:6,12
257:13,23
258:18 259:11
260:10 261:21
262:9,13,21
263:1,4,7
264:3,6,19

266:8 281:17
281:18
NRC's 197:13
NRR 242:4
nuance 285:17
nuclear 89:6
93:16 96:22
97:18 98:15,23
101:4 110:12
110:13,14
112:6 117:6
118:16 120:3
123:15 125:2,9
125:18 131:7
134:16 135:2
136:21 138:8
141:1,2,3
146:20 148:12
148:21 154:17
155:3 156:21
157:14 160:14
161:18 165:4,5
165:5 166:10
166:14 171:7
171:20 172:8
172:20 173:19
181:7 185:9
187:5 188:14
188:15,19
189:7 192:13
195:19 197:13
199:14 224:8
224:21 228:20
230:4,9,22
232:17 233:19
235:2 236:12
237:12,15,18
238:15 239:11
241:8 242:9
243:9 244:2,9
244:19 245:6
245:18 246:11
247:7,17,19,22
249:2,13,20
250:13 251:3
251:14 253:9

253:12 255:2,4
256:8,23 257:4
257:9 258:11
259:18 261:2
262:5,14
266:23 267:10
270:8,20 271:5
274:2,2,5
275:14 276:11
276:21 277:2
278:6,17 279:2
279:6,11 280:9
280:14 283:13
285:7 286:4
291:20 294:12
296:1
number 93:8,10
93:13,15,18,21
94:1,4,7,10,13
94:15,17 95:3
95:6,8,11,14
95:18,21
113:16 115:2
116:18 117:18
133:14 135:5
136:11 137:5
137:16,19
143:20 146:12
156:11 164:5
166:9 167:5
183:7 184:12
186:4 191:9
194:21 200:2
203:8 204:13
216:23 217:1
230:14 233:13
234:20 242:23
251:9 252:2
256:17 258:5
263:21 267:6
268:14 272:16
277:11 292:6
296:16
numbered 167:5
numbers 197:2
294:1,8,11

298:3
numeral 218:22
220:17 222:1
222:18 223:1
226:3,7 227:17
numerous 106:9
298:9

O

O'Rear 90:4
101:20 128:13
132:22 133:21
134:1,4 144:1
144:4,23
151:10 155:15
156:14 158:7
158:11,15,20
158:23 159:7
159:13,19
169:13 173:3
175:14,18
176:1,4,12
178:19 179:15
179:19 196:6
196:13 202:23
205:11,23
206:5,15 223:9
229:3 232:1,8
232:19 233:1,9
234:10 235:7
236:17 237:21
238:3,11,14,19
241:10 245:20
252:5 255:16
258:23 259:21
260:1 263:14
263:18,20
265:14,21
270:10,14,22
271:14 280:3
280:21 296:23
297:4,6 301:5
o-p-e-r 167:7
O&M 294:23
oath 199:11
object 110:12

144:23 234:10
238:3 255:16
259:21
**objection**
128:13 132:22
158:7 169:13
173:3 176:1,12
178:19 196:6
205:12,14
232:19 233:9
235:7 236:17
237:21 238:18
241:10 263:14
270:10,22
280:3
**objections**
271:14
**obligated**
103:22 247:11
270:19
**obligation**
248:13,18
270:8 271:13
**obligations**
247:5,13 248:1
248:22 249:1
260:16
**obtain** 120:3
126:4 162:17
167:7 169:23
173:17 174:21
181:7 269:19
275:18
**obtained** 174:9
**obviously**
139:18 154:4
275:3
**occasion** 117:1
**occur** 161:22
176:21 177:3
177:20 209:11
268:8 281:18
**occurred** 98:6
119:14 142:2
162:4 166:19
193:12 206:19

237:14 246:1
260:17 276:17
**occurring**
276:16
**October** 130:20
239:13 282:1
284:9 285:1
286:11,20
291:19 292:14
298:11,17
300:5,10,18
**off-taker** 270:2
270:3
**Off-the-record**
96:12
**offer** 119:15
207:4 241:17
241:23 291:23
295:8,11
**office** 91:15
137:19 190:16
203:6 250:7,23
251:3 276:19
278:19
**officer** 272:9
277:10
**officials** 142:7
276:5,10
**OGC** 157:18,20
158:2,6 159:9
159:12 160:10
**Oh** 137:3 144:6
226:10 249:23
275:10 297:13
298:15
**okay** 106:6,16
106:20 108:23
109:9 111:23
117:15 118:17
135:20,20
143:17 144:4
144:18 146:5
147:22 150:17
152:12 153:3,8
154:12 158:20
163:23 164:4

164:16,18
166:5 167:19
170:15 175:11
178:5 181:7,16
181:16 188:10
191:8 194:14
198:11,23
200:1,21
202:20 203:7
203:16 204:12
208:23 210:12
210:20,23
212:4,14
213:20 214:3
214:15 215:4
217:20 218:17
218:21 221:8
221:16 222:9
222:18,22
227:12 229:2
230:9 231:23
232:12 237:11
238:8 242:2
244:22 248:5
250:3 251:8
253:20 254:17
256:18 258:3
259:4 260:22
262:19 263:17
266:2 267:4
268:20 273:11
280:7,21
295:20 297:13
**old** 107:8 201:14
**once** 126:12
131:15 138:20
211:1 213:22
214:10,16
245:1,5 246:8
257:23
**ongoing** 148:3
150:8 187:6
207:18
**OpCo** 220:7
**open** 149:16
162:9 271:4

**opened** 158:9
159:2
**operate** 201:14
**operating** 135:2
139:15,16,21
162:17 167:7,9
174:15,21
197:18,19
201:11 202:2,9
208:12,13
272:8 292:4,4
292:18 295:2
295:10,13
**operation** 138:8
272:12 283:2
**operations**
137:12,14
188:15,19
**operator** 213:9
288:20
**opinion** 119:11
119:13,15,19
202:19
**opportunity**
206:3
**opposed** 107:17
289:17
**optimistic**
299:16
**oral** 179:15,20
**Ordaz** 187:4,11
187:12,16
**order** 128:4
206:13 252:9
258:12,21
259:12
**orderly** 228:19
**organization**
125:16 147:2
183:21 184:16
276:17
**organizational**
184:14
**original** 253:3
**output** 300:19
**outside** 202:8

271:7
**outstanding**
199:7
**overall** 141:14
257:2 294:1,7
294:11
**overlap** 124:9
**overly** 216:3,7
**overnight** 96:17
**owned** 259:18
**owner** 134:20
212:7,11 220:8
**ownership**
166:12 174:10
176:9 181:8
197:18 257:3

**P**

**P** 90:1,1 91:1,1
92:1,1
**p.m** 229:20,22
229:23 230:2
280:23 281:2,2
281:4 301:11
301:13
**pace** 172:16
**Package** 95:19
**page** 93:2,7 95:2
114:10 119:2,7
147:23 164:16
165:21 186:8
186:13,21
188:11 189:20
197:1,5 198:8
200:1,22,23
203:16 206:17
217:20 223:5
225:1,17,17,18
226:4,7,9,17
230:16 231:6
231:17 233:12
233:12 239:22
240:9 242:22
243:11 249:17
249:17 250:2
251:8,10

William McCollum

252:13 253:18
253:21 254:17
254:18 256:16
258:4,4 260:21
261:9 264:6
265:4,5,18
267:15 293:5
293:13,17
**pages** 205:5
206:5 216:11
218:2 251:23
261:6
**Paper** 114:10
117:16 118:18
120:4,11
121:16,17,20
122:18
**paragraph**
115:4 116:19
117:18 119:8
119:10 165:11
191:17 192:4
192:23 198:12
200:2,22 202:1
233:15 239:23
243:12,12
244:23 249:20
250:1 251:11
252:16 253:22
254:22 255:1
261:10 265:4
265:18 266:3
**parallel** 253:14
**part** 94:10 99:23
105:20 117:16
140:19 141:13
169:8 172:14
180:15 221:15
227:18 228:8
232:8,9 241:9
265:3,4,18,20
284:5 295:13
**participant**
279:2
**participate**
107:16 213:10

217:8 281:6,16
**participated**
275:22 280:10
**particular**
135:23 137:7
147:5 196:3
**particularly**
274:9
**parties** 107:12
115:15 302:14
**partners** 105:8
125:4 126:1
127:1
**parts** 104:12
**party** 107:17
108:8
**pass** 247:23
**passed** 118:2
168:4
**path** 93:11
209:5
**Patrick** 160:20
**pause** 126:20
**pay** 249:13
**paying** 291:5
**payment** 271:10
**pays** 289:19
**PD** 257:5
**pending** 119:11
198:15 205:23
237:2
**people** 97:15
98:9 99:21
137:5,17 139:1
147:10,13
184:15 189:16
219:20 277:11
290:4,14,17
**percent** 203:23
204:10 296:22
297:15
**perception**
216:20
**perform** 139:10
247:12 248:14
265:10 271:8

286:5
**performed**
254:16 285:22
**performing**
219:21 248:23
**period** 100:11
101:8 122:7
123:11 127:4
166:22 211:22
217:3 245:23
246:12 248:20
257:22 261:12
261:13,18
266:9 267:20
282:13,21
285:11,14,18
286:9,18
**permissible**
237:18 238:15
239:3
**permission**
237:8
**permit** 95:10,13
117:20 118:1,5
119:3 133:8
145:18 146:22
148:4,14,22
149:11 167:6
167:15 168:3,9
168:15 169:4
169:22 170:22
171:10 172:1
172:10 173:2
173:18 174:21
175:9 177:18
180:13 181:19
191:5 192:21
194:3,11,15
202:17 220:23
240:1 249:19
252:13,17
253:3,9,11,16
253:16 262:6
267:23 268:6
**permits** 97:2
99:3 101:15

106:5 108:7,20
109:6 110:11
113:3,8,13
114:15 115:7
126:14 131:9
138:11,18,21
139:12 140:12
140:18 141:6
142:1,11,14,23
152:10,16
153:21 154:2
162:22 163:2
165:7 167:18
174:2 180:19
181:9 185:5
188:2,6 199:18
208:17 212:11
219:16 231:1
232:15,16
233:6,21 234:6
235:3,12,13
236:4 237:19
237:20 238:12
239:3 240:3
242:17 243:6
245:2,5,14
246:2,9,13,21
246:23 247:11
247:19 248:1
251:17,22
252:8,10 254:3
255:7,15 256:7
257:3,14,23
259:19 261:22
262:2 281:20
287:6
**persisted** 217:2
**person** 137:13
137:13 193:3
225:19
**personally**
102:13 110:16
111:23 112:21
133:6 271:19
**personnel**
118:13 122:2

278:12 279:14
281:7,17
**pertaining**
134:10 278:5
279:2,6
**Peters** 186:10,14
**phase** 225:19,23
250:17,17,20
282:23 283:1
**phone** 134:11
149:1 183:18
184:6,10 185:1
185:21 187:4
187:10,18,23
278:23 279:5
280:8,16
**phrased** 149:6
**physical** 245:7
245:12 246:3
247:6 248:2
**pick** 220:21
**Piers** 90:16
**pile** 204:19
**place** 89:14 91:7
125:20,21
126:10 127:1,2
149:15 166:23
168:23 170:6
170:14 177:6
191:1 209:19
223:12 227:10
233:7 260:15
**placed** 242:5
**places** 274:8
**plainly** 205:19
**Plaintiff** 89:7
90:3
**plan** 94:2 142:12
193:5 227:19
227:22 228:23
261:1,10,11,15
261:17
**planned** 244:1
**planning** 147:16
225:8
**plans** 98:18

William McCollum

124:3,7 130:8
132:10 165:6
165:13,16
191:23 192:2
245:6
plant 135:3
138:22 139:12
178:13 223:22
224:1 232:17
233:7,21 234:6
234:7 235:4,5
235:14,17,18
236:4,8,8,13
236:14 237:6,8
239:4,5 242:5
242:18 243:2
243:14 247:8
261:16 283:14
283:22 286:20
292:4 296:21
297:15
plants 94:12
233:23 234:14
237:12 239:12
239:17 240:3,5
240:9 241:1,16
247:7 300:22
play 145:23
274:3
please 186:15
191:23 238:9
plenty 115:11
116:19
Plus 290:6
point 99:14
122:23 127:10
139:23 180:18
181:5,6 184:20
185:17,17,23
186:1 188:5
190:20 204:7,9
213:21 229:9
235:13 245:20
248:4 281:16
285:12 286:8
291:9 299:20

points 288:15,17
Policies 94:18
policy 94:11
196:11 197:8
233:23 234:14
239:12,17
240:6,9 241:1
241:16 243:2
250:8 251:7
271:4
portion 127:12
position 122:20
122:21 187:17
188:13 189:1
244:20
possession
143:12
possibility
148:10 149:17
150:19 167:23
224:8,17
247:20,23
258:18 259:11
possibly 210:22
260:3,5
post-closing
248:13
potential 126:1
185:8 189:11
189:19 213:8
279:20 281:7
281:11 285:22
288:12 289:4
292:3
power 117:6
189:12 236:12
269:7,9,22
270:2,5,9,20
271:7,23
272:10 284:1
284:13,21
285:5,15
287:20 288:3
289:1,5,12,13
290:9,11 291:3
291:21 300:19

PPA 294:17
295:1
practical 134:22
practice 143:5
pre 143:18
precedence
115:12
precedent 115:5
116:22
preliminary
269:6
preparation
109:15 152:8
152:15 169:20
prepare 96:18
107:9 156:19
166:3
prepared 214:5
261:1
preparing
108:10 129:1
146:21 154:1
154:14,19,23
155:20 157:10
present 136:16
215:20 232:19
277:1,1
presentation
202:21 281:22
284:8 285:1,20
288:13 292:13
298:10 300:4
presented
297:21
presenting
296:3 297:23
preservation
245:7,12 246:4
247:6 248:3
preserved
207:17
president
188:14,18
Press 95:19
291:16
pretty 101:2

273:23
previous 117:5
118:1 163:16
198:14 215:11
271:23
previously 95:1
96:4 113:17,21
120:17,21
139:16 143:21
152:1 191:18
191:22 203:9
203:13 204:8
204:14,18
268:15 292:7
292:11
price 292:1,15
292:16 293:20
295:14,16,18
296:8
prices 289:1,2
289:13
primarily 129:5
131:13
prior 106:18
113:4 120:4,4
120:7 121:7
128:21 181:8
183:15 208:8
233:18 234:8
235:1 245:13
246:5 247:17
261:18
Pritchett 89:20
302:20
privilege 132:23
205:18
privy 159:15
probably 141:21
problem 109:17
117:19
problems 281:7
procedures
94:19 183:23
195:4 274:8
proceed 116:3
232:18 262:14

267:12
process 95:9,12
96:22 97:4
103:9,16
114:14 126:9
129:15 140:21
169:17 190:19
208:9 211:3,17
211:22 250:16
250:20 275:4
processing
142:13
produced
192:13
product 128:9
130:1 132:4
Professional
89:22
program 123:14
127:5,16 128:4
129:10 132:9
190:16 207:17
209:19 210:2,7
210:14 212:7
212:12,23
226:5,11 250:7
250:23 251:2
256:20 257:2,5
257:8,17
276:19 299:3
progress 190:4
progressing
141:14
prohibited
224:11
project 99:18
124:2,16,17
125:18 126:3
134:18,23
135:8 136:3,4
137:18 141:9
141:14 165:4
165:13,14,22
169:2,8,18
171:5,13,14
179:11,22

180:6,16
181:11,13
183:20,20
184:2,3,18
185:2,9,10,15
187:21 188:4,4
189:17,19
190:2 213:10
227:12 249:21
275:21 277:9
**projecting**
192:19
**projects** 283:14
**property** 99:4
166:14,22
171:16 174:4
174:19 176:18
176:21 181:8
181:14,20
184:21 190:22
268:6 274:6
277:17 280:1
**proposal** 252:16
**proposed**
129:10 172:1
228:11 251:17
254:3 264:12
**proprietary**
232:2
**prosecute** 171:5
**prosecution**
124:15
**prospective**
242:13
**protection**
264:13
**protocols**
139:10
**prove** 103:10
**provide** 97:12
101:17 102:3
102:21 103:23
104:9,14
111:14 115:12
174:17 266:4
291:11 300:8

**provided** 103:19
124:10 205:19
243:21 250:22
262:15 263:9
265:8 285:11
**provider** 296:20
297:4,9,11
**providing**
101:13 285:13
**provision** 196:4
232:20
**provisions**
197:11
**public** 89:23
95:4 182:19
202:21 203:2
203:18,22
206:22 232:6,8
232:9 254:5
264:14 302:21
**publication**
195:4
**publicly** 289:10
289:21
**pull** 100:16
120:21 268:18
292:10
**punch** 214:5,17
214:19 217:6
217:23 218:2
218:10,13,22
219:14,18,23
222:2 223:6,16
225:2,17 226:4
226:9 229:8
282:15
**purchase** 138:7
162:16 165:4
224:11 230:6
248:21 270:5
296:1
**purchasing**
108:4
**purpose** 285:19
287:17
**purposes** 124:19

**pursuant** 251:11
**pursue** 114:13
288:3
**pursued** 250:15
**pursuing** 249:21
**put** 97:10,15
98:9 102:20
104:6,21 105:3
125:21 127:17
138:8 139:18
154:6 160:18
162:18 168:19
170:6 172:9,12
173:1 219:14
239:9 256:7
266:7,17
275:20 284:2
**putting** 97:8
107:16 126:10
191:1

─────────────
**Q**
**QA** 128:4 129:8
132:9 207:5,13
207:17 209:19
210:2,7,14
212:7,11,23
216:9 256:19
257:2,5,8
260:16 261:10
**Qualification**
227:2
**qualifications**
98:20 105:1
109:23 119:9
127:6 222:2
226:18 265:10
**quality** 98:19
104:23 127:5
127:16 128:14
129:6,10 226:5
226:11 257:5
257:20 260:23
**question** 106:3
106:14,14
108:15 109:8

109:10,12,18
116:6,8 117:2
117:3,5,5
126:21 127:8,8
134:6,8 149:6
150:22 157:3
157:13 158:22
163:15,16
171:18,19,20
175:13,17
176:3,6,7
179:20 188:17
196:12,15
200:5 206:1
208:4,5,20,22
213:21 223:12
224:14,15
225:3 236:18
237:22 238:5
238:20 247:21
252:6,7 255:17
255:18 271:16
**questions**
100:18 109:11
123:17 159:2
175:22 195:12
200:18 205:13
205:15 211:5
276:2 301:4,5
302:8
**quickly** 141:8
142:16 211:11
**Quirk** 278:17
279:6
**quite** 100:14
276:8
**quo** 245:7,12
**quote** 197:15,16
**QV** 257:17,19

─────────────
**R**
**R** 90:1 91:1 92:1
96:8 301:10
302:1
**raise** 156:22
**raised** 156:18

158:1,5 281:12
**ramp** 190:22
**ramping** 165:16
**range** 289:17
**rate** 289:8
**rating** 294:13
**re-reading**
119:4
**reached** 204:9
234:1
**reactor** 184:16
**reactors** 134:21
**read** 114:7
117:17 118:20
119:12 195:7
195:14,17
197:23 200:7
200:15 201:18
211:6,12
214:13 237:23
238:2,8,10
243:2 252:5
255:9 265:23
271:22 293:9
**reading** 114:17
178:5 195:10
202:1 265:15
**reads** 197:11
**ready** 124:16
126:17 127:20
128:10,17
130:3,13 132:4
141:11 167:1
178:16,21
179:2 183:21
206:4 210:2,3
222:16 268:11
274:5 288:19
**realistic** 178:15
183:2 258:18
259:10 283:5,7
286:23
**realization**
170:2
**realized** 172:5
**really** 135:17

150:3 240:21
274:3 277:13
278:3
**realtime** 89:21
289:12,13
**reason** 114:4
120:6 123:1,5
148:16 211:14
**reasonable**
288:23
**recall** 97:17,20
112:14 113:5
113:11 114:16
114:19 121:1
123:6 131:21
132:3 134:9,11
134:13 136:11
136:13,23
137:1,4 138:3
140:14,16
141:20 142:21
143:2 145:13
146:1,3 152:11
153:7,14
154:11 155:5
155:17,21
158:4 162:10
162:19 180:2
180:10 182:21
185:3 187:22
188:9 190:12
192:18 193:15
194:1,14
195:14,17
202:20 204:3
205:3 207:12
207:14,15,22
220:2,3 221:11
229:15 230:4
272:2 273:4,18
273:20 277:22
278:1,8,10,22
278:23 279:8
280:10,11,18
281:9,22 282:3
282:18 285:16

287:22 292:19
296:13,15,18
298:4 300:9,17
300:22
**recalling** 203:5
**receipt** 201:7
**receive** 250:9,14
251:4
**received** 109:16
109:19 114:5
118:19 120:14
195:8 250:20
268:5
**receiving** 121:1
146:17 183:15
184:7 285:7
**recess** 229:21
**recognize**
113:22 239:10
**recollection**
112:23 130:4
132:1 137:6,21
140:5 149:6
156:1 161:23
163:20 179:23
188:21 191:7
195:13,16
199:23 210:9
210:14 255:12
266:14 267:3
280:5
**recommend**
288:2
**record** 96:10
151:14,18
160:4 163:8,10
163:14 196:20
205:13 229:18
229:20 230:2
235:8 238:2,10
280:23 281:4
301:11
**recurring**
217:12,16
**reduced** 302:9
**refer** 117:3

139:2 205:5
234:13
**reference** 229:9
242:16
**referenced**
113:18 120:18
143:22 147:22
152:1 203:10
204:15 239:16
240:17 268:16
292:8 298:8
**references**
241:18
**referred** 252:23
279:13
**referring** 106:21
116:22 122:10
128:14 178:9
214:23 215:3
223:3,4 232:21
232:22 238:11
239:16 240:12
245:23 255:17
257:13 269:18
274:18 285:20
297:6
**refers** 144:14
166:13 185:7
257:17 272:23
273:8,10
**reflect** 191:23
251:17 255:6,7
**reflected** 170:11
170:18 193:20
193:22
**reflects** 223:16
**refresh** 118:23
137:6 138:1
194:6 205:6
210:8 212:3
255:12
**refreshes** 140:5
**refurbish** 125:5
162:17
**refurbishment**
178:12

**regard** 99:2
104:3 118:8
170:16 246:14
247:3 248:2
255:14 263:11
271:13
**regarding** 97:12
107:19 123:13
132:18 134:17
147:8 148:3
150:8 153:23
205:16 244:7
264:11
**regardless**
125:16
**Region** 139:9
**Registered**
89:22
**registering**
216:18
**regulated**
106:11
**regulations**
125:7 197:14
197:15 254:8
254:14 274:3
**regulatory**
116:22 134:17
135:2 153:16
181:22 197:13
221:1 223:6
239:11 264:13
267:10
**reimbursed**
249:2
**reiterated**
153:22
**related** 98:18
101:1 207:4
273:10 276:7
276:10 279:11
281:11,12
286:6
**relates** 202:2
257:22
**relating** 104:3

123:17 165:12
187:5 247:6
276:5,21 280:8
280:13
**relationship**
135:8
**relatively** 154:5
**relied** 202:12
254:15
**relief** 199:10
**relies** 296:21
297:14
**rely** 223:18
**remain** 220:5
239:3
**remained** 118:6
**remains** 244:13
**remember**
123:4 144:18
145:4 156:6
164:1 182:17
184:9 187:14
277:14,20
290:23 291:2
**remembered**
127:7
**renewal** 243:23
244:13
**reopen** 160:5
196:21
**rephrase** 178:22
**replacement**
178:12
**report** 206:18
288:14
**REPORTED**
89:19
**reporter** 89:21
89:23 234:18
**reporting** 95:3
203:17 298:6
**reports** 137:17
**represent**
192:12
**representation**
283:13 285:17

representative
288:10
representatives
291:15 300:11
represented
119:19 291:13
295:20
representing
160:14 161:15
161:18 243:9
represents
119:11 302:10
**Req** 94:2
request 94:9
112:21 113:9
117:21 118:3,5
124:1 138:10
140:11 165:11
211:1 213:23
236:20 240:2
243:22 266:20
269:20,23
271:5
requested
109:14,19
120:10 230:5
233:18 243:17
250:19 258:6
262:11 266:8
266:17
requesting
110:18
requests 190:17
198:14 199:2,9
199:10,15
233:20 234:2
250:21 251:15
255:2,5 258:12
require 138:11
140:19
required 97:11
139:7 171:23
197:17 208:11
222:5 258:7
271:8
requirements

125:7 254:7,13
257:2,8 264:13
271:4 274:1,8
requires 138:18
research 254:11
271:11,17,21
272:5
reservation
205:12,15
reserve 160:4
196:20 232:11
Resnick 90:16
resolve 168:2
resource 138:19
165:13
resources
125:19 126:2
138:16 139:8
140:19 165:17
169:7 170:6
171:5,9,22
176:19 188:4
190:23 191:1
193:23
respect 187:6
205:13
respond 133:19
264:18 269:13
269:15
responded
208:3,23 212:5
212:21 269:16
274:11
responding
134:9 211:4
response 149:9
207:20,22
214:16 248:23
275:3
responses 207:6
responsibilities
197:19 227:20
275:10
responsibility
131:14 137:14
257:1,8 272:9

responsible
128:23 219:4
222:3 225:19
246:3 272:11
rest 215:5
restate 237:22
result 254:5
302:16
results 285:21
288:11 296:4
298:1,6
resume 139:1
resuming 96:17
261:19
returned 193:2
revenue 290:11
reverse 206:13
review 138:19
140:20 142:10
206:3 211:3,10
214:11 218:6
258:6,20
259:11 262:14
262:18,21
264:19 265:7
265:20 267:12
267:17,20,23
274:12 297:17
reviewed 264:7
reviewing 119:1
119:7,22
120:23 144:9
156:13 183:9
186:6 191:20
198:9,11 200:3
203:15 204:20
205:22 222:21
231:7 239:20
250:3 260:22
267:8 293:2
reviews 142:19
revise 106:10
139:21 163:16
revised 193:17
244:7 255:8
256:8 268:4

revision 257:6,6
rewrites 129:17
right 98:5,13,16
98:21 100:7
101:2 102:15
104:1,11
105:10,22
107:23 108:11
108:18,23
110:6,16 111:1
111:10,17
112:11 114:16
119:6 120:2
121:13 124:23
127:15 129:8
129:23 130:6
130:11 131:3
131:21 132:7
133:2 134:13
136:5,18 137:1
138:3 140:3,9
142:5 143:17
144:10 145:11
146:10 147:19
148:4,5 150:4
151:5,9 152:4
152:5 153:13
154:20 155:13
156:4 157:19
160:4,18
161:14 164:13
164:20 165:10
165:19 166:16
168:10 172:7
172:19 175:10
176:15 177:7
177:15 179:13
180:10 186:18
186:20 187:10
187:14 191:16
192:6,9,18
193:15 194:19
195:21 196:20
197:8 198:7,12
198:20 200:1,8
200:15 202:4

204:22 205:4
206:16 208:1
209:6 210:5,17
211:6,8,12
212:4,19 213:2
213:12 214:1
214:13,15
215:19 216:17
218:6,9,12,21
220:1,4,17
221:11 222:3
223:11,22
225:16 226:17
227:1,17 228:4
228:12 229:16
230:19 231:5
232:11 233:11
234:3 235:19
237:7 239:9
241:7,12 242:6
242:11,21
243:11 244:22
245:4,4 246:10
247:1,8,10,15
247:21 248:12
248:19 249:12
249:16 250:4
253:18 254:21
255:23 256:15
257:16,21
259:23 260:9
260:12,20
261:2,4,8,13
261:20,22
262:6 263:5
266:6,23
267:20 268:21
269:1,3,11
270:6 271:1
273:5 274:13
274:20 275:5
275:17 277:18
277:20 278:15
286:16 287:8
291:3 292:21
293:12 294:16

296:2,19
298:20 300:3
**right-hand**
197:2
**rights** 269:20,21
270:1 271:6,9
272:1
**risk** 221:1 254:5
299:2,6
**road** 221:22
**Rody** 290:21
**role** 136:1
145:23 154:18
189:10,14
276:1
**Roman** 218:21
220:17 222:1
222:18 223:1
226:3,7 227:17
**room** 137:20
**roughly** 132:7
174:3,9 180:22
221:15
**rounds** 190:17
**RSA** 90:7
**rule** 235:1
**ruled** 237:16
**rulemaking**
119:10,12,13
119:21
**run** 289:16

_____
**S**
**S** 90:1 91:1 92:1
**s/** 302:20
**safeguards**
273:8,15
**safety** 135:4
245:8,13 246:4
247:7 248:3
254:6 264:14
**SAITH** 301:15
**sale** 142:2
166:21 177:20
224:11 230:6
235:2 237:15

244:2 248:21
281:12
**sales** 100:5
103:22 290:11
**satisfaction**
127:13
**satisfied** 248:2
263:1
**savings** 285:23
288:12 289:4
295:22 296:6
297:20
**saw** 104:13
**saying** 104:3
107:10,17
116:4,8 123:5
148:6 204:3
205:9 212:5
214:5 235:22
236:1,15
241:22 274:12
284:18 289:20
300:22
**says** 117:19
122:8 148:1
160:23 165:8,9
165:13 175:17
183:17 186:13
186:14 187:3
190:3 191:21
198:1,13
200:10 201:2
203:21 207:2
214:9 217:5,11
220:21 224:2
225:11 227:18
235:23 239:14
242:3,7 243:16
254:2 255:4
256:22 269:4
293:22 294:16
294:22 295:7
scchin@tva.gov
91:21
**schedule** 165:13
165:22 166:3

167:4,5 169:15
170:4,12,19
171:3,23 172:6
172:17 173:22
174:5,6 182:23
183:4 190:6
191:17 193:17
194:2 217:12
220:23 258:7
268:5 282:20
**schedules** 124:7
130:8 132:11
184:22
**scheduling**
121:21
**scope** 125:17
261:10
**SEC** 290:8
**second** 165:10
165:15 186:8
186:12 192:23
219:9 222:22
225:1 239:19
239:22 242:22
253:22 258:10
290:23 293:5
293:13
**section** 197:7,10
197:11 225:18
233:23 240:5,8
240:13,23
241:15 242:2
242:12,17
244:1 253:8,16
256:19 257:16
258:6 261:9,9
**securing** 169:17
**security** 245:7
245:12 246:4
247:6 248:3
254:4 273:10
274:2,2
**security-related**
273:15
**see** 100:17,18
116:1 140:4

143:10 145:15
160:21 161:3
164:14,17
167:10 184:4
186:11,16,23
187:8 189:22
190:6 192:3
193:5,9,10
197:21 198:17
199:12 200:4,9
200:12 201:2
201:16 203:19
204:1,2 206:18
207:10 208:1,6
209:12,21
211:18 212:23
213:6 214:7,21
215:8 217:9,14
219:22 220:9
220:19 221:3
223:23 224:4
225:20 226:6
226:12,19
227:5,19,22
228:2 230:20
235:9 240:6,7
240:10 242:12
242:16 243:14
243:18 244:4
244:10 245:1,9
249:21 250:4,9
251:10,20
252:14 253:23
254:9,19 255:1
256:19 257:10
257:17 258:8
258:14 264:15
265:21 273:1
273:16 283:4
289:13 293:7
294:3 295:3,4
**seeking** 102:13
112:2
**seen** 177:7
203:14 204:21
210:12

**selection** 221:8
**sell** 269:8 291:20
**selling** 108:3
**senators** 277:7
**send** 126:7
138:23 139:5
181:23 192:7
200:5 222:16
299:4,12
**sending** 121:8
166:5 195:3
214:12 219:12
**sense** 121:17
122:17 123:1
**sensitive** 273:14
**sent** 119:18
121:11 164:9
165:23 191:17
191:22 192:14
195:8 208:2
232:14 266:15
**sentence** 123:7
123:10 197:10
239:21 242:3
245:1 250:5
251:14 255:1,4
256:13,22
258:11 295:4
**separate** 117:3
168:6
**separately**
215:23
**September**
191:13 193:9
194:7,16 195:1
267:17 268:2
287:7
**series** 144:10
217:18
**servers** 99:20
**service** 162:18
297:11
**set** 153:19 187:4
274:8 295:2
**setting** 122:1,5
153:10 172:19

273:13
settled 183:21
seven 200:23
seventeen
  259:13
seventy 291:18
seventy-five
  289:18,22
  290:1,15
seventy-four
  289:18 290:12
seventy-three
  261:5
SGI 273:1,6
shame 154:3
Shannon 92:4
Shea 95:6
  102:18 103:2,4
  104:4,19
  105:17 110:19
  111:1 112:20
  133:5 144:11
  144:15 145:2,4
  146:5,16 147:4
  148:1 149:2,7
  150:4,10,20
  151:4,5,21
  152:7,13,19
  153:5,10
  154:17 155:2
  155:22 157:1,5
  160:16
Shea's 155:7
Shelby 288:1
Sherry 278:16
  278:17
short 153:20
  268:13 280:19
shortly 100:4,4
  182:1 199:5
  208:1
show 120:20
  133:12 143:17
  146:10 156:9
  163:5 164:7
  183:5 186:2

191:11 194:19
203:12 204:17
230:12 267:4
272:14
shown 251:18
  262:5 288:21
shows 174:18
  176:8
sic 96:9
side 102:22
  136:21
sign 208:4,20
  213:5 241:9
signed 100:6
  231:5 241:8
  243:3
significant
  189:9 283:15
significantly
  289:2
signing 213:22
similar 124:5
  219:21
simple 216:15
simplified 216:4
  216:7,21 217:2
simply 105:5
  162:23 181:22
sir 128:15
  144:22 194:12
  198:10 222:23
  223:5 224:2
  253:4
site 138:20
  139:9 141:19
  162:16 165:5
  166:11 174:10
  175:2 176:10
  176:19 177:20
  207:19 228:21
  230:7 247:16
  248:14 259:18
sitting 110:1
  241:13
situation 108:20
  108:21 116:12

117:8 118:12
122:14 135:6
six 142:15
  221:21 240:9
  282:18 283:3
six-month 230:5
sixty-five 291:14
size 125:16
  296:20 297:12
  297:13
slides 122:9
slots 162:9
slower 172:16
SNC 212:14,23
SNC-Lavalin
  129:3,9 261:1
so-called 114:9
Socol 90:16
sold 290:10
sole 123:16
solely 123:19
soliciting 224:12
somebody
  148:13
soon 102:18
  129:18 170:11
sooner 167:2
sorry 118:20
  119:4 133:22
  134:1,6 144:7
  157:2 175:6
  176:6 219:3
  223:11 237:22
  249:23 265:15
  283:23
sort 97:9 106:21
  111:14 112:2
  124:8 127:2
  143:6 173:15
  187:21 188:11
  277:3 285:16
sounds 191:3
  208:3
source 225:12
  269:22
Southern

125:17 269:5
speak 112:15
  161:10 216:19
  288:5
special 274:5
specific 106:15
  115:14,15
  140:14 157:21
  158:3 159:21
  188:7 194:14
  196:12,14
  213:18 232:20
  236:16 240:15
specifically
  123:9,10
  141:20 181:15
  200:19 210:16
specifics 112:16
  115:10 140:15
  146:1 163:3
  196:10 291:12
specified 257:3
specify 106:20
  269:21
spend 122:22
  170:7 171:7
  172:21,22
  173:10,16
spending 170:8
  171:12 172:9
spent 173:6
spoke 147:6
  153:5 287:14
  287:18 288:14
  291:12 300:18
SRI 272:23
  273:3,9
stack 268:19
staff 116:20
  118:2 122:4
  134:17 137:10
  138:6,11,15,18
  139:20,23
  140:7 165:2
  184:2 185:10
  199:1 202:22

211:4,10
228:20 264:6
264:10 265:7
275:23 298:22
299:19
staffers 207:3,12
stakeholders
  189:4,18 288:1
stamped 232:5
stand 257:19
standpoint
  103:12
start 115:22
  131:4 167:20
  172:9 173:12
  190:22 237:13
  247:4 252:3,3
  292:22
start-up 282:23
  283:1
started 167:2
  274:1,7 275:4
state 199:6
  232:1 234:13
  267:18 302:3
stated 181:16
  205:18 234:11
  262:16 298:16
statement 94:11
  101:13 104:9
  110:9,15
  111:14 115:4
  115:18 117:19
  119:5 132:15
  155:18 196:11
  208:3 239:12
  240:13 250:13
  264:23 285:18
  286:9 289:23
  294:6,7,15
  301:1
statements
  115:2 119:23
  240:19
STATES 89:1
stating 266:4

Station 93:16
status 99:3,4
  138:22 139:11
  139:12,13
  168:3,9 232:17
  233:7,22 234:7
  234:7 235:4,5
  235:15 236:5,8
  236:9,13,14
  237:2,6,9
  239:4,6 240:4
  242:5,18 243:6
  243:14,23
  244:13 245:7
  245:12 247:8
  261:16
statute 271:12
stenotypy 302:8
step 209:16
steps 208:5,10
  214:6
Steven 91:14
  214:10,18
stick 220:15
stipulate 197:16
stop 115:19
  121:17 123:15
stopped 139:19
  207:3
stored 99:19
storing 273:14
  274:9
Street 90:8,17
strengthened
  288:23
strike 115:22
  123:3 142:8
  161:16 176:5
  177:10 263:19
stronger 189:10
  189:13
structure 189:5
  220:5,15
structured
  183:20 294:17
struggled

101:11
studies 288:21
study 269:5,18
  269:19 271:8
  285:21 286:2,5
  288:11 296:4
  296:11 298:1,2
  298:7,8
Subj 93:9,11,14
  93:16,19,22
  94:2,5,8,18
  95:9,12,19
subject 196:14
  271:9 292:2,15
  292:15,17,17
submission
  128:11,21
  129:14 180:12
  180:13 181:18
  187:23 192:20
  194:3
submit 97:11
  98:18 99:2
  127:21 128:4
  128:18 130:19
  140:11,17
  141:4,10 169:9
  172:1 173:7
  174:1,8,13
  175:8 181:1,12
  188:5 190:20
  199:3 209:16
  211:1 213:23
  214:7 216:5
  222:17
submittal 118:4
  129:18 131:2
  167:16 168:5
  210:4 212:10
  213:17
submitted
  109:21 118:3
  126:13,16
  129:19,21
  139:16 170:23
  172:15 173:9

177:19 180:1
  182:22 191:6
  191:18 199:11
  199:17 228:9
  228:23 229:11
  230:22 233:4
  250:18 258:17
  259:6,10
  262:10
submitting
  95:16 96:23
  97:16 138:9
  258:19
subsequent
  285:14 299:18
substantially
  204:1,11
substantive
  189:6
substantively
  233:17
succeed 135:17
succeeding
  218:2
successful
  211:15
sufficient
  233:17 263:9
  263:12 265:9
suggest 136:2
  220:21
suggested
  153:17 193:1
  253:15
suggesting
  255:14 262:2
suggestion
  217:7 220:6
suggestions
  207:4
Suisse 294:1,8
  294:11
suitable 131:20
Suite 90:9,17
summary
  234:11 253:22

254:2
summer 127:13
  127:22 180:22
  182:7
Summit 91:17
supervision
  302:10
supplement
  139:21
supplemental
  264:8,23 266:7
  266:16
supply 104:22
  284:1 287:20
supplying
  123:23
support 97:16
  100:16 102:4
  102:22 103:4,9
  103:14,15
  104:8,9 109:7
  109:20,23
  113:15 124:3
  124:11,13
  129:2 132:16
  135:1,4,23
  139:11 145:17
  147:14 169:7
  192:2 193:23
  225:12
supported
  110:13 126:23
supporting
  111:14 216:8
supports 122:18
supposed 212:6
sure 106:13
  114:8 127:7
  145:20 157:4
  160:9 164:18
  164:19 171:1
  171:17 182:16
  192:14 199:22
  215:5,12 225:2
  232:9 234:12
  236:10 238:4

269:6 296:10
surplus 277:17
  280:1
surprise 208:19
  208:21
surprised
  148:11,17
surprising
  215:21
suspect 252:1
switched 234:6
  235:4,10
switching 243:6
sworn 96:4
sync 269:22
synonymous
  263:12
system 272:13
  273:13 288:20
  289:2

_____
T
T 291:8 302:1,1
table 136:21
  252:6
tactfully 136:1
take 104:20
  105:15 108:3,9
  135:12,19
  140:20 142:9
  142:14,19,19
  143:3 146:20
  148:8 151:10
  154:14,18
  155:4 167:7
  168:7 171:15
  175:11 205:5
  208:15 211:17
  211:22 214:1
  214:10 233:7
  235:12 266:6
  271:7 280:19
  290:9
taken 229:22
  242:13 273:22
  302:7

talk 153:18
  216:14
talked 110:19
  138:7,20
  139:14 153:20
  157:4,8 159:9
  169:5 184:13
talking 109:13
  110:8,9 112:2
  112:7 129:7
  145:19 146:5
  148:13 151:20
  187:20 207:13
  215:22 246:10
  273:11 274:7
  277:4
talks 218:22
  242:12
target 282:17
Targets 95:20
team 147:7
  148:2 149:22
  150:1,2,7
  284:1 287:20
  287:22
technical 97:13
  98:19 103:20
  104:23 109:6
  109:23 124:6
  124:20 125:1
  125:10 126:6
  126:17,20,22
  127:9,12 130:2
  132:10 169:6,9
  216:8 222:2
  265:9 275:21
Technologies
  92:5
telephone
  179:21 180:5
  184:12 193:14
  217:18
tell 102:6,12,15
  105:13,14,18
  110:22 111:10
  121:13 123:2

124:23 132:21
138:2 139:6
141:16 153:13
155:2 174:7
180:20,23
181:3,6 182:9
184:9 185:20
185:22 188:13
264:17 283:8
283:21 287:13
291:10 292:14
292:20
telling 103:18
  155:5 269:16
  282:3 285:5
ten-month
  267:20
tended 216:10
Tennessee 89:9
  91:16,18 99:7
  99:17 101:12
  108:2,2,6
  118:12 132:16
  252:17,23
  253:6 277:7,7
  279:23
term 198:22
  201:23 235:9
  252:22 253:10
  256:2,5,11
  260:1
terminated
  233:21 234:7
  235:5,14,18
  236:7,14 237:5
  237:8 239:5
  240:3 242:5,18
  243:6 261:16
terms 113:14
  119:20 128:9
  130:1 135:1
  171:3 194:2
  205:8 210:3
  248:10 255:19
  256:13 264:12
  300:21

territory 271:7
testified 96:5
  144:16,20
  158:12 282:16
  287:4
testify 107:6
  109:18
testimony 128:2
  163:23 177:1
testing 277:13
  282:23
thank 144:9
  147:12 207:3
  301:6,8
thanking 207:23
Thanks 214:16
thereof 283:18
thereto 302:9
thing 97:10
  127:2 187:21
  207:14,15
  212:6,9
things 97:14
  100:18 105:8
  117:13 122:22
  124:8 126:10
  129:16 135:5
  143:8 155:7
  184:22 209:20
  215:7 219:22
  282:20 296:17
think 103:12
  105:7 106:21
  108:14 119:22
  145:1 147:16
  147:22 148:20
  148:21 149:5
  149:14 152:17
  157:17,23
  159:2 164:15
  171:11 177:21
  211:14 212:5,6
  214:6 215:2
  216:10 238:23
  255:18 256:1,1
  262:16,19,23

263:3
thinking 163:20
  167:22
third 165:21
  225:17,18
  226:4 243:12
thirteen 258:4
thirty-nine
  291:21 293:19
  295:16,18
  296:8
thought 105:6
  105:23 131:19
  148:10 150:18
  154:3 161:11
  163:18 166:11
  167:22 168:6
  170:4 171:13
  210:6 233:1
  287:5
Thoughts
  212:18 269:10
three 117:18
  119:8 130:22
  142:14 163:21
  164:10 170:19
  226:7,9 229:10
  249:17 264:18
  265:5,18
threw 142:15
throw 143:8
  216:12
Tim 97:5 112:8
  129:2 131:16
  132:18 157:17
  157:22 159:5,9
  159:11 196:1
  230:17
time 99:10,16
  100:2,9 101:2
  101:8,10 102:1
  102:19 103:2,7
  109:4,21
  114:17,21
  119:17 120:1
  121:21 122:7

122:23 123:11
123:20 124:1
125:22 126:11
126:12 127:4
128:18 132:2,8
132:19 135:9
137:11 138:11
138:12 139:23
141:7 142:15
142:18,19
146:19 149:2
150:23 151:4
153:20 162:8,9
166:18 172:8
172:13,14
173:8 174:3,9
174:11 182:2
184:1 185:16
189:4,5,15
190:9 198:15
199:17 204:8
210:1 211:9,17
213:17 215:20
217:3 218:7
219:13 229:10
230:10 233:17
234:1 238:9
239:1 245:21
245:23 253:5
257:22 259:9
261:18 266:10
266:17 272:4,7
274:21 276:4,8
276:9 277:8,14
278:9,13
279:14 282:7
282:11,13,16
285:7 287:2
291:9 295:23
296:9 299:21
301:4
timeline 165:14
  188:8
timelines 184:3
  185:10
timely 118:3,4

William McCollum

168:5 243:22
244:13
**times** 102:14
147:2 179:10
289:15 298:9
**timetable**
192:20
**timing** 171:3
**title** 189:5
197:14
**titled** 223:6
**titles** 189:8
**today** 105:18
110:1 145:8
156:5 175:23
241:13 255:22
282:14 287:2
289:19
**today's** 96:9,19
**told** 105:23
113:9 140:10
141:9 142:20
145:7,14
149:10,17,23
150:2,5,6,20
151:6 154:2
155:19 156:5
157:11 158:5
158:13,19
159:11 174:12
181:10,11
182:13 190:14
194:1 206:7
208:8,14 210:5
241:9 251:3
255:22 264:6
269:20 284:9
284:19 287:10
290:3,14
291:19 299:1
**top** 137:13
147:23 189:20
200:22
**topic** 112:13
152:8,15
155:23 157:18

157:20 190:10
274:22,23
276:14,15,15
286:1 300:14
**topics** 124:22
140:2 190:4
280:17
**total** 283:2
**totally** 275:3,13
**Tower** 90:7
**transaction**
105:9 115:9
142:2 200:7
201:7,9 281:8
**transactions**
107:12
**transcript**
302:11,23
**transfer** 93:11
94:8 95:9,12
97:1 101:14
106:1,5,8,18
106:21,23
107:7 108:3
109:5 110:11
110:13,14
113:3,7,12
114:14 115:5
115:14 119:3
124:11,14
126:13 128:5
130:8 131:8
133:9 138:10
140:11,17
141:5,10,17,23
142:11,13,22
145:18 146:22
148:4,15,23
149:8,11 152:9
152:16 153:21
154:1,19
162:21 163:1
165:6 166:9,11
166:14 167:6
167:14,17
168:14,15

169:4 170:22
171:10 172:2
172:10,15
173:2,7,18
174:2,18,20
175:2,9 176:9
176:17,20
177:18 180:14
180:19 181:9
181:19 185:4
187:7 188:1,6
190:5,21 191:5
192:21 194:4
194:10,15
197:15,17
199:18 201:6
202:16 208:16
209:17 211:1
212:10 213:23
219:15 230:23
233:19 235:1
237:3,16 240:1
242:19 245:13
246:21,23
247:18 249:19
251:17 254:3,6
254:12 255:7
256:23 257:7
257:14,23
260:11 261:21
264:12 267:23
274:10 281:19
287:7
**transferee**
242:14
**transferred**
245:2,5 246:2
246:9,13
247:17
**transferring**
108:19 138:17
214:20 215:1
**transfers** 94:6
115:7 195:5
**transition** 99:12
99:13 147:7

148:2 149:22
150:1,2,7
227:20 228:20
248:9 269:5,18
**transitions**
276:16
**transmission**
269:19,19,21
270:1 271:6,9
272:1,10,13
288:21 292:5
**transmit** 270:8
270:20
**transmitted**
218:1,3,18
222:14 227:16
**transmitting**
231:2 240:1
249:18 273:14
**treatment** 207:5
207:13,17
**tried** 169:16
216:14 256:1
**triple** 294:18
**trouble** 99:8
**true** 103:11,13
231:10,11,14
231:15,19
234:23 240:19
244:17 270:6
290:8 299:14
302:11
**try** 166:21 170:2
213:21 269:23
**trying** 101:12
102:9 135:10
135:11 136:1
189:17 286:1
**turn** 103:13
197:1 217:20
249:16 254:17
256:16 258:3
260:20
**turnover** 227:20
227:23
**TVA** 99:14,21

100:13,22
101:1,4,17
102:6,10,20
103:2,19,22
104:2,14 105:3
105:15 109:3
109:14,20
110:7,17 112:1
112:9,12,21
118:14,14
119:2 125:17
133:7 139:16
139:18 144:11
145:22 146:19
147:1,11,14
148:7,7,12,18
148:18,22
149:3,4,7,12
149:15,18,21
150:1,10 151:1
152:14,20
153:5 154:9,13
154:21 155:20
156:19,22
157:9,15,18,20
158:6 160:15
165:7 177:12
199:15 202:5
204:9 209:18
224:12 227:21
227:21 228:20
230:18 235:14
236:3,5 237:19
242:8 243:5,16
243:21 245:8
245:18 246:5
247:11 248:6
248:12,16,17
248:22 249:3,7
249:13 257:4,7
259:20 260:15
262:5 269:4
270:7,9,19,21
271:3,6,7,22
272:1,9,12
275:12 277:10

278:12 279:10
279:13 280:13
281:6,12
285:11 288:3
289:3,23 290:4
290:5,10 291:5
291:13
**TVA's** 145:17
212:15 271:13
277:16 290:7
**TVABLN0328**
95:23
**TVABLN7572**
95:17
**TVABLN7584**
95:17
**twelve** 256:16
**twenty** 289:16
**two** 104:12
116:18 119:2
130:22 138:8
152:7,12 153:5
165:12 170:19
178:4 193:21
209:13 223:5
236:3 243:11
250:17,20
265:4 282:19
**two-thirds**
251:10
**two-year** 166:22
**type** 115:5
116:21 275:8
**types** 300:21
**typewriting**
302:9
**typically** 143:6
198:13

**U**

**Uh-huh** 115:20
130:10 136:17
155:10 175:4
197:4 201:1
219:1 286:5
**ultimately**

125:20 293:4
**unclassified**
273:15
**understand**
104:20 135:14
149:14 171:1
178:21 198:19
198:22 201:19
205:9 216:1
233:10 234:12
235:20 236:7
237:17 238:20
238:22 247:5
248:16 256:4,5
293:23 297:3
**understanding**
102:19 105:3
105:11,19
108:12 111:12
118:7 138:15
145:17 147:5
153:22 227:9
239:1 240:16
240:22 241:5
241:14 257:15
258:2 270:15
270:19,23
271:2 295:8,9
**understood**
105:6 112:5
131:5 232:15
233:3 235:12
235:13 236:3
241:21 247:10
252:21 253:7
256:10 258:16
259:9
**undertake** 97:22
246:20,22
**undertaken**
235:6 246:8
**underway**
124:16
**undue** 254:5
**unexpired**
233:21 240:4

**unheard** 149:13
**unintelligible**
238:4
**unique** 115:9
**unit** 117:20,23
118:5 167:9,14
167:20 168:1,3
168:8 178:7,17
199:16,16
203:22,23
204:8,10,10
221:16,18,22
243:18 244:2
244:13 252:13
253:15 268:3
282:4 283:1,22
284:10
**UNITED** 89:1
**units** 93:22 94:3
138:8 139:17
162:17 165:17
176:22 243:13
255:15 257:4
**unknown**
119:20
**unnecessary**
176:5
**update** 180:1,8
190:2 243:21
244:6
**updated** 298:23
299:12 300:8
300:14
**updates** 180:4
180:16
**upper** 289:16
**urging** 298:12
298:12 300:7
**use** 112:7 212:15
213:4 255:19
260:1 263:6
**uses** 142:17
**utilities** 297:18

**V**

**V** 227:17

**valid** 118:6
**Valley** 89:9
91:16 99:7,17
101:12 108:2,6
118:12 132:16
252:17,23
253:6 279:23
**varies** 162:8,8
**various** 106:11
139:10 168:12
179:10,10
208:10 290:18
**verbal** 179:14
179:16,17,17
179:19 180:16
**verbally** 150:21
269:16
**verification**
257:20
**Vic** 211:10
212:2
**vice** 188:14,18
**Victor** 137:8,10
137:11,16
138:6 139:20
140:7 161:11
164:10,21
173:23 174:12
**Victor's** 138:12
**VIDEO** 89:12
**VIDEOGRAP...**
92:3 96:7
151:13,17
163:9,13
229:19 230:1
280:22 281:3
301:9
**videotape** 285:1
**view** 107:23
114:13 122:14
141:13 210:13
216:4,7,21
217:2
**viewed** 116:9
**virtually** 98:13
98:17

**visit** 207:4
**VOLUME**
89:11
**Volunteer**
290:21
**Vonna** 187:4
**vs** 89:8

**W**

**w/attachment**
95:15
**Wait** 296:23
**waited** 299:4
**waiting** 101:17
**waived** 205:19
**walk** 227:21
**want** 135:15,16
227:19,21,22
254:21 269:7,8
292:22
**wanted** 104:14
122:19 164:18
298:23 299:15
**wanting** 132:15
**wants** 199:1
269:9
**Washington**
203:3
**wasn't** 98:22
109:8 112:7
116:4 129:3,17
145:20 147:16
150:2,5,6
151:7 155:20
210:9 216:15
222:15 224:13
266:11 287:16
**watched** 284:23
**Water** 90:8
**way** 101:4 105:7
142:4 149:6
202:14 223:20
228:10,15,15
228:18 234:13
246:15 251:10
276:10 292:23

**William McCollum**                                    **11/13/2019**

294:3,13
**we'll** 104:22
**Weaver** 291:9
**week** 283:18
  284:1 287:14
  287:19 288:6
**weeks** 210:18
  214:1
**went** 141:15
  264:17 275:21
  288:9 294:2,12
  295:15
**weren't** 101:17
  103:8 153:23
  154:18 156:2
  170:13 235:21
  284:12 286:19
**West** 90:17
  91:17
**Westinghouse**
  212:16
**whatsoever**
  105:19
**Wheeler** 291:1
**White** 114:9
  117:15 118:18
  120:3,11
  121:16,17,20
  122:18
**Whitten** 160:20
**wield** 269:6
**William** 89:12
  96:3,8 301:10
**willing** 172:22
  262:14
**withdraw** 297:1
**withdrawn**
  233:22 240:4
**witness** 159:8
  196:7 238:21
  302:12
**won** 126:12
**word** 231:9,14
  255:19 283:11
**wording** 126:21
**words** 154:10

263:6
**work** 97:7,19,22
  99:20 102:20
  103:3 104:6
  107:15,18
  122:5 124:12
  125:5,13,14
  134:22 135:7
  136:3 139:19
  149:8,10,15,19
  152:21 154:10
  155:20 169:1
  169:17 170:6,8
  170:10,16,18
  171:14 174:14
  189:10 199:2
  206:8 207:18
  248:10 282:12
  292:23
**worked** 97:7,14
  99:15 127:2,3
  169:16 174:5
**workers** 225:12
**working** 98:8
  105:9 118:14
  124:2 125:8,22
  135:7 147:1
  150:5,6,11,19
  151:1,7 154:9
  166:20 172:12
  173:12 180:17
  184:1,19 185:8
  185:11,19
  193:21 212:23
  275:8,11
**works** 205:8
**wouldn't** 98:17
  101:8 104:13
**wrapped** 288:13
**write** 104:15
  216:10
**write-ups** 104:7
  104:14 128:17
**writing** 130:18
  150:21
**written** 128:9

130:1,12,23
131:2 132:3
179:16,18,19
180:1,8 220:1
268:12
**wrote** 129:16
  176:20 186:14
  210:1 235:19
  236:20 243:20
  244:6 245:5
**WT6** 91:17

—————
**X**
—————
**Y**
—————
**y'all** 122:9
**Yeah** 105:13
  109:17 110:19
  125:12 155:17
  158:23 202:18
  206:15 235:9
**year** 111:9
  178:18 179:3
  193:20 194:9
  205:21 221:19
  275:1 276:13
  283:2 286:20
  289:5,6 294:23
  295:22 296:6
  297:20
**years** 193:21
  221:13,21
  236:11 282:5
  282:18,21
  283:3,14
  284:11,14,19
  284:21 285:7
**yesterday** 96:19
  105:23 106:3
  144:3 155:6
  205:2,12,18
  290:19
**Young** 291:8

—————
**Z**
—————
**0**
—————

—————————
**1**
—————————
**1** 165:17 167:9
  167:14 176:22
  178:7,17
  199:16 203:22
  204:8,10
  221:16,22
  252:13 255:15
  268:3 282:4
  283:22 284:10
**1-b** 223:10 253:8
  253:16
**1&2** 93:19,22
  94:3
**1.3** 261:9
**1/27/17** 93:13
**1/5/17** 93:8
**1:08** 229:22
  230:2
**10** 95:3 119:9
  197:14,15
  203:8,13,17
  243:23 251:11
**10-K** 290:7
**10:11** 151:14,16
**10:25** 151:16,18
**10:38** 163:10,12
**10:41** 163:12,14
**10CFR** 94:10
**11** 90:8
**11/13/18** 94:7
**11/25/2019**
  302:23
**11/5/19** 94:15
**11/8/17** 94:17
**113** 95:8
**116** 302:22
**12/20/16** 95:8
**12/2016** 95:11
**12:00** 229:20,22
**120** 95:11
**12th** 96:9
**13** 89:17 96:1
  239:17
**133** 93:8
**13th** 230:19

258:20 259:6
**14** 239:13
**143** 95:6
**146** 93:10
**14th** 153:11
  154:12 191:13
  206:19
**156** 93:13
**15th** 209:12
  212:9,22
**16** 222:6,12
  225:9,14 226:1
  226:15,22
  227:8,14
**164** 93:15
**16th** 218:14
  219:7 220:12
  221:6 222:20
**18** 298:11
  300:18
**1819** 89:15 91:8
**183** 93:18
**184** 197:11
**186** 93:21
**1884** 93:20
**18th** 186:23
**191** 94:1
**194** 94:4
**1954** 197:12
**1987** 239:13
**19th** 195:1
**1st** 164:9 168:11
  178:15 179:1
  258:13

—————————
**2**
—————————
**2** 117:20,23
  118:5 165:18
  167:20 168:1,3
  168:8 176:22
  199:16 204:1,8
  204:10 221:18
  243:18 244:13
  251:18 252:1,3
  253:15 255:15
  265:3,4,18

**William McCollum**

**2.109** 244:1
**2/1/17** 93:15
**2/1/2017** 179:12
**2/6/17** 93:18
**2:14** 280:23
  281:2
**2:21** 281:2,4
**2:46** 301:11,13
**20** 221:15
**2005** 250:8
**2014** 243:16
**2016** 121:4
  125:11
**2017** 95:7
  100:13 110:23
  111:17,19,22
  133:4,17 136:6
  137:22 138:4
  140:6 143:1
  144:12 145:5
  145:10 146:7
  146:16 149:2
  150:16 151:22
  153:6,11
  154:12 156:20
  156:23 157:6
  160:16,21
  162:1,11 164:9
  166:6,12,17
  167:10,14
  168:11 171:8
  171:22 172:14
  172:23 173:9
  174:20,22
  175:3,10
  176:11,21,23
  177:2,3,12,22
  178:15 179:1
  182:23 183:11
  186:13 188:19
  189:22 191:13
  192:19 194:7,9
  194:17 195:1
  243:21 268:23
  269:2 272:6,19
  272:23

**2018** 100:20
  126:16 127:14
  127:22 129:20
  129:22 130:5
  130:20 132:2
  178:17 179:3
  180:22 182:8
  188:22 202:22
  203:2 218:3,14
  219:7 220:12
  221:6 222:7,13
  222:20 225:5,9
  225:14 226:1
  226:15,22
  227:8,14 230:4
  230:19 239:18
  259:3,7,14
  260:12,18
  272:6 281:15
  282:1,16 284:9
  285:2 286:11
  286:20 291:19
  292:14 298:17
  300:5,10
**2019** 89:17 96:1
  96:10 182:7
  258:13 264:2,4
  267:10
**2020** 267:17
  268:2 287:7
**2022** 178:8
**2023** 177:17,21
  286:21
**2024** 167:10
  221:15 286:22
  286:23
**2027** 268:9
  287:8
**203** 95:3
**204** 95:14
**205.251.8000**
  91:10
**205.790.5841**
  92:7
**20th** 186:13
**21st** 121:4

**230** 94:7
**234** 94:10
**23rd** 122:10
  161:1,7,8
  165:1,3 174:12
  178:1
**251.432.5511**
  90:11
**263** 94:13
**267** 94:15
**268** 95:21
**27** 160:20
**272** 94:17
**292** 95:18
**29th** 95:7 144:12
  230:4

---

**3**

**3** 265:20
**3/14/17** 93:10
**3:20** 186:13
**30200** 90:9
**30th** 95:7 144:12
  259:14 260:17
**312.580.0100**
  90:19
**31st** 243:21
  293:5,14
**33** 257:6
**3477** 197:5
**3488** 198:8,9,13
**3497** 200:1
**35203** 89:16
  91:9
**36602** 90:10
**37** 95:6 143:19
  143:20 144:2,8
  146:18 147:20
**37902** 91:18

---

**4**

**4** 251:18 252:4
**4/5/19** 94:13
**4/7/2017** 95:21
**400** 91:17
**4000** 90:17

**4761** 233:13
**4762** 242:23
**4763** 249:17
**4764** 251:9
  253:19
**4765** 231:6
**4766** 231:17
**4769** 254:17
**4780** 256:17
**4781** 258:5
**48** 95:8 113:16
  113:21 114:11
  117:16
**4836** 260:21
**4840** 261:9
**49** 95:11 120:16
  120:22
**4907** 252:2
**4908** 252:2,13
**4913** 252:3

---

**5**

**5** 133:17,22,23
  264:2 267:10
**5:18-CV-0198...**
  89:4
**50** 94:11
**50.33** 119:10
**50.80** 119:4
  197:15
**50.90** 251:12
**5th** 264:4

---

**6**

**6** 183:11
**6.5** 291:14
**6/7/17** 93:21
**60** 95:14 204:13
  204:18 205:14
  205:16 217:21
**60602** 90:18
**65** 95:18 292:6
  292:11,22
  293:13
**67** 95:21 268:14
  268:19

---

**7**

**7** 269:2
**7/31/18** 95:18
**70** 90:17
**74** 93:8 133:13
  133:14
**75** 93:10 146:11
  146:12 150:14
  153:9
**7577** 205:7
  206:8,17
**7581** 217:21
**76** 93:13 156:10
  156:11 160:19
**77** 93:15 163:6
  164:5,8
**78** 93:18 183:6,7
**79** 93:21 186:3,4
  186:7,8 188:12
  189:21
**7th** 189:22
  268:23

---

**8**

**8** 258:6 272:23
**80** 94:1 191:9,12
**81** 94:4 194:20
  194:21
**82** 94:7 230:13
  230:14 231:8
  239:22 242:23
  258:5 260:21
**83** 94:10 234:19
  234:20 239:10
  240:9 242:3
**84** 94:13 263:21
  264:1 265:6
**85** 94:15 267:5,6
**86** 94:17 272:15
  272:16
**865.632.3052**
  91:19

---

**9**

**9/14/17** 94:1
**9/19/17** 94:4

**William McCollum**

| | | | | |
|---|---|---|---|---|
| **9/30/2020**<br> 302:22<br>**9:02** 96:1,10<br>**96** 93:3 | | | | |

**DEPOSITION EXHIBIT**

**10**

**To:**    Johnson, Bill[BillJohnson@tva.gov]; Quirk, Sherry Ann[saquirk@tva.gov]; Thomas, John
Madison III[jmthomas@tva.gov]; Wardlaw, Van M[vmwardlaw@tva.gov]
**From:**    Maierhofer, Justin C
**Sent:**    Tue 8/14/2018 11:52:15 PM
**Subject:**    Fwd: NRC public mtg on Bellefonte Project

:::
;;;

Sent from my iPad

Begin forwarded message:


     **From:** "FINNERTY, Sean" <stf@nei.org>
**Date:** August 14, 2018 at 5:52:32 PM CDT
**To:** Justin Maierhofer <jcmaierhofer@tva.gov>, Bevin Wilkinson Taylor
     <bewilkinson@tva.gov>
**Subject: Fwd: NRC public mtg on Bellefonte Project**



     TVA External Message. Please use caution when opening.

     Let me know if I can get any questions y'all might have answered?
     Sean

Sent from my iPhone

Begin forwarded message:


     **From:** "BELL, Russ" <rjb@nei.org>
**Date:** August 14, 2018 at 3:44:10 PM EDT
**To:** "TSCHILTZ, Michael" <mdt@nei.org>, "AUSTGEN, Kati" <kra@nei.org>,
     "REDMOND, Everett" <elr@nei.org>, "NICHOL, Marcus"
     <mrn@nei.org>, "CHARLES, Chris" <cic@nei.org>, "FINNERTY,
     Sean" <stf@nei.org>, "COTTINGHAM, Anne" <awc@nei.org>
**Subject: NRC public mtg on Bellefonte Project**



     Today I attended an NRC public mtg with Nuclear Development, LLC to
     discuss that company's plans to acquire and complete the two unfinished at
     Bellefonte. ND was represented by Bill McCullum, long time Duke exec and
     more recently TVA COO. With Bill was Tim Mathews of Morgan Lewis.
     There were no handouts.

       • Bill described Unit 1 at 90% complete and U2 as "substantially
         complete."

EXHIBIT

*10*

Johnson

Confidential

- He described plans to submit an application to transfer the Bellefonte CP "soon" in connection with closure with TVA on the sale of the two units, expected in November. Not discussed, but we understand the sale is contingent on ND securing their loan guarantee from DOE.
- Tim said ND seeks to transfer the CP in its current deferred plant status, and will later complete phase two of the transfer of the CP to enable construction after providing NRC the required 120-day notice.
- ND will begin engineering and licensing work in parallel upon closure of the sale.
- ND plans to contract with an experienced nuclear operator to support application for the OL.
- Bill said a more detailed licensing schedule would be available in early 2019.
- Tim summarized ND financial and technical qualifications, including working with experienced partners such as SNC Lavolin, and relying on some preliminary work performed by TVA before abandoning the project. ND looks forward to a full demonstration of their financial and technical qualifications
- NRC expressed interest in early interactions on the Bellefonte project QA plan
- There were 39 people on the phone. BREDL ("Gary") asked the only questions, one about NRC independence despite the President's political ties to Frank Haney. And one about reported issues concerning the physical condition of the units. On that point, NRC said they were aware and that NRC inspections would ensure safety.

I spoke with Bill about the timing of joining NEI. He said the right time might be when ND contracts to develop the Bellefonte OL application. I noted to both Bill and Tim that NRC plans to revise Part 50 over the next 1-2 years and that those changes may impact OL application requirements. I told them NEI would be leading the industry response to that rulemaking and that this is something they will want to stay aware of.

Let me know if you have any questions.

Russ

*This electronic message transmission contains information from the Nuclear Energy Institute, Inc. The information is intended solely for the use of the addressee and its use by any other person is not authorized. If you are not the intended recipient, you have received this communication in error, and any review, use, disclosure, copying or distribution of the contents of this communication is strictly prohibited. If you have received this electronic transmission in error, please notify the sender immediately by telephone or by electronic mail and permanently delete the original message. IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS and other taxing authorities, we inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.*

Confidential

TVABLN00008331

# DEPOSITION EXHIBIT

# 37

**To:**      'bill@wrmccollum.com'[bill@wrmccollum.com]
**From:**    Shea, Joseph W
**Sent:**    Mon 1/30/2017 8:29:31 AM
**Subject:** RE: Bellefonte Construction permit transfer

Bill,

I am available at 2:30 pm tomorrow and it may be best to call me at 423-718-9576.

I confirmed with our transition team this morning that we do not have any activity ongoing regarding developing a permit transfer application.

Look forward to talking,

Joe

**From:** bill@wrmccollum.com [mailto:bill@wrmccollum.com]
**Sent:** Sunday, January 29, 2017 6:28 PM
**To:** Shea, Joseph W
**Subject:** RE: Bellefonte Construction permit transfer

**TVA External Message. Please use caution when opening.**

Joe,

We definitely need to talk. If I understand you correctly, what you are telling me is the opposite of what I got from talking to Frank. I had understood from him that TVA was taking the lead because you were the current holder of the permits, and that we would support you with information, such as financial viability information.

Please correct me if I have misunderstood your note.

I can talk any time after 2:00pm on Tuesday. Just let me know when and what number to call. Thanks.

Bill McCollum

-------- Original Message --------
Subject: Re: Bellefonte Construction permit transfer
From: "Shea, Joseph W" <jwshea@tva.gov>
Date: Sun, January 29, 2017 3:18 pm
To: "bill@wrmccollum.com" <bill@wrmccollum.com>

Hi Bill,

Thanks for the question on the transfer application path ahead.

I have had several conversations with Franklin, Frank and Larry B about this.
I suspect it would be worth a conversation between yourself and myself. To date, in my conversations

EXHIBIT
37

TVABLN00002656

with NRC execs (both before and after your drop-in last week) I have deferred questions on transfer
schedule to Nuclear Development as, per the transfer process, you all would have the lead. As I
mentioned, I believe we should discuss further.

I have an all day conference tomorrow but I am available after 2 pm on Tuesday.  If you are local that
day we could meet at COC or nearby. Alternatively, I am available that pm for a telecon.

Joe
Cell- 423-718-9576


Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
**From:** bill@wrmccollum.com
**Sent:** Sunday, January 29, 2017 2:49 PM
**To:** Shea, Joseph W
**Subject:** Bellefonte Construction permit transfer

**TVA External Message. Please use caution when opening.**
Joe,

Hi! I just wanted to check on the schedule for transfer of the construction permits for
Bellefonte Units 1&2 from TVA to Nuclear Development. We are beginning to
interface with the NRC staff on the overall project schedule for Bellefonte and they
wanted us to provide information about the overall project schedule and Operating
License schedule. I wanted to see if you guys have provided them any information on
the schedule for the transfer of the construction permits, so we can be aligned on any
communications with the staff.

Just let me know. Thanks,

Bill McCollum

Confidential

# DEPOSITION EXHIBIT

# 42

Message

| | |
|---|---|
| **From:** | Larry D. Blust [lblust@HSPLEGAL.COM] |
| **Sent:** | 8/18/2016 6:56:13 PM |
| **To:** | coneill@ceadvisors.com |
| **CC:** | Franklin Haney, Sr. [flh@flhcompany.com]; Frank Haney [frankhaney@flhcompany.com]; Bill Mccollum [bill@wrmccollum.com]; Gloria Thurman [Gloria@flhcompany.com] |
| **Subject:** | FW: |
| **Attachments:** | Confidental Agmt Tennesse Valley TVA Buyer 8.18.16 Redline (00699593x9D9DD).docx; Confidentiality Agmt Tennesse Valley TVA Buyer 8.18.16 clean (00699547x9D9DD).doc |

When I discussed with you that our client and its predecessor has been working with TVA on various proposals to complete the Bellefonte plants since at least 2001 and as a result had some problems with your draft confidentiality agreement, you suggested that I submit a revision to take care of those concerns. Such a revision is attached together with a redline showing the changes from the draft you sent out.

Most of the changes are self-explanatory but briefly the changes and the reasons for them are as follows:

1. In section 3, we deleted c barring disclosure of the Transaction and Nuclear Development's ("ND") participation in it. You have publicized this transaction and ND was the main party urging TVA to dispose of the Site so ND could complete the plants once TVA determined it would not complete these plants. As part of this process, ND has contacted various interested government officials and legislators and met with DOE, NRC, IRS and other governmental agencies and customers and suppliers of TVA about the feasibility and financing of the project, Our client's supporters periodically make requests for updates as to the disposition process. In addition, ND has applied for a DOE guaranteed loan under the program for advanced nuclear facilities and must be able to inform DOE where it is in the process. It is naïve to assume that this transaction or our client's participation in it is confidential. Similar changes were made to section 8.

2. We added new sections 10(a) & (b) dealing with ND's existing confidentiality agreement with TVA. In 10(b) we extended the permission in the amendment to that agreement to disclose information to DOE in regard to ND's pending loan application to the documents provided by TVA pursuant to this Agreement.

3. As we discussed, we added a 109c) making the confidentiality provisions mutual. Unlike some potential bidders, our client is an SPE formed just for this transaction by a wealthy family whose assets and activities are and always have been very private. In order to complete the Request for Qualification Information, our client needs to assure that its response will be confidential. In section 12 (formerly 11), we excepted out our client's existing exclusive arrangements and any new arrangements ND may make in regard to completing the plants as opposed to just acquiring the Site. Our client has to be able to make these arrangements before it acquires the Site.

If these changes are acceptable, please have the Confidentiality Agreement signed by a TVA representative and returned to me. I will secure Mr. Haney's signature and send you back a fully executed copy and our client's completed Request for Qualification Information. If you have any questions about or issues with these changes, please call me

**From:** Juanita Crudup
**Sent:** Thursday, August 18, 2016 11:53 AM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:**



EXHIBIT
42

ND_004966



**Juanita Crudup**, *Legal Assistant*
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 60602
Dir **312.604.2682**  Fax **312.604.2683**

jcrudup@hsplegal.com

# DEPOSITION EXHIBIT

# 43

Message

| | |
|---|---|
| **From:** | Larry D. Blust [lblust@HSPLEGAL.COM] |
| **Sent:** | 9/9/2016 7:50:02 PM |
| **To:** | Carrie O'Neill [coneill@ceadvisors.com] |
| **CC:** | Franklin L. Haney (flh@flhcompany.com) (flh@flhcompany.com) [flh@flhcompany.com]; Frank Haney [frankhaney@flhcompany.com]; Bill McCollum [bill@wrmccollum.com] |
| **Subject:** | Emailing - Confidential Indicative Bid Nuclear Development (00703998x9D9DD).pdf |
| **Attachments:** | Confidential Indicative Bid Nuclear Development (00703998x9D9DD).pdf |

Attached is Nuclear Development LLC's Indicative Bid.  This follows the organization in  and contains the material required by your September 2, 2016 letter to me rather than the Offering Memo.  The material requested in the Offering Memo is slightly different than that requested in your letter.  The major substantive difference is the request in the offering memo for what additional due diligence is required.  That is not in your letter and is more appropriately done in regard to negotiating a contract in any event since what is relevant to us is unliely in most cases to be relevant to other bidders..

Please call me if you have any questions.  Please confirm receipt of this.

EXHIBIT

43

tabbies®

CONFIDENTIAL

Indicative Bid
Nuclear Development, LLC ("ND")

1. <u>Buyer Group Contract</u>.

Questions regarding clarification of the Indicative Bid should be directed to:

Larry D. Blust
Phone: 312 604-2672
Cell:    312 524-6218
Email: lblust@hsplegal.com

2. <u>Buyer Group and Ownership Structure</u>.

The bidder is Nuclear Development, LLC ("ND"). ND was formed in 2012 by Franklin L. Haney as a special purpose entity to acquire, finance, complete and operate the two partially completed nuclear plants at the Bellefonte Nuclear Station near Hollywood, Alabama.

Currently, Franklin L. Haney is the sole member and manager of ND. Officers with authority to act for it under the manager's direction are Franklin L. Haney, Jr. President, William R. McCollum, Vice President Nuclear Operations, and Larry D. Blust, Secretary and General Counsel.

ND is a special purpose entity ("SPE") formed exclusively for this transaction and will be the buying entity. The type of financing ND plans to use for the estimated $13,370,625,000 cost of the project requires an SPE to insulate risks for the lenders and investors. ND's current ownership structure is shown on Exhibit A. As soon as ND has been approved as the successful bidder for the BLN site, ND will be expanded as indicated in Exhibit A in order to raise the required equity and debt.

The BLN reactor designs have been certified by DOE to constitute Advanced Nuclear Facilities as defined in Title XVII of the Energy Policy Act of 2005 for the purpose of qualifying for production tax credits under Internal Revenue Code Section 45J and for qualifying for a DOE guaranteed loan under Title XVII. ND applied for and has been awarded tax credits worth approximately $1.0 billion for each plant. ND has gone through Phase I of the DOE loan application process and has been determined to be eligible for such a loan. ND applied for a $10.6 billion loan but a second phase of DOE due diligence is required before DOE decides whether to award a loan and in what amount, which is discretionary with DOE.

The type of equity and financing to be used for this project means that the providers of the securitized equity and securitized debt will not be known until such funds are raised, which will be after the closing of the purchase of the property. These parties, who are likely to be institutional or private equity funds, will be merely passive investors in any event. The Haney family, who have already funded over $5.0 million in front end costs, will remain the residual equity holders

in ND. When the tax credit funds are raised, the ownership may be split into two SPEs as shown in Exhibit A to accomodate the tax credit investors.

      3.    <u>Advisors</u>. Mr. Blust's law firm is assisting in the transaction, as is Mr. McCollum's consulting firm. In addition, investment advisors and engineering firms provided advice in regard to the DOE guaranteed loan application. After ND acquires the site, other advisors may be retained in regard to the project.

      4.    <u>Indicative Bid Form</u>.

The following is the completed indicative bid form:

      A.    <u>Overview and End Use</u>.

      ND plans to acquire the site to complete the two partially completed nuclear power plants and to operate these plants as merchant power plants connected to the grid through the existing transmission lines of the TVA and Southern Companies. The plants are comprised of two Babcock and Wilcox 205 advanced design pressurized water reactors. This design has never been fully licensed and operated in the United States. The Bellefonte units have NRC construction licenses and when completed and in operation will have a 1250 MW name plate capacity and will be the largest capacity advanced reactors in the United States.

      B.    <u>Purchase Price</u>. $36.4 million. Per TVA's appraisal, the BLN site has no value to a purchaser that wishes to complete the plants for their intended use as nuclear power plants due to the risk and large additional investment required. However, ND promised TVA that it would initially bid the amount the appraisal found the value of the site to be for other uses so that TVA could not be accused of disposing of the property for less fees then its land value regardless of use. While ND expected that value to be lower given the demolition and other costs which would be required for any other use, ND is honoring this commitment.

      C.    <u>Property Taxes</u>. ND has made no arrangements with host communities regarding property taxes. ND's proposed use of the site will result in the site's highest assessed valuation for property tax purposes by a large multiple over other uses since ND is budgeting spending $13.4 billion on the plants. ND would expect to discuss some real estate tax incentives with the host communities at some future time in light of the tremendous benefits this use will provide to local communities in addition to real estate taxes.

      D.    <u>Committed Future Investments</u>. With the required approvals and financing, ND will be committed to future investment of the cost of completion which is presently budgeted at $13.4 billion over the next 4 to 6 years.

      E.    <u>Description of Committed Future Investments</u>. The above committed future investments are conditioned only on the same conditions required for ND to close the acquisition of the site. They are approval by the NRC of the transfer of the existing construction licenses to ND and commitments for either the DOE guaranteed loan of $10.6 billion or other debt financing acceptable to ND. Unlike with possible bidders for other uses, who may be dependent on sales demand for commercial, industrial or residential property development in order to provide any

CONFIDENTIAL

substantial benefits to the local communities, these expenditures will be committed to when the license transfer is approved and the debt committed.

Based on similar size U.S. nuclear projects, the project will create 8,000 to 10,000 direct and indirect construction jobs during the period of peak construction. Most of these workers will come from other locations creating a need for housing, restaurants, recreation facilities and other support facilities in the local communities.

The project will create approximately 2,400 direct and indirect permanent jobs, most of which will be high paying, including those involved in operation, maintenance and support as well as personnel required for refueling and maintenance outages. The positive ongoing economic impact to the surrounding region will exceed $1.0 billion per year. The Alabama Governor's economic development experts view this project as the single largest potential economic development project in Alabama. The likely useful life of these two plants when completed is 60 years. This compares to roughly 20 years for a combined cycle natural gas plant of similar capacity which would also provide far fewer jobs. Other possible uses are likely to provide only a nominal amount of jobs and at lower wages than construction or operation of a nuclear plant. Thus, the benefit of providing employment is not only much greater in numbers and dollars than alternative possible uses, ND's proposal would provide multi-generational economic stability to the area, unlike any other likely proposals.

F.    Other Value. In addition to the hugh value construction and operation of these nuclear plants would provide to the local communities and the state of Alabama, TVA should consider that having a long-term source of base power should TVA need it is a tremendous advantage to TVA. TVA's latest IRP does not conclude that TVA will never need the additional base power which would be produced from these plants at an attractive and non-fluctuating cost. In fact it concludes that substantial additional base power would be needed by the time these plants would be operational and over their 60 year likely operating life. It simply concludes that TVA should buy this additional power rather than fund and own the generating capacity.

No other possible use can provide this benefit. Natural gas, while cheap presently has historically not only commanded substantially higher prices, but has been subject to large spikes in the price of natural gas. If the proposals presently being considered for export of LNG to Europe and Asia come to pass, use of natural gas as a fuel for long-term base power needs is likely to cause large rate increases. In addition, a large combined cycle gas plant is capable of operating at only 50% to 70% of capacity as opposed to 90% to 95% for a nuclear plant and generally requires replacement or substantial rebuilding approximately every 20 years. Moreover, natural gas causes carbon emissions equal to 30% to 50% of a coal plant while nuclear causes no such emissions. Assuming that the current proposed "Clean Power" EPA regulations or something else to cause the U.S. to meet its international commitments to carbon emissions reduction ultimately becomes effective, these nuclear plants will aid TVA and the various states, particularly Alabama, to meet carbon reduction requirements in the most attractive way.

Comparing completing these plants to renewable energy such as solar or wind on this site is like comparing apples and oranges. Renewable power cannot provide reliable base power and generally requires subsidies to be price competitive.

CONFIDENTIAL

Non energy uses will, of course, provide no collateral benefits to TVA despite its substantial prior costs.

This collateral benefit of a merchant owner completing the plants will inure to TVA without any commitments from TVA or conditions.

G.    Financial Resources.

As to the purchase of the site, ND has available from the Haney family sufficient cash to pay the bid price. It is not in a position to do so without having the licensing approval and financing approvals discussed under item 5 below, however, since the BLN site is worth nothing to ND unless it has the ability to complete the two plants.

The more complicated challenge is to finance the estimated $13,370,625,000 cost of the project. To do this, as soon as ND has been approved as the successful bidder for the site and has committed debt financing, ND will start raising securitized equity/debt from institutional and private equity players. The Haney family has already expended over $5 million on the Bellefonte project which is not included in the $13.4 billion figure above. The Haney family will leave this equity in ND and is likely to invest additional funds.

The currently projected funding for the entire project is as follows:

|  | In billions |
|---|---|
| DOE guaranteed loan | $10.6 |
| Securitized subordinate debt/equity to be taken out by tax credit investors | 2.0 |
| Balance of securitized equity/debt | .8 |
| Total | $13.4 |

The ratio of debt to equity is contemplated to be 79%/21%. ND's projections indicate the ability to pay more than the $10.6 billion debt with sufficient coverage ratios.

In regard to the DOE guaranteed loan and the financing backed by tax credits, the plants have already been certified by DOE to constitute Advanced Nuclear Facilities as defined in Title XVII of the Energy Policy Act of 2005 for the purpose of qualifying for production tax credits under Internal Revenue Code Section 45J and for qualifying for a DOE guaranteed loan under Title XVII. ND applied for and has been awarded tax credits worth approximately $1.0 billion for each plant. ND has gone through Phase I of the DOE loan application process and has been determined to be eligible for such a loan. ND applied for a $10.6 billion loan but a second phase of DOE due diligence is required before DOE decides whether to award a loan and in what amount, which is discretionary with DOE.

As part of the DOE second phase application process, ND  is required to obtain a shadow rating from a national credit rating agency based on projected revenue without credit enhancements. ND assumes that this rating is likely to be BB or slightly lower. If for some reason, DOE declines to offer a loan commitment to ND, or ND for some reason rejects DOE'S terms,

CONFIDENTIAL

this shadow rating should allow ND to raise replacement securitized debt albeit on more onerous terms.

The above $13.4 billion amount includes all future project costs to completion including environmental and regulatory.

ND does not anticipate initially having or requiring credit support since the DOE loan guarantee of the Federal Financing Bank loan is intended to alleviate the need for credit enhancement. Later on, however, ND would expect to have financeable power purchase contacts for a substantial amount of the power generated.

5.    Mark Up to Commercial Terms

Because of the unique nature of ND's proposal, ND would require the following changes to TVA's initial commercial terms as stated in its offering memo:

A.    Excluded Assets.

Basically in order to complete these plants on a timely basis, ND needs to step into TVA's shoes as to both on-site and off-site project assets. As to the excluded assets discussed in the offering memorandum:

(1) Steam Generators. It is essential to ND's ability to timely complete these plants that ND receive the two substantially complete steam generators and step into TVA's shoes in regard to TVA's contract for the Plant 2 steam generators by assuming TVA's rights and obligations in regard thereto. ND would not expect to increase its purchase price as a result as requested. ND would end up paying the manufacturer for the Plant 2 generators per the contract. As to the substantially complete generators for Plant 1, ND understands that they were manufactured specifically for this plant and thus have no value to TVA greater than their scrap value. No other bidder is likely to want these generators so, in essence, ND would be paying TVA more for the same property than anyone else if it added a separate amount for the generators.

(2) Training building and storage facility on pole yard. ND believes it needs fee ownership of these facilities both for its operation of the plants and for licensing purposes. ND is willing to enter into an agreement with TVA for TVA's access and use, however.

(3) FF&E. ND would expect TVA to leave any furniture and fixtures. TVA can remove any computers and phones if it desires. As part of the sale, however, ND requires all the programming, data, and records relating to the project  Thus, it might be more efficient for some or all of the computers to be transferred. This is a minor issue with numerous possible negotiated solutions.

(4) 250 acres of buffer land and closed dumps. ND has no desire to own these unless required for regulatory purposes. In any event, ND would not build on this assuming the survey shows it is outside the part of the site used for the plants and access thereto.

5

(5) <u>Transmission Lines</u>. ND assumed that the transmission lines dedicated to the plant would be transferred but ND has no problem with TVA retaining them so long as TVA enters into an interconnection agreement providing for their maintenance and use by ND and for any required upgrades at ND's cost.

(6) <u>Licenses and Contracts</u>. ND expects TVA to transfer all licenses and assignable contracts as proposed in the offering memo. See discussion below as to transfer of licenses.

B. <u>Closing Conditions</u>.

ND has no problem with the requirement to sign a purchase and sale agreement and deposit 20% of the purchase price within 48 hours of auction completion provided such a contract can be negotiated prior to auction completion. However, the closing itself and payment of the purchase price must, in addition to environmental clearance, be conditioned on NRC approval of the transfer of the existing construction licenses and ND receiving a written commitment for financing of the completion costs.

In regard to a loan commitment, ND as required submitted a written term sheet to DOE as part of its application. A commitment on these terms or similar in the amount of $10.6 billion would satisfy this condition as would a commitment for securitized debt on comparable terms.

There is no reason why these conditions should be detrimental to TVA. As discussed above completion of these plants is by far the site's most desirable use as far as both the local community and TVA are concerned. While it is possible that ND might never be able to satisfy these conditions, ND is fairly far along in the process and as far as it can get without an agreement with TVA to acquire the plants. If these conditions were to prove unattainable, TVA can simply go back to any other bidding parties and negotiate a sale. These other possible uses will always be available; this is probably TVA's only chance to secure completion of the plants for the use originally planned which is the best possible outcome for all stakeholders. It is difficult to imagine how TVA would be damaged by accepting these conditions.

00703592.DOCX

6

ND_005054

Bellefonte. I. C. Organization (Corporate and Personnel). 1. V1. pdf



**Organizational Chart
(Current)**

Project

100% owner

Nuclear Development, LLC
(Sponsor)

Sole Member

Franklin L. Haney
(Principal)



**Organizational Chart
(On Entering Into Definitive Agreement)**

Project

100% owner

Nuclear Development, LLC

Pari Passu
Debt
Securitized Debt
Holders

100%
Equity

DOE Debt

Franklin L. Haney as Trustee of various Haney Family Trusts
for Benefit of Franklin L. Haney, Emmeline Haney and their
5 children and their grandchildren



EXHIBIT

A



Possible Future Organization Chart
(on Split into 2 Projects to
Accommodate Tax Credit Investors)



2

CONFIDENTIAL

ND_005056

# DEPOSITION EXHIBIT

# 45

Message

**From:** Carrie O'Neill [coneill@ceadvisors.com]
**Sent:** 10/4/2016 10:15:32 PM
**To:** Frank Haney [frankhaney@flhcompany.com]
**CC:** bill@wrmccollum.com; Franklin Haney, Sr. [flh@flhcompany.com]; Larry D. Blust [lblust@hsplegal.com]
**Subject:** Re: P&S contract draft

Yes, we will find it and upload.

---

**From:** Frank Haney <frankhaney@flhcompany.com>
**Sent:** Tuesday, October 4, 2016 6:06:33 PM
**To:** Carrie O'Neill
**Cc:** Larry D. Blust; Franklin Haney, Sr.; bill@wrmccollum.com
**Subject:** Re: P&S contract draft

Carrie

Can you added 2010 transition study to data center? We had 100m in budget and the new line went to murphisburo (sp) as an FYI.

Frank

Sent from my iPhone

On Oct 3, 2016, at 9:47 AM, Carrie O'Neill <coneill@ceadvisors.com> wrote:

> Thank you, Larry. We can discuss these issues tomorrow. I have circulated them to the TVA team.
>
> Frank,
> I know TVA is still working to get you the cash flow items from the list you sent us last week. The other documents were posted to DataSite. Have you been able to get access to those? I just want to check with you again that you are not expecting to discuss any of those documents in detail tomorrow. Jim Chardos will be at the meeting, but no one else from the engineering group will be there. Also, many of the folks involved in Bellefonte for TVA are no longer at TVA.
> See you all tomorrow,
> Carrie
>
> **From:** Larry D. Blust [mailto:lblust@HSPLEGAL.COM]
> **Sent:** Sunday, October 02, 2016 5:53 PM
> **To:** Carrie O'Neill <coneill@ceadvisors.com>
> **Cc:** Franklin Haney <flh@flhcompany.com>; Frank Haney <frankhaney@flhcompany.com>; bill@wrmccollum.com
> **Subject:** P&S contract draft
>
> In order to facilitate the discussion under the second item of the second bullet in the revised meeting agenda, we have the following concerns and/or needs for clarification regarding the proposed purchase and sale contract:
>
> A. What buying:

EXHIBIT 45

1. Recital C; 3(e);  Deed 1B. The pole yard training center should be part of the property conveyed. We are willing to give TVA an easement for use as well as access as stated in our indicative bid.
2. 1(c); 9(a)(ii).   The records should be part of the purchase price. Section  9(a)(ii) appears to provide the needed access preclosing so there is no reason these should only be provided post closing or at additional cost.
3. 1(d)   Without Schedule 1(d) it is impossible to tell what contracts are being assigned and assumed.  Of crucial importance is the contract for the generators/turbines.  This issue is also related to 6(a)(vi) and Schedule 6(f) required consents  The last sentence of 1(d) should be eliminated and TVA should have an obligation to transfer these contracts with any consents required being a closing condition under 6(f) which can be waived by the buyer.  In addition as to the generator contract and any other crucial contract there should be the normal saving clause that, if a required consent is not given, TVA will perform the post closing obligations at Buyer's expense and for its benefit.
4. 1(e).  Similar to item 3 above, the last sentence of 1(e) stating that if the license transfer is not approved in 1 year, TVA no longer has an obligation to get it transferred needs to be eliminated and the transfer of the license needs to be a condition to closing by making approval of transfer a required consent in Schedule 6(h).
5. 3(a). Deed 1E. What are the large components to be removed?  We need to see Schedule 1(d).
6. 3(d); 12(d);  Deed 1C & D. What is the purpose of the two easements in (ii) & (iii) for the switchyard and fiber optic system and how does this affect our use?
7. 5(c)(ii).  What electrical components need to be relocated off site and why should the Buyer pay for this?
8. Deed 1F & 2D & G.  As we stated in the indicative bid, we need verification that the two flood plain restrictions do not interfere with the plants' operations.

B.   Reimbursable expenses:
1.  5(c). We cannot accept a requirement to reimburse "certain cost and expenses" which are defined only by certain items which are included.  We agreed to pay for the appraisal and additional environmental work on closing but we never contemplated or discussed paying for surveys, administrative staff of TVA, Concentric payments, or "other associated administrative costs". These are customarily seller's costs of sale. What is your proposed cap?
2.  21. Section 21 provides that these costs will be paid by Buyer whether or not the transaction closes. This was not our understanding and makes no sense in that the TVA would get reimbursed even it was responsible for not closing.

C.   Closing Conditions:
1.  6(a)(vi). Assuming that Item A3 &4 discussed above are required consents under 6(a)(vi), these items are taken care of.
2.  6(a)(i);  11(a)(iv)(B). This should be eliminated as to us since TVA should know now that this is true given the extra environmental work.
3.  Additional conditions:
    (a) As stated in our indicative bid, there needs to be a  contingency for financing In the form of a DOE loan commitment acceptable to Buyer or an alternative commitment for $10.6 billion.
    (b)  We should have the right to obtain a satisfactory title commitment and title insurance at our expense (even though this generally is a seller cost) since this will be a requirement for financing.
    (c) A transmission agreement with TVA providing both for maintenance and use of the lines and for the right to upgrade them to get the power out of the facility to the nearest connection to the grid.

ND_005153

D. Termination Provisions:
  1. 11(a)(v)(A). This cannot work since there is no time period and thus should be eliminated leaving only the outside date in B. The parties should discuss if the time in B is adequate.
  2. 11(c). This provision appears to be misdrafted since 11(a) (iv) do not relate to anything done by Buyer but are things outside the parties control.
E. Drafting issues.
  1. There is no section 11(b).
  2. 16(a) refers to 13(a)(viii) which does not exist. I could not tell what this was intended to refer to.
  3. In the Recitals to the P&S agreement and the deed there are elaborate and unnecessary references to the sales process. Not only are these the type of thing that should appear, if at all, only in resolutions, they are incorrect in stating that a public auction is required to sell this property. We sent TVA a white paper which clearly established that a private sale is authorized by the TVA Act and in fact has been used by TVA before in disposing of surplus property and that there are many types of public sales authorized by federal procurement regulations that do not resemble what is happening here. Moreover, it is our understanding that other factors than price were being considered as the requirement for additional investment in the deed clearly establishes. This recitation should be deleted. It seems to just give an objector a grounds for trying to challenge the deal.

**Larry D. Blust**, *Attorney*
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 60602
Dir 312.604.2672  Fax 312.604.2673

lblust@hsplegal.com

ND_005154

# DEPOSITION EXHIBIT

# 48

Message

| | |
|---|---|
| **From:** | MIGNOGNA Gary (AREVA) [Gary.Mignogna@areva.com] |
| **Sent:** | 12/20/2016 11:16:21 PM |
| **To:** | Franklin Haney, Sr. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=aad4c80960aa49d0809094ab700b30a4-flh] |
| **CC:** | WILLIAMS Lee (AREVA) [Lee.Williams@areva.com]; PETERS Gary (AREVA) [Gary.Peters@areva.com]; Victor Puccio [victor.puccio@aecom.com]; William R. (Bill) McCollum (bill@wrmccollum.com) [bill@wrmccollum.com]; Frank Haney [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a9eafc5d1ecf4a1393f7ad39df2c1328-frankhaney]; Larry D. Blust - Hughes - Socol - Piers - Resnick - DYM LTD (lblust@HSPLEGAL.COM) [lblust@HSPLEGAL.COM] |
| **Subject:** | Process to Transfer Bellefonte Construction Permit |
| **Attachments:** | White Paper - Dec20.docx |

Franklin,
Please find attached the "white paper" you requested on the transfer of the Bellefonte construction permit from TVA to ND.
Best regards,
GMM

Gary M. Mignogna
President & CEO, AREVA Inc.
434-832-2371 (office)
434-841-2303 (mobile)

**From:** PETERS Gary (DTI)
**Sent:** Tuesday, December 20, 2016 2:14 PM
**To:** MIGNOGNA Gary (CORP-NP)
**Cc:** WILLIAMS Lee (IB); BRYAN Marty (DTI); RYAN Tom (DTI); HOTTLE Nathan (DTI); PARECE Marty (DTI); ELLIOTT Gayle (DTI); DUNKIN La Dawna (IB)
**Subject:** Process to Transfer Bellefonte Construction Permit

Gary – attached is current version that is ready for your use.  We will also prepare summary slides that can be used to guide our discussion with the NRC on Jan 23. Please let me know if you have any comments or questions.
Thanks
Gary
Director, Licensing and Regulatory Affairs
434 832-3945



EXHIBIT
48

ND_005685

**Bellefonte Nuclear Station**
**Process to Transfer Bellefonte Construction Permit**

**PROBLEM STATEMENT:**

TVA currently holds deferred status NRC Construction Permits for Bellefonte (BLN) Units 1 and 2. Deferred status is governed by NRC Generic Letter 87-15. NRC guidance includes defined processes for what is required while in a deferred state, how to reactivate construction, how to transfer a permit, and how to extend a Construction Permit (CP). The current situation is unique due to: (1) Nuclear Development, LLC (ND) is not a pre-qualified entity as defined by NRC financial and technical requirements; (2) There is no precedent for this type of transfer; and (3) Bellefonte Unit 2 CP has expired but an extension request to 10/1/2017 has not been acted on by NRC.

**PROPOSED SOLUTION:**

AREVA recommends that the Construction Permits be transferred from TVA to ND in the current "deferred status" state as defined by NRC Generic Letter 87-15. This would represent a "like-for-like transfer" and minimize the work by TVA, NRC and ND in the near-term. This proposal assumes that ND will be the CP holder. To support the transfer, TVA has to submit the CP transfer application 3-6 months prior to transfer. Additionally, NRC approval is required before the transfer can proceed. In order to complete the transfer by December 2017, ND will need to engage TVA and NRC to gain a common understanding, agree on a path forward, and allow the NRC 3-6 months to review the transfer application. Significant progress in various areas can be accomplished while the CP is in the "deferred status" state. The next step would involve transitioning from deferred to active construction. In accordance with NRC Generic Letter 87-15, ND would submit a letter to the NRC at least 120 days before plant construction is expected to resume that would include detailed information about the plant status, design changes and regulatory issues. This is expected to occur early in 2018.

**ACTION PLAN:**

Extension of the Unit 2 CP

TVA action is potentially required to request extension of the Unit 2 CP. The latest TVA extension request extends the Unit 2 CP to October 2017, but the NRC has not acted on it yet. The regulations (10 CFR 2.109) specify that the permits do not expire until NRC takes action. Previously, TVA had agreed to inform NRC of its plans six months prior to the expiration date (i.e. April 2017). It's possible that no further extension is required if TVA informs NRC of the current status and ND states their intent.

NRC Interface

Interactions with the NRC need to confirm the minimum technical and financial requirements for a deferred status CP applicant. The NRC will approve the CP transfer if it determines that (1) the proposed transferee is technically and financially qualified to be the holder of the CP;

1

ND_005686

and (2) transfer of the CP is consistent with applicable provisions of law, regulations, and orders. Previous NRC requirements for TVA reobtaining the Bellefonte CP after termination included verification of a functional quality assurance program, written site procedures to control necessary programs, a corrective action program to identify and correct problems, and appropriate documentation controls.

<u>ND Quality Assurance Program</u>

NRC regulation 10 CFR 50.34 requires that each application for a CP include the implementation of a quality assurance program in accordance with 10 CFR 50, Appendix B. An argument needs to be made that ND can provide quality controls equivalent to TVA for a deferred CP site. Developing a QA program similar to TVA's will be a challenge for an organization that has never held a license or permit. Assumption of TVA's current quality control program or use of a partner's defined quality program would expedite this process.

Appendix G of the TVA Nuclear Quality Assurance Plan (NQAP) defines the Bellefonte Units 1 and 2 Quality Assurance Programs. This is the top level policy that assigns major functional responsibilities for activities conducted by or for BLN while the construction permits for the units remain in deferred status. The NQAP describes the methods and establishes the administrative control requirements that meet applicable 10 CFR 50, Appendix B requirements, NRC Generic Letter 87-15, "Policy Statement on Deferred Plants," and the BLN 1 & 2 construction permits.

<u>ND Organizational Structure</u>

ND's organizational structure, functional responsibilities, levels of authority and interfaces for establishing, executing, and verifying the implementation of quality assurance requirements for BLN 1 & 2 needs to be defined and included in the NQAP. This organization needs to be sized commensurate with the required duties and responsibilities for a deferred status site. Regulatory issue Summary (RIS) 01-006 provides a roadmap that would allow ND to remain the final decision-making authority while transferring operating control for service companies to provide maintenance, QA and security services for the site.

<u>TVA Interface for Construction Permit Transfer – 10 CFR 50.80</u>

TVA must process the application for transfer of the CP licenses, to include all technical and financial qualifications of the proposed transferee as would be required if the application were for an initial license. The application must also include the purpose for which the transfer of the license is requested, the nature of the transaction necessitating or making desirable the transfer of the license, and consent for the applicant to possess the facility.

TVA will need to support the transition of site activities and Programs to allow CP Transfer, to include:

- Quality Assurance elements described in the NQAP will be accomplished through written, reviewed, and approved governing site procedures to support deferred status. These procedures will include actions necessary to maintain and preserve

2

ND_005687

units until construction reactivation. It is recommended that ND adopt TVA's existing procedures for BLN maintenance, security, employee concerns, etc.

- A corrective action program (CAP) is established commensurate with the deferred status. ND would need to assume the current program.
- Documentation is properly prepared, reviewed, approved, and distributed. QA records stored, maintained, and controlled in a manner to support deferred status. ND would need to assume and maintain the QA records TVA currently maintains for the plant.

Design and Licensing Basis

TVA provided the technical and design information for the Bellefonte Nuclear Plant in the PSAR and in the Final Safely Analysis Report (FSAR) in 1974. The NRC staff evaluated the technical and design information and documented the results in the original BLN Safety Evaluation Report (SER). As stated in the original SER, this was only the first stage of a continuing review by the NRC staff of the design, construction, and operating features of BLN. In its 2009 application requesting reinstatement of the CPs, TVA did not propose to change the design of the facility, as described in the PSAR and FSAR. Also, no information has been identified that would invalidate the conclusions presented in the staff's original SER. The original NRC SER remains valid. ND would need to adopt these documents as the design and licensing basis of BLN, with the understanding that updates will be needed prior to construction restart.

Financial Qualifications per 10 CFR 50.33 – new Rulemaking

The NRC has never received an application for a CP from a non-electric utility. Over the past few years the NRC staff has been working to update the financial qualification rule to be more applicable to the non-electric utility applicant. The rulemaking will remove the rigor of the detailed requirements for a power reactor applicant to demonstrate that it possesses or can provide reasonable assurance of obtaining the funds necessary for construction and operation. In this rulemaking, the applicant will be required to submit a plan describing how it will proceed to finance the construction and operation of the facility. The plan would ensure that the applicant has both a well-articulated understanding of the size of the project it is undertaking and the financial capacity to obtain the necessary financing before beginning reactor construction. The proposed rulemaking would permit the NRC to issue licenses with conditions to applicants that may have insufficient (or no) funding at the outset of the license application review.

The revised NRC financial qualification process demonstrates an understanding of the complexities of these types of major projects, the challenges in raising capital, and the need to ensure financing before the start of reactor construction. The new NRC financial qualification rule is in the final stages of implementation. The extensive work done by ND for DOE loan approval should support these financial requirements for a CP transfer applicant.

3

ND_005688

## Environmental Requirements

TVA submitted an Environmental Report in 1973 and the NRC issued an Environmental Impact Statement in 1974.  NRC performed an environmental assessment and reached a finding of no significant impact dated March 3, 2009 for the reinstatement of the TVA CPs. Based on the environmental assessment, the staff determined that reinstatement of the CPs will not have a significant effect on the quality of the human environment.  The current NRC environmental assessment and the extensive environmental work done recently by TVA should be sufficient for a NRC CP transfer.

## Work Allowed during Deferred Status of Construction Permit

10 CFR 50.10 defines activities that constitute construction and require a permit, activities that do not constitute construction and require no permit and activities that may be accomplished under a limited work authorization.  Work performed during the deferral period supports preservation and maintenance activities and at no time during such period will work be performed which would further plant construction or completion.

TVA developed a Position Paper that outlined the major activities that could continue while the plant was in a deferred status.  Some examples include: engineering walk downs, design or analysis of plant structures, systems and components (SSCs), surveying, site exploration, site clearing, grading, road construction, erection of site support buildings, procurement, fabrication, refurbishment, receipt and storage of SSCs, maintenance and preservation of SSCs including restoration activities to prevent degradation, removal of both safety-related and non-safety related equipment under controlled conditions, refurbishment of cranes, refurbishment of meteorological tower, refurbishment of the construction HVAC, etc. All work orders need to be reviewed and approved to ensure no work is authorized that could be identified as advancing plant construction while in a deferred status.

## Potential Timeline



4

ND_005689

Transition to Active Construction Permit

NRC Generic Letter 87-15 outlines the information required to be submitted to the NRC 120 days before plant construction is expected to resume.  Information includes: a schedule for construction completion, schedule for submittal of an operating license application, current status of the plant site and equipment, listing of licensing issues and proposed resolutions, listing of new regulatory requirements during the deferral period and proposed plans for compliance, description of the construction management organization, description of plant design changes, revised FSAR, etc.   The NRC will then review the activities implemented for preservation and maintenance to determine if there are areas that require special NRC attention.  They will also verify design change modifications, the corrective actions program and the results of NRC inspections.  Based on the success of Watts Bar 2 reactivating their construction permit, we have confidence that Bellefonte can receive an active construction permit in 2018 to complete the plant.

5

CONFIDENTIAL

**DEPOSITION EXHIBIT**

**49**

| Message | |
|---|---|
| **From:** | Frank Haney [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A9EAFC5D1ECF4A1393F7AD39DF2C1328-FRANKHANEY] |
| **Sent:** | 12/21/2016 7:22:19 PM |
| **To:** | MIGNOGNA Gary (AREVA) [Gary.Mignogna@areva.com] |
| **CC:** | Franklin Haney, Sr. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=aad4c80960aa49d0809094ab700b30a4-flh]; WILLIAMS Lee (AREVA) [Lee.Williams@areva.com]; PETERS Gary (AREVA) [Gary.Peters@areva.com]; Victor Puccio [victor.puccio@aecom.com]; William R. (Bill) McCollum (bill@wrmccollum.com) [bill@wrmccollum.com]; Larry D. Blust - Hughes - Socol - Piers - Resnick - DYM LTD (lblust@HSPLEGAL.COM) [lblust@HSPLEGAL.COM] |
| **Subject:** | Re: Process to Transfer Bellefonte Construction Permit |

Guys

We are focused solely on the doe loan guarantee and answering any questions. We need to cut back on expenses until we get further along. As such we don't need slides or for y'all to attend the 23rd nrc meeting. We would appreciate y'all setting up a meeting around the 23rd with edf. We understand they will be in town. Happy holidays. Thanks

Frank

Sent from my iPhone

On Dec 20, 2016, at 6:16 PM, MIGNOGNA Gary (AREVA) <Gary.Mignogna@areva.com> wrote:

> Franklin,
> Please find attached the "white paper" you requested on the transfer of the Bellefonte construction permit from TVA to ND.
> Best regards,
> GMM
>
> Gary M. Mignogna
> President & CEO, AREVA Inc.
> 434-832-2371 (office)
> 434-841-2303 (mobile)
>
>> **From:** PETERS Gary (DTI)
>> **Sent:** Tuesday, December 20, 2016 2:14 PM
>> **To:** MIGNOGNA Gary (CORP-NP)
>> **Cc:** WILLIAMS Lee (IB); BRYAN Marty (DTI); RYAN Tom (DTI); HOTTLE Nathan (DTI); PARECE Marty (DTI); ELLIOTT Gayle (DTI); DUNKIN La Dawna (IB)
>> **Subject:** Process to Transfer Bellefonte Construction Permit
>>
>> Gary – attached is current version that is ready for your use.  We will also prepare summary slides that can be used to guide our discussion with the NRC on Jan 23.  Please let me know if you have any comments or questions.
>> Thanks
>> Gary
>> Director, Licensing and Regulatory Affairs
>> 434 832-3945
>>
>>
>> <White Paper - Dec20.docx>



CONFIDENTIAL

ND_005691

# DEPOSITION EXHIBIT

# 60

**To:**      Chardos, James S[jschardos@tva.gov]
**From:**    Gillman, Marie
**Sent:**    Tue 10/16/2018 11:07:18 PM
**Subject:** McCollum action list
<u>Items Necessary Before Submitting an NRC Application- Responsibilities.pdf</u>

**TVA External Message. Please use caution when opening.**

---

**From:** "bill@wrmccollum.com" <<u>bill@wrmccollum.com</u>>
**Date:** Thursday, August 16, 2018 at 14:57:06
**To:** "Matthews, Timothy P." <<u>timothy.matthews@morganlewis.com</u>>
**Cc:** "Burdick, Stephen J." <<u>stephen.burdick@morganlewis.com</u>>, "Gillman, Marie"
<<u>Marie.Gillman@snclavalin.com</u>>
**Subject:** RE: NRC Public Meeting 8/14 - Summary

Guys,

Based on our conversation, I've attached a copy of the punch list with responsibilities noted in the
appropriate boxes. Please let me know if you have any questions or concerns. In between calls,
we should keep each other updated on progress, changes or hard spots that may arise.

Thanks,

Bill McCollum

-------- Original Message --------
Subject: RE: NRC Public Meeting 8/14 - Summary
From: "Matthews, Timothy P." <<u>timothy.matthews@morganlewis.com</u>>
Date: Thu, August 16, 2018 1:55 pm
To: "<u>bill@wrmccollum.com</u>" <<u>bill@wrmccollum.com</u>>
Cc: "Burdick, Stephen J." <<u>stephen.burdick@morganlewis.com</u>>,
Marie Gillman <<u>Marie.Gillman@snclavalin.com</u>>

Draft punch list attached.

**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main: +1.202.739.3000 | Fax: +1.202.739.3001
timothy.matthews@morganlewis.com | www.morganlewis.com
Assistant: Angela M. Perry | +1.202.739.5315 | angela.perry@morganlewis.com

**From:** bill@wrmccollum.com <<u>bill@wrmccollum.com</u>>
**Sent:** Thursday, August 16, 2018 1:08 PM
**To:** Matthews, Timothy P. <<u>timothy.matthews@morganlewis.com</u>>

EXHIBIT
60

Confidential

TVABLN00007572

**Cc:** Burdick, Stephen J. <stephen.burdick@morganlewis.com>; Marie Gillman
    <Marie.Gillman@snclavalin.com>
**Subject:** RE: NRC Public Meeting 8/14 - Summary

[EXTERNAL EMAIL]
Great. Marie sent out a number, so I'll see you on the call at 2.

Bill McCollum


    -------- Original Message --------
**Subject:** RE: NRC Public Meeting 8/14 – Summary
**From:** "Matthews, Timothy P." <timothy.matthews@morganlewis.com>
**Date:** Thu, August 16, 2018 11:31 am
**To:** "bill@wrmccollum.com" <bill@wrmccollum.com>
**Cc:** "Burdick, Stephen J." <stephen.burdick@morganlewis.com>,
Marie Gillman <Marie.Gillman@snclavalin.com>
    2pm Works.

**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main: +1.202.739.3000 | Fax: +1.202.739.3001
timothy.matthews@morganlewis.com | www.morganlewis.com
Assistant: Angela M. Perry | +1.202.739.5315 | angela.perry@morganlewis.com

    **From:** bill@wrmccollum.com <bill@wrmccollum.com>
**Sent:** Thursday, August 16, 2018 11:05 AM
**To:** Matthews, Timothy P. <timothy.matthews@morganlewis.com>
**Cc:** Burdick, Stephen J. <stephen.burdick@morganlewis.com>; Marie Gillman
    <Marie.Gillman@snclavalin.com>
**Subject:** RE: NRC Public Meeting 8/14 - Summary

[EXTERNAL EMAIL]

Tim,

I would like to have a call today at 2:00pm Eastern/ 1:00pm
Central to go over the list. Goal for today would be to identify
who is doing what to get each item completed and when. At
the end of the call we can decide on the timing for the next
call. If 2:00pm won't work for you guys, let me know what
time fits.
If you guys have a conference line we can use that would be
good, otherwise if you and Steven are dialing in form the
same line we can conference the three lines together.

Regards,

Confidential

Bill McCollum


-------- Original Message --------
Subject: RE: NRC Public Meeting 8/14 - Summary
From: "Matthews, Timothy P." <timothy.matthews@morganlewis.com>
Date: Thu, August 16, 2018 9:26 am
To: "bill@wrmccollum.com" <bill@wrmccollum.com>
Cc: "Burdick, Stephen J." <stephen.burdick@morganlewis.com>

Bill,
Attached is our draft of the punch list.   We fully agree with your suggestion
on coordination and are anxious to participate.   Stephen and I are generally
available today except 11-12:30 and 3-4 (Eastern).  If we could schedule a
recurring alignment meeting that might be helpful too.  Just let us know what
works for you and Marie.
Tim

**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main: +1.202.739.3000 | Fax: +1.202.739.3001
timothy.matthews@morganlewis.com | www.morganlewis.com
Assistant: Angela M. Perry | +1.202.739.5315 | angela.perry@morganlewis.com

**From:** bill@wrmccollum.com <bill@wrmccollum.com>
**Sent:** Wednesday, August 15, 2018 6:40 PM
**To:** Matthews, Timothy P. <timothy.matthews@morganlewis.com>
**Subject:** RE: NRC Public Meeting 8/14 - Summary

[EXTERNAL EMAIL]
Tim,

Thanks. Once you have the punch list together, I would
like for you, Steven, Marie Gillman and I to get together
on a call and discuss the punch list and earlier note on
transferring the CP's.
My goal is to make sure Marie and the rest of us are
aligned on what we need to do and how, and also to
identify if there are any things we need someone else to
do for us.
At the present time, Marie is confused by some of what
she has heard, which is not surprising since she has
been talking to Frank, me and you guys separately.
I am available any time tomorrow, so just let me know
the best time for you guys.

Thanks,

Confidential

Bill McCollum


-------- Original Message --------
Subject: RE: NRC Public Meeting 8/14 - Summary
From: "Matthews, Timothy P."
    <timothy.matthews@morganlewis.com>
Date: Wed, August 15, 2018 5:10 pm
To: "bill@wrmccollum.com" <bill@wrmccollum.com>

Bill,

I've prepared a punch list of what I think are the decisions, steps and
information we need before we can submit. I've asked Stephen to
take a look at it. Once he has, I'll forward for your review and
comment before sending it on. I expect to have that to you early
tomorrow.

We saw almost nothing in the press today about the NRC meeting
yesterday except one mention that it took place.

Thanks,
Tim

**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main: +1.202.739.3000 | Fax: +1.202.739.3001
timothy.matthews@morganlewis.com | www.morganlewis.com
Assistant: Angela M. Perry | +1.202.739.5315 |
angela.perry@morganlewis.com

From: bill@wrmccollum.com <bill@wrmccollum.com>
**Sent:** Wednesday, August 15, 2018 10:58 AM
**To:** Frank Haney <frankhaney@flhcompany.com>
**Cc:** Matthews, Timothy P. <timothy.matthews@morganlewis.com>; Burdick,
    Stephen J. <stephen.burdick@morganlewis.com>
**Subject:** RE: NRC Public Meeting 8/14 - Summary

[EXTERNAL EMAIL]
Frank,

Marie is working on the SNC QA program. We can
only use Exelon's if they sign up, which they have
not agreed to yet.

I agree we do need to move forward with the
application ASAP.

My only point to try to answer your question about

Confidential

TVABLN00007575

NRC signing off was to say that once we submit
the transfer request, approval from NRC will take
months, not days or weeks.

I'll let Steven and Tim respond with what they see
as next steps needed prior to submitting
application.

Bill McCollum


-------- Original Message --------
Subject: Re: NRC Public Meeting 8/14 - Summary
From: Frank Haney <frankhaney@flhcompany.com>
Date: Wed, August 15, 2018 10:46 am
To: William McCollum <bill@wrmccollum.com>
Cc: "Matthews, Timothy P."
        <timothy.matthews@morganlewis.com>, "Burdick,
Stephen J." <stephen.burdick@morganlewis.com>

I think the only thin we lack is an Owner QA program.  SNC
        said they would formulate, or we can use TVA's or
        Westinghouse said they could help or maybe exelon
        would help. We just need to decide and move
        forward.  Thoughts?

        Frank
        Sent from my iPad

On Aug 15, 2018, at 10:06 AM, William McCollum
        <bill@wrmccollum.com> wrote:

        Frank,

        The four of us should get together on a call
        and discuss the path forward so that we are
        clear on details.
        The next step is for us to submit a formal
        application for transfer of the CP's from TVA to
        ND. We need to get at least a minimum
        credible QA program in place, and do a few
        other things.
        Once we submit a request to transfer the CP's,
        which we have not done yet, NRC will go
        through a months-long process of review,
        involving many meetings with the staff and
        responding to questions from them, before
        making a decision.
        NRC has been very clear since the first time
        we met with Vic McRee and his staff that this
        review ( and hopefully approval) will not go

Confidential

quickly.
I don't think there is any reason to believe we
won't be successful in getting approval, but it
won't happen without going through the
process, and that will take time.
Tim, Steven, if you disagree based on your
discussions with staff, please correct me. (This
is one case where I would be happy to be
wrong)

Regards,
Bill McCollum

On Aug 14, 2018, at 16:33, Frank Haney
<frankhaney@flhcompany.com> wrote:

Sounds awesome. So when will they
sign off? Next steps?

Frank
Sent from my iPhone

On Aug 14, 2018, at 4:16 PM, Matthews,
Timothy P.
<timothy.matthews@morganlewis.com
> wrote:

PRIVILEGED &
CONFIDENTIAL

Frank,
I wanted to give you this
short report on today's
meeting.  By NRC
standards, I'd call it very
successful.  Bill and I got
through our planned
discussions with no
resistance and few
questions from the NRC.
They emphasized
communication going
forward, primarily to
assure availability of NRC
resources.

NRC had approximately 10
people in the room.  The

Confidential

most senior was Robert Taylor, a Division Director in the Office of New Reactors. (This was typical and appropriate.) Also present were our Branch Chief and Project Manager, as well as staff responsible for QA, financial qualification, construction inspection, OGC and Public Affairs among others.

Also present in the room were representatives from NEI and EXCEL services and Victor Trebules (DOE contractor, but he did not identify that affiliation).

The telephone operator said there were 39 callers. Those included Larry, Stephen, NRC, Jim Chardos, Sharon Harris from the DOE LPO, a couple of anti-nukes from BREDL, and reps from several of your Bellefonte partners (e.g. SNC, Framatome). Media personnel listening in, if any, did not self-identify.

The only public questions came from Gary Morgan (BREDL) directed to NRC focused on independence of the NRC review and "structural integrity" issues associated with the plants. NRC handled both questions very well.

Confidential

The NRC's few questions during the meeting emphasized their desire for long, advance notice on when their licensing and inspection resources would be necessary for BLN.

The meeting lasted just over 35 minutes.

Following the meeting, a few of the NRC staffers stopped to thank us for the visit and offer suggestions related to our treatment of QA, decommissioning funding assurance and several deferred responses to NRC information demands (e.g. Fukushima modifications) that will need to be addressed going forward.

Tim

**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW |
Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main:
+1.202.739.3000 | Fax:
+1.202.739.3001
timothy.matthews@morganlewis.com |
www.morganlewis.com
Assistant: Angela M. Perry |
+1.202.739.5315 |
angela.perry@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.

If you are not an intended recipient, you
may not review,
copy or distribute this message. If you
have received this
communication in error, please notify us
immediately by
e-mail and delete the original message.

CONFIDENTIAL AND PRIVILEGED INFORMATION NOTICE
This email, and any attachments, may contain information that is confidential,
proprietary, privileged, subject to copyright, or exempt from disclosure.
Any unauthorized review, disclosure, reproduction, retransmission,
dissemination or other use of or reliance on this information may be unlawful
and is strictly prohibited.
If you are not the intended recipient of this e-mail, please contact the sender
and delete this email.

TVABLN00007581

Privileged & Confidential
Attorney Client Communications
Attorney Work Product

DRAFT
8/16/2018

## Items Necessary Before Submitting an NRC Application

| Information Need | Responsible | Status |
|---|---|---|
| **I. Identification of the Applicant** | Bill | |
| A.  Full identification of Nuclear Development LLC:  owners/members/voting control/place of incorporation/officers and their citizenship | | |
| B.  Similar full identification of all legal entities (companies/LLCs/ partnerships/ individuals) that own or control ND LLC (disclosure of all affiliates with voting control), continuing up the chain(s) of ownership to controlling individual(s) and their citizenship(s) | | |
| C.  Decide whether to remain with current structure (ND as both owner and operator), or follow EXC's recent suggestion of creating separate ND OpCo to conduct activities on behalf of the owner. Both would be NRC licensees.  (This would be similar to Georgia Power as owner and Southern Nuclear Op Co as the operator; Both are on the license with defined responsibilities.  Financial obligations reside with owner(s). | | |
| **II.  Estimated (Latest) Date for Completion of Construction** | Bill | |
| Suggest we pick a late date rather than an aggressive construction schedule so that the permit life is not at risk without additional regulatory action. | | |
| **III.  Technical Qualifications** | Bill | |
| **A.  Owner Organization –**<br>1.  Deferred Plant Phase -  Fill out at least minimal positions on the ND Org Chart below W. McCollum, Chief Nuclear Officer (CNO). E.g. Provide names and resumes for:<br>a.  **Manager of Quality Assurance** – must meet experience and applicable training requirements. Must be independent of site operations responsibilities | | |

DB1/ 99131517.2

Confidential

Privileged & Confidential
Attorney Client Communications
Attorney Work Product

DRAFT
8/15/2018

| Information Need | Responsible | Status |
|---|---|---|
| b. **Manger Regulatory Affairs/Licensing**– should be someone very familiar with how NRC regulates, nuclear construction, NRC licensing experience, TVA/BLN experience also would be helpful. (This person will need a staff of 3-5 people including admins and licensing engineers before moving to Phase 1 engineering work) | Bill | |
| c. **Plant Manager – Deferred Plant** – Essentially what Chardos is doing now; Chardos would be a good candidate if available | Bill | |
| d. **Director Construction Planning** – I see this as forward looking.  Reporting to Bill, with responsibility for overseeing SNC-Lavalin initial Phase 1 Work. | Bill | |
| e. Also Need to describe **source of additional workers** who will support these managers (e.g., contract with EXC, SNC-L, other, or ND direct hire and train) | Bill | |

DB/ 99131517.2

TVABLN00007582

Confidential

TVABLN00007583

Privileged & Confidential
Attorney Client Communications
Attorney Work Product

DRAFT
8/15/2018

| Information Need | Responsible | Status |
|---|---|---|
| 2. Construction Phase – This must be included in the CP Transfer Application – Our organization must be capable of overseeing all activities including plant testing receipt of fuel on site. This may be more rigorous and different capabilities than initially needed to design and construct. To meet this, our application will need to show on of the following options:<br><br>a. ND's and SNC-L's QA Programs and Management team will be prepared to oversee this broad scope of activities when necessary; (Note: This is our preferred option)<br><br>OR<br><br>b. Show the NRC a contract with EXC (or other Part 50 operator) describing scope of work and experience overseeing Design Engineering, Construction, and Testing;<br><br>OR<br><br>c. Propose a TQ license condition saying ND will provide evidence of such a contract before submitting 120-day letter. (We've drafted a proposed condition, but this is asking NRC to do something they have never done before. It creates schedule risk.)<br><br>We should be able to say we'll provide in future submittals specific names and resumes for the rest of the ND oversight organization covering later phases. | Marie | |
| B.     Quality Assurance Program Description – The licensee (operator if split owner/opco) must have and follow its own QA Program Description. This is a QA Procedure sufficiently detailed to cover all Appendix B requirements during active construction and testing. Multiple templates are available, but which one we intend to follow brings us to a fork in the road. If we plan to bring in EXC as an ops support contractor, we will want to use theirs as the model. Otherwise we will have to change the approval later (possible but an extra step). Plan B would be to model ND's on SNC-Lavalin's. They're working on one now and should be able to show enough for construction, but we'll need one like Exelon's or TVA's later for our Operating License Application. It would be easier to have the full plan in place up front. | Marie | |

3

Confidential

Privileged & Confidential
Attorney Client Communications
Attorney Work Product

DRAFT
8/15/2018

| Information Need | Responsible | Status |
|---|---|---|
| C.    **Qualifications of the Constructor** – This is probably easiest on the list; we'll need to describe SNC-L's relevant experience and organization, identify their leaders (resumes) and describe their QA/Procedures or ours.  (SLN is working on this) | Marie | |
| **IV.  Financial Qualification** | | |
| A.    **Newly Formed Entity Info** - The regs at 50.33(f) require a special purpose entity to provide very **detailed information on sources of funds**, and **contractual relationships with owners or stock holders**.  As that relates to ND, we will have to show where ND is getting the money to pay for deferred plant activities prior to first draw.  If that includes loans from FLH Company or individuals, we'll need to show the loan agreements and plans for repayment.  It could also mean NRC wants to see the lender's sources of income and expenses and any restriction on use of cash streams (e.g. prohibitions on lending to ND).  We'll need to **demonstrate a reliable source of funds in excess (10%) of our anticipated expenses while in deferred plant**.  This may be filed exempt from public disclosure, but may also prompt more intrusive questions from NRC. | Bill<br>Will discuss with Larry Blust, Frank and Franklin | |
| B.    **Project Financing** – We need to demonstrate that we either have, or have reasonable assurance of obtaining financing to cover construction and related fuel cycle costs.  NRC may want to see either the **conditional guarantee or some statement from the LPO that one is forthcoming** in order to file the application.  (It has not demanded this evidence in the past, but ND should anticipate potential challenges to completeness and accuracy of any assurances we provide in this regard.) | Bill:<br>Discuss with Larry Blust | |
| **V. Other**<br>While not formally a part of the application, NRC will want to see our **plan for transition/turnover of responsibilities from TVA**.  They won't want TVA to just walk away. Rather, they will want to see a plan for turnover of function by function from one Company to the next. | Marie | |

4

DB1/ 99131517.2

TVABLN00007584

Confidential

# DEPOSITION EXHIBIT

# 65



**From:** William McCollum <bill@wrmccollum.com>
**Sent:** Tuesday, July 31, 2018 2:50 PM
**To:** Frank Haney
**Cc:** Kray, Marilyn C:(GenCo-Nuc); Fewell, J Bradley B:(GenCo-Nuc); Peterson, Carol R:(GenCo-Nuc); Hanson, Bryan C:(GenCo-Nuc); Kropp, Christine:(GenCo)
**Subject:** [EXTERNAL] Re: [EXTERNAL] RE: [EXTERNAL] RE: FINAL - Release, Press Package, Media Targets

10am Eastern tomorrow works for me.

Bill McCollum

On Jul 31, 2018, at 14:46, Frank Haney <frankhaney@flhcompany.com> wrote:

> Works for me

**From:** Kray, Marilyn C:(GenCo-Nuc) <marilyn.kray@exeloncorp.com>
**Sent:** Tuesday, July 31, 2018 2:42 PM



EXHIBIT

65

ND_004012

**To:** Frank Haney <frankhaney@flhcompany.com>; Fewell, J Bradley B:(GenCo-Nuc)
<Bradley.Fewell@exeloncorp.com>; Peterson, Carol R:(GenCo-Nuc) <carol.peterson@exeloncorp.com>;
Hanson, Bryan C:(GenCo-Nuc) <bryan.hanson@exeloncorp.com>; William McCollum
<bill@wrmccollum.com>; Kropp, Christine:(GenCo) <christine.kropp@exeloncorp.com>
**Subject:** Re: [EXTERNAL] RE: [EXTERNAL] RE: FINAL - Release, Press Package, Media Targets

Wonderful.  Thanks for the speedy reply.  If 9am CT/10am ET works for you and Bill, I'll
ask my assistant to send out a call-in number.

---

**From:** Frank Haney <frankhaney@flhcompany.com>
**Sent:** Tuesday, July 31, 2018 2:33 PM
**To:** Kray, Marilyn C:(GenCo-Nuc); Fewell, J Bradley B:(GenCo-Nuc); Peterson, Carol R:(GenCo-
Nuc); Hanson, Bryan C:(GenCo-Nuc); William McCollum
**Subject:** [EXTERNAL] RE: [EXTERNAL] RE: FINAL - Release, Press Package, Media Targets

I attached bill to the email as well.  You pick a day and time and we can jump on the phone.  Im sure
mostly him but myself as well can hopefully answer any questions you may have. Thanks

Frank

**From:** Kray, Marilyn C:(GenCo-Nuc) <marilyn.kray@exeloncorp.com>
**Sent:** Tuesday, July 31, 2018 2:31 PM
**To:** Frank Haney <frankhaney@flhcompany.com>; Fewell, J Bradley B:(GenCo-Nuc)
<Bradley.Fewell@exeloncorp.com>; Peterson, Carol R:(GenCo-Nuc) <carol.peterson@exeloncorp.com>;
Hanson, Bryan C:(GenCo-Nuc) <bryan.hanson@exeloncorp.com>
**Subject:** Re: [EXTERNAL] RE: FINAL - Release, Press Package, Media Targets

Thanks, Frank.  It was a pleasure meeting Marie, and she did a great job of conveying
our issues to you.  We'd like to take you up on your suggestion to have a call with Bill
McCollum to discuss our proposed ND employee model.  Thanks also for the overall
budget assumptions; however, this has prompted some questions.  Not sure if Bill would
be good to field these as well.

---

**From:** Frank Haney <frankhaney@flhcompany.com>
**Sent:** Tuesday, July 31, 2018 12:00 PM
**To:** Kray, Marilyn C:(GenCo-Nuc); Fewell, J Bradley B:(GenCo-Nuc); Peterson, Carol R:(GenCo-
Nuc); Hanson, Bryan C:(GenCo-Nuc)
**Subject:** [EXTERNAL] RE: FINAL - Release, Press Package, Media Targets

All-

I understand from Marie that yall have two questions:

1) Breakdown of O&M expenses.  Our budget breakdown for the $39/MW PPA price is:

| Breakdown of the $39/MW | Total Yearly Expense | Total In $/MW |
|---|---|---|
| **Annual Debt Service** | | |
| Total | $272,907,720 | $24.47 |
| **Operating Expenses** | | |
| Operation & Maintenance | $80,000,000 | $7.17 |
| Fuel | $45,000,000 | $4.04 |
| Waste | $12,000,000 | $1.08 |
| Decommissioning | $25,000,000 | $2.24 |
| Total | $162,000,000 | $14.53 |
| Total PPA | $434,907,720 | $39.00 |

*Note: Transmission Expenses included in O&M line item.*

I understand this is not a detailed budget but the overall numbers are what Credit Suisse came up with when we went to the rating agencies way back when. The PPA we have structured is important because it as a triple net lease.  Meaning whatever the O&M charge is on any given year, the PPA increases to cover all costs including capital and operating above floor set above.

2) I understand you want ND to employee the Exelon employees and ND needs to set up its ND operating staff.  I admit this is beyond my knowledge.  I suggest we set up a call with us and Bill McCollum to discuss so we can go over what you want in detail.

Let me know if you would like to do this.  Thanks

Frank

**From:** Frank Haney
**Sent:** Friday, July 27, 2018 3:38 PM
**To:** marilyn.krav@exeloncorp.com; Bradley Fewell <Bradley.Fewell@exeloncorp.com>; Carol Peterson
<carol.peterson@exeloncorp.com>; Hanson, Bryan C: <bryan.hanson@exeloncorp.com>
**Subject:** Fwd: FINAL - Release, Press Package, Media Targets

Our press release. Should be a big event.

Sent from my iPhone
Begin forwarded message:

> **From:** "Whitcomb, John" <John.Whitcomb@fticonsulting.com>
> **Date:** July 27, 2018 at 10:18:04 AM EDT
> **To:** Frank Haney <frankhaney@flhcompany.com>, "Gillman, Marie"
> <Marie.Gillman@snclavalin.com>
> **Cc:** "Cramer, Bud" <Bud.Cramer@fticonsulting.com>
> **Subject: FINAL - Release, Press Package, Media Targets**
>
> All,
>
> Attached is the final press release, the press package, and our media targets list. Also,
> below is text of an email we will be sending to our media targets in the next 15 minutes.
> Please let us know ASAP if you have any questions or concerns.
>
> > *[NAME],*
> > *I wanted to invite you to an industry briefing by SNC-Lavalin on its plan to complete*
> > *Bellefonte Nuclear Plant. The briefing will occur on Monday, July 30 at 10:00 AM*
> > *(CDT). The location of the briefing will be the Bellefonte Nuclear Plant in Hollywood,*
> > *Alabama. More details of the briefing are attached. I have also included a press*
> > *package that includes recent press statements and coverage on the recent*
> > *selection of SNC-Lavalin to be the project manager.*
> > *If you would like to attend the briefing, please RSVP to Sheila*
> > *Shepard:shepard@scottsboro.org*
> > *Thank you,*

**Confidentiality Notice:**

This email and any attachments may be confidential and protected by legal privilege. If you are not the intended
recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If
you have received this email in error, please notify us immediately by replying to the sender and then delete this
copy and the reply from your system. Thank you for your cooperation.

This Email message and any attachment may contain information that is proprietary, legally privileged, confidential and/or subject to copyright belonging to Exelon Corporation or its affiliates ("Exelon"). This Email is intended solely for the use of the person(s) to which it is addressed. If you are not an intended recipient, or the employee or agent responsible for delivery of this Email to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this Email is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete this Email and any copies. Exelon policies expressly prohibit employees from making defamatory or offensive statements and infringing any copyright or any other legal right by Email communication. Exelon will not accept any liability in respect of such communications. -EXCIP

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

ND_004016

# DEPOSITION EXHIBIT

# 67

**To:** Chardos, James S[jschardos@tva.gov]; bill@wrmccollum.com[bill@wrmccollum.com];
Franklin Haney, Sr.[flh@flhcompany.com]; Larry Blust[lblust@HSPLEGAL.COM]
**From:** Frank Haney
**Sent:** Fri 4/7/2017 1:30:44 PM

TVA External Message. Please use caution when opening.

Jim and bill

Should we ask tva and southern company to do transition study or a preliminary one to make sure we can wield the power to whatever area we want on existing lines? We want to confirm we can actually sell the power to whomever wants to buy it. Thoughts?

Frank

Sent from my iPhone



EXHIBIT
67

tabbies®

TVABLN00000328

# DEPOSITION EXHIBIT

# 73

Enclosure 2

# William R. ( Bill ) McCollum, Jr.

## Personal Information

Mailing address:    44 Beekeeper Trail      Telephone: (828) 686-1621 (Home)
                      Swannanoa, NC 28778                  (828) 333-2609 (Mobile)
eMail Address:       bill@wrmccollum.com

## Career Summary

Seasoned executive with 44-year track record of delivering results in all phases of the electric utility business. Demonstrated success in building executive teams, developing business strategy and creating alignment with employees and stakeholders to achieve sustainable improved business results.

Experienced in performance turnaround as performance transformation leadership, as well as M&A organizational consolidation. Demonstrated performance in a progression of responsible leadership roles including C-level positions over nuclear operations, fossil operations, transmission and power supply functions.

Strong experience in construction management, project management and controls implementation and project oversight functions.

## Education:

BS in Electrical Engineering, Georgia Tech;
MS in Nuclear Engineering, Georgia Tech;
MBA from UNC-Charlotte.

Training: NRC Senior Reactor Operator's License (Catawba Nuclear Station)
Registered Professional Engineer-NC   #10382
                             SC   #22547



EXHIBIT
73
tabbies

Enclosure 2

# <u>Work Experience:</u>

07/01/2012-Present    **Owner, McCollum Holdings, LLC**
Consultant to firms in the energy industry. Provides executive management consulting on nuclear industry issues, electric energy strategy issues and other energy matters.

05/01/2007-06/30/2012   **Chief Operating Officer, Tennessee Valley Authority**
Responsible for all Generation, Transmission, Construction and River Operations functions, and associated support activities for the nation's largest public power provider. Provide leadership for all operational functions as well as development and construction of new nuclear and conventional generation assets. Led an organization of over 9000 employees, a similar number of contractors, and an operating and routine capital budget of over $9B. Responsible for capital expansion projects with total budgets of over $5B. In addition to nuclear access clearances, held Top Secret clearance.
In this role, led a performance turnaround effort to re-tool the organization and assets, including significant reorganization, leadership change and introduction of a new management model to refocus the organization on operational excellence. Established improved labor relations, moving from an adversarial relationship to a collaborative relationship while gaining better management rights contract terms. Improved employee safety culture, resulting in recordable injury rates in top decile of industry.

10/24/2006-04/01/2007   **Executive Vice-President and Chief Regulated Generation Officer, Duke Energy Corporation**
Responsible for leadership of Regulated Fossil-Hydro Generation, Engineering & Technical Services, Procurement, Regulated Bulk Power Marketing and New Generation Construction (Fossil and Nuclear). Provide Operational leadership to achieve and improve business results of Regulated operations in Carolinas and Midwest regions. As a direct report to the CEO, provide leadership in developing and executing business and regulatory strategy to provide earnings growth through cost reductions, operational excellence and capital management.

4/1/2006-10/24/2006   **Group Vice-President, Regulated Fossil-Hydro Generation**
Responsible for operation of 21,000 MW of Fossil-fuel and Hydroelectric generating assets. Provide leadership for development and execution of growth strategy and planning for environmental compliance while achieving operational excellence.

1/1/2005-4/1/2006   **Vice- President, Strategic Planning and Business Development**
Primary Accomplishment: Led strategic planning efforts for Duke Power Company. Implemented a much more structured and disciplined approach to forward generation and financial planning. Expanded the planning horizon from three to ten years, in order to capture key decision drivers. Led efforts to acquire non-nuclear generation assets to expand the power company generation portfolio.

11/01/2002-12/31/2004 VP, **Nuclear Support** Duke Power Company
Annual O&M Budget: $150 Million
Primary Accomplishment: Managed nuclear support functions, including Nuclear Fuels management, core design and fuels purchasing, Nuclear Supply chain services, Regulatory/ Self-Assessment functions and Engineering/ Scientific Services.

ND_004813

Enclosure 2

12/14/1997-10/31/2002 **Site VP- Oconee Nuclear Station**; Duke Power Company   Annual O&M Budget: $215 Million
Primary Accomplishment: Developed and implemented turnaround strategy to recover profitability while regaining regulatory confidence. Developed and led initiatives to change culture to support competitive success. Put in place a management team which would drive the organization to success. Implemented communications strategies to better engage workforce to support needed changes. Dramatically increased the discipline and structure for management decision-making. Led development of a five-year business and workforce plan to provide longer-term focus, rather than reactive approaches.

08/01/1995-12/14/1997   **Site VP - Catawba Nuclear Station**; Duke Power Company Annual O&M Budget: $160 Million
Primary Accomplishment: Led continuous improvement in business focus and results. Developed communication strategies to engage workforce in organizational improvement.

11/01/1991-08/01/1995 **Station Manager, Catawba Nuclear Station,** Duke Power Company Annual O&M Budget: $ 80 Million
Primary Accomplishment: Led group through re-organization and selected people for key management roles. Improved business results while engaging workforce. Led development of an approach to human performance improvement which became the model for the nuclear function.

01/01/1989-11/01/1991 **Maintenance Superintendent, Catawba Nuclear Station Duke Power Company**

03/01/1987-01/01/1989 **Superintendent of Station Services; Catawba Nuclear Station Duke Power Company**
Primary Accomplishment: Managed Human Resources function during times of first company-wide layoff. Coordinated selection and implementation planning for downsizing. Coordinated station communication planning and Employee Relations plans to ensure effective maintenance of employee engagement.

09/14/1974  03/01/1987 Held various roles in engineering, operations and project management within the Nuclear Generation function of Duke Power Company.

Enclosure 2

**Professional Associations:**

1.) B&W Owners Group Chairman of Executive Committee (2 years)
        Led B&WOG during time of transition and challenges from industry consolidation and
regulatory pressures.

2.) Member, INPO Executive Review Group (5 years)
        Provided advice and consultation to management of INPO during time of significant
changes. Often asked to work on subcommittees to provide assistance in shaping key process
changes.

3.) Member, Nuclear Energy Institute Program and Resources Committee (2 years)
        Developed plans for NEI involvement to improve industry position with regulators and
legislators.

4.) Member, Electric Power Research Institute, Nuclear Power Council
        Led industry efforts to deal with significant materials reliability issues in BWRs and
PWRs, managed oversight of programs to deploy industry resources to address key technical and
regulatory issues.

5.) Board Member, National Academy for Nuclear Training
        Participated in and led Board reviews to determine accreditation of nuclear training
programs for US, Canadian and South African power plants.


**Civic Involvement:**

1.)   Board member, Chattanooga Aquarium:
      Served as a member of the Board of Directors of the Chattanooga Aquarium, one of the
      largest aquarium and educational operations on the US. Helped lead expansion and
      redirection of the aquarium in response to changing economic conditions and competitive
      landscape.
2.)   Board member, Chattanooga Chamber of Commerce:
      The Chattanooga Chamber is a very active and effective force in recruiting new and
      expanded business into the Chattanooga area.
3.)   Board member, Georgia Tech Nuclear and Radiological Health Physics Advisory Board
4.)   Board Chair, Fluoride High Temperature Reactor External Advisory Board. Led an advisory
      Board for a multi-university government funded research project to move the design of an
      advanced Fluoride salt cooled reactor toward commercialization by resolving key technical
      barriers and analytical gaps.

ND_004815

# DEPOSITION EXHIBIT

# 74

**To:**      bill@wrmccollum.com[bill@wrmccollum.com]
**From:**   MIGNOGNA Gary (AREVA)[Gary.Mignogna@areva.com]
**Sent:**    Thur 1/5/2017 2:27:36 PM (UTC)
**Subject:** NRC Meeting

...e you preparing Frank for the NRC meeting?  What is his goal or your goal for the meeting?  From my perspective, there are two topics that need to be covered.  First is the process for transferring of the construction permit and upgrading the status from deferred to full; and second is the allocation of NRC resources to support Bellefonte licensing over the duration of the project.

For attendance, I assume it's you, Frank, and me (also possibly Gary Peters who is our VP Licensing & Regulatory Affairs).  We need to submit the names in advance to gain access, so let me know if I have the attendance wrong.

Thanks,
GMM

**EXHIBIT**

tabbies®

74

ND_001664

# DEPOSITION EXHIBIT

# 75

**To:**      William R McCollum Jr[bill@wrmccollum.com]
**From:**    Shea, Joseph W[jwshea@tva.gov]
**Sent:**    Tue 3/14/2017 3:42:39 PM (UTC)
**Subject:** Re: Bellefonte CP Transfer Path Forward

    Looking forward to it.

Joe

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
   **From:** William R McCollum Jr
   **Sent:** Tuesday, March 14, 2017 11:41 AM
   **To:** Shea, Joseph W
   **Subject:** Re: Bellefonte CP Transfer Path Forward


**TVA External Message. Please use caution when opening.**

Joe,

1:30 it is. I'll meet you at the sign that says "RIC cancelled" .


Bill McCollum

On Mar 14, 2017, at 11:06, Shea, Joseph W <jwshea@tva.gov> wrote:

        Bill,

        Sounds good.  Why don't we meet just inside the exhibit hall and then find an empty conference room.  How about
        1:30?

        Joe

        **From:** William R McCollum Jr [mailto:bill@wrmccollum.com]
        **Sent:** Tuesday, March 14, 2017 11:02 AM
        **To:** Shea, Joseph W
        **Subject:** Re: Bellefonte CP Transfer Path Forward


        **TVA External Message. Please use caution when opening.**

        Joe,

        I agree. I am at the Marriott now. Just let me know what's a good time for you. I'm free to day after lunch if that works.

        Bill McCollum
        On Mar 14, 2017, at 10:23, Shea, Joseph W <jwshea@tva.gov> wrote:

            Bill,

            As we discussed on the phone a month or two back, it may be of value to compare notes on Nuclear
            Development's plans for the CP transfer while in town for the RIC.  Let me know if that is of interest to
            you.

            Thanks
            Joe

            Joseph Shea



EXHIBIT

75

ND_002937

Vice President, Nuclear Licensing
Tennessee Valley Authority
423-751-6887 (o)
423-718-9576 (c)

ND_002938

# DEPOSITION EXHIBIT

# 76

**To:** bill@wrmccollum.com[bill@wrmccollum.com]; Frank Haney (frankhaney@flhcompany.com)[frankhaney@flhcompany.com]; Blust, Larry[lblust@hsplegal.com]
**Cc:** PETERS Gary (AREVA)[Gary.Peters@areva.com]; BRYAN Marty (AREVA)[Martin.Bryan@areva.com]; ELLIOTT Gayle (AREVA)[Gayle.Elliott@areva.com]
**From:** WHITTEN Patrick (AREVA)[Patrick.Whitten@areva.com]
**t:** Fri 1/27/2017 7:10:08 PM (UTC)
** subject:** NRC Commission Meetings

Gentlemen,

From your meeting with the NRC on January 23, a followup meeting with each Commissioner was agreed.  AREVA is confirming to meet on April 24 and we request you to confirm that this date is acceptable for you and to identify who will be attending on behalf of ND.  We are working to confirm meeting times for all the Commissioners in the afternoon.

Regards, Pat

Patrick Whitten, PE
Contracts
Installed Base, AREVA Inc.

434.832.2625 (o)  ~  434.544.1633 (m)  ~  434.382.2625 (fax)
patrick.whitten@areva.com  ~  www.us.areva.com

> **From:** ELLIOTT Gayle (DTI)
> **Sent:** Friday, January 27, 2017 1:33 PM
> **To:** WHITTEN Patrick (IB)
> **Cc:** PETERS Gary (DTI)
> **Subject:** NRC Commission Meetings
>
> Pat,
>
> NRC Commission meetings are being confirmed for April 24th.  This is in response to an action item that developed from the January 23rd meetings with the NRC EDO and Directors.  Meetings with the Commission are needed to discuss the status of the Bellefonte project and the need for resources to support the project.
>
> Please work with ND's Bill McCollum, Frank Haney Sr., and Franklin Haney Jr. to determine their availability for attendance at these meetings.  Currently we are meeting with Commissioner Baran at 2:30 p.m. and Commissioner Burns at 3:00 p.m. I am still working to confirm a time for Chairman Sviniki; she is available but no time has yet been confirmed.
>
> Thank you,
>
> *Gayle Elliott*
> *Deputy Director, Licensing & Regulatory Affairs*
> *AREVA Inc.*
> *3315 Old Forest Road*
> *Lynchburg, Va. 24501*
> *Office:  (434) 832-3347*
> *Cell:  (434) 841-0306*
> *email:  gayle.elliott@areva.com*

EXHIBIT
76

ND_001830

# DEPOSITION EXHIBIT

# 77

**To:**   victor.mccree@nrc.gov[victor.mccree@nrc.gov]; michael.johnson@nrc.gov[michael.johnson@nrc.gov];
bill.dean@nrc.gov[bill.dean@nrc.gov]; vonna.ordaz@nrc.gov[vonna.ordaz@nrc.gov]
**Cc:**   Franklin Haney, Sr.[flh@flhcompany.com]; Frank Haney[frankhaney@flhcompany.com]; Larry
Blust[lblust@HSPLEGAL.COM]
**From:**   bill@wrmccollum.com[bill@wrmccollum.com]
      **:**   Wed 2/1/2017 7:41:39 PM (UTC)
   ,ect:   Bellefonte Nuclear Station
BLN Project Ind Resource Schedule.pdf
Bellefonte Indicative Schedule .pdf

Victor,

I appreciate you and your staff members meeting with us on January 23rd to discuss the Bellefonte Nuclear project, the
purchase of the Bellefonte Nuclear site by Nuclear Development, LLC (ND) and our plans to apply for transfer of the
Construction permits from TVA to ND. Following a successful transfer of the permits from TVA to ND we intend to
proceed with submitting our Operating License application under 10 CFR Part 50 and plan to restart construction activities,
following successful satisfaction of all regulatory requirements.

Per your request, attached are two documents relating to the project schedule and resource plans. The first is a timeline of
major project milestones, the second is a bar graph indicating our plans for ramping up construction resources to complete
units 1 & 2. I hope this provides NRC with the information you need to begin to plan for resources to support the Bellefonte
project. Please let me know if you have any questions on these attachments.

Realizing that in these matters more detail is always welcome, I will send you more detailed timeline and resource
information as soon as it is available. In the meantime, please don't hesitate to reach out to me if there are any questions or
concerns related to the project.

Best Regards,

   McCollum

EXHIBIT

77

ND_001866



ND_001867

**Bellefonte Project Schedule**

| Activity # | Activity Description | Unit 1 Start | Unit 1 Finish | Unit 2 Start | Unit 2 Finish |
|---|---|---|---|---|---|
| | | Project Dates | | | |
| 1 | Transfer Bellefonte to Nuclear Development and begin mobilization | Jul, 2017 | Dec, 2017 | Jul, 2017 | Dec, 2017 |
| 2 | Engineering Fully Mobilized | N/A | Oct, 2017 | N/A | Oct, 2018 |
| 3 | Engineering and Design (Nuclear Steam Supply System) | Aug, 2017 | Mar, 2019 | Jul, 2019 | Nov, 2020 |
| 4 | Engineering and Design (Balance of Plant) | Aug,2017 | Mar,2019 | Sep, 2019 | Mar, 2021 |
| 5 | Licensing: FSAR Chapter Development and Submittals | Aug,2017 | Mar,2019 | Mar,2018 | Jan,2020 |
| 7 | Operator Training | May, 2018 | Dec,2021 | May,2018 | Dec,2021 |
| 8 | Final Safety Analysis Report (FSAR) Revision and Submittal to NRC | Nov, 2018 | Jun, 2019 | Nov, 2018 | Jun, 2019 |
| 8a | Submit Application for Operating License | Jan, 2019 | N/A | Jan, 2019 | N/A |
| 8b | Operating License Review and Approval Process | Jan, 2019 | Sept, 2022 | Jan, 2019 | Sept, 2022 |
| 9 | Licensing: Transfer Construction Permit and Obtain Oper License | Jul, 2017 | Mar, 2024 | Aug, 2017 | Mar, 2025 |
| 10 | Simulator Received and Acceptance Tested Onsite | May, 2020 | Sep, 2020 | N/A | N/A |
| 11 | Active Construction | Jan, 2018 | Jan, 2022 | Jun, 2019 | Jun, 2023 |
| 12 | Component Testing / System Hydro's | Nov, 2020 | Mar, 2022 | Nov, 2021 | Nov, 2023 |
| 13 | Replacement of Steam Generators | Mar, 2020 | Sep, 2020 | Oct, 2020 | May,2021 |
| 14 | System Turnovers to Start-Up Organization | Jun, 2019 | Mar, 2022 | Jun, 2020 | Aug, 2023 |
| 16 | Switchyard Reconstruction | Aug,2020 | Mar, 2022 | Aug,2020 | Mar, 2023 |
| 17 | Turbine/Generator Upgrade and Overhaul | Jul, 2019 | Aug, 2020 | Jul,2020 | Aug, 2021 |
| 18 | Cold Hydro Testing | Mar, 2022 | Apr, 2022 | Sep, 2023 | Oct, 2023 |
| 19 | Hot Functional Testing | Jul,2022 | Aug, 2022 | Jan, 2024 | Feb, 2024 |
| 20 | Pre-Fuel Load Surveillance Testing | Aug, 2022 | Oct, 2022 | Feb, 2024 | Apr, 2024 |
| 21 | Fuel Load | Oct, 2022 | Nov, 2022 | Apr, 2024 | May, 2024 |
| 22 | Perform Post-Fuel Core Flow Testing | Nov, 2022 | Dec, 2022 | May, 2024 | Jun, 2024 |
| 22A | Initial Criticality and Low-Power Physics Testing | Jan, 2023 | Feb, 2023 | Jul, 2024 | Aug, 2024 |
| 23 | Initial Synchronization to the Grid | Feb, 2023 | Feb, 2023 | Aug, 2024 | Aug, 2024 |
| 24 | Power Ascension Testing | Feb, 2023 | May, 2023 | Aug, 2024 | Nov, 2024 |
| 25 | Commercial Operation Declared | N/A | May, 2023 | N/A | Nov, 2024 |

ND_001868

# DEPOSITION EXHIBIT

# 78

**To:**       bill@wrmccollum.com[bill@wrmccollum.com]
**From:**     Akstulewicz, Frank[Frank.Akstulewicz@nrc.gov]
**Sent:**     Mon 2/6/2017 1:39:40 PM (UTC)
**Subject:**  Nuclear Development, LLC efforts for Bellefonte 1 & 2

od Morning,

By way of getting the conversation started, I am Frank Akstulewicz and my position is the Division Director for the Division of New Reactor Licensing.  Subsequent to your recent visit to our Executive Director for Operations (Victor McCree), I was informed that the licensing activities for Bellefonte 1 & 2 will occur out of my Division.  I believe that we could benefit from a phone call to exchange contact information and to learn more about how your project is structured, if all your project organization is settled and ready to interface with NRC, how and when we implement our fee billing procedures, and when might be a good time for a working group meeting so that our project managers and your staff can meet face-to-face to discuss the project timelines.

Frank Akstulewicz
Director, Division of New Reactor Licensing
Office of New Reactors
301-415-1199

EXHIBIT

78

ND_001884

# DEPOSITION EXHIBIT

# 79

**To:**   William R McCollum Jr[bill@wrmccollum.com]
**From:**   Akstulewicz, Frank[Frank.Akstulewicz@nrc.gov]
**Sent:**   Wed 6/7/2017 12:12:53 PM (UTC)
**Subject:**   RE: Re: Bellefonte units 1&2

od Morning Bill

Was wondering if there was time today or tomorrow to get an update on the Bellefonte project. Would like to hear about progress with DOE and funding, progress in developing the license transfer application and schedule, and progress in setting up a licensing and technical organization for the project.

If not this week, then maybe the week of June 19. I'm on travel the week of June 12 – 16

My phone number is 301- 415- 2248 ( direct line)
Or
301 – 415- 1199 ( my admin assistant)

Look forward to our future discussion

Frank

**From:** William R McCollum Jr [mailto:bill@wrmccollum.com]
**Sent:** Thursday, April 20, 2017 3:30 PM
**To:** Akstulewicz, Frank <Frank.Akstulewicz@nrc.gov>
**Subject:** [External_Sender] Re: Bellefonte units 1&2

Yes, My position with Nuclear Development, LLC is Vice-President, Nuclear Operations .

Bill McCollum
On Apr 20, 2017, at 14:16, Akstulewicz, Frank <Frank.Akstulewicz@nrc.gov> wrote:

> So are you now contractually connected to Nuclear Development as the licensing organization?
>
> **From:** bill@wrmccollum.com [mailto:bill@wrmccollum.com]
> **Sent:** Thursday, April 20, 2017 1:14 PM
> **To:** Akstulewicz, Frank <Frank.Akstulewicz@nrc.gov>
> **Subject:** [External_Sender] RE: Re: Bellefonte units 1&2
>
> Frank,
>
> We could do a call tomorrow between 10:00am to 11:00 am Eastern, or between 1:30pm-4:30pm Eastern. Please let me know if there is a time that will work for you.
> Because of travel commitments, Frank asked that I take the lead on the call, he will join if he is available. Just let me know what works best for you guys.
>
> Thanks,
>
> Bill McCollum
>
>
> -------- Original Message --------
> Subject: RE: Re: Bellefonte units 1&2
> From: "Akstulewicz, Frank" <Frank.Akstulewicz@nrc.gov>
> Date: Tue, April 18, 2017 1:24 pm
> To: Frank Haney <frankhaney@flhcompany.com>
> Cc: "bill@wrmccollum.com" <bill@wrmccollum.com>, "MIGNOGNA Gary (AREVA)" <Gary.Mignogna@areva.com>, "PETERS Gary (AREVA)" <Gary.Peters@areva.com>



EXHIBIT
79

Hello Mr. Haney

ND_003287

Vonna Ordaz, current Acting Office Director in the Office of New Reactors, would like to set up a phone call with the Nuclear Development, LLC folks related to activities ongoing with respect to license transfer and future construction and licensing.

She was wondering if we could have the call before the end of this week.  Please let me know what times work for you and we will try to pick a time that works for both of us.

Thanks.

Frank Akstulewicz
Director, Division of New Reactor Licensing
Office of New Reactors
301-415-1199


**From:** Frank Haney [mailto:frankhaney@flhcompany.com]
**Sent:** Friday, February 10, 2017 3:58 PM
**To:** PETERS Gary (AREVA) <Gary.Peters@areva.com>
**Cc:** bill@wrmccollum.com; MIGNOGNA Gary (AREVA) <Gary.Mignogna@areva.com>; Akstulewicz, Frank <Frank.Akstulewicz@nrc.gov>
**Subject:** [External_Sender] Re: Bellefonte Completion Schedule

We sent same schedule we submitted to doe.

Frank

Sent from my iPhone
On Feb 10, 2017, at 3:20 PM, PETERS Gary (AREVA) <Gary.Peters@areva.com> wrote:

> Bill  – can you please contact  Frank Akstulewicz (NRC, Director New Reactor Licensing) at 301-415-2248.  He is meeting with other NRC Directors next week to discuss how they are going to support the schedule you recently sent them.  I have not seen the schedule you sent to the NRC, so I was unable to answer Frank's questions.  They also want to understand the best points of contact for all the major action items.
> Thanks
> Gary
> Director, Licensing and Regulatory Affairs
> 434 832-3945

# DEPOSITION EXHIBIT

# 80

**To:**       Bill McCollum (bill@wrmccollum.com)[bill@wrmccollum.com]
**Cc:**       Dixon-Herrity, Jennifer[Jennifer.Dixon-Herrity@nrc.gov]
**From:**     Gleaves, Bill[Bill.Gleaves@nrc.gov]
**Sent:**     Thur 9/14/2017 3:19:32 PM (UTC)
**Subject:**  Request for Business Plan for Bellefonte Units 1 &2
'fonte Business Email.pdf

Mr. McCollum,

We are at the point where we are focusing on the future of the work in the New Reactor Business Line in preparation for the start of the budget cycle for upcoming fiscal years and putting together business model discussions for each project. I've attached the Business Model you have sent previously. Please mark it up to reflect your plans going forward to ensure that NRC budgets appropriately to best support your plans.

We would then appreciate a meeting (either in-person or by conference call) to discuss and finalize our budget cycle plan. The goal is to hold that meeting before the end of September so that the document is available for agency budget discussions in October. I'm including a generic list of questions that we've sent out to applicants/licensees that we looking forward to being addressed in the plan. This is a process that we do annually for all applicants. We look forward to meeting with you.

For your convenience, I'd like to let you know that we have the following opportunities open to discuss the subject:
9.21.17, Thursday 1-2pm
9.26.17, Tuesday, 8:30-9:30am
9.28.17, Thursday, 8:30-9:30am
Other times are available.

Do note that these discussions and the resulting business plan write up will be treated as proprietary or sensitive internal information.

Please let me know if you have questions. To reach me you may use my office phone at 301-415-5848 but know that I'm ^t good at retrieving messages. I prefer message by email and communications by calling or texting my cell at 443-756-19.

Sincerely,

Billy
William (Billy) Gleaves
**Lead Project Manager for**
 V.C. Summer Units 2 and 3
**Licensing Branch 4**
**Office OWFN 8H17**
**US NRC, Office of New Reactors**
The contents of this message may be sensitive. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Do not disseminate this message without the permission of the author. Communications by this author are not binding on The Commission.



CONFIDENTIAL

ND_003466

Bauer, Laurel

**Subject:**              FW: Bellefonte Nuclear Station
**Attachments:**     BLN Project Ind Resource Schedule.pdf; Bellefonte Indicative Schedule .pdf

**From:** "bill@wrmccollum.com" <bill@wrmccollum.com>
**Subject:** [External_Sender] Bellefonte Nuclear Station
**Date:** 01 February 2017 14:41
**To:** "McCree, Victor" <Victor.McCree@nrc.gov>, "Johnson, Michael" <Michael.Johnson@nrc.gov>, "Dean,
Bill" <Bill.Dean@nrc.gov>, "Ordaz, Vonna" <Vonna.Ordaz@nrc.gov>
**Cc:** "Haney Franklin" <fh@fhcompany.com>, "Frank Haney" <frankhaney@fhcompany.com>, "Larry Blust"
<lblust@HSPLEGAL.COM>
Victor,

I appreciate you and your staff members meeting with us on January 23rd to discuss the Bellefonte Nuclear
project, the purchase of the Bellefonte Nuclear site by Nuclear Development, LLC (ND) and our plans to apply
for transfer of the Construction permits from TVA to ND. Following a successful transfer of the permits from
TVA to ND we intend to proceed with submitting our Operating License application under 10 CFR Part 50 and
plan to restart construction activities, following successful satisfaction of all regulatory requirements.

Per your request, attached are two documents relating to the project schedule and resource plans. The first is a
timeline of major project milestones, the second is a bar graph indicating our plans for ramping up construction
resources to complete units 1 & 2. I hope this provides NRC with the information you need to begin to plan for
resources to support the Bellefonte project. Please let me know if you have any questions on these attachments.

Realizing that in these matters more detail is always welcome, I will send you more detailed timeline and
resource information as soon as it is available. In the meantime, please don't hesitate to reach out to me if there
are any questions or concerns related to the project.

Best Regards,

Bill McCollum

1

CONFIDENTIAL

**Bellefonte Project Schedule**

| | | Project Dates | | | |
|---|---|---|---|---|---|
| | | Unit 1 | | Unit 2 | |
| Activity # | Key Activities / Activity Description | Start | Finish | Start | Finish |
| 1 | Transfer Bellefonte to Nuclear Development and begin mobilization | Jul. 2017 | Dec. 2017 | Jul. 2017 | Dec. 2017 |
| 2 | Engineering Fully Mobilized | N/A | Oct. 2017 | N/A | Oct. 2018 |
| 3 | Engineering and Design (Nuclear Steam Supply System) | Aug. 2017 | Mar. 2019 | Jul. 2019 | Nov. 2020 |
| 4 | Engineering and Design (Balance of Plant) | Aug. 2017 | Mar. 2019 | Sep. 2019 | Mar. 2021 |
| 5 | Licensing: FSAR Chapter Development and Submittals | Aug. 2017 | Mar. 2019 | Mar. 2018 | Jun. 2020 |
| 7 | Operator Training | May. 2018 | Dec. 2021 | May. 2018 | Dec. 2021 |
| 8 | Final Safety Analysis Report (FSAR) Revision and Submittal to NRC | Nov. 2018 | Jun. 2019 | Nov. 2018 | Jun. 2019 |
| 8a | Submit Application for Operating License | Jan. 2019 | N/A | Jan. 2019 | N/A |
| 8b | Operating License Review and Approval Process | Jan. 2019 | Sept. 2022 | Jan. 2019 | Sept. 2022 |
| 9 | Licensing: Transfer Construction Permit and Obtain Oper License | Jul. 2017 | Mar. 2024 | Aug. 2017 | Mar. 2025 |
| 10 | Simulator Received and Acceptance Tested Onsite | May. 2020 | Sep. 2020 | N/A | N/A |
| 11 | Active Construction | Jan. 2018 | Jan. 2022 | Jun. 2019 | Jun. 2023 |
| 12 | Component Testing / System Hydro's | Nov. 2020 | Mar. 2022 | Nov. 2021 | Nov. 2023 |
| 13 | Replacement of Steam Generators | Mar. 2020 | Sep. 2020 | Oct. 2020 | May. 2021 |
| 14 | System Turnovers to Start-Up Organization | Jun. 2019 | Mar. 2022 | Jun. 2020 | Aug. 2023 |
| 16 | Switchyard Reconstruction | Aug. 2020 | Mar. 2022 | Aug. 2020 | Mar. 2023 |
| 17 | Turbine/Generator Upgrade and Overhaul | Jul. 2019 | Aug. 2020 | Jul. 2020 | Aug. 2021 |
| 18 | Cold Hydro Testing | Mar. 2022 | Apr. 2022 | Sep. 2023 | Oct. 2023 |
| 19 | Hot Functional Testing | Jul. 2022 | Aug. 2022 | Jan. 2024 | Feb. 2024 |
| 20 | Pre-Fuel Load Surveillance Testing | Aug. 2022 | Oct. 2022 | Feb. 2024 | Apr. 2024 |
| 21 | Fuel Load | Oct. 2022 | Nov. 2022 | Apr. 2024 | May. 2024 |
| 22 | Perform Post-Fuel Core Flow Testing | Nov. 2022 | Dec. 2022 | May. 2024 | Jun. 2024 |
| 22A | Initial Criticality and Low-Power Physics Testing | Jan. 2023 | Feb. 2023 | Jul. 2024 | Aug. 2024 |
| 23 | Initial Synchronization to the Grid | Feb. 2023 | Feb. 2023 | Aug. 2024 | Aug. 2024 |
| 24 | Power Ascension Testing | Feb. 2023 | May. 2023 | Aug. 2024 | Nov. 2024 |
| 25 | Commercial Operation Declared | N/A | May. 2023 | N/A | Nov. 2024 |

CONFIDENTIAL

ND_003468

Bellefonte Nuclear Project- Indicative Resource Schedule: Units 1 & 2 Total



CONFIDENTIAL

ND_003469

# DEPOSITION EXHIBIT

# 81

| | |
|---|---|
| **To:** | Bill McCollum (bill@wrmccollum.com)[bill@wrmccollum.com] |
| **Cc:** | Dixon-Herrity, Jennifer[Jennifer.Dixon-Herrity@nrc.gov] |
| **From:** | Gleaves, Bill[Bill.Gleaves@nrc.gov] |
| **Sent:** | Tue 9/19/2017 12:35:30 PM (UTC) |
| **Subject:** | NRC Guidance on License Transfers |

107 R2 License Transfers.pdf

Mr. McCollum

Attached to this email (and also found in NRCs ADAMS document system at ML17031A006) is the NRCs Office Instruction on "Procedures for Handling License Transfers."   The Office Instruction lays out the NRC policy on the issue, as well as gives insight as to how the staff will process a license transfer request.  As this is not a "Standard Review Plan" it doesn't delineate precisely the requirements for a license transfer application.

Sincerely,

Billy

P.S. – I hope that you have received my other previous emails in earlier weeks.

William (Billy) Gleaves
Senior Project Manager
Licensing Branch 4
Office OWFN 8H17
US NRC, Office of New Reactors

The contents of this message may be sensitive.  If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Do not disseminate this message without the permission of the author. Communications by this author are not binding on The Commission.



ND_003474



# U.S. Nuclear Regulatory Commission
# Office of Nuclear Reactor Regulation

# *NRR OFFICE INSTRUCTION*

# Change Notice

| | |
|---|---|
| Office Instruction No.: | **LIC-107, Revision 2** |
| Office Instruction Title: | **Procedures for Handling License Transfers** |
| Effective Date: | **June 5, 2017** |
| Approved By: | **Michele G. Evans** |
| Date Approved: | **May 30, 2017** |
| Primary Contact: | **Tanya E. Hood**          **Richard V. Guzman**<br>**301-415-1387**          **301-415-1030**<br>**Tanya.Hood@nrc.gov**    **Richard.Guzman@nrc.gov** |
| Responsible Organization: | **NRR/DORL** |

**Summary of Changes:**  This issuance of LIC-107, Revision 2, "Procedures for Handling License Transfers," reflects the elimination of the Office of Federal and State Materials and Environmental Management Programs (FSME); additional responsibilities for the Office of Nuclear Material Safety and Safeguards (NMSS); additional guidance on indemnity agreements; additional guidance for the licensing assistants to ensure that conforming amendments are updated in the ADAMS authority file and that any organizational name changes are reflected in the plant's boilerplates, associated NRC Web pages and plant rosters; organizational changes; the availability of updated boilerplates in ADAMS; and miscellaneous editorial changes and clarifications.

| | |
|---|---|
| Training: | None |
| ADAMS Accession No.: | **ML17031A006** |

ND_003475

Office Instruction:  LIC-107, Revision 2, "Procedures for Handling License Transfers"
Dated:

**ADAMS Accession No. ML17031A006**

| OFFICE | NRR/LPL1/PM | NRR/LSPB/LA | NRR/PFPB/BC | NRR/APHB/BC | NMSS/RDB/BC |
|--------|-------------|-------------|-------------|-------------|-------------|
| NAME | DPickett | JBurkhardt | ABowers | SWeerakkody | BWatson |
| DATE | 03 / 07 /2017 | 02 / 10 / 2017 | 03 / 16 /2017 | 03 / 13 /2017 | 03 / 15 /2017 |
| OFFICE | NMSS/DUWP/D | NRR/LPL1/BC | NRR/DRA/D | NRR/DIRS/D | OGC |
| NAME | JTappert | JDanna | JGiitter | CMiller | BMizuno |
| DATE | 04 / 06 /2017 | 03 / 22 /2017 | 03 / 13 /2017 | 03 / 31 /2017 | 04 / 14 /2017 |
| OFFICE | NRR/DORL/DD | NRR/PMDA/D | NRR/DD | | |
| NAME | EBenner | SAbraham | MEvans | | |
| DATE | 03 / 28 /2017 | 05/12 /2017 | 05/30/2017 | | |

**OFFICIAL AGENCY RECORD**

**NRR OFFICE INSTRUCTION**
**LIC-107, Revision 2**
**Procedures for Handling License Transfers**

1.   **POLICY**

The provisions of Section 184 of the Atomic Energy Act of 1954, as amended, and the Nuclear Regulatory Commission's (NRC's) regulations at Title 10 of the *Code of Federal Regulations* (10 CFR) 50.80, "Transfer of licenses," stipulate that NRC approval is required for transfer of control of the ownership and/or operating authority responsibilities within the facility operating license. Specifically, 10 CFR 50.80(a) states, in part, that "No license for a production or utilization facility..., shall be transferred, assigned, or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of the license to any person, unless the Commission gives its consent in writing."

An application for transfer of a license is required by 10 CFR 50.80(b) to include as much of the technical and financial qualifications information described in 10 CFR 50.33 and 50.34 on the proposed transferee as would be required for an initial license. After appropriate notice to interested persons (e.g., members of the public), an application for the transfer of a license will be approved, if the Commission determines that: (1) the proposed transferee is qualified to be the holder of the license; and (2) the transfer of the license is otherwise consistent with applicable provisions of law, regulations, and orders issued by the Commission pursuant thereto. For indirect license transfers that do not involve a change to the licensee, the relevant question with respect to qualifications is whether the indirect transfer of control of the license would affect the qualifications of the existing licensee to continue to hold the license. An approval of the transfer of the license will be accomplished through an order authorizing the transfer and, as necessary, a conforming license amendment will be approved by the order and will be issued when the transfer is consummated.

Other Federal (e.g., Federal Energy Regulatory Commission, Federal Trade Commission, and Department of Justice) and State (e.g., Public Service Commissions) approvals may be required before the proposed transfer can be consummated. These organizations have jurisdiction over issues such as antitrust, rates, and public benefit. The NRC reviews and authorizes, if found acceptable, the proposed transfer within the NRC's jurisdiction. However, the transfer cannot be consummated until the applicant(s) has received regulatory approvals from all governmental agencies with jurisdiction over the transfer.

2.   **OBJECTIVES**

This office instruction describes the processing by the Office of Nuclear Reactor Regulation (NRR) of license transfer applications, including orders and associated conforming amendments. This office instruction also specifies the responsibilities of the NRR licensing project manager (PM) and the technical and financial qualifications reviewers, as well as the interfaces with other offices (e.g., Offices of the General Counsel (OGC) and Nuclear Material Safety and Safeguards (NMSS)) in processing

Case 5:18-cv-01983-LCB   Document 84-8   Filed 10/06/20   Page 207 of 231

these licensing actions.  This instruction applies to power reactors and research and test reactors.

3.    **BACKGROUND**

License transfer requests can include either "direct" transfers, which are generally those that involve the transfer of ownership or operating authority of the plant itself from one entity to another (e.g., the sale of a plant), or "indirect" transfers, which are generally those that involve the transfer of ownership or control of the licensee itself rather than the facility (e.g., the formation of a new parent holding company above a licensee). License transfer requests can also include partial direct or partial indirect transfers (e.g., the sale of a percentage of a plant or a percentage of a licensee).

The transfer of a license, direct or indirect, normally does not result in any physical changes to the plant or any changes in the conduct of operations.  Thus, license transfers do not involve the type of technical issues that would impact plant operation. Typically, the on-site organization and plant staff, including senior managers, will remain essentially unchanged by the license transfer, and plant procedures and policies will not change.  Further, the NRC's regulations and the licensee's compliance responsibilities will not change as a result of a license transfer.  Therefore, the safety and health of the public is not expected to be adversely affected by the license transfer.

The majority of the staff review of license transfer applications consists of determining whether the ultimately licensed entity meets the financial qualifications, decommissioning funding, foreign ownership, control, or domination, insurance and indemnity, and technical qualifications requirements in the NRC's regulations.  The NRC has determined that requests for hearings on applications for license transfers should be governed by a separate subpart of the regulations (Subpart M of 10 CFR Part 2) that provides an efficient and streamlined process for handling hearing requests associated with license transfer applications.  The guidance in this office instruction applies to all license transfers conducted under 10 CFR 50.80.

4.    **BASIC REQUIREMENTS**

License transfers are unique in that they result in the exchange of ownership and/or the responsibility for operating a nuclear facility.  Typically, the exchange is orchestrated by a team of lawyers representing both the current and future owners and is financially supported by complex agreements that are planned and scheduled for months in advance.  It is critical that the PM be aware of the planned transaction date of the license transfer and that the staff's review be supportive of the proposed schedule.  Significant financial penalties can be incurred on all parties involved if the staff's review does not support the planned transaction date.

The legal staff of OGC will be involved throughout the processing of the application. Frequent communications between OGC and the legal staffs of the current and/or future owners will occur.  Once the application is submitted, the PM should immediately confer with the assigned attorney from OGC to confirm the licensee's characterization of the proposed transaction as being direct versus indirect.

Processing of applications for license transfers is, in many respects, similar to the processing of other licensing actions. Submittals are made to the NRC under oath and affirmation by applicants (current and proposed licensees). If the application is not being made by the current licensee, the applicant should clearly state that the application is being made on behalf of the current licensee, unless there is a hostile acquisition involved, which would be extremely rare and in which case the NRC must give appropriate notice to the current licensee. Staff evaluations are then conducted, and a safety evaluation (SE) is prepared that will accompany the order. In direct transfers, a license amendment will normally be issued upon consummation of the transfer to conform the facility operating license and technical specifications to reflect the new owner and/or operator. The thorough involvement of OGC during the processing of the application from the initial individual *Federal Register* (*FR*) notice to the final order is essential.

5.   **RESPONSIBILITIES AND AUTHORITIES**

Office of General Counsel

The Operating Reactors Division of OGC provides legal advice regarding operating reactors and represents the NRC's staff position in administrative proceedings concerning applications for license amendments. Legal services include, in part, reviewing applications for license transfers, providing advice to the Office of Commission Appellate Adjudication staff regarding license transfer adjudicatory proceedings when the staff is not a party to these proceedings, representing the staff when it is a party to license transfer adjudicatory proceedings, advising the staff on implementation of the Price-Anderson Act, being the point of contact between the NRC and counsel representing licensees and prospective licensees in license transfer applications, and advising the staff throughout the entire license transfer process. Legal services in support of license transfers includes reviewing the initial *FR* notice, reviewing requests for additional information, and reviewing the proposed order, safety evaluation, and conforming amendments.

Director, NRR

Consistent with the delegation of signature authority in NRR Office Instruction ADM-200, "Delegation of Signature Authority," the Director of NRR signs all orders authorizing the direct transfer of operating licenses and approving the associated conforming amendments for both power reactors and research and test reactors. Although the conforming amendment(s) is not signed and issued until the actual transfer of the ownership of the plant and/or operating authority is consummated, the conforming amendment(s) is approved by the order.

Director, NMSS

If the facility is in SAFSTOR or has been transferred to NMSS in accordance with NRR Office Instruction COM-101, "NRR Interfaces with NMSS," and a "Transfer of Project Management Responsibilities" memorandum has been signed, NMSS prepares the

order and the Director of NMSS, or designee, signs the order for both direct and indirect license transfers. The Director of NMSS, or designee, also signs the order for any transfer of an independent spent fuel storage installation (ISFSI) that has a specific license as opposed to authorization under the general license provisions of Subpart K to 10 CFR Part 72, "General License for Storage of Spent Fuel at Power Reactor Sites." Finally, the Director of NMSS, or designee, signs the amended ISFSI license if a specific license is involved.

NRR Divisions

The NRR focal points for initial assessment of license transfer requests are the Division of Operating Reactor Licensing (DORL) and the Division of Licensing Projects (DLP). Staff within DORL is responsible for overall management of the review for power reactors whereas DLP is responsible for overall management of the review for research and test reactors.

Director of DORL

Consistent with the delegation of signature authority in ADM-200, the Director of DORL signs all orders approving indirect license transfers for power reactors. In the unusual situation where license amendments are involved with an indirect transfer, the Director of DORL will sign them when issued.

DORL Project Manager

Project manager responsibilities are similar to those for other licensing actions. In addition to the process presented in this office instruction, PMs can find general and other supporting guidance in NRR Office Instruction LIC-101, "License Amendment Review Procedures."

Unlike other licensing actions where OGC does its review and provides "no legal objection" at the conclusion of the review, OGC should be involved from the beginning of the review for license transfers.

The PM will need to be cognizant whether an ISFSI has a specific license or is authorized under the general license provisions of Subpart K to 10 CFR Part 72. Whether an ISFSI is authorized under a specific license or a general license can be readily determined by referring to the appendix to NUREG-1350, "Information Digest," entitled, "Dry Cask Spent Fuel Storage Licensees." Review and approval by NMSS is not required for the transfer of an ISFSI authorized under a general license. However, as discussed further in this office instruction, NMSS approval is required when dealing with an ISFSI authorized under a specific license. The PM will need to coordinate as appropriate with the NMSS counterpart.

### DORL Licensing Assistant

Licensing assistant responsibilities are similar to those for other licensing actions. In addition to the process presented in this office instruction, licensing assistants can find general and other supporting guidance in Office Instruction LIC-101.

### Division of Licensing Projects

The Director of the Division of Licensing Projects is responsible for financial reviews including decommissioning funding, foreign ownership, control, or domination, insurance and indemnity, reviews of amendments to antitrust license conditions, and for all licensing and oversight for research and test reactors. The Director also signs all orders approving indirect license transfers for research and test reactor licenses, as well as associated license amendments.

### Research and Test Reactors Licensing Branch

The Research and Test Reactors Licensing Branch is responsible for overall management of license transfer reviews for research and test reactors. Project management responsibilities for these transfers are similar to those for power reactor license transfers

### Financial Projects Branch

The Branch Chief of the Financial Projects Branch (PFPB) is responsible for assigning the review resources and complying with the agreed upon schedule for completion of the financial qualification evaluation as reflected in the NRR Reactor Program System - Licensing/Workload Management (RPS - Licensing/WM) software. The Branch Chief determines whether the target dates and estimate of staff hours required for the review are reasonable. If not, the Branch Chief negotiates new figures with the DORL staff and assigns a PFPB financial analyst to perform the review.

### Financial Analyst

The financial analyst will review the financial qualifications, including decommissioning funding, foreign ownership, control, or domination, and insurance and indemnity of the new licensee if a direct transfer is involved or the effect on the current licensee if an indirect transfer is involved, and provide SE input. The financial analyst will work closely with the assigned OGC attorney during the review.

### Division of Risk Assessment

The Director of the Division of Risk Assessment is responsible, in part, for providing technical expertise in evaluating licensee technical qualifications.

Operations and Human Factors Branch

The Branch Chief of the Operations and Human Factors Branch is responsible for assigning the review resources and complying with the agreed upon schedule for completion of the technical qualifications evaluation as defined in the RPS - Licensing/WM software.  The Branch Chief determines whether the target dates and estimate of staff hours required for the review are reasonable.  If not, the Branch Chief negotiates new figures with the DORL staff and assigns a technical qualifications reviewer to perform the review.

Technical Qualifications Reviewer

The technical qualifications reviewer from the Operations and Human Factors Branch will provide an SE input in those transfer cases where the responsibility for the operating authority, plant staffing, technical qualifications, or organizational structure is changed by the transfer.

Other Technical Review Organizations

Branches within the Office of Nuclear Security and Incident Response (NSIR) may provide input on special emergency preparedness or security issues, while NMSS may address spent fuel issues that might be affected by the proposed license transfer.  Inputs should be provided to the PM in accordance with the schedule agreed upon in the RPS - Licensing/WM software, so as not to delay issuance of the transfer order.

6.    **ACTIVITIES IN PROCESSING LICENSE TRANSFER APPLICATIONS**

> **Note:  Because the license transfer process is a complex matter governed by many regulations, a companion checklist has been prepared to assist PMs with identifying and addressing all details appropriately.  The checklist is included as Enclosure 2 to this office instruction.  Project Managers are urged to use the checklist in combination with this office instruction.**

The governing parts of the regulations are 10 CFR Part 2, Subpart M (e.g., 2.1301, 2.1315, and 2.1316), 10 CFR Sections 50.33, 50.34, 50.38, 50.40, 50.54(w), 50.80, 50.90 (if an amendment request is involved) and 10 CFR Parts 51 and 140.

Section III.1.e of NUREG-1577, "Standard Review Plan on Power Reactor Licensee Financial Qualifications and Decommissioning Funding Assurance," describes the types of transfers that are subject to a 10 CFR 50.80 review.  Examples include those involving ownership changes, mergers, formation of holding companies, creation of new unregulated entities which are either subsidiaries of a holding company or stand-alone entities, and other restructuring proposals that go beyond corporate name changes or simple internal reorganizations of functions.  If the entity that will become the operating authority (i.e., the operator) is different from the entity that will have ownership of the facility, the financial qualifications for both entities need to be assessed.  In this regard, the Commission has stated that, while the same type of financial review done for an

Case 5:18-cv-01983-LCB   Document 84-8   Filed 10/06/20   Page 212 of 231

owner is not applicable, there still has to be a financial review for the operator. The operator review is a combination of the financial qualifications of the owner (assuming it is ultimately responsible for costs) with the analysis of the contract between the owner and the operator regarding the payment of costs. The Commission's ruling requiring an appropriate financial qualifications review of a non-owner operator is in the Northern States Power Company/Monticello case, CLI-00-14, 52 NRC 37 (2000), and the companion case, CLI-00-19, 52 NRC 135 (2000).

The NRC consents to license transfers via an order. The order is accompanied by a supporting SE which, in turn, typically has a proprietary and a non-proprietary version due to the discussion of proprietary financial information as part of the financial qualifications analysis. The DORL or DLP administrative staffs and licensing assistants must ensure that the proprietary version of the SE is not dispatched to organizations that have not entered into a non-disclosure agreement with the owner of the information. For indirect license transfers, issuance of the order and SE generally concludes the staff's actions. Direct license transfers typically occur in two separate actions. The first action includes issuance of the order and SE with an unsigned, unnumbered, and undated conforming amendment. The second action includes issuance of the signed, numbered, and dated conforming amendment. As a condition of the license transfer order, the licensee/applicant will inform the staff when all approvals are in place and that the transfer will occur on a specific date. When the specified date arrives and upon notification by the applicant that the transfer will be consummated, the staff will sign and issue the conforming amendment. As its name implies, the conforming amendment does no more than conform the license to reflect the transfer action and is administrative in nature. Typically, a conforming amendment will change the name of the licensee throughout the license so that the license accurately reflects the approved license transfer.

An example of an indirect license transfer is the transfer of the ultimate ownership of the Susquehanna renewed facility operating licenses and general ISFSI license, which is available in Agencywide Documents Access and Management System (ADAMS) under Accession No. ML16320A084. An example of a direct license transfer is the transfer from Entergy to Exelon of the FitzPatrick renewed facility operating license and general ISFSI license. The FitzPatrick order consenting to the license transfer, the supporting SE, and the unsigned, undated, and unnumbered conforming amendment are available in ADAMS under Accession No. ML17041A196. The signed, dated, and numbered conforming amendment for FitzPatrick is available in ADAMS under Accession No. ML17082A283. An example of an amendment to an indemnity agreement is available in ADAMS under Accession No. ML15161A121.

Upon receipt of an application for either a direct or indirect license transfer, the PM, in conjunction with the applicable technical review groups, perform the acceptance review in accordance with NRR Office Instruction LIC-109, "Acceptance Review Procedures," to ensure that the application contains sufficient information as required by 10 CFR 50.80 for the staff to conduct its review. The PM will determine whether the applicant has provided the basis for its schedule request and whether the schedule request is reasonable. If not, the PM and the assigned OGC attorney should contact the applicant and negotiate an appropriate time period for the staff to complete its evaluation. The PM

Case 5:18-cv-01983-LCB   Document 84-8   Filed 10/06/20   Page 213 of 231

will need to obtain a specific licensee point of contact and the licensee's schedule for completion of all regulatory reviews in order to coordinate the NRC review schedule. Although license transfer requests are typically filed by licensees, requests may also be filed by a non-licensee (e.g., the intended buyer of the plant), or a co-licensee that is not the operator of the plant (see the Wolf Creek license transfer as an example of two non-operator co-licensees requesting a license transfer despite the opposition of the third non-operator co-licensee, available in ADAMS under Accession No. ML17037D120). In all cases, the NRC products are an order and supporting SE. However, products may include a conforming license amendment and an amendment to the licensee's indemnity agreement. Project managers need to determine which of these products the application supports. License transfer applications can also vary considerably. Occasionally, the staff may not agree with a licensee's determination about the characterization of the request as indirect versus direct. Should the technical and/or legal review staffs determine that an application is incorrectly characterized or does not contain sufficient information to begin the review, the PM will follow the guidance of LIC-109 and work with the assigned OGC attorney.

If the request is for a direct transfer (i.e., one that involves a new licensee and thus requires a conforming change in the name of the owner(s) or operators stated in the license), there should be an accompanying license amendment request pursuant to 10 CFR 50.90. If not, the PM should check with OGC to determine if an amendment is required. The license amendment that conforms the operating license to the new licensees, is referred to as a conforming amendment. Normally, a license amendment is not required for an indirect transfer. However, there are exceptions, particularly if the matter involves an organizationally complex indirect transfer.

The PM may need to coordinate the license transfer review with NMSS. NMSS has responsibility for (1) facilities that are in SAFSTOR, (2) facilities that have been transferred to NMSS in accordance with NRR Office Instruction COM-101, "NRR Interfaces with NMSS," and a "Transfer of Project Management Responsibilities" memorandum has been signed, and (3) ISFSIs that received a specific license. NMSS review and approval is not required for an ISFSI authorized under the general license provisions of Subpart K to 10 CFR Part 72. License transfer reviews may include a permanently shut down facility and almost all license transfer reviews include an ISFSI. The NMSS Office Director, or designee, will need to approve and sign any orders associated with facilities under the responsibility of NMSS. When a license transfer falls under the responsibilities of both NMSS and NRR, the DORL PM typically takes the lead and prepares the SE, order, and conforming amendment. If required, NMSS will prepare the amended license for the ISFSI. The NMSS Office Director, or designee, co-signs the order consenting to the license transfer, signs the applicable conforming amendment(s) and the amended license for the ISFSI if the ISFSI has a specific license.

Most license transfer requests include proprietary financial or commercial information, along with an affidavit requesting that the information be withheld from public disclosure under 10 CFR 2.390. The PM must coordinate (usually with the financial analyst) the review of the information requested to be withheld to determine whether the staff agrees that the information should be withheld. The PM and technical staff should refer to NRR Office Instruction LIC-204, "Handling Requests to Withhold Proprietary Information from

Case 5:18-cv-01983-LCB    Document 84-8    Filed 10/06/20    Page 214 of 231

Public Disclosure," for specific guidance. The PM must be aware that the proprietary information may need to be withheld from some of the co-applicants in addition to the general public. The PM must issue a proprietary information determination letter for the proprietary material.

In accordance with the RPS – Licensing/WM software, the PM must request a Cost Activity Code (CAC) for each unit involved. The PM must also confirm that the application is in ADAMS, and that the proprietary and non-proprietary information have been properly profiled.

Working with the NRR Web Services, the PM will request that a non-proprietary copy of the application be placed on the NRC public Web site (a license transfer and merger Web page is available for posting of these documents) in accordance with 10 CFR 2.1301 and 2.1303. The PM should send an e-mail message to NRRWebServices.Resource@nrc.gov and request that information regarding the proposed license transfer be noticed at http://www.nrc.gov/about-nrc/regulatory/adjudicatory/hearing-license-applications.html#change, "Notice of Ownership Change." The PM will need to provide NRR Web Services with the exact information to be included (i.e., 1) Deadline for Filing Hearing Request, 2) Facility and Location, 3) Applicant, 4) Licensing Action, 5) ADAMS Accession Number, and 6) Contact). In addition to the application and any associated requests, the PM will request that NRR Web Services also add to the NRC public Web site Commission correspondence with the applicant related to the application, *FR* notices, the staff's SE, the staff's order acting on the license transfer application and, if a hearing is held, the hearing record and decision. Once the staff has completed all actions associated with the license transfer, the PM should contact NRR Web Services to request that the notice be removed from the NRC's public Web page.

Using the templates for the transmittal letter and the individual *FR* notice (ADAMS Accession Nos. ML082130259 and ML14022A036, respectively) for direct/indirect license transfers (also available in the list of "DORL Master Boilerplates" located on the DORL home page, http://fusion.nrc.gov/nrr/team/dorl/default.aspx), the PM shall process the *FR* notice. The notice must be reviewed and concurred on by OGC. The notice will state that following publication in the *FR*, stakeholders will be permitted to (1) provide comments within 30 days, and (2) request a hearing within 20 days. The PM should be aware that the *FR* notice directs anyone seeking access to the proprietary, confidential information redacted from the publicly available version of the application (typically the proprietary financial projections) to the applicant as opposed to the NRC.

As stated in 10 CFR 2.1315, the Commission has determined that any conforming amendment that only reflects the license transfer action involves no significant hazards consideration. Therefore, such a conforming amendment for a license transfer does not need to be included in the biweekly notice (i.e., BWN) in the *FR*.

The license to be transferred may also reference other licenses that were issued under Parts 30, 40, 70, and/or 72. If that is the case, the PM should coordinate with the offices issuing those licenses so that all transfers are accomplished in parallel and smoothly.

Occasionally, the applicant may request approval of other changes such as a Quality Assurance Plan that must be scheduled to be issued with the transfer order.

The PM shall verify that a copy of the license transfer application was received by the State representative.

The PM needs to be aware of any changes that may need to be made to the indemnity agreement. The Price-Anderson Act (Section 170 of the Atomic Energy Act of 1954, as amended) and the NRC's regulations at 10 CFR Part 140, "Financial Protection Requirements and Indemnity Agreements," and 10 CFR 50.54(w), "Conditions of licenses," require that the plant owner(s) maintain sufficient levels of insurance and that the indemnity agreement reflect the current plant ownership.

Direct license transfers require a change to a licensee's indemnity agreement. The indemnity agreement is updated through PFPB and an advance copy is provided to the PM for licensees to examine for completeness. After the licensees agree to or provide comments on the content of the indemnity agreement, the PM should notify PFPB for further processing. The final copies are forwarded to the PM with signatures from the branch chief of PFPB. Once the order has been issued approving the license transfer, the PM should send out all original signed copies of the indemnity agreement to the licensees for signature. The indemnity agreement(s) should be signed by all licensees concurrently with the issuance of the conforming license amendments upon the consummation of the license transfer action. After the indemnity agreement has all required signatures, one copy should be retained by each licensee for their records and one copy should be sent back to the NRC. A signed copy should be received back to the NRC within 7 days following the consummation of the license transfer action.

Each of the 10 items listed below are distinct sections of the SE for review of a license transfer application. The financial analyst is responsible for producing the content for sections A, B, C, D, and F below. Also, the financial analyst provides input to section J, but not necessarily all of its content. The technical qualifications reviewer is responsible for producing the content for section E while the remaining sections are provided by the PM.

   A. Financial Qualifications

   B. Decommissioning Funding Assurance

   C. Antitrust (special attention must be given if the license contains antitrust conditions; see NUREG-1574, Revision 2)

   D. Foreign Ownership, Control, or Domination

   E. Technical Qualifications

   F. Insurance and Indemnity

   G. Conforming Amendment

Case 5:18-cv-01983-LCB Document 84-8 Filed 10/06/20 Page 216 of 231

   H.  State Consultation

   I.  Environmental Consideration

   J.  Conclusion

The financial analyst is responsible for collaboration with the assigned OGC attorney to ensure that all aspects of the financial review are identified, that the scope and content of the evaluation is sufficient, and that any unique financial instruments, license conditions, and indemnity agreement changes are identified. The financial analyst is also responsible for keeping the PM informed and involved in the process. The PM need not be present for every interaction between the financial analyst and OGC. However, the financial analyst needs to keep the PM informed of issues that will require additional information, as well as any significant impact on the overall review schedule.

When preparing an SE, the financial analyst may need to request additional information from the applicant in order to clarify a particular item and complete the review. A request for additional information (RAI) will follow the guidance included in LIC-101. Since requests for license transfers generally involve strict deadlines due to time sensitive financial implications, the financial analyst should attempt to identify any necessary RAIs as soon as possible during the review. Unlike routine RAIs for licensing actions, RAIs associated with license transfers should include OGC review and/or concurrence. The PM should discuss the need for concurrence with OGC before issuing the RAI. Also, since requests for license transfers more often than not contain proprietary information, the resulting staff RAI may also contain proprietary information. Therefore, the PM should discuss the RAI with the applicant before formally issuing the RAI to ensure that any proprietary information is identified and handled appropriately.

The technical qualifications reviewer will review the application using the relevant sections of Chapter 13, "Conduct of Operations," of NUREG-0800, "Standard Review Plan for the Review of Safety Analysis Reports for Nuclear Power Plants," regarding the conduct of operations to determine whether the plant staffing and management are acceptable to support the technical qualifications of the proposed new operator or the existing operator under the proposed new owner.

License transfers meet the eligibility criterion for categorical exclusion set forth in 10 CFR 51.22(c)(21). Therefore, pursuant to 10 CFR 51.22(b), no environmental impact statement or environmental assessment needs to be prepared in connection with the approval of the license transfer or any associated conforming amendments. This finding should be included in the Environmental Consideration section of the SE.

After receipt of SE inputs documenting the results of the technical and financial reviews, the PM prepares the order, the final SE, and the conforming license amendment if required. Templates for the preparation of a direct transfer order, conforming amendment, and SE are available in ADAMS at Accession Nos. ML090500005 and ML090500022. Templates for the preparation of an indirect transfer order and SE are available in ADAMS at Accession Nos. ML090500028 and ML090500026. The SE is

typically prepared in both proprietary and non-proprietary versions. Guidance on the treatment of proprietary information and the NRC's procedures for handling sensitive unclassified non-safeguards information is provided in NRR Office Instruction LIC-204. Any public comments received as a result of the *FR* notice are to be addressed in the SE. Note that it is current practice to have a technical editor review and concur on any document that is to be signed by the NRR Office Director. Thus, the PM may need to forward the draft order to QTE Resource and request that a technical editor review and edit the document. Changes from the tech editor should be incorporated before the document is sent to OGC for concurrence.

The staff's SE will often impose specific conditions on the approval of the license transfer. The PM should ensure that the conditions described in the SE are accurately reflected in the order.

The licensing assistant is responsible for reviewing all license transfer related documents in accordance with the guidance document "DORL Licensing Assistant Review (for Most Documents)" (ADAMS Accession No. ML15352A155), and NRR Office Instruction LIC-101. The licensing assistant will ensure correct usage of noticing templates, and check www.regulations.gov to determine if there were any public comments received. The licensing assistant will review changes to the license if a conforming amendment is involved against the application/supplements and the current license, and assign an amendment number, if needed, for a conforming amendment. In addition, the licensing assistant will perform a final quality and proprietary information check prior to issuance. If the approved license transfer is consummated, the licensing assistant may have additional follow-up activities to ensure that the amended license (if any) is updated in the ADAMS authority file and that any organizational name changes from the conforming amendments are reflected in the plant's boilerplates, and associated NRC Web pages and plant rosters.

> Caution: If the package will be forwarded to the NRR Office Director for signature, it is expected that a second licensing assistant perform a peer review of the package before it is sent to the NRR Office Director. It is recommended that this step be performed after the DORL Division Director review so that all changes made during the concurrence process are reviewed. The DORL PM should request the licensing assistant peer review through their respective branch chief.

If a conforming amendment is issued, the PM will prepare a biweekly notice of issuance of conforming amendments (i.e., BWI) in the *FR* using the DORL template found at ML16166A006.

Typically, there are licensing requests made by the previous license holder that are pending at the time that the conforming amendment is issued. If the new license holder wants the staff to continue work on those licensing requests, the new license holder must submit a letter on the docket on the date of issuance of the conforming amendment or shortly thereafter. The letter must state that the new licensee "adopts and endorses" all outstanding items on the docket, including, but not limited to, requests for license

amendments, exemptions, relief requests, etc. The letter needs to be submitted under oath or affirmation.

The package should have concurrence through the Director, DORL or DLP, before it is sent for final OGC concurrence. Concurrence by OGC will be finalized just prior to the package being presented to the approving official (Office or Division Director, as appropriate). Orders for direct transfers are signed according to the delegation authority of ADM-200. The signature of the NMSS Office Director may be needed if the transfer involves an ISFSI or other NMSS license.

The PM will discuss the need for a communication plan with DORL, DLP, and Regional management. If it is determined that a communication plan is needed, the PM will prepare the plan. The Office of Public Affairs in both headquarters and the Region must be notified at least 3 days before issuance. The Office of Public Affairs may prepare a press release to coincide with release of an order.

If there has been a request for a hearing, it should be addressed in the SE and the order. In the case of a hearing, the Commission will be the "Presiding Officer," unless it designates otherwise. If the Commission remains as the Presiding Officer, the Office of Commission Appellate Adjudication may contact the staff for assistance or information in their role of supporting the Commission as long as the staff does not become a party to the proceeding. If the staff is prepared to issue the order while a hearing request or hearing is pending, the PM must prepare a Notice of Significant Licensing Action (NSLA), prior to issuance of the order, to the Commission and to other NRC offices informing them of the intended issuance of the order approving the license transfer. A copy of the proposed NSLA is included with the package when it is sent to OGC for final concurrence. The NSLA is not made publicly available. Guidance and a template regarding NSLAs are available in an NRR memorandum dated December 13, 2000 (ADAMS Accession No. ML003779315). The NSLA template is also available in ADAMS at Accession No. ML15113A963. [Note: In the rare situation where a hearing request is made subsequent to issuance of the order but prior to issuance of a conforming amendment for a direct license transfer, the PM should use the NSLA template found at ADAMS Accession No. ML15113A797 for the proposed issuance of a conforming amendment.]

The NSLA must be concurred upon by the Director of NRR and the Executive Director for Operations. After the Executive Director for Operations concurs, and at least 5 work days before the proposed issuance of the order, the NSLA should be dated and sent to the Commission. The PM should inform OGC of the transmission of the NSLA to the Commission so that OGC can notify the Presiding Officer and the parties to any proceeding of this communication, as appropriate. After 5 work days, if no communication to the contrary has been received from the Commission, the PM should contact the Office of the Executive Director of Operations to confirm that the Commission does not object to the staff's proposed action. If there is no objection, the order can be issued. The PM should inform OGC of the issuance of the order so that OGC can notify the Presiding Officer and the parties to any proceeding of this action, as appropriate.

7.   **PERFORMANCE MEASURES**

No performance measures for this office instruction have been developed at this time.

8.   **PRIMARY CONTACTS**

Tanya E. Hood                          Richard V. Guzman
NRR/DORL/LPL1                       NRR/DORL/LPL1
301-415-1387                           301-415-1030
Tanya.Hood@nrc.gov                 Richard.Guzman@nrc.gov

9.   **RESPONSIBLE ORGANIZATION**

NRR/DORL

10.  **EFFECTIVE DATE**

June 5, 2017

11.  **REFERENCES**

1.   *Code of Federal Regulations*, Title 10, Section 50.80, "Transfer of licenses."

2.   *Code of Federal Regulations*, Title 10, Section 50.90, "Application for amendment of license, construction permit, or early site permit."

3.   NUREG-1577, Revision 1, "Standard Review Plan on Power Reactor Licensee Financial Qualifications and Decommissioning Funding Assurance."

4.   NUREG-1574, Revision 2, "Standard Review Plan on Transfer and Amendment of Antitrust License Conditions and Antitrust Enforcement."

5.   NUREG-0800, "Standard Review Plan for the Review of Safety Analysis Reports for Nuclear Power Plants," Chapter 13, "Conduct of Operations," Section 13.1.1, Revision 6, August 2016, and Sections 13.1.2 and 13.1.3, Revision 7, August 2016.

Enclosures:
1.   Appendix A - Change History
2.   Appendix B – Checklist

Appendix A - Change History

**Office Instruction LIC-107, Revision 2**
**Procedures for Handling License Transfers**

| LIC-107 Change History | | | |
|---|---|---|---|
| **Revision Date** | **Description of Changes** | **Method Used to Announce & Distribute** | **Training** |
| 03/21/2002 | This office instruction discusses procedures for handling direct or indirect license transfer requests in accordance with 10 CFR 50.80. | E-mail to NRR staff | None |
| 11/22/2008 | Revision to increase level of detail, reflect organizational and editorial changes, and include research and test reactors within the instruction scope. | E-mail to NRR staff | None |
| 05/30/2017 | Revision 2 reflects the elimination of the Office of Federal and State Materials and Environmental Management Programs (FSME); additional responsibilities for the Office of Nuclear Material Safety and Safeguards (NMSS); additional guidance on indemnity agreements; additional guidance for the licensing assistants to ensure that the conforming amendment is updated in the ADAMS authority file and that any organizational name changes are reflected in the plant's boilerplates, associated NRC Web pages and plant rosters; organizational changes; the availability of updated boilerplates in ADAMS; and miscellaneous editorial changes and clarifications. | E-mail to NRR staff | None |

Enclosure 1

**Appendix B - Checklist**

**Office Instruction LIC-107, Revision 2**
**Procedures for Handling License Transfers**

This checklist is meant as an aid to PMs in handling license transfer orders and conforming amendments. As such, it is a document that accompanies NRR Office Instruction LIC-107, "Procedures for Handling License Transfers." This checklist does not replace or negate the need to understand the responsibilities and actions required in this office instruction. It should be used in conjunction with the office instruction to assist the PM with planning the work involved in processing and issuing the order, SE, conforming amendment, and other associated documents and to ensure that nothing is inadvertently overlooked. The PM must refer to the details in the office instruction to fully address the scope of actions in the checklist.

---

## FRONT-END ACTIONS OR QUESTIONS

Shortly after receipt of the application from the licensee or applicant, the PM should address the following questions and take appropriate actions:

(1)    Does the application meet all pertinent regulatory requirements for submission of an application?

⊙ Yes  ⊙ No

"Any person" may submit an application for license transfer, provided that the application can be supported by "a written consent from the existing licensee, or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right ... to possession of the facility or site involved" (10 CFR 50.80). Such an application must be executed in a signed original by a duly authorized officer under oath or affirmation (10 CFR 50.30) and addressed to the NRC Document Control Desk (10 CFR 50.4). For additional guidance regarding oath or affirmation, and an alternate method to meet this requirement, see Regulatory Issue Summary 2001-18 (ADAMS Accession No. ML010990211). The PM should discuss with the licensee remedial actions if any of these requirements are not met.

(2)    Is the transfer direct or indirect?                         ⊙ Direct  ⊙ Indirect

Did the application request a conforming amendment?             ⊙ Yes  ⊙ No

A direct transfer involves a new licensee, and most likely would need a name change in the license (i.e., the application should include an application for a conforming amendment to reflect the new licensee name). On the other hand, an indirect transfer may involve a change in the parent or holding company of the current licensee, and may not need anything changed in the current operating license. If in doubt, consult with OGC and discuss with the licensee.

In terms of work planning, a separate CAC number may be needed for the conforming amendment if the target date for consummation of the transfer is significantly later than that for the order.

Enclosure 2

ND_003492

- 2 -

(3)    Does the application include "as much of the information described in §§ 50.33 and 50.34 of this part with respect to the identity and technical and financial qualifications of the proposed transferee as would be required by those sections if the application were for an initial license"?

⑤ Yes  ⑤ No

At this early stage of review, the PM should discuss the acceptance review for sufficiency of information to begin the review with the responsible technical branches. The PM should refer to NRR Office Instruction LIC-109, "Acceptance Review Procedures," for guidance. The PM should promptly communicate with the licensee if any deficiency is identified.

(4)    Is a copy of the publicly available version of the application placed on the NRC public Web site?        ⑤ Yes  ⑤ No

This requirement is stated in 10 CFR 2.1301. Per 10 CFR 2.1303, unless exempt from disclosure under 10 CFR Part 9, the following documents should also be placed on the NRC public Web site: (a) correspondence to and from the applicant or licensee related to the application, (b) *FR* notices, (c) NRC staff safety evaluations, (d) NRC staff order, and (e) if a hearing is held, hearing records and decision.

(5)    If the plant site houses an independent spent fuel storage installation (ISFSI) with a specific license, did the application also address transfer of the ISFSI?

⑤ Yes  ⑤ No

The PM needs to discuss this with NMSS to understand its scope of review as it relates to NRR's review, and agree on target dates. If the application makes no mention of the ISFSI with a specific license, the PM should immediately discuss with the licensee and NMSS about the omission.

(6)    Has OGC been informed of the application and provided copies?        ⑤ Yes  ⑤ No

License transfer reviews are mostly concerned with legal and financial matters. Accordingly, OGC should be involved from the start of the acceptance review. The assigned OGC attorney normally keeps in touch with attorneys representing the applicant and/or the licensee, the NRR financial reviewer(s), and the PM during the review. Note that OGC must concur on all correspondence from the staff including *FR* notices and may also need to concur on requests for additional information, particularly when a hearing has been requested.

(7)    Is public notification prepared and issued?        ⑤ Yes  ⑤ No

The regulations at 10 CFR 50.80 requires the NRC staff to issue an "appropriate notice to interested persons, including the existing licensee." This notice is to be published in the *FR* (see template at ADAMS Accession No. ML14022A036). The notice will (1) describe the proposed transfer; (2) announce that requests for a hearing must be filed within 20 days; (3) announce that written comments must be filed within 30 days per

- 3 -

10 CFR 2.1305, (4) declare that, per 10 CFR 2.1315, and unless otherwise determined by the Commission, the conforming amendment to be issued involves no significant hazards consideration (NSHC) and no comments on the NSHC determination are solicited from the public; and (5) state that the comment procedures contained in 10 CFR 2.1305 apply.  The PM should make sure that the *FR* notice directs anyone seeking access to the proprietary, confidential information redacted from the publicly available version of the application (typically the proprietary financial projections) to the applicant as opposed to the NRC.

If the applicant determined that a conforming amendment is needed, it would apply for it under 10 CFR 50.90.  Under such circumstance, 10 CFR 50.91 requires the applicant to provide an NSHC analysis.  The NRC staff, however, does not need to publish an NSHC evaluation because 10 CFR 2.1315 has generically determined that a conforming amendment involves NSHC; this is so stated in the NRC staff's *FR* notice regarding the proposed license transfer.

Per 10 CFR 2.309(b)(1), the *FR* notice will specify a date, 20 days from publication, on or before which hearing requests and intervention petitions must be filed.

(8)     Does the application propose an issuance date for the order and conforming amendment?

⑤ Yes  ⑤ No

Some applications are very specific in this regard, while others only provide a general target date because the applicant/licensee may still be undergoing financial negotiations and seeking approval from other governmental bodies.  License transfers typically involve significant time-sensitive financial implications (e.g., the fuel in a reactor core is worth tens of thousands of dollars less after each day of burnup).  The NRC staff's failure to approve the transfer on the date the application specifies could mean significant financial penalty, or significant re-work of the financial arrangements.  Thus, it is incumbent upon the PM to ensure that the NRR technical review branches, NMSS, and OGC all aim their review schedule using the same target date.

(9)     What should be done about environmental considerations?

There is no statutory or regulatory requirement for an environmental impact statement or environmental assessment for the order and conforming amendment.  The regulation at 10 CFR 51.22(c)(21) provides that approvals of direct or indirect license transfers and any associated conforming amendments are categorically excluded from environmental review.  The "Environmental Considerations" section of the SE should cite this regulation.

(10)    Does the application indicate that a copy has been sent to the designated State official?

⑤ Yes  ⑤ No

This requirement is specified in 10 CFR 50.91(b)(1) regarding amendments. Specifically, the licensee should have sent a copy of the application to the designated State official.

- 4 -

(11)     Does the application contain proprietary information?                    ⑤ Yes  ⑤ No

License transfer applications usually contain proprietary information.  The NRC staff
should follow the guidance of NRR Office Instruction LIC-204.  In the context of a
proposed license transfer order and conforming amendment, the staff needs to be
cautious in its day-to-day activities (e.g., issuance of formal or draft correspondence)
such that proprietary information is not inadvertently released.  The PM should be
cognizant that one party in the transaction may be withholding certain information from
another party.  This is typical for financial projections when each entity is in competition
in the same power market area.  Note that proprietary information may be as simple as a
number (e.g., dollar amounts), a word, or a single phrase.  Inadvertent release of
proprietary information is reportable to the Inspector General and the Executive Director
for Operations (see Management Directive 3.4, section on "Inadvertent Release of
Information").

## WORK PLANNING

License transfers typically involve significant time-sensitive financial implications (e.g., the fuel
in a reactor core is worth tens of thousands dollars less after each day of burnup).  The NRC
staff's failure to approve the transfer on the date the application specifies could mean significant
financial penalty, or significant re-work of the financial arrangements.

(1)     Through RPS - Licensing/WM software, assign PFPB to complete the financial
qualifications review.  PFPB reviews the financial qualifications of the proposed owner
and operator (if different from the owner).

If the entity that will become the operator is different from the entity that will become the
owner, the financial qualification for both entities needs to be assessed.  While the exact
same type of financial review done for an owner is not applicable for the operator, PFPB
still needs to review a combination of the financial qualifications of the owner (assuming
it is ultimately responsible for costs) with the analysis of the contract between the owner
and the operator regarding the payment of costs.  See the Commission ruling on the
Northern States Power Company/Monticello case, CLI-00-14, 52 NRC 37 (2000), and
the companion case, CLI-00-19, 52 NRC 135 (2000).

⑤ Yes  ⑤ No

(2)     Through RPS - Licensing/WM software, assign the Operations and Human Factors
Branch to complete the technical qualifications review.

⑤ Yes  ⑤ No

(3)     Does the plant site include an ISFSI, under a specific or general license, which would be
transferred at the same time?

⑤ Yes  ⑤ No

If the ISFSI received a specific license as opposed to authorization under the general
license provisions of Subpart K to 10 CFR Part 72, the NMSS Office Director, or

- 5 -

designee, must sign the order consenting to the license transfer and the amended ISFSI license. The DORL PM should also confirm that NMSS will revise the ISFSI license as appropriate.

(4)    Are the SE target dates supportive of the proposed date of consummation of the transfer?

ⓢ Yes ⓢ No

## PRE-ISSUANCE OBLIGATIONS FOR THE ORDER

(1)    Has the 20-day period (i.e., the period for requesting a hearing) required by 10 CFR 2.309(b)(1) passed since publication of the notice in the *FR*?    ⓢ Yes ⓢ No

(2)    Any comments from the public or State government?    ⓢ Yes ⓢ No

Per 10 CFR 2.1305, as an alternative to requests for hearings and petition to intervene, persons may submit written comments regarding license transfer applications. The NRC will consider and, if appropriate, respond to these comments, but these comments do not otherwise constitute part of the decisional record.

(3)    Are all of the applicant's submittals (i.e., original application and any supplemental information) submitted under oath or affirmation, and docketed in ADAMS?

ⓢ Yes ⓢ No

(4)    Has the PM issued a letter to determine withholding from public disclosure for each applicant submittal containing proprietary information?

ⓢ Yes ⓢ No

The applicant's submittals typically contain proprietary information of financial nature (i.e., dollar amounts). The PM should suspect that any formal or informal communication with the applicant may likewise contain proprietary information, and handle them accordingly.

(5)    If a hearing has been requested and the hearing will not be completed before issuance of the order, did the PM prepare an NSLA to inform the Commission of the imminent issuance of the order?

ⓢ Yes ⓢ No

If there is an ongoing or pending hearing, it should be so noted in the SE and the order. Before issuance of the order, the PM prepares an NSLA to inform the Commission of the imminent issuance of the order. The PM should inform OGC when the NSLA is transmitted to the Commission.

ND_003496

- 6 -

(6)    Did the PM discuss with management and the Regional office about the need for a communication plan?

Ⓢ Yes  Ⓢ No

There is no regulatory requirement or guidance that specifies a communication plan. The need for such would be determined by the level of public interest in the proposed license transfer or the plant itself (e.g., requests for intervention, public comments, State government comments, media interest, etc.).

(7)    Did the proposed new licensee provide a letter to the NRC stating that it has the required insurance?

Ⓢ Yes  Ⓢ No

This letter is needed before PFPB can issue an amendment to the indemnity agreement to reflect the name of the new licensee.

(8)    Has PFPB prepared an amended or new indemnity agreement?

Ⓢ Yes  Ⓢ No

An indemnity agreement is required to reflect the ownership of the facility. Therefore, a direct license transfer typically requires an amended or new indemnity agreement that is issued concurrent with the conforming amendment(s) upon the consummation of the license transfer action. The indemnity agreement for an indirect license transfer is generally unchanged.

(9)    Did the licensee/applicant send a letter to the NRC to indicate the date the transaction will be consummated?

Ⓢ Yes  Ⓢ No

The conforming amendment is to be issued on that day, not before and not after.

(10)    Did the new licensee send a letter to the NRC to identify all the ongoing reviews (amendments, exemptions, relief requests, etc.), and request the NRC to continue its review of those actions?

Ⓢ Yes  Ⓢ No

This letter is needed because those actions were requested by the prior licensee, and the NRC has no reason to continue its review unless the new licensee "adopts and endorses" the outstanding items on the docket. Since some of the ongoing reviews (e.g., amendments) were requested by the prior licensee under oath or affirmation, the new licensee's "adoption" letter must also be under oath or affirmation, or equivalent.

**PREPARATION OF CONFORMING AMENDMENT**

Issuing the conforming amendment is essentially done the same way as issuing a regular amendment, except that the package contains no SE because the conforming amendment is referenced and approved as part of the order consenting to the license transfer. In addition, the

- 7 -

amendment package contains a biweekly notice of issuance of conforming amendments (template at ADAMS Accession No. ML16166A006).

The conforming amendment, the amended or new indemnity agreement, the amended ISFSI license, if applicable, and biweekly notice of issuance are issued on the day the license transfer transaction is consummated and after receipt of notification from the licensee confirming the transaction. This is necessary because if it is issued before, the new licensee name may invalidate the operating license for the current and exiting licensee, and if it is issued afterwards, the new licensee would have no authorization to operate under the old license.

(1)    Does the conforming amendment package include an amendment to the indemnity agreement (prepared by PFPB) for the new licensee?

⑤ Yes  ⑤ No

(2)    Did the PM inform the NRR Director, who is the signer of the conforming amendment, that the conforming amendment is identical to the draft issued with the order, or that minor changes had been made?

⑤ Yes  ⑤ No

ND_003498

# DEPOSITION EXHIBIT

# 82

| | |
|---|---|
| **To:** | Christopher C. Chandler (ccchandler0@tva.gov)[ccchandler0@tva.gov] |
| **Cc:** | bill@wrmccollum.com[bill@wrmccollum.com] |
| **From:** | Matthews, Timothy P.[timothy.matthews@morganlewis.com] |
| **Sent:** | Tue 11/13/2018 10:18:31 PM (UTC) |
| **Subject:** | Nuclear Development' Bellefonte CP Transfer Request |

\-11-13 LTA (non-proprietary).pdf

Chris,

Please see the attached courtesy copy of the non-proprietary version of the 10 CFR 50.80 consent request filed through EIE today.   ADAMS Accession numbers for the filing are as follows:

- Proprietary:  ML18317A400
- Non-Proprietary:  ML18317A401

Other distributions are being made by overnight mail.  If you have questions please contact me.


If you have questions please contact me.
Regards,
Tim


**Timothy P. Matthews**
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW | Washington, DC 20004-2541
Direct: +1.202.739.5527 | Main: +1.202.739.3000 | Fax: +1.202.739.3001
timothy.matthews@morganlewis.com | www.morganlewis.com
Assistant: Angela M. Perry | +1.202.739.5315 | angela.perry@morganlewis.com


DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.



EXHIBIT
82

ND_004760

~~INCLUDES CONFIDENTIAL INFORMATION – WITHHOLD UNDER 10 CFR 2.390~~
Unrestricted Upon Removal of Enclosure 4P

# Nuclear Development, LLC

3 Bethesda Metro Center
Suite 515
Bethesda, MD 20814

November 13, 2018

10 CFR 50.80
10 CFR 50.90

U.S. Nuclear Regulatory Commission
ATTN: Document Control Desk
Washington, D.C. 20555-0001

Subject:      Application for Order Approving Construction Permit Transfers and
Conforming Administrative Construction Permit Amendments

Bellefonte Nuclear Plant, Units 1 and 2
Construction Permits Nos. CPPR-122 and CPPR-123
NRC Docket Nos. 50-438 and 50-439

In accordance with Section 184 of the Atomic Energy Act, 10 CFR 50.80, and the Commission Policy Statement on Deferred Plants, 52 *Federal Register* 38077, Oct. 14, 1987 ("Deferred Plants Policy"), Nuclear Development LLC ("Nuclear Development") hereby submits the enclosed application ("Application") requesting that the U.S. Nuclear Regulatory Commission ("NRC") consent to the transfer of Construction Permit Nos. CPPR-122 and CPPR-123 (the "Permits") for the Bellefonte Nuclear Plant, Units 1 and 2 ("Bellefonte Units") now held by the Tennessee Valley Authority ("TVA") to Nuclear Development. Nuclear Development also requests that the NRC issue the conforming administrative amendments described in the Application and amend the Permits to reflect the revised construction completion dates discussed therein. To the extent the NRC does not have sufficient time to decide substantively on the matters requested in the Application prior to closing of the asset transfer, Nuclear Development requests that the NRC hold the Permits in terminated plant (but unexpired and not withdrawn) status, consistent with the Section III.B of the Deferred Plants Policy, until such time as the Commission has reached its determination on these requests.

Nuclear Development is a special purpose entity owned by Mr. and Mrs. Franklin L. Haney and trusts for members of their family. In 1967, Mr. Haney founded the Franklin L. Haney Company, LLC, a highly-successful, privately-held real estate and property development company with headquarters in Chattanooga, TN and Washington, DC. The Franklin L. Haney Company has more than 40 years of experience in project development and a development portfolio of more than $10 billion. Its model for success has included engaging partners with project-related expertise, as with the Dulles Greenway Toll Road project. Additional information about Nuclear Development is contained in the Application.

U.S. Nuclear Regulatory Commission
November 13, 2018
Page 2

As noted by TVA in its March 31, 2017 letter, Nuclear Development was the successful bidder in an auction for the plant conducted by TVA in November of 2016. Under the terms of the Purchase and Sale Agreement as amended, (enclosed with the Application as Attachment 1), Nuclear Development plans to purchase from TVA the Bellefonte Purchased Assets, including certain real property, material equipment, machinery, tools, other tangible property, books and records (including permitting, quality assurance, maintenance and other records related to design, construction or operation of the Units), certain agreements and obligations, and subject to all applicable law, all permits, and authorizations, including the Permits that are the subject of this Application. As amended, the current agreement with TVA would require closing of the asset transfer by November 30, 2018. However, the parties may agree to a further extension.

Nuclear Development's business objectives are to obtain the appropriate authority to safely complete high quality construction of Units 1 and 2, reactivate the docketed Operating License Application, begin commercial operation, and sell clean, safe, reliable power from the plants in the regional wholesale market. Toward those objectives, Nuclear Development has begun a methodical, stepwise approach to this project, including identifying leaders in the nuclear industry to augment its core team to better develop a regulatory roadmap, ensure appropriate oversight of quality and safety, plan construction methods and reliably estimate costs, solicit interest of potential power customers, and pursue available financial incentives that make private sector pursuit of a project of this magnitude achievable and economical. It has made substantial progress on all of these fronts and expects to proceed with the purchase as planned. Nuclear Development approaches this project with an appreciation for the safety significance of the approvals it is requesting and an appreciation for its responsibilities to provide the NRC the requisite bases for the supporting findings the agency must make before granting each requested approval in sequence.

Both Bellefonte Units are currently in Deferred Plant Status. In 2011, NRC extended the construction date for Unit 1 to October 1, 2020. In 2014, TVA requested an extension of the completion date for Unit 2. On March 31, 2017, TVA provided an update on that extension request noting the continuing timely renewal status of that application under 10 CFR § 2.109 and informing NRC of the planned sale of the Bellefonte Units to Nuclear Development. This update also deferred action regarding a revised construction completion date to interaction between NRC and Nuclear Development. Thus, Unit 2 remains in timely renewal status. The enclosed Application provides the basis for and requests updated construction completion dates for both units, *i.e.*, October 1, 2029 for Unit 1, and October 1, 2030 for Unit 2.

Nuclear Development recognizes that Section 185 of the Atomic Energy Act and NRC regulations at 10 CFR 50.10(c) require that a company hold a Construction Permit before performing licensed construction, subject to any other regulatory restrictions. Nuclear Development plans to close on the acquisition of the Bellefonte Units (and related Purchased Assets), but undertake no licensed construction activities unless and until the NRC grants the authority requested in this Application. Nuclear Development is guided in this approach by the considerations explained in Section III.B.2 of the Deferred Plant Policy related to transfers of plants in deferred or terminated construction status, and whose Construction Permits have not been withdrawn by the NRC. Once the Permits have been transferred, Nuclear Development plans to continue only the status quo physical preservation, security and safety activities now being conducted by TVA. The Application describes Nuclear Development's plans for oversight of these site preservation, security and safety activities in the interim period and following Permit transfer and before restarting licensed construction, during which they will no longer be subject to