FILED

2020 Oct-06  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# EXHIBIT 6

## Deposition of Larry Blust
## Dated 11/13-14/2019
## Deposition Exhibits
## 42, 43, 87-94

## Page 1

1   IN THE UNITED STATES DISTRICT COURT NORTHERN

2   DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

3

4   CIVIL ACTION NO. 5:18-CV-01983-LCB

5

6   NUCLEAR DEVELOPMENT, LLC,

7          Plaintiff,

8   vs.

9   TENNESSEE VALLEY AUTHORITY,

10         Defendant.

11

12        VIDEO DEPOSITION OF LARRY BLUST

13      Bradley Arant Boult Cummings, LLP

14         One Federal Place

15        1819 Fifth Avenue North

16        Birmingham, Alabama 35203

17         November 13, 2019

18

19   REPORTED BY:

20      Gail B. Pritchett

21      Certified Realtime Reporter,

22      Registered Professional

23      Reporter and Notary Public

## Page 2

1          A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4       Mr. Caine O'Rear III

5       Attorney at Law

6       Hand Arendall, LLC

7       RSA Tower

8       11 North Water Street

9       Suite 30200

10      Mobile, Alabama 36602

11      251.432.5511

12      corear@handarendall.com

13

14   FOR THE DEFENDANT:

15      Mr. Matthew H. Lembke

16      Attorney at Law

17      Bradley Arant Boult Cummings, LLP

18      One Federal Place

19      1819 Fifth Avenue North

20      Birmingham, Alabama 35203

21      205.251.8000

22      mlembke@bradley.com

23

## Page 3

1          A P P E A R A N C E S (continuing)

2

3   ALSO FOR THE DEFENDANT:

4       Mr. Steven C. Chin

5       Office of the General Counsel

6       Tennessee Valley Authority

7       400 West Summit Hill Drive, WT6

8       Knoxville, Tennessee 37902

9       865.632.3052

10      scchin@tva.gov

11

12   THE VIDEOGRAPHER:

13      Ms. Shannon Campbell

14      Courtroom Technologies, Inc.

15      brad@crtrialtech.com

16      205.790.5841

17

18

19

20

21

22

23

## Page 4

1          INDEX OF EXAMINATION

2                    Page:

3   EXAMINATION BY MR. LEMBKE          8

4

5          INDEX OF EXHIBITS

6                    Page:

7   Exhibit Number 87 - Resume          11

8   Exhibit Number 88 - 10/3/16 email,    62

9   SUBJ: P&S Contract Draft,

10  ND5144-ND5148

11  Exhibit Number 89 - 10/18/16 email,   63

12  SUBJ: Bellefonte P&S Agreement,

13  ND5159-ND5162

14  Exhibit Number 90 - 10/24/16 letter   65

15  from C. O'Neill, RE: Potential Sale

16  of Bellefonte Nuclear Plant Site,

17  ND415-ND417

18  Exhibit Number 91 - 8/29/18 email,    81

19  SUBJ: ND to TVA Extension Letter

20  Rev. 2

21  Exhibit Number 92 - 11/2018 emails,   83

22  SUBJ: Did we get any feedback,

23  ND4315-4316

Larry Blust                                               11/13/2019

Page 5

1          INDEX OF PREVIOUSLY MARKED EXHIBITS
2                          Page:
3     Exhibit Number 42 - 8/18/16 email     51
4     from L. Blust to C. O'Neill, ND4966-
5     ND4967
6     Exhibit Number 43 - 9/9/16 email      59
7     with Indicative Bid, ND5048-ND5056
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED, by
3    and between the parties, through their
4    respective counsel, that the deposition of
5    LARRY BLUST may be taken before Gail B.
6    Pritchett, Commissioner, Certified Realtime
7    Reporter, Registered Professional Reporter and
8    Notary Public;
9          That the signature to and reading
10   of the deposition by the witness is waived, the
11   deposition to have the same force and effect as
12   if full compliance had been had with all laws
13   and rules of Court relating to the taking of
14   depositions;
15          That it shall not be necessary for
16   any objections to be made by counsel to any
17   questions, except as to form or leading
18   questions, and that counsel for the parties may
19   make objections and assign grounds at the time
20   of trial, or at the time said deposition is
21   offered in evidence, or prior thereto.
22
23

Page 7

1          I, Gail B. Pritchett, a Certified
2    Realtime Reporter and Registered Professional
3    Reporter of Birmingham, Alabama, and a Notary
4    Public for the State of Alabama at Large,
5    acting as Commissioner, certify that on this
6    date, as provided by the Federal Rules of Civil
7    Procedure of the United States District Court,
8    and the foregoing stipulation of counsel, there
9    came before me at the offices of Bradley Arant
10   Boult Cummings, LLP, One Federal Place,
11   1819 Fifth Avenue North, Birmingham, Alabama
12   35203, on the 13th day of November, 2019,
13   commencing at 3:57 p.m., LARRY BLUST, witness
14   in the above cause, for oral examination,
15   whereupon the following proceedings were had:
16
17          THE VIDEOGRAPHER:  This marks the
18   beginning of video deposition of Larry D.
19   Blust.  Today's date is November 13th, 2019;
20   the time is now 3:57 p.m.  This is in the
21   matter of Nuclear Development, LLC, plaintiff,
22   versus Tennessee Valley Authority, defendant,
23   filed in the United States District Court for

Page 8

1    the Northern District of Alabama, Northeastern
2    Division, Case Number 5:18-CV-01983-LCB.
3          Will counsel please state who you
4    are and who you represent.
5          MR. LEMBKE:  Matt Lembke for
6    defendant TVA.
7          MR. CHIN:  Steve Chin for
8    defendant TVA.
9          MR. O'REAR:  Caine O'Rear for the
10   plaintiff, Nuclear Development.
11
12          LARRY BLUST,
13   having been first duly sworn, was examined and
14   testified as follows:
15
16          THE COURT REPORTER:  Usual
17   stipulations?
18          MR. LEMBKE:  Yes.
19          MR. O'REAR:  Okay.
20
21   EXAMINATION BY MR. LEMBKE:
22          Q.   Will you state your name for the
23   record, please?

**Larry Blust**                                                    **11/13/2019**

Page 9

1    A.   Larry D. Blust.

2    Q.   Mr. Blust, have you ever been

3  deposed before?

4    A.   Yes.

5    Q.   All right.  How many times?

6    A.   I couldn't tell you.  It's not a

7  huge number of times, but I have been

8  practicing fifty years, I don't remember how

9  many times.

10    Q.   Well, is it more than five?

11    A.   It's probably more than five.

12    Q.   All right.  When is the last time

13  you remember being deposed?

14    A.   I don't know what year, but it has

15  been quite a while ago.

16    Q.   All right.  Well, you understand

17  that you have been placed under oath and I will

18  ask you a series of questions that you need to

19  answer to the best of your ability.  If at any

20  time you don't understand one of my questions

21  and need me to repeat it or rephrase it, I will

22  be happy to do so; otherwise I will assume you

23  understand the question, okay?

Page 10

1    A.   Great.

2    Q.   And if at any point you need to

3  take a break, just let me know; and as soon as

4  we have resolved the pending question, we will

5  be happy to take a break.

6        And if I -- if you ever say uh-uh

7  or uh-huh, I will ask you to verbalize yes or

8  no so the court reporter can get a clear record

9  of --

10    A.   I appreciate that.

11    Q.   -- what's being said.

12        All right.  Mr. Blust, what is

13  your home address?

14    A.   1847 Lincoln, Chicago, Illinois.

15    Q.   What is the zip code?

16    A.   60614.

17    Q.   And what is your business address?

18    A.   70 West Madison, Suite 4000,

19  Chicago 60602.

20    Q.   All right.  And what is the name

21  of the law firm at which you practice?

22    A.   Hughes Socol Piers Resnick & Dym,

23  LTD.

Page 11

1    Q.   All right.  Let me show you what I

2  am going to ask the court reporter to mark as

3  Exhibit 87.

4        (Exhibit Number 87 was marked for

5        identification.)

6    Q.   And do you recognize this, Mr.

7  Blust?

8    A.   (Reviewing document.)  Looks like

9  it came from our firm website.

10    Q.   And I will represent that this was

11  an enclosure with the application submitted by

12  Nuclear Development in November 2018 to the NRC

13  for approval of the transfer of the Bellefonte

14  construction permits.

15        Does this accurately reflect your

16  education?

17    A.   Yes, it does.

18    Q.   All right.  Now, Mr. Blust, does

19  this accurately reflect the nature of your

20  current law practice?

21    A.   Let me just read the top here.

22  (Reviewing document.)  The major areas, yes.

23    Q.   All right.  And you have been a

Page 12

1  partner at your current law firm since 2014,

2  correct?

3    A.   Correct.

4    Q.   Where were you practicing prior to

5  that?

6    A.   Barnes & Thornburg in Chicago.

7    Q.   All right.  And how long were you

8  with Barnes & Thornburg?

9    A.   Since the start of 2002 to 2014.

10    Q.   And prior to that where did you

11  practice law?

12    A.   Jenner & Block in Chicago.

13    Q.   And how long were you at Jenner &

14  Block?

15    A.   Thirty some years.  It would have

16  been from my graduation, with the exception of

17  three years when I was in the U. S. Air Force,

18  all the way until 2002.

19    Q.   And was the nature of your

20  practice any different when you were at Barnes

21  & Thornburg or Jenner & Block versus what it is

22  today?

23    A.   I'm sure it was, particularly in

Page 13

1 the early years.  When I was an associate, I
2 didn't practice in all of these areas.  But,
3 you know, it has just matured over the years as
4 transactions have changed and everything else.
5      Q.   And you are a member of which
6 Bars?
7      A.   I am a member of the Illinois Bar,
8 the Bar of the 7th Circuit, the Northern
9 District of Illinois.  I'm a member of this
10 particular Bar for this particular case, and I
11 also may still be admitted in Delaware for a
12 particular case until the case is over.  I am a
13 member of the Tax Court and a member of the
14 Court of Federal Claims Bar.  And I am trial
15 bar member of the Northern District of
16 Illinois.
17      Q.   Now, prior to any work you did for
18 Nuclear Development, had you ever had any
19 experience in legal work connected to the
20 nuclear power industry?
21      A.   Not nuclear power, no.
22      Q.   And have you ever had any
23 experience in conjunction with construction of

Page 14

1 a nuclear plant?
2      A.   Prior to my experience with
3 Bellefonte or --
4      Q.   Yes.
5      A.   No.
6      Q.   All right.  Prior to --
7      A.   Well, I'm sorry, that's wrong.  I
8 represented a client who did all of the piping
9 at most of the Commonwealth Edison plants,
10 nuclear plants, and I did contracting work for
11 their company.  So I contracted with Exelon
12 which was Commonwealth Edison at that time.
13      Q.   All right.  Have you ever had any
14 experience prior to your representation of
15 Nuclear Development with the operation of a
16 nuclear plant?
17      A.   No.
18      Q.   Prior to your representation of
19 Nuclear Development, did you ever represent an
20 owner of a nuclear plant?
21      A.   No.
22      Q.   Prior to your work for Nuclear
23 Development, have you ever been involved in

Page 15

1 applying for the transfer of a construction
2 permit pertaining to a nuclear plant?
3      A.   No.
4      Q.   Prior to your work for Belle --
5 Nuclear Development, have you ever been
6 involved in legal work in connection with any
7 application to the Nuclear Regulatory
8 Commission?
9      A.   Not to the NRC.  However, I had
10 experience before this with regard to
11 Bellefonte, but --
12      Q.   I'm sorry, say that again?
13      A.   Prior to the current thing on
14 Bellefonte, I had experience with the NRC in
15 regard to Bellefonte.
16      Q.   All right.  Tell me about that.
17      A.   We -- I had an associate of mine
18 also doing this, but we had meetings with the
19 NRC to be sure that the plant licenses for
20 Bellefonte were still good.
21      Q.   And when was that?
22      A.   Probably would have been somewhere
23 between 2'02 and 2'05.

Page 16

1      Q.   All right.  And why were you doing
2 that?
3      A.   Because we were attempting to
4 finance or acquire Bellefonte, and we -- and
5 these were relatively old permits and we wanted
6 to make sure that the NRC had no problem with
7 the existing permits.  That's what we
8 established in those meetings.
9      Q.   And this was for work for Franklin
10 Haney or one of his companies?
11      A.   Correct.
12      Q.   How long have you had a business
13 relationship with Franklin Haney?
14      A.   You mean as a lawyer?  I don't
15 have any business relationship with him.  I am
16 a lawyer for him.
17      Q.   Well, you are more than a lawyer,
18 aren't you?  You are an officer of Nuclear
19 Development, right?
20      A.   I am officer of other clients,
21 too.  Officer is general counsel or secretary,
22 it's just the same thing as a lawyer.  I am an
23 outside lawyer.  I've always been an outside

**Larry Blust**                                                **11/13/2019**

Page 17

1    lawyer.  I was a general counsel of a public
2    company for a while, but that was just because
3    somebody else was out of -- I have worked for
4    Franklin Haney since 1983 on various different
5    projects.
6          Q.   Now, Mr. Blust, when you say --
7    you are aware that the representation was made
8    to the Nuclear Regulatory Commission that you
9    are an officer of Nuclear Development, correct?
10         A.   And I am.  There is a designation
11   of me as an officer.
12         Q.   And it was not stated to the
13   Nuclear Regulatory Commission that you are an
14   outside lawyer, correct?
15         A.   I don't know what was stated to
16   them.
17         Q.   You don't know?
18         A.   Uh-uh, I don't have any idea.
19         Q.   You didn't read the application?
20         A.   No.
21         Q.   Mr. Blust, you say you began
22   working with Franklin Haney in 1983.  Has your
23   work for him and his companies been essentially

Page 18

1    steady for the last thirty-six years?
2          A.   Well, it has grown because I
3    replaced a number of other lawyers.  I had one
4    project for him in 1983 and I became later on
5    the family lawyer and also for all of the other
6    projects.  So I acquired over the years -- I
7    guess I survived a whole bunch of other
8    attorneys would be the best way to put it.
9          Q.   Other than your work for Nuclear
10   Development, are you currently doing work for
11   any of Franklin Haney's companies?
12         A.   Yes.
13         Q.   All right.  And do you bill Mr.
14   Haney for work on the Bellefonte project at an
15   hourly rate?
16         A.   Yes.
17         Q.   What is that hourly rate?
18         A.   This particular year it's six
19   hundred seventy dollars an hour.
20         Q.   Has that changed over the last
21   five years?
22         A.   Yes.  It changes virtually every
23   year, but not by much.

Page 19

1          Q.   Do you have personal knowledge of
2    how long it takes the NRC to typically review
3    an application for transfer of construction
4    permits for a nuclear plant?
5          A.   What does personal knowledge mean?
6          Q.   Personal knowledge.
7          A.   Does it mean have I done it or
8    does it mean I have heard from them how long it
9    takes or I have heard from somebody else how
10   long it takes?
11         Q.   Well, you said you have never done
12   it, right?
13         A.   Correct.
14         Q.   All right.  Have you heard from
15   NRC how long it will take?
16         A.   Yes.
17         Q.   And what did they tell you?
18         A.   Six months.
19         Q.   But you now know it is going to
20   take longer than that for Bellefonte?
21         A.   Well, not really.  The most recent
22   thing they did is roughly that kind of time
23   frame, maybe it's eight or nine months.

Page 20

1          Q.   Well, isn't it ten?
2          A.   Depends on how you count it.
3          Q.   Well, you are aware they sent
4    Nuclear Development a letter on November 8th,
5    correct?
6          A.   I guess.  I don't remember the
7    date.
8          Q.   Well, I will represent to you it
9    was November 8.
10         A.   Yeah, okay.
11         Q.   And they say it will be done by
12   December 2020, correct?
13         A.   I think that's right.
14         Q.   Isn't that ten months?
15         A.   I would count it as ten months or
16   nine and a half or whatever it is.
17              MR. O'REAR:  I think it's November
18   5th.
19              (Off-the-record discussion.)
20         Q.   (BY MR. LEMBKE:)  And you said --
21   you suggested that -- well, you were asking me
22   if I was asking if others told you how long it
23   would take.  Have others told you how long it

**Larry Blust**                                                    **11/13/2019**

Page 21

1   would take, other than NRC people, to get
2   approval of a license transfer application?
3        A.   Yes, and I would have to say to
4   you, maybe I should clarify the last answer,
5   there is obviously a range.  What I was talking
6   about was six months, would take at least six
7   months.  So you have always got a range with
8   any application because you have different
9   issues and different things.  Sometimes they
10  want more information which requires you to
11  take longer time, et cetera, et cetera.  So --
12       Q.   Have you ever personally been a
13  party in civil litigation?
14       A.   No.
15       Q.   How did you prepare for today's
16  deposition?
17       A.   I went over with Mr. Caine some
18  documents that he asked me about, et cetera,
19  and talked to him about the deposition.
20       Q.   Did you read anyone else's
21  deposition?
22       A.   Not in preparation for this.  I
23  have read because I was at the other

Page 22

1   depositions, as you know, and I have read those
2   when they -- when the transcripts came out.
3   But I didn't re-read them for this -- to
4   prepare for this.
5        Q.   Mr. Blust, when were you first
6   involved in any matter involving Nuclear
7   Development?
8        A.   It was either 2001 or 2002.  It
9   was either late 2001 or early 2002.
10       Q.   Well, let me -- I think --
11       A.   It had to be 2001, I'm sorry,
12  because I left at the start of 2002.  It had to
13  be 2001.  I was still at Jenner.
14       Q.   All right.  Well, Nuclear
15  Development wasn't formed until 2012, right?
16       A.   Correct.
17       Q.   All right.  So you are referring
18  to some matter involving Bellefonte in 2001,
19  right?
20       A.   Correct.
21       Q.   Okay.  What were you involved with
22  in 2001?
23       A.   A whole series of different

Page 23

1   proposals.  We negotiated with TVA, met with
2   TVA numerous times and various financing
3   proposals.  At that time TVA had a -- TVA has a
4   financing cap imposed by Congress and they did
5   not have ability to finance under that cap the
6   three nuclear plants that they hadn't
7   completed.  So Mr. Haney, who has always had
8   business dealings with TVA, somehow decided he
9   wanted to make a proposal on financing these,
10  and I came up with those proposals.
11       Q.   And those proposals were not
12  accepted, correct?
13       A.   Unless you view the fact that they
14  did one of those proposals without us.  I guess
15  that's true.
16       Q.   Well, they -- Mr. Haney's
17  companies weren't involved in the financing --
18       A.   Correct.
19       Q.   -- correct?
20       A.   Correct.
21       Q.   All right.  After that series of
22  proposals, as you describe it, in 2001, what do
23  you recall as your next involvement doing work

Page 24

1   for Mr. Haney or any of his companies in
2   connection with Bellefonte?
3        A.   Well, that went through -- all the
4   way through the time when we actually -- when
5   they declared surplus and did the bidding.
6   There was rarely a time we weren't making some
7   kind of proposal to TVA.  There may have been
8   months here and months there, but this was a
9   continuous stream of proposals.
10       Q.   None of which were accepted,
11  correct?
12       A.   With the caveat I just said,
13  that's right.
14       Q.   Were you involved in forming
15  Nuclear Development as a company?
16       A.   I did.
17       Q.   All right.  Why was it formed?
18       A.   It was formed because we got far
19  enough along that we felt we had to have a new
20  -- an entity actually to do this, and that was
21  largely in regard to the tax credits.
22       Q.   Far enough along with what?
23       A.   With the proposals in doing

**Larry Blust**

Page 25

1  something with nuclear plant. And so we first
2  used it in regard to the tax credits.
3       Q.  All right. When you refer to the
4  tax credits, what do you mean?
5       A.  Well, there's a set of production
6  tax credits authorized by 45J of the Internal
7  Revenue Code which we applied for.
8       Q.  And does nuclear power have to be
9  produced to get the tax credits?
10      A.  To get the tax credits, yes. It's
11  a production tax credit, so based on
12  production.
13      Q.  And does one have to be the owner
14  of a nuclear plant to get the tax credits?
15      A.  Not to get the allocation of tax
16  credits, but to get the -- if you are talking
17  about actually use the credits, the amount of
18  credit you can use is based on production. And
19  you have to be the owner of that production.
20  Well, I shouldn't say that either. There was
21  an amendment to this provision that allowed
22  certain not-for-profits to transfer these
23  credits to people who were not owners of

Page 26

1  plants. So when we applied, the answer to your
2  question is yes.
3       Q.  So it's fair to say that the only
4  way that Nuclear Development or any of Mr.
5  Haney's companies would get a tax credit or Mr.
6  Haney get a tax credit is if the plant is built
7  and generates power?
8       A.  Correct.
9       Q.  Now, Nuclear Development was
10  formed in 2012, correct?
11      A.  I think that's right.
12      Q.  All right. That was four years
13  before, give or take a few months, TVA -- the
14  decision of the TVA Board to declare Bellefonte
15  to be surplus property?
16      A.  Correct.
17      Q.  What -- what was Nuclear
18  Development proposing when it was first
19  formed --
20      A.  It was formed to get the tax
21  credits. Tax credits are assigned -- you don't
22  get the tax credits until -- I think there was
23  a time period where you bid on the tax credits.

Page 27

1  This was formed to bid on the tax credits. We,
2  in fact, were accepted, but we formed it for
3  that purpose. And then it made various
4  proposals.
5       Q.  And would each of those proposals
6  have resulted in Nuclear Development owning all
7  or a part of the Bellefonte nuclear plant?
8       A.  No.
9       Q.  All right. Well, how was -- if
10  Nuclear Development wasn't going to own all or
11  part of the Bellefonte nuclear plant, how would
12  it ever get the benefit of any tax credits?
13      A.  The initial proposals were
14  long-term leases. Under the Internal Revenue
15  Code, a long-term lease with the right terms is
16  equivalent to ownership under the Code. So our
17  original proposals did not necessarily envision
18  us owning the plants, it was either/or
19  basically. And the proposals being made to TVA
20  at the time were we would lease the plant.
21      Q.  And at the time Nuclear
22  Development was formed, had TVA yet decided to
23  discontinue its plan to complete the

Page 28

1  construction of Bellefonte?
2       A.  Well, they had decided that at
3  least once and going back and decided to
4  complete and et cetera, et cetera. I don't --
5  I think it may have been a couple of times. So
6  the answer is yes, they had decided it.
7       Q.  Well, setting aside the first time
8  they did it, had they made -- had they made
9  that decision for the second time at the time
10  Nuclear Development was formed?
11      A.  I could be wrong on this, and it's
12  a matter of public record, but I believe they
13  did as to Plant 2. I believe they only were
14  willing to proceed ahead with Plant 1, that's
15  the second time around. Now, I would have to
16  go back and check the NRC records -- or the DOE
17  records actually.
18      Q.  And what -- do you know what your
19  exact position is at Nuclear Development?
20      A.  Yeah, it's secretary/general
21  counsel.
22      Q.  And what are your duties?
23      A.  Well, as secretary, I do corporate

**Larry Blust**

Page 29

1   minutes and consents, which is what a
2   traditional corporate secretary does.
3   Generally a secretary has no authority to do
4   anything in the way of a business matter; they
5   certify stuff.
6           And as general counsel, my -- my
7   position is exactly the same as were I not
8   general counsel and hired to be the attorney
9   for the company.
10          Q.   And your compensation arrangement
11  is hourly rate billing for those duties?
12          A.   Correct.
13          Q.   Have your duties changed over time
14  for Nuclear Development as general counsel and
15  secretary?
16          A.   What you do is change over time
17  with proposals, but my duties haven't changed.
18  I am the lawyer and I am the secretary.
19          Q.   And who do you report to?
20          A.   Well, you know, as a lawyer you
21  service a lot of people in the company, but I
22  report ultimately to Franklin Haney.
23          Q.   What is his position at Nuclear

Page 30

1   Development?
2           A.   Nuclear Development is an LLC, and
3   he is the sole manager and originally was the
4   sole member.
5           Q.   Are there other members now?
6           A.   There are other members now.
7           Q.   Who are the other members?
8           A.   The other members are five trusts
9   for each of his children, one trust -- one
10  trust each for each of his children might be a
11  better way to put it.
12          Q.   And who are the other officers of
13  Nuclear Development?
14          A.   Well, originally the other
15  officers were Frank Haney, Jr. as president,
16  William McCollum as vice president and chief
17  nuclear officer.  Let's see, somebody else in
18  there?  Myself as secretary-treasurer --
19  secretary -- I mean, secretary/general counsel.
20  I think that's it.
21          Q.   And how has that changed over
22  time?
23          A.   Well, at some point in time, Bill

Page 31

1   McCollum was made chief executive officer.  And
2   so he vaulted over Frank who remained
3   president, but a lot of companies will have a
4   CEO who is number one and a president who is
5   number two, and that was the structure that was
6   changed.  I don't remember exactly when.
7           Q.   And why was it changed?
8           A.   I got the impression that it was
9   changed because of Frank, Jr.'s divorce, when
10  he was going through an ugly divorce.  That was
11  my impression.  Nobody told me that.
12          Q.   What was the length between his
13  divorce and elevating Mr. McCollum to CEO?
14          A.   The length before -- from his
15  filing of his -- well, I don't -- you would
16  have to tell me what you want as a starting
17  point and what you want as a finish point.
18          Q.   Well, I am not going to tell you
19  how to answer a question, Mr. Blust.  What I'm
20  asking you --
21          A.   Well, to answer it, I have got to
22  understand those two.  What are you talking
23  about?

Page 32

1           Q.   Well, I am talking about when I
2   asked you why Mr. McCollum was made CEO and
3   vaulted over Frank Haney, Jr. as president, you
4   said you thought it was because of Frank, Jr.'s
5   divorce?
6           A.   Yes.
7           Q.   And my question is what about his
8   divorce caused that change to be made?
9           A.   Oh, my impression, this is just my
10  impression, was he was in a very bitter divorce
11  and his attention was taken away and his time
12  was taken away by his divorce issues.  Now,
13  some of this is -- I use the word divorce by --
14  as a colloquial term, because you can have
15  being in a divorce situation without having a
16  divorce on file.  And that was Frank's
17  situation.  We were negotiating separation
18  agreements and stuff like that.  So it's -- you
19  know, he didn't file like a lot of people that
20  divorce until later on, but he was in a
21  disputed marital situation.
22          Q.   And when do you recall this
23  disputed marital situation occurring?

**Larry Blust**                                        **11/13/2019**

Page 33

1     A.  Oh, boy.  I think it was the
2  latter part of '17 and the early part of '18.
3  I'm pretty sure he got divorced in about March
4  or April of '18.
5     Q.  And from your personal
6  observation, was he distracted from his work at
7  Nuclear Development by the divorce?
8     A.  Yes.
9     Q.  Did you discuss that with Franklin
10  Haney?
11     A.  I --
12         MR. O'REAR:  Let me object to the
13  extent you had an attorney-client communication
14  with Mr. Haney.
15     A.  I think that would involve
16  attorney-client communication on the thing,
17  but --
18     Q.  (BY MR. LEMBKE:)  Now, the -- at
19  what point did you learn that TVA might declare
20  Bellefonte to be surplus property?
21     A.  It was some -- I can't give you
22  the dates, but it was somewhere in probably
23  2016, I would guess, maybe 2015.

Page 34

1     Q.  And had Nuclear Development been
2  urging TVA to declare it to be surplus
3  property?
4     A.  No.  We were urging it to do it --
5  either sell it to us or lease it to us.  We
6  didn't care which.  The prior general counsel
7  of TVA took the position that they would only
8  lease it.  The new general counsel, the current
9  general counsel, took the position they would
10  have to declare it surplus property and sell
11  it.
12     Q.  The current general counsel being
13  Ms. Quirk?
14     A.  Right.
15     Q.  All right.  And is it true that
16  Nuclear Development urged TVA to sell it, the
17  Bellefonte property to Nuclear Development
18  without an auction?
19     A.  Correct.
20     Q.  And TVA declined, correct?
21     A.  Correct.
22     Q.  All right.  And were you involved
23  in a meeting -- did you attend a meeting with

Page 35

1  the Governor of Alabama at which Franklin Haney
2  was in attendance along with representatives of
3  TVA and Alabama -- or Southern Company?
4     A.  Was a representative of Alabama
5  Power, but yes, I was.
6     Q.  When do you recall that meeting
7  occurring?
8     A.  I don't remember, 2015, 2016.
9     Q.  And how was it that that meeting
10  came to be?
11     A.  I'm not sure.
12     Q.  What -- did Nuclear Development
13  contact the Governor of Alabama to enlist him
14  to hold that meeting?
15     A.  Once again, I'm not sure that
16  anybody contacted the Governor himself.  We
17  were having meetings with various people in the
18  administration in Alabama, particularly
19  environmental people, et cetera, and we had
20  some local attorneys in Alabama who I would
21  assume set that meeting up or did something.  I
22  don't know -- I mean, I didn't set the meeting
23  up.

Page 36

1     Q.  And who were those local attorneys
2  in Alabama?
3     A.  They are Hand Arendall.
4     Q.  Who at Hand Arendall?
5     A.  Roger -- Roger Bates.
6     Q.  Had you had any prior meetings
7  with Governor Bentley of Alabama before the
8  meeting with Alabama Power and TVA in
9  attendance?
10     A.  Yes.
11     Q.  Tell me about the prior meeting.
12     A.  Well, there may have been more
13  than one, I think there was more than one.
14  They were in general discussions of what we
15  wanted to do and what we needed from the
16  governor's office, and part of that was the
17  environmental end of the thing.
18     Q.  Well, tell me what you were asking
19  or telling Governor Bentley that you needed
20  from his office.
21     A.  Well, it changed over time, but we
22  wanted -- we wanted his support in regard to
23  economic development incentives and we wanted

**Larry Blust**

Page 37

1   his support in regard to the Clean Power
2   Regulations, the Obama Administration.
3       Q.   What do you mean by that?
4       A.   Well, the Obama Administration
5   came out with something called the Clean Power
6   Regulations, which was a significant detriment
7   to the use of coal for power and to some extent
8   to the use of natural gas.  And obviously this
9   benefitted nuclear.  So we met with the
10  governor's economic development coordinator,
11  whatever he was entitled, and also the chief
12  environmental person of the State to secure the
13  backing of the State for support of the clean
14  power plan.
15      Q.   And so you were urging the
16  Governor of Alabama to support regulations that
17  would be detrimental to the coal industry?
18          MR. O'REAR:  Objection,
19  argumentative.
20      A.   Well, let me put it a different
21  way.  They would be positive to nuclear energy
22  or any other hundred percent clean.
23      Q.   (BY MR. LEMBKE:)  And you

Page 38

1   understood that they would also be detrimental
2   to the coal industry?
3           MR. O'REAR:  Objection,
4   argumentative.
5       A.   Well, they clearly were
6   detrimental, that's why they got repealed by
7   the Trump Administration.  But they were
8   clearly detrimental to the coal industry.
9       Q.   (BY MR. LEMBKE:)  All right.  You
10  say there were two meetings that you recall
11  with Governor Bentley before the meeting he
12  attended with Alabama Power and TVA?
13      A.   I don't believe I said the number.
14      Q.   How many do you recall?
15      A.   I -- there had to have been at
16  least two, I don't remember how many.
17      Q.   All right.  Did you attend both of
18  the two you were --
19      A.   Well, I don't specifically
20  remember the two meetings.  I attended
21  virtually all of the meetings that I am aware
22  of in regard to Governor Bentley.
23      Q.   All right.  And what, if anything,

Page 39

1   do you recall him saying during those meetings
2   before the big meeting?
3       A.   He was very supportive.
4       Q.   Had Franklin Haney been a
5   political contributor to Governor Bentley's
6   campaigns?
7       A.   Not originally, I don't -- I don't
8   really know who Franklin contributes to, but I
9   know he made a later contribution before
10  Bentley was impeached or whatever happened to
11  him, but -- because it was part of the
12  proceeding, but I don't really know.  I doubt
13  it.
14      Q.   All right.  So you are saying even
15  though you have represented Mr. Haney for
16  thirty-six years, you don't know who he
17  contributes to politically?
18      A.   Well, from time to time I will
19  hear a statement about a political
20  contribution.  From time to time I will vet a
21  501(c)(4) or somebody -- or a PAC as to whether
22  they are entitled to take contributions.  But
23  even then I rarely know what did he contribute

Page 40

1   or did he contribute at all.
2       Q.   Are you aware if he was a
3   contributor to Governor Bentley's 501(c)(4)?
4       A.   I believe he was.
5       Q.   Do you know how much he
6   contributed?
7       A.   No.
8       Q.   Have you told me everything you
9   can remember Governor Bentley saying at those
10  pre-meetings that you attended?
11      A.   Pre --
12      Q.   When I say -- before the big
13  meeting.
14      A.   Oh, before the big meeting?  Yes.
15  General -- all I remember is generalities.
16      Q.   Do you remember what Mr. Haney
17  said at those meetings?
18      A.   Well, he would have promoted the
19  project.  I mean, he would have -- whatever
20  status the project was in, he would have been
21  the guy who led off and opened the meeting as
22  to here is where we are.
23      Q.   All right.  Now, the meeting that

**Larry Blust**                                          **11/13/2019**

Page 41

1   included Governor Bentley and Alabama Power and
2   TVA and you and the other Nuclear Development
3   representatives, what do you remember Governor
4   Bentley saying at that meeting?
5       A.   He was very supportive.  I don't
6   remember any specific statements by him, but he
7   was very supportive of the project.  He was
8   trying to encourage everybody in the room to
9   support the project because it was important to
10  the economic development of Alabama.
11      Q.   And do you recall what Alabama
12  Power representatives had to say at the
13  meeting?
14      A.   I think there was only one, and he
15  came out and said that he did not need the
16  power.
17      Q.   And do you recall if Bill Johnson
18  was there for TVA?
19      A.   I believe Bill was there.  Sherry
20  was there.  I believe Bill was there too.
21      Q.   All right.  What do you recall
22  Bill Johnson saying at the meeting?
23      A.   I thought it was Sherry, but one

Page 42

1   of the two of them said TVA doesn't need the
2   power either.  Might have been Bill, because he
3   was talking to the governor.
4       Q.   All right.  And do you remember
5   what Mr. Haney or anyone for Nuclear
6   Development had to say at the meeting?
7       A.   I just told you in general, and I
8   don't remember specifics.  I'm sure he promoted
9   the number of jobs, the amount of economic
10  development.  If we were at the time still
11  talking about the clean power issues, he
12  probably would have promoted this as a hundred
13  percent clean power.  I just don't remember any
14  specific conversations.
15      Q.   All right.  And after that meeting
16  do you ever recall another meeting that you
17  attended with Governor Bentley about
18  Bellefonte?
19      A.   I attended one more meeting with
20  Governor Bentley about Bellefonte, and it was
21  about the vacant Senate seat.
22      Q.   What do you recall being discussed
23  at that meeting?

Page 43

1       A.   The desire to have the Alabama
2   delegation continue to support this project and
3   therefore the Governor to appoint a senator who
4   was in favor of this also.
5       Q.   And did Mr. Haney do the talking
6   for Nuclear Development at that meeting?
7       A.   Yeah, I don't think I did any
8   talking.
9       Q.   And was Mr. Haney pushing a
10  particular candidate?
11      A.   No.
12      Q.   Didn't make any suggestions?
13      A.   Well, the Governor stated who he
14  was considering, and the Governor stated who
15  his was, and Mr. Haney supported that.
16      Q.   And who was that person?
17      A.   Luther Strange who did become
18  Senator.  He was the Attorney General at the
19  time.
20      Q.   All right.  Do you recall any
21  other meetings with Governor Bentley?
22      A.   Well, Governor Bentley was right
23  out of office after that, so there couldn't

Page 44

1   have been any other meetings.
2       Q.   Have you had any meetings with
3   Governor Ivey that you have attended about
4   Bellefonte?
5       A.   I possibly had one with Governor
6   Ivey, but I am not even sure that's the case.
7       Q.   Have you -- have you personally
8   participated in meetings with members of the
9   Alabama congressional delegation about
10  Bellefonte?
11      A.   Yes.
12      Q.   All right.  Who have you met with?
13      A.   Well, you would have to tell me
14  who the delegation is, but Luther Strange as
15  Senator was one of them.  And we met with -- I
16  met with various -- in a good share of the
17  case, it wasn't with the delegation members, it
18  was with the staff, usually meet with staff.
19  Because I am there to provide facts.
20      Q.   Did you meet with Richard Shelby?
21      A.   I do not believe I personally met
22  with Richard Shelby.
23      Q.   Do you know if Franklin Haney did?

**Larry Blust**

Page 45

1    A.   I would assume he did.

2    Q.   Did you meet with Jeff Sessions?

3    A.   I don't believe I ever met with

4  Jeff Sessions.

5    Q.   Do you know if Mr. Haney did?

6    A.   I would assume he did.  I don't

7  know.

8    Q.   Do you -- did you ever meet with

9  Congressman Aderholt?

10        MR. O'REAR:  Let me ask you to not

11  speculate or --

12    A.   Yeah, I don't know who Congressman

13  Aderholt is, so I don't know.

14    Q.   (BY MR. LEMBKE:)  All right.  Did

15  you ever meet with Congressman Brooks?

16    A.   Yes, Mo Brooks, yes.

17    Q.   And how many times have you met

18  with Mo Brooks?

19    A.   I actually met with him personally

20  once.

21    Q.   And what did you discuss with him?

22    A.   Discussed the support of Bellmont

23  -- Bellefonte.

Page 46

1    Q.   When was that?

2    A.   Well, he wasn't in office very

3  long, so it was not long after he took office.

4  I had another meeting with his staff.

5    Q.   All right.  And were there

6  specific subjects you were covering?

7    A.   I was covering the legal aspects

8  of Bellefonte and what, you know, we were

9  promoting, what it could do for the State of

10  Alabama.

11    Q.   What do you mean by legal aspects

12  of Bellefonte?

13    A.   The structure, the tax credits, et

14  cetera, et cetera, et cetera, the budget.  Some

15  of these are in regard to the Trump

16  Administration has proposed to rescind the

17  budget of this program every single year, so

18  some of these meetings consisted of meetings

19  predominantly with staff to say please support

20  keeping this budget, it is a good program.  And

21  I provided the background, not the lobbying,

22  but the background or the mechanics of how the

23  budget worked.

Page 47

1    Q.   And who provided the lobbying?

2    A.   Becky Halkias or Bud Cramer or

3  Ickes, although I don't think he did much of

4  the direct lobbying.

5    Q.   Who is Mickey Halkias?

6    A.   Becky.

7    Q.   Becky.  Who is Becky Halkias?

8    A.   She works for Bud Cramer, FTI I

9  think is the name of the firm.  Whatever --

10  it's a big lobbying firm that Bud Cramer is

11  with.

12    Q.   And that firm is paid thirty-five

13  thousand dollars a month every month by Nuclear

14  Development, correct?

15    A.   If I hadn't heard that the other

16  day in this very room I wouldn't know that.

17  But yes, it has always been paid, like almost

18  all lobbyists, a monthly retainer.  I suspect

19  it was less earlier.

20    Q.   And what does -- is it Harold

21  Ickes?

22    A.   Harold Ickes.

23    Q.   And what does Harold Ickes do for

Page 48

1  Nuclear Development?

2    A.   He was also a lobbyist.

3    Q.   Who was he lobbying?

4    A.   I assume the same people.  I never

5  saw him lobby anybody, but I am assuming the

6  same people.  He was a Democratic lobbyist.

7  But Cramer who was a former Republican

8  Congressman was the Republican lobbyist.  All

9  lobbyists lobby all sides.

10    Q.   All right.  Did you ever meet with

11  Congressman Rogers, Mike Rogers of Alabama?

12    A.   Not that I can remember.

13    Q.   Did you ever meet with either of

14  the Tennessee senators or any of the Tennessee

15  senators about this project?

16    A.   Me personally?  No.

17    Q.   Yes.  Did you ever meet with any

18  senior officials of the Obama Administration

19  about this project?

20    A.   No.  I had a couple of

21  conversations with I think it was McCarthy,

22  whoever it was that was the EPA administrator,

23  but those were on the phone and they were in

**Larry Blust**                                                    **11/13/2019**

Page 49

1   regard to the clean power plant and our support
2   of it.
3       Q.   What about have you ever attended
4   meetings with senior members of the Trump
5   Administration about the Bellefonte project?
6       A.   Well, once again --
7       Q.   Or spoken to them on the phone?
8       A.   Once again, it's who is the senior
9   member.  If you consider the people who work
10  for DOE and NRC to be senior members, then I
11  guess I have met with senior members.  But I
12  haven't met with anybody of any power in the
13  Trump Administration.
14      Q.   You have not met with Secretary
15  Perry?
16      A.   No.
17      Q.   Do you know if Mr. Haney has met
18  with Secretary Perry?
19      A.   I don't know.
20      Q.   And Nuclear Development hired a
21  lobbyist who has particular connections to
22  Secretary Perry, correct?
23      A.   Well, all lobbyists purport to

Page 50

1   have connections with whoever they are
2   lobbying.  There were a number of different
3   people who were lobbying DOE people, I don't
4   know if they really had connections with Perry.
5       Q.   You know who I am talking about,
6   though, don't you?
7       A.   No.  Why don't you tell me?
8       Q.   Mr. Bailey?
9       A.   Oh, Mr. Bailey?  He was rather
10  recently hired, yes.
11      Q.   And you are aware that he has
12  connections to Mr. Perry from Texas, right?
13      A.   I am aware that Mr. Bailey is from
14  Texas and has been a contributor to Mr. Trump.
15  I am not aware at all of what connections he
16  has to Mr. Trump.
17      Q.   You mean Mr. Perry?
18      A.   Oh, Mr. Perry, I'm sorry.  I
19  thought you were talking -- yeah, he didn't
20  contribute to Perry.  He contributed to Trump.
21  He may have contributed to Perry too.  Perry
22  was already in the Secretary of DOE position
23  when he was hired, so --

Page 51

1       Q.   Were you involved in the decision
2   by Bellefonte to submit a bid at the auction
3   for the sale of the Bellefonte property?
4       A.   Well, once again, it depends -- I
5   hate to say like Bill Clinton, but it depends
6   on what you mean by involved.  I drafted up the
7   bid.  I can hardly say that I was a member of
8   making the decision to do the bid, but I
9   drafted the bid itself, I negotiated the stuff
10  with Concentric, et cetera.
11      Q.   All right.  And let me get you to
12  look for Exhibit 42 which is in your --
13      A.   Stack here?
14      Q.   -- should be in your stack.
15          (Whereupon, Exhibit Number 42,
16           having been previously marked for
17           identification, was referenced in
18           this deposition.)
19      A.   Let's look in this stack here.
20  42.  Maybe they are in order at the bottom,
21  give me a minute --
22          MR. O'REAR:  It would have been
23  the second one that we had in the stack if they

Page 52

1   are in order.
2       A.   There is a bunch of 37s here too
3   -- I think they are in order.  Hang on a minute
4   here.  Here looks like 42.  Okay.  Yes, it is
5   42.
6       Q.   (BY MR. LEMBKE:)  All right.
7   Before we look at 42, you are aware that TVA's
8   adviser in connection with the auction of the
9   Bellefonte site was Concentric, right?
10      A.   Correct.
11      Q.   And you dealt primarily with
12  Carrie O'Neill at Concentric, correct?
13      A.   Yes.
14      Q.   All right.  And this 42 is an
15  email that you sent to Ms. O'Neill on August
16  18th, 2016, correct?
17      A.   Looks like it.
18      Q.   And in the numbered paragraph one,
19  which I believe is a response to a suggestion
20  of confidentiality, right?
21      A.   Response to a suggestion of --
22      Q.   About a confidentiality provision.
23  Number one begins in Section 3, We deleted C

Page 53

1  barring disclosure of the --
2      A.  Oh, you are talking paragraph one.
3  I'm sorry, okay.
4      Q.  Yes, sir.
5      A.  Okay, I'm sorry.  I thought you
6  were talking Section 1, which is not really in
7  here.  Okay, paragraph one -- yes?
8      Q.  At the end of the third line, you
9  say:  As part of this process, ND has contacted
10  various interested government officials and
11  legislators and met with DOE, NRC, IRS, and
12  other governmental agencies and customers and
13  suppliers of TVA about the feasibility and
14  financing of the project.  Do you see that?
15      A.  I see it.
16      Q.  And I guess my question to you is
17  other than who we have talked about, what other
18  government officials and legislators had
19  Nuclear Development contacted as of the time
20  you wrote this, that you can recall?
21      A.  Well, there were other legislators
22  that I don't recall the name of or their staff.
23  In most cases I met with staff.

Page 54

1      Q.  All right.  So sitting here today,
2  you can't recall the name of another government
3  official or legislator, is that fair, other
4  than what was previously talked about?
5      A.  Other than what we previously
6  talked about, yeah, I think that's fair.
7      Q.  All right.  Now, the meetings with
8  the DOE pertain to the application or a
9  potential application for a loan to Nuclear
10  Development?
11      A.  Correct.
12      Q.  All right.  And the meetings with
13  the IRS pertain to potential tax credits?
14      A.  Tax credits.
15      Q.  All right.  As of this time,
16  August 18th, 2016, other than what you told me
17  about your meetings in early, you know -- many
18  years before about the continuing validity of
19  the permits, what had Nuclear Development
20  representatives met with the NRC about as of
21  this date?
22      A.  I think that was mainly the
23  meetings by then, I don't know exactly what the

Page 55

1  dates where we met with people.  But I think it
2  was after 8/18/16 that we actually met with NRC
3  in regard to the specific transfer thing,
4  because we were talking about a leasing
5  transaction prior to that.  But I don't know.
6      Q.  Okay.  When you say here that met
7  with other governmental agencies, other than
8  the Alabama state agencies you have referenced
9  relating to environment and economic
10  development, do you recall other governmental
11  agencies that -- and the Office of the Governor
12  of course that you talked about -- other
13  governmental agencies, state, federal, local,
14  that you met with -- or Nuclear Development met
15  with as of August 18th, 2016?
16      A.  We met with the finance director
17  who is a separate officer of the Governor of
18  Alabama.  I think he's the second most
19  powerful.  In regard to also legislatures, I
20  met with certain state legislatures too.  And
21  also local community officials, although
22  largely meet and greet, people from Huntsville
23  and the area around the plant.

Page 56

1      Q.  Any others you can remember?
2      A.  Well, as far as government
3  agencies, I already related that I talked to
4  the EPA --
5      Q.  Right.
6      A.  -- support of the green power
7  raids.
8      Q.  Any others?
9      A.  Not that I can think of, that's --
10      Q.  You also indicate as of August
11  18th, 2016 that Nuclear Development has
12  contacted customer -- or met with customers of
13  TVA about the feasibility in financing the
14  project.  What were you referring to there?
15      A.  Well, I'm sure that Franklin and
16  Bud Cramer met with customers.
17      Q.  Why are you sure?
18      A.  Because I actually in some cases
19  supplied information.
20      Q.  Do you know what customers they
21  met with?
22      A.  Not offhand, no, and I don't know
23  the times.

**Larry Blust**                                          **11/13/2019**

Page 57

1     Q.   All right.  Any other knowledge
2   you have or -- or anything else you meant by
3   that reference to meetings with customers of
4   TVA?
5     A.   Well, let me just say one more
6   thing.  TVPPP -- PPA, Tennessee Valley Private
7   Power Association, which is an association of
8   customers.
9     Q.   Did you meet with them?
10    A.   I met with them.
11    Q.   And what was the nature of that
12  meeting?
13    A.   The meeting I attended was their
14  annual meeting, and actually had to do with
15  would they like to invest.  They were out
16  looking for a plant investment at the time.
17    Q.   All right.
18    A.   And how to structure that if they
19  did.
20    Q.   Any other customer meetings that
21  you can recall that you were referring to when
22  you sent this note to Ms. O'Neill?
23    A.   At this time, no.

Page 58

1     Q.   All right.  And then what
2   suppliers of TVA had ND met with that you were
3   referring to as of August 18th, 2016 when you
4   sent this to Ms. O'Neill?
5     A.   Well, as Frank Haney said,
6   virtually everybody who provided nuclear
7   services had done something for TVA.  And we
8   did a round-robin with virtually every major
9   company that provided -- and there aren't that
10  many -- who provide nuclear service.
11    Q.   All right.  And had you been
12  involved in those meetings?
13    A.   Some of them I was involved in.
14  Most of them I just negotiated an NDA.
15    Q.   All right.  And NDA meaning
16  nondisclosure agreement?
17    A.   Right.
18    Q.   And which ones do you remember
19  being part of the meeting with?
20    A.   At this time it probably would
21  have been Bechtel, assuming we had met with
22  Bechtel at this time.  Some of these may be
23  after this time, because most of those meetings

Page 59

1   were after there was already a sale.  I met
2   with AREVA and I met with Bechtel.  And those
3   are probably the only two at this time,
4   although it's possible that other -- whole
5   other list we could have met with sometime
6   here.
7     Q.   All right.  Now, let me get you to
8   look at Exhibit 43 that has been previously
9   marked that should be in your stack.
10         (Whereupon, Exhibit Number 43,
11         having been previously marked for
12         identification, was referenced in
13         this deposition.)
14    A.   Okay.
15    Q.   All right.  This is an email you
16  sent to Ms. O'Neill on September 9th, 2016
17  attaching Nuclear Development's Indicative Bid
18  for the Bellefonte auction, right?
19    A.   Correct.
20    Q.   And what is an Indicative Bid, Mr.
21  Blust?
22    A.   It's your intent to bid at an
23  auction.

Page 60

1     Q.   And did you personally prepare
2   this or oversee its preparation?
3     A.   I believe I personally prepared
4   this.
5     Q.   All right.  And if you look at
6   page six of the Indicative Bid which is Bates
7   number 5054 at the bottom --
8     A.   (Reviewing document.)  Okay.
9     Q.   Under the first paragraph, Closing
10  Conditions, and that last sentence of the
11  Indicative Bid stated:  However, the closing
12  itself and payment of the purchase price must,
13  in addition to environmental clearance, be
14  conditioned on NRC approval of the transfer of
15  the existing construction licenses and ND
16  receiving a written commitment for financing of
17  the completion costs.
18         Do you see that?
19    A.   No.  Which paragraph was this in?
20    Q.   Do you see on page six of the --
21    A.   Oh, first paragraph.  I was
22  looking at the last paragraph.
23    Q.   Yes, sir.

**Larry Blust**                                                    **11/13/2019**

Page 61

1    A.   First paragraph, yes.
2    Q.   So the second sentence --
3    A.   I see it.
4    Q.   -- beginning however?
5    A.   Uh-huh.
6    Q.   It says:  The closing itself and
7    payment of the purchase price must, in addition
8    to environmental clearance, be conditioned on
9    NRC approval of the transfer of the existing
10   construction licenses and ND receiving a
11   written commitment for financing of the
12   completion cost.
13        Do you see that?
14   A.   Sure do.
15   Q.   And why was it that Nuclear
16   Development wanted to condition closing on NRC
17   approval of the transfer of the existing
18   construction licenses?
19   A.   Didn't want to take the risk.
20   Q.   And the same with the financing?
21   A.   Yes.
22   Q.   All right.  And when you say
23   didn't want to take the risk, you mean the risk

Page 62

1    that the transfer would not be approved?
2    A.   Hang on.  Put it over here?  Oh,
3    sorry.  I'm sorry, I didn't hear your question.
4    Q.   All right.  And when you say
5    didn't want to take the risk, you mean the risk
6    that the transfer would not be approved?
7    A.   Correct.
8    Q.   Now, let me ask you to look at
9    what I am going to mark as Exhibit 88.
10        (Exhibit Number 88 was marked for
11        identification.)
12   Q.   And in particular I would like you
13   to look at the third page of that exhibit.
14   There is an email from you to Carrie O'Neill on
15   October 2nd, 2016; do you see that?
16   A.   Yes, I do.
17   Q.   All right.  And this is an email
18   where you are conveying Nuclear Development's
19   concerns or needs for clarification regarding
20   the proposed Purchase and Sale Contract, right?
21   A.   Yes.
22   Q.   All right.  And if you look under
23   A4, you are making a comment about Section 1E.

Page 63

1    A.   Uh-huh.
2    Q.   And in it you say:  The transfer
3    of the license needs to be a condition to
4    closing by making approval of transfer a
5    required consent in Schedule 6H, right?
6    A.   That's right.
7    Q.   And was that again an attempt to
8    reduce risk?
9    A.   Yes.
10   Q.   All right.  Now, let me show you
11   what I am going to mark as Exhibit 89.
12        (Exhibit Number 89 was marked for
13        identification.)
14   Q.   And this is an email you sent to
15   Carrie O'Neill on October 18th, 2016 indicating
16   that Nuclear Development was not satisfied with
17   the draft of the contract and attaching a
18   letter that contained the actual changes that
19   Nuclear Development said it required, correct?
20   A.   Correct.
21   Q.   And then attached to that email is
22   your letter of October 18, 2016 to Ms. O'Neill,
23   correct?

Page 64

1    A.   I think that was the letter you
2    were just talking about a moment ago.  There is
3    only one letter attached to this.
4    Q.   Right.  I was referring a moment
5    ago to the cover email.
6    A.   Oh, I'm sorry.  I thought you were
7    referring to the letter.
8    Q.   All right.  Well, the letter, in
9    fact, contains the changes to the proposed
10   Purchase and Sale Contract that Nuclear
11   Development wanted made, correct?
12   A.   At this time that's right.
13   Q.   All right.  And at the bottom of
14   the first page --
15        Well, I will just leave it with
16   this contained the changes that you were asking
17   for as of October 18, correct?
18   A.   In regard to the draft that we had
19   reviewed at that point, that's right.
20   Q.   Yes.
21   A.   The drafts changed.
22   Q.   Okay.  Then I want to show you
23   what I am going to mark as Exhibit 90.

**Larry Blust**

**11/13/2019**

Page 65

1        (Exhibit Number 90 was marked for
2        identification.)
3        Q.   And this is Ms. O'Neill's letter
4    to you of October 24th, 2016 in response to
5    your October 18 letter, right?
6        A.   Correct.
7        Q.   All right.  In the second
8    paragraph at the end of the second line, Ms.
9    O'Neill says:  As you know, TVA and Concentric
10   met with you and representatives of your client
11   Nuclear Development, LLC, including Franklin
12   Haney, on October 4th, 2016.
13       Do you see that?
14       A.   Correct.
15       Q.   And do you recall attending that
16   meeting?
17       A.   Yes.
18       Q.   What do you recall being discussed
19   at that meeting?
20       A.   What I recall being discussed at
21   that meeting was our need for the changes that
22   we were talking about.
23       Q.   All right.  And then Ms. --

Page 66

1        A.   Says here I reported on financing
2    -- they probably asked me some questions about
3    where we were on things.
4        Q.   So Ms. O'Neill said you reported
5    on your client's progress in arranging
6    financing to complete the two partially-
7    constructed nuclear reactors on the BLN
8    property and in obtaining the approval of the
9    Nuclear Regulatory Commission, NRC, to transfer
10   TVA's permits to construct the two units.
11       Do you see that?
12       A.   See it.
13       Q.   And you don't have any quarrel
14   that that's what you reported on at the
15   meeting, right?
16       A.   I don't have any quarrel.
17       Q.   All right.  And do you recall what
18   progress you reported on obtaining the approval
19   of the NRC to transfer TVA's permits to
20   construct the two units?
21       A.   It was probably what I related to
22   you about the meeting with the NRC, that the
23   NRC was receptive to transferring those and

Page 67

1    didn't have a problem with those permits.
2        Q.   Well, you told me that that
3    meeting had occurred in 2001 or 2002, I
4    thought.
5        A.   No, it was later than 2001 or
6    2002.  It was probably anywhere from 2002 to
7    2005 is what I think I told you --
8        Q.   All right.
9        A.   -- during that area.  It's when we
10   checked the permits.
11       Q.   All right.  And you had a
12   discussion with the NRC at that time about
13   whether they would be open to transferring the
14   permits to a Haney entity?
15       A.   Well, the main discussion there
16   was the validity of the permits and whether
17   they were amenable to continuing those permits.
18   And we viewed the lease, a long-term lease, as
19   a transfer.  I don't know whether NRC did or
20   not.
21       Q.   All right.  Well, other than that
22   discussion with the NRC about the permits in
23   the 2002 to --

Page 68

1        A.   2005 --
2        Q.   -- '05/'06 range, had you had any
3    conversations before you sent this letter to
4    Ms. O'Neill with the NRC about a potential
5    transfer of the construction permits for
6    Bellefonte?
7        A.   It's possible, but I don't
8    remember any.
9        Q.   Okay.  Then Ms. O'Neill goes on to
10   say:  You said that your client needed to be
11   able to show that it was the winner at the
12   public auction before November 23rd, 2016, and
13   that time was needed to complete financing and
14   transfer the permits before your client would
15   fully commit to purchase and invest in the BLN
16   property.
17       Do you see that?
18       A.   I see that.
19       Q.   Do you have any quarrel with what
20   she said there?
21       A.   No, I don't have any quarrel.
22       Q.   And then she goes on to say:  You
23   estimated that it would take one year to

**Larry Blust**                                                **11/13/2019**

Page 69

1    complete financing and to obtain NRC approvals
2    after the auction, but could take as long as
3    two years.
4            Do you see that?
5        A.    I see that.
6        Q.    And do you have any quarrel with
7    her relating what you said on that point?
8        A.    Well, I'm sure I said the one
9    year.  I don't remember the two years, but it's
10   possible.
11       Q.    But you don't dispute -- if she
12   said you said it, you don't dispute that you
13   said it?
14       A.    Well, I just don't know if I said
15   it.
16       Q.    Okay.  Then if we look at the
17   bottom paragraph on the first page, she says:
18   Accordingly, TVA has informed interested
19   entities that it would not accept open-ended
20   contingencies that would allow the successful
21   bidder to defer investing in the site for an
22   unlimited period of time.
23           Do you see that?

Page 70

1        A.    I see that.
2        Q.    And then she goes on:  After
3    Concentric's discussions with multiple
4    potential bidders, TVA recognizes that
5    providing the successful bidder more time to
6    address whatever contingency the bidder may
7    encounter could encourage more bids and would
8    be reasonable.
9            Do you see that?
10       A.    Yes.
11       Q.    She then goes on to say:  The
12   draft agreement was revised to do this by
13   deferring closing for two years, at which time
14   the full purchase price would have to be paid.
15           Do you see that?
16       A.    See that.
17       Q.    And so you understood that they
18   were accommodating the concern about -- on the
19   part of Nuclear Development that it wanted to
20   have approval for transfer of the construction
21   permits before closing, they addressed that by
22   extending the time for closing to two years?
23       A.    That's what they said.  I didn't

Page 71

1    view that as addressing our concern.
2        Q.    All right.
3        A.    I believe there is a subsequent
4    communication with Concentric that says I
5    didn't view that as addressing our concern.
6        Q.    All right.  But you understood
7    that's how Concentric --
8        A.    I understood that's what she was
9    saying.
10       Q.    All right.  And then she goes on
11   to say:  The agreement also would start a
12   minimum investment period one year after this
13   deferred closing date.
14           You see that?
15       A.    Yep.
16       Q.    All right.  And then on the second
17   page where she responds to Nuclear
18   Development's specific request, under Section
19   1, Licensing Issue, Part B, she says:  You
20   asked that TVA condition closing on the
21   successful bidder obtaining identified
22   environmental permits and transfer of the two
23   NRC construction permits.

Page 72

1            Do you see that?
2        A.    Correct.
3        Q.    She says:  Based on your
4    statements, the two-year deferred closing
5    should be more than sufficient time for your
6    client and any other bidder who may be
7    interested in a transfer of the permits to
8    accomplish this.
9            Do you see that?
10       A.    I see it.
11       Q.    All right.  And ultimately Nuclear
12   Development accepted the two-year closing
13   period and did not insist on the specific
14   closing condition that you were seeking?
15       A.    Well, we were turned down a second
16   time and we gave up, if that's what you mean by
17   we accepted.  I mean --
18       Q.    Nuclear Development signed the
19   contract --
20       A.    Correct.
21       Q.    -- without what you were asking
22   for in it?
23       A.    Right.

**Larry Blust**

**11/13/2019**

Page 73

1    Q.   All right.  Now, in all of your
2  interactions with TVA, you knew that TVA was
3  represented by its in-house counsel, correct?
4    A.   Well, I also knew that TVA had
5  lots of outside counsel that was primarily on
6  litigation, but I knew that they were
7  represented on most internal negotiations by
8  in-house counsel.
9    Q.   Well, and you knew in conjunction
10 with -- from the time the sales and purchase
11 agreement was signed by Nuclear Development
12 through November 2018, you knew that TVA's
13 in-house counsel was involved in representing
14 TVA?
15    A.   Yeah, I don't know if anybody else
16 was, but I do know Sherry Quirk was --
17    Q.   Okay.
18    A.   -- and her people.
19    Q.   All right.  And you understand as
20 a lawyer that you have certain ethical limits
21 on your ability to communicate with non-lawyers
22 who are represented by lawyers, correct?
23    A.   If you have a dispute going, yes.

Page 74

1  Typically in contract negotiations, you
2  communicate with all kinds of people who are
3  not lawyers.  That's the way contracts are
4  normally done.
5    Q.   Who is Jim Chardos?
6    A.   Jim Chardos was the plant manager
7  at Bellefonte.
8    Q.   All right.  And did anyone at TVA
9  authorize you to communicate with Mr. Chardos
10 without the participation of counsel?
11    A.   Yeah, we got -- we got
12 instructions to contact him because he was the
13 contact person for the transition team.  He
14 provided the due diligence -- this is the way
15 most contracts work, I am not saying there is
16 anything different.  Typically you have a
17 business person who provides a due diligence
18 rather than an attorney.  The attorney would go
19 to a business person and get it and give it to
20 you, that's kind of a waste of expense.  And in
21 this particular case, Mr. Chardos was tied with
22 several things:  One was get us what we needed
23 for due diligence, another one was to do the

Page 75

1  transition for the sale.  And he had a
2  committee or group, but I was told talk to
3  Chardos, don't talk to the committee or the
4  group.
5    Q.   About those subjects?
6    A.   About those subjects, and I did
7  talk about both of those subjects.
8    Q.   All right.  And who gave you that
9  instruction?
10    A.   I don't remember.  I think there
11 may even be a written instruction, I just don't
12 remember.
13    Q.   All right.  Did you -- what would
14 be your best estimate between November of 2016
15 and November of 2018 of the number of
16 conversations -- phone conversations you had
17 with Mr. Chardos?
18    A.   Probably hundreds.
19    Q.   Hundreds?  All right.  And how
20 many face-to-face meetings do you recall having
21 with Mr. Chardos?
22    A.   Well, I attended some meetings
23 down at the plant which were generally tours of

Page 76

1  either myself and the other people representing
2  Nuclear Development or of other people who were
3  suppliers or potential contractors or whatever
4  else, or our engineering folks.  I actually
5  attended as a courtesy mainly the tour by the
6  DOE people of the plant.  Mr. Chardos conducted
7  each one of those tours.  He is a wonderful
8  tour host.
9    Q.   And have you had any
10 communications with Mr. Chardos after November
11 30th, 2018?
12    A.   I don't believe so.  It's possible
13 he would have called me to confirm that the
14 contract had been terminated, but I don't
15 believe that's true.
16    Q.   You don't recall any other
17 communications with him?
18    A.   After November 30th?
19    Q.   Yes, sir.
20    A.   Uh-uh.
21    Q.   And if you had received such
22 communication, you would have told him it was
23 not appropriate for you to talk to him?

**Larry Blust**                                          11/13/2019

Page 77

1    A.   Well, it would depend on what that
2  was.  If he -- if he had called me to say did
3  somebody terminate the contract, I probably
4  would have told him yes.  I don't think he did
5  that.
6    Q.   And what is the last interaction
7  you recall having with Mr. Chardos?
8    A.   Well, he was -- at the end he was
9  calling me virtually every day, because he was
10 arranging contracts with the various people who
11 -- almost all of the services at Bellefonte
12 were provided by contractors, they are not
13 provided by TVA employees.  So you had Mr.
14 Chardos and maybe two other employees there or
15 something, I don't know how many, but he was
16 arranging --
17       For instance, the security
18 company, we were trying to arrange the exact
19 same services that TVA had with the same
20 people.  And he was the guy negotiating -- or
21 at least supervising the negotiations, so he
22 was acutely concerned, where are you?  And a
23 lot of his concern was did you get an

Page 78

1  extension?  Because he was on the line to have
2  a contract in place if we didn't get an
3  extension.  And we were right up against the
4  deadline here, and he was the point man for
5  these contracts.
6    Q.   So Mr. Chardos was negotiating
7  contracts on behalf of Nuclear Development?
8    A.   Mr. Chardos or somebody under him.
9  Mr. Chardos was the guy that talked to me about
10 the contracts.  Remember, I was supposed to be
11 talking to Mr. Chardos.
12   Q.   Yes.
13   A.   And he would call me about -- I
14 remember particularly a -- I think he may have
15 distributed me a copy of the security contract.
16 He needed to have us approve any of the
17 contracts.  There was a maintenance contract, a
18 security contract, those are the two main
19 contracts down there.  He was trying to be sure
20 that he could contract with those same people
21 who were providing their service so that after
22 the transfer of the property, the exact same
23 services would have been provided.

Page 79

1    Q.   I am having trouble understanding,
2  Mr. Blust, why a TVA employee was negotiating
3  contracts between third-parties and Nuclear
4  Development.
5    A.   Because he was tasked by TVA of
6  making sure that you didn't simply have an
7  abandoned nuclear plant the day after the
8  closing.  I mean, typically somebody who is on
9  the sale side of a transaction tries to do
10 transition services, and lot of times they will
11 contract to do it themselves.  Had TVA been
12 providing these services themselves, I'm
13 assuming we would have had a contract with TVA
14 to provide these services.  They were not
15 providing these services themselves.
16   Q.   So you believed it was within the
17 charge to Mr. Chardos as a TVA employee to be
18 negotiating contracts on behalf of Nuclear
19 Development?
20   A.   Well, once again, I didn't view
21 him as negotiating contracts on behalf of
22 Nuclear Development.  I negotiate -- I believed
23 he was negotiating on behalf of TVA to have an

Page 80

1  orderly transition of the project and that
2  somebody else tasked him.  I never asked him to
3  negotiate any contracts.  And I don't know
4  whether he did it or somebody -- there is a
5  transition committee, mostly -- I didn't know
6  who it was.  There were some lawyers on it, et
7  cetera, et cetera, and I would suspect that Mr.
8  Chardos didn't himself negotiate these
9  contracts.  But he was the guy who I was
10 supposed to be talking to, and I honored that
11 and he honored it.
12   Q.   All right.  Mr. Blust, there came
13 a time when Nuclear Development decided to ask
14 for an extension of the closing date, correct?
15   A.   Correct.
16   Q.   And did you ask Mr. Chardos to
17 draft the letter making that request to TVA on
18 behalf of Nuclear Development?
19   A.   I don't believe I ever asked him
20 to do it.  He apparently did it.  So I am
21 assuming somebody on the TVA side asked him to
22 do it.  I never asked him to do it.  I sent an
23 email, I believe, maybe it was a letter, asking

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Larry Blust**                                    **11/13/2019**

Page 81

1   for the extension.  And suddenly popped up a
2   draft of -- a very short draft of an extension.
3   It looked very professionally done, so my guess
4   is some TVA lawyer did it, but I don't know.
5       Q.   I am not talking about that.  I am
6   talking about the letter you sent to TVA
7   requesting an extension.  Was --
8       A.   I drafted that.
9       Q.   You drafted that?
10      A.   Yeah.
11      Q.   Well, let me show you --
12      A.   There is another letter, however,
13   that actually was a formal extension.  You are
14   talking about the one that Mr. Chardos sent me.
15   I am the one who originally drafted up that we
16   would like an extension.
17          MR. O'REAR:  Just let him ask you
18   a question.  I am not sure you are responding
19   to his question.
20      Q.   (BY MR. LEMBKE:)  Well, let me
21   show you what I am going to mark as Exhibit 91.
22          (Exhibit Number 91 was marked for
23          identification.)

Page 82

1       Q.   Now, this was produced out of
2   Nuclear Development's files.
3       A.   Correct.
4       Q.   And at the top it appears as
5   though the name of the letter is ND to TVA
6   Extension Letter; do you see that?
7       A.   Right.  We also produced a copy of
8   that letter.
9       Q.   What letter is it that Mr. Chardos
10   drafted?
11      A.   Well, once again, I don't know
12   that he drafted it.  He sent a letter which was
13   a formal request on TVA letterhead.
14      Q.   For what?
15      A.   For the extension.
16      Q.   Why would TVA be requesting an
17   extension?
18      A.   At the time, my understanding was
19   that TVA people who were dealing with this
20   would have liked to have seen an extension.
21      Q.   All right.
22      A.   Okay?  Now, I don't know, because
23   it appeared on my email as a surprise to me.

Page 83

1       Q.   And did you contact any TVA
2   lawyers with whom you were dealing on a regular
3   basis about that?
4       A.   No.  The only comment I had is
5   what you see right here (indicating).
6       Q.   All right.  Now, Mr. Blust, you
7   are aware that Nuclear Development was pressing
8   TVA for an answer --
9       A.   Yes.
10      Q.   -- about the six-month extension
11   request, correct?
12      A.   Well, not at this time, but later
13   on, yes.
14      Q.   All right.  In early November
15   2016, correct?
16      A.   Even earlier than that, yes.
17      Q.   Right.  And you were dealing with
18   TVA lawyers in discussions about where that
19   decision stood with regard to that, correct?
20      A.   Correct.
21      Q.   All right.  Let me show you what I
22   am going to mark as Exhibit 92.
23          (Exhibit Number 92 was marked for

Page 84

1          identification.)
2       Q.   And if you start on the second
3   page, it begins with an email from Mr. Chardos
4   to you asking did we get any feedback; do you
5   see that?
6       A.   (Reviewing document.)  Yes, I do.
7       Q.   And you responded:  TVA has now
8   delayed a response to Monday giving the excuse
9   that Bill Johnson is in London.
10          Do you see that?
11      A.   I think that is the predicate to
12   the one you read above.
13      Q.   No, I -- the one I am talking
14   about is the beginning is the bottom email --
15      A.   I thought you were asking about
16   did we get any feedback.
17      Q.   It is.  And that's -- that's
18   November 2nd, 2018 at 3:15 p.m.; do you see
19   that?
20      A.   Well, we didn't get any feedback
21   until November 5th.
22      Q.   No, sir, right -- if you look
23   where I am pointing over here, it's right

**Larry Blust**                                    **11/13/2019**

---

Page 85

1    there.

2          A.   Yeah, that was an email prior to

3    the November 5th one.  That was November 2nd.

4          Q.   Right.  That was from Jim Chardos

5    to you asking did we get any feedback.

6          A.   No, the one you are talking about

7    was from me.  It says Larry D. Blust wrote.

8    That's the way emails are often copied.

9          Q.   Right.  But if you look below

10   that, Mr. Blust, you were responding to Mr.

11   Chardos' email asking did we get any feedback

12   at 3:15 on November 2nd.

13         A.   Correct.  That was an email

14   exactly the same as the one up above earlier.

15         Q.   Yes.

16         A.   Okay.  That's the one you are

17   talking about?

18         Q.   Yes.

19         A.   And that was my response.

20         Q.   All right.  Now, you believed it

21   was appropriate to be having discussions about

22   what was going on with TVA even though your

23   primary discussions about the extension -- let

---

Page 86

1    me start over.

2               Your primary discussions about the

3    extension were with TVA lawyers, correct?

4          A.   Yes, eventually when the TVA

5    lawyers were on it, that's right.

6          Q.   In November 2018, you were talking

7    to TVA lawyers about where the extension

8    request stood, correct?

9          A.   I originally kept calling Sherry

10   to get it, right.

11         Q.   All right.  And then when Mr.

12   Chardos was asking you to know what was going

13   on, you believed it was appropriate for you to

14   communicate with a TVA employee without copying

15   the lawyers?

16         A.   I can't tell from this whether I

17   even copied the lawyers, but regardless of

18   whether I -- you don't have the ability to tell

19   that from this kind of email.  But regardless

20   of whether I did or not, yes, I felt it was

21   appropriate to share with Mr. Chardos because

22   he was doing the transition.  He needed to know

23   and he certainly had the right to ask me those

---

Page 87

1    questions.

2          Q.   He had the right to ask you -- a

3    TVA employee, non-lawyer, you say had the right

4    to ask you a question about what was going on

5    in your discussions with TVA lawyers?

6          A.   These aren't my discussions with

7    TVA lawyers.  This is what was going on.

8          Q.   Well, but what was going on you

9    were finding out about from discussions with

10   TVA lawyers, right?

11         A.   This is November 2nd.  Probably

12   right.

13         Q.   Yeah.  All right.  Well, let's

14   look at the bottom of page one.  And you sent

15   an email to Mr. Chardos copying no one else on

16   November 5th at 5:16 p.m.; do you see that?

17         A.   Correct.

18         Q.   And you respond -- or you say to

19   him:  No, Bill Johnson called Franklin this

20   a.m. and said he would get back to him this

21   afternoon, but I just talked to Franklin and so

22   far that has not happened.  I have called

23   Sherry and Cliff several times today, but have

---

Page 88

1    not gotten a return call.

2               Do you see that?

3          A.   I certainly do.

4          Q.   And then Mr. Chardos sends you an

5    email the next day, the morning at 10:15 a.m.

6    saying:  Anything today, thanks.

7               See that?

8          A.   Yep, sure do.

9          Q.   And then at that same day, 11:09

10   a.m., you respond:  Per Cliff Beach, Bill

11   Johnson is meeting with -- and let me stop.

12              Cliff Beach is an in-house TVA

13   lawyer, correct?

14         A.   I believe he is in the legal

15   department, yes.

16         Q.   All right.  Per Cliff Beach, Bill

17   Johnson is meeting with Memphis City Council

18   this afternoon and will not make up his mind

19   until after that meeting.

20              Do you see that?

21         A.   Uh-huh, sure do.

22         Q.   And then you say:  Also, Cliff

23   said somebody called TVA Public Relations

---

**Larry Blust**                                                                        **11/13/2019**

Page 89

1   saying they represented ND and wanted a list of
2   employees.  Do you know anything about that?
3            Do you see that?
4       A.   Correct.
5       Q.   So a TVA lawyer has made a
6   statement to you and you are asking a
7   non-lawyer at TVA to discuss or give
8   information about something the TVA lawyer told
9   you, is that right?
10      A.   No.
11      Q.   How is that not right?
12      A.   I am -- I am responding to the
13  person I am supposed to be responding to on
14  transition stuff.
15      Q.   But you are asking him if he knows
16  anything about what a TVA lawyer has told you,
17  correct?
18      A.   Well, in regard to the Public
19  Relations inquiry, yeah, because I assumed that
20  they would have inquired of the transition
21  committee.
22      Q.   Well, and you believe it was
23  appropriate for you to ask a question of a TVA

Page 90

1   non-lawyer to inquire about something that the
2   TVA lawyer told you?
3       A.   Yes.
4       Q.   Not -- all right.  And then Mr.
5   Chardos responded to that.  And --
6       A.   This is what I am telling you.  He
7   called virtually every day or emailed virtually
8   every day.
9       Q.   Right.  But you made the decision
10  after talking to Mr. Beach, TVA's lawyer, to
11  ask Mr. Chardos a follow-up question about what
12  Mr. Beach had told you?
13      A.   Yes, because I thought that's
14  where the knowledge would be.
15      Q.   And you didn't copy Mr. Beach on
16  that?
17      A.   I had phone calls in to Mr. Beach
18  and in to Ms. Quirk and they never returned
19  them.  So I was trying to get ahold of them, as
20  referenced in the bottom of the last email
21  there, okay?
22      Q.   Well, you had obviously -- I am
23  not talking about the bottom email.  I am

Page 91

1   talking about the November 6 email at 11:09
2   a.m.; you had clearly talked to Mr. Beach,
3   correct?
4            MR. O'REAR:  Let me object.  You
5   are just arguing with the witness right now.  I
6   don't mind you asking him a question about
7   this.  I think he has answered fully.  And you
8   are asking the same question over and over in
9   an argumentative manner.
10      A.   I don't even know if that's that
11  day, to be honest with you.  But yes, I am
12  talking about something that Mr. Beach said to
13  me.  So at some point in time he talked to me,
14  could have been prior to that, could have been
15  that time.
16      Q.   (BY MR. LEMBKE:)  And you did not
17  think it was necessary to copy Mr. Beach on
18  your communication to Mr. Chardos?
19      A.   No.
20      Q.   Okay.  Did you ever have any
21  discussion with Mr. Chardos about him working
22  at the plant after the closing?
23      A.   The only discussion I had with Mr.

Page 92

1   Chardos was to tell him about the provision of
2   the contract that says we couldn't talk to him
3   about work at the plant after closing.
4       Q.   Well, tell me the circumstances of
5   how that came up.
6       A.   I wanted to be sure nobody talked
7   to him.
8       Q.   When did you tell him that?
9       A.   I don't know.  It was probably
10  soon after the contract was negotiated.  I
11  don't remember.  Could have been later.
12      Q.   What did he say?
13      A.   He seemed fine.  I don't know
14  anything specific he said, but he said he
15  understood or something like that.  I just
16  wanted him to make sure that he knew that.
17           MR. LEMBKE:  Let's take a short
18  break.
19           THE VIDEOGRAPHER:  We are off the
20  record at 5:20 p.m.
21           (Whereupon, a break was had from
22           5:20 p.m. until 5:26 p.m.)
23           THE VIDEOGRAPHER:  We are back on

**Larry Blust**                                        **11/13/2019**

Page 93

1   the record at 5:26 p.m.

2        MR. LEMBKE:  By agreement of

3   Counsel, we are going to adjourn the deposition

4   until 9 a.m. tomorrow.

5        THE VIDEOGRAPHER:  We are off the

6   record at 5:27 p.m.

7

8    (Deposition was adjourned at 5:27 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 94

1      C E R T I F I C A T E

2

3   STATE OF ALABAMA

4   JEFFERSON COUNTY

5

6       I hereby certify that the above

7   and foregoing deposition was taken down by me

8   in stenotypy, and the questions and answers

9   thereto were reduced to typewriting under my

10   supervision, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13       I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17

18

19

20   /s/ Gail B. Pritchett

21   COMMISSIONER-NOTARY PUBLIC

22   ACCR LICENSE NO. 116, Exp. 9/30/2020

23   Transcript Certified On 11/25/2019

**Larry Blust**

11/13/2019

Page 95

---

**A**

a.m 87:20 88:5
88:10 91:2
93:4
A4 62:23
abandoned 79:7
ability 9:19 23:5
73:21 86:18
able 68:11
accept 69:19
accepted 23:12
24:10 27:2
72:12,17
accommodating
70:18
accomplish 72:8
ACCR 94:22
accurately
11:15,19
acquire 16:4
acquired 18:6
acting 7:5
action 1:4 94:15
actual 63:18
acutely 77:22
addition 60:13
61:7
address 10:13
10:17 70:6
addressed 70:21
addressing 71:1
71:5
Aderholt 45:9
45:13
adjourn 93:3
adjourned 93:8
administration
35:18 37:2,4
38:7 46:16
48:18 49:5,13
administrator
48:22
admitted 13:11
adviser 52:8
afternoon 87:21
88:18

agencies 53:12
55:7,8,11,13
56:3
ago 9:15 64:2,5
AGREED 6:2
agreement 4:12
58:16 70:12
71:11 73:11
93:2
agreements
32:18
ahead 28:14
ahold 90:19
Air 12:17
Alabama 1:2,16
2:10,20 7:3,4
7:11 8:1 35:1,3
35:4,13,18,20
36:2,7,8 37:16
38:12 41:1,10
41:11 43:1
44:9 46:10
48:11 55:8,18
94:3
allocation 25:15
allow 69:20
allowed 25:21
amenable 67:17
amendment
25:21
amount 25:17
42:9
annual 57:14
answer 9:19
21:4 26:1 28:6
31:19,21 83:8
answered 91:7
answers 94:8
anybody 35:16
48:5 49:12
73:15
anywise 94:15
apparently
80:20
appeared 82:23
appears 82:4

application
11:11 15:7
17:19 19:3
21:2,8 54:8,9
applied 25:7
26:1
applying 15:1
appoint 43:3
appreciate
10:10
appropriate
76:23 85:21
86:13,21 89:23
approval 11:13
21:2 60:14
61:9,17 63:4
66:8,18 70:20
approvals 69:1
approve 78:16
approved 62:1,6
April 33:4
Arant 1:13 2:17
7:9
area 55:23 67:9
areas 11:22 13:2
Arendall 2:6
36:3,4
AREVA 59:2
arguing 91:5
argumentative
37:19 38:4
91:9
arrange 77:18
arrangement
29:10
arranging 66:5
77:10,16
aside 28:7
asked 21:18
32:2 66:2
71:20 80:2,19
80:21,22
asking 20:21,22
31:20 36:18
64:16 72:21
80:23 84:4,15

85:5,11 86:12
89:6,15 91:6,8
aspects 46:7,11
assign 6:19
assigned 26:21
associate 13:1
15:17
association 57:7
57:7
assume 9:22
35:21 45:1,6
48:4
assumed 89:19
assuming 48:5
58:21 79:13
80:21
attached 63:21
64:3
attaching 59:17
63:17
attempt 63:7
attempting 16:3
attend 34:23
38:17
attendance 35:2
36:9
attended 38:12
38:20 40:10
42:17,19 44:3
49:3 57:13
75:22 76:5
attending 65:15
attention 32:11
attorney 2:5,16
29:8 43:18
74:18,18
attorney-client
33:13,16
attorneys 18:8
35:20 36:1
auction 34:18
51:2 52:8
59:18,23 68:12
69:2
August 52:15
54:16 55:15

56:10 58:3
authority 1:9
3:6 7:22 29:3
authorize 74:9
authorized 25:6
Avenue 1:15
2:19 7:11
aware 17:7 20:3
38:21 40:2
50:11,13,15
52:7 83:7

**B**

B 1:20 6:5 7:1
71:19 94:20
back 28:3,16
87:20 92:23
background
46:21,22
backing 37:13
Bailey 50:8,9,13
bar 13:7,8,10,14
13:15
Barnes 12:6,8
12:20
barring 53:1
Bars 13:6
based 25:11,18
72:3
basically 27:19
basis 83:3
Bates 36:5 60:6
Beach 88:10,12
88:16 90:10,12
90:15,17 91:2
91:12,17
Bechtel 58:21,22
59:2
Becky 47:2,6,7,7
began 17:21
beginning 7:18
61:4 84:14
begins 52:23
84:3
behalf 78:7
79:18,21,23

80:18
**believe** 28:12,13
　38:13 40:4
　41:19,20 44:21
　45:3 52:19
　60:3 71:3
　76:12,15 80:19
　80:23 88:14
　89:22
**believed** 79:16
　79:22 85:20
　86:13
**Belle** 15:4
**Bellefonte** 4:12
　4:16 11:13
　14:3 15:11,14
　15:15,20 16:4
　18:14 19:20
　22:18 24:2
　26:14 27:7,11
　28:1 33:20
　34:17 42:18,20
　44:4,10 45:23
　46:8,12 49:5
　51:2,3 52:9
　59:18 68:6
　74:7 77:11
**Bellmont** 45:22
**benefit** 27:12
**benefitted** 37:9
**Bentley** 36:7,19
　38:11,22 39:10
　40:9 41:1,4
　42:17,20 43:21
　43:22
**Bentley's** 39:5
　40:3
**best** 9:19 18:8
　75:14
**better** 30:11
**bid** 5:7 26:23
　27:1 51:2,7,8,9
　59:17,20,22
　60:6,11
**bidder** 69:21
　70:5,6 71:21

72:6
**bidders** 70:4
**bidding** 24:5
**bids** 70:7
**big** 39:2 40:12
　40:14 47:10
**bill** 18:13 30:23
　41:17,19,20,22
　42:2 51:5 84:9
　87:19 88:10,16
**billing** 29:11
**Birmingham**
　1:16 2:20 7:3
　7:11
**bitter** 32:10
**BLN** 66:7 68:15
**Block** 12:12,14
　12:21
**Blust** 1:12 5:4
　6:5 7:13,19
　8:12 9:1,2
　10:12 11:7,18
　17:6,21 22:5
　31:19 59:21
　79:2 80:12
　83:6 85:7,10
**Board** 26:14
**bottom** 51:20
　60:7 64:13
　69:17 84:14
　87:14 90:20,23
**Boult** 1:13 2:17
　7:10
**boy** 33:1
**brad@crtrialt...**
　3:15
**Bradley** 1:13
　2:17 7:9
**break** 10:3,5
　92:18,21
**Brooks** 45:15,16
　45:18
**Bud** 47:2,8,10
　56:16
**budget** 46:14,17
　46:20,23

**built** 26:6
**bunch** 18:7 52:2
**business** 10:17
　16:12,15 23:8
　29:4 74:17,19

─────────
**C**
**C** 2:1 3:1,4 4:15
　5:4 52:23 94:1
　94:1
**Caine** 2:4 8:9
　21:17
**call** 78:13 88:1
**called** 37:5
　76:13 77:2
　87:19,22 88:23
　90:7
**calling** 77:9 86:9
**calls** 90:17
**campaigns** 39:6
**Campbell** 3:13
**candidate** 43:10
**cap** 23:4,5
**care** 34:6
**Carrie** 52:12
　62:14 63:15
**case** 8:2 13:10
　13:12,12 44:6
　44:17 74:21
**cases** 53:23
　56:18
**cause** 7:14 94:16
**caused** 32:8
**caveat** 24:12
**CEO** 31:4,13
　32:2
**certain** 25:22
　55:20 73:20
**certainly** 86:23
　88:3
**Certified** 1:21
　6:6 7:1 94:23
**certify** 7:5 29:5
　94:6,13
**cetera** 21:11,11
　21:18 28:4,4

35:19 46:14,14
　46:14 51:10
　80:7,7
**change** 29:16
　32:8
**changed** 13:4
　18:20 29:13,17
　30:21 31:6,7,9
　36:21 64:21
**changes** 18:22
　63:18 64:9,16
　65:21
**Chardos** 74:5,6
　74:9,21 75:3
　75:17,21 76:6
　76:10 77:7,14
　78:6,8,9,11
　79:17 80:8,16
　81:14 82:9
　84:3 85:4
　86:12,21 87:15
　88:4 90:5,11
　91:18,21 92:1
**Chardos'** 85:11
**charge** 79:17
**check** 28:16
**checked** 67:10
**Chicago** 10:14
　10:19 12:6,12
**chief** 30:16 31:1
　37:11
**children** 30:9,10
**Chin** 3:4 8:7,7
**Circuit** 13:8
**circumstances**
　92:4
**City** 88:17
**civil** 1:4 7:6
　21:13
**Claims** 13:14
**clarification**
　62:19
**clarify** 21:4
**clean** 37:1,5,13
　37:22 42:11,13
　49:1

**clear** 10:8
**clearance** 60:13
　61:8
**clearly** 38:5,8
　91:2
**client** 14:8 65:10
　68:10,14 72:6
**client's** 66:5
**clients** 16:20
**Cliff** 87:23
　88:10,12,16,22
**Clinton** 51:5
**closing** 60:9,11
　61:6,16 63:4
　70:13,21,22
　71:13,20 72:4
　72:12,14 79:8
　80:14 91:22
　92:3
**coal** 37:7,17
　38:2,8
**code** 10:15 25:7
　27:15,16
**colloquial** 32:14
**commencing**
　7:13
**comment** 62:23
　83:4
**Commission**
　15:8 17:8,13
　66:9
**Commissioner**
　6:6 7:5
**COMMISSIO...**
　94:21
**commit** 68:15
**commitment**
　60:16 61:11
**committee** 75:2
　75:3 80:5
　89:21
**Commonwealth**
　14:9,12
**communicate**
　73:21 74:2,9
　86:14

communication
  33:13,16 71:4
  76:22 91:18
communicatio...
  76:10,17
community
  55:21
companies
  16:10 17:23
  18:11 23:17
  24:1 26:5 31:3
company 14:11
  17:2 24:15
  29:9,21 35:3
  58:9 77:18
compensation
  29:10
complete 27:23
  28:4 66:6
  68:13 69:1
completed 23:7
completion
  60:17 61:12
compliance 6:12
Concentric
  51:10 52:9,12
  65:9 71:4,7
Concentric's
  70:3
concern 70:18
  71:1,5 77:23
concerned 77:22
concerns 62:19
condition 61:16
  63:3 71:20
  72:14
conditioned
  60:14 61:8
Conditions
  60:10
conducted 76:6
confidentiality
  52:20,22
confirm 76:13
Congress 23:4
congressional

44:9
Congressman
  45:9,12,15
  48:8,11
conjunction
  13:23 73:9
connected 13:19
connection 15:6
  24:2 52:8
connections
  49:21 50:1,4
  50:12,15
consent 63:5
consents 29:1
consider 49:9
considering
  43:14
consisted 46:18
construct 66:10
  66:20
constructed
  66:7
construction
  11:14 13:23
  15:1 19:3 28:1
  60:15 61:10,18
  68:5 70:20
  71:23
contact 35:13
  74:12,13 83:1
contacted 35:16
  53:9,19 56:12
contained 63:18
  64:16
contains 64:9
contingencies
  69:20
contingency
  70:6
continue 43:2
continuing 3:1
  54:18 67:17
continuous 24:9
contract 4:9
  62:20 63:17
  64:10 72:19

74:1 76:14
  77:3 78:2,15
  78:17,18,20
  79:11,13 92:2
  92:10
contracted
  14:11
contracting
  14:10
contractors 76:3
  77:12
contracts 74:3
  74:15 77:10
  78:5,7,10,17
  78:19 79:3,18
  79:21 80:3,9
contribute
  39:23 40:1
  50:20
contributed
  40:6 50:20,21
contributes 39:8
  39:17
contribution
  39:9,20
contributions
  39:22
contributor
  39:5 40:3
  50:14
conversations
  42:14 48:21
  68:3 75:16,16
conveying 62:18
coordinator
  37:10
copied 85:8
  86:17
copy 78:15 82:7
  90:15 91:17
copying 86:14
  87:15
corear@hand...
  2:12
corporate 28:23
  29:2

correct 12:2,3
  16:11 17:9,14
  19:13 20:5,12
  22:16,20 23:12
  23:18,19,20
  24:11 26:8,10
  26:16 29:12
  34:19,20,21
  47:14 49:22
  52:10,12,16
  54:11 59:19
  62:7 63:19,20
  63:23 64:11,17
  65:6,14 72:2
  72:20 73:3,22
  80:14,15 82:3
  83:11,15,19,20
  85:13 86:3,8
  87:17 88:13
  89:4,17 91:3
  94:11
cost 61:12
costs 60:17
Council 88:17
counsel 3:5 6:4
  6:16,18 7:8 8:3
  16:21 17:1
  28:21 29:6,8
  29:14 30:19
  34:6,8,9,12
  73:3,5,8,13
  74:10 93:3
  94:14
count 20:2,15
COUNTY 94:4
couple 28:5
  48:20
course 55:12
court 1:1 6:13
  7:7,23 8:16
  10:8 11:2
  13:13,14
courtesy 76:5
Courtroom 3:14
cover 64:5
covering 46:6,7

Cramer 47:2,8
  47:10 48:7
  56:16
credit 25:11,18
  26:5,6
credits 24:21
  25:2,4,6,9,10
  25:14,16,17,23
  26:21,21,22,23
  27:1,12 46:13
  54:13,14
Cummings 1:13
  2:17 7:10
current 11:20
  12:1 15:13
  34:8,12
currently 18:10
customer 56:12
  57:20
customers 53:12
  56:12,16,20
  57:3,8

_____
          D
_____
D 7:18 9:1 85:7
date 7:6,19 20:7
  54:21 71:13
  80:14
dates 33:22 55:1
day 7:12 47:16
  77:9 79:7 88:5
  88:9 90:7,8
  91:11
deadline 78:4
dealing 82:19
  83:2,17
dealings 23:8
dealt 52:11
December 20:12
decided 23:8
  27:22 28:2,3,6
  80:13
decision 26:14
  28:9 51:1,8
  83:19 90:9
declare 26:14

**Larry Blust**

11/13/2019

Page 98

33:19 34:2,10
**declared** 24:5
**declined** 34:20
**defendant** 1:10
2:14 3:3 7:22
8:6,8
**defer** 69:21
**deferred** 71:13
72:4
**deferring** 70:13
**Delaware** 13:11
**delayed** 84:8
**delegation** 43:2
44:9,14,17
**deleted** 52:23
**Democratic**
48:6
**department**
88:15
**depend** 77:1
**depends** 20:2
51:4,5
**deposed** 9:3,13
**deposition** 1:12
6:4,10,11,20
7:18 21:16,19
21:21 51:18
59:13 93:3,8
94:7,11
**depositions** 6:14
22:1
**describe** 23:22
**designation**
17:10
**desire** 43:1
**detriment** 37:6
**detrimental**
37:17 38:1,6,8
**development**
1:6 7:21 8:10
11:12 13:18
14:15,19,23
15:5 16:19
17:9 18:10
20:4 22:7,15
24:15 26:4,9

26:18 27:6,10
27:22 28:10,19
29:14 30:1,2
30:13 33:7
34:1,16,17
35:12 36:23
37:10 41:2,10
42:6,10 43:6
47:14 48:1
49:20 53:19
54:10,19 55:10
55:14 56:11
61:16 63:16,19
64:11 65:11
70:19 72:12,18
73:11 76:2
78:7 79:4,19
79:22 80:13,18
83:7
**Development's**
59:17 62:18
71:18 82:2
**different** 12:20
17:4 21:8,9
22:23 37:20
50:2 74:16
**diligence** 74:14
74:17,23
**direct** 47:4
**director** 55:16
**disclosure** 53:1
**discontinue**
27:23
**discuss** 33:9
45:21 89:7
**discussed** 42:22
45:22 65:18,20
**discussion** 20:19
67:12,15,22
91:21,23
**discussions**
36:14 70:3
83:18 85:21,23
86:2 87:5,6,9
**dispute** 69:11,12
73:23

**disputed** 32:21
32:23
**distracted** 33:6
**distributed**
78:15
**District** 1:1,2
7:7,23 8:1 13:9
13:15
**Division** 1:2 8:2
**divorce** 31:9,10
31:13 32:5,8
32:10,12,13,15
32:16,20 33:7
**divorced** 33:3
**document** 11:8
11:22 60:8
84:6
**documents**
21:18
**DOE** 28:16
49:10 50:3,22
53:11 54:8
76:6
**doing** 15:18 16:1
18:10 23:23
24:23 86:22
**dollars** 18:19
47:13
**doubt** 39:12
**draft** 4:9 63:17
64:18 70:12
80:17 81:2,2
**drafted** 51:6,9
81:8,9,15
82:10,12
**drafts** 64:21
**Drive** 3:7
**due** 74:14,17,23
**duly** 8:13
**duties** 28:22
29:11,13,17
**Dym** 10:22

———— E ————

**E** 2:1,1 3:1,1
94:1,1

**earlier** 47:19
83:16 85:14
**early** 13:1 22:9
33:2 54:17
83:14
**economic** 36:23
37:10 41:10
42:9 55:9
**Edison** 14:9,12
**education** 11:16
**effect** 6:11
**eight** 19:23
**either** 22:8,9
25:20 34:5
42:2 48:13
76:1
**either/or** 27:18
**elevating** 31:13
**else's** 21:20
**email** 4:8,11,18
5:3,6 52:15
59:15 62:14,17
63:14,21 64:5
80:23 82:23
84:3,14 85:2
85:11,13 86:19
87:15 88:5
90:20,23 91:1
**emailed** 90:7
**emails** 4:21 85:8
**employee** 79:2
79:17 86:14
87:3
**employees** 77:13
77:14 89:2
**enclosure** 11:11
**encounter** 70:7
**encourage** 41:8
70:7
**energy** 37:21
**engineering**
76:4
**enlist** 35:13
**entities** 69:19
**entitled** 37:11
39:22

**entity** 24:20
67:14
**environment**
55:9
**environmental**
35:19 36:17
37:12 60:13
61:8 71:22
**envision** 27:17
**EPA** 48:22 56:4
**equivalent**
27:16
**essentially** 17:23
**established** 16:8
**estimate** 75:14
**estimated** 68:23
**et** 21:11,11,18
28:4,4 35:19
46:13,14,14
51:10 80:6,7
**ethical** 73:20
**eventually** 86:4
**everybody** 41:8
58:6
**evidence** 6:21
**exact** 28:19
77:18 78:22
**exactly** 29:7
31:6 54:23
85:14
**examination** 4:1
4:3 7:14 8:21
**examined** 8:13
**exception** 12:16
**excuse** 84:8
**executive** 31:1
**Exelon** 14:11
**exhibit** 4:7,8,11
4:14,18,21 5:3
5:6 11:3,4
51:12,15 59:8
59:10 62:9,10
62:13 63:11,12
64:23 65:1
81:21,22 83:22
83:23

**EXHIBITS** 4:5
  5:1
**existing** 16:7
  60:15 61:9,17
**Exp** 94:22
**expense** 74:20
**experience**
  13:19,23 14:2
  14:14 15:10,14
**extending** 70:22
**extension** 4:19
  78:1,3 80:14
  81:1,2,7,13,16
  82:6,15,17,20
  83:10 85:23
  86:3,7
**extent** 33:13
  37:7

**F**

**F** 94:1
**face-to-face**
  75:20
**fact** 23:13 27:2
  64:9
**facts** 44:19
**fair** 26:3 54:3,6
**family** 18:5
**far** 24:18,22
  56:2 87:22
**favor** 43:4
**feasibility** 53:13
  56:13
**federal** 1:14
  2:18 7:6,10
  13:14 55:13
**feedback** 4:22
  84:4,16,20
  85:5,11
**felt** 24:19 86:20
**Fifth** 1:15 2:19
  7:11
**fifty** 9:8
**file** 32:16,19
**filed** 7:23
**files** 82:2

**filing** 31:15
**finance** 16:4
  23:5 55:16
**financing** 23:2,4
  23:9,17 53:14
  56:13 60:16
  61:11,20 66:1
  66:6 68:13
  69:1
**finding** 87:9
**fine** 92:13
**finish** 31:17
**firm** 10:21 11:9
  12:1 47:9,10
  47:12
**first** 8:13 22:5
  25:1 26:18
  28:7 60:9,21
  61:1 64:14
  69:17
**five** 9:10,11
  18:21 30:8
**folks** 76:4
**follow-up** 90:11
**following** 7:15
**follows** 8:14
**force** 6:11 12:17
**foregoing** 7:8
  94:7,10
**form** 6:17
**formal** 81:13
  82:13
**formed** 22:15
  24:17,18 26:10
  26:19,20 27:1
  27:2,22 28:10
**former** 48:7
**forming** 24:14
**four** 26:12
**frame** 19:23
**Frank** 30:15
  31:2,9 32:3,4
  58:5
**Frank's** 32:16
**Franklin** 16:9
  16:13 17:4,22

  18:11 29:22
  33:9 35:1 39:4
  39:8 44:23
  56:15 65:11
  87:19,21
**FTI** 47:8
**full** 6:12 70:14
**fully** 68:15 91:7
**further** 94:13

**G**

**Gail** 1:20 6:5 7:1
  94:20
**gas** 37:8
**general** 3:5
  16:21 17:1
  29:6,8,14 34:6
  34:8,9,12
  36:14 40:15
  42:7 43:18
**generalities**
  40:15
**generally** 29:3
  75:23
**generates** 26:7
**give** 26:13 33:21
  51:21 74:19
  89:7
**given** 94:12
**giving** 84:8
**go** 28:16 74:18
**goes** 68:9,22
  70:2,11 71:10
**going** 11:2 19:19
  27:10 28:3
  31:10,18 62:9
  63:11 64:23
  73:23 81:21
  83:22 85:22
  86:12 87:4,7,8
  93:3
**good** 15:20
  44:16 46:20
**gotten** 88:1
**government**
  53:10,18 54:2

  56:2
**governmental**
  53:12 55:7,10
  55:13
**governor** 35:1
  35:13,16 36:7
  36:19 37:16
  38:11,22 39:5
  40:3,9 41:1,3
  42:3,17,20
  43:3,13,14,21
  43:22 44:3,5
  55:11,17
**governor's**
  36:16 37:10
**graduation**
  12:16
**Great** 10:1
**green** 56:6
**greet** 55:22
**grounds** 6:19
**group** 75:2,4
**grown** 18:2
**guess** 18:7 20:6
  23:14 33:23
  49:11 53:16
  81:3
**guy** 40:21 77:20
  78:9 80:9

**H**

**H** 2:15
**half** 20:16
**Halkias** 47:2,5,7
**Hand** 2:6 36:3,4
**Haney** 16:10,13
  17:4,22 18:14
  23:7 24:1 26:6
  29:22 30:15
  32:3 33:10,14
  35:1 39:4,15
  40:16 42:5
  43:5,9,15
  44:23 45:5
  49:17 58:5
  65:12 67:14

**Haney's** 18:11
  23:16 26:5
**Hang** 52:3 62:2
**happened** 39:10
  87:22
**happy** 9:22 10:5
**Harold** 47:20,22
  47:23
**hate** 51:5
**hear** 39:19 62:3
**heard** 19:8,9,14
  47:15
**hearing** 94:12
**Hill** 3:7
**hired** 29:8 49:20
  50:10,23
**hold** 35:14
**home** 10:13
**honest** 91:11
**honored** 80:10
  80:11
**host** 76:8
**hour** 18:19
**hourly** 18:15,17
  29:11
**huge** 9:7
**Hughes** 10:22
**hundred** 18:19
  37:22 42:12
**hundreds** 75:18
  75:19
**Huntsville** 55:22

**I**

**Ickes** 47:3,21,22
  47:23
**idea** 17:18
**identification**
  11:5 51:17
  59:12 62:11
  63:13 65:2
  81:23 84:1
**identified** 71:21
**III** 2:4
**Illinois** 10:14
  13:7,9,16

**impeached** 39:10
**important** 41:9
**imposed** 23:4
**impression** 31:8 31:11 32:9,10
**in-house** 73:3,8 73:13 88:12
**incentives** 36:23
**included** 41:1
**including** 65:11
**INDEX** 4:1,5 5:1
**indicate** 56:10
**indicating** 63:15 83:5
**Indicative** 5:7 59:17,20 60:6 60:11
**industry** 13:20 37:17 38:2,8
**information** 21:10 56:19 89:8
**informed** 69:18
**initial** 27:13
**inquire** 90:1
**inquired** 89:20
**inquiry** 89:19
**insist** 72:13
**instance** 77:17
**instruction** 75:9 75:11
**instructions** 74:12
**intent** 59:22
**interaction** 77:6
**interactions** 73:2
**interested** 53:10 69:18 72:7 94:15
**internal** 25:6 27:14 73:7
**invest** 57:15 68:15

**investing** 69:21
**investment** 57:16 71:12
**involve** 33:15
**involved** 14:23 15:6 22:6,21 23:17 24:14 34:22 51:1,6 58:12,13 73:13
**involvement** 23:23
**involving** 22:6 22:18
**IRS** 53:11 54:13
**Issue** 71:19
**issues** 21:9 32:12 42:11
**Ivey** 44:3,6

**———— J ————**

**Jeff** 45:2,4
**JEFFERSON** 94:4
**Jenner** 12:12,13 12:21 22:13
**Jim** 74:5,6 85:4
**jobs** 42:9
**Johnson** 41:17 41:22 84:9 87:19 88:11,17
**Jr** 30:15 32:3
**Jr.'s** 31:9 32:4

**———— K ————**

**keeping** 46:20
**kept** 86:9
**kin** 94:14
**kind** 19:22 24:7 74:20 86:19
**kinds** 74:2
**knew** 73:2,4,6,9 73:12 92:16
**know** 9:14 10:3 13:3 17:15,17 19:19 22:1 28:18 29:20

32:19 35:22 39:8,9,12,16 39:23 40:5 44:23 45:5,7 45:12,13 46:8 47:16 49:17,19 50:4,5 54:17 54:23 55:5 56:20,22 65:9 67:19 69:14 73:15,16 77:15 80:3,5 81:4 82:11,22 86:12 86:22 89:2 91:10 92:9,13
**knowledge** 19:1 19:5,6 57:1 90:14
**knows** 89:15
**Knoxville** 3:8

**———— L ————**

**L** 5:14 6:1
**Large** 7:4
**largely** 24:21 55:22
**Larry** 1:12 6:5 7:13,18 8:12 9:1 85:7
**late** 22:9
**law** 2:5,16 10:21 11:20 12:1,11
**laws** 6:12
**lawyer** 16:14,16 16:17,22,23 17:1,14 18:5 29:18,20 73:20 81:4 88:13 89:5,8,16 90:2 90:10
**lawyers** 18:3 73:22 74:3 80:6 83:2,18 86:3,5,7,15,17 87:5,7,10
**leading** 6:17

**learn** 33:19
**lease** 27:15,20 34:5,8 67:18 67:18
**leases** 27:14
**leasing** 55:4
**leave** 64:15
**led** 40:21
**left** 22:12
**legal** 13:19 15:6 46:7,11 88:14
**legislator** 54:3
**legislators** 53:11 53:18,21
**legislatures** 55:19,20
**Lembke** 2:15 4:3 8:5,5,18,21 20:20 33:18 37:23 38:9 45:14 52:6 81:20 91:16 92:17 93:2
**length** 31:12,14
**let's** 30:17 51:19 87:13 92:17
**letter** 4:14,19 20:4 63:18,22 64:1,3,7,8 65:3 65:5 68:3 80:17,23 81:6 81:12 82:5,6,8 82:9,12
**letterhead** 82:13
**license** 21:2 63:3 94:22
**licenses** 15:19 60:15 61:10,18
**Licensing** 71:19
**liked** 82:20
**limits** 73:20
**Lincoln** 10:14
**line** 53:8 65:8 78:1
**list** 59:5 89:1
**litigation** 21:13

73:6
**LLC** 1:6 2:6 7:21 30:2 65:11
**LLP** 1:13 2:17 7:10
**loan** 54:9
**lobby** 48:5,9
**lobbying** 46:21 47:1,4,10 48:3 50:2,3
**lobbyist** 48:2,6,8 49:21
**lobbyists** 47:18 48:9 49:23
**local** 35:20 36:1 55:13,21
**London** 84:9
**long** 12:7,13 16:12 19:2,8 19:10,15 20:22 20:23 46:3,3 69:2
**long-term** 27:14 27:15 67:18
**longer** 19:20 21:11
**look** 51:12,19 52:7 59:8 60:5 62:8,13,22 69:16 84:22 85:9 87:14
**looked** 81:3
**looking** 57:16 60:22
**looks** 11:8 52:4 52:17
**lot** 29:21 31:3 32:19 77:23 79:10
**lots** 73:5
**Luther** 43:17 44:14

**———— M ————**

**Madison** 10:18

main 67:15
78:18
maintenance
78:17
major 11:22
58:8
making 24:6
51:8 62:23
63:4 79:6
80:17
man 78:4
manager 30:3
74:6
manner 91:9
March 33:3
marital 32:21,23
mark 11:2 62:9
63:11 64:23
81:21 83:22
marked 5:1 11:4
51:16 59:9,11
62:10 63:12
65:1 81:22
83:23
marks 7:17
Matt 8:5
matter 7:21 22:6
22:18 28:12
29:4
Matthew 2:15
matured 13:3
McCarthy
48:21
McCollum
30:16 31:1,13
32:2
mean 16:14 19:5
19:7,8 25:4
30:19 35:22
37:3 40:19
46:11 50:17
51:6 61:23
62:5 72:16,17
79:8
meaning 58:15
meant 57:2

mechanics
46:22
meet 44:18,20
45:2,8,15
48:10,13,17
55:22 57:9
meeting 34:23
34:23 35:6,9
35:14,21,22
36:8,11 38:11
39:2 40:13,14
40:21,23 41:4
41:13,22 42:6
42:15,16,19,23
43:6 46:4
57:12,13,14
58:19 65:16,19
65:21 66:15,22
67:3 88:11,17
88:19
meetings 15:18
16:8 35:17
36:6 38:10,20
38:21 39:1
40:17 43:21
44:1,2,8 46:18
46:18 49:4
54:7,12,17,23
57:3,20 58:12
58:23 75:20,22
member 13:5,7
13:9,13,13,15
30:4 49:9 51:7
members 30:5,6
30:7,8 44:8,17
49:4,10,11
Memphis 88:17
met 23:1 37:9
44:12,15,16,21
45:3,17,19
49:11,12,14,17
53:11,23 54:20
55:1,2,6,14,14
55:16,20 56:12
56:16,21 57:10
58:2,21 59:1,2

59:5 65:10
Mickey 47:5
Mike 48:11
mind 88:18 91:6
mine 15:17
minimum 71:12
minute 51:21
52:3 64:2
minutes 29:1
mlembke@br...
2:22
Mo 45:16,18
Mobile 2:10
moment 64:4
Monday 84:8
month 47:13,13
monthly 47:18
months 19:18,23
20:14,15 21:6
21:7 24:8,8
26:13
morning 88:5
multiple 70:3

─────────────
          N
─────────────

N 2:1 3:1 6:1
name 8:22 10:20
47:9 53:22
54:2 82:5
natural 37:8
nature 11:19
12:19 57:11
ND 4:19 53:9
58:2 60:15
61:10 82:5
89:1
ND415-ND417
4:17
ND4315-4316
4:23
ND4966- 5:4
ND4967 5:5
ND5048-ND5...
5:7
ND5144-ND5...
4:10

ND5159-ND5...
4:13
NDA 58:14,15
necessarily
27:17
necessary 6:15
91:17
need 9:18,21
10:2 41:15
42:1 65:21
needed 36:15,19
68:10,13 74:22
78:16 86:22
needs 62:19 63:3
negotiate 79:22
80:3,8
negotiated 23:1
51:9 58:14
92:10
negotiating
32:17 77:20
78:6 79:2,18
79:21,23
negotiations
73:7 74:1
77:21
neither 94:14
never 19:11 48:4
80:2,22 90:18
new 24:19 34:8
nine 19:23 20:16
non-lawyer 87:3
89:7 90:1
non-lawyers
73:21
nondisclosure
58:16
normally 74:4
North 1:15 2:8
2:19 7:11
Northeastern
1:2 8:1
Northern 1:1
8:1 13:8,15
not-for-profits
25:22

Notary 1:23 6:8
7:3
note 57:22
November 1:17
7:12,19 11:12
20:4,9,17
68:12 73:12
75:14,15 76:10
76:18 83:14
84:18,21 85:3
85:3,12 86:6
87:11,16 91:1
NRC 11:12 15:9
15:14,19 16:6
19:2,15 21:1
28:16 49:10
53:11 54:20
55:2 60:14
61:9,16 66:9
66:19,22,23
67:12,19,22
68:4 69:1
71:23
nuclear 1:6 4:16
7:21 8:10
11:12 13:18,20
13:21 14:1,10
14:15,16,19,20
14:22 15:2,5,7
16:18 17:8,9
17:13 18:9
19:4 20:4 22:6
22:14 23:6
24:15 25:1,8
25:14 26:4,9
26:17 27:6,7
27:10,11,21
28:10,19 29:14
29:23 30:2,13
30:17 33:7
34:1,16,17
35:12 37:9,21
41:2 42:5 43:6
47:13 48:1
49:20 53:19
54:9,19 55:14

56:11 58:6,10
59:17 61:15
62:18 63:16,19
64:10 65:11
66:7,9 70:19
71:17 72:11,18
73:11 76:2
78:7 79:3,7,18
79:22 80:13,18
82:2 83:7
**number** 4:7,8,11
4:14,18,21 5:3
5:6 8:2 9:7
11:4 18:3 31:4
31:5 38:13
42:9 50:2
51:15 52:23
59:10 60:7
62:10 63:12
65:1 75:15
81:22 83:23
**numbered** 52:18
**numerous** 23:2

---
**O**

**O** 6:1
**O'Neill** 4:15 5:4
52:12,15 57:22
58:4 59:16
62:14 63:15,22
65:9 66:4 68:4
68:9
**O'Neill's** 65:3
**O'Rear** 2:4 8:9
8:9,19 20:17
33:12 37:18
38:3 45:10
51:22 81:17
91:4
**oath** 9:17
**Obama** 37:2,4
48:18
**object** 33:12
91:4
**Objection** 37:18
38:3

**objections** 6:16
6:19
**observation**
33:6
**obtain** 69:1
**obtaining** 66:8
66:18 71:21
**obviously** 21:5
37:8 90:22
**occurred** 67:3
**occurring** 32:23
35:7
**October** 62:15
63:15,22 64:17
65:4,5,12
**Off-the-record**
20:19
**offered** 6:21
**offhand** 56:22
**office** 3:5 36:16
36:20 43:23
46:2,3 55:11
**officer** 16:18,20
16:21 17:9,11
30:17 31:1
55:17
**officers** 30:12,15
**offices** 7:9
**official** 54:3
**officials** 48:18
53:10,18 55:21
**Oh** 32:9 33:1
40:14 50:9,18
53:2 60:21
62:2 64:6
**okay** 8:19 9:23
20:10 22:21
52:4 53:3,5,7
55:6 59:14
60:8 64:22
68:9 69:16
73:17 82:22
85:16 90:21
91:20
**old** 16:5
**once** 28:3 35:15

45:20 49:6,8
51:4 79:20
82:11
**ones** 58:18
**open** 67:13
**open-ended**
69:19
**opened** 40:21
**operation** 14:15
**oral** 7:14
**order** 51:20 52:1
52:3
**orderly** 80:1
**original** 27:17
**originally** 30:3
30:14 39:7
81:15 86:9
**outside** 16:23,23
17:14 73:5
**oversee** 60:2
**owner** 14:20
25:13,19
**owners** 25:23
**ownership**
27:16
**owning** 27:6,18

---
**P**

**P** 2:1,1 3:1,1 6:1
**P&S** 4:9,12
**p.m** 7:13,20
84:18 87:16
92:20,22,22
93:1,6,8
**PAC** 39:21
**page** 4:2,6 5:2
60:6,20 62:13
64:14 69:17
71:17 84:3
87:14
**paid** 47:12,17
70:14
**paragraph**
52:18 53:2,7
60:9,19,21,22
61:1 65:8

69:17
**part** 27:7,11
33:2,2 36:16
39:11 53:9
58:19 70:19
71:19
**partially-** 66:6
**participated**
44:8
**participation**
74:10
**particular** 13:10
13:10,12 18:18
43:10 49:21
62:12 74:21
**particularly**
12:23 35:18
78:14
**parties** 6:3,18
94:14
**partner** 12:1
**party** 21:13
**payment** 60:12
61:7
**pending** 10:4
**people** 21:1
25:23 29:21
32:19 35:17,19
48:4,6 49:9
50:3,3 55:1,22
73:18 74:2
76:1,2,6 77:10
77:20 78:20
82:19
**percent** 37:22
42:13
**period** 26:23
69:22 71:12
72:13
**permit** 15:2
**permits** 11:14
16:5,7 19:4
54:19 66:10,19
67:1,10,14,16
67:17,22 68:5
68:14 70:21

71:22,23 72:7
**Perry** 49:15,18
49:22 50:4,12
50:17,18,20,21
50:21
**person** 37:12
43:16 74:13,17
74:19 89:13
**personal** 19:1,5
19:6 33:5
**personally**
21:12 44:7,21
45:19 48:16
60:1,3
**pertain** 54:8,13
**pertaining** 15:2
**phone** 48:23
49:7 75:16
90:17
**Piers** 10:22
**piping** 14:8
**place** 1:14 2:18
7:10 78:2
**placed** 9:17
**plaintiff** 1:7 2:3
7:21 8:10
**plan** 27:23 37:14
**plant** 4:16 14:1
14:16,20 15:2
15:19 19:4
25:1,14 26:6
27:7,11,20
28:13,14 49:1
55:23 57:16
74:6 75:23
76:6 79:7
91:22 92:3
**plants** 14:9,10
23:6 26:1
27:18
**please** 8:3,23
46:19
**point** 10:2 30:23
31:17,17 33:19
64:19 69:7
78:4 91:13

**Larry Blust**

**11/13/2019**

Page 103

pointing 84:23
political 39:5,19
politically 39:17
popped 81:1
position 28:19
  29:7,23 34:7,9
  50:22
positive 37:21
possible 59:4
  68:7 69:10
  76:12
possibly 44:5
potential 4:15
  54:9,13 68:4
  70:4 76:3
power 13:20,21
  25:8 26:7 35:5
  36:8 37:1,5,7
  37:14 38:12
  41:1,12,16
  42:2,11,13
  49:1,12 56:6
  57:7
powerful 55:19
PPA 57:6
practice 10:21
  11:20 12:11,20
  13:2
practicing 9:8
  12:4
Pre 40:11
pre-meetings
  40:10
predicate 84:11
predominantly
  46:19
preparation
  21:22 60:2
prepare 21:15
  22:4 60:1
prepared 60:3
president 30:15
  30:16 31:3,4
  32:3
pressing 83:7
pretty 33:3

previously 5:1
  51:16 54:4,5
  59:8,11
price 60:12 61:7
  70:14
primarily 52:11
  73:5
primary 85:23
  86:2
prior 6:21 12:4
  12:10 13:17
  14:2,6,14,18
  14:22 15:4,13
  34:6 36:6,11
  55:5 85:2
  91:14
Pritchett 1:20
  6:6 7:1 94:20
Private 57:6
probably 9:11
  15:22 33:22
  42:12 58:20
  59:3 66:2,21
  67:6 75:18
  77:3 87:11
  92:9
problem 16:6
  67:1
Procedure 7:7
proceed 28:14
proceeding
  39:12
proceedings
  7:15
process 53:9
produced 25:9
  82:1,7
production 25:5
  25:11,12,18,19
Professional
  1:22 6:7 7:2
professionally
  81:3
program 46:17
  46:20
progress 66:5,18

project 18:4,14
  40:19,20 41:7
  41:9 43:2
  48:15,19 49:5
  53:14 56:14
  80:1
projects 17:5
  18:6
promoted 40:18
  42:8,12
promoting 46:9
property 26:15
  33:20 34:3,10
  34:17 51:3
  66:8 68:16
  78:22
proposal 23:9
  24:7
proposals 23:1,3
  23:10,11,14,22
  24:9,23 27:4,5
  27:13,17,19
  29:17
proposed 46:16
  62:20 64:9
proposing 26:18
provide 44:19
  58:10 79:14
provided 7:6
  46:21 47:1
  58:6,9 74:14
  77:12,13 78:23
provides 74:17
providing 70:5
  78:21 79:12,15
provision 25:21
  52:22 92:1
public 1:23 6:8
  7:4 17:1 28:12
  68:12 88:23
  89:18 94:21
purchase 60:12
  61:7 62:20
  64:10 68:15
  70:14 73:10
purport 49:23

purpose 27:3
pushing 43:9
put 18:8 30:11
  37:20 62:2

---

**Q**

quarrel 66:13
  66:16 68:19,21
  69:6
question 9:23
  10:4 26:2
  31:19 32:7
  53:16 62:3
  81:18,19 87:4
  89:23 90:11
  91:6,8
questions 6:17
  6:18 9:18,20
  66:2 87:1 94:8
Quirk 34:13
  73:16 90:18
quite 9:15

---

**R**

R 2:1 3:1 94:1
raids 56:7
range 21:5,7
  68:2
rarely 24:6
  39:23
rate 18:15,17
  29:11
re-read 22:3
reactors 66:7
read 11:21
  17:19 21:20,23
  22:1 84:12
reading 6:9
really 19:21
  39:8,12 50:4
  53:6
Realtime 1:21
  6:6 7:2
reasonable 70:8
recall 23:23
  32:22 35:6

38:10,14 39:1
  41:11,17,21
  42:16,22 43:20
  53:20,22 54:2
  55:10 57:21
  65:15,18,20
  66:17 75:20
  76:16 77:7
received 76:21
receiving 60:16
  61:10
receptive 66:23
recognize 11:6
recognizes 70:4
record 8:23 10:8
  28:12 92:20
  93:1,6
records 28:16
  28:17
reduce 63:8
reduced 94:9
refer 25:3
reference 57:3
referenced
  51:17 55:8
  59:12 90:20
referring 22:17
  56:14 57:21
  58:3 64:4,7
reflect 11:15,19
regard 15:10,15
  24:21 25:2
  36:22 37:1
  38:22 46:15
  49:1 55:3,19
  64:18 83:19
  89:18
regarding 62:19
regardless 86:17
  86:19
Registered 1:22
  6:7 7:2
regular 83:2
regulations 37:2
  37:6,16
Regulatory 15:7

---

17:8,13 66:9
**related** 56:3
66:21
**relating** 6:13
55:9 69:7
**Relations** 88:23
89:19
**relationship**
16:13,15
**relatively** 16:5
**remained** 31:2
**remember** 9:8
9:13 20:6 31:6
35:8 38:16,20
40:9,15,16
41:3,6 42:4,8
42:13 48:12
56:1 58:18
68:8 69:9
75:10,12 78:10
78:14 92:11
**repealed** 38:6
**repeat** 9:21
**rephrase** 9:21
**replaced** 18:3
**report** 29:19,22
**reported** 1:19
66:1,4,14,18
**reporter** 1:21,23
6:7,7 7:2,3
8:16 10:8 11:2
**represent** 8:4
11:10 14:19
20:8
**representation**
14:14,18 17:7
**representative**
35:4
**representatives**
35:2 41:3,12
54:20 65:10
**represented**
14:8 39:15
73:3,7,22 89:1
**representing**
73:13 76:1

**represents**
94:10
**Republican** 48:7
48:8
**request** 71:18
80:17 82:13
83:11 86:8
**requesting** 81:7
82:16
**required** 63:5
63:19
**requires** 21:10
**rescind** 46:16
**Resnick** 10:22
**resolved** 10:4
**respective** 6:4
**respond** 87:18
88:10
**responded** 84:7
90:5
**responding**
81:18 85:10
89:12,13
**responds** 71:17
**response** 52:19
52:21 65:4
84:8 85:19
**result** 94:16
**resulted** 27:6
**Resume** 4:7
**retainer** 47:18
**return** 88:1
**returned** 90:18
**Rev** 4:20
**Revenue** 25:7
27:14
**review** 19:2
**reviewed** 64:19
**Reviewing** 11:8
11:22 60:8
84:6
**revised** 70:12
**Richard** 44:20
44:22
**right** 9:5,12,16
10:12,20 11:1

11:18,23 12:7
14:6,13 15:16
16:1,19 18:13
19:12,14 20:13
22:14,15,17,19
23:21 24:13,17
25:3 26:11,12
27:9,15 34:14
34:15,22 38:9
38:17,23 39:14
40:23 41:21
42:4,15 43:20
43:22 44:12
45:14 46:5
48:10 50:12
51:11 52:6,9
52:14,20 54:1
54:7,12,15
56:5 57:1,17
58:1,11,15,17
59:7,15,18
60:5 61:22
62:4,17,20,22
63:5,6,10 64:4
64:8,12,13,19
65:5,7,23
66:15,17 67:8
67:11,21 71:2
71:6,10,16
72:11,23 73:1
73:19 74:8
75:8,13,19
78:3 80:12
82:7,21 83:5,6
83:14,17,21
84:22,23 85:4
85:9,20 86:5
86:10,11,23
87:2,3,10,12
87:13 88:16
89:9,11 90:4,9
91:5
**risk** 61:19,23,23
62:5,5 63:8
**Roger** 36:5,5
**Rogers** 48:11,11

**room** 41:8 47:16
**roughly** 19:22
**round-robin**
58:8
**RSA** 2:7
**rules** 6:13 7:6

---

**S**

**S** 2:1 3:1 6:1
12:17
**s/** 94:20
**sale** 4:15 51:3
59:1 62:20
64:10 75:1
79:9
**sales** 73:10
**satisfied** 63:16
**saw** 48:5
**saying** 39:1,14
40:9 41:4,22
71:9 74:15
88:6 89:1
**says** 61:6 65:9
66:1 69:17
71:4,19 72:3
85:7 92:2
**scchin@tva.gov**
3:10
**Schedule** 63:5
**seat** 42:21
**second** 28:9,15
51:23 55:18
61:2 65:7,8
71:16 72:15
84:2
**secretary** 16:21
28:23 29:2,3
29:15,18 30:19
49:14,18,22
50:22
**secretary-trea...**
30:18
**secretary/gen...**
28:20 30:19
**Section** 52:23
53:6 62:23

71:18
**secure** 37:12
**security** 77:17
78:15,18
**see** 30:17 53:14
53:15 60:18,20
61:3,13 62:15
65:13 66:11,12
68:17,18 69:4
69:5,23 70:1,9
70:15,16 71:14
72:1,9,10 82:6
83:5 84:5,10
84:18 87:16
88:2,7,20 89:3
**seeking** 72:14
**seen** 82:20
**sell** 34:5,10,16
**Senate** 42:21
**senator** 43:3,18
44:15
**senators** 48:14
48:15
**sends** 88:4
**senior** 48:18
49:4,8,10,11
**sent** 20:3 52:15
57:22 58:4
59:16 63:14
68:3 80:22
81:6,14 82:12
87:14
**sentence** 60:10
61:2
**separate** 55:17
**separation**
32:17
**September**
59:16
**series** 9:18 22:23
23:21
**service** 29:21
58:10 78:21
**services** 58:7
77:11,19 78:23
79:10,12,14,15

Sessions 45:2,4
set 25:5 35:21
35:22
setting 28:7
seventy 18:19
Shannon 3:13
share 44:16
86:21
Shelby 44:20,22
Sherry 41:19,23
73:16 86:9
87:23
short 81:2 92:17
show 11:1 63:10
64:22 68:11
81:11,21 83:21
side 79:9 80:21
sides 48:9
signature 6:9
signed 72:18
73:11
significant 37:6
simply 79:6
single 46:17
sir 53:4 60:23
76:19 84:22
site 4:16 52:9
69:21
sitting 54:1
situation 32:15
32:17,21,23
six 18:18 19:18
21:6,6 60:6,20
six-month 83:10
Socol 10:22
sole 30:3,4
somebody 17:3
19:9 30:17
39:21 77:3
78:8 79:8 80:2
80:4,21 88:23
soon 10:3 92:10
sorry 14:7 15:12
22:11 50:18
53:3,5 62:3,3
64:6

Southern 35:3
specific 41:6
42:14 46:6
55:3 71:18
72:13 92:14
specifically
38:19
specifics 42:8
speculate 45:11
spoken 49:7
stack 51:13,14
51:19,23 59:9
staff 44:18,18
46:4,19 53:22
53:23
start 12:9 22:12
71:11 84:2
86:1
starting 31:16
state 7:4 8:3,22
37:12,13 46:9
55:8,13,20
94:3
stated 17:12,15
43:13,14 60:11
statement 39:19
89:6
statements 41:6
72:4
States 1:1 7:7,23
status 40:20
steady 18:1
stenotypy 94:8
Steve 8:7
Steven 3:4
STIPULATED
6:2
stipulation 7:8
stipulations
8:17
stood 83:19 86:8
stop 88:11
Strange 43:17
44:14
stream 24:9
Street 2:8

structure 31:5
46:13 57:18
stuff 29:5 32:18
51:9 89:14
SUBJ 4:9,12,19
4:22
subjects 46:6
75:5,6,7
submit 51:2
submitted 11:11
subsequent 71:3
successful 69:20
70:5 71:21
suddenly 81:1
sufficient 72:5
suggested 20:21
suggestion
52:19,21
suggestions
43:12
Suite 2:9 10:18
Summit 3:7
supervising
77:21
supervision
94:10
supplied 56:19
suppliers 53:13
58:2 76:3
support 36:22
37:1,13,16
41:9 43:2
45:22 46:19
49:1 56:6
supported 43:15
supportive 39:3
41:5,7
supposed 78:10
80:10 89:13
sure 12:23 15:19
16:6 33:3
35:11,15 42:8
44:6 56:15,17
61:14 69:8
78:19 79:6
81:18 88:8,21

92:6,16
surplus 24:5
26:15 33:20
34:2,10
surprise 82:23
survived 18:7
suspect 47:18
80:7
sworn 8:13

**T**

T 6:1,1 94:1,1
take 10:3,5
19:15,20 20:23
21:1,6,11
26:13 39:22
61:19,23 62:5
68:23 69:2
92:17
taken 6:5 32:11
32:12 94:7
takes 19:2,9,10
talk 75:2,3,7
76:23 92:2
talked 21:19
53:17 54:4,6
55:12 56:3
78:9 87:21
91:2,13 92:6
talking 21:5
25:16 31:22
32:1 42:3,11
43:5,8 50:5,19
53:2,6 55:4
64:2 65:22
78:11 80:10
81:5,6,14
84:13 85:6,17
86:6 90:10,23
91:1,12
tasked 79:5 80:2
tax 13:13 24:21
25:2,4,6,9,10
25:11,14,15
26:5,6,20,21
26:22,23 27:1

27:12 46:13
54:13,14
team 74:13
Technologies
3:14
tell 9:6 15:16
19:17 31:16,18
36:11,18 44:13
50:7 86:16,18
92:1,4,8
telling 36:19
90:6
ten 20:1,14,15
Tennessee 1:9
3:6,8 7:22
48:14,14 57:6
term 32:14
terminate 77:3
terminated
76:14
terms 27:15
testified 8:14
Texas 50:12,14
thanks 88:6
thereto 6:21
94:9
thing 15:13
16:22 19:22
33:16 36:17
55:3 57:6
things 21:9 66:3
74:22
think 20:13,17
22:10 26:11,22
28:5 30:20
33:1,15 36:13
41:14 43:7
47:3,9 48:21
52:3 54:6,22
55:1,18 56:9
64:1 67:7
75:10 77:4
78:14 84:11
91:7,17
third 53:8 62:13
third-parties

79:3
**Thirty** 12:15
**thirty-five** 47:12
**thirty-six** 18:1
39:16
**Thornburg** 12:6
12:8,21
**thought** 32:4
41:23 50:19
53:5 64:6 67:4
84:15 90:13
**thousand** 47:13
**three** 12:17 23:6
**tied** 74:21
**time** 6:19,20
7:20 9:12,20
14:12 19:22
21:11 23:3
24:4,6 26:23
27:20,21 28:7
28:9,9,15
29:13,16 30:22
30:23 32:11
36:21 39:18,18
39:20,20 42:10
43:19 53:19
54:15 57:16,23
58:20,22,23
59:3 64:12
67:12 68:13
69:22 70:5,13
70:22 72:5,16
73:10 80:13
82:18 83:12
91:13,15
**times** 9:5,7,9
23:2 28:5
45:17 56:23
79:10 87:23
**today** 12:22 54:1
87:23 88:6
**today's** 7:19
21:15
**told** 20:22,23
31:11 40:8
42:7 54:16

67:2,7 75:2
76:22 77:4
89:8,16 90:2
90:12
**tomorrow** 93:4
**top** 11:21 82:4
**tour** 76:5,8
**tours** 75:23 76:7
**Tower** 2:7
**traditional** 29:2
**transaction** 55:5
79:9
**transactions**
13:4
**transcript** 94:11
94:23
**transcripts** 22:2
**transfer** 11:13
15:1 19:3 21:2
25:22 55:3
60:14 61:9,17
62:1,6 63:2,4
66:9,19 67:19
68:5,14 70:20
71:22 72:7
78:22
**transferring**
66:23 67:13
**transition** 74:13
75:1 79:10
80:1,5 86:22
89:14,20
**trial** 6:20 13:14
**tries** 79:9
**trouble** 79:1
**true** 23:15 34:15
76:15 94:11
**Trump** 38:7
46:15 49:4,13
50:14,16,20
**trust** 30:9,10
**trusts** 30:8
**trying** 41:8
77:18 78:19
90:19
**turned** 72:15

**TVA** 4:19 8:6,8
23:1,2,3,3,8
24:7 26:13,14
27:19,22 33:19
34:2,7,16,20
35:3 36:8
38:12 41:2,18
42:1 53:13
56:13 57:4
58:2,7 65:9
69:18 70:4
71:20 73:2,2,4
73:14 74:8
77:13,19 79:2
79:5,11,13,17
79:23 80:17,21
81:4,6 82:5,13
82:16,19 83:1
83:8,18 84:7
85:22 86:3,4,7
86:14 87:3,5,7
87:10 88:12,23
89:5,7,8,16,23
90:2
**TVA's** 52:7
66:10,19 73:12
90:10
**TVPPP** 57:6
**two** 31:5,22
38:10,16,18,20
42:1 59:3 66:6
66:10,20 69:3
69:9 70:13,22
71:22 77:14
78:18
**two-year** 72:4
72:12
**typewriting**
94:9
**typically** 19:2
74:1,16 79:8

_____
**U**
**U** 6:1 12:17
**ugly** 31:10
**uh-huh** 10:7

61:5 63:1
88:21
**uh-uh** 10:6
17:18 76:20
**ultimately** 29:22
72:11
**understand** 9:16
9:20,23 31:22
73:19
**understanding**
79:1 82:18
**understood** 38:1
70:17 71:6,8
92:15
**United** 1:1 7:7
7:23
**units** 66:10,20
**unlimited** 69:22
**urged** 34:16
**urging** 34:2,4
37:15
**use** 25:17,18
32:13 37:7,8
**Usual** 8:16
**usually** 44:18

_____
**V**
**vacant** 42:21
**validity** 54:18
67:16
**Valley** 1:9 3:6
7:22 57:6
**various** 17:4
23:2 27:3
35:17 44:16
53:10 77:10
**vaulted** 31:2
32:3
**verbalize** 10:7
**versus** 7:22
12:21
**vet** 39:20
**vice** 30:16
**video** 1:12 7:18
**VIDEOGRAP...**
3:12 7:17

92:19,23 93:5
**view** 23:13 71:1
71:5 79:20
**viewed** 67:18
**virtually** 18:22
38:21 58:6,8
77:9 90:7,7
**vs** 1:8

_____
**W**
**waived** 6:10
**want** 21:10
31:16,17 61:19
61:23 62:5
64:22
**wanted** 16:5
23:9 36:15,22
36:22,23 61:16
64:11 70:19
89:1 92:6,16
**wasn't** 22:15
27:10 44:17
46:2
**waste** 74:20
**Water** 2:8
**way** 12:18 18:8
24:4 26:4 29:4
30:11 37:21
74:3,14 85:8
**website** 11:9
**went** 21:17 24:3
**weren't** 23:17
24:6
**West** 3:7 10:18
**William** 30:16
**willing** 28:14
**winner** 68:11
**witness** 6:10
7:13 91:5
94:12
**wonderful** 76:7
**word** 32:13
**work** 13:17,19
14:10,22 15:4
15:6 16:9
17:23 18:9,10

18:14 23:23
33:6 49:9
74:15 92:3
**worked** 17:3
46:23
**working** 17:22
91:21
**works** 47:8
**wouldn't** 47:16
**written** 60:16
61:11 75:11
**wrong** 14:7
28:11
**wrote** 53:20
85:7
**WT6** 3:7

_____
**X**
_____

_____
**Y**
_____
**yeah** 20:10
28:20 43:7
45:12 50:19
54:6 73:15
74:11 81:10
85:2 87:13
89:19
**year** 9:14 18:18
18:23 46:17
68:23 69:9
71:12
**years** 9:8 12:15
12:17 13:1,3
18:1,6,21
26:12 39:16
54:18 69:3,9
70:13,22
**Yep** 71:15 88:8

_____
**Z**
_____
**zip** 10:15

_____
**0**
_____
**05/'06** 68:2

_____
**1**
_____
**1** 28:14 53:6

71:19
**10/18/16** 4:11
**10/24/16** 4:14
**10/3/16** 4:8
**10:15** 88:5
**11** 2:8 4:7
**11/2018** 4:21
**11/25/2019**
94:23
**11:09** 88:9 91:1
**116** 94:22
**13** 1:17
**13th** 7:12,19
**17** 33:2
**18** 33:2,4 63:22
64:17 65:5
**1819** 1:15 2:19
7:11
**1847** 10:14
**18th** 52:16 54:16
55:15 56:11
58:3 63:15
**1983** 17:4,22
18:4
**1E** 62:23

_____
**2**
_____
**2** 4:20 28:13
**2'02** 15:23
**2'05** 15:23
**2001** 22:8,9,11
22:13,18,22
23:22 67:3,5
**2002** 12:9,18
22:8,9,12 67:3
67:6,6,23
**2005** 67:7 68:1
**2012** 22:15
26:10
**2014** 12:1,9
**2015** 33:23 35:8
**2016** 33:23 35:8
52:16 54:16
55:15 56:11
58:3 59:16
62:15 63:15,22

65:4,12 68:12
75:14 83:15
**2018** 11:12
73:12 75:15
76:11 84:18
86:6
**2019** 1:17 7:12
7:19
**2020** 20:12
**205.251.8000**
2:21
**205.790.5841**
3:16
**23rd** 68:12
**24th** 65:4
**251.432.5511**
2:11
**2nd** 62:15 84:18
85:3,12 87:11

_____
**3**
_____
**3** 52:23
**3:15** 84:18 85:12
**3:57** 7:13,20
**30200** 2:9
**30th** 76:11,18
**35203** 1:16 2:20
7:12
**36602** 2:10
**37902** 3:8
**37s** 52:2

_____
**4**
_____
**400** 3:7
**4000** 10:18
**42** 5:3 51:12,15
51:20 52:4,5,7
52:14
**43** 5:6 59:8,10
**45J** 25:6
**4th** 65:12

_____
**5**
_____
**5:16** 87:16
**5:18-CV-0198...**
1:4 8:2
**5:20** 92:20,22

**5:26** 92:22 93:1
**5:27** 93:6,8
**501(c)(4)** 39:21
40:3
**5054** 60:7
**51** 5:3
**59** 5:6
**5th** 20:18 84:21
85:3 87:16

_____
**6**
_____
**6** 91:1
**60602** 10:19
**60614** 10:16
**62** 4:8
**63** 4:11
**65** 4:14
**6H** 63:5

_____
**7**
_____
**70** 10:18
**7th** 13:8

_____
**8**
_____
**8** 4:3 20:9
**8/18/16** 5:3 55:2
**8/29/18** 4:18
**81** 4:18
**83** 4:21
**865.632.3052**
3:9
**87** 4:7 11:3,4
**88** 4:8 62:9,10
**89** 4:11 63:11,12
**8th** 20:4

_____
**9**
_____
**9** 93:4
**9/30/2020** 94:22
**9/9/16** 5:6
**90** 4:14 64:23
65:1
**91** 4:18 81:21,22
**92** 4:21 83:22,23
**9th** 59:16

**Larry Blust**                                                    **11/14/2019**

---

Page 95

1    IN THE UNITED STATES DISTRICT COURT NORTHERN

2    DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

3

4    CIVIL ACTION NO. 5:18-CV-01983-LCB

5

6    NUCLEAR DEVELOPMENT, LLC,

7         Plaintiff,

8    vs.

9    TENNESSEE VALLEY AUTHORITY,

10         Defendant.

11         VOLUME II

12    VIDEO DEPOSITION OF LARRY BLUST

13    Bradley Arant Boult Cummings, LLP

14    One Federal Place

15    1819 Fifth Avenue North

16    Birmingham, Alabama 35203

17    November 14, 2019

18

19    REPORTED BY:

20    Gail B. Pritchett

21    Certified Realtime Reporter,

22    Registered Professional

23    Reporter and Notary Public

---

Page 96

1         A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    Mr. Caine O'Rear III

5    Attorney at Law

6    Hand Arendall, LLC

7    RSA Tower

8    11 North Water Street

9    Suite 30200

10    Mobile, Alabama 36602

11    251.432.5511

12    corear@handarendall.com

13

14    FOR THE DEFENDANT:

15    Mr. Matthew H. Lembke

16    Attorney at Law

17    Bradley Arant Boult Cummings, LLP

18    One Federal Place

19    1819 Fifth Avenue North

20    Birmingham, Alabama 35203

21    205.251.8000

22    mlembke@bradley.com

23

---

Page 97

1         A P P E A R A N C E S (continuing)

2

3    ALSO FOR THE DEFENDANT:

4    Mr. Steven C. Chin

5    Office of the General Counsel

6    Tennessee Valley Authority

7    400 West Summit Hill Drive, WT6

8    Knoxville, Tennessee 37902

9    865.632.3052

10    scchin@tva.gov

11

12    THE VIDEOGRAPHER:

13    Mr. Joey Watson

14    Southeastern Legal Video

15    85 Bagby Drive, Suite 306

16    Birmingham, Alabama 36209

17    205.871.4300

18    southeasternlegalvideo.com

19

20

21

22

23

---

Page 98

1         INDEX OF EXAMINATION

2                              Page:

3    EXAMINATION BY MR. LEMBKE         100

4    (continuing)

5

6

7         INDEX OF EXHIBITS

8                              Page:

9    Exhibit Number 93 - 4/17/17 email    111

10    from F. Akstulewicz to L. Blust,

11    SUBJ: Update on Current Bellefonte

12    Progress, TVABLN5035

13    Exhibit Number 94 - 10/24/18 email   131

14    from L. Blust to S. Quirk, SUBJ:

15    Follow Up, ND4222-4223

16

17    INDEX OF PREVIOUSLY MARKED EXHIBITS

18                              Page:

19    Exhibit Number 8 - 8/2017 emails,    113

20    Subj: L44 170331 001 BLN U2,

21    TVABLN 0333-0334

22    Exhibit Number 13 - L. Blust letter   141

23    to TVA requesting 6-month extension

---

Page 99

1   Exhibit Number 17 - 11/9 email from   149
2   C. Beach to L. Blust
3   Exhibit Number 19 - 11/12/18 email   145
4   from L. Blust to C. Beach
5   Exhibit Number 23 - 11/28 email   179
6   exchange between L. Blust and C.
7   Beach
8   Exhibit Number 24 - 11/24 letter   184
9   from S. Quirk to L. Blust
10  Exhibit Number 25 - email   186
11  transmitting 11/30 letter from L.
12  Blust to S. Quirk
13  Exhibit Number 36 - emails between   176
14  L. Blust and C. Beach
15  Exhibit Number 48 - 12/20/16 email,   116
16  Subj: Process to Transfer Bellefonte
17  Construction Permit, ND5686-ND5690
18
19
20
21
22
23

Page 100

1   November 14, 2019              9:07 A.M.
2
3        THE VIDEOGRAPHER:  We are on the
4   record.  This is the continued deposition of
5   Larry D. Blust.  We are on the record, November
6   14th, 2019 at 9:07 a.m.
7
8        LARRY BLUST,
9   having been previously duly sworn, was examined
10  and testified further as follows:
11
12  EXAMINATION BY MR. LEMBKE (continuing):
13       Q.   Mr. Blust, we are going to resume
14  your deposition now after our overnight break.
15       When your firm sends statements to
16  Nuclear Development, do you have one matter you
17  record time on or multiple matters?
18       A.   Are you talking about for Mr.
19  Haney?
20       Q.   Talking about for Nuclear
21  Development.
22       A.   Oh, for Nuclear Development.  We
23  have one matter, Nuclear Development.

Page 101

1        Q.   One matter.  All right.  And so
2   any time you have spent on the litigation since
3   it was filed would be on that one matter,
4   correct?
5        A.   Yes.
6        Q.   Mr. Blust, you are aware that
7   Nuclear Development filed an application for
8   transfer of the construction permits for
9   Bellefonte with the Nuclear Regulatory
10  Commission in November 2018, correct?
11       A.   November 2018.  Yes, I am.
12       Q.   And what involvement did you have
13  in the process leading to the filing of the
14  application?
15       A.   Virtually none.
16       Q.   Did you ever meet with the Nuclear
17  Regulatory Commission about -- at which --
18  during which -- let me start over.
19       Did you ever attend a meeting with
20  any employee or official at the Nuclear
21  Regulatory Commission where the subject of an
22  application for the transfer of construction
23  permits came up?

Page 102

1        A.   Yes.
2        Q.   All right.  What do you recall
3   being discussed?
4        A.   The only times I did that was
5   before the application had been filed.  It was
6   mainly their need for some idea of timing,
7   because they wanted our support for a budget.
8   They were critically concerned with -- I don't
9   know if you know how the NRC works, but they
10  were critically concerned with having Congress
11  appropriate a reasonable budget so that they
12  had the personnel to, in fact, review the
13  permit transfer.  There is not a lot of
14  transfers or permits going on at the NRC so --
15  that's the situation.
16       Q.   Let me go back to my previous
17  question and make sure you and I are
18  understanding the same one.  When I asked if
19  you had any involvement in the process, I mean
20  the process that included the compiling of the
21  information to submit the application.  Is your
22  answer still the same with that?
23       A.   I'm assuming it is.  Very early on

**Larry Blust**                                                    **11/14/2019**

Page 103

1    I may have sent Tim Matthews some history of
2    the permits, although I think he got it all off
3    of the NRC -- it's all public information.  I
4    think he got it off of the NRC site.
5        Q.   Okay.
6        A.   I had nothing to do with the other
7    stuff that was filed with it.
8        Q.   All right.  How many meetings do
9    you recall attending with the NRC or any of its
10   employees at which the topic of an application
11   for the transfer of the construction permits
12   was discussed?
13       A.   I remember two.  It's possible
14   there might be more, but I think it's just two.
15       Q.   All right.  What do you recall the
16   first one being?
17       A.   The first one was a meeting with
18   the staff -- or was it the second one?  One of
19   the meetings was a meeting with their -- huge
20   number of staff people which was to introduce
21   us to the staff and the staff to us.  They had
22   recently changed the personnel and the
23   structure of the division on this, so they were

Page 104

1    introducing new people to new people.  And the
2    other one I had was with the commissioners.  I
3    met with three commissioners with all of the
4    other people but --
5        Q.   All right.  With regard to the
6    first meeting, was that in early 2017?
7        A.   It would have been 2017.  I don't
8    remember which was which.  I think we met
9    with -- we might have met with the staff
10   meeting after the meeting of the commissioners.
11   It was one of the two.
12       Q.   All right.  Do you recall if
13   Victor McCree was in attendance at the meeting
14   you attended with the staff?
15       A.   I believe that's the case.  I
16   think I was introduced to him at the time.
17       Q.   And do you recall any specifics of
18   what was discussed with regard to transfer of
19   construction permits at that meeting with the
20   staff?
21       A.   It was almost a solely
22   introductory meeting.  The people who would
23   have to deal with it were introduced to us.

Page 105

1    The southeast region people had come up for the
2    thing.  And the other part of it was budget.
3    They were interested in timing, because they
4    had to develop a budget to be sure they had the
5    staff.
6        Q.   All right.  Do you remember
7    anything that anyone at that meeting said
8    specifically about the issue of transfer of the
9    construction permits?
10       A.   About the issue?
11       Q.   Yes, sir.
12       A.   What's the issue?
13       Q.   Well, about the potential
14   application for transfer of the construction
15   permits.
16       A.   As I said, it was mainly timing
17   and budget.
18       Q.   All right.
19       A.   They advised us on timing.  They
20   advised us on budget.  They asked us about
21   timing.  They reminded us that we had to pay
22   for it, you know, blah, blah, blah.  They also
23   had to get appropriation from Congress in order

Page 106

1    to have the people to be able to do it.  And
2    they were acutely concerned with Congress
3    appropriating enough money.  They wanted our
4    clients' support in Congress for appropriation
5    of the NRC.
6        Q.   All right.  What do you recall
7    Nuclear Development saying about timing of the
8    filing of the application at the meeting with
9    the staff?
10       A.   Well, at the time that I met with
11   the staff, we were on a trajectory of a very
12   early timing.  Later on we changed that timing,
13   as you know.  But at that time we were
14   projecting a very early timing on the thing,
15   which would have occurred in the budget year
16   that was about to come up, which I think starts
17   October, I believe, in the federal budget year.
18   So it would have occurred in that budget year
19   that was coming up for '17 -- '17/'18.
20       Q.   And do you remember anything
21   specifically that any member of the NRC staff
22   said at that meeting about an application for
23   transfer of the construction permits?

**Larry Blust**                                        **11/14/2019**

---

Page 107

1    A.    Well, I don't remember anything
2    specific.  I mean it was described to us how
3    they would process the application.  Nothing
4    much specific was ever said in any of my
5    meetings about this particular construction
6    permit transfer.
7        Q.    Now, you said you also met with
8    commissions.  How many commissions do you
9    recall meeting with?
10       A.    Three.
11       Q.    Was that one meeting or three
12   meetings?
13       A.    It was separate meetings with each
14   commissioner.
15       Q.    Do you remember in those meetings
16   with the commissioners having any discussion
17   about transfer of the construction permits?
18       A.    Yes, I mean that's what the
19   meeting was about with them.
20       Q.    All right.  Well, tell me what was
21   discussed at that meeting about transfer of
22   the -- those meetings about transfer of the
23   construction permits.

---

Page 108

1        A.    The amount of staff it would take,
2    the timing and the need for the budget.
3        Q.    All right.
4        A.    The commissioners were acutely
5    concerned with their budget not being cut, and
6    I think one of them at least told us if we lose
7    the staff that we have got -- if it wasn't for
8    this permit being processed, we might lose the
9    staff that we have got and then we wouldn't
10   have staff that are familiar with this process,
11   et cetera.  So they wanted to retain their
12   staff with the congressional budget.
13       Q.    And at the time you met with the
14   commissioners, was Nuclear Development still on
15   the fast trajectory for submission of an
16   application for transfer of the --
17       A.    Yes.
18       Q.    -- construction permits?
19       A.    Yes.  The two meetings I had were
20   not that far apart.
21       Q.    All right.  And do you remember
22   anything specifically that anyone with Nuclear
23   Development said in the meetings with the

---

Page 109

1    commissioners about an application for transfer
2    of the construction permits?
3        A.    Would you repeat that?  I didn't
4    --
5        Q.    Certainly.  Do you remember
6    anything specifically that Nuclear Development
7    said in the meetings with the commissioners
8    about an application for transfer of the
9    construction permits?
10       A.    I don't remember anything
11   specifically.  I'm sure we described the
12   current time schedule we were on, because
13   that's what the people we were meeting with
14   were interested in hearing.
15       Q.    Other than the meeting with the
16   staff and the meeting with the commissioners
17   that you have already told me about, did you
18   ever have any other face-to-face meetings with
19   Nuclear Regulatory Commission staff?
20       A.    I don't believe so.  It's possible
21   that there were two staff meetings, but I only
22   remember one.
23       Q.    And other than the meeting you

---

Page 110

1    just told me about with the commissioners, did
2    you have any other meeting with NRC
3    commissioners --
4        A.    No.
5        Q.    -- about Bellefonte?
6        A.    No.
7        Q.    Have you had any phone calls with
8    members of the NRC staff, say, after the time
9    the contract with TVA for purchase of
10   Bellefonte was executed through today, any
11   other -- or any phone calls with NRC staff or
12   commissioners?
13       A.    It's possible, but I don't
14   remember any.
15       Q.    Did you ever have any discussion
16   with Jim Chardos about the application for
17   transfer of the construction permits?
18       A.    About the specific application?
19       Q.    About anything related to the
20   application for transfer of the construction
21   permits.
22       A.    I suppose it's how broad that
23   class is.  I didn't -- certainly wasn't

---

**Larry Blust**                                        **11/14/2019**

Page 111

1  primarily discussing with Mr. Chardos the
2  application for transfer of the construction
3  permits, because he wasn't involved.  But he
4  was the transition head.  So in some ways
5  transition has to do with that same -- with
6  what you are doing in regard to
7  responsibilities for the plant, et cetera, but
8  he was not involved in the transfers as far as
9  I know, could have been involved with Tim
10  Matthews.
11      Q.   Do you recall ever discussing the
12  timing of the filing of the application for
13  transfer of the construction permits with Mr.
14  Chardos?
15      A.   No.
16      Q.   Let me show you what I am going to
17  mark as Exhibit 93.
18          (Exhibit Number 93 was marked for
19          identification.)
20      Q.   This is an email to you from Mr.
21  Akstulewicz of the Nuclear Regulatory
22  Commission on April 17, 2017, right?
23      A.   Looks like it, yeah.

Page 112

1      Q.   And in it he said:  It's been a
2  couple of months since we spoke.  Any insights
3  into progress on licensing activities for the
4  license transfers?  Do you see that?
5      A.   Yep.
6      Q.   And then he says:  Especially
7  timelines for getting that in place.  Do you
8  see that?
9      A.   Yes.
10      Q.   Do you recall if you responded to
11  this email?
12      A.   I may have.  I may have.  I would
13  have also kicked this over to Tim Matthews.
14      Q.   Okay.  So sitting here today, you
15  don't recall any specific response to this?
16      A.   I don't recall one.  It wouldn't
17  surprise me if I made some response.
18      Q.   All right.  Did you ever have a
19  discussion with any staff member of the NRC or
20  NRC commissioner about whether the transfer of
21  the construction permits needed to be approved
22  prior to the time of the closing on the sale of
23  the Bellefonte site?

Page 113

1      A.   No.
2          (Whereupon, Exhibit Number 8,
3          having been previously marked for
4          identification, was referenced in
5          this deposition.)
6      Q.   Let me show you what has been
7  previously marked as Exhibit 8.
8      A.   (Reviewing document.)
9      Q.   And, Mr. Blust, at the bottom of
10  page one of Exhibit 8 is an email from you to
11  Jim Chardos, Scott Vance, Chris Chandler and
12  Aaron Nix of TVA dated August 29, 2017,
13  correct?
14      A.   Is there another page?
15      Q.   The bottom of page one is that
16  email I'm referring --
17      A.   No, that's an email from Carla
18  Edmondson to Jim Chardos, on the copy I have
19  got.
20      Q.   No, at the bottom of page one of
21  Exhibit 8.
22      A.   Oh, page one, okay.  I'm sorry.
23  Yes.

Page 114

1      Q.   That's an email from you to --
2      A.   Correct.
3      Q.   -- Chardos, Vance, Chandler and
4  Nix of TVA, correct?
5      A.   Correct.
6      Q.   And in it you are discussing a
7  potential letter that Nuclear Development was
8  wanting sent relating to the expiration date
9  for the Unit 2 construction permit, correct?
10      A.   I believe.  I was reading it as
11  you asked that question before, but yes.
12      Q.   All right.  And then on August
13  31st at the top of page one of Exhibit 8, Scott
14  Vance responded to your email saying:  TVA will
15  not send a subsequent extension letter as
16  requested.  Do you see that?
17      A.   Correct.
18      Q.   And then it says:  If you have
19  questions or concerns about this decision,
20  please raise them above my level.  Do you see
21  that?
22      A.   I do.  I remember that.
23      Q.   Did you ever raise concerns about

**Larry Blust**                                           **11/14/2019**

Page 115

1    that decision above Mr. Vance's level?
2        A.   I'm not even sure that I knew at
3    the time what Mr. Vance's level was.  But the
4    answer is basically no, I probably discussed
5    this with Chandler at some time or other, who
6    is not in that department and above -- might be
7    above his level, I don't know.  He's in the
8    Office of General Counsel, isn't he?
9        Q.   Mr. Blust, I am going to ask the
10   question.
11       A.   Okay.  Okay.  I don't know.
12       Q.   Well, you said you probably
13   discussed it with Chris Chandler.  Do you have
14   a specific recollection of discussing it --
15       A.   No.
16       Q.   -- with Chris Chandler?
17       A.   No.  Either Mr. Matthews or I
18   would have discussed it with Chris Chandler,
19   and I don't remember which, it could have been
20   together.
21       Q.   But you don't have any memory of
22   being involved in such a discussion?
23       A.   No.  I could find out if I was

Page 116

1    involved in the discussion, but I don't have a
2    memory currently.
3            (Whereupon, Exhibit Number 48,
4            having been previously marked for
5            identification, was referenced in
6            this deposition.)
7        Q.   All right.  If you will pull out
8    of your stack what has previously been marked
9    as Exhibit 48.
10       A.   48.  Okay.  There is already an
11   Exhibit 8 in my stack so -- I guess I put it
12   twice but -- 48.
13       Q.   48.  This is an email from Mr.
14   Mignogna of AREVA on December 20th, 2016 to
15   Franklin Haney, Sr. with you receiving a copy,
16   correct?
17       A.   Let me look.  Oh, yeah, I'm the
18   last one on the copy, yeah.
19       Q.   And this is where Mr. Mignogna
20   transmitted a White Paper relating to transfer
21   of the Bellefonte construction permit from TVA
22   to Nuclear Development --
23       A.   Correct.

Page 117

1        Q.   -- right?
2        A.   Right.
3        Q.   Did you read it when it came in?
4        A.   I'm not sure I read it exactly
5    when it came in, but I read it.
6        Q.   All right.  After you read it, did
7    you raise any comments or concerns with anyone
8    about it?
9        A.   Only the concern of why were they
10   even writing this.  So far as I knew, we had
11   never asked them to write a White Paper on
12   this, and I didn't have any great respect for
13   them as regulatory people but --
14       Q.   But in terms of the substance
15   contained in the so-called white paper, you
16   didn't raise any comment or concern --
17       A.   I don't think I --
18       Q.   Mr. Blust, it will be easier on
19   the court reporter if you let me finish my
20   question --
21       A.   Oh, I'm sorry.  I thought you were
22   done.
23       Q.   -- before you start talking.

Page 118

1            So the question was, do you recall
2    after reading this so-called white paper, did
3    you raise any comment, question or concern with
4    anyone about what was in it?
5        A.   I don't think I did, because I
6    thought it was a nullity but --
7        Q.   What do you mean you thought it
8    was a nullity?
9        A.   Nobody was asking, to my
10   knowledge, these people to do the regulatory
11   work.
12       Q.   Do you know one way or the other
13   if Franklin Haney requested the white paper
14   from them?
15       A.   I don't know.  I doubt it.
16       Q.   Did you ever discuss that issue
17   with him, whether he had requested it?
18       A.   I might have, I don't remember.
19       Q.   Mr. Blust, other than the
20   application for a DOE loan, are there any other
21   efforts to obtain funding that have gone on in
22   the last two years for Nuclear Development?
23       A.   Last two years.  That would be

**Larry Blust**                                            **11/14/2019**

Page 119

1   since the contract was signed or --
2        Q.   I will go ahead and say since the
3   contract was signed, which is three years.
4        A.   Okay.  I'm sure there have been.
5        Q.   Well, what do you recall them
6   being?
7        A.   Well, there was an effort to see
8   if Credit Suisse would raise securitized
9   subordinate debt with this.
10       Q.   What was the outcome of that?
11       A.   It just sort of dropped by the
12  wayside.  I think that their feeling was it was
13  premature to discuss that.
14       Q.   All right.  Other than Credit
15  Suisse and the DOE, any other effort since the
16  contract was signed in November 2016 to obtain
17  financing?
18       A.   There were various efforts to find
19  like private equity funds.
20       Q.   Were any of those successful?
21       A.   I wasn't really involved with
22  those, but I assume that they were not or I
23  would have heard about them.

Page 120

1        Q.   Who was involved with those?
2        A.   Primarily Franklin Haney.
3        Q.   All right.  Other than --
4        A.   Frank may have been too, I don't
5   know.
6        Q.   Other than efforts to find private
7   equity funds, outreach to Credit Suisse and the
8   DOE application, any other efforts to obtain
9   financing since November 2016 that you can
10  recall?
11       A.   By financing do you mean equity
12  and debt?
13       Q.   Yes, sir.
14       A.   I suspect there were some
15  proposals to joint venture to equity, I wasn't
16  involved with them.
17       Q.   All right.  Anything else along
18  those lines that you can recall, meaning
19  efforts to obtain financing debt or equity
20  since November 2016?
21       A.   And you are not including the
22  Haney family?
23       Q.   Well, tell me what you mean by

Page 121

1   that.
2        A.   Well, the Haney family provided
3   equity here to ND, lots of equity.  I mean --
4   are you asking me about that?
5        Q.   No.
6        A.   Okay.
7        Q.   Anything else?
8        A.   Not that I remember.
9        Q.   All right.  What involvement had
10  you had in the process to attempt to obtain a
11  DOE loan?
12       A.   Well, I am the designated
13  representative to put the -- there is a
14  specific process you have to do the filings
15  with.  And I am the one who has the access to
16  the portal and puts the filings in.  I have
17  also been at numerous meetings with the DOE
18  people to discuss various issues.  So I am, I
19  guess, sort of a point person on the financing,
20  if you want to call it that.
21       Q.   What issues do you recall
22  discussing with the DOE?
23       A.   There is lots of these, but

Page 122

1   requirements for a conditional commitment,
2   including the changes in the regs that were
3   made, the one-step versus two-step licensing,
4   equity structures, debt structures.  I also led
5   the first tour at the plant by the lower
6   ranking bureaucrats from the DOE, I sort of
7   hosted along with Jim Chardos.  Got to be ton
8   more of issues.  Whatever came up in regard to
9   -- was like a legal issue, I dealt with.
10       Q.   Did you ever have discussions with
11  DOE about the status of the closing?
12       A.   I hesitate to say, because I don't
13  know what the meaning of status is.  You need
14  to clarify that a little bit.
15       Q.   All right.  Did you ever have
16  discussions with DOE about whether the closing
17  was going to occur as scheduled in November
18  2018?
19       A.   Whether it was going to occur in
20  November '18?
21       Q.   Yes.
22       A.   Well, I gave them a copy of the
23  contract that says November 14, '18.  Up until

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Larry Blust**                                                   **11/14/2019**

Page 123

1   a couple days before November 30th, I was under
2   the assumption it was going to close in
3   November '18, so I didn't have any discussions
4   with them then.  They were aware of the
5   lawsuit, et cetera.
6        Q.   Have you had discussions with them
7   about the lawsuit?
8        A.   Only that we had filed it.  They
9   picked it up from the Press, just like
10  everybody else.
11       Q.   When you said you discussed
12  one-step versus two-step licensing with them,
13  what did you mean?
14       A.   Well, there's two types of
15  licensing for nuclear plants.  One is called
16  one-step, one is called two-step.  One was in
17  Part 50 of the regulations and the other one
18  was in Part 52.
19            Part 52 was an overlay.  There was
20  a feeling that licensing was taking too long.
21  And so they amended the licensing rules to try
22  to speed it up.  Doesn't seem to have that
23  result but, in fact, that was the idea.  So you

Page 124

1   could get a single license, it's called a COL,
2   combined operating license, combined
3   construction and operating license.
4            Part 50 is what this plant is
5   under, and it provided for a construction
6   license, which is a construction permit.  And
7   then later on you got the operating license.
8   Those are two different processes and two
9   different regulations.  And there was a feeling
10  by the NRC -- the DOE that one-step licensing
11  was less risky than two-step.  And we rebutted
12  that.
13       Q.   And what was the argument in
14  rebuttal?
15       A.   The argument in rebuttal is as it
16  turned out practically, the same risks are
17  there.  Because the fact that they give you an
18  operating license up front, you have to meet a
19  whole bunch of requirements to ever use that
20  license.  And those requirements are virtually
21  the same as to turn your construction permit
22  into an operating license.  And we used the
23  Vogtle plant and Summer plant which are the

Page 125

1   only one-step licensing out there, we used
2   those as a good example of this is neither
3   quicker, cheaper or more certain.  The risks
4   are the same -- or reasonably, the same idea of
5   risk.
6        Q.   Other than the meeting you
7   attended with the Governor of Alabama that you
8   mentioned yesterday, when is the first time you
9   recall meeting with Bill Johnson concerning any
10  issue involving Bellefonte?
11       A.   I don't recall.
12       Q.   Well, sitting here today, other
13  than the meeting that you attended with the
14  Governor of Alabama at which Bill Johnson was
15  in attendance, what other meetings do you
16  remember having that pertained to Bellefonte at
17  which Mr. Johnson was in attendance?
18       A.   I remember the meeting with Mr.
19  Johnson on the 23rd of October.
20       Q.   2018?
21       A.   2018.
22       Q.   All right.
23       A.   It wouldn't -- it wouldn't

Page 126

1   surprise me if Mr. Johnson was at some other
2   meetings, but he wouldn't have been the primary
3   person there, even though he's important,
4   obviously.  I don't remember any.
5        Q.   All right.  So sitting here today,
6   the only meetings about Bellefonte that you can
7   recall having with Bill Johnson were the one
8   with the Governor of Alabama and then the one
9   on October 23rd, 2018?
10       A.   Correct.
11       Q.   All right.  Tell me what you
12  recall about the meeting that occurred on
13  October 23rd, 2018.
14       A.   Well, that meeting was scheduled
15  by Sherry Quirk at our request, and it was a
16  meeting to determine what was going to happen
17  to our request for an extension.  We had -- as
18  you asked yesterday, we had a request for
19  extension like in August, sometime like that,
20  we had been trying to get an answer.  And she
21  called up the day after Bill McCollum's trip to
22  Memphis that Mr. Johnson complained about about
23  this meeting -- at this meeting and scheduled

**Larry Blust**                                               **11/14/2019**

Page 127

1    that meeting.
2       Q.   All right.  What do you recall
3    being said by Mr. Johnson at that meeting?
4       A.   Mr. Johnson talked about how
5    unhappy he was about Mr. McCollum's comments to
6    the City of Memphis in regard to leaving TVA.
7    Mr. Johnson actually said, you know, I always
8    assumed that there would be competition here
9    and I realize that, in fact, you could compete
10   with us in regard to some of our customers.
11   But I never really understood that you would
12   talk to people about leaving TVA even though
13   they wouldn't be going to Bellefonte.  And Mr.
14   McCollum made a proposal that had nothing to do
15   with Bellefonte by saying leave for me.  So
16   that wasn't my understanding or what his
17   understanding was in regard to what Mr.
18   McCollum was proposing, but regardless of that,
19   that was Johnson's statement.
20      Q.   All right.  What else, if
21   anything, do you recall Mr. Johnson saying
22   during that meeting?
23      A.   Well, we discussed a proposal by

Page 128

1    Franklin Haney, and Franklin explained that
2    proposal, I probably explained a little bit of
3    that proposal.  Mr. Johnson said he would
4    consider that proposal.
5       Q.   What was the proposal?
6       A.   The proposal -- you should have in
7    your documents a written version of that
8    proposal which I, in fact, dictated on the
9    plane on the way back from that meeting and
10   sent the next day.  But the proposal, in
11   essence, was to -- was to share with TVA any
12   revenue from sale to -- of power to Memphis
13   from Bellefonte and in essence to joint venture
14   with TVA and to, you know, have TVA in some
15   ways as a partner of ND in regard to that.  A
16   written copy of that is in a -- what's
17   disclosed, I'm sure, here.
18      Q.   And what was TVA's response to
19   that proposal?
20      A.   Ultimately they didn't accept that
21   proposal.  I didn't really get a formal
22   response of proposal.  I was told they weren't
23   going to go with that proposal, but I never got

Page 129

1    any response on the terms.
2       Q.   Who told you that?
3       A.   I think it was Sherry -- it was
4    either Beach or Quick -- Quirk.
5       Q.   Now, that proposal was unrelated
6    to the extension request, right?
7       A.   No, it was related to the
8    extension request.
9       Q.   How?
10      A.   It was made by saying give us an
11   extension request, we are going to participate
12   with you in regard to this.  It wasn't
13   unrelated at all.  It was related to the
14   extension request.
15      Q.   And was there any reason stated --
16   well, what do you remember -- do you remember
17   Ms. Quirk saying anything at that meeting?
18      A.   Do I remember anything -- I'm sure
19   she said things, I don't remember much of any
20   specifics she said.
21      Q.   Okay.
22      A.   Mr. Johnson was the main person
23   who talked at that meeting.

Page 130

1       Q.   Other than what you have told me
2    about what Mr. Johnson said about Memphis and
3    Mr. McCollum's statements as he understood them
4    in Memphis, what else do you recall being said
5    by Mr. Johnson, if anything, at that meeting?
6       A.   Well, that's pretty much it.  He
7    did a fairly long -- it wasn't as short a
8    statement as what I just described it as.  It
9    was a fairly long diatribe in regard to what
10   Bill McCollum said.
11      Q.   All right.  Other than the
12   proposal that was presented about TVA
13   essentially becoming a joint venturer with
14   Nuclear Development as to Bellefonte, what else
15   do you recall you or Mr. Haney saying at the
16   meeting?
17      A.   I'm sure Mr. Haney emphasized the
18   advantages to the region of activating
19   Bellefonte.
20      Q.   Anything else you remember?
21      A.   No, I don't remember much of
22   anything.
23      Q.   Other than you and Mr. Haney, was

**Larry Blust**                                   **11/14/2019**

---

Page 131

1  anyone else there for Nuclear Development?
2      A.   No.
3      Q.   Other than Ms. Quirk and Mr.
4  Johnson, was anyone else in the room for TVA?
5      A.   No.
6      Q.   Let me show you what I am going to
7  mark as Exhibit 94.
8          (Exhibit Number 94 was marked for
9          identification.)
10     A.   (Reviewing document.)
11     Q.   Is this the follow-up email you
12 were talking about a moment ago that you sent
13 after the October 23rd meeting?
14     A.   Yes.
15     Q.   And page two is the list of
16 so-called talking points as the -- followed up
17 on what was said at the meeting, correct?
18     A.   Yes.
19     Q.   And why had Nuclear Development
20 not presented this sort of joint venture
21 proposal to TVA prior to this time?
22     A.   Well, I believe Mr. Haney
23 discussed this proposal prior to the meeting,

---

Page 132

1  but it would have been right before the
2  meeting, I assume.
3      Q.   With who?
4      A.   With Mr. Johnson.
5      Q.   Okay.
6      A.   There were several conversations
7  that I was not on between Mr. Haney and Mr.
8  Johnson.
9      Q.   But you don't know the precise
10 content of those communications?
11     A.   No.
12     Q.   Okay.  Was there any discussion --
13 well, strike that.
14         You have told me everything you
15 can remember specifically about the discussion
16 that occurred at the October 23rd, 2018
17 meeting, correct?
18     A.   Correct.  I should say one thing.
19 Several of these points would have been
20 discussed for better over a year with TVA, such
21 as the third point, becoming the operator.  We
22 had proposed originally that TVA become the
23 operator of the plant.  We have discussed the

---

Page 133

1  arrangement for transmission delivery before we
2  even entered into a bid.  We had discussed the
3  partial requirements contract with TVA.  So
4  those three things had been on the table for a
5  long time.
6          The new one -- and you will notice
7  that the extension is part of this proposal.
8  The new one is number four.
9      Q.   All right.  And had TVA ever
10 suggested any interest prior to this time in a
11 partial requirements contract between Memphis
12 and TVA with Nuclear Development providing base
13 power to the extent generated by Bellefonte
14 Unit 1?
15     A.   I would not necessarily know if
16 they had or not.  I don't know of any interest
17 that they had.
18     Q.   All right.  And even though it had
19 been raised previously, had TVA ever indicated
20 any interest in making its transmission system
21 available to Nuclear Development?
22     A.   Yes.
23     Q.   When was that?

---

Page 134

1      A.   When we were negotiating the
2  contracts -- I am talking about now the
3  contract to acquire the plant --
4      Q.   Right.
5      A.   -- which would have been in 2016.
6  When we were negotiating the contract to
7  acquire the plant, I had asked to include in
8  the contract a transmission agreement.  What I
9  was told by somebody at TVA or Concentric, may
10 have been relayed to me by Concentric, I think
11 it was at TVA, but I was told that it was
12 premature for two reasons:  One, because when
13 you are going to do a transmission request,
14 there is a need for -- I think Mr. McCollum
15 described this the other day -- there is a need
16 for a transmission study to determine what
17 additional costs there would be; like do you
18 have to upgrade any lines, do you have to
19 provide interconnections that aren't there, et
20 cetera, et cetera.
21         And TVA said it's too early to
22 make that study, because your plants aren't
23 going to be completed for a number of years

---

**Larry Blust**                                                           **11/14/2019**

Page 135

1   here and the whole thing could change.  So we
2   don't know what the load would be at that time
3   so -- on the study.  And they also said and you
4   should be applying then for the transmission at
5   that time, not now, because of the fact that
6   it's premature.  We don't know what other power
7   we are going to be carrying.  We don't know
8   whether you need to put up another pole and
9   wires, we don't know anything about that.  But
10  they indicated perfectly willing to provide the
11  transmission.
12          Q.   Well, who made that -- gave that
13  indication?
14          A.   I don't remember whether it was
15  Concentric relaying it or whether it was
16  directly from -- it may have been Sherry.
17          Q.   But you don't remember
18  specifically?
19          A.   I don't remember specifically.  I
20  might be able to look back and see, but I don't
21  remember specifically.
22          Q.   But that did not end up in the
23  contract?

Page 136

1           A.   Correct, for the reasons I just
2   said.
3           Q.   And TVA has never made a written
4   contractual commitment to Nuclear Development
5   to provide transmission to it, correct?
6           A.   Correct.
7           Q.   Nor has Nuclear Development ever
8   asked that the transmission study be performed,
9   correct?
10          A.   Correct.
11          Q.   Now, TVA also had never indicated
12  any interest about being the operator of the
13  plant, correct?
14          A.   Probably correct.  Once again, I
15  might know -- not know whether they were
16  interested in it.  They never told me they were
17  willing to do it, let's put it that way.
18          Q.   All right.  And just so I'm clear,
19  sitting here today, you can't as to this -- you
20  said that TVA indicated an interest in
21  providing transmission, right?
22          A.   I would say they indicated an
23  assumption that they would be providing the

Page 137

1   transmission.
2           Q.   All right.  And who said that?
3           A.   Once again, I don't remember for
4   sure.
5           Q.   And what precisely did they say?
6           A.   Exactly what I just explained to
7   you.  It was too early to do it because -- the
8   assumption was they would be willing to provide
9   it, provided the transmission study showed the
10  cost and we paid the cost.
11          So there was never any indication
12  that I have ever heard from TVA that they
13  weren't willing to transmit the power.
14          Q.   Well, was the assumption your
15  assumption?
16          A.   It seemed to be the assumption of
17  the TVA people.  They didn't say no, we won't
18  transmit the power.  They said you need to go
19  through the normal procedures.  They have a
20  tariff that they file with FERC.  And what they
21  were saying to me was you have to go through
22  the tariff procedures and part of that is a
23  transmission study.  And we had in our budget a

Page 138

1   certain amount of upgrade for that
2   transmission.  And the budget for the plant, we
3   had an amount for that.  TVA had always assumed
4   that they were going to transmit the power when
5   they owned it over their own lines, and we
6   assumed the same thing.  And so did they,
7   apparently, because nobody ever made any
8   objections to transmitting the power.
9           Q.   All right.  So you are saying you
10  are basing your assumption that TVA had no
11  objection to transmitting the power on the
12  basis that they never told you they wouldn't
13  transmit the power, is that fair?
14          A.   No, I don't think it's fair.  I
15  think it was more clear that as long as we went
16  through the procedures and were willing to pay
17  the cost that they definitely would transmit
18  the power.
19          Q.   They told you they would
20  definitely --
21          A.   No, they didn't -- I say I think
22  it was fair that that was the assumption on the
23  thing.  We never got there, because we were

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Larry Blust**                                                **11/14/2019**

---

Page 139

1   premature on submitting any application and
2   still probably are.  Because we have got three
3   or four years of construction to go here.
4        Q.   All right.  You have now told me
5   about the only meetings with Bill Johnson on
6   Bellefonte that you can remember, correct?
7        A.   Correct.
8        Q.   Do you remember being on any phone
9   calls with Bill Johnson about Bellefonte?
10       A.   I would assume I was, but I don't
11  remember any specific phone calls.
12       Q.   Did you ever have any face-to-face
13  meetings with Sherry Quirk that Bill Johnson
14  was not also in attendance at concerning
15  Bellefonte?
16       A.   Sure.
17       Q.   All right.  Tell me about the
18  first of those that you remember.
19       A.   Well, we met with Sherry Quirk
20  prior to the contract, I don't know how many
21  times but -- and I had numerous phone calls
22  with her prior to that.  Bill Johnson was not
23  involved in any of those.  She was the one who

---

Page 140

1   was conducting the transaction, if you want to
2   put it that way.  I discussed with her the
3   process of the sale, et cetera, et cetera, et
4   cetera.  So we had considerable amount of
5   discussion with her.  Most of those were phone
6   calls.  I think there was one or two that were
7   actually in-person meetings.
8        Q.   Tell me about the in-person
9   meetings, what you recall about them.
10       A.   I don't really recall anything
11  specific about them.
12       Q.   All right.  What about after the
13  contract, the Purchase and Sale Agreement, was
14  signed, did you have any face-to-face meetings
15  with Ms. Quirk that did not involve Mr.
16  Johnson?
17       A.   That did not involve Mr. Johnson.
18  I have trouble remembering phone calls versus
19  meetings, but we might have.  But most of them
20  were phone calls.
21       Q.   And do you remember anything
22  specific about the phone calls with her?
23       A.   Well, we had -- the various topics

---

Page 141

1   that I have just related, I had numerous phone
2   calls with her on those topics.
3             (Whereupon, Exhibit Number 13,
4             having been previously marked for
5             identification, was referenced in
6             this deposition.)
7        Q.   Okay.  Let me show you what has
8   been previously marked as Exhibit 13.
9        A.   (Reviewing document.)
10       Q.   This is your letter to TVA
11  requesting on behalf of Nuclear Development a
12  six-month extension to the closing date under
13  the agreement, correct?
14       A.   Right.
15       Q.   And the closing date is a contract
16  term in the Purchase and Sale Agreement,
17  correct?
18       A.   I don't know if closing date is.
19  Closing is.  I would have to look at the
20  contract.
21       Q.   Well, the fact that the closing
22  was going to occur on November 14th was in the
23  contract, correct?

---

Page 142

1        A.   Correct.
2        Q.   All right.  And so any change of
3   that would have required an amendment to the
4   contract, correct?
5        A.   Correct.
6        Q.   And you would agree that TVA was
7   not under any obligation to agree to any
8   amendment to the contract --
9        A.   Correct.
10       Q.   -- correct?  Is that correct?
11       A.   That's correct.
12            MR. O'REAR:  Wait for him to
13  finish his question, if you would.
14       Q.   (BY MR. LEMBKE:)  Why did Nuclear
15  Development ask for this extension?
16       A.   Well, we wanted an extension to
17  put the whole project together.  One of the
18  reasons, of course, was the transfer of the
19  construction permits; one of the reasons was to
20  put the rest of the financing package together.
21  We would have preferred obviously to have an
22  extension and have those things in place, the
23  same way we asked for those as conditions

---

**Larry Blust**                                            **11/14/2019**

---

Page 143

1   originally.
2        Q.   Wasn't the main reason you asked
3   for this the fact that you wanted to get the
4   approval of the transfer of the construction
5   permits prior to closing?
6        A.   I wouldn't view that as the main
7   reason.  That was one of the major reasons.
8        Q.   All right.  Would you agree that
9   the main reason that Nuclear Development
10  requested the transfer of the construction
11  permits was that the -- this was a case of
12  first impression for the NRC; the NRC would
13  likely prefer that its approval occur before
14  closing; and Nuclear Development would also
15  prefer that it occur before closing?
16           MR. O'REAR:  Objection.
17       A.   I don't even understand the
18  question.
19           MR. O'REAR:  I don't understand
20  the question either.
21       Q.   (BY MR. LEMBKE:)  All right.
22  Well, isn't it true that the main reason -- let
23  me just show you this.

---

Page 144

1        A.   Okay.
2        Q.   This is what has been --
3            MR. O'REAR:  Your question was,
4   was the main reason that they applied for the
5   --
6        A.   Why don't you show it to me?
7            MR. O'REAR:  -- transfer.
8        A.   It would cut through this stuff.
9            MR. O'REAR:  I'm not sure you
10  actually said what you meant to say.
11       Q.   (BY MR. LEMBKE:)  Well, Mr. Beach,
12  let me try it again before I show you any
13  exhibit.
14       A.   It's Blust.
15       Q.   Excuse me.  What did I say?
16       A.   Mr. Beach.
17       Q.   Oh, sorry.
18       A.   He would be deeply offended by
19  that.
20       Q.   I was reading his note here.
21           Mr. Blust, isn't it true that you
22  understood that the NRC would likely prefer
23  that approval of the transfer of the

---

Page 145

1   construction permits occur before a closing?
2        A.   Yes.
3        Q.   And isn't it true that Nuclear
4   Development also preferred that the approval of
5   the transfer of the construction permits occur
6   before closing?
7        A.   Yes.
8        Q.   And isn't it true that those
9   factors were the main reason that Nuclear
10  Development had requested an extension of the
11  closing date?
12       A.   Well, if I used the word the main
13  reason, it should have said a main reason.  As
14  I said in my prior answer to one of your
15  questions, that was one of the main reasons.
16           (Whereupon, Exhibit Number 19,
17           having been previously marked for
18           identification, was referenced in
19           this deposition.)
20       Q.   Well, if we take a look at Exhibit
21  19, which is an email from you to Cliff Beach
22  on November 12, 2018, in the first paragraph --
23       A.   First paragraph.

---

Page 146

1        Q.   -- you describe that as the main
2   reasons we had requested an extension of the
3   closing date.
4        A.   Yeah, but I used the word reasons,
5   not reason.
6        Q.   Right.  But what was listed here
7   were the reasons you viewed as the main
8   reasons, correct?
9        A.   No.  I just testified what I
10  viewed as the main reasons.  It probably should
11  have said was a main -- one of the main
12  reasons, okay?
13       Q.   So you are basically now saying
14  that what you said to Mr. Beach on November
15  12th, 2018 did not accurately reflect what you
16  intended to say?
17       A.   Well, I think the use of the word
18  reasons accurately reflects it.  It may not be
19  grammatically -- I wouldn't be proud of the
20  grammar.
21       Q.   Well, but the other things you
22  mentioned as main reasons, other than what is
23  on here, are not on here, correct?

---

**Larry Blust**                                              **11/14/2019**

---

Page 147

1      A.   Correct.
2      Q.   Okay.  When, Mr. Blust, did you
3  first learn from TVA that TVA thought there was
4  any legal impediment to the closing if NRC
5  approval had not been obtained?
6      A.   Any legal impediment?  I think it
7  was 15th.
8      Q.   15th of November?
9      A.   November.
10     Q.   Of 2018?
11     A.   Correct.
12     Q.   And what do you recall learning on
13  the 15th of November?
14     A.   Well, in a phone call I was told
15  by both Sherry Quirk and Chris Chandler, I
16  believe it was, that they had just discovered
17  that Section 101 of the AEA, in their opinion,
18  made it illegal to close the transaction.  I,
19  of course, didn't agree with that and stated
20  the reasons why I didn't agree with it.
21     Q.   Mr. Blust, isn't it true that they
22  had told you prior to that date -- or someone
23  at TVA had told you prior to that date that TVA

---

Page 148

1  believed that there would be a permit violation
2  if the plant ownership was transferred without
3  approval of the transfer of the construction
4  permits by NRC?
5      A.   No.
6      Q.   You don't recall that?
7      A.   No, I think you are thinking of a
8  different topic.
9      Q.   Well, what do you think I am
10  thinking of?
11     A.   I think you are thinking of on the
12  8th when we asked for an extension to study the
13  issue.
14     Q.   Well, aren't you aware that TVA
15  had been expressing a concern about whether
16  they would be -- whether TVA would be in
17  violation of the permits if the closing
18  occurred without approval of the transfer by
19  NRC?
20     A.   I was aware on the 8th because I
21  was informed on the 8th by Sherry Quirk that,
22  in fact, they had looked at the permits and
23  they wanted to study the issue of whether there

---

Page 149

1  was a problem in regard to not transferring the
2  permits at the time of closing.  I was not told
3  anything about any illegality, word wasn't even
4  used.  I was not told anything about the
5  permits violated, et cetera.  I think those
6  conversations occurred later.  But yes, there
7  was a discussion later.
8              (Whereupon, Exhibit Number 17,
9              having been previously marked for
10             identification, was referenced in
11             this deposition.)
12     Q.   Well, let me show you what has
13  been marked as Exhibit 17 previously.
14     A.   This is probably the later I was
15  just referring to.
16     Q.   Well, this is November 9th.
17     A.   Correct.
18     Q.   And this is an email to you from
19  Mr. Beach, correct?
20     A.   Right.
21     Q.   And he says:  As a promise,
22  attached are several bullets relating to our
23  recent discussion, do you see that?

---

Page 150

1      A.   Correct.
2      Q.   And did you understand the recent
3  discussion was your conversation the day
4  before?
5      A.   Correct.
6      Q.   All right.  And the fourth bullet
7  says -- on page two says:  Because the
8  construction permits expressly reference TVA
9  ownership of the site, CPPR-122 and -123
10  Section 2, acquisition of the site by another
11  entity would result in a failure to comply with
12  one or more terms of the permits.  Do you see
13  that?
14     A.   That was not stated the prior day
15  before.
16     Q.   Well, but it -- you would
17  acknowledge that TVA expressed a concern about
18  the legality of the transfer based on the
19  permit compliance issue on November 9th?
20     A.   I did not assume that bullet four
21  expressed any regard to the legality of the
22  transfer.  I read number four exactly as it
23  says.  He doesn't say that the transfer is

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Larry Blust**                                                    **11/14/2019**

Page 151

1   there. He said it would result in failure to
2   comply with one or more terms of the permits.
3   He didn't say the transfer would be illegal,
4   that was never said until the 15th.
5        Q.   Well, he was certainly indicating
6   to you that TVA was concerned that it would be
7   in violation of the permits, correct?
8        A.   Correct.
9        Q.   And that would be a violation of
10  law, correct?
11            MR. O'REAR:  Objection, calls for
12  a question of law.
13       A.   I don't believe it would be a
14  violation of law. The permit might have been
15  violated by that, but the transfer of the
16  property doesn't even require a transfer of the
17  permit. So there can't be any violation by --
18  this doesn't refer to the transfer of the
19  property.
20       Q.   (BY MR. LEMBKE:)  So, Mr. Blust,
21  it is your position that if TVA is in violation
22  of a permit, that's not a violation of law?
23       A.   It was not my understanding that

Page 152

1   this was a violation of the permit.
2        Q.   Well, but TVA was expressing its
3   indication that it was, right?
4        A.   Well, I don't know really -- I can
5   tell you what I think this thing says. But, in
6   fact, it didn't say anything about the transfer
7   of the property. The transactions referred to
8   in the --
9            MR. O'REAR:  Just answer his
10  question.
11       A.   Yeah. No, I didn't agree with
12  that.
13       Q.   (BY MR. LEMBKE:)  You didn't agree
14  with what?
15       A.   What you just said.
16       Q.   That TVA was expressing its
17  concern that it would be in violation of the
18  law if the transfer occurred without the
19  permits being changed?
20       A.   No, I don't agree with that.
21       Q.   You don't agree with that or you
22  don't -- well, do you agree that TVA was
23  expressing that concern?

Page 153

1        A.   First of all, this is a failure to
2   comply; it doesn't say a violation of law. And
3   second, we were discussing the contract terms
4   which do not require a transfer of the permit
5   to transfer the property nor does the law
6   require that. So it did not rise to the level
7   of any statement of anything in the contract
8   would have been violated.
9        Q.   Well, you understand that there is
10  a provision -- a closing condition in the
11  contract indicating that if consummation of the
12  transactions would result in a violation of the
13  law, that closing could not proceed, correct?
14       A.   It was a condition -- I don't say
15  the closing could not proceed; it was a
16  condition of closing.
17       Q.   All right. And you are saying
18  that when you read acquisition of the site by
19  another entity, you understood that was
20  referring to acquisition of Bellefonte by
21  Nuclear Development --
22       A.   Yes.
23       Q.   -- right? And so when he said

Page 154

1   that would result in a failure to comply with
2   one or more terms of the permits, you didn't
3   understand that that would -- that meant that
4   TVA would be in violation of the law?
5        A.   Well, TVA could be in violation of
6   the law by turning around and crossing a power
7   line somewhere. I didn't understand that had
8   any violation of the law in regard to the
9   transactions to be consummated in the contract.
10  The contract does not require the transfer of
11  the permits, either at closing or any other
12  time, it specifically does not require. It
13  relieves on the closing any obligation of TVA
14  to transfer the permit.
15            So to me, this is a nice
16  statement, we didn't agree with the statement
17  either, but, you know, it doesn't have anything
18  to do with the law on prohibiting a contract or
19  making the transformation of the transactions.
20  There is no requirement to transfer the permits
21  of the contract.
22       Q.   Why did you not agree with the
23  statement in that bullet?

**Larry Blust**                                      **11/14/2019**

Page 155

1    A.   I just repeated that.
2    Q.   No, I don't --
3    A.   Well, what you --
4    Q.   You just said I don't agree -- I
5    did not agree with the statement in that
6    bullet.
7         A.   And we later explained this.  I
8    sent them our -- the fact is we don't believe
9    there is anything in the permits that requires
10   the continued ownership by the applicant of the
11   permit.  The term in the permit applicant's
12   property, which is what he was talking about,
13   simply describes the location of the nuclear
14   plant that gets the license.  It doesn't have
15   anything to do with a requirement that that
16   applicant keep the license.  In fact, there is
17   a procedure for transferring a permit by
18   applicant A to B.  And the person who gets the
19   transfer of the permit has that same
20   requirement that it's that facility.  You can't
21   move the facility -- the permit from facility A
22   to facility B, and that's all that this
23   particular thing says in the permit.

Page 156

1    Q.   Did you have any -- if the closing
2    had occurred, TVA would have still been the
3    permittee, correct?
4    A.   Correct.
5    Q.   But would have had no control over
6    the site, correct?
7         A.   We would have agreed to control
8    the site.  We were negotiating for the same
9    exact thing that TVA was doing at the site.  We
10   were in process of negotiating -- TVA
11   maintained the site and security of the site,
12   two things that are concerned here by
13   contractors.
14        As I said yesterday, Mr. Chardos
15   was in the process, along with us, of getting
16   the same contracts to continue after the
17   transfer.  So anything TVA would have wanted us
18   to agree on how we are going to do that, we
19   would be more than happy to agree.  But we were
20   going to do the same thing that TVA was doing
21   to comply with the permits.
22        MR. LEMBKE:  Move to strike as
23   nonresponsive.

Page 157

1    Q.   (BY MR. LEMBKE:)  Mr. Blust, it
2    will help if you will answer my question and
3    just the question.
4         A.   I obviously didn't understand the
5    question.  What was the question?
6         Q.   Here is my question:  You
7    understood that TVA would have had the legal
8    obligation as the permittee to satisfy all
9    terms of the contract until those permits were
10   transferred, correct?
11        A.   The contract?
12        Q.   All term -- let me start over.
13        You understood that TVA would have
14   had the legal obligation as the permittee to
15   satisfy all terms of the permit until those
16   permits were transferred, correct?
17        A.   Correct.
18        MR. O'REAR:  Object to the form,
19   calls for legal conclusion.
20        Q.   (BY MR. LEMBKE:)  And you also
21   agree that once TVA closed on the transaction,
22   it had no right to access the Bellefonte site?
23        A.   No, I don't agree with that.

Page 158

1    Q.   You don't?
2    A.   No.
3    Q.   What right of access would TVA
4    have had?
5         A.   Anything they would want to have.
6    We would have been happy to negotiate access to
7    the site, if they had wanted it.  I don't know
8    why they would want it, but we would have been
9    happy to do it.
10        Q.   But as of the time -- as of
11   November 2018, there was no contractual right
12   of access that TVA would have had, absent some
13   additional agreement that was entered into?
14        A.   Correct.  No one ever asked us for
15   that agreement.
16        Q.   And -- okay.  All right.  Do you
17   recall having any discussions after November
18   8th with anyone at TVA about the issue of the
19   permit violation, if the closing occurred
20   without NRC approval?
21        A.   Well, you consider the 9th a
22   discussion or not?
23        Q.   Well, other than this email -- I

**Larry Blust**                                                    **11/14/2019**

Page 159

1   was really -- first I want to talk about a
2   telephone or face-to-face discussion about it.
3       A.   This topic was -- came up in the
4   November 15th, although it was not the primary
5   topic of the November 15th.
6       Q.   All right.  What do you recall
7   being discussed on November 15th?
8       A.   There was a statement similar to
9   this in regard to it would violate the permit,
10  and I disagreed.
11      Q.   And who said it would violate the
12  permit?
13      A.   I don't know.  It was either
14  Chandler or Beach or Quirk.  Those people all
15  talked during that thing.
16      Q.   And do you recall specifically
17  what you said?
18      A.   I repeated that it would not.  And
19  I also supplied a paper that said that.  So we
20  didn't have any elaborate conversations,
21  because we supplied in writing our view of
22  this.
23      Q.   But you understood that this issue

Page 160

1   was a question of first impression for the NRC
2   without clear precedent, correct?
3       A.   What is this issue?
4       Q.   The issue of the transfer of the
5   plant without the prior approval of NRC for
6   transfer of the construction permits pertaining
7   to the plant.
8       A.   Yes, although I didn't understand
9   that it had anything to do with the violation
10  of the terms of the permit, but that's right.
11      Q.   And you understood that if there
12  had been a transfer of the plant without
13  approval of the transfer of the construction
14  permits, that would result in a degree of
15  responsibility and risk to TVA after the
16  closing occurred?
17      A.   Correct, and I said that to TVA.
18      Q.   All right.  What did you mean by
19  responsibility and risk to TVA?
20      A.   Exactly what you just asked me
21  before.  They would still be the permit holder.
22  To TVA or to NRC?
23      Q.   To TVA.  What was the

Page 161

1   responsibility --
2       A.   I think you -- I confused your
3   question -- why don't you repeat your question?
4       MR. O'REAR:  Slow down, Larry.
5       A.   Yeah, yes.
6       MR. O'REAR:  Let him finish his
7   question and then you can --
8       Q.   (BY MR. LEMBKE:)  My question is,
9   you said that you agreed that there would be a
10  degree of responsibility and risk to TVA after
11  closing, if TVA transferred ownership of the
12  Bellefonte site to Nuclear Development without
13  NRC approval of transfer of the construction
14  permits.
15      MR. O'REAR:  Just --
16      Q.   And my question is, what did you
17  mean by -- what was the degree of
18  responsibility and risk that TVA would have?
19      MR. O'REAR:  Excuse me, just a
20  minute.  What exhibit are you reading from?
21      MR. LEMBKE:  I mean that's not
22  relevant.  I am asking a question unrelated to
23  an exhibit.

Page 162

1       MR. O'REAR:  I know, but you are
2   reading from an exhibit and if you could give
3   the witness the benefit of --
4       MR. LEMBKE:  That's not a proper
5   objection.  I'm not going to give him the
6   benefit.  I will ask him about the exhibit in
7   due course if I choose to.  I am asking him a
8   follow-up to his answer, not any exhibit.
9       A.   I have forgotten the question, so
10  could you repeat the question?
11      Q.   (BY MR. LEMBKE:)  Yes.  A moment
12  ago you agreed that if there was a sale of the
13  Bellefonte site, a closing on the sale by TVA
14  to Nuclear Development without NRC approval of
15  the transfer of the construction permits, that
16  there would be a degree of responsibility and
17  risk to TVA as a result of that happening.
18      And my question is, what did you
19  mean when you said there would be a degree of
20  responsibility and risk to TVA?
21      A.   Exactly what I just explained,
22  which was they would still be responsible for
23  the compliance with the permit.  They would

**Larry Blust**                                                **11/14/2019**

---

Page 163

1    be -- continue to be --
2         (Reporter interruption.)
3         A.   They would continue to be permit
4    holder until approval was given and they would
5    continue to be responsible for complying with
6    the permit.
7         Q.   Are you aware of any situation in
8    American history where the owner of the plant
9    subject to a nuclear construction permit from
10   the NRC was not also the permit holder for the
11   construction permit?
12        A.   On construction permits, no, but I
13   am on operating permits.
14        Q.   Pardon me?
15        A.   I am on operating permits.
16        Q.   Well, my question was construction
17   permit.
18        A.   I don't know if it has ever -- I
19   think there may be one situation where that
20   occurred but --
21        Q.   When was it?
22        A.   It would have been in regard to
23   the south or east Texas one.

---

Page 164

1         (Reporter interruption.)
2         A.   I reviewed all of the cases here,
3    and I don't remember for sure.
4         MR. O'REAR:  Slow down.  She
5    didn't understand what you said --
6         A.   I'm sorry, what --
7         MR. O'REAR:  -- when you said
8    Texas.
9         A.   South Texas or east Texas, there
10   was a plant that was actually -- was actually
11   -- requested a permit to build that never was
12   built in Texas.  It moved around from place to
13   place.  It had a rather checkered history of
14   ownership.
15        Q.   (BY MR. LEMBKE:)  And so it is
16   your testimony that that was a situation where
17   the owner of the plant and the permittee of the
18   NRC were not the same?
19        A.   Well, the owner of the plant issue
20   also goes to people who are part of the
21   ownership entity.  There is a situation, and I
22   believe it was the Texas one, where, in fact,
23   part of the ownership of the entity was

---

Page 165

1    transferred without approval of the NRC.
2         Q.   And the NRC said that was okay?
3         A.   They went ahead and ultimately
4    granted the approval of the permit.
5         Q.   So it's your position that the NRC
6    has said it's okay for a part owner of a
7    nuclear plant not to be the permittee?
8         A.   It's not my position at all.
9    Don't put words in my mouth.
10        Q.   No, I'm asking you is that your
11   testimony?
12        A.   No, no.
13        Q.   All right.  So you don't know
14   whether the NRC has said that's okay or not?
15        A.   I am not aware of any formal
16   regulatory procedure which the NRC would go to
17   say that is okay or not.
18        Q.   All right.  If you will pull out
19   Exhibit 19.  This is an email that you sent to
20   Cliff Beach with copies to others on Monday,
21   November 12th, 2018, correct?
22        A.   Correct.
23        Q.   And this is where we already

---

Page 166

1    looked at the first paragraph where you say:
2    In our call Thursday I briefly explained ND's
3    proposed path forward to transfer the
4    construction permits in deferred status by
5    filing the application before closing with the
6    approval to occur after closing and stated that
7    we agree with you that this would be a case of
8    first impression to the NRC, that the NRC would
9    likely prefer that the its (sic) approval occur
10   before closing as would we and that this was
11   the main reasons we had requested an extension
12   of the closing date.  Did I read that right?
13        A.   I think you did, including a
14   couple of typos there.
15        Q.   And so that was your view back --
16   that was at least one of the main reasons you
17   had requested the extension date back in
18   August, correct?
19        A.   Correct.
20        Q.   All right.  Now, then if you look
21   down in the third paragraph you say:  Although
22   there is some difference between Tim's position
23   and yours -- well, let's start with the first

---

**Larry Blust**                                                    **11/14/2019**

---

Page 167

1    paragraph.
2         First you say in that third
3    paragraph: Based on your analysis, TVA cannot
4    perform its obligation to transfer the plants
5    until a license transfer has received NRC
6    approval and would be in breach of contract
7    unless the closing date is extended. Do you
8    see that?
9         A.  I see that.
10        Q.  Now, as of November 12th, the only
11   issue that had been raised by TVA with you
12   related to whether they'd be out of compliance
13   with the permit, correct?
14        A.  Correct.
15        Q.  All right. And so you understood
16   that TVA was saying that prevented it from
17   performing its obligation to transfer the
18   plant, correct?
19        A.  What I was saying is that's what
20   their analysis would lead them to say.
21        Q.  Okay. So you understood that was
22   what TVA's analysis was leading to?
23        A.  Well, I assumed it would lead to.

---

Page 168

1    They said they wanted time to analyze this
2    issue.
3         Q.  All right. So then you go on to
4    say: Although there is some difference between
5    Tim's position and yours, I think we are all in
6    agreement that the safe way to do this is to
7    close after NRC approval of the construction
8    permit transfers. Otherwise, both parties
9    incur risks which can be easily avoided. Do
10   you see that?
11        A.  Correct.
12        Q.  What was the risk to TVA that you
13   were talking about?
14        A.  The risk that they were still
15   responsible for permit compliance after closing
16   until the approval occurred, the very risk that
17   we just talked about.
18        Q.  What was the risk to Nuclear
19   Development?
20        A.  The risk to Nuclear Development
21   was that somebody at the NRC would say we are
22   not going to renew your permit.
23        Q.  Because this had happened?

---

Page 169

1         A.  Because this had happened, right.
2         Q.  All right. And that's why you
3    said the safe way to do it is to close after
4    NRC approval of the transfers, right?
5         A.  Correct.
6         Q.  All right. And then the second
7    page is a legal write-up that you sent about --
8    that you entitled, Regulatory Path Forward For
9    Transfer of the Bellefonte Construction
10   Permits, correct?
11        A.  Correct.
12        Q.  Now, in this -- you are aware that
13   in the application that Nuclear Development
14   submitted on November 13th, which was the next
15   day from this email, Nuclear Development asked
16   that the NRC hold the permits in terminated
17   plant status, you recall that?
18        A.  I recall the testimony yesterday.
19   I have never read that permit.
20        Q.  Okay. Well, there is nothing
21   about asking the NRC to hold the permits in
22   terminated plant status in this one-page
23   Regulatory Path Forward document that was sent

---

Page 170

1    the day before, is there?
2         A.  No. And I believe, by the way,
3    you mischaracterized hold the permits in
4    terminated status. I haven't read yet the
5    transfer, but the testimony yesterday from Mr.
6    McCollum and the provisions you read, that
7    wasn't what the application said.
8         MR. LEMBKE: I move to strike.
9         Q.  (BY MR. LEMBKE:) Mr. Blust, we
10   are here for your deposition, not for you to
11   make an argument, not for you to make
12   statements. You are here to answer the
13   questions and only the questions that I ask or
14   Mr. O'Rear asks, and would you please adhere to
15   that?
16        A.  You put that very statement in
17   your question. If you would like to read back
18   your question, that is exactly what you stated
19   to me. And I was just saying I don't believe
20   that's a true statement. If you want to
21   premise your questions by statements that you
22   think are facts or legal conclusions, then I am
23   entitled to respond to whether I agree with

---

**Larry Blust**                              **11/14/2019**

Page 171

1  them or not.
2        MR. LEMBKE:  Move to strike.
3        Q.   (BY MR. LEMBKE:)  All right.  And
4  in the last paragraph of the Regulatory Path
5  Forward document it says, the first sentence:
6  ND acknowledges that this regulatory path
7  involving temporary separation of ownership of
8  a site for utilization facility from the
9  recipient of the permits authorizing its
10 construction appears to be a situation of first
11 impression for the NRC without clear precedent
12 and results in a degree of responsibility and
13 risk to TVA after closing until the CP
14 transfers are approved.  Did I read that
15 correctly?
16       A.   I am not sure where you are
17 reading from.  Why don't you tell me again what
18 you're reading from.
19       Q.   I am in the last paragraph.
20       A.   Of first page or --
21       Q.   Of the second page, the Regulatory
22 Path Forward document.
23       A.   Okay.

Page 172

1        Q.   And the first sentence says:  ND
2  acknowledges that this regulatory path
3  involving temporary separation of ownership of
4  a site for utilization facility from the
5  recipient of the permits authorizing its
6  construction appears to be a situation of first
7  impression for the NRC without clear precedent
8  and results in a degree of responsibility and
9  risk to TVA after closing until the CP
10 transfers are approved, correct?
11       A.   Is that a correct reading?  It
12 sounds like to me it's a correct reading.
13       Q.   And nothing -- there was no
14 discussion in this document about Section 101
15 of the Atomic Energy Act, correct?
16       MR. O'REAR:  Objection.
17 Mischaracterization of the document.
18       Q.   (BY MR. LEMBKE:)  Mr. Blust, is
19 there any discussion in page two of Exhibit 19
20 about Section 101 of the Atomic Energy Act?
21       A.   Well, I believe that's what the
22 second paragraph is referring to, the first
23 sentence in the second paragraph.  I didn't

Page 173

1  write this, as you well know.
2        Q.   Right.  Now, did Nuclear
3  Development ever provide to TVA -- well, first
4  let me ask, did Nuclear Development ever obtain
5  an opinion letter from any law firm about any
6  of the legal issues that had been raised by
7  TVA?
8        A.   A formal opinion?
9        Q.   Yes.
10       A.   I don't believe so.
11       Q.   And, in fact, you told TVA that it
12 was not opinionable, correct?
13       A.   What was not opinionable?
14       Q.   The issue of whether the transfer
15 of the Bellefonte site could proceed without
16 violation of the Atomic Energy Act or the
17 permits.
18       A.   No, I think you are confused about
19 what I told the TVA.
20       Q.   Well, what did you tell the TVA?
21       A.   I told TVA that I didn't think we
22 could get an opinion from the NRC, that it was
23 very difficult to get an opinion from the NRC.

Page 174

1        Q.   Well, didn't TVA ask you --
2  representatives of TVA ask you if you had a
3  formal legal opinion on the legal issues that
4  were being discussed and your response was it's
5  not opinionable?
6        A.   No, that's not right.
7        Q.   But, in fact, Nuclear Development
8  did not have a formal legal opinion on those
9  issues, correct?
10       A.   Correct.
11       Q.   Did Nuclear Development ask its
12 counsel for a formal legal opinion?
13       A.   Not at this time.  This is the
14 first time anything came up.
15       Q.   At anytime prior to November 30th,
16 2018, did Nuclear Development ask its counsel
17 if it would provide a formal legal opinion on
18 any of the legal issues that were being --
19       A.   You need to state that again.
20 Anytime before when?
21       Q.   At any -- were you aware that the
22 closing contractually was to occur on November
23 30th, 2018 as a result of the first amendment

**Larry Blust**                                                **11/14/2019**

Page 175

1   to the Purchase and Sale Agreement?
2       A.  Correct.
3       Q.  At any time prior to that date, on
4   or before that date, November 30th, 2018, did
5   Nuclear Development ask any outside counsel for
6   a formal legal opinion on any legal issue
7   relevant to the closing?
8       A.  On any legal issue?
9       Q.  Well, let me break it down.  Did
10  you ask for -- did Nuclear Development ask any
11  outside counsel on or before November 30th,
12  2018 for a formal legal opinion on whether
13  Section 101 of the Atomic Energy Act prohibited
14  the transfer from occurring?
15      A.  No.
16      Q.  Did -- at any time prior to
17  November 30th, 2018, did Nuclear Development
18  ask any outside counsel for a formal legal
19  opinion on whether TVA would be in violation of
20  its permits, construction permits, if it
21  transferred Bellefonte without prior approval
22  of the transfer for the construction permits by
23  the NRC?

Page 176

1       A.  No.
2           (Whereupon, Exhibit Number 36,
3           having been previously marked for
4           identification, was referenced in
5           this deposition.)
6       Q.  Now let me show you, Mr. Blust,
7   what has been previously marked as Exhibit 36.
8       A.  (Reviewing document.)
9       Q.  At the bottom of 36 is an email
10  from Mr. Beach to you on November 16th,
11  correct?
12      A.  Yes.
13      Q.  And in it he says:  Below is the
14  Atomic Energy Act section we discussed
15  yesterday.  Do you see that?
16      A.  Right.
17      Q.  And he quotes Section 101 of the
18  Atomic Energy Act, right?
19      A.  Correct.
20      Q.  And you then responded the same
21  day saying:  As per the voicemail I left
22  yesterday for Sherry, this is the section we
23  have been looking at and thought you were too.

Page 177

1   Do you see that?
2       A.  Correct.
3       Q.  All right.  How long had you been
4   looking at Section 101 of the Atomic Energy Act
5   and how it pertained to the potential closing?
6       A.  Well, I had asked Mr. Matthews
7   about this issue which is why you got the --
8           MR. O'REAR:  Object --
9       A.  -- email.
10          MR. O'REAR:  Larry, instruct you
11  not to communicate your conversations with Mr.
12  Matthews.
13      A.  Probably since August or
14  September.
15      Q.  (BY MR. LEMBKE:)  And then you go
16  on to say:  I assume you were already looking
17  at them, but if you -- if not, you should also
18  look at the definitions in section eleven.  Do
19  you see that?
20      A.  Correct.
21      Q.  And then you say:  Beyond that and
22  the differed plant rule, I don't know of much
23  else relevant out there.  Do you see that?

Page 178

1       A.  Correct.
2       Q.  All right.  Now, it says you left
3   a voicemail for Sherry Quirk.  Do you recall
4   what was in that voicemail?
5       A.  It would have stated that -- they
6   asked whether we were looking at the same
7   section that they were.  Okay?  And it would
8   have said, I assume, yes, we were.  And I'm
9   assuming this from this particular email but --
10      Q.  And what section of the deferred
11  plant rule did you view as relevant here?
12      A.  I reviewed -- I reviewed the -- I
13  don't know what section it is, I'm not sure
14  what any section of the deferred plant rule is,
15  but I viewed the deferred plant rule which
16  meant you could not do activities that would
17  have required a construction permit as a
18  deferred plant to be relevant to this.
19          MR. LEMBKE:  Let's take a short
20  break.
21      A.  Sure.
22          THE VIDEOGRAPHER:  We are going
23  off the record.  The time is 10:28 a.m.

**Larry Blust**                                                    **11/14/2019**

Page 179

1    (Whereupon, a break was had from
2    10:28 a.m. until 10:37 a.m.)
3    THE VIDEOGRAPHER:  We are on the
4 record at 10:37 a.m.
5    (Whereupon, Exhibit Number 23,
6    having been previously marked for
7    identification, was referenced in
8    this deposition.)
9    Q.   (BY MR. LEMBKE:)  Mr. Blust, let
10 me show you what has been previously marked as
11 Exhibit 23.
12    Well, first, you mentioned to me
13 that you had the phone conversation on November
14 8th and the phone conversation on November 15th
15 with TVA personnel.
16    Did you have telephone
17 conversations between the 15th and the 30th of
18 November?
19    A.   I had another conversation on the
20 19th, I believe.
21    Q.   All right.
22    A.   The same people that were on the
23 15th.

Page 180

1    Q.   And what do you recall occurring
2 during the conversation on the 19th?
3    A.   Well, let me preface that by
4 saying on the 15th, Sherry had told me that Mr.
5 Johnson was not inclined to extend the contract
6 because of what we had been doing in regard to
7 Memphis.  I told her that she should get back
8 to Mr. Johnson and tell him that there was
9 going to be a breach of contract here if he
10 refused to close this and ask him again whether
11 he was willing to make an extension on this.
12 The 19th call came up because of -- they
13 indicated that they would do that and get back
14 to me.
15    So on the 19th, in fact, they got
16 back to me, informed me that Mr. Johnson was
17 still unwilling to give an extension.  They
18 also told me on the 19th that they were still
19 of the impression that this was -- would
20 violate the law to close and that Mr. Johnson
21 or somebody, I assume Mr. Johnson, that he had
22 suggested that maybe it was time to unwind the
23 transaction.

Page 181

1    Q.   And who told you that on that
2 call?
3    A.   On the unwind?  I believe that was
4 Sherry Quirk.
5    Q.   What about on the others you --
6    A.   Most of the conversation was her.
7 It could have been Cliff Beach.
8    Q.   All right.
9    A.   Might have been Chandler, although
10 most of these conversations were Cliff Beach
11 and Sherry, they kind of alternated between
12 each other.
13    Q.   Was anyone on the call for Nuclear
14 Development other than yourself?
15    A.   On the 19th?
16    Q.   Yes, sir.
17    A.   No.
18    Q.   What about on the 15th?
19    A.   15th I was the only one from
20 Nuclear Development.
21    Q.   What about on the 8th?
22    A.   Well, the 8th they called me, and
23 no one was on it other than me.  I answered on

Page 182

1 my cell phone.
2    Q.   All right.  Now, other than what
3 you have already told me, do you recall
4 anything else about what occurred during the
5 phone call on the 19th?
6    A.   What I explained to you was the
7 fact that Mr. Johnson was still opposed to
8 extension, all right?  And that was the primary
9 conversation, because that's what the 15th they
10 had agreed to get back to me on.  They were
11 still of the impression that this violated.
12 And I believe I probably said this is going to
13 lead to a lawsuit if you take that position.
14    And I'm trying to remember
15 whether -- I don't think there was another -- I
16 think this was later, and I think you handed me
17 the document that deals with the later proposal
18 by Franklin.  There were conversations during
19 this time between Franklin Haney and Mr.
20 Johnson I was not on.  And --
21    MR. O'REAR:  He has asked you
22 about what else was said on the November 19th
23 call.

**Larry Blust**                                                                    **11/14/2019**

---

Page 183

1          A.   Yeah, and I'm just saying I don't
2    remember anything in regard to the proposal
3    being on the 19th call.
4          Q.   (BY MR. LEMBKE:)  What proposal
5    are you talking about?
6          A.   We made the proposal on the
7    meeting back in October.
8          Q.   Oh, okay.  After November 19th,
9    did you have any other phone conversations with
10   TVA personnel between then and November 30th?
11         A.   I don't believe I did.  I tried to
12   get ahold of Ms. Quirk and also of Cliff Beach
13   to find out what they were going to do in
14   regard to closing, but I don't believe I ever
15   had any conversations that I actually hooked up
16   on.
17         Q.   All right.  Exhibit 23 that I put
18   in front of you is an email exchange between
19   you and Mr. Beach on November 28th, correct?
20         A.   Yeah, there's two emails here,
21   right.
22         Q.   And you had asked basically to
23   find out what TVA was going to do, correct?

---

Page 184

1          A.   Correct.
2          Q.   And then Mr. Beach responded and
3    said:  Franklin provides Bill Johnson with a
4    last minute extension proposal this afternoon
5    that we are now considering.  Do you see that?
6          A.   I see that.
7          Q.   Do you know what the last minute
8    extension proposal was on November 28th?
9          A.   No, I don't.
10         Q.   All right.  Then Mr. Beach says:
11   As to the Atomic Energy Act issue that TVA has
12   been raising with increasing concern in recent
13   weeks, we did receive an unequivocal opinion
14   from Pillsbury today opining that ND's
15   acquisition of the site would be unlawful under
16   the Act.  The implications of this opinion are
17   fairly obvious.  Do you see that?
18         A.   I see that.
19         Q.   All right.
20              (Whereupon, Exhibit Number 24,
21              having been previously marked for
22              identification, was referenced in
23              this deposition.)

---

Page 185

1          Q.   Then let me show you what has been
2    previously marked as Exhibit 24.  This is a
3    letter you received from Ms. Quirk on November
4    29th, correct?
5          A.   That looks like it, correct.
6          Q.   And this is when Ms. Quirk
7    indicates that TVA is not going to close
8    without NRC approval of construction of
9    permits?
10         A.   Correct.
11         Q.   Or transfer of the construction
12   permits, correct?
13         A.   Approval of transfer, correct.
14         Q.   And if you look in the second
15   paragraph of the letter, the one that begins:
16   This conclusion is confirmed by an opinion of
17   TVA's outside nuclear licensing counsel.  Do
18   you see that?
19         A.   Uh-huh.
20         Q.   Is that a yes?
21         A.   Yes.
22         Q.   And then it says:  That opinion
23   concludes that should the parties proceed with

---

Page 186

1    closing without ND holding the permits, ND's
2    acquisition of the site would violate Section
3    101 of AEA.  Do you see that?
4          A.   Correct.
5          Q.   Then she says:  From our
6    discussions, we understand that ND's regulatory
7    counsel is unwilling to provide a contrary
8    legal opinion that closing would, in fact, not
9    violate the AEA.  Do you see that?
10         A.   I see it, yes.
11         Q.   And you had told her that,
12   correct?
13              MR. O'REAR:  Objection.
14         A.   No.  What I told her was it was
15   unlikely we would get an opinion from the NRC.
16   Because what she asked me was specifically --
17   and stated to me, we would need an opinion from
18   the NRC in order to close this transaction.
19   And I told her something along the lines of
20   it's not very easy to get an opinion from the
21   NRC.
22              (Whereupon, Exhibit Number 25,
23              having been previously marked for

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**Larry Blust**                                           **11/14/2019**

Page 187

1    identification, was referenced in
2    this deposition.)
3        Q.   All right.  Then, let me show you
4    what has been previously marked as Exhibit 25.
5    And this is essentially an email transmitting
6    the letter you sent to Sherry Quirk on November
7    30th, correct?
8        A.   Correct.
9        Q.   In response to her letter of the
10   29th, correct?
11       A.   Right.
12       Q.   And if you look at the second
13   page, in the paragraph beginning in addition?
14       A.   In addition.
15       Q.   Which is the third paragraph.
16       A.   Okay.
17       Q.   All right.  The third sentence of
18   that paragraph says:  ND and its expert, Tim
19   Matthews of Morgan, Lewis & Brockius, LLP,
20   believes that Section 101 is not applicable
21   here.  We supplied you with his outline setting
22   forth his reasoning.  Do you see that?
23       A.   Correct.

Page 188

1        Q.   And by that you were referring to
2    the document we were looking at a minute ago
3    which was the attachment to Exhibit 19,
4    correct?
5        A.   The Regulatory Path Forward,
6    right.
7        Q.   All right.  Then in the numbered
8    paragraph two --
9        A.   Number two, okay.
10       Q.   -- the first paragraph of that
11   section, about halfway through it, do you see a
12   sentence beginning:  When met with your
13   licensing people?
14       A.   Yes.
15       Q.   You write:  When met with your
16   licensing people and long after the agreement
17   was signed to try to coordinate with them
18   getting this done, ND was rebuffed.  What are
19   you talking about there?
20       A.   Well, I'm talking about a meeting
21   with Mr. Shea, first meeting in December or
22   January right after the agreement was signed,
23   near December of 2016 or January of 2017, I

Page 189

1    think it was December, in which we met with Mr.
2    Shea.  And my assumption from the contracts,
3    particularly 1(e), was that the application for
4    transfer of the license was going to be
5    prepared by TVA and specifically by the
6    regulatory people of TVA which were headed by
7    Mr. Shea.
8        So I scheduled a meeting and flew
9    down to Chattanooga and met with Mr. Shea.  Mr.
10   Shea lectured me on why I was wrong in the
11   sense of that it was not TVA's responsibility
12   to prepare a license transfer application and
13   basically said I'm not going to have anything
14   to do with it.  I think he even said somebody
15   told me I wasn't supposed to have anything to
16   do with this.  But, you know, the fact is he
17   got across very clear to me that he was not
18   going to cooperate with the application for
19   transfer.  And I made that assumption.
20       Then we had several other
21   situations where we tried to get cooperation
22   with licensing situations on the permit.  One
23   of them you showed me which was the extension

Page 190

1    of the permit on Plant 2.  A second one was an
2    extension of the date for completion on Plant
3    1.  Both of which TVA -- and this was TVA's
4    legal, by the way, because Mr. Shea didn't take
5    part in that, TVA's legal said we will not do
6    this.  And that's what I am referring to.  We
7    never got any cooperation from TVA in regard to
8    the processing of these permits.
9        Q.   Well, the extension on -- are you
10   saying that TVA's decision not to send the
11   letter on the Unit 2 extension that ND had
12   requested in some way impeded Nuclear
13   Development's ability to submit its application
14   for transfer of the construction permits?
15       A.   That's not what I'm saying.
16           (Reporter interruption.)
17       A.   That's not what I'm saying.
18       Q.   All right.  And, in fact, that
19   issue didn't have anything to do with the
20   application for transfer of the construction
21   permits, did it?
22       A.   Well, part of the application for
23   transfer of the construction permits is to

**Larry Blust**                                              **11/14/2019**

Page 191

1    explain the status of the construction permits.
2    So I would say that's not true, but it
3    didn't -- it didn't impede.  It's just
4    evidence -- one more piece of evidence of what
5    I just said here which is we never got any
6    cooperation from TVA on the construction
7    permits.
8         Q.   Well, didn't Mr. Vance indicate to
9    you that if you could -- if you wanted to raise
10   it above his level, you could?
11        A.   I believe he did.
12        Q.   And you didn't raise it with
13   anyone above his level, correct?
14        A.   No.
15        Q.   All right.  And then you said that
16   there was some request relating to the
17   expiration date on Unit 1?
18        A.   Yes.  They wanted to extend out
19   the construction completion date on Unit 1.
20        Q.   Who did?
21        A.   We did, Nuclear Development.
22        Q.   All right.  And was some request
23   made to TVA?

Page 192

1         A.   A request was made to TVA.
2         Q.   Who at TVA received that request?
3         A.   I don't remember offhand.
4         Q.   All right.
5         A.   I think it was somebody in the
6    General -- it may have been Chandler.  It was
7    somebody in General Counsel's office.
8         Q.   And what was the specific request?
9         A.   It was to extend the construction
10   date under the permit so it better met our
11   schedule of construction.  The construction
12   date, I don't remember what it is, it's a
13   matter of record, but it was relatively soon,
14   you know, and it was suggested to us -- and I
15   didn't do the request, but it was suggested to
16   us and we made the request -- we being Nuclear
17   Development made a request to TVA to amend that
18   permit to extend out the construction date, and
19   we were told no.
20        Q.   So you didn't make the request?
21        A.   No, I didn't make the request.
22        Q.   Was the request in writing?
23        A.   Yes.

Page 193

1         Q.   Have you seen the writing?
2         A.   I have seen the request.
3         Q.   All right.  But you can't remember
4    who it was to?
5         A.   No.  I could probably look at the
6    request and tell you, but I don't remember at
7    this date of who it was to.
8         Q.   And when was that request made?
9         A.   I believe it was made prior to the
10   number two request, but I don't know exactly
11   the month and or et cetera.
12        Q.   And TVA's decision not to grant
13   that request did not impede Nuclear
14   Development's ability to submit an application
15   for transfer of the construction permits,
16   correct?
17        A.   Not in my opinion.
18        Q.   Now, you mentioned that you met
19   with Mr. Shea and -- did Mr. McCollum also
20   attend that meeting?
21        A.   I don't believe so.
22        Q.   So when, to the best of your
23   recollection, did this meeting occur?

Page 194

1         A.   I believe it was December, it
2    could have been January, December of '16 or
3    January of '17.  I could check flight records
4    and let you know, but that's the time period.
5         Q.   And you were certainly aware that
6    almost all of the information needed for the
7    application of the construction permit was
8    going to have to come from Nuclear Development,
9    correct?
10        A.   I wasn't aware of that at all.
11        Q.   Well, you were certainly aware
12   that all of the information about technical
13   capability of Nuclear Development would have to
14   come from Nuclear Development, right?
15        A.   I was aware of the two things that
16   were stated in 1(e) that were specifically not
17   the responsibility of TVA, which was technical
18   qualification and financial qualification.  I
19   was of the assumption that was a relatively
20   small part of the permit extension request.
21        Q.   And did you ever raise the issue
22   of what Mr. Shea had told you above his level
23   at TVA?

**Larry Blust**                                                    **11/14/2019**

Page 195

1      A.   If I did, it wasn't just to
2   complain.  I don't think I raised that.
3      Q.   All right.  But ultimately Nuclear
4   Development made the decision to slow down its
5   preparation of the application for the
6   construction permit transfer, correct?
7      A.   What does slow down mean?
8      Q.   Well, were you aware that Nuclear
9   Development initially had intended to submit an
10  application for the construction permit
11  transfer by the middle of 2017?
12     A.   I certainly was at one point in
13  time, yes.
14     Q.   And you are aware that Nuclear
15  Development decided that it wanted to slow down
16  its expenditure of funds on that process and so
17  it extended out the time period at which it
18  planned to submit that application?
19     A.   Well, I'm aware that we changed
20  our whole schedule in regard to this, is that
21  what you are asking me?  Yes.
22     Q.   Okay.
23     A.   But not for those reasons.

Page 196

1      Q.   Well, what reasons do you say the
2   schedule changed?
3      A.   Well, the schedule changed for one
4   reason because we did not get the environmental
5   clearance from Mr. Johnson until August of
6   2017.  There was an absolute out in this
7   contract on TVA's behest at Mr. Johnson's total
8   discretion as to whether he was satisfied with
9   the environmental assessment and would sign
10  off.  And it didn't have anything to do with
11  what was in the environmental assessment, it
12  was just absolute.  And so I was of the
13  impression that we should not spend a great
14  deal of money on this issue until we -- and
15  that's really the regulations -- you have to
16  have some right to the plant to make an
17  application for a permit transfer.
18         So my view was that until that
19  happened -- and I was on the phone constantly
20  trying to find out from Sherry when is this
21  going to happen.  When are you going to get the
22  environmental assessment?  Now that you've got
23  the environmental assessment, when is Mr.

Page 197

1   Johnson going to sign off on the environmental
2   assessment?  So I probably, with paranoia, made
3   some assumption that maybe this would never
4   occur.  And I don't know why one would spend a
5   great deal of money until it did.
6          The second thing was we changed
7   our view as to whether we were going to
8   immediately give a hundred-and-twenty-day
9   notice after the closing.
10     Q.   What do you mean by that?
11     A.   Well, when you are in deferred
12  plant status, you have to give a
13  hundred-and-twenty-day notice to activate the
14  permit before you can do anything that would be
15  required for a permit.  So our original
16  schedule here said that we would try to -- by
17  the end of '17, I believe, we would try to
18  complete the -- in order to get the
19  hundred-and-twenty-day notice, of course, you
20  have got to have the permit activated.  So --
21  transferred not activated, I'm sorry.
22         So we had scheduled originally
23  that we wanted to immediately after we closed

Page 198

1   start construction.  We didn't want to wait.
2   We wanted to do it because time is money.  So
3   as a practical matter we had a schedule that
4   had like a one-year period to get the permit
5   transferred, then to give the one
6   hundred-and-twenty-day notice and at the end of
7   the one hundred-twenty-day notice, you are
8   entitled to commence construction under the
9   permit.
10         We did not stay with that idea,
11  because it turned out to be totally really
12  unfeasible.  When we got all of the information
13  of the due diligence from TVA, it was not true
14  that they had engineering completed drawings,
15  particularly on Plant 2, for what had to occur.
16  So one of the things that we agreed with DOE on
17  and we proposed and changed our schedule was,
18  we will provide for a one-year or two-year
19  period that we do no work on the nuclear
20  island, and instead we develop packages for
21  engineering.
22         So it was no longer important to
23  us to have the plant permit transfer effective

**Larry Blust**                                           **11/14/2019**

Page 199

1  by the closing date, because it didn't mean
2  anything in regard to our schedule. Our
3  schedule had either, however you want to read
4  it, one-year or two-year period to put together
5  engineering package, bid the construction, et
6  cetera, when we were going to do no work that
7  required a permit. So that's the two changes
8  that occurred in regard to this.
9       MR. O'REAR: Let me just -- that
10  was a long answer, but you do need to slow down
11  --
12       A.  Okay.
13       MR. O'REAR: -- so the court
14  reporter can pick it all up.
15       Q.  (BY MR. LEMBKE:) When did you
16  make that -- or let me start over.
17       You said you communicated to DOE
18  that there was going to be a one- or two-year
19  delay period built in before the
20  hundred-and-twenty-day notice was given?
21       A.  (Nodding head affirmatively.)
22       Q.  When was that done, meaning when
23  was that communication had with the DOE?

Page 200

1       A.  I don't know, part of that came
2  from the DOE. We hired MPR as our independent
3  engineer. And one of the conclusions of MPR
4  when everybody went through the due diligence
5  packages here was that we needed more
6  engineering design. And we even came to this
7  conclusion also in the early part of this
8  thing. That we needed the time period to do
9  this in order to get fixed bids. We wanted to
10  have guaranteed bids, closed price bids,
11  because that had been the problem -- caused
12  problems with other nuclear plants. And we
13  were told in order to do that, more work is
14  necessary. Despite all of the work done by TVA
15  when they were going to reactivate this plant,
16  they don't, in fact, have complete packages for
17  this, so you need to get that done. And so we
18  decided to do that. I didn't decide that, but
19  people dealing with the issue decided that.
20       We were under some pressure once
21  the engineer's report came in to change our
22  schedule with DOE for the construction period.
23  Because they didn't believe that it was

Page 201

1  reasonable. They said you are not going to --
2  you are not going to complete it in the time
3  period you're talking about. You're going to
4  put an engineering period ahead of it.
5       Q.  When you said the materials from
6  which you drew this conclusion were in the due
7  diligence package, what are you talking about?
8  What due diligence package?
9       A.  Well, Mr. Chardos and his team
10  provided us an enormous amount of information
11  from TVA in regard to the prior studies of
12  reactivating this plant. We had I don't know
13  how many different engineering studies, cost
14  estimates and et cetera. And -- primarily
15  Frank went through those, but Bill McCollum did
16  some of that too and we hired engineers, as you
17  heard, to go through all of that. And the
18  conclusion was you are not going to be able to
19  get fixed pricing based on what TVA has. So
20  you are going to have to do some of your own --
21  and very elaborate time period -- engineering
22  here in order to be able to do that, or you can
23  do I guess a design and build, which is what

Page 202

1  has happened with the other plants and it has
2  been a disaster.
3       Q.  And when did you get those due
4  diligence materials?
5       A.  They came -- they didn't come at
6  one time.
7       Q.  When did they start?
8       A.  Probably at least in the mid-'17
9  period.
10       Q.  Do you know what conversations Mr.
11  Matthews and Mr. Chandler had -- let me strike
12  that.
13       Were you on any conversations with
14  Mr. Matthews and Mr. Chandler about TVA
15  submitting a consent letter to the transfer of
16  the construction permit application?
17       A.  I don't believe I was in any
18  conversations about it.
19       Q.  So if -- all right. You were not
20  party to any conversations that those two had
21  about that topic?
22       A.  Well, do you consider -- once
23  again we have the issue, do you consider emails

**Larry Blust**                                                                 **11/14/2019**

---

Page 203

1    conversations?

2         Q.   No, I am talking about

3    face-to-face or telephone conversations.

4         A.   I don't believe I was.

5         Q.   All right.

6         MR. LEMBKE:  I don't have any

7    further questions.

8         MR. O'REAR:  No questions.

9         MR. LEMBKE:  Thank you, Mr. Blust.

10        THE VIDEOGRAPHER:  This concludes

11   the deposition.  We are going off the record at

12   11:03 a.m.

13

14        FURTHER THE DEPONENT SAITH NOT

15

16

17        (Deposition was concluded at 11:03 a.m.)

18

19

20

21

22

23

---

Page 204

1         C E R T I F I C A T E

2

3    STATE OF ALABAMA

4    JEFFERSON COUNTY

5

6         I hereby certify that the above

7    and foregoing deposition was taken down by me

8    in stenotypy, and the questions and answers

9    thereto were reduced to typewriting under my

10   supervision, and that the foregoing represents

11   a true and correct transcript of the deposition

12   given by said witness upon said hearing.

13        I further certify that I am

14   neither of counsel nor of kin to the parties to

15   the action, nor am I in anywise interested in

16   the result of said cause.

17

18

19

20   /s/ Gail B. Pritchett

21   COMMISSIONER-NOTARY PUBLIC

22   ACCR LICENSE NO. 116, Exp. 9/30/2020

23   Transcript Certified On 11/25/2019

---

**Larry Blust**

**11/14/2019**

Page 205

**A**

**a.m** 100:1,6
  178:23 179:2,2
  179:4 203:12
  203:17
**Aaron** 113:12
**ability** 190:13
  193:14
**able** 106:1
  135:20 201:18
  201:22
**absent** 158:12
**absolute** 196:6
  196:12
**accept** 128:20
**access** 121:15
  157:22 158:3,6
  158:12
**ACCR** 204:22
**accurately**
  146:15,18
**acknowledge**
  150:17
**acknowledges**
  171:6 172:2
**acquire** 134:3,7
**acquisition**
  150:10 153:18
  153:20 184:15
  186:2
**Act** 172:15,20
  173:16 175:13
  176:14,18
  177:4 184:11
  184:16
**action** 95:4
  204:15
**activate** 197:13
**activated** 197:20
  197:21
**activating**
  130:18
**activities** 112:3
  178:16
**acutely** 106:2
  108:4

**addition** 187:13
  187:14
**additional**
  134:17 158:13
**adhere** 170:14
**advantages**
  130:18
**advised** 105:19
  105:20
**AEA** 147:17
  186:3,9
**affirmatively**
  199:21
**afternoon** 184:4
**ago** 131:12
  162:12 188:2
**agree** 142:6,7
  143:8 147:19
  147:20 152:11
  152:13,20,21
  152:22 154:16
  154:22 155:4,5
  156:18,19
  157:21,23
  166:7 170:23
**agreed** 156:7
  161:9 162:12
  182:10 198:16
**agreement**
  134:8 140:13
  141:13,16
  158:13,15
  168:6 175:1
  188:16,22
**ahead** 119:2
  165:3 201:4
**ahold** 183:12
**Akstulewicz**
  98:10 111:21
**Alabama** 95:2
  95:16 96:10,20
  97:16 125:7,14
  126:8 204:3
**alternated**
  181:11
**amend** 192:17

**amended** 123:21
**amendment**
  142:3,8 174:23
**American** 163:8
**amount** 108:1
  138:1,3 140:4
  201:10
**analysis** 167:3
  167:20,22
**analyze** 168:1
**answer** 102:22
  115:4 126:20
  145:14 152:9
  157:2 162:8
  170:12 199:10
**answered**
  181:23
**answers** 204:8
**anytime** 174:15
  174:20
**anywise** 204:15
**apart** 108:20
**apparently**
  138:7
**appears** 171:10
  172:6
**applicable**
  187:20
**applicant**
  155:10,16,18
**applicant's**
  155:11
**application**
  101:7,14,22
  102:5,21
  103:10 105:14
  106:8,22 107:3
  108:16 109:1,8
  110:16,18,20
  111:2,12
  118:20 120:8
  139:1 166:5
  169:13 170:7
  189:3,12,18
  190:13,20,22
  193:14 194:7

195:5,10,18
  196:17 202:16
**applied** 144:4
**applying** 135:4
**appropriate**
  102:11
**appropriating**
  106:3
**appropriation**
  105:23 106:4
**approval** 143:4
  143:13 144:23
  145:4 147:5
  148:3,18
  158:20 160:5
  160:13 161:13
  162:14 163:4
  165:1,4 166:6
  166:9 167:6
  168:7,16 169:4
  175:21 185:8
  185:13
**approved**
  112:21 171:14
  172:10
**April** 111:22
**Arant** 95:13
  96:17
**Arendall** 96:6
**AREVA** 116:14
**argument**
  124:13,15
  170:11
**arrangement**
  133:1
**asked** 102:18
  105:20 114:11
  117:11 126:18
  134:7 136:8
  142:23 143:2
  148:12 158:14
  160:20 169:15
  177:6 178:6
  182:21 183:22
  186:16
**asking** 118:9

121:4 161:22
  162:7 165:10
  169:21 195:21
**asks** 170:14
**assessment**
  196:9,11,22,23
  197:2
**assume** 119:22
  132:2 139:10
  150:20 177:16
  178:8 180:21
**assumed** 127:8
  138:3,6 167:23
**assuming**
  102:23 178:9
**assumption**
  123:2 136:23
  137:8,14,15,16
  138:10,22
  189:2,19
  194:19 197:3
**Atomic** 172:15
  172:20 173:16
  175:13 176:14
  176:18 177:4
  184:11
**attached** 149:22
**attachment**
  188:3
**attempt** 121:10
**attend** 101:19
  193:20
**attendance**
  104:13 125:15
  125:17 139:14
**attended** 104:14
  125:7,13
**attending** 103:9
**Attorney** 96:5
  96:16
**August** 113:12
  114:12 126:19
  166:18 177:13
  196:5
**Authority** 95:9
  97:6

**authorizing**
171:9 172:5
**available** 133:21
**Avenue** 95:15
96:19
**avoided** 168:9
**aware** 101:6
123:4 148:14
148:20 163:7
165:15 169:12
174:21 194:5
194:10,11,15
195:8,14,19

**B**

**B** 95:20 155:18
155:22 204:20
**back** 102:16
128:9 135:20
166:15,17
170:17 180:7
180:13,16
182:10 183:7
**Bagby** 97:15
**base** 133:12
**based** 150:18
167:3 201:19
**basically** 115:4
146:13 183:22
189:13
**basing** 138:10
**basis** 138:12
**Beach** 99:2,4,7
99:14 129:4
144:11,16
145:21 146:14
149:19 159:14
165:20 176:10
181:7,10
183:12,19
184:2,10
**becoming**
130:13 132:21
**beginning**
187:13 188:12
**begins** 185:15

**behalf** 141:11
**behest** 196:7
**believe** 104:15
106:17 109:20
114:10 131:22
147:16 151:13
155:8 164:22
170:2,19
172:21 173:10
179:20 181:3
182:12 183:11
183:14 191:11
193:9,21 194:1
197:17 200:23
202:17 203:4
**believed** 148:1
**believes** 187:20
**Bellefonte** 98:11
99:16 101:9
110:5,10
112:23 116:21
125:10,16
126:6 127:13
127:15 128:13
130:14,19
133:13 139:6,9
139:15 153:20
157:22 161:12
162:13 169:9
173:15 175:21
**benefit** 162:3,6
**best** 193:22
**better** 132:20
192:10
**Beyond** 177:21
**bid** 133:2 199:5
**bids** 200:9,10,10
**Bill** 125:9,14
126:7,21
130:10 139:5,9
139:13,22
184:3 201:15
**Birmingham**
95:16 96:20
97:16
**bit** 122:14 128:2

**blah** 105:22,22
105:22
**BLN** 98:20
**Blust** 95:12
98:10,14,22
99:2,4,6,9,12
99:14 100:5,8
100:13 101:6
113:9 115:9
117:18 118:19
144:14,21
147:2,21
151:20 157:1
170:9 172:18
176:6 179:9
203:9
**bottom** 113:9,15
113:20 176:9
**Boult** 95:13
96:17
**Bradley** 95:13
96:17
**breach** 167:6
180:9
**break** 100:14
175:9 178:20
179:1
**briefly** 166:2
**broad** 110:22
**Brockius** 187:19
**budget** 102:7,11
105:2,4,17,20
106:15,17,18
108:2,5,12
137:23 138:2
**build** 164:11
201:23
**built** 164:12
199:19
**bullet** 150:6,20
154:23 155:6
**bullets** 149:22
**bunch** 124:19
**bureaucrats**
122:6

**C**

**C** 96:1 97:1,4
99:2,4,6,14
204:1,1
**Caine** 96:4
**call** 121:20
147:14 166:2
180:12 181:2
181:13 182:5
182:23 183:3
**called** 123:15,16
124:1 126:21
181:22
**calls** 110:7,11
139:9,11,21
140:6,18,20,22
141:2 151:11
157:19
**capability**
194:13
**Carla** 113:17
**carrying** 135:7
**case** 104:15
143:11 166:7
**cases** 164:2
**cause** 204:16
**caused** 200:11
**cell** 182:1
**certain** 125:3
138:1
**certainly** 109:5
110:23 151:5
194:5,11
195:12
**Certified** 95:21
204:23
**certify** 204:6,13
**cetera** 108:11
111:7 123:5
134:20,20
140:3,3,4
149:5 193:11
199:6 201:14
**Chandler**
113:11 114:3
115:5,13,16,18

147:15 159:14
181:9 192:6
202:11,14
**change** 135:1
142:2 200:21
**changed** 103:22
106:12 152:19
195:19 196:2,3
197:6 198:17
**changes** 122:2
199:7
**Chardos** 110:16
111:1,14
113:11,18
114:3 122:7
156:14 201:9
**Chattanooga**
189:9
**cheaper** 125:3
**check** 194:3
**checkered**
164:13
**Chin** 97:4
**choose** 162:7
**Chris** 113:11
115:13,16,18
147:15
**City** 127:6
**CIVIL** 95:4
**clarify** 122:14
**class** 110:23
**clear** 136:18
138:15 160:2
171:11 172:7
189:17
**clearance** 196:5
**clients'** 106:4
**Cliff** 145:21
165:20 181:7
181:10 183:12
**close** 123:2
147:18 168:7
169:3 180:10
180:20 185:7
186:18
**closed** 157:21

197:23 200:10
**closing** 112:22
  122:11,16
  141:12,15,18
  141:19,21
  143:5,14,15
  145:1,6,11
  146:3 147:4
  148:17 149:2
  153:10,13,15
  153:16 154:11
  154:13 156:1
  158:19 160:16
  161:11 162:13
  166:5,6,10,12
  167:7 168:15
  171:13 172:9
  174:22 175:7
  177:5 183:14
  186:1,8 197:9
  199:1
**COL** 124:1
**combined** 124:2
  124:2
**come** 105:1
  106:16 194:8
  194:14 202:5
**coming** 106:19
**commence**
  198:8
**comment**
  117:16 118:3
**comments** 117:7
  127:5
**Commission**
  101:10,17,21
  109:19 111:22
**commissioner**
  107:14 112:20
**COMMISSIO...**
  204:21
**commissioners**
  104:2,3,10
  107:16 108:4
  108:14 109:1,7
  109:16 110:1,3

110:12
**commissions**
  107:8,8
**commitment**
  122:1 136:4
**communicate**
  177:11
**communicated**
  199:17
**communication**
  199:23
**communicatio...**
  132:10
**compete** 127:9
**competition**
  127:8
**compiling**
  102:20
**complain** 195:2
**complained**
  126:22
**complete** 197:18
  200:16 201:2
**completed**
  134:23 198:14
**completion**
  190:2 191:19
**compliance**
  150:19 162:23
  167:12 168:15
**comply** 150:11
  151:2 153:2
  154:1 156:21
**complying**
  163:5
**Concentric**
  134:9,10
  135:15
**concern** 117:9
  117:16 118:3
  148:15 150:17
  152:17,23
  184:12
**concerned** 102:8
  102:10 106:2
  108:5 151:6

156:12
**concerning**
  125:9 139:14
**concerns** 114:19
  114:23 117:7
**concluded**
  203:17
**concludes**
  185:23 203:10
**conclusion**
  157:19 185:16
  200:7 201:6,18
**conclusions**
  170:22 200:3
**condition**
  153:10,14,16
**conditional**
  122:1
**conditions**
  142:23
**conducting**
  140:1
**confirmed**
  185:16
**confused** 161:2
  173:18
**Congress**
  102:10 105:23
  106:2,4
**congressional**
  108:12
**consent** 202:15
**consider** 128:4
  158:21 202:22
  202:23
**considerable**
  140:4
**considering**
  184:5
**constantly**
  196:19
**construction**
  99:17 101:8,22
  103:11 104:19
  105:9,14
  106:23 107:5

107:17,23
  108:18 109:2,9
  110:17,20
  111:2,13
  112:21 114:9
  116:21 124:3,5
  124:6,21 139:3
  142:19 143:4
  143:10 145:1,5
  148:3 150:8
  160:6,13
  161:13 162:15
  163:9,11,12,16
  166:4 168:7
  169:9 171:10
  172:6 175:20
  175:22 178:17
  185:8,11
  190:14,20,23
  191:1,6,19
  192:9,11,11,18
  193:15 194:7
  195:6,10 198:1
  198:8 199:5
  200:22 202:16
**consummated**
  154:9
**consummation**
  153:11
**contained**
  117:15
**content** 132:10
**continue** 156:16
  163:1,3,5
**continued** 100:4
  155:10
**continuing** 97:1
  98:4 100:12
**contract** 110:9
  119:1,3,16
  122:23 133:3
  133:11 134:3,6
  134:8 135:23
  139:20 140:13
  141:15,20,23
  142:4,8 153:3

153:7,11 154:9
  154:10,18,21
  157:9,11 167:6
  180:5,9 196:7
**contractors**
  156:13
**contracts** 134:2
  156:16 189:2
**contractual**
  136:4 158:11
**contractually**
  174:22
**contrary** 186:7
**control** 156:5,7
**conversation**
  150:3 179:13
  179:14,19
  180:2 181:6
  182:9
**conversations**
  132:6 149:6
  159:20 177:11
  179:17 181:10
  182:18 183:9
  183:15 202:10
  202:13,18,20
  203:1,3
**cooperate**
  189:18
**cooperation**
  189:21 190:7
  191:6
**coordinate**
  188:17
**copies** 165:20
**copy** 113:18
  116:15,18
  122:22 128:16
**corear@hand...**
  96:12
**correct** 101:4,10
  113:13 114:2,4
  114:5,9,17
  116:16,23
  126:10 131:17
  132:17,18

136:1,5,6,9,10
136:13,14
139:6,7 141:13
141:17,23
142:1,4,5,9,10
142:10,11
146:8,23 147:1
147:11 149:17
149:19 150:1,5
151:7,8,10
153:13 156:3,4
156:6 157:10
157:16,17
158:14 160:2
160:17 165:21
165:22 166:18
166:19 167:13
167:14,18
168:11 169:5
169:10,11
172:10,11,12
172:15 173:12
174:9,10 175:2
176:11,19
177:2,20 178:1
183:19,23
184:1 185:4,5
185:10,12,13
186:4,12 187:7
187:8,10,23
188:4 191:13
193:16 194:9
195:6 204:11
**correctly** 171:15
**cost** 137:10,10
138:17 201:13
**costs** 134:17
**counsel** 97:5
115:8 174:12
174:16 175:5
175:11,18
185:17 186:7
204:14
**Counsel's** 192:7
**COUNTY** 204:4
**couple** 112:2

123:1 166:14
**course** 142:18
147:19 162:7
197:19
**court** 95:1
117:19 199:13
**CP** 171:13 172:9
**CPPR-122**
150:9
**Credit** 119:8,14
120:7
**critically** 102:8
102:10
**crossing** 154:6
**Cummings**
95:13 96:17
**current** 98:11
109:12
**currently** 116:2
**customers**
127:10
**cut** 108:5 144:8

___ **D** ___

**D** 100:5
**date** 114:8
141:12,15,18
145:11 146:3
147:22,23
166:12,17
167:7 175:3,4
190:2 191:17
191:19 192:10
192:12,18
193:7 199:1
**dated** 113:12
**day** 126:21
128:10 134:15
150:3,14
169:15 170:1
176:21
**days** 123:1
**deal** 104:23
196:14 197:5
**dealing** 200:19
**deals** 182:17

**dealt** 122:9
**debt** 119:9
120:12,19
122:4
**December**
116:14 188:21
188:23 189:1
194:1,2
**decide** 200:18
**decided** 195:15
200:18,19
**decision** 114:19
115:1 190:10
193:12 195:4
**deeply** 144:18
**Defendant**
95:10 96:14
97:3
**deferred** 166:4
178:10,14,15
178:18 197:11
**definitely**
138:17,20
**definitions**
177:18
**degree** 160:14
161:10,17
162:16,19
171:12 172:8
**delay** 199:19
**delivery** 133:1
**department**
115:6
**DEPONENT**
203:14
**deposition** 95:12
100:4,14 113:5
116:6 141:6
145:19 149:11
170:10 176:5
179:8 184:23
187:2 203:11
203:17 204:7
204:11
**describe** 146:1
**described** 107:2

109:11 130:8
134:15
**describes**
155:13
**design** 200:6
201:23
**designated**
121:12
**Despite** 200:14
**determine**
126:16 134:16
**develop** 105:4
198:20
**Development**
95:6 100:16,21
100:22,23
101:7 106:7
108:14,23
109:6 114:7
116:22 118:22
130:14 131:1
131:19 133:12
133:21 136:4,7
141:11 142:15
143:9,14 145:4
145:10 153:21
161:12 162:14
168:19,20
169:13,15
173:3,4 174:7
174:11,16
175:5,10,17
181:14,20
191:21 192:17
194:8,13,14
195:4,9,15
**Development's**
190:13 193:14
**diatribe** 130:9
**dictated** 128:8
**differed** 177:22
**difference**
166:22 168:4
**different** 124:8
124:9 148:8
201:13

**difficult** 173:23
**diligence** 198:13
200:4 201:7,8
202:4
**directly** 135:16
**disagreed**
159:10
**disaster** 202:2
**disclosed** 128:17
**discovered**
147:16
**discretion** 196:8
**discuss** 118:16
119:13 121:18
**discussed** 102:3
103:12 104:18
107:21 115:4
115:13,18
123:11 127:23
131:23 132:20
132:23 133:2
140:2 159:7
174:4 176:14
**discussing** 111:1
111:11 114:6
115:14 121:22
153:3
**discussion**
107:16 110:15
112:19 115:22
116:1 132:12
132:15 140:5
149:7,23 150:3
158:22 159:2
172:14,19
**discussions**
122:10,16
123:3,6 158:17
186:6
**DISTRICT** 95:1
95:2
**division** 95:2
103:23
**document** 113:8
131:10 141:9
169:23 171:5

171:22 172:14
172:17 176:8
182:17 188:2
**documents**
128:7
**DOE** 118:20
119:15 120:8
121:11,17,22
122:6,11,16
124:10 198:16
199:17,23
200:2,22
**doing** 111:6
156:9,20 180:6
**doubt** 118:15
**drawings**
198:14
**drew** 201:6
**Drive** 97:7,15
**dropped** 119:11
**due** 162:7
198:13 200:4
201:6,8 202:3
**duly** 100:9

**E**

**E** 96:1,1 97:1,1
204:1,1
**early** 102:23
104:6 106:12
106:14 134:21
137:7 200:7
**easier** 117:18
**easily** 168:9
**east** 163:23
164:9
**easy** 186:20
**Edmondson**
113:18
**effective** 198:23
**effort** 119:7,15
**efforts** 118:21
119:18 120:6,8
120:19
**either** 115:17
129:4 143:20

154:11,17
159:13 199:3
**elaborate**
159:20 201:21
**eleven** 177:18
**email** 98:9,13
99:1,3,5,10,15
111:20 112:11
113:10,16,17
114:1,14
116:13 131:11
145:21 149:18
158:23 165:19
169:15 176:9
177:9 178:9
183:18 187:5
**emails** 98:19
99:13 183:20
202:23
**emphasized**
130:17
**employee**
101:20
**employees**
103:10
**Energy** 172:15
172:20 173:16
175:13 176:14
176:18 177:4
184:11
**engineer** 200:3
**engineer's**
200:21
**engineering**
198:14,21
199:5 200:6
201:4,13,21
**engineers**
201:16
**enormous**
201:10
**entered** 133:2
158:13
**entitled** 169:8
170:23 198:8
**entity** 150:11

153:19 164:21
164:23
**environmental**
196:4,9,11,22
196:23 197:1
**equity** 119:19
120:7,11,15,19
121:3,3 122:4
**Especially** 112:6
**essence** 128:11
128:13
**essentially**
130:13 187:5
**estimates**
201:14
**et** 108:11 111:7
123:5 134:19
134:20 140:3,3
140:3 149:5
193:11 199:5
201:14
**everybody**
123:10 200:4
**evidence** 191:4,4
**exact** 156:9
**exactly** 117:4
137:6 150:22
160:20 162:21
170:18 193:10
**EXAMINATI...**
98:1,3 100:12
**examined** 100:9
**example** 125:2
**exchange** 99:6
183:18
**Excuse** 144:15
161:19
**executed** 110:10
**exhibit** 98:9,13
98:19,22 99:1
99:3,5,8,10,13
99:15 111:17
111:18 113:2,7
113:10,21
114:13 116:3,9
116:11 131:7,8

141:3,8 144:13
145:16,20
149:8,13
161:20,23
162:2,6,8
165:19 172:19
176:2,7 179:5
179:11 183:17
184:20 185:2
186:22 187:4
188:3
**EXHIBITS** 98:7
98:17
**Exp** 204:22
**expenditure**
195:16
**expert** 187:18
**expiration** 114:8
191:17
**explain** 191:1
**explained** 128:1
128:2 137:6
155:7 162:21
166:2 182:6
**expressed**
150:17,21
**expressing**
148:15 152:2
152:16,23
**expressly** 150:8
**extend** 180:5
191:18 192:9
192:18
**extended** 167:7
195:17
**extension** 98:23
114:15 126:17
126:19 129:6,8
129:11,14
133:7 141:12
142:15,16,22
145:10 146:2
148:12 166:11
166:17 180:11
180:17 182:8
184:4,8 189:23

190:2,9,11
194:20
**extent** 133:13

**F**

**F** 98:10 204:1
**face-to-face**
109:18 139:12
140:14 159:2
203:3
**facility** 155:20
155:21,21,22
171:8 172:4
**fact** 102:12
123:23 124:17
127:9 128:8
135:5 141:21
143:3 148:22
152:6 155:8,16
164:22 173:11
174:7 180:15
182:7 186:8
189:16 190:18
200:16
**factors** 145:9
**facts** 170:22
**failure** 150:11
151:1 153:1
154:1
**fair** 138:13,14
138:22
**fairly** 130:7,5
184:17
**familiar** 108:10
**family** 120:22
121:2
**far** 108:20 111:8
117:10
**fast** 108:15
**federal** 95:14
96:18 106:17
**feeling** 119:12
123:20 124:9
**FERC** 137:20
**Fifth** 95:15
96:19

**file** 137:20
**filed** 101:3,7
    102:5 103:7
    123:8
**filing** 101:13
    106:8 111:12
    166:5
**filings** 121:14,16
**financial** 194:18
**financing**
    119:17 120:9
    120:11,19
    121:19 142:20
**find** 115:23
    119:18 120:6
    183:13,23
    196:20
**finish** 117:19
    142:13 161:6
**firm** 100:15
    173:5
**first** 103:16,17
    104:6 122:5
    125:8 139:18
    143:12 145:22
    145:23 147:3
    153:1 159:1
    160:1 166:1,8
    166:23 167:2
    171:5,10,20
    172:1,6,22
    173:3 174:14
    174:23 179:12
    188:10,21
**fixed** 200:9
    201:19
**flew** 189:8
**flight** 194:3
**Follow** 98:15
**follow-up**
    131:11 162:8
**followed** 131:16
**follows** 100:10
**foregoing** 204:7
    204:10
**forgotten** 162:9

**form** 157:18
**formal** 128:21
    165:15 173:8
    174:3,8,12,17
    175:6,12,18
**forth** 187:22
**forward** 166:3
    169:8,23 171:5
    171:22 188:5
**four** 133:8 139:3
    150:20,22
**fourth** 150:6
**Frank** 120:4
    201:15
**Franklin** 116:15
    118:13 120:2
    128:1,1 182:18
    182:19 184:3
**front** 124:18
    183:18
**funding** 118:21
**funds** 119:19
    120:7 195:16
**further** 100:10
    203:7,14
    204:13

——————
**G**
**Gail** 95:20
    204:20
**General** 97:5
    115:8 192:6,7
**generated**
    133:13
**getting** 112:7
    156:15 188:18
**give** 124:17
    129:10 162:2,5
    180:17 197:8
    197:12 198:5
**given** 163:4
    199:20 204:12
**go** 102:16 119:2
    128:23 137:18
    137:21 139:3
    165:16 168:3

    177:15 201:17
**goes** 164:20
**going** 100:13
    102:14 111:16
    115:9 122:17
    122:19 123:2
    126:16 127:13
    128:23 129:11
    131:6 134:13
    134:23 135:7
    138:4 141:22
    156:18,20
    162:5 168:22
    178:22 180:9
    182:12 183:13
    183:23 185:7
    189:4,13,18
    194:8 196:21
    196:21 197:1,7
    199:6,18
    200:15 201:1,2
    201:3,18,20
    203:11
**good** 125:2
**Governor** 125:7
    125:14 126:8
**grammar**
    146:20
**grammatically**
    146:19
**grant** 193:12
**granted** 165:4
**great** 117:12
    196:13 197:5
**guaranteed**
    200:10
**guess** 116:11
    121:19 201:23

——————
**H**
**H** 96:15
**halfway** 188:11
**Hand** 96:6
**handed** 182:16
**Haney** 100:19
    116:15 118:13

**120**:2,22 **121**:2
**128**:1 **130**:15
    130:17,23
    131:22 132:7
    182:19
**happen** 126:16
    196:21
**happened**
    168:23 169:1
    196:19 202:1
**happening**
    162:17
**happy** 156:19
    158:6,9
**head** 111:4
    199:21
**headed** 189:6
**heard** 119:23
    137:12 201:17
**hearing** 109:14
    204:12
**help** 157:2
**hesitate** 122:12
**Hill** 97:7
**hired** 200:2
    201:16
**history** 103:1
    163:8 164:13
**hold** 169:16,21
    170:3
**holder** 160:21
    163:4,10
**holding** 186:1
**hooked** 183:15
**hosted** 122:7
**huge** 103:19
**hundred-and-...**
    197:8,13,19
    198:6 199:20
**hundred-twen...**
    198:7

——————
**I**
**idea** 102:6
    123:23 125:4
    198:10

**identification**
    111:19 113:4
    116:5 131:9
    141:5 145:18
    149:10 176:4
    179:7 184:22
    187:1
**II** 95:11
**III** 96:4
**illegal** 147:18
    151:3
**illegality** 149:3
**immediately**
    197:8,23
**impede** 191:3
    193:13
**impeded** 190:12
**impediment**
    147:4,6
**implications**
    184:16
**important** 126:3
    198:22
**impression**
    143:12 160:1
    166:8 171:11
    172:7 180:19
    182:11 196:13
**in-person** 140:7
    140:8
**inclined** 180:5
**include** 134:7
**included** 102:20
**including**
    120:21 122:2
    166:13
**increasing**
    184:12
**incur** 168:9
**independent**
    200:2
**INDEX** 98:1,7
    98:17
**indicate** 191:8
**indicated**
    133:19 135:10

136:11,20,22
180:13
**indicates** 185:7
**indicating** 151:5
153:11
**indication**
135:13 137:11
152:3
**information**
102:21 103:3
194:6,12
198:12 201:10
**informed**
148:21 180:16
**initially** 195:9
**insights** 112:2
**instruct** 177:10
**intended** 146:16
195:9
**interconnectio...**
134:19
**interest** 133:10
133:16,20
136:12,20
**interested** 105:3
109:14 136:16
204:15
**interruption**
163:2 164:1
190:16
**introduce**
103:20
**introduced**
104:16,23
**introducing**
104:1
**introductory**
104:22
**involve** 140:15
140:17
**involved** 111:3,8
111:9 115:22
116:1 119:21
120:1,16
139:23
**involvement**

101:12 102:19
121:9
**involving**
125:10 171:7
172:3
**island** 198:20
**issue** 105:8,10
105:12 118:16
122:9 125:10
148:13,23
150:19 158:18
159:23 160:3,4
164:19 167:11
168:2 173:14
175:6,8 177:7
184:11 190:19
194:21 196:14
200:19 202:23
**issues** 121:18,21
122:8 173:6
174:3,9,18

_____
                    **J**
_____
**January** 188:22
188:23 194:2,3
**JEFFERSON**
204:4
**Jim** 110:16
113:11,18
122:7
**Joey** 97:13
**Johnson** 125:9
125:14,17,19
126:1,7,22
127:3,4,7,21
128:3 129:22
130:2,5 131:4
132:4,8 139:5
139:9,13,22
140:16,17
180:5,8,16,20
180:21 182:7
182:20 184:3
196:5 197:1
**Johnson's**
127:19 196:7

**joint** 120:15
128:13 130:13
131:20

_____
                    **K**
_____
**keep** 155:16
**kicked** 112:13
**kin** 204:14
**kind** 181:11
**knew** 115:2
117:10
**know** 102:9,9
105:22 106:13
111:9 115:7,11
118:12,15
120:5 122:13
127:7 128:14
132:9 133:15
133:16 135:2,6
135:7,9 136:15
136:15 139:20
141:18 152:4
154:17 158:7
159:13 162:1
163:18 165:13
173:1 177:22
178:13 184:7
189:16 192:14
193:10 194:4
197:4 200:1
201:12 202:10
**knowledge**
118:10
**Knoxville** 97:8

_____
                    **L**
_____
**L** 98:10,14,22
99:2,4,6,9,11
99:14
**L44** 98:20
**Larry** 95:12
100:5,8 161:4
177:10
**law** 96:5,16
151:10,12,14
151:22 152:18

153:2,5,13
154:4,6,8,18
173:5 180:20
**lawsuit** 123:5,7
182:13
**lead** 167:20,23
182:13
**leading** 101:13
167:22
**learn** 147:3
**learning** 147:12
**leave** 127:15
**leaving** 127:6,12
**lectured** 189:10
**led** 122:4
**left** 176:21 178:2
**legal** 97:14
122:9 147:4,6
157:7,14,19
169:7 170:22
173:6 174:3,3
174:8,12,17,18
175:6,6,8,12
175:18 186:8
190:4,5
**legality** 150:18
150:21
**Lembke** 96:15
98:3 100:12
142:14 143:21
144:11 151:20
152:13 156:22
157:1,20 161:8
161:21 162:4
162:11 164:15
170:8,9 171:2
171:3 172:18
177:15 178:19
179:9 183:4
199:15 203:6,9
**let's** 136:17
166:23 178:19
**letter** 98:22 99:8
99:11 114:7,15
141:10 173:5
185:3,15 187:6

187:9 190:11
202:15
**level** 114:20
115:1,3,7
153:6 191:10
191:13 194:22
**Lewis** 187:19
**license** 112:4
124:1,2,3,6,7
124:18,20,22
155:14,16
167:5 189:4,12
204:22
**licensing** 112:3
122:3 123:12
123:15,20,21
124:10 125:1
185:17 188:13
188:16 189:22
**line** 154:7
**lines** 120:18
134:18 138:5
186:19
**list** 131:15
**listed** 146:6
**litigation** 101:2
**little** 122:14
128:2
**LLC** 95:6 96:6
**LLP** 95:13
96:17 187:19
**load** 135:2
**loan** 118:20
121:11
**location** 155:13
**long** 123:20
130:7,9 133:5
138:15 177:3
188:16 199:10
**longer** 198:22
**look** 116:17
135:20 141:19
145:20 166:20
177:18 185:14
187:12 193:5
**looked** 148:22

166:1
**looking** 176:23
177:4,16 178:6
188:2
**looks** 111:23
185:5
**lose** 108:6,8
**lot** 102:13
**lots** 121:3,23
**lower** 122:5

_____

**M**

**main** 129:22
143:2,6,9,22
144:4 145:9,12
145:13,15
146:1,7,10,11
146:11,22
166:11,16
**maintained**
156:11
**major** 143:7
**making** 133:20
154:19
**mark** 111:17
131:7
**marked** 98:17
111:18 113:3,7
116:4,8 131:8
141:4,8 145:17
149:9,13 176:3
176:7 179:6,10
184:21 185:2
186:23 187:4
**materials** 201:5
202:4
**matter** 100:16
100:23 101:1,3
192:13 198:3
**matters** 100:17
**Matthew** 96:15
**Matthews** 103:1
111:10 112:13
115:17 177:6
177:12 187:19
202:11,14

**McCollum**
127:14,18
130:10 134:14
170:6 193:19
201:15
**McCollum's**
126:21 127:5
130:3
**McCree** 104:13
**mean** 102:19
107:2,18 118:7
120:11,23
121:3 123:13
160:18 161:17
161:21 162:19
195:7 197:10
199:1
**meaning** 120:18
122:13 199:22
**meant** 144:10
154:3 178:16
**meet** 101:16
124:18
**meeting** 101:19
103:17,19
104:6,10,10,13
104:19,22
105:7 106:8,22
107:9,11,19,21
109:13,15,16
109:23 110:2
125:6,9,13,18
126:12,14,16
126:23,23
127:1,3,22
128:9 129:17
129:23 130:5
130:16 131:13
131:17,23
132:2,17 183:7
188:20,21
189:8 193:20
193:23
**meetings** 103:8
103:19 107:5
107:12,13,15

107:22 108:19
108:23 109:7
109:18,21
121:17 125:15
126:2,6 139:5
139:13 140:7,9
140:14,19
**member** 106:21
112:19
**members** 110:8
**memory** 115:21
116:2
**Memphis**
126:22 127:6
128:12 130:2,4
133:11 180:7
**mentioned**
125:8 146:22
179:12 193:18
**met** 104:3,8,9
106:10 107:7
108:13 139:19
188:12,15
189:1,9 192:10
193:18
**mid-'17** 202:8
**middle** 195:11
**Mignogna**
116:14,19
**minute** 161:20
184:4,7 188:2
**Mischaracteri...**
172:17
**mischaracteri...**
170:3
**mlembke@br...**
96:22
**Mobile** 96:10
**moment** 131:12
162:11
**Monday** 165:20
**money** 106:3
196:14 197:5
198:2
**month** 193:11
**months** 112:2

**Morgan** 187:19
**mouth** 165:9
**move** 155:21
156:22 170:8
171:2
**moved** 164:12
**MPR** 200:2,3
**multiple** 100:17

_____

**N**

**N** 96:1 97:1
**ND** 121:3
128:15 171:6
172:1 186:1
187:18 188:18
190:11
**ND's** 166:2
184:14 186:1,6
**ND4222-4223**
98:15
**ND5686-ND5...**
99:17
**near** 188:23
**necessarily**
133:15
**necessary**
200:14
**need** 102:6
108:2 122:13
134:14,15
135:8 137:18
174:19 186:17
199:10 200:17
**needed** 112:21
194:6 200:5,8
**negotiate** 158:6
**negotiating**
134:1,6 156:8
156:10
**neither** 125:2
204:14
**never** 117:11
127:11 128:23
136:3,11,16
137:11 138:12
138:23 151:4

164:11 169:19
190:7 191:5
197:3
**new** 104:1,1
133:6,8
**nice** 154:15
**Nix** 113:12
114:4
**Nodding** 199:21
**nonresponsive**
156:23
**normal** 137:19
**North** 95:15
96:8,19
**NORTHEAS...**
95:2
**NORTHERN**
95:1
**Notary** 95:23
**note** 144:20
**notice** 133:6
197:9,13,19
198:6,7 199:20
**November**
95:17 100:1,5
101:10,11
119:16 120:9
120:20 122:17
122:20,23
123:1,3 141:22
145:22 146:14
147:8,9,13
149:16 150:19
158:11,17
159:4,5,7
165:21 167:10
169:14 174:15
174:22 175:4
175:11,17
176:10 179:13
179:14,18
182:22 183:8
183:10,19
184:8 185:3
187:6
**NRC** 102:9,14

**Larry Blust**

11/14/2019

Page 213

103:3,4,9
106:5,21 110:2
110:8,11
112:19,20
124:10 143:12
143:12 144:22
147:4 148:4,19
158:20 160:1,5
160:22 161:13
162:14 163:10
164:18 165:1,2
165:5,14,16
166:8,8 167:5
168:7,21 169:4
169:16,21
171:11 172:7
173:22,23
175:23 185:8
186:15,18,21
**nuclear** 95:6
100:16,20,22
100:23 101:7,9
101:16,20
106:7 108:14
108:22 109:6
109:19 111:21
114:7 116:22
118:22 123:15
130:14 131:1
131:19 133:12
133:21 136:4,7
141:11 142:14
143:9,14 145:3
145:9 153:21
155:13 161:12
162:14 163:9
165:7 168:18
168:20 169:13
169:15 173:2,4
174:7,11,16
175:5,10,17
181:13,20
185:17 190:12
191:21 192:16
193:13 194:8
194:13,14

195:3,8,14
198:19 200:12
**nullity** 118:6,8
**number** 98:9,13
98:19,22 99:1
99:3,5,8,10,13
99:15 103:20
111:18 113:2
116:3 131:8
133:8 134:23
141:3 145:16
149:8 150:22
176:2 179:5
184:20 186:22
188:9 193:10
**numbered** 188:7
**numerous**
121:17 139:21
141:1

**O**

**O'Rear** 96:4
142:12 143:16
143:19 144:3,7
144:9 151:11
152:9 157:18
161:4,6,15,19
162:1 164:4,7
170:14 172:16
177:8,10
182:21 186:13
199:9,13 203:8
**Object** 157:18
177:8
**objection**
138:11 143:16
151:11 162:5
172:16 186:13
**objections** 138:8
**obligation** 142:7
154:13 157:8
157:14 167:4
167:17
**obtain** 118:21
119:16 120:8
120:19 121:10

173:4
**obtained** 147:5
**obvious** 184:17
**obviously** 126:4
142:21 157:4
**occur** 122:17,19
141:22 143:13
143:15 145:1,5
166:6,9 174:22
193:23 197:4
198:15
**occurred** 106:15
106:18 126:12
132:16 148:18
149:6 152:18
156:2 158:19
160:16 163:20
168:16 182:4
199:8
**occurring**
175:14 180:1
**October** 106:17
125:19 126:9
126:13 131:13
132:16 183:7
**offended** 144:18
**offhand** 192:3
**office** 97:5 115:8
192:7
**official** 101:20
**Oh** 100:22
113:22 116:17
117:21 144:17
183:8
**okay** 103:5
112:14 113:22
115:11,11
116:10 119:4
121:6 129:21
132:5,12 141:7
144:1 146:12
147:2 158:16
165:2,6,14,17
167:21 169:20
171:23 178:7
183:8 187:16

188:9 195:22
199:12
**once** 136:14
137:3 157:21
200:20 202:22
**one-** 199:18
**one-page** 169:22
**one-step** 122:3
123:12,16
124:10 125:1
**one-year** 198:4
198:18 199:4
**operating** 124:2
124:3,7,18,22
163:13,15
**operator** 132:21
132:23 136:12
**opining** 184:14
**opinion** 147:17
173:5,8,22,23
174:3,8,12,17
175:6,12,19
184:13,16
185:16,22
186:8,15,17,20
193:17
**opinionable**
173:12,13
174:5
**opposed** 182:7
**order** 105:23
186:18 197:18
200:9,13
201:22
**original** 197:15
**originally**
132:22 143:1
197:22
**outcome** 119:10
**outline** 187:21
**outreach** 120:7
**outside** 175:5,11
175:18 185:17
**overlay** 123:19
**overnight**
100:14

**owned** 138:5
**owner** 163:8
164:17,19
165:6
**ownership**
148:2 150:9
155:10 161:11
164:14,21,23
171:7 172:3

**P**

**P** 96:1,1 97:1,1
**package** 142:20
199:5 201:7,8
**packages** 198:20
200:5,16
**page** 98:2,8,18
113:10,14,15
113:20,22
114:13 131:15
150:7 169:7
171:20,21
172:19 187:13
**paid** 137:10
**paper** 116:20
117:11,15
118:2,13
159:19
**paragraph**
145:22,23
166:1,21 167:1
167:3 171:4,19
172:22,23
185:15 187:13
187:15,18
188:8,10
**paranoia** 197:2
**Pardon** 163:14
**part** 105:2
123:17,18,19
124:4 133:7
137:22 164:20
164:23 165:6
190:5,22
194:20 200:1,7
**partial** 133:3,11

**Larry Blust**

11/14/2019
Page 214

participate
129:11
particular 107:5
155:23 178:9
particularly
189:3 198:15
parties 168:8
185:23 204:14
partner 128:15
party 202:20
path 166:3
169:8,23 171:4
171:6,22 172:2
188:5
pay 105:21
138:16
people 103:20
104:1,1,4,22
105:1 106:1
109:13 117:13
118:10 121:18
127:12 137:17
159:14 164:20
179:22 188:13
188:16 189:6
200:19
perfectly 135:10
perform 167:4
performed
136:8
performing
167:17
period 194:4
195:17 198:4
198:19 199:4
199:19 200:8
200:22 201:3,4
201:21 202:9
permit 99:17
102:13 107:6
108:8 114:9
116:21 124:6
124:21 148:1
150:19 151:14
151:17,22
152:1 153:4

154:14 155:11
155:11,17,19
155:21,23
157:15 158:19
159:9,12
160:10,21
162:23 163:3,6
163:9,10,11,17
164:11 165:4
167:13 168:8
168:15,22
169:19 178:17
189:22 190:1
192:10,18
194:7,20 195:6
195:10 196:17
197:14,15,20
198:4,9,23
199:7 202:16
permits 101:8
101:23 102:14
103:2,11
104:19 105:9
105:15 106:23
107:17,23
108:18 109:2,9
110:17,21
111:3,13
112:21 142:19
143:5,11 145:1
145:5 148:4,17
148:22 149:2,5
150:8,12 151:2
151:7 152:19
154:2,11,20
155:9 156:21
157:9,16 160:6
160:14 161:14
162:15 163:12
163:13,15
166:4 169:10
169:16,21
170:3 171:9
172:5 173:17
175:20,20,22
185:9,12 186:1

190:8,14,21,23
191:1,7 193:15
permittee 156:3
157:8,14
164:17 165:7
person 121:19
126:3 129:22
155:18
personnel
102:12 103:22
179:15 183:10
pertained
125:16 177:5
pertaining
160:6
phone 110:7,11
139:8,11,21
140:5,18,20,22
141:1 147:14
179:13,14
182:1,5 183:9
196:19
pick 199:14
picked 123:9
piece 191:4
Pillsbury 184:14
place 95:14
96:18 112:7
142:22 164:12
164:13
Plaintiff 95:7
96:3
plane 128:9
planned 195:18
plant 111:7
122:5 124:4,23
124:23 132:23
134:3,7 136:13
138:2 148:2
155:14 160:5,7
160:12 163:8
164:10,17,19
165:7 167:18
169:17,22
177:22 178:11
178:14,15,18

190:1,2 196:16
197:12 198:15
198:23 200:15
201:12
plants 123:15
134:22 167:4
200:12 202:1
please 114:20
170:14
point 121:19
132:21 195:12
points 131:16
132:19
pole 135:8
portal 121:16
position 151:21
165:5,8 166:22
168:5 182:13
possible 103:13
109:20 110:13
potential 105:13
114:7 177:5
power 128:12
133:13 135:6
137:13,18
138:4,8,11,13
138:18 154:6
practical 198:3
practically
124:16
precedent 160:2
171:11 172:7
precise 132:9
precisely 137:5
preface 180:3
prefer 143:13,15
144:22 166:9
preferred
142:21 145:4
premature
119:13 134:12
135:6 139:1
premise 170:21
preparation
195:5
prepare 189:12

prepared 189:5
presented
130:12 131:20
Press 123:9
pressure 200:20
pretty 130:6
prevented
167:16
previous 102:16
previously
98:17 100:9
113:3,7 116:4
116:8 133:19
141:4,8 145:17
149:9,13 176:3
176:7 179:6,10
184:21 185:2
186:23 187:4
price 200:10
pricing 201:19
primarily 111:1
120:2 201:14
primary 126:2
159:4 182:8
prior 112:22
131:21,23
133:10 139:20
139:22 143:5
145:14 147:22
147:23 150:14
160:5 174:15
175:3,16,21
193:9 201:11
Pritchett 95:20
204:20
private 119:19
120:6
probably 115:4
115:12 128:2
136:14 139:2
146:10 149:14
177:13 182:12
193:5 197:2
202:8
problem 149:1
200:11

problems
200:12
procedure
155:17 165:16
procedures
137:19,22
138:16
proceed 153:13
153:15 173:15
185:23
process 99:16
101:13 102:19
102:20 107:3
108:10 121:10
121:14 140:3
156:10,15
195:16
processed 108:8
processes 124:8
processing
190:8
Professional
95:22
progress 98:12
112:3
prohibited
175:17
prohibiting
154:18
project 142:17
projecting
106:14
promise 149:21
proper 162:4
property 151:16
151:19 152:7
153:5 155:12
proposal 127:14
127:23 128:2,3
128:4,5,6,8,10
128:19,21,22
128:23 129:5
130:12 131:21
131:23 133:7
182:17 183:2,4
183:6 184:4,8

proposals
120:15
proposed
132:22 166:3
198:17
proposing
127:18
proud 146:19
provide 134:19
135:10 136:5
137:8 173:3
174:17 186:7
198:18
provided 121:2
124:5 137:9
201:10
provides 184:3
providing
133:12 136:21
136:23
provision
153:10
provisions 170:6
public 95:23
103:3 204:21
pull 116:7
165:18
purchase 110:9
140:13 141:16
175:1
put 116:11
121:13 135:8
136:17 140:2
142:17,20
165:9 170:16
183:17 199:4
201:4
puts 121:16

_____ Q _____

qualification
194:18,18
question 102:17
114:11 115:10
117:20 118:1,3
142:13 143:18

143:20 144:3
151:12 152:10
157:2,3,5,5,6
160:1 161:3,3
161:7,8,16,22
162:9,10,18
163:16 170:17
170:18
questions
114:19 145:15
170:13,13,21
203:7,8 204:8
Quick 129:4
quicker 125:3
Quirk 98:14
99:9,12 126:15
129:4,17 131:3
139:13,19
140:15 147:15
148:21 159:14
178:3 181:4
183:12 185:3,6
187:6
quotes 176:17

_____ R _____

R 96:1 97:1
204:1
raise 114:20,23
117:7,16 118:3
119:8 191:9,12
194:21
raised 133:19
167:11 173:6
195:2
raising 184:12
ranking 122:6
reactivate
200:15
reactivating
201:12
read 117:3,4,5,6
150:22 153:18
166:12 169:19
170:4,6,17
171:14 199:3

reading 114:10
118:2 144:20
161:20 162:2
171:17,18
172:11,12
realize 127:9
really 119:21
127:11 128:21
140:10 152:4
159:1 196:15
198:11
Realtime 95:21
reason 129:15
143:2,7,9,22
144:4 145:9,13
145:13 146:5
196:4
reasonable
102:11 201:1
reasonably
125:4
reasoning
187:22
reasons 134:12
136:1 142:18
142:19 143:7
145:15 146:2,4
146:7,8,10,12
146:18,22
147:20 166:11
166:16 195:23
196:1
rebuffed 188:18
rebuttal 124:14
124:15
rebutted 124:11
recall 102:2
103:9,15
104:12,17
106:6 107:9
111:11 112:10
112:15,16
118:1 119:5
120:10,18
121:21 125:9
125:11 126:7

126:12 127:2
127:21 130:4
130:15 140:9
140:10 147:12
148:6 158:17
159:6,16
169:17,18
178:3 180:1
182:3
receive 184:13
received 167:5
185:3 192:2
receiving 116:15
recipient 171:9
172:5
recollection
115:14 193:23
record 100:4,5
100:17 178:23
179:4 192:13
203:11
records 194:3
reduced 204:9
refer 151:18
reference 150:8
referenced
113:4 116:5
141:5 145:18
149:10 176:4
179:7 184:22
187:1
referred 152:7
referring 113:16
149:15 153:20
172:22 188:1
190:6
reflect 146:15
reflects 146:18
refused 180:10
regard 104:5,18
111:6 122:8
127:6,10,17
128:15 129:12
130:9 149:1
150:21 154:8
159:9 163:22

180:6 183:2,14
190:7 195:20
199:2,8 201:11
**regardless**
127:18
**region** 105:1
130:18
**Registered**
95:22
**regs** 122:2
**regulations**
123:17 124:9
196:15
**regulatory**
101:9,17,21
109:19 111:21
117:13 118:10
165:16 169:8
169:23 171:4,6
171:21 172:2
186:6 188:5
189:6
**related** 110:19
129:7,13 141:1
167:12
**relating** 114:8
116:20 149:22
191:16
**relatively**
192:13 194:19
**relayed** 134:10
**relaying** 135:15
**relevant** 161:22
175:7 177:23
178:11,18
**relieves** 154:13
**remember**
103:13 104:8
105:6 106:20
107:1,15
108:21 109:5
109:10,22
110:14 114:22
115:19 118:18
121:8 125:16
125:18 126:4

129:16,16,18
129:19 130:20
130:21 132:15
135:14,17,19
135:21 137:3
139:6,8,11,18
140:21 164:3
182:14 183:2
192:3,12 193:3
193:6
**remembering**
140:18
**reminded**
105:21
**renew** 168:22
**repeat** 109:3
161:3 162:10
**repeated** 155:1
159:18
**report** 200:21
**REPORTED**
95:19
**reporter** 95:21
95:23 117:19
163:2 164:1
190:16 199:14
**representative**
121:13
**representatives**
174:2
**represents**
204:10
**request** 126:15
126:17,18
129:6,8,11,14
134:13 191:16
191:22 192:1,2
192:8,15,16,17
192:20,21,22
193:2,6,8,10
193:13 194:20
**requested**
114:16 118:13
118:17 143:10
145:10 146:2
164:11 166:11

166:17 190:12
**requesting**
98:23 141:11
**require** 151:16
153:4,6 154:10
154:12
**required** 142:3
178:17 197:15
199:7
**requirement**
154:20 155:15
155:20
**requirements**
122:1 124:19
124:20 133:3
133:11
**requires** 155:9
**respect** 117:12
**respond** 170:23
**responded**
112:10 114:14
176:20 184:2
**response** 112:15
112:17 128:18
128:22 129:1
174:4 187:9
**responsibilities**
111:7
**responsibility**
160:15,19
161:1,10,18
162:16,20
171:12 172:8
189:11 194:17
**responsible**
162:22 163:5
168:15
**rest** 142:20
**result** 123:23
150:11 151:1
153:12 154:1
160:14 162:17
174:23 204:16
**results** 171:12
172:8
**resume** 100:13

**retain** 108:11
**revenue** 128:12
**review** 102:12
**reviewed** 164:2
178:12,12
**Reviewing**
113:8 131:10
141:9 176:8
**right** 101:1
102:2 103:8,15
104:5,12 105:6
105:18 106:6
107:20 108:3
108:21 111:22
112:18 114:12
116:7 117:1,2
117:6 119:14
120:3,17 121:9
122:15 125:22
126:5,11 127:2
127:20 129:6
130:11 132:1
133:9,18 134:4
136:18,21
137:2 138:9
139:4,17
140:12 141:14
142:2 143:8,21
146:6 149:20
150:6 152:3
153:17,23
157:22 158:3
158:11,16
159:6 160:10
160:18 165:13
165:18 166:12
166:20 167:15
168:3 169:1,2
169:4,6 171:3
173:2 174:6
176:16,18
177:3 178:2
179:21 181:8
182:2,8 183:17
183:21 184:10
184:19 187:3

187:11,17
188:6,7,22
190:18 191:15
191:22 192:4
193:3 194:14
195:3 196:16
202:19 203:5
**rise** 153:6
**risk** 125:5
160:15,19
161:10,18
162:17,20
168:12,14,16
168:18,20
171:13 172:9
**risks** 124:16
125:3 168:9
**risky** 124:11
**room** 131:4
**RSA** 96:7
**rule** 177:22
178:11,14,15
**rules** 123:21

---

**S**

**S** 96:1 97:1
98:14 99:9,12
**s/** 204:20
**safe** 168:6 169:3
**SAITH** 203:14
**sale** 112:22
128:12 140:3
140:13 141:16
162:12,13
175:1
**satisfied** 196:8
**satisfy** 157:8,15
**saying** 106:7
114:14 127:15
127:21 129:10
129:17 130:15
137:21 138:9
146:13 153:17
167:16,19
170:19 176:21
180:4 183:1

190:10,15,17
says 112:6
  114:18 122:23
  149:21 150:7,7
  150:23 152:5
  155:23 171:5
  172:1 176:13
  178:2 184:10
  185:22 186:5
  187:18
scchin@tva.gov
  97:10
schedule 109:12
  192:11 195:20
  196:2,3 197:16
  198:3,17 199:2
  199:3 200:22
scheduled
  122:17 126:14
  126:23 189:8
  197:22
Scott 113:11
  114:13
second 103:18
  153:3 169:6
  171:21 172:22
  172:23 185:14
  187:12 190:1
  197:6
section 147:17
  150:10 172:14
  172:20 175:13
  176:14,17,22
  177:4,18 178:7
  178:10,13,14
  186:2 187:20
  188:11
securitized
  119:8
security 156:11
see 112:4,8
  114:16,20
  119:7 135:20
  149:23 150:12
  167:8,9 168:10
  176:15 177:1

177:19,23
184:5,6,17,18
185:18 186:3,9
186:10 187:22
188:11
seen 193:1,2
send 114:15
  190:10
sends 100:15
sense 189:11
sent 103:1 114:8
  128:10 131:12
  155:8 165:19
  169:7,23 187:6
sentence 171:5
  172:1,23
  187:17 188:12
separate 107:13
separation
  171:7 172:3
September
  177:14
setting 187:21
share 128:11
Shea 188:21
  189:2,7,9,10
  190:4 193:19
  194:22
Sherry 126:15
  129:3 135:16
  139:13,19
  147:15 148:21
  176:22 178:3
  180:4 181:4,11
  187:6 196:20
short 130:7
  178:19
show 111:16
  113:6 131:6
  141:7 143:23
  144:6,12
  149:12 176:6
  179:10 185:1
  187:3
showed 137:9
  189:23

sic 166:9
sign 196:9 197:1
signed 119:1,3
  119:16 140:14
  188:17,22
similar 159:8
simply 155:13
single 124:1
sir 105:11
  120:13 181:16
site 103:4
  112:23 150:9
  150:10 153:18
  156:6,8,9,11
  156:11 157:22
  158:7 161:12
  162:13 171:8
  172:4 173:15
  184:15 186:2
sitting 112:14
  125:12 126:5
  136:19
situation 102:15
  163:7,19
  164:16,21
  171:10 172:6
situations
  189:21,22
six-month
  141:12
slow 161:4 164:4
  195:4,7,15
  199:10
small 194:20
so-called 117:15
  118:2 131:16
solely 104:21
somebody 134:9
  168:21 180:21
  189:14 192:5,7
soon 192:13
sorry 113:22
  117:21 144:17
  164:6 197:21
sort 119:11
  121:19 122:6

131:20
sounds 172:12
south 163:23
  164:9
southeast 105:1
Southeastern
  97:14
southeasternl...
  97:18
specific 107:2,4
  110:18 112:15
  115:14 121:14
  139:11 140:11
  140:22 192:8
specifically
  105:8 106:21
  108:22 109:6
  109:11 132:15
  135:18,19,21
  154:12 159:16
  186:16 189:5
  194:16
specifics 104:17
  129:20
speed 123:22
spend 196:13
  197:4
spent 101:2
spoke 112:2
Sr 116:15
stack 116:8,11
staff 103:18,20
  103:21,21
  104:9,14,20
  105:5 106:9,11
  106:21 108:1,7
  108:9,10,12
  109:16,19,21
  110:8,11
  112:19
start 101:18
  117:23 157:12
  166:23 198:1
  199:16 202:7
starts 106:16
state 174:19

204:3
stated 129:15
  147:19 150:14
  166:6 170:18
  178:5 186:17
  194:16
statement
  127:19 130:8
  153:7 154:16
  154:16,23
  155:5 159:8
  170:16,20
statements
  100:15 130:3
  170:12,21
STATES 95:1
status 122:11,13
  166:4 169:17
  169:22 170:4
  191:1 197:12
stay 198:10
stenotypy 204:8
Steven 97:4
Street 96:8
strike 132:13
  156:22 170:8
  171:2 202:11
structure
  103:23
structures 122:4
  122:4
studies 201:11
  201:13
study 134:16,22
  135:3 136:8
  137:9,23
  148:12,23
stuff 103:7
  144:8
Subj 98:11,14
  98:20 99:16
subject 101:21
  163:9
submission
  108:15
submit 102:21

Larry Blust

11/14/2019
Page 218

190:13 193:14
195:9,18
**submitted**
169:14
**submitting**
139:1 202:15
**subordinate**
119:9
**subsequent**
114:15
**substance**
117:14
**successful**
119:20
**suggested**
133:10 180:22
192:14,15
**Suisse** 119:8,15
120:7
**Suite** 96:9 97:15
**Summer** 124:23
**Summit** 97:7
**supervision**
204:10
**supplied** 159:19
159:21 187:21
**support** 102:7
106:4
**suppose** 110:22
**supposed**
189:15
**sure** 102:17
105:4 109:11
115:2 117:4
119:4 128:17
129:18 130:17
137:4 139:16
144:9 164:3
171:16 178:13
178:21
**surprise** 112:17
126:1
**suspect** 120:14
**sworn** 100:9
**system** 133:20

**T**

**T** 204:1,1
**table** 133:4
**take** 108:1
145:20 178:19
182:13 190:4
**taken** 204:7
**talk** 127:12
159:1
**talked** 127:4
129:23 159:15
168:17
**talking** 100:18
100:20 117:23
131:12,16
134:2 155:12
168:13 183:5
188:19,20
201:3,7 203:2
**tariff** 137:20,22
**team** 201:9
**technical** 194:12
194:17
**telephone** 159:2
179:16 203:3
**tell** 107:20
120:23 126:11
139:17 140:8
152:5 171:17
173:20 180:8
193:6
**temporary**
171:7 172:3
**Tennessee** 95:9
97:6,8
**term** 141:16
155:11 157:12
**terminated**
169:16,22
170:4
**terms** 117:14
129:1 150:12
151:2 153:3
154:2 157:9,15
160:10
**testified** 100:10

146:9
**testimony**
164:16 165:11
169:18 170:5
**Texas** 163:23
164:8,9,9,12
164:22
**Thank** 203:9
**thereto** 204:9
**they'd** 167:12
**thing** 105:2
106:14 132:18
135:1 138:6,23
152:5 155:23
156:9,20
159:15 197:6
200:8
**things** 129:19
133:4 142:22
146:21 156:12
194:15 198:16
**think** 103:2,4,14
104:8,16
106:16 108:6
117:17 118:5
119:12 129:3
134:10,14
138:14,15,21
140:6 146:17
147:6 148:7,9
148:11 149:5
152:5 161:2
163:19 166:13
168:5 170:22
173:18,21
182:15,16,16
189:1,14 192:5
195:2
**thinking** 148:7
148:10,11
**third** 132:21
166:21 167:2
187:15,17
**thought** 117:21
118:6,7 147:3
176:23

**three** 104:3
107:10,11
119:3 133:4
139:2
**Thursday** 166:2
**Tim** 103:1 111:9
112:13 187:18
**Tim's** 166:22
168:5
**time** 100:17
101:2 104:16
106:10,13
108:13 109:12
110:8 112:22
115:3,5 125:8
131:21 133:5
133:10 135:2,5
149:2 154:12
158:10 168:1
174:13,14
175:3,16
178:23 180:22
182:19 194:4
195:13,17
198:2 200:8
201:2,21 202:6
**timelines** 112:7
**times** 102:4
139:21
**timing** 102:6
105:3,16,19,21
106:7,12,12,14
108:2 111:12
**today** 110:10
112:14 125:12
126:5 136:19
184:14
**told** 108:6
109:17 110:1
128:22 129:2
130:1 132:14
134:9,11
136:16 138:12
138:19 139:4
147:14,22,23
149:2,4 173:11

173:19,21
180:4,7,18
181:1 182:3
186:11,14,19
189:15 192:19
194:22 200:13
**ton** 122:7
**top** 114:13
**topic** 103:10
148:8 159:3,5
202:21
**topics** 140:23
141:2
**total** 196:7
**totally** 198:11
**tour** 122:5
**Tower** 96:7
**trajectory**
106:11 108:15
**transaction**
140:1 147:18
157:21 180:23
186:18
**transactions**
152:7 153:12
154:9,19
**transcript**
204:11,23
**transfer** 99:16
101:8,22
102:13 103:11
104:18 105:8
105:14 106:23
107:6,17,21,22
108:16 109:1,8
110:17,20
111:2,13
112:20 116:20
142:18 143:4
143:10 144:7
144:23 145:5
148:3,18
150:18,22,23
151:3,15,16,18
152:6,18 153:4
153:5 154:10

154:14,20
155:19 156:17
160:4,6,12,13
161:13 162:15
166:3 167:4,5
167:17 169:9
170:5 173:14
175:14,22
185:11,13
189:4,12,19
190:14,20,23
193:15 195:6
195:11 196:17
198:23 202:15
**transferred**
148:2 157:10
157:16 161:11
165:1 175:21
197:21 198:5
**transferring**
149:1 155:17
**transfers** 102:14
111:8 112:4
168:8 169:4
171:14 172:10
**transformation**
154:19
**transition** 111:4
111:5
**transmission**
133:1,20 134:8
134:13,16
135:4,11 136:5
136:8,21 137:1
137:9,23 138:2
**transmit** 137:13
137:18 138:4
138:13,17
**transmitted**
116:20
**transmitting**
99:11 138:8,11
187:5
**tried** 183:11
189:21
**trip** 126:21

**trouble** 140:18
**true** 143:22
144:21 145:3,8
147:21 170:20
191:2 198:13
204:11
**try** 123:21
144:12 188:17
197:16,17
**trying** 126:20
182:14 196:20
**turn** 124:21
**turned** 124:16
198:11
**turning** 154:6
**TVA** 98:23
110:9 113:12
114:4,14
116:21 127:6
127:12 128:11
128:14,14
130:12 131:4
131:21 132:20
132:22 133:3,9
133:12,19
134:9,11,21
136:3,11,20
137:12,17
138:3,10
141:10 142:6
147:3,3,23,23
148:14,16
150:8,17 151:6
151:21 152:2
152:16,22
154:4,5,13
156:2,9,10,17
156:20 157:7
157:13,21
158:3,12,18
160:15,17,19
160:22,23
161:10,11,18
162:13,17,20
167:3,11,16
168:12 171:13

172:9 173:3,7
173:11,19,20
173:21 174:1,2
175:19 179:15
183:10,23
184:11 185:7
189:5,6 190:3
190:7 191:6,23
192:1,2,17
194:17,23
198:13 200:14
201:11,19
202:14
**TVA's** 128:18
167:22 185:17
189:11 190:3,5
190:10 193:12
196:7
**TVABLN** 98:21
**TVABLN5035**
98:12
**twice** 116:12
**two** 103:13,14
104:11 108:19
109:21 118:22
118:23 123:14
124:8,8 131:15
134:12 140:6
150:7 156:12
172:19 183:20
188:8,9 193:10
194:15 199:7
202:20
**two-step** 122:3
123:12,16
124:11
**two-year** 198:18
199:4,18
**types** 123:14
**typewriting**
204:9
**typos** 166:14

——— **U** ———

**U2** 98:20
**Uh-huh** 185:19

**ultimately**
128:20 165:3
195:3
**understand**
143:17,19
150:2 153:9
154:3,7 157:4
160:8 164:5
186:6
**understanding**
102:18 127:16
127:17 151:23
**understood**
127:11 130:3
144:22 153:19
157:7,13
159:23 160:11
167:15,21
**unequivocal**
184:13
**unfeasible**
198:12
**unhappy** 127:5
**Unit** 114:9
133:14 190:11
191:17,19
**UNITED** 95:1
**unlawful** 184:15
**unrelated** 129:5
129:13 161:22
**unwilling**
180:17 186:7
**unwind** 180:22
181:3
**Update** 98:11
**upgrade** 134:18
138:1
**use** 124:19
146:17
**utilization** 171:8
172:4

——— **V** ———

**Valley** 95:9 97:6
**Vance** 113:11
114:3,14 191:8

**Vance's** 115:1,3
**various** 119:18
121:18 140:23
**venture** 120:15
128:13 131:20
**venturer** 130:13
**version** 128:7
**versus** 122:3
123:12 140:18
**Victor** 104:13
**Video** 95:12
97:14
**VIDEOGRAP...**
97:12 100:3
178:22 179:3
203:10
**view** 143:6
159:21 166:15
178:11 196:18
197:7
**viewed** 146:7,10
178:15
**violate** 159:9,11
180:20 186:2,9
**violated** 149:5
151:15 153:8
182:11
**violation** 148:1
148:17 151:7,9
151:14,17,21
151:22 152:1
152:17 153:2
153:12 154:4,5
154:8 158:19
160:9 173:16
175:19
**virtually** 101:15
124:20
**Vogtle** 124:23
**voicemail**
176:21 178:3,4
**VOLUME**
95:11
**vs** 95:8

——— **W** ———

**wait** 142:12
198:1
**want** 121:20
140:1 158:5,8
159:1 170:20
198:1 199:3
**wanted** 102:7
106:3 108:11
142:16 143:3
148:23 156:17
158:7 168:1
191:9,18
195:15 197:23
198:2 200:9
**wanting** 114:8
**wasn't** 108:7
110:23 111:3
119:21 120:15
127:16 129:12
130:7 143:2
149:3 170:7
189:15 194:10
195:1
**Water** 96:8
**Watson** 97:13
**way** 118:12
128:9 136:17
140:2 142:23
168:6 169:3
170:2 190:4,12
**ways** 111:4
128:15
**wayside** 119:12
**weeks** 184:13
**went** 138:15
165:3 200:4
201:15
**weren't** 128:22
137:13
**West** 97:7
**white** 116:20
117:11,15
118:2,13
**willing** 135:10
136:17 137:8
137:13 138:16

180:11
**wires** 135:9
**witness** 162:3
204:12
**word** 145:12
146:4,17 149:3
**words** 165:9
**work** 118:11
198:19 199:6
200:13,14
**works** 102:9
**wouldn't** 108:9
112:16 125:23
125:23 126:2
127:13 138:12
143:6 146:19
**write** 117:11
173:1 188:15
**write-up** 169:7
**writing** 117:10
159:21 192:22
193:1
**written** 128:7,16
136:3
**wrong** 189:10
**WT6** 97:7

**——————**
          **X**
**——————**
          **Y**
**——————**
**yeah** 111:23
116:17,18
146:4 152:11
161:5 183:1,20
**year** 106:15,17
106:18 132:20
**years** 118:22,23
119:3 134:23
139:3
**Yep** 112:5
**yesterday** 125:8
126:18 156:14
169:18 170:5
176:15,22
**——————**
          **Z**
**——————**

**——————**
          **0**
**——————**
**001** 98:20
**0333-0334** 98:21

**——————**
          **1**
**——————**
**1** 133:14 190:3
191:17,19
**1(e)** 189:3
194:16
**10/24/18** 98:13
**10:28** 178:23
179:2
**10:37** 179:2,4
**100** 98:3
**101** 147:17
172:14,20
175:13 176:17
177:4 186:3
187:20
**11** 96:8
**11/12/18** 99:3
**11/24** 99:8
**11/25/2019**
204:23
**11/28** 99:5
**11/30** 99:11
**11/9** 99:1
**11:03** 203:12,17
**111** 98:9
**113** 98:19
**116** 99:15
204:22
**12** 145:22
**12/20/16** 99:15
**123** 150:9
**12th** 146:15
165:21 167:10
**13** 98:22 141:3,8
**131** 98:13
**13th** 169:14
**14** 95:17 100:1
122:23
**141** 98:22
**145** 99:3
**149** 99:1
**14th** 100:6

141:22
**15th** 147:7,8,13
151:4 159:4,5
159:7 179:14
179:17,23
180:4 181:18
181:19 182:9
**16** 194:2
**16th** 176:10
**17** 99:1 106:19
111:22 149:8
149:13 194:3
197:17
**17/'18** 106:19
**170331** 98:20
**176** 99:13
**179** 99:5
**18** 122:20,23
123:3
**1819** 95:15
96:19
**184** 99:8
**186** 99:10
**19** 99:3 145:16
145:21 165:19
172:19 188:3
**19th** 179:20
180:2,12,15,18
181:15 182:5
182:22 183:3,8

**——————**
          **2**
**——————**
**2** 114:9 150:10
190:1,11
198:15
**2016** 116:14
119:16 120:9
120:20 134:5
188:23
**2017** 104:6,7
111:22 113:12
188:23 195:11
196:6
**2018** 101:10,11
122:18 125:20
125:21 126:9

126:13 132:16
145:22 146:15
147:10 158:11
165:21 174:16
174:23 175:4
175:12,17
**2019** 95:17
100:1,6
**205.251.8000**
96:21
**205.871.4300**
97:17
**20th** 116:14
**23** 99:5 179:5,11
183:17
**23rd** 125:19
126:9,13
131:13 132:16
**24** 99:8 184:20
185:2
**25** 99:10 186:22
187:4
**251.432.5511**
96:11
**28th** 183:19
184:8
**29** 113:12
**29th** 185:4
187:10

**——————**
          **3**
**——————**
**30200** 96:9
**306** 97:15
**30th** 123:1
174:15,23
175:4,11,17
179:17 183:10
187:7
**31st** 114:13
**35203** 95:16
96:20
**36** 99:13 176:2,7
176:9
**36209** 97:16
**36602** 96:10
**37902** 97:8

**Larry Blust**

**11/14/2019**
Page 221

| 4 | | | | |
|---|---|---|---|---|
| **4/17/17** 98:9 | | | | |
| **400** 97:7 | | | | |
| **48** 99:15 116:3,9 | | | | |
| 116:10,12,13 | | | | |

| 5 |
|---|
| **5:18-CV-0198...** |
| 95:4 |
| **50** 123:17 124:4 |
| **52** 123:18,19 |

| 6 |
|---|
| **6-month** 98:23 |

| 7 |
|---|

| 8 |
|---|
| **8** 98:19 113:2,7 |
| 113:10,21 |
| 114:13 116:11 |
| **8/2017** 98:19 |
| **85** 97:15 |
| **865.632.3052** |
| 97:9 |
| **8th** 148:12,20,21 |
| 158:18 179:14 |
| 181:21,22 |

| 9 |
|---|
| **9/30/2020** |
| 204:22 |
| **9:07** 100:1,6 |
| **93** 98:9 111:17 |
| 111:18 |
| **94** 98:13 131:7,8 |
| **9th** 149:16 |
| 150:19 158:21 |

# DEPOSITION EXHIBIT

# 42

Message

| | |
|---|---|
| **From:** | Larry D. Blust [lblust@HSPLEGAL.COM] |
| **Sent:** | 8/18/2016 6:56:13 PM |
| **To:** | coneill@ceadvisors.com |
| **CC:** | Franklin Haney, Sr. [flh@flhcompany.com]; Frank Haney [frankhaney@flhcompany.com]; Bill Mccullom [bill@wrmccollum.com]; Gloria Thurman [Gloria@flhcompany.com] |
| **Subject:** | FW: |
| **Attachments:** | Confidental Agmt Tennesse Valley TVA Buyer 8.18.16 Redline (00699593x9D9DD).docx; Confidentiality Agmt Tennesse Valley TVA Buyer 8.18.16 clean (00699547x9D9DD).doc |

When I discussed with you that our client and its predecessor has been working with TVA on various proposals to complete the Bellefonte plants since at least 2001 and as a result had some problems with your draft confidentiality agreement, you suggested that I submit a revision to take care of those concerns. Such a revision is attached together with a redline showing the changes from the draft you sent out.

Most of the changes are self-explanatory but briefly the changes and the reasons for them are as follows:

1. In section 3, we deleted c barring disclosure of the Transaction and Nuclear Development's ("ND") participation in it. You have publicized this transaction and ND was the main party urging TVA to dispose of the Site so ND could complete the plants once TVA determined it would not complete these plants. As part of this process, ND has contacted various interested government officials and legislators and met with DOE, NRC, IRS and other governmental agencies and customers and suppliers of TVA about the feasibility and financing of the project, Our client's supporters periodically make requests for updates as to the disposition process. In addition, ND has applied for a DOE guaranteed loan under the program for advanced nuclear facilities and must be able to inform DOE where it is in the process. It is naïve to assume that this transaction or our client's participation in it is confidential. Similar changes were made to section 8.

2. We added new sections 10(a) & (b) dealing with ND's existing confidentiality agreement with TVA. In 10(b) we extended the permission in the amendment to that agreement to disclose information to DOE in regard to ND's pending loan application to the documents provided by TVA pursuant to this Agreement.

3. As we discussed, we added a 109c) making the confidentiality provisions mutual. Unlike some potential bidders, our client is an SPE formed just for this transaction by a wealthy family whose assets and activities are and always have been very private. In order to complete the Request for Qualification Information, our client needs to assure that its response will be confidential. In section 12 (formerly 11), we excepted out our client's existing exclusive arrangements and any new arrangements ND may make in regard to completing the plants as opposed to just acquiring the Site. Our client has to be able to make these arrangements before it acquires the Site.

If these changes are acceptable, please have the Confidentiality Agreement signed by a TVA representative and returned to me. I will secure Mr. Haney's signature and send you back a fully executed copy and our client's completed Request for Qualification Information. If you have any questions about or issues with these changes, please call me

**From:** Juanita Crudup
**Sent:** Thursday, August 18, 2016 11:53 AM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:**


EXHIBIT
42

CONFIDENTIAL

ND_004966



**Juanita Crudup**, *Legal Assistant*
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 60602
Dir **312.604.2682**  Fax **312.604.2683**
jcrudup@hsplegal.com

# DEPOSITION EXHIBIT

# 43

Message

| | |
|---|---|
| **From:** | Larry D. Blust [lblust@HSPLEGAL.COM] |
| **Sent:** | 9/9/2016 7:50:02 PM |
| **To:** | Carrie O'Neill [coneill@ceadvisors.com] |
| **CC:** | Franklin L. Haney (flh@flhcompany.com) (flh@flhcompany.com) [flh@flhcompany.com]; Frank Haney [frankhaney@flhcompany.com]; Bll McCollum [bill@wrmccollum.com] |
| **Subject:** | Emailing - Confidential Indicative Bid Nuclear Development (00703998x9D9DD).pdf |
| **Attachments:** | Confidential Indicative Bid Nuclear Development (00703998x9D9DD).pdf |

Attached is Nuclear Development LLC's Indicative Bid.  This follows the organization in  and contains the material required by your September 2, 2016 letter to me rather than the Offering Memo.  The material requested in the Offering Memo is slightly different than that requested in your letter.  The major substantive difference is the request in the offering memo for what additional due diligence is required. That is not in your letter and is more appropriately done in regard to negotiating a contract in any event since what is relevant to us is unliely in most cases to be relevant to other bidders..

Please call me if you have any questions.  Please confirm receipt of this.

EXHIBIT

43

ND_005048

CONFIDENTIAL

Indicative Bid
Nuclear Development, LLC ("ND")

1. <u>Buyer Group Contract</u>.

Questions regarding clarification of the Indicative Bid should be directed to:

> Larry D. Blust
> Phone: 312 604-2672
> Cell:   312 524-6218
> Email: lblust@hsplegal.com

2. <u>Buyer Group and Ownership Structure</u>.

The bidder is Nuclear Development, LLC ("ND"). ND was formed in 2012 by Franklin L. Haney as a special purpose entity to acquire, finance, complete and operate the two partially completed nuclear plants at the Bellefonte Nuclear Station near Hollywood, Alabama.

Currently, Franklin L. Haney is the sole member and manager of ND. Officers with authority to act for it under the manager's direction are Franklin L. Haney, Jr. President, William R. McCollum, Vice President Nuclear Operations, and Larry D. Blust, Secretary and General Counsel.

ND is a special purpose entity ("SPE") formed exclusively for this transaction and will be the buying entity. The type of financing ND plans to use for the estimated $13,370,625,000 cost of the project requires an SPE to insulate risks for the lenders and investors. ND's current ownership structure is shown on Exhibit A. As soon as ND has been approved as the successful bidder for the BLN site, ND will be expanded as indicated in Exhibit A in order to raise the required equity and debt.

The BLN reactor designs have been certified by DOE to constitute Advanced Nuclear Facilities as defined in Title XVII of the Energy Policy Act of 2005 for the purpose of qualifying for production tax credits under Internal Revenue Code Section 45J and for qualifying for a DOE guaranteed loan under Title XVII. ND applied for and has been awarded tax credits worth approximately $1.0 billion for each plant. ND has gone through Phase I of the DOE loan application process and has been determined to be eligible for such a loan. ND applied for a $10.6 billion loan but a second phase of DOE due diligence is required before DOE decides whether to award a loan and in what amount, which is discretionary with DOE.

The type of equity and financing to be used for this project means that the providers of the securitized equity and securitized debt will not be known until such funds are raised, which will be after the closing of the purchase of the property. These parties, who are likely to be institutional or private equity funds, will be merely passive investors in any event. The Haney family, who have already funded over $5.0 million in front end costs, will remain the residual equity holders

in ND.  When the tax credit funds are raised, the ownership may be split into two SPEs as shown in Exhibit A to accomodate the tax credit investors.

      3.    <u>Advisors</u>.  Mr. Blust's law firm is assisting in the transaction, as is Mr. McCollum's consulting firm.  In addition, investment advisors and engineering firms provided advice in regard to the DOE guaranteed loan application.  After ND acquires the site, other advisors may be retained in regard to the project.

      4.    <u>Indicative Bid Form</u>.

The following is the completed indicative bid form:

      A.    <u>Overview and End Use</u>.

      ND plans to acquire the site to complete the two partially completed nuclear power plants and to operate these plants as merchant power plants connected to the grid through the existing transmission lines of the TVA and Southfern Companies.  The plants are comprised of two Babcock and Wilcox 205 advanced design pressurized water reactors.  This design has never been fully licensed and operated in the United States.  The Bellefonte units have NRC construction licenses and when completed and in operation will have a 1250 MW name plate capacity and will be the largest capacity advanced reactors in the United States.

      B.    <u>Purchase Price</u>.  $36.4 million.  Per TVA's appraisal, the BLN site has no value to a purchaser that wishes to complete the plants for their intended use as nuclear power plants due to the risk and large additional investment required.  However, ND promised TVA that it would initially bid the amount the appraisal found the value of the site to be for other uses so that TVA could not be accused of disposing of the property for less fees then its land value regardless of use.  While ND expected that value to be lower given the demolition and other costs which would be required for any other use, ND is honoring this commitment.

      C.    <u>Property Taxes</u>.  ND has made no arrangements with host communities regarding property taxes.  ND's proposed use of the site will result in the site's highest assessed valuation for property tax purposes by a large multiple over other uses since ND is budgeting spending $13.4 billion on the plants.  ND would expect to discuss some real estate tax incentives with the host communities at some future time in light of the tremendous benefits this use will provide to local communities in addition to real estate taxes.

      D.    <u>Committed Future Investments</u>.  With the required approvals and financing, ND will be committed to future investment of the cost of completion which is presently budgeted at $13.4 billion over the next 4 to 6 years.

      E.    <u>Description of Committed Future Investments</u>.  The above committed future investments are conditioned only on the same conditions required for ND to close the acquisition of the site.  They are approval by the NRC of the transfer of the existing construction licenses to ND and commitments for either the DOE guaranteed loan of $10.6 billion or other debt financing acceptable to ND.  Unlike with possible bidders for other uses, who may be dependent on sales demand for commercial, industrial or residential property development in order to provide any

2

ND_005050

substantial benefits to the local communities, these expenditures will be committed to when the license transfer is approved and the debt committed.

Based on similar size U.S. nuclear projects, the project will create 8,000 to 10,000 direct and indirect construction jobs during the period of peak construction. Most of these workers will come from other locations creating a need for housing, restaurants, recreation facilities and other support facilities in the local communities.

The project will create approximately 2,400 direct and indirect permanent jobs, most of which will be high paying, including those involved in operation, maintenance and support as well as personnel required for refueling and maintenance outages. The positive ongoing economic impact to the surrounding region will exceed $1.0 billion per year. The Alabama Governor's economic development experts view this project as the single largest potential economic development project in Alabama. The likely useful life of these two plants when completed is 60 years. This compares to roughly 20 years for a combined cycle natural gas plant of similar capacity which would also provide far fewer jobs. Other possible uses are likely to provide only a nominal amount of jobs and at lower wages than construction or operation of a nuclear plant. Thus, the benefit of providing employment is not only much greater in numbers and dollars than alternative possible uses, ND's proposal would provide multi-generational economic stability to the area, unlike any other likely proposals.

F.    Other Value. In addition to the hugh value construction and operation of these nuclear plants would provide to the local communities and the state of Alabama, TVA should consider that having a long-term source of base power should TVA need it is a tremendous advantage to TVA. TVA's latest IRP does not conclude that TVA will never need the additional base power which would be produced from these plants at an attractive and non-fluctuating cost. In fact it concludes that substantial additional base power would be needed by the time these plants would be operational and over their 60 year likely operating life. It simply concludes that TVA should buy this additional power rather than fund and own the generating capacity.

No other possible use can provide this benefit. Natural gas, while cheap presently has historically not only commanded substantially higher prices, but has been subject to large spikes in the price of natural gas. If the proposals presently being considered for export of LNG to Europe and Asia come to pass, use of natural gas as a fuel for long-term base power needs is likely to cause large rate increases. In addition, a large combined cycle gas plant is capable of operating at only 50% to 70% of capacity as opposed to 90% to 95% for a nuclear plant and generally requires replacement or substantial rebuilding approximately every 20 years. Moreover, natural gas causes carbon emissions equal to 30% to 50% of a coal plant while nuclear causes no such emissions. Assuming that the current proposed "Clean Power" EPA regulations or something else to cause the U.S. to meet its international commitments to carbon emissions reduction ultimately becomes effective, these nuclear plants will aid TVA and the various states, particularly Alabama, to meet carbon reduction requirements in the most attractive way.

Comparing completing these plants to renewable energy such as solar or wind on this site is like comparing apples and oranges. Renewable power cannot provide reliable base power and generally requires subsidies to be price competitive.

3

ND_005051

Non energy uses will, of course, provide no collateral benefits to TVA despite its substantial prior costs.

This collateral benefit of a merchant owner completing the plants will inure to TVA without any commitments from TVA or conditions.

G.    Financial Resources.

As to the purchase of the site, ND has available from the Haney family sufficient cash to pay the bid price. It is not in a position to do so without having the licensing approval and financing approvals discussed under item 5 below, however, since the BLN site is worth nothing to ND unless it has the ability to complete the two plants.

The more complicated challenge is to finance the estimated $13,370,625,000 cost of the project. To do this, as soon as ND has been approved as the successful bidder for the site and has committed debt financing, ND will start raising securitized equity/debt from institutional and private equity players. The Haney family has already expended over $5 million on the Bellefonte project which is not included in the $13.4 billion figure above. The Haney family will leave this equity in ND and is likely to invest additional funds.

The currently projected funding for the entire project is as follows:

|  | In billions |
|---|---|
| DOE guaranteed loan | $10.6 |
| Securitized subordinate debt/equity to be taken out by tax credit investors | 2.0 |
| Balance of securitized equity/debt | .8 |
| Total | $13.4 |

The ratio of debt to equity is contemplated to be 79%/21%. ND's projections indicate the ability to pay more than the $10.6 billion debt with sufficient coverage ratios.

In regard to the DOE guaranteed loan and the financing backed by tax credits, the plants have already been certified by DOE to constitute Advanced Nuclear Facilities as defined in Title XVII of the Energy Policy Act of 2005 for the purpose of qualifying for production tax credits under Internal Revenue Code Section 45J and for qualifying for a DOE guaranteed loan under Title XVII. ND applied for and has been awarded tax credits worth approximately $1.0 billion for each plant. ND has gone through Phase I of the DOE loan application process and has been determined to be eligible for such a loan. ND applied for a $10.6 billion loan but a second phase of DOE due diligence is required before DOE decides whether to award a loan and in what amount, which is discretionary with DOE.

As part of the DOE second phase application process, ND is required to obtain a shadow rating from a national credit rating agency based on projected revenue without credit enhancements. ND assumes that this rating is likely to be BB or slightly lower. If for some reason, DOE declines to offer a loan commitment to ND, or ND for some reason rejects DOE'S terms,

4

ND_005052

this shadow rating should allow ND to raise replacement securitized debt albeit on more onerous terms.

The above $13.4 billion amount includes all future project costs to completion including environmental and regulatory.

ND does not anticipate initially having or requiring credit support since the DOE loan guarantee of the Federal Financing Bank loan is intended to alleviate the need for credit enhancement. Later on, however, ND would expect to have financeable power purchase contacts for a substantial amount of the power generated.

5.    Mark Up to Commercial Terms

Because of the unique nature of ND's proposal, ND would require the following changes to TVA's initial commercial terms as stated in its offering memo:

A.    Excluded Assets.

Basically in order to complete these plants on a timely basis, ND needs to step into TVA's shoes as to both on-site and off-site project assets. As to the excluded assets discussed in the offering memorandum:

(1) Steam Generators. It is essential to ND's ability to timely complete these plants that ND receive the two substantially complete steam generators and step into TVA's shoes in regard to TVA's contract for the Plant 2 steam generators by assuming TVA's rights and obligations in regard thereto. ND would not expect to increase its purchase price as a result as requested. ND would end up paying the manufacturer for the Plant 2 generators per the contract. As to the substantially complete generators for Plant 1, ND understands that they were manufactured specifically for this plant and thus have no value to TVA greater than their scrap value. No other bidder is likely to want these generators so, in essence, ND would be paying TVA more for the same property than anyone else if it added a separate amount for the generators.

(2) Training building and storage facility on pole yard. ND believes it needs fee ownership of these facilities both for its operation of the plants and for licensing purposes. ND is willing to enter into an agreement with TVA for TVA's access and use, however.

(3) FF&E. ND would expect TVA to leave any furniture and fixtures. TVA can remove any computers and phones if it desires. As part of the sale, however, ND requires all the programming, data, and records relating to the project  Thus, it might be more efficient for some or all of the computers to be transferred. This is a minor issue with numerous possible negotiated solutions.

(4) 250 acres of buffer land and closed dumps. ND has no desire to own these unless required for regulatory purposes. In any event, ND would not build on this assuming the survey shows it is outside the part of the site used for the plants and access thereto.

5

ND_005053

(5) <u>Transmission Lines</u>. ND assumed that the transmission lines dedicated to the plant would be transferred but ND has no problem with TVA retaining them so long as TVA enters into an interconnection agreement providing for their maintenance and use by ND and for any required upgrades at ND's cost.

(6) <u>Licenses and Contracts</u>. ND expects TVA to transfer all licenses and assignable contracts as proposed in the offering memo. See discussion below as to transfer of licenses.

B. <u>Closing Conditions</u>.

ND has no problem with the requirement to sign a purchase and sale agreement and deposit 20% of the purchase price within 48 hours of auction completion provided such a contract can be negotiated prior to auction completion. However, the closing itself and payment of the purchase price must, in addition to environmental clearance, be conditioned on NRC approval of the transfer of the existing construction licenses and ND receiving a written commitment for financing of the completion costs.

In regard to a loan commitment, ND as required submitted a written term sheet to DOE as part of its application. A commitment on these terms or similar in the amount of $10.6 billion would satisfy this condition as would a commitment for securitized debt on comparable terms.

There is no reason why these conditions should be detrimental to TVA. As discussed above completion of these plants is by far the site's most desirable use as far as both the local community and TVA are concerned. While it is possible that ND might never be able to satisfy these conditions, ND is fairly far along in the process and as far as it can get without an agreement with TVA to acquire the plants. If these conditions were to prove unattainable, TVA can simply go back to any other bidding parties and negotiate a sale. These other possible uses will always be available; this is probably TVA's only chance to secure completion of the plants for the use originally planned which is the best possible outcome for all stakeholders. It is difficult to imagine how TVA would be damaged by accepting these conditions.

00703592.DOCX

6

Bellefonte. I. C. Organization (Corporate and Personnel). 1. V1. pdf



Organizational Chart
(Current)

Project

100% owner

Nuclear Development, LLC
(Sponsor)

Sole Member

Franklin L. Haney
(Principal)



Organizational Chart
(On Entering Into Definitive Agreement)

Project

100% owner

Nuclear Development, LLC

Pari Passu
Debt
Securitized Debt
Holders

100%
Equity

DOE Debt

Franklin L. Haney as Trustee of various Haney Family Trusts
for Benefit of Franklin L. Haney, Emmeline Haney and their
5 children and their grandchildren



EXHIBIT

A

CONFIDENTIAL

ND_005055



Possible Future Organization Chart
(on Split into 2 Projects to
Accommodate Tax Credit Investors)



Franklin L. Haney as Trustee of various Haney Family Trusts
for Benefit of Franklin L. Haney, Emmeline Haney, and their 5
children and their grandchildren

2

CONFIDENTIAL

ND_005056

# DEPOSITION EXHIBIT

# 87

Enclosure 2



# Larry D. Blust

T: 312.604.2672
F: 312.604.2673
lblust@hsplegal.com (mailto:lblust@hsplegal.com)
70 W. Madison Street Suite 4000, Chicago, Illinois 60602

Larry Blust became a Partner of Hughes Socol Piers Resnick Dym, Ltd. in 2014. Mr. Blust has been in private practice since 1988, except for three years during which he served as a Staff Judge Advocate and Military Judge in the U.S. Air Force. Mr. Blust has extensive experience in virtually every area of corporate, tax, wealth, and real estate law. Specifically, Mr. Blust       practices in the areas of mergers and acquisitions; tax reporting, consulting and controversies; gaming transactions; taxable and tax exempt bonds; infrastructure financing; other types of financing; fund structures; maritime matters; tax credits; entity       structuring; wealthy family representation; and real estate law. Mr. Blust has also conducted a tax dispute practice in federal and state courts.

Prior to joining HSPRD, Mr. Blust was a partner at Barnes & Thornburg, where he served as the head of its Chicago Corporate and Business Department. Prior to that, Mr. Blust was a partner at Jenner & Block, where he was the head of the transitional Tax Department for over 20 years and was on the firm's Management Committee for 15 years.

Prior to receiving his law degree, Mr. Blust received a degree in accounting and an Illinois CPA Certificate and worked for PricewaterhouseCoopers.

## EDUCATION

▶ University of Illinois College of Law (J.D. 1968)
  – Valedictorian
  – University of Illinois Law Review
▶ University of   Illinois at Urbana   -Champaign (B.S. Accounting 1965)
  –         Co-valedictorian

## ADMISSIONS

**BAR ADMISSIONS**
▶ Illinois (1968)

**COURT ADMISSIONS**
▶ Illinois Supreme Court
▶ U.S. Court of Appeals for the Seventh Circuit
▶ U.S. District Court for the Northern District of Illinois – Trial Bar
▶ Tax Court
▶ Court of Federal Claims

## PROFESSIONAL RECOGNITION

▶ AV Preeminent™ Rating by Martindale Hubbell
▶ Selected by peers as Super Lawyer (2005 to Present)
▶ Selected by peers as Leading Lawyer in the areas of Closely & Privately Held Business Law, Corporate Finance Law, Gaming and Casino Law, Mergers & Acquisitions Law, and Tax Law: Business
▶ Law Member of Illinois CPA Board of Examiners (1978 – 1981)

**EXHIBIT 87**

ND_004817

## MEMBERSHIPS/ ASSOCIATIONS

### CIVIC / COMMUNITY

► Member, Board of Directors, Bailiwick Chicago

► Founding Director, Wisdom Bridge Theater (a not-for-profit theater)

► Founding Director, Chicago Moving Company (a not-for-profit dance company)

► Former Member, Board of Directors, Victory Gardens Theatre

► Former Chairman of Operation & Finance Committee and Member, Board of Directors, Augustana Hospital

► Former Member, Board of Directors, Lutheran General Hospital

► Former Member, Board of Directors, Lincoln Park Conservation Association

► Former President and Member, Old Town Triangle Association

► Member, Neighborhood Urban Renewal Advisory Board by appointment of Mayor Byrne and Mayor Daley

► Mr. Blust has also been active in Chicago neighborhood organizations and in zoning and planning matters

## MERGERS AND ACQUISITIONS

Mr. Blust represents buyers and sellers in M&A transactions, including complicated tax structuring and cross border

transactions. Some of his specialized niche areas are tax-exempt entity acquisitions and LLC acquisition structures minimizing tax on retained minority interests and Hart-Scott -Rodino filings. Recent transactions include:

► Sale of two consulting practices for large consulting firm

► Joint venture between state university and a publisher on financial index

► Acquisition of beer distributorship

► Sale of manufacturer with Canadian and European operations

## TAX REPORTING, CONSULTING, AND CONTROVERSIES

Mr. Blust represents taxpayers at the audit, appellate, administrative hearing, and court levels regarding federal income, estate, and excise taxes and state and local income, sales, use, and franchise taxes. Recent matters include:

► Settlement of TEFRA audit

► Settlement of Chicago lease and use tax matter at administrative hearing level

► Settlement of federal accumulated surplus tax case at appeals

In addition to representing taxpayers in controversies, Mr. Blust counsels on situsing to minimize state and local taxes, handles unclaimed property audits and issues, develops structures for foreign clients for investments in the U.S. and negotiates and drafts tax reimbursement (secondment) agreements and tax allocation agreements regarding U.S. employees and operation located overseas. Mr. Blust also consulted for a former governor regarding Illinois tax legislation, including a possible gross receipts tax and regarding film tax credits.

## TAXABLE AND TAX EXEMPT BONDS

Mr. Blust has acted as bond counsel, borrower's counsel, underwriter's counsel, issuer's counsel, and credit enhancer's counsel on virtually every type of tax exempt and taxable bond. He was a pioneer on 501(c)(3) and Indian bonds and various synthetic bond and credit enhancement structures. Recent taxable bond transactions include the financing of a number of failed condominium project loans for several community banks by taxable variable rate demand bonds credit enhanced by Federal Home Loan Bank back to back letters of credit.

Recent tax-exempt bond transactions include:

► Issuer's counsel on 2009 and 2010 Central DuPage Hospital bonds of $90 million and $240 million respectively

► Bond and borrower's counsel on $50,000,000 re-credit enhancement of housing bonds

► Several low and moderate income housing financings involving tax credits as well as tax exempt   bonds

## INFRASTRUCTUREINANCING

Mr. Blust represents developers in structuring and financing infrastructure projects under public/private partnerships such as a toll road as to which he has represented the owners in over $2 billion in partnership financings  and refinancings. In addition, he represented the same owners in $1 billion of mezzanine financing based on excess rated debt service coverage.

Mr. Blust also represents one of the largest developers and financers of federal and state office buildings in  federal, state, and local government financings of buildings rented to government agencies in D.C. and other locations.

Mr. Blust is currently representing a client proposing to purchase and finance two partially completed nuclear reactors. This project also involves advanced nuclear facility production tax credits.

# DEPOSITION EXHIBIT

# 88

Message

| | |
|---|---|
| **From:** | Larry D. Blust [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A3BEB81C98844ECB863088FDA63CFF42-LARRY BLUST] |
| **Sent:** | 10/3/2016 3:50:12 PM |
| **To:** | WILLIAMS Lee (AREVA) [Lee.Williams@areva.com] |
| **Subject:** | RE: P&S contract draft |

Please don't send out string emails like this  which includes our comments on P&S agreement.

**From:** WILLIAMS Lee (AREVA) [mailto:Lee.Williams@areva.com]
**Sent:** Monday, October 03, 2016 10:10 AM
**To:** Frank Haney <frankhaney@flhcompany.com>; john.debruin@aecom.com; Larry D. Blust <lblust@HSPLEGAL.COM>; bill@wrmccollum.com
**Subject:** RE: P&S contract draft

To my knowledge, we have access to the docs needed. What is needed now is the authorization to proceed based on our estimate.

Lee

*H. Lee Williams*

*Senior Vice President – IB-A Projects*
AREVA NP
*Office- 704-805-2065*

*Cell - 704-617-1913*

**"Having just the vision's no solution; _Everything depends on Execution._"**
-- Stephen Sondheim,
composer and lyricist

*The information in this e-mail is AREVA property and is intended solely for the addressees. Reproduction and distribution are prohibited. Thank you.*

**From:** Frank Haney [mailto:frankhaney@flhcompany.com]
**Sent:** Monday, October 03, 2016 10:23 AM
**To:** john.debruin@aecom.com; WILLIAMS Lee (IB); lblust@hsplegal.com; bill@wrmccollum.com
**Subject:** Fwd: P&S contract draft

Did y'all get docs requested from my secretary from Tva except for cash flow items discussed below? If you need more let me know.

EXHIBIT
88

ND_005144

Frank

Sent from my iPhone

Begin forwarded message:

> **From:** Natasha Carey <natasha@flhcompany.com>
> **Date:** October 3, 2016 at 10:11:49 AM EDT
> **To:** Frank Haney <frankhaney@flhcompany.com>
> **Subject: RE: P&S contract draft**
>
> Frank,
>
> It was sent to John Debrum, Larry Blust, Lee Williams, and Bill Mccollum.
>
> Best Regards,
> Natasha Carey
> Executive Office Manager
>
> Franklin L. Haney Company
> 1250 Maryland Avenue SW, Suite 503
> Washington, DC 20024
> Tel: (202)479-1101
> Fax: (202)479-1106
> Email: natasha@flhcompany.com
>
> **From:** Frank Haney
> **Sent:** Monday, October 03, 2016 10:00 AM
> **To:** Natasha Carey
> **Subject:** Fwd: P&S contract draft
>
> Did you send all new Tva docs to AREVA and bill and Larry?
>
> Frank
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Carrie O'Neill <coneill@ceadvisors.com>
>> **Date:** October 3, 2016 at 9:47:07 AM EDT
>> **To:** "Larry D. Blust" <lblust@HSPLEGAL.COM>
>> **Cc:** Franklin Haney <flh@flhcompany.com>, Frank Haney
>> <frankhaney@flhcompany.com>, "bill@wrmccollum.com" <bill@wrmccollum.com>
>> **Subject: RE: P&S contract draft**
>>
>> Thank you, Larry. We can discuss these issues tomorrow. I have circulated them to
>> the TVA team.
>>
>> Frank,
>> I know TVA is still working to get you the cash flow items from the list you sent us
>> last week. The other documents were posted to DataSite. Have you been able to get
>> access to those? I just want to check with you again that you are not expecting to

CONFIDENTIAL

ND_005145

discuss any of those documents in detail tomorrow. Jim Chardos will be at the meeting, but no one else from the engineering group will be there. Also, many of the folks involved in Bellefonte for TVA are no longer at TVA.
See you all tomorrow,
Carrie


**From:** Larry D. Blust [mailto:lblust@HSPLEGAL.COM]
**Sent:** Sunday, October 02, 2016 5:53 PM
**To:** Carrie O'Neill <coneill@ceadvisors.com>
**Cc:** Franklin Haney <flh@flhcompany.com>; Frank Haney <frankhaney@flhcompany.com>; bill@wrmccollum.com
**Subject:** P&S contract draft

In order to facilitate the discussion under the second item of the second bullet in the revised meeting agenda, we have the following concerns and/or needs for clarification regarding the proposed purchase and sale contract:

A.   What buying:
1.   Recital C; 3(e); Deed 1B. The pole yard training center should be part of the property conveyed. We are willing to give TVA an easement for use as well as access as stated in our indicative bid.
2.   1(c); 9(a)(ii). The records should be part of the purchase price. Section 9(a)(ii) appears to provide the needed access preclosing so there is no reason these should only be provided post closing or at additional cost.
3.   1(d)   Without Schedule 1(d) it is impossible to tell what contracts are being assigned and assumed. Of crucial importance is the contract for the generators/turbines. This issue is also related to 6(a)(vi) and Schedule 6(f) required consents The last sentence of 1(d) should be eliminated and TVA should have an obligation to transfer these contracts with any consents required being a closing condition under 6(f) which can be waived by the buyer. In addition as to the generator contract and any other crucial contract there should be the normal saving clause that, if a required consent is not given, TVA will perform the post closing obligations at Buyer's expense and for its benefit.
4.   1(e). Similar to item 3 above, the last sentence of 1(e) stating that if the license transfer is not approved in 1 year, TVA no longer has an obligation to get it transferred needs to be eliminated and the transfer of the license needs to be a condition to closing by making approval of transfer a required consent in Schedule 6(h).
5.   3(a): Deed 1E. What are the large components to be removed? We need to see Schedule 1(d).
6.   3(d): 12(d); Deed 1C & D. What is the purpose of the two easements in (ii) & (iii) for the switchyard and fiber optic system and how does this affect our use?
7.   5(c)(ii). What electrical components need to be relocated off site and why should the Buyer pay for this?
8.   Deed 1F & 2D & G. As we stated in the indicative bid, we need verification that the two flood plain restrictions do not interfere with the plants' operations.

CONFIDENTIAL

B. Reimbursable expenses:

1. 5(c). We cannot accept a requirement to reimburse "certain cost and expenses" which are defined only by certain items which are included. We agreed to pay for the appraisal and additional environmental work on closing but we never contemplated or discussed paying for surveys, administrative staff of TVA, Concentric payments, or "other associated administrative costs". These are customarily seller's costs of sale. What is your proposed cap?

2. 21. Section 21 provides that these costs will be paid by Buyer whether or not the transaction closes. This was not our understanding and makes no sense in that the TVA would get reimbursed even it was responsible for not closing.

C. Closing Conditions:

1. 6(a)(vi). Assuming that Item A3 &4 discussed above are required consents under 6(a)(vi), these items are taken care of.

2. 6(a)(i); 11(a)(iv)(B). This should be eliminated as to us since TVA should know now that this is true given the extra environmental work.

3. Additional conditions:

(a) As stated in our indicative bid, there needs to be a contingency for financing In the form of a DOE loan commitment acceptable to Buyer or an alternative commitment for $10.6 billion.

(b) We should have the right to obtain a satisfactory title commitment and title insurance at our expense (even though this generally is a seller cost) since this will be a requirement for financing.

(c) A transmission agreement with TVA providing both for maintenance and use of the lines and for the right to upgrade them to get the power out of the facility to the nearest connection to the grid.

D. Termination Provisions:

1. 11(a)(v)(A). This cannot work since there is no time period and thus should be eliminated leaving only the outside date in B. The parties should discuss if the time in B is adequate.

2. 11(c). This provision appears to be misdrafted since 11(a) (iv) do not relate to anything done by Buyer but are things outside the parties control.

E. Drafting issues.

1. There is no section 11(b).

2. 16(a) refers to 13(a)(viii) which does not exist. I could not tell what this was intended to refer to.

3. In the Recitals to the P&S agreement and the deed there are elaborate and unnecessary references to the sales process. Not only are these the type of thing that should appear, if at all, only in resolutions, they are incorrect in stating that a public auction is required to sell this property. We sent TVA a white paper which clearly established that a private sale is authorized by the TVA Act and in fact has been used by TVA before in disposing of surplus property and that there are many types of public sales authorized by federal procurement regulations that do not resemble what is happening here. Moreover, it is our understanding that other factors than price were being considered as the requirement for additional investment in the deed clearly establishes. This recitation should be deleted. It seems to just give an objector a grounds for trying to challenge the deal.

CONFIDENTIAL

ND_005147



**Larry D. Blust**, *Attorney*
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 W. Madison St., Suite 4000
Chicago, IL 60602
Dir **312.604.2672**  Fax **312.604.2673**

lblust@hsplegal.com

ND_005148

# DEPOSITION EXHIBIT

## 89

Message

| | |
|---|---|
| **From:** | Larry D. Blust [lblust@HSPLEGAL.COM] |
| **Sent:** | 10/18/2016 9:01:58 PM |
| **To:** | Carrie O'Neill [coneill@ceadvisors.com] |
| **CC:** | Franklin Haney, Sr. [flh@flhcompany.com]; Frank Haney [frankhaney@flhcompany.com]; Bill Mccollum [bill@wrmccollum.com] |
| **Subject:** | Emailing - O'Neill ltr 10.18.16 Bellefonote Purchase and Sale Agmt (00713615x9D9DD).pdf |
| **Attachments:** | O'Neill ltr 10.18.16 Bellefonote Purchase and Sale Agmt (00713615x9D9DD).pdf |

Nuclear Development LLC ("ND") would like to accommodate your client's desire to have an auction in which all qualified interested parties willing and able to bid the $36.4 million minimum purchase price bid on the same terms even though ND, because of its intent to complete the plants at a cost in excess of $13 billion, needs some different terms. We appreciate your effort to revise the contract to accommodate our client's needs. The contract is not there yet, however.

So you don't have to guess what we need I have attached a letter that contains the actual changes required. Please call me with any questions you have.



EXHIBIT

89

ND_005159

**HUGHES
SOCOL
PIERS
RESNICK
DYM,** LTD. hsplegal.com

70 West Madison Street
Suite 4000
Chicago, Illinois 60602
T. 312.580.0100
F. 312.580.1994

Larry D. Blust
Direct Line: 312.604.2672
Direct Fax: 312.604.2673
Email: lblust@hsplegal.com

October 18, 2016

<u>Via Email Delivery:</u> coneill@ceadvisors.com
Carrie O'Neill
Concentric Energy Advisors
293 Boston Post Road West, Suite 500
Marlborough, MA 01752

Dear Carrie:

We have reviewed your revised Bellefonte Purchase and Sale Agreement ("P&S Agreement") and the changes you made in regard to our concerns so Nuclear Developing LLC ("ND") can meet the terms for bidding at the auction. Unfortunately, your latest draft still does contain terms that ND could agree to as a condition to bidding at the auction and/or bidding the minimum price. The following changes are necessary to achieve that result:

1.    <u>Licensing Issue</u>:

We appreciate you allowing two years to close but your revisions do not allow a closing to occur in less than 2 years if the conditions precedent are met. Our client needs to close as soon as possible. The two constraining conditions are final environmental signoff and approval by the NRC of the construction license transfers. To achieve this result the following changes need to be made:

(a) revise the first sentence of 5(a) to read as follows:

The closing of the transaction contemplated by and under this Agreement (the "Closing") shall occur as soon as practicable (but in no event more than thirty (30) calendar days) after all conditions set forth in <u>Section 6</u> below shall have been satisfied (or stand ready to be satisfied at Closing) or waived by the party to whom the condition benefits.

(b) add after 6 (a) (v) the following and renumber (vi) as (vii):

(vi) unless Buyer informs TVA that it does not require transfer of the Permits listed in <u>schedule 11(e)</u>, approval by the applicable Governmental Authorities of the transfer of such Permits to the Buyer.

Thirty years of excellence.

ND_005160

Carrie O'Neill
Concentric Energy Advisors
October 18, 2016
Page 2

✦HSPRD

(c) Revise 11(a)(iv) by adding at the end of (B) the words "or fails to make the determination required in closing condition 6(a)(i) on or prior to November 13, 2018" and add the following after (C) "(D) closing condition 6(a)(vi) (if applicable) has not occurred by November 13, 2018, or (E) closing condition 6(a)(ii) has not occurred by November 13, 2018.

(d) Delete 11(a)(v), make 11(a)(vi) into (a) (v) and revise it to read:

(v) By Buyer at its convenience at any time prior to the earlier of Closing or November 13, 2018, upon written notice to TVA.

(e) Revise 11(b) to read as follows:

Upon any termination or expiration of this Agreement pursuant to Section 11(a)(iii) or 11(a)(v), TVA shall be entitled to retain the Down Payment and any Cost Reimbursements paid by Buyer to the date of termination as liquidated damages and not as a penalty resulting from such termination. If termination occurs for any other reason, TVA shall return the Down Payment and any Cash Reimbursements paid by Buyer to Buyer within 30 days by check or electronically as directed by Buyer.

2.    Cost and Reimbursement Issues.

Obviously, no one can agree to this P & S Agreement with unknown obligations for costs and reimbursements.

(a) Thus, the amount in 1(f) for estimated salvage value must be filled in and ND (which is probably the only potential bidder interested in this) must have approved it. Please provide this number and backup as soon as possible. Also, since the closing date will no longer be an outside date certain, please provide the terms of storage cost.

(b) In 5(c), the numbers need to be filled in and (i) and (ii) need to be actual numbers not estimates and should have separate amounts for each. Number (iv) needs to be only the additional environmental costs for the successful bidder's use. It is thus difficult to understand how you can have an estimated number for all bidders.

(c)    New Section 12 (e) apparently will apply only to ND. ND will not pay TVA's costs of maintaining the property which TVA would have to incur for any Buyer and which are incurred before TVA has met its environmental conditions for sale. If ND is the highest bidder these maintenance costs simply reflect what it takes to get more for the property. Thus, ND believes this new provision should be deleted. As a compromise ND would agree to the following:

(i) the quarterly fee amount filled in would represent only the excess of the cost of NRC requirements over what TVA would otherwise have to pay.

Thirty years of excellence.

CONFIDENTIAL

ND_005161

Carrie O'Neill
Concentric Energy Advisors
October 18, 2016
Page 3

✦ HSPRD

(ii)  the charge would apply only after TVA met condition 6(a)(i) and (ii) since TVA could not sell the property until these conditions are met.

(iii) the charge would be refunded if the sale fails to close for a reason entitling ND to a refund of Reimbursements and the Down Payment.

(iv)  these amount are paid only to the extent they exceed ND's purchase price reduced if there are another qualified bidders by the amount bid by any other qualified bidders. This, if there were no other qualified bidders there would be no maintenance charge paid until the charges exceeded $36.4 million. On the other hand, if ND bid $37.0 million and someone else bid $36.4 million, the charge would apply only to the extent the total exceeded .6 million.

The proposed wording for this alternative would read:

Notwithstanding anything provided herein, if Buyer elects to have TVA continue to maintain assets that support completion and operation of the two unfinished nuclear units in a manner sufficient to meet NRC quality control requirements until Closing, Buyer shall pay TVA $_____ per quarter (every three-month period from the date that both closing conditions 6(a)(i) and (ii) have been satisfied until the Closing or termination) by wire transfer without further invoicing or billing by TVA, provided that no such payments shall apply until the aggregate cumulative amount which would otherwise be due exceeds the Purchase Price less, if there are any other qualified bidders for the Property, the highest amount bid by such qualified bidders and provided further that, if the Agreement is terminated per Section 11, any amount so paid shall be refunded to Buyer if the Deposit and the Reimbursable Costs are refunded to Buyer.

(b) the reference in 21 to 11(c) is a mistake and should be to 11(b).

ND wishes to be able to bid at TVA's auction, but the above issues must be resolved before it can submit your required statement of intent.  Please contact me if you have any questions.

Larry D. Blust

Thirty years of excellence.

CONFIDENTIAL

ND_005162

# DEPOSITION EXHIBIT

# 90



October 24, 2016                                                    VIA E-MAIL DELIVERY

Larry D. Blust
Hughes, Socol, Piers, Resnick & Dym, Ltd.
70 West Madison Street
Suite 4000
Chicago, Illinois 60602

RE: POTENTIAL SALE OF BELLEFONTE NUCLEAR PLANT SITE

Dear Mr. Blust,

This letter responds to your October 18, 2016 letter to me regarding the revised Purchase and Sale Agreement (Agreement) for the Bellefonte Nuclear Plant Site (BLN Property) TVA has carefully considered the changes you requested to the Agreement and thought it would be helpful to provide its response before the Agreement is released in final.

TVA has offered to meet with all interested entities of the BLN Property before the final stage of the auction process to discuss any issues they have and get comments on the draft Agreement. As you know, TVA and Concentric met with you and representatives of your client, Nuclear Development LLC, including Franklin Haney on October 4, 2016. You reported on your client's progress in arranging financing to complete the two partially-constructed nuclear reactors on the BLN Property and in obtaining the approval of the Nuclear Regulatory Commission (NRC) to transfer TVA's permits to construct the two units. You said that your client needed to be able to show that it was "the winner" at the public auction before November 23, 2016 and that time was needed to complete financing and transfer of the permits before your client would fully commit to purchase and invest in the BLN Property. You estimated that it would take one year to complete financing and to obtain NRC approvals after the auction, but could take as long as two years.

TVA's objective in selling the BLN Property is to stimulate economic investment at the site to the benefit of the area and surrounding communities. Because it is unlikely that TVA will need additional baseload generation or use the site for 20 or more years, TVA is offering to sell the site to determine if some other entity could productively use the site and will commit to invest in it. It would not serve the area well to transfer the site to another entity that would simply continue to sit on it for years.

Accordingly, TVA has informed interested entities that it would not accept open-ended contingencies that would allow the successful bidder to defer investing in the site for an unlimited period of time. After Concentric's discussions with multiple potential bidders, TVA recognizes that providing the successful bidder more time to address whatever contingencies a bidder may encounter could encourage more bids and would be reasonable. The draft Agreement was revised to do this by deferring closing for two years at which time the full purchase price would have to be paid. The Agreement also would start a minimum investment period one year after this deferred closing date. That is consistent with the outer time period needed by your client and results in a closing date of November 14, 2018, assuming the public auction is held next month on November 14. A deferred closing also provides TVA time to conclude its activities and vacate the site. The deferred closing will, therefore, address concerns you had raised regarding those activities in your October 2, 2016 email and in our recent meeting.

EXHIBIT

9U

293 BOSTON POST ROAD WEST, SUITE 500 • MARLBOROUGH, MASSACHUSETTS 01752 • TEL 508 263 6200 • FAX 508 263 3500

ND_000415



Here are TVA's responses to your specific requests:

1.  Licensing Issue:

    a.  You have stated that your client needs to close as soon as possible and ask that the deferred closing language be removed. This is not consistent with what you told TVA in our meeting on October 4, 2016. TVA believes the deferred closing is a reasonable compromise that allows potential bidders, including your client, sufficient time to resolve contingencies and also provides TVA time to vacate the site without having to establish rights to continue to use the site to do this. If a Buyer can resolve its contingencies and TVA can wrap up its activities sooner than November 14, 2018, TVA will in good faith work with the Buyer to advance the closing date.

    b.  You ask that TVA condition closing on the successful bidder obtaining identified environmental permits and transfer of the two NRC construction permits. Based on your statements, the two-year deferred closing should be more than sufficient time for your client and any other bidder who may be interested in a transfer of the permits to accomplish this. Your proposed condition is the kind of open-ended contingency that TVA will not accept and the Agreement will not be changed as you request.

    c.  You ask that TVA modify one of the termination provisions to allow termination of the Agreement if its Chief Executive Officer does not determine that potential environmental impacts have been appropriately considered and found acceptable by November 13, 2018. TVA thinks that allowing termination of the Agreement at the Buyer's discretion before the closing date (November 14, 2018) addresses this, but is not opposed to revising this provision to make that clearer and will do this.

    d.  You ask that the Agreement be modified to remove a party's right to terminate the Agreement if closing has not occurred on or prior to November 14, 2018. Because TVA is retaining the deferred closing approach in the Agreement, this termination provision is needed and will be retained.

2.  Cost and Reimbursement Issues:

    a.  You ask that TVA modify the Agreement to limit its right to retain the down payment and any cost reimbursement payments only if the Agreement is terminated because of a Buyer breach or if the Buyer terminates the Agreement at its convenience before closing. In addition to these events, the Agreement is currently drafted to allow TVA to retain payments if the Agreement is terminated by mutual consent or if closing does not occur by the deferred closing date, November 14, 2018. TVA thinks it is appropriate to retain payments for these other two events.

    The Buyer will be able to take into account TVA's retention of any payments before agreeing to terminate the Agreement by consent. If payment retention is a sufficient disincentive to agree to termination, the Buyer does not have to consent. The deferred closing will allow a successful bidder time to address contingencies before having to close on the site and complete payments. This is akin to a two-year option to acquire the site and is obviously valuable. TVA is not willing to make your requested change.

ND_000416



b.   You state that bidders should not be expected to commit to signing the Agreement if payment-related information is not provided. TVA agrees and I have provided you an updated version of the Agreement that includes the reimbursement information.

c.   Finally, you request that Section 12(e) be significantly changed. That section now provides that TVA is willing to continue to maintain nuclear plant components consistent with NRC requirements until closing if a Buyer asks TVA to do this and agrees to pay TVA the increase over normal maintenance costs. Your position is that your client will not agree to pay normal site maintenance costs. I have subsequently explained that the $875,000 quarterly charge in the Agreement is limited to the increase in NRC-driven maintenance costs.

You propose to begin the payment of these increased maintenance costs after TVA completes the environmental review process and remediation of any environmental substance contamination. You also propose a complicated formula that appears to make these payments dependent on their aggregating to the purchase price for the site or some variation of that. Finally, if this hurdle on payments is crossed, you would require reimbursement of any payments that are made if the Agreement is terminated under Section 11. That would include termination at the Buyer's discretion. This is not acceptable to TVA. These NRC-driven maintenance costs would result only if the Buyer asks TVA to continue to do this level of maintenance. It is appropriate and fair that a Buyer reimburse TVA these costs.

TVA paid close attention to the concerns that you and your client representatives raised in our meeting. It adjusted the sale structure in a way that gives your client the opportunity to secure the site for just 20% of the purchase price and, if your client's project fails to materialize for any reason for two more years, allows your client to terminate the arrangement without paying the remaining 80% of the purchase price. You asked that TVA make the two steam generators that are being fabricated for the plant part of the sale. These generators are uniquely designed for the Bellefonte plant and cannot be used elsewhere. They do, however, have scrap value. Accordingly, TVA revised the Agreement to allow a buyer to acquire the steam generators for their scrap value. On the other hand, these generators are necessary to complete the nuclear plant and have a value of almost $170 million for a buyer that needs them. Selling them for scrap value is a significant concession and should be a substantial incentive for any entity who plans to finish the plant.

Based on what you and your client said in our meeting, TVA believes the revisions it has made to the Agreement should be sufficient to address any legitimate concerns and enable your client to submit a conforming bid. TVA hopes that your client chooses to do so and participates in the public auction on November 14, 2016.

Sincerely,

Carrie O'Neill

Carrie O'Neill
Concentric Energy Advisors

CON/vlp

---

ND_000417

# DEPOSITION EXHIBIT

# 91

**To:**     Larry D. Blust[lblust@HSPLEGAL.COM]
**From:**   Chardos, James S[jschardos@tva.gov]
**Sent:**   Wed 8/29/2018 9:09:00 PM (UTC)
**Subject:** RE: Letter
<u>ND to TVA Extension Letter Rev 2.pdf</u>

ange made  will send out tomorrow in the am
Thanks


Jim Chardos
Site Manager Bellefonte Nuclear Plant
Nuclear Projects

2744 Bellefonte Road
Hollywood,Alabama 35752
256 574-8228
Cell  423 309-7072
jschardos@tva.gov

**From:** Larry D. Blust [mailto:lblust@HSPLEGAL.COM]
**Sent:** Wednesday, August 29, 2018 3:41 PM
**To:** Chardos, James S
**Subject:** RE: Letter


**TVA External Message. Please use caution when opening.**

I suggest changing the words "necessary for" to  "to accommodate".  Otherwise looks great.

**From:** Chardos, James S <jschardos@tva.gov>
**t:** Wednesday, August 29, 2018 3:30 PM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:** Letter


Jim Chardos
Site Manager Bellefonte Nuclear Plant
Nuclear Projects

2744 Bellefonte Road
Hollywood,Alabama 35752
256 574-8228
Cell  423 309-7072
jschardos@tva.gov

EXHIBIT
tabbies
91

ND_004070

# DEPOSITION EXHIBIT

# 92

**To:** Larry D. Blust[lblust@HSPLEGAL.COM]
**From:** Chardos, James S[jschardos@tva.gov]
**Sent:** Tue 11/6/2018 5:18:36 PM (UTC)
**Subject:** RE: Did we get any feedback

I don't know nothing about TVA public relations and a list of employees.  Franklin just called me a few minutes ago seeing if I had on when Bill Johnson would get back to him. Need to talk later on insurance, etc.
Thanks

Jim Chardos
Site Manager Bellefonte Nuclear Plant
Nuclear Projects

2744 Bellefonte Road
Hollywood,Alabama 35752
256 574-8228
Cell  423 309-7072
jschardos@tva.gov

**From:** Larry D. Blust [mailto:lblust@HSPLEGAL.COM]
**Sent:** Tuesday, November 06, 2018 11:09 AM
**To:** Chardos, James S
**Subject:** RE: Did we get any feedback

**TVA External Message. Please use caution when opening.**

Per Cliff Beach, Bill Johnson is meeting with Memphis City Council this  afternoon and will not make up his mind until after that meeting.  Also Cliff said someone called TVA public relations saying they represented ND and wanted a list of employees.  Do you know anything about that?

**From:** Chardos, James S <jschardos@tva.gov>
**Sent:** Tuesday, November 06, 2018 10:15 AM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:** RE: Did we get any feedback

Anything today
Thanks

Jim Chardos
Site Manager Bellefonte Nuclear Plant
Nuclear Projects

2744 Bellefonte Road
Hollywood,Alabama 35752
256 574-8228
Cell  423 309-7072
jschardos@tva.gov

**From:** Larry D. Blust [mailto:lblust@HSPLEGAL.COM]
**Sent:** Monday, November 05, 2018 5:16 PM
**To:** Chardos, James S
**Subject:** RE: Did we get any feedback

EXHIBIT
92

**TVA External Message. Please use caution when opening.**

No.  Bill Johnson called Franklin this am and said he would get back to him this afternoon but I just talked to Franklin and so far that has not happened.  I have called Sherry and Cliff several times today but have not gotten a return call.

ND_004315

**From:** Chardos, James S <jschardos@tva.gov>
**Sent:** Monday, November 05, 2018 4:37 PM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:** Re: Did we get any feedback

thing yet

Sent from my iPhone
On Nov 2, 2018, at 7:38 PM, Larry D. Blust <lblust@HSPLEGAL.COM> wrote:

TVA External Message. Please use caution when opening.

TVA has now delayed a response to Monday giving the excuse that Bill Johnson is in London.

**From:** Chardos, James S <jschardos@tva.gov>
**Sent:** Friday, November 02, 2018 3:15 PM
**To:** Larry D. Blust <lblust@HSPLEGAL.COM>
**Subject:** Did we get any feedback

**DEPOSITION EXHIBIT**

**93**

**To:**      lblust@hsplegal.org[lblust@hsplegal.org]
**Cc:**      Chardos, James S[jschardos@tva.gov]
**From:**    Akstulewicz, Frank
**Sent:**    Mon 4/17/2017 12:09:18 PM
**Subject:** update on current Bellefonte progress

**TVA External Message. Please use caution when opening.**

Hi Larry

It's been a couple of months since we spoke... any insights into progress on licensing activities for the license transfers, construction organization, or the setup for a licensing organization would be great to hear – especially timelines for getting that in place.

We have selected the lead licensing project manager for your project and would like to engage with your staff on the working level to discuss activities going forward.

Frank Akstulewicz
Director, Division of New Reactor Licensing
NRC
301-415-2248
frank.akstulewicz@nrc.gov



EXHIBIT

93

Confidential

# DEPOSITION EXHIBIT

# 94

**To:**       Quirk, Sherry Ann[saquirk@tva.gov]
**Cc:**       Franklin Haney, Sr.[flh@flhcompany.com]; Frank Haney[frankhaney@flhcompany.com]
**From:**     Larry D. Blust[lblust@HSPLEGAL.COM]
**Sent:**     Wed 10/24/2018 6:00:26 PM (UTC)
**Subject:**  Follow up
2018_10_24_12_55_26.pdf

Per our meeting yesterday, a list of our talking points is attached. I left you messages this am to discuss any suggestions you have on these as a result of our meeting yesterday. Please let me know if you have any suggestions for changes



Following up on our meeting, Nuclear Development LLC ("ND") would be willing to discuss the following to resolve any issues with TVA regarding Memphis:

- ND recommending to Memphis a partial requirements contact between Memphis and TVA with ND providing base power to the extent generated by Bellefonte unit one to Memphis and TVA providing the balance of Memphis Power needs at its regular price including excess base power, peak power and backup power.

- ND would arrange for the delivery of Bellefonte power to Memphis through TVA's transmission system at TVA's tariff rates with ND funding any needed upgrades to TVA's transmission system.

- TVA becoming the operator of the Bellefonte plants at market rates including fees for training.

- A TVA equity interest in ND as to Unit 1.  This would be a carried interest with TVA not contributing any capital to ND but receiving a 50% interest in the profits from Unit 1 such profit to be paid 50% to TVA after invested capital plus an 8% priority rate of return is received by the other ND owners.  DOE financing is not recourse to ND members so TVA would have no obligation to contribute capital.  All tax credit proceeds would inure to the benefit of the other ND members.  This and the operator position would depend on OMB approval under the Appropriations Act of 2009.

- A 6 month closing extension on ND's purchase contract on commercially agreed terms.

00912365.DOCX