FILED

2020 Oct-07  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

TVA Tract No. XBEGP-3

### BELLEFONTE NUCLEAR PLANT SITE
### PURCHASE AND SALES AGREEMENT

      THIS PURCHASE AND SALES AGREEMENT (this "Agreement") is entered into as of the 14th day of November, 2016 (the "Effective Date"), by and between THE UNITED STATES OF AMERICA, ACTING BY AND THROUGH THE TENNESSEE VALLEY AUTHORITY ("TVA") and NUCLEAR DEVELOPMENT, LLC, a Delaware limited liability company ("Buyer") (TVA, on the one hand, and Buyer on the other hand, are each referred to herein as a "Party" and collectively as the "Parties)."

### RECITALS:

A. TVA has custody and control of the Bellefonte Nuclear Plant Site, located in Jackson County, Alabama, including certain infrastructure and other assets located thereon (the "BLN Property");

B. The real property that comprises the BLN Property was acquired by the United States of America by virtue of the instruments of record identified in Schedule R.1(a);

C. The BLN Property nominally consists of approximately 1,600 acres; however, TVA excluded from sale most of the shoreline as well as two archeological sites, and the location where a sewer treatment plant is operated by the Jackson County Water Authority. In addition, TVA is excluding a pole yard training center that is used to train transmission line repair and maintenance personnel employed by TVA and members of the Tennessee Valley Public Power Association located on the Site (the "Pole Yard Training Center"), unless Buyer elects to take fee title to this center (as provided herein below) and if Buyer does so elect, TVA will retain a permanent easement to continue to use the Pole Yard Training Center;

D. With the exclusions referenced in Recital C above, the approximate acreage being conveyed by TVA to Buyer is approximately 1,400 acres and is described more fully in Schedule R.1(a) and shown on the survey in Schedule R.1(b) (the "Site"). TVA has drawn the Site boundaries to separate the acreage and associated assets at the Site from the acreage and portions of the BLN Property that will not be conveyed in a sale. TVA's primary objective in drawing these asset boundaries is to meet certain TVA programmatic needs and provide the Buyer with ownership and operating control of only that portion of the BLN Property necessary to optimize the use of the location and its long-term value. Accordingly, the auction sale included only those structures and improvements located on the Site;

E. The Site includes two partially-constructed B&W pressurized water nuclear reactors with associated infrastructure including, but not limited to, two cooling towers, reinforced containment buildings, spent fuel storage pools, water intake and discharge systems on the Tennessee River, two training centers in addition to the Pole Yard Training Center, office and warehouse buildings, diesel powered generators, a railroad spur, a helicopter landing pad, parking lots, and 161-kV and 500-kV switchyards and associated on-site transmission lines that are located within the boundaries of the acreage being sold;

F. The TVA Board of Directors at its regularly scheduled meeting on May 5, 2016 declared the Site to be surplus and authorized its sale in whole or in part at public auction under Section 31 of the Tennessee Valley Authority Act (subject to successful completion of any additional environmental reviews);

G. TVA through its consultant Concentric Energy Advisors, Inc. ("Concentric") and its own communications has widely advertised the availability of the Site for purchase, and provided



EXHIBIT
I
Johnson



EXHIBIT A

interested buyers the opportunity to access Site documents, tour the Site, and to meet with TVA management to discuss the purchase and sale;

H.   TVA used a two-stage auction process for the sale of the Site:  Stage 1 included an opportunity for interested buyers to submit on a confidential basis indicative bids to TVA describing their potential use of the Site, spend plan for investing in the Site and surrounding area, financial capabilities, and other information, and Stage 2 during which additional due diligence activities by interested buyers could be conducted leading to a public auction that was open to all interested buyers which were determined to be financially qualified ("Bidders");

I.   TVA established as the minimum acceptable bid for the Site the sum of Thirty-Six Million, Four Hundred Thousand U.S. Dollars ($36,400,000) based on a professional appraisal that was completed for TVA by Federal Appraisal and Consulting;

J.   TVA held a public auction open to all qualified Bidders starting at 9:00 a.m. (CST) November 14, 2016;

K.   Buyer participated in the public auction and TVA determined that Buyer made the highest and best bid in terms of sales price and investment schedule;

L.   TVA desires to sell the Site to Buyer and Buyer desires to purchase the Site; and

M.   TVA has acquired replacement steam generators (the "Steam Generators") for the two partially-constructed B&W pressurized water nuclear reactors pursuant to TVA Contract No. 4088 between TVA and Babcock & Wilcox Canada Ltd. (the "B&W Contract")  The Steam Generators are being manufactured in Canada and are scheduled to be completed by May 31, 2017.  As further set forth herein, TVA is willing to grant an option to Buyer to purchase the Steam Generators on the terms set forth herein.

## AGREEMENT:

IN CONSIDERATION of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

**1.   Purchase and Sale.**

At the Closing (as defined in Section 5 below), TVA shall sell, transfer, convey, assign and deliver title and possession to Buyer, and Buyer shall purchase and pay for, all of TVA's right, title and interest in each of the following (the following items (a) through (f) being, collectively, the "Purchased Assets"):

(a)      All the real property comprising the Site (together with all buildings, structures, fixtures, and other improvements located thereon), all as more particularly described in Schedule R.1(a) and shown on the survey in Schedule R.1(b) (the "Real Property");

(b)      All materials, equipment, machinery, tools, parts, supplies, consumables (meaning any and all of the expendable materials, supplies and other items consumed at the Bellefonte Nuclear Plant facility (the "Facility") in the ordinary course of the operation of the Facility), tangible personal property and other such items present or held for use at the Facility;

(c)      If requested by Buyer within 180 days of Closing (as defined in Section 5 below), TVA shall provide within 90 days of being requested by Buyer, the following: all books, operating records, permitting records, quality assurance records, purchasing records, and equipment repair, maintenance or service records relating primarily or exclusively to the design, construction, permitting or operation of the

2

infrastructure located on the Site, including, but not limited to, the two partially-constructed B&W nuclear reactors; and all Site-related operating, safety and maintenance manuals, inspection reports, environmental assessments, environmental reports, engineering design plans, documents, blueprints and as built plans, specifications, procedures and other similar items of TVA, wherever located within TVA's facilities, relating primarily to the Site; whether in electronic or physical form, owned by and in possession or control of TVA at Closing (as defined in Section 5(a) below) other than the books and records of TVA excluded under Section 3(b) below (the "Facility Books and Records"); provided, however, that TVA shall have the right to retain copies of all such books and records described in this Section 1(c) for its use and shall treat as confidential certain of these records that Buyer designates as confidential to the extent permitted by law;

(d)       All assumed agreements and obligations (to include the benefit of any prepayments and deposits, if any, made for the account of the same, but excluding any agreements and contracts expressly requiring the consent of TVA's counter-parties prior to any assignment and assumption between TVA and Buyer) listed on Schedule 1(d) (the "Assumed Agreements"), if any, and as further provided in Section 2 below, as the same may be updated at Closing pursuant to Section 6(g)(i); and

(e)       To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e) (the "Permits"); provided, however, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this Section 1(e) shall not require TVA to certify that Buyer is qualified and fit to complete construction of and operate those reactors and, if Buyer informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this Section 1(e) by Closing, TVA's obligations under this Section 1(e) shall cease.

(f)       Any and all other assets owned, leased, licensed or contracted for by TVA and used at the Site as of the Closing (as defined in Section 5(a)) located on the Site, but specifically excluding those certain Excluded Assets as defined in Section 3 below and those listed in Schedule 3(a), if any.

**2.   Assignment and Assumption of Assumed Agreements and Assumed Liabilities.**

On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing (as defined in Section 5), Buyer shall assume, pay, discharge, perform and be responsible for the following obligations from and after the Closing (collectively, the "Assumed Liabilities"):

(a)       Obligations under the Assumed Agreements accruing on or after the Closing; and

(b)       Obligations and liabilities relating to the ownership and use of the Purchased Assets arising from and after the Closing, excluding TVA's Retained Environmental Liabilities (as hereinafter defined).

**3.   Excluded Assets.**

Notwithstanding Section 1, the Purchased Assets shall not include TVA's interests in the following agreements, assets and properties (the "Excluded Assets"), and Buyer shall have no liability with respect thereto:

(a)       Certain large components located on the Site, as delineated in Schedule 3(a), which TVA shall have the right to remove before Closing; provided, however, that if TVA has not removed such components within that time period and Buyer has not agreed to extend such time period, then Buyer shall take ownership of any of these components that remain on the Site;

(b)      Books and records of TVA not relating directly and materially to the Purchased Assets including either of TVA's minute books, tax records, financial statements, accounting records and related notes, records related to other Excluded Assets or Excluded Liabilities (as defined in Section 4 below), market projections, marketing materials, Bidder information, reports prepared for management, lenders, and affiliates of TVA, and appraisals and information prepared in connection with the sale of the Purchased Assets;

(c)      Rights of TVA arising under this Agreement, the Transaction Documents (as defined in Section 6(c) below), and any other instrument or document executed and delivered pursuant to this Agreement;

(d)      As further set forth in the Special Warranty Deed in the form attached as Exhibit A hereto (the "Warranty Deed"), the following retained easements: (i) a permanent non-exclusive easement to enter and leave the Pole Yard Training Center along Bellefonte Road for TVA's employees, contractors, agents, and invitees and (ii), if Buyer elects to take fee title to the Pole Yard Training Center under the terms set forth in the Warranty Deed, a permanent easement to continue to use the Pole Yard Training Center by TVA, its employees, and invitees subject to Buyer's right to reasonable control access at times that may be necessary under applicable permits or licenses; provided, however, that (A) Buyer shall be required to provide TVA with notice of its intent to elect to take fee title to the Pole Yard Training Center and enter into such permanent easement not less than thirty days prior to Closing, and (B) the easements described above in this subpart (d) shall include the right for Buyer or any successor-in-title to Buyer to: (y) place underground utilities on the Pole Yard Training Center provided that such easements do not interfere with TVA's use of the Pole Yard Training Center and provided, further, that TVA is fairly compensated for the location of such utilities and is reimbursed for its expenses in connection with such placement, and (z) relocate the Pole Yard Training Center and the access road thereto at any time, and from time to time, to another location on the Site or in the vicinity of the Site having, as determined by TVA in its reasonable discretion, comparable access, facilities, topography, utility for training linemen, at the cost and expense of the Buyer or the successor-in-title to Buyer requesting the relocation, which relocation shall be memorialized in a publicly recorded amendment to the easements, thereby releasing the former Pole Yard Training Center and access roads if applicable, thereto from the encumbrance of the former Pole Yard Training Center and access easements;

(e)      Acreage and fixtures outside the boundary of the Site, as depicted on the survey map found at Schedule R.1(b) and as more fully described in the legal description at Schedule R.1(a), including but not limited to (i) two areas that have been determined to have potentially-important archeological resources; (ii) areas along the shoreline that contain wetlands; (iii) the Pole Yard Training Center (unless Buyer elects to take fee title to this center), and (iv) the location where the Jackson County Water Authority operates a sewer treatment plant. Notwithstanding the foregoing, upon Buyer's request (which request shall be made by Buyer to TVA not less than thirty days prior to Closing), TVA shall provide Buyer an easement to access and use the metrological tower and associated equipment (the "Met Tower") located within the Pole Yard Training Center or, alternatively, TVA will allow Buyer to remove and relocate the Met Tower. Additionally, if TVA, in its sole discretion, ceases to use the Pole Yard Training Center at any time in the future, TVA shall convey the Pole Yard Training Center to Buyer  or, alternatively, shall terminate the permanent easement if the Buyer elected to take fee title to the Pole Yard Training Center at no additional cost;

(f)      The Steam Generators; provided, however, that Buyer shall have the option on or before Closing to purchase the Steam Generators and to assume (subject to consent from Babcock & Wilcox Canada Ltd.), all of TVA's rights and obligations under the B&W Contract upon advance written notice to TVA and payment to TVA of the additional sum of $1,193,130, which is the estimated scrap value of the Steam Generators.  In the event that Buyer elects to purchase the Steam Generators, TVA shall transfer ownership to Buyer upon payment of such amount by Buyer ; on or before Closing, Buyer shall be responsible for making arrangements to continue to store the steam generators or to have them delivered to another location;

(g)      Ownership of the 161-kV and 500-kV transmission line conductors and towers located on the Site to the points of terminus in the 161-kV and 500-kV switchyards on the Site including a permanent

4

easement to access and maintain this infrastructure; provided, however, that Buyer shall have the option to take ownership of this infrastructure by delivering written notice to TVA not later than thirty days in advance of the Closing. If Buyer exercises this option, this infrastructure shall be transferred with other transferrable assets on Closing;

(h)      Notwithstanding anything to the contrary in this Agreement, Buyer may control access to and use of the excluded real property that comprised the approximately 1,600 acres of the Bellefonte Nuclear Site that was acquired by the United States of America by virtue of the instruments of record identified in Schedule R.1(a) to the extent necessary to establish owner-controlled access for NRC permitting and licensing purposes and to the extent reasonable and consistent with the rights TVA reserves and the covenants Buyer makes in the Warranty Deed; and

(i)      Notwithstanding anything to the contrary in this Agreement, Buyer shall not be entitled to obtain or view the records relating to TVA's employees, both those working on the Site at and before Closing, and those working at other TVA locations or facilities, including salary and benefit information and any other personally identifiable information.

## 4. Excluded Liabilities.

Buyer shall expressly not assume and is not assuming pursuant to this Agreement any liability or obligation of TVA set forth below:

(a)      Obligations, liabilities or duties of TVA for (i) any environmental liabilities incurred, accrued, existing or arising during the period prior to Closing and related to the Purchased Assets, (ii) any liability or obligation to any Governmental Authority prior to Closing, and (iii) any contractual obligations not assumed under the Assumed Agreements (collectively, "TVA's Retained Environmental Liabilities");

(b)      Obligations incurred under Assumed Agreements prior to the Closing, including any obligations attributable to any failure by TVA prior to the Closing to comply with the terms of any such Assumed Agreement; and

(c)      Obligations or liabilities with respect to employees of TVA and contractors of TVA (unless such contractual obligations are Assumed Liabilities); regardless, in each case, of when a claim may be asserted;

each of the above Sections 4(a) through 4(c) being, collectively, the "Excluded Liabilities."

## 5. Closing and Purchase Price.

(a)      The closing of the transaction contemplated by and under this Agreement (the "Closing") shall occur on November 14, 2018; provided, however, that all conditions to the Closing set forth in Section 6 below shall have been satisfied or waived by the Party to whom the condition benefits. Closing shall take place at such location as the Parties may mutually agree. Provided that the Closing Condition set forth in Section 6(a)(i) has been satisfied and subject to the terms and conditions of this Agreement and the Warranty Deed, including but not limited to TVA's right under the Warranty Deed to undertake remediation activities subsequent to the Closing, Buyer shall have the right and option to elect to close the purchase of the Purchased Assets, and take title to the Purchased Assets on a closing date specified by Buyer, before TVA has completed its close-out activities at the Site, including removal of the Excluded Assets or the satisfaction of the condition set forth in Section 6(a)(ii), by Buyer giving TVA not less than sixty (60) days prior notice of the date Buyer elects to close the purchase of the Purchased Assets (for purposes of this Section 5(a), the "Early Closing Date"). Should Buyer exercise its option to close on an Early Closing Date, and the removal of the Excluded Assets from the Site and satisfaction of the condition provided in Section 6(a)(ii) below has not been fulfilled, then Buyer shall as of the Early Closing Date grant TVA an easement, having a term not to exceed two (2) years from the Early Closing Date and otherwise on terms acceptable to TVA in its sole discretion, permitting TVA to complete its close-out activities at the Site subsequent to the Early Closing Date, including the removal of the Excluded Assets.

(b)      In consideration of the sale, assignment, conveyance, transfer and delivery by TVA to Buyer as of the Closing, Buyer shall pay to TVA an amount equal to One Hundred Eleven Million Dollars ($111,000,000.00) (the "Purchase Price") in cash, payable in two installments as follows:

(i)      One installment of Twenty-Two Million Two Hundred Thousand Dollars ($22,200,000.00), which is equal to twenty percent (20%) of the Purchase Price, payable immediately upon execution of this Agreement (the "Down Payment"); and

(ii)      One installment of Eighty Eight Million Eight Hundred Thousand Dollars ($88,800,000.00), which is equal to eighty percent (80%) of the Purchase Price, payable at the Closing.

Each such payment shall be made by wire transfer of immediately available funds to such account as TVA shall provide to Buyer.

(c)      In addition to the Purchase Price, Buyer shall also compensate TVA for its costs and expenses that TVA incurred in selling the Site, which include: (i) the cost of appraisals, property surveys and realty services, (ii) other associated administrative costs including the cost of TVA staff and payment to Concentric for its services, (iii) the cost of relocating off the Site certain large electrical components, and (iv) the cost of additional environmental reviews (collectively, the "Compensated Costs"). The amount due TVA under subparagraphs (c)(i) and (ii) is fixed at $750,000 and shall be paid by Buyer immediately upon execution of this Agreement when the first installment of the Purchase Price is paid by wire transfer. The amount due under subparagraphs (c)(iii) and (iv) is fixed at $1,650,000 and shall be paid on or before Closing by wire transfer.

**6.   Conditions to Closing.**

(a)      The obligations of TVA and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or before the Closing, of each of the following conditions:

(i)      TVA's Chief Executive Officer (the "TVA CEO") determines that potential environmental impacts have been appropriately addressed or are acceptable; provided, however, that notwithstanding any other provision of this Agreement, it is recognized that such determination is in the discretion of the TVA CEO and if the TVA CEO does not make such determination by Closing, then this condition shall be considered impossible or impracticable to satisfy and such impossibility or impracticability shall not be considered a breach by TVA of this Agreement;

(ii)      Environmental substance contamination that exists on the Site has been appropriately remediated under Section 120(h), 42 U.S.C. § 9620;

(iii)      Each of the Parties shall have performed and complied with the agreements, covenants and obligations required by this Agreement to be so performed or complied with by it at or before the Closing in all material respects;

(iv)      Each of the representations and warranties made by the other Party  in this Agreement shall be true and correct in all material respects on and as of the date hereof and the Closing as though made at and as of the Closing (except to the extent expressly made at an earlier time);

(v)      There shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below) restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement; and

(vi)     The Parties shall have executed and delivered to one another the items set forth in each of <u>Sections 6(b)</u> and <u>6(c)</u> below.

(b)     At the Closing, Buyer shall pay or have paid to TVA the Purchase Price and Compensated Costs in accordance with <u>Section 5</u> above and execute (as applicable) and deliver the following items (collectively, the "<u>Buyer Transaction Documents</u>") to TVA:

(i)     a Bill of Sale, Assignment and Assumption Agreement (the "<u>Bill of Sale and Assignment Agreement</u>") in substantially the form of <u>Exhibit B</u> attached hereto as necessary for TVA to sell, transfer and deliver the Purchased Assets to Buyer and for TVA to assign and Buyer to assume TVA's rights and obligations with respect to the Purchased Assets, including but not limited to the Assumed Agreements;

(ii)     an incumbency certificate of the Secretary or Assistant Secretary of Buyer identifying the name and title and bearing the signatures of the officers of Buyer authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby;

(iii)     a certificate addressed to TVA dated as of the Closing executed by the duly authorized officer of Buyer (A) as to the matters in <u>Section 8(a)(ii)</u>, and (B) to the effect that Buyer has performed and complied with the agreements, covenants and obligations required by this Agreement to be so performed or complied with by Buyer at or before the Closing in all material respects;

(c)     On or before the Closing, TVA shall execute (as applicable) and deliver to Buyer the following items (collectively, the "<u>TVA Transaction Documents</u>"):

(i)     the Bill of Sale and Assignment Agreement, together with fully executed copies of any and all Assumed Agreements, to deliver exclusive title to and possession of the non-realty Purchased Assets to Buyer;

(ii)     the Warranty Deed and any closing statement and other documents necessary to deliver exclusive title to and possession of and convey the Site to Buyer;

(iii)     bills of sale and certificates of title, where applicable, for the items of vehicles and equipment that are part of the Purchased Assets;

(iv)     copies, certified by the Secretary of TVA, of resolutions or actions on written consent of the members and managers of TVA authorizing the execution and delivery of this Agreement and all of the other agreements and instruments, in each case, to be executed and delivered by TVA in connection herewith;

(v)     an incumbency certificate of the Secretary of TVA identifying the name and title and bearing the signatures of the officers of TVA authorized to execute and deliver this Agreement and the other agreements and instruments contemplated hereby, and such other evidence of the approval of the transactions provided for hereunder, TVA's authority, due execution of documents and due organization as may be reasonably required by Buyer; and

(vi)     a certificate addressed to Buyer dated as of the Closing executed by the duly authorized officers of TVA (A) as to the matters in <u>Sections 7(a)(ii)</u> and <u>(iii)</u>, and (B) to the effect that TVA has performed and complied with the agreements, covenants and obligations required by this Agreement to be so performed or complied with by it at or before the Closing in all material respects.

(d)    The Buyer Transaction Documents and the TVA Transaction Documents shall be collectively referred to as the "Transaction Documents."

### 7.   TVA's Representations and Warranties.

(a)    To induce Buyer to enter into this Agreement, TVA represents and warrants to Buyer as follows:

(i)    TVA is an agency and instrumentality of the United States created and existing under the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C. §§ 831-831ee.

(ii)    TVA has the authority to execute this Agreement and to transfer the Site to Buyer. This Agreement has been duly and validly executed and TVA has the authority to execute and deliver to Buyer the deed transferring ownership of the Site to Buyer.

(iii)    At its regularly scheduled meeting on May 5, 2016, the TVA Board of Directors declared the Site surplus and authorized the TVA CEO to sell the Site in whole or in part. No other authorization or approval is needed for the actions contemplated by this Agreement.

(iv)    Any environmental substance contamination that exists on the Site has been or will be appropriately remediated by Closing by TVA under Section 120(h), 42 U.S.C. § 9620 and TVA shall remain liable to remediate any other environmental substance contamination that exists on the Site before the Closing if discovered after Closing to the extent necessary under applicable environmental laws. Buyer shall provide TVA reasonable access to the location of any such post-closing discovered contamination to remediate it without charge.

(v)    William D. Johnson, President and the TVA CEO, is authorized to execute this Agreement on TVA's behalf.

(vi)    No investigation, action or proceeding is pending and, to TVA's knowledge, no action or proceeding is threatened and no investigation looking toward such an action or proceeding has begun, which questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(vii)    TVA has full right, power and authority to execute and deliver this Agreement and to consummate the purchase and sale transactions provided for herein, and no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the TVA of this Agreement or the consummation by the TVA of the transactions contemplated hereby.

(viii)    To TVA's knowledge and except as disclosed in the Warranty Deed and in that certain Offering Memorandum issued by Concentric with regard to the Site dated August 19, 2016, no options to acquire easements, options to purchase, purchase agreements, purchase and sale agreements, rights of refusal or other rights or options to acquire or lease all or any portion of the Site, or any gas, oil, coal, geothermal, mineral or mining rights with respect to the Site, exist.

(b)    The representations and warranties made in this Agreement by TVA shall be deemed remade by TVA as of the Closing with the same force and effect as if made on, and as of, such date.

### 8.   Buyer's Representations and Warranties.

(a)    To induce TVA to enter into this Agreement, Buyer represents and warrants to TVA as follows:

(i)    Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware, is authorized to transact business as a limited

liability company in the State of Alabama, and has full limited liability company power and authority to own, use and lease, as applicable, and acquire the Purchased Assets and to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(ii)     Buyer has taken all necessary action to authorize the execution, delivery and performance of this Agreement and upon the execution and delivery of any document to be delivered by Buyer on or prior to the Closing, this Agreement and each such document shall constitute the valid and binding obligation and agreement of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors and to the extent that the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses or would be subject to the discretion of the court before which any proceeding therefor may be brought.

(iii)     No investigation, action or proceeding is pending and, to Buyer's knowledge, no action or proceeding is threatened and no investigation looking toward such an action or proceeding has begun, which questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(iv)     Neither the execution, delivery or performance of this Agreement by Buyer, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness or any other agreement or instrument by which Buyer is bound.

(v)     Buyer warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon agreement or understanding for a commission, percentage, brokerage or contingent fee for which TVA will be liable.

(vi)     No authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the Buyer of this Agreement or the consummation by the Buyer of the transactions contemplated hereby.

(vii)     Except for express representations and warranties of TVA set forth herein, any of the Transaction Documents and any other agreement delivered in connection with Buyer's purchase of the Purchased Assets and Buyer's assumption of the Assumed Agreements, Buyer has relied and is relying solely on its own inspections, investigation and analyses of the Purchased Assets and the Assumed Agreements.

(b)     The representations and warranties made in this Agreement by Buyer shall be deemed remade by Buyer as of the Closing with the same force and effect as if made on, and as of, such date.

### 9.   Covenants. After the Effective Date and Prior to Closing.

(a)     The Parties hereby make to one another the following covenants to be effective after the Effective Date and prior to Closing:

(i)     Subject to the terms and conditions herein, each of the Parties agrees to use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein.

(ii)     Each Party shall provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal,

9

state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site consistent with Section 1(e). The Parties shall keep each other apprised of the status of any communications with and any inquiries or requests for additional or supplemental information from applicable Governmental Authorities, and shall provide any such additional or supplemental information that may be reasonably requested in connection with any such filings or submissions. All applications, appearances, presentations, briefs, and proposals made or submitted by or on behalf of either Party before any Governmental Authorities in connection with the approval of this Agreement and the transactions contemplated hereby shall be subject to the control of the Party making such application, appearance, presentation, filing or submission.

(iii)     Buyer and its officers, employees and agents shall have access upon reasonable prior notice to the Site, if requested, all for purposes of inspection and review. During any inspection or review, Buyer shall comply and shall cause its employees, officers and agents to comply, with all applicable safety and security procedures applicable to the Site and to conduct any inspection or review in a manner causing minimum interference with TVA's activities, and Buyer shall further have the right to enter the Site and conduct any survey, operational or equipment inspection (including with respect to inventory validation), or environmental inspection or assessment; provided, that neither Buyer nor any of its representatives shall collect or analyze any environmental samples (including building materials, indoor or outdoor air, surface or groundwater, or surface or subsurface soils) without TVA's prior consent, such consent not to be unreasonably conditioned, withheld or delayed. Notwithstanding anything to the contrary contained herein, Buyer shall not be permitted to contact any of TVA's vendors or suppliers without TVA's prior consent (not to be unreasonably withheld, conditioned or delayed) with respect to the Site or the transactions contemplated by this Agreement.

(iv)     TVA shall give prompt notice to Buyer that, upon learning of any material change in any condition with respect to the Purchased Assets or of any event, circumstance, occurrence or non-occurrence which makes any representation or warranty of TVA to Buyer under this Agreement untrue, misleading or inaccurate in any material respect, TVA shall promptly notify Buyer thereof (Buyer mutually agreeing, on learning of any such fact or condition, likewise promptly to notify TVA thereof);

(v)     TVA shall not, without the prior written consent of Buyer: (A) dispose of, assign, or transfer all or any portion of the Purchased Assets or any rights therein or thereto, or incur, create or permit any lien or encumbrance on, any of the Purchased Assets; or (B) enter into, amend, modify, terminate, grant any waiver of any term under or give any consent with respect to any easement, any Assumed Agreement, or any new contract or any permit related to the Site, in any manner adverse to Buyer in any material respect; provided, however, that the consent of Buyer shall not be required in the event of any emergency situations in which TVA must take action to prevent injury to persons or physical loss or damage to the Purchased Assets or as required to comply with applicable law. Additionally, TVA shall not (1) except in the ordinary course of TVA's operations at the Site, including transmission line maintenance, or to the extent caused by emergency or events of force majeure, commit or permit the cutting or severing of any timber, trees or other vegetation on the Real Property; (2) commit or permit the withdrawal or severing of any gas, oil coal, geothermal or minerals from the Real Property within the control of TVA; (3) perform or consent to any zoning, re-zoning, land use change or annexation affecting the Real Property except as requested by Buyer; or (4) enter into any options to purchase, purchase agreements, purchase and sale agreements, rights of refusal or other rights or options to acquire or lease all or any portion of the Purchased Assets, or any gas, oil, coal, geothermal, mineral or mining rights with respect to the Purchased Assets.

(b)     From time to time after the Closing, without further consideration, TVA will, at its own expense, execute and deliver such documents to Buyer as Buyer may reasonably request in order to vest more

effectively in Buyer the right, title and interest in and to the Purchased Assets.  If, after the Closing, TVA, on the one hand, or Buyer or any of its affiliates, on the other hand (as applicable, the "Receiving Party"), receives any funds that, pursuant to the terms of this Agreement, belong to the other party (the "Entitled Party"), the Receiving Party shall hold such funds in trust for, and immediately pay over such funds to, the Entitled Party.

**10.  Site and Area Expenditure Requirements.**

(a)      Buyer agrees to make a cumulative total expenditure of $25 million in capital improvements to be made at the Site or to other land or easement areas located in Jackson County, Alabama  in the amounts and by the dates indicated in Table 10(a) below:

**Table 10(a)**

| Expenditure Date (After Closing) | Cumulative Amount (Minimum) |
|---|---|
| One year | $ 5 millions |
| Two years | $ 10 millions |
| Three years | $ 15 millions |
| Four years | $ 20 millions |
| Five years | $25 millions |

For purposes of this Section 10, demolition, removal and/or restoration costs paid with respect to work on the Site shall be credited towards satisfaction of the Cumulative Amounts set forth above.  Additionally, the crediting of any capital improvements located off the Site but within Jackson County shall be subject to TVA's determination, in its sole discretion, that such improvements are connected to Buyer's improvements on the Site and would not have been made but for Buyer's development of the Site.   The Parties further agree that the acquisition of additional realty rights shall not constitute a capital improvement for purposes of this Section 10.

(b)      Buyer shall notify TVA in writing within 90 days when each of the above expenditure requirements is satisfied by Buyer and shall generally describe what it invested in.

(c)      If Buyer fails to meet any of these expenditure requirements when scheduled, it shall explain to TVA in writing why it did not make the required expenditure within 30 days of the expenditure date and shall have 180 days from the expenditure date to cure such failure; provided, however, that if Buyer has made a good faith effort towards obtaining required federal, state or local permits or licenses necessary for the  construction of such capital improvements and such time limitation expires through no fault of Buyer, then TVA at its reasonable discretion, and upon request, may extend such time limitation to facilitate Buyer's obtaining of such permits or licenses.

(d)      In the event that Buyer fails to meet an expenditure requirement and fails to cure this pursuant to Section 10(c) above, TVA in its sole discretion, and as agent for the United States of America upon written notice to Buyer, may reenter the Site and take possession of the Purchased Assets, as if the conveyance provided for pursuant to this Agreement had never been made and without repayment of the Purchase Price or Reimbursable Costs and without making any other payment to Buyer.  Upon receipt of such notice, Buyer shall cease any ongoing activities on the Site in a safe manner within 30 days of receipt of notice and shall vacate the Site.  Within this same 30-day period, Buyer shall have the right to remove any personal property that it brought onto the Site.  Any of Buyer's personal property remaining on the Site after this 30-day period shall become TVA's property if TVA in its sole discretion decides to take ownership of it.  Buyer must remove from the Site any personal property that TVA chooses not to take ownership of and if Buyer fails to do this, TVA may remove it at Buyer's expense.

(e)      At the end of each year described in Table 10(a), TVA agrees to promptly execute and deliver to Buyer a certification, in recordable form, for purposes of memorializing in the public records the Cumulative Amount of expenditures pursuant to Table 10(a) that Buyer demonstrates to have been made for such year, provided, however, that the Cumulative Amounts expended shall be fully effective and shall apply to the satisfaction of such capital improvements requirement, whether or not any such certification is executed or delivered by TVA.

**11.     Termination; Waiver.**

(a)      This Agreement may be terminated as described in Section 12 below.  In addition, it may be terminated at any time prior to the date on which Closing is to occur pursuant to Section 5(a) (the "Closing Date"), as provided below:

> (i)   By the mutual consent of both Parties in writing;
>
> (ii)  By Buyer, if the closing condition set forth in Section 6(a)(ii) is unfulfilled as of the Closing Date or if there has been a violation or breach by TVA  of any covenant, agreement, representation or warranty contained in this Agreement  and such violation or breach (A) is not cured by TVA within thirty (30) days following notification by Buyer, and (B) such failure, violation or breach has not been waived by Buyer in writing;
>
> (iii) By TVA, if there has been a violation or breach by Buyer  of any covenant, agreement, representation or warranty contained in this Agreement and such violation or breach (A) is not cured by Buyer within thirty (30) days following notification by TVA, and (B) such failure, violation or breach has not been waived by TVA in writing;
>
> (iv)  By either Party, upon written notice to the other Party, if (A) any judicial decision or order of a Governmental Authority prohibiting the sale of the Site has been issued and made final or non-appealable, (B) the closing conditions set forth in Sections 6(a)(i) or 6(a)(v) are unfulfilled as of the Closing Date, or (C) the parties are not able to negotiate pursuant to Section 12(c) an adjustment to the Purchase Price in the event of damage to a Purchased Asset; or
>
> (v)   By either Party, upon written notice to the other Party if Closing has not occurred on or prior to November 14, 2018 ;
>
> (vi)  By Buyer at its convenience at any time prior to the Closing, upon written notice to TVA;

provided, however, that the termination of this Agreement under either of Sections 11(a)(ii) or 11(a)(iii) shall not relieve the non-terminating Party for liability for any breach or default that occurred prior to termination; and provided, further, that the right to terminate this Agreement pursuant to Section 11(a)(v) shall not be available to a Party if such Party shall have failed to perform, or caused any of its affiliates to perform, any of its respective obligations under this Agreement.

(b)      Upon any termination or expiration or this Agreement, TVA shall be entitled to retain the Down Payment and any Compensated Costs paid by Buyer on or before termination or expiration, unless termination is under Section 11(a)(ii) or Section 11(a)(iv), in which event TVA shall return the Down Payment and any Compensated Costs paid by Buyer to Buyer within 30 days by check or electronically as directed by Buyer.

(c)      At any time prior to the Closing, either Party, in its sole discretion, may (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant to this Agreement or (iii) waive compliance with any of the covenants, agreements or conditions contained in this Agreement.  Any such extension or waiver shall be valid only if set forth  in writing signed by the Party to

be bound thereby. The waiver by a Party of a breach of any term or provision of the Agreement shall not be construed as a waiver of any subsequent breach.

12. **Risk of Loss.**

(a)      Except as otherwise provided in this Agreement, prior to Closing, Buyer shall not bear any risk of loss or damage to the Purchased Assets.  Until Closing occurs, TVA shall perform reasonable and normal maintenance activities to preserve the Purchased Assets in their current condition until Closing.  If a Purchased Asset is damaged, TVA shall inform Buyer within 15 days of the event and Buyer shall have the right to view and inspect the damaged Purchased Asset.

(b)      Subject to Section 12(c) below, TVA shall use commercially reasonable efforts, at TVA's cost and expense, to replace or repair any damaged Purchased Asset if requested to do so by Buyer if the asset was damaged before Closing.  TVA shall take such action as necessary to replace or repair the damaged Purchased Asset as expeditiously as practicable.  TVA shall have the right to access the damaged Purchased Asset as necessary to complete replacement or repair if control of the Site has been transferred to Buyer before this work is completed.

(c)      TVA shall have the right not to repair or replace the damaged Purchased Asset, in which event it shall notify Buyer in writing and TVA shall negotiate in good faith with Buyer to adjust the Purchase Price to account for the reduced value of the damaged Purchased Asset.  If such negotiations cannot be completed to the satisfaction of the Parties within 30 days, then this Agreement may be terminated in accordance with Section 11(a)(iv)(C).

(d)      After the Closing, if TVA's access to and continued operation of the 161-kV switchyard, associated controls and on-site 161-kV transmission lines, and its fiber optic system results in damage to other Purchased Assets transferred to Buyer, TVA shall, at TVA's cost and expense, use commercially reasonably efforts to replace or repair any such damaged assets if requested to do so by Buyer.  TVA shall take such action as necessary to replace or repair the damaged Purchased Asset as expeditiously as practicable.  TVA shall have the right to access the damaged Purchased Asset as necessary to complete replacement or repair.

(e)      Notwithstanding anything provided herein, if Buyer elects by written notice to TVA to have TVA continue to maintain assets that support completion and operation of the two unfinished nuclear units in a manner sufficient to meet NRC quality control requirements until Closing, Buyer shall pay TVA $875,000 per quarter (every three-month period from the date this Agreement is signed until Closing) by wire transfer without further invoicing or billing by TVA.

13. **Deed Covenants; Tax Matters.**

(a)      Buyer, by acceptance of the Warranty Deed from TVA, covenants and agrees on behalf of itself and its successors and assigns to all of the deed covenants expressed in the Warranty Deed.

(b)      TVA is a federal agency and instrumentality and is not subject to local, state, or federal taxes. Accordingly, its ownership and sale of the Site does not result in any taxes payable by TVA.  Buyer is solely responsible for the payment of any local, state, or federal taxes that its purchase and ownership of the Site may generate.

(c)      TVA shall deliver exclusive possession of the Real Property to Buyer free and clear of all tenants, occupants, parties in possession, leases, licenses and permits, however subject to the rights of third parties and the reserved rights of TVA as expressly set forth in this Agreement and the Warranty Deed,

14.     **TVA Employees**.

        Until after the Closing, Buyer shall not contact or discuss with any current TVA employee possible future employment at the Site or in connection with activities that support development of the Site, including completion of the two nuclear reactors located at the Site, without TVA's prior express notification and permission.

15.     **TVA Disclaimers and Buyer Acknowledgements**.

(a)     Except as expressly set forth in this Agreement, the Site is sold expressly in an "AS IS, WHERE IS," "WITH ALL FAULTS" condition, with no representations or warranties of any kind including as to the infrastructure and personal property located on the Site that are being transferred to Buyer, or their condition, operability, value or any other matter other than as expressly provided in this Agreement. TVA does not represent that the Site will be acceptable as security for loans of money or that it will not be rendered unacceptable as such security by reason of the deed provisions and restrictions applicable thereto. While TVA may have suggested or recommended in its advertising or otherwise what it believes to be the highest and best use of the Site, it does not represent or warrant that the same is safe or suitable in any respect for any such use.

(b)     The Site is being conveyed to Buyer expressly subject to each of the following:  (i) such rights as may be vested in the state, county, or adjoining owners in any public road running through the Site, (ii) such rights as may be vested in third parties to rights of way for telephone, electric, or other utilities, (iii) such rights of third parties as would be revealed by a physical inspection or survey of the Site, (iv) such rights of third parties as would be revealed by an examination of the public records of Jackson County, Alabama, (v) such burial rights and rights of ingress and egress as may be vested in third parties to that certain cemetery known as the Finnel Cemetery as recited in the Judgment recorded in Deed Book 007, page 62, Office of the Judge of the Probate, Jackson County, Alabama, and (vi) any known or unknown encroachments located on the Site.

(c)     Buyer hereby acknowledges that TVA has not made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Site not otherwise expressly included in this Agreement. Buyer further acknowledges that:

        (i)     Buyer, either alone or together with its representatives and agents, has knowledge and experience in transactions of this type and is therefore capable of evaluating the risks and merits of acquiring the Site;

        (ii)    Buyer has relied on its own independent investigation, and has not relied on any information or representations furnished by TVA or any of its representatives or agents (except as specifically set forth in this Agreement), in determining to enter into this Agreement;

        (iii)   Neither TVA nor any of its representatives or agents has given any investment, legal or other advice or rendered any opinion as to whether the purchase of the Site is prudent, and Buyer is not relying on any representation or warranty by TVA or any of TVA's representatives or agents except as set forth in this Agreement;

        (iv)    Buyer has conducted extensive due diligence, including a review of the documents provided by or on behalf of TVA; and

        (v)     TVA has made available to Buyer documents, records and books pertaining to the Site that Buyer and Buyer's attorneys, accountants and advisors have requested, and Buyer and its attorneys, accountants and advisors have had the opportunity to visit the Site and to ask questions and receive answers concerning the Site and the assets located thereon and the terms and conditions of this Agreement. All such questions have been answered to Buyer's complete satisfaction.

14

(d)      Buyer hereby acknowledges that (i) electric service at the Site is currently provided by TVA and the North Alabama Electric Cooperative, (ii) a two-mile, 13-kV three-phase circuit owned by the North Alabama Electric Cooperative provides service to various training facilities and storage huts, (iii) the balance of electric service needs are provided by TVA and that both services are metered and billed to the Site, and (iv) Buyer is responsible for obtaining electric service to the Site after Closing.

16.      **Section 26a Application Rights; Certain Real Property Matters**.

(a)      TVA will grant Buyer the right to apply under § 26a of the Tennessee Valley Authority Act, as amended, to construct, operate, and maintain water-use facilities on and over the adjoining land lying between the boundary of the Site and the adjacent waters of Guntersville Reservoir and in and on such waters; and the further right of suitable ingress and egress to and from the waters of the lake and to and from all structures, facilities, and improvements maintained in, on, or over said land or waters pursuant to the rights herein conveyed, all upon the express condition that said rights shall be subject to and shall not in any way interfere with TVA's statutory program for river control and development, including those rights set forth in the Warranty Deed.

(b)      The acreage being conveyed as part of the Purchased Assets and that acreage being excluded as part of the Excluded Assets is generally depicted on the map attached as Schedule R.1(b). TVA believes the acreage is correctly stated; provided, however, the Site is not sold on an acreage basis and no representation or warranty as to acreage is made by TVA.

(c)      TVA shall convey the real property that comprises the Site to Buyer by Warranty Deed substantially in the form attached as Exhibit A. Title to the Site was examined by TVA prior to purchase and is believed to be good, but no further warranties or insurance will be furnished by TVA except as otherwise expressly provided as to risk of loss in Section 12.

17.      **Jurisdiction and Venue**.

Each Party hereto irrevocably submits to the sole and exclusive jurisdiction of the United States District Court for the Northern District of Alabama for the purposes of any action arising out of or based upon this Agreement or relating to the subject matter hereof. Each Party hereto further agrees that service of any process, summons, notice or document by U.S. registered or certified mail to such Party's respective address set forth in Section 18 below shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction in this Section 17. Each Party hereto irrevocably and unconditionally waives any objection to the laying of jurisdiction and venue of any action, suit or proceeding in the United States District Court for the Northern District of Alabama, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR ANY MATTER ARISING HEREUNDER OR THEREUNDER.

18.      **Notices**.

Unless this Agreement specifically requires otherwise, any notice, demand or request provided for in this Agreement, or served, given or made in connection with it, shall be in writing and shall be deemed properly served, given or made if delivered in person or sent by facsimile or sent by registered or certified mail, postage prepaid, or by a nationally recognized overnight courier service that provides a receipt of delivery, in each case, to a Party at its address specified below:

*If to TVA, to:*

15

Tennessee Valley Authority
Attn: Senior Manager, Realty Services and GIS
1101 Market Street
Chattanooga, Tennessee 37402
Tel: (423) 751-7175
Fax: (423) 751-8458

*With a copy to:*

Tennessee Valley Authority
Attn: Office of General Counsel
400 West Summit Hill Drive, WT 6A
Knoxville, Tennessee 37902
Tel: (865) 632-4131
Fax: (865) 632-2422

*If to Buyer, to:*

Nuclear Development, LLC
c/o Franklin L. Haney Company, LLC
1250 Maryland Avenue S.W., Suite 503
Washington, DC 20024
Tel: (423) 421-3451
Fax:_____

*With a copy to:*

Larry D. Blust, Esq.
Hughes Socol Piers Resnick & Dym, Ltd.
70 West Madison Street
Suite 4000
Chicago, Illinois 60602
Tel: (312) 604-2672
Fax: (312) 580-1994

Notice given by personal delivery, mail or overnight courier pursuant to this <u>Section 18</u> shall be effective upon physical receipt. Notice given by fax pursuant to this <u>Section 18</u> shall be effective as of (i) the date of confirmed delivery if delivered before 5:00 p.m. Eastern Time on any business day; or (ii) the next succeeding business day if confirmed delivery is after 5:00 p.m. Eastern Time on any business day or during any non-business day.  By giving at least thirty (30) days' prior written notice thereof, any party may from time to time and at any time change its mailing addresses for notices to be given pursuant to this Section 18.

19.     <u>**Post-Closing Efforts and Further Assurances**</u>.

(a)     After the Closing, each of the Parties shall, without further consideration, at the other Party's prior reasonable request, use commercially reasonable efforts to execute and deliver to one another, as necessary, such other instruments and documents of sale, transfer, conveyance, assignment, notice, and confirmation, and provide documents, information and assistance, as are reasonably necessary or desirable for the complete effectuation and consummation of the transactions provided for and contemplated under this Agreement, and shall furnish to the requesting Party, at the requesting Party's reasonable request and sole expense, non-privileged books and records in connection with any audits, tax filings and other proceedings involving the Purchased Assets, subject to applicable confidentiality obligations; <u>provided</u>, <u>however</u>, that such cooperation shall not interfere with either TVA's or Buyer's operation of their respective businesses.

(b)        Without limiting the foregoing, to the extent that TVA, in connection with any compliance requirements or any investigation or monitoring process of any Governmental Authority, including but not limited to NRC, the Federal Energy Regulatory Commission, the North American Electricity Reliability Corporation or the SERC Reliability Corporation, with respect to activities, matters, inactions, or other issues occurring, arising or associated with periods prior to Closing, Buyer shall provide TVA with access to any and all types of documentary or electronic information, or individual knowledge, pertinent to the subject of such investigation, monitoring process or self-report to the extent that such information or knowledge was transferred to Buyer under this Agreement.

20.    **Entire Agreement.**

      This Agreement, and all schedules and exhibits hereto, supersedes all prior discussions and agreements, whether oral or written, between the Parties or their respective affiliates with respect to the subject matter hereof, including the certain Mutual Nondisclosure Agreement, dated as of August 23, 2016 ("Mutual Nondisclosure Agreement"), and contains the sole and entire agreement between the Parties hereto with respect to the subject matter hereof and thereof.

21.    **Expenses.**

      Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated hereby are consummated, each Party will pay its own costs and expenses incurred in connection with the negotiation, execution and performance under this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby, provided, however, that Buyer shall pay any recording fees incurred in connection with such transactions and, provided, further, that Buyer shall be responsible for the Compensated Costs as specified in Section 5(c); except to the extent otherwise provided in Section 11(c).

22.    **Public Announcements.**

      TVA or Buyer may issue or make any press releases or similar public announcements concerning this Agreement or the transactions contemplated after this Agreement; provided, however, each Party shall inform the other Party of any such releases or announcements and shall to the extent feasible provide the other Party copies of such public releases or announcements at least eight hours prior to the public release or announcement.

23.    **Confidentiality.**

(a)        Each Party hereto will hold, and will use commercially reasonable efforts to cause its affiliates, employees, agents, and representatives to hold, in strict confidence from any other person, unless (i) compelled to disclose by judicial or administrative process (including in connection with obtaining the necessary approvals of this Agreement and the transactions contemplated hereby of Governmental Authorities) or by other requirements of law or (ii) disclosed in an action or proceeding brought by a Party hereto in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning the other Party labeled or marked as proprietary or confidential and furnished to it by the other Party or on such other Party's behalf in connection with this Agreement or the transactions contemplated hereby ("Confidential Information"), except to the extent that such documents or information can be shown to have: (w) been in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving Party, (x) been later acquired by the receiving Party from another source if the receiving Party is not aware that such source is under an obligation to another Party hereto to keep such documents and information confidential, or (y) become the property of the receiving Party at or subsequent to Closing, provided that either Party may disclose Confidential Information to its lenders, investors, and affiliates provided they are advised of the confidential nature thereof. In the event the transactions contemplated hereby are not consummated, upon the request of the other Party, each Party hereto will use commercially reasonable efforts to cause its affiliates, employees, agents, and representatives to promptly (and in no event later than fifteen (15) business days after such request) destroy or cause to be destroyed all copies of Confidential Information and information furnished

by the other Party in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings to the extent containing such Confidential Information prepared by the Party furnished such Confidential Information.  Notwithstanding the foregoing, Buyer agrees that TVA may release in its entirety the bid that Buyer submitted at the auction referenced in the recitals of this Agreement and a copy of this Agreement after execution.

(b)     The Parties acknowledge and agree that (i) divulgence or unauthorized use of confidential information could damage the disclosing Party and that the disclosing Party therefore has an interest in protecting the information by all legal means; (ii) that breach of the obligations set forth in Section 23(a) above could cause irreparable damage to the disclosing Party possessing proprietary rights in information wrongfully disclosed; and (iii) further that in the event of such breach, the disclosing Party may seek an injunction, specific performance, or other equitable relief to prevent the violation of the promises mentioned above. Under 18 U.S.C. § 1905, because Buyer's officers and employees are subject to criminal liability in the event confidential information is disclosed unless such disclosure is authorized by law, TVA acknowledges and agrees that, in addition to the equitable relief identified above in this Section 23(b), TVA shall only be entitled to recover from Buyer, its officers, agents and employees any and all gains wrongfully acquired, directly or indirectly, from unauthorized disclosure of any confidential information covered under the provisions of this Section 23.

(c)     The obligations contained in this Section 23 shall survive for a period of three (3) years following the Closing or any termination of this Agreement pursuant to Section 11 above.

24.   **Waivers**.

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof in that Party's sole discretion, but no such waiver shall be effective unless set forth in a written instrument duly executed by the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. Except as otherwise expressly provided herein, all remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

25.   **Exercise of Remedies**.

To the fullest extent that is permitted by law, no failure or delay of any Party, in any one or more instances, (a) in exercising any power, right or remedy (other than failure or unreasonable delay in giving notice of default) under this Agreement or (b) in insisting upon the strict performance by the other Party of such other Party's covenants, obligations or agreements under this Agreement, shall operate as a waiver, discharge or invalidation thereof, nor shall any single or partial exercise of any such right, power or remedy or insistence on strict performance, or any abandonment or discontinuance of steps to enforce such a right, power or remedy or to enforce strict performance, preclude any other or future exercise thereof or insistence thereupon or the exercise of any other right, power or remedy. The covenants, obligations, and agreements of a defaulting Party and the rights and remedies of the other Party upon a default shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

26.   **Amendment.**

This Agreement and any of the Transaction Documents may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party hereto.

27.   **No Construction Against Drafting Party**.

The language used in this Agreement is the product of both Parties' efforts, and each Party

hereby irrevocably waives the benefits of any rule of contract construction that disfavors the drafter of a contract or the drafter of specific words in a contract.

28.   **No Third-Party Beneficiary**.

The terms and provisions of this Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person.

29.   **Headings**.

The headings of all articles, paragraphs and sections used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

30.   **Invalid Provisions.**

If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any Party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) Buyer and TVA shall negotiate an equitable adjustment in the provisions of the Agreement with a view toward effecting the purposes of the Agreement, and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby.

31.   **Governing Law**.

TVA is a corporate agency and instrumentality of the federal government of the United States of America; therefore, federal law shall at all times govern the validity, interpretation, and enforceability of this Agreement and (unless clearly specified to the contrary therein) the Transaction Documents and the transactions contemplated by this Agreement; provided, however, that to the extent there is no body of federal law for guidance or federal law adopts State law for a rule of decision or procedure, the laws of the State of Alabama, but not its choice of law provisions or principles thereof regarding resolution of conflicts of law, shall so govern.

32.   **Required Federal Contracting Clauses**.

No member or delegate of the United States Congress or resident commissioner or any officer, employee, special government employees, or agent of TVA shall be admitted to any share or part of this Agreement, the Transaction Documents and the closing of the transactions contemplated hereby or to any benefit to arise therefrom unless the agreement be made with a corporation for general benefit, nor shall Buyer offer or give, directly or indirectly, to any officer, employee, special government employee or agent of TVA, any gift, gratuity, favor, entertainment, loan or any other thing of monetary value, except as provided in 5 C.F.R Part 2635; any breach of this provision shall constitute a material breach of this Agreement. Furthermore, to the extent legally required, this Agreement and the Transaction Documents shall be subject to all contract provisions and clauses required under the federal laws of the United States of America applicable to TVA and parties contracting with TVA, set forth in 18 C.F.R. Part 1316. To the extent applicable, this Agreement incorporates by reference the Equal Opportunity clause, 41 C.F.R. 60-1.4.

33.   **Court Costs; Interest.**

With respect to any court proceeding between the Parties, the non-prevailing Party shall pay the prevailing Party (i) all court costs, and (ii) pre- and post-judgment interest at the rate of six percent (6%) per annum on the amount awarded from the date of the applicable breach until paid.

34.   **No Assignment; Binding Effect.**

Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any Party hereto without the prior written consent of the other Party hereto (which consent shall not be unreasonably withheld), and any attempt to do so will be void, except for (i) collateral assignment to its or its affiliate's lenders, (ii) assignments and transfers to any entity that controls, is controlled by or under common control with Buyer, provided, however, that Buyer shall remain obligated under this Agreement or, at TVA's option, guaranty the affiliated entity's obligations to TVA, and (iii) assignments and transfers by operation of law. Any purported assignment or delegation not effected in accordance with this Section 34 shall be deemed void. This Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and assigns.

35.   **Specific Performance; Limitation on Damages.**

EACH PARTY AGREES THAT THE DAMAGE REMEDIES SET FORTH IN THIS AGREEMENT MAY BE DIFFICULT OR IMPOSSIBLE TO CALCULATE OR OTHERWISE INADEQUATE TO PROTECT ITS INTERESTS AND THAT IRREPARABLE DAMAGE MAY OCCUR IN THE EVENT THAT PROVISIONS OF THIS AGREEMENT ARE NOT PERFORMED BY THE PARTIES IN ACCORDANCE WITH THE SPECIFIC TERMS OF THIS AGREEMENT. ANY PARTY MAY SEEK TO REQUIRE THE PERFORMANCE OF ANY OTHER PARTY'S OBLIGATIONS UNDER THIS AGREEMENT THROUGH AN ORDER OF SPECIFIC PERFORMANCE RENDERED BY THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA. ADDITIONALLY, NOTWITHSTANDING ANY OTHER TERM OR PROVISION OF THIS AGREEMENT TO THE CONTRARY, IF BUYER COMMITS A DEFAULT, VIOLATION OR BREACH UNDER THIS AGREEMENT PRIOR TO CLOSING, THE SOLE AND EXCLUSIVE REMEDY OF TVA SHALL BE TO TERMINATE THIS AGREEMENT BY GIVING BUYER A WRITTEN NOTICE OF TERMINATION WHILE SUCH DEFAULT IS OUTSTANDING AND UNCURED, WHEREUPON, TVA SHALL KEEP AND RETAIN THE DOWN PAYMENT AND COMPENSATED COSTS PAID PRIOR TO THE DATE OF SUCH DEFAULT, VIOLATION OR BREACH AS FULL LIQUIDATED DAMAGES FOR BUYER'S DEFAULT, VIOLATION OR BREACH, IT BEING AGREED THAT TVA'S DAMAGES AS A RESULT OF ANY DEFAULT, VIOLATION OR BREACH BY BUYER MIGHT BE IMPOSSIBLE TO ASCERTAIN AND THAT SUCH DOWN PAYMENT AND COMPENSATED COSTS ARE NOT AND SHALL NOT BE DEEMED TO BE A PENALTY, BUT ARE A REASONABLE ESTIMATE OF TVA'S DAMAGES. THE FOREGOING LIMITATION SHALL NOT APPLY TO LIMIT BUYER'S LIABILITY, OR TVA'S RIGHT TO SPECIFIC PERFORMANCE, FOR ANY DEFAULT, VIOLATION OR BREACH UNDER THIS AGREEMENT SUBSEQUENT TO CLOSING. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES AS A RESULT OF DEFAULT, VIOLATION OR BREACH OF ANY COVENANT, REPRESENTATION OR WARRANTY CONTAINED IN THIS AGREEMENT.

36.   **Counterparts.**

This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Each Party expressly acknowledges the legal effectiveness and validity of faxed or electronic (e.g. pdf. format) signatures as original signatures.   Furthermore, this Agreement may be executed and delivered by facsimile or electronic transmission.   The parties intend that faxed or electronic (e.g. pdf. format) signatures constitute original signatures and that a faxed or electronic copy or counterparts of this Agreement containing signatures (original, faxed or electronic) of a party is binding upon that party. Each signature page to any counterpart of this Agreement may be detached from such counterpart without impairing the legal effect

of the signatures thereon and thereafter attached to another counterpart of this Agreement identical thereto except having attached to it additional signature pages.

37.     **Time of the Essence.**

Time shall be of the essence in the performance of all obligations under this Agreement.  If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act required under this Agreement must be performed, or by which Closing must be held, expires on a Saturday, Sunday or a holiday, then such time period shall be automatically extended to the next business day.

38.     **Survival.**

All covenants, agreements, representations and warranties contained in this Agreement shall survive the Closing, transfer of the Real Property and Purchased Assets to Buyer and the payment of the Purchase Price, and shall not merge into any deed delivered at Closing; provided, however, that as between such surviving provisions and the terms of the Warranty Deed, the terms of the Warranty Deed shall control.

39.     **Memorandum of Agreement.**  Upon request of Buyer, the Parties shall execute and deliver to each other duplicate originals of an instrument in recordable form which will constitute a memorandum of this Agreement, setting forth a description of the Site and the term of this Agreement, which memorandum shall be recorded in the office of the Judge of Probate of Jackson County, Alabama.  Upon any termination of this Agreement, the Parties shall, within 15 days of such termination, execute and deliver such instruments in recordable form as TVA may request to evidence such termination.

*Signatures appear on following page*

21

## SIGNATURES

IN WITNESS WHEREOF, the Parties have executed this Agreement through their respective officers thereunto duly authorized as of the Effective Date.

TVA:

### TENNESSEE VALLEY AUTHORITY

By: _____

Name: Aaron B. Nix

Title: Senior Manager, Realty Services and GIS


### NUCLEAR DEVELOPMENT, LLC

By: _____

Name: Franklin L. Haney

Title: Sole Member and Manager

## LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule R.1(a) | Legal Description of the Real Property Comprising the Site and Property Survey |
| Schedule R.1(b) | Map of the Real Property |
| Schedule 1(d) | Assumed Agreements |
| Schedule 1(e) | Facility Permits |
| Schedule 3(a) | Excluded Assets |
| Exhibit A | Form of Special Warranty Deed |
| Exhibit B | Form of Bill of Sale, Assignment and Assumption Agreement |

## DEFINED TERMS

| Defined term | Where defined |
|---|---|
| "Agreement" | Recitals |
| "Assumed Agreements" | 1(d) |
| "Assumed Liabilities" | 2 |
| "Bidders" | Recitals |
| "Bill of Sale and Assignment Agreement" | 6(b)(i) |
| "BLN Property" | Recitals |
| "Buyer" | Recitals |
| "Buyer Transaction Documents" | 6(b) |
| "B&W Contract" | Recitals |
| "Closing" | 5 |
| Closing Date | 11(a) |
| "Compensated Costs" | 5(c) |
| "Concentric" | Recitals |
| "Confidential Information" | 23(a) |
| "Cumulative Amount" | Table 10(a) |
| "Down Payment" | 5(b) |
| "Early Closing Date" | 5(a) |
| "Effective Date" | Recitals |
| "Entitled Party" | 9(b) |
| "Excluded Assets" | 3 |
| "Excluded Liabilities" | 4 |
| "Facility" | 1(b) |
| "Facility Books and Records" | 1(c) |
| "Governmental Authority" | 9(a)(ii) |
| "Met Tower" | 3(e)(iv) |
| "Mutual Nondisclosure Agreement" | 20 |
| "NRC" | 1(e) |
| "Party" or "Parties" | Recitals |
| "Permits" | 1(e) |
| "Pole Yard Training Center" | Recitals |
| ""Purchase Price" | 5(b) |
| "Purchased Assets" | 1 |
| "Real Property" | 1(a) |
| "Receiving Party" | 9(b) |
| "Site" | Recitals |
| "Steam Generators" | Recitals |
| "TVA's Retained Environmental Liability | 4(a) |
| "TVA" | Recitals |
| "TVA CEO" | 6(a) |
| "TVA Transaction Documents" | 6(c) |
| "Transaction Documents" | 6(d) |
| "Warranty Deed" | 3(d) |

TVA Tract No. XBEGP-3

Schedule R.1(a)
to
Bellefonte Nuclear Plant Site
Purchase and Sales Agreement

A parcel of land located in Sections 12 &13 Township 4 South Range 6 East and Sections 5, 6, 7, 8, and 18 Township 4 South Range 7 East of the Huntsville Meridian in Jackson County, Alabama, as shown on US-TVA Drawing No. 88 MS 461 K 513(D) R.0 and being more particularly described as follows:

Beginning at a concrete monument (found) in the US-TVA Bellefonte reservation boundary line, having coordinates of N: 1530845.28 E: 624406.85 and being corner 142A; thence leaving the said US-TVA Bellefonte reservation boundary line N60°15'13"E, 1123.77 feet to an aluminum monument (set), being corner 3-1; thence N09°41'24"W, 1112.11 feet to an aluminum monument (set), being corner 3-2; thence N67°08'58"E, 39.55 feet to an aluminum monument (set), being corner 3-3; thence S43°24'29"E, 997.94 feet to an aluminum monument (set), being corner 3-4; thence N39°35'20"E, 3289.06 feet to an angle iron (set), being corner 3-5; thence N88°45'53"E, 2260.13 feet to an aluminum monument (set), being corner 3-6; thence N05°24'09"E, 825.81 feet to an aluminum monument (set), being corner 3-7; thence N30°33'32"E, 902.48 feet to an aluminum monument (set), being corner 3-8; thence N67°16'58"E, 1679.67 feet to an aluminum monument (set), being corner 3-9; thence N09°38'21"E, 1034.15 feet to an angle iron (set), being corner 3-10; thence N26°49'10"W, 187.29 feet to an angle iron (set), being corner 3-11; thence N31°57'47"W, 193.53 feet to an aluminum monument (set), being corner 3-12; thence N57°04'58"E, 49.15 feet to an angle iron (set), being corner 3-13; thence S34°17'53"E, 194.69 feet to an angle iron (set), being corner 3-14; thence S25°18'33"E, 267.48 feet to an aluminum monument (set), being corner 3-15; thence S21°15'40"E, 187.66 feet to an aluminum monument (set), being corner 3-16; thence S15°29'48"E, 155.40 feet to an angle iron (set), being corner 3-17; thence N71°31'34"E, 408.46 feet to an angle iron (set), being corner 3-18; thence S45°09'09"E, 1474.32 feet to an aluminum monument (set), being corner 3-19; thence N68°55'27"E, 351.56 feet to an aluminum monument (set), being corner 3-20; thence S70°52'31"E, 818.87 feet to an aluminum monument (set), being corner 3-21; thence S14°54'31"E, 244.91 feet to an aluminum monument (set), being corner 3-22; thence S05°51'21"W, 111.20 feet to an aluminum monument (set), being corner 3-23; thence S64°25'31"W, 358.52 feet to an aluminum monument (set), being corner 3-24; thence S05°00'20"W, 469.32 feet to an aluminum monument (set), being corner 3-25; thence S50°08'54"W, 353.88 feet to an aluminum monument (set), being corner 3-26; thence S20°56'02"W, 778.44 feet to an aluminum monument (set), being corner 3-27; thence S36°39'03"W, 2955.35 feet to an angle iron (set), being corner 3-28; thence N60°39'21"W, 1094.24 feet to an angle iron (set), being corner 3-29; thence S39°05'13"W, 351.50 feet to an angle iron (set), being corner 3-30; thence S53°09'50"W, 579.79 feet to an angle iron (set), being corner 3-31; thence S03°17'31"E, 691.94 feet to an aluminum monument (set), being corner 3-32; thence S59°35'12"W, 427.56 feet to an angle iron (set), being corner 3-33; thence S32°49'40"W, 3484.38 feet to an angle iron (set), being corner 3-34; thence N89°23'42"W, 242.40 feet to an angle iron (set), being corner 3-35; thence S30°28'27"E, 311.52 feet to an angle iron (set), being corner 3-36; thence S34°48'39"W, 2090.74 feet to an aluminum monument (set), being corner 3-37; thence N49°11'17"W, 199.55 feet to an aluminum monument (set), being corner 3-38; thence S12°29'05"E, 214.82 feet to an aluminum monument (set), being corner 3-39; thence S35°40'33"W, 1454.17 feet to an aluminum monument (set), being corner 3-40; thence N47°16'27"W, 694.93 feet to an aluminum monument (set), being

corner 3-41; thence N10°27'48"W, 72.36 feet to a point, being corner 3-42; thence N30°30'00"E, 40.00 feet to a concrete monument (found), being corner 59-A; thence N43°22'38"W, 720.00 feet to a concrete monument, being corner 59; thence N30°30'00"E, 12.00 feet to a point, being corner 699-5; thence N30°05'13"W, 63.33 feet to a point, being corner 699-4D; thence N31°22'00"W, 1336.00 feet to a point, being corner 699-4C; thence N33°39'00"W, 126.00 feet to a point, being corner 699-4B; thence N40°58'00"W, 128.00 feet to a point, being corner 699-4A; thence N43°17'00"W, 408.00 feet to a point, being corner 699-4; thence N42°28'00"W, 1125.00 feet to a point, being corner 699-3C; thence N41°59'00"W, 86.00 feet to a point, being corner 699-3B; thence N37°11'00"W, 80.00 feet to a point, being corner 699-3A; thence N34°28'00"W, 1378.00 feet to a point, being corner 699-3; thence N36°06'00"W, 386.00 feet to a point, being corner 699-2C; thence N30°16'00"W, 138.00 feet to a point, being corner 699-2B; thence N19°03'00"W, 131.00 feet to appoint, being corner 699-2A; thence N16°11'00"W, 88.00 feet to a point, being corner 699-2; thence N65°06'00"E, 398.00 feet to a point, being corner 699-1A; thence N65°17'00"E, 833.00 feet to a point, being corner 699-1; thence N30°00'00"W, 34.00 feet to the point of beginning.

Less and except the following:

Pole Yard Training Center

Beginning at an aluminum monument (set) having coordinates of N: 1534680.14 E: 630507.27 and being corner 3-43; thence leaving the point of beginning N34°59'55"E, 891.61 feet to an aluminum monument (set), being corner 3-44; thence N56°27'56"E, 1461.92 feet to an angle iron (set), being corner 3-45; thence N85°51'29"E, 395.70 feet to an angle iron (set), being corner 3-46; thence S18°36'04"W, 267.20 feet to an angle iron (set), being corner 3-47; thence S27°23'30"W, 341.60 feet to an aluminum monument (set), being corner 3-48; thence S36°45'14"W, 308.13 feet to an aluminum monument (set), being corner 3-49; thence S44°57'47"W, 251.65 feet to an angle iron (set), being corner 3-50; thence S51°00'12"W, 431.56 feet to an aluminum monument (set), being corner 3-51; thence S49°13'01"W, 354.64 feet to an aluminum monument (set), being corner 3-52; thence S41°21'07"W. 148.59 feet to an aluminum monument (set), being corner 3-53; thence S33°47'49"W, 147.07 feet to an aluminum monument (set), being corner 3-54; thence S78°25'48"W, 616.16 feet to an aluminum monument (set), being corner 3-55; thence N25°41'17"W, 305.67 feet to the point of beginning and containing 35.38 acres, more or less.

Tract XBEGP-1

A parcel of land located in the SW 1/4 of Section 7 and the NW 1/4 of Section 18, Township 4 South, Range 7 East, on the Bellefonte Nuclear Plant Reservation as shown on US-TVA drawing 88 MS 422 K 502, R2 and being more particularly described as follows:

Beginning at a point (Coordinates: N. 1,528,198; E. 468,490) in the centerline of Sublet Ferry Road, the said road centerline being the boundary of US-TVA's Bellefonte Nuclear Plant Reservation, the said point being US-TVA Corner No. TP-13; thence N47°32'E, 200 feet to a point; thence S42°28'E, 500 feet to a point; thence S47°32'W, 200 feet to a point in the centerline of Sublet Ferry Road; thence with the centerline of the road N42°28'W, 500 feet to the point of beginning and containing 2.3 acres, more or less.

With the above exceptions, Tract XBEGP-3 contains a total of 1331.64 acres, more or less.

## RAILROAD TRACTS

**Tract A**
Beginning at an aluminum monument (set), having coordinates of N: 1532499.09, E: 625195.35 and being corner 3-2; thence N23°50'37"W, 218.86 feet to a point; thence N23°26'50"W, 157.98 feet to a point; thence with a curve to the left having a chord bearing and distance of N35°45'56"W, 472.98 feet, an arc length of 477.27 feet, a radius of 1027.24 feet, and a delta angle of 26°37'13" to a point; thence N51°30'46"W, 96.37 feet to a point; thence N52°44'55"W, 375.07 feet to a point; thence N37°12'41"E, 40.00 feet to a point; thence S52°44'55"E, 375.53 feet to a point; thence S49°28'36"E, 64.20 feet to a point; thence with a curve to the right having a chord bearing and distance of S35°46'43"E, 491.20 feet, an arc length of 495.64 feet, a radius of 1067.24 and a delta angle of 26°36'33"; thence S23°26'50"E, 157.51 feet to a point; thence S23°43'28"E, 219.40 feet to an aluminum monument (set), being corner 3-3; thence S67°08'58"W, 39.55 feet to the point of beginning and containing 1.28 acres, more or less.

**Tract B**
Commencing at an aluminum monument (set), having coordinates of N: 1532499.09, E: 625195.35 and being corner 3-2; thence N23°50'37"W, 218.86 feet to a point; thence N23°26'50"W, 157.98 feet to a point; thence with a curve to the left having a chord bearing and distance of N35°45'56"W, 472.98 feet, an arc length of 477.27 feet, a radius of 1027.24 feet, and a delta angle of 26°37'13" to a point; thence N51°30'46"W, 96.37 feet to a point; thence N52°44'55"W, 375.07 feet to a point; thence N45°48'18"W, 1115.04 feet to a point, being the point of beginning.

Thence leaving the point of beginning N22°58'47"W, 80.42 feet to a point; thence N18°54'56"W, 109.18 feet to a point; thence N13°02'43"W, 120.55 feet to a point; thence N53°55'50"E, 45.57 feet to a point; thence S05°34'59"E, 14.95 feet to a point; thence S13°02'43"W, 121.50 feet to a point; thence S18°54'56"E, 105.71 feet to a point; thence S22°58'47"E, 65.19 feet to a point; thence S47°58'23"W, 42.32 feet to the point of beginning and containing 0.28 acres, more or less.

Also included are the following 12 tracts which are more particularly described on pages 4 through 32 of this Schedule R.1(a):

| | | |
|---|---|---|
| BNPRR-1 | BNPRR-4A | BNPRR-8 |
| BNPRR-2 | BNPRR-5 | BNPRR-9 |
| BNPRR-3 | BNPRR-6 | BNPRR-10 |
| BNPRR-4 | BNPRR-7 | BNPRR-11 |

Positions of corners and directions of lines are referred to the Alabama East State Plane Coordinate System, NAD 83 Horizontal Datum.

This description was prepared from the aforementioned US-TVA Drawing No. 08 MS 422 B 436 (D) R.0 and a survey dated 11/24/2016 by:

TVA Surveying
Tennessee Valley Authority
1101 Market Street
Chattanooga, TN 37402-2801

BOOK 258 PAGE 48

EXHIBIT A



TRACT NO. BNPRR-1

A parcel of land located in Secs. 35 and 36, T. 3 S., R. 6 E. in Jackson County, State of Alabama, southeast of and adjacent to the southeast line of the right o way of the Southern Railway, approximately 1-3/4 miles northeast of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said parcel lying on each side of the center line of a railroad location, and being more particularly described as follows:

Beginning at a point where the center line of the railroad location crosses the east line of the land of Robert E. Sebring, which is the west line of the land of the Pearl Stewart Heirs, at survey station 22 + 67.9 on the center line of the railroad location, said point being ¾. 00° 31' 50" W., 492.0 feet from a corner of the lands of Robert E. Sebring, Sam Arnold, and the Pearl Steward Heirs; thence with the east line of the land of Robert E. Sebring, which is the west line of the land of the Pearl Stewart Heirs, S. 00° 31' 50" W., 62.6 feet to a point; thence, leaving the property line, with a line 50.0 feet southwest of and parallel to the center line of the railroad location N. 52° 29' 13" W., 55.6 feet to a point opposite survey station 22 + 50.00 on the center line of the railroad location at the P. S. of a No. 8 Turnout on the north leg of a railroad wye; thence continuing with a line 50.0 feet southwest of and parallel to the center line of the railroad location N. 52° 27' 13" W., 30.00 feet to a point opposite survey station 22 + 20.00 on the center line of the railroad location at the P. I. of the above mentioned No. 8 Turnout on the north leg of the railroad wye; thence with a line 50.0 feet southeast of and parallel to the center line of the location of the west leg of the railroad wye S. 5?° 2?' 13" W., 73.03 feet to a point 50.0 feet southwest of and parallel, opposite survey station 21 + 46.9? at the tangent point of a 12 or 24 curve on the center line of the location of the west leg of the railroad wye; theice with a line 50.0 feet southwest of and parallel

-1-

BOOK 256 PAGE 49

to the curve on the center line of the location of the south leg of the railroad wye as it curves to the left in a westerly direction, 618.1 feet to a point radially opposite survey station 14 + 56.58 at the tangent point of the curve; thence, leaving the line that is 50.0 feet south of and parallel to the center line of the location of the south leg of the railroad wye, S. 39° 24' 30" W., 448.6 feet to a point; thence N. 52° 29' 10" W., 20.0 feet to a point in the southeast line of the right of way of the Southern Railway; thence with the southeast line of the right of way of the Southern Railway, a line 50.0 feet southeast of and parallel to the center line of the main line track, N. 37° 30' 47" E., 1026.0 feet, crossing the center line of the location of the south leg of the railroad wye at 526.7 feet and at survey station 15 + 30.3, to a point where the railway right of way line intersects the north line of the land of Robert E. Sebring, which is the south line of the land of Sam Arnold; thence, leaving the southeast line of the right of way of the Southern Railway, with the north line of the land of the land of Robert E. Sebring, which is the south line of the land of Sam Arnold, N. 87° 21' 00" E. 371.5 feet, crossing the center line of the location of the north leg of the railroad wye at 123.0 feet, to a corner of the lands of Robert E. Sebring, Sam Arnold, and the Pearl Stewart Heirs; thence with the east line of the land of Robert E. Sebring, which is the west line of the land of the Pearl Stewart Heirs, S. 00° 31' 50" W., 492.0 feet to the point of beginning, and containing 5.2 acres, more or less.

Furthermore, the right to construct an outlet ditch within an area lying south-east of and adjacent to the southeast line of the above described parcel of land at or near survey station 12 + 85 on the center line of the location of the south leg of the railroad wye, the area extending in an easterly direction approximately 250 feet and having a width of approximately 85 feet.

-2-

Case 5:18-cv-01983-LCB   Document 1-1   Filed 11/30/18   Page 31 of 54

BOOK 258 PAGE 70

EXHIBIT A

TRACT NO. BHPAR-2

A parcel of land located in the SW1/4 sec. 25 and SE1/4SE1/4 sec. 26, T. 3 S., R. 6 E. in Jackson County, State of Alabama, approximately 1-3/4 miles northeast of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said parcel lying on each side of the center line of the location of the north leg of a railroad wye and being more particularly described as follows:

Beginning at Corner 699-10, a corner of the lands of Sam Arnold, the Pearl Stewart Heirs, and Robert E. Sebring, said corner being 337.6 feet east of the southwest corner of sec. 25 and being N. 87° 21' 00" E., 248.5 feet from survey station 17 + 08 on the center line of the location of the north leg of the railroad wye; thence with the south line of the land of Sam Arnold, which is the north line of the land of Robert E. Sebring, S. 87° 21' 00" W., 371.5 feet to a point in the southeast line of the existing right of way of the Southern Railway at Corner 699-11; thence, leaving the south line of the land of Sam Arnold, with the southeast line of the existing right of way of the Southern Railway , a line 50.0 feet southeast of and parallel to the center line of the main line track, N. 37° 30' 47" E., 1692.0 feet, crossing the center line of the location of the north leg of the railroad wye at 274.1 feet and at survey station 14 + 90.4, to a point in the north line of the land of Sam Arnold, which is the south line of the land of Robert L. Meeks, at Corner 699-6; thence, leaving the existing railroad right of way line, with the boundary line between the lands of Sam Arnold and Robert L. Meeks N. 88° 12' 00" E., 265.4 feet to Corner 699-7; thence S. 00° 01' 00" W., 667.0 feet to Corner 699-8, a corner of the lands of Sam Arnold, Robert L. Meeks, and Daisy G. Horne et al; thence with the east line of the land of Sam Arnold, which is the west line of the land of Daisy G. Horne et al, S. 00° 15' 00" E., 631.2 feet to a point in the south line of sec. 25, at Corner

1-9-76

-1-

BOOK 256 PAGE 71

699-9, a corner of the lands of Sam Arnold, Daisy G. Horne et al, and the Pearl
Stewart Heirs; thence with the south line of sec. 25, which is the south line of the
land of Sam Arnold and the north line of the land of the Pearl Stewart Heirs,
S. 87° 50' 00" W., 931.3 feet to the point of beginning and containing 23.4 acres,
more or less.\

1-9-76

-2-

ᴄᴋ 256 ᴘᴀ377

**EXHIBIT A**

TRACT NO. RWFRR-3

A strip of land located in Sec. 36 T. 3 S., R. 6 E. in Jackson County, State of Alabama, approximately 1-3/4 miles northeast of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said strip being 150.0 feet wide, lying 75 feet on each side of the center line of a railroad location, the center line of the railroad location and the end boundaries of the strip being more particularly described as follows:

Beginning at a point where the center line of the railroad location crosses the west line of the land of the Pearl Stewart Heirs, which is the east line of the land of Robert E. Sebring, at survey station 22 + 67.9 on the center line of the railroad location, said point being S. 00° 31' 50" W., 492.0 feet from a corner of the lands of the Pearl Stewart Heirs, Robert E. Sebring, and Sam Arnold, the strip being bounded on the northwest end by the west line of the land of the Pearl Stewart Heirs; thence S. 52° 27' 13" E., 1162.6 feet to a point where the center line of the railroad location crosses the east line of the land of the Pearl Stewart Heirs, which is the west line of the land of Pearl Jones, at survey station 34 + 30.5 where the strip terminates and becomes bounded on the southeast end by the east line of the land of the Pearl Stewart Heirs, a line that extends on a bearing of N. 00° 46' 50" E.

The above described strip of land contains 4.0 acres, more or less.,
Furthermore, the right to construct the following:

1. An outlet ditch within an area lying northeast of and adjacent to the northwest line of the above described strip of land at or near survey station 28 + 65, the area extending approximately 330 feet in a northeasterly direction and having a width of approximately 65 feet.

-1-

TRACT NO. IMPRR-3

BOOK 253 PAGE 378

2.   A farm entrance within an area lying southwest of and adjacent to the southwest line of the above described strip of land at or near survey station 33 + 50, the area extending approximately 85 feet along the southwest line of the strip and having a width of approximately 80 feet.

3.   A farm entrance within an area lying northwest of and adjacent to the northeast line of the above described strip of land, the area extending from the east property line in a northwesterly direction approximately 75 feet along the northeast line of the strip and having a width of approximately 60 feet.

Return to PRA 535 Lupton Bldg.
Chattanooga, Tennessee 37401

-2-

EXHIBIT A                BOOK 262 PAGE 139

TRACT NO. ENFRR-4. 6

A strip of land located in the NW1/4 sec. 36, T. 3 S., R. 6 E. in Jackson County, State of Alabama, approximately 1-3/4 miles northeast of the Town of Holly-wood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said strip being 105 feet wide, lying 55.0 feet on the northeast side and 50.0 feet on the southwest side of the center line of a railroad location, the center line of the railroad location and the end boundaries of the strip being more particularly described as follows:

Beginning at a point where the center line of the railroad location crosses the south line of the land of Daisy G. Horne et al, which is the north line of the land of Pearl Jones, at survey station 44 + 98.3 on the center line of the railroad location, said point being S. 86° 30' 10" W., 202.0 feet from a point in the center line of an existing county road, a corner of the lands of Daisy G. Horne et al, Eddie Humphrey, John W. Snodgrass et ux, and Pearl Jones, the strip being bounded on the southeast end by the south line of the land of Daisy G. Horne et al; thence with a 1 degree and 30 minute curve on the center line of the railroad location as it curves to the left in a northwesterly direction, 825.75 feet to the tangent point of the curve at survey station 36 + 72.55; thence continuing with the center line of the railroad location N. 52° 29' 13" W., 242.05 feet to a point where the center line of the railroad location crosses the west line of the land of Daisy G. Horne et al, which is the east line of the land of the Pearl Stewart Heirs, at survey station 34 + 30.5 where the strip terminates and becomes bounded on the north-west end by the west line of the land of Daisy G. Horne et al, a line that extends on a bearing of N. 00° 46' 50" E.

The above described strip of land contains 2.6 acres, more or less.

Furthermore, the right to construct the following:

1. A farm entrance within an area lying southwest of and adjacent to the southwest line of the above described strip of land at or near survey station 38 + 30, the area extending approximately 85 feet along the southwest line of the strip and having a maximum width of approximately 45 feet.

2. A farm entrance within an area lying northeast of and adjacent to the northeast line of the above described strip of land at or near survey station 38 + 30, the area extending approximately 85 feet along the northeast line of the strip and having a maximum width of approximately 50 feet.

-1-

EXHIBIT A                   BOOK 258 PAGE 761

TRACT NO. BNPRR-4A )

A strip of land located in the NW1/4 sec. 36, T. 3 S., R. 6 E. in Jackson County, State of Alabama, approximately 1-3/4 miles northeast of the Town of Holly- wood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said strip being 105 feet wide, lying 55.0 feet on the northeast side and 50.0 feet on the southwest side of the center line of a railroad location, the center line of the railroad location and the end boundaries of the strip being more particularly described as follows:

Commencing at the tangent point of a 1 degree and 30 minute curve on the center line of the railroad location at survey station 55 + 15.75, the bearing of the tangent south of the said point being N. 24° 50' 20" W.; thence with the curve on the center line of the railroad location as it curves to the left in a northwesterly direction, 674.25 feet to the POINT OF BEGINNING where the center line of the rail- road location crosses the east line of the land of Pearl Jones, which is the west line of the land of John W. Snodgrass et ux, at survey station 48 + 41.5, said point being N. 01° 32' 40" W., 108.5 feet from a corner of the lands of Pearl Jones, John W. Snodgrass et ux, and Annie McGill, the strip being bounded on the southeast end by the east line of the land of Pearl Jones; thence, entering the land of Pearl Jones, continuing with the curve on the center line of the railroad location in a north- westerly direction, 343.2 feet to a point where the center line of the railroad location crosses the north line of the land of Pearl Jones, which is the south line of the land of Daisy G. Horne et al, at survey station 44 + 98.3, said point being S. 86° 30' 10" W., 202.0 feet from a point in the center line of an existing county road, a corner of the lands of Pearl Jones, Daisy G. Horne et al, Eddie Humphrey, and John W. Snodgrass et ux, the strip terminating and being bounded on the northwest end by the north line of the land of Pearl Jones.

-1-

BOOK 258 PAGE 762

The above described strip of land contains 0.8 acre, more or less.

The above described land is subject to the following:

1.   Such rights as may be vested in the county to a right of way for a road.

2.   Such rights as may be vested in third parties to rights of way for electric power and telephone lines.

-2-

EXHIBIT A

BOOK 256 PAGE 137

TRACT NO. HIPRR-5

A strip of land located in sec. 36, T. 3 S., R. 6 E. in Jackson County, State of Alabama, approximately 2 miles northeast of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said strip lying on each side of the center line of a railroad location, the center line of the railroad location and the boundaries of the strip being more particularly described as follows:

Commencing at the tangent point of a 1 degree and 30 minute curve on the center line of the railroad location at survey station 55 + 15.75 on the center line of the railroad location, the bearing of the tangent on the center line of the location south of the said survey station being N. 24° 50' 20" W.; thence with the curve on the center line of the location, as it curves to the left in a northerly direction, 158.45 feet to the POINT OF BEGINNING at survey station 53 + 57.3, said survey station being radially opposite the intersection of a line 55.0 feet east of and parallel to the center line of the location with the south line of the land of John W. Snodgrass et ux, which is the north line of the land of Earlyne Allison et al, the strip being bounded on the east by the line that is 55.0 feet east of and parallel to the center line of the location and on the south by the said south line of the land of John W. Snodgrass et ux; thence continuing with the curve on the center line of the location in a northerly direction, 28.3 feet to a point where the center line of the location crosses the south line of the land of John W. Snodgrass et ux, which is the north line of the land of Earlyne Allison et al, at survey station 53 + 29.0, said point being N. 83° 56' 30" E., 241.7 feet from a corner of the lands of John W. Snodgrass et ux, Earlyne Allison et al, and Annie McGill; thence, entering the land of John W. Snodgrass et ux, continuing

-1-

CEX 256 PAGE 138

with the curve on the center line of the location in a northerly direction, 118.5
feet to survey station 52 + 16.9, said survey station being 212.5 feet east of and
radially opposite the above mentioned corner of the lands of John W. Snodgrass
et ux, Earlyne Allison et al, and Annie McGill, at the intersection of the south
and west lines of the land of John W. Snodgrass et ux, where the strip becomes
bounded on the west by the west line of the land of John W. Snodgrass et ux, which
is the east line of the land of Annie McGill; thence continuing with the curve on
the center line of the railroad location in a northwesterly direction, 277 feet to
survey station 49 + 33.5, said survey station being 58.7 feet northeast of and
radially opposite a corner of the lands of John W. Snodgrass et ux, Annie McGill,
and Pearl Jones, at an angle in the west line of the land of John W. Snodgrass
et ux, where the strip becomes bounded on the west by the west line of the land
of John W. Snodgrass et ux, which is the east line of the land of Pearl Jones;
thence, continuing with the curve on the center line of the railroad location in
a northwesterly direction, 92 feet to a point where the center line of the location
crosses the west line of the land of John W. Snodgrass et ux, which is the east
line of the land of Pearl Jones, at survey station 48 + 41.5, said point being
N. 1° 32' 46" W., 168.5 feet from the above mentioned corner of the lands of
John W. Snodgrass et ux, Annie McGill, and Pearl Jones. thence, leaving the land
of John W. Snodgrass et ux, continuing with the curve on the center line of the
location   in a northwesterly direction, 80.9 feet to survey station 47 + 60.6
radially opposite which the strip terminates at the intersection of the line that
is 55.0 feet northeast of and parallel to the center line of the location with the
west line of the land of John W. Snodgrass et ux.

The above described strip of land contains 1.9 acres, more or less.

EXHIBIT A                    BOOK 255 PAGE 808

TRACT NO. DHPRR-6 ‡

A strip of land located in Section 36, T 3 S , R 6 E, and Section
1, T 4 S, R 6 E, in Jackson County, State of Alabama, on the right side
of the Tennessee River, approximately 2 miles northeast of the Town of
Hollywood, as shown on a map prepared by the Tennessee Valley Authority
and entitled "Access Railroad," said strip lying on each side of the
center line of a railroad location, the center line of the railroad
location and the boundaries of the strip being more particularly described
as follows:

Beginning at a point where the center line of the railroad location crosses
the north line of the land of Earlyne Allison et al, which is the south line of
the land of John W. Snodgrass et ux, at survey station 53 + 29.0 on the center line
of the location, said point being N. 89° 56' 30" E., 241.7 feet from a corner of
the lands of Earlyne Allison et al, Annie McGill, and John W. Snodgrass et ux, the
strip being bounded on the north by the north line of the land of Earlyne Allison
et al and having a width of 105.0 feet, lying 55.0 feet on the east side and 50.0
feet on the west side of the center line of the location; thence with a 1 degree
and 30 minute curve on the center line of the location as it curves to the right in
a southerly direction, 186.75 feet to the P. T. of the curve at survey station
55 + 15.75, said survey station being 55.0 feet west of and opposite a point
where the strip becomes bounded on the east by a line that extends on a bearing of
S. 26° 01' 20" E. for a distance of 484.4 feet to a point 65.0 feet east of and
opposite survey station 60 + 00 on the line ahead and also being 50.0 feet east of
and opposite a point where the strip becomes bounded on the west by a line that
extends on a bearing of S. 21° 53' 00" E. for a distance of 484.9 feet to a point
75.0 feet west of and opposite the above mentioned survey station 60 + 00 on the
line ahead; thence from survey station 55 + 15.75 continuing with the center line
of the location S. 24° 50' 20" E., 484.25 feet to the above mentioned survey station

-1-

BOOK 200 PAGE 609

60 + 00 where the strip becomes 140.0 feet wide, lying 65.0 feet on the east side
and 75.0 feet on the west side of the center line of the location; thence continuing
with the center line of the location S. 24° 50' 20" E., 1500 feet to survey station
75 + 00, said survey station being 75.0 feet east of and opposite a point where the
strip becomes bounded on the west by a line that extends on a bearing of S. 25°
59' 00" E. for a distance of 500.10 feet to a point 65.0 feet west of and
opposite survey station 80 + 00 on the line ahead; thence from survey station
75 + 00 continuing with the center line of the location S. 24° 50' 20" E., 500
feet to the above mentioned survey station 80 + 00 opposite which the strip becomes
bounded on the west by a line 65.0 feet west of and parallel to the center line of
the location, said survey station also being 65.0 feet west of and opposite a point
where the strip becomes bounded on the east by a line that extends on a bearing of
S. 26° 44' 50" E. for a distance of 300.17 feet to a point 75.0 feet east of and
opposite survey station 83 + 00 on the line ahead; thence from survey station 80 + 00
continuing with the center line of the location S. 24° 50' 20" E., 300 feet to the
above mentioned survey station 83 + 00 where the strip becomes 140.0 feet wide,
lying 75.0 feet on the east side and 65.0 feet on the west side of the center line
of the location; thence continuing with the center line of the location S. 24° 50'
20" E., 219.1 feet to survey station 85 + 19.1, said survey station being 75.0 feet
west of and opposite a point in the northwest line of the right of way of the U.S.
Highway 72 where the strip becomes bounded on the southeast by the highway right of
way line; thence continuing with the center line of the location S. 24° 50' 20" E.,
18.1 feet to a point where the center line of the location crosses the northwest
line of the right of way of U.S. Highway 72, at survey station 85 + 37.2, said
point being 182.2 feet, as measured along the said highway right of way line in a
southwesterly direction, from the intersection of the highway right of way line
with the east line of the land of Earlyne Allison et al, which is the west line

воок 255 раде 610

of the land of Susie Lee Humphrey; thence, leaving the tract of land herein described, continuing with the center line of the location S. 24° 50' 20" E., 15.7 feet to survey station 69 + 52.9 opposite which the strip terminates at the intersection of the line that is 65.0 feet west of and parallel to the center line of the location with the northwest line of the right of way of U.S. Highway 72.

The above described strip of land contains 9.9 acres, more or less.

Furthermore, the right to construct the following:

1. An outlet ditch within an area lying east of and adjacent to the east line of the above described strip of land at or near survey station 62 + 50, the area extending approximately 130 feet in a northeasterly direction and having a width of approximately 90 feet.

2. A drainage ditch within an area lying northwest of and adjacent to the northwest line of the right of way of U.S. Highway 72, the area extending from the west line of the above described strip of land in a southwesterly direction for a distance of approximately 410 feet along the northwest highway right of way line and having a maximum width of approximately 75 feet and an average width of 37 feet.

The above described land is subject to such rights as may be vested in third parties to rights of way for electric power and telephone lines.

This land is conveyed subject to the right of the undersigned to use a field entrance on the east and west side of the described tract of land, at or near survey station 69 + 40, for the passage of livestock, farm equipment, and machinery. The Tennessee Valley Authority will erect a gate 28 feet in width at each of the two field entrances.

BOOK 258 PAGE 774

EXHIBIT A

TRACT NO. BNPRR-7 ↓

Two parcels of land located in sec. 1, T. 4 S., R. 6 E. and in the Harlin Morgan and Rilie Reservation, in Jackson County, State of Alabama, on the right side of the Tennessee River, approximately 2 miles east of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said parcels lying on each side of the center line of a railroad location, and being more particularly described as follows:

Parcel No. 1

A strip of land located in sec. 1, T. 4 S., R. 6 E. and lying on each side of the center line of the hereinabove mentioned railroad location, the center line of the railroad location and the boundaries of the strip being more particularly described as follows:

Beginning at survey station 85 + 86.8 on the center line of the railroad location, said survey station being 135.6 feet west of and opposite the intersection of the southeast line of the right of way of U.S. Highway 72 with the east line of the land of Harold T. Foster, which is the west line of the land of James B. Phillips, the strip being bounded on the northwest by the said highway right of way line and on the east by the east line of the land of Harold T. Foster, which is the west line of the land of James B. Phillips; thence with the center line of the railroad location S. 24° 50' 20" E., 32.7 feet to a point where the center line crosses the southeast line of the right of way of U.S. Highway 72 at survey station 86 + 19.5, said point being 139.5 feet, as measured along the highway right of way line in a southwesterly direction, from the above mentioned intersection of the highway right of way line with the east line of the land of Harold T. Foster; thence, entering the tract of land herein described, continuing with the center line of the railroad location S. 24° 50' 20" E., 16.6 feet to survey station 86 + 36.1, said survey station

-1-

BOOK 258 PAGE 775

being 68.7 feet east of and opposite a point in the southeast line of the right of way of U.S. Highway 72 where the strip becomes bounded on the west by a line that extends on a bearing of S. 22° 17' 00" E. for a distance of 229.0 feet to a point 60.0 feet west of and radially opposite survey station 88 + 75.9 on the line ahead; thence from survey station 86 + 36.1 continuing with the center line of the railroad location S. 24° 50' 20" E., 1.65 feet to the P. C. of a 4 degree curve to the right at survey station 86 + 37.75; thence with the curve on the center line of the rail-road location in a southerly direction, 238.15 feet to the above mentioned survey
station 88 + 75.9/opposite which the strip becomes bounded on the west by a line
radially
60.0 feet west of and parallel to the center line of the railroad location; thence continuing with the curve on the center line of the railroad location in a southerly direction, 107.5 feet to a point where the center line crosses the east line of the land of Harold T. Foster, which is the west line of the land of James B. Phillips, at survey station 89 + 83.4, said point being N. 00° 35' 20" W., 121.7 feet from a corner of the lands of Harold T. Foster, James B. Phillips, and J. A. Braselton; thence, leaving the land of Harold T. Foster, continuing with the curve on the center line of the railroad location in a southerly direction, 122.9 feet to a point where the center line of the railroad location crosses the south line of the land of James B. Phillips, which is the north line of the land of J. A. Braselton, at survey station 91 + 06.3, said point being N. 89° 27' 10" E., 17.0 feet from the above mentioned corner of the lands of Harold T. Foster, James B. Phillips, and J. A. Brazelton, at an angle in the east line of the land of Harold T. Foster where the strip becomes bounded on the east by the east line of the land of Harold T. Foster, which is the west line of the land of J. A. Braselton; thence continuing with the curve on the center line of the railroad location in a southerly direction, 93.7 feet to survey station 92 + 00, said survey station being 60.0 feet east of and radially opposite a point where the strip becomes bounded on the west by a line that extends on a bearing of S. 05° 11' 30" E. for a distance of 111.3 feet to a point

-2-

BOOK 258 PAGE 776

50.0 feet west of and radially opposite survey station 93 + 15.35 on the line ahead; thence from survey station 92 + 00 continuing with the curve on the center line of the railroad location in a southerly direction, 115.35 feet to the P. T. of the curve at the above mentioned survey station 93 + 15.35 opposite which the strip becomes bounded on the west by a line 50.0 feet west of and parallel to the center line of the railroad location; thence continuing with the center line of the railroad location S. 02° 15' 54" W., 325.05 feet to survey station 96 + 40.4, said survey station being 14.7 feet east of and opposite a corner of the lands of Harold T. Foster, J. A. Brazelton, and Charles O. Hass, at the intersection of the east and south lines of the land of Harold T. Foster, where the strip becomes bounded on the south by the south line of the land of Harold T. Foster, which is the north line of the land of Charles O. Hass; thence continuing with the center line of the railroad location S. 02° 15' 54" W., 4.5 feet to survey station 96 + 44.9 opposite which the strip terminates at the intersection of the line that is 50.0 feet west of and parallel to the center line of the railroad location with the south line of the land of Harold T. Foster.

The above described strip of land contains 1.5 acres, more or less.

Parcel No. 2 .

A strip of land located in the Harlin Morgan and Rilie Reservation and lying on each side of the center line of the here inabove mentioned railroad location, the center line of the railroad location and the boundaries of the strip being more particularly described as follows:

Beginning at survey station 107 + 19.3 on the center line of the railroad location, said survey station being opposite the intersection of a line 50.0 feet west of and parallel to the center line of the railroad location with the east line of the land of Harold T. Foster, the strip being bounded on the east by the east line of the land of Harold T. Foster, which is the west line of the land of Charles O. Hass, and on the west side by the line that is 50.0 feet west of and parallel to

-3-

BOOK 258 PAGE 777

the center line of the railroad location; thence with the center line of the
railroad location S. 2° 15' 54" W., 801.3 feet to survey station 115 + 20.6, said
survey station being 30.9 feet east of and opposite a corner of the lands of Harold T.
Foster and Charles O. Hass, at the intersection of the east and north lines of the
land of Harold T. Foster, where the strip becomes bounded on the north by the north
line of the land of Harold T. Foster, which is the south line of the land of Charles O.
Hass; thence continuing with the center line of the railroad location S. 2° 15' 54" W.,
3.3 feet to a point where the center line of the railroad location crosses the north
line of the land of Harold T. Foster, which is the south line of the land of Charles O.
Hass, at survey station 115 + 23.9, said survey station being N. 81° 39' 50" W.,
147.2 feet from a corner of the lands of Harold T. Foster and Charles O. Hass,
at the intersection of the north and east lines of the land of Harold T. Foster,
where the strip becomes bounded on the east by the east line of the land of Harold T.
Foster, which is the west line of the land of Charles O. Hass, a line that extends
on a bearing of S. 10° 24' 00" W. for a distance of 562.2 feet to a point 66.9 feet
east of and opposite survey station 120 + 96.0 on the line ahead; thence from survey
station 115 + 23.9, entering the land of Harold T. Foster, continuing with the
center line of the railroad location S. 2° 15' 54" W., 572.1 feet to the above
mentioned survey station 120 + 96.0, said survey station being 66.9 feet west of and
opposite an angle in the east line of the land of Harold T. Foster where the strip
continues to be bounded on the east by the east line of the land of Harold T. Foster,
a line that extends on a bearing of S. 5° 16' 10" W. for a distance of 72.6 feet to
a corner of the lands of Harold T. Foster, Charles O. Hass, and W. L. Matthews et ux;
thence from survey station 120 + 96.0 continuing with the center line of the
railroad location S. 2° 15' 54" W., 72.5 feet to survey station 121 + 68.5, said
survey station being 63.1 feet west of and opposite the above mentioned corner of
the lands of Harold T. Foster, Charles O. Hass, and W. L. Matthews et ux where the

-4-

BOOK **258** PAGE **778**

strip becomes bounded on the east by the east line of the land of Harold T. Foster,
which is the west line of the land of W. L. Matthews et ux, a line that extends on
a bearing of S. 4° 54' 50" W. for a distance of 405.4 feet to a point in the center
line of an existing county road at a corner of the lands of Harold T. Foster, W. L.
Matthews et ux, and Charles R. Bradford, Jr.; thence from survey station 121 + 68.5
continuing with the center line of the railroad location S. 2° 15' 54" W., 261.71
feet to the P. C. of a 5 degree curve to the left at survey station 124 + 30.21;
thence with the curve on the center line of the railroad location in a southerly
direction, 150.99 feet to survey station 125 + 81.2, said survey station being 34.6
feet west of and radially opposite the above mentioned corner of the lands of Harold T.
Foster, W. L. Matthews et ux, and Charles R. Bradford, Jr., where the strip becomes
bounded on the east by the east line of the land of Harold T. Foster, which is the
west line of the land of Charles R. Bradford, Jr., a line that extends on a bearing
of S. 8° 59' 30" W. for a distance of 79.3 feet to a corner of the lands of
Harold T. Foster, Charles R. Bradford, Jr., and the United States of America (US-TVA
Tract No. GR-1224); thence from survey station 125 + 81.2 continuing with the curve
on the center line of the railroad location in a southerly direction, 77.8 feet to
survey station 126 + 59.0, said survey station being 12.4 feet west of and radially
opposite the above mentioned corner of the lands of Harold T. Foster, Charles R.
Bradford, Jr., and Tract No. GR-1224, at the intersection of the east and southeast
lines of the land of Harold T. Foster, where the strip becomes bounded on the south-
east by the southeast line of the land of Harold T. Foster, which is the northwest
line of Tract No. GR-1224; thence continuing with the curve on the center line of
the railroad location in a southerly direction, 6.2 feet to a point where the center
line of the railroad location crosses the said southeast line of the land of Harold T.
Foster, at survey station 126 + 65.2, said point being S. 54° 00' 20" W., 13.9 feet
from the above mentioned corner of the lands of Harold T. Foster, Charles R. Bradford,

-5-

BOOK 258 PAGE 779

Jr., and Tract No. GR-1224; thence, leaving the land of Harold T. Foster, continu'
with the curve on the center line of the railroad location in a southerly direction,
23.8 feet to survey station 126 + 89.0 radially opposite which the strip terminates
at the intersection of the line that is 50.0 feet west of and parallel to the center
line of the railroad location with the southeast line of the land of Harold T. Foster.

The above described Parcels No. 1 and No. 2 contain a total of 5.1 acres, more
or less.

Furthermore, the right to construct an inlet ditch within an area lying west
of and adjacent to the west line of the above described strip of land at or near
survey station 113 + 45, the area extending approximately 220 feet along the
said west line of the strip of land and having a maximum width of approximately 30
feet.

The above described land is subject to the following:

1. Such rights as may be vested in the county to a right of way for a road.

2. Such rights as may be vested in third parties to rights of way for electric
power and telephone lines.

-6-

Case 3:18-cv-01983-HNJ   Document 1-1   Filed 11/30/18   Page 49 of 59

BOOK 263 PAGE 968

TRACT NO. BNPRR-8
PAGE 1 OF 2 PAGES

An estate in fee simple in the following described land:

TRACT NO. BNPRR-8

A strip of land located in sec. 1, T. 4 S., R. 6 E. in Jackson
County, State of Alabama, on the right side of the Tennessee
River, approximately 2 miles east of the town of Hollywood,
said strip lying on each side of the center line of a railroad
location, the center line of the railroad location and the
boundaries of the strip being more particularly described as
follows:

Commencing at the P. C. of a 4 degree curve on the center line
of the railroad location at survey station 86 + 37.75, the
bearing of the center line north of the said survey station
being S. 24° 50' 20" E.; thence with the curve on the center
line of the railroad location as it curves to the right in a
southerly direction, 26.95 feet to the POINT OF BEGINNING at
survey station 86 + 64.7, said survey station being radially
opposite the intersection of a line 100.0 feet east of and
parallel to the center line of the railroad location with the
west line of the land of James B. Phillips, which is the east
line of the land of Harold T. Foster, the strip being bounded
on the west by the said west line of the land of James B.
Phillips and on the east by the line that is 100.0 feet east
of and parallel to the center line of the railroad location;
thence continuing with the curve on the center line of the
railroad location in a southerly direction, 318.7 feet to a
point where the center line of the railroad location crosses
the west line of the land of James B. Phillips, which is the
east line of the land of Harold T. Foster, at survey station
89 + 83.4, said point being N. 00° 35' 20" W., 121.7 feet from
a corner of the lands of James B. Phillips, J. A. Braselton,
and Harold T. Foster; thence, entering the land of James B.
Phillips, continuing with the curve on the center line of the
railroad location in a southerly direction, 121.3 feet to
survey station 91 + 04.7, said survey station being 16.9 feet
east of and radially opposite the above-mentioned corner of
the lands of James B. Phillips, J. A. Braselton, and Harold T.
Foster, at the intersection of the west and south lines of
the land of James B. Phillips, where the strip becomes bounded
on the south by the south line of the land of James B. Phillips,
which is the north line of the land of J. A. Braselton; thence
continuing with the curve on the center line of the railroad
location in a southerly direction, 1.6 feet to a point where
the center line of the railroad location crosses the south
line of the land of James B. Phillips, which is the north line
of the land of J. A. Braselton, at survey station 91 + 06.3,
said point being N. 89° 27' 10" E., 17.0 feet from the above-
mentioned corner of the lands of James B. Phillips, J. A.
Braselton, and Harold T. Foster; thence, leaving the land of
James B. Phillips, continuing with the curve on the center line

3

TVA 44 (OS-9-43)

BOOK 263 PAGE 969

of the railroad location in a southerly direction, 9.1 feet to
survey station 91 + 15.4 radially opposite which the strip
terminates at the intersection of the line that is 100.0 feet
east of and parallel to the center line of the railroad loca-
tion with the south line of the land of James B. Phillips.

The above-described land contains 0.8 acre, more or less, a
portion of which is subject to an existing easement heretofore
acquired and now owned by the United States of America by virtue
of a deed recorded in Deed Book 98, page 354, in the office of
the Judge of Probate, Jackson County, Alabama.

TVA 69 100-3-10
UNITED STATES GOVERNMENT

BOOK 257 PAGE 545

EXHIBIT A

TRACT NO. ENPRR-9

A strip of land located in sec. 1, T. 4 S., R. 6 E. in Jackson County, State of Alabama, on the right side of the Tennessee River, approximately 2 miles east of the Town of Hollywood, as shown on a map prepared by the Tennessee Valley Authority and entitled "Access Railroad," said strip lying on each side of the center line of a railroad location, the center line of the railroad location and the boundaries of the strip being more particularly described as follows:

Beginning at a point where the center line of the railroad location crosses the north line of the land of J. A. Brazelton, which is the south line of the land of James B. Phillips, at survey station 91 + 06.3 on the center line of the railroad location, said point being N. 89° 27' 10" E., 17.0 feet from a corner of the lands of J. A. Brazelton, Harold T. Foster, and James B. Phillips, at the intersection of the north and west lines of the land of J. A. Brazelton, the strip being bounded on the north end by the north line of the land of J. A. Brazelton, on the west side by the west line of the land of J. A. Brazelton, which is the east line of the land of Harold T. Foster, and on the east side by a line 50.0 feet east of and parallel to the center line of the railroad location; thence with a 4 degree curve on the center line of the railroad location as it curves to the right in a southerly direction, 209.05 feet to the P. T. of the curve at survey station 93 + 15.35; thence S. 02° 15' 54" W., 323.15 feet to a point where the center line of the railroad location crosses the south line of the land of J. A. Brazelton, which is the north line of the land of Charles O. Haas, at survey station 96 + 38.5, said point being N. 85° 01' 30" E., 14.8 feet from a corner of the lands of J. A. Brazelton, Charles O. Haas, and Harold T. Foster where the strip terminates at the intersection

11-3

-1-

BOOK 257 PAGE 546

of the west and south lines of the land of J. A. Braselton.

The above described strip of land contains 0.9 acre, more or less.

Furthermore, the right to construct an outlet ditch within an area lying north of and adjacent to the south line of the land of J. A. Braselton, which is the north line of the land of Charles O. Hass, the area extending from the east line of the above described strip of land in an easterly direction for a distance of approximately 115 feet along the south property line and having a maximum width of approximately 85 feet.

The above described land is subject to such rights as may be vested in third parties to a right of way for a street.

The above described land will be conveyed subject to a transmission line easement.

-2-

BOOK 204 PAGE 100

(TRACT NO. BNPRR-10)
(PAGE 1 OF 2 PAGES )

An estate in fee simple in the following described land:

TRACT NO. BNPRR-10

A strip of land located in sec. 1, T. 4 S., R. 6 E. in
Jackson County, State of Alabama, on the right side of the
Tennessee River, approximately 2 miles east of the Town
of Hollywood, said strip lying on each side of the center
line of a railroad location, the center line of the rail-
road location and the boundaries of the strip being more
particularly described as follows:

Beginning at survey station 96 + 32.1 on the center line
of the railroad location, said survey station being opposite
the intersection of a line 50.0 feet east of and parallel
to the center line of the railroad location with the north
line of the land of Charles O. Hass, which is the south
line of the land of J. A. Brazelton, the strip being bounded
on the north by the north line of the land of Charles O.
Hass and on the east by the line that is 50.0 feet east
of and parallel to the center line of the railroad location;
thence with the center line of the railroad location S. 02°
15' 54" W., 6.4 feet to a point where the center line
crosses the north line of the land of Charles O. Hass
at survey station 96 + 38.5, said survey station being
N. 85° 01' 30" E., 14.8 feet from a corner of the lands of
Charles O. Hass, Harold T. Foster, and J. A. Braselton;
thence, entering the land of Charles O. Hass, continuing
with the center line of the railroad location S. 02° 15'
54" W., 1.9 feet to survey station 96 + 40.4, said survey
station being 14.7 feet east of and opposite the above-
mentioned corner of the lands of Charles O. Hass, Harold
T. Foster, and J. A. Brazelton where the strip continues
to be bounded on the north by the north line of the land
of Charles O. Hass, which is the south line of the land of
Harold T. Foster; thence S. 02° 15' 54" W., 7.7 feet to
survey station 96 + 48.1, said survey station being 75.6
feet east of and opposite a corner of the lands of Charles
O. Hass and Harold T. Foster, at the intersection of the
north and west line of the land of Charles O. Hass where
the strip becomes bounded on the west by the west line of
the land of Charles O. Hass, which is the east line of the
land of Harold T. Foster, a line that extends on a bearing
of S. 00° 53' 50" W. for a distance of 1873.0 feet to
its intersection with the south line of the land of Charles
O. Hass; thence from survey station 96 + 48.1 continuing
with the center line of the railroad location S. 02° 15'
54" W., 751.9 feet to survey station 104 + 00, said survey
station being 50.0 feet west of and opposite a point where
the strip becomes bounded on the east by a line that extends
on a bearing of S. 00° 35' 50" E. for a distance of 200.2
feet to a point 60.0 feet east of and opposite survey
station 106 + 00 on the line ahead; thence from survey
station 104 + 00 continuing with the center line of the
railroad location S. 02° 15' 54" W., 200 feet to the above-
mentioned survey station 106 + 00 opposite which the strip
becomes bounded on the east by a line 60.0 feet east of and
parallel to the center line of the railroad location; thence

2

BOOK 201 PAGE 101

(TRACT NO. BNPRR-10)
(PAGE 2 OF 2 PAGES )

continuing with the center line of the railroad location
S. 02° 15' 54" W., 920.6 feet to survey station 115 + 20.6,
said survey station being 30.9 feet east of and opposite
a corner of the lands of Charles O. Hass and Harold T.
Foster at the above-mentioned intersection of the line
that extends on a bearing of S. 00° 53' 50" W. with the
south line of the land of Charles O. Hass, where the
strip becomes bounded on the south by the south line of
the land of Charles O. Hass, which is the north line of
the land of Harold T. Foster; thence continuing with the
center line of the railroad location S. 02° 15' 34" W.,
3.3 feet to a point where the center line of the railroad
location crosses the said south line of the land of
Charles O. Hass, which is the north line of the land of
Harold T. Foster, at survey station 115 + 23.9, said point
being S. 81° 39' 50" E., 31.0 feet from the above-mentioned
corner of the lands of Charles O. Hass and Harold T.
Foster; thence, leaving the land of Charles O. Hass, con-
tinuing with the center line of the railroad location S.
02° 15' 54" W., 6.4 feet to survey station 115 + 30.3
opposite which the strip terminates at the intersection of
the line that is 60.0 feet east of and parallel to the
center line of the railroad location with the south line
of the land of Charles O. Hass.

The above-described strip of land contains 4.7 acres,
more or less.

Furthermore, the right to construct an outlet ditch
within an area lying east of and adjacent to the east
line of the above-described strip of land, the area
extending from the south line of the land of Charles O.
Hass in a northerly direction for a distance of approxi-
mately 185 feet along the east line of the said strip
and having a maximum width of approximately 125 feet.

3

BOOK 2U4 PAGE 94

TRACTS BNPRH-~ AND BNPRH-11
PAGE 2 OF 4 PAGES

~~as it curves to the right in a northerly direction, 61.3 feet
to the point of beginning, and containing 0.3 acre, more or
less.~~

~~The above-described easement is acquired subject to the
following:~~

~~1.   Such rights as may be vested in the county to
a right-of-way for a road;~~

~~2.   Such rights as may be vested in third parties
to rights-of-way for electric power and tele-
phone lines.~~

## PART II

An estate in fee simple in the following described land:

### TRACT NO. BNPRH-11 ;

Two parcels of land located in the Harlin Morgan and Rilie
Reservation, in Jackson County, State of Alabama, on the right
side of the Tennessee River, approximately 2 miles east of the
Town of Hollywood, said parcels being more particularly
described as follows:

### Parcel No. 1

A strip of land lying on each side of the center line of a
railroad loca''on, the center line of the railroad location
and the boundaries of the strip being more particularly
described as follows:

Beginning at survey station 129 + 53.2 on the center line of
the railroad location, said survey station being 65.0 feet west
of and radially opposite the intersection of a line that extends
on a bearing of S. 30° 03' 10" E. with the northwest line of
the land of Charles R. Bradford, Jr., which is the southeast
line of the land of the United States of America (US-TVA Tract
No. GR-1224), the strip being bounded on the northwest by the
said northwest line of the land of Charles R. Bradford, Jr., and
on the northeast by the line that begins at the above-mentioned
intersection with the northwest property line and extends on a
bearing of S. 30° 03' 10" E. for a distance of 232.4 feet to a
point 65.0 feet northeast of and radially opposite survey sta-
tion 132 + 00 on the line ahead; thence from survey station 129
+ 53.2 with a 5 degree curve on the center line of the railroad
location as it curves to the left in a southerly direction, 21.2
feet to a point where the center line of the railroad location
crosses the northwest line of the land of Charles R. Bradford,
Jr., which is the southeast line of Tract No. GR-1224, at survey
station 129 + 74.4, said point being N. 48° 00' 00" E., 93.6
feet from Corner No. 63-101, a corner of the land of Charles R.
Bradford, Jr., and Tract No. GR-1224, at the intersection of
the northwest and southwest lines of the land of Charles R.
Bradford, Jr., where the strip becomes bounded on the southwest
by the southwest line of the land of Charles R. Bradford, Jr.,
which is the northeast line of Tract No. GR-1224, a line that