FILED
2020 Oct-07  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
2                    NORTHEASTERN DIVISION
3                CASE NO. 5:18-CV-01983-LCB
4

NUCLEAR DEVELOPMENT, LLC,

5

             Plaintiff,

6

vs.

7

TENNESSEE VALLEY AUTHORITY,

8

             Defendant.

9

_____/

10
11                              1100 South Ocean Blvd.
                                Manalapan, Florida
12                              January 24, 2020
                                9 a.m. - 12:25 p.m.
13
14
15
16
17
18      VIDEOTAPED DEPOSITION OF FRANKLIN HANEY, SR.
19
20      Taken on behalf of the Defendant before
21   Alice J. Teslicko, RMR, Notary Public in and for the
22   State of Florida at Large, pursuant to a Notice of
23   Taking Deposition in the above cause.
24
25

Page 2

```
 1  APPEARANCES:
 2
    HAND, ARENDALL, HARRISON, SALE, LLC
 3  BY:  CAINE O'REAR, III, ESQ.
    104 Saint Francis Street, Suite 300
 4  Mobile, AL 36602
    (251) 432-5511
 5  corear@handarendall.com
 6    and
 7  HUGHES, SOCOL, PIERS, RESNICK, DYM, LTD.
    BY:  LARRY DAVID BLUST, ESQ.
 8  70 West Madison Street, Suite 4000
    Chicago, IL 60602
 9  (312) 580-0100
    lblust@hsplegal.com
10  Attorneys for the Plaintiff and Attorneys for the
        witness, Franklin L. Haney, Sr.
11
12
    BRADLEY, ARANT, BOULT, CUMMINGS, LLP
13  BY:  MATTHEW H. LEMBKE, ESQ.
    1819 Fifth Avenue North
14  Birmingham, AL 35203
    (205) 521-8000
15  mlembke@bradley.com
16    and
17  OFFICE OF THE GENERAL COUNSEL - TENNESSEE VALLEY
        AUTHORITY
18  BY:  DAVID D. AYLIFFE, ESQ.
        STEVEN C. CHIN, ESQ.
19  400 West Summit Hill Drive, WT6
    Knoxville, TN 37902
20  (865) 632-3052
    Attorneys for the Defendant
21
22  Also Present:  Pedro Martinez - Videographer
23         - - -
24
25
```

Page 3

```
 1               I N D E X
 2  WITNESS                          PAGE
 3
 4  FRANKLIN HANEY, SR.
 5  Direct Examination by Mr. Lembke    8
 6  Certificate of Oath               138
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         DEFENDANT'S EXHIBITS
 2  EXHIBIT        DESCRIPTION        PAGE
 3
    Exhibit 119   Email from Larry Blust      64
 4        dated 1/3/2016
 5  Exhibit 120   Nuclear Development's      120
        Interim Damages Computation
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  PREVIOUSLY MARKED EXHIBITS REFERRED TO
 2  EXHIBIT       DESCRIPTION       PAGE
 3
    Exhibit 42   Email chain dated 8/18/2016    42
 4
    Exhibit 43   Email from Larry Blust      61
 5        dated 9/9/2016
 6  Exhibit 45   Email chain dated 10/4/2016    62
 7  Exhibit 89   Email from Larry Blust      63
        dated 10/18/2016
 8
    Exhibit 1    Bellefonte Nuclear Plant     66
 9        Site Purchase and Sales
        Agreement
10
    Exhibit 18   Email chain dated 11/9/2018    70
11
    Exhibit 116  Email from Marie Gillman      91
12        dated 10/17/2018
13  Exhibit 48   Email chain dated       96
        12/20/2016
14
    Exhibit 49   Email chain dated       98
15        12/21/2016
16  Exhibit 15   Email chain dated       114
        10/25/2018
17
18
19
20
21
22
23
24
25
```

Page 6

1      THE VIDEOGRAPHER:  Here begins media number
2  one in the deposition of Franklin L. Haney, Sr.
3  in the matter of Nuclear Development, LLC vs.
4  Tennessee Valley Authority.  Today's date is
5  January 24th, 2020.  The time on the video is
6  9:03 a.m.
7      This video specialist is Pedro Martinez.
8  The court reporter is Alice Teslicko on behalf of
9  Veritext Legal Solutions.  This video deposition
10  is taking place at 1100 South Ocean Boulevard,
11  Manalapan, Florida 33462.
12      Counsel, please identify yourself and whom
13  you represent.
14      MR. O'REAR:  Caine O'Rear for Nuclear
15  Development.
16      MR. BLUST:  And Larry Blust for Nuclear
17  Development.
18      MR. LEMBKE:  Matt Lembke for the defendant.
19      MR. AYLIFFE:  David Ayliffe for defendant.
20      MR. CHIN:  Steve Chin for the TVA defendant.
21      THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness.
23
24
25

Page 7

1  Thereupon:
2          FRANKLIN HANEY, SR.
3  was called as a witness and having been first duly
4  sworn, was examined and testified as follows:
5      THE WITNESS:  I do.
6      THE COURT REPORTER:  Thank you.
7          DIRECT EXAMINATION
8  BY MR. LEMBKE:
9      Q    Will you please state your name for the
10  record?
11      A    Franklin Haney.
12      Q    Mr. Haney, my name is Matt Lembke and we
13  were introduced a few minutes ago.  I represent the
14  defendant, Tennessee Valley Authority, in this case
15  and I'm here to take your deposition today.
16      Have you ever had your deposition taken
17  before?
18      A    I have, about 20 or 30 years ago.
19      Q    Okay.  Well, as you know, I'm going to ask
20  you a series of questions and you've just been placed
21  under oath, so you need to answer the questions to the
22  best of your ability.
23      If at any time you don't understand one of
24  my questions or you need it repeated, just let me know
25  and I'll be happy to do that.  Otherwise I'll assume

Page 8

1  you understand the question, okay?
2      A    Okay.
3      Q    As you know, the court reporter is taking
4  down everything that we say.  So if you answer
5  "uh-huh" or "uh-uh", I will likely say "was that yes
6  or was that no," and I'm not doing it to be rude.  I'm
7  just doing it to make sure we have a clear record,
8  okay?
9      A    Okay.
10      Q    If at any point you'd like to take a break,
11  as soon as we answer the pending question we'll be
12  happy to take as many breaks as we need, all right?
13      A    Thank you.
14      Q    What is your home address, Mr. Haney?
15      A    1100 South Ocean Boulevard, Manalapan,
16  Florida.
17      Q    So you're a legal resident of the State of
18  Florida?
19      A    Yes, sir.
20      Q    And what is your business address?
21      A    If I have one, it's here.  We have an office
22  in Chattanooga and in Washington, D.C.
23      Q    And when you say "we have an office," who is
24  "we"?
25      A    Well, really my son and I and my daughter in

Page 9

1  Washington, and in Chattanooga we've got one lady.
2      Q    And what is the business that you have these
3  offices for?
4      A    Well, we have a lot of properties.  We own a
5  major interest in the Dulles Toll Road, which is in
6  Washington, D.C.  We own a few million square feet of
7  property in Washington.  In Birmingham we have the
8  Birmingham Social Security building.  We have beer
9  companies in Arkansas.  We have properties in -- all
10  over the place.
11      Q    Okay.  You said you had your deposition
12  taken previously 20 or 30 years ago.  What was that in
13  connection with?
14      A    I can't even remember.
15      Q    And how did you prepare for today's
16  deposition?
17      A    I went over just some of the things, because
18  I don't do the normal day-to-day thing because I'll be
19  80 years old in two months, so -- but I had my lawyer
20  here and Larry, of course, took me over different
21  things.
22      Q    Did you read any of the depositions that
23  have been taken prior to yours in this case?
24      A    The only one I've looked at was my son's and
25  I spent -- just went through.  I didn't spend a long

Page 10

1 time, but I -- just to see what it was all about.
2    Q   Did you have any discussion with him about
3 the deposition?
4    A   No.
5    Q   And did you review any documents to prepare
6 for today's deposition, other than your son's
7 deposition transcript?
8    A   The only thing was what the lawyers
9 presented me to look at.
10    Q   Okay.  Now, Mr. Haney, tell me what your
11 educational background is.
12    A   Well, I went to University of Tennessee, and
13 I graduated night law school at GW Law School.
14    Q   In Washington?
15    A   Yeah.
16    Q   And what year did you graduate from
17 Tennessee?
18    A   Oh, lord.  '62, I think.
19    Q   Okay.  And tell me what was your first job
20 out of college.
21    A   My first job out of college was to work for
22 Senator Gore, I think, or a senator from Tennessee.
23    Q   And then after working for Senator Gore,
24 what did you do next?
25    A   I went back to Nashville and I was

Page 11

1 temporarily -- for a very short period of time worked
2 for the Tennessee Public Service Commission and
3 then -- for a very short time.  Then I decided I
4 didn't like that and started developing properties,
5 moved back to Chattanooga.
6    Q   And what sort of properties did you develop?
7    A   Well, in Chattanooga I've done -- well, at
8 one time I owned every TVA building.  I owned the ones
9 in Chattanooga, the ones in Knoxville, the ones in
10 Muscle Shoals.  That would be an example of what I do.
11    Q   Now, where did law school fit into that
12 sequence, was that before or after you worked for
13 Senator Gore?
14    A   It was during when I worked for Senator
15 Gore.  It was at night law school.  I really didn't
16 want to go, but the only way he would hire me is I'd
17 would go to law school.
18    Q   And did you finish law school?
19    A   Yeah.
20    Q   And did you take the bar in any state?
21    A   I did, in Tennessee.
22    Q   You did, and are you still a licensed lawyer
23 in Tennessee?
24    A   I don't know.
25    Q   Did you ever practice law?

Page 12

1    A   No.
2    Q   So since the time you left the Tennessee
3 Public Service Commission, is it fair to say you've
4 pretty much worked for yourself?
5    A   Yes.
6    Q   And that would have been in the mid-1960s?
7    A   Yeah.  It was the '60s on, yeah.  Late '60s
8 on, yeah.
9    Q   Okay.  Now, have you ever had any experience
10 with the nuclear power industry?
11    A   Well, we've been working on the Bellefonte
12 plants for what, the last 15 or 20 years.  I mean,
13 they used -- TVA used our formula to do the Memphis
14 bonds that they did for Browns Ferry, because you
15 remember Memphis became an issue for the debt for
16 Browns Ferry, because TVA didn't have the thing.  So
17 we've been for years trying to get TVA to finish.
18        But we got -- we pushed them hard on Browns
19 Ferry, and then we pushed them hard on Watts Bar, and
20 we pushed them hard on Bellefonte, because they spent
21 so much money and it was Rick Perry's money that they
22 could -- that they should finish them, and they have
23 finished most of them.
24    Q   Now, what was your involvement -- when you
25 say that the bonds were issued for Browns Ferry, what

Page 13

1 role did you or your companies play in that?
2    A   Well, Larry and our people came up with the
3 structure of how you finance it, and they adopted the
4 financing structure and did it themselves.
5    Q   They did it themselves?
6    A   We made a proposal, but they went ahead and
7 did it themselves, which is okay.
8    Q   Okay.  And when you say Memphis was
9 involved, that was through a power purchase agreement
10 to back the bonds?
11    A   Well, now Larry would have to go into the
12 details on how to do it.  I'm not that.  That's not my
13 job.
14    Q   To your knowledge, have you or your company
15 ever been involved in actually issuing or -- issuing
16 bonds in connection with any TVA project?
17    A   I know we have.  I'm pretty sure we have.
18    Q   Do you recall any of the specifics?
19    A   Let me think.  I can't think of -- I mean, I
20 don't know how we financed.  We did so many of them, I
21 don't remember how we financed.
22    Q   You said in response to my question a minute
23 ago that you or your companies have been involved with
24 Bellefonte for 15 or 20 years?
25    A   Well, all those nuclear plants.  I've been

4 (Pages 10 - 13)

1 very pro TVA and still -- and I always thought if they
2 spent this kind of money like they did at Browns Ferry
3 or they did at Watts Bar and they did at the other
4 places, that they should finish them, and they have
5 and planned it most of the time to finish even
6 Bellefonte until recently.
7    Q   What is the first involvement that you
8 recall you or your companies having with respect to
9 Bellefonte?
10    A   Let's see.  I wouldn't know the date.  It
11 would be about 19- -- it would be 2002 or -- it's been
12 a long time.
13    Q   All right.  And what was going on in 2002?
14    A   We made a proposal -- and of course Larry
15 could go into detail, but we made a proposal to --
16 because TVA had more or less reached their cap on
17 being able to do Watts Bar, for example.  We made a
18 proposal to do -- to use their -- you know, to enter
19 into a lease agreement and issue debt.
20       But they ended up paying for it out of their
21 own pocket, so --
22    Q   Now, that was Watts Bar?
23    A   We even tried to help TVA, spent a lot of
24 time getting tax credits, and we tried to make Watts
25 Bar get its tax credits so TVA could sell them.

1       In fact, we got the tax credits for
2 Bellefonte because it was an advanced use facility,
3 but they ruled that -- the DOE ruled that Watts Bar
4 was not an advanced nuclear.  So we were pushing
5 Bellefonte over Watts Bar.
6       But for whatever reason we still got to see
7 them do it, because the only two nuclear plants that's
8 been done in the United States, practically, has been
9 TVA.  So we were happy with that.
10    Q   How does your company make money if TVA had
11 accepted one of these proposals for issuance of debt?
12    A   Well, we would have to come in and do
13 everything like we're doing now.  We would have had to
14 come in and gotten an operator.  We would assume it
15 would be TVA.  And then we'd have to -- we'd even do
16 the construction, put it out for competitive bids.
17       We've always been arguing with TVA that
18 there's not -- we don't think there's enough
19 competitive bids on these things.  Then we would
20 actually put the bond issues together, working with
21 Larry -- and Larry could go into detail with him --
22 because you got the credit of TVA, and that's how we
23 do it.
24       I mean, I've done lots of these kind of
25 deals where you use government as the credit or you

1 use a company like as a credit or you got something
2 like the toll road you use as a credit, and we borrow
3 large sums of money.  We've gotten some huge deals and
4 some -- many small deals.
5    Q   But where does your -- where is the profit
6 in it for your company?
7    A   Well, the development fee plus ownership.  I
8 always do things where we end up as ownership.
9       Like the toll road is a great example.  We
10 financed it and we ended up owning half of it.  It's
11 the Dulles Toll Road from the Dulles Airport to
12 Leesburg, and it's a multi-billion dollar project and
13 of course we made a fortune off of it.
14       It was going into bankruptcy and it wasn't
15 working and they didn't know what to do with it, and
16 we picked it up and redid it and got the State of
17 Virginia to extend the -- not the lease, but whatever
18 you call it, so that they could continue the toll road
19 for a longer period of time and so on.
20       So we carried it from start to finish, just
21 like we would Browns Ferry.  It's just a normal thing
22 that we've done.  We would -- we can use Browns Ferry.
23       I mean, but Bellefonte, the money is
24 available, which we've kept in the budget thanks to
25 Senator Shelby and Senator Lamar Alexander.  They're

1 both chairmen of appropriations of nuclear.  They've
2 kept the money in the Congress to finish Bellefonte,
3 and the money is there.
4       Even though they try to take it out every
5 time the budget comes together, Senator Shelby and
6 Senator Alexander have kept it there for anybody that
7 could put it together.
8    Q   And when you say the money is there, do you
9 mean money to back a DOE loan?
10    A   No, it would be the DOE loan.  The actual
11 money is there.  I mean, it's in the budget.
12    Q   Okay.
13    A   It's in there now.  Nobody else is trying to
14 get the money.  That's what's interesting.  We've even
15 tried to get TVA to let us do it for them.  You know,
16 we've made all sorts of proposals.
17       But this is a very common deal for us.  I
18 mean, we take a project -- like I took Birmingham when
19 I was very young, and they had a government lease and
20 I used the lease and maybe -- I remember your firm
21 from something.  It seems like we worked together or
22 something.
23       But the point is we -- this Bellefonte is
24 just what we do.  I mean, that type of financing,
25 putting it together, ending up owning it, and we

Page 18

1 always pick projects where people have already spent a
2 lot of money.
3     Like TVA spent $5 billion there, so you
4 don't have to spend that much to finish it. The toll
5 road, they spent billions there, so we were able to --
6 so we think we're pretty good at it.
7     Q   When you say, Mr. Haney, that you've done
8 lots of these projects, other than what you're doing
9 now at Bellefonte, have any of them involved nuclear
10 power plants?
11     A   Not that we've done, but we've shown them
12 how to do it at Browns Ferry and at -- of course Watts
13 Bar, they did it themselves.
14     Q   Now, a minute ago you said that you and your
15 company have pushed hard for Browns Ferry and Watts
16 Bar and Bellefonte. When you say you "pushed hard,"
17 what do you mean?
18     A   Well, we just always made proposals to them
19 if they said you should finish these plants because
20 you spent so much money and it would be very good for
21 the -- not only for the employment that it would do,
22 but for the power would be much cheaper because you
23 already spent all this money.
24     Q   With respect to Bellefonte, are there any
25 specifics you can tell me about how you pushed hard

Page 19

1 for them to complete it before TVA decided to declare
2 it surplus property?
3     A   I'm sorry, repeat.
4     Q   Yes, sir. I want to talk now about the time
5 period before TVA decided that it was going to declare
6 Bellefonte surplus property, okay, before that.
7     A   Okay.
8     Q   Were you or your company involved in pushing
9 TVA to finish Bellefonte during that period?
10     A   We made proposals to them. Yes, we did.
11     Q   And just what sorts of proposals did you
12 make in that time period?
13     A   Well, we made many different proposals,
14 because -- and I think Mr. Kilgore had a stake. He
15 was very much for it. We would have probably done
16 Bellefonte, but then of course when former chairman --
17 during that period of time in Nashville -- my mind is
18 kind of -- there's a little medicine I'm taking -- the
19 former chairman of TVA pushed it hard, was one of our
20 cohorts to finish Bellefonte.
21     MR. LEMBKE: Let's stop and go off the
22 record for a second. We'll wait for Mr. O'Rear
23 to get back.
24     THE WITNESS: Okay.
25     THE VIDEOGRAPHER: Going off the record.

Page 20

1     The time is 9:19.
2     (Discussion off the record.)
3     THE VIDEOGRAPHER: Back on the record. The
4 time is 9:20 a.m.
5 BY MR. LEMBKE:
6     Q   Mr. Haney, before we went off the record we
7 were talking about the time period before TVA's
8 decision to declare Bellefonte to be surplus property
9 and as part of your company's efforts to push
10 Tennessee, the TVA hard on Bellefonte, did you engage
11 lobbyists?
12     A   I don't know. We could have, but I don't
13 know.
14     Q   You don't remember. Did you talk to elected
15 officials about it?
16     A   Yeah. Yes, we did. Dennis Bottorff and I
17 were partners in the deal. He was, as I said, the
18 former chairman of TVA, and Mr. Kilgore I think asked
19 us to come in. I'm not quite sure.
20     As I said, we were going down the road. We
21 would have done it, because he tried to do it while he
22 was chairman and then they elected a Democrat and he
23 didn't get reappointed to the board and they quit
24 doing Bellefonte, even though they spent a lot of
25 money on Bellefonte.

Page 21

1     So he spent full-time practically working
2 with me trying to do Bellefonte.
3     Q   And what business is he in in Nashville?
4     A   Well, he was one of the major bankers there
5 and in the country before he became chairman of the
6 board of TVA.
7     Q   Is he retired now?
8     A   I don't know if he's retired or not.
9     Q   Okay.
10     A   I mean, he works. I mean, he probably would
11 not call it retirement.
12     Q   Are you still doing any business with him
13 today?
14     A   I always consult him on things.
15     Q   Which elected officials do you remember
16 meeting with pertaining to pushing TVA hard to
17 complete Bellefonte?
18     A   Goodness, we even had a meeting before the
19 board of TVA with Lamar Alexander and Corker, and of
20 course Senator Shelby has always been a huge supporter
21 trying to finish Bellefonte, because he's chairman of
22 the appropriations, the Senator.
23     The other Senator -- well, all the
24 Congressmen in Alabama and Tennessee have worked hard
25 to try to push Bellefonte to be finished. It's not --

6 (Pages 18 - 21)

Page 22

1 Republican and Democrat.
2    Q   Have you ever had any experience in actually
3 constructing a nuclear plant?
4    A   No.
5    Q   Have you or your company -- and that goes
6 for your company as well?
7    A   That's true.
8    Q   Have you or your company ever had any
9 experience in operating a nuclear plant?
10    A   No.
11    Q   Have you or your company ever had any
12 experience in owning a nuclear plant?
13    A   No.  Tried hard, but no.
14    Q   All right.  Have you or your company --
15 prior to November of 2018, have you or your company
16 ever applied for any license from the Nuclear
17 Regulatory Commission?
18    A   I don't know.
19    Q   Have you kept any personal notes of meetings
20 you've had about Bellefonte?
21    A   No.
22    Q   Have you kept any other documents relating
23 to Bellefonte?
24    A   I would assume we got a lot of documents.
25    Q   Do you have any -- well, have you made an

Page 23

1 effort to collect documents, your documents that may
2 be responsive to requests for production of documents
3 submitted by TVA in this case?
4    A   I haven't.
5    Q   You haven't.  Are there documents here in
6 your house relating to Bellefonte?
7    A   I don't know.  I mean, there might be
8 something, but nothing that wouldn't -- that my office
9 in Chattanooga or Washington wouldn't have.
10    Q   Have you made any effort to go through your
11 personal -- your documents in your personal office
12 relating to Bellefonte?
13    A   No.
14    MR. LEMBKE:  All right.  Let me state for
15 the record that we think we're entitled to any
16 responsive documents that Mr. Haney has in his
17 possession.  The fact that others may have them
18 is not sufficient, and we'll reserve our right to
19 resume this deposition once we find out if there
20 are such documents.
21    MR. O'REAR:  Yeah, I'm not aware of any that
22 others wouldn't have or they haven't produced.
23    MR. LEMBKE:  Well, as you know, Caine, you
24 can't say "well, someone else has it, so we don't
25 have to produce it."

Page 24

1    MR. BLUST:  We had Mr. Haney's office
2 produce all of his records.  He doesn't maintain
3 them personally.
4    THE WITNESS:  I don't maintain them.
5    MR. BLUST:  So I would say to you that I
6 doubt it.  We can take another look, but the fact
7 is that his family office, which maintains the
8 records, produced all the records of his.
9 BY MR. LEMBKE:
10    Q   Mr. Haney, am I correct you testified a
11 minute ago you may have some documents pertaining to
12 Bellefonte in your own office here that have not been
13 looked through, correct?
14    A   No, no, I didn't mean that.  I think they --
15 we would not hold anything back.
16    Q   No, my question is, you may have some
17 documents -- you have an office here in your home,
18 correct?
19    A   Well, I've got a desk, yes.
20    Q   And you may have some documents pertaining
21 to Bellefonte here in your home, right?
22    A   There could be.
23    Q   And you've not looked for those, correct?
24    A   No, I haven't.
25    Q   Has anyone looked for those, the ones that

Page 25

1 are here in your home?
2    A   That I don't know.
3    Q   You don't know, okay.
4    Do you keep calendars, your calendars that
5 would reflect meetings you've had pertaining to
6 Bellefonte?
7    A   No.
8    Q   Would your office have those?
9    A   They could -- they should.  The Chattanooga
10 office should have them.
11    Q   Okay.
12    A   I don't know.
13    Q   All right.  Now, have you ever been involved
14 personally in civil litigation?  Not your company, but
15 you, yourself, sued or been sued?
16    A   I don't know over the years.
17    Q   Okay.
18    A   I haven't had that many lawsuits.  But I
19 don't know, there could have been one.  I don't know.
20    Q   Has your company sued or been sued other
21 than in this case, that you can recall?
22    MR. O'REAR:  You're talking about Nuclear
23 Development?
24 BY MR. LEMBKE:
25    Q   I'm talking about any of your companies.

7 (Pages 22 - 25)

1    A   I don't know.  There might be.  I don't
2   know.
3    Q   Okay.
4    A   I don't think so, but I don't know.
5    Q   All right.  So to the best of your
6   knowledge, none of your companies has ever filed a
7   lawsuit prior to Nuclear Development suing TVA?
8    A   We don't go around suing people.  I don't
9   know.  I just really don't know.
10    Q   Have you ever been indicted before?
11    A   I was once for a campaign contribution.
12    Q   And campaign contributions to whom?
13    A   I think it was to Senator Gore, but I was
14   acquitted of it.
15    Q   And other than the one time you recall that
16   you don't remember the case, is that the only time
17   you've had your deposition taken, once?
18    A   No, I've had my deposition I'm sure taken
19   more than once, but it's been a long time.
20    Q   You don't remember any of the specifics?
21    A   No.
22    Q   Okay.  Now, what is Nuclear Development LLC?
23    A   Well, of course he can answer it, but it's a
24   company set up to develop, I assume, Bellefonte.
25    Q   And I'm going to represent to you that

1   there's a document that Nuclear Development prepared
2   that says Nuclear Development was formed in 2012.
3       Do you have any reason to doubt that?
4    A   I don't know.
5    Q   Okay.  Why was it formed in 2012?
6    A   I don't know.
7    Q   All right.  Well, 2012 was several years
8   before TVA declared Bellefonte to be surplus property,
9   so what was Nuclear Development's purpose prior to
10   that time?
11    A   I don't know exactly, but it might have been
12   trying to do one of the other nuclear plants.
13    Q   Who owns Nuclear Development?
14    A   I think the way it's set up, the family
15   is -- I own a small percentage.  My wife is trustee
16   for the children for 75 percent -- this is the way we
17   set it up.  I mean, I'll be 80 next month, so I don't
18   need more for myself.  But that's the way it's set up
19   for the children.
20    Q   So you and family trusts own it; is that
21   what you're saying?
22    A   Right.
23    Q   What is your position at Nuclear
24   Development?
25    A   I imagine I'm the chairman.

1    Q   You're not sure?
2    A   I'm not sure.  I know I'm the boss, so --
3    Q   Okay.  So basically everyone answers to you
4   at Nuclear Development?
5    A   Well, they don't bother me most of the time,
6   but I'm the final say-so.
7    Q   Okay.  Now, who are the officers of Nuclear
8   Development, do you know?
9    A   Yeah, my son I think is president and Bill
10   McCollum, who used to be with the TVA, is -- was
11   number two, and then my son, and then I guess my wife
12   is like secretary or something like that.
13    Q   All right.  I'm going to represent to you
14   that Nuclear Development has stated that Mr. Blust is
15   an office of Nuclear Development.
16    A   He is, he is.  I'm sorry, he's a secretary.
17   He's been our lawyer for a long time.
18    Q   What are your son's qualifications to be
19   president of Nuclear Development?
20    A   Well, he was primarily responsible for doing
21   the Dulles Speedway, which was a huge financing, and
22   he's done a lot of these things over the years.  I'm
23   not a detail person, and he's more -- he's done quite
24   well and is good working with the rating agencies and
25   good working with the different law firms and that

1   sort of stuff, so --
2    Q   He's never had any experience of any kind in
3   building a nuclear plant, correct?
4    A   Correct.
5    Q   Or in operating a nuclear plant, correct?
6    A   Correct.
7       MR. O'REAR:  You're talking about before the
8   Nuclear Development project?
9       MR. LEMBKE:  I wasn't aware that Nuclear
10   Development has built a nuclear plant.
11       MR. O'REAR:  Well, he's been involved in
12   that, so I just -- your question was unclear.
13       MR. LEMBKE:  Well, is there an objection?
14       MR. O'REAR:  Yeah, your question was unclear
15   as to timing.
16       MR. LEMBKE:  Well, I would ask that we do
17   away with speaking objections and just state an
18   objection to form and if --
19       MR. O'REAR:  I object to the form,
20   ambiguous.
21       MR. LEMBKE:  All right.
22   BY MR. LEMBKE:
23    Q   Nuclear Development to this date has never
24   built a nuclear plant, correct?
25    A   No, it hasn't.

Page 30

1   Q   And Nuclear Development to this date has
2   never operated a nuclear plant, correct?
3   A   Correct.
4   Q   Prior to the time that Nuclear Development
5   entered into its contract with TVA to purchase
6   Bellefonte, your son had never had any involvement of
7   any kind in overseeing construction of a nuclear
8   plant, correct?
9   A   Right, yeah, that's correct.
10   Q   Nor had he had any experience in overseeing
11   operation of a nuclear plant, correct?
12   A   That's correct.
13   Q   And he has no training in nuclear
14   engineering, correct?
15   A   Right.
16   Q   He's a finance guy, correct?
17   A   He is, but spent a lot of time on
18   construction of nuclear plants and that sort of stuff.
19   Q   Well, which nuclear plants did he spend time
20   on construction?
21   A   Well, I mean, we were given all the plans
22   and stuff by TVA on Bellefonte and we spent months.
23   He did.  We had most of the major contractors in the
24   United States looking at all the plans to see what the
25   cost was.

Page 31

1   Q   But your son would have no way to read those
2   plans and understand whether it was a viable plan to
3   build a nuclear plant, correct, in terms of the
4   science?
5   A   I wouldn't think so.
6   Q   Now, I understand that Mr. McCollum's office
7   changed.  He was elevated to CEO at some point in
8   Nuclear Development, right?
9   A   Right.
10   Q   Why was his role changed?
11   A   Well, he's highly qualified for things that
12   we were getting down to, having worked at TVA stuff.
13   So I depend on him to be the one that knows all this
14   stuff.
15   Q   Were there any problems with the existing
16   management structure that led you to elevate
17   Mr. McCollum?
18   A   Well, not any problems, except my son was
19   getting a divorce at that time and he had spent a
20   lot -- he's got four small kids -- and he spent a lot
21   of time on it.  So I thought that Bill should move up
22   till -- during that period of time.
23   Q   And when was this going on with your son?
24   A   During that period of time.
25   Q   The 2016 to 2018 time period?

Page 32

1   A   No, it's been this year or last year, the
2   end of last year.
3   Q   And last year being 2018 or '19?
4   A   '19.
5   Q   Okay.  So the year just completed?
6   A   Right, just the last part of the year.
7   Q   And when did he first start having to spend
8   time on his divorce, do you recall?
9   A   I don't know exactly, because we had known
10   about it for a while.  But you know, the last part of
11   last year.
12   Q   All right.  At or about the time
13   Mr. McCollum was elevated to CEO, that was one of the
14   reasons why he was elevated; is that fair?
15   A   That's fair.
16   Q   Now, Mr. McCollum, even though he's the
17   chief executive officer, he's not an employee of
18   Nuclear Development, correct?
19   A   That's correct.
20   Q   Is that in your experience an unusual
21   situation, where the CEO is not an employee of the
22   company over which he's the CEO?
23   A   Not unusual, but we just try to get the best
24   people we can for what we're trying to do.
25   Q   And Mr. Blust, even though he's secretary

Page 33

1   and general counsel, is not an employee, correct?
2   A   Correct.
3   Q   He's just paid on an hourly basis, correct?
4   A   Correct.
5   Q   Same with Mr. McCollum, right?
6   A   Correct.
7   Q   Now, a minute ago we were talking about --
8   well, let me strike that and start over.
9         At some point you learned that TVA had made
10   the decision that they were not going to proceed with
11   Bellefonte, correct?
12   A   I did the night before.
13   Q   The night before the decision was made?
14   A   No, the night before we were supposed to
15   close.
16   Q   No, sir.  I'm now talking about prior to the
17   time TVA declared Bellefonte to be surplus property.
18   I'm talking about when TVA made the decision that TVA
19   itself was not going to complete Bellefonte.
20         MR. O'REAR:  What's the question?
21         MR. LEMBKE:  I'm trying to give him the
22   timeframe.
23   BY MR. LEMBKE:
24   Q   So that's the timeframe I'm talking about
25   and my question is, do you recall learning that TVA

9 (Pages 30 - 33)

Page 34

1 had made the decision that TVA itself was not going to
2 complete Bellefonte?
3     A    I think Mr. Johnson told me that, yes.
4     Q    Okay.  And did you or your company make any
5 effort to encourage TVA not to make that decision?
6     A    Not that I know of.
7     Q    All right.  I understand, Mr. Haney, that
8 there came a point at which you had a meeting with
9 Robert Bentley, the Governor of Alabama, about
10 Bellefonte?
11     A    That's correct.
12     Q    Did you have more than one meeting with
13 Governor Bentley about Bellefonte?
14     A    Could have.  He and I were very close.
15     Q    How many do you recall having with him?
16     A    We were putting a tenant, a State tenant
17 which we won by competitive bids, into Birmingham.  So
18 I would have -- I might have talked to him many times,
19 but not about nuclear power.
20     Q    All right.  When do you recall first
21 discussing the Bellefonte project with Governor
22 Bentley?
23     A    I don't know the exact date.  All I know is
24 that he called a meeting, which the president of
25 Alabama Power and all the people -- because he was

Page 35

1 very interested.  They were closing all the coal
2 plants in Alabama and he wanted to create jobs and
3 wanted to do Bellefonte.
4     Q    Now, is it fair to say that you had had some
5 conversation with Governor Bentley about Bellefonte
6 before he called that meeting with the president of
7 TVA and the president of Alabama Power?
8     A    Probably, yeah.
9     Q    Do you remember any of the details about
10 that conversation?
11     A    Well, the only thing I remember is that we
12 had a meeting once that Mr. Johnson was there and he
13 promised the Governor that since they were closing all
14 those coal plants at those places, that they would do
15 a million square feet -- a million megawatts of power
16 in Alabama.  He could do a gas plant or a nuclear
17 plant.
18     Q    Was that the meeting at which the president
19 of Alabama Power was also --
20     A    No, that was a different meeting.
21     Q    And you were in attendance at that meeting,
22 the one where -- was it Mr. Johnson making that
23 promise?
24     A    Yeah.
25     Q    Were you in attendance at that meeting?

Page 36

1     A    I think so.  It's been a long time.
2     Q    Was that in Montgomery, in the Governor's
3 office?
4     A    I don't know.  I just know that there was --
5 I don't know the exact on that one, because that was
6 not my meeting.
7     Q    Okay.  Have you told me everything you can
8 remember about that meeting with Mr. Johnson
9 pertaining to the million megawatts of power?
10     A    Yeah, that's the only thing.
11     Q    Now, you mentioned there was a meeting, am I
12 right, it was in Governor Bentley's office in
13 Montgomery with Mr. Crosswhite of Alabama Power?
14     A    It was huge, everybody.  I don't remember
15 who the Governor invited.  He invited -- the room was
16 completely packed with the business leaders of
17 Alabama.
18     Q    And you were there?
19     A    Yeah.
20     Q    Mr. Blust was there?
21     A    I think so.
22     Q    Mr. Johnson was there?
23     A    Yeah.
24     Q    Do you remember if Ms. Quirk was there from
25 TVA?

Page 37

1     A    I don't remember.
2     Q    Mr. Crosswhite was there?
3     A    Yeah.
4     Q    And the Governor?
5     A    Yeah.
6     Q    Do you recall anyone else who was there?
7     A    Well, I know that the -- his staff was
8 there.
9     Q    Anyone else there for Nuclear Development?
10     A    I don't know.
11     Q    Now, tell me what you remember occurring at
12 that meeting.
13     A    Everybody was going to work together to try
14 to see what they could do about Bellefonte or this
15 other stuff.
16     Q    What other stuff?
17     A    Anything to do with development in Alabama.
18 I think it wasn't just -- I don't think it was just
19 for Bellefonte, but I don't remember the exact.  But
20 it was -- Bellefonte was a big part of it.
21     Q    What do you remember Mr. Crosswhite saying
22 about Bellefonte on behalf of Alabama Power?
23     A    Well, what I expected him to say is they
24 didn't need the power, but they were all for it.
25     Q    And what do you remember Mr. Johnson saying?

10 (Pages 34 - 37)

Page 38

1     A    I think the same thing.
2     Q    They didn't -- TVA didn't need the power?
3     A    I think so, but they all say that.
4     Q    Well, you act as though you didn't believe
5 that; is that fair?
6     A    That's fair.
7     Q    Why didn't you believe it?
8     A    Well, because they're closing down all these
9 coal plants and things and you know -- of course,
10 that's my own view.
11    Q    Had you done any studies of all of the TVA
12 generation facilities and the future needs to see
13 whether there was a basis for your skepticism as to
14 TVA's conclusion in that regard?
15    A    No, but I had advisers, Bill and
16 Mr. Bottorff, who was chairman, the one that spoke.
17 They were very high up and they, of course, took the
18 view that TVA needed the power.
19    Q    Okay.  Was there any specific takeaway from
20 the meeting with the Governor, Mr. Crosswhite,
21 Mr. Johnson, and yourself and others?
22    A    Any what?
23    Q    Any specific takeaway from that meeting?
24    A    No, I thought it was a great meeting.  I
25 mean, they weren't going to -- at least they said they

Page 39

1 weren't going to stand in the way of doing Bellefonte
2 and thought it was -- if you could get it done, it was
3 something that should be done.
4          That's how I come away from the meeting.
5     Q    Now, subsequent to that meeting TVA made the
6 decision to auction off Bellefonte as surplus
7 property, correct?
8     A    Correct.
9     Q    And what research did you do before deciding
10 that Nuclear Development would make a bid on the
11 Bellefonte property?
12    A    Well, I consulted with Bill and I consulted
13 with Johnson and the others -- and I had great
14 relationships at that time with Mr. Johnson, thought
15 highly of him, and I just figured that something could
16 be worked out, because we had already gotten and spent
17 a fortune getting the construction tax credits.
18          We had two and a half billion of
19 construction tax credits and the Governor was talking
20 about -- and we still do -- the Governor was talking
21 about the probability that the State might do 800 to a
22 billion dollars of subsidy if we did Bellefonte.
23    Q    Now, when you say construction tax credits,
24 do you mean production tax credits?
25    A    Production tax credits.

Page 40

1     Q    And when you said you talked to Bill, are
2 you referring to McCollum or Johnson?
3     A    No, both of them knew we had construction
4 tax credits -- I mean, production tax credits.
5     Q    Well, what I was -- when I asked the
6 question about what research you did before deciding
7 that Nuclear Development would make a bid on the
8 Bellefonte property, you said you talked to Bill and I
9 was unclear whether you were referring to Johnson
10 or --
11    A    No, I'm sorry, Bill McCollum.
12    Q    Bill McCollum.  What do you recall
13 discussing with Bill McCollum?
14    A    Same old thing about need, and he's very
15 familiar with all these kind of things and of
16 course -- and so did Mr. Butteroff, and they all felt
17 that TVA didn't need it.
18          Now, of course, they could go build other
19 things and they did, but it was a matter of what they
20 decided to do.  At least that was their opinion, which
21 had great weight on me.
22    Q    What had great weight, McCollum's view?
23    A    And Mr. Bottoroff's, with the kind of
24 experience they had.
25    Q    Now, any other research that you did

Page 41

1 yourself before deciding that Nuclear Development
2 would make a bid on the Bellefonte property?
3     A    I probably did, but I don't remember.
4     Q    Are you aware of any other research that
5 others at Nuclear Development did prior to the
6 decision to make a bid?
7     A    I'm not, but --
8     Q    Let me show you what has previously been
9 marked as Exhibit 42 in this case.  I'll let you take
10 a minute to review this, and I'm going to direct your
11 attention particularly to numbered paragraph one in
12 this email on the first page.
13    A    It's so small I can hardly read it.
14    Q    Mr. Haney, if you have reading glasses that
15 you need to put on or get --
16    A    I don't have them.
17    Q    Okay.
18    A    This all happened since the illness.  I had
19 perfect vision.
20          I don't even know what this is.
21    Q    Well, if you look at the top of the first
22 page of Exhibit 42, it is an email from Larry Blust on
23 August 18th, 2016 and I'll represent to you that
24 coneill@ceadvisors.com is Carrie O'Neill at Concentric
25 Advisors, and you received a copy of this email.

Page 42

1      You see that?
2   A   Yeah.
3   Q   And this was a few months before Nuclear
4   Development entered into the contract with TVA, okay?
5   A   Okay.
6   Q   In paragraph one, numbered paragraph one, at
7   the end of the third line of that numbered
8   paragraph -- well, I'll even read the -- I'll just
9   read to you.
10      It says:  "In section three" -- this is
11   talking about a draft of a confidentiality agreement.
12   "In section three we deleted C, barring disclosure of
13   the transaction and Nuclear Development's
14   participation in it.  You have publicized this
15   transaction, and ND was the main party urging TVA to
16   dispose of the site so ND could complete the plants
17   once TVA determined it would not complete these
18   plants."
19      Then it says:  "As part of this process, ND
20   has contacted various interested government officials
21   and legislators and met with DOE, NRC, IRS, and other
22   governmental agencies and customers and suppliers of
23   TVA about the feasibility and financing of the
24   project."  Okay?
25   A   Yes.

Page 43

1   Q   And my question is, what contact -- or what
2   interested government officials and legislators did ND
3   contact as part of this process?
4   A   Who's ND?
5   Q   ND is Nuclear Development.
6   A   Okay.  I have no idea.
7   Q   Okay.
8   A   This is definitely not written by me, so I
9   don't know.
10   Q   So other than what you've told me
11   previously, you're not aware of what government
12   officials and legislators that ND met with in the time
13   period leading up to its entering into the agreement
14   with TVA to purchase the Bellefonte site?
15   A   Well, I would have personally, you know,
16   gotten in touch with people like Shelby or the
17   senators or there are people who I see, you know, I'm
18   sure.  But I don't have any -- because I didn't write
19   this.  I don't --
20   Q   Well, do you -- what do you remember
21   discussing with Senator Shelby?
22   A   Well, I've always discussed with him -- he's
23   always wanted Bellefonte to be finished because of the
24   jobs it would create.
25   Q   All right.  Now, during this time period the

Page 44

1   other Alabama Senator was Jeff Sessions.  Did you have
2   any conversations with Senator Sessions about
3   Bellefonte?
4   A   I did not, but he was for it, I was told.
5   But I did not.
6   Q   Did you have any conversations with other
7   Congressmen or women from Alabama about Bellefonte?
8   A   I did, the Congressman I forget there at the
9   site.  I can't think --
10   Q   Mo Brooks?
11   A   Mo Brooks, yeah.
12   Q   What do you remember discussing with
13   Mo Brooks?
14   A   Well, he's very much for having the plant be
15   built for the jobs it would have created.
16   Q   Anything else you remember talking with him
17   about?
18   A   Just help me where you can.
19   Q   Okay.  And do you remember having
20   conversations with any of the other Alabama
21   Congressmen or Congresswomen about this?
22   A   I personally don't believe I did, but we did
23   get letters of support from most of the Congressmen.
24   Q   Okay.  Did you have any discussions with
25   Senator Alexander of Tennessee about Bellefonte?

Page 45

1   A   Yes.
2   Q   What do you remember discussing with him?
3   A   Just make sure that they keep the money in
4   the program so we can finance it.
5   Q   All right.  And you mentioned earlier you
6   had had discussions with Senator Corker while he was
7   still in the Senate?
8   A   I'm sure I did.
9   Q   About the same topic or --
10   A   Yeah.
11   Q   Have you had any conversations with Senator
12   Blackburn of Tennessee about Bellefonte?
13   A   Lately or during this period?
14   Q   Well, when she was a Congresswoman during
15   this period, did you have any conversations?
16   A   No.
17   Q   What about lately?
18   A   I mean, she knows about it now because all
19   of the press that's been going on in Memphis.
20   Q   Are there any other Senators or Congressmen
21   or women that you remember talking about Bellefonte
22   with?
23   A   That's a hard question.  I don't know, and I
24   can't just pick one out.
25   Q   Okay.  And you spoke to Governor Bentley

12 (Pages 42 - 45)

Page 46

1 about it. Have you had any conversations with
2 Governor Ivey about it?
3     A   I personally have not, but our staffs have.
4     Q   It also references in this email that
5 Nuclear Development had contacted and met with the
6 Department of Energy. Were you ever involved in
7 meeting with officials of the Department of Energy?
8     A   Yeah.
9     Q   Tell me about that.
10     A   Well, we had certain meetings of trying
11 to -- you know, they've got the money to loan to build
12 the facility. See if we can get -- if they were
13 interested in making the loan, and they have been
14 interested in making the loan.
15     Q   All right.
16     A   Nobody else is trying to get it. There's
17 nobody else trying to build a nuclear plant, so --
18     Q   How many meetings have you personally
19 participated in with anyone at the Department of
20 Energy?
21     A   I don't know, two or three.
22     Q   What do you recall is the first one?
23     A   Oh, lord. I can't remember what the first
24 one -- what I said or whatever. It would just be
25 trying to get the loan.

Page 47

1     Q   And have you ever -- have any of your
2 meetings included the Secretary of Energy?
3     A   Not mine.
4     Q   Do you know if anyone with Nuclear
5 Development has met with the Secretary of Energy?
6     A   They could have, yeah. They could have.
7     Q   Who do you remember meeting with at the
8 Department of Energy?
9     A   The staff people.
10     Q   Do you remember any specific names?
11     A   Not this minute.
12     Q   And other than what you've told me, do you
13 remember any of the specifics of those conversations?
14     A   Well, I mean not specifics, just you know,
15 get your stuff in. You've got to get control of the
16 plant. You know, those things.
17     Q   So people at the Department of Energy said
18 you had to get control of the plant to get the money?
19     A   Well, you would have to or they wouldn't
20 make the loan.
21     Q   Okay, and has the Department of Energy ever
22 committed to Nuclear Development that it would make
23 the loan?
24     A   No, but I should say this, though. That we
25 have -- they have different stages. So we went

Page 48

1 through stage one, they put us in stage two. You have
2 to pay for it every time. So we were in the last
3 stage and have actually signed off that we've gotten
4 in everything that's necessary for the loan.
5     Q   All right. Has anyone at the Department of
6 Energy told you when a final decision will be made?
7     A   No.
8     Q   It also says that Nuclear Development has
9 met with the Nuclear Regulatory Commission. Prior to
10 the time that Nuclear Development entered into its
11 contract with TVA to purchase the Bellefonte site,
12 were you involved in meeting with anyone at the
13 Nuclear Regulatory Commission?
14     A   I've met with the people, the Nuclear
15 Regulatory on this -- on Bellefonte. I don't really
16 know, whenever.
17     Q   Meaning you don't know the time period?
18     A   No.
19     Q   Well, what was -- how many meetings have you
20 had with officials at the NRC?
21     A   I've had at least two or three, but most of
22 that is handled by Mr. Blust and the lawyers and Bill.
23 I don't handle that kind of stuff.
24     Q   Well, for the meetings that you attended,
25 what was the purpose of those meetings?

Page 49

1     A   To make sure that if we got Bellefonte, they
2 would work on the project and consider us to get --
3 you know, to transfer the license.
4     Q   And with whom were you meeting at the NRC?
5     A   I don't know.
6     Q   And what did they say to you with regard to
7 the transfer of the license?
8     A   Well, they said they'd work on it if we got
9 it.
10     Q   What do you mean, "if you got it"?
11     A   Well, you've got to get the project.
12     Q   All right. So did you understand that to be
13 you had to have the contract with TVA for purchase of
14 it in order for them to consider the transfer?
15         MR. O'REAR: Objection, leading.
16         MR. LEMBKE: He is an adverse witness.
17         MR. O'REAR: Yeah. Objection, misleading.
18     A   I don't know, to be honest.
19     Q   Anything else you remember being discussed
20 in your meeting with -- the meetings that you've
21 attended with the Nuclear Regulatory Commission?
22     A   No, because it's not my job, except they
23 want to know who you are.
24     Q   Have you ever had meetings with anyone at
25 the IRS about the Bellefonte project?

13 (Pages 46 - 49)

Page 50

1    A   I don't think I have, but our staff has.
2    Q   Okay.  Have you ever had meetings with
3  anyone at any other governmental agencies about the
4  Bellefonte project?
5    A   I'm sure I have, but -- you know, nobody
6  listened to me when I talked to them.
7    Q   It also says that Nuclear Development had
8  had meetings with customers and suppliers of TVA about
9  the feasibility and financing of the Bellefonte
10  project.
11       What customers and suppliers -- well, first
12  let's do customers.  What customers of TVA have you
13  met with about Bellefonte?
14    A   Well, Mr. Johnson told me that you can meet
15  with distributors, you know, that kind of competition.
16  So of course I met with different distributors like
17  Chattanooga or --
18    Q   What other --
19    A   Of course Memphis, which has got him all
20  upset.
21    Q   So you met -- you personally met with
22  officials in Memphis?
23    A   Yes.
24    Q   And you personally met with officials in
25  Chattanooga?

Page 51

1    A   Yeah, made no bones, because he said I had
2  the right to do that.
3    Q   And have you met with officials in any
4  other -- as you call it, of any other distributors who
5  purchase power from TVA?
6    A   I met with the Seven States, which is the
7  organization, because they invited me.  I know I met
8  with somebody else, but I can't remember the name of
9  it.
10    Q   Okay.  Any other customers who purchased
11  power from TVA that you met with other than
12  Chattanooga, Memphis, and the Seven States
13  organization?
14    A   I can't remember any, but I probably have.
15    Q   Now, you mentioned first Chattanooga.  When
16  do you first -- how many meetings have you had with
17  officials at Chattanooga?
18    A   Two or three.  I mean, that's my home place.
19  I mean, I know everybody there.
20    Q   Who did you meet with in Chattanooga?
21    A   I met with the board.
22    Q   Which board?
23    A   The power board.
24    Q   All right.
25    A   It was no secret to Mr. Johnson.

Page 52

1    Q   Anyone else other than the power board that
2  you met with in Chattanooga?
3    A   Well, it's home.  I don't know who all I met
4  with.  I mean, you know, I'm sure I talked to the
5  mayor.  I don't --
6    Q   What do you remember discussing with people
7  in Chattanooga about the Bellefonte project?
8    A   The jobs that it would create, because most
9  of the people that work at Bellefonte live in
10  Chattanooga there.
11    Q   Anything else you remember discussing with
12  officials in Chattanooga about the Bellefonte project?
13    A   Well, we discussed that we would have very
14  competitive prices because of the tax credits and how
15  much money had already been spent by TVA.  I mean --
16    Q   All right.  Anything else you remember
17  discussing with anyone?
18    A   I did, but it's been a while, so I don't
19  remember just exact things.
20    Q   Any other general topics you remember
21  discussing with the people in Chattanooga about the
22  Bellefonte project?
23    A   Not really.  I mean, just -- you know, if we
24  get it, we build it, we hope you consider buying some
25  power.  I mean, that's about all you want from them.

Page 53

1    Q   And what was Chattanooga's response?  Did
2  they commit to buy power from Bellefonte?
3    A   They didn't commit, but they said they
4  wanted to be a party and keep them informed.
5    Q   Now, you said you also met -- have met at
6  least once with people in Memphis about the Bellefonte
7  project?
8    A   Oh, yes.
9    Q   How many meetings would you estimate you've
10  attended with Memphis people about Bellefonte?
11    A   Well, Memphis is a different story because
12  Memphis, you know, in 2015 put out a brochure that --
13  I don't know where it is, but -- that they were
14  considering leaving TVA because they could buy power
15  cheaper across the river there in MISO.
16       So Memphis contacted me, but back when we
17  got the project.  So I've had hundreds of meetings
18  with people in Memphis -- not hundreds.  I've had many
19  meetings with people in Memphis.
20    Q   All right.
21    A   Because they've asked for it.  I didn't ask
22  for the meeting.
23    Q   Okay.
24    A   And Mr. Johnson was familiar with it.
25    Q   Who in Memphis contacted you initially?

14 (Pages 50 - 53)

Page 54

1    A   I don't know whether it was the Congressman
2  or somebody, but -- of course it was pretty common
3  knowledge, though, that Memphis was unhappy with TVA.
4  It was in the papers all the time.
5    Q   But you don't remember who contacted you?
6    A   No, I don't.
7    Q   Who do you remember meeting?  Have you met
8  with the Mayor?
9    A   Yes.
10    Q   On how many occasions would you estimate?
11    A   Not many, but four, five.
12    Q   Have you met with the City Council in
13  Memphis?
14    A   I have not.
15    Q   Have you met with individual members of the
16  City Council in Memphis?
17    A   I don't think so, but I might have met with
18  one or two of them, just meeting them.
19    Q   Okay.
20    A   That's just not my job.
21    Q   Who else do you recall meeting with in
22  Memphis?
23    A   The Congressman.
24    Q   Which Congressman?
25    A   Cohen.

Page 55

1    Q   What did you discuss with Congressmen Cohen?
2    A   He's one of my best friends, so I have no
3  secrets from Congressmen Cohen.
4    Q   Well, my question was, what did you discuss
5  with him?
6    A   We discussed about getting Bellefonte and
7  what did he -- anyone who can help, because again, the
8  jobs it would create.
9    Q   But you weren't suggesting there would be
10  jobs for people in Memphis, right?
11    A   Well, they were talking about that there
12  could be some jobs for Memphis because of the training
13  that you have to do to -- maybe like some of the
14  training programs that train the people to operate the
15  nuclear plants could occur in Memphis, so --
16        But their main reason was they were just
17  very unhappy with TVA, which is no secret.
18    Q   And did Congressman Cohen indicate that he
19  supported Memphis leaving TVA?
20    A   He said so in the paper many, many times.
21    Q   And other than the Mayor and Congressman
22  Cohen, who else do you recall personally meeting with
23  who's associated with Memphis?
24    A   Well, I met with the county executive.  I
25  met with a lot of people in Memphis.  I mean, I just

Page 56

1  don't want to be -- because they're going to leave
2  TVA.
3    Q   Have they told you that?
4    A   Well, you read the papers, that's what the
5  papers say.
6    Q   Well, my question, sir, was have they told
7  you that?
8    A   No.
9    Q   When was the last time you met with anyone
10  associated with Memphis?
11    A   It's been a few months.
12    Q   And what was discussed -- who was that with?
13    A   I can't remember exactly.
14    Q   Do you remember anyone who was at the
15  meeting other than yourself?
16    A   Well, it could have been -- no, I don't.
17    Q   And what do you recall being discussed at
18  that last meeting you attended?
19    A   I would think we'd have been talking about
20  the election that was coming up.
21    Q   Which election?
22    A   They had a city election in Memphis.
23    Q   What did that have to do with Nuclear
24  Development?
25    A   The City Council decides whether they stay

Page 57

1  with TVA or not.
2    Q   And has Nuclear Development been making
3  political contributions to City Council members in
4  Memphis?
5    A   They made some contributions, yeah.
6    Q   Have you personally been making political
7  contributions to City Councilmen in Memphis?
8    A   I have some that I know of.
9        (Discussion off the record.)
10        MR. LEMBKE:  Sure, let's take a short break.
11        THE VIDEOGRAPHER:  Going off the record.
12    The time is 10:06.
13        (Whereupon a recess was taken from
14    10:06 a.m. to 10:19 a.m.)
15        THE VIDEOGRAPHER:  Back on the record.  The
16    time is 10:19 a.m.
17  BY MR. LEMBKE:
18    Q   Mr. Haney, who were the Memphis City Council
19  members to whom you made political contributions?
20    A   I don't know the names.
21    Q   Well, a minute ago they were
22  friends of yours.  You don't recall who they are?
23    A   No, I don't.  I mean, I don't.
24    Q   Not even one?
25    A   Not even one.

15 (Pages 54 - 57)

Page 58

1    Q   What about the Mayor, have you made
2  political contributions to the Mayor?
3    A   I did not.
4    Q   What about, do you know the identity of the
5  Memphis City Council persons to whom Nuclear
6  Development made political contributions?
7    A   I do not.
8    Q   Well, who on the Memphis City Council are
9  your friends?
10    A   Well, I've never been to a Memphis City
11  Council meeting, so I just don't know the people.
12  That's just not my job.
13    Q   Well, did I misunderstand your testimony?  I
14  thought a few minutes ago you said that you made
15  contributions to some people on the City Council who
16  are your friends?
17       MR. O'REAR:  I don't recall that.  The
18  record speaks for itself.
19    A   I don't know.  All I'm saying is that I'm
20  sure we made some contributions, small ones, to the
21  City Council members.
22       MR. LEMBKE:  Would you go right up before --
23       THE COURT REPORTER:  Sure, give me a moment.
24       THE WITNESS:  But I don't know one City
25  Council member from another.

Page 59

1       (The portion requested was read back by the
2   reporter as above recorded.)
3       MR. O'REAR:  Were we correct, that he did
4   not say that?
5       MR. LEMBKE:  He did not say that in
6   connection with the Memphis City Council.
7       MR. O'REAR:  Okay, thank you.
8  BY MR. LEMBKE:
9    Q   How did you decide to whom you would make
10  personal contributions in the Memphis City Council
11  election?
12    A   I'm sure I listened to Bill.
13    Q   McCollum?
14    A   Because he's done that.
15    Q   McCollum?
16    A   Yes.  I haven't been there in months.
17    Q   Now, back on Exhibit 42, this also said that
18  Nuclear Development had met with suppliers of TVA
19  prior to the time that Nuclear Development entered
20  into the contract with TVA for the purchase of
21  Bellefonte.
22       Were you involved in meetings with any
23  suppliers of TVA that are being referenced?
24    A   You're talking about buyers of power?
25    Q   No, sir.  I'm talking about suppliers of

Page 60

1  services or equipment.
2    A   I've never met with anybody like that.
3    Q   Okay.  Now let me show you what has been
4  previously marked as Exhibit 43 in this case,
5  Mr. Haney.
6    A   Thank you.
7    Q   I'll represent to you the first page of this
8  is a transmittal email by which Nuclear Development
9  sent its Indicative Bid to TVA's consultant,
10  Concentric Advisors, on September 9, 2016 and the
11  remaining pages of this exhibit are the Indicative
12  Bid, and I would note on the first page it shows you
13  as having received a copy of this transmittal.
14       Do you see that?
15    A   Yeah.
16    Q   Do you remember the Indicative Bid?
17    A   No.
18    Q   Did you review it before it was sent?
19    A   I doubt it, because I don't remember.  This
20  is not my letter, so --
21    Q   Okay.  Is Nuclear Development LLC a special
22  purpose entity that was formed to acquire, finance,
23  complete, and operate the two partially completed
24  nuclear plants at the Bellefonte nuclear station?
25    A   Again, I hate to say, but I don't know

Page 61

1  because --
2    Q   You don't know.
3       Do you know what conditions Nuclear
4  Development was asking TVA to include in the contract,
5  conditions for closing that Nuclear Development wanted
6  TVA to include in the contract for the purchase of
7  Bellefonte?
8    A   No, I do not.
9    Q   Let me show you what's been previously
10  marked as Exhibit 45 in this case.
11    A   Thank you.
12    Q   At the bottom of the first page is the
13  beginning of an email from Mr. Blust to Ms. O'Neill
14  dated October 2nd, 2016, that you're copied on.
15       Do you see that?
16    A   Yes.
17    Q   I want to refer to that email and my
18  question is, did you read this email when it came in?
19    A   I don't think so.
20    Q   You don't --
21    A   I don't remember.
22    Q   Okay.  Do you remember discussing with
23  anyone at Nuclear Development what conditions Nuclear
24  Development wanted TVA to include prior to closing for
25  the Bellefonte site?

16 (Pages 58 - 61)

Page 62

1      MR. O'REAR:  Objection, asked and answered,
2  I believe.  Go ahead.
3      A   No, I don't.
4      Q   Okay.  Let me show you what's been
5  previously marked as Exhibit 89 in this case.
6          Now, on page one, this is an email again
7  from Mr. Blust to Ms. O'Neill dated October 18th,
8  2016, on which you're copied.
9          Do you see that?
10     A   Yes.
11     Q   And you don't have any reason to doubt that
12  you received in your email inbox these emails that
13  you're copied on, correct?
14     A   Yeah, but I don't remember this.  I've never
15  seen it.
16     Q   And do you remember -- attached to this
17  email is a letter from Mr. Blust to Ms. O'Neill of the
18  same date.  Do you remember reading this letter?
19     A   I do not.
20     Q   Okay.  Is it your practice to read all the
21  emails that you receive?
22     A   It's not, particularly if it's from Larry,
23  because he's been with us 40 years.
24     Q   All right.  Let me show you what I'm going
25  to mark as Exhibit 119.

Page 63

1          (Whereupon a document/item was marked for
2          identification as Defendant's Exhibit 119.)
3      MR. O'REAR:  Just for housekeeping, the last
4  Marie Gillman deposition was 118.
5      MR. LEMBKE:  That's my understanding.
6  BY MR. LEMBKE:
7      Q   Now, Mr. Haney, the first page of this is an
8  email from Larry Blust again to Ms. O'Neill dated
9  November 3rd, 2016, and you're copied on it.  Do you
10  see that?
11     A   Yes.
12     Q   Now, I want to direct your attention -- and
13  it's transmitting a Letter of Intent to Bid, which is
14  on page two.  Do you see that?
15     A   Yes.
16     Q   And you signed that, correct?
17     A   Yes.
18     Q   All right.  And attached to the Letter of
19  Intent to Bid -- well, first of all, let me ask, did
20  you read the Letter of Intent to Bid before you signed
21  it?
22     A   I don't remember, but I could have.
23     Q   Will you sometimes sign documents without
24  reading them?
25     A   I do.

Page 64

1      Q   And attached to the Letter of Intent to Bid
2  is the Indicative Bid --
3      A   Is this confidential?
4      Q   -- which begins at page three.
5          At the top it says -- page two it says
6  "Confidential Letter of Intent to Bid", and page three
7  says "Confidential Indicative Bid."
8          Do you see that?
9      A   Yeah, Indicative Bid, yeah.
10     Q   And the Letter of Intent to Bid that you
11  signed referenced the Indicative Bid.  And in
12  paragraph two of the Letter of Intent to Bid on page
13  two, which is the one you signed, you see numbered
14  paragraph two that says "Bidder and Ownership
15  Structure"?
16     A   On page what?
17     Q   On the second page, which is the page you
18  signed, item two says "Bidder and Ownership
19  Structure."
20     A   Right.
21     Q   Okay.  And you see where it says:  "See
22  section two in ND's Indicative Bid emailed to you on
23  September 9, 2016, a copy of which is attached hereto
24  and incorporated by reference"?
25          Do you see that?

Page 65

1      A   Yes.
2      Q   And so that indicates the Indicative Bid was
3  being attached and incorporated by reference in the
4  Letter of Intent to Bid, right?
5      A   I guess.
6      Q   And I guess my question is, does that
7  refresh your recollection that you read the Indicative
8  Bid before you signed this Letter of Intent to Bid?
9      A   I don't remember doing it, because I decided
10  what I was going to bid when I got there.
11     Q   So it's your best recollection that you did
12  not read the Indicative Bid at any time?
13     A   I don't remember doing it.
14     Q   All right.  Mr. Haney, now let me show you
15  what's been previously marked as Exhibit 1 in this
16  case, and this is a copy of the Purchase and Sales
17  Agreement entered into between Nuclear Development and
18  TVA pertaining to Bellefonte, correct?
19     A   Yes, that's what it says.
20     Q   And if you look at page 22 of this
21  document -- and the numbers are down at the bottom of
22  each page.
23     A   Page 22.
24     Q   That's your signature, signing as the sole
25  member and manager of Nuclear Development LLC,

Page 66

1  correct?
2   A   Yep.
3   Q   Now, did you read this contract before you
4  signed it?
5   A   No.
6   Q   So you cannot say that in signing it on
7  behalf of Nuclear Development, you cannot say that you
8  understood everything in it, correct?
9   A   Well, I'm sure I discussed it with Larry,
10  but I wouldn't take the time to read all this.
11   Q   Okay.  Now, do you have a recollection of
12  discussing it with Larry before you signed it?
13   A   I know I would.
14   Q   But do you have a specific recollection of
15  doing so?
16   A   No.
17   Q   And would you have discussed every single
18  provision in it with Larry before you signed it?
19   A   No.
20       MR. O'REAR:  Objection, no foundation.  He
21  said he didn't recall what he discussed with him.
22       MR. BLUST:  Privilege.
23       MR. O'REAR:  Well, he hasn't asked him what
24  yet.
25

Page 67

1  BY MR. LEMBKE:
2   Q   You understood in signing this, your
3  signature was binding Nuclear Development to the terms
4  of this deal, correct?
5   A   If Larry said to sign it, I used to sign it.
6   Q   That wasn't my question.  My question was,
7  you understood as a lawyer --
8   A   Oh, yeah.
9   Q   -- that by signing it for Nuclear
10  Development, you were binding Nuclear Development to
11  its terms, correct?
12   A   Correct.
13   Q   Have you ever read this contract?
14   A   No.
15   Q   Now, let me get you to turn to page 5A --
16  excuse me, page five of the agreement --
17       MR. O'REAR:  Well, we're going to object to
18   questions directed to the language of the
19   agreement, based on lack of foundation.
20  BY MR. LEMBKE:
21   Q   Do you see page five?
22   A   Uh-huh.  Yes, I'm sorry.
23       MR. LEMBKE:  And the lack of foundation is
24   even though he signed it, he didn't read it?
25       MR. O'REAR:  Right.

Page 68

1       MR. LEMBKE:  But we're going to ask the
2   question.
3  BY MR. LEMBKE:
4   Q   Because you understood at all times that
5  because you signed it, Nuclear Development was bound
6  to its terms, correct?
7   A   Yes, if Larry told me to sign it.
8   Q   Now, if you look at -- well, first on page
9  one, this is on the very first paragraph, it says it
10  is entered into as of the 14th day of November, 2016.
11       You see that?
12   A   Yes.
13   Q   Then on page five it says:  "The closing of
14  the transaction contemplated by" -- I'm sorry, I'll
15  let you get there.
16   A   I'm sorry.
17   Q   No problem.  I'm at paragraph 5A, which is
18  the last paragraph at the bottom of page five.
19   A   I see it.
20   Q   All right.  And the first clause of that
21  paragraph says:  "The closing of the transaction
22  contemplated by and under this agreement (the closing)
23  shall occur on November 14, 2018".
24       Do you see that?
25   A   Yes.

Page 69

1   Q   So that's two years from the date -- the
2  effective date of the contract, correct?
3   A   Correct.
4   Q   Why was there a two-year closing period?
5   A   I don't know.  I guess they thought it would
6  take them that long to put it all together.
7   Q   Now, you're aware that that date was later
8  extended to November 30th, 2018, correct?
9   A   Correct.
10   Q   In fact, I'm going to show you what's been
11  previously marked as Exhibit 18 and if you look at the
12  third page of Exhibit 18, it is the first amendment to
13  the Bellefonte Purchase and Sales Agreement, correct?
14   A   Correct.
15   Q   And on the last page of the exhibit you
16  signed it, right?
17   A   Yes.
18   Q   Okay.  And did you read this one before you
19  signed it?
20   A   I don't remember.
21   Q   Okay.  And did you understand that the
22  purpose of this amendment was to extend the closing
23  date from November 14th, 2016 -- 2018 -- to
24  November 30th, 2018, right?
25   A   Right.

18 (Pages 66 - 69)

1    Q   And this is the only amendment that was ever
2  executed pertaining to the Purchase and Sales
3  Agreement, correct?
4    A   I guess, yes.
5    Q   Now, going back to Exhibit 1, which is
6  the --
7    A   The biggy.
8    Q    -- the biggy, I'd like to direct you to
9  paragraph six, page six, section six.
10   A   Okay.
11   Q   In section -- section six is entitled
12 "Conditions To Closing."  Do you see that?
13   A   Yes, sir.
14   Q   And A says:  "The obligations of TVA and
15 buyer to consummate the transactions contemplated by
16 this agreement shall be subject to the fulfillment at
17 or before the closing of each of the following
18 conditions.
19        Do you see that?
20   A   Yes.
21   Q   Then if you look at the very bottom of the
22 page, subsection five, do you see where it says:
23        "There shall not be in effect at the closing
24 any law, statute, rule, regulation, permit,
25 certificate, or binding order, decree or decision of

1  any governmental authority (as defined in Section
2  9(a)(ii) below) restraining, enjoining, or otherwise
3  prohibiting or making illegal the consummation of the
4  transactions contemplated by this agreement."
5        Do you see that?
6    A   Yes.
7    Q   Now, when you signed this agreement, did you
8  understand what that meant?
9        MR. O'REAR:  Objection, lacks foundation,
10   and also the document speaks for itself.
11 BY MR. LEMBKE:
12   Q   You can answer.
13   A   I guess.  I don't know.
14   Q   You don't know whether you understood it
15 when you signed it?
16   A   I didn't read it.
17   Q   Okay, but you accept that Nuclear
18 Development was bound to follow it?
19   A   I assumed that Larry and him looked at it as
20 usual.
21   Q   That wasn't my question.  My question was,
22 you understood that by signing it --
23   A   Oh, yes, of course.
24   Q    -- Nuclear Development would be bound to the
25 provision, whether you read it or not, right?

1    A   Yes, right.
2    Q   Do you personally know if there is any law,
3  statute, rule, regulation, permit, certificate, or
4  binding order, decree or decision of any governmental
5  authority that would have prohibited or made illegal
6  the consummation of the transactions under the
7  agreement?
8    A   I do not know.
9    Q   Okay.  And you understand that if there were
10 such a law, statute, rule, regulation, permit,
11 certificate, or binding order, decree or decision of
12 any governmental authority that prohibited or made
13 illegal the consummation of the transactions, that
14 that meant the closing could not go forward, right?
15       MR. O'REAR:  Objection, calls for a legal
16   conclusion and also lacks foundation.
17   A   I don't know.
18   Q   Well, you understand from your training as a
19 lawyer and your years in business what a closing
20 condition is, right?
21   A   Yes.
22   Q   And you understand from your years of
23 training as a lawyer and your experience in business
24 that if a closing condition is not satisfied, a
25 closing does not occur, correct?

1        MR. O'REAR:  Objection, calls for a legal
2    conclusion, irrelevant to the facts of this case.
3        MR. LEMBKE:  That's not an objection to
4    form.  It's improper.
5        You can answer.
6        MR. O'REAR:  It's not based on any -- the
7    question is not -- the predicate of the question
8    is not based on any facts in this case.
9  BY MR. LEMBKE:
10   Q   You can answer.  Do you need me to repeat
11 the question?
12       MR. O'REAR:  Which is a hypothetical
13   question.
14       THE WITNESS:  Am I supposed to answer?  I
15   just don't know.
16       MR. LEMBKE:  Okay, we need to go off the
17   record to change the tape.
18       THE VIDEOGRAPHER:  Here ends media number
19   one.  Going off the record.  The time is
20   10:41 a.m.
21       (Discussion off the record.)
22       THE VIDEOGRAPHER:  Back on the record.  Here
23   begins media number two.  The time is 10:42 a.m.
24 BY MR. LEMBKE:
25   Q   Mr. Haney, let me direct your attention to

Page 74

1 page eight of the Purchase and Sales Agreement that is
2 Exhibit 1.
3    A    Page eight?
4    Q    Yes, sir.  And at the very bottom, do you
5 see the section entitled "Buyer's Representations and
6 Warranties?"  Do you see that?
7    A    Yes.
8    Q    And then A says:  "To induce TVA to enter
9 into this agreement, buyer represents and warrants to
10 TVA as follows".  You see that?
11    A    I think so, yes.
12    Q    So you understood these were representations
13 and warranties being made by Nuclear Development,
14 right?
15    A    I didn't read it, but yes.
16    Q    Well, you understand that's what a buyer's
17 representation warranty is in an agreement, right?
18    A    I think so, yes.
19    Q    Now I want to direct your -- if you'll flip
20 the page over to page nine, do you see about
21 two-thirds of the way down the page, representation
22 number six, which is the little Roman numeral (vi)?
23        It's the second to last one.
24    A    Right.
25    Q    And it says:  "No authorization, consent or

Page 75

1 approval or other order or action of or filing with
2 any governmental authority is required for the
3 execution and delivery by the buyer of this agreement
4 or the consummation by the buyer of the transactions
5 contemplated hereby."
6        Do you see that?
7    A    Yes.
8    Q    Now, did you do any research to determine
9 whether that representation that Nuclear Development
10 was making was accurate?
11    A    No.
12    Q    Do you know if anyone at Nuclear Development
13 did any research?
14    A    I'm sure Mr. Blust did.
15    Q    Do you know that, though?
16    A    He always does.
17    Q    Do you know it here?
18    A    I don't.
19    Q    Now let me get you to change your -- or move
20 over to page 14 of Exhibit 1.
21        Okay, do you see Section 15 entitled "TVA
22 Disclaimers and Buyer Acknowledgments"?
23    A    Yes.
24    Q    And then if you look down to Subsection C
25 under 15, it says:  "Buyer hereby acknowledges that

Page 76

1 TVA has not made any representation or warranty,
2 express or implied, as to the accuracy or completeness
3 of any information regarding the site not otherwise
4 expressly included in this agreement.  Buyer further
5 acknowledges that" -- do you see that?
6    A    Yes.
7    Q    And then under Subsection One under "What
8 Buyer Further Acknowledges," it says:
9        "Buyer, either alone or together with its
10 representatives and agents, has knowledge and
11 experience in transactions of this type and is
12 therefore capable of evaluating the risk and merits of
13 acquiring the site."
14        Do you see that?
15    A    Yes.
16    Q    Was that a true statement when made?
17    A    Yes, I think so.
18    Q    And what's the basis for your understanding
19 of why that was true?
20    A    Because I trust Bill and Larry and these
21 people to do this work.
22    Q    Okay.  And you didn't -- did you have any
23 knowledge or experience in a transaction to purchase a
24 nuclear plant personally before this?
25    A    Only trying to purchase those other plants.

Page 77

1    Q    But none of those ever reached the stage of
2 a purchase and sales agreement, correct?
3    A    Correct.
4    Q    And then under the second acknowledgment
5 that Nuclear Development was making, it says:
6        "Buyer has relied on its own independent
7 investigation and has not relied on any information or
8 representations furnished by TVA or any of its
9 representatives or agents, except as specifically set
10 forth in this agreement, in determining to enter into
11 this agreement."
12        Do you see that?
13    A    Yes.
14    Q    And was that true when you signed the
15 agreement?
16    A    Same statement I've said before.  I never --
17 I didn't read it, so --
18    Q    So you didn't know whether what you were
19 signing was true or false?
20    A    No, I really didn't.  I just trust the
21 people that work for me.
22    Q    Okay.  Now, let me turn -- get you to turn
23 to page 20 of Exhibit 1 and do you see on page 20,
24 Section 35 entitled "Specific Performance, Limitation
25 on Damages"?

20 (Pages 74 - 77)

Page 78

1   A   Yes.
2   Q   And then I want you to look down to the very
3 last four lines of that section and do you see the
4 sentence that begins: "In no event shall either
5 party"?
6   A   Right.
7   Q   "In no event shall either party be liable
8 for any indirect, incidental, consequential, special,
9 punitive or exemplary damages as a result of default,
10 violation or breach of any covenant, representation or
11 warranty contained in this agreement."
12      Do you see that?
13   A   Yes.
14   Q   And you intended Nuclear Development to be
15 bound to that provision, correct, when you signed the
16 document?
17   A   Well, I didn't know it was in there, but I
18 of course took their word for it.
19   Q   Well, you understood when you signed it that
20 if that -- if this sentence was in there, it would
21 bind Nuclear Development by you signing it, right?
22   A   Well, I signed it.  I guess it does.
23   Q   Okay.  You understand, whether you read the
24 document or not, if you sign a contract on behalf of
25 Nuclear Development, you're binding Nuclear

Page 79

1 Development to the contract, correct?
2      MR. O'REAR:  Objection, asked and answered
3 twice.
4 BY MR. LEMBKE:
5   Q   You can answer.
6      MR. O'REAR:  Go ahead.
7   A   Yeah, I mean, we have a small company that
8 does big deals.  I don't have time to read all these
9 documents.
10   Q   But that wasn't my question.  My question
11 was, you understand when you sign a document --
12   A   I trust them, yes.
13   Q   -- whether you read it or not, you know that
14 your signature binds Nuclear Development?
15   A   Yes.
16   Q   Thank you.  Now let me get you to look at
17 page 18 of Exhibit 1.
18   A   Okay.
19   Q   And do you see at the bottom of the page,
20 Section 26, "Amendment"?
21   A   Yes.
22   Q   And that section reads: "This agreement and
23 any of the transaction documents may be amended,
24 supplemented or modified only by a written instrument
25 duly executed by or on behalf of each party hereto."

Page 80

1      Do you see that?
2   A   Yes.
3   Q   And you understand that by signing it,
4 Nuclear Development is bound to that provision,
5 correct?
6   A   If that's what it says, that's probably
7 true, I guess.
8   Q   And other than the amendment to extend the
9 closing date till November 30th, you're not -- of
10 2018 -- you're not aware of any other written
11 amendment that was signed by Nuclear Development,
12 correct?
13   A   There could have been something else.  I
14 mean, I just don't know.
15   Q   But to your personal knowledge, you're
16 unaware of any other written amendment?
17   A   As far as -- I mean, I don't know.  I can't
18 keep up with it.
19   Q   All right.  Mr. Haney, would you explain to
20 me what efforts Nuclear Development has undertaken to
21 obtain financing for the Bellefonte project?
22   A   Well, we've done a few things.  We tried to
23 get DOE, because that's practically the only place you
24 can get money for nuclear development, a nuclear
25 project.  We've also tried to work with foreign

Page 81

1 entities such as the Qataris, because they came and
2 wanted to put $40 million in the U.S. for projects,
3 which we read about in the paper.  We met with them.
4   Q   $40 million or $40 billion?
5   A   $40 billion.  That's about it.
6   Q   With regard to your meeting with the
7 Qataris, when do you recall that occurring?
8   A   I can't remember when it was.  It was a year
9 ago or something.
10   Q   All right.
11   A   It's in the papers, you know.
12   Q   And did you attend that meeting?
13   A   I did.
14   Q   And with whom did you meet?
15   A   I met the head of the banking in the United
16 States, the top president of their banking.
17   Q   And where did that meeting occur?
18   A   In Miami.
19   Q   And did the Qataris express interest in
20 funding the project?
21   A   They had expressed interest, but they never
22 did.
23   Q   And do you view that avenue of financing as
24 dead?
25   A   Well, I never think anything as dead, but

21 (Pages 78 - 81)

Page 82

1 probably.
2    Q   With regard to your efforts to obtain a DOE
3 loan -- and that's what it is, right, a loan?
4    A   Yes.
5    Q   Did you or Nuclear Development hire any
6 advisers to assist you?
7    A   Yes.
8    Q   Who do you recall hiring to assist you?
9    A   Let's see.  Roy Beasley, who's a lobbyist,
10 and Bud Cramer, who's a lobbyist, and that's about it.
11 I mean --
12    Q   Who is Roy Beasley?
13    A   He's a lobbyist from Texas that does, you
14 know, work -- you know, tries to get -- to work on
15 loans for you, you know.
16        But we know the people at DOE after all
17 these years.  I mean, Larry does and Bill does.  So
18 they're always -- if we get it, we're going to get it
19 on our own, it looks to me like.
20    Q   Had you ever worked with Roy Beasley before
21 this project?
22    A   No.
23    Q   Who found Roy Beasley?
24    A   I did.
25    Q   And why were you -- of all the lobbyists in

Page 83

1 the world, why Roy Beasley?
2    A   Well, he came highly recommended, you know,
3 that he gets jobs done.
4    Q   Who highly recommended him?
5    A   I don't think -- it really occurred because
6 he was -- he's a big fundraiser for I think the
7 President.
8    Q   Did he also -- did you also understand him
9 to have a relationship with Rick Perry?
10    A   He could have, because he's no longer in
11 there, so it wouldn't help me very much.
12    Q   Was Mr. Beasley brought on after President
13 Trump took office?
14    A   Yes, we've had -- yeah.
15    Q   And is Mr. Beasley still engaged?
16    A   Yes.
17    Q   How often have you met with Mr. Beasley?
18    A   How often have I?
19    Q   Yes, sir.
20    A   Three or four times.
21    Q   And when was the last time you recall
22 meeting with him?
23    A   It's been two or three months.
24    Q   And what is his view of the likelihood of
25 getting the loan?

Page 84

1    A   Well, since nobody else is trying to get it,
2 he thinks it's pretty high if we put it all together.
3    Q   What do you mean by "put it all together"?
4    A   Well, TVA sell us the project.
5    Q   Anything else?
6    A   That's the major one.
7    Q   Now, Bud Cramer has been involved from the
8 beginning, right?
9    A   That's correct.
10    Q   And why Bud Cramer?
11    A   Well, I've known Bud for years as a
12 Congressman and starting a child -- the children's
13 group that he works with, my wife is involved in it.
14 But he's from Alabama and he's a very honest guy, as
15 far as I can tell.
16    Q   And he was a Democratic Congressman for the
17 district in which Bellefonte is located, correct?
18    A   I think that's Huntsville.  I don't know if
19 that's -- he's in that.
20    Q   And how many meetings have you attended with
21 Mr. Cramer?
22    A   Over the years, I mean a lot, you know.
23    Q   Has Mr. Cramer ever done any lobbying work
24 for any of your companies other than Nuclear
25 Development?

Page 85

1    A   Yeah, he has.
2    Q   Which ones?
3    A   On some of our -- at least one of our major
4 office buildings.
5    Q   Is that the one in Birmingham?
6    A   No, the one in Washington.
7    Q   And what has his work been directed to with
8 regard to that?
9    A   Just making sure the funds are available to
10 pay the rent.  I mean, you know.
11    Q   And is that work ongoing?
12    A   No, that's over with.
13    Q   When was that?
14    A   Oh, two, three years ago.
15    Q   And did he just have one monthly retainer
16 that all of your companies paid him to do, whatever
17 work he was going to do for your companies?
18    A   Yeah, he just has one retainer.
19    Q   And has your company in any way tried to
20 allocate the amount of the retainer between Nuclear
21 Development and the office building project he was
22 working on?
23    A   I don't know.
24    Q   And when was the last time you spoke with
25 Mr. Cramer?

22 (Pages 82 - 85)

Page 86

1    A    I haven't spoken to him in a while.  A few
2  months.
3    Q    And is his -- what would you describe is his
4  primary effort of his lobbying?
5    A    His primary effort of his lobby is to keep
6  the funds available in the budget, because the
7  administration has taken them out every year for
8  nuclear and it's to keep the funds in there.  That's
9  his primary purpose.
10   Q    And those are the funds --
11   A    That would be available.
12   Q    -- to fund the DOE loan program?
13   A    Right.
14   Q    And has both the Obama and the Trump
15  administration removed those funds in their budget
16  proposal every year?
17   A    I don't know.
18   Q    You know the Trump administration has?
19   A    I know they have the last year or two.
20   Q    Okay.  Now, did Nuclear Development hire
21  Michael Cohen as an adviser in conjunction with the
22  Bellefonte project?
23   A    We did for a week or two before he was
24  indicted and we fired him.
25   Q    Okay, and --

Page 87

1    A    But we did not hire him as a lobbyist,
2  though.
3    Q    What was he hired as?
4    A    He was hired just to see if he could help us
5  with -- you know, find people that were investors.
6         For example, like -- he didn't do it, but
7  like the Arabs.  I mean, you know, he had all these
8  contacts, supposedly as the President's lawyer, but it
9  turned out he was just a liar.
10   Q    And how did you make the decision to retain
11  Michael Cohen?
12   A    Worst decision I ever made.  But he really
13  was a con guy and -- he said himself that he was the
14  President's lawyer that turned out not to be
15  necessarily true and had done all these great deals,
16  which he hadn't done.  And of course when he was
17  indicted we fired him -- or when he was exposed we
18  fired him, like many other companies that hired him.
19       So --
20   Q    Did he call you or did you call him first?
21   A    He called me.
22   Q    How did he know to call you?
23   A    Well, because I'm a member of Mar-a-Lago
24  here, and he happened to be there and saw me and I
25  guess I was -- he thought he had a -- he was just a

Page 88

1  crook.  That's all I can say about him.
2    Q    Did Nuclear Development pay him any money?
3    A    We did the first month or so.
4    Q    And was it paid to him personally or to a
5  law firm, do you know?
6    A    I don't know.
7    Q    How much did you pay him, do you know?
8    A    I don't know the exact number.
9    Q    And did you have personal discussions with
10  him about what he was going to do?
11   A    Not really.  I mean, he was supposed to,
12  like I said, set me up with people.  We were looking
13  for an alternative to DOE, which is -- we specifically
14  forbid him to lobby DOE because he wasn't a lobbyist,
15  he was a lawyer.
16   Q    Was there ever any discussion of him going
17  to Memphis to work on that part of the deal?
18   A    No, no, no, no.
19   Q    Have you had any discussions with President
20  Trump about the Bellefonte project?
21   A    None.
22   Q    None?
23   A    None.
24   Q    Did you ever tell anyone at TVA that you
25  had?

Page 89

1    A    I could have said I talked to his people.  I
2  might have mentioned it to him.  But I mean, I haven't
3  talked any details about this with President Trump.
4    Q    So you might have mentioned the Bellefonte
5  project to President Trump?
6    A    I could have in a conversation, but I've
7  never, you know, lobbied him or said "this is
8  something I want you to help me with" or I've never
9  been to the White House or whatever.
10   Q    Have you talked with any of the White House
11  staff about the Bellefonte project?
12   A    I haven't.
13   Q    Has anyone at Nuclear Development?
14   A    They could have.  I don't know.
15   Q    Have you ever represented to anyone at TVA
16  that the President was interested in the project?
17   A    I could have.
18   Q    How would you know that the President was
19  interested in the project?
20   A    Because he's very pro-nuclear.
21   Q    Well, did you have any indication that he
22  was interested in this particular nuclear project as
23  opposed to nuclear power generally?
24   A    Well, except for Vogtle, there's no other
25  nuclear power being built right now.  So I'm -- that's

Page 90

1  the only one there is.
2      Q    Well, do you recall ever being told by
3  anyone that the President was interested in the
4  Bellefonte project?
5      A    No, I don't think so.
6      Q    As you sit here today, can you -- you said
7  you may have had a brief discussion with the
8  President.  Do you think that occurred?
9      A    It could have, because I see him all the
10  time.
11     Q    And do you ever recall mentioning to the
12  President that there was a desire for a nine -- or for
13  a multi-billion dollar loan from DOE?
14     A    I would never say that.
15     Q    Let me show you what's been previously
16  marked as Exhibit 116 in this case.
17        Mr. Haney, who is Marie Gillman?
18     A    I know that she used to work for I think
19  TVA.
20     Q    And you're also aware that she worked at
21  SNC-Lavalin --
22     A    Yeah.
23     Q    -- which was working with Nuclear
24  Development, right?
25     A    That's correct, yeah, that's where.  Now I

Page 91

1  know.  That's with government.
2      Q    And have you ever met her face-to-face?
3      A    Yes.
4      Q    Now, this is an email from her, it doesn't
5  indicate to whom it's sent, on October 17th, 2018.  Do
6  you see that?
7      A    Yes.
8      Q    And if you look down, do you see about a
9  third of the way down on page one it says:  "DOE Loan
10  Guarantee Process," right?
11     A    Right.
12     Q    And at the second bullet it says:  "Franklin
13  Haney is setting up a meeting with President Trump,
14  who has agreed to meeting, to advocate pushing DOE
15  decision.  This is expected to happen in the next two
16  weeks."
17        Do you see that?
18     A    That's not true.
19     Q    It's not true?
20     A    Not true.
21     Q    So you never told anyone that President
22  Trump had agreed to meet with you about -- and the
23  purpose of the meeting would be to advocate pushing
24  the DOE decision?
25     A    No, I have not.  She misunderstood it or

Page 92

1  whatever.
2      Q    Then in the next paragraph it says:
3        "Help requested.  In preps for meeting with
4  Trump, the Haneys have requested that we all lobby the
5  U.S. government administration.  Please see attached
6  talking points and reach out to all your local, state,
7  and federal representatives and lobbyists if you have
8  any, and urge approval action for this project."
9        Do you see that?
10     A    I see it.
11     Q    Now, did you in fact request a lobbying
12  effort in October of 2018?
13     A    I don't remember doing it.
14     Q    But you might have?
15     A    I could have.
16     Q    Now, as of November 30th, 2018 Nuclear
17  Development had not finalized financing for the
18  Bellefonte project, correct?
19     A    Correct.
20     Q    And still has not today, correct?
21     A    Correct.
22        MR. LEMBKE:  All right.  Let's take five
23  minutes.
24        THE VIDEOGRAPHER:  Going off the record.
25  The time is 11:08 a.m.

Page 93

1        (Whereupon a recess was taken from
2  11:08 a.m. to 11:21 a.m.)
3        THE VIDEOGRAPHER:  Back on the record.  The
4  time is 11:21 a.m.
5  BY MR. LEMBKE:
6      Q    Mr. Haney, after Nuclear Development signed
7  the Purchase and Sales Agreement with TVA in November
8  of 2016, you talked about the efforts Nuclear
9  Development made after that to obtain funding for the
10  project.
11        What else are you aware of that Nuclear
12  Development was doing after it signed the Purchase and
13  Sales Agreement, other than obtaining funding?
14     A    Well, I mean they were talking to
15  contractors.  We had all the major contractors coming
16  in.  TVA made all of their plans available to us and
17  all -- everything they had they made available to us.
18  They made it available to us.  It couldn't have been
19  better.
20        We set up shop in -- down there in the plant
21  and of course we had to pay for the $875,000 a
22  quarter, about $3 million a year, to keep the plant
23  open and we had sometimes -- like the company you were
24  talking about a minute ago, remember I wasn't involved
25  with that.  That was Frank and the other people.  But

Page 94

1 they had 30 or 40 people working down there,
2 getting -- coming up with a plan.
3     The TVA people came in and helped determine
4 what the price would be. They showed us all sorts of
5 things so that we would know what size loan we needed
6 to finish the project, and they also were very
7 open-minded about -- well, it was just a great
8 relationship. It just fell apart. I mean, I was
9 shocked.
10    I talked to Bill the night before and didn't
11 think we had a problem. Because he always said, "You
12 don't want to worry about time. We'll give you
13 extensions. Nobody else wants the project anyway.
14 They can afford it." So we were shocked.
15    Q   Were you involved in the talking to
16 contractors that you referenced?
17    A   Very -- no, because I don't know much about
18 construction.
19    Q   Other than talking to contractors and
20 working up the plans for the construction of the
21 project, anything else that you're aware of that
22 Nuclear Development was working on after it signed the
23 Purchase and Sales Agreement?
24    A   Well, it was working on getting the
25 operators, working on selling the power, it was

Page 95

1 working on getting the financing, it was working on
2 the construction. We spent close to what, about
3 $40 million at this point.
4    Q   Anything else you can think of that Nuclear
5 Development was working on?
6    A   That's enough. It was full-time. We didn't
7 take on any other projects because of it and you know,
8 we still plan to finish it if we ever get to own it.
9    Q   Let me show you what I'm going to mark as
10 Exhibit 48 -- or what's been previously marked as
11 Exhibit 48 in this case.
12    This is an email to you on page one dated
13 December 20, 2016 from Gary Mignogna of AREVA. Do you
14 see that?
15    A   Yes.
16    Q   And did you know Mr. Mignogna?
17    A   I met him because he was trying to get the
18 job, since he said the plans belonged to them. You
19 know, there was a problem.
20    Q   The text of the email reads: "Franklin,
21 please find attached the white paper you requested on
22 the transfer of the Bellefonte construction permit
23 from TVA to ND. Best regards, GMM."
24    Do you see that?
25    A   Yes.

Page 96

1    Q   And had you requested this white paper from
2 him?
3    A   Not that I know of. He was always
4 submitting something, trying to work his way in. We
5 were not going to use him because TVA didn't recommend
6 him very highly.
7    Q   Do you recall receiving this white paper
8 from him?
9    A   I do not.
10    Q   Do you know if you read the white paper when
11 it came in?
12    A   I would doubt it.
13    Q   Okay.
14    A   I don't handle that sort of stuff.
15    Q   And are you saying you did not request it or
16 you just don't remember whether you did or did not?
17    A   I doubt if I requested it, because as I
18 said, I didn't -- they weren't considered. They were
19 called AREVA at that time. They had nothing but
20 financial problems.
21    Q   Did you respond to Mr. Mignogna, to this?
22    A   I have no idea.
23    Q   Let me show you what's been marked as
24 Exhibit 49 in this case.
25    A   Okay, thank you.

Page 97

1    Q   Yes, sir.
2    Now, Exhibit 48 was on December 20th. This
3 is an email from Frank Haney to Mr. Mignogna the next
4 day.
5    A   This is from Franklin?
6    Q   This is from your son.
7    MR. O'REAR: He's referring to the top
8 message.
9    THE WITNESS: Oh, I'm sorry.
10 BY MR. LEMBKE:
11    Q   The middle message is what Mr. -- what we
12 just looked at, which was where Mr. Mignogna sent you
13 the white paper.
14    A   Right.
15    Q   And then the next day your son sends this
16 email to Mr. Mignogna and copies you. Do you see
17 that?
18    A   Yeah.
19    Q   And you don't doubt that you received this,
20 correct?
21    A   I don't remember it, but I'm sure I did.
22    Q   Okay, and it says: "Guys, we are focused
23 solely on the DOE loan guarantee and answering any
24 questions."
25    Do you see that?

25 (Pages 94 - 97)

Page 98

1    A    Right.
2    Q    And was that true?  Was that what Nuclear
3  Development was focused on in December of 2016, solely
4  on the DOE loan guarantee?
5    A    That's not true.  But where these people
6  were concerned, we were focusing on it.  We didn't
7  want to hire them to begin with.
8    Q    Then it says:  "We need to cut back on
9  expenses until we get further along."  Do you see
10 that?
11   A    Right.
12   Q    Was that true?
13   A    Well, we didn't, but we didn't hire these
14 people.
15   Q    Did you discuss what your son would say to
16 Mr. Mignogna before he sent this?
17   A    No.
18   Q    Okay.  Now, did you have any involvement in
19 any effort by Nuclear Development to apply to the
20 Nuclear Regulatory Commission for approval of transfer
21 of the TVA construction permits?
22   A    No.
23   Q    Did you have any awareness of the details of
24 that process?
25   A    No.

Page 99

1    Q    Do you know why the application for the
2  transfer of the construction permits was not filed
3  until November 2018?
4    A    No, I mean --
5    Q    And who was in charge of compiling the
6  application?
7    A    I would think that Bill and Larry would be.
8    Q    Okay.
9    A    I think they hired some firm to help them, I
10 think if I remember correctly.
11   Q    Okay.
12   A    But I never paid -- it's over my head.
13   Q    Okay.  So it's fair to say you don't have
14 any knowledge, personal knowledge of the details about
15 that process, correct?
16   A    I have no knowledge about it.
17   Q    Okay.  Now, I want to now turn to talk about
18 meetings you had with Bill Johnson at TVA about
19 Bellefonte, and you know that Bill Johnson was the CEO
20 of TVA during the time period of the Bellefonte --
21 your contract pertaining to Bellefonte, right?
22   A    Yeah, he once asked me two or three years
23 whether I could get involved in Bellefonte when he
24 first came there.
25   Q    All right.  Well, tell me about that.

Page 100

1    A    Well, he was just joking, I think, "Why
2  don't you get involved with Bellefonte?"
3         I liked Bill Johnson, contrary to popular
4  belief.
5    Q    When was the first time you remember meeting
6  with Bill Johnson about Bellefonte?
7    A    Oh, that goes back to when we were talking
8  about Dennis Bottorff and all of his -- because
9  Dennis, as I said, was the president, so he was very
10 familiar with everything and Bill and the whole group.
11 That's when we first met him, when he first came.
12   Q    Okay, and what were you talking to him about
13 then?
14   A    I don't know that.  But he was highly
15 qualified.  I don't know.  I mean, I don't know when
16 we started talking about it.
17   Q    So you regarded Bill Johnson as a highly
18 qualified CEO?
19   A    I did.
20   Q    And do you remember -- how many meetings
21 would your best estimate be that you had with Bill
22 Johnson about Bellefonte?
23   A    Well, most of the meetings with him were
24 over the phone because he was always so busy.
25   Q    Well, between in-person and telephone calls,

Page 101

1  what would be your best estimate of how many you had
2  with him in which Bellefonte was one of the topics?
3    A    Over the years, quite a few.  I don't know.
4  I wouldn't know where to start.
5    Q    Okay.
6    A    He was always very available if you called
7  him.
8    Q    Do you remember prior to the time that you
9  signed Exhibit 1, which is the Purchase and Sales
10 Agreement, do you remember having meetings or
11 telephone calls with him about this deal for Nuclear
12 Development to purchase Bellefonte?
13   A    I don't have any exact, but I know we talked
14 about it.
15   Q    But you don't remember any of the details;
16 is that fair?
17   A    I think that's fair.  I kept trying to get
18 him to buy the power, you know.
19   Q    Well, and what you mean by that is you kept
20 wanting TVA to commit that if Nuclear Development
21 built Bellefonte, TVA would buy some or all of the
22 power, right?
23   A    Absolutely.
24   Q    And Mr. Johnson never expressed any interest
25 in doing that; is that right?

26 (Pages 98 - 101)

Page 102

1    A    Well, he did once before Thanksgiving of the
2  first year or last year.  I thought we were close to
3  him being willing to do it, and then it went on for a
4  few months and then he changed his mind.
5    Q    Okay, and that was his right to do so,
6  right?
7    A    Yes, it was.
8    Q    Okay.
9    A    But he kept telling me too, though, "You've
10  got the right to call on anybody you want to too,"
11  because I think the real problem here is Memphis.  But
12  anyway --
13    Q    What do you mean, "the real problem here is
14  Memphis"?
15    A    Well, I just think that he got upset over
16  Memphis.
17    Q    Well, why do you think he got upset over
18  Memphis?
19    A    Because he thought they were going to leave
20  TVA.
21    Q    Did you have discussions with him about
22  Memphis?
23    A    Yes.
24    Q    What do you remember him saying?
25    A    I don't remember being too concerned about

Page 103

1  it, because it didn't seem like he was.  But he always
2  said, "You've got the right to call on anybody you
3  want to."
4        He just got peed off at Bill McCollum, you
5  know.  It's public information.  Because I mean, he --
6  the day before this -- the closing, he called me and
7  told me-- he called me the day before the next one and
8  surprised me the next night, said he wasn't going to
9  close.
10    Q    Well, let me go back and I'm going to work
11  through several things you just said there.  You said
12  he got angry at Bill McCollum?
13    A    That's what I was told, but I don't know
14  whether it's true or not.
15    Q    Were you told by him, by Bill Johnson?
16    A    No, no.
17    Q    You were not?
18    A    Somebody told me that.  I don't know.
19    Q    So you never had a meeting with Bill Johnson
20  at which he expressed to you displeasure with things
21  Bill McCollum said in Memphis?
22    A    No, I had a meeting with him -- we had a
23  meeting where he was very upset with what Bill --
24  I think Bill -- or he called me once and was very
25  upset about what Bill had said in Memphis at a City

Page 104

1  Council meeting or something, and I told him I was
2  sorry that he did that.  I didn't mean for that to
3  happen, or something like that.
4    Q    What did Mr. Johnson say that McCollum had
5  said?
6    A    I can't remember.
7    Q    Did you ever do any investigation into what
8  had been said?
9    A    No.
10    Q    So you don't know whether it was a
11  legitimate concern or not about what McCollum had
12  said?
13    A    No, I think it was about leaving, getting
14  him to leave.  Something about getting to leave.
15        But it had been in the papers, so --
16    Q    But you don't remember the details?
17    A    No.
18    Q    There came a point at which Nuclear
19  Development asked for an extension of the closing
20  date, correct?
21    A    Yes.
22    Q    And it was a proposed six-month extension,
23  correct?
24    A    Correct.
25    Q    And did you ask Mr. McCollum for the --

Page 105

1  excuse me, Mr. Johnson for the extension?
2    A    Before that he told me, "Don't worry about
3  extensions.  You know, we're in no hurry."  I mean,
4  and then everything was working very good and then it
5  all blew up.  That's all I know.
6        I don't know what, when, where, what the
7  reason was.  But I mean, we had gotten along great up
8  until the last two, three days.  I think I talked to
9  him that last week four, five times.
10    Q    All right.  Well, when did he tell you
11  "don't worry about any extensions"?
12    A    In one of those calls.  I mean -- because
13  nobody else wanted it.  We certainly weren't enemies
14  or anything.
15    Q    And you asked for a six-month extension, but
16  he didn't -- you asked for it in the summer of 2018,
17  right?
18    A    Yeah, we asked him.  We thought we would
19  have no problem getting it.
20    Q    And he did not agree to it, correct?
21    A    I guess.
22    Q    Well, and you understood that it was up
23  to -- TVA had the discretion to say yes or no to an
24  extension, right?
25    A    I guess, yes.

27 (Pages 102 - 105)

Page 106

1    Q   I mean, it was their call, right?
2    A   I guess.  I don't know.  There was a
3  contract.
4    Q   Well, you understood there was a specific
5  closing date in the contract, right?
6    A   And I was willing to close.
7    Q   Well, that's not my question.  My question
8  was, you understood there was a specific closing date
9  in the contract, right?
10    A   Right, and I deposited the money and TVA
11  knew the money was there to be deposited.
12    Q   And you understood --
13       MR. LEMBKE:  Move to strike as
14    nonresponsive.
15  BY MR. LEMBKE:
16    Q   You understood that any amendment to a
17  written contract term had to be agreed by the parties,
18  right?
19    A   I guess.  I'm not the lawyer.
20    Q   Well, you were asking for TVA to agree to a
21  six-month extension, right?
22    A   Yeah, we were asking him.  But as far as
23  I know -- I didn't personally ask for the six-month
24  extension.  I'm saying Mr. Blust, Bill, and them just
25  wanted a six-months extension.

Page 107

1    Q   So you never asked for -- you never asked
2  Bill Johnson for a six-month extension?
3    A   I probably did.
4    Q   You think you did?
5    A   I think I might have.
6    Q   And what did you tell him was the reason why
7  Nuclear Development needed a six-month extension?
8    A   Well, we thought -- that was before.  He
9  told me before that not to worry, you know, about
10  extensions, but something happened.
11    Q   Well, that wasn't my question.  My question,
12  Mr. Haney, is first, why did Nuclear Development need
13  a six-month extension?
14    A   To close, we didn't.
15    Q   Well, Nuclear Development asked for the
16  extension, not TVA, correct?
17    A   Yeah, but we didn't say we wouldn't close.
18  They'd give it or didn't give it.
19    Q   Well, why did Nuclear Development ask for an
20  extension of the closing date by six months?
21    A   Because we thought they didn't care.
22    Q   That was the only reason?
23    A   Yeah.  I planned to close and the money was
24  deposited.
25    Q   Okay.  So Nuclear Development didn't need

Page 108

1  the extension, but just decided they'd ask for it
2  nonetheless?
3    A   No.  No, I mean, as far as buying it, I was
4  going to buy it and the money was there.
5    Q   Well, why did an extension even come up
6  then?
7    A   Because he -- as I've told you, he said
8  don't worry about the time.  He always said, you know,
9  we got -- "if you need another extension, I'll be glad
10  to give it," blah, blah, blah, and then the last week
11  something happened.  That's all I'm trying to say.
12    Q   But you asked -- Nuclear Development asked
13  for an extension long before the last week.  Why did
14  they do that?
15    A   I don't know.  I'm sure that they have a
16  good reason.
17    Q   Okay.  And if Mr. Blust has made a written
18  statement about why they may -- why Nuclear
19  Development asked for an extension, you would accept
20  that as accurate?
21    A   Yeah.
22    Q   Now, do you have any specific recollection
23  of conversations you had with Bill Johnson after
24  Nuclear Development requested the six-month extension,
25  pertaining to the extension?

Page 109

1       MR. O'REAR:  Objection.  I think he's
2    already answered some of those questions.  So
3    objection, asked and answered.
4    A   He called me -- I wrote it down.  He called
5  me the day before.  The only time I found out we
6  weren't going to close was 9 o'clock the night before,
7  so --
8    Q   So the first time you knew that there was
9  any potential not to close, that TVA was not going to
10  close, was 9 o'clock the night before the closing?
11    A   That's right.
12    Q   All right.  And is it --
13    A   I didn't believe it.
14    Q   Is it your testimony that no one at Nuclear
15  Development had any idea there was a potential problem
16  prior to that?
17    A   No, I don't know what they had that I knew.
18  I was just talking my idea.
19    Q   So it was just -- you're the only one who
20  didn't know it till the night before?
21    A   Because I was the one that was putting up
22  the money.
23    Q   Now I want to go back to my question.
24       My question was, after Nuclear Development
25  made the request, and I'm going to -- well, after

28 (Pages 106 - 109)

Page 110

1 Nuclear Development made the request for the
2 extension, do you recall any specific conversations
3 you had with Mr. Johnson about that requested
4 extension?  After you made the request, before the
5 closing date.
6     A    After they made the request, I don't know.
7 I didn't.  I didn't tell him about it.
8     Q    So you never had another conversation with
9 Bill Johnson --
10     A    I had a conversation with Bill Johnson, but
11 I don't know if we talked about the extension.
12     Q    Just so she can take it down, if you would
13 let me finish asking my question.
14     A    I'm sorry.
15     Q    That's perfectly okay.  If you'll let me
16 finish.
17         My question was, after Nuclear Development
18 requested the extension, do you recall ever having a
19 discussion with Bill Johnson about that extension
20 request in which you were personally involved?
21     A    I don't know.
22     Q    Okay.  So you don't recall one, sitting
23 here?
24     A    Because I talked to him two in a row, but I
25 don't know if we talked about the extension.

Page 111

1     Q    All right.  In the fall of 2018, which I'll
2 define to be -- the closing date was -- by amendment
3 was going to be November 30th.  So I'm focusing on
4 September, October, November.  Do you recall having
5 any discussions with Bill Johnson about Bellefonte
6 during that period -- September, October, November --
7 prior to the last two days?
8         I'm going to get to the last two days, but
9 prior to the last two days do you recall having any
10 discussions with him about Bellefonte?
11     A    I don't know.
12     Q    You're just not sure?
13     A    Just not sure.
14     Q    Okay.  Now, you are sure that you had
15 conversations with him in the last two days; is that
16 right?
17     A    I think it was the last two days, yeah.
18     Q    Tell me everything you remember about -- and
19 you said there were two conversations in the last two
20 days?
21     A    Yes.  We were in Memphis and I was driving
22 in a car to meet with the Mayor, and he called me on
23 the phone and he was just happy, happy, happy, said
24 "I'll call you tomorrow about" -- I guess he might
25 have said the extension.

Page 112

1         But he said, "I'll call you tomorrow and we
2 can talk."  Because I said, "I've been here, I can't
3 do all that."
4         So I came back here and the next day he kept
5 his word.  He called me.  That's when he broke it.
6 That's the day before the closing or something.  I
7 said I'd already made arrangements to put the money up
8 because I thought we were going to close.
9         Then he called and said, "Well, Franklin" --
10 his lawyers called him and said we're not going to
11 close.  I thought I was going to have a heart attack
12 out there.
13     Q    So the first time, the first of those two
14 phone calls there was no substantive discussion.  It
15 was just you were busy and he agreed to call you the
16 next day?
17     A    I think that's right.
18     Q    Okay, and the next day he called as
19 promised?
20     A    Like he said.
21     Q    And other than what you just told me, do you
22 remember anything else about that conversation?
23     A    That was about it, short and sweet.
24     Q    And that was at 9 o'clock the night before?
25     A    I don't remember, somewhere around there or

Page 113

1 whatever time it was.
2     Q    And that was the first you had any idea
3 there was a question about whether TVA would go
4 forward with the closing?
5     A    Well, I was told that, you know, if you
6 didn't get an extension you just close, right?  So I
7 put the money up.  It was wired, they knew the money
8 was there and -- 90-something million dollars, and I
9 figured that it was all over.
10         So we didn't get the extension.
11     Q    Well, my question, though, Mr. Haney, was it
12 wasn't until Bill Johnson called you the night before
13 that you had any idea that TVA was not going to close
14 the next day if there was no extension; is that fair?
15     A    I didn't.
16     Q    You did not know?
17     A    No, I did not know.
18     Q    Okay.  Let me show you what's been
19 previously marked as Exhibit 15 in this case and
20 really, if you'll focus on the bottom of page one and
21 then page two, the bottom of page one is an
22 email from Larry Blust to Sherry Quirk that copied you
23 on October 24, 2018.
24         Do you see that?
25     A    Here at the bottom, "TVA External" --

29 (Pages 110 - 113)

1   Q   I'm pointing.  It's right here at the
2   bottom.
3   A   Okay.
4      MR. O'REAR:  Yeah, you're looking at it.
5      THE WITNESS:  Okay, I'm sorry.
6   BY MR. LEMBKE:
7   Q   So that's an email from Mr. Blust to
8   Ms. Quirk in which you're copied, right?
9   A   Yes.
10   Q   So let me let you look at that email and
11   then what's on the next page and then I'll have a
12   question for you.
13   A   Okay, I see it.
14   Q   Now, you know Ms. Quirk is the general
15   counsel of TVA, right?
16   A   Yes.
17   Q   You met her?
18   A   Yes.
19   Q   Does this refresh your recollection that you
20   had a meeting with Bill Johnson and Ms. Quirk and
21   Larry Blust on October 23rd, 2018?
22   A   I'm sure we did.
23   Q   The second page indicates a proposal that
24   Nuclear Development was making to TVA to resolve any
25   issues with TVA regarding Memphis.  Do you see that?

1   A   I see it, yes.
2   Q   Do you recall this proposal?
3   A   No, but I'm not surprised.  It could have
4   been put out by somebody.
5   Q   Was that discussed -- do you recall if that
6   was discussed at the meeting on October 23rd that you
7   attended with Mr. Johnson and Ms. Quirk?
8   A   No, I don't remember what -- I don't
9   remember.
10   Q   After that phone call you had the night
11   before with Mr. Johnson at which you found out that
12   TVA was not going to close, did you ever have another
13   conversation with Mr. Johnson about Bellefonte?
14   A   I don't think so.
15   Q   And have you seen him since then?
16   A   I don't think so.
17   Q   Did you ever participate in any meetings or
18   phone calls with TVA personnel that Mr. Johnson was
19   not on?
20   A   Well, I mean the manager down at the plant,
21   I'm sure I talked to him.
22   Q   Jim Chardos.
23   A   Right.
24   Q   Other than Mr. Chardos, do you ever remember
25   meeting with anyone at TVA when Mr. Johnson was not

1   present?
2   A   Well, I can't -- I don't remember one.
3   Q   Okay.
4   A   But I don't know.  I could have.
5   Q   Okay.
6   A   I don't think so.
7   Q   Now, you said that Mr. Chardos was the
8   manager of the Bellefonte plant?
9   A   Yeah, that TVA had.
10   Q   And how often do you recall interacting with
11   him, either in person or by phone?
12   A   Not too often, because that was more or less
13   them talking to him, but --
14   Q   Do you remember any specific conversations
15   with Mr. Chardos?
16   A   He was always big on Bellefonte.  But I
17   don't -- he was a great guy, thought he did a great
18   job down there.
19   Q   But you don't recall the specifics of any of
20   your conversations with him?
21   A   No, I don't.
22   Q   And you considered him to be competent at
23   his job?
24   A   Yes.
25   Q   Did you ever talk to him about coming to

1   work at Nuclear Development after he left TVA?
2   A   He mentioned it many, many times, but I
3   would tell him -- I said we'd talk about it after we
4   close.
5   Q   Did anyone at TVA ever explain to you why
6   TVA thought it could not close on November 30th, 2018?
7   A   Personally, no.  I don't know.
8   Q   And so sitting here today, you don't have an
9   understanding of why TVA felt it could not close; is
10   that fair?
11   A   That's fair.
12   Q   Okay.  Mr. Haney, during the period from
13   November of '16 to November of -- well, to the
14   present, do you go to Washington, D.C. on business?
15   A   Sometimes.
16   Q   And does it concern a number of your
17   companies when you go?
18   A   Well, we don't have that many companies.  I
19   mean, no, it's all been about -- most of it's always
20   been about this.  In the past, before that it was
21   a little bit about when we were working on a lease,
22   but that was two, three years ago.
23   Q   What lease were you working on?
24   A   With the building -- what's it called --
25   Portals, which is the headquarters of the Federal

Page 118

1 Communication Commission.
2     Q    And you went to D.C. for meetings --
3     A    I've only been there two or three times.
4     Q    And did you handle some Bellefonte-related
5 business while you were there for those Portals
6 meetings?
7     A    I don't think so.
8     Q    Okay.
9     A    If we did, we would have -- we certainly
10 wouldn't have put them on these costs to TVA.
11    Q    Did you ever have any -- have you had any
12 meetings related to the Dulles Toll Road in D.C.
13 during the period of November 2016 to the present?
14    A    I don't know of any.
15    Q    Have you had any meetings about your other
16 real estate enterprises in D.C. in the -- during that
17 period of November 2016 to the present?
18    A    I don't think so.
19    Q    So to the best of your knowledge, in the
20 last three years and two months you've not had a
21 single meeting in Washington, D.C. about the Dulles
22 Toll Road?
23    A    Well, I could have had, but I don't think
24 so.
25    Q    And same thing -- you have that significant

Page 119

1 office building holding still in D.C., correct?
2     A    I don't have anything to do with it. I'm a
3 limited partner.
4     Q    But you haven't had a single meeting about
5 that in D.C. in the last three years and two months?
6     A    No, I would have had a meeting about it.
7     Q    Okay.
8     A    But we certainly wouldn't turn it in as a
9 cost to TVA, is what I'm trying to say, if we did.
10    Q    Well, is it possible that while you were in
11 D.C. to meet on Bellefonte issues, you also did
12 something on these other issues; killed two birds with
13 one stone?
14    A    Well, I would have if it's true, but I just
15 don't know of any.
16    Q    Now, let me show you what I'm going to mark
17 as Exhibit 120 and I'll say this is the corrected
18 damages computation calculation. The previous exhibit
19 was the initial computation that had the --
20        MR. O'REAR:  It had a mathematical error and
21 we withdrew it.
22        MR. LEMBKE:  Mathematical error, yes. So
23 this is the correct one.
24        (Whereupon a document/item was marked for
25 identification as Defendant's Exhibit 120.)

Page 120

1 BY MR. LEMBKE:
2     Q    Now, have you seen this document before?
3     A    I saw it yesterday for the first time.
4     Q    So you know this is at least as of a few
5 months ago the damages being requested by Nuclear
6 Development in this matter from TVA, right?
7     A    That's what I'm told.
8     Q    Did you have any involvement in preparing
9 this?
10    A    No.
11    Q    Okay. Now, where on here is the listing for
12 Michael Cohen's advising fee?
13    A    I have no idea.
14    Q    Do you think it's on here?
15    A    I don't know.
16    Q    Well, take a minute and look through, if you
17 would.
18    A    Okay. Does anybody see it? I don't know
19 where to look.
20    Q    Well, I will say -- I'll represent to you
21 there's nothing with Michael Cohen's name on here, and
22 I'm just wondering if you recognize any of these other
23 entities as perhaps some entity that Michael Cohen
24 billed for his services through.
25    A    I didn't prepare this, so I don't know.

Page 121

1     Q    Okay. Now, Ali Sedan Services is a
2 limousine service in D.C.; is that correct?
3     A    Yes.
4     Q    And you sometimes travel to the D.C. area to
5 see your grandchildren, right?
6     A    Right.
7     Q    For no business reason at all, correct?
8     A    That could be, but not too often.
9     Q    But that certainly has happened in the last
10 three years and two months, right?
11    A    Right.
12    Q    Just you go up there for family reasons,
13 non-business reasons, right?
14    A    Right.
15    Q    And when you go you always fly on a private
16 jet, right?
17    A    Right.
18    Q    And when you go you have Ali's Sedan
19 Services drive you around, correct?
20    A    Sometimes, yes.
21    Q    Can you say with certainty that none of the
22 listings for Ali's Sedan Services involve trips that
23 were of a solely personal nature?
24    A    I can say that Gloria, who I'm sure prepared
25 it, has been with me 40 years and I would -- she would

31 (Pages 118 - 121)

Page 122

1 not do something like that, I don't think.
2    Q   Well, that wasn't my question.  My question
3 was, if you look at the dates and the charges for
4 Ali's Sedan Services -- and these were primarily
5 services for driving you around, right?
6    A   Well, they could have been me.  It could
7 have been Bill, it could have been Frank, anybody
8 connected with us.
9    Q   My question is, you can't state with
10 certainty that none of these involve any -- well, let
11 me start over.
12       In looking at the list of charges for Ali's
13 Sedan Services, you can't say whether any of these
14 involved solely personal transportation, correct?
15    A   I can't, but I promise you that she wouldn't
16 do that.
17    Q   Okay, and if you look on the listing for
18 FlexJet, LLC, you can't say that none of those
19 involved personal trips, correct?
20    A   Well, she wouldn't count it if it was, if it
21 wasn't on a project.
22       MR. LEMBKE:  Let me move to strike as
23 nonresponsive.
24    Q   Mr. Haney, my question to you is --
25       MR. O'REAR:  We object to that motion, but

Page 123

1 go ahead.
2 BY MR. LEMBKE:
3    Q   My question to you is -- and we'll get out
4 of here faster if you'll answer the questions --
5       MR. O'REAR:  He's trying.
6    Q    -- the question, though, is based on your
7 personal knowledge.  You can't tell me that none of
8 these FlexJet entries are for personally -- let me
9 start over.
10       Based on your personal knowledge, you don't
11 know what the purpose of each of these trips was, do
12 you?
13    A   I don't.
14    Q   Okay.  And for Flight Options, LLC, based on
15 your personal knowledge, you can't tell me what the
16 purpose of each of those trips was for, correct?
17    A   I can't.
18    Q   All right.  And the same is true going back
19 to Ali's Sedan Services, for all of those entries,
20 based on your personal knowledge, you can't tell me
21 what the purpose of each of those trips was, correct?
22    A   Correct.
23    Q   Okay.  Mr. Haney, back on page one, do you
24 know what AECOM is?
25    A   No.

Page 124

1    Q   Okay.  Do you know what Aladdin Printing &
2 Copying did for Nuclear Development?
3    A   No.
4    Q   On page two, do you know what Chadbourne &
5 Parke did for Nuclear Development?
6    A   I don't.
7    Q   Do you know what Julien Debonnet did for
8 Nuclear Development?
9    A   No.
10    Q   Do you know what Dentons US, LLP did for
11 Nuclear Development?
12    A   No.
13    Q   Do you know what Fitch Ratings did for
14 Nuclear Development?
15    A   Yeah, we had to have a rating for DOE.
16    Q   And you got more than one rating; is that
17 correct?
18    A   I think we got two.  You had to have two.
19 I'm not sure.
20    Q   You're saying that DOE required two ratings?
21    A   I'm pretty sure.  If it's in here -- I don't
22 know, is it in here?  I don't --
23    Q   Well, I'll represent to you that there's a
24 separate entry for Moody's Investor Services.
25    A   They may have been required too.  Yeah, they

Page 125

1 did require two.
2    Q   So based on your personal knowledge, DOE
3 required two separate ratings?
4    A   I'm pretty sure of that.
5    Q   Okay.
6    A   I didn't see the other one, if it's true.
7    Q   On the next page, do you know what services
8 Framatome provided for Nuclear Development?
9    A   Yeah, that's AREVA, same group that --
10 remember they had the plans and you had to work with
11 them on certain things.
12    Q   Well, do you know what they were doing for
13 $63,500?
14    A   I don't.
15    Q   Okay.  Do you know what FTI is?
16    A   No.
17    Q   Okay.  So you don't know what it did for
18 Nuclear Development, correct?
19    A   Correct, I don't.
20    Q   All right.  Now, Hand Arendall is obviously
21 Mr. O'Rear's firm.  Do you know what services Hand
22 Arendall provided between December of 2016 and October
23 of 2018 for which Nuclear Development is seeking
24 reimbursement in this case?
25    A   Is this --

32 (Pages 122 - 125)

Page 126

1          MR. O'REAR:  Roger, Roger's firm.
2          THE WITNESS:  No, I don't.
3   BY MR. LEMBKE:
4      Q    On the next page, you're aware that Hughes
5   Socol is Mr. Blust's firm, right?
6      A    Right.
7      Q    Do you know what services Mr. Blust's firm
8   provided between January of 2017 and March of 2019 for
9   which Nuclear Development is seeking reimbursement in
10  this case?
11     A    He was working on it night and day.
12     Q    Well, my question is, do you know which
13  categories of services Nuclear Development is seeking
14  reimbursement for?
15     A    I do not.
16     Q    So you don't know whether any of these seek
17  amounts relating to litigation, correct?
18     A    I don't.
19     Q    Do you know what ICF Consulting Group is?
20     A    That sounds familiar.  What page is it on?
21     Q    It's just below the Hughes Socol entry.
22     A    I don't know what page it's on.
23     Q    Well, let me count for you.
24         MR. O'REAR:  I'll find it for you.
25     Q    It's on the fifth page.

Page 127

1      A    You're talking about Ickes?
2      Q    ICF Consulting Group.
3      A    They were a lobbying group back a long time
4   ago, but we let them go.
5      Q    Who worked there?
6      A    I don't even know.
7      Q    And so you're not sure what the $567,150 for
8   which Nuclear Development is --
9      A    For Ickes?  I don't see that number.  I --
10         MR. O'REAR:  He's looking at I think the
11  Ickes.
12         MR. LEMBKE:  Oh, I'm referring to ICF
13  Consulting Group, which is $567,000.
14         MR. O'REAR:  Yeah, he's looking at this one,
15  not that one.
16         MR. BLUST:  He's a lobbyist.
17         MR. LEMBKE:  Mr. Blust, I'm going to move to
18  strike that.
19         MR. BLUST:  Fine.
20         MR. LEMBKE:  You need to remain quiet,
21  please.
22         MR. BLUST:  I will say whatever I want to
23  say, as I told you last time, okay.
24         MR. LEMBKE:  Well, Mr. Blust, if we need to
25  get the Court on the phone, we can, but you're

Page 128

1   not entitled to say whatever you want to say in a
2   deposition under the Federal Rules of Civil
3   Procedure, as you know.
4          MR. BLUST:  I don't know that at all.
5   I know the exact opposite.  But let's go on with
6   the questioning and let's get this done.
7          THE WITNESS:  Cut this out.
8   BY MR. LEMBKE:
9      Q    The entry for $567,150 for ICF Consulting
10  Group, do you see that?
11     A    Yeah.
12     Q    Do you know what ICF Consulting Group is?
13     A    I don't.
14     Q    Now, as you said, you're the ultimate
15  authority at Nuclear Development, right?
16     A    Right.
17     Q    And this money was essentially coming out of
18  your pocket to pay these bills, right?
19     A    That's right.
20     Q    And you don't know -- $567,000 was spent on
21  this group and you don't know who it is; is that fair?
22     A    That's fair.
23     Q    Now, you indicated that the Ickes & Enright
24  Group, which is just under $274,000, that was for
25  lobbying services in 2016 and 2017?

Page 129

1      A    I'm sure it is.  It has to be because
2   they're a lobbying firm.  I just knew that.
3      Q    And what were they lobbying?  You did not
4   mention them earlier.  Who were they?
5      A    They were a lobbying firm.  I don't know --
6   they probably had been -- I imagine at that time it
7   was the tax credits we were trying to get.  I would
8   just imagine.  I don't know if that's true or not.
9      Q    Okay.  Then the next entry is for just under
10  $1.3 million to McCollum Holdings.  Do you see that?
11     A    Yes.
12     Q    And that's basically the compensation to
13  Mr. McCollum for his hourly rate work?
14     A    Yes.
15     Q    Next is Midcontinent Independent for
16  $16,000.  Do you know what that is?
17     A    No.
18     Q    We've already talked about the Moody's
19  Investor Service, $195,000, right?
20     A    That is a rating, yes.
21     Q    Yes, sir.  Then next is $548,567.23 to
22  Morgan Lewis.  You see that?
23     A    Yes.
24     Q    Who is Morgan Lewis?
25     A    It's another law firm.  I don't know what

Page 130

1 they did, but it's a law firm.
2    Q    Next is $287,788.15 for MPR Associates.  Do
3 you see that?
4    A    Yes.
5    Q    And what is MPR Associates?
6    A    I don't know.
7    Q    Next is $35,906.87 to Thomas J. Myers.  Who
8 is that?
9    A    I don't know.  I really don't.
10   Q    Next is a little over $5500 to Navton
11 Consulting Services.  Who is that?
12   A    I don't know.
13   Q    Sir?
14   A    I don't know.
15   Q    Next is $217,664.22 to Norton Rose
16 Fulbright.
17   A    Looks like a law firm, but I don't know.
18   Q    Next is a little over $5,000 to RepEquity,
19 Inc.  Do you know what that is?
20   A    No.
21   Q    Next is $150,000 to Rock Creek Advisors.  Do
22 you see that?
23   A    That is a lobbying firm.
24   Q    Now, that's in addition to the ones you
25 mentioned to me earlier?

Page 131

1    A    Yes.
2    Q    What did Rock Creek --
3    A    We don't employ them anymore.
4    Q    What does Rock Creek Advisory -- what did
5 they do?
6    A    I don't even know.
7    Q    Do you know who the principal is you were
8 dealing with there?
9    A    I wasn't dealing with him.
10   Q    Next is Rocket City Digital for just under
11 $7,500.  What's that?
12   A    I don't know.
13   Q    Okay.  Next is a little over $91,000 to
14 Susan Adler Thorp Corporation.  Do you see that?
15   A    Yes.
16   Q    Who is that?
17   A    She's a lady that's the public relations in
18 Memphis.
19   Q    And what sort of public relations work is
20 she doing in Memphis?
21   A    Well, anything that needs to be done.
22   Q    With regard to what?
23   A    With regard to Memphis.
24   Q    So encouraging Memphis to dump TVA?
25   A    Not necessarily that, just representing us,

Page 132

1 period.
2    Q    Well, might she be involved in encouraging
3 Memphis to dump TVA?
4    A    She could be.  I don't know.
5    Q    Do you think it would be appropriate if she
6 is, to ask TVA to pay for that?
7    A    I don't know about that.
8    Q    Well, this is my one and only chance to ask
9 you that question.  Do you think it's appropriate --
10   A    I wouldn't pay it if I was them.
11   Q    You don't think that's fair?
12   A    No.
13   Q    Sutton Reid Advertising, which is a little
14 over $95,000, is another Memphis expenditure, correct?
15   A    It is.
16   Q    And do you think it's fair to ask TVA to pay
17 for that?
18   A    I don't know, but I wouldn't if I was them.
19   Q    Well, you're the one asking them to pay it.
20 Do you think they ought to pay it?
21   A    Well, I mean, I think they ought to pay it,
22 but they probably wouldn't.  I mean, because if they
23 leave -- I don't know if they're going to leave or
24 not.  But anyway --
25   Q    Well, why do you think TVA should be paying

Page 133

1 for expenses that are aimed in Memphis -- at Memphis
2 not continuing with TVA?
3    A    Well, that's not the reason.  We have a
4 right to go to talk to the Memphis board, according
5 to -- there's nothing wrong with that.
6    Q    Well, I under- -- my question, though, is do
7 you think TVA should be responsible for paying the
8 expenses of --
9    A    If they don't close, they should be.
10   Q    Why?
11   A    Because they should honor their commitment.
12 They should close.
13   Q    But you don't know -- well, we've already
14 covered that.
15        So the reason you think TVA should pay for
16 the Memphis expenditures is simply because TVA did not
17 close?
18   A    Well, no, I think that we have a right to
19 talk to anybody we want to about buying power for
20 nuclear.  There's no question about that.  You got to
21 have people that -- in anyplace that -- I mean, the
22 point I'm trying to make is we have the right to
23 choose the people and we have -- I can't go over there
24 and do it.  I mean --
25   Q    Why not?

34 (Pages 130 - 133)

Page 134

1    A   I'm 80 years of age.  I can't do it.  I'll
2  just kill myself.
3    Q   Well, but you had Mr. McCollum.  Why did you
4  need outside consultants?
5    A   Well, I don't know.  I'm sure Bill hired
6  them.  I don't know.
7    Q   Next is Bruce Turner, PLLC, for a little
8  over $18,000.  Do you know who that is?
9    A   It's a law firm that I think Larry and them
10  got.
11    Q   Well, what did he do?
12    A   I don't know.
13    Q   The last entry is the U.S. Department of
14  Energy for $350,000.  That's the fee for the loan
15  application, correct?
16    A   I think that's true.
17    Q   Okay.  Now, let me direct your attention --
18  strike that.
19       All right.  Let me direct your attention
20  back to the fifth page again, the entry about the
21  Ickes firm.
22    A   Yeah.
23    Q   The first entry there is dated November 1,
24  2016.  Do you see that?
25    A   Wait a minute.  Yeah, I see it.  Yeah, I see

Page 135

1  it.
2    Q   And we saw earlier that the date of the
3  contract between TVA and Nuclear Development was
4  November 16, 2016.  Do you recall that?
5    A   Yes.
6    Q   Why would TVA owe money to Nuclear
7  Development for something paid before the date of the
8  contract?
9    A   I don't know.
10    MR. O'REAR:  That may not be the date of
11  payment.  That may be -- well, it could be an
12  invoice date or it could be an undated invoice.
13  So we can check on that.
14       If it does predate -- if it services that
15  predate the contract, that is not claimed.
16    MR. LEMBKE:  All right.  Let's go off the
17  record and take a short break.
18    THE WITNESS:  Okay, thank you.
19    THE VIDEOGRAPHER:  Here marks the end of
20  media number two.  Going off the record.  The
21  time is 12:16 p.m.
22    (Whereupon a recess was taken from 12:16
23  p.m. to 12:24 p.m.)
24    THE VIDEOGRAPHER:  Back on the record.  Here
25  marks the beginning of media unit three.  The

Page 136

1  time is 12:24 p.m.
2    MR. LEMBKE:  Mr. Haney, subject to my
3  statement earlier, we don't have any further
4  questions at this time and we appreciate your
5  hospitality.  Thank you, sir.
6    MR. O'REAR:  I have no questions.
7    THE VIDEOGRAPHER:  This concludes the
8  deposition of Franklin L. Haney, Sr.  The number
9  of media were three and will be sent to Veritext
10  Legal Solutions.
11    Going off the record.  The time is
12  12:24 p.m.
13    (Whereupon, the taking of the deposition was
14  concluded at 12:25 p.m.)
15       - - -
16
17
18
19
20
21
22
23
24
25

Page 137

1       CERTIFICATE OF OATH
2
3    I, Alice J. Teslicko, RMR, a Notary Public
4  for the State of Florida at large, do hereby
5  certify that the witness, FRANKLIN L. HANEY, SR.,
6  appeared personally before me and was duly sworn.
7    Signed and sealed this 1st day of February,
8  2020.
9
10
11
12       Alice J. Teslicko, RMR
13
14  Commission No. GG249076
   My Commission Expires:
15  December 14, 2022
16
17
18
19
20
21
22
23
24
25

35 (Pages 134 - 137)

Page 138

```
1              CERTIFICATE
2  STATE OF FLORIDA    )
                       )  ss.
3  COUNTY OF MARTIN    )
4
       I, ALICE TESLICKO, RMR, a Registered
5  Merit Reporter and Notary Public for the State of
   Florida at Large, do hereby certify that I reported
6  the deposition of Franklin L. Haney, Sr., a witness
   called by the Defendant in the above-styled cause; and
7  that the foregoing pages constitute a true and correct
   transcription of my shorthand report of the deposition
8  of said witness.
9       I further certify that I am not an attorney
   or counsel of any of the parties, nor a relative or
10 employee of counsel connected with the action, nor
   financially interested in the action.
11
       WITNESS my hand and official seal in the
12 City of Stuart, County of Martin, State of Florida,
   this 1st day of January, 2020.
13
14

15                Alice J. Teslicko, RMR
16 My commission expires:
   December 14, 2022
17 Commission No. GG249076
18
19
20
21
22
23
24
25
```

Page 139

```
1  To: CAINE O'REAR, III, ESQ.
2  Re: Signature of Deponent Franklin Haney, Sr.
3  Date Errata due back at our offices: 3/6/2020
4
5  Greetings:
6  This deposition has been requested for read and sign by
   the deponent.  It is the deponent's responsibility to
7  review the transcript, noting any changes or corrections
   on the attached PDF Errata.  The deponent may fill
8  out the Errata electronically or print and fill out
   manually.
9
10 Once the Errata is signed by the deponent and notarized,
   please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
   and forward to the taking attorney to file with the
13 original transcript.  We will also send copies of the
   Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
   to readandsign@veritext.com
19 or mail to
20 Veritext Production Facility
21 2031 Shady Crest Drive
22 Hoover, AL 35216
23 205-397-2397
24
25
```

Page 140

```
1  ERRATA for ASSIGNMENT #3833163
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24
25
```

Page 141

```
1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16
17
18 _____
   DEPONENT'S SIGNATURE
19
   Sworn to and subscribed before me this ___ day of
20
   _____, _____.
21
22 _____
23 NOTARY PUBLIC / My Commission Expires:_____
24
25
```

36 (Pages 138 - 141)