FILED
2020 Oct-07  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## Page 1

THE UNITED STATES DISTRICT COURT NORTHERN

DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

CIVIL ACTION NO. 5:18-CV-01983-LCB

NUCLEAR DEVELOPMENT, LLC,

    Plaintiff,

vs.

TENNESSEE VALLEY AUTHORITY,

    Defendant.

VIDEOCONFERENCE AND VIDEO DEPOSITION

OF

WILLIAM MCCOLLUM

July 9, 2020

REPORTED BY:

    Gail B. Pritchett

    Certified Realtime Reporter,

    Registered Professional

    Reporter and Notary Public

## Page 2

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4          Mr. Caine O'Rear III
5          Attorney at Law
6          Hand Arendall, LLC
7          RSA Tower
8          11 North Water Street
9          Suite 30200
10         Mobile, Alabama 36602
11         251.432.5511
12         corear@handarendall.com
13            - and -
14         Mr. Larry David Blust
15         Attorney at Law
16         Hughes Socol Piers Resnick Dym, LTD
17         70 West Madison Street, Suite 4000
18         Chicago, Illinois 60602
19         312.580.0100
20         lblust@hsplegal.com
21
22
23
```

## Page 3

```
1    A P P E A R A N C E S (continuing)
2
3    FOR THE DEFENDANT:
4          Mr. Matthew H. Lembke
5          Attorney at Law
6          Bradley Arant Boult Cummings, LLP
7          One Federal Place
8          1819 Fifth Avenue North
9          Birmingham, Alabama 35203
10         205.251.8000
11         mlembke@bradley.com
12            - and -
13         Mr. Steven C. Chin
14         Office of the General Counsel
15         Tennessee Valley Authority
16         400 West Summit Hill Drive, WT6
17         Knoxville, Tennessee 37902
18         865.632.3052
19         ddayliffe@tva.gov
20         scchin@tva.gov
21
22
23
```

## Page 4

```
1              INDEX OF EXAMINATION
2                                  Page:
3    EXAMINATION BY MR. LEMBKE            9
4
5
6    INDEX OF PREVIOUSLY MARKED EXHIBITS
7                                  Page:
8    Exhibit Number 133            14
9    Exhibit Number 134            73
10   Exhibit Number 135            76
11   Exhibit Number 136            78
12   Exhibit Number 137            92
13   Exhibit Number 138            97
14   Exhibit Number 139            99
15   Exhibit Number 140            100
16   Exhibit Number 141            14
17   Exhibit Number 142            14
18   Exhibit Number 143            104
19   Exhibit Number 144            108
20   Exhibit Number 145            112
21   Exhibit Number 146            115
22   Exhibit Number 147            120
23   Exhibit Number 148            125
```

Page 5

| | | |
|---|---|---|
| 1 | Exhibit Number 149 | 133 |
| 2 | Exhibit Number 150 | 137 |
| 3 | Exhibit Number 151 | 141 |
| 4 | Exhibit Number 152 | 143 |
| 5 | Exhibit Number 153 | 144 |
| 6 | Exhibit Number 154 | 147 |
| 7 | Exhibit Number 155 | 149 |
| 8 | Exhibit Number 156 | 154 |
| 9 | Exhibit Number 157 | 155 |
| 10 | Exhibit Number 158 | 159 |
| 11 | Exhibit Number 159 | 160 |
| 12 | Exhibit Number 160 | 161 |
| 13 | Exhibit Number 161 | 162 |
| 14 | Exhibit Number 162 | 164 |
| 15 | Exhibit Number 163 | 166 |
| 16 | Exhibit Number 164 | 169 |
| 17 | Exhibit Number 165 | 170 |
| 18 | Exhibit Number 166 | 173 |
| 19 | Exhibit Number 167 | 176 |
| 20 | Exhibit Number 168 | 179 |
| 21 | | |
| 22 | | |
| 23 | | |

Page 6

```
 1          S T I P U L A T I O N
 2          IT IS STIPULATED AND AGREED, by
 3  and between the parties, through their
 4  respective counsel, that the video and
 5  videoconference deposition of WILLIAM MCCOLLUM
 6  may be taken before Gail B. Pritchett,
 7  Commissioner, Certified Realtime Reporter,
 8  Registered Professional Reporter and Notary
 9  Public;
10          That it shall not be necessary
11  for any objections to be made by counsel to
12  any questions, except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at the
15  time of trial, or at the time said deposition
16  is offered in evidence, or prior thereto.
17
18
19
20
21
22
23
```

Page 7

```
 1          I, Gail B. Pritchett, a Certified
 2  Realtime Reporter and Registered Professional
 3  Reporter of Birmingham, Alabama, and a Notary
 4  Public for the State of Alabama at Large,
 5  acting as Commissioner, certify that on this
 6  date, as provided by the Federal Rules of
 7  Civil Procedure of the United States District
 8  Court, and the foregoing stipulation of
 9  counsel, there came before me via
10  videoconference deposition on the 9th day of
11  July, 2020, commencing at 10:04 a.m., WILLIAM
12  MCCOLLUM, witness in the above cause, for oral
13  examination, whereupon the following
14  proceedings were had:
15
16          THE COURT REPORTER:  We are now on
17  the record.  This is the video deposition of
18  William McCollum in the matter of Nuclear
19  Development, LLC vs. Tennessee Valley
20  Authority, in the United States District Court
21  for the Northern District of Alabama
22  Northeastern Division, Case Number
23  5:18-CV-01983-LCB.  Today's date is July 9,
```

Page 8

```
 1  2020 and the time is 10:04 a.m.
 2          Would counsel and all present
 3  please introduce yourself for the record after
 4  which time I will swear in the witness.
 5          MR. LEMBKE:  This is Matt Lembke,
 6  counsel for TVA.
 7          MR. CHIN:  This is Steve Chin for
 8  defendant TVA.
 9          MR. O'REAR:  Caine O'Rear for the
10  plaintiff Nuclear Development.
11          THE COURT REPORTER:  Mr. McCollum,
12  would you raise your right hand, please?
13          MR. LEMBKE:  Hold on.  Mr. Blust
14  needs to unmute his phone.
15          MR. BLUST:  This is Larry Blust, I
16  am also attorney for the plaintiff.
17          THE COURT REPORTER:  Mr. McCollum,
18  would you raise your right hand, please.
19          MR. LEMBKE:  Ms. Pritchett, hold
20  on one second.  I just want to note for the
21  record that the parties have agreed that this
22  deposition can be taken before Gail Pritchett,
23  an Alabama licensed court reporter.  Mr.
```

## Page 9

1  O'Rear, is that accurate?

2      MR. O'REAR:  Yes.

3

4          WILLIAM MCCOLLUM,

5  having been first duly sworn, was examined and

6  testified as follows:

7

8          THE COURT REPORTER:  Usual

9  stipulations?

10      MR. LEMBKE:  Yes.

11      MR. O'REAR:  That's fine.

12

13  EXAMINATION BY MR. LEMBKE:

14      Q.   Good morning, Mr. McCollum.  Will

15  you state your name for the record, please?

16      A.   My name is William Ralph McCollum,

17  Jr.

18      Q.   And as you know, you were

19  previously deposed in this case.  Has any of

20  your -- has your residence address changed

21  since that time?

22      A.   No.

23      Q.   And are you still the CEO of

## Page 10

1  Nuclear Development?

2      A.   Yes.

3      Q.   Mr. McCollum, as I said at the

4  last deposition, you have now been placed under

5  oath.  I am going to ask you a series of

6  questions.  If at any time you don't understand

7  a question or need me to repeat it, I will be

8  happy to do so.  Otherwise, I will assume you

9  understand the question, okay?

10      A.   Yes.

11      Q.   And if at any point you need to

12  take a break, just let me know as soon as the

13  pending question has been answered, we can take

14  a break, all right?

15      A.   Okay.

16      Q.   Now, Mr. McCollum, as you likely

17  know, this is the deposition of Nuclear

18  Development, LLC and you have been designated

19  to testify on the topic of the nature and

20  extent of any and all damages claimed by

21  Nuclear Development in this case.  Is that your

22  understanding of what you are here to testify

23  to today?

## Page 11

1      A.   Yes.

2      Q.   And you understand your answers --

3  you will be speaking on behalf of the company

4  in giving your answers, right?

5      A.   Yes.

6      Q.   Okay.  What did you do to prepare

7  for today's deposition?

8      A.   I reviewed information related to

9  some of the charges that were submitted for

10  damages.

11      Q.   All right.  Did you have any

12  meetings with anyone about that?

13      A.   Yes.  I met with Gloria Thurman.

14      Q.   Who is Gloria Thurman?

15      A.   Gloria Thurman is secretary for

16  Nuclear Development and Franklin Haney, and she

17  is the person who processed the invoices.

18      Q.   And when did you -- did you meet

19  with her face to face?

20      A.   No, I met with her over the phone.

21      Q.   And when did that meeting occur?

22      A.   That was this past Monday, the 6th

23  of July.

## Page 12

1      Q.   And how long did that meeting

2  last?

3      A.   Approximately an hour.

4      Q.   And did you have any conversations

5  with anyone else in preparation for your

6  testimony today?

7      A.   Just counsel.

8      Q.   And do you have any notes or other

9  documents in the room there with you?

10      A.   I do.

11      Q.   All right.  What notes do you have

12  with you in the room?

13      A.   I have a summary sheet of invoices

14  from FlexJet for flights that were billed with

15  some notes that I made to refresh my memory

16  about the -- each of the flights.

17      Q.   Okay.

18      A.   And I have the Exhibit 120, the

19  damages computation spreadsheet.

20      Q.   And from FlexJet, is it the

21  information that FlexJet provided pursuant to

22  our subpoena that you have that lists out each

23  flight one by one or is it something else?

**Page 13**

1    A.   It is a summary worksheet that has
2  a list of the flights.  It doesn't have all of
3  the specifics that were on the FlexJet invoice.
4    Q.   Okay.  And from whom did you
5  obtain the summary?
6    A.   Well, I got information from
7  Gloria Thurman about the FlexJet flights.  And
8  then I finished out the spreadsheet by adding
9  my comments.
10    MR. O'REAR:  If I could say, Matt,
11  the document he has is the document produced by
12  FlexJet pursuant to the subpoena.
13    MR. LEMBKE:  Okay.
14    Q.   (BY MR. LEMBKE:)  And did you go
15  through each of those flights to determine the
16  purpose of those flights, Mr. McCollum?
17    A.   I did, in conjunction with Gloria
18  Thurman.
19    Q.   Okay.  Very well.  Now, you
20  referenced that you have Exhibit 120 in front
21  of you and that that's also -- a copy of it is
22  in the box if you want to look at it.  But you
23  understand Exhibit 120 to be a listing of the

**Page 14**

1  various damages that Nuclear Development is
2  claiming in this case, correct?
3    A.   That's correct.
4    Q.   Okay.  Now, if you would, we are
5  largely going to go in numerical order in the
6  box, but if you would go pull out Exhibit 133,
7  141, and 142.
8    (Exhibit Number 133, Exhibit
9    Number 141, and Exhibit Number 142
10    were referred to in this
11    deposition.)
12    A.   Okay.  133, 141, and 142.
13    Q.   Yes, sir.
14    A.   Okay.  I have those.
15    Q.   If you will look at Number 142,
16  these are invoices and payment records to TVA
17  by Nuclear Development pertaining to the
18  charges by Flight Options, LLC, correct?
19    A.   Yes.
20    Q.   And it is your understanding that
21  Flight Options, LLC then changed its name and
22  became FlexJet, LLC, right?
23    A.   That's what I have been told, yes.

**Page 15**

1    Q.   And then if you look at Exhibit
2  141, it is a compilation of the invoices and
3  payment records sent by FlexJet, correct, for
4  which Nuclear Development is seeking
5  reimbursement as damages in this case, right?
6    A.   Just one second.
7    Q.   Okay.
8    A.   (Reviewing document.)  Yes.
9    Q.   Okay.  Now, if I could get you to
10  turn your attention to Exhibit 133.
11    A.   Okay.
12    Q.   And this is the spreadsheet that
13  was produced by FlexJet that contains the
14  flight options and FlexJet flights
15  corresponding to the invoices that we just went
16  over in Exhibits 141 and 142, is that your
17  understanding?
18    A.   Yes.
19    Q.   Okay.  I want to begin with the
20  first two entries on the first page of Exhibit
21  133.  The entries are for flights that occurred
22  on November 13th and November 14th, 2016 --
23    A.   Yes.

**Page 16**

1    Q.   -- correct?  And that was before
2  the contract was executed, TVA and Nuclear
3  Development, correct?
4    A.   I believe so, yes.
5    Q.   So Nuclear Development is seeking
6  as damages the cost of flights that occurred
7  before the contract was ever signed, right?
8    A.   Yes.  These were -- this was a
9  trip to attend the Bellefonte auction.
10    Q.   All right.  Now, I notice that
11  there are a number of flights from Teterboro,
12  New Jersey, which is in the New York
13  metropolitan area.  Does Mr. Franklin Haney
14  have a home in the New York area?
15    A.   He has a condo, yes.
16    Q.   Okay.  And so the first flight you
17  said was for Mr. and Mrs. Haney to travel to
18  Scottsboro for the closing?
19    A.   Yes.
20    Q.   And the second one was for them to
21  go to West Palm Beach after the closing?
22    A.   Yes.
23    Q.   All right.  On -- hold on one

Page 17

1  second.
2       (Brief pause.)
3       Q.   (BY MR. LEMBKE:)  All right.  The
4  next entry on this log is for November 21st,
5  2016, a flight from Miami to
6  West Palm Beach where Franklin Haney II was on
7  the plane, do you see that?
8       A.   I do.
9       Q.   What was the purpose of that
10 flight?
11      A.   So ultimately the flight went from
12 West Palm Beach to -- excuse me, from Miami to
13 West Palm Beach, picked up the remaining
14 passengers, Franklin and Emeline Haney, and
15 then went on to Dulles, to the D.C. area for
16 meetings with congressional and Senate members
17 and staff on the Hill.
18      Q.   And the flight from Miami to West
19 Palm Beach, it was because Frank Haney was in
20 Hawaii at the time?
21      A.   Yes.
22      Q.   And so -- and that is a charge for
23 three thousand eight hundred and fifty-nine

Page 18

1  dollars to fly from Miami to West Palm Beach,
2  correct?
3       A.   Yes, that's what it says here.
4       Q.   All right.  On December 7th there
5  is a flight from West Palm Beach to Scottsboro,
6  with Franklin Haney on board.  What was the
7  purpose of that trip?
8       A.   Okay.  I think you cut out a
9  little bit.  Are you referring to the December
10 7th, 2016 --
11      Q.   Yes, sir.
12      A.   -- flight at 3:46 p.m.?
13      Q.   Yes, sir.
14      A.   Okay.  So that was to meet at the
15 Bellefonte site to review where we were with
16 the site and have some meetings with staff down
17 there.
18      Q.   All right.  And -- okay.  The next
19 entry is December 8th from Huntsville to West
20 Palm Beach, and that was the return flight
21 after those meetings?
22      A.   Yes.
23      Q.   And then on December 18th, there

Page 19

1  is a flight from West Palm Beach to
2  Chattanooga.  What was the purpose of that
3  flight?
4       A.   To meet with one or two members
5  from the board of -- the Electric Power Board
6  of Chattanooga, which is the city utility in
7  the city of Chattanooga, Tennessee.
8       Q.   Did Mrs. Haney participate in
9  those meetings?
10      A.   I was not at the meeting, so I
11 can't say for certain that she was there.  It
12 is my understanding that she participated in
13 the meetings, but I can't tell you that for
14 certain.
15      Q.   All right.  I am assuming the dog
16 did not participate in any meetings?
17      A.   I'm sure he didn't have a speaking
18 part in any of the meetings.
19      Q.   All right.  And then -- now, did
20 the meetings cover four days?  Because I see
21 the return flight on December 22nd was four
22 days after the trip up.
23      A.   Yeah, it is my understanding that

Page 20

1  in order to match the schedules of the folks
2  they were meeting with, they had to stay a few
3  days to be able to get on the calendars for
4  folks.
5       Q.   All right.  Then there is a flight
6  on January 3rd from West Palm Beach to
7  Chattanooga.  What was the purpose of that
8  trip?
9       A.   So those were -- that trip was to
10 have discussions with stakeholders in
11 Chattanooga about the possible -- possibility
12 of the sale of power from Bellefonte to
13 Chattanooga.
14      Q.   All right.  And the return trip
15 was on January 4th, correct?
16      A.   Yes.
17      Q.   And it's fair to say that the
18 discussions about the potential sale of the
19 power were not necessary to get to the closing
20 or to complete the closing on the Purchase and
21 Sale Agreement, they were for potential
22 contractual arrangements that might exist once
23 the power started being generated, correct?

Page 21

1    A.   Well, there is a chicken and egg
2  issue with developing the project.  So that --
3  the purpose for buying Bellefonte was to
4  complete it and operate it as a commercial
5  nuclear power plant.  In order to get
6  financing -- in order to secure financing to be
7  able to effect the completion of the plant and
8  put it in service, you needed to have some
9  confidence of the ability to sell the power
10  once the plant is completed.
11        So the people that you would talk
12  to about obtaining financing for the plant
13  would want to know do you have a place to sell
14  the power once the plant is completed, thus
15  ensuring cash flow to be able to pay off the
16  loans.  So it's -- you really have to start
17  working on getting the customers lined up in
18  order to begin discussions about the financing
19  to be able to complete the plan.
20    Q.   Well, but I was talking about the
21  -- getting to closing on the Purchase and Sale
22  Agreement and it was not conditioned in any way
23  on financing of the plant, correct?

Page 22

1    A.   Yeah, I don't have the Purchase
2  and Sales Agreement in front of me.  All I am
3  saying is our only motivation for buying the
4  plant was to complete it and put it in service
5  to produce power, and to do that we needed to
6  line up customers and financing and perform
7  licensing work and that sort of thing.
8    Q.   But what I am getting at, Mr.
9  McCollum, is the construction of -- or the
10  completion of the nuclear units at the plant
11  was separate and apart from the Purchase and
12  Sale Agreement, correct?
13        MR. O'REAR:  Let me object.  I
14  think this is outside the scope of the question
15  regarding damages, but I will let him answer
16  one more time.
17    A.   Yes, I can't speak to what is in
18  the Purchase and Sales Agreement because I
19  don't have it in front of me.  But, again, our
20  view is it's all one package, you buy the site
21  and the existing facilities in order to
22  complete the plant and produce electricity.
23  And in order to do that, you have to get

Page 23

1  financing lined up, and in order to do that,
2  you have to pursue customers.  So it's all part
3  of one package to be able to accomplish what we
4  were trying to accomplish when we bid on the
5  Bellefonte facility.
6    Q.   (BY MR. LEMBKE:)  Now let's look
7  at the next entry which is January 25th from
8  Dulles to Scottsboro.  What was the purpose of
9  that trip?
10    A.   That was another site visit to get
11  people on site and better understand the
12  condition of the facility and start to look at
13  how we would line up personnel to get on site
14  and begin putting together construction
15  estimates and that sort of thing.
16    Q.   All right.  And then later that
17  same day, a flight from Scottsboro to West Palm
18  Beach, so that was taking Mrs. Haney and Frank
19  Haney down to Mrs. Haney's home in West Palm
20  Beach -- or in Palm Beach?
21    A.   Yes.
22    Q.   All right.  Next it is February
23  1st, West Palm Beach to Montgomery.  What was

Page 24

1  the purpose of that trip?
2    A.   So as part of putting together the
3  total financing package for the project, it was
4  our desire to pursue state incentives for the
5  project.  You are familiar with the fact that a
6  lot of major projects will apply for state
7  incentives for -- they can come in various
8  forms.  But that was the purpose of the meeting
9  was to meet with people in Montgomery about
10  exploring the possibility of state incentives
11  for the Bellefonte project which would have
12  been part of the total financing package.
13    Q.   And then the next day was the
14  return flight to West Palm Beach, correct?
15    A.   Okay.  Tell me again which date
16  you are looking at.
17    Q.   February 2nd, 2017.
18    A.   Right, yeah, that is the return
19  flight to West Palm Beach.
20    Q.   All right.  And then on February
21  20th, 2017, there is a flight from Boca Raton
22  to Birmingham.  What was the purpose of that
23  flight?

Page 25

1    A.   Okay.  So that -- hang on, it
2  takes me a second here to follow these lines
3  all the way across the spreadsheet and just
4  make sure I don't get on the wrong line.
5           And so that flight was in
6  connection with discussions with Southern
7  Company about the possible sale of power and
8  operation of the facility.
9    Q.   All right.  And then the next
10 flight on February 21st was the return flight
11 to Florida, correct?
12   A.   Yes.
13   Q.   All right.  Then on March 6th
14 there was a flight from West Palm Beach to
15 Dulles.  What was the purpose of that trip?
16   A.   That was for meetings with
17 congressional staff in D.C.
18   Q.   All right.  And the return
19 occurred on March 9th, correct?
20   A.   March 9th, yes.
21   Q.   All right.  And then on April 3rd
22 there was a flight from West Palm Beach to
23 Birmingham.  What was the purpose of that trip?

Page 26

1    A.   That was, again, some further
2  discussions with Southern Company.
3    Q.   All right.  And the return flight
4  was the next day, correct?
5    A.   Yes.
6    Q.   All right.  On April 18th there
7  was a flight from West Palm Beach to Dulles.
8  What was the purpose of that?
9    A.   Okay.  April 18th was for meetings
10 with people from the Fluor Corporation to
11 explore the possibility of Flora being a
12 potential contractor for the Bellefonte
13 project.
14   Q.   Going back to the entry on --
15 well, let's finish that.  And then the return
16 flight was the next day on March -- excuse me,
17 April 19th, correct?
18   A.   Yes.
19   Q.   All right.  Going back, when you
20 referenced in connection with the March 6th
21 flight, that it was meeting with congressional
22 staff --
23   A.   Yes.

Page 27

1    Q.   -- what was being discussed with
2  congressional staff?
3    A.   Well, a number of things.  So we
4  were making application with the Department of
5  Energy for loan guarantees under a program for
6  loan guarantee funding for construction of
7  nuclear facilities.  And there had been efforts
8  to zero the money for that program out of the
9  budget.  And so we needed to explore with the
10 congressional staff the level of confidence
11 that that program would remain in the upcoming
12 budgets so that we would have access to it.
13 And then also discussion about the program that
14 offered incentives in the form of power
15 production tax credits for new nuclear
16 facilities that were completed.
17   Q.   Mr. McCollum, who provided the
18 detail to you on the purpose of all of these
19 trips?  Was it Ms. Thurman?
20   A.   A lot of them I had knowledge of
21 through conversations with Franklin Haney and
22 Frank Haney -- excuse me, Frank Haney.  And I
23 went through these with Gloria Thurman to help

Page 28

1  refresh my memory and make sure my
2  recollections were accurate.
3    Q.   And did Ms. Thurman refer to
4  calendars of Mr. Haney or how did she have this
5  information available to her?
6    A.   Well, this was a telephone
7  conversation, so I can't be sure what she
8  looked at, but it seemed that she was able to
9  recall from going through the spreadsheet what
10 the purpose of most of all of these trips was,
11 because she is the one involved in arranging
12 and scheduling the flights and the details, you
13 know, the passenger lists and so forth, and
14 setting up the -- in the case of the D.C. trip,
15 setting up the car service when needed and
16 making hotel arrangements.  So she seemed to
17 have a pretty good recollection of most of
18 these trips.
19   Q.   All right.  Referring now to the
20 trip on April 23rd, 2017, from West Palm Beach
21 to Dulles.  What was the purpose of that trip?
22   A.   Just -- April 23rd.
23   Q.   Yes, sir.

Page 29

1     A.   Okay.  So we had meetings with the
2  NRC staff -- excuse me, to begin initial
3  discussions about the Bellefonte completion and
4  the licensing work that would have to be done
5  for that, including the transfer of the
6  construction permits.
7     Q.   All right.  And then the return
8  flight was two days later, correct?
9     A.   The 25th, yes.
10    Q.   Yes, sir.  And did the meetings
11 with the NRC extend over more than one day?
12    A.   The meetings -- the meetings
13 were -- I'm not certain, but I -- but my best
14 recollection is that we had visits with the NRC
15 commissioners, and you can only meet with one
16 commissioner at a time.  And so I think it
17 stretched over to a couple of days to be able
18 to catch everyone's calendar.
19    Q.   And so those meetings with the
20 commissioners occurred during that April 23rd
21 to 25th time period in 2017?
22    A.   That's my best recollection, yeah.
23    Q.   Okay.  Next is an entry on June

Page 30

1  7th, 2017, from Dulles to Teterboro.  What was
2  the purpose of that trip?
3     A.   Okay.  June 7th, Dulles to
4  Teterboro was a flight back to New York after
5  some meetings on the Hill with congressional
6  staff.
7     Q.   About the same topics you
8  referenced earlier?
9     A.   Yes.
10    Q.   And then June 8th, 2017, there is
11 a flight from Scottsboro to Gaithersburg,
12 Maryland.  What was the purpose of that flight?
13    A.   That was again a return trip
14 coming back from some meetings that we had at
15 the Bellefonte site.
16    Q.   And what were those meetings
17 concerning?
18    A.   How to get -- how to best get
19 started with the review of the existing
20 construction schedules and estimates that we
21 had and develop the plan for completion of
22 Bellefonte.
23    Q.   On June 12th, 2017, there is a

Page 31

1  flight from Teterboro to Dulles.  What was the
2  purpose of that trip?
3     A.   That again was meeting with
4  congressional leaders and staff about the
5  Bellefonte project.
6     Q.   And were the same topics covered
7  in those meetings with congressional staff as
8  you referenced earlier?
9     A.   The budget, the nuclear production
10 tax credit program, and the potential licensing
11 of the plant under Part 50, yes.  And financing
12 from the DOE loan program.
13    Q.   All of those topics were discussed
14 with the congressional staffers?
15    A.   Yes.
16    Q.   And the return flight on that trip
17 was June 14th?
18    A.   June 14th.
19    Q.   The next entry is June 26, 2017,
20 Nantucket, Massachusetts to Dulles.  Do Mr. and
21 Mrs. Haney have a home at Nantucket?
22    A.   That's correct.
23    Q.   What was the purpose of that trip

Page 32

1  from Nantucket to Dulles?
2     A.   So -- well, hang on just a second.
3  I have to make sure I have my line items
4  correct.
5         Okay.  So Mr. Haney -- Franklin
6  Haney flew from Nantucket to Dulles, picked up
7  Frank Haney and flew on from Dulles to
8  Scottsboro.  And the purpose -- excuse me, the
9  purpose of that trip was to conduct a site tour
10 at Bellefonte with a potential customer for
11 Bellefonte power.
12    Q.   And who were John and Mae Grennan?
13    A.   Mae is one of Franklin Haney's
14 children and John is her husband.
15    Q.   And they were not involved in any
16 way in the business aspect of this trip,
17 correct?
18    A.   Correct.  Yeah, it's my
19 understanding that the cost of the flight is
20 billed based on the rate and the number of
21 hours and that adding or subtracting passengers
22 doesn't change the amount that you get billed.
23 So it would have been the same amount if it had

Page 33

1   just been Franklin Haney flying from Nantucket
2   to Dulles.
3       Q.   Well, that is not true if you have
4   to go up to a larger plane, correct?
5       A.   True.  But the small plane that --
6   the smallest plane I have ever been on with
7   FlexJet with the Haneys is one that seated six
8   passengers.
9       Q.   Okay.  And then it looks like
10  there was a return trip on June 28th in three
11  segments from Huntsville -- two segments,
12  Huntsville to Dulles and then Dulles to
13  Nantucket, correct?
14      A.   Yes.
15      Q.   And Ms. Grennan -- and his
16  daughter got back on the flight going back to
17  Nantucket, correct?
18      A.   Yes.  They dropped Frank Haney off
19  at D.C. and Mae Grennan hitched a ride on the
20  flight back to Nantucket.
21      Q.   All right.  Then on July 10th of
22  2017, there is a flight from Nantucket to
23  Dulles, do you see that?

Page 34

1       A.   July 10th, yes.
2       Q.   And who is Anderson Grennan?
3       A.   I believe that is one of Franklin
4   Haney's grandchildren.
5       Q.   All right.  And what was the
6   purpose of the flight on July 10th from
7   Nantucket to Dulles?
8       A.   Back to D.C. for more
9   congressional and NRC discussions.
10      Q.   All right.  And were the topics
11  the same with the congressional staffers on
12  that trip as you referenced a minute ago?
13      A.   Yes.
14      Q.   And with what NRC staffers were --
15  was Mr. Haney meeting with on that trip?
16      A.   I don't have that information in
17  front of me.
18      Q.   All right.  But you are sure it
19  was -- he was personally meeting with NRC
20  staffers on that trip, is that what I
21  understand you to be saying?
22      A.   I'm not certain that he met with
23  anybody from the NRC face to face.  I think we

Page 35

1   may -- my best recollection is we may have had
2   a phone call during that -- did I lose you
3   guys?
4       Q.   No, we can hear you.
5       A.   Okay.  Somehow I lost my own
6   picture.  But anyway, my best recollection is
7   that we may have had a phone conversation.
8       Q.   All right.  And then there was a
9   return trip on July 12th, correct?
10      A.   Yes.
11      Q.   With the grandson on board again,
12  correct?
13      A.   Yes.
14      Q.   All right.  Then on July 26th
15  there were two segments, first from Nantucket
16  to Dulles and then Dulles to Scottsboro.  What
17  was the purpose of that trip?
18      A.   Okay.  So July 26th, the flight
19  went to Dulles, picked up Frank Haney, and then
20  proceeded on to Scottsboro for a Bellefonte
21  site tour.
22      Q.   And who was on that tour, do you
23  recall?

Page 36

1       A.   No, I do not.
2       Q.   Was it a tour of potential vendors
3   to Nuclear Development?
4       A.   I honestly don't recall who was on
5   that tour.  The TVA personnel at the Bellefonte
6   site should have a record of that.
7       Q.   All right.  Then the next entry on
8   July 28th, I understand that is not a
9   flight for which Nuclear Development is
10  claiming reimbursement, from New Bern, North
11  Carolina to Chattanooga, is that correct?
12      A.   That's correct.
13      Q.   All right.  And it is my
14  understanding that is the only flight on this
15  entire log for which Nuclear Development is not
16  claiming reimbursement, correct?
17      A.   No, that's not correct.
18      Q.   Okay.  We will get to the rest.
19  The next flight on July 30th, 2019 from
20  Chattanooga to Nantucket, what was the purpose
21  of that?
22      A.   That is also a flight that we are
23  not claiming for damages.

Page 37

```
1          Q.   Well, are you sure that is not
2   included in the totals on Exhibit 120?
3          A.   I don't know, I haven't verified
4   the totals.
5              MR. O'REAR:  Let me say this, if
6   it is, we will deduct that.  In light of the
7   way the invoices are bundled, we just need to
8   check that, do a little bit of an accounting to
9   check that.  But I will represent to you that
10  we will -- if there is any -- if there are any
11  dollars on that Exhibit 120 that need to be
12  reduced because of Mr. McCollum's testimony, we
13  will do that, get that to you.
14             MR. LEMBKE:  And I will just state
15  for the record that we have gone through and
16  compared these log entries with those invoices,
17  and the only flight that we believe is not
18  included on Exhibit 120 was the July 28th, 2017
19  flight, but I accept your statement, Mr.
20  O'Rear.
21         Q.   (BY MR. LEMBKE:)  The next date is
22  August 23rd, 2017.  Is that a flight for which
23  Nuclear Development is seeking reimbursement?
```

Page 38

```
1          A.   It is.  So the flight from
2   Nantucket went to Dulles where he picked up
3   Frank Haney, and Frank and Franklin flew to
4   Huntsville, Alabama for site meetings at the
5   Bellefonte plant.
6          Q.   And what was the purpose of those
7   site meetings?
8          A.   We were meeting with contractors,
9   potential contract personnel, to talk about
10  completion of the project.
11         Q.   All right.  Now, the flight from
12  Dulles to Huntsville was not until the next
13  day, twenty-four hours later, correct?
14         A.   Okay.  So there is the meeting --
15  the flight on August 23rd, Nantucket to Dulles
16  and then the flight August 24th from Dulles to
17  Huntsville.  So, yeah, there is -- that was the
18  following day, that flight from Dulles to
19  Huntsville was the following day.
20         Q.   And on the flight -- on August
21  23rd, there were five members of a Maddux
22  family.  Who were the Madduxes?
23         A.   That's, again, the family of one
```

Page 39

```
1   of Mr. and Mrs. Haney's -- Franklin Haney's
2   children.
3          Q.   Okay.  Does that Maddux family
4   live in the Washington, D.C. area?
5          A.   I do not know that.
6          Q.   All right.  And then on August
7   25th there was a return flight from Huntsville
8   to Cambridge, Maryland, correct?
9          A.   August 25th, yes.
10         Q.   And then from Cambridge, Maryland
11  back up to Massachusetts, correct?
12         A.   Just one second.  Yes.
13         Q.   All right.  On September 2nd there
14  are flights from Teterboro to Dulles, Dulles to
15  Columbia, South Carolina, and then return
16  flights from Columbia to Dulles and Dulles to
17  Teterboro.  What was going on in Columbia,
18  South Carolina?
19         A.   We were discussing -- we were
20  discussing with people from South Carolina the
21  possibility of making a deal to sell power from
22  Bellefonte.
23         Q.   All right.  And then on September
```

Page 40

```
1   5th there are flights from Teterboro to Dulles,
2   Dulles to Columbia, Columbia to White Plains,
3   New York, and White Plains, New York to Dulles.
4   What was the purpose of that series of trips?
5          A.   Yeah, again, that was a trip down
6   to Columbia, South Carolina to meet with people
7   in South Carolina about the potential sale of
8   power from Bellefonte.
9          Q.   And who is William Gaynor?
10         A.   He is a -- I don't know the
11  gentleman but my understanding is he is a
12  lobbyist.
13         Q.   And so he was helping lobby the
14  entity in South Carolina?
15         A.   That is my understanding.
16         Q.   And where is Mr. Gaynor based?
17         A.   I do not know.
18         Q.   Okay.  You just don't know?
19         A.   I don't know where Mr. Gaynor's
20  primary residence is.
21         Q.   Okay.  I think we will see
22  something about him later today.
23             September 13th, Teterboro to
```

1    Huntsville.  What was the purpose of that trip?
2        A.   That was again another site
3    meeting at the Bellefonte site.
4        Q.   For what purpose?
5        A.   Yeah, so during this time frame,
6    we were -- we had a number of site meetings to
7    get familiar with the site, review information
8    that we had gotten from TVA -- excuse me, and
9    discuss with the TVA site staff the condition
10   of the facilities and, again, formulate plans
11   for how we would approach completion.
12       Q.   Okay.  Then September 14th there
13   was a return trip, correct?
14       A.   Huntsville to Teterboro, yes.
15       Q.   Then a week later on September
16   21st, 2017, there was a trip from Teterboro to
17   Chattanooga.  What was the purpose of that?
18       A.   To meet with people in Chattanooga
19   about the potential sale of power.
20       Q.   All right.  Then on September 22nd
21   there was a trip from Chattanooga to Nashville.
22   What was the purpose of that trip?
23       A.   To meet with people in Nashville

1    about the potential sale of power.
2        Q.   All right.  And then on September
3    23rd there was a flight from Nashville to
4    Dulles.  What was the purpose of that?
5        A.   Yeah, that's the return flight
6    from the -- this series of Tennessee visits.
7        Q.   Do Mr. and Mrs. Haney have a
8    residence in the Washington, D.C. area?
9        A.   Yes.  They have a condo in D.C.
10       Q.   All right.  And then on October
11   10th there was a flight from Dulles to
12   Chattanooga.  What was the purpose of that
13   trip?
14       A.   To meet with the members of the
15   organization Seven States Power about the
16   potential sale of power from Bellefonte.
17       Q.   All right.  And then there was a
18   flight on the 11th of October from
19   Chattanooga -- excuse me, from Ashville, North
20   Carolina to Chattanooga, and was that for
21   joining that meeting?
22       A.   That is correct.
23       Q.   All right.  And then the return

1    trips were later that day, the 11th, correct,
2    from Chattanooga to Ashville and from Ashville
3    to Dulles, right?
4        A.   That's correct.  Yeah, the
5    afternoon of the 11th.
6        Q.   All right.  And then on October
7    16th there was a flight from Dulles to Greer,
8    South Carolina.  What was the purpose of that
9    trip?
10       A.   To meet with stakeholders in South
11   Carolina.  So I mentioned earlier we had
12   explored the potential sale of power from
13   Bellefonte.  And there were a number of things
14   going on in South Carolina and discussion
15   around several different possible deal
16   structures, one of which involved possibly
17   taking a financial interest in one or more
18   entities in South Carolina.  So we ended up
19   having several discussions around what was
20   going on relative to SCANA and issues with the
21   V.C. Summer nuclear plant and what was going on
22   in South Carolina relative to the state-owned
23   Santee Cooper electric utility.

1        Q.   And who is Britton Clarke?
2        A.   I do not know.
3        Q.   Who is James Mullen?
4        A.   I don't know Mr. Mullen either.
5        Q.   Okay.  And there was a return trip
6    on the 16th of October from Spartanburg to
7    Dulles?
8        A.   Spartanburg to Dulles, yes.
9        Q.   And then on October 26, 2017,
10   there was a flight from Dulles to Scottsboro.
11   What was the purpose of that trip?
12       A.   October 26, 9:03 a.m., from Dulles
13   to Scottsboro was -- excuse me, for a meeting
14   we were having at the site to discuss potential
15   contractors for the completion of the facility.
16       Q.   All right.  Why was Mr. Gaynor on
17   that trip?
18       A.   I do not know.
19       Q.   And who is Michael Bastasch?
20       A.   I don't believe I have -- I know
21   him either.
22       Q.   All right.  And then there was a
23   return trip on the 26th from Huntsville to

Page 45

1    Dulles, correct?
2        A.    26th, yes, Huntsville to Dulles.
3        Q.    And then on October 31st, there
4    was a trip from Dulles to Chattanooga.  What
5    was the purpose of that trip?
6        A.    That was for a meeting with people
7    from the Tennessee Valley Power Providers
8    Association (sic) to discuss completion of
9    Bellefonte and potential sale of power.
10       Q.    Okay.  And then there is a flight
11   on November 2nd from Knoxville to Dulles.  What
12   was the purpose of that trip?
13       A.    So there were discussions -- there
14   were discussions in Knoxville about the
15   potential sale of power from Bellefonte.  And
16   then the -- and then the return from -- so that
17   was the return from Knoxville to Dulles.
18       Q.    All right.  Then on November 3rd
19   there was a flight from Dulles to West Palm
20   Beach.  What was the purpose of that?
21       A.    That was the -- that was the
22   return flight for Franklin Haney to return home
23   from this series of meetings in Tennessee.

Page 46

1        Q.    Well, but the trip on October 31st
2    originated in Northern Virginia, not South
3    Florida, right?
4        A.    That's right.
5        Q.    And on the flight from Dulles to
6    West Palm Beach, you had Mr. Haney accompanied
7    by Mrs. Haney and the dog, right?
8        A.    That's correct.
9        Q.    But Nuclear Development
10   nonetheless says that is a reimbursable trip,
11   correct?
12       A.    That's correct.
13       Q.    Let's turn the page and look at
14   the entry on November 27th, 2017, from West
15   Palm Beach to Dulles, do you see that?
16       A.    November 2nd, 2017?
17       Q.    No, sir.  November 27th.
18       A.    Oh, 27th, from West Palm Beach to
19   Dulles, yes.
20       Q.    What was the purpose of that trip?
21       A.    Those were for meetings on the
22   Hill with congressional staff.
23       Q.    Were the topics of those meetings

Page 47

1    the same as earlier congressional meetings you
2    referenced?
3        A.    Yes.
4        Q.    All right.  And then the return
5    trip was on the 29th of November, correct?
6        A.    Yes.
7        Q.    All right.  Next, on December
8    15th, 2017, there was a flight from West Palm
9    Beach to Memphis.  What was the purpose of that
10   trip?
11       A.    Just one second.  Okay.  So those
12   were meetings with stakeholders in Memphis
13   about the possible sale of power from
14   Bellefonte.
15       Q.    All right.
16       A.    So before we go -- before we go
17   further, can I take you back to the October
18   16th, 2017, trip from Dulles to Greer, South
19   Carolina and then the return from Spartanburg,
20   South Carolina to Dulles?
21       Q.    Yes, sir.
22       A.    I should have said when you asked
23   me about those entries that Nuclear Development

Page 48

1    is not claiming those amounts as part of the
2    damages.
3        Q.    Okay.  Thank you.
4        MR. O'REAR:  We have been going an
5    hour, can we take a short break?
6        MR. LEMBKE:  Certainly.  Let's
7    take a five-minute break.
8        THE COURT REPORTER:  We are off
9    the record at 11:01.
10       (Whereupon, a break was had from
11       11:01 a.m. until 11:09 a.m.)
12       Q.    (BY MR. LEMBKE:)  We are back on
13   the record after a short break, and we were
14   looking at Exhibit 133, page three, Mr.
15   McCollum.  And toward the top of the page we
16   had talked about the trip on December 15th,
17   16th to Memphis.  Would you tell me again what
18   was the purpose of that trip?  You are on mute,
19   Mr. McCollum.
20       A.    Okay.  Can you hear me now?
21       Q.    Yes.  Thank you.
22       A.    So that was for discussions with
23   people in Memphis about the possible sale of

Page 49

1  Bellefonte power.
2      Q.  December 18th there is a flight
3  from West Palm Beach to Huntsville.  What was
4  the purpose of that trip?
5      A.  That was for a site meeting at the
6  Bellefonte plant.
7      Q.  And what was going on at the site
8  meeting on that trip?
9      A.  December 18th, that was the time
10 we were in discussions -- excuse me, we were in
11 discussions about the -- setting up the
12 contractor -- hang on.  Sorry.  We were in
13 discussions about setting up the contracting
14 plan and completion schedule for Bellefonte.
15     Q.  Okay.  And then on December
16 20th -- excuse me, December 19th there is a
17 flight from Huntsville to Dulles.  What was the
18 purpose of that trip?
19     A.  Yeah, so the 18th was to take
20 Franklin Haney to the Bellefonte meeting and
21 the 19th flight returned Mr. Haney and Frank
22 Haney to D.C.
23     Q.  And was there any meeting in D.C.

Page 50

1  that caused Mr. Haney to stay over for a night?
2  I see that he did not return to South Florida
3  until the next day.
4      A.  I don't have a record of a meeting
5  on that date.
6      Q.  All right.  Then on January 1st
7  there is a flight from Boca Raton to Memphis.
8      A.  Yes.
9      Q.  And what was the purpose of that
10 flight?
11     A.  More discussions with Memphis
12 about the potential sale of power.
13     Q.  All right.  Then on the 2nd, there
14 is a flight from West Palm Beach to Dulles.  Is
15 Nuclear Development claiming reimbursement for
16 that flight from West Palm Beach to Dulles?
17     A.  No.
18     Q.  All right.  On the 2nd there is a
19 flight from Memphis to West Palm Beach, I take
20 it that is the return leg for Mr. Haney
21 following the meeting in Memphis?
22     A.  Okay.  The flight on January 2nd,
23 2018, 3:35 p.m., you are correct, is the return

Page 51

1  flight for Franklin Haney from the Memphis
2  meeting.
3      Q.  And the Memphis meeting was about
4  potential purchase of Bellefonte power,
5  correct?
6      A.  Correct.
7      Q.  And then on the 9th there is a
8  flight from West Palm Beach to Dulles.  What
9  was the purpose of that trip?
10     A.  That was for more congressional
11 meetings related to Bellefonte.
12     Q.  And were the topic of those
13 congressional meetings the same as you
14 described earlier?
15     A.  Yes.
16     Q.  All right.  And then the return
17 trip was on the 10th of January, correct?
18     A.  That's correct.
19     Q.  All right.  Then on the 25th of
20 January, 2018, there was a flight from West
21 Palm Beach to Scottsboro.  What was the purpose
22 of that trip?
23     A.  January 25th, 2018, we had --

Page 52

1  excuse me, we had discussions at the Bellefonte
2  site about potential subcontractors and a
3  potential vendor for the turbine rotor
4  replacement.
5      Q.  Okay.  Then on December (sic)
6  26th, 2018, there is a flight from Van Nuys,
7  California to Huntsville.  Is Nuclear
8  Development claiming reimbursement for that
9  flight?
10     A.  Sorry, give me that date again,
11 please.
12     Q.  January 26th, 2018 at 8:45 in the
13 morning, Van Nuys, California to Huntsville,
14 Alabama.
15     A.  No.
16     Q.  All right.  And then on that same
17 day, January 26th, 2018, there was a flight
18 from Huntsville to West Palm Beach.  Is Nuclear
19 Development claiming that flight?
20     A.  Yes, that is the return flight
21 for -- let me get my line items lined up here.
22 That is the return flight for Franklin Haney
23 back from the Bellefonte site meeting to West

Page 53

1     Palm Beach.
2          Q.   On February 4th, there is a flight
3     from West Palm Beach to Memphis.  What was the
4     purpose of that trip?
5          A.   We had meetings with the Memphis
6     utility, MLGW, regarding the potential sale of
7     power from Bellefonte.
8          Q.   And it must not have been a very
9     long meeting because the return flight was less
10    than three hours after the first flight
11    arrived, correct?
12         A.   Yeah, my best recollection is it
13    was a one-hour meeting.
14         Q.   All right.  And that was again
15    relating to the potential purchase of
16    Bellefonte power by Memphis?
17         A.   Correct.
18         Q.   All right.  February 18th, 2018,
19    there is a trip from Boca Raton to Memphis with
20    a return the next -- well, let's just do Boca
21    Raton to Memphis.
22         A.   Uh-huh.
23         Q.   What was the purpose of that trip?

Page 54

1          A.   That was to discuss potential sale
2     of power to Memphis.
3          Q.   All right.  The next day, February
4     19th, there is a flight from Memphis to
5     Chattanooga.  What was the purpose of the trip
6     to Chattanooga?
7          A.   To discuss the potential sale of
8     power to the Chattanooga Electric Power Board.
9          Q.   All right.  And then on February
10    22nd, three days later, there is a flight from
11    Chattanooga to West Palm Beach, correct?
12         A.   That's correct.
13         Q.   And who is Faye Pickett and Wayne
14    Pickett?
15         A.   I don't recall.
16         Q.   All right.  On March 7th, 2018,
17    there is a flight from West Palm Beach to
18    Memphis, and the purpose of that trip and the
19    return the same day -- well, let's start with
20    March 7th.  Was the purpose of that trip the
21    potential purchase of power by Memphis?
22         A.   March 7th, 2018, 9:23 a.m., yes.
23         Q.   And then the return flight that

Page 55

1     same day to West Palm Beach from that trip,
2     correct?
3          A.   Correct, 4 p.m.
4          Q.   All right.  And then on the March
5     7th at 10:52 in the morning, there is a flight
6     from Dulles to Memphis, and was that for Frank
7     Haney to attend the same meeting in Memphis?
8          A.   That's correct.
9          Q.   All right.  And on March 8th,
10    2018, there is a flight from Teterboro to West
11    Palm Beach with Michael Cohen as the only
12    passenger, correct?
13         A.   That's correct.  So let me take
14    you to that entry and the next five entries.
15    So there are three flights on March 8th, 2018,
16    and then there are three flights listed for
17    March 26th, 2018.  So Nuclear Development is
18    not claiming the amounts for those six flights
19    as part of the damages.
20         Q.   All right.  On April 15th, 2018,
21    there is a flight from West Palm Beach to
22    Dulles?
23         A.   Yes.

Page 56

1          Q.   What was the purpose of that trip?
2          A.   Meetings with congressional
3     members and congressional staff.
4          Q.   And were the topics of those
5     meetings the same as the prior meetings with
6     congressional staff as you testified?
7          A.   Yes.
8          Q.   All right.  And then the return
9     flight is on the 18th, correct, of April?
10         A.   The 18th of April, yes.
11         Q.   And did the meetings extend over
12    three days or did the Haneys just decide to
13    spend a few days in Washington while they were
14    there?
15         A.   I don't have the records in front
16    of me of which days they met with people on the
17    Hill.  It could have been any or all of those
18    days, but I can't say for sure there were
19    meetings every day.
20         Q.   Then turning to page four of
21    Exhibit 133, April 26, 2018, there is a flight
22    from West Palm Beach to Dulles, do you see
23    that?

Page 57

1    A.   Yes.
2    Q.   What was the purpose of that trip?
3    A.   That was back for more meetings on
4  the Hill with congressional staff.
5    Q.   And were the topics the same as
6  you testified to earlier --
7    A.   Yes.
8    Q.   -- meetings with congressional
9  staff?
10   A.   Yes.
11   Q.   And then the return trip was the
12 next day on the 27th of April, correct?
13   A.   Yes.
14   Q.   All right.  And then on May 8th,
15 there was another trip from West Palm Beach to
16 Dulles.  What was the purpose of that trip?
17   A.   That was more meetings on the Hill
18 with congressional staff.
19   Q.   And were the topics of those
20 meetings the same as the ones you testified to
21 earlier with respect to other congressional
22 meetings?
23   A.   Yes.

Page 58

1    Q.   All right.  And the return flight
2  for that trip was on May 9th, correct?
3    A.   Yes.
4    Q.   All right.  Then on May 18th,
5  2018, there is a flight from West Palm Beach to
6  Chattanooga.  What was the purpose of that
7  trip?
8    A.   On that trip -- so there is -- so
9  there is a trip from West Palm Beach to
10 Chattanooga for meetings with board members
11 from Chattanooga Electric Power Board and then
12 a flight on to Nashville, Tennessee to meet
13 with Tennessee senators regarding the
14 Bellefonte project.  And then from Dulles --
15 excuse me, Nashville back to Dulles on the
16 21st.
17   Q.   Well, it wasn't back to Dulles
18 because it started in West Palm Beach, right?
19   A.   Okay.  To Dulles.
20   Q.   So were there meetings in the
21 Washington D.C. area around May 21st or did Mr.
22 and Mrs. Haney decide they wanted to change
23 their location?

Page 59

1    A.   I don't have a record of the
2  meetings.
3    Q.   Okay.  On June 17th, 2018, there
4  is a trip from Dulles to Teterboro.  What was
5  the purpose of that trip?
6    A.   I don't know.  I don't have a
7  meeting associated with that trip.
8    Q.   Okay.  On June 24th, 2018, there
9  is a trip from Teterboro to Dulles.  What was
10 the purpose of that trip?
11   A.   That was to meet with
12 congressional staff.
13   Q.   And would the topics of those
14 meetings be the same as the topics of the other
15 meetings which you have already testified
16 concerning congressional staff meetings?
17   A.   Yes.
18   Q.   And then there is a return trip on
19 June 25th, correct?
20   A.   Yes.
21   Q.   And then on July 21st there is a
22 trip from Nantucket to Chattanooga.  What was
23 the purpose of that trip?

Page 60

1    A.   So for meetings with the
2  Memphis -- excuse me, Chattanooga Electric
3  Power Board, a member of the Electric Power
4  Board board of directors.  That was regarding
5  sale of Bellefonte power.
6    Q.   And on July 22nd from Dulles to
7  Chattanooga, was that for Frank Haney to
8  participate in those same meetings?
9    A.   Yes.
10   Q.   All right.  Then on July 22nd
11 there is a trip from Chattanooga to Memphis, do
12 you see that?
13   A.   Yes.
14   Q.   And what was the purpose of that
15 trip?
16   A.   We met with the mayor of Memphis
17 to discuss possible sale of Bellefonte power.
18   Q.   All right.  And why was Marie
19 Gillman on that trip?
20   A.   Marie Gillman was the lead site
21 manager for SNC-Lavalin who by this time had
22 been selected as our contract -- part lead
23 contract partner for Bellefonte completion.

Page 61

1    Marie was their top person at the Bellefonte
2    site and she went along so she could explain to
3    the mayor and the other people who attended the
4    meeting how we proposed to go about the
5    completion of the facility.
6        Q.   All right.  And then on July 23rd
7    there is a flight from Memphis to Chattanooga.
8    What was the purpose of that trip?
9        A.   Yeah, that was just to -- yeah,
10   that was -- let me make sure I'm following the
11   line.  So that flight returned myself and Marie
12   Gillman to Chattanooga.  And then the remaining
13   passengers went on on the following flight from
14   Chattanooga to Dulles.
15       Q.   And who are David Gerhardt and
16   Judah Rose?
17       A.   David Gerhardt and Judah Rose are
18   two people from a consulting company, ICF, who
19   we used to perform a power supply study in
20   support of our loan application with the
21   Department of Energy.  And they attended the
22   meeting with the mayor of Memphis in order to
23   explain their analysis of how you would get

Page 62

1    power from the Bellefonte site to Memphis.
2        Q.   All right.  And then on July 29th
3    there is a trip from Dulles to Scottsboro.
4    What was the purpose of that trip?
5        A.   We had a meeting on site with a
6    significant number of potential contract
7    partners and local stakeholders from the
8    Bellefonte area, including one of the
9    congressional members from that district and
10   some -- and a member of the Alabama State
11   Senate and toured people around the facility to
12   familiarize them with Bellefonte and what we
13   were proposing to do with the completion of the
14   plan.
15       Q.   July 30th, 2018, there is a flight
16   from Scottsboro to Dulles, that is the return
17   trip, correct?
18       A.   Yes.
19       Q.   And then on July 30th there was a
20   flight from Dulles to Nantucket, do you see
21   that?
22       A.   Yes.
23       Q.   Is Nuclear Development claiming

Page 63

1    reimbursement for that flight?
2        A.   No.
3        Q.   All right.  Then on September 9th,
4    2018, there is a flight from Teterboro to
5    Ashville?
6        A.   Yes.
7        Q.   What was the purpose -- and then
8    Ashville to Chattanooga.  So it looks like Mr.
9    Haney picked you up and then you went with him
10   to Chattanooga, correct?
11       A.   That's correct.
12       Q.   And what was the purpose of the
13   meeting in Chattanooga?
14       A.   Yeah, we went to meet with people
15   from the Electric Power Board of Chattanooga
16   and for a meeting with members of the board of
17   Seven States Power.  And then we went on to a
18   meeting the following day with -- hang on, let
19   me get the name right, Volunteer Electric
20   Cooperative (sic) in Cleveland, Tennessee on
21   September the 9th and then flew from Cleveland,
22   Tennessee -- and then I flew from Cleveland,
23   Tennessee back to Ashville.

Page 64

1        Q.   And then there is a flight on
2    September 11th, 2018, from Chattanooga to
3    Teterboro.  Did that --
4        A.   Right --
5        Q.   -- take Mr. Haney home?
6        A.   -- Mr. Haney -- so Mr. Haney
7    stayed over for an additional meeting with
8    people from the Electric Power Board and then
9    flew back.
10       Q.   All right.  October 8th there is a
11   trip that starts at Dulles to Ashville and then
12   Ashville to Memphis.  What was the purpose of
13   that trip to Memphis?
14       A.   That was a trip where we attended
15   a meeting of the Memphis city council to
16   discuss a possible sale of power to Memphis.
17       Q.   All right.  And then the return
18   trip for Mr. Haney was on the 9th, correct, of
19   October?
20       A.   Yes.
21       Q.   All right.  Then on the 22nd of
22   October, there is a flight from Dulles to
23   Knoxville.

Page 65

1      A.   Yes.
2      Q.   What was the purpose of that trip?
3      A.   So we had a series of meetings --
4  excuse me, a series of meetings with members of
5  the press in Knoxville and then at the
6  Bellefonte site.
7      Q.   About what?
8      A.   About the potential completion of
9  the plant and sale of power.
10     Q.   All right.  Well, on October 23rd
11 there is a flight from Memphis to Knoxville
12 where the only passenger was Susan Thorp.  Who
13 is Susan Thorp?
14     A.   So Susan Thorp's consulting with
15 us, and so she joined Mr. Haney in Knoxville
16 and then they flew on to Scottsboro for
17 meetings there at the site.
18     Q.   Was Ms. Thorp allowed to go into
19 the site on that trip?
20     A.   Actually TVA refused to allow any
21 of us to go inside the fence on that trip.
22     Q.   And the purpose of the trip had
23 been to meet with the press, correct?

Page 66

1      A.   And to tour the site, which we
2  weren't allowed to do.
3      Q.   All right.  Then on October 23rd
4  there is a flight from Scottsboro to Memphis.
5  I take it that was to take Ms. Thorp back to
6  Memphis?
7      A.   Yes.
8      Q.   And then on October 23rd from
9  Memphis to Chattanooga?
10     A.   Yes.
11     Q.   Which was to take Mr. Haney back
12 to Chattanooga?
13     A.   Yes.
14     Q.   All right.  Then on October 23rd
15 there is a flight from Dulles to Chattanooga.
16 Is Nuclear Development claiming reimbursement
17 for that flight?
18     A.   No.
19     Q.   All right.  Then on October 24th,
20 there is a flight from Chattanooga to Dulles.
21 What was the purpose of that trip?
22     A.   So that returns Mr. Haney back to
23 Dulles after this series of trips to Knoxville,

Page 67

1  Memphis, Scottsboro, et cetera.
2      Q.   Is Nuclear Development claiming
3  reimbursement for that trip?
4      A.   For October 24th, 2018, 4:49 p.m.,
5  yes, sir.
6      Q.   Yes, sir.
7      A.   Yes.
8      Q.   Then on November 6th, 2018, there
9  is a flight from Dulles to Memphis.  What was
10 the purpose of that trip?
11     A.   We were meeting with a number of
12 stakeholders in the Memphis community and
13 Memphis government about the potential sale of
14 power from Bellefonte.
15     Q.   All right.  And then on November
16 7th there is a trip from Dulles to Ashville?
17     A.   Uh-huh.
18     Q.   And what was the purpose of that
19 trip?  It looks like then at the top of the
20 next page, page five of Exhibit 133, it then --
21 there is a flight from Ashville to Memphis?
22     A.   Yes.  So they stopped in Ashville
23 to pick me up and go on to -- go on to Memphis

Page 68

1  for meetings with Memphis stakeholders.
2      Q.   I notice that Mrs. Haney and the
3  dog were on the first leg of that trip but not
4  the second, what happened to them?  Did they
5  stay behind in Ashville?
6      A.   That -- I think that may be an
7  error, because I don't -- I think there is an
8  error there.  I know Frank and Judah Rose and I
9  went for meetings with the people from the
10 mayor's office and city council, but I don't
11 recall Mrs. Haney and Reggie.
12     Q.   So they would have -- they would
13 have gotten off --
14     A.   We'll have to verify that.
15     Q.   Okay.
16     A.   I don't think they got off in
17 Ashville, so we will have to verify that.
18     Q.   All right.  And then on November
19 8th, 2018, there is a return trip from Memphis
20 to Dulles, correct?
21     A.   Correct.
22     Q.   All right.
23     A.   And that is why I say -- that's

Page 69

1    why I say -- so we will go back and verify, but
2    I believe that Mrs. Haney and Reggie went on to
3    Memphis and then this is the return trip where
4    she and the dog and Franklin and Frank and
5    Judah Rose went back to D.C.
6         Q.   All right.  Then on November 17th,
7    2018, there is a flight from Dulles to West
8    Palm Beach.  Is Nuclear Development claiming
9    reimbursement for that flight?
10        A.   Okay.  I'm looking at November
11   17th, 10:05 a.m.
12        Q.   Yes, sir.
13        A.   Yes.
14        Q.   What was the purpose of that trip?
15        A.   I'm sorry.  I got on the wrong
16   line with my right hand.  So November 17th,
17   2018, 10:05 a.m., we are not claiming.
18        Q.   All right.  November 27th, 2018,
19   West Palm Beach to Memphis, what was the
20   purpose of that trip?
21        A.   That was for meetings in Memphis
22   about the sale of power from Bellefonte.
23        Q.   All right.  And the return on

Page 70

1    that day -- was on the same day, correct?
2         A.   Later that afternoon, yes.
3         Q.   All right.  Then on March 24th,
4    2019, there is a flight from Boca Raton to
5    Memphis, do you see that?
6         A.   Yes.
7         Q.   Now, by that date, Nuclear
8    Development knew that the closing had not
9    occurred, correct, the closing of the Purchase
10   and Sales Agreement had not occurred, correct?
11        A.   I believe that's correct.
12        Q.   Okay.  What was the purpose of the
13   trip on March 24th?
14        A.   To meet with the Memphis city
15   council and other stakeholders in Memphis about
16   potential sale of power from Bellefonte.
17        Q.   And the return trip on that was
18   March 26th?
19        A.   Correct.
20        Q.   All right.  And then on April 3rd,
21   2019, there is a trip from West Palm Beach to
22   Memphis.  What was the purpose of that trip?
23   Same purpose?

Page 71

1         A.   Same purpose.  And the return
2    flight --
3         Q.   And the return --
4         A.   -- at 5:48 p.m. on April 3rd.
5         Q.   All right.  And then on April
6    25th, 2019, there is a flight from West Palm
7    Beach to Chattanooga.  What was the purpose of
8    that trip?
9         A.   So it's a series of trips, West
10   Palm Beach to Chattanooga, Chattanooga to
11   Nashville, Nashville to Chattanooga,
12   Chattanooga to West Palm Beach.  That series of
13   meetings was to discuss potential sale of power
14   to Nashville, Tennessee and potential of sale
15   of power to Chattanooga, Tennessee.
16        Q.   All right.  And then on May 13th
17   there is a trip from West Palm Beach to Dulles,
18   what was the purpose of that trip?
19        A.   Okay.  So that -- so that was
20   to -- for Franklin Haney to pick up Frank Haney
21   to go to meetings in Memphis where we were
22   discussing a potential sale of power to Memphis
23   and then return -- they both went -- no, I'm

Page 72

1    sorry.  And then Franklin Haney flew back to
2    West Palm Beach and Frank Haney flew commercial
3    back from Memphis to D.C.
4         Q.   All right.  Other than what -- the
5    trips shown on Exhibit 133, are there any other
6    flights from FlexJet or its predecessor, Flight
7    Options, for which Nuclear Development is
8    claiming reimbursement in the case as damages?
9         A.   Not to my knowledge.
10        Q.   All right.  I will note that if we
11   were doing an in-person deposition, I would
12   mark as an exhibit the notes to which Mr.
13   McCollum has been referring and we would ask
14   that a copy of those notes be produced to us.
15        MR. O'REAR:  I will look at them
16   and consider that.
17        MR. LEMBKE:  All right.  Now, let
18   me -- let's go off the record for a second.
19        THE COURT REPORTER:  Off the
20   record at 11:47.
21        (Whereupon, the lunch recess was
22        taken at 11:47 a.m. until
23        12:19 p.m.)

Page 73

1    THE COURT REPORTER:  We are back
2  on the record at 12:19.
3    Q.   (BY MR. LEMBKE:)  Mr. McCollum, we
4  are back on the record after our lunch break.
5  I would now like to turn your attention to
6  Exhibit 120, which is the list of damages
7  computation.  And I am going to go through this
8  in order now, and the first provider is AECOM.
9  Is that pronounced AECOM?
10    A.   Usually AECOM.
11    Q.   Okay.  What is AECOM?
12    A.   Sorry?
13    Q.   What is AECOM?
14    A.   AECOM is a general contractor,
15  construction engineering firm.  So they do all
16  sorts of large construction engineering
17  projects around the world.
18    Q.   And let me refer you to Exhibit
19  134.
20    (Exhibit Number 134 was referred
21    to in this deposition.)
22    Q.   Is this the information on payment
23  record and invoices for AECOM that was produced

Page 74

1  in the case by Nuclear Development?
2    A.   Yes.
3    Q.   All right.  I notice there are two
4  payment records but only one invoice.  Do you
5  know why there is no invoice for the twenty-six
6  thousand six hundred ninety-three dollar
7  payment?
8    A.   I do not.
9    Q.   All right.  What did AECOM do for
10  Nuclear Development?
11    A.   They -- they helped to review the
12  completion plans that we inherited from TVA
13  when we won the bid and signed the sales
14  contract and helped to develop from that
15  background information and then there were --
16  helped to develop information that we were
17  required to submit in support of our Department
18  of Energy loan application.
19    Q.   And when you say completion, do
20  you mean completion of the construction of
21  Units 1 and 2?
22    A.   Yes.  So after we signed the sales
23  contract we got the right to see all of TVA's

Page 75

1  previous information, construction plans and
2  schedules for completion of Bellefonte, cost
3  estimates, work hour estimates, all of those
4  sorts of things.
5    Q.   Now, if you look at the second
6  page of Exhibit 134, it is an invoice dated
7  December 9th, 2016 from AECOM.
8    A.   Yes.
9    Q.   And it lists -- most of the
10  charges relate to subcontractor work by AREVA.
11  What is AREVA?
12    A.   So this is a company that has
13  changed names a number of times.  It was -- a
14  long time ago it was Babcock & Wilcox, and then
15  it became Framatome, then it became AREVA, and
16  now it is Framatome again.  So this is the
17  company that owns the rights that originally
18  designed the nuclear reactors at Bellefonte and
19  owns the rights to the nuclear -- what is
20  referred to as the nuclear steam supply system
21  design.
22    Q.   And do you know what work AREVA
23  was doing for AECOM?

Page 76

1    A.   Yes.  AECOM and AREVA chose to
2  invoice together, but they were both working
3  with us to develop information in support of
4  the DOE loan application.
5    Q.   And do you know -- the twenty-six
6  thousand six hundred ninety-three dollar charge
7  for which we don't have an invoice, do you know
8  what that work was for?
9    A.   I don't know specifically, no.
10    Q.   Okay.  All right.  Now, the next
11  item on Exhibit 120 is Aladdin Printing
12  Company?
13    A.   Uh-huh.
14    Q.   And let me get you to pull out
15  Exhibit 135, and am I correct this is the
16  payment invoice -- payment record and invoice
17  pertaining to that vendor's amounts you are
18  seeking as damages?
19    (Exhibit Number 135 was referred
20    to in this deposition.)
21    A.   Yes.
22    Q.   And if you look at the second page
23  of Exhibit 135, it says thirty Bellefonte

Page 77

1    books, seven thousand seven hundred eight
2    dollars and twenty-five cents, do you see that?
3        A.   Yes.
4        Q.   Plus tax.  What are these
5    Bellefonte books?
6        A.   So when we talked about the
7    flights, I referenced a number of meetings that
8    we had with potential buyers of the power from
9    Bellefonte in Memphis and Chattanooga,
10   Nashville, and South Carolina.  So what we did
11   was put together a large number of documents
12   that we had pertaining to background
13   information on Bellefonte, the history of
14   Bellefonte while it was with TVA and plans for
15   completion of Bellefonte, plans and information
16   in terms of potential supply of power and that
17   sort of thing, and put all of that information
18   that we would want to use in making
19   presentations to potential purchasers of the
20   power, put those together into three-ring
21   binders.
22        And Gloria had the Aladdin Company
23   photocopy all of that information and then

Page 78

1    punch it and bind it into thirty three-ring --
2    large three-ring binders.  So we used those
3    binders in various meetings with the Tennessee
4    Valley Power Providers Association (sic), Seven
5    States Power, Chattanooga Electric Power Board,
6    lots of different groups in Memphis and people
7    that we met with in Nashville as well as
8    potential customers in South Carolina.
9        Q.   All right.  Now let me get you to
10   refer to -- if you would pull out Exhibit 136.
11        (Exhibit Number 136 was referred
12            to in this deposition.)
13        Q.   And these are the payment records
14   and invoices pertaining to the claim damages
15   relating to services provided by Ali's Sedan
16   Service, correct?
17        A.   Yes.
18        Q.   All right.  Now, is -- let me ask,
19   have you gone through these invoices to verify
20   that all of these are properly chargeable to
21   TVA by Nuclear Development?
22        A.   I have -- I have not validated
23   every one of these invoices, no.

Page 79

1        Q.   All right.  Well, are you -- is
2    Nuclear Development claiming that the full
3    amount of all of these invoices should be paid
4    as damages by TVA?
5        A.   Yes.
6        Q.   Is it possible that there are
7    charges of a personal nature that are in these
8    invoices?
9        A.   I don't know.
10       Q.   Okay.  Now, Frank Haney lives in
11   the D.C. area, correct?
12       A.   In Maryland, yes.
13       Q.   Why was there a need for Frank
14   Haney to be driven around by a car service?
15       A.   Well, a lot of times if you are
16   meeting with people on the Hill, it's hard to
17   -- it's hard to park anywhere close to where
18   you are going to have to go through security.
19   And so in order to be able to get to and from
20   meetings, it's usually a lot easier to take a
21   taxi or a car service and be dropped off and
22   picked up.
23       Q.   All right.  Let me refer you to

Page 80

1    page -- and down in the lower right is the
2    so-called Bates number on the document, the
3    page 5767 which is the second page of Exhibit
4    136.
5        A.   Okay.
6        Q.   Do you know why Frank Haney needed
7    seven hours of sedan service on November 30th,
8    2016?
9        A.   I don't -- I don't know
10   specifically who he was meeting with, no.
11       Q.   All right.  On page 5769, and I
12   will tell you that it appears as though the
13   only charges on this invoice for which Nuclear
14   Development is seeking reimbursement are the
15   charges on January 23rd and January 24th which
16   total eight hundred seventy-five dollars.
17        Do you know why Frank -- excuse
18   me, Franklin Haney needed eight hours of SUV
19   service on January 23rd, 2017?
20       A.   Yeah, according to the notation
21   here, that was the day that we had -- had
22   representatives from Nuclear Development and
23   AREVA went to meet with some officials from the

20  (Pages 77 to 80)

Page 81

1    NRC.
2        Q.   And let me get you to turn to page
3    5771.  Why is it that when Franklin Haney would
4    get back from a business trip, Nuclear
5    Development thinks that TVA should pay for the
6    car service from the airport to his residence?
7        A.   Well, he has to have some way of
8    getting back from the residence, so there would
9    either be some transportation charge or parking
10   charge or whatever.
11       Q.   And would your answer be the same
12   for why Nuclear Development is seeking as
13   damages amounts to take Frank Haney to and from
14   the airport?
15       A.   Yes.
16       Q.   All right.  Now let me get you to
17   turn to page 5783.  On July 10, 2017, the first
18   entry, do you see it?
19       A.   I do.
20       Q.   It says, Provided SUV service for
21   Mr. and Mrs. Haney from IAD to resident, made
22   two stops, to the office then to 2510 Foxhall
23   Rd, Northwest, Washington D.C.

Page 82

1        Why were they going to 2510
2    Foxhall Road?
3        A.   I don't know.  I don't recognize
4    that address.
5        Q.   Do you think that might be a
6    personal trip?
7        A.   I can't say, because I don't
8    recognize the address.
9        Q.   All right.  Now, when Nuclear
10   Development would have its meetings with
11   congressional staff, would Mrs. Haney,
12   Franklin's wife, typically go along?
13       A.   It's not uncommon for her to go
14   along on those meetings with Mr. Haney.  She
15   is -- you know, she is personally acquainted
16   with a number of the senators and congressmen,
17   so she might very well go along on those
18   meetings.  I have been in numerous meetings
19   that she has attended with stakeholders like
20   that.
21       Q.   All right.  On page 5785, there is
22   an entry on August 24th, 2017, Provided four
23   hours of SUV service for Mr. Haney and guests.

Page 83

1    Do you see that?
2        A.   I do.
3        Q.   Do you know who the guests were?
4        A.   Just a second.
5        Q.   Okay.
6        A.   (Reviewing document.)  I don't.  I
7    don't have that list.
8        Q.   All right.  Now, let me get you to
9    turn to page 5788.  And do you see the entry on
10   September 8, 2017, Provided four hours of sedan
11   service for Mr. Frank Haney, the car was
12   reserved until four p.m.?  Do you see that?
13       A.   I do.
14       Q.   And what was Mr. Frank Haney doing
15   that day that he needed car service that should
16   be paid for by TVA?
17       A.   I'm not certain, I think he was
18   meeting with people on the Hill that day.
19       Q.   But you are not certain?
20       A.   I'm not certain.
21       Q.   All right.  Let me get you to turn
22   to page 5797.
23       A.   Okay.

Page 84

1        Q.   There is an entry on November
2    28th, 2017, for four hours of SUV service for
3    Mr. Frank Haney, and then on November 29th for
4    seven hours of SUV service for Mr. Frank Haney,
5    do you see that?
6        A.   Yes.
7        Q.   Do you know what he needed SUV
8    service for on those two days?
9        A.   Yeah, those were -- those dates
10   were for meeting with congressional staff and
11   Senate staff.
12       Q.   And so essentially Nuclear
13   Development is asking TVA to pay for the limo
14   driver's time while he sat around and waited
15   for the Haneys to finish their meetings,
16   correct?
17       A.   Well, the charge is related to the
18   transportation, yes.
19       Q.   Well, but seven hours, it didn't
20   take seven hours to drive from Frank Haney's --
21   to and from Frank Haney's wherever he was
22   going -- let me start over.
23          The seven hours would have

Page 85

1    included the time that Frank Haney was in the
2    meetings, correct?
3        A.   Correct.
4        Q.   All right.  And did he ever
5    consider taking an Uber each way?
6        A.   I don't know.
7        Q.   That certainly would have been
8    cheaper, correct?
9        A.   Yeah, I don't know.
10       Q.   You don't -- you think it would
11   have cost five hundred ninety-five dollars for
12   a round trip in an Uber?
13       A.   I don't know what options were
14   considered or the availability of other
15   transportation options on that day.
16       Q.   On page 5798, let me direct your
17   attention to the entry on that, on December
18   4th, 2017, do you see that?
19       A.   Yes.
20       Q.   What did Frank Haney need the SUV
21   service for on that day?
22       A.   I don't know specifically.
23       Q.   All right.  Let me direct your

Page 86

1    attention to page 5810.
2        A.   Okay.
3        Q.   The first entry is on Sunday,
4    April 15th, 2018, do you see that?
5        A.   I do.
6        Q.   And it says, Provided minimum
7    three hours of sedan service as directed for
8    Mr. and Mrs. Haney.  Do you see that?
9        A.   I do.
10       Q.   What meetings relating to Nuclear
11   Development were Mr. and Mrs. Haney having on a
12   Sunday?
13       A.   Typically, many times what Mr.
14   Haney will do is if we are having meetings with
15   stakeholders, we will get together the
16   afternoon before with any consultants,
17   lobbyists, anybody else that we are working
18   with for those particular meetings, and have
19   pre-meetings to prepare and discuss what we
20   will talk about in the meeting the following
21   day.  You know, that's typically the sort of
22   thing you see on these is there will be work
23   the day before and then there will be work the

Page 87

1    day of the meetings and transportation in and
2    out to fly in and go back.
3        Q.   Well, do you know if that is, in
4    fact, what the time of the entry was on Sunday,
5    April 15th, 2018?
6        A.   I don't know specifically where
7    they went and who they met with on April the
8    18th (sic).
9        Q.   Okay.  Do you know who they met
10   with on April the 16th that required three
11   hours of sedan service for them?
12       A.   Yeah, those were meetings on the
13   Hill with congressional and Senate staff,
14   committee staff.
15       Q.   All right.  And is the same true
16   on the 17th, the ten hours of SUV service?
17       A.   Yes.
18       Q.   Do you know -- page 5812.  Do you
19   know what the four hours of SUV service was for
20   for Mr. Haney on April 27th, 2018?
21       A.   There were other meetings on -- on
22   the Hill that day.
23       Q.   All right.  All right.  Referring

Page 88

1    to page 5814, do you know what Mr. Haney needed
2    four hours of SUV service for on -- at 3:15
3    a.m. on May 9th, 2018?
4        A.   I do not.
5        Q.   All right.  Let me refer you to
6    page 5817.  Do you know what Mr. Haney needed
7    three hours of SUV service for on June 6, 2018?
8        A.   No, I don't have specifics on
9    that.
10       Q.   All right.  Let me refer you to
11   page 5819.  Do you know what Mr. and Mrs. Haney
12   needed three hours of -- excuse me, three hours
13   of service for at 10 a.m. on Sunday, June 24th,
14   2018?
15       A.   My understanding was that they
16   were meeting with congressional leaders and
17   staff on those two days.  I don't know
18   specifically who they met with on Sunday.
19       Q.   But it is your testimony they were
20   meeting with congressional members or staff on
21   Sunday, June 24th?
22       A.   That's my understanding.
23       Q.   All right.  And what's the basis

Page 89

1 of that understanding?
2    A.   My conversations with Gloria
3 Thurman.
4    Q.   All right.  Let me direct you to
5 page 5821.  Do you know what Frank Haney needed
6 four hours of sedan service for on July 10,
7 2018?
8    A.   I don't.
9    Q.   All right.  Let me direct your
10 attention to page 5823.  Do you know what Mr.
11 and Mrs. Haney needed sedan service for, for
12 three hours on July 24th, 2018?
13    A.   I don't.
14    Q.   All right.  On page 5829 -- well,
15 first thing -- hold on, let me -- yes, 5829,
16 these are for -- this is for limo service in
17 May 2019, correct?
18    A.   Yes.
19    Q.   And that was after Nuclear
20 Development knew that TVA would not close as
21 scheduled on November 30th, 2018, correct?
22    A.   I suppose.
23    Q.   All right.  Now, I'll direct your

Page 90

1 attention to the entry on Thursday, May 2nd,
2 2019.  Do you know what Mr. and Mrs. Haney
3 needed six hours of SUV service for on that
4 day?
5    A.   I don't.
6    Q.   All right.  On Sunday, May 5th,
7 2019, they were picked up at 7 a.m. from 801
8 Pennsylvania Avenue to go to the airport.  Do
9 you know what the purpose of that trip was?
10    A.   No.
11    Q.   Now let me direct your attention
12 to page 5831.  On May 14th, 2019, do you know
13 why Mr. Haney needed seven hours of SUV
14 service?
15    A.   The 5/14 and 5/15 would have
16 coincided with our trip to Memphis to meet with
17 stakeholders to discuss power purchase
18 agreements.
19    Q.   Well, I guess that raises a good
20 question.  If you were in Memphis -- if we look
21 back at Exhibit 133, May 14th, 2019, a plane
22 left Dulles at 1:45 p.m. going to Memphis,
23 right?

Page 91

1    A.   Yes.
2    Q.   Was Mr. Haney doing something for
3 seven hours before that flight pertaining to
4 Nuclear Development on that day in the D.C.
5 area?
6    A.   I don't know exactly what
7 transpired before the flight left that day.
8    Q.   Okay.  Looking back to Exhibit
9 120, the next entry pertains to the provider
10 Chadbourne & Parke.  And what was Chadbourne &
11 Parke doing for Nuclear Development?
12    A.   They provided legal advice
13 relative to our DOE loan application and
14 communication.  We had to put together quite a
15 bit of financial information for rating
16 agencies in support of the DOE loan
17 application.  And looking at -- giving us
18 advice about how to navigate some of the
19 aspects of the DOE loan application process,
20 like the engineer's report that is required,
21 some of those things.
22    Q.   What involvement did they have
23 with the ratings reports?

Page 92

1    A.   So there is -- there is a bit of
2 an overlap.  In the DOE loan application
3 process, they require extensive financial
4 information to be submitted.  They -- for
5 someone that's not a large or publicly traded
6 company, doesn't have an established credit
7 rating, they want to -- they want to see a
8 shadow credit rating.  So we put together a lot
9 of financial information in support of the DOE
10 loan application, much of which was also used
11 in support of obtaining a shadow credit rating.
12        But then there is some other
13 information you have to put together because
14 DOE and the people that do the ratings don't
15 ever want the financial information in exactly
16 the same way, so you end up preparing similar
17 information in a little different form.  So
18 they helped us with those financial submittals.
19    Q.   Now, let me get you to look at
20 page -- excuse me, Exhibit 137.
21        (Exhibit Number 137 was referred
22        to in this deposition.)
23    A.   Okay.

Page 93

1    Q.   Am I correct that these are
2  invoices and pay records pertaining to the
3  amounts claimed as damages that were charged by
4  Chadbourne & Parke?
5    A.   Yes.
6    Q.   Now, beginning at page 6309, you
7  will see that the descriptions of the work
8  being performed are redacted, do you see that?
9  Really from there to the end of the exhibit,
10  there are numerous pages with all of the
11  billing time entries redacted, correct?
12    A.   Yeah, I see the black bar in the
13  middle of the document, so it has dates and
14  names and hours.
15    Q.   Right.  Have you reviewed the
16  documents without the redacted -- in unredacted
17  form?
18    A.   I have not.
19    Q.   Do you know if these individuals
20  who are recording time, are they all lawyers?
21    A.   I don't know that.
22    Q.   All right.  Let me next get you to
23  refer back to Exhibit 120.  The next provider

Page 94

1  whose charges Nuclear Development is seeking as
2  damages is Julien Debonnet, do you see that?
3    A.   Yes.
4    Q.   All right.  And that total is
5  sixty-seven thousand five hundred dollars,
6  correct?
7    A.   Yes.
8    Q.   Who is Mr. Debonnet?
9    A.   I'm sorry, say that again, please.
10    Q.   Who is Mr. Debonnet?
11    A.   He is an individual who helped us
12  with running financial models.  So in order to
13  put together the financials required for the
14  DOE loan application and the credit rating, you
15  have to -- you have to run a lot of numbers
16  about projecting cost over time and revenues
17  versus cost and that sort of thing.  So Mr.
18  Debonnet helped with constructing some
19  elaborate financial models in Excel to prepare
20  the information in the sort of form that the
21  Department of Energy wanted.
22    Q.   And he was on a monthly retainer?
23    A.   Yes.

Page 95

1    Q.   Why did Nuclear Development agree
2  to a retainer for modeling work?
3    A.   Because -- you know, basically
4  because at the rate he was charging it would
5  have been -- it was -- it was cheaper to pay
6  him a flat amount than if we had paid on a
7  per-hour basis to do the amount of modeling
8  work that we got into.
9    Q.   And how much was his hourly rate?
10    A.   Well, the hourly rates that we
11  might have paid other individuals to do this
12  sort of work would have been, you know, in the
13  three hundred dollar range.
14    Q.   Did you ever discuss with Mr.
15  Debonnet doing -- him doing the work on an
16  hourly rate basis?
17    A.   I did not.
18    Q.   Do you know if anyone at Nuclear
19  Development did?
20    A.   I'm not aware that they did, but
21  they may have.
22    Q.   How did Nuclear Development get
23  connected with Mr. Debonnet in California?

Page 96

1    A.   I believe he was recommended by --
2  well, by someone to Mr. Frank Haney.  And I'm
3  not sure if that came from -- that
4  recommendation came from someone at Credit
5  Suisse or someone else.  I seem to recall that
6  -- Frank saying he had heard about this person
7  through someone at Credit Suisse, but that
8  might not be correct.
9    Q.   Do you have any idea how many
10  hours in total Mr. Debonnet worked?
11    A.   I don't.
12    Q.   Okay.  And why did the model
13  retainer stop from February to May in 2019?
14    A.   So this thing with -- this loan
15  application with DOE sort of goes in cycles.
16  You have a flurry of activity.  They want some
17  big pile of information submitted to them, you
18  put that together, you submit it, and then
19  there is sort of a lull while they digest all
20  of that information and decide what they are
21  going to do or ask for next.  And so we put a
22  pause on Mr. Debonnet's work for a period of
23  time.

Page 97

1    Q.   Let me get you to refer to Exhibit
2    138.
3         (Exhibit Number 138 was referred
4         to in this deposition.)
5    A.   Okay.
6    Q.   Am I correct that these are the
7    payment records and invoices for the amounts
8    claimed as damages by Nuclear Development for
9    the work by Mr. Debonnet?
10   A.   Yes.
11   Q.   And am I correct that the invoices
12   give zero description of the services he
13   provided?
14   A.   There is no detailed breakout of
15   the hours and specific work tests.
16   Q.   Nor even the subject matter,
17   correct?
18   A.   Well, we were in frequent contact
19   with Mr. Debonnet about building -- building
20   the financial models and providing information.
21   So I'm sure he assumed that we knew the type of
22   work that he was doing for us.
23        MR. LEMBKE:  I will move to strike

Page 98

1    that as nonresponsive.
2    Q.   (BY MR. LEMBKE:)  My question, Mr.
3    McCollum, was, there is not even a statement of
4    the subject matter of his work on the invoices
5    he provided to you, correct?
6    A.   Other than services provided,
7    that's correct.
8    Q.   Okay.  Now, the next provider on
9    Exhibit 120 is -- well, hold on, let's go back
10   to Mr. Debonnet.
11        Nuclear Development continued --
12   or is seeking damages for amounts charged after
13   the closing date -- or the closing did not
14   occur on November 30th, 2018, correct?
15   A.   Correct.
16   Q.   Now, the next provider on Exhibit
17   120 is Dentons USA -- excuse me, Dentons US,
18   LLP.  Do you see that?
19   A.   Yes.
20   Q.   All right.  And they did some work
21   the fall of 2018, correct?
22   A.   Yes.
23   Q.   All right.  What were they doing?

Page 99

1    A.   They provided us legal advice on a
2    number of issues related to the -- primarily
3    related to the transportation of electric power
4    from Bellefonte.
5    Q.   Okay.  And let me get you to look
6    at page -- or Exhibit 139.
7         (Exhibit Number 139 was referred
8         to in this deposition.)
9    A.   Uh-huh.
10   Q.   These are the payment records and
11   invoices pertaining to the amounts charged by
12   Dentons US for which Nuclear Development is
13   asking TVA to pay damages?
14   A.   Correct.
15   Q.   All right.  And beginning at page
16   thirty-six -- excuse me, 6328, there are
17   several pages where the narratives for the
18   charges have been redacted, correct?
19   A.   Yes.
20   Q.   Have you reviewed these bills in
21   unredacted form?
22   A.   No.
23   Q.   All right.  Next on the list is

Page 100

1    Fitch Ratings.  And let me get you to look at
2    Exhibit 140.
3    A.   Yes.
4         (Exhibit Number 140 was referred
5         to in this deposition.)
6    Q.   This is a -- the payment record
7    and invoice corresponding to the seventy-five
8    thousand dollar amount that Nuclear Development
9    was seeking in damages pertaining to charges by
10   Fitch Ratings, correct?
11   A.   Yes.
12   Q.   What did Fitch Ratings do?
13   A.   We worked with Fitch Ratings to
14   obtain a shadow credit rating for the
15   Bellefonte project in support of our DOE loan
16   application.  As I mentioned before, the DOE
17   wanted to see some sort of credit rating
18   associated with the project and we worked with
19   Fitch to secure that.
20   Q.   And how was it determined that the
21   fee for this work would be seventy-five
22   thousand dollars?
23   A.   Well, basically that's what Fitch

1    said they were going to charge us for doing the
2    work in support of a credit rating for this
3    type of project.
4        Q.    Do you know if that is a
5    reasonable and customary charge in the industry
6    for that type of credit opinion?
7        A.    I don't -- I don't deal with
8    credit opinions on a regular basis.
9        Q.    All right.  Now, I see later on
10   Exhibit 120 there is a charge from Moody's
11   Investor Services?
12       A.    Correct.
13       Q.    And were they doing the same thing
14   as Fitch or something different?
15       A.    They were also working on the
16   shadow credit rating.
17       Q.    Was it a separate shadow credit
18   rating by Moody's?
19       A.    It was separate work, yes.
20       Q.    All right.  Did -- was it a
21   completely separate opinion, one from Fitch and
22   one from Moody's?
23       A.    Yes.

1        Q.    All right.
2        A.    Credit rating.
3        Q.    Why did Nuclear Development need
4    two?
5        A.    Because it would have been
6    preferable for DOE for us to be able to show
7    multiple credit ratings to show that --
8    essentially you get validation,
9    cross-validation of the credit rating you're
10   getting.
11       Q.    What is your basis for your
12   statement that it was preferable to DOE for it
13   to have two?
14       A.    Just based on discussions we had
15   with the DOE staff members.
16       Q.    Okay.  Why did -- and if you look
17   at Exhibit 120, Moody's charge was a hundred
18   and ninety-five thousand dollars.  Do you see
19   that?
20       A.    Let me look.
21       Q.    Okay.
22       A.    Yes, I see that.
23       Q.    All right.  And did Moody's do a

1    substantial amount of work -- let me strike
2    that.
3            Did Moody's do substantially more
4    work than Fitch did?
5        A.    They did.
6        Q.    And why was that?
7        A.    Well, they had a -- we pursued --
8    we pursued a couple of different options with
9    them which increased the amount of work.  And
10   then they also had a process where we had to
11   meet with them a number of times and take that
12   up through their approval chain.
13       Q.    Do you know how many hours of work
14   Fitch performed to get to its credit opinion?
15       A.    I do not.
16       Q.    Do you know how many hours of work
17   Moody's performed to get to its?
18       A.    No.
19       Q.    Do you know if the hundred and
20   ninety-five thousand dollar charge by Moody's
21   is reasonable and customary in the industry for
22   the work it did?
23       A.    I do not.

1        Q.    All right.  On Exhibit 120, you
2    have already covered the next vendor which is
3    FlexJet and Flight Options.  So after that is
4    Framatome.  If you would, look at Exhibit 143.
5            (Exhibit Number 143 was referred
6            to in this deposition.)
7        Q.    Am I correct that 143 are the
8    Framatome invoices and payment records
9    attributable to the amounts for which Nuclear
10   Development is seeking TVA to pay damages?
11       A.    I'm not finding 143, hang on.
12       Q.    Okay.
13       A.    I'm sorry, I can't find a 143.  I
14   have 141, 142 and 144, but I can't find a 143.
15   Let me see if these are stuck -- okay.  Here it
16   is.
17       Q.    Okay.
18       A.    It was stuck to the staple.
19       Q.    Do you want me to repeat my
20   question?
21       A.    Sorry.
22       Q.    Am I correct that Exhibit 143 are
23   the invoices for Framatome and associated

Page 105

1  payment records pertaining to amounts charged
2  by Framatome for which Nuclear Development is
3  seeking TVA to pay damages?
4      A.   Yes.
5      Q.   Okay.  Now, what was Framatome
6  doing -- these invoices are from the summer of
7  2019, correct?
8      A.   Yes.
9      Q.   And that was long after this
10 lawsuit started, correct?
11     A.   It was after the lawsuit started,
12 correct.
13     Q.   All right.  And what was Framatome
14 doing in the summer of 2019?
15     A.   They were performing work in
16 support of the DOE loan application
17 providing -- helping us provide the technical
18 information that the DOE staff requested.
19     Q.   All right.  If you will look at
20 the second page of Exhibit 143 and the fourth
21 page, those are the two invoices from
22 Framatome, correct?
23     A.   Yes.

Page 106

1      Q.   And there is no description of any
2  kind of the services being performed, correct?
3      A.   Correct.
4      Q.   How did the amounts being charged,
5  how were they arrived at?
6      A.   I -- I don't understand the
7  question.  Can you rephrase it?
8      Q.   Certainly.  Was this an agreed
9  amount?  This does not look like hourly billing
10 because it comes out at, you know, round
11 numbers.  So was there some negotiated price
12 for this?
13     A.   Give me just a second.
14     Q.   Yes, sir.
15     A.   The -- I just needed to check them
16 against Exhibit 134.  So the amounts on these
17 invoices from Framatome were arrived at based
18 on the hours put in and hourly rates of
19 different people who worked on these two
20 deliverables.
21     Q.   And what from Exhibit 134 told you
22 that?
23     A.   I think -- yes, there is nothing

Page 107

1  from -- there is nothing from Exhibit 143 that
2  told me that.  You would have to -- you would
3  have to reference the PO that's -- that the
4  invoices came off of.
5      Q.   And so you believe that these are
6  totals on the two invoices for hourly rate
7  charges?
8      A.   Yes.
9      Q.   All right.  And do you know how
10 many hours Framatome worked to reach these
11 amounts?
12     A.   I don't have that in front of me,
13 no.
14     Q.   All right.
15         MR. LEMBKE:  Why don't we take
16 five minutes for a quick break?
17         MR. O'REAR:  That's fine.
18         THE COURT REPORTER:  Going off the
19 record at 1:13.
20         (Whereupon, a break was had from
21         1:13 p.m. until 1:20 p.m.)
22         THE COURT REPORTER:  Back on the
23 record at 1:20.

Page 108

1      Q.   (BY MR. LEMBKE:)  Mr. McCollum,
2  the next vendor on the list on Exhibit 120 is
3  FTI.  And what is FTI?
4      A.   It is a -- it's a consulting
5  lobbying firm.  One of the -- one of the
6  individuals at FTI, Bud Cramer, who is a former
7  congressman from Alabama, does a lot of work
8  for us.
9         (Exhibit Number 144 was referred
10         to in this deposition.)
11     Q.   Let me direct you to Exhibit 144.
12 This is a declaration that Mr. Cramer has given
13 in connection with this case.  Have you read
14 this?
15     A.   No.
16     Q.   You would agree that not all of
17 the meetings in which Mr. Cramer through FTI
18 personnel have participated are confidential,
19 correct?
20         MR. O'REAR:  Let me object to
21 that.  I mean, that's outside the scope of this
22 deposition.  So we -- that is a matter for
23 another argument which we have already had and

1   this witness is not being tendered to testify
2   on that.
3           MR. LEMBKE:  Well, then we may
4   have to take that up with the Judge if you are
5   not going to let him answer that question.
6           MR. O'REAR:  Well, he is here to
7   testify about the nature of the services
8   provided by FTI and the damages that are being
9   claimed and not as to whether or not the
10  content of their records are confidential.
11      Q.   (BY MR. LEMBKE:)  All right.  Mr.
12  Cramer -- excuse me.  Mr. McCollum, Mr. Cramer
13  has said that he has provided the following
14  services to Nuclear Development:  Government
15  relations consulting.  Is that an accurate
16  statement?
17      A.   That's what it says here, yes.
18      Q.   Well, my question is, has FTI
19  provided government relations consulting?
20      A.   Oh, yes.
21      Q.   And what has that consulting
22  involved?
23      A.   Advising us on the best way to get

1   things done in terms of discussions with people
2   in government in pursuit of the Bellefonte
3   project.
4       Q.   All right.  Then Mr. Cramer has
5   said that he -- that FTI also provided
6   assistance in preparing for confidential
7   meetings and communications with, and
8   participating in confidential meetings and
9   communications, with federal, state, and local
10  governmental officials on behalf of ND,
11  particularly relating to pursuing and securing
12  incentive packages for the Bellefonte project
13  and pursuing and securing support for a United
14  States Department of Energy loan for the
15  Bellefonte project.
16           Is that an accurate statement as
17  to the services provided by FTI?
18      A.   It is.
19      Q.   Are there any other services that
20  FTI has provided that aren't -- that weren't
21  identified by Mr. Cramer?
22      A.   No, I think the statements here in
23  item four cover work that he has done for us.

1       Q.   All right.  Other than members of
2   Congress and DOE officials, what other federal
3   officials has Mr. Cramer participated in
4   meetings with on behalf of Nuclear Development?
5           MR. O'REAR:  You said federal?
6           MR. LEMBKE:  Yes.
7       A.   Other than -- other than members
8   of Congress and their staff and congressional
9   committee staff members and DOE personnel, I
10  can't recall anyone else right now --
11      Q.   (BY MR. LEMBKE:)  All right.
12      A.   -- where Mr. Cramer was in
13  attendance.
14      Q.   What state officials has Mr.
15  Cramer participated in meeting with on behalf
16  of Nuclear Development?
17      A.   Primarily Alabama State officials,
18  legislators, Governor, Governor's staff.
19      Q.   And what local governmental
20  officials has Mr. Cramer participated in
21  meetings and communications with on behalf of
22  Nuclear Development?
23      A.   Local -- local officials in

1   Scottsboro, Alabama, and Huntsville, Alabama
2   primarily.
3       Q.   Okay.  Any others that you can
4   think of?
5       A.   No, he has participated with us in
6   meetings with state departments, Department of
7   Commerce, Department of Environmental
8   Management, various people in state government
9   who are not elected officials.
10      Q.   Okay.  Now, Nuclear Development is
11  seeking one million eighty-six thousand four
12  hundred forty-five dollars and forty-nine cents
13  pertaining to charges by FTI, correct?
14      A.   One million eighty-six thousand
15  four hundred forty-five dollars and forty-nine
16  cents is correct.
17      Q.   Right.  And let me refer you to
18  Exhibit 145.
19           (Exhibit Number 145 was referred
20           to in this deposition.)
21      A.   Okay.
22      Q.   These are payment records and
23  invoices that pertain to those claimed damages

Page 113

1    related to the charges by FTI, correct?
2        A.   Correct.
3        Q.   Now, the charge -- charges began
4    in December 2016 at a rate of thirty-five
5    thousand dollars a month, correct?
6        A.   Correct.
7        Q.   And how was that rate negotiated?
8        A.   I didn't personally negotiate the
9    rate, but it is my understanding that that was
10   the -- that's the typical payment arrangement
11   that Mr. Cramer works for is on retainer basis.
12       Q.   Well, I'm not talking about the
13   retainer basis, I am talking more about the
14   thirty-five thousand dollar monthly amount.
15       A.   Yeah, that was -- that was just
16   the amount that was arrived at through
17   discussion with Mr. Cramer.
18       Q.   And on the invoices in Exhibit
19   145, Mr. Cramer did not in any way identify the
20   number of hours he spent each month, correct?
21       A.   That's correct.
22       Q.   Or anyone else at FTI spent,
23   correct?

Page 114

1        A.   That's correct.
2        Q.   And there is no description of the
3    specific services given each month, correct?
4        A.   That's correct.
5        Q.   Do you have any idea how many
6    hours Mr. Cramer and others at FTI spent on --
7    for Nuclear Development for the months for
8    which Nuclear Development is claiming damages
9    from TVA?
10       A.   I do not.  He was on a retainer
11   basis, so he didn't report hours to us.
12       Q.   Okay.  And the amounts that are
13   being sought from TVA include several months
14   after the closing did not occur on November
15   30th, 2018, correct?
16       A.   Correct.
17       Q.   And several months after the onset
18   of this lawsuit, correct?
19       A.   Correct.
20       Q.   Is he still on a monthly retainer?
21       A.   Yes.
22       Q.   What is he doing now?
23       A.   He is still working with the

Page 115

1    stakeholders on project incentives and helping
2    us with being successful on the DOE loan
3    application.
4        Q.   Next provider is the Hand Arendall
5    firm.  And let me ask you, I know that the Hand
6    Arendall firm represents Nuclear Development in
7    this litigation.  But what did Hand Arendall do
8    as services for which Nuclear Development is
9    seeking TVA to pay damages in this case?
10       A.   Yeah, these are -- these are
11   services providing legal advice and support to
12   us in pursuit of state incentives and trying to
13   negotiate the state requirements for the
14   project --
15       Q.   Let me --
16       A.   -- in the state of Alabama.
17       Q.   Let me direct your attention to
18   Exhibit 146.
19            (Exhibit Number 146 was referred
20            to in this deposition.)
21       A.   Uh-huh.
22       Q.   Am I correct this is a compilation
23   of the invoices and payment records for the

Page 116

1    amounts charged by Hand Arendall that Nuclear
2    Development is seeking as damages in this case?
3        A.   It is.
4        Q.   All right.  And as with others we
5    have looked at before, if you look to page
6    6338, beginning at that page, the descriptions
7    of the services provided are redacted, do you
8    see that?
9        A.   Yes.
10       Q.   Have you looked at the nonredacted
11   version of the invoices?
12       A.   I have not personally, no.
13       Q.   All right.  Now, on page 6338, am
14   I correct that the charges start on the day
15   that the contract was executed, is that right?
16       A.   I'm not -- I'm not sure I
17   understand.  Which contract?
18       Q.   The Purchase and Sale Agreement
19   between Nuclear Development and TVA.
20       A.   Oh.  Okay, yes.
21       Q.   All right.  Are any of the amounts
22   charged by Hand Arendall for which Nuclear
23   Development is seeking TVA to pay as damages

Page 117

1    related to advice concerning the dispute that
2    forms the basis of the current lawsuit?
3         MR. O'REAR:  Let me object to the
4    form of that.  I will say this, that there are
5    no litigation fees included in the claim.  I
6    think your question is ambiguous.
7         Q.   (BY MR. LEMBKE:)  Mr. McCollum,
8    you are aware that a dispute exists between the
9    parties over whether it would have been lawful
10   for the closing to occur on November 30th,
11   2018, correct?
12        A.   Yes.
13        Q.   Are any of the charges in Exhibit
14   146 for which Nuclear Development is seeking
15   TVA to pay as damages related to advice given
16   concerning that dispute?
17        A.   It's my understanding that all of
18   the charges from Hand Arendall for which we are
19   seeking to include in damages are not related
20   to the litigation over the sale, the closing
21   contract.
22        Q.   What about pre-litigation advice
23   concerning the dispute that culminated in

Page 118

1    litigation?
2         A.   No.  The -- you will recall that
3    our knowledge of the assertion that there was a
4    legal matter -- a legal issue with closing only
5    came to our attention a day or so before the
6    closing date, so there is not any legal advice
7    or opinions or anything, you know, concerning
8    that assertion.
9         Q.   So your testimony under oath today
10   is that Nuclear Development had no knowledge at
11   all of any potential issue concerning the
12   legality with closing until a day or two before
13   the scheduled closing?
14        MR. O'REAR:  Objection.  That is
15   outside the scope of this deposition.
16        MR. LEMBKE:  I am following up on
17   the statement that he made.
18        MR. O'REAR:  I know.  But he is
19   not being tendered on behalf of Nuclear
20   Development with respect to that question.
21        Q.   (BY MR. LEMBKE:)  All right.  You
22   may answer the question.
23        MR. O'REAR:  Same objection.

Page 119

1         A.   (No response.)
2         Q.   Do you need me to repeat the
3    question, Mr. McCollum?
4         MR. O'REAR:  I think he was trying
5    to answer your question, Matt, about the timing
6    of the charges and the nature of the charges.
7         MR. LEMBKE:  I am following up on
8    his answer.
9         MR. O'REAR:  I understand what you
10   are doing.  He is not tendered as a witness on
11   behalf of Nuclear Development for that
12   question.  It is outside the scope of the
13   deposition.  Your question -- your questions
14   are related to -- or should be related to the
15   extent and nature of the damages.
16        Q.   (BY MR. LEMBKE:)  Do you need me
17   to repeat the question, Mr. McCollum?
18        A.   No.
19        Q.   All right.  Well, what's the
20   answer to my question?
21        A.   So the answer is that I don't know
22   and can't testify to exactly when the first
23   communication occurred to make someone

Page 120

1    associated with Nuclear Development aware of a
2    TVA hypothetical legal issue.  But I do know
3    that we don't -- we are not asking for damages
4    related to any legal opinions that we got
5    associated with that assertion or this
6    litigation.
7         Q.   All right.  The next vendor on the
8    list is the Hughes Socol law firm.  Let me
9    direct your attention to Exhibit 147.
10        (Exhibit Number 147 was referred
11        to in this deposition.)
12        A.   Yes.
13        Q.   And 147 are the payment records
14   and invoices pertaining to the charges of
15   Hughes Socol that Nuclear Development is
16   seeking as damages in this lawsuit, correct?
17        A.   Correct.
18        Q.   What -- what are the nature of the
19   services provided by Hughes Socol for which
20   Nuclear Development is seeking TVA to pay as
21   damages?
22        A.   Hughes Socol personnel provide the
23   bulk of the legal advice that we get on just

Page 121

1    about everything we do with the project.  So
2    they were involved intimately in the TVA sale,
3    the contract, the licensing, license transfer
4    issues, the financial and potential tax issues
5    associated with the project, DOE loan
6    application, submittal information.  So it's --
7    they are the primary source of legal advice for
8    every aspect of the project.
9         Q.   And are there services included on
10   all of those topics in the amounts for which
11   Nuclear Development is seeking reimbursement?
12        A.   Yes.
13        Q.   All right.  And as with previous
14   statements, the description of services detail
15   has been redacted, correct?
16        A.   Correct.
17        Q.   And you have not looked at the
18   unredacted invoices, correct?
19        A.   I have not personally reviewed the
20   unredacted invoices, that's correct.
21        Q.   How do you know, then, what the
22   subject of the services is if you have not
23   reviewed the unredacted invoices?

Page 122

1         A.   From discussions with Gloria
2    Thurman.
3         Q.   What is the first date of a time
4    charge for which Nuclear Development is seeking
5    reimbursement for services provided by the
6    Hughes Socol firm?
7         A.   If I'm reading this correctly, it
8    looks like October 1st of 2016.
9         Q.   Am I correct that much of the time
10   for which Hughes Socol has charged in Exhibit
11   147 for which Nuclear Development is asking TVA
12   to pay damages pertains to the work done on
13   resuming construction of the Bellefonte plant?
14        MR. O'REAR:  You were breaking up
15   on me, I am not sure I got the complete
16   question.
17        MR. LEMBKE:  Okay.
18        Q.   (BY MR. LEMBKE:)  Am I correct
19   looking -- again, referring to Exhibit 147, am
20   I correct, Mr. McCollum, that a substantial --
21   a number of the charges relate to services
22   undertaken in connection with Nuclear
23   Development's plans to resume construction on

Page 123

1    the nuclear plant at Bellefonte?
2         A.   Well, broadly speaking, that's
3    correct, because in order to resume
4    construction we have to pursue the transfer of
5    the construction permits, we have to pursue
6    other work with NRC and other regulatory
7    agencies, we have to secure financing and get
8    that in place.  So all of those things are in
9    support of resuming construction, completing
10   the plant, so I would say yes to your question.
11        Q.   And are also charges in Exhibit
12   147 that pertain to Nuclear Development's
13   efforts to find customers to purchase the
14   power --
15        A.   That's correct.
16        Q.   -- from Bellefonte?
17        A.   That is correct.
18        Q.   Okay.  And you can't break down by
19   category how much of the services pertain to
20   any particular topic, can you?
21        A.   I think it would be virtually
22   impossible to do that, for one reason a lot of
23   this work overlaps.  So as I mentioned before,

Page 124

1    in pursuit of the DOE loan application, we had
2    to -- the DOE staff requested that we do a --
3    have a power supply study performed, and we had
4    that performed by ICF.  And then the same power
5    supply study that was done for the DOE loan
6    application was also used in a bunch of
7    discussions with stakeholders to who we were
8    wanting to sell power.  And so Hughes Socol
9    provided support in all of those areas.  So
10   there is in many cases overlap across those
11   categories.
12        Q.   Mr. McCollum, do you know if there
13   is any time included in any of the invoices of
14   Exhibit 147 pertaining to the litigation
15   between TVA and Nuclear Development?
16        A.   It's my understanding that we are
17   not requesting damages for any Hughes Socol
18   expenses related to this litigation.
19        Q.   What is the basis of that
20   understanding?
21        A.   Discussions with Gloria Thurman.
22        Q.   All right.  The next vendor on the
23   list is ICF Consulting.  And let me direct your

Page 125

1  attention to Exhibit 148.
2       (Exhibit Number 148 was referred
3    to in this deposition.)
4       Q.   Am I correct that this is a
5  compilation of invoices and payment records
6  pertaining to ICF's work for which Nuclear
7  Development is asking TVA to pay in damages?
8       A.   Yes.
9       Q.   What did ICF Consulting do for
10  Nuclear Development?
11       A.   As I mentioned, they performed the
12  power supply study that was required for our
13  DOE loan application.  They also did several
14  studies -- smaller studies regarding the
15  transmission of power from Bellefonte to
16  potential customers.
17       Q.   Do you know that -- if the work
18  for which they invoiced TVA in Exhibit 148
19  began before the Purchase and Sale Agreement
20  was signed on November 14th, 2016?
21       A.   Did you say invoiced TVA?
22       Q.   Excuse me, I meant to say invoiced
23  Nuclear Development.  Do you want me to repeat

Page 126

1  the question?
2       A.   Yes, I think that would be
3  helpful.
4       Q.   All right.  Do you know if any of
5  the charges for the services provided by ICF to
6  Nuclear Development contained in Exhibit 148
7  were incurred prior to the time that the
8  Purchase and Sale Agreement between TVA and
9  Nuclear Development was signed on November
10  14th, 2016?
11       A.   Okay.  Just a second.  (Reviewing
12  document.)  I don't believe so.
13       Q.   What is the basis for your saying
14  that?
15       A.   The review of my records and
16  discussions with Gloria Thurman.
17       Q.   What did Ms. Thurman have to say
18  about that?
19       A.   I believe that she had reviewed --
20  she had reviewed these and the support that
21  they were providing began at the time of the
22  sales agreement.
23       Q.   And what in your records provides

Page 127

1  the basis for the statement you just made?
2       A.   Just communications with ICF about
3  a number of the tasks that we had them working
4  on.
5       Q.   All right.  Let me get you to turn
6  to page 6031 in Exhibit 148.
7       A.   Okay.
8       Q.   Do you see a reference to task
9  one, two, and four?
10       A.   Yes.
11       Q.   What is task one, two, and four?
12       A.   So this was the portions of the
13  power study that I referred to before.  Base
14  case assumptions is them developing and being
15  able to provide support for a set of
16  assumptions for market price study, doing the
17  forward price projections and developing a
18  report that would show the projections of
19  future power prices and revenue that might be
20  available from sale of power in future time
21  frames.
22       Q.   And it says just below task one,
23  two, and four, Nuclear DEV colon Due DIL

Page 128

1  Support, which I assume means due diligence
2  support?
3       A.   Yes.
4       Q.   What is due diligence support?
5       A.   I believe that refers to the due
6  diligence that the Department of Energy staff
7  has to perform in support of reviewing our loan
8  application.  And part of that includes getting
9  an independent engineer's report, getting a
10  credit rating, getting a power supply study
11  done, those sorts of things.
12       Q.   All right.  Now let me direct your
13  attention to page 6033.  And here there is an
14  entry below due diligence support that simply
15  says phase one.  Do you know what that means?
16       A.   Excuse me just one second.  I
17  don't know specifically.  I think that it
18  refers to supporting us in the first phase of
19  DOE's review of our loan application, but I'm
20  not a hundred percent certain.
21       Q.   And do you know how the amounts
22  were arrived at charged for the due diligence
23  support?

Page 129

1    A.   Yeah, when you request a task such
2  as developing this power supply study, ICF will
3  scope out the task and what they think it's
4  going to take and then they provide a price
5  quote.  And they will then bill amounts in
6  support of that task up to the quote for the
7  task.  So if they tell you -- if they tell you
8  they can do a particular market review, for
9  example, for X number of dollars, they will
10  invoice charges up to the amount that they
11  quoted for the task.
12    Q.   Do you know if the charges ICF
13  invoiced to Nuclear Development are reasonable
14  and customary for that kind of work in the
15  industry?
16    A.   Not these charges specifically.  I
17  know that -- I know that ICF's overall cost for
18  this sort of consulting work in the industry
19  are comparable to other large consulting firms.
20    Q.   All right.  Let me direct your
21  attention to page 6035 in Exhibit 148.  And
22  there is another line added on this invoice
23  below phase one PPA and LCOE.  What does that

Page 130

1  mean?
2    A.   PPA stands for power purchase
3  agreement, so that was work they were doing in
4  support of our pursuit of customers to buy
5  power from Bellefonte.  LCOE is levelized cost
6  of energy, and so they did some work for us
7  projecting the future levelized cost of energy
8  from various competitive power sources for
9  Bellefonte so that we would understand where
10  Bellefonte's power costs -- production costs
11  would stack up against other market sources for
12  electricity.
13    Q.   All right.  Now let me direct your
14  attention to page 6040 in that same exhibit.
15  And over on the left margin it says FLH colon
16  Memphis Light, Gas -- and I believe that is an
17  abbreviation for water --
18    A.   Yes.
19    Q.   What work does that involve?
20    A.   Well, as we saw on the flight
21  records, ICF personnel accompanied us to
22  several meetings with stakeholders in Memphis,
23  the mayor, people on his staff, city council --

Page 131

1  city council members and a group that the mayor
2  formed that is called Power Supply Advisory
3  Team, and so they helped us develop information
4  and make presentations to various stakeholders
5  in Memphis in pursuit of the sale of power to
6  Memphis.
7    Q.   And what did they do, I mean, for
8  two hundred and sixty-two thousand dollars on
9  that?
10    A.   Well, they developed -- they
11  revised some previous studies that they had
12  performed to incorporate slightly different
13  assumptions that were suggested by people that
14  we met with in Memphis.  They then took that
15  information and created fairly large documents
16  or presentations that we could share with
17  people in Memphis and then personally came and
18  participated in some of the meetings.
19    Q.   Now let me direct your attention
20  to page 6045.  This is an invoice from February
21  of 2019, do you see that?
22    A.   Yes.
23    Q.   So this is after the lawsuit has

Page 132

1  started, correct?
2    A.   Yes.
3    Q.   And this says, Analysis on
4  alternative markets for Bellefonte power
5  including PJM, Southern and MISO north.  What
6  does that mean?
7    A.   So that was an analysis they
8  performed to look at the potential to sell
9  Bellefonte power into -- into PJM which would
10  be up diagonally across Tennessee into Virginia
11  to reach PJM territory.  Potential for selling
12  into MISO north which is the section of the
13  Midcontinent Independent System Operator
14  territory that is north of the
15  Arkansas/Missouri border and then Southern
16  being able to sell power down through -- wheel
17  the power through the Southern system either to
18  the customers within the Southern footprint,
19  Southern Company footprint or potentially to
20  Florida.
21    Q.   All right.  The next entity on the
22  list is Ickes & Enright Group.
23    A.   Yes.

Page 133

1      Q.   For a total of two hundred
2  seventy-three thousand nine hundred
3  seventy-three dollars and fifty-five cents.
4  Let me direct your attention to Exhibit 149.
5          (Exhibit Number 149 was referred
6          to in this deposition.)
7      A.   Yes.
8      Q.   Am I right these are a compilation
9  of payment records and invoices for Ickes &
10  Enright Group for which Nuclear Development is
11  seeking damages from TVA?
12     A.   Yes.
13     Q.   And what is the Ickes & Enright
14  Group?
15     A.   They are basically a lobbying firm
16  in D.C.
17     Q.   All right.  And what were they
18  retained to do for Nuclear Development?
19     A.   To lobby on our behalf for
20  continuance of the tax credit program,
21  production tax credits for advanced nuclear
22  facilities program.
23     Q.   And were they lobbying members of

Page 134

1  Congress and their staffs?
2      A.   Yes.  As I mentioned before, the
3  program for loan guarantees and the program for
4  awarding production tax credits, those -- the
5  funding for those programs comes up for
6  scrutiny every budget cycle.  And so I wanted
7  to be sure that those programs were continued.
8      Q.   Looking at page 6047 of Exhibit
9  149, this indicates that Nuclear Development is
10  seeking damages from TVA for services performed
11  prior to the date the Purchase and Sale
12  Agreement was executed, correct?
13          MR. O'REAR:  Object to the form.
14  Mischaracterization of the invoice.
15     Q.   (BY MR. LEMBKE:)  All right.  Let
16  me just ask this:  Is Nuclear Development
17  seeking damages from TVA for services performed
18  by the Ickes & Enright Group prior to November
19  14th, 2016?
20     A.   I don't think so, but I can't tell
21  that from this invoice.
22     Q.   Well, why do you say you don't
23  think so?

Page 135

1      A.   Well, because I know it was our
2  intent not to ask for damages --
3      Q.   Well --
4      A.   -- currently.
5      Q.   If you look at paragraph (sic)
6  6047, it is a contract dated October 15th,
7  2016, with the Ickes & Enright Group, correct?
8      A.   Correct.
9      Q.   And that was prior to the date the
10  PSA was executed, correct?
11     A.   Yes, but I can't tell from the
12  invoice when they actually did the work.
13     Q.   Well, do you have any reason to
14  believe that they did not start their work
15  until after the PSA was executed?
16     A.   Yeah, I just can't tell one way or
17  the other from this invoice.
18     Q.   Well, I am not really limiting it
19  to the invoice.  Do you know one way or the
20  other whether Nuclear Development is seeking
21  damages for services provided by -- for
22  services performed prior to the date the PSA
23  was executed?

Page 136

1      A.   I don't.
2      Q.   Why did they stop working for ND?
3      A.   Well, there reached -- there
4  reached a point in time where we decided that
5  we wanted to cut back on the number of these
6  kinds of services that we were getting.  And so
7  we concentrated on just a couple of firms to
8  help us with this type of work, one of them
9  being Bud Cramer's firm that we talked about
10  already.  So we used them for a period of time
11  and decided that we weren't going to continue.
12     Q.   They are more a
13  democratic-oriented lobbying firm, correct?
14     A.   That's what I have been told.
15     Q.   The next vendor is McCollum
16  Holdings, LLC, correct?
17     A.   Yes.
18     Q.   And that is your company, correct?
19     A.   It is.
20     Q.   And Exhibit 150 is a compilation
21  of the invoices and payment records that your
22  company has sent to Nuclear Development for
23  which Nuclear Development is seeking TVA to pay

Page 137

1  damages, correct?
2      A.   Correct.
3          (Exhibit Number 150 was referred
4          to in this deposition.)
5      Q.   And does this represent the full
6  amount you were paid by Nuclear Development for
7  the time period covered by these invoices?
8      A.   For the time period covered by
9  these invoices, yes.
10     Q.   Okay.  And when did you become
11 CEO?
12     A.   I would have to go back and check
13 the date.  I think we covered that in my
14 previous deposition.  I don't recall the exact
15 date right now.
16     Q.   And Nuclear Development is asking
17 for the payments made to you -- let me start
18 over.
19         Nuclear Development is seeking in
20 damages amounts paid to you for services
21 rendered after the closing did not occur on
22 November 30th, 2018, correct?
23     A.   That's correct.

Page 138

1      Q.   And were you involved at all in
2  reviewing the lawsuit that was filed in this
3  case prior to it being filed?
4      A.   Not prior to it being filed.
5      Q.   All right.  Did you review it
6  after it was filed?
7      A.   Yes, I read documents pertaining
8  to the lawsuit after they were filed.
9      Q.   All right.  And is your time for
10 doing that included in Exhibit 150?
11     A.   No.
12     Q.   Nothing related to the litigation
13 is included in Exhibit 150, is that right?
14     A.   That's correct.
15     Q.   All right.  Have you billed for
16 your time you spent in connection with the
17 litigation separately?
18     A.   No.
19     Q.   You are saying from the time the
20 lawsuit was filed in late November of 2018
21 through May of 2019, you did not charge one
22 minute of time for anything relating to the
23 litigation?

Page 139

1      A.   So, yeah, the term related to the
2  litigation, so the hours -- the hours that I
3  spent preparing for and giving depositions are
4  included in my invoices.
5      Q.   Well, I guess let me ask between
6  late November of 2018 and the end of May of
7  2019, were you involved in meetings pertaining
8  to the litigation?
9      A.   Other than preparing for and
10 giving depositions and conversations with
11 lawyers about scheduling depositions, that sort
12 of thing, no.
13     Q.   Okay.  So am I understanding you
14 to say that prior to getting ready for your
15 deposition both substantively and logistically,
16 you had no involvement with the litigation?
17     A.   That's right.
18     Q.   Okay.  Now, in looking through the
19 detailed invoices which begin at page 6557
20 through -- in Exhibit 150 --
21     A.   Yes.
22     Q.   -- I think it would be fair to say
23 that the description contained under the column

Page 140

1  Item is rather limited.  Would you agree with
2  that?
3      A.   Yes, I don't provide detailed
4  descriptions.
5      Q.   It appears as though most of your
6  entries are either for meetings, research on
7  Bellefonte project, or report writing
8  Bellefonte, is that a fair characterization?
9      A.   Yes.  I have about four or five
10 categories that I bill under, and those are far
11 and away the three most common.
12     Q.   And you certainly -- your time as
13 shown in Exhibit 150 included work to find
14 customers for power that might be generated by
15 Nuclear Development Bellefonte, correct?
16     A.   Correct.
17     Q.   And it would include your work in
18 helping prepare the application for transfer of
19 the construction permits, correct?
20     A.   Correct.
21     Q.   And it would include your work in
22 locating the various vendors that would be
23 involved in preparing for and resuming

1  construction of the Bellefonte plant, correct?
2      A.   Correct.
3      Q.   And it would include time spent
4  with regard to the DOE loan application,
5  correct?
6      A.   Correct.
7      Q.   Did you have an understanding with
8  Nuclear Development that you would only bill in
9  whole-hour increments?
10     A.   No.
11     Q.   That's just how you do it?
12     A.   Yeah, if I spend -- if I spend
13  three and a half hours researching information
14  on -- to validate our assumptions on future
15  power prices, for example, I'll typically bill
16  three hours.  So I don't try to break it down
17  to every fifteen minute increment.
18     Q.   Okay.  The next entry is for
19  Midcontinent Independent System Operator, Inc.
20  known as MISO, correct?
21     A.   Correct.
22         (Exhibit Number 151 was referred
23         to in this deposition.)

1      Q.   And if you look at Exhibit 151,
2  this is the payment records for two payments
3  and the invoice for one of those payments,
4  correct?
5      A.   Yes.
6      Q.   And why did Nuclear Development
7  join MISO?
8      A.   So TVA's stated position is that
9  it will not wheel power through its
10  transmission system if the delivery point is
11  within their TVA service territory.  So to get
12  from Bellefonte -- the Bellefonte location to
13  Memphis, you would have to go through the
14  south -- wheel through the Southern Company
15  system and then up through MISO.  And so to do
16  that, you need to be a generating member of
17  MISO.  So Nuclear Development joined MISO as a
18  generating member.
19     Q.   Why did Nuclear Development feel
20  the need to do that when they were years away
21  from generating?
22     A.   Because becoming a member you get
23  a seat at the table when MISO looks at

1  potential transmission options and delivery
2  options for Memphis as a customer.
3      Q.   All right.  The next entry is for
4  Moody's which we have already talked about a
5  little.  Let me direct you to Exhibit 152.
6         (Exhibit Number 152 was referred
7         to in this deposition.)
8      Q.   And am I correct that this is the
9  payment record and invoice for the amount that
10  Moody's charged for its credit rating?
11     A.   Yes, that's correct.
12     Q.   And I can't remember if I asked
13  this earlier, but do you know if a hundred and
14  ninety-five thousand dollars is a reasonable
15  and customary charge in the industry for the
16  work that Moody's Investor Service did for
17  Nuclear Development on this project?
18     A.   I don't.  But there are very
19  limited options for where you can go to get a
20  credit rating from a recognized authority.  So
21  it's -- there is not a lot of competition.
22     Q.   All right.  The next vendor on the
23  list is Morgan Lewis.

1      A.   Yes.
2         (Exhibit Number 153 was referred
3         to in this deposition.)
4      Q.   Turn your attention to Exhibit
5  153.  Am I correct that that is the compilation
6  of payment records and invoices for the work
7  done by Morgan Lewis for which Nuclear
8  Development is asking TVA to pay damages?
9      A.   Yes.
10     Q.   And what role did Morgan Lewis
11  play?
12     A.   They are -- they are our attorney.
13  The portion of Morgan Lewis that we are engaged
14  with specializes in nuclear licensing matters
15  for the NRC and ACRS, and so they have provided
16  us legal advice related to -- most of the work
17  is directly related to the transfer application
18  for transferring construction permits and our
19  other NRC interface.  But then collaterally
20  they get involved with supporting -- providing
21  some information for the DOE application
22  because DOE asks questions about what is it
23  going to take for you to do X, Y, or Z with

Page 145

1    NRC, and so we have gotten legal opinions from
2    Morgan Lewis on some of those topics.
3        Q.   You said the ACRS.  What is ACRS?
4        A.   The ACRS is the Advisory Committee
5    for Reactor Safety.  And so in the licensing
6    process, when you apply for an operating level
7    construction permit or an operating license,
8    there is a step in the process where after the
9    technical review by the NRC staff, the
10   application would go to the ACRS for review and
11   approval prior to approval by the Nuclear
12   Regulatory Commission.  So they are an
13   independent group that reviews significant
14   licensing actions.
15       Q.   Now, as with other law firm
16   invoices we have looked at, this has the
17   description of services provided redacted.
18   Have you reviewed the unredacted version of
19   these invoices?
20       A.   I have not.
21       Q.   And you are aware that much of the
22   work done by Morgan Lewis involved meeting with
23   non-Nuclear Development personnel, correct?

Page 146

1        A.   Yes.
2        Q.   All right.  And then if you look
3    at page 6773 of Exhibit 153, this indicates
4    that Nuclear Development is seeking damages
5    from TVA for services rendered by Morgan Lewis
6    after the closing did not occur on November
7    30th, 2018, correct?
8        A.   That's correct.
9        Q.   The next vendor is MPR Associates.
10   Before we go on to that, why don't we take a
11   five-minute break?
12       MR. O'REAR:  Okay.
13       THE COURT REPORTER:  Off the
14   record at 2:19.
15       (Whereupon, a break was had from
16   2:19 p.m. until 2:26 p.m.)
17       THE COURT REPORTER:  We are back
18   on the record at 2:26.
19       Q.   (BY MR. LEMBKE:)  Mr. McCollum,
20   the next vendor on the list, as I said before
21   our break, is MPR Associates.  And I want to
22   direct your attention to Exhibit 154 which is
23   the declaration of Robert N. Coward that's been

Page 147

1    submitted in connection with this case.  Have
2    you reviewed this prior to today?
3        A.   I have not.
4        (Exhibit Number 154 was referred
5    to in this deposition.)
6        Q.   Well, let me direct your attention
7    to paragraph four and have you review it, MPR's
8    statement of the services it provided to
9    Nuclear Development.
10       A.   (Reviewing document.)  Okay.
11       Q.   All right.  And Mr. Coward says
12   MPR prepared an independent engineer report for
13   use in connection with the United States
14   Department of Energy Loan Guarantee Program.
15   Do you believe that is an accurate statement?
16       A.   It is.
17       Q.   He says that MPR prepared
18   preliminary project plans for executing the
19   project to complete construction of the
20   Bellefonte Nuclear Plant.  Is that accurate?
21       A.   Yes.
22       Q.   He says MPR prepared supplemental
23   materials to support Nuclear Development's

Page 148

1    engagement with the Department of Energy and
2    the Nuclear Regulatory Commission.  Is that
3    accurate?
4        A.   That's true.
5        Q.   He says that MPR prepared plans
6    for the Nuclear Development Owner's
7    Organization during construction and operation
8    of Bellefonte.  Is that accurate?
9        A.   Yes.
10       Q.   And he says that MPR prepared an
11   economic benefits paper assessing the benefits
12   to the Alabama local community from completing
13   the Bellefonte Nuclear Plant.  Is that
14   accurate?
15       A.   Yes.
16       Q.   All right.  Is there anything else
17   that MPR did for Nuclear Development that is
18   not listed in paragraph four of Mr. Coward's
19   declaration?
20       A.   Not that I am aware of.
21       Q.   All right.  Now, for those
22   services, MPR charged a little over two hundred
23   eighty-seven thousand -- almost two hundred

Page 149

1    eighty-eight thousand dollars.  Is it your
2    understanding that those are reasonable and
3    customary charges for the work that MPR
4    performed in this matter?
5        A.   They are for the -- for the level
6    of capability and expertise that MPR provides.
7        Q.   And have you had prior experience
8    with MPR before Nuclear Development?
9        A.   Yes.
10       Q.   Let me direct your attention to
11   Exhibit 155.
12           (Exhibit Number 155 was referred
13           to in this deposition.)
14       Q.   This is a compilation of the
15   invoices and payment records pertaining to the
16   amounts charged by MPR for which Nuclear
17   Development is asking TVA to pay damages,
18   correct?
19       A.   Yes.
20       Q.   And if we look at page 6161, this
21   is an invoice pertaining to the Bellefonte
22   independent engineer report, do you see that?
23       A.   I do.

Page 150

1        Q.   And the contract maximum for that
2    was two hundred fifteen thousand dollars,
3    correct?
4        A.   Correct.
5        Q.   And did -- how was that amount
6    negotiated?
7        A.   Basically it was a discussion with
8    MPR.  They -- we were referred to MPR as one of
9    the few firms that had extensive experience in
10   preparing these types of independent engineer
11   reports for the Department of Energy -- for
12   Department of Energy applications.  And so we
13   had discussions with them.  They understood the
14   scope and form of the report that the DOE staff
15   was expecting.  So -- and then we discussed the
16   availability of the information on Bellefonte,
17   how that could be provided, and arrived at a
18   contract figure.
19       Q.   And then if you look at 6164,
20   looks like that amount was ultimately increased
21   to two hundred nineteen thousand nine hundred
22   eighty-three dollars for the independent
23   engineer report, correct?

Page 151

1        A.   Yes.
2        Q.   And then if you look at the next
3    page, 6166, in Exhibit 155, the contract charge
4    for the economic benefit analysis was
5    twenty-five thousand dollars, right?
6        A.   Yes.
7        Q.   And were you involved in
8    negotiating that amount with MPR?
9        A.   Not directly.
10       Q.   Who did it?
11       A.   One second.  Sorry.  Frank Haney
12   had discussions with them about that particular
13   contract, and they arrived at the twenty-five
14   thousand dollar figure to do that scope of
15   work.
16       Q.   I could not hear, which Haney did
17   you say had that conversation?
18       A.   Frank.
19       Q.   Frank, okay.  And do you know if
20   twenty-five thousand dollars is a reasonable
21   and customary charge in the industry for an
22   economic benefit analysis of that type?
23       A.   Yes, based on my experience with

Page 152

1    having similar studies done in other places,
2    that seems like a reasonable figure.
3        Q.   All right.  If you look at page
4    6168 in the same exhibit, the next project is
5    Bellefonte restart planning with a contract
6    maximum of fifteen thousand five hundred
7    seventy dollars fifteen cents.  Do you see
8    that?
9        A.   Yes.
10       Q.   What did that restart planning
11   involve?
12       A.   We -- we got a request from --
13   well, we got a number of requests from the
14   Department of Energy staff for additional
15   pieces of information.  One of those was to put
16   together a better representation of what the
17   organization and schedule would look like for
18   beginning the completion of the plant through
19   start-up.  And so MPR helped us put a portion
20   of that together.
21       Q.   All right.  And if you look at
22   6182 in the same exhibit, it looks like that
23   contract maximum ultimately rose to forty-two

Page 153

1    thousand eight hundred three dollars and
2    sixteen cents, right?
3        A.   Yes.
4        Q.   Was that done on an hourly rate
5    basis?
6        A.   It was a combination.  We
7    continued to get additional feedback and
8    questions from DOE staff.  So it -- you know,
9    we started out with a scope and then they had
10   to add more work and more detail, do some work
11   on the graphical representation of some of the
12   information.  And so when they gave us the
13   amounts for the contract price increases, I
14   think some of that was just based off of how
15   much time and material it was going to cost
16   them to do the additional work.
17       Q.   All right.  The next vendor is
18   Thomas Myers.  Who is Thomas Myers?
19       A.   He is a retired engineer with --
20   who has a lot of experience with Bellefonte and
21   with cost -- project cost and schedule
22   management.
23       Q.   And where did he retire from?

Page 154

1        A.   Well, he has worked several
2    places, but TVA most notably.
3        Q.   Did he work at Bellefonte?
4        A.   It is my understanding that he
5    worked on the Bellefonte project at one time.
6        Q.   And do you know how long ago he
7    retired?
8        A.   I don't know.
9             (Exhibit Number 156 was referred
10            to in this deposition.)
11       Q.   Okay.  And am I correct that
12   Exhibit 156 reflects the invoices and payment
13   records for the amounts charged by Mr. Myers
14   for which Nuclear Development wants TVA to pay
15   damages?
16       A.   Yes.
17       Q.   And so I'm not sure I am entirely
18   clear.  What engineering business was he
19   providing or what was he supporting with those
20   services?
21       A.   Yeah, his expertise is in project
22   costing and cost and scheduling.  So he was
23   providing support in running numbers and

Page 155

1    reviewing estimates for completion of the
2    project and reviewing information, bids
3    submitted by other firms for work that they
4    might do in support of the Bellefonte
5    completion.
6        Q.   All right.  The next invoice is
7    from Navton Consulting Services, LLC.  Let me
8    direct you to paragraph (sic) 157.
9             (Exhibit Number 157 was referred
10            to in this deposition.)
11       Q.   This is an invoice, a payment
12   record, correct?
13       A.   Yes.
14       Q.   And what did Navton Consulting
15   Services do for Nuclear Development?
16       A.   So they -- they prepared an
17   engineer's report.  When we began the process
18   of applying for the Department of Energy
19   loan -- loan guarantee, we had Navton, which is
20   a small company composed mostly of people who
21   were involved in engineering at Bellefonte at
22   TVA and have since retired, we had them prepare
23   a short engineer's report reviewing the status

Page 156

1    of the project.  And since Bellefonte is unique
2    in terms of the kinds of projects that DOE was
3    doing, we had them highlight for the DOE staff
4    the status of the plant, the amount of physical
5    completion there, the status of the systems,
6    work that had been done to review the systems
7    for readiness, for completion and that sort of
8    thing, and submitted that report as part of our
9    initial package of information to the DOE in
10   support of our loan application.
11            MR. LEMBKE:  Let's go off the
12   record for just a second.
13            (Off-the-record discussion.)
14            MR. LEMBKE:  Let's go back on the
15   record.
16       Q.   (BY MR. LEMBKE:)  Mr. McCollum,
17   looking at Exhibit 157, it indicates the
18   invoice period is October 29th to November
19   30th, 2016.  Do you know if Navton began work
20   before the Purchase and Sale Agreement between
21   Nuclear Development and TVA was executed?
22       A.   Yes, they did.
23       Q.   They did.  And so Nuclear

Page 157

1    Development is seeking damages from TVA for
2    services rendered before the contract was
3    executed, right?
4        A.  Yes.
5            MR. O'REAR:  Well, they are on the
6    list.  As Mr. McCollum said, there was no
7    intent to do that.  The date of the invoice is
8    December 13th that we received from Ms.
9    Thurman.  So if those were the dates of service
10   then -- and if they preceded November 14, 2016,
11   we will not claim that amount.
12       Q.  (BY MR. LEMBKE:)  Do you know, Mr.
13   McCollum, how much of the five thousand five
14   hundred twelve dollars and fifty cents was
15   incurred prior to the contract execution date
16   between TVA and Nuclear Development?
17       A.  I do not.
18           MR. LEMBKE:  Let's go off the
19   record again.
20           (Off-the-record discussion.)
21           MR. LEMBKE:  Let's go back on the
22   record.
23       Q.  (BY MR. LEMBKE:)  The next vendor

Page 158

1    on Exhibit 120 is Norton Rose Fulbright.  Mr.
2    McCollum, what did Norton Rose Fulbright do for
3    Nuclear Development?
4        A.  They are a law firm that provided
5    advice for us on -- primarily related to
6    pursuing the DOE loan application.  So -- so
7    like the people we are engaged with at Morgan
8    Lewis, their expertise is specifically in
9    dealing with matters before the Nuclear
10   Regulatory Commission or matters involving
11   commercial nuclear power plants.  And these
12   folks are -- we engaged for their expertise on
13   the Department of Energy loan application
14   process and how to -- it is a Byzantine
15   process, so you need help to be able to
16   navigate the steps in the process and
17   understand what the requirements are and how
18   you are supposed to comply with those
19   requirements in your application.
20       Q.  All right.  Let me direct your
21   attention to Exhibit 158.  Am I correct that
22   this is a compilation of records and invoices
23   for charges by Norton Rose Fulbright for which

Page 159

1    Nuclear Development is asking TVA to pay
2    damages?
3        A.  Yes.
4            (Exhibit Number 158 was referred
5            to in this deposition.)
6        Q.  Am I correct that other lawyer
7    invoices we looked at today -- and this has a
8    number of pages that -- where the narrative
9    description of the services rendered have been
10   redacted?
11       A.  That's correct.
12       Q.  And you have not reviewed an
13   unredacted copy of this bill?
14       A.  That's correct.
15       Q.  All right.  RepEquity, what is
16   RepEquity?
17       A.  So they -- they are a media
18   relations firm that we engaged to help us with
19   some work associated with pursuing the sale of
20   Bellefonte power.
21       Q.  All right.  And there is reference
22   to the ORM -- well, first, let me direct you to
23   Exhibit 159.

Page 160

1            (Exhibit Number 159 was referred
2            to in this deposition.)
3        Q.  Am I correct that this is a copy
4    of the invoice and payment records of the
5    amounts charged by RepEquity for which Nuclear
6    Development has asked TVA to pay damages?
7        A.  Yes.
8        Q.  And the -- on page 6216 of Exhibit
9    159, there is a reference to an ORM retainer,
10   do you see that?
11       A.  Yes.
12       Q.  What is an ORM retainer?
13       A.  I do not recall.  This has been a
14   while back.  I do not recall what ORM stands
15   for, I'm sorry.
16       Q.  All right.  The next vendor on the
17   list is Rock Creek Advisors?
18       A.  Yes.
19       Q.  And if you look at Exhibit 160,
20   that is a declaration given by Mr. William
21   Gaynor of Rock Creek Advisors in connection
22   with this litigation.  Have you seen this
23   declaration before?

Page 161

1          (Exhibit Number 160 was referred
2          to in this deposition.)
3      A.   I have not.
4      Q.   Let me direct your attention to
5  paragraph five and give you a moment to review
6  it. Mr. Gaynor describes what Rock Creek
7  Advisors provided for Nuclear Development.
8      A.   (Reviewing document.)  Okay.
9      Q.   All right.  In paragraph five, Mr.
10 Gaynor says strategic outreach.  Did Rock Creek
11 Advisors assist Nuclear Development with
12 strategic outreach?
13     A.   Yes.
14     Q.   What does that mean?
15     A.   That normally translates into
16 contacting and meeting with people who are in
17 either elected positions or appointed positions
18 in agencies that can help you with, in this
19 case, the DOE loan application.
20     Q.   And was the work that Rock Creek
21 Advisors -- the work it did for Nuclear
22 Development directed to the DOE loan
23 application?

Page 162

1      A.   Yes.
2      Q.   Do you recall them providing any
3  advice or services in connection with any other
4  matter for Nuclear Development, other than the
5  DOE loan application?
6      A.   Yeah, so there was some incidental
7  work that was done providing advice related to
8  the federal incentive programs and some advice
9  regarding the interface between the federal
10 officials and some of the state issues such as
11 the issues that were going on in South Carolina
12 related to the mixed oxide fuel project and
13 funding for that project, which was a potential
14 fuel source for Bellefonte.  So incidentally
15 there were some other issues that Mr. Gaynor
16 provided some input and advice on.  But the
17 overwhelming amount of his time was spent in
18 support of the DOE loan application.
19     Q.   All right.  Let me direct your
20 attention to para -- or Exhibit 161.
21          (Exhibit Number 161 was referred
22          to in this deposition.)
23     Q.   Which is -- am I correct that this

Page 163

1  is a compilation of the records and invoices
2  from Rock Creek Advisors for which Nuclear
3  Development is asking TVA to pay damages?
4      A.   Yes.
5      Q.   How did the amount of thirty
6  thousand dollars for a monthly retainer provide
7  that?
8      A.   Well, like most of these
9  lobbyists, they want to do a retainer type of
10 arrangement as opposed to having to bill hours.
11 And so there was discussion between Mr. Gaynor
12 and the Haneys and they agreed on a thirty
13 thousand dollar retainer fee.
14     Q.   And why were these not billed in
15 consecutive months?  It looks like they were
16 March and April and then a few months -- May
17 and June were not months in which you did
18 anything in 2017 and then did things for a few
19 more months and then it ended.  What was the
20 reason for that intermittent work?
21     A.   I think it was just that this DOE
22 loan application process kind of proceeds in
23 fits and starts.  As I indicated earlier, you

Page 164

1  develop a lot of information in support of the
2  application and have a lot of discussions, then
3  you upload a bunch of information to the DOE
4  staff and they work on that.  And you basically
5  don't hear much from them for a period of time.
6  So we just sort of adjusted his work based on
7  what kind of activity was going on.
8      Q.   All right.  The next vendor in
9  Exhibit 120 is Rocket City Digital.  Let me
10 direct you to 162, Exhibit 162.
11          (Exhibit Number 162 was referred
12          to in this deposition.)
13     Q.   Am I correct that this is a
14 compilation of the payment records and invoices
15 for which Nuclear Development has asked --
16 invoices from Rocket City Digital for which
17 Nuclear Development is asking TVA to pay
18 damages?
19     A.   That's correct.
20     Q.   What did Rocket City Digital do
21 for TVA?
22     A.   For Nuclear Development?
23     Q.   For Nuclear Development, thank

Page 165

1   you.
2       Q.   So Rocket City which refers to
3   Huntsville, Alabama, Rocket City Digital is a
4   video production outfit.  They were engaged to
5   put together a couple of videos for us which
6   were intended to be used to -- in meetings with
7   local Bellefonte or Alabama stakeholders and
8   potential power customers to help us tell the
9   story of what Bellefonte was, what kind of
10  condition it is in, how you would go about
11  bringing it to life and so forth.  So it's a
12  way of having that discussion with potential
13  customers in a more engaging form than trying
14  to read something off of a piece of paper.
15      Q.   And did you ever see the video
16  that was produced by Rocket City Digital?
17      A.   Well, I saw -- I saw one video
18  they produced which -- which opens with a --
19  like an early morning sunrise at Bellefonte,
20  picture of a view, and then it proceeds on from
21  there.  We used that -- we used that a number
22  of times in discussions with other people.
23      Q.   All right.  What other people did

Page 166

1   you use it with?
2       A.   Well, the mayor and chief
3   operating officer of the City of Memphis, the
4   head of -- well, I guess his title is probably
5   chairman of the board of Seven States Power,
6   the -- some of the members of the Tennessee
7   Valley Power Providers Association (sic).  I
8   believe -- I believe it was shown to some
9   people -- some elected officials in Nashville
10  as well and then some people associated with
11  the Electric Power Board of Chattanooga.
12      Q.   Was anyone ever told when they saw
13  it that they had to keep it confidential, what
14  they saw?
15      A.   Not that I am aware.
16      Q.   All right.  The next vendor on the
17  list is Susan Adler Thorp Communications.  It
18  says corporation on the Exhibit 120.
19      A.   Yes.
20      Q.   And let me take you to
21  paragraph -- excuse me, Exhibit 163 --
22           (Exhibit Number 163 was referred
23            to in this deposition.)

Page 167

1       Q.   -- the declaration that Susan
2   Adler Thorp gave in connection to this
3   litigation.  And let me direct your attention
4   to paragraph five and give you a minute to look
5   at it.
6       A.   (Reviewing document.)  Yes.
7       Q.   All right.  Also take a look at
8   paragraph four, I want to develop that first.
9       A.   (Reviewing document.)
10      Q.   In it -- in four, Ms. Thorp
11  testifies that she was engaged to advise ND and
12  assist ND in developing its confidential
13  governmental relations, media and media
14  relations, public relations, and political
15  strategies related to the acquisition and use
16  of the Bellefonte Nuclear Plant site for
17  Nuclear Development, LLC's ("ND") use.
18           My question to you is what role
19  did she play with regard to the acquisition of
20  the Bellefonte site?
21      A.   None.
22      Q.   Okay.
23      A.   I have no idea why item four is

Page 168

1   worded in that way.
2       Q.   Okay.  Now, with regard to
3   paragraph five, she said she provided
4   confidential political and marketing research,
5   do you see that?
6       A.   Yes.
7       Q.   Is that an accurate statement?
8       A.   It is.
9       Q.   What did it pertain to?
10      A.   She helped us with political and
11  marketing relative to local stakeholders in
12  Memphis, Tennessee in and outside of
13  government.
14      Q.   Was her work focused specifically
15  on the potential purchase of power from
16  Bellefonte by Memphis?
17      A.   Yes.
18      Q.   All right.  And is the remainder
19  of what she identifies in paragraph five an
20  accurate statement of what she did for ND?
21      A.   Yes.
22      Q.   All right.  And is there anything
23  not listed here that you recall her performing

Page 169

```
 1   for ND?
 2        A.   No, I believe these topics that
 3   she provides in here cover everything that she
 4   has done on our behalf.
 5        Q.   All right.  Now, let me direct
 6   your attention to Exhibit 164.
 7             (Exhibit Number 164 was referred
 8             to in this deposition.)
 9        Q.   And am I correct that this is a
10   compilation of payment records and invoices
11   from Susan Adler Thorp Communications for which
12   Nuclear Development is asking TVA to pay
13   damages?
14        A.   Yes.
15        Q.   All right.  And none of the
16   invoices provide any detail of what she was
17   doing, correct?
18        A.   That's correct.
19        Q.   And her monthly retainer started
20   at five thousand dollars a month but then
21   increased in March 2019 to six thousand dollars
22   a month, correct?
23        A.   Correct.
```

Page 170

```
 1        Q.   Why did it go up?
 2        A.   Well, her -- her contract was
 3   coming up and so we negotiated a revised
 4   contract amount with her.
 5        Q.   All right.  And Nuclear
 6   Development is asking TVA to pay as damages the
 7   amounts she charged several months after the
 8   closing did not occur on November 30th, 2018,
 9   correct?
10        A.   Right.
11             (Exhibit Number 165 was referred
12             to in this deposition.)
13        Q.   Next on the list is Sutton Reid
14   Advertising.  And let me direct your attention
15   to Exhibit 165 which is a declaration that
16   Steven Reid has given in this matter.  And in
17   particular, I want you to focus on paragraphs
18   four and five of his declaration.  First, let
19   me ask, have you seen this declaration before
20   today?
21        A.   (Reviewing document.)
22        Q.   Have you seen this declaration
23   before today, Mr. McCollum?
```

Page 171

```
 1        A.   (No response.)
 2        Q.   Mr. McCollum, can you hear me?
 3        A.   No, I have not, I'm sorry, I
 4   just --
 5        MR. O'REAR:  Bill, we can't hear
 6   you, you are breaking up.
 7        MR. LEMBKE:  Let's go off the
 8   record.
 9        THE COURT REPORTER:  Off the
10   record at 3:00.
11             (Off-the-record discussion.)
12        THE COURT REPORTER:  Back on at
13   3:04.
14        Q.   (BY MR. LEMBKE:)  Mr. McCollum, I
15   was asking you about Exhibit 165 when we had
16   technical difficulty.  Have you seen Exhibit
17   165 before today?
18        MR. O'REAR:  I don't see him on my
19   screen.
20        MR. LEMBKE:  He is on the screen
21   but he is frozen.  Let's go off the record.
22             (Off-the-record discussion.)
23        THE COURT REPORTER:  Back on the
```

Page 172

```
 1   record at 3:08.
 2        Q.   (BY MR. LEMBKE:)  Mr. McCollum, we
 3   are working through some technical
 4   difficulties.  Can you hear me?
 5        A.   Yes, I can.
 6        Q.   Okay.  I was asking you about
 7   Exhibit 165 which is the declaration of Mr.
 8   Reid.  Have you seen that before today?
 9        A.   I have not.
10        Q.   And I previously asked you about
11   the declaration of Susan Adler Thorp which was
12   Exhibit 163.  Had you seen that?
13        A.   I have not.
14        Q.   Okay.  Now, with regard to -- in
15   paragraph four of Exhibit 165 which is Mr.
16   Reid's declaration, he talks about being
17   retained to advise Nuclear Development on --
18   and as with Ms. Adler Thorp, he says services
19   were, quote, related to the acquisition and use
20   of the Bellefonte Nuclear Plant site for
21   Nuclear Development, LLC's use.  My question
22   is, did Mr. Reid have anything to do with
23   advising Nuclear Development on the acquisition
```

Page 173

1  of the Bellefonte Nuclear Plant site?
2      A.   He did not.
3      Q.   Okay.  And looking at his
4  description of services he provided in
5  paragraph five, do you regard that as a full
6  and complete statement of the services his firm
7  provided for Nuclear Development?
8      A.   Yes, I do.
9      Q.   And is it fair to say that all of
10  his work related to the effort to get Memphis
11  to purchase power from Bellefonte?
12      A.   That is correct.
13      Q.   Okay.  It says in paragraph five
14  that he wrote, produced, and directed a video
15  promoting the Bellefonte Nuclear Plant and the
16  benefits to Memphis.  Was that ever shown to
17  anybody?
18      A.   Not that I am aware.
19      Q.   Okay.  Now let me direct your
20  attention to Exhibit 166.
21          (Exhibit Number 166 was referred
22          to in this deposition.)
23      Q.   And am I correct that this is a

Page 174

1  compilation of payment records and invoices
2  from Sutton Reid Advertising to Nuclear
3  Development that Nuclear Development is asking
4  TVA to pay as damages?
5      A.   Yes.
6      Q.   And am I correct that these --
7  Sutton Reid was retained on a retainer basis,
8  correct?
9      A.   That's correct.
10      Q.   And that retainer amount went from
11  five thousand dollars to six thousand dollars a
12  month in March 2019, correct?
13      A.   Yes.
14      Q.   And why was retainer for Sutton
15  Reid increased?
16      A.   Well, there are no secrets in
17  Memphis, so when Ms. Thorp negotiated a higher
18  rate, so did Mr. Reid.
19      Q.   Okay.  And Nuclear Development is
20  asking TVA to pay amounts to -- or amounts in
21  damages for services provided by Sutton Reid
22  for several months after the November 30th,
23  2018 closing date, correct?

Page 175

1      A.   Correct.
2      Q.   And Mr. Reid indicated that he was
3  involved in participating in meetings with
4  government officials in Memphis.  What
5  government officials did he meet with?
6      A.   City council members, the mayor
7  and members of the administration such as the
8  city attorney, chief operating officer, as well
9  as Memphis Light, Gas & Water board members and
10  executives.
11      Q.   And do you know what --
12          (Reporter interruption.)
13      Q.   Mr. Reid indicates that he met
14  with reporters and members of the media
15  regarding Bellefonte and power supply options
16  for Memphis.  Do you know who he met with in
17  that regard?
18      A.   I'm sure I don't know everyone
19  that he met with, but he had interviews with
20  Bill Dries with the Memphis "Commercial Appeal"
21  and Sam Hardiman with the Daily Memphian and
22  Richard Ransom with one of the local Memphis
23  television stations.

Page 176

1          (Exhibit Number 167 was referred
2          to in this deposition.)
3      Q.   The last vendor on Exhibit 120 is
4  Bruce Turner firm.  And let me direct your
5  attention to Exhibit 167 which is a declaration
6  of Van Turner.  Have you seen that before
7  today?
8      A.   No, I have not.
9      Q.   Let me ask you to take a moment to
10  review paragraphs four and five.
11      A.   (Reviewing document.)  Yes,
12  paragraph five is accurate.
13      Q.   With regard to paragraph four, is
14  it correct when he says he was engaged for
15  legal representation related to the acquisition
16  of the Bellefonte Nuclear Plant site?
17      A.   No.
18      Q.   Okay.  Does paragraph five provide
19  a full statement and complete statement of the
20  services that Mr. Turner's law firm provided
21  Nuclear Development?
22      A.   Yes.
23      Q.   Now, it says that part of the work

## Page 177

1  he did was to prepare memoranda on legal
2  issues, including law relating to potential
3  political donations.  Do you see that?
4      A.  I do.
5      Q.  And Nuclear Development is asking
6  TVA to pay its damages amounts for a legal memo
7  on potential political donations?
8      A.  Related to our effort to market
9  power to Memphis, yes.
10     Q.  And these were political donations
11 to who?
12     A.  I'm not sure who political
13 donations were ultimately made to, but we were
14 looking at issues related to donations to city
15 council, people who were running for city
16 council in Memphis and the mayor's election.
17     Q.  Other than the law relating to
18 potential political donations, what other areas
19 of legal topics did Mr. Turner's law firm
20 research or prepare memoranda on?
21     MR. O'REAR:  I object to that.
22 That's part of the attorney-client privilege.
23     MR. LEMBKE:  That is not part --

## Page 178

1  the subject matter is not part of the
2  attorney-client privilege.
3      MR. O'REAR:  It could very well
4  be, yes.  And --
5      MR. LEMBKE:  You are asking us to
6  pay for legal research and yet you don't want
7  to tell us the topic of the legal research.
8      MR. O'REAR:  Well, I don't know if
9  there is any legal research.
10     MR. LEMBKE:  That is my question.
11     MR. O'REAR:  You can ask him that.
12 That wasn't your question but you can ask him
13 that.
14     Q.  (BY MR. LEMBKE:)  Are you aware of
15 any legal research or legal memoranda prepared
16 by the Bruce Turner law firm other than on the
17 subject of the law related to political
18 donations?
19     A.  I am not.
20     Q.  With regard to the Bruce Turner
21 firm's review, revision, and drafting of
22 contracts and other legal documents relating to
23 Bellefonte project, other than drafts of

## Page 179

1  potential contracts and agreements with the
2  City of Memphis and/or Memphis Light, Gas &
3  Water, are you aware of any other contracts or
4  other legal documents the Bruce Turner firm
5  worked on?
6      A.  I am not.
7      Q.  Now, Mr. Turner indicates that he
8  participated in means and communications with
9  governmental officials in Memphis on behalf of
10 Nuclear Development.  Which officials did he
11 meet with?
12     A.  The mayor, members of the mayor's
13 administration, and city council members.
14     Q.  All right.  Now let me direct your
15 attention to Exhibit 168.
16     (Exhibit Number 168 was referred
17     to in this deposition.)
18     Q.  This is the payment record and
19 invoice pertaining to the amounts charged by
20 Bruce Turner for which Nuclear Development is
21 seeking damages in this case, correct?
22     A.  That's correct.
23     Q.  And as with other legal invoices,

## Page 180

1  the description of services have been redacted,
2  correct?
3      A.  Correct.
4      Q.  And you have not read the
5  unredacted version, correct?
6      A.  That's correct.
7      MR. LEMBKE:  Mr. McCollum, I don't
8  have any more questions at this time.
9      MR. O'REAR:  I have no questions.
10     THE COURT REPORTER:  This
11 concludes the deposition.  The time is 3:20
12 p.m.
13
14     FURTHER THE DEPONENT SAITH NOT
15
16     (Deposition concluded at 3:20 p.m.)
17
18
19
20
21
22
23

Page 181

DEPONENT'S CERTIFICATE

1
2
3      I, WILLIAM MCCOLLUM, the witness
4   herein, have read the transcript of my
5   testimony and the same is true and correct, to
6   the best of my knowledge.  Any corrections
7   and/or additions, if any, are listed
8   separately.
9
10
11      WILLIAM MCCOLLUM
        c/o Mr. Caine O'Rear III
12      Attorney at Law
        Hand Arendall, LLC
13      RSA Tower
        11 North Water Street
14      Suite 30200
        Mobile, Alabama 36602
15      251.432.5511
        corear@handarendall.com
16
17
18      Sworn to and subscribed before me, this
19   the      day of        , 2020, to certify
20   which witness my hand and seal of office.
21
22
23      NOTARY PUBLIC

Page 182

C E R T I F I C A T E

1
2
3   STATE OF ALABAMA
4   JEFFERSON COUNTY
5
6      I hereby certify that the above
7   and foregoing deposition was taken down by me
8   in stenotypy, and the questions and answers
9   thereto were reduced to typewriting under my
10  supervision, and that the foregoing represents
11  a true and correct transcript of the
12  deposition given by said witness upon said
13  hearing.
14      I further certify that I am
15  neither of counsel nor of kin to the parties to
16  the action, nor am I in anywise interested in
17  the result of said cause.
18
19
20      /s/ Gail B. Pritchett
21  COMMISSIONER-NOTARY PUBLIC
22  ACCR LICENSE NO. 116, Exp. 9/30/2020
23  Transcript Certified On 7/26/2020