4.      I was the Lead Partner for the Winston & Strawn LLP nuclear energy practice group at the time of
        my retirement from the firm in 2017.  Through 2017 I was frequently recognized by global and
        domestic legal evaluation publications – including *Chambers USA*, *Chambers Global*, and *Legal
        500* – as a leading lawyer in the field of nuclear energy regulation.

5.      Prior to working with Winston & Strawn LLP, I was an attorney at the NRC responsible for advising
        agency staff on issues related to nuclear regulation and licensing, and represented NRC staff in
        significant   administrative litigation at the NRC in connection with nuclear licensing matters
        (construction permits and operating licenses).  My employment at NRC was from September 1981
        to June 1984.

6.      Since retiring from Winston & Strawn LLP in 2017, I have advised select clients on nuclear
        regulatory, licensing, compliance, and enforcement matters.  This has included representing a
        group of creditors in connection with an NRC license transfer related to a bankruptcy
        reorganization plan impacting the nuclear licensees and the related nuclear assets.  That
        engagement began in the first half of 2018 and has continued through the licensee's development
        and filing of a license transfer application and the NRC's subsequent review of that application
        and NRC approval in December 2019.

7.      I received a JD from Georgetown University Law Center in 1981.  I received a BA in Physics from
        Northwestern University in 1978.

## PUBLICATIONS AUTHORED

8.      I am the co-author of the following publications on legal and nuclear regulatory topics:

        - "Deep Decarbonization and Nuclear Energy," *Environmental Law Reporter,* 48 *ELR* 10244
          (March 2018);
        - "A Dose of History: Nuclear Energy Cases That Shaped Environmental Law," *Natural
          Resources & Environment*, Summer 2010;
        - "Proximity, Presumptions, and Public Participation: Reforming Standing at the Nuclear
          Regulatory Commission," 62 *Admin. L. Rev.* 583 (Spring 2010); and
        - "The Revival of Nuclear Power Plant Licensing," *Natural Resources & Environment*, Winter
          2005.

        In addition, while at Winston & Strawn I was a frequent blogger on the firm's "Energy Watch" web
        site on topics related to nuclear energy regulations and policy.

9.      I have also been a frequent speaker at nuclear energy industry and legal conferences, both
        nationally and internationally.  For example, I spoke on the topic of "Regulating Nuclear Safety
        Culture: A Collaborative Approach," at Nuclear Power Asia in Jakarta, Indonesia, in January 2016.
        I spoke on "Legal and Regulatory Frameworks for Nuclear Power: Risks, Subsidies, and Public
        Acceptance," at Platts European Nuclear Power Conference in Budapest, Hungary, in June 2014.
        At various domestic conferences I have spoken on diverse topics – including the nuclear licensing
        hearing process, legal issues related to safety conscious work environments and alleged

discrimination for raising safety and compliance issues, and nuclear license renewal, and the regulatory processes related to maintenance of the licensing basis and configuration of nuclear facilities.

**PREVIOUS EXPERT TESTIMONY**

10.    I have not previously served as an expert witness in any matter.

**STATEMENT OF COMPENSATION**

11.    I am being paid $ 600 per hour (plus expenses) for my work on this engagement.

**ISSUE POSED**

12.    The issue posed to me by Nuclear Development is whether the parties to the Purchase and Sale Agreement ("Agreement") for the Bellefonte Nuclear Plant site – including the real property, existing structures, and equipment at the site in its current status (collectively, "Bellefonte" or "the site") – may lawfully complete the transaction by conveying the site from TVA to Nuclear Development prior to approval by the NRC of the transfer of the Construction Permits ("CPs") previously issued to TVA for a nuclear "utilization facility" at the site. I have concluded that transferring ownership of Bellefonte in its current status, without prior NRC approval of CP transfers, would not violate federal statutes or regulations.

13.    A subsidiary issue addressed below is whether Bellefonte, in its current condition, is a "utilization facility" under the relevant statute and regulations. In this regard, based on the engineering evaluations provided to me, I understand that Bellefonte is not presently in a condition such that it is capable of making use of special nuclear material by operating as a nuclear reactor that could sustain nuclear fission in a self-supporting chain reaction. Accordingly, as discussed further below, I have concluded that Bellefonte is not presently a "utilization facility" as defined by the statute and NRC regulations.

**DOCUMENTS CONSIDERED**

14.    A list of the documents I have considered in connection with this report is attached as Exhibit A. I have relied principally upon the relevant statute and NRC regulations, NRC adjudicatory precedent, and other NRC administrative documents as referenced herein.

15.    I have also specifically reviewed and considered the arguments made by TVA in its Motion to Dismiss and Supporting Brief in this case, dated February 4, 2019 (including the Exhibits thereto) ("TVA Brief"); the Plaintiff's Brief in Opposition to Motion to Dismiss, dated February 25, 2019; the arguments made by TVA in its Reply Brief in connection with the Motion to Dismiss, dated March 11, 2019; the Memorandum Opinion and Order, dated May 15, 2019; and the analysis in an undated memorandum from TVA's outside counsel (Michael G. Lepre, Pillsbury Winthrop Shaw Pittman LLP) to TVA (Christopher Chandler), "Legal Opinion Regarding Bellefonte Nuclear Plant's NRC Construction Permits" (Deposition Exhibit 22) ("Pillsbury Opinion").

**FACTS AND DATA CONSIDERED**

16.    Facts and documents that I have considered are referenced throughout the discussion below. The facts and data that I have considered include the following: (1) the Agreement between the parties; (2) Construction Permit Nos. CPPR-122 and CPPR-123, and NRC transmittal letter, dated December 24, 1974; (3) TVA BLN DSEP Report, "Bellefonte Nuclear Plant, Detailed Scoping, Estimating, and Planning Study Report," dated March 22, 2010; and (4) MPR Report, "Bellefonte Nuclear Power Plant Completion Project – Independent Engineer Evaluation Report," Revision 1, signed May 19, 2017.

17.    I also understand that Bellefonte is presently in "Deferred Status" under the NRC's Deferred Plant Policy Statement (52 Fed. Reg. 38,077 (October 14, 1987)). In accordance with the Policy Statement, Section III.A.6, the applicant, licensee, or permit holder would be required to submit to the Commission a substantial amount of information to reactivate the project at least 120 days prior to resuming construction of the licensed facility.

18.    I further understand that on November 13, 2018, Nuclear Development filed an application in accordance with 10 C.F.R. § 50.80 for NRC consent to transfer of the Bellefonte CPs. Nuclear Development stated in the license transfer application (at page 3) that it will "undertake no licensed construction activities unless and until the NRC grants the authority" to conduct those activities (by transferring the CPs to it). As of November 2019, based on supplemental information provided by Nuclear Development on August 28, 2019, the NRC·has formally accepted and docketed the transfer application for review but has not yet approved the transfer.

**EXHIBITS**

19.    There are no exhibits to this report other than Exhibit A. The documents considered and listed in Exhibit A are available to the parties and many have been marked as exhibits in depositions.

**STATEMENT OF OPINIONS AND BASES**

*Relevant Statutes, Regulations, and Construction Permits*

20.    Under Section 101 of the Atomic Energy Act ("AEA"), 42 U.S.C. § 2131, it is unlawful for any person to "transfer, acquire, possess, use, import, or export . . ." any "utilization or production facility except under or in accordance with a license issued by the [NRC] pursuant to section 103 or section 104" of the AEA (emphasis added). The Bellefonte CPs were issued under Section 103 of the AEA, 42 U.S.C. § 2133.

21.    Under NRC regulations, 10 C.F.R. § 50.10(c), no person "may begin the construction" of a "utilization facility" without a license or permit (a limited work authorization, construction permit, or combined license). The NRC has defined "construction" activities that require a license in 10 C.F.R. § 50.10(a). The enumerated items in the regulation are all "activities": driving piles,

Case 5:18-cv-01983-LCB   Document 86-79   Filed 10/14/20   Page 4 of 19

Page 5

subsurface preparation, placement of backfill or concrete, or installation, excavation, assembly, erection, fabrication, or testing of various designated structures, systems, and components. "Construction" under the terms of Section 50.10(a) (and therefore the license requirement) does not extend to mere ownership or possession of a site, structures, equipment, or materials related to a utilization facility. Section 185 of the AEA, 42 U.S.C. § 2235, similarly specifies that applicants for a license to "construct or modify production or utilization facilities" will initially be granted a construction permit.

22.    Section 184 of the AEA, 42 U.S.C. § 2234, provides that no license (including a construction permit) or any right thereunder can be transferred without prior Commission consent. Commission regulations in 10 C.F.R. § 50.80 implement this requirement. The regulation prohibits transfer of a license or any right thereunder, "either voluntarily or involuntarily, directly or indirectly, through transfer of control of the license to any person, unless the Commission gives its consent in writing."

23.    Each of the Bellefonte CPs delineates the specific authorities granted by the Commission in the permit. Paragraph 2 states that the Commission is issuing a CP for a "utilization facility" as described in the permit application and at the designated site. The specific authorities granted in (and the specific conditions of) the permits are delineated in Paragraph 3, stating that the CP "authorizes the applicant to construct the facility described in the application and hearing record. . . ." It is important to note that the authorization language in Paragraph 3 of the CPs contrasts with NRC operating licenses, which typically provide specific authorities to "possess," "use," or "operate" a licensed facility and related radiological materials (such as special nuclear material, or nuclear fuel). Consistent with the license requirement in the regulations (section 50.10), Paragraph 3 of the Bellefonte CPs does not specifically authorize a holder to "own" or "possess" a site or a facility. The CPs authorize the licensee to "construct" a utilization facility.

24.    Each CP (one for each unit) is based upon a Commission finding in Paragraph 1.F that, among other findings, the applicant is "financially qualified to design and construct the proposed facility." The finding does not refer to, and is not specifically premised upon, financial qualifications to own the site or the equipment. The financial qualifications findings in the CP by their terms relate to the licensee's ability to conduct specific activities, not to obtain or maintain legal ownership.

### Neither the AEA Nor NRC Regulations Make It Illegal to Transfer Bellefonte in its Current Status Prior to NRC Approval of Transfer of the Construction Permits

25.    The issue here is whether ownership of the Bellefonte site can be legally transferred prior to NRC consent to transfer of the permits and the licensed authorities therein. In my opinion, the transfer of Bellefonte prior to transfer of the CPs would not be unlawful under the AEA or NRC regulations because: (1) the permits are not being transferred at closing; (2) the prohibitions on ownership, possession, or transfer of a "utilization facility" do not preclude the asset transfer because Bellefonte is not presently a "utilization facility;" (3) a license or permit is not required for the legal rights being conveyed (that is, ownership and/or possession of the site and facility, as is); (4) no activities requiring a license or permit will be conducted by the purchaser prior to

transfer of the CPs (that is, there will be no activities that constitute construction of a "utilization facility" under NRC regulations); and (5) the prohibition on transfer of a right under a permit does not preclude the asset transfer because neither ownership nor possession of Bellefonte is a licensed right under the terms of the CPs. These points are discussed more fully below.

26.     There is no question that under Section 184 of the AEA and 10 C.F.R. § 50.80 of the regulations, the NRC must approve the transfer of the CPs (and the authorities therein). In the present case, the Agreement in Paragraph 1(e) lists the Bellefonte CPs as assets being conveyed, but subject to applicable laws – and therefore subject to NRC approval.     An agreement for purchase and sale of an NRC-licensed asset can lawfully provide for the purchase and sale of real property, structures, and equipment. It can also establish, implicitly or explicitly, the obligations of the parties and/or the right for the purchaser to seek NRC consent to a transfer of a license or permit for the site. But a private transaction cannot in and of itself transfer an NRC permit or the authorities contained in that permit. Only the NRC has the authority to approve a transfer of a permit and the authorities therein.     Closing on the Agreement in this case would transfer ownership of Bellefonte, but it could not transfer the CPs as an asset without prior NRC approval.

27.     The Agreement itself contemplates a distinction between transfer of ownership of Bellefonte and transfer of the CPs. In Paragraph 7(a)(vii) TVA made a representation and warranty that it had the full right, power and authority "to consummate the purchase and sale transactions" and that "no authorization, consent or approval" of any Governmental Authority is needed for the consummation of the transactions. It follows from this representation and warranty that the parties contemplated that NRC approval was not necessary prior to transfer of ownership of the site and that the transfer of the CPs to Nuclear Development was not necessary as a prerequisite to closing. The Agreement recognizes that the CPs could be transferred by NRC later and separate from consummating the asset transfer. Paragraph 1(e) of the Agreement also provides that if the NRC has not accepted or otherwise allowed the transfer of the CPs by the closing date, TVA's obligation in regard to the CP transfer would cease. This provision again recognizes that asset transfer may precede CP transfer. Nuclear Development has the right to seek NRC approval of the CP transfer after transfer of the assets, but in effect would proceed to closing on the asset purchase at risk that it may never receive the NRC approval to transfer the permits authorizing it to construct a utilization facility at the site.

28.     With respect to the requirement for a license, Sections 101 and 103 of the AEA, 42 U.S.C. §§ 2131 and 2133, specifically require a license to transfer or receive, acquire, possess, or use a "utilization facility."   Under the statute, an NRC license is not required for mere ownership of a site for a future utilization facility or for possession of structures and equipment in an unassembled or incomplete condition that cannot function as a "nuclear reactor."     Specifically, a "utilization facility" is defined in clause (1) of Section 11.cc of the AEA (42 U.S.C. § 2014.cc) as any equipment or device capable of making use of special nuclear material (for present purposes, enriched uranium fuel).  In its regulations, 10 C.F.R. § 50.2, the Commission has defined a "utilization facility" as a "nuclear reactor," which is defined as an "apparatus, other than an atomic weapon, designed or used to sustain nuclear fission in a self-supporting chain reaction."

29.     An NRC Licensing Board in *Cincinnati Gas & Electric Co.* (Wm. H. Zimmer Nuclear Power Station, Unit 1), LBP-84-33, 20 NRC 765 (1984), applied the definition of "utilization facility" by focusing on the functional capability of the equipment at the site. The Commission's Licensing Board granted an applicant's motion to withdraw an application for an operating license for a facility that was almost completely built. The Board recognized that under the AEA, a "utilization facility" is a facility that is capable of making use of special nuclear material. To assure that the operating license was no longer needed for possession of the site, and following an NRC staff recommendation, it conditioned the withdrawal of the application on the applicant making modifications to the nuclear steam supply system to eliminate the capability for use of special nuclear material. The Board observed that this would be accomplished by (a) removing fuel from the site; (b) severing and welding caps on main feedwater lines and main steam lines; and (c) removing control rod drive mechanisms.

30.     The current condition of the systems at Bellefonte is described in the TVA DSEP Study Report and the MPR Independent Engineer Report referenced above.  These reports document the components that have been removed as part of the TVA Investment Recovery effort over the years, as well as the substantial amount of work (and investment) needed to restore and complete the facility.     For example, the TVA study (at p. 14) lists the major components that have been removed.  These include the control rod drive mechanisms, the feedwater system, the steam generators, and unspecified pumps, piping, and electrical equipment – with a total estimated replacement cost of almost $ 400 Million.  Similar information is presented in the MPR report (at p. 3-3).  The TVA study (at p. A-3 to A-4) also includes projected schedules showing years of work on the Reactor Coolant System and the Feedwater System, among others, to complete the plant.

31.     Based on the engineering  evaluations, I conclude that Bellefonte is not currently a "utilization facility."  Bellefonte in its current, incomplete and cannibalized condition is not a facility "capable of making use of special nuclear material."  Nor is the existing facility in its current condition a "nuclear reactor" encompassing the necessary support equipment that could achieve and sustain a self-supporting nuclear chain reaction.  Significant additional construction and restoration activities are necessary for either unit to meet the definition threshold.  While some structures and equipment at the site may be "designed" for eventual use in a nuclear reactor, the NRC's regulations do not require a license for individual structures or components.  The definition of "nuclear reactor" presupposes a functional, collective "apparatus" for sustaining a nuclear chain reaction.  A license is required to possess an <u>actual</u> nuclear reactor or facility – not to possess equipment or a design for an apparatus that may one day become a nuclear reactor.

32.     Clause (2) in the definition of "utilization facility" in AEA Section 11.cc provides that a "utilization facility" may be "any important component part especially designed for such equipment or device [capable of making use of special nuclear material] <u>as determined by the Commission</u>" (emphasis added).  However, NRC has not made any such determination or designation.  In its definition of "utilization facility" in 10 C.F.R. § 50.2, the NRC refers only to a "nuclear reactor" generally (and one specific subcritical operating assembly for irradiation of materials described in one specific docket designated in the regulation that is not applicable here).  Nothing in the regulations implements the discretion provided by AEA Section 11.(cc) for NRC to designate "important"

components of a nuclear reactor that would constitute a "utilization facility."    Absent such a determination, even equipment designed for future use in a nuclear reactor would not trigger a requirement for a license to simply own or possess that equipment.

33.    In addition, in its regulations stating the requirements for a license or permit the NRC does not designate any specific equipment (i.e., components) that might alone require a construction permit or license. Instead, as described above, in its regulations the NRC has focused exclusively on activities that require a construction permit.   Under NRC 10 C.F.R. § 50.10(c), no person "may begin the construction" of a "utilization facility" without a license or permit (a limited work authorization, construction permit, or combined license). The NRC further defined "construction" activities that require a license in 10 C.F.R. § 50.10(a).  The regulation is directed solely to activities (driving piles, preparing the subsurface, placing backfill, and installing, assembling, erecting, fabricating, and testing structures and equipment with safety functions), and not to ownership or possession of any designated equipment.   "Construction" under the regulation does not include ownership or possession of a site, structures, equipment, or materials related to a prospective utilization facility.  Nor does it even include site activities that do not rise to the types of safety-related activities specified in the regulation.

34.    Accordingly, if Nuclear Development will not conduct activities requiring a license until NRC consents to transfer of the CPs, closing on an acquisition of ownership of Bellefonte alone (that is, ownership of a site that is not a "utilization facility") would not trigger the license requirement in either the statute or the regulations.  In fact, as noted above, Nuclear Development filed an application in November 2018 for NRC consent to transfer the Bellefonte CPs and committed that it will not undertake licensed construction activities unless and until the NRC grants the authority to conduct those activities by approving a transfer of the CPs to it.  Until the NRC issues that approval, Nuclear Development will have no CP and therefore no authority to construct a "utilization facility" at the site.    The AEA and NRC license requirements will not be violated by transfer of ownership of the site alone.

35.    I recognize that there may be a hypothetical issue for facilities under active construction regarding when in time the facility/equipment under construction would become a "utilization facility" – that is, when it becomes a "nuclear reactor" as defined in the regulations – and therefore when a license would be required to "own" or "possess" the facility under Section 101 of the AEA. While a facility with a CP and under active construction may at some point become a "nuclear reactor" capable of using special nuclear material, the issue is typically mooted by issuance of an operating license.  Under the NRC's two-step licensing process in Part 50, a separate operating license is required under the statute and regulations that will authorize the holder to "possess," "use," and "operate" a utilization facility. Therefore, during construction the construction permit holder will file an application for the operating license which, when issued (before construction is completed),  will authorize possession and ownership of a utilization facility. See, e.g.,  10 C.F.R. § 50.55(d) (requiring an operating license application "[a]t or about the time of completion of the construction").   And, in any event, the hypothetical issue does not arise in this case.  Bellefonte has not reached that point as discussed above..  There is no doubt under the statute and regulations  that transfers of ownership of a completed facility with an operating license must be

approved by NRC by prior written consent to transfer of the operating license. But ownership of a site such as the one at issue here – subject to a CP, with incomplete and cannibalized systems, and with deferred construction – is simply a different question.

36. Closing on the Agreement to transfer ownership of the site and equipment in its current state also would not be contrary to the license transfer prohibitions in AEA Section 184 or 10 C.F.R. § 50.80, or the terms of the CPs. Section 184 of the AEA and Section 50.80 of NRC regulations prohibit the transfer of a license or any right thereunder without NRC approval. As already noted, the Agreement itself does not transfer the CPs – only NRC can do that. And, as also noted above, the Bellefonte CPs themselves do not confer the right to "possess" or "own" the site, structures, or equipment. They confer authority to construct a "utilization facility." Ownership of the site is not an authority or "right" under Paragraph 3 of the CPs. Therefore, transfer of ownership of the site and related property is not, in and of itself, a "transfer of control" of the license or transfer of any right thereunder.

37. In Deposition Exhibit 17, an email from TVA to Nuclear Development in November 2018, TVA personnel suggested that "[b]ecause the construction permits expressly reference TVA ownership of the site (CPPR-122 and -123, Section 2), acquisition of the site by another entity would result in a failure to comply with one or more terms of the permits." A similar argument was made in connection with the Motion to Dismiss. I disagree with the argument. The referenced paragraph in the CPs states that the CP was issued to the applicant (TVA) for a utilization facility as described in the application, to be located at the "applicant's site." The reference to TVA and the site is by no means a term or condition of the CP – it is merely a factual reference to the application and historic applicant. As already discussed, legal ownership of the site does not require a license until there is a "utilization facility." The authority being authorized in the CPs is for construction, not ownership. If there is no construction, there is no failure to comply with the permit. The historical references in the CPs to the application and TVA can be addressed, if even necessary to do so, in the NRC's license transfer process by conforming administrative amendments to the CPs that will accompany a transfer consent.

38. As noted above, Nuclear Development committed in its license transfer application that it will not undertake construction activities unless and until the NRC authorizes transfer of the CPs. Because Bellefonte is in "Deferred Status" under the NRC's Deferred Plant Policy Statement, Nuclear Development would be required to notify the Commission at least 120 days prior to resuming construction of the licensed facility. Any premature reactivation of the project would be plainly visible to the Commission, which could act to preclude construction activities pending appropriate NRC review. This consideration provides further assurance that transfer of ownership of the deferred Bellefonte project will not itself violate the AEA or NRC regulations and will not cause a future violation (i.e., Nuclear Development conducting unlicensed activities).

39. Assuming the Bellefonte asset transfer is closed prior to the NRC approval of a transfer of the permits, there will be certain regulatory compliance issues to be addressed by the parties. TVA, as the NRC licensee or permit holder, would still be subject to the CPs and conditions therein as well as certain conditions in 10 C.F.R. §§ 50.54 and 50.55 – including requirements for a Quality

Assurance (QA) program related to the ongoing activities for maintenance of equipment and records that would be relied upon when the project is reactivated. And Nuclear Development would have a commercial interest in maintaining the programs in place to preserve the condition of the equipment and to facilitate obtaining an operating license for the plant in the future. However, these regulatory compliance and commercial matters do not make completion of the asset transfer transaction illegal. Rather, these post-closing compliance issues would be consequences of the transfer of ownership of the site that the parties would need to plan for and resolve – most likely, by appropriate commercial arrangements.

40.     I am also aware from review of the record in this case that Nuclear Development's contractors have prepared lists and recommendations for various programs and activities that would be implemented to maintain Bellefonte equipment and to maintain compliance with the CPs after transfer of ownership of the site.     Deposition Exhibit 112 (emails and a list of post-closing programs and activities from August 2018) is one example. The list includes, in addition to a QA program, activities such as maintaining procedures, site security, and personnel fitness for duty. None of the listed activities are activities requiring an NRC license in and of themselves. They could be accomplished by Nuclear Development through appropriate vendors or contractors. Any theoretical future non-compliance with respect to NRC regulations or expectations would, should one arise, be addressed in either the future licensing process for the plant or NRC's administrative enforcement process (which would ordinarily lead to corrective actions to bring the programs into compliance). The possibility of a possible future compliance issue, after closing, does not make closing on the asset transfer unlawful.

### NRC Adjudicatory Decisions and Other Administrative Documents Do Not Support TVA's Conclusion that the Asset Transfer Would Be Illegal

41.     The statute and regulations discussed above provide the basis for my conclusion that transfer of ownership of a deferred Bellefonte project will not violate the AEA and NRC regulations. While the parties have cited other agency decisions, none of these administrative decisions is controlling. They do not address the facts at hand, and they have minimal precedential value beyond the specific situation involved in each matter.

42.     In *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), ALAB-459, 7 NRC 179 (1978), an NRC Appeal Board affirmed a Licensing Board decision that under AEA Sections 101 and 103, the word "possess" includes "own." The latter word is not stated in the statute. The decision was based on the observation that, "in ordinary parlance," "possess" includes "own" – a questionable conclusion when applied to words with distinctly different meanings in a legal context. However, without re-litigating that issue here, the Appeal Board concluded only that co-owners of a utilization facility must be licensed and therefore must be co-applicants. Consistent with that precedent, longstanding NRC practice has been that co-owners must be co-applicants, and construction permits, operating licenses, and combined licenses separately list co-owners of undivided interests in nuclear facilities as co-licensees. NRC licenses are issued based on a finding that each owner has the technical and/or financial qualifications for their share of the obligations under the license and the owners' agreements.

43.     However, the *Marble Hill* precedent does not address the situation or issue at hand.  It does not address whether a license (or construction permit) is required to "possess" (or even "own") a site that is not yet a "utilization facility" – structures and equipment that are not capable of utilizing nuclear fuel in a self-supporting chain reaction – and where no licensed construction activities (or activities requiring a license) will be conducted prior to NRC consent to a transfer of the license to construct.  The decision specifically holds only that "prospective co-owners of nuclear power plants must be co-applicants."  7 NRC at 201.  That is, the co-owners will be co-licensees when the license is issued.   Nuclear Development is an applicant and, upon transfer of the CPs, will be the licensee.

44.     The Appeal Board in *Marble Hill* cited a Commission decision in *Public Service Co. of New Hampshire* (Seabrook Station, Units 1 and 2), CLI-78-1, 7 NRC 1, 22 (1978), for the seemingly broad proposition that "[a]ny transfer of ownership would require Commission approval."   But that broad statement from the *Seabrook* case does not apply here. The Commission in *Seabrook* was addressing a different question.   In that case the Commission was reviewing a lower administrative board decision on the financial qualifications of the applicants for a construction permit.  The intervenors raised the prospect that those applicants might later dispose of their interests. The Commission determined that in the review of the current applicants' qualifications, it did not need to review the financial qualifications of prospective future owners – because review of any future ownership changes could await a future license amendment application. The Commission was merely re-stating a truism under *Marble Hill* – that future owners of the plant would need to apply for a license amendment to become licensees.  Indeed, in the present case, as in *Seabrook*, the financial qualifications (and technical qualifications) of Nuclear Development will be reviewed in connection with the CP transfer. But the *Seabrook* statement simply does not dictate a result on the issue here.   The quote from *Seabrook* should not be read as a broad statement that a license is required to own a site that is not a "utilization facility."   Likewise, the decision should not be read as barring a transfer of ownership of an incomplete and a deferred project   where, as here,   the licensed authority (to "construct" a facility) is not yet being transferred and no licensed activities will be conducted.   These facts were not before the Commission in *Seabrook*.

45.     Similarly, historical Commission construction permit amendments – such as those in TVA Exhibits B and C in TVA's Brief – to add new participants or co-owners to a permit do not address the situation where a new owner will not engage in any licensed activity until the permit is transferred (and amended to conform to the transfer).  In the historical cases cited in the TVA Brief, the new applicants were reviewed by the Commission to determine that they were financially qualified to assume their ownership interest – that is, that they could meet their pro-rata financial obligations with respect to the design and construction of a facility.  Financial qualifications for operation would be reviewed in connection with a subsequent operating license.   Again, in the present circumstances, that issue is not relevant to transfer of the site and will be addressed in the review of the Nuclear Development CP transfer application – before the permits are transferred and licensed activities are authorized.

46.     Exhibit D in TVA's Brief is a 1978 analysis by the Acting Director of the Commission's Office of Nuclear Reactor Regulation at the time, addressing a request from a public stakeholder for an enforcement action against Detroit Edison Company, the licensee for the Fermi 2 facility. The petitioner requested action because the company made a sale of an undivided 20% interest in the Fermi project without prior Commission consent under 10 C.F.R. § 50.80. This was an enforcement decision by an NRC staff manager. It was not a Commission decision nor was it a Commission adjudicatory board decision, and therefore it has little, if any, precedential weight.

47.     In the Fermi 2 enforcement matter, the Acting Director concluded in the document referenced that there was no license transfer under 10 C.F.R. § 50.80 (that is, that the regulation "is not applicable" to the Fermi transaction) because the 20% interest being transferred was not a controlling interest in the project/license. In this regard, the decision is contrary to the Appeal Board decision in *Marble Hill*. It is also contrary to current NRC practice for sales of interests in plants with operating licenses. But, in any event, this aspect of the decision is not relevant to the issue at hand – which relates only to the timing of the Commission consent to transfer of the CPs under 10 C.F.R. § 50.80.

48.     In a footnote on page 2 of the document, the Acting Director drew a distinction between the licensing provision of Section 101 of the AEA and the license transfer provision of Section 184. He stated that the former applies to facilities; the latter applies to licenses. That distinction is entirely consistent with my analysis above as to why Section 184 and 10 C.F.R. § 50.80 do not preclude transfer of ownership of the facility prior to transfer of the license – particularly where, as here, ownership is not specifically an authority granted under the permits.

49.     The Acting Director's enforcement decision in connection with the Fermi project recognizes the separate Section 101 license requirement for certain facilities. The Acting Director concluded that there was a violation of Section 101 because a "present interest has been acquired, prior to Commission approval." However, his analysis does not address whether an acquisition of a site, structures, and equipment – in the absence of licensed activities – requires a license. Likewise, it does not definitively address when the site, structures, and equipment would become a "utilization facility" for which a license would be required. Instead, in a footnote on page 4, the Acting Director offered a view, from the perspective of 1978, that a "distinction between construction and completion is not relevant here because the agreement clearly contemplates acquiring both an interest in the plant under construction and the completed plant. Thus, an interest in a completed facility has been, in fact, acquired." The Acting Director further observed in the footnote that it "has been a longstanding practice of the Commission to consider a utilization facility under construction to be a utilization facility. Therefore, in our view a right to own a utilization facility under construction is a right to own a utilization facility if complete." The Acting Director therefore assumes away the very issue at hand – whether a site with incomplete structures and equipment, that is listed by NRC in Deferred Status, and is not under active construction, is a "utilization facility" – on the basis of a purported "longstanding practice" to treat a plant under construction as a completed plant.

50.    The Acting Director's observation in 1978 about the "longstanding practice of the Commission" to consider a utilization facility under construction to be a "utilization facility" is also a simplification of uncertain provenance and should be given no precedential weight. It is an observation in a footnote to an enforcement decision in a specific case. There is no authority in the statute or regulations cited. And, even assuming it to be accurate statement of practice in 1978, that "practice" has not since been formalized in policy or codified in any regulation. In fact, under the NRC's traditional two-stage licensing process, the construction permit will be replaced late in the construction process by authorizations to bring nuclear fuel on site, to load fuel in the reactor, and/or conduct low power testing, and ultimately by an operating license that would authorize "possession" and "use" of the site as a utilization facility. So, the Acting Director's statement does not even address a situation that would typically arise. The Acting Director's statement in the footnote is also inconsistent with the fact discussed above that construction permits, including the Bellefonte CPs, do not authorize ownership, possession, or use of the site or the facility in the designated authorities in the permit. In focusing on ownership, the Acting Director's simplification is not consistent with the current license requirement in Section 50.10 discussed above – requiring a CP for certain safety-related construction activities and not for mere possession of a site or for site preparation work.

51.    The Fermi 2 situation is also factually distinguishable from the current situation for Bellefonte. At Bellefonte, as a plant in Deferred Status, no construction and no licensed activities are ongoing – and none will take place until the CP is transferred by NRC and the project is reactivated with notice to the NRC in accordance with the Deferred Plant Policy Statement. As noted above, among other things, the licensee would need to provide information under Section III.A.6 of the Deferred Plant Policy Statement on the status of plant equipment. In the Fermi case, construction was not in "deferred status" at the time of the sale of the ownership interest. Fermi 2 in fact was completed, became a utilization facility, and began operation under a Commission operating license.

52.    In contrast to the Fermi 2 enforcement letter from 1978, the NRC staff more recently considered the issue of whether a site and facility constitute a "utilization facility" at the end of the life cycle of the plant. In a pending rulemaking the NRC is considering clarifying its decommissioning rules – based on the existing definitions in the regulations and the analysis of the Licensing Board in the *Zimmer* case discussed above – to specify that when a facility is no longer a "utilization facility" it is no longer subject to certain regulations in 10 C.F.R. Part 50.[1] The NRC's reasoning is that, once a facility ceases operations and defuels and the licensee files certifications to those milestones, and the facility is modified such that it is no longer capable of making use of special nuclear material without significant alterations, it would no longer be "designed or used to sustain nuclear fission in a self-supporting chain reaction," as contemplated in the definition of "utilization facility" in 10 C.F.R. § 50.2. At that point certain regulatory obligations would no longer apply.

---

[1]    SECY-18-0055, Enclosure 1: Federal Register Notice, Proposed Rule – Regulatory Improvements for Production and Utilization Facilities Transitioning to Decommissioning, at 172 – 176, NRC Accession # ML18012A022 (added to NRC ADAMS, May 22, 2018).

53.    As discussed above, the same logic applied in the *Zimmer* case and the decommissioning rulemaking applies during construction, under the existing statutory and regulatory definitions and license requirements discussed above. If significant construction work remains to allow the plant to be used to sustain nuclear fission in a self-supporting chain reaction, it would not be a "utilization facility." Mere ownership or possession of the property, structures, and equipment would not require a license.   However, the CP for the site – the license to conduct activities defined in the regulations that constitute "construction" of a utilization facility – would remain in effect, allowing the NRC to have continuing jurisdiction over activities at the site.  Construction activities could not begin prior to NRC approval, even where the site is not yet a "utilization facility."

54.    As also discussed above, the AEA and NRC regulations do not generally require licenses to buy and sell equipment to be used in a nuclear power plant. In this light, we can consider another related circumstance.  TVA would not need a license to sell the equipment at the Bellefonte site, nor would a purchaser need one to buy the equipment.  Or, suppose another bidder had been successful in the auction for the Bellefonte site, where the bidder had no plans to finish a nuclear plant and instead planned to use the site for other energy generation or industrial purposes? Acquisition of ownership of the site alone (with existing facilities and equipment to be sold and/or demolished) would not require NRC approval or transfer of the CPs at any time.  The parties could either affirmatively seek to terminate the permits or let the permits expire.   Transferring Bellefonte – in its incomplete and cannibalized condition and with construction in Deferred Status – for later transfer of the CPs and eventual resumption of licensed construction, is not significantly different, from a regulatory perspective, from that scenario.

55.    In this regard, I observe that by letter dated September 14, 2006 (NRC Accession # ML061810505), the NRC granted a TVA request to terminate the CPs for the two Bellefonte units ("the [NRC] staff considers [the CPs] to be terminated"). On February 18, 2009 (NRC Accession # ML0904908738), the Commission authorized NRC staff to reinstate the CPs (and placing the facility in "terminated plant status"). Therefore, TVA itself owned and possessed Bellefonte in essentially its current condition for a period of over two years without any CP, with NRC acceptance.

56.    I also observe that the Acting Director in connection with the Fermi 2 matter in 1978 (discussed above) concluded that, in that case, there was a violation of the license requirement of Section 101 of the AEA because of the sale of a minority ownership interest in the project – where licensed construction activities were ongoing – prior to NRC approval.  Nonetheless, as he explained in the letter, the Acting Director chose to take no enforcement action.  He concluded that the transaction involved no threat to public health and safety; the necessary information on the new participant had been submitted; and the new owners would be required to submit applications to become co-licensees prior to the construction permit being amended.

57.    Similar circumstances exist here – with the additional factor that no licensed activities are ongoing.  The NRC meeting summary dated September 4, 2018, of a public meeting with NRC requested by Nuclear Development and conducted on August 14, 2018 (Deposition Exhibit 11), confirms that NRC was made aware of Nuclear Development's plans to close on the purchase in

November 2018. And Nuclear Development has since submitted the November 2018 license transfer application as noted above. If no licensed activities will be conducted prior to approval of the transfer and amendment of the CPs, there would be no actual or even potential public health and safety, radiological security, or environmental consequences from transfer of ownership of the asset. Notwithstanding my conclusion that transferring Bellefonte in its current status would not violate federal statutes or regulations, the NRC has authority to issue exemptions from its regulations (*see, e.g.,* 10 C.F.R. § 50.12) and has substantial, inherent enforcement discretion with respect to non-compliances. Even if a regulatory issue were perceived to exist, that issue could be resolved, either before or after closing, to allow the asset transfer to proceed.

*The Pillsbury Opinion is Flawed and Not Persuasive*

58.     The undated Pillsbury Opinion concludes that "acquiring or transferring ownership of Bellefonte (and/or its Construction Permits) without some form of consent [footnote omitted] would be a violation of the [AEA] and NRC regulations. . . ." Pillsbury Opinion, at page 1. However, this conclusion equates transferring ownership of the site and transferring the CPs. As discussed above, the Agreement transfers only ownership of the property. Only the NRC can transfer the CPs, and Nuclear Development has applied for the NRC CP transfer approval. Transfer of the CPs will only occur when NRC grants the transfer consent. So, the real issue in the present case is whether the parties can properly transfer ownership of the present site without prior NRC consent to the transfer of the CPs.

59.     The Pillsbury Opinion states that, because the CPs were issued under AEA Section 103, the permits are subject to the transfer restrictions in Section 101 of the AEA. Pillsbury Opinion, at page 3. However, this is simply a truism. There is no dispute that the CPs are subject to Sections 101 and 103 (including the transfer restrictions). The point, as made above, is that (a) the CPs are not yet being transferred and will only be transferred with NRC approval; and (b) the assets being transferred are not presently a "utilization facility" and therefore are not subject to the restriction in Section 101 related to transferring, acquiring, possessing or using a "utilization facility." Moreover, Nuclear Development will not exercise any authority under the license – that is, the authority to construct a "utilization facility" – or take any action for which a license is required until NRC transfers the CPs.

60.     The Pillsbury Opinion also cites the NRC license transfer regulation, 10 C.F.R. § 50.80. Pillsbury Opinion, at page 3. Again, however, this regulation implements Sections 101 and 184 of the AEA and is subject to the same analysis as above. The Pillsbury Opinion goes on to state that it is improper to "separate acquisition of a facility under Section 101 of the AEA from the requirement to hold a Commission license. . . ." Pillsbury Opinion, at page 4. However, the separation is inherent in the statute and in the CPs themselves. As discussed above, the statute and regulations address transfer, acquisition, and possession of a "utilization facility," not of a site or equipment related to a prospective utilization facility. And, the CPs do not authorize "possession" at all; they grant authority to construct a "utilization facility." No activities subject to the license will be conducted. And no right under the CPs (that is, the right to construct a utilization facility) would be transferred by the closing on the Agreement.

61.    The Pillsbury Opinion relies upon *Marble Hill*. That precedent is distinguished above. That case
       simply does not address the present circumstances.

62.    The Pillsbury Opinion also suggests that 10 C.F.R. § 50.80(b) requires "NRC approval prior to
       transferring the Bellefonte Construction Permits" to Nuclear Development. Pillsbury Opinion, at
       page 4 (footnote 9). However, that point is not in dispute – NRC approval is required to transfer
       the CPs. More to our question here, Section 50.80(b) says nothing about transfer of ownership
       and contains no additional prohibition beyond the transfer restriction in Section 50.80(a). Section
       50.80(b) merely addresses the content of a license transfer application – again, something not in
       dispute here. The fact that, under the regulation, NRC "may" require the consent to the transfer
       of the CPs from the current licensee also does not preclude the transfer of the asset. Rather, it
       suggests that the applicant must have a legal right to own the asset prior to transfer of the license
       or permit. Furthermore, with respect to licensee consent to the transfer of the permits, the
       regulation is inherently discretionary ("may" require), and also provides for an alternative to such
       consent (*i.e.,* a court order or judgment attesting to the transfer applicant's right to possession of
       the site and facility).

63.    Finally, the Pillsbury Opinion suggests that the historic information in Paragraph 2 of the CPs about
       TVA's ownership of the site precludes the transfer of ownership. Pillsbury Opinion, at page 4
       (footnote 10). The CP states that the Bellefonte facility "will be located on applicant's site."
       However, as discussed above, this language in Paragraph 2 is historic and administrative in nature.
       Ownership of the site is not an authority granted in, or a condition of, the CPs listed in Paragraph
       3 of the permits. Transfers of the assets or the permits would not make the historic information
       in Paragraph 2 inaccurate. And there would be no "false representation" going forward where,
       as here, a license transfer application has been filed and the NRC license docket has been clear with
       respect to the transaction and ownership status. If necessary, the NRC could update the
       recitations in the CPs as part of the administrative amendments to the CPs that would be issued
       at the time of the transfer consent.

**SUMMARY**

64.    Given that Bellefonte is not presently a "utilization facility," that NRC regulations do not require
       a permit or license to own or possess the site as is, that Nuclear Development will not conduct
       licensed activities until after the NRC approves a transfer of the CPs, and that no right under the
       CPs would be transferred by transferring ownership alone, it would not be illegal for the parties
       to the Agreement to complete the transaction and transfer ownership of Bellefonte (including the
       real property, structures, and equipment at the site), prior to NRC approval of the transfer of the
       construction permits. The purchaser would not have authority from the NRC to conduct
       construction activities that require a license under NRC regulations unless and until the NRC issues
       an order consenting to a transfer of the CPs. Further, given the deferred status of the project
       under NRC policy, no licensed construction activities can be conducted without substantial prior
       notice to the NRC in accordance with the NRC's Deferred Plant Policy.

65.   This opinion was prepared by the undersigned:

David A. Repka

2 -11 -2020

Date

**INVENTORY OF DOCUMENTS CONSIDERED**

**David A. Repka**

1.  Purchase and Sale Agreement, Bellefonte Nuclear Power Plant Site, dated November 14, 2016
2.  Construction Permit Nos. CPPR-122 and CPPR-123, and NRC transmittal letter, dated December 24, 1974
3.  Complaint, Nuclear Development v. TVA, dated November 30, 2018 (including Exhibits A, B, C, D)
4.  Motion for Preliminary Injunction, dated November 30,2018
5.  Declaration of Franklin L. Haney, dated November 30, 2018
6.  Defendant's Motion to Dismiss, dated February 4, 2019; Defendant's Brief in Support of Motion to Dismiss, dated February 4, 2019  (including Exhibits A, B, C, D)
7.  Plaintiff's Brief in Opposition to Motion to Dismiss, dated February 25, 2019
8.  Defendant's Reply Brief in Support of Motion to Dismiss, dated March 11, 2019.
9.  Memorandum Opinion and Order, dated May 15, 2019
10. Pillsbury "Legal Opinion Regarding Bellefonte Nuclear Plant's NRC Construction Permits," undated (CONFIDENTIAL) (Deposition Exhibit 22)
11. Nuclear Development, LLC, Application for Order Approving Construction Permit Transfers, Bellefonte Nuclear Plant, Units 1 and 2, dated November 13, 2018 (NRC Accession # ML18318A428)
12. NRC Correspondence to William McCollum, Jr. (Nuclear Development, LLC), requesting Supplemental Information in connection with license transfer application and acceptance review, dated April 5, 2019 (NRC Accession # ML18348B139 and # ML18348B064) (Deposition Exhibit 84)
13. Nuclear Development, LLC, Response to Request for Supplemental Information, dated August 28, 2019 (NRC Accession # ML19240A382)
14. NRC Correspondence to William McCollum, Jr. (Nuclear Development, LLC), Acceptance of Application for Orders Approving Construction Permit Transfers and Conforming Administrative Amendments, dated November 5, 2019 (Deposition Exhibit 85)
15. TVA BLN DSEP Report, "Bellefonte Nuclear Plant, Detailed Scoping, Estimating, and Planning Study Report," dated March 22, 2010
16. MPR Report (prepared for Nuclear Development, LLC), "Bellefonte Nuclear Power Plant Completion Project – Independent Engineer Evaluation Report," 1618-0001-RPT-001, Revision 1, signed May 19, 2017
17. NRC Policy Statement on Deferred Plants, 52 Fed. Reg. 38,077 (October 14, 1987)
18. SECY-18-0055, Enclosure 1: Federal Register Notice, Proposed Rule – Regulatory Improvements for Production and Utilization Facilities Transitioning to Decommissioning, DRAFT, NRC Accession # ML18012A022 (added to NRC ADAMS, May 22, 2018)
19. NRC Office Instruction, LIC-107, Rev. 2, "Procedures for Handling License Transfers," effective June 5, 2017 (Deposition Exhibit 81)
20. Email, L. Blust to J. Chardos, August 18, 2017, "TVA Letter to NRC.docx" (Deposition Exhibit 7)
21. Email chain, C. Chandler, J. Chardos, SS. Vance and L. Blust, August 28-31, 2017, "RE: L44 170331 001 BLN U2" (Deposition Exhibits 8 and 33)

**EXHIBIT A**

22.    Email chain, T. Matthews and S. Chardos, dated June 18-19, 2018, "Feedback from meeting w/ Frank last week" (Deposition Exhibit 9)

23.    Emails dated August 14, 2018, re: NRC public meeting on Bellefonte Project (with R. Bell notes) (Deposition Exhibit 10)

24.    NRC Memorandum, Summary of Public Pre-Submittal Meeting with Nuclear Development, LLC, on August 14, 2018, dated September 4, 2018 (Deposition Exhibit 11)

25.    Email chain, T. Matthews and C. Chandler, dated August 18, 2018, re: "Bellefonte Transfer," with draft TVA letter to consent to CP transfers (Deposition Exhibit 14)

26.    Email, L. Blust to S. Quirk, dated October 24, 2018, re: "Follow up" with attached "talking points" (Deposition Exhibit 15)

27.    Email, C. Beach to L. Blust, dated November 9, 2019, re: "License Transfer Discussion," with attached "NRC License Transfer Requirements" (Deposition Exhibit 17)

28.    Email, L. Blust to C. Beach, dated November 12, 2018, re: "License Transfer Issues," with attached "Regulatory Path Forward for Transfer of the Bellefonte Construction Permits" (Deposition Exhibit 19)

29.    Letter from S. Quirk to Nuclear Development, LLC and L. Blust, dated November 29, 2018, re: "Purchase and Sale Agreement dated November 14, 2016 (Agreement) for Bellefonte Nuclear Plant Site . . . ." (Deposition Exhibit 24)

30.    Letter from L. Blust to S. Quirk, dated November 30, 2018 (Deposition Exhibit 25)

31.    Email, S. Quirk to L. Blust, dated November 13, 2018, re: "License Transfer Issues" (Deposition Exhibit 26)

32.    Email chain, S. Quirk, L. Blust and C. Beach, re: "Atomic Energy Act Cite," dated November 16, 2018 (Deposition Exhibits 28 and 36)

33.    Email chain, J. Chardos, M. Gillman, W. McCollum, and T. Matthews, re: Items Necessary Before Submitting an NRC Application," dated August 14-16, 2018 (Deposition Exhibit 60)

34.    Letter from C. O'Neill (Concentric Advisors) to L. Blust, dated October 24, 2016, "Potential Sale of Bellefonte Nuclear Plant Site" (Deposition Exhibit 90)

35.    Email chain, T. Matthews and M. Gillman, dated July 18-19, 2018, re: "Meeting on 30th Info" (Deposition Exhibit 107)

36.    Email chain, T. Matthews, J. Chardos, and M. Gillman, dated July 18-20, 2018, re: "Bellefonte Construction Permit – required actions," with attached TVA letters re: transition to Deferred Status (Deposition Exhibit 108)

37.    Email chain, M. Gillman, J. Chardos and R. Davis, dated August 22-28, 2018, re: What is Required to Keep Bellefonte Up and Running When TVA Transfers Site to Haney," with attached "Actions Required to Retain and Maintain Construction Permit in Deferred Status Following Transfer of Bellefonte Site from TVA to ND, LLC" (Deposition Exhibit 112)

38.    Letter from NRC (Catherine Haney) to TVA (Karl M. Singer), "Bellefonte Nuclear Plant, Units 1 and 2 – Withdrawal of Construction Permit Nos. CPPR-122 and CPPR-123," dated September 14, 2006 (NRC Accession #ML061810505)

39.    NRC Memorandum, "Staff Requirements – COMSECY-08-0041 – Staff Recommendations Related to Reinstatement of the Construction Permits for Bellefonte Nuclear Plant, Units 1 and 2," dated February 18, 2009 (NRC Accession #ML090490838)

**********

EXHIBIT A

1. Deposition of William Johnson, dated October 10, 2019
2. Deposition of Chris Chandler, dated October 29, 2019
3. Deposition of Sherry Quirk, dated October 29, 2019
4. Deposition of Joseph Shea, dated October 30, 2019
5. Deposition of Clifford Beach, dated October 30, 2019
6. Deposition of Franklin Haney, Jr., dated November 12, 2019
7. Deposition of William McCollum, Vol. I and II, dated November 12 and 13, 2019
8. Deposition of Larry Blust, Vol. I and II, dated November 13 and 14, 2019
9. Deposition of Marie Gillman, dated November 26, 2019

**********

1. Atomic Energy Act (42 U.S.C. §§ 2011, *et seq.*)
2. NRC Regulations (10 C.F.R. Part 50)
3. *Kentucky v. NRC*, 626 F. 2d 995 (DC Cir. 1980)
4. *Power Auth. of State of NY* (James A. Fitzpatrick Nuclear Plant and Indian Point, Unit 3), CLI-00-22, 52 NRC 266 (2000)
5. *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), LBP-77-4, 5 NRC 433 (1977)
6. *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), ALAB-459, 7 NRC 179 (1978)
7. *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), ALAB-493, 8 NRC 253 (1978)
8. *Public Service Co. of New Hampshire* (Seabrook Station, Units 1 and 2), CLI-78-1, 7 NRC 1 (1978)
9. *Vermont Yankee Nuclear Power Corp.* (Vermont Yankee Nuclear power Station), CLI-00-17, 52 NRC 79 (2000)
10. *Cincinnati Gas & Electric Co.* (Wm. H. Zimmer Nuclear Power Station, Unit 1), LBP-84-33, 20 NRC 765 (1984)
11. Letter from E. G. Case (Acting Director, NRC Office of Nuclear Reactor Regulation) to R. G. Asperger (Midland, Michigan), dated ___ 1978 [date not legible], re: request for enforcement action under 10 C.F.R. § 2.206 related to Detroit Edison Company Enrico Fermi Atomic Power Plant Unit 2

**EXHIBIT A**