FILED

2021 Jan-06  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

2020 Oct-14  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 8 (Part 9)

# Deposition of Stephen Burns Dated 8/19/2020
# With Deposition Exhibits
# 129 Con't, 130, 131, 132, 199 (redacted)

Irradiated fuel. The report must include the following information, current through the end of the previous calendar year:

\*     \*     \*     \*     \*

(viii) A licensee may use § 50.75 decommissioning trust funds for spent fuel management and 10 CFR part 72 specific license ISFSI decommissioning expenses provided the following conditions are met:

(A) The NRC has docketed the licensee's certifications required under § 50.82(a)(1) of this part;

(B) At least 90 days have passed since the NRC has received the licensee's PSDAR; and

(C) The licensee continues to meet § 50.82(a)(8)(i)(B) and (C) of this part.

(9) All power reactor licensees that commenced operation must submit an application for termination of license. The application for termination of license must be accompanied or preceded by a license termination plan to be submitted for NRC approval.

\*     \*     \*     \*     \*

(ii)\*\*\*

(F) An updated site-specific estimate of remaining decommissioning costs and identification of sources of funds for license termination, spent fuel management, and ISFSI decommissioning, as applicable;

\*     \*     \*     \*     \*

(b) For non-power production or utilization facilities and fuel reprocessing plants—

\*     \*     \*     \*     \*

(6) The facility licensed under this part is no longer a production or utilization facility once the following criteria are met:

(i) The NRC removes the licensee's authority to operate the facility through a license

257

amendment; and

(ii) The licensee modifies the facility to be incapable of the production of special nuclear material, separation of the isotopes of plutonium, processing of irradiated materials containing special nuclear material, or making use of special nuclear material, without significant facility alterations necessary to restore the capability to produce special nuclear material, separate the isotopes of plutonium, process irradiated materials containing special nuclear material, or make use of special nuclear material.

(7) For a facility licensed under this part that is no longer a production or utilization facility under paragraph (b)(6) of this section, the NRC maintains the authority to regulate the 10 CFR part 50 license with respect to the possession of special nuclear material, source material, and byproduct material under sections 53, 63, 81, and 161 of the Act, as applicable. Until the termination of the 10 CFR part 50 license under paragraph (b)(8) of this section, the regulations of this chapter applicable to a non-power production or utilization facility or fuel reprocessing plant continue to apply to the holder of the license unless the regulations explicitly state otherwise.

\*       \*       \*       \*       \*

18.    Revise § 50.109 to read as follows:

## § 50.109 Backfitting.

(a) *Backfitting for nuclear power reactor licensees prior to decommissioning.*

(1)(i) *Definition.* Backfitting is defined as the modification of or addition to systems, structures, components, or design of a facility; or the design approval or manufacturing license for a facility; or the procedures or organization required to design, construct or operate a facility; any of which may result from a new or amended provision in the

258

Commission's regulations or the imposition of a regulatory staff position interpreting the
Commission's regulations that is either new or different from a previously applicable staff
position after:

(A) The date of issuance of the construction permit for the facility for facilities having
construction permits issued after October 21, 1985;

(B) Six (6) months before the date of docketing of the operating license application for
the facility for facilities having construction permits issued before October 21, 1985;

(C) The date of issuance of the operating license for the facility for facilities having
operating licenses;

(D) The date of issuance of the design approval under subpart E of part 52 of this
chapter;

(E) The date of issuance of a manufacturing license under subpart F of part 52 of this
chapter;

(F) The date of issuance of the first construction permit issued for a duplicate design
under appendix N of this part; or

(G) The date of issuance of a combined license under subpart C of part 52 of this
chapter, provided that if the combined license references an early site permit, the
provisions in § 52.39 of this chapter apply with respect to the site characteristics, design
parameters, and terms and conditions specified in the early site permit. If the combined
license references a standard design certification rule under subpart B of

10 CFR part 52, the provisions in § 52.63 of this chapter apply with respect to the design
matters resolved in the standard design certification rule, provided however, that if any
specific backfitting limitations are included in a referenced design certification rule, those
limitations shall govern. If the combined license references a standard design approval
under subpart E of 10 CFR part 52, the provisions in § 52.145 of this chapter apply with

259

respect to the design matters resolved in the standard design approval. If the combined license uses a reactor manufactured under a manufacturing license under subpart F of 10 CFR part 52, the provisions of § 52.171 of this chapter apply with respect to matters resolved in the manufacturing license proceeding.

(ii) *Proposed backfitting*. Except as provided in paragraph (a)(1)(iv) of this section, the Commission shall require a systematic and documented analysis pursuant to paragraph (a)(2) of this section for backfits which it seeks to impose.

(iii) *Backfit analysis*. Except as provided in paragraph (a)(1)(iv) of this section, the Commission shall require the backfitting of a facility only when it determines, based on the analysis described in paragraph (a)(2) of this section, that there is a substantial increase in the overall protection of the public health and safety or the common defense and security to be derived from the backfit and that the direct and indirect costs of implementation for that facility are justified in view of this increased protection. (iv) *Exceptions*. The provisions of paragraphs (a)(1)(ii) and (iii) of this section are inapplicable and, therefore, backfit analysis is not required and the standards in paragraph (a)(1)(iii) of this section do not apply where the Commission or staff, as appropriate, finds and declares, with appropriated documented evaluation for its finding, either:

(A) That a modification is necessary to bring a facility into compliance with a license or the rules or orders of the Commission, or into conformance with written commitments by the licensee; or

(B) That regulatory action is necessary to ensure that the facility provides adequate protection to the health and safety of the public and is in accord with the common defense and security; or

260

(C) That the regulatory action involves defining or redefining what level of protection to the public health and safety or common defense and security should be regarded as adequate.

(v) *Mandatory backfitting.* The Commission shall always require the backfitting of a facility if it determines that such regulatory action is necessary to ensure that the facility provides adequate protection to the health and safety of the public and is in accord with the common defense and security.

(vi) *Documented evaluation.* The documented evaluation required by paragraph (a)(1)(iv) of this section shall include a statement of the objectives of and reasons for the modification and the basis for invoking the exception. If immediately effective regulatory action is required, then the documented evaluation may follow rather than precede the regulatory action. The documented evaluation required by paragraph (a)(1)(iv)(A) of this section must include a consideration of the costs of imposing the modification.

(vii) *Implementation.* If there are two or more ways to achieve compliance with a license or the rules or orders of the Commission, or with written licensee commitments, or there are two or more ways to reach a level of protection which is adequate, then ordinarily the applicant or licensee is free to choose the way which best suits its purposes. However, should it be necessary or appropriate for the Commission to prescribe a specific way to comply with its requirements or to achieve adequate protection, then cost may be a factor in selecting the way, provided that the objective of compliance or adequate protection is met.

(2) *Backfit analysis factors.* In reaching the determination required by paragraph (a)(1)(iii) of this section, the Commission will consider how the backfit should be scheduled in light of other ongoing regulatory activities at the facility and, in addition, will

261

consider information available concerning any of the following factors as may be
appropriate and any other information relevant and material to the proposed backfit:

(i) Statement of the specific objectives that the proposed backfit is designed to achieve;

(ii) General description of the activity that would be required by the licensee or applicant
in order to complete the backfit;

(iii) Potential change in the risk to the public from the accidental off-site release of
radioactive material;

(iv) Potential impact on radiological exposure of facility employees;

(v) Installation and continuing costs associated with the backfit, including the cost of
facility downtime or the cost of construction delay;

(vi) The potential safety impact of changes in plant or operational complexity, including
the relationship to proposed and existing regulatory requirements;

(vii) The estimated resource burden on the NRC associated with the proposed backfit
and the availability of such resources;

(viii) The potential impact of differences in facility type, design or age on the relevancy
and practicality of the proposed backfit;

(ix) Whether the proposed backfit is interim or final and, if interim, the justification for
imposing the proposed backfit on an interim basis.

(3) *Impact on licensing actions.* No licensing action will be withheld during the pendency
of backfit analyses required by the Commission's rules.

(b) *Backfitting for decommissioning nuclear power reactor licensees.*

(1) *Definition.* Backfitting is defined as the modification of or addition to systems,
structures, or components still in operation during the decommissioning of the licensee's
facility, or the design of the licensee's facility, or the procedures or organization required
to decommission the facility, any of which may result from a new or amended provision

262

in the Commission rules or the imposition of a regulatory staff position interpreting the Commission rules that is either new or different from a previously applicable staff position, after the date of issuance of the operating license issued under this part or combined license issued under subpart C of part 52 of this chapter.

(2) *Proposed backfits.* Except as provided in paragraph (b)(4) of this section, the Commission shall require a systematic and documented analysis pursuant to paragraph (b)(8) of this section for backfits that it seeks to impose.

(3) *Backfit analysis.* Except as provided in paragraph (b)(4) of this section, the Commission shall require the backfitting of a facility only when it determines, based on the analysis described in paragraph (b)(8) of this section, that there is a substantial increase in the overall protection of the public health and safety or the common defense and security to be derived from the backfit and that the direct and indirect costs of implementation for that facility are justified in view of this increased protection.

(4) *Exceptions.* The provisions of paragraphs (b)(2) and (3) of this section are inapplicable and, therefore, backfit analysis is not required and the standards in paragraph (b)(3) of this section do not apply where the Commission or staff, as appropriate, finds and declares, with appropriated documented evaluation for its finding, either:

(i) That a modification is necessary to bring a facility into compliance with a license or the rules or orders of the Commission, or into conformance with written commitments by the licensee;

(ii) That regulatory action is necessary to ensure that the facility provides adequate protection to the health and safety of the public and is in accord with the common defense and security; or

263

(iii) That the regulatory action involves defining or redefining what level of protection to the public health and safety or common defense and security should be regarded as adequate.

(5) *Mandatory backfitting.* The Commission shall always require the backfitting of a facility if it determines that such regulatory action is necessary to ensure that the facility provides adequate protection to the health and safety of the public and is in accord with the common defense and security.

(6) *Documented evaluation.* The documented evaluation required by paragraph (b)(4) of this section shall include a statement of the objectives of and reasons for the modification and the basis for invoking the exception. If immediately effective regulatory action is required, then the documented evaluation may follow rather than precede the regulatory action. The documented evaluation required by paragraph (b)(4)(i) of this section must include a consideration of the costs of imposing the modification.

(7) *Implementation.* If there are two or more ways to achieve compliance with a license or the rules or orders of the Commission, or with written licensee commitments, or there are two or more ways to reach a level of protection that is adequate, then ordinarily the licensee is free to choose the way that best suits its purposes. However, should it be necessary or appropriate for the Commission to prescribe a specific way to comply with its requirements or to achieve adequate protection, then cost may be a factor in selecting the way, provided that the objective of compliance or adequate protection is met.

(8) *Backfit analysis factors.* In reaching the determination required by paragraph (b)(3) of this section, the Commission will consider how the backfit should be scheduled in light of other ongoing regulatory activities at the facility and, in addition, will consider

264

information available concerning any of the following factors as may be appropriate and any other information relevant and material to the proposed backfit:

(i) Statement of the specific objectives that the proposed backfit is designed to achieve;

(ii) General description of the activity that would be required by the licensee in order to complete the backfit;

(iii) Potential change in the risk to the public from the accidental off-site release of radioactive material;

(iv) Potential impact on radiological exposure of facility employees;

(v) Installation and continuing costs associated with the backfit, including the cost of decommissioning delay;

(vi) The potential safety impact of changes in major decommissioning activities, including the relationship to proposed and existing regulatory requirements;

(vii) The estimated resource burden on the NRC associated with the proposed backfit and the availability of such resources;

(viii) The potential impact of differences in facility type and the percentage of decommissioning completed on the relevancy and practicality of the proposed backfit; and

(ix) Whether the proposed backfit is interim or final and, if interim, the justification for imposing the proposed backfit on an interim basis.

(9) *Impact on licensing actions.* No licensing action will be withheld during the pendency of backfit analyses required by the Commission's rules.

(c) *Responsibility for implementation.* The Executive Director for Operations shall be responsible for implementation of this section, and all analyses required by this section shall be approved by the Executive Director for Operations or his designee.

265

19.    Add § 50.200 to read as follows:

**§ 50.200 Power reactor decommissioning emergency plans.**

(a) *Post-shutdown emergency plans* (PSEP). If the licensee elects in § 50.54(q)(7)(i) of
this part to comply with this section, then the licensee's onsite emergency response
plans must meet the planning standards of § 50.47(b) of this part and the requirements
in appendix E to this part. For a PSEP, emergency response organization (ERO)
staffing required by § 50.47(b)(2) of this part and appendix E to this part may be
commensurate with a reduced spectrum of credible accidents for a permanently
shutdown and defueled power reactor facility.

(b) *Permanently defueled emergency plans* (PDEP). If the licensee elects in
§ 50.54(q)(7)(ii) of this part to comply with this section, then the licensee's onsite
emergency response plans must meet the requirements in paragraph (c) of this section
and the following planning standards:

(1) Primary responsibilities for emergency response by the nuclear facility licensee and
by State and local organizations have been assigned, the emergency responsibilities of
the various supporting organizations have been specifically established, and each
principal response organization has staff to respond and to augment its initial response
on a continuous basis.

(2) On-shift facility licensee responsibilities for emergency response are unambiguously
defined, adequate staffing to provide initial facility accident response in key functional
areas is maintained at all times, timely augmentation of response capabilities is available
and the interfaces among various onsite response activities and offsite support and
response activities are specified.

266

(3) Arrangements for requesting and effectively using assistance resources have been made, and other organizations capable of augmenting the planned response have been identified.

(4) A standard emergency classification and action level scheme, the bases of which include facility system and effluent parameters, is in use by the nuclear facility licensee.

(5) Procedures have been established for notification, by the licensee, of State and local response organizations and for notification of emergency personnel by all organizations; the content of initial and followup messages to response organizations has been established.

(6) Provisions exist for prompt communications among principal response organizations to emergency personnel.

(7) The principal points of contact with the news media for dissemination of information during an emergency are established in advance, and procedures for coordinated dissemination of information to the public are established.

(8) Adequate emergency facilities and equipment to support the emergency response are provided and maintained.

(9) Adequate methods, systems, and equipment for assessing and monitoring actual or potential consequences of a radiological emergency condition are in use.

(10) A range of protective actions has been developed for emergency workers and the public.

(11) Means for controlling radiological exposures in an emergency are established for emergency workers.

(12) Arrangements are made for medical services for contaminated injured individuals.

(13) General plans for recovery and reentry are developed.

(14) Periodic exercises will be conducted to evaluate major portions of emergency response capabilities, periodic drills will be conducted to develop and maintain key skills, and deficiencies identified as a result of exercises or drills will be corrected.

(15) Radiological emergency response training is provided to those who may be called on to assist in an emergency.

(16) Responsibilities for plan development and review and for distribution of emergency plans are established, and planners are properly trained.

(c) Content of emergency plans.

(1) Emergency plans must contain, but not necessarily be limited to, information needed to demonstrate compliance with the elements set forth below, *i.e.*, organization for coping with radiological emergencies, assessment actions, activation of emergency organization, notification procedures, emergency facilities and equipment, training, maintaining emergency preparedness, and recovery.

(i) Organization.

(A) The organization for coping with radiological emergencies must be described, including definition of authorities, responsibilities, and duties of individuals assigned to the licensee's emergency organization and the means for notification of such individuals in the event of an emergency.  Specifically, the following must be included:

(1) A description of the normal plant organization.

(2) A description of the onsite ERO with a detailed discussion of:

(i) Authorities, responsibilities, and duties of the individual(s) who will take charge during an emergency;

(ii) Plant staff emergency assignments;

268

(*iii*) Authorities, responsibilities, and duties of an onsite emergency coordinator who shall be in charge of the exchange of information with offsite authorities responsible for coordinating and implementing offsite emergency measures.

(3) Identification, by position and function to be performed, of persons within the licensee organization who will be responsible for making dose projections, and a description of how these projections will be made and the results transmitted to State and local authorities, NRC, and other appropriate governmental entities.

(4) A description of the local offsite services to be provided in support of the licensee's emergency organization.

(5) Identification of assistance expected from appropriate State, local, and Federal agencies with responsibilities for coping with emergencies, including an act directed toward a nuclear power plant or its personnel that includes the use of violent force to destroy equipment, take hostages, and/or intimidate the licensee to achieve an end. This includes attack by air, land, or water using guns, explosives, projectiles, vehicles, or other devices used to deliver destructive force.

(B) [Reserved]

(ii) Assessment actions.

(A) The means to be used for determining the magnitude of, and for continually assessing the impact of, the release of radioactive materials must be described, including emergency action levels that are to be used as criteria for determining the need for notification and participation of local and State agencies, the Commission, and other Federal agencies, and the emergency action levels that are to be used for determining when and what type of protective measures should be considered within the site boundary to protect health and safety. The emergency action levels must be based on in-plant conditions and instrumentation in addition to onsite monitoring. Emergency

269

action levels must be reviewed with the State and local governmental authorities on an
annual basis.

(B) A licensee desiring to change its entire emergency action level scheme must submit
an application for an amendment to its license and receive NRC approval before
implementing the change. Licensees must follow the change process in § 50.54(q) for
all other emergency action level changes.

(iii) Activation of emergency organization.

(A) The entire spectrum of emergency conditions that involve the alerting or activating of
progressively larger segments of the total emergency organization must be described.
The communication steps to be taken to alert or activate emergency personnel under
each class of emergency must be described. Emergency action levels, based not only
on onsite radiation monitoring information but also on readings from a number of
sensors that indicate a potential emergency for notification of offsite agencies, must be
described. The existence, but not the details, of a message authentication scheme must
be noted for such agencies. The emergency classes defined must include:

(1) Notification of unusual events, and

(2) Alert.

(B) Licensees must establish and maintain the capability to assess, classify, and declare
an emergency condition as soon as possible and within 60 minutes after the availability
of indications to plant operators that an emergency action level has been exceeded and
must promptly declare the emergency condition as soon as possible following
identification of the appropriate emergency classification level. Licensees must not
construe these criteria as a grace period to attempt to restore plant conditions to avoid
declaring an emergency action due to an emergency action level that has been
exceeded. Licensees must not construe these criteria as preventing implementation of

270

response actions deemed by the licensee to be necessary to protect public health and safety provided that any delay in declaration does not deny the State and local authorities the opportunity to implement measures necessary to protect the public health and safety.

(iv) Notification procedures.

(A) Administrative and physical means for notifying local, State, and Federal officials and agencies must be described.  This description must include identification of the State and local government agencies.

(B) A licensee must have the capability to notify responsible State and local governmental agencies as soon as possible and within 60 minutes after declaring an emergency.

(v) Emergency facilities and equipment.  Adequate provisions must be made and described for emergency facilities and equipment, including:

(A) Equipment at the site for personnel monitoring;

(B) Equipment for determining the magnitude of and for continuously assessing the impact of the release of radioactive materials to the environment;

(C) Facilities and supplies at the site for decontamination of onsite individuals;

(D) Facilities and medical supplies at the site for appropriate emergency first aid treatment;

(E) Arrangements for medical service providers qualified to handle radiological emergencies onsite;

(F) Arrangements for transportation of contaminated injured individuals from the site to specifically identified treatment facilities outside the site boundary;

(G) Arrangements for treatment of individuals injured in support of licensed activities on the site at treatment facilities outside the site boundary;

271

(H) A licensee facility from which effective direction can be given and effective control can be exercised during an emergency;

(I) At least one onsite and one offsite communications system; each system must have a backup power source. All communication plans must have arrangements for emergencies, including titles and alternates for those in charge at both ends of the communication links and the primary and backup means of communication. Where consistent with the function of the governmental agency, these arrangements will include:

(1) Provision for communications with contiguous State and local governments. Such communications must be tested monthly.

(2) Provision for communications with Federal emergency response organizations. Such communications systems must be tested annually.

(3) Provisions for communications by the licensee with NRC Headquarters and the appropriate NRC Regional Office Operations Center from the facility. Such communications must be tested monthly.

(vi) Training.

(A) The training program must provide for:

(1) The training of employees and exercising, by periodic drills, of emergency plans to ensure that employees of the licensee are familiar with their specific emergency response duties, and

(2) The participation in the training and drills by other persons whose assistance may be needed in the event of a radiological emergency. The plan must include a description of specialized initial training and periodic retraining programs to be provided to each of the following categories of emergency personnel:

(i) Directors and/or coordinators of the plant emergency organization;

272

(*ii*) Personnel responsible for accident assessment;

(*iii*) Radiological monitoring teams;

(*iv*) Fire control teams (fire brigades);

(*v*) Repair and damage control teams;

(*vi*) First aid and rescue teams;

(*vii*) Medical support personnel; and

(*viii*) Security personnel.

(*3*) In addition, a radiological orientation training program must be made available to local services personnel, such as local emergency services and local law enforcement personnel.

(B) The plan must describe provisions for the conduct of emergency preparedness exercises as follows: Exercises must test the adequacy of timing and content of implementing procedures and methods, test emergency equipment and communications networks, and ensure that emergency organization personnel are familiar with their duties.[1]

(*1*) Within two years of the NRC's docketing of the licensee's certifications required under § 50.82(a)(1) of this part or § 52.110(a) of this chapter, each licensee must conduct an exercise of its onsite emergency plan.

(*2*) Each licensee at each site must conduct a subsequent exercise of its onsite emergency plan every 2 years. In addition, the licensee must take actions necessary to ensure that adequate emergency response capabilities are maintained during the interval between biennial exercises by conducting drills, including at least one drill involving a combination of some of the principal functional areas of the licensee's onsite

---

[1] Use of site-specific simulators or computers is acceptable for any exercise.

emergency response capabilities. The principal functional areas of emergency response include activities such as management and coordination of emergency response, accident assessment, event classification, notification of offsite authorities, assessment of the onsite impact of radiological releases, system repair, and mitigative action implementation. During these drills, activation of all of the licensee's emergency response facilities is not necessary, licensees have the opportunity to consider accident management strategies, supervised instruction is permitted, operating staff in all participating facilities have the opportunity to resolve problems (success paths) rather than have controllers intervene, and the drills may focus on the onsite exercise training objectives.

(3) Licensees must enable any State or local government to participate in the licensee's drills and exercises when requested by such State or local government.

(4) Remedial exercises will be required if the emergency plan is not satisfactorily tested during the biennial exercise, such that NRC cannot: (1) find reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency or (2) determine that the ERO has maintained key skills specific to emergency response.

(5) All exercises, drills, and training that provide performance opportunities to develop, maintain, or demonstrate key skills must provide for formal critiques in order to identify weak or deficient areas that need correction. Any weaknesses or deficiencies that are identified in a critique of exercises, drills, or training must be corrected.

(6) Licensees must use drill and exercise scenarios that provide reasonable assurance that anticipatory responses will not result from preconditioning of participants. Exercise and drill scenarios as appropriate must emphasize coordination among onsite and offsite response organizations.

274

(vii) Maintaining emergency preparedness.

(A) Provisions to be employed to ensure that the emergency plan, its implementing procedures, and emergency equipment and supplies are maintained up to date must be described.

(B) [Reserved]

(viii) Recovery.

(A) Criteria to be used to determine when, following an accident, reentry of the facility would be appropriate must be described.

(B) [Reserved]

(2) [Reserved]

20.    In appendix A to part 50, revise the last sentence of criterion 1 of section I. Overall Requirements to read as follows:

**Appendix A to Part 50--General Design Criteria for Nuclear Power Plants**
*****

I. Overall Requirements

*Criterion 1—Quality standards and records.* *** Appropriate records of the design, fabrication, erection, and testing of structures, systems, and components important to safety shall be maintained by or under the control of the nuclear power unit licensee until the NRC dockets the certifications required under § 50.82(a)(1) of this part or § 52.110(a) of this chapter and the licensee concludes, using an NRC-approved change process, that these structures, systems, and components will not in the future serve any safety purpose regulated by the NRC.

*   *   *   *   *

275

21.    Amend appendix E to part 50 by:

a. Removing paragraph I.6;

b. In paragraph IV.4, remove the words "of the later of the date" and "or

December 23, 2011,";

c. Add paragraph IV.8;

d. In paragraph IV.A.7, remove the words, "By June 23, 2014,

identification" and add in their place the word, "Identification";

e. In paragraph IV.A.9, remove the words, "By December 24, 2012, for"

and add in its place the word, "For";

f. In paragraph IV.B.1, remove the words, "By June 20, 2012, for" and

add in their place the word, "For";

g. In paragraph IV.C.2, remove the words, "By June 20, 2012, nuclear"

and add in their place the word, "Nuclear";

h. Remove paragraph IV.D.4;

i. In paragraph IV.E.8.c introductory text, remove the words, "By June 20,

2012, for" and add in their place the word, "For";

j. In paragraph IV.E.8.d, remove the last sentence;

k. In paragraph IV.F.2.d remove the words "and should fully participate in

one hostile action exercise by December 31, 2015";

l. In paragraph IV.F.2.j, remove the 5th sentence;

m. Add paragraph IV.F.2.k;

n. In paragraph IV.I, remove the words, "By June 20, 2012, for" and add

in their place the word, "For";

o. In paragraph VI.4.a, remove the words, "by October 28, 1991";

276

p. In paragraph VI.4.d, remove the words "by February 13, 1993, or" and

", whichever comes later".

The revisions and addition read as follows:

**Appendix E to Part 50 – Emergency Planning and Preparedness for Production and Utilization Facilities**

\*   \*   \*   \*   \*
IV.\*\*\*

8. A nuclear power reactor licensee is not subject to the requirements of paragraphs 4, 5, and 6 of this section once the NRC dockets the licensee's certifications required under § 50.82(a)(1) of this part or § 52.110(a) of this chapter.

\*   \*   \*   \*   \*
F.\*\*\*

2.\*\*\*

k. For each nuclear reactor for which the NRC has docketed the certifications required under § 50.82(a)(1) of this part or § 52.110(a) of this chapter, the nuclear reactor's licensee must follow the biennial exercise requirements of either paragraph 2 of this section or § 50.200(c) of this part.

\*   \*   \*   \*   \*

**PART 51 – ENVIRONMENTAL PROTECTION REGULATIONS FOR DOMESTIC LICENSING AND RELATED REGULATORY FUNCTIONS**

22.   The authority citation for part 51 continues to read as follows:

**Authority:** Atomic Energy Act of 1954, secs. 161, 193 (42 U.S.C. 2201, 2243) Energy Reorganization Act of 1974, secs. 201, 202 (42 U.S.C. 5841, 5842); National Environmental Policy Act of 1969 (42 U.S.C. 4332, 4334, 4335); Nuclear Waste Policy

Act of 1982, sec. 144(f), 121, 135, 141, 148 (42 U.S.C. 10134(f), 10141, 10155, 10161, 10168); 44 U.S.C. 3504 note.

## § 51.53 Postconstruction environmental reports. [Amended]

23.    In § 51.53, remove the words "Each applicant for a license amendment authorizing decommissioning activities for a production or utilization facility either for unrestricted use or based on continuing use restrictions applicable to the site; and each applicant for a license amendment approving a license termination plan or decommissioning plan under § 50.82 of this chapter" and add in their place the words "Each applicant for a license amendment approving a license termination plan under § 50.82 of this chapter or § 52.110 of this chapter or a decommissioning plan under § 50.82 of this chapter".

## § 51.95 Postconstruction environmental impact statements. [Amended]

24.    In § 51.95, remove the words "of an operating or combined license authorizing decommissioning activities at a production or utilization facility covered by § 51.20," and add in their place the words "approving a license termination plan under § 50.82 of this chapter or § 52.110 of this chapter or a decommissioning plan under § 50.82 of this chapter".

## PART 52 – LICENSES, CERTIFICATIONS, AND APPROVALS FOR NUCLEAR POWER PLANTS

25.    The authority citation for 10 CFR part 52 is revised to read as follows:

**Authority:** Atomic Energy Act of 1954, secs. 53, 63, 81, 103, 104, 147, 149, 161, 181, 182, 183, 185, 186, 189, 223, 234 (42 U.S.C. 2073, 2093, 2113, 2133, 2134, 2167, 2169, 2201, 2231, 2232, 2233, 2235, 2236, 2239, 2273, 2282); Energy Reorganization Act of 1974, secs. 201, 202, 206, 211 (42 U.S.C. 5841, 5842, 5846, 5851); 44 U.S.C. 3504 note.

26.    In § 52.0, revise paragraph (a) to read as follows:

**§ 52.0 Scope; applicability of 10 CFR Chapter I provisions.**

(a) This part governs the issuance of early site permits, standard design certifications,

combined licenses, standard design approvals, and manufacturing licenses for nuclear

power facilities licensed under Section 103 of the Atomic Energy Act of 1954, as

amended (68 Stat. 919), and Title II of the Energy Reorganization Act of 1974 (88 Stat.

1242) through the termination of the associated 10 CFR part 52 licenses. This part also

gives notice to all persons who knowingly provide to any holder of or applicant for an

approval, certification, permit, or license, or to a contractor, subcontractor, or consultant

of any of them, components, equipment, materials, or other goods or services that relate

to the activities of a holder of or applicant for an approval, certification, permit, or license,

subject to this part, that they may be individually subject to NRC enforcement action for

violation of the provisions in 10 CFR 52.4.

\*        \*        \*        \*        \*

27.    In § 52.3, revise paragraph (b)(9) to read as follows:

**§ 52.3 Written communications.**

\*        \*        \*        \*        \*

(b)\*\*\*

279

(9) *Certification of permanent fuel removal*. The licensee's certification of permanent

fuel removal, under § 52.110(a)(1), must state the date of permanent cessation of

operations, the date on which the fuel was removed from the reactor vessel, and the

disposition of the fuel, and must be submitted to the NRC's Document Control Desk.

This submission must be under oath or affirmation.

\*       \*       \*       \*       \*

      28.    In § 52.63, revise paragraph (b)(2) to read as follows:

**§ 52.63 Finality of standard design certifications.**

\*       \*       \*       \*       \*

(b)\*       \*       \*

(2) Subject to § 50.59 of this chapter, a licensee who references a design certification

rule may make departures from the design of the nuclear power facility, without prior

Commission approval, unless the proposed departure involves a change to the design

as described in the rule certifying the design.

(i) The licensee shall maintain records of all departures from the design of the facility and

these records must be maintained and available for audit until the date of termination of

the license.

(ii) Licensees for which the NRC has docketed the certifications required under §

52.110(a) of this part are not required to retain records of departures from the design of

the facility associated with structures, systems, and components that have been

permanently removed from service using an NRC-approved change process.

\*\*\*\*\*

280

**§ 52.109 [Amended]**

  29. In § 52.109, remove the words "to authorize ownership and possession of the production or utilization facility,".

  30. In § 52.110, revise paragraphs (b), (d), (f)(2), (h)(1)(i), and (h)(2), add paragraphs (h)(5) through (8), and revise paragraph (i) introductory text and paragraph (i)(2)(vi) to read as follows:

**§ 52.110 Termination of license.**

\*  \*  \*  \*  \*

(b)(1) Upon the NRC's docketing of the licensee's certifications required under paragraph (a) of this section, or when a final legally effective order to permanently cease operations has come into effect, the 10 CFR part 52 license no longer authorizes operation of the reactor or emplacement or retention of fuel into the reactor vessel.
(2) The facility licensed under this part is no longer a utilization facility once the licensee meets the criteria of paragraph (b)(1) of this section and modifies the facility to be incapable of making use of special nuclear material without significant facility alterations necessary to restore the capability to make use of special nuclear material. The NRC maintains the authority to regulate the 10 CFR part 52 license with respect to the possession of special nuclear material, source material, and byproduct material under sections 53, 63, 81, and 161 of the Act, as applicable. Until the termination of the 10 CFR part 52 license under paragraph (k) of this section, the regulations of this chapter applicable to a utilization facility continue to apply to the holder of the license unless the regulations explicitly state otherwise.

\*  \*  \*  \*  \*

(d)(1) Prior to or within 2 years following permanent cessation of operations, the licensee shall submit a post-shutdown decommissioning activities report (PSDAR) to the NRC, and a copy to the affected State(s). The PSDAR must include a description of the planned decommissioning activities along with a schedule for their accomplishment, a discussion that provides whether the environmental impacts associated with site-specific decommissioning activities will be bounded by appropriate federally issued environmental review documents, and a site-specific decommissioning cost estimate. (2) The NRC shall notice in the *Federal Register* the receipt of the PSDAR and the availability for public comment of the PSDAR and the Irradiated Fuel Management Plan required by § 50.54(bb) of this chapter. The NRC shall also schedule a public meeting in the vicinity of the licensee's facility upon receipt of the PSDAR. The NRC shall include a notice in a forum, such as local newspapers, that is readily accessible to individuals in the vicinity of the site, and in the *Federal Register* notice required by this paragraph (d)(2), announcing the date, time and location of the meeting, along with a brief description of the purpose of the meeting.

\*       \*       \*       \*       \*

(f)***

(2) Result in significant environmental impacts not bounded by appropriate federally issued environmental review documents; or

\*       \*       \*       \*       \*

(h)***

(1)***

(i) The withdrawals are for expenses for activities consistent with the definition of decommissioning in § 52.1 of this part;

\*       \*       \*       \*       \*

(2) Initially, 3 percent of the generic amount specified in § 50.75(b) and (c) of this chapter may be used for decommissioning planning. For licensees that have submitted the certifications required under paragraph (a) of this section and commencing 90 days after the NRC has received the PSDAR, an additional 20 percent may be used. A site-specific decommissioning cost estimate must be submitted to the NRC before the licensee may use any funding in excess of these amounts.

*       *       *       *       *

(5) After submitting its site-specific decommissioning cost estimate required by paragraph (d)(1) of this section, and until the licensee has completed its final radiation survey and demonstrated that residual radioactivity has been reduced to a level that permits termination of its license, the licensee must annually submit to the NRC, by March 31, a financial assurance status report. The report may combine the reporting requirements of § 72.30 of this chapter and § 52.110(h)(7) of this part. The report must include the following information, current through the end of the previous calendar year:
(i) The amount spent on decommissioning, both cumulative and over the previous calendar year, the remaining balance of any decommissioning funds, and the amount provided by other financial assurance methods being relied upon;
(ii) An estimate of the costs to complete decommissioning, reflecting any difference between actual and estimated costs for work performed during the year, and the decommissioning criteria upon which the estimate is based;
(iii) Any modifications occurring to a licensee's current method of providing financial assurance since the last submitted report; and
(iv) Any material changes to trust agreements or financial assurance contracts.

(6) If the sum of the balance of any remaining decommissioning funds, plus earnings on such funds calculated at not greater than a 2 percent real rate of return, together with the amount provided by other financial assurance methods being relied upon, does not cover the estimated cost to complete the decommissioning, the financial assurance status report must include additional financial assurance to cover the estimated cost of completion.

(7) After submitting its site-specific decommissioning cost estimate required by paragraph (d)(1) of this section, if spent fuel is on site, the licensee must annually submit to the NRC, by March 31, a report on the status of its funding for managing irradiated fuel. The report must include the following information, current through the end of the previous calendar year:

(i) The amount of funds accumulated to cover the cost of managing the irradiated fuel;

(ii) The projected cost of managing irradiated fuel until title to the fuel and possession of the fuel is transferred to the Secretary of Energy; and

(iii) If the funds accumulated do not cover the projected cost, a plan to obtain additional funds to cover the cost.

(8) A licensee may use 10 CFR 50.75 decommissioning trust funds for spent fuel management and 10 CFR part 72 specific license ISFSI decommissioning expenses provided the following conditions are met:

(i) The NRC has docketed the licensee's certifications required under § 52.110(a) of this part;

(ii) At least 90 days have passed since the NRC has received the licensee's PSDAR; and

(iii) The licensee continues to meet § 52.110(h)(1)(ii) and (iii) of this part.

284

(i) All power reactor licensees that commenced operation must submit an application for termination of license. The application for termination of license must be accompanied or preceded by a license termination plan to be submitted for NRC approval.

(2)*      *      *

(vi) An updated site-specific estimate of remaining decommissioning costs and identification of sources of funds for license termination, spent fuel management, and ISFSI decommissioning, as applicable;

*      *      *      *      *

## PART 72 – LICENSING REQUIREMENTS FOR THE INDEPENDENT STORAGE OF SPENT NUCLEAR FUEL, HIGH-LEVEL RADIOACTIVE WASTE, AND REACTOR-RELATED GREATER THAN CLASS C WASTE

31.    The authority citation for 10 CFR part 72 continues to read as follows:

**Authority:** Atomic Energy Act of 1954, secs. 51, 53, 57, 62, 63, 65, 69, 81, 161, 182, 183, 184, 186, 187, 189, 223, 234, 274 (42 U.S.C. 2071, 2073, 2077, 2092, 2093, 2095, 2099, 2111, 2201, 2210e, 2232, 2233, 2234, 2236, 2237, 2238, 2273, 2282, 2021); Energy Reorganization Act of 1974, secs. 201, 202, 206, 211 (42 U.S.C. 5841, 5842, 5846, 5851); National Environmental Policy Act of 1969 (42 U.S.C. 4332); Nuclear Waste Policy Act of 1982, secs. 117(a), 132, 133, 134, 135, 137, 141, 145(g), 148, 218(a) (42 U.S.C. 10137(a), 10152, 10153, 10154, 10155, 10157, 10161, 10165(g), 10168, 10198(a)); 44 U.S.C. 3504 note.

32.    In § 72.13, add paragraph (e) to read as follows:

## § 72.13 Applicability.

*      *      *      *      *

(e) The following sections apply to activities associated with a general license, where the licensee has elected to provide for physical protection of the spent fuel in accordance

with § 72.212(b)(9)(vii)(A): § 72.1; § 72.2(a)(1), (b), (c), and (e); §§ 72.3 through

72.6(c)(1); §§ 72.7 through § 72.13(a) and (e); § 72.30(b), (c), (d), (e), and (f); § 72.32(c)

and (d); § 72.44(b) and (f); § 72.48; § 72.50(a); § 72.52(a), (b), (d), and (e); § 72.60;

§ 72.62; §§ 72.72 through 72.80(f); §§ 72.82 through 72.86; §§ 72.104 through 72.106;

§§ 72.122 through 72.126; §§ 72.140 through 72.176; §§ 72.180 through 72.186;

§ 72.190; § 72.194; §§ 72.210 through 72.220; and § 72.240(a).


33.    In § 72.30, revise paragraph (b) and (c) introductory text to read as

follows:

**§ 72.30 Financial assurance and recordkeeping for decommissioning.**

*    *    *    *    *

(b)(1) Each applicant for a specific license under this part must submit, as part of its

application, a decommissioning funding plan for NRC review and approval.

(2) Each holder of a general license under this part must submit, prior to the initial

storage of spent fuel under § 72.212(a)(3) of this part, a decommissioning funding plan

for NRC review and approval.

(3) The decommissioning funding plans required by paragraphs (b)(1) and (2) of this

section must contain:

(i) Information on how reasonable assurance will be provided that funds will be available

to decommission the ISFSI or MRS.

(ii) A detailed cost estimate for decommissioning, in an amount reflecting:

(A) The cost of an independent contractor to perform all decommissioning activities;

(B) An adequate contingency factor; and

(C) The cost of meeting the § 20.1402 of this chapter criteria for unrestricted use,

provided that, if the applicant or licensee can demonstrate its ability to meet the

286

provisions of § 20.1403 of this chapter, the cost estimate may be based on meeting the
§ 20.1403 criteria.

(iii) Identification of and justification for using the key assumptions contained in the
decommissioning cost estimate.

(iv) A description of the method of assuring funds for decommissioning from paragraph
(e) of this section, including means for adjusting cost estimates and associated funding
levels periodically over the life of the facility.

(v) The volume of onsite subsurface material containing residual radioactivity that will
require remediation to meet the criteria for license termination.

(vi) A certification that financial assurance for decommissioning has been provided in the
amount of the cost estimate for decommissioning.

(c) At the time of license renewal and at intervals not to exceed 3 years, the
decommissioning funding plan must be resubmitted with adjustments as necessary to
account for changes in costs and the extent of contamination. The decommissioning
funding plan must update the information submitted with the original or prior plan and
must specifically consider the effect of the following events on decommissioning costs:

\*      \*      \*      \*      \*

34.     In § 72.32, revise paragraph (a) introductory text and paragraph (c) to
read as follows:

§ 72.32 Emergency Plans.

\*      \*      \*      \*      \*

(a) Each application for an ISFSI that is licensed under this part which is not located on
the site or within the exclusion area, as defined in 10 CFR part 100, of a nuclear power

reactor licensed under parts 50 or 52 of this chapter must be accompanied by an
Emergency Plan that includes the following information:

\*       \*       \*       \*       \*

(c) For an ISFSI that is located on the site or within the exclusion area, as defined in
10 CFR part 100, of a nuclear power reactor licensed under parts 50 or 52 of this
chapter, the emergency plan required by 10 CFR 50.47 shall be deemed to satisfy the
requirements of this section.

     35.      In § 72.72, revise paragraph (d) to read as follows:

**§ 72.72 Material balance, inventory, and records requirements for stored materials.**

\*       \*       \*       \*       \*

(d)(1) Except as provided in paragraph (d)(2) of this section, records of spent fuel, high-
level radioactive waste, and reactor-related GTCC waste containing special nuclear
material meeting the requirements in paragraph (a) of this section must be kept in
duplicate.  The duplicate set of records must be kept at a separate location sufficiently
remote from the original records that a single event would not destroy both sets of
records.

(2) A single copy of the records described in paragraph (d)(1) of this section may be
maintained in a single storage facility provided the facility meets the requirements of an
NRC-approved quality assurance program for the storage of records.

(3) Records of spent fuel or reactor-related GTCC waste containing special nuclear
material transferred out of an ISFSI or records of spent fuel, high-level radioactive waste,
or reactor-related GTCC waste containing special nuclear material transferred out of an
MRS must be preserved for a period of five years after the date of transfer.

36.    In § 72.212, add paragraph (b)(9)(vii) to read as follows:

**§ 72.212 Conditions of general license issued under § 72.210.**

(b)***

(9)***

(vii)(A) Upon NRC docketing of the certifications required under § 50.82(a)(1) of this

chapter or § 52.110(a) of this chapter, and when all spent fuel has been placed in dry

cask storage at the facility, the licensee may, as an alternative to the requirements of

§ 72.212(b)(9)(i) through (vi) of this part, provide for physical protection of the spent fuel

under subpart H of this part and § 73.51 of this chapter.

(B) A licensee who elects to provide physical protection under subpart H of this part and

§ 73.51 of this chapter will submit their physical security plan to the NRC under

§ 50.54(p) of this chapter.

*        *        *        *        *

37.    Revise § 72.218 to read as follows:

**§ 72.218 Termination of licenses.**

(a) Upon removal of the spent fuel stored under this general license from the reactor

site, the licensee must decommission the ISFSI consistent with requirements in § 50.82

of this chapter or § 52.110 of this chapter, as applicable.

(b) The general license under this part is terminated upon termination of the

10 CFR part 50 or 10 CFR part 52 license under § 50.82(a)(11) of this chapter or §

52.110(k) of this chapter, respectively.

289

**PART 73 – PHYSICAL PROTECTION OF PLANTS AND MATERIALS**

38.   The authority citation for 10 CFR part 73 continues to read as follows:

**Authority:**  Atomic Energy Act of 1954, secs. 53, 147, 149, 161, 170D, 170E, 170H, 170I, 223, 229, 234, 1701 (42 U.S.C. 2073, 2167, 2169, 2201, 2210d, 2210e, 2210h, 2210i, 2273, 2278a, 2282, 2297f); Energy Reorganization Act of 1974, secs. 201, 202 (42 U.S.C. 5841, 5842); Nuclear Waste Policy Act of 1982, secs. 135, 141 (42 U.S.C. 10155, 10161); 44 U.S.C. 3504 note.

Section 73.37(b)(2) also issued under sec. 301, Pub. L. 96-295, 94 Stat. 789 (42 U.S.C. 5841 note).

39.   In § 73.51, revise paragraphs (a) introductory text, (a)(1) introductory text,

and (a)(2) and add paragraph (a)(3) to read as follows:

**§ 73.51 Requirements for the physical protection of stored spent nuclear fuel and high-level radioactive waste.**

(a) *Applicability.*  Notwithstanding the provisions of § 73.20, § 73.50, or § 73.67 of this

part, the physical protection requirements of this section apply to each licensee that

stores spent nuclear fuel and high-level radioactive waste:

(1) Under a specific license issued pursuant to part 72 of this chapter:

\*       \*       \*       \*       \*

(2) At a geologic repository operations area (GROA) licensed pursuant to part 60 or 63

of this chapter; or

(3) Under a general license issued pursuant to part 72 of this chapter and upon the

NRC's docketing of the certifications required under § 50.82(a)(1) of this chapter or §

52.110(a) of this chapter, when all spent fuel has been placed in dry cask storage at the

facility, and notification has been made to the NRC under the provisions of §

72.212(b)(9)(vii) of this chapter.

\*      \*      \*      \*      \*

40.      In § 73.54, remove the introductory text, revise the introductory text of
paragraphs (a), (b), and (c), and add paragraphs (i) and (j) to read as follows:

**§ 73.54 Protection of digital computer and communication systems and networks.**

(a) Each holder of an operating license for a nuclear power reactor under part 50 of this
chapter and each holder of a combined license under part 52 of this chapter for which
the Commission has made the finding under § 52.103(g) of this chapter shall provide
high assurance that its digital computer and communication systems and networks are
adequately protected against cyber attacks, up to and including the design basis threat
as described in § 73.1 of this part.

\*      \*      \*      \*      \*

(b) To accomplish the objectives in paragraph (a) of this section, the licensee shall:

\*      \*      \*      \*      \*

(c) The licensee's cyber security program must be designed to:

\*      \*      \*      \*      \*

(i) The requirements of this section no longer apply once the following criteria are
satisfied:

(1) The NRC has docketed the licensee's certifications required under § 50.82(a)(1) of
this chapter or § 52.110(a) of this chapter; and

(2) At least 10 months (for a boiling water reactor) or at least 16 months (for a
pressurized water reactor) have elapsed since the date of permanent cessation of

291

operations, or an NRC-approved alternative spent fuel decay period, submitted under § 50.54(q)(7)(ii)(A) and (B) of this chapter, has elapsed.

(j) *Removal of cyber security license condition*. The cyber security plan license condition, which requires the licensee to fully implement and maintain in effect all provisions of the Commission-approved cyber security plan including changes made pursuant to the authority of § 50.90 of this chapter and § 50.54(p) of this chapter, is removed from the license once the conditions in paragraph (i) of this section are satisfied.

      41.    In § 73.55:

          a. Revise paragraph (b)(3) introductory text;

          b. Add paragraphs (b)(9)(ii)(B)(*1*) and (*2*);

          c. Revise paragraphs (c)(6), (e)(9)(v)(A), (j)(4)(ii), and (p)(1)(i) and (ii).

The revisions and additions read as follows:

**§ 73.55 Requirements for physical protection of licensed activities in nuclear power reactors against radiological sabotage.**

\*    \*    \*    \*    \*

(b)\*\*\*

(3) The physical protection program must be designed to prevent significant core damage until the NRC has docketed the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter. The physical protection program must also be designed to prevent spent fuel sabotage. Specifically, the program must:

\*    \*    \*    \*    \*

(9)\*\*\*

(ii)\*\*\*

(B)\*\*\*

(1) Licensees who are implementing 10 CFR part 26, regardless of whether they are required to do so, are in compliance with paragraph (b)(9)(ii)(B) of this section.

(2) Licensees, upon the NRC's docketing of their certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter, will be in compliance with paragraph (b)(9)(ii)(B) of this section by implementing the following:

(i) A fitness for duty program in which individuals who maintain unescorted access authorization and have unescorted access to a vital area, individuals who perform the duties under § 26.4(a)(5) of this chapter, and individuals who perform duties under § 26.4(g) of this chapter, are subject to the requirements in 10 CFR part 26 except for subparts I and K; and

(ii) A fitness for duty program in which those individuals who are not included in paragraph (b)(9)(ii)(B)(2)(i) of this section, maintain unescorted access authorization, and have unescorted access to the protected area are subject to the requirements of §§ 26.31(c)(1) and (2) and 26.33 of this chapter.

\*      \*      \*      \*      \*

(c)\*\*\*

(6) Cyber Security Plan. The licensee shall establish, maintain, and implement a Cyber Security Plan in accordance with the requirements of § 73.54 of this part. The licensee no longer needs to maintain and implement its Cyber Security Plan once the criteria in § 73.54(i) of this part have been satisfied.

\*      \*      \*      \*      \*

(e)\*\*\*

(9)\*\*\*

293

(v)***

(A) The reactor control room, unless the licensee has submitted and the NRC has docketed the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter, and the licensee has documented that all vital equipment has been removed from the control room and the control room does not serve as the vital area boundary for other vital areas;

\*      \*      \*      \*      \*

(j)***

(4)***

(ii) A system for communication with the control room, or, if the NRC has docketed the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter, a system for communication with the certified fuel handler or the senior on-shift licensee representative responsible for overall safety and security of the permanently shutdown and defueled facility.

\*      \*      \*      \*      \*

(p)***

(1)***

(i) In accordance with § 50.54(x) and (y) of this chapter, the licensee may suspend any security measures under this section in an emergency when this action is immediately needed to protect the public health and safety and no action consistent with license conditions and technical specifications that can provide adequate or equivalent protection is immediately apparent.  This suspension of security measures must be approved as a minimum by a licensed senior operator, or, if the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter have been docketed by

the NRC, by either a licensed senior operator or a certified fuel handler, before taking this action.

(ii) During severe weather when the suspension of affected security measures is immediately needed to protect the personal health and safety of security force personnel and no other immediately apparent action consistent with the license conditions and technical specifications can provide adequate or equivalent protection. This suspension of security measures must be approved, as a minimum, by a licensed senior operator, or, if the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter have been docketed by the NRC, by either a licensed senior operator or a certified fuel handler, with input from the security supervisor or manager, before taking this action.

\*    \*    \*    \*    \*

## PART 140 – FINANCIAL PROTECTION REQUIREMENTS AND INDEMNITY AGREEMENTS

42.    The authority citation for 10 CFR part 140 continues to read as follows:

**Authority:** Atomic Energy Act of 1954, secs. 161, 170, 223, 234 (42 U.S.C. 2201, 2210, 2273, 2282); Energy Reorganization Act of 1974, secs. 201, 202 (42 U.S.C. 5841, 5842); 44 U.S.C. 3504 note.

43.    In § 140.11, add paragraph (a)(5), redesignate paragraph (b) as paragraph (c), revise newly redesignated paragraph (c), and add new paragraph (b) to read as follows:

**§ 140.11 Amounts of financial protection for certain reactors.**

295

(a)***

(5) In the amount of at least $100,000,000, for each nuclear reactor:

(i) For which the NRC has docketed the certifications required under § 50.82(a)(1) of this chapter or § 52.110(a) of this chapter, and

(ii) For which at least 10 months (for a boiling water reactor) or 16 months (for a pressurized water reactor) have elapsed since the date of permanent cessation of operations, or for which an NRC-approved alternative to the 10 or 16 month spent fuel decay period, submitted under § 50.54(q)(7)(ii)(A) and (B) of this chapter, has elapsed.
(b) Secondary financial protection (in the form of private liability insurance available under an industry retrospective rating plan providing for deferred premium charges) will no longer be required once the criteria in § 140.11(a)(5)(i) and (ii) of this part have been met.

(c) In any case where two or more nuclear reactors at the same location are licensed under parts 50, 52, or 54 of this chapter, the total financial protection required of the licensee for all such reactors (excluding any applicable secondary financial protection) is the highest amount which would otherwise be required for any one of those reactors; provided, that such financial protection covers all reactors at the location.

44.   In § 140.81, revise paragraph (a) to read as follows:

### § 140.81 Scope and purpose.

(a) *Scope.* This subpart applies to applicants for and holders of operating licenses issued under part 50 of this chapter, combined licenses issued under part 52 of this chapter, or renewed licenses issued under part 54 of this chapter, authorizing operation of production facilities and utilization facilities, and to other persons indemnified with

296

respect to such facilities.  This subpart shall cease to apply to licensees under part 50,

part 52, and part 54 of this chapter once the licensee satisfies the criteria in

§ 140.11(a)(5)(i) and (ii) of this part.

\*       \*       \*       \*       \*

Dated at Rockville, Maryland, this      day of          , 2018.

For the Nuclear Regulatory Commission.

Annette L. Vietti-Cook,
Secretary of the Commission.

297

**FRN:  REGULATORY IMPROVEMENTS FOR PRODUCTION AND UTILIZATION FACILITIES TRANSITIONING TO DECOMMISSIONING   [ENTER DATE HERE]**

ADAMS Accession Number: PKG: ML18012A019;  FRN: ML18012A022.  WITS: SRM-S14-0118-3       * via e-mail

| OFFICE | NMSS/DRM/RRPB/PM* | NMSS/DRM/RRPB/RS* | NMSS/DRM/RRPB/BC | NMSS/DRM/D |
|--------|-------------------|-------------------|------------------|------------|
| NAME | DDoyle | GLappert | MKhanna | PHolahan |
| DATE | 2/7/2018 | 2/6/2018 | 1/31/2018 | 2/21/2018 (w/comments) |
| OFFICE | RES/DE/D* | OCIO/GEMSD/ISB/ICT* | RES/D* | OE/D* |
| NAME | BThomas | DCullison | MWeber | ABoland |
| DATE | 2/13/2018 | 3/2/2018 | 3/6/2018 | 3/2/2018 |
| OFFICE | NSIR/D* | NMSS/D* | NRO/D* | OGC* |
| NAME | BMcDermott (JLubinski for) | MDapas (JTappert for) | FBrown | HBenowitz (NLO) |
| DATE | 3/8/2018 | 3/11/2018 | 3/8/2018 | 4/20/2018 |
| OFFICE | NMSS/DRM/RASB/BC* | NRR/D | EDO | |
| NAME | CBladey | BHolian (MEvans for) | VMcCree (MJohnson for) | |
| DATE | 4/10/2018 | 4/19/2018 | 5/ 7 /2018 | |

OFFICIAL RECORD COPY

# DEPOSITION EXHIBIT

## 130

September 14, 2006

Mr. Karl W. Singer
Chief Nuclear Officer and
    Executive Vice President
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN 37402-2801

SUBJECT:    BELLEFONTE NUCLEAR PLANT, UNITS 1 AND 2 - WITHDRAWAL OF
            CONSTRUCTION PERMIT NOS. CPPR-122 FOR UNIT 1 AND CPPR-123 FOR
            UNIT 2 (TAC NOS. MD1185 and MD1186)

Dear Mr. Singer:

This is in response to your letter of April 6, 2006, as supplemented by letter dated
June 29, 2006, requesting termination of Construction Permit Nos. CPPR-122 and CPPR-123,
issued to the Tennessee Valley Authority (TVA) on December 12, 1974. Construction Permit
Nos. CPPR-122 and CPPR-123 authorized construction of the Bellefonte Nuclear Plant, Units 1
and 2. As requested in your letter of April 6, 2006, your application to withdraw Construction
Permit Nos. CPPR-122 and CPPR-123 is hereby granted. Accordingly, the staff considers
Construction Permit Nos. CPPR-122 and CPPR-123 to be terminated.

The staff has reviewed the Unit 1 and 2 Site Stabilization Plan, included in your letter of
April 6, 2006, as supplemented by letter dated June 29, 2006, and concludes that TVA has
maintained the site in an environmentally stable condition that is not capable of being operated
as a utilization facility. Therefore, the staff finds the Site Stabilization Plan acceptable.

The staff's safety evaluation is enclosed.

                            Sincerely,

                            /RA/

                            Catherine Haney, Director
                            Division of Operating Reactor Licensing
                            Office of Nuclear Reactor Regulation

Docket Nos. 50-438 and 50-439

Enclosure: Safety Evaluation

cc w/encl: See next page

Exhibit 130
D. Repka
2-28-2020
N. Martin, Reporter
Veritext Legal
Solutions

September 14, 2006

Mr. Karl W. Singer
Chief Nuclear Officer and
    Executive Vice President
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN 37402-2801

SUBJECT:    BELLEFONTE NUCLEAR PLANT, UNITS 1 AND 2 - WITHDRAWAL OF
            CONSTRUCTION PERMIT NOS. CPPR-122 FOR UNIT 1 AND CPPR-123  FOR
            UNIT 2 (TAC NOS. MD1185 and MD1186)

Dear Mr. Singer:

This is in response to your letter of April 6, 2006, as supplemented by letter dated
June 29, 2006, requesting termination of Construction Permit Nos. CPPR-122 and CPPR-123,
issued to the Tennessee Valley Authority (TVA) on December 12, 1974.  Construction Permit
Nos. CPPR-122 and CPPR-123 authorized construction of the Bellefonte Nuclear Plant, Units 1
and 2.  As requested in your letter of April 6, 2006, your application to withdraw Construction
Permit Nos. CPPR-122 and CPPR-123 is hereby granted.  Accordingly, the staff considers
Construction Permit Nos. CPPR-122 and CPPR-123 to be terminated.

The staff has reviewed the Unit 1 and 2 Site Stabilization Plan, included in your letter of
April 6, 2006, as supplemented by letter dated June 29, 2006, and concludes that TVA has
maintained the site in an environmentally stable condition that is not capable of being operated
as a utilization facility.  Therefore, the staff finds the Site Stabilization Plan acceptable.

The staff's safety evaluation is enclosed.

                                    Sincerely,

                                    /RA/

                                    Catherine Haney, Director
                                    Division of Operating Reactor Licensing
                                    Office of Nuclear Reactor Regulation

Docket Nos. 50-438 and 50-439

Enclosure:  Safety Evaluation

cc w/encl:  See next page

Distribution
PUBLIC                          LPL2-2 R/F          RidsNrrPMDPickett          RidsNrrLACSola
RidsNrrDorlLpl2-2        RidsNrrDorl         RidsOgcRp                  RidsNrrDlrReba
RidsNrrAcrsAcnwMailCenter                    RidsRgn2MailCenter         S. Crane, NRR
RidsNrrDnrlNepb

**ADAMS Accession Number: ML061810505**                      NRR-106

| OFFICE | LPL2-2:PM | LPL2-2:LA | NEPB:BC | OGC | LPL2-2:BC | DORL:D |
|--------|-----------|-----------|---------|--------|----------------|--------|
| NAME | DPickett | RSola | CNolan | MYoung | JDixon-Herrity | CHaney |
| DATE | 08/30/06 | 08/31/06 | 07/25/06 | 07/10/06 | 08/31/06 | 09/14/06 |

**OFFICIAL RECORD COPY**

Mr. Karl W. Singer
Tennessee Valley Authority

cc:
Mr. Ashok S. Bhatnagar
Senior Vice President
Nuclear Operations
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN  37402-2801

Mr. Larry S. Bryant, Vice President
Nuclear Engineering & Technical Services
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN  37402-2801

Mr. Robert J. Beecken, Vice President
Nuclear Support
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN  37402-2801

General Counsel
Tennessee Valley Authority
ET 11A
400 West Summit Hill Drive
Knoxville, TN  37902

Mr. John C. Fornicola, Manager
Nuclear Assurance and Licensing
Tennessee Valley Authority
6A Lookout Place
1101 Market Street
Chattanooga, TN  37402-2801

Mr. Glenn W. Morris, Manager
Corporate Nuclear Licensing
   and Industry Affairs
Tennessee Valley Authority
4X Blue Ridge
1101 Market Street
Chattanooga, TN  37402-2801

**BELLEFONTE NUCLEAR PLANT**

Mr. Jack A. Bailey, Vice President
Nuclear Generation Development
   and Business Support
Tennessee Valley Authority
3F Blue Ridge
1101 Market Street
Chattanooga, TN  37402-2801

Chairman
Jackson County Commission
Courthouse
Scottsboro, AL  35752-0200

State Health Officer
Alabama Dept. of Public Health
RSA Tower - Administration
Suite 1552
P.O. Box 303017
Montgomery, AL 36130-3017

Director
Alabama Emergency Management Agency
P.O. Drawer 2160
Clanton, AL  35045-5160

SAFETY EVALUATION BY THE OFFICE OF NUCLEAR REACTOR REGULATION

WITHDRAWAL OF CONSTRUCTION PERMIT NOS. CPPR-122 AND CPPR-123

TENNESSEE VALLEY AUTHORITY

BELLEFONTE NUCLEAR PLANT, UNITS 1 AND 2

DOCKET NO. 50-438 AND 50-439

1.0    INTRODUCTION

This safety evaluation supports withdrawal of Construction Permit Nos. CPPR-122 and
CPPR-123, which authorized construction of the Bellefonte Nuclear Plant (BLN), Units 1 and 2,
located in Jackson County, Alabama.  The Construction Permits, which are held by the
Tennessee Valley Authority (TVA, permittee), were issued on December 12, 1974.

In accordance with the guidance of Generic Letter (GL) 87-15, "Policy Statement on Deferred
Plants," TVA's letter of December 12, 2005, informed the staff of its intention to permanently
terminate construction activities associated with BLN, Units 1 and 2.  In addition, TVA's letter
dated December 15, 2005, included the following information: as of October 1, 2005, TVA
ceased equipment lay-up activities and associated inspections as allowed by the Nuclear
Quality Assurance Plan; there has been no special nuclear material located at the site since
1992; TVA has removed safeguards information from the site; and TVA will maintain
compliance with all appropriate federal, state, and local regulations.

2.0    EVALUATION

The BLN facility is located about 6 miles east-northeast of Scottsboro, Alabama, on the west
shore of the Guntersville Reservoir at Tennessee River Mile 392, in Jackson County, Alabama.
TVA plans to maintain such major components as the intake and discharge facilities, cooling
towers, wastewater system, and transmission switch yards.  Structures not identified as
necessary will be sold, taken apart, and removed from the site, abandoned in place, or
demolished.

In accordance with 10 CFR 51.41, "Requirement to submit environmental information," and
GL 87-15, TVA's letter of April 6, 2006, as supplemented by letter dated June 29, 2006,
submitted the Site Stabilization Plan for BLN, Units 1 and 2, to redress portions of the BLN site
affected by construction activities.

The staff has reviewed the Site Stabilization Plan for BLN, Units 1 and 2, and concludes that
the actions therein are appropriate and acceptable.  BLN, Units 1 and 2, cannot be used as
utilization facilities.  In addition, all nuclear fuel and nuclear sources were removed from the

-2-

site. The BLN site is in an environmentally stable condition that poses no significant hazard to persons on site, and BLN, Units 1 and 2, cannot be operated in their present condition.

For further details regarding the proposed action, see the permittee's letter dated April 6, 2006, and TVA's Final Environmental Assessment dated January 30, 2006, which is publicly available at the permitee's website, http://www.tva.gov/environment/reports/bellefonte2/index.htm.

## 3.0   ENVIRONMENTAL CONSIDERATION

Pursuant to 10 CFR 50.21, 50.32, and 50.35, the NRC staff has prepared an Environmental Assessment and Finding of No Significant Impact, which was published in the *Federal Register* on August 29, 2006 (71 FR 50948). Accordingly, based on the environmental assessment, the Commission has determined that terminating the construction permits will have no significant effect on the quality of the human environment.

## 4.0   CONCLUSION

On the basis of the foregoing considerations, the staff concludes that CPPR-122 and CPPR-123 can be terminated without undue risk to the health and safety of the public or workers, and without any significant impact on the public or the environment.

Principal Contributor:  S. Crane, NRR

Date:  September 14, 2006

# DEPOSITION EXHIBIT

# 131

February 18, 2009

MEMORANDUM TO:    R. W. Borchardt
                  Executive Director for Operations

FROM:             Andrew L. Bates, Acting Secretary        /RA/

SUBJECT:          STAFF REQUIREMENTS – COMSECY-08-0041 – STAFF
                  RECOMMENDATION RELATED TO REINSTATEMENT OF THE
                  CONSTRUCTION PERMITS FOR BELLEFONTE NUCLEAR
                  PLANT UNITS 1 AND 2

The Director of NRR is authorized to issue an Order reinstating the construction permits for
Bellefonte Units 1 and 2, placing the facility in terminated plant status.

The staff should publish a notice of opportunity for hearing in association with reinstatement of
the Bellefonte construction permits with the scope of the hearing limited to whether good cause
exists for the reinstatement.

Should TVA choose to pursue deferred plant status, the Director of NRR is authorized to return
the facility to deferred plant status once the Director determines that TVA has demonstrated
compliance with the Commission Policy Statement on Deferred Plants (52 FR 38077, Oct. 14,
1987).

cc:   Chairman Klein
      Commissioner Jaczko
      Commissioner Lyons
      Commissioner Svinicki
      OGC
      CFO
      OCA
      OPA
      Office Directors, Regions, ACRS, ASLBP (via E-Mail)
      PDR

Exhibit 131
D. Repka
2 28 2020
N. Martin, Reporter
Veritext Legal
Solutions

# DEPOSITION EXHIBIT

# 132

In the Matter of CINCINNATI GAS & ELECTRIC COMPANY,..., 20 N.R.C. 765 (1984)

20 N.R.C. 765, 1984 WL 49846

In the Matter of
CINCINNATI GAS & ELECTRIC COMPANY, *et al.*
(William H. Zimmer Nuclear Power Station, Unit 1)

NUCLEAR REGULATORY COMMISSION

ATOMIC SAFETY AND LICENSING BOARD
LBP–84–33
Docket No. 50–358–OL (ASLBP No. 76–317–01–OL)
August 29, 1984

*1 Before Administrative Judges: John H Frye, III, Chairman; Gustave A. Linenberger; Dr. Frank F. Hooper

Licensing Board grants Applicants," unopposed motion to withdraw their application for an operating license for the Zimmer Station and to terminate this proceeding, subject to the condition that Applicants implement, with Staff verification, their site restoration plan. The Board refuses to impose a condition, consented to by Applicants, that the grant of the motion be with prejudice to any future application by these Applicants for a nuclear reactor at this site on the ground that such a condition is unnecessary.

LICENSING BOARDS: DISMISSAL OF PROCEEDINGS
Dismissal of an operating license application with prejudice is a severe sanction which is reserved for unusual situations where it is necessary to prevent substantial prejudice to a party who opposed the application.

**MEMORANDUM AND ORDER**

**(Ruling on Applicants" Motion to Withdraw Application)**

On March 20, 1984, Applicants moved for an Order authorizing withdrawal of their application for an operating license for this facility and dismissing this proceeding. In support of their motion, Applicants represented that:
(1) All fuel would be removed from the site by August 31, 1984;

(2) The nuclear steam supply system would be modified to prevent its operation as a "utilization facility" (defined by § 11(cc) of the Atomic Energy Act) by:
(a) severing and welding caps on the two main feedwater lines and four main steam lines; and

(b) removing the control rod drive mechanisms;

(3) The balance of the plant will be used to the extent possible as part of a fossil-fired generating station; and

(4) Applicants have no objection to the dismissal of the application "with prejudice.'

Only the NRC Staff responded to this motion. In its April 9, 1984, response, Staff points out that § 11(cc) of the Atomic Energy Act defines a "utilization facility" as one which is capable of making use of special nuclear material. Therefore, according to Staff, because the facility is essentially complete, it must be disabled so that it cannot make use of special

Exhibit 132
D. Repka
2-28-2020
N. Martin, Reporter
Veritext Legal
Solutions

nuclear material. Staff found that the modifications which Applicants represented they would make would accomplish this purpose. Staff therefore urged that the motion be granted subject to the condition that these modifications be made and to the condition that the fuel be shipped from the site by August 31; with implementation of the conditions to be verified by Staff.

Staff also noted that it had no objection to dismissal of the application with prejudice and urged that we include such a condition. Staff gave no reasons for this position.

*2 Finally, Staff noted that it was reviewing the site to determine whether conditions for the protection of the environment were necessary. Staff indicated that it would advise the Board of its conclusions in this regard.

On August 2, 1984, Applicants filed certain information with the Board relevant to their motion. In this filing, Applicants advised us that they had shipped their fuel off site and had accomplished the modifications to the nuclear steam supply system which they represented they would make. Applicants therefore renewed the request contained in their motion. On August 7, the Board Chairman wrote counsel for Applicants indicating that the Board would act on the motion promptly upon receiving Staff's conclusions with regard to the need for conditions to protect the environment.

On August 17, the Staff filed a further response to the Applicants" motion. Staff noted that it had conducted an inspection and verified.that the feedwater and main steam lines had been severed and capped, and that the Applicants were in the process of removing the control rod drive mechanisms. During the inspection, Staff verified that the fuel had been removed from the site. This inspection was conducted from April 27 through July 16, 1984. Staff attached a copy of Inspection Report 50–358/84–05 to its response.

Staff also advised us that it had reviewed certain additional information relevant to environmental protection which Applicants furnished in response to Staff's request and had visited the site. Staff concluded that, based upon this review, withdrawal of the application should be conditioned on implementation of Applicants" June 1, 1984, restoration plan (which was furnished with the information Staff requested), such implementation to be verified by Staff. Staff furnished its environmental review and the affidavit of Germain La Roche in support of its conclusion.

After receiving Staff's August 17 response, we inquired of Applicants" counsel whether he wished to reply and were informed that he did not.

We agree with Staff that it is necessary that the nuclear steam supply system be modified to prevent its utilization of special nuclear material and that the reactor fuel be shipped off site. We are satisfied that these steps have been accomplished. Having heard no objection from Applicants, we will condition our authorization to withdraw the application on implementation of the June, 1, 1984, site restoration plan, such implementation to be verified by Staff.

Applicants do not object to the authorization of withdrawal of the application with prejudice and have included such a provision in the draft order accompanying their motion. That provision states that the authorization is 'with prejudice to future reapplication by the Applicants for the construction and operation of any nuclear power facility at the same site.' Staff, without elaboration, urges that the authorization be so conditioned. Ordinarily such a condition would only be imposed if substantial prejudice would otherwise result to a party who opposed the application. *See Puerto Rico Electric Power Authority* (North Coast Nuclear Plant, Unit 1), ALAB–662, 14 NRC 1125 (1981) and *Philadelphia Electric Co.* (Fulton Generating Station, Units 1 and 2), ALAB–657, 14 NRC 967 (1981). Here no party has seen fit to attempt to make such a showing. And despite years of consideration of both the construction permit and operating license, no final agency decision has been rendered which disapproves these Applicants, this site, or this reactor. In these circumstances, we view the attachment of such a condition to the authorization to withdraw the application as unnecessary. Therefore we have not included such a condition.

**In the Matter of CINCINNATI GAS & ELECTRIC COMPANY,..., 20 N.R.C. 765 (1984)**

**\*3** In consideration of the foregoing, it is, this 27th day of August 1984, ORDERED that:

Applicants" motion for authorization to withdraw their application and for termination of this proceeding is granted subject to the condition that Applicants are to implement their June 1, 1984, site restoration plan and Staff is to verify that this has been accomplished within 6 months of the date of this Memorandum and Order.

Dr. Hooper concurs but was unavailable to sign this Memorandum and Order.

FOR THE ATOMIC SAFETY AND LICENSING BOARDGustave A. LinenbergerADMINISTRATIVE JUDGEJohn H Frye III, ChairmanADMINISTRATIVE JUDGE
Bethesda, Maryland

August 29, 1984

20 N.R.C. 765, 1984 WL 49846

End of Document                         © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# DEPOSITION EXHIBIT

# 199

# REDACTED