FILED

2021 Jan-06  AM 10:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

2020 Oct-14  PM 04:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 8 (Part 10)

## Deposition of Stephen Burns
## Dated 8/19/2020
## With Deposition Exhibit
## 199 (redacted) Con't

# Highlighted Portions Confidential

## EXPERT REPORT

Prepared by: Stephen G. Burns

Attorney
Consultant on Nuclear Safety and Regulation
3016 Tilden Street NW, Apt. 201
Washington, DC  20008
Email: sgburns05@gmail.com

Admitted to practice in the District of Columbia

Date: 24 April 2020

### Introduction

1. I served as a Commissioner of the U.S. Nuclear Regulatory Commission (NRC) from November 2014 through April 2019, during which period I was designated Chairman by President Obama from 1 January 2015 until 23 January 2017. I also served as an attorney at the agency from 1978 to 2012, culminating in my service as General Counsel from April 2009 through March 2012. This report documents my expert opinion on an issue of nuclear licensing and regulation that relates to the Purchase and Sale Agreement between Nuclear Development, LLC and the Tennessee Valley Authority (TVA) for the Bellefonte Nuclear Plant Site in Jackson County, Alabama. My report addresses issues related to the application of the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2201 et seq., the NRC's implementing regulations and administrative decisions, as well as issues concerning TVA's compliance with construction permits issued to it.

### Qualifications

2. I left service with the NRC on 30 April 2019 shortly before my term as Commissioner would have expired in June 2019. I was appointed Commissioner by President Obama on 4 November 2014 after confirmation of my nomination by the United States Senate. On 23 December 2014, President Obama designated me as Chairman of the agency effective 1 January 2015 upon conclusion of Chairman Allison Macfarlane's service. As Chairman of the NRC, I was responsible for overall leadership of the agency and supervision of senior agency executives responsible for licensing and oversight of regulated entities and for general administration of the agency. As a Commissioner, I was responsible for decision-making with my colleagues on policy matters, major rulemakings, and adjudications that came before the Commission. As Chairman and Commissioner, I was called to testify before Senate and House committees with jurisdiction over NRC related matters.

3. Prior to my service as an NRC Commissioner, I was the Head of Legal Affairs for the Nuclear Energy Agency (NEA) of the Organisation for Economic Co-operation and Development (OECD) in Paris, France, from April 2012 through October 2014. The NEA is a specialized agency within the OECD which is comprised of 33 member countries that cooperate on nuclear safety, technology, and science, the environment, and nuclear law. As Head of Legal Affairs, I provided legal advice and support to NEA management on contracts and nuclear law issues, carried out the legal education and publications program of the



EXHIBIT
199

NEA, and provided advice and secretariat services to the Nuclear Law Committee and to the Contracting Parties to the Paris Convention on Third Party Liability in the Field of Nuclear Energy. I also served on the International Expert Group on Nuclear Liability which explores nuclear liability issues and advises the International Atomic Energy Agency's Director General.

4. Prior to my post at the OECD NEA, I was employed at the NRC for nearly 34 years. I started with the NRC in 1978 after graduation from law school and served in a number of legal positions with increasing responsibility until I retired as General Counsel in 2012. I was the Deputy Director for Regional Operations and Enforcement from 1983 until 1986 when I became the legal advisor to Vice Admiral (Retired) Kenneth M. Carr upon his appointment to the Commission. When Commissioner Carr was designated Chairman in mid-1989, I also served as his chief of staff. Upon the conclusion of his term in June 1991, the Commission appointed me the Director of the newly formed Office of Commission Appellate Adjudication, which was responsible for monitoring adjudicatory proceedings conducted by the NRC's Atomic Safety and Licensing Board Panel (ASLBP) and drafting Commission decisions in response to appeals from ASLBP decisions or other adjudicatory matters coming directly before the Commission.

5. In 1994, I became Associate General Counsel for Hearings, Enforcement and Administration, and I was responsible for supervising the legal staff engaged in licensing, enforcement, and related adjudications, as well as on personnel and contractual matters related to the NRC's operations. In January 1998, I became Deputy General Counsel, a position in which I supported the General Counsel in managing the office and acted as principal legal advisor to the NRC's Executive Director for Operations. The Commission appointed me General Counsel in April 2009. I managed an office of over 100 lawyers and support staff in providing counsel and representation to the Commission and NRC staff on all aspects of agency programs. I also served as NRC's representative to the Administrative Conference of the United States and as a delegate to the Nuclear Law Committee of the OECD NEA. In recognition of my service to the agency, I received the Presidential Meritorious Executive Rank Award in 1998 and 2008 and NRC's Distinguished Service Award in 2001.

6. My experience at the NRC, both as a lawyer and as a Commissioner, encompassed the vast range of issues related to regulatory matters subject to the NRC's jurisdiction. I advised on and drafted decisions on petitions for enforcement action filed under 10 CFR 2.206, counseled agency staff on enforcement orders and imposition of civil penalties and represented agency staff in hearings on such actions, managed legal staff on licensing matters and related hearings for both materials and reactor applications, and was involved in several bankruptcy or license transfer issues. Among specific assignments, I was the legal counsel for implementation of safety enhancements following the Three Mile Island accident, was assigned to accompany the NRC's on-site Incident Investigation Team after a significant event at a power reactor in 1985, was involved in the adoption and implementation of the NRC's revised licensing approach under 10 CFR Part 52, served on an agency committee working on initial implementation of the license renewal process for reactors under 10 CFR Part 54, and was the senior legal counsel working with NRC staff on implementation of security upgrades after the September 2001 terrorist attacks. In sum, I have broad experience in and understanding of NRC's regulatory system and its implementation.

2

7. Since ending my service as a Commissioner in 2019, I have provided some consulting services to both the OECD NEA and to the International Atomic Energy Agency related to nuclear law and regulation and the organization of regulatory bodies.

8. I received a J.D. with honors from the George Washington University Law School in Washington, DC, in 1978 and was the topics editor on the George Washington University Law Review from 1977-1978. I received a B.A. in German, *magna cum laude*, from Colgate University, Hamilton, NY, in 1975. The facts and data which form the basis of my opinions expressed herein are based upon my personal knowledge; my review of the facts and data, including Exhibit A, referenced *infra* at page 5; and my own professional knowledge, experience, training, and education (all of which I have reasonably and typically relied upon during my forty-two (42) years working in the nuclear industry, nearly forty (40) of which were at the Nuclear Regulatory Commission).

## Publications and Other Professional Engagement

9. I am the author or co-author of the following publications:
   - *The impact of the major nuclear power plant accidents on the international legal framework for nuclear power*, OECD Nuclear Energy Agency NUCLEAR LAW BULLETIN No. 101, p. 7 (2018);
   - *Reformed and reforming: Adapting the licensing process to meet new challenges*, OECD Nuclear Energy Agency NUCLEAR LAW BULLETIN No. 99, p. 7 (2017);
   - *Progress towards a Global Nuclear Liability Regime*, in R. Manovil (ed.), NUCLEAR LAW IN PROGRESS, p. 633 (Legis Argentina 2014) (with X. Vasquez-Maignan);
   - *Decommissioning and Waste Management in the European Union*, ABA Nuclear Law Committee Newsletter, Vol. 7, No. 1, p. 7 (Sept. 2014);
   - *Progress towards a Global Nuclear Liability Regime*, OECD Nuclear Energy Agency NEA NEWS, No. 31.2, p. 8 (2013);
   - *The Fukushima Daiichi Accident: The International Community Responds*, WASHINGTON UNIVERSITY GLOBAL STUDIES LAW REVIEW, Vol. 11, No. 4, p. 739 (2012);
   - *After Fukushima — the Challenge for Nuclear Power*, 9 ABA ENERGY COMMITTEES NEWSLETTER, Vol. 9, No. 3, p. 5 (June 2012);
   - *NRC Clarifies Mandatory Hearing Process for New Reactor Applications*, ABA ENERGY COMMITTEES NEWSLETTER, Vol. 8, No. 3, p. 1 (April 2011);
   - *Energy Bar Association General Counsel Roundtable*, ENERGY LAW JOURNAL, Vol. 3, No. 1, p. 371 (2010);
   - *Legal Challenges in Establishing the Design Basis Threat*, in NUCLEAR INTER JURA 2009 PROCEEDINGS, p. 503 (2009) (with A. Wolfsheimer);
   - *Looking Backward, Moving Forward: Licensing New Reactors in the United States*, OECD Nuclear Energy Agency NUCLEAR LAW BULLETIN No. 81, p. 7 (2008);
   - *Security and Public Administrative Law*, in PROCEEDINGS OF NUCLEAR INTER JURA 2007, p. 981 (Bruylant 2008);
   - *Licensing the Next Generation of Reactors in the United States*, INT'L JOURNAL OF NUCLEAR LAW, Vol. 1, p. 239 (2006) (with S. Crockett and K. Cyr).

10. Since 2010, I have been a lecturer on nuclear regulation and the development of international nuclear law at the International School of Nuclear Law, a comprehensive two week program on nuclear energy law jointly sponsored annually by the OECD NEA and the University of Montpellier, France. I have also lectured since 2011 at NEA's annual

3

International Nuclear Law Essentials course, usually held in Paris, France. While serving as counsel at NRC, I was an instructor in the National Nuclear Security Administration's workshops on nuclear infrastructure development for countries exploring nuclear power development, held at the Lawrence Livermore National Laboratory and the Pacific Northwest National Laboratory and in Amman, Jordan. I have presented on nuclear energy law topics at each of the congresses of the International Nuclear Law Association held since 2005, respectively in Slovenia, Belgium, Canada, the United Kingdom, Argentina, India, and the United Arab Emirates. I have spoken on topics related to nuclear regulation and nuclear energy law at conferences sponsored by various domestic organizations, including the American Bar Association, the Institute for Nuclear Power Operations, and the Nuclear Energy Institute.

## Prior Expert Testimony

11. I have not previously served as an expert witness in any matter.

## Statement of Compensation

12. I am being compensated at the rate of $500 per hour, plus expenses, for my work on this matter.

## Issues posed

13. I have considered the following issue posed to me by TVA: whether TVA, under the Bellefonte Nuclear Plant Site Purchase and Sales Agreement, may lawfully convey to Nuclear Development, LLC, the Bellefonte site prior to the NRC's approval of the transfer of the construction permits currently held by TVA for the site. Based on my experience and my review of relevant documents, applicable NRC precedent and practice, I have concluded that TVA may not lawfully convey the site prior to NRC approval of the transfer of the construction permits. Such action would be contrary to the requirements of the Atomic Energy Act, the NRC's regulations, and the terms of the Bellefonte construction permits.

14. In reaching this conclusion, I have also considered the secondary issue posed by Nuclear Development as to the whether the units on Bellefonte Nuclear Plant site in their current state are operable "utilization facilities" under the Atomic Energy Act of 1954, as amended (hereinafter the Atomic Energy Act) and NRC's regulations. I disagree with the view that so long as the facilities on the site are not capable of being put into operation (and no "new" construction is undertaken), then title may be transferred prior to transfer of the construction permits. In my view, such an approach is at odds with NRC's regulatory authority under the Atomic Energy Act and the NRC's precedent and practice. In my opinion, the facilities on the Bellefonte site are utilization facilities subject to NRC oversight.

## Documents Considered

15. A list of documents that I considered in connection with my review is attached as Exhibit A. The list also identifies the principal statutes, NRC regulations, NRC adjudicatory decisions, and other NRC administrative determinations which I have referenced in my analysis.

16. I have specifically reviewed and considered the arguments made in various filings in this case, including TVA's Motion to Dismiss and Supporting Brief dated February 4, 2019 (including the accompanying Exhibits); Nuclear Development's Plaintiff's Brief in Opposition

4

to the Motion to Dismiss dated February



**Facts and Data Considered**

17. I have referenced the relevant facts and documents which I have considered throughout the analysis in this report. Among the relevant facts and data are the Purchase and Sale Agreement between TVA and Nuclear Development, and the two Construction Permits, Nos. CPPR-122 and CPPR-123 issued to TVA for the Bellefonte units by the Atomic Energy Commission on December 24, 1974. I note the fact that the NRC terminated the construction permits at the request of TVA in 2006, but then reinstated the permits in 2009 at TVA's request. *See Tennessee Valley Authority (Bellefonte Nuclear Plant Units 1 and 2); Order*, 74 Fed. Reg. 10,969-02 (March 13, 2009) Initially, NRC reinstated the permits in "terminated status" under the NRC's *Policy Statement on Deferred Plants*, 52 Fed. Reg. 38,077 (Oct. 14, 1987). Subsequently, TVA requested, and NRC's Director of Nuclear Reactor Regulation approved on January 14, 2010, re-categorization of the Bellefonte plants into "deferred status." I also understand that, consistent with the *Policy Statement on Deferred Plants*, no active construction is being undertaken at the Bellefonte site. However, the deferred status subjects TVA as the permit holder to continued NRC jurisdiction over the site and obligates TVA to provide prior notice and additional information to NRC if active construction were to resume at the site. TVA is also obligated to implement programs and procedures to maintain and preserve equipment as well as to retain and protect plant records. Similar obligations are imposed on the construction permit holder even if the facility subject to the permit is held in terminated status if the permit holder wishes to maintain the option of plant reactivation or transfer of ownership to others who might wish to complete the facility. *Policy Statement on Deferred Plants*, 52 Fed. Reg. at 38,079-38,080.

18. I also understand that Nuclear Development filed an application on November 13, 2018, for NRC's consent to transfer of the Bellefonte construction permits from TVA. Nuclear Development requested the NRC to hold the Permits in "terminated" (but unexpired and not withdrawn) status if the NRC was unable to act on the application prior to November 30, 2018, the date for asset transfer. There is no indication that NRC granted that request. NRC accepted the application for review on November 5, 2019, as reflected in a Letter from O. Tabatabai, NRC Office of Nuclear Reactor Regulation (NRR), to William R. McCollum, Jr., Nuclear Development sent on that date (NRC ADAMS # ML19298A194) (Deposition Exhibit 85). NRC's review is still pending.

**Exhibits**

19. The only exhibit to this report is Exhibit A. Exhibit A contains a list of documents considered in my analysis, all of which are available to the parties and many of which have been marked as exhibits in filings or depositions related to this litigation.

**Statement of Opinions and the Bases Therefor**

*Relevant Statutes, Regulations and NRC Permits*

20. Section 101, 42 U.S.C. § 2131, of the Atomic Energy Act prohibits "any person within the United States to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, use, import, or export any utilization or production facility except under and in accordance with a license issued by the Commission pursuant to section 103 or section 104." The general requirement for a license for a utilization or production facility is reflected in the NRC's regulation 10 CFR 50.10(b). The NRC defines a "utilization facility" to include "[a]ny nuclear reactor other than one designed or used primarily for the formation of plutonium or U-233" and defines a "nuclear reactor" as "an apparatus, other than an atomic weapon, designed or used to sustain nuclear fission in a self-supporting chain reaction." 10 CFR 50.2.

21. Under section 185(a), 42 U.S.C. § 2235(a), those intending to construct and operate a utilization or production facility must first secure a construction permit, and for all purposes of the Atomic Energy Act, a construction permit is considered a license. This provision is implemented through 10 CFR 50.10(c) which provides that "[n]o person may begin the construction of a production or utilization facility on a site on which the facility is to be operated until that person has been issued either a construction permit under this part, a combined license under part 52 of this chapter, an early site permit authorizing the activities under paragraph (d) of this section, or a limited work authorization under paragraph (d) of this section." Effectively, the regulatory framework under section 101, 103, and 185 of the Atomic Energy Act and the NRC's implementing regulations means that once an authorization is issued to construct a utilization facility on a site, the entity holding the permit and the site are subject to the plenary control of the NRC until the permit is cancelled due to project termination or until the end of the life and subsequent decommissioning of the facility if construction is completed and operation is authorized. It also follows that an entity wishing to acquire a site where construction has already begun and to continue the project must have the construction permit from the outset.

22. Section 184 of the Atomic Energy Act, 42 U.S.C. § 2234, prohibits the transfer of a license – including a construction permit – or any right thereunder "either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this chapter, and shall give its consent in writing." The statutory provision is implemented through NRC's regulations in 10 CFR 50.80, with particular reference to construction permits in 10 CFR 50.80(b)(1).

23. The permits were issued by the Atomic Energy Commission (AEC), NRC's predecessor agency, in 1974 pursuant to section 103 of the Atomic Energy Act, 42 U.S.C. § 2133, after review by the AEC staff and conduct of the required hearing by a Licensing Board. *Tennessee Valley Authority* (Bellefonte Nuclear Plant Units 1 and 2), LBP-74-91, 8 AEC 1124 (1974*), aff'd sua sponte*, ALAB-253, 8 AEC 1182 (1975). As specified in the Licensing Board order and as reflected in each of the construction permits, the construction permits are based on a number of findings, including the acceptability of the proposed location of the two units and the related environmental review (see sections 1.E. and 1.I. of the permits). *Id.* at 1127. Section 2 of the permits authorizes construction of a utilization facility as described in the application and any amendments thereto and as further described in the evidence at the hearing on the application. TVA's Preliminary Safety Analysis Report (PSAR), section 2.1.2, describes in particular that the exclusion area "will be owned by the United States and in the custody of TVA." An exclusion area is defined in 10 CFR 50.2 as "that area

6

surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area."     As authorized under Section 2 of CPPR-122 and CPPR-123, the facilities "will be located on the applicant's site," and as provided in section 3.B the facility "shall be constructed and located at the site described in the application, in Jackson County, Alabama."

24. NRC is given broad authority under the Atomic Energy Act to enforce the provisions of the Act and NRC's regulations and the terms of licenses and construction permits issued thereunder. NRC can impose sanctions up to and including revocation of a license or impose civil penalties for such violations. *See, e.g.*, Atomic Energy Act § 161b., § 186a. & § 234a., 42 U.S.C § 2201(b), § 2236(a) & § 2282(a). This enforcement authority is reflected in NRC's regulations in 10 CFR 2.201 (notice of violation), 2.202 (orders), 2.205 (civil penalties), 50.100 (revocation, suspension, modification, amendment of licenses and permits), and 50.110 (violations). Within its statutory authority, the NRC's "choice of sanction is quintessentially a matter of the agency's sound discretion." *Advanced Medical Systems, Inc.*, CLI-94-6, 39 NRC 285, 313 (1994), *aff'd sub nom. Advanced Medical Systems, Inc. v. NRC*, 61 F.3d 903 (6th Cir. 1995) (table).

25. Given that the site ownership is specified in the Bellefonte permits and the underlying application on which they are based, a site transfer prior to NRC approval of the transfer of the construction permits would constitute an unlawful violation of the permits by TVA and would subject TVA to potential enforcement action under the Atomic Energy Act for an unapproved transfer.

### NRC Approval of Transfer of the Construction Permits is Required prior to Transfer of the Bellefonte Site

26. The primary issue at hand is whether the ownership of the Bellefonte Nuclear Plant site may be transferred legally prior to the NRC's approval of the transfer of the construction permits for the site. I have concluded that TVA may not lawfully convey the site ownership prior to NRC approval of the transfer of the construction permits for multiple reasons. My opinion is based on the following considerations: (a) the terms of the construction permits for Bellefonte Nuclear Plant units specify the ownership of the site by the United States in the custody of TVA; (b) section 101 of the Atomic Energy Act prohibits acquisition or possession of a utilization facility except under a license issued under section 103 or section 104 of the Act; (c) the Bellefonte Nuclear Plant units are utilization facilities under section 101 of the Atomic Energy Act for which construction permits under section 103 are required before one can acquire or possess such facilities; (d) the transfer of a construction permit is subject to the NRC's prior approval in accordance with section 184 of the Atomic Energy Act and 10 CFR 50.80; and (e) NRC's historic interpretation and practice reflect the necessity of prior approval of changes in ownership or control of facilities and activities subject to a construction permit.

27. In assessing the issue posed to me, I have considered the opinion provided to TVA in November 2018 by Mr. Lepre of the Pillsbury law firm. I agree with the Pillsbury Opinion. As expressed in the opinion, I am also not aware of any instance in which NRC has allowed a site subject to a construction permit to be sold or acquired prior to the NRC's approval of the permit's transfer.

28. I have also considered the arguments made by Nuclear Development LLC and the report prepared on its behalf by David A. Repka, as well as Mr. Repka's deposition. Nuclear

7

Development LLC does not dispute that the statutes and regulations referenced in paragraphs 20-23 above bear on the transaction to acquire the Bellefonte Nuclear Plant site from TVA. It disputes primarily the allowable timing of aspects of the transaction and, particularly, the control the legal requirements place on transfer of site ownership.

29. There is no doubt that the Bellefonte construction permits, issued under section 103 of the Atomic Energy Act, are for "utilization facilities" as described in the Act and the NRC's implementing regulations. The permits themselves say so. Although a completed utilization facility brings on a whole other level of regulation to govern its operation, the NRC is obviously no less interested in a utilization facility under construction. The statutory and regulatory provisions, e.g., in section 101 of the Atomic Energy Act and 10 CFR 50.10, broadly include more than merely facilities capable of operation, and the construction permit is required to undertake the creation of a utilization facility on a specified site. In this regard, the NRC defines as relevant here a "utilization facility" as "[a]ny nuclear reactor other than one *designed* or used primarily for the formation of plutonium or U–233" and a "[n]uclear reactor means an apparatus, other than an atomic weapon, *designed* or used to sustain nuclear fission in a self-supporting chain reaction." 10 CFR 50.2 (emphasis added). The distinction reflected in the definition underscores the NRC's intention to exercise the full scope of its statutory authority over a utilization facility as it progresses toward potential operation.

30. Mr. Repka essentially untethers the Bellefonte Nuclear Plant site from the construction permits, at least for purposes of transferring of the site property itself. For example, in paragraph 63 of his report, he dismisses the Pillsbury Opinion by suggesting that statements in section 2 of the construction permits regarding TVA's ownership constitute mere "historic information." *See also* Repka report, paragraph 37.

31. To the contrary, the specification of the site is not merely an "historic" recitation of the context for the licensing review but is integral to a construction permit. Not only does it establish the foundation for the safety, environmental and other related regulatory conclusions necessary to issue the permit and ultimately an operating license if the facility is completed, but the specification of the site also provides a basis for NRC's ongoing oversight of authorized activities under the permit. Holders of a construction permit or license must permit authorized NRC representatives to inspect their premises and activities. 10 CFR 50.70(a). The NRC has the authority to make such investigations and inspections as it deems fit to carry out its responsibilities. *Union Electric Co.* (Callaway Plant, Units 1 & 2), LBP-78-31, 8 NRC 366, 374 (1978), *aff'd*, ALAB-527, 9 NRC 126 (1979). If the licensee does not have the legal title or control over the site to allow such inspection, the NRC's authority is impaired, an outcome that would result from an attempted transfer of the Bellefonte site from TVA to Nuclear Development prior to the NRC's authorization of the transfer of the construction permits. In my experience, the NRC is not satisfied with indirect or bifurcated control over the activities that it regulates, i.e. dealing with both a license holder and an unlicensed entity in its oversight of a site and activities unarguably within the scope of its authority. Although Mr. Repka suggests that only "active" construction that advances the completion of the utilization facilities are subject to the NRC's construction permits, that view essentially dismisses the required activities to maintain equipment, preserve records, and allow NRC inspection in "deferred" or "terminated" status if the intent is keep the site and its governing permits viable for resumed construction.

32. Given the foregoing context, I disagree with the suggestion in Mr. Repka's report that the governing statutes, regulations and permits are unconcerned with site ownership or control

8

under a construction permit. He suggests, for example, in paragraph 21 of his report that, because 10 CFR 50.10(a) does not include ownership or possession of a site within the definition of construction activities, the ability to transfer a construction permit is unconstrained – at least as long as the new owner undertakes no activities that can be construed as construction. However, once a permit is issued for the specific site, the site is controlled by the permit and its underlying basis and terms, which here includes ownership of the site by the United States in the custody of TVA, such that a transfer of the site would require prior NRC approval of the transfer of the construction permits for Bellefonte. As also expressed in the Pillsbury Opinion (page 4), I am also not aware of any circumstance in which the NRC has allowed site acquisition to proceed prior to transfer of the construction permits.

### NRC Adjudicatory Decisions and Staff Practice Establish that Transfer of the Site prior to Approval of the Construction Permits Would Be Unlawful

33. With respect to transfer of construction permits, the NRC's regulation implementing section 184 of the Atomic Energy Act is clear:

> No license for a production or utilization facility (including, but not limited to, permits under this part [50] and part 52 of this chapter...), or any right thereunder, shall be transferred, assigned, or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of the license to any person, unless the Commission gives its consent in writing.

10 CFR 50.80(a); *see also* 10 CFR 50.80(b) on construction permits. A few NRC adjudicatory decisions as well as administration of licensing by the Office of Nuclear Reactor Regulation, the office responsible for carrying out licensing of nuclear reactors at the NRC, reflect NRC's consistent approach of requiring its prior assent to potential changes to ownership of plants subject to a construction permit.

34. It is worth noting that the cases and staff documents referenced in the following analysis date back to the late 1970s or early 1980s. This is not surprising, given that that time period covers the most active period of licensing new plants for construction, particularly under the two-phase scheme in 10 CFR Part 50 using a construction permit and then a separate operating license to bring a completed plant into operation. Every nuclear power plant that has come into operation in the United States has been licensed under this process. After 1990, only about eight construction permits for nuclear power plants remained in effect: three units that eventually went into operation (Comanche Peak Unit 2, Watts Bar Units 1 and 2); two that were terminated before receiving an operating license (Grand Gulf Unit 2, Washington Nuclear Project Nos. 1 and 3); and the two for the Bellefonte site. *See NRC Information Digest, 2019-2020*, NUREG-1350, Vol. 31, Appendices A & D.

35. The Atomic Safety and Licensing Appeal Board made clear in the *Marble Hill* case that changes in ownership of a facility mandate NRC approval before the ownership transfer occurs. *Public Service Co. of Indiana, Inc.* (Marble Hill Nuclear Generating Station, Units 1 and 2), ALAB-459, 7 NRC 179, 201 (1978), *on review of* LBP-77-4, 5 NRC 433 (1977). Of particular significance is the fact that the *Marble Hill* decision was decided in the context of a site where activities were not yet underway for which a construction permit was required. *Id.* at 182. Only the pre-construction activities were being conducted pursuant to an NRC limited work authorization (LWA). *Id.* An LWA permits preliminary activities such as "the driving of piles, subsurface preparation, placement of backfill, concrete, or permanent

9

retaining walls within an excavation, installation of the foundation, including placement of concrete, any of which are for an SSC [safety-related structure, system, or component] of the facility for which either a construction permit or combined license is otherwise required." 10 CFR 50.10(d)(1).

36. The case involved an appeal of the grant of an LWA to Public Service Co. of Indiana. Public Service challenged the ruling by the licensing board that the co-owners of the proposed nuclear plant were *de facto* co-applicants for the construction permits and deemed the application amended to reflect the ownership. LBP-77-4, 5 NRC 433 (1977). Public Service argued that it had a right to an NRC license without the co-owners as co-applicants and essentially contended that one was not prohibited from owning a nuclear power plant without a license. ALAB-459, 7 NRC at 199. The Appeal Board rejected the argument that co-owners need not be co-applicants for a construction permit, noting that it saw "no reason why Congress would want to exempt owners of nuclear power plants from Commission regulation." *Id.* at 200. The Appeal Board noted a then recent decision by the Commission in *Public Service Co. of New Hampshire* (Seabrook Station, Units 1 and 2), CLI-78-1, 7 NRC 1, 22 (1978), which affirms the basic principle that "Any transfer of ownership would require Commission approval." In that case, the Commission declined to evaluate the potential effects of the possible future turnover or adjustment in the ownership of the Seabrook plant, but was satisfied with the control that the agency could assert over any future proposed transfers of control. CLI-78-1, 7 NRC at 22-23.

37. NRC staff practice aligned with the decisions referenced in the preceding paragraph. A number of examples reflect NRC approvals through amendments to the affected construction permits to approve changes in ownership of an incomplete facility subject to a construction permit. *See, e.g.*, Letter from D. Vassalo, NRR, to D. Switzer Northeast Nuclear Energy Co. (Dec. 10, 1975) (Millstone Unit 3); Letter from J. Stolz, NRR, to E. Van Brunt, Jr., Arizona Public Service Co. (April 19, 1978) (Palo Verde Units 1-3); Letter from R. Boyd, NRR, to L.C. Dail, Duke Power Co. (Oct. 19, 1978) (Catawba Unit 3); Letter from R. Boyd, NRR, to G. Rhode, Niagara Mohawk Power Co. (Oct. 27, 1978) (Nine Mile Point Unit 2); Letter from D. Eisenhut, NRR, to W.C. Tallman, Public Service Co. of New Hampshire (Aug. 6, 1980) (Seabrook Units 1 & 2). Indeed, the letter to Mr. Dail regarding Catawba Unit 3 specifically references the Appeal Board's decision in ALAB-459 on Marble Hill, noting that the newly approved co-owners would be referenced as co-applicants and be added to the construction permit.

38. Moreover, in a letter to Dr. Robert Asperger (March 3, 1978), Acting Director of Nuclear Reactor Regulation Edson G. Case considered issues related to a transfer of an ownership interest in the Fermi Unit 2 facility. The letter sent by Mr. Case to Dr. Asperger was a decision pursuant to 10 CFR 2.206. Under the regulation, any person may file a request for enforcement action with the appropriate NRC staff office director who is to render a decision on the petition within a "reasonable time." The director's decision is subject to *sua sponte* review by the full Commission per 10 CFR 2.206(c). Such decisions were assumed to be reviewable in the federal courts of appeal (and a number were so appealed) until the Supreme Court's decision in *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985), which referred to the Court's ruling on the same day in *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), regarding the reviewability of inherently discretionary enforcement decisions by a federal agency. In 1979, the NRC began publishing Director's Decisions under 10 CFR 2.206 with adjudicatory decisions of the Commission, the Atomic Safety and Licensing Appeal Board Panel, and the Atomic Safety and Licensing Board Panel. As with the decision by Mr. Case, a decision by the Director of the Office of Nuclear Reactor Regulation is one

made by the senior agency official responsible under statute for carrying out licensing and regulation associated with the construction and operation of nuclear reactors. Energy Reorganization Act of 1974 § 203(b)(1), 42 U.S.C. § 5843(b)(1). As the Commission itself has noted, "Agency practice, of course, is one indicator of how an agency interprets its own regulations." *Yankee Atomic Electric Co.* (Yankee Atomic Power Station), CLI-96-6, 43 NRC 123, 129 (1996), *citing Power Reactor Development Corp. v. Int'l Union*, 367 US 396, 408 (1961); *accord, Northeast Nuclear Energy Co.* (Millstone Nuclear Power Station, Unit 3), CLI-01-10, 53 NRC 353, 368 (2001).

39. In his decision, Mr. Case addressed the issue of whether the Detroit Edison Company had violated the Atomic Energy Act and NRC's regulations by transferring a 20% interest in Unit 2 of the Fermi Atomic Power Plant prior to the NRC's written consent. Although Mr. Case declined to take action under 10 CFR 50.80 with regard to an unlawful transfer of control of the license under the regulation, he found that the agreement between Detroit Edison to the electric co-operatives in fact constituted an acquisition of an interest in a utilization facility in violation of the requirement for prior NRC approval under section 101 of the Atomic Energy Act and 10 CFR 50.10. Case letter at pp. 3-4. Mr. Case rejected Detroit Edison's argument that the approval requirements of section 101 did not apply until the plant was complete and special nuclear material was received, but stated that "it has been long standing practice of the Commission to consider a utilization facility under construction to be a utilization facility." *Id.* at 4 n.*. Contrary to Mr. Repka's characterization (paragraph 56), Mr. Case took enforcement action based on his finding by issuing Detroit Edison a Notice of Violation. *See* Enclosure 5 to the Case letter. In determining that issuance of a Notice of Violation was the appropriate enforcement sanction for the violation, Mr. Case relied in part on the Appeal Board's then recent decision in *Marble Hill* as resolving the issue as to whether co-owners must be licensees. *Id.* at 5.

40. Although the references cited in paragraphs 35-39 date from 1975-1980, they remain instructive and there is no indication that they should not be followed. Indeed, the *Marble Hill* decision is cited with approval in the Commission's *Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry*, 62 Fed. Reg. 44071-01, 44077 (Aug. 19, 1997) and its *Final Standard Review Plan on Foreign Ownership, Control, or Domination*, 64 Fed. Reg. 52,355-01, 52356 (Sept. 28, 1999). Based on my experience as a senior agency lawyer and as a Commissioner, I am aware of no more recent relevant cases directly addressing construction permits, and any new precedent construing the legal parameters applicable to Part 50 construction permits would have been unlikely. Although new construction has been authorized in the United States in the last decade, NRC has approved new nuclear power plants under 10 CFR Part 52, initially established in 1989, which provides for issuance of a combined license (COL) incorporating both construction authorization and a conditional operating license.

#### Nuclear Development's Arguments are Unavailing

41. Nuclear Development LLC rests its position on a narrow construction of the applicable statutes, regulations and permits: Nuclear Development would not be in possession of a utilization facility even if it assumed ownership of the Bellefonte Nuclear Plant site, and it promises not do anything which might be construed as construction. Nuclear Development rejects the NRC's longstanding decisions and administrative practice as inapplicable because they dealt with situations in which construction activities were ongoing.

11

42. As reflected in Mr. Repka's report (*see* paragraphs 28, 30-31), Nuclear Development's primary argument against considering the unfinished Bellefonte plants "utilization facilities" is that the units are not capable of operation, *i.e.* capable of using special nuclear material. In this regard, Mr. Repka asserts that there are no specific strictures against acquiring or disposing of equipment that will be used to construct the nuclear power plant nor the site itself. Therefore, he argues, transfer of the site, the partially constructed units, and equipment located on site do not require prior NRC approval. He concedes that his view would only allow transfer of the site property and would require Nuclear Development's forbearance from undertaking any activity that could be construed as construction prior to NRC's approval of transfer of the Bellefonte construction permits. *Id.*, paragraph 34. Mr. Repka cites (paragraph 29) a Licensing Board decision terminating the proceedings on the operating license for the Zimmer Plant. *Cincinnati Gas & Elec. Co.* (W.H. Zimmer Nuclear Power Station, Unit 1), LBP-84-33, 20 NRC 765 (1984). In the decision, the Board granted the applicant's motion to withdraw its application based in part on conditions imposed by the NRC staff to ensure the nearly completed facility was incapable of operation as a utilization facility. *Zimmer* does not speak to the issue at hand. Rather, the *Zimmer* decision underscores the NRC's assertion of regulatory control of facilities subject to its authority and insistence that facilities, if they are to be abandoned as utilization facilities, be put in a state that appropriately can allow release from NRC jurisdiction.

43. Likewise, Mr. Repka (paragraph 55) suggests that the termination of the Bellefonte permits in 2006 (Letter from C. Haney, NRR, to K. Singer, TVA, dated Sept. 14, 2006) prior to their reinstatement in 2009 supports his view that Nuclear Development's mere possession of the Bellefonte site itself would be unobjectionable because the partially constructed facilities were not operable utilization facilities. But, again, the NRC's purpose in that letter was only to determine whether the Bellefonte facilities and the site could be released from NRC's jurisdiction. The letter does not give free reign to assume title to the site and facilities remaining under an NRC construction permit for which the intention is to resume construction.

44. In distinguishing the NRC precedent and rationalizing the detachment of site transfer from the construction permits, Mr. Repka rests on an essential premise: that Nuclear Development would promise to take no action prior to transfer of the construction permits which could be construed as "construction". In his deposition (pages 128-129, 174-177), he goes so far to say that, after receiving title to the site, Nuclear Development could itself sell the site to another owner, and that owner could transfer the site again, and none of these transactions would be subject to NRC's direct authority if no new construction activities were undertaken. This view, of course, assumes that the maintenance and preservation activities required of the Bellefonte units under the *Policy Statement on Deferred Plants* are not considered "construction" (*see* paragraph 17 above), another narrow interpretation that does not square with the purpose of maintaining an appropriate regulatory footprint through a construction permit over a plant that may resume active construction. Mr. Repka (paragraph 50) dismisses *Marble Hill* and its invocation of the Commission's *Seabrook* decision as uncontrolling and as only holding that prospective co-owners must be co-applicants. However, in the *Marble Hill* decision, the Appeal Board noted the concern raised by the NRC staff in response to an argument raised by Public Service that the co-owners need not be included as co-applicants because they did not possess the site and its facilities: "The staff also contends that distinguishing owners from possessors would have the effect of hampering the Commission's regulatory authority. Public Service disputes this. It argues that the Commission could always exercise its authority effectively if indirectly by actions against licensees." ALAB-459, 7 NRC at 200. The Appeal Board agreed with the staff, finding

12

"significant areas of the Commission's regulatory authority could be placed under a cloud by accepting Public Service's reading of the Act. As we have been offered no good reason why we should give the remedial and regulatory provisions of the Atomic Energy Act the crabbed interpretation the company suggests...." *Id.* at 201.

45. Here, where Nuclear Development would take title to the site but not resume new construction, a similarly "crabbed" application of NRC's regulatory jurisdiction would be created. Mr. Repka (paragraph 53) asserts that because the construction permits would be in effect, NRC would have continuing jurisdiction over the site, but it is far from clear why NRC would be satisfied with keeping track of the division between TVA as the responsible licensee on the permits and Nuclear Development as an unlicensed entity. The permits would still be held by TVA. Is TVA as permit holder, despite no longer having title to the site, responsible for Nuclear Development's breach of the construction restriction? Rather than exercising direct regulatory control over licensed activities at the site through its jurisdiction over the permit holder, the NRC is put in the position of having to exercise its control over a non-licensed entity. This appears to be the type of muddled, convoluted situation that the Appeal Board rejected in *Marble Hill*. In my experience, the NRC does not rely on indirect control over entities who do not hold the appropriate license or permit to exercise its regulatory authority over facilities clearly subject to NRC's authority.

46. Mr. Repka (paragraphs 46-51) also dismisses the applicability of Mr. Case's decision under section 2.206 as instructive in the current circumstances. He believes (paragraphs 46 and 50) that the decision is entitled to little weight because it was not issued by the Commission or in an adjudication. While not issued as part of an adjudication, the decision was by the Acting Director of Nuclear Reactor Regulation (the statutory official responsible for nuclear reactor licensing under the Energy Reorganization Act), was subject to review by the Commission on its own motion, and reflected staff practice in addressing treatment of co-owners of nuclear facilities. I know of no subsequent decisions or Commission policies that would suggest that Mr. Case's view on the treatment of utilization facilities subject to a construction permit no longer holds. Again, to reiterate the Commission's view on such matters, "Agency practice, of course, is one indicator of how an agency interprets its own regulations." *Yankee Atomic Electric Co.* (Yankee Atomic Power Station), CLI-96-6, 43 NRC 123, 129 (1996). Mr. Repka (paragraph 49) also distinguishes Mr. Case's decision on the basis that it does not address whether the acquisition of the site (including structures and equipment on the location) when construction activities are not being conducted requires a license or permit. Contrary to Mr. Repka's view (paragraph 49-50), I believe that the site in its current condition is in fact tied to the construction permits as explained in paragraphs 29-32 above.

47. Nuclear Development relies on the NRC's *Policy Statement on Deferred Plants*, 52 Fed. Reg. 38077 (Oct 14, 1987), in support of its position that it can assume ownership of the Bellefonte Nuclear Plant site without prior NRC approval so long as it does not conduct any new construction activities at the site. As noted earlier, the policy statement allows holders of construction permits to essentially halt construction of a facility but identifies required steps to preserve the facility if the permittee wishes to keep open the option of either eventual resumption of construction or, alternatively, transfer to another entity with NRC approval for continuation of construction under new ownership. NRC has adapted the policy statement to similar circumstances involving combined licenses issued under 10 CFR Part 52. Memorandum from Fred Brown, Director of New Reactors (NRO), to NRO Division and Deputy Division Directors, forwarding "Current NRC Staff Views on Applying the Deferred

Plant Policy Statement to Part 52 Plants." (NRC ADAMS # ML18066A054 and # ML18065B257).

48. As noted above (*see* paragraph 18), the construction permits for Bellefonte were initially reinstated in 2009 in "terminated" status and then were put into "deferred" status with NRC's approval in. 2010. Under the *Policy Statement on Deferred Plants*, the permit holder of a facility in either "deferred" or "terminated" status is expected to take steps to develop and implement a maintenance and preservation program for structures, systems and components important to safety and for related documentation to allow potential reactivation of the plant. 52 Fed. Reg. at 38,079-38,080. Moreover, the NRC expects under the policy statement 120 days' notice prior to resumption of new construction activities. In sum, the NRC continues to exercise control over a facility subject to a construction permit as provided in the policy statement even if it is in deferred or terminated status. Although Nuclear Development recognizes the need to satisfy the maintenance and preservation requirements outlined in the policy statement, it muddles the normally direct responsibility of a permit holder to the NRC by suggesting that either TVA continue to meet those obligations after site transfer or that Nuclear Development undertake compliance even though it is not under direct NRC oversight through a construction permit. *See* Repka report paragraphs 39-40. In my view, such an approach is inconsistent with the expectations set out in the policy statement or the usual structure of NRC's oversight of activities subject to a construction permit.

49. Mr. Repka (paragraph 52) also points to a staff rulemaking proposal pending before the Commission in support of its claim that the Bellefonte units need not be considered utilization facilities. *See* SECY 18-0055, Proposed Rule: Regulatory Improvements for Production and Utilization Facilities Transitioning to Decommissioning (May 7, 2018) (NRC ADAMS # ML18012A019). Apart from the fact that the document is only a rulemaking proposal that has yet to be acted on by the Commission and thus has no operative effect, the draft rule does not support Nuclear Development's position. In the draft proposed rule the staff lays out proposals to alter the status of a facility as a utilization facility by withdrawing its authority to operate and ensuring modifications are made to render the facility in fact incapable of operation. As a result, certain requirements applicable to an operating plant would no longer apply, and the rulemaking proposal would allow the licensee to step back from some requirements. But this proposal has no real application here. The plant owner is not released from regulation; it is still governed by a license until decommissioning can allow license termination. The staff proposal only lays out a path to refine the regulatory imprint over facilities that have entered the decommissioning phase. A plant that is undergoing decommissioning and is disabled as an operating facility is still subject to the NRC's licensing authority and close oversight by the NRC to ensure decontamination and remediation are conducted safely.

50. In sum, Mr. Repka's references to non-operational utilization facilities deal primarily with the circumstances in which termination of NRC jurisdiction or transfer to a new status not requiring the full scope of controls applicable to an operating facility (such as decommissioning) is sought. The references do not address the circumstance in which the intention is to allow continued future construction of a utilization facility, which by necessity requires a construction permit. Thus, the Appeal Board's decision in *Marble Hill* and Mr. Case's section 2.206 decision are pertinent to these circumstances.

14

**Summary**

51. Given the terms of the construction permits, the statutory controls on possession or ownership of utilization facilities like those under construction at the Bellefonte Nuclear Plant site, and prior NRC precedent relating to ownership and transfer of utilization facilities under construction, I do not believe it would be lawful to transfer the Bellefonte site prior to NRC authorization of a transfer of the related construction permits.

52. This opinion was prepared by the undersigned.

*Stephen Burns*

_____

Stephen G. Burns, Esq.

24 April 2020

_____

Date

## EXHIBIT A

## INVENTORY OF DOCUMENTS CONSIDERED
## Stephen G. Burns

### Documents

1. Purchase and Sale Agreement, Bellefonte Nuclear Power Plant Site, dated November 14, 2016

2. Construction Permit Nos. CPPR-122 and CPPR-123, attached to letter from A. Schwencer, Directorate of Licensing, Atomic Energy Commission, dated December 24,1974

3. Tennessee Valley Authority (TVA), Preliminary Safety Analysis Report, docketed June 21, 1973

4. Complaint, Nuclear Development v. TVA, dated November 30, 2018 (including Exhibits A, B, C, D)

5. Motion for Preliminary Injunction, dated November 30, 2018

6. Defendant's Motion to Dismiss, dated February 4, 2019; Defendant's Brief Support of Motion to Dismiss, dated February 4, 2019 (including Exhibits A, B, C, D)

7. Plaintiffs Brief in Opposition to Motion to Dismiss, dated February 25, 2019

8. Defendant's Reply Brief in Support of Motion to Dismiss, dated March 11, 2019

9. Nuclear Development v. TVA, Memorandum Opinion and Order, dated May 15, 2019

10. Letter to Christopher Chandler, TVA, from Michael G. Lepre, Pillsbury Winthrop Shaw Pittman LLP, "Legal Opinion Regarding Bellefonte Nuclear Plant's NRC Construction Permits," undated (Confidential) (Deposition Exhibit 22)

11. David A. Repka, Expert Report re: Bellefonte Nuclear Power Plant – NRC Requirements for Transfer of Site, dated February 11, 2020

12. Nuclear Development, LLC, Application for Order Approving Construction Permit Transfers, Bellefonte Nuclear Plant, Units 1 and 2, dated November 13, 2018 (NRC ADAMS Accession # ML18318A428)

13. NRC Correspondence to William McCollum, Jr., Nuclear Development, LLC, requesting Supplemental Information in connection with license transfer application and acceptance review, dated April 5, 2019 (NRC ADAMS Accession # ML18348B139 and # ML183488064) (Deposition Exhibit 84)

14. Nuclear Development, LLC, Response to Request for Supplemental Information, dated August 28, 2019 (NRC ADAMS Accession # ML19240A382)

15. Letter from Omid Tabatabai, NRC Office of Nuclear Reactor Regulation, to William McCollum, Jr., Nuclear Development, LLC, Acceptance of Application for Orders Approving Construction Permit Transfers and Conforming Administrative Amendments, dated November 5, 2019 (NRC ADAMS Accession # ML19298A194) (Deposition Exhibit 85)

17. SECY-18-0055, Enclosure 1: Federal Register Notice, Proposed Rule - Regulatory Improvements for Production and Utilization Facilities Transitioning to Decommissioning, dated May 7, 2018 (NRC ADAMS Accession # ML18012A022)

18. NRC Office Instruction, LIC-107, Rev. 2, "Procedures for Handling License Transfers," effective June 5, 2017 (Deposition Exhibit 81)

19. Email, L. Blust to J. Chardos, August 18, 2017, "TVA Letter to NRC.docx" (Deposition Exhibit 7)

20. Email chain, C. Chandler, J. Chardos, S. Vance and L. Blust, August 28-31, 2017, "RE: L44170331 001 BLN U2" (Deposition Exhibits 8 and 33)

21. Email chain, T. Matthews and S. Chardos, dated June 18-19, 2018, "Feedback from meeting w/ Frank last week" (Deposition Exhibit 9)

22. Emails dated August 14, 2018, re: NRC public meeting on Bellefonte Project (with R. Bell notes) (Deposition Exhibit 10)

23. NRC Memorandum, Summary of Public Pre-Submittal Meeting with Nuclear Development, LLC, on August 14, 2018, dated September 4, 2018 (Deposition Exhibit 11)

24. Email chain, T. Matthews and C. Chandler, dated August 18, 2018, re: "Bellefonte Transfer," with draft TVA letter to consent to CP transfers (Deposition Exhibit 14)

25. Email, L. Blust to S. Quirk, dated October 24, 2018, re: "Follow up" with attached "talking points" (Deposition Exhibit 15)

26. Email, C. Beach to L. Blust, dated November 9, 2019, re: "License Transfer Discussion," with attached "NRC License Transfer Requirements" (Deposition Exhibit 17)

27. Email, L. Blust to C. Beach, dated November 12, 2018, re: "License Transfer Issues," with attached "Regulatory Path Forward for Transfer of the Bellefonte Construction Permits" (Deposition Exhibit 19)

28. Letter from S. Quirk to Nuclear Development, LLC and L. Blust, dated November 29, 2018, re: "Purchase and Sale Agreement dated November 14, 2016 (Agreement) for Bellefonte Nuclear Plant Site" (Deposition Exhibit 24)

29. Letter from L. Blust to S. Quirk, dated November 30, 2018 (Deposition Exhibit 25)

30. Email, S. Quirk to L. Blust, dated November 13, 2018, re: "License Transfer Issues" (Deposition Exhibit 26)

31. Email chain, S. Quirk, L. Blust and C. Beach, re: "Atomic Energy Act Cite," dated November 16, 2018 (Deposition Exhibits 28 and 36)

32. Email chain, J. Chardos, M. Gillman, W. McCollum, and T. Matthews, re: "Items Necessary Before Submitting an NRC Application," dated August 14-16, 2018 (Deposition Exhibit 60)

33. Letter from C. O'Neill (Concentric Advisors) to L. Blust, dated October 24, 2016, "Potential Sale of Bellefonte Nuclear Plant Site" (Deposition Exhibit 90)

34. Email chain, T. Matthews and M. Gillman, dated July 18-19, 2018, re: "Meeting on 30th Info" (Deposition Exhibit 107)

35. Email chain, T. Matthews, J. Chardos and M. Gillman, dated July 18-20, 2018, re: "Bellefonte Construction Permit – required actions" with attached TVA letters re: transition to Deferred Status (Deposition Exhibit 108)

17

36.  Email chain, M. Gillman, J. Chardos and R. Davis, dated August 22-28, 2018, re "What is Required to Keep Bellefonte Up and Running When TVA Transfers Site to Haney," with attached "Actions Required to Retain and Maintain Construction Permit in Deferred Status Following Transfer of Bellefonte Site from TVA to ND, LLC" (Deposition Exhibit 112)

37.  Letter from NRC (Catherine Haney) to TVA (Karl M. Singer), "Bellefonte Nuclear Plant, Units 1 and 2 - Withdrawal of Construction Permit Nos. CPPR-122 and CPPR-123," dated September 14, 2006 (NRC ADAMS Accession # ML061810505)

38.  NRC Memorandum, "Staff Requirements - COMSECY 08-0041 – Staff Recommendations Related to Reinstatement of the Construction Permits for Bellefonte Nuclear Plant, Units 1 and 2," dated February 18, 2009 (NRC ADAMS Accession # ML090490838)

39.  *Tennessee Valley Authority (Bellefonte Nuclear Plant Units 1 and 2); Order*, 74 Fed. Reg. 10,969 (March 13, 2009)

40.  Letter from E. Leeds, Director, NRR, to A. Bhatnager, TVA, Re: "Bellefonte Nuclear Plant, Units 1 and 2-Request Transition to Deferred Plant Status" (TAC Nos. ME1904 and ME1905) (January 14, 2010) (NRC ADAMS Accession # ML093420915)

41.  *NRC Information Digest, 2019-2020*, NUREG-1350, Vol. 31, Appendices A & D, available at www.nrc.gov/reading-rm/doc-collections/nuregs/staff/sr1350/

42.  Letter from D. Vassalo, NRR, to D. Switzer Northeast Nuclear Energy Co. (Dec. 10, 1975) (Millstone Unit 3)

43.  Letter from J. Stolz, NRR, to E. Van Brunt, Jr., Arizona Public Service Co. (April 19, 1978) (Palo Verde Units 1-3)

44.  Letter from R. Boyd, NRR, to L.C. Dail, Duke Power Co. (Oct. 19, 1978) (Catawba Unit 3) (Exhibit C to TVA Brief in support of Motion to Dismiss)

45.  Letter from R. Boyd, NRR, to G. Rhode, Niagara Mohawk Power Co. (Oct. 27, 1978) (Nine Mile Point Unit 2)

46.  Letter from D. Eisenhut, NRR, to W.C. Tallman, Public Service Co. of New Hampshire (Aug. 6, 1980) (Seabrook Units 1 & 2) (Exhibit B to TVA Brief in support of Motion to Dismiss)

**Depositions**

1.  Deposition of Larry Blust, dated November 13-14, 2019

2.  Deposition of Chris Chandler, dated October 29, 2019

3.  Deposition of William R. McCollum, Jr., dated November 12-13, 2019

4.  Deposition of David A. Repka, dated February 28, 2020

**Statutes; Judicial Decisions; NRC Regulations, Policy Statements, and Decisions**

1.  Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011 *et seq*.

2.  Energy Reorganization Act of 1974, as amended, 42 U.S.C. §§ 5801 *et seq*.

3.  NRC Regulations (10 CFR Parts 2, 50, 100)

4.  NRC *Policy Statement on Deferred Plants*, 52 Fed. Reg. 38,077 (Oct. 14, 1987)

5.  NRC *Final Policy Statement on the Restructuring and Economic Deregulation of the Electric Utility Industry*, 62 Fed. Reg. 44071-01 (Aug. 19, 1997)

18

6.    NRC *Final Standard Review Plan on Foreign Ownership, Control, or Domination*, 64 Fed. Reg. 52,355-01 (Sept. 28, 1999)

7.    *Advanced Medical Systems, Inc.*, CLI-94-6, 39 NRC 285 (1994), *aff'd, Advanced Medical Systems, Inc. v. NRC*, 61 F.3d 903 (6th Cir. 1995) (table)

8.    *Cincinnati Gas & Electric Co.* (Wm. H. Zimmer Nuclear Power Station, Unit 1), LBP-84-33, 20 NRC 765 (1984)

9.    *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)

10.   *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)

11.   *Northeast Nuclear Energy Co.* (Millstone Nuclear Power Station, Unit 3), CLI-01-10, 53 NRC 353 (2001)

12.   *Power Reactor Development Corp. v. Int'l Union*, 367 US 396, 406 (1961)

13.   *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), LBP-77-4, 5 NRC 433 (1977), *aff'd*, ALAB-459, 7 NRC 179 (1978), *aff'd sub nom. Kentucky v. NRC,* 626 F. 2d 995 (D.C. Cir. 1980) (judicial review focused on boundary issue between Kentucky and Indiana)

14.   *Public Service Co. of Indiana* (Marble Hill Nuclear Generating Station, Units 1 and 2), ALAB-493, 8 NRC 253 (1978)

15.   *Public Service Co. of New Hampshire* (Seabrook Station, Units 1 and 2), CLI-78-1, 7 NRC 1 (1978)

16.   *Tennessee Valley Authority* (Bellefonte Nuclear Plant Units 1 and 2), LBP-74-91, 8 AEC 1124 (1974), *aff'd sua sponte*, ALAB-253, 8 AEC 1182 (1975)

17.   *Tennessee Valley Authority* (Bellefonte Nuclear Plant Units 1 and 2), CLI-10-6, 71 NRC 113 (2010)

18.   *Union Electric Co.* (Callaway Plant, Units 1 & 2), LBP-78-31, 8 NRC 366, 374 (1978), *aff'd*, ALAB-527, 9 NRC 126 (1979)

19.   *Vermont Yankee Nuclear Power Corp.* (Vermont Yankee Nuclear Power Station), CLI-00-17, 52 NRC 79 (2000)

20.   *Yankee Atomic Electric Co.* (Yankee Atomic Power Station), CLI-96-6, 43 NRC 123 (1996)

21.   Letter from E.G. Case, Acting Director, NRC Office of Nuclear Reactor Regulation, to R. G. Asperger, dated March 3, 1978, re: Request for Enforcement Action under 10 C.F.R §2.206 related to Detroit Edison Company Enrico Fermi Atomic Power Plant, Unit 2 (Exhibit D to TVA Brief in support of Motion to Dismiss)

19