FILED

2021 Jan-06  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 5:18-CV-01983-LCB |
| | ) | |
| TENNESSEE VALLEY | ) | **ORAL ARGUMENT** |
| AUTHORITY, | ) | **REQUESTED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

## HIGHLIGHTED PORTIONS CONFIDENTIAL

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... i

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT .................................................................................................... 17

I.      Summary judgment should not be entered in ND's favor on
        whether TVA's transfer of the Bellefonte site to ND without NRC
        approval would have been unlawful. ................................................... 17

        A.      Transfer of ownership to ND would have violated the
                Construction Permits. .................................................................. 17

        B.      Transfer of ownership to ND would have violated the AEA. .. 18

II.     Summary judgment should not be entered in ND's favor on
        whether ND failed to satisfy a condition precedent. ........................... 22

III.    Summary judgment should not be entered in ND's favor on its
        specific performance claim because there is evidence that ND was
        not ready, willing, and able to close. .................................................. 26

IV.     Summary judgment should not be entered in ND's favor on
        TVA's affirmative defense of illegality. .............................................. 26

V.      Summary judgment should not be entered in ND's favor on its
        equitable estoppel argument. .............................................................. 28

VI.     ND cannot recover ancillary monetary relief as incidental
        damages. ............................................................................................. 30

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alfa Specialty Ins. Co. v. Jennings*,
  906 So. 2d 195 (Ala. Civ. App. 2005) ................................................................. 27

*Apotex Inc. v. Sanofi-Aventis*,
  2009 WL 10688058 (D.N.J. June 30, 2009) ......................................................... 23

*Bassidji v. Goe*,
  413 F.3d 928 (9th Cir. 2005) ............................................................................... 27

*In re BCP Mgmt., Inc.*,
  320 B.R. 265 (Bankr. D. Del. 2005) ..................................................................... 29

*Coast Fed. Bank, FSB v. United States*,
  323 F.3d 1035 (Fed. Cir. 2003) ........................................................................... 25

*Cudd v. Wood*,
  89 So. 52 (Ala. 1921) ........................................................................................... 26

*Durden v. Furniture Fair of Dothan, Inc.*,
  348 So. 2d 1375 (Ala. 1977) ................................................................................ 26

*Fed. Crop Ins. Corp. v. Merrill*,
  332 U.S. 380 (1947) ............................................................................................. 29

*Goodwin v. Tr. Co. of Columbus*,
  242 S.E.2d 302 (Ga. App. 1978) ......................................................................... 27

*Grimes v. Alfa Mut. Ins. Co.*,
  227 So. 3d 475 (Ala. 2017) .................................................................................. 27

*Guar. Fin. Servs., Inc. v. Ryan*,
  928 F.2d 994 (11th Cir. 1991) ............................................................................. 23

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1982) ............................................................................................... 27

*Korea Devel. Corp. v. United States*,
  9 Cl. Ct. 167 (1985) ............................................................................................23

*Martin v. Social Security Admin., Comm'r*,
  903 F.3d 1154 (11th Cir. 2018) ..........................................................................22

*Massachusetts v. NRC*,
  878 F. 2d 1516 (1st Cir. 1989)............................................................................22

*Palmer v. Chamberlain*,
  191 F.2d 532 (5th Cir. 1951) ..............................................................................27

*In the Matter of Pub. Serv. Co. of Ind., Inc.*,
  7 N.R.C. 179 (1978).............................................................................................20

*In the Matter of Pub. Serv. Co. of N.H. v. NRC*,
  7 N.R.C. 1 (1978)................................................................................................22

*Seh Ahn Lee v. United States*,
  895 F.3d 1363 (Fed. Cir. 2018) ..........................................................................28

*Siegel v. Atomic Energy Comm'n*,
  400 F.2d 778 (D.C. Cir. 1968).............................................................................22

*Smithy Braedon Co. v. Hadid*,
  825 F.2d 787 (4th Cir. 1987) ..............................................................................27

*Troutman v. S. Ry. Co.*,
  441 F.2d 586 (5th Cir. 1971) ..............................................................................27

*Unger v. Leviton*,
  787 N.Y.S.2d 625 (Sup. Ct. 2004)......................................................................27

*United States v. Johnson Controls, Inc.*,
  713 F.2d 1541 (Fed. Cir. 1983) ..........................................................................23

*United States v. Ryals*,
  480 F.3d 1101 (11th Cir. 2007) ..........................................................................21

**Statutes**

42 U.S.C. § 2014cc ...................................................................................................19

42 U.S.C. § 2131 ......................................................................................................18

**Other Authorities**

10 C.F.R. § 50.2 ........................................................................................................19

52 Fed. Reg. 38077-01 (Oct. 14, 1987) ...................................................................15

20 NRC 765 (1984)...................................................................................................21

## **INTRODUCTION**

This Court should not enter summary judgment in favor of Plaintiff Nuclear Development LLC ("ND") because it would be inconsistent with controlling law and because there are genuine issues of material fact on several key issues.

ND begins its brief with an array of factual assertions that have no relevance to the summary judgment issues. ND paints itself as a victim of a nefarious plot by TVA's CEO to seek revenge for comments adverse to TVA made by an ND representative to Memphis officials. As demonstrated below, however, this tale is pure fiction. The evidence shows that TVA did not close the transaction because TVA had a legal opinion from one of the Nation's leading nuclear law firms that it would be unlawful to do so. In addition, an NRC official had expressed concern to TVA about TVA relinquishing control of the site without NRC approval. Furthermore, ND's general counsel acknowledged to TVA before the closing date that the transfer of the Bellefonte site without NRC approval would be illegal.

As for ND's summary judgment arguments, they come up short. In order to be entitled to summary judgment, ND would have to establish all of the following as a matter of law:

- The closing would not have violated the terms of the Bellefonte construction permits; and

- The closing would not have violated the Atomic Energy Act; and

- The express condition precedent that precluded the closing if it would

1

violate any statute or permit should be disregarded; and

- ND was ready, willing, and able to close the transaction; and

- This Court has the ability to order TVA to take an illegal act; and

- The doctrine of equitable estoppel can be utilized to force TVA to take an illegal act.

As TVA sets out below, there are genuine issues of material fact on several of these issues, and ND's arguments on these points disregard controlling law.

## STATEMENT OF FACTS

### A. Response to ND's statement of undisputed facts

1-8. Admitted.

9. The first and third sentences of Paragraph 9 are admitted. TVA disputes the second sentence because nothing in the resolution limited TVA's CEO's authority to terminate the agreement to sell Bellefonte *only* if environmental impact issues were not satisfactorily addressed. ND Ex. L; ND Ex. M 115:18-116:23.[1]

10. TVA admits the first sentence of Paragraph 10. TVA disputes the second sentence of Paragraph 10 because Mr. Johnson testified that he did not recognize ND's Exhibit O during his deposition. ND Ex. J at 35:14-18.

---

[1] TVA refers to exhibits submitted as part of ND's evidentiary submission in support of summary judgment (Doc. 72) as "ND Ex." TVA refers to exhibits submitted as part of its evidentiary submission in support of summary judgment (Doc. 75) as "TVA Ex." As to new exhibits submitted with this opposition, TVA refers to such exhibits as "Ex." All citations are to internal page numbers, not PDF page numbers.

2

11.    Admitted.

12.    The first and second sentences of Paragraph 12 are admitted. TVA disputes the third sentence because Mr. Johnson testified that he could not recall ND requesting that transfer of the Bellefonte construction permits ("CPs") be a closing condition.   ND Ex. J at 32:11-15.   Additionally, Ms. Quirk's and Mr. Beach's testimony does not indicate that they specifically presented the issue of the closing condition to Mr. Johnson.  ND Ex. M at 37:14-22; ND Ex. Q at 27:25-29:1.

13.    The first sentence of Paragraph 13 is admitted. TVA disputes the second sentence because $22.2 million is not twice the value of $11.3 million.

14.    TVA disputes Paragraph 14 because Section 7(a)(vii) of the agreement makes no reference to the NRC,  ND Ex. P at 8, and Ms. Quirk testified only that she "assume[d]" Section 7(a)(vii) would include the NRC,  ND Ex. M at 40:8-23.  Ms. Quirk also testified that she "[could not] say" "[w]hat effect the [representations and warranties] had on Nuclear Development."  ND Ex. M at 38:18-39:1.

15.    TVA disputes Paragraph 15 because the "authorization" referenced in Section 7(a)(iii) of the Agreement is limited to the authorization provided to TVA's CEO by the TVA Board.  ND Ex. P at 8.

16.    TVA disputes Paragraph 16 because the Agreement does not contain the express statement alleged by ND.  ND Ex. P.

17.     TVA disputes Paragraph 17 because Section 9(a)(ii) states that the applicable period is between the "Effective Date and prior to Closing" and that each party would "provide reasonable cooperation." ND Ex. P at 9-10; ND Ex. M at 49:21-23.

18.     TVA disputes the first sentence of Paragraph 18 because Section 6(a) contained explicit closing conditions that had to be satisfied before TVA was required to transfer title of Bellefonte to ND. Ex. P at 6-7. The second sentence is admitted.

19.     Admitted.

20.     TVA disputes the first sentence of Paragraph 20 because the stated purpose of the meeting was "[t]o introduce the members of Nuclear Development, LLC, and to discuss issues associated with the submittal of a request to transfer the deferred construction permit for Bellefonte Nuclear Generating Station (BLN), Units 1 and 2." ND Ex. V at TVABLN00002048. As for the second sentence, to the extent ND is suggesting that the term "licensing activities" related to its application to transfer the CPs, it is denied. Ex. 1 (J. Chardos Decl.) at ¶ 5. The third sentence is admitted.

21.     Admitted.

22.     TVA disputes Paragraph 22 because Mr. Johnson testified that he intended to close "[i]f all the conditions were met." ND Ex. J at 53:3-6. In addition, TVA acknowledged that ND intended to close the transaction, not that the closing would occur. ND Ex. Z.

4

23.     TVA disputes Paragraph 23 because there is nothing in the cited material suggesting a significant savings for Memphis. ND Ex. AA at 281:22-282:2, 285:16-286:7. Additionally, Mr. Johnson's description of the comments he criticized differs from the statement in Paragraph 23. ND Ex. J at 46:18-47:22.

24.     TVA disputes Paragraph 24 because Mr. Chandler testified that Mr. Matthews sent the draft letter to him to review but did not request that TVA submit the consent letter. ND Ex. BB at 36:16-38:16. Furthermore, Mr. Shea—who is not an attorney, ND Ex. X at 10:12-18—testified that he was not "involved in any decisions made by TVA not to provide the NRC with a document that consented to the sale of the property to [ND]." ND Ex. X at 87:21-88:3.

25.     TVA disputes the first sentence of Paragraph 25 because Ms. Quirk could not recall the precise date on which she made the request for the meeting. ND Ex. M at 79:6-11. The remaining sentences are admitted.

26.     Admitted.

27.     TVA disputes the first sentence of Paragraph 27 because the email was expressing concern about the legality of transferring ownership of the Bellefonte site prior to NRC approval of the transfer of the CPs. ND Ex. DD. TVA disputes the second sentence because, taken in context, Erin Henderson was responding to a question about whether ND could seek transfer of the CPs prior to transfer of ownership of the Bellefonte site. *See* ND Ex. EE at TVABLN00000627.

5

28. TVA disputes that the memorandum states unequivocally that the CPs could be lawfully transferred after closing. Instead, Mr. Matthews acknowledged that his proposed regulatory path "appear[ed] to be a situation of first impression for the NRC without clear precedent and results in a degree of responsibility and risk to TVA after closing and until the CP transfers are approved." ND Ex. FF at TVABLN00000044.

29. TVA disputes Paragraph 29 because ND's deposition citation does not support that statement, and Mr. Chandler testified that the issue of the consent letter was not discussed on that date. ND Ex. BB at 48:4-13.

30. Admitted.

31. The first sentence of Paragraph 31 is admitted. TVA disputes the second sentence because it does not state the complete question, which included "[w]hy give an extension to provide more time to sell it off." ND Ex. J at 93:23-94:1. TVA also disputes the third sentence because Mr. Johnson's response did not begin with that statement. ND Ex. J at 94:2-6. TVA disputes the fourth sentence because it is taken out of context. Although TVA admits Johnson used the quoted language, TVA disputes that the language can be fairly construed without reading it in context. *See* ND Ex. J at 94:2-96:2.

32. The first sentence of Paragraph 32 is admitted. TVA disputes the second sentence because it is taken out of context. Although TVA admits Johnson used the

6

quoted language, TVA disputes that the language can be fairly construed without reading it in context. *See* ND Ex. J at 96:6-97:9.

33. TVA disputes the first sentence of Paragraph 33 because Mr. Johnson did not make the decision based on alleged illegality, but instead on actual illegality as reflected in a legal opinion from a respected nuclear licensing law firm and his own analysis of the Atomic Energy Act ("AEA") and certain cases. *See* ND Ex. J at 136:18-137:11, 149:8-23. TVA disputes the second sentence because the cited testimony does not support the stated proposition, and Mr. Johnson testified that he made his decision on the length of the extension prior to that time. ND Ex. J at 136:3-8; ND Ex. S. TVA admits that Mr. Johnson did not take his decision to a meeting of TVA's Board of Directors, but to the extent this statement suggests that Mr. Johnson did not take the decision to the Board in any context, it is disputed. *See* ND Ex. J at 117:8-13; Ex. 2 (TVA's Am. Resp. to ND's First Interrog.) at 2-4. The last sentence is admitted.

34. The first sentence of Paragraph 34 is admitted. TVA disputes the second sentence because Mr. Blust did not provide any valid legal arguments to refute TVA's position. *See* ND Ex. JJ.

35. TVA disputes Paragraph 35 because ND was not going to close if it was not comfortable that financing was in place for the project, and at the time of closing,

ND had not finalized financing for the project. Ex. 3 (F. Haney, Jr. Depo.) at 112:6-13; ND Ex. KK at 80:19-25; 92:16-19.

36.    TVA disputes Paragraph 36 because ND includes in its calculation of damages amounts that were incurred prior to the date the contract was signed and because ND could not identify a reason for a number of the expenditures included in its calculation. TVA Ex. 8 at 15:19-16:9; 120:7-124:11; 132:21-136:14; 155:6-157:16; 35:14-36:6; 59:3-7; 79:23-80:10; 81:16-82:8; 82:21-83:7; 83:8-20; 85:16-22; 85:23-87:8; 87:23-88:9; 89:4-13; 89:23-90:10 & Depo. Ex. 133 & 136. In addition, TVA disputes Paragraph 36 because the cited deposition testimony does not support the statement that the amounts were expended in reliance of TVA's performance of the contract to convey the Bellefonte to ND. *See* ND Ex. MM at 13:19-14:3. The statement is further disputed because the itemization of damages includes amounts that ND admitted were not properly included in its claimed damages. TVA Ex. 8 at 36:7-37:13; 50:13-17; 52:5-15; 55:9-19; 62:19-63:2; 66:14-18; 69:10-17.

37.    TVA disputes ND's statement that the application is "under successful review" because the NRC has issued no decision on the application. ND Ex. W at 50:9-10; 200:9-17; Ex. 4 (C. Chandler Decl.) at ¶ 7. TVA also disputes the second sentence because the cited evidence does not support the statement that the NRC is monitoring the litigation. ND Ex. W at 26:13-27:3, 79:6-80:3, 139:9-18. TVA further disputes the statement because NRC precedent, as discussed later in this

brief, directly supports TVA's argument that closing the transaction prior to approval of the transfer of the permits would be unlawful. TVA admits that the NRC has not submitted any argument in support of either party in this proceeding.

38.     TVA disputes the first sentence of Paragraph 38 because the parties did not choose a remedy for breach but instead agreed that any party may seek an order of specific performance to require the performance of any other party's obligations under the contract. ND Ex. P at § 35. The second sentence is admitted.

**B.     TVA's additional undisputed facts**

**Background Facts**

39.     TVA and ND agreed in the Bellefonte Nuclear Site Purchase and Sales Agreement ("Agreement") that "federal law shall at all times govern the validity, interpretation, and enforceability of th[e Agreement]," with Alabama law providing a backup in the event that there is no applicable body of federal law on a particular legal or procedural point. ND Ex. P at § 31.

40.     To induce TVA to enter into the Agreement, ND represented and warranted that "[n]o authorization, consent or approval or order of action of or filing with any Governmental Authority [wa]s required for the execution and delivery by the Buyer of th[e] Agreement or the consummation by the Buyer of the transaction contemplated hereby." ND Ex. P at § 8(a)(vi).

41.     The Agreement contains the following condition in Section 6(a)(v) that was

9

subject to fulfillment at or before the closing:

> **There shall not be in effect at the Closing any law, statute, rule, regulation, permit**, certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below) restraining, enjoining, or otherwise prohibiting or **making illegal the consummation of the transactions contemplated by this Agreement**.

ND Ex. P at § 6(a)(v) (emphasis added)

42. Shortly after execution of the Agreement, TVA's transition team leader sent timelines to ND showing that the CPs had to be transferred prior to closing. Ex. 1 at ¶¶ 2-4 & App. 1.

43. At no point prior to November 30, 2018, did TVA management tell the TVA transition team to stop working toward the completion of the activities necessary to close the sale of the Bellefonte site. Ex. 1 at ¶ 6.

44. TVA's refusal to agree in 2017 to send a letter about the expiration date for the Unit 2 permit did not impede ND's ability to submit an application to the NRC for transfer of the CPs. TVA Ex. 6 at 190:9-191:3.

45. ND could not have submitted its application to the NRC for transfer of the CPs sooner if TVA had taken some action. ND Ex. W at 77:9-13.

46. ND requested a six-month extension of closing to obtain NRC approval of the transfer of the CPs and to secure financing for the project. TVA Ex. 6 142:14-143:7.

47. TVA had no obligation under the Agreement to consent to an extension of the

10

closing date. TVA Ex. 6 at 141:10-142:11.

48.     Ordinarily, the NRC does not publicly challenge parties, or otherwise speak, at public hearings like the one held on August 14, 2018. Ex. 6 (D. Repka Depo.) at 189:14-22.

49.     The NRC told ND in April 2019 that its application for transfer of the CPs was insufficient. Ex. 5 (4/5/19 NRC letter to W.McCollum); TVA Ex. 5 at 264:1-4.

50.     As of October 13, 2020, the NRC has not issued a decision on ND's application to transfer the CPs. Ex. 4 at ¶ 7.

51.     Each Bellefonte unit contains a partially completed apparatus designed to sustain nuclear fission in a self-sustaining chain reaction. Ex. 7 (R. Coward Depo.) at 58:9-16, ND Ex. B at 143:8-25, ND Ex. E at 58:19-59:7.

52.     The CPs each state in Section 2 that "[t]he facility . . . will be located on the applicant's site in Jackson County, Alabama," and "applicant" is defined to be TVA. TVA Ex. 1 at App. 1, § 2.

53.     The CPs each state as a permit condition in Section 3(B) that "[t]he facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama." TVA Ex. 1 at App. 1, § 3(B).

54.     As part of the application for the Bellefonte construction permits, TVA included a Preliminary Safety Analysis Report ("PSAR"), and Section 2.1.2 of the PSAR, which is entitled "Site Description," includes this description of the site: "The

11

exclusion area will be owned by the United States and in the custody of TVA." TVA Ex. 1 at ¶ 4 & App. 2; TVA Ex. 4 at 220:2-5.

55.     The NRC has never approved the transfer of ownership of a plant subject to a construction permit without first approving transfer of the construction permit. Ex. 8 (S. Burns Depo.) at 335:14-19; Ex. 6 at 85:22-86:8.

56.     In 2017, an NRC official sent ND the NRC's Procedures for Handling License Transfers, which states, "License transfers are unique in that they result in the **exchange of ownership** and/or the responsibility for operating a nuclear facility. TVA Ex. 5 at 194:19-195:6 & Depo. Ex. 81, p. ND_003478.

**Atomic Energy Act and Construction Permits**

57.     In the summer of 2018, Christopher Chandler, a TVA attorney, identified that transfer of the Bellefonte site to ND without NRC approval could violate the CPs and the AEA. ND Ex. BB at 41:16-42:12.

58.     TVA informed ND no later than October 2018 about a concern that closing without NRC approval would cause TVA to violate the CPs. ND Ex. Q at 34:8-24, 83:4-84:3.

59.     On November 12, 2018, ND's general counsel Larry Blust sent TVA a memo authored by ND's licensing counsel Timothy Matthews. ND Ex. FF; ND Ex. R at ¶ 1. In his cover email to the memo, Mr. Blust "agreed" that ND's "proposed path forward to transfer the construction permits in deferred status by filling [sic] the

12

application before closing with the approval to occur after closing … would be a case of first impression for the NRC." ND Ex. FF at TVABLN00000043.

60.     In the memo, Mr. Matthews stated that "ND acknowledges that this regulatory path -- involving temporary separation of ownership of a site for a utilization facility from the recipient of the permits authorizing its construction -- appears to be a situation of first impression for the NRC without clear precedent and results in a degree of responsibility and risk to TVA after closing until the CP transfers are approved." ND Ex. FF at TVABLN00000044.

61.     In mid-November 2018, TVA notified ND that it discovered an issue under the AEA concerning the legality of closing without NRC approval. ND Ex. Q at 58:8-14, 61:10-16, 63:21-64:4; ND Ex. BB at 52:1-53:7.

62.     In late November 2018, TVA received an opinion letter from the Pillsbury firm, TVA's regulatory counsel, advising it that "acquiring or transferring ownership of Bellefonte (and/or its CPs) without some form of prior NRC consent would be a violation of the [AEA] and NRC regulations, as they have been previously interpreted." Ex. 4 at App. 1; ND Ex. J at 112:12-13; ND Ex. BB at 18:3-5.

63.     Prior to November 30, 2018, Chris Chandler contacted Brian Harris at the NRC to discuss the idea of transferring ownership of the Bellefonte site to ND in escrow, and Mr. Harris expressed concern about TVA ceding control of the plant without NRC approval. ND Ex. BB at 58:13-59:16.

13

**TVA CEO's decision not to close the sale of Bellefonte**

64.    During an employee forum on November 26, 2018, TVA CEO Bill Johnson explained to TVA employees: "There's a lot of technical problems with [ND] closing. Mostly that they don't have a permit from the NRC, so they can't actually own the site which they think they can do later." ND Ex. J at 97:5-8.

65.    During that employee forum, Mr. Johnson also discussed his "three rules of the universe" as "lighthearted banter with the group." ND Ex. J at 99:9-100:2. Mentioning the rules was "one of the things that [he] like[d] to do at the[] events" to "have little fun and make [the employees] laugh a little bit," but "it had nothing to do with [Bellefonte]." ND Ex. J at 101:13-17.

66.    On November 29, 2018, Mr. Johnson made the decision that TVA could not close the next day. ND Ex. J at 101:3-7, 136:18-137:11, 149:14-23.  Mr. Johnson based that decision on the Pillsbury opinion letter and his review of the AEA and cases cited in that opinion letter. ND Ex. J at 136:18-137:11, 149:14-23.

**TVA's 2006 letter to NRC**

67.    In 2005, TVA decided that it would not complete the two nuclear reactors at the Bellefonte site and that it would request that the CPs for those two units be withdrawn by the NRC. Ex. 4 at ¶ 2. In making that decision, TVA abandoned any intent to complete the design of the units. *Id.* Thus, once TVA made that decision, the units at the Bellefonte site were no longer designed to sustain nuclear fission in

14

a self-supporting chain reaction. *Id.*

68.     Consistent with NRC policy, and in support of withdrawal of the CPs, TVA sent the June 29, 2006, letter to assure the NRC that the Bellefonte site could not possibly be operated. Ex. 8 at 263:16-266:19.

69.     In 2008, TVA requested the NRC to reinstate the CPs. In making that request, TVA indicated that it could complete the units. Ex. 4 at ¶ 3. The NRC reinstated the CPs and placed them in "terminated plant" status in accordance with the NRC's Policy Statement on Deferred Plants. *Id.* Once the NRC reinstated the CPs, the units were designed to sustain nuclear fission in a self-supporting chain reaction. Ex. 4 at ¶ 3. The NRC then placed the CPs in deferred status in 2010. TVA Ex. 4 at 100:8-19 & Depo. Ex. 108, p. TVABLN00003942-47.

70.     Under the NRC's Policy Statement on Deferred Plants, a permittee must comply with all requirements of a construction permit, even if the plant is in deferred or terminated-but-not-withdrawn status. 52 Fed. Reg. 38077-01, §§ III(A)(1), III(A)(3), III(B)(1) (Oct. 14, 1987). In that policy statement, the NRC states that all regulatory requirements and policy statements applicable to plants under construction are applicable to plants in deferred status. *Id.* at III(A)(3), III(A)(5).

## C.     Additional disputed facts

71.     Under longstanding NRC practice, there is a difference between (a) a permit holder wishing to abandon permanently a nuclear project and relinquish its

15

construction permit; and (b) a permit holder who suspends active construction of a nuclear project, but leaves open the possibility that it (or some other party) may resume construction at some point pursuant to an existing construction permit. Ex. 8 at 332:9-335:10; 337:2-338:12; 343:20-344:13; *but see* Ex. 6 at 106:1-107:22. In the former case, the NRC will relinquish any oversight over the site once it is satisfied the nuclear reactor is not capable of operation. Ex. 8 at 332:9-334:4; 337:2-338:12; 343:20-344:13; *but see* Ex. 6 at 106:1-107:22. In the latter circumstance, the NRC maintains plenary control over the site, even though the nuclear reactor is not capable of operation and there is no active construction. Ex. 8 at 334:6-335:10; 337:2-338:12; *but see* Ex. 6 at 106:1-107:22.

72.    Under longstanding NRC practice, before ownership of a plant subject to a construction permit may be transferred, the NRC must first approve the transfer of the permit. Ex. 8 at 323:6-9, 325:6-13, 335:14-19; *but see* Ex. 6 at 53:7-22.

73.    During the negotiation of the Agreement, TVA agreed to defer closing for two years to allow time for ND to obtain financing and to gain NRC approval for transfer of the CPs. TVA Ex. 6 at 64:22-72:23 & Depo. Ex. 90; *but see* TVA Ex. 6 at 69:6-15, 70:17-71:5.

74.    During a November 15, 2018, call between TVA representatives and Larry Blust, TVA's General Counsel Sherry Quirk asked Mr. Blust if Timothy Matthews had rendered a legal opinion on whether closing would be lawful under the AEA.

Ex. 4 at ¶ 4. Mr. Blust responded that Mr. Matthews said it was not opinionable. *Id.*; *but see* TVA Ex. 6 at 173:2-19.

75.     During a November 19, 2018, Larry Blust stated to TVA representatives that transferring ownership of the Bellefonte site without NRC approval would violate the AEA. Ex. 4 at ¶ 5; *but see* ND Ex. BB at 53:21-54:17.

## ARGUMENT

**I.      Summary judgment should not be entered in ND's favor on whether TVA's transfer of the Bellefonte site to ND without NRC approval would have been unlawful.**

ND has not established as a matter of law that consummation of the sale of the Bellefonte site would have been lawful without NRC approval. To the contrary, there are two separate and independent reasons why such a transfer would not have been lawful: the transfer would have caused TVA to violate the CPs and it would have violated the AEA.

### A.      Transfer of ownership to ND would have violated the Construction Permits.

As TVA explained in its motion for summary judgment, TVA would have violated the terms of the CPs by transferring the site to ND without NRC approval, which would have been an unlawful act. Doc. 75 at 15-18. ND's cursory discussion of the permits in its brief does not undermine TVA's argument. Indeed, ND relies on a misstatement of the permits.

Contrary to ND's contention, the requirement in Section 3(B) of the permits

17

that "[t]he facility shall be constructed and located **at the site as described in the application**, in Jackson County, Alabama" is an express condition of the permits. *See supra* at ¶ 53 (emphasis added).  And ND does not even bother to address the fact that a key component of TVA's permit application described the site as "owned by the United States and in the custody of TVA."  *Supra* at ¶ 54; Doc. 75 at 17-18. Had TVA transferred the site to ND without NRC approval, the facilities covered by the permits would have been located on a site not owned by the United States and not in TVA's custody, thereby directly contravening a condition of the permits.  As explained in TVA's summary judgment brief, that would have been unlawful.  Doc. 75 at 15-18.  ND has presented no basis from which this court could conclude that ND is entitled to summary judgment on this issue.

## B.     Transfer of ownership to ND would have violated the AEA.

There is also no basis for entry of summary judgment in ND's favor concerning the separate and independent reason why TVA would have broken the law by transferring the site to ND without NRC approval, namely that it would have violated the AEA.  At a minimum, there is a genuine issue of material fact as to whether the Bellefonte units meet the NRC's definition of "utilization facility."

As ND notes in its brief, Section 101 of the AEA makes it unlawful for any person to transfer or acquire a utilization facility without an NRC permit.  42 U.S.C. § 2131.  ND also correctly recognizes that the NRC has defined "utilization facility"

18

as a "nuclear reactor," which in turn is defined as an "apparatus, other than an atomic weapon, **designed** or used to sustain nuclear fission in a self-supporting chain reaction." 10 C.F.R. § 50.2 (emphasis added).[2]

In its effort to obtain summary judgment, ND ignores the critical evidence that each Bellefonte unit is designed to sustain nuclear fission in a self-supporting chain reaction. *See supra* at ¶ 51. That evidence by itself creates a genuine issue of material fact on whether each of the units is a utilization facility, and thus whether the AEA required ND to have permits in order for the closing to occur.[3]

And there is more relevant evidence that ND fails to mention. ND's general counsel acknowledged to TVA prior to the closing date that transfer of ownership of the Bellefonte site without NRC approval would violate the AEA. *See supra* at ¶ 75. Furthermore, both ND's expert and TVA's expert testified that they knew of no instance where ownership of a facility subject to a construction permit had ever been transferred without NRC approval. *See supra* at ¶ 55. And in 2017, an NRC official

---

[2]     Congress assigned to the NRC the duty to determine "by rule of the [NRC]" what equipment or devices should be deemed to be a "utilization facility" under the AEA. 42 U.S.C. § 2014cc. The rule promulgated by the NRC containing a definition of "utilization facility" is entitled to deference. *See infra* n.8.

[3]     ND points to a letter that TVA wrote in 2006 and a subsequent response from the NRC stating that each unit at Bellefonte was not a utilization facility at that time. But when that letter was sent and the NRC responded, the Bellefonte units were not designed to sustain nuclear fission in a self-supporting chain reaction because TVA had abandoned any intent to complete the units. *See supra* at ¶ 67. Thus, the units did not meet the definition of "utilization facility" at that time. When the Construction Permits were reinstated in 2009, the units were again designed to sustain nuclear fission, so they met the definition of "utilization facility" from that point to the present. *See supra* at ¶ 69.

sent ND the NRC's Procedures for Handling License Transfers, which states that the result of such a transfer is the <u>exchange of ownership</u>. *See supra* at ¶ 56.

Although this Court need not delve into the NRC's adjudicatory history in order to deny ND's motion, the NRC's precedents compel the conclusion that it would violate the AEA for TVA to have transferred ownership of the site to ND without NRC approval. In its brief, ND ignores a seminal decision showing that every owner of a facility subject to a construction permit must be a party to the permit even when construction pursuant to the permit is not underway. *See In the Matter of Pub. Serv. Co. of Ind., Inc.*, 7 N.R.C. 179 (1978).

In that decision involving the Marble Hill plant, the NRC's Atomic Safety and Licensing Appeal Board confronted an argument that "Sections 101 and 103 do not explicitly forbid one to 'own' a nuclear plant site without a license." *Id.* at 199. The Board disagreed, ruling that, under Section 101 and Section 103 of the AEA, every owner of a site for which a construction permit is sought must be a co-applicant for a construction permit. *Id.* at 199-200. The Board based its decision on the safety concerns underlying the Act. *Id.* at 199-200. Indeed, the Board noted that "it takes little to appreciate that an owner can influence the actions and attitudes of its tenants and agents," underscoring the need for the licensing of any owner. *Id.* at 200.

The Board issued this ruling in the Marble Hill case even though no construction pursuant to the permit was underway. *Id.* at 183. If ND were correct

20

in its argument that whether a facility is "under construction" is dispositive of whether an owner must also be a holder of the construction permit, then the Board's decision would have come out the other way.[4]

Other NRC precedent is consistent in requiring any owner of a facility subject to a construction permit to obtain NRC approval. In 1978, the NRC addressed a situation where an entity sought to sell a 20% stake in an under-construction nuclear plant. The entity that sought to sell the interest argued that the approval requirements of Section 101 are not triggered until construction of a plant is complete. The NRC rejected that argument, noting that "it has been the longstanding practice of the Commission to consider a utilization facility under construction to be a utilization facility."[5] NRC Letter to Dr. R.G. Asperger, 3/7/1978 at p. 2, n.* (copy attached as

---

[4] ND erroneously suggests that the NRC's decision in *Cincinnati Gas & Elec. Co.* (Zimmer Nuclear Power Station, Unit 1), 20 NRC 765 (1984), supports its argument. ND ignores the critical factual difference that the owner of the Zimmer plant sought to withdraw its NRC permit. Under established NRC practice, when a party asks for withdrawal of a permit, the NRC's focus is on ensuring that the units cannot be operated. In such a circumstance, the NRC is determining that it can appropriately withdraw the permit and thereby relinquish control over the site. *See supra* at ¶ 71. By contrast, when a permit remains in effect, the NRC maintains plenary control over the applicable site. *Id.*

ND also errs in suggesting that a proposed NRC rule supports its position. Under controlling circuit precedent, "[p]roposed regulations . . . are merely suggestions for comment and have no legal effect." *United States v. Ryals*, 480 F.3d 1101, 1107 n.8 (11th Cir. 2007). In addition, the proposed rule is irrelevant because, even if were in effect today, it would apply only to decommissioned plants that will not be operated, not to plants subject to a construction permit.

[5] ND's attempt to distinguish this letter because Bellefonte is not under active construction won't fly. In the letter, the NRC official contrasted the situation of a plant under construction with one that is completed. There is nothing to suggest that the NRC official meant that a party can be an owner of a facility subject to a construction permit if the facility is not under active construction at that moment, and such a parsing of the words "under construction" is inconsistent with the Marble Hill decision, which is cited in the letter.

In addition, the NRC applies all regulations and policy statements applicable to plants under

21

Ex. 9).  The NRC concluded that "[s]ection 101 of the Act . . . requires Commission

approval before and not after an ownership interest is acquired."  *Id.* at 3-4.[6]

Consistent with that decision and the Marble Hill ruling, the NRC has

repeatedly required that any change in ownership (even partial ownership) of a

facility subject to a construction permit must be approved by the NRC before the

transfer occurs.[7]  In a decision pertaining to the Seabrook Plant, the NRC could not

have been clearer: "[a]ny transfer of ownership would require [NRC] approval."  *In*

*the Matter of Pub. Serv. Co. of N.H. v. NRC*, 7 N.R.C. 1, 15 (1978).[8]

## II.   Summary judgment should not be entered in ND's favor on whether ND failed to satisfy a condition precedent.

Summary judgment should not be entered in ND's favor on whether ND failed

---

construction to plants in deferred status.  *See supra* at ¶ 70.  In other words, the NRC treats a deferred plant, which is subject to a construction permit, as a plant under construction.

[6]   The legal interpretations of the NRC reflected in this letter ruling, along with the other NRC letter rulings cited in this brief, are entitled, at a minimum, to *Skidmore* deference because of the thoroughness evident in the NRC's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and the inherent power in the letters to persuade.  *See Martin v. Social Security Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018).

[7]   *See, e.g.,* NRC Letter to W.C. Tallman, 8/6/1980, at 1-2 & 6, https:// adamswebsearch2. nrc.gov/webSearch2/main.jsp?AccessionNumber=ML011790530 (attached as Ex. 10); NRC Letter to L.C. Dail, 10/19/1978, at 1 & 4-5, https:// adamswebsearch2. nrc.gov/webSearch2/ main.jsp? AccessionNumber=ML013100139 (attached as Ex. 11).

[8]   This longstanding line of NRC decisions in interpreting the AEA to require an entity to be a holder of the applicable construction permit before it becomes an owner of an unfinished nuclear plant is entitled to deference.  Courts have long recognized that the AEA "is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives."  *Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 783 (D.C. Cir. 1968).  Due to "the amount of discretion granted the [NRC] in working to achieve the statute's ends," "the scope of review of NRC actions is extremely limited."  *Massachusetts v. NRC*, 878 F. 2d 1516, 1523 (1st Cir. 1989) (internal quotations and citations omitted).

to satisfy the express condition precedent that there would not be in effect at the closing any law, statute, rule, or permit making illegal the consummation of the transactions contemplated by the Agreement. *See supra* at ¶ 41. Having voluntarily agreed to include this provision in the Agreement, ND cannot escape its application.

As explained in TVA's summary judgment brief, the plain meaning of the condition precedent in § 6(a)(v) must be applied. Doc. 75 at 18-20. Because it would have been illegal under the AEA and the CPs for TVA to transfer ownership of the Bellefonte site to ND without NRC approval, the condition precedent was not satisfied, so TVA did not breach the Agreement by failing to close. *Id.*

ND's effort to dodge this condition precedent, which is based largely on non-federal-law cases, cannot succeed. The fact that ND and TVA had a section in the Agreement expressly spelling out the conditions precedent, including the one at issue, (ND Ex. P at § 6) removes any doubt that the provision must be applied as written. *See Korea Devel. Corp. v. United States*, 9 Cl. Ct. 167, 174-76 (1985); *Apotex Inc. v. Sanofi-Aventis*, 2009 WL 10688058, at *3 (D.N.J. June 30, 2009).

There is no merit to ND's argument that the condition precedent at issue would render meaningless other provisions of the Agreement. "[No] provision [should] be construed as being in conflict with another unless no other reasonable interpretation is possible." *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983); *accord Guar. Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 999–

23

1000 (11th Cir. 1991). Both TVA in § 7(a)(vii) and ND in § 8(a)(vi) warranted that no further approval of a governmental authority was needed to consummate the transactions contemplated by the Agreement. *See supra* at ¶ 40; ND Ex. P at § 7(a)(vv). Nothing in those representations as written has any impact on the condition precedent in § 6(a)(v), and applying the plain meaning of § 6(a)(v) does not render the representations meaningless. Indeed, the representations and § 6(a)(v) are entirely consistent.[9]

Nor is ND correct in arguing that the closing condition in § 6(a)(v) would render meaningless the provision in § 1(e) concerning ND's ability to notify TVA that ND did not seek to transfer the CPs, which would trigger TVA's obligation to terminate them. If ND had exercised its option under § 1(e) prior to closing, TVA could have had the permits withdrawn by the NRC. If they were withdrawn (as had already happened once between 2006 and 2009), then it would have violated neither the AEA nor the CPs for TVA to transfer ownership of the Bellefonte site without NRC approval. Thus, ND is simply wrong in stating that the condition precedent in § 6(a)(v) would have nullified that part of § 1(e).[10]

---

[9]     Both TVA and ND made a mistake in making those representations. But the fact that the parties made erroneous representations does not mean that the representations conflict with the condition precedent in § 6(a)(v). In fact, there is a separate condition precedent requiring that the representations made by the parties remain true at the time of closing. ND Ex. P at § 6(a)(iv).

[10]     ND is also wrong in asserting that the last sentence of § 1(e) "expressly anticipates" that ND would not get NRC approval of the transfer of the permits, but TVA would nonetheless be required to close even if it would be illegal to do so. Doc. 71 at 23. Section 1(e) pertains not only to the CPs, but also to certain air and water permits issued by ADEM. ND Ex. P at Sch. 1(e). The last

24

ND engages in wishful thinking in arguing that § 6(a)(v) should only be applied to laws or regulations passed after the execution of the Agreement. ND does not explain why the parties would have been willing to engage in illegal conduct if the law or regulation being violated predated November 2016. More to the point, if the parties had wanted to limit § 6(a)(v) in that way, they could have. But they didn't, so the plain, unambiguous language of the provision must be applied.

Finally, because § 6(a)(v) is unambiguous, there is no basis to resort to extrinsic evidence to determine its meaning. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls."). But if there were ambiguity as ND suggests, then there is a genuine issue of material fact as to the parties' intent. While ND focuses on TVA's refusal to make the transfer of any permit a condition of the Agreement, ND ignores the evidence that TVA extended the period in the Agreement between execution and closing to two years to provide ample time for ND to obtain NRC approval. *See supra* at ¶ 73. In short, TVA's refusal to condition closing on the transfer of all the

---

sentence simply states that TVA's obligations under § 1(e) cease if a government authority does not approve the transfer of one or more of those permits before closing. The cessation of TVA's obligations under § 1(e) does not in any way mean that TVA was obligated to close if doing so would be illegal. In short, ND grossly overstates the import of that last sentence in § 1(e).

various permits does not compel a conclusion that TVA would be required under the contract to transfer ownership of the site, even if doing so were unlawful.[11]

III.   **Summary judgment should not be entered in ND's favor on its specific performance claim because there is evidence that ND was not ready, willing, and able to close.**

Summary judgment also cannot be entered on ND's specific performance claim because there is a genuine issue of material fact as to whether ND was ready, willing, and able to close on the closing date. It is settled law that a party cannot obtain specific performance if it was not ready, willing, and able to perform its contractual obligations. *See, e.g., Durden v. Furniture Fair of Dothan, Inc.*, 348 So. 2d 1375, 1376 (Ala. 1977); *Cudd v. Wood*, 89 So. 52, 54 (Ala. 1921). ND would not have closed if it was not comfortable that the financing would be in place, and according to Franklin Haney, Sr., "as of November 30th, 2008 [ND] had not finalized financing for the Bellefonte Project." *See supra* at ¶ 35. Thus, there is a genuine issue of material fact as to whether ND was ready, willing, and able to close.

IV.   **Summary judgment should not be entered in ND's favor on TVA's affirmative defense of illegality.**

Summary judgment cannot be entered in ND's favor on TVA's affirmative defense of illegality. ND's argument on this point should be rejected because it relies on misstatements of applicable law. Even though the Agreement designates

---

[11]   Furthermore, ND is simply wrong in suggesting that TVA never made ND aware before November 9, 2018, of any concern about the legality of transferring ownership without NRC approval. *See supra* at ¶ 58.

26

federal law as controlling, *see supra* at ¶ 39, ND cites to an array of non-federal-law cases concerning how the illegality defense is applied in specific jurisdictions.[12] What ND does not cite is the controlling federal-law case on the illegality defense.

In addressing the illegality defense, the U.S. Supreme Court held that "illegal promises will not be enforced in cases controlled by the federal law." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982). According to the Supreme Court, "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in ... federal statutes...." *Id.* at 83-84 (internal quotations and citation omitted). "Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power." *Id.* at 84 (internal quotation and citation omitted).[13] In other words, "where a promise can only be enforced by commanding unlawful conduct—then the principle that illegal promises will not be enforced in cases controlled by the federal

---

[12] *See Troutman v. S. Ry. Co.*, 441 F.2d 586 (5th Cir. 1971) (Georgia law); *Grimes v. Alfa Mut. Ins. Co.*, 227 So. 3d 475 (Ala. 2017) (Alabama law); *Palmer v. Chamberlain*, 191 F.2d 532 (5th Cir. 1951) (Missouri law); *Unger v. Leviton*, 787 N.Y.S.2d 625, 628–29 (Sup. Ct. 2004) (New York law); *Alfa Specialty Ins. Co. v. Jennings*, 906 So. 2d 195 (Ala. Civ. App. 2005) (Alabama law); *Smithy Braedon Co. v. Hadid*, 825 F.2d 787 (4th Cir. 1987) (D.C., Maryland, & Virginia law); *Goodwin v. Tr. Co. of Columbus*, 242 S.E.2d 302 (Ga. App. 1978) (Georgia law).

[13] The *Kaiser Steel* holding fatally undermines ND's argument that this Court should assess whether the contract requirement at issue subverts the public policy underlying the statute that is being violated. As *Kaiser Steel* makes clear, a violation of the terms of a statute necessarily subverts the public policy expressed in the statute. In any event, failure to enforce the statutory requirements in this case would subvert the jurisdiction of the NRC. *See* Ex. 8 at 209:4-210:20.

law takes center stage and does not admit of exceptions." *Bassidji v. Goe*, 413 F.3d 928, 936–37 (9th Cir. 2005) (internal quotation omitted).[14]  ND's public policy arguments provide no avenue to circumvent this controlling rule—as the Supreme Court made clear in *Kaiser Steel*, a statutory requirement is mandatory public policy.

As applied in this case, the illegality defense under federal law means that this Court cannot enforce the closing requirement under the Agreement if it would be unlawful for TVA to transfer ownership of the Bellefonte site without NRC approval.  As explained above, ND cannot establish that it is entitled to summary judgment on whether such a transfer of ownership would cause TVA to violate the AEA or the CPs.  With those issues foreclosed from summary judgment, then ND's request for summary judgment on the illegality defense is also foreclosed.

## V.  Summary judgment should not be entered in ND's favor on its equitable estoppel argument.

Summary judgment should not be entered on ND's equitable estoppel argument.  As TVA explained in its summary judgment brief, equitable estoppel does not apply as a matter of law for two separate and independent reasons.  First, equitable estoppel cannot be employed to require a party to undertake an illegal act. *See* Doc. 75 at 22-23.  Second, ND cannot establish that it should not have known

---

[14]  Although ND cites *dicta* in a Federal Circuit case to suggest that courts have the ability to enforce a contract even if it violates a statute, that case is not on point.  The Federal Circuit in that case found that the contract at issue did not contravene a statutory requirement. *See Seh Ahn Lee v. United States*, 895 F.3d 1363, 1372 (Fed. Cir. 2018).

28

the true facts, which is an element of equitable estoppel. *See* Doc. 75 at 23-24.

In addition to those reasons, ND also cannot establish as a matter of law that it reasonably and detrimentally relied on TVA's representation, which ND admits is another element of equitable estoppel. There is at least a genuine issue of material fact as to whether ND actually relied on TVA's representation in § 7(a)(vii) because it made the same representation in § 8(a)(vi). *See In re BCP Mgmt., Inc.*, 320 B.R. 265, 279 (Bankr. D. Del. 2005) (rejecting PwC's estoppel theory because "PwC has not demonstrated any reliance on representations of BCPM because PwC made the same representations to this Court."). And even if ND could establish that it relied on TVA's representation, ND cannot establish that any such reliance was reasonable. Reliance on TVA's representation would not have been reasonable because a party cannot rely on a Government agent's statement about what the law is; instead, everyone is charged with knowledge of federal laws and regulations. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947).

As part of its equitable estoppel argument, ND asserts, without citation to any authority, that "principles of equity" (apparently without regard to the elements for equitable estoppel) compel summary judgment because "TVA consistently attempted to thwart ND's efforts to effectuate the transfer." Doc. 71 at 28. ND, however, ignores the genuine issues of material fact that exist on whether TVA thwarted ND's efforts. ND's general counsel admitted that TVA had no obligation

29

under the Agreement to consent to an extension of the closing date, and he also acknowledged that TVA's refusal to agree in 2017 to send a letter about the expiration date for the Unit 2 permit did not adversely affect ND. *See supra* at ¶ 44, 47. ND's licensing lawyer admitted that ND could not have submitted its application to the NRC for transfer of the CPs sooner if TVA had taken some action. *See supra* at ¶ 45. In addition, TVA's in-house lawyer disputes that TVA was ever asked to submit the draft letter consenting to the transfer, and, in any event, TVA's failure to consent did not preclude NRC action before the closing date because the NRC told ND in April 2019 that its application was insufficient. *See supra* at ¶¶ 24, 49.

## VI.    ND cannot recover ancillary monetary relief as incidental damages.

ND cannot recover the "ancillary monetary relief" that it seeks. The only authorities that ND cites in support of this relief are two Alabama cases relating to the award of incidental damages. Doc. 71 at 30. But as TVA explained in its summary judgment brief, ND agreed in the Agreement that it could not recover incidental damages. *See* Doc. 75 at 25-26. Nor does Section 33 of the Agreement support this relief as ND argues. That section provides for interest "on the amount awarded" in a court proceeding, not interest on amounts that ND paid pursuant to the Agreement's terms that are not awarded as damages. ND Ex. P at § 33.

## CONCLUSION

Based on the foregoing reasons, ND's motion should be denied.

30

Respectfully submitted this 14th day of October, 2020.

*s/ Matthew H. Lembke*
Attorney for Defendant

OF COUNSEL:

Matthew H. Lembke
Riley McDaniel
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
mlembke@bradley.com
rmcdaniel@bradley.com

David D. Ayliffe
Jill McCook
Office of the General Counsel
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive, WT6
Knoxville, Tennessee 37902
Telephone: (865) 632-3052
ddayliffe@tva.gov
jemccook@tva.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2020, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record:

Caine O'Rear, III
HAND ARENDALL HARRISON SALE, LLC
Post Office Box 123
Mobile, Alabama  36601
corear@handarendall.com

Edward Shane Black
HAND ARENDALL LLC
102 South Jefferson Street
Athens, Alabama  35611
sblack@handarendall.com

Larry David Blust
HUGHES SOCOL PIERS RESNICK DYM, LTD.
70 West Madison Street, Suite 4000
Chicago, Illinois  60602
lblust@hsplegal.com


_____*s/ Matthew H. Lembke*_____
OF COUNSEL