FILED
2020 Oct-28  AM 10:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT J

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF ALABAMA
3                     NORTHEASTERN DIVISION
4
5    NUCLEAR DEVELOPMENT, LLC,
6                    Plaintiff,
7    vs.                        No. 5:18-cv-01938-LCB
8    TENNESSEE VALLEY AUTHORITY,
9                    Defendant.
                                      /
10
11
12
13        VIDEOTAPED DEPOSITION OF WILLIAM JOHNSON
14                    October 9, 2019
15
16
17
18
19
20
21
22   Reported By:
23   ANGELA SINCLAIR,
24   CCRR, CRR, RPR, CSR No. 13902
25   JOB NO. 10061754
```

**Page 2**

```
1
2                        I N D E X
3    Examinations                              Page
4    EXAMINATION BY MR. O'REAR           7, 141, 150
5    EXAMINATION BY MR. LEMBKE              120, 149
6
7
8
9                     E X H I B I T S
10
     No.         Description                    Page
11
     Exhibit 1   Bellefonte Nuclear Plant Site    15
12               Purchase and Sale Agreement
13   Exhibit 2   Board of Directors memorandum    16
                 dated April 25, 2016
14
     Exhibit 3   TVA Board of Directors           21
15               Minutes dated May 5, 2016
16   Exhibit 4   Proposed Board Resolution        23
17   Exhibit 5   TVA Press Release                25
18   Exhibit 6   Bellefonte Nuclear Project       34
                 outline
19
     Exhibit 7   E-mail exchange dated August     39
20               18, 2017
21   Exhibit 8   E-mail exchange dated August     40
                 31, 2017
22
     Exhibit 9   E-mail exchange dated June       42
23               19, 2018
24   Exhibit 10  E-mail exchange dated August     44
                 14, 2018
25
```

**Page 3**

```
1
     Exhibit 11  United States Nuclear            48
2                Regulatory Commission
                 memorandum dated September 4,
3                2018
4    Exhibit 12  TVA letter dated August 21,      52
                 2018
5
     Exhibit 13  TVA letter dated August 29,      53
6                2018
7    Exhibit 14  E-mail exchange dated October    72
                 18, 2018
8
     Exhibit 15  E-mail exchange dated October    76
9                25, 2018
10   Exhibit 16  E-mail exchange dated            82
                 November 6, 2018
11
     Exhibit 17  E-mail exchange dated            83
12               November 9, 2018
13   Exhibit 18  E-mail exchange dated            85
                 November 9, 2018
14
     Exhibit 19  E-mail exchange dated            88
15               November 12, 2018
16   Exhibit 20  Picture copy of CD               91
17   Exhibit 21  Flash drive                     113
18   Exhibit 22  Letter from Pillsbury Law       113
19   Exhibit 23  E-mail exchange dated           113
                 November 28, 2018
20
     Exhibit 24  TVA letter dated November 29,   114
21               2018
22   Exhibit 25  E-mail exchange dated           115
                 November 30, 2018
23
24
25
```

**Page 4**

```
1                DEPOSITION OF WILLIAM JOHNSON
2
3         BE IT REMEMBERED, that pursuant to Notice, and
4    on the 9th day of October 2019, commencing at the hour
5    of 8:48 a.m., in the offices of Hanson Bridgett, 425
6    Market Street, 26th Floor, San Francisco, California,
7    before me, ANGELA SINCLAIR, a Certified Shorthand
8    Reporter, personally appeared WILLIAM JOHNSON, produced
9    as a witness in said action, and being by me first duly
10   sworn, was thereupon examined as a witness in said
11   cause.
12
13                     ---o0o---
14
15   APPEARANCES:
16   For the Plaintiff:
17        CAINE O'REAR III
          HAND ARENDALL HARRISON SALE LLC
18        104 Saint Francis Street, Suite 300
          Mobile, Alabama 36602
19        (251) 432-5511
          corear@handarendall.com
20
21        LARRY BLUST (pro hac vice)
          HUGHES SOCOL PIERS RESNICK DYM, LTD.
22        70 West Madison Street, Suite 4000
          Chicago, Illinois 60602
23        (312) 604-2672
          lblust@hsplegal.com
24
25
```

Page 5

```
1   For the Defendant:
2                 MATTHEW LEMBKE
                  BRADLEY ARANT BOULT CUMMINGS LLP
3                 One Federal Place
                  1819 Fifth Avenue North
4                 Birmingham, Alabama 35203
                  (202) 521-8000
5                 mlembke@bradley.com
6
                  DAVID AYLIFFE
7                 OFFICE OF THE GENERAL COUNSEL
                  TENNESSEE VALLEY AUTHORITY
8                 400 West Summit Hill Drive, WT6
                  Knoxville, Tennessee 37902
9                 (866) 632-2101
                  ddayliffe@tva.gov
10
11  Also Present:
12                Lorenzo Fernandez-Kopec, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    THE VIDEOGRAPHER:  Good morning.  This begins
2  the videotaped deposition of William Johnson in the
3  matter Nuclear Development, LLC, verse Tennessee Valley
4  Authority filed in the United States District Court for
5  the Northern District of Alabama, Northeastern Division.
6  Case Number 5:18-CV-01983-LCB.
7    This deposition is being held at 425 Market
8  Street in San Francisco, California, on October 9th,
9  2019.  My name is Lorenzo Fernandez-Kopec.  I'm the
10  videographer.  The court reporter today is
11  Angela Sinclair, and we are both here representing
12  Aptus Court Reporters located at One Embarcadero Center,
13  Suite 1060, in San Francisco, California.
14    Please note that audio and video recording will
15  be taking place unless all parties have agreed to go off
16  the record.  The time is 8:49.  We're on the record now.
17    Counsel, will you please state your appearance
18  and affiliation.
19    MR. O'REAR:  Caine O'Rear.  I'm with the
20  Hand Arendall firm, and I represent Nuclear Development.
21    MR. BLUST:  Larry Blust.  I'm with the Hughes
22  Socol firm, and I represent Nuclear Development.
23    MR. LEMBKE:  I'm Matt Lembke with the Bradley
24  firm.  I represent the Tennessee Valley Authority.
25    MR. AYLIFFE:  I'm David Ayliffe with the

Page 7

1  Tennessee Valley Authority Office of General Counsel
2  representing Tennessee Valley Authority.
3    (Oath administered by the reporter.)
4  THE WITNESS:  I do.
5      WILLIAM JOHNSON,
6    affirmed as a witness,
7    testified as follows:
8  EXAMINATION BY MR. O'REAR:
9    Q.  Again, Mr. Johnson, my name is Caine O'Rear
10  from Mobile, Alabama, and I represent Nuclear
11  Development in this case.
12    State your name, please.
13    A.  William Dean Johnson.
14    Q.  And what is your current employment?
15    A.  I'm the president and chief executive officer
16  of PG&E Corporation here in San Francisco.
17    Q.  And can you tell us when you started in that
18  position?
19    A.  May 2nd, 2019.
20    Q.  What is the office -- your office address
21  currently?
22    A.  77 Beall Street, San Francisco 94105.
23    Q.  What is your permanent residence address, or
24  what's the city and state of your permanent residence?
25    A.  That's a good question.  I think I'm now a

Page 8

1  California resident, but I might be a Tennessee
2  resident.  I'm in between residencies.  It takes about
3  six or seven months to get a driver's license here, so
4  I'll give you two addresses if that works.
5    Q.  That's fine.
6    A.  So I currently live at 850 Powell Street in
7  San Francisco 94108, and in Tennessee 615 State Street,
8  Number 301.  I've forgotten my ZIP Code there.
9    Q.  All right.
10    A.  39402.
11    Q.  Are you establishing a permanent residence in
12  California as we speak?
13    A.  That remains to be seen.
14    Q.  Okay.  Are you personally represented here by
15  Mr. Lembke or Mr. Ayliffe at this deposition?
16    A.  So my understanding is that they represent TVA
17  in this matter, and my appearance is in my former role
18  as an executive in TVA, so for this matter they are
19  representing me in that role.
20    Q.  Do you understand that this deposition may or
21  will be used at the trial of our case or otherwise in
22  the proceedings of this case that's pending in the
23  Northern District of Alabama?
24    A.  Yes, sir, I do.
25    Q.  Can you tell us before you started with PG&E

Page 9

1  where you worked?
2     A.  Well, immediately before I was at the TVA from
3  the beginning of 2013 until May the 1st of 2019 as the
4  CEO, and before that I was the CEO of a company called
5  Progress Energy in Raleigh, North Carolina, and spent
6  about 20 years there.
7     Q.  Okay.
8     A.  Prior to that I was a partner at Hunton &
9  Williams.
10    Q.  In Richmond?  Where were you?
11    A.  In Raleigh.
12    Q.  In Raleigh?
13    A.  One of the lesser offices, as they would say.
14    Q.  So you have a law degree; is that right?
15    A.  I do.
16    Q.  And you practiced law in private practice?
17    A.  I did.  About ten years.
18    Q.  Okay.  What years?
19    A.  '83 through '92, something along those lines.
20    Q.  Where did you get your undergraduate degree?
21    A.  Duke University.
22    Q.  And what was your degree in?
23    A.  History and education.
24    Q.  Where did you attend law school?
25    A.  The University of North Carolina.

Page 10

1     Q.  Are you currently licensed as an attorney?
2     A.  I am not.
3     Q.  When was the last time you were licensed in any
4  state?
5     A.  I would say around the year 2000.  Been a
6  while.
7     Q.  What was the nature of your practice when you
8  were in private practice?
9     A.  I was a trial lawyer representing almost
10 exclusively utility companies.
11    Q.  Have you been in the utility or power business
12 ever since you left the private practice of law?
13    A.  Yes.  I left the firm to join a client and have
14 been in the utility business since '92.
15    Q.  Have you read the complaint in this case?
16    A.  I think I looked at it when it was filed but
17 have not studied it closely.
18    Q.  Do you understand the general nature of the
19 claims being made by Nuclear Development against TVA?
20    A.  Yes.
21    Q.  And when we say "TVA" we mean Tennessee Valley
22 Authority; is that correct?
23    A.  Yes.  Yes, I understand the general --
24    Q.  What's your understanding generally of the
25 claim?

Page 11

1     A.  The claim is for specific performance of a
2  contract for the sale of, I suppose, realty but
3  partially finished nuclear plant, and I think there are
4  some other damage claims in there.
5     Q.  Were you the CEO of TVA when the complaint was
6  filed on November 30, 2018?
7     A.  I was.
8     Q.  And you said your last day at TVA was
9  May 1st --
10    A.  May 1st.
11    Q.  -- 2019?
12    A.  Yes, sir.
13    Q.  What was the reason for leaving TVA?
14    A.  I announced in November my retirement.  I
15 turned 65 in January of 2019, so it was time to retire.
16    Q.  And, yet, you picked up another job
17 immediately; right?
18    A.  It wasn't immediately, but it was shortly after
19 I announced my retirement.  I had friends here, friends
20 on the board who asked me to come and help them at PG&E.
21 So yeah, it was pretty quick.  It was a short
22 retirement.
23    Q.  Yeah.  You started the day after you left TVA?
24    A.  Yes.
25    Q.  Is that correct?

Page 12

1     A.  Yeah.  But there were two weeks of vacation in
2  between.  So. . .
3     Q.  Just to put on the record, there have been a
4  number of communications and documents that have been
5  exchanged in this case that relate to this case in the
6  years 2016, 2017, 2018.  You were CEO of TVA during
7  that -- during all of those years; is that correct?
8     A.  That's correct.
9     Q.  Does TVA have a board of directors?
10    A.  Yes.
11    Q.  How large is the board?
12    A.  I believe it's nine seats.  I don't know how
13 many are filled at the moment.
14    Q.  And are those board members appointed by the
15 President?
16    A.  Appointed by the President, confirmed by the
17 Senate.
18    Q.  Of the United -- President of the
19 United States?
20    A.  Yes, sir.
21    Q.  Who was the chairman of the board when you left
22 TVA?
23    A.  Richard Howorth.
24    Q.  Who was the chairman that preceded him?
25    A.  Joe Rich.

William Johnson

Page 13

1    Q.  And when did Richard Howorth become chairman of
2  the board, if you know?
3    A.  I think the end of 2017, but I'm not entirely
4  certain.  Somewhere in that time frame.
5    Q.  Do you know who the chair is now?
6    A.  I believe the chair is Skip Thompson from
7  Decatur, Alabama.
8    Q.  As president and CEO of TVA, did you report to
9  the board?
10   A.  Yes.
11   Q.  Were you appointed as president and as CEO by
12  the board?
13   A.  I was in the fall of 2012.
14   Q.  And did you serve at the pleasure of the board?
15   A.  Absolutely.
16   Q.  Are the members of the board of directors
17  responsible for establishing the policies of TVA?
18   A.  The duties of the board are spelled out in the
19  TVA Act specifically, and that is in fact one of the
20  things in the act, that they help create and oversee
21  policy.
22   Q.  The CEO is not charged with or authorized to
23  set the policy of TVA absent board approval; is that
24  correct?
25   A.  The CEO works in conjunction with the board, I

Page 14

1  can't remember the specific language, but to develop and
2  implement policies.
3    Q.  But the CEO cannot independently establish the
4  policy of CVA -- of TVA; is that correct?
5    A.  I think that would require me to parse the
6  statutory language, and I don't think that's one of my
7  main core skills anymore.  So I would refer you to the
8  act.
9    Q.  All right.  Is there anything in the act that
10  you're aware of that says the CEO can establish the
11  policy of TVA?
12   A.  Sitting here, I can't remember.  But I hadn't
13  looked at the act in some time.
14   Q.  Can you tell us generally what you did to
15  prepare for your deposition here today?
16   A.  Sure.  I met for a short time yesterday with
17  these two lawyers.
18   Q.  Mr. Lembke and Mr. Ayliffe?
19   A.  Correct.
20   Q.  Is that it?
21   A.  Yep.
22   Q.  Did you review the contract between Nuclear
23  Development and TVA?
24   A.  We reviewed a number of documents.
25   Q.  Did you review e-mails?

Page 15

1    A.  We reviewed a number of documents.
2    Q.  Did they include e-mails?
3    A.  They did.
4    Q.  Let me show you what's been marked as Exhibit 1
5  to your deposition.
6      (Deposition Exhibit 1 was marked.)
7      MR. O'REAR:  Let me see.  Keep this clip on
8  because they're not --
9      MR. BLUST:  Here you go.
10     MR. O'REAR:  This is one document.
11  BY MR. O'REAR:
12   Q.  Can you identify Exhibit 1?
13   A.  It is titled the "Bellefonte Nuclear Plant Site
14  Purchase and Sales Agreement."
15   Q.  I'll represent to you this is a copy of the
16  contract that was attached to the complaint filed in
17  this lawsuit.
18      Can you identify that as the complaint
19  between -- excuse me -- the contract between TVA and
20  Nuclear Development?
21   A.  That is what it appears to be.
22   Q.  If you could keep the clip on that, keep those
23  pages from scattering, I'd appreciate it.
24   A.  Yep.
25   Q.  Before that contract --

Page 16

1      MR. LEMBKE:  I'm going to object to the form
2  and just ask:  Is the amendment to the contract included
3  in this document?
4      MR. O'REAR:  The amendment extending the -- no,
5  it's not attached to that exhibit, but it will be an
6  exhibit.
7      MR. LEMBKE:  All right.  Well, I object to the
8  form of the question of asking if this is the complete
9  contract.
10  BY MR. O'REAR:
11   Q.  Does that appear to be the contract that was
12  executed on November 14, 2016?
13   A.  It appears to be the document I was looking at
14  about that time, yes.
15   Q.  Did you issue a report to the board prior to
16  the execution of this contract that recommended the sale
17  of Bellefonte as surplus property of TVA?
18   A.  Yes, I did.
19      (Deposition Exhibit 2 was marked.)
20  BY MR. O'REAR:
21   Q.  I'm handing you what has been marked as
22  Exhibit 2 to your deposition.  Can you identify that?
23   A.  Yes.  This is a memorandum from me and the
24  general counsel of TVA to the board of directors
25  requesting that we declare a surplus and authorize to

Page 17

1  sell at auction the Bellefonte Nuclear Plant and site.
2      Q.  Directing your attention to the second page of
3  the exhibit under the caption "recommended action and
4  potential risk."
5      Did you recommend that the site be sold without
6  conditions on the potential use of the site by the
7  buyer?
8      A.  I don't think there are any conditions listed
9  here.  We certainly did have some conditions we would
10 consider for uses of this site when it got around to the
11 auction, but here I don't think we limited any
12 conditions.
13     Q.  Okay.  Well, could you read the first sentence
14 under that caption?
15     A.  "Management recommends that the board declare
16 the site surplus and authorize its sale without
17 conditions on the potential use of the site."
18     Q.  And that was part of the report --
19     A.  Yeah.
20     Q.  -- that you submitted to the board?
21     A.  Right.
22     Q.  Ultimately in terms of parties that were
23 interested in purchasing the site, were there any
24 parties interested in using the site as a nuclear
25 facility other than Nuclear Development?

Page 18

1      A.  I believe there was one other interested party.
2  I know there was at least another interested party that
3  engaged in the bidding.  I don't recall whether they had
4  a nuclear interest in it or some other.
5      Q.  Do you know who that interested party was?
6      A.  What I recall is I think it was a group from
7  India, but I've -- can't recall exactly who it was.
8      Q.  Wasn't that bidder the losing bidder in the
9  auction; is that correct?  Is that who you're referring
10 to?
11     A.  The party I'm referring to was in the auction
12 and did not prevail, yes.
13     Q.  Wasn't the intent of that bidder to sell the
14 parts from Bellefonte to India?
15     A.  I don't know the answer to that.
16     Q.  You don't have any information on that?
17     A.  I have no recollection of what it was.
18     Q.  Do you think you may have had information on
19 that at the time of the auction?
20     A.  Possible.  Really can't recall.
21     Q.  Keeping your attention on page 2 of the report,
22 did you, in making this recommendation to the board,
23 recognize that there could be competition from a
24 potential buyer of Bellefonte with TVA by a merchant
25 nuclear plant?

Page 19

1      A.  Yes.  That condition existed and continues to
2  exist for anybody who wants to build a plant in the TVA
3  service territory.
4      Q.  So in your recommendation there was no
5  requirement for a noncompetition agreement or a
6  nonsolicitation agreement by a potential buyer --
7      A.  No.
8      Q.  -- of the plant; is that correct?
9      A.  That's correct.
10     Q.  In 2016, when this report was prepared, who was
11 TVA's largest power customer?
12     A.  Probably the City of Memphis.  I'm trying to
13 remember.  There was a bigger one, but I think they had
14 gone out of business by then.
15     Q.  When you left TVA, who was TVA's largest power
16 customer?
17     A.  It was either Memphis or Nashville.
18 Historically it had been Memphis.  Nashville was gaining
19 on them, so I don't know exactly, but it was one of
20 those two.
21     Q.  Direct your attention to page 4 of your report,
22 there's reference to an appraisal that was done for TVA
23 of the Bellefonte site.  Do you recall that?
24     A.  I do.
25     Q.  Do you recall the value that was reached in

Page 20

1  that appraisal?
2      A.  So I don't have any direct recollection.  I can
3  see what's written here.
4      Q.  As far as you know, is what is written there
5  correct?
6      A.  I'm sure it was correct at the time since I
7  signed this.
8      Q.  You wouldn't -- you wouldn't have put an
9  incorrect --
10     A.  Right.
11     Q.  -- appraisal amount in the report, would you?
12     A.  No.  No.
13     Q.  And it says that the appraisal company
14 estimated the fair market value of the plant
15 infrastructure supporting these uses at 36.4 million;
16 correct?
17     A.  That's correct.  That's what it says.
18     Q.  And did TVA, as it says here, do an internal
19 appraisal and estimate the fair market value at
20 11.3 million?
21     A.  Yes, that's what it says here.  Again, no
22 direct recollection, but that's what it says here.
23     Q.  And what was the ultimate bid price by Nuclear
24 Development at the auction?
25     A.  I believe it was 110 or 111 million, somewhere

William Johnson

Page 21

1  in that range.

2      Q.  Now, after this report was submitted to the
3  board, did the board adopt a resolution approving the
4  sale of Bellefonte as surplus property?

5      A.  Yes.

6          (Deposition Exhibit 3 was marked.)

7  BY MR. O'REAR:

8      Q.  I'm handing you what's been marked as Exhibit 3
9  to the deposition.  Can you identify Exhibit 3 as the
10  minutes of the board of directors meeting of May 5th,
11  2016, approving the sale of Bellefonte as surplus
12  property?

13      A.  The document is entitled "Minutes of the
14  meeting of the board of directors Tennessee Valley
15  Authority May 5, 2016."

16      Q.  Look at the second page.  You were in
17  attendance at that meeting; correct?

18      A.  Correct.

19      Q.  All right, sir.  If you would direct your
20  attention to page 8 and continuing through page 9 and
21  10, is that the resolution that was adopted by the board
22  to sell Bellefonte?

23      A.  That is the resolution with two members
24  abstaining to declare a surplus at auction, yes, sir.

25      Q.  But the resolution was adopted according to

Page 22

1  vote under bylaws of the -- of TVA; is that correct?

2      A.  Correct.

3      Q.  Are these minutes part of the public record of
4  TVA?

5      A.  I don't know whether these -- they are
6  certainly part of the official record.  I don't know if
7  they're publicly available or not, but they're certainly
8  part of the official record.

9      Q.  All right, sir.  And do you know whether
10  they're posted on the website of TVA or not?

11      A.  I do not.

12      Q.  Are these minutes available to anyone that
13  would ask for them, any member of the public that would
14  ask for them?

15      A.  Again, I don't know the answer to that.  I seem
16  to recall they're not.  But I really don't know.  I
17  always had them.

18      Q.  What leads you to believe they may not be
19  subject to production to a member of the public?

20      A.  I just -- I don't know the answer.  Minutes
21  generally are not available as a regular corporate
22  matter.  I don't know how it applies here at TVA.  Never
23  had to go look publicly for them because I had them.

24      Q.  When you say minutes are generally not
25  available, you're referring to the minutes of a board of

Page 23

1  a private company?

2      A.  Right, correct.

3      Q.  TVA is a government corporation; is that
4  correct?

5      A.  That is correct.

6          (Deposition Exhibit 4 was marked.)

7  BY MR. O'REAR:

8      Q.  I'm handing you Exhibit 4 to the deposition.
9  Does that appear to be a stand-alone copy of the
10  resolution that was adopted by the board at its meeting
11  on May the 5th, 2017 -- excuse me -- 2016?

12      A.  Yes, it does.

13      Q.  Pardon me.  I didn't give you the original.
14  Let me substitute this for that document, Number 3.
15  Number 3.

16      A.  That's 4.

17      MR. LEMBKE:  That's 4.

18  BY MR. O'REAR:

19      Q.  I'm sorry.  Number 4.

20          Directing your attention back to Exhibit 2 and
21  the first page of that exhibit, in your report did you
22  state that the purpose of the sale would be to bring
23  economic development and jobs into the area surrounding
24  the Bellefonte plant?

25      A.  Yes.

Page 24

1      Q.  After this resolution was adopted, did TVA
2  retain a company by the name of Concentric Energy
3  Advisors to assist it in the sales process?

4      A.  Yes.

5      Q.  What was their role, scope of work?

6      A.  As I recall it, their scope was to identify
7  potential buyers.  Concentric had a history of being
8  engaged in the sale of nuclear plant and nuclear
9  facilities.  And also just to see what the appetite in
10  the market was for the property.

11      Q.  Who was responsible at TVA for supervising
12  Concentric?

13      A.  I do not know.

14      Q.  Were you?

15      A.  No.

16      Q.  Okay.  Did you have direct communications with
17  them regarding this project?

18      A.  I didn't have direct oral communication.  I did
19  have some -- I saw some correspondence with them.

20      Q.  That you were copied on?

21      A.  No.

22      Q.  You saw correspondence between them and other
23  members of TVA, other employees --

24      A.  I saw --

25      Q.  -- of TVA?

**Page 25**

1    A.  Pardon me.

2         I saw correspondence between them, and I don't

3  know if it was Nuclear Development then, but the entity

4  that eventually became Nuclear Development.

5    Q.  Part of the process in developing the contract,

6  is that what these -- this correspondence related to?

7    A.  Yes.  The correspondence I recall was related

8  to terms being negotiated.

9    Q.  But did you recall if you ever made any

10  decisions or gave any direction to Concentric in terms

11  of the negotiation of the terms of the contract?

12    A.  I never gave any directions to Concentric.

13    Q.  The bid process was put in motion after

14  Concentric was retained; is that correct?

15    A.  Correct.

16    Q.  And was the appraisal value of 36.4 million

17  established as a minimum bid price?

18    A.  I really don't recall that.

19       (Deposition Exhibit 5 was marked.)

20  BY MR. O'REAR:

21    Q.  I'm handing you Exhibit 5 to the deposition.

22  Can you identify that as a TVA press release regarding

23  the sale of Bellefonte to Nuclear Development dated

24  November 14, 2016?

25    A.  This is identified as a press release from the

**Page 26**

1  TVA titled "TVA completes Bellefonte sale November 14th,

2  2016."

3    Q.  And the first paragraph references the sale of

4  1,400-acre Bellefonte property near Hollywood, Alabama,

5  to Nuclear Development, LLC?

6    A.  Correct.

7    Q.  For the purchase price of 100 million -- excuse

8  me -- 111 million?

9    A.  111 million.

10    Q.  Then if you look to the middle of that page, it

11  says, "TVA set the property's minimum auction price at

12  36.4 million"?

13    A.  That is what it says.

14    Q.  Okay.  You don't contest that, do you?

15    A.  No.  I just don't recall that, but. . .

16    Q.  It also says, "Concentric Advisors marketed the

17  property to more than 500 potential buyers with 11

18  expressing an interest and signing confidentiality

19  agreements."

20       Do you see that?

21    A.  I do see that.

22    Q.  It says, "Three bidders completed letters of

23  intent which included financial qualifications and a

24  plan on how they intend to use the property"; correct?

25    A.  That's what it says, yes, sir.

**Page 27**

1    Q.  All right, sir.  So would there be some record

2  in TVA about the intent of the three bidders on how they

3  expected to use the property?

4    MR. LEMBKE:  Object to the form.  Vague.

5       You can answer if you understand it.

6    THE WITNESS:  I don't know what would be in the

7  records.

8  BY MR. O'REAR:

9    Q.  If this press release is true, three bidders

10  that completed letters of intent included in that

11  financial qualifications and a plan on how they intend

12  to use the property; correct?

13    A.  That's what it says.  And I believe that if TVA

14  issued this, it is true.  Where those documents are,

15  what they are, I do not know.

16    Q.  All right, sir.  It also says that, "As part of

17  the deal, TVA required Nuclear Development to make a

18  25 million minimum investment in the Bellefonte property

19  during the five-year period following the closing."

20       Was that a true statement?

21    A.  Correct.

22    Q.  Okay.  And that -- was that part of the goal of

23  TVA, to promote economic development in the area around

24  the Bellefonte plant?

25    A.  Yes.  So we wanted to put this site into

**Page 28**

1  productive use of some kind.  And given the length of

2  the closing period requested by the buyer, we wanted to

3  make sure there was some activity happening that would

4  promote economic development in the short term.

5    Q.  Do you recall the bidder other than Nuclear

6  Development at this auction to be a company called

7  National Environmental Group with a principal by the

8  name of Aaron Abadi?

9    A.  I do not.

10    Q.  Did you ever have any direct communication with

11  a principal of the National Environmental Group or

12  Mr. Abadi regarding this matter?

13    A.  No.

14    Q.  Have you spoken to Mr. Abadi or anyone on

15  behalf of the National Environmental Group since the

16  closing date, the contractual closing date of

17  November 30, 2018?

18    A.  I have not.  I may have spoken to somebody from

19  that group just coincidentally, but I have no knowledge

20  of that.

21    Q.  Okay.

22    A.  I meet a lot of people in my life, but no

23  direct knowledge of anything like that.

24    Q.  Have you -- I asked if you had ever spoken

25  with.  Have you had any communication with anyone on

Page 29

1  behalf of National Environmental Group since the date of
2  the closing of November 30, 2018?
3      A.  To the best of my knowledge, no.
4      Q.  And I believe you testified earlier you do not
5  know the stated purpose by that group for use of this
6  site; is that correct?
7      A.  Correct.
8      Q.  If that group had been the successful bidder on
9  this project, would TVA have transferred the property to
10 him without the transfer of the construction permits?
11     MR. LEMBKE:  Object to the form.  Calls for
12 speculation.
13     You can answer if you know.
14     THE WITNESS:  I don't think it would have been
15 lawful to do so.
16 BY MR. O'REAR:
17     Q.  Were you the person that approved the final
18 version of the contract with Nuclear Development?
19     A.  No.
20     Q.  Who was that?
21     A.  I would assume it was the general counsel.
22     Q.  Did you make any decisions regarding the
23 approval or the rejection of any particular provisions
24 of the contract during the negotiations before it was
25 signed?

Page 30

1      A.  I didn't make any requests, but I did have some
2  discussions, particularly about the length of --
3      MR. LEMBKE:  Stop.  I don't want you to
4  disclose any internal --
5      THE WITNESS:  There we go.
6      MR. LEMBKE:  I instruct you not to answer as to
7  internal discussions with TVA counsel.
8      MR. O'REAR:  Well, he can testify if he had
9  discussions.  I haven't even asked him about that yet.
10     MR. LEMBKE:  Well, he started to say the
11 content of the discussions and so I stopped him.
12     MR. O'REAR:  Okay.
13 BY MR. O'REAR:
14     Q.  My question was:  Did you make any decisions
15 regarding any aspect of the contract before it was
16 signed?
17     MR. LEMBKE:  Object to the form.  Vague.
18     THE WITNESS:  Yes.
19 BY MR. O'REAR:
20     Q.  And what aspects of the contract?
21     A.  Length of the due diligence period.
22     Q.  And what was your decision on that?
23     A.  Well, really I wanted to understand why it was
24 extended, and I wanted to make sure that we didn't have
25 an open-ended condition, in other words, that this

Page 31

1  process could drag on for a long period of time when our
2  objective was short-term economic development and
3  prosperity in the region.
4      So that was the main thing I was interested in.
5      Q.  When you said a due diligence period, are you
6  referring to the two years between the date of the
7  contract and the date of the closing?
8      A.  Yes.  And so probably better said in the
9  closing period, but yes, the two-year period.
10     Q.  Is that the only section of the contract that
11 you recall you made a decision on?
12     A.  I don't believe I said I made a decision on it.
13 I was interested in discussing it, but in general I
14 didn't make any decision about the terms.  That was the
15 party that was doing the negotiating for us.
16     Q.  And who was that?
17     A.  That was a group of people.  It was the general
18 counsel's office, the real estate people, some of the
19 nuclear people.
20     Q.  Okay.  Who at the general counsel's office was
21 responsible for those decisions?
22     A.  So my interface was with Sherry Quirk, the
23 general counsel.
24     Q.  And was she the person at the general counsel's
25 office responsible for the decisions made with respect

Page 32

1  to the contract?
2      A.  Yes.
3      Q.  Who at the real estate division?
4      A.  I really can't remember.
5      Q.  Anyone at the licensing division?
6      A.  I don't know.
7      Q.  Any other individuals that you recall that had
8  ultimate responsibility for their department or division
9  regarding the formation of the contract?
10     A.  I really can't remember.
11     Q.  Were you aware, during negotiation of the terms
12 of the contract, that Nuclear Development requested that
13 the transfer of the construction permits be a condition
14 of the closing?
15     A.  I can't recall that, no.
16     Q.  Do you recall that you made any decisions
17 regarding a condition of the contract being a transfer
18 of the construction permits?
19     MR. LEMBKE:  Objection.  Asked and answered.
20     THE WITNESS:  I did not.
21 BY MR. O'REAR:
22     Q.  How many lawyers are in the legal department of
23 TVA?
24     A.  I think that department was about 50.  I don't
25 think they were all lawyers, but I think the department

Page 33

1  was about 50.
2      Q.  Was Joe Shea the head of the licensing
3  department at this time?
4      A.  What time?
5      Q.  The time the contract was formed in 2016.
6      A.  I believe he was.
7      Q.  Was he head of the licensing department in
8  2018?
9      A.  I believe he was.
10     Q.  How large is that department?
11     A.  I don't know.
12     Q.  Do you know if there are any lawyers that are
13  assigned to the licensing department?
14     A.  There were lawyers who had responsibility for
15  nuclear matters generally, so I would assume that maybe
16  includes licensing.  All I know is that there were
17  people who had nuclear responsibilities.
18     Q.  In terms of the promotion of the economic
19  development to result from the sale of this project,
20  were you familiar with Nuclear Development's projections
21  that this project would create an average of 8,420 jobs
22  per year during the construction period and 12.6 billion
23  in economic and fiscal impact?
24     A.  I can remember Nuclear Development talking
25  about the benefits to the region.  I can't recall any

Page 34

1  specific numbers as you -- as you've quoted there.
2      Q.  I'll read you another and ask you if you recall
3  this.
4          Were you aware at the time of the creation of
5  the contract of Nuclear Development's projection that
6  the contract and project would create an average of
7  4,176 jobs per year during the 60-year operational
8  period and 37.7 billion in economic and fiscal impact?
9          MR. LEMBKE:  Object to the form.  We don't know
10  what you're reading from.
11  BY MR. O'REAR:
12     Q.  Would your answer be the same, you don't recall
13  the specific figures?
14     A.  Correct.  I remember Nuclear Development
15  promoting the benefits of their projects, but the
16  specifics I don't recall.
17          (Deposition Exhibit 6 was marked.)
18  BY MR. O'REAR:
19     Q.  Let me show you what has been marked as
20  Exhibit 6.  That is a document that's been produced from
21  TVA's records regarding this.
22          Do you recall ever seeing this document or
23  something similar to it?
24          MR. BLUST:  I think you handed the wrong one.
25  Let's see what you got here.  Okay.  You don't have that

Page 35

1  in this packet I don't think unless it's stapled to
2  that.
3          MR. O'REAR:  Should be.
4          MR. BLUST:  What is it?  Yeah, I don't have
5  that in the order.  Let's just see what we got here.
6          MR. O'REAR:  Excuse me.  Off the record for
7  just a minute.
8          THE VIDEOGRAPHER:  All right.  The time is
9  9:29.  We're going off the record.
10          (Break taken at 9:29 a.m.)
11          THE VIDEOGRAPHER:  The time is 9:32.  We're
12  back on the record.
13  BY MR. O'REAR:
14     Q.  Mr. Johnson, do you recognize Exhibit 6 as a
15  document within TVA's files regarding Nuclear
16  Development's projections of the economic impact of this
17  project?
18     A.  No, I do not.
19     Q.  When the contract was signed, did you believe
20  that Nuclear Development would have the financial
21  ability to close the deal?
22     A.  I didn't have a basis to know whether they
23  would or not.
24     Q.  Did you have any personal opinion about that?
25     A.  I thought it would be a difficult project to

Page 36

1  finance and build, but I had plenty of my own issues to
2  deal with at that time.  So I really didn't spend a lot
3  of time thinking about how they were going to do it.
4      Q.  Did you ever make a statement that you did not
5  believe that Nuclear Development could raise the funds
6  to close the deal?
7          MR. LEMBKE:  Mr. Johnson, I direct you, to the
8  extent this would require you to reveal statements made
9  to TVA's counsel, you should not disclose those
10  statements.
11          MR. O'REAR:  Well, I don't understand how that
12  would be legal advice.
13          MR. LEMBKE:  My instruction stands.
14          MR. O'REAR:  Well, reserve the right to contest
15  that.
16          THE WITNESS:  I don't recall ever making any
17  such statement.
18  BY MR. O'REAR:
19     Q.  When the contract was signed, did you have any
20  personal opinion about whether Nuclear Development would
21  have the technical capability to construct and operate a
22  nuclear facility?
23     A.  Nuclear Development itself I did not think had
24  the capability, but I also knew that they were looking
25  for the capability to build it, looking for an architect

William Johnson

Page 37

1 engineer, and I was told by Nuclear Development that
2 they were looking for an operating partner.
3     **Q. Did you have any personal opinion about whether**
4 **they would be successful in that effort?**
5     A. I had a personal opinion that TVA would have
6 had a very difficult time doing this project. That's
7 why we decided not to do it. So I thought anybody would
8 have a very difficult time with this project.
9     **Q. Did you ever make a statement to anyone that**
10 **you did not believe Nuclear Development could ever**
11 **construct or build a nuclear facility at Bellefonte?**
12     MR. LEMBKE: Same instruction.
13 BY MR. O'REAR:
14     **Q. Construct or operate. Excuse me.**
15     MR. LEMBKE: Same instruction.
16     THE WITNESS: I don't recall any such
17 statement.
18 BY MR. O'REAR:
19     **Q. When the contract was signed, were you**
20 **concerned about potential competition from Nuclear**
21 **Development for any of TVA's customers with regard to**
22 **the sale of power?**
23     A. No, I was not concerned. It was a risk we had
24 considered and talked to -- talked about with the board,
25 but I was not concerned about it. It's a fact of life

Page 38

1 in the business.
2     **Q. Now, this -- this plant as designed contains**
3 **two units; is that correct?**
4     A. Correct.
5     **Q. Can you describe for the Court what "units"**
6 **mean?**
7     A. Yes. So when we refer to nuclear units, we
8 refer to reactors. So there are many plants around the
9 country that have one unit. Some have two and some have
10 three. And so the Bellefonte plant was designed to have
11 two separate reactors, two units.
12     **Q. One called Unit 1 and one called Unit 2;**
13 **correct?**
14     A. Common parlance, yes. Sometimes alpha and
15 bravo but usually one and two.
16     **Q. Were you aware of or involved in any**
17 **discussions regarding the expiration date for the**
18 **construction permit on Unit 2?**
19     MR. LEMBKE: Same --
20     MR. O'REAR: Go ahead.
21     MR. LEMBKE: Same instruction.
22     THE WITNESS: I don't recall any discussion
23 specifically to the expiration of Unit 2's permit.
24 BY MR. O'REAR:
25     **Q. Were you aware that TVA had asked the Nuclear**

Page 39

1 **Regulatory Commission in 2014 to extend the completion**
2 **date on the construction permit for Unit 2 to**
3 **October 2017?**
4     A. I was aware that the extension had been asked
5 for in 2014. I couldn't recall the later date for the
6 end of the extension, but I knew the permit was
7 requested to be extended, yes.
8     **Q. And after this contract with Nuclear**
9 **Development was signed, were you aware that Nuclear**
10 **Development asked TVA to send a letter to the Nuclear**
11 **Regulatory Commission requesting action on the extension**
12 **request?**
13     A. I don't recall that, no. Excuse me.
14     (Deposition Exhibit 7 was marked.)
15 BY MR. O'REAR:
16     **Q. I've handed you Exhibit 7 which has a cover**
17 **e-mail on it from Mr. Larry Blust to James Chardos dated**
18 **August 18, 2017.**
19     **Do you have that before you?**
20     A. Yes, sir.
21     **Q. And who is James Chardos?**
22     A. He was, and perhaps still is, an employee of
23 TVA. At this time he was sort of the, for lack of a
24 better word, caretaker for the Brunswick site. That's
25 not the right title.

Page 40

1     **Q. Was he the plant manager?**
2     A. I don't know what his title was.
3     **Q. You said Brunswick?**
4     A. I'm sorry.
5     **Q. Are you referring to Bellefonte?**
6     A. Bellefonte. Brunswick is another two-unit
7 nuclear plant in the country. Yeah, Bellefonte,
8 correct.
9     **Q. All right, sir. Can you identify the letter**
10 **having -- can you identify whether or not you ever saw**
11 **or were made aware of this letter that was proposed by**
12 **Nuclear Development for TVA to send to the NRC regarding**
13 **the extension of the completion date for the**
14 **construction permit on Unit 2?**
15     A. I have no recollection of having seen this
16 document.
17     **Q. Did you make any decisions on behalf of TVA to**
18 **either grant or reject Nuclear Development's request**
19 **that's expressed in this e-mail, in this letter?**
20     A. Not to my recollection, no.
21     **Q. Do you know who at TVA made the final decision**
22 **with respect to this request?**
23     A. I do not.
24     (Deposition Exhibit 8 was marked.)
25         ---o0o---

Page 41

1 BY MR. O'REAR:
2    Q.  Directing your attention to Exhibit 8, which is
3 a document from the records of TVA and a copy of an
4 e-mail from Scott Vance to Mr. Blust and Mr. Chardos and
5 others dated August 31, 2017.
6      Do you have that before you?
7    A.  I do.
8    Q.  Mr. Vance is stated there as associate general
9 counsel Nuclear Office of the General Counsel.
10      Do you see that?
11    A.  I do.
12    Q.  Now, that letter says TVA will not send a
13 subsequent extension letter as requested; correct?
14    A.  That is what it says, yes.
15    Q.  Are you familiar --
16      MR. LEMBKE:  Object to the form.  Lack of
17 foundation.
18 BY MR. O'REAR:
19    Q.  Were you familiar with this e-mail, or do you
20 recall that this e-mail was sent?
21    A.  No.  And I don't appear to be copied on it
22 anywhere.
23    Q.  Okay.
24    A.  No.
25    Q.  I'm showing you this e-mail to see if it

Page 42

1 refreshes your recollection about whether or not you
2 recall who made the decision not to send a subsequent
3 extension letter as requested by Nuclear Development?
4    A.  No, it doesn't.
5    Q.  Do you know anything about why the request for
6 a new extension letter was rejected?
7    A.  I do not.
8    Q.  Were you aware in June of 2018 that Nuclear
9 Development requested TVA to consent to the transfer of
10 the construction permits to Nuclear Development?
11    A.  No recollection of that.
12    (Deposition Exhibit 9 was marked.)
13 BY MR. O'REAR:
14    Q.  I've handed you what's marked as Exhibit 9.
15 The second e-mail in the middle of the first page is an
16 e-mail from Tim Matthews, licensing counsel for Nuclear
17 Development, to James Chardos dated June 19, 2018.  And
18 the text of that, as you can see, refers to the fact
19 that Nuclear Development has drafted an application to
20 the NRC for consent to the transfer that TVA was to
21 sign.
22      Do you see that?
23      MR. LEMBKE:  Object to the form.  Misstates the
24 evidence.  It speaks for itself.
25      MR. O'REAR:  Well, I mean, it does speak for

Page 43

1 itself.
2 BY MR. O'REAR:
3    Q.  I'll just read it to you for the record:
4      "Jim, as we discussed, Nuclear Development has
5 developed a draft application to the NRC under 10 CFR
6 50.80 for consent to transfer the Bellefonte
7 construction permit and continuing their deferred plant
8 status."
9      Is it still your testimony that you were not
10 aware that this request had been made by Nuclear
11 Development to TVA?
12      MR. LEMBKE:  Object to the form.  Lack of
13 foundation.
14      THE WITNESS:  I have no knowledge of the
15 information.
16      MR. LEMBKE:  And object to the form.  It
17 misstates the evidence.
18      THE WITNESS:  I have no knowledge of the
19 information in this document.
20 BY MR. O'REAR:
21    Q.  Were you ever aware of Nuclear Development's
22 request to TVA to consent to the transfer of the
23 construction permits?
24      MR. LEMBKE:  Object to the form.  Lack of
25 foundation.

Page 44

1      THE WITNESS:  I have no recollection of that.
2 BY MR. O'REAR:
3    Q.  You -- were you aware that on August the 14th,
4 2018, a Nuclear Regulatory Commission conducted a public
5 meeting regarding the Bellefonte site and the issue of
6 the construction permits regarding that site?
7      MR. LEMBKE:  Object to the form.  Lack of
8 foundation.
9      THE WITNESS:  I recall that there was an NRC
10 public meeting in that time period.  I wouldn't know the
11 specific date.  I don't recall the construction permits
12 being discussed, but I do know that a public meeting
13 about the plant was held.
14      (Deposition Exhibit 10 was marked.)
15 BY MR. O'REAR:
16    Q.  You have before you Exhibit 10.  It shows at
17 the top that this was an e-mail from Mr. Justin
18 Maierhofer to you, Ms. Quirk, and others dated
19 August 14, 2018.  Do you see that?
20    A.  Yes.
21    Q.  Did you review this document yesterday in
22 preparation?
23      MR. LEMBKE:  I instruct you not to answer that
24 question.  That will require revealing attorney work
25 product.

William Johnson

Page 45

1  BY MR. O'REAR:
2      Q.  This is a document produced from the records of
3  TVA.  Did you receive this e-mail?
4      A.  Actually, yes, I remember receiving this
5  e-mail.
6      Q.  And is this a report from Mr. Russ Bell with
7  the Nuclear Energy Institute to others who then
8  forwarded this to you regarding what transpired at the
9  NRC public meeting on August 14, 2018, the same date of
10  the e-mail to you?
11     A.  That is what it appears to be, yes.
12     Q.  And who is -- who is Justin Maierhofer?
13     A.  Justin Maierhofer.
14     Q.  Maierhofer.
15     A.  It's a hard name -- was -- is the head of
16  public affairs/governmental relations at TVA.
17     Q.  And so you read this e-mail when it came in;
18  right?  You said you recalled it?
19     A.  I do recall it, yes.
20     Q.  Do you see on the second page of this e-mail
21  that Mr. Bell reported that "Nuclear Development will
22  begin engineering and licensing work in parallel upon
23  closure of the sale"?
24     A.  I'm sorry, I got lost here.  Tell me where you
25  are again.

Page 46

1      Q.  Okay.  Look at the second page and the third
2  bullet point on the second page.
3      A.  I see the bullet point.
4      Q.  Okay.  And did you understand that to mean that
5  Nuclear Development would seek licensing of the
6  construction permits through NRC after the closing of
7  the sale of Bellefonte?
8      A.  So I recall this e-mail.  I don't recall the
9  content of it nor do I recall thinking very hard about
10  what was in it.  So on that specific point, do I
11  remember that?  No.
12     Q.  Do you contest that the e-mail says that?
13         MR. LEMBKE:  Object to the form.  That
14  misstates the evidence.
15         THE WITNESS:  I would say that Exhibit 10 says
16  what it says.
17  BY MR. O'REAR:
18     Q.  All right, sir.  There's a reference in this
19  e-mail from Mr. Bell to the fact that Nuclear
20  Development was represented by Bill McCollum at that
21  meeting.  Do you see that reference on that first page?
22     A.  Yes.
23     Q.  And tell the Court who Bill McCollum is.
24     A.  Bill McCollum, I believe, was an employee of
25  Nuclear Development, was previously a executive at TVA,

Page 47

1  and prior to that was a executive at Duke Energy.
2      Q.  Was he the chief operating officer at TVA?
3      A.  He was gone by the time I got there, but I
4  believe that was his title.
5      Q.  So he left TVA before you arrived in 2013?
6      A.  I got there at the beginning of 2013, and he
7  was no longer there.
8      Q.  Have you publicly criticized any of the
9  comments made by Mr. McCollum regarding Bellefonte?
10     A.  I don't know if I've criticized his comments on
11  Bellefonte.  I've criticized some of his other comments.
12     Q.  What others have you criticized?
13     A.  The comment that Memphis should leave TVA and
14  not go to Nuclear Development but go to MISO or
15  somewhere else, because any deal is better than a deal
16  they're getting from TVA.
17     Q.  Do you dislike Mr. McCollum?
18     A.  I don't know him.  I've met him.  I don't have
19  a personal opinion of him.  I've met him briefly several
20  times.
21     Q.  Were you upset with him about those comments?
22     A.  I was.
23     Q.  Do you recall that TVA received a summary of
24  the August 14, 2018, public meeting from the NRC?
25     A.  I do not recall that, no.

Page 48

1         (Deposition Exhibit 11 was marked.)
2  BY MR. O'REAR:
3      Q.  Let me show you what's been marked as
4  Exhibit 11.
5         MR. O'REAR:  Yeah, that's it.
6  BY MR. O'REAR:
7      Q.  Again, this is a document produced from the
8  files of TVA.  Can you identify it as the summary issued
9  by the National Regulatory Commission on September 4th,
10  2018, of the comments made at the public meeting on
11  August 14, 2018?
12     A.  It says it's a summary of a public presubmittal
13  meeting with Nuclear Development, LLC, on August 14,
14  2018.  It's dated September the 4th, 2018.
15     Q.  And I believe you said you did not recall that
16  the meeting involved a discussion of the transfer, but
17  this first paragraph says specifically "to discuss
18  issues associated with the submittal of a request to
19  transfer the deferred construction permit for Bellefonte
20  Nuclear Generating Station Units 1 and 2."
21         MR. LEMBKE:  Objection.  Lack of foundation.
22  BY MR. O'REAR:
23     Q.  Do you see that?
24         MR. LEMBKE:  Same objection.
25         THE WITNESS:  The document says, "The purpose

William Johnson

Page 49

1  of the meeting was to introduce the members of NDL, LLC,
2  and to discuss issues associated with the submittal of a
3  request to transfer the deferred construction permit for
4  Bellefonte Nuclear Station." Yes.
5  BY MR. O'REAR:
6      Q. And if you would turn over to the list of
7  attendees at this meeting, which is five pages over.
8      Do you see that?
9      A. I do.
10     MR. LEMBKE: Objection. Lack of foundation.
11     THE WITNESS: I see the --
12     MR. O'REAR: What's the lack of foundation?
13     MR. LEMBKE: You've not established that he's
14 ever seen this document before.
15     MR. O'REAR: I'm asking.
16     MR. LEMBKE: And it's not appropriate to put a
17 document in front of a witness --
18     MR. O'REAR: Certainly.
19     MR. LEMBKE: -- and ask him for -- to testify
20 to something if you haven't established that he's ever
21 seen it before.
22     MR. O'REAR: Well, I'm asking him if he can
23 identify some of the information on the document.
24     MR. LEMBKE: Same objection. That's
25 inappropriate if he's never seen it before.

Page 50

1  BY MR. O'REAR:
2      Q. All right. Mr. -- Mr. Johnson, could you look
3  at the list of attendees? Do you have that there?
4      A. I do.
5      Q. Do you see the list of attendees on behalf of
6  TVA at this meeting?
7      MR. LEMBKE: Objection. Lack of foundation.
8      THE WITNESS: This list contains one, two,
9  three, four, five names from -- that says TVA by them,
10 yes.
11 BY MR. O'REAR:
12     Q. Okay, sir. And we've already discussed
13 Mr. Chardos. He's the first name; correct?
14     A. Correct.
15     MR. LEMBKE: Same objection.
16 BY MR. O'REAR:
17     Q. Who is Ryan Dreke?
18     A. I do not know.
19     Q. Who is Aaron Henderson?
20     A. Aaron works in nuclear and I believe in nuclear
21 licensing, at least he did when I was there.
22     Q. Who is Dan -- excuse me -- John Lockaby?
23     A. I do not know.
24     Q. Who is Dan Stout?
25     A. Dan Stout is in the nuclear organization, was

Page 51

1  when I was there, and when I was there was focused on
2  small modular reactors.
3      Q. Did you receive any reports from anyone on this
4  meeting other than what's referenced in the e-mail,
5  Exhibit 10, or this summary issued by the NRC as
6  Exhibit 11?
7      MR. LEMBKE: Objection. Lack of foundation.
8  You haven't established that he ever received
9  Exhibit 11. So it mis --
10 BY MR. O'REAR:
11     Q. Did you receive anything --
12     MR. LEMBKE: It's a compound question.
13 BY MR. O'REAR:
14     Q. Did you receive any information reporting on
15 this meeting besides Exhibit 10?
16     A. To the best of my recollection, no.
17     Q. Did you have any discussions with anyone
18 concerning what was stated at this meeting about either
19 Exhibit 10 or any other information you may have had
20 about the meeting?
21     A. I don't have any recollection of that.
22     Q. Were you aware that within a week of this
23 meeting with the NRC that there was a letter issued by
24 TVA expressing its intent to close the contract on the
25 contracted closing date --

Page 52

1      MR. LEMBKE: Object.
2  BY MR. O'REAR:
3      Q. -- with Nuclear Development?
4      MR. LEMBKE: Objection. Lack of foundation.
5      THE WITNESS: I have no such recollection.
6      MR. O'REAR: I'm trying to determine if he is
7  aware of that, Matt.
8      THE WITNESS: I have no recollection of that.
9      (Deposition Exhibit 12 was marked.)
10     MR. BLUST: 12 or 13. 12; right?
11 BY MR. O'REAR:
12     Q. Directing your attention to Exhibit 12 before
13 you which is a letter from Mr. Aaron Nix of TVA to
14 Larry Blust dated August 21, 2018.
15     Did you ever see this letter or were you ever
16 made aware that TVA represented on this date that it was
17 working toward completion of the transaction documents
18 in contemplation of the closing?
19     A. I have no recollection of this document or
20 being aware of this document.
21     Q. Did you in your own mind think in August of
22 2018 that TVA would close the transaction with Nuclear
23 Development?
24     A. We were working toward closing it. At some
25 point during this process, the issue of the permits came

William Johnson

Nuclear Development, LLC vs.
Tennessee Valley Authority

Page 53

1  to the fore, and I can't remember exactly what that was,
2  but we were moving toward closing.
3      Q.  So it is your best recollection that in
4  August 2018, as far as your intent was concerned, that
5  the transaction would be closed?
6      A.  Yes.  If all the conditions were met.
7      Q.  All right, sir.  Were you aware that shortly
8  after this letter which is marked as Exhibit 12 that
9  Nuclear Development requested of TVA to agree to an
10  extension of the closing date for six months to
11  May 14th, 2019?
12     A.  I don't recall the specific date, but I do
13  recall there was a request for a six-month extension,
14  yes.
15         (Deposition Exhibit 13 was marked.)
16  BY MR. O'REAR:
17     Q.  Direct your attention to Exhibit 13.  Does this
18  refresh your recollection that there was a request on
19  August 29, 2018, by Nuclear Development to extend the
20  closing date to May 14, 2019?
21     A.  I don't have any recollection of having seen
22  this document, but I do recall about this time frame a
23  request for a six-month extension into May, yes.
24     Q.  Did you ever discuss this request with
25  Mr. Franklin Haney of Nuclear Development?

Page 54

1      A.  Yes.
2      Q.  Tell me what you recall about that.
3      A.  Let me -- I discussed several times with him
4  requests for extension, yeah.  So. . .
5      Q.  The request for extension of the six-month is
6  represented in Exhibit 13?
7      A.  I don't remember specifically whether we talked
8  about the six-month.  I know we talked several times
9  about extensions.  It may have been the six-month.  It
10  may have been the shorter extension that we actually
11  granted.  But there were discussions about extension.
12     Q.  Now, the shorter extension you're referring to,
13  that was requested by TVA; is that correct?
14     A.  My recollection of that is there was a request
15  for an extension sometime later than this that I sat on
16  for a little bit as I was considering it.  And so since
17  I had used up some of the time, I wanted to make sure
18  that it was fair, that I gave some of it back.  So that
19  was the reason for the two-week extension later in, I
20  guess, November.
21     Q.  So the reason for giving the two-week extension
22  was that you had sat on the Nuclear Development request
23  for a six-month extension for a period of time and you
24  wanted to give some time back on that?
25     A.  "Sat on" was the wrong words.

Page 55

1      Q.  I thought you said "sat on."
2      A.  I did say, but what I meant was I was seriously
3  considering whether we should give the extension or not,
4  and it took a little bit of time for me to work through
5  that and discuss it.  And so I thought it would be a
6  fair thing to give a little extension because the
7  discussion of the bigger extension took a while.
8      Q.  The little extension was an extension from
9  November 14 to November 30; is that correct?
10     A.  I remember it was roughly a two-week extension,
11  so that sounds about right.
12     Q.  And the reason for that was to give some time
13  back because you had been considering their extension
14  and thought it was fair to give them an additional
15  16 days?
16     A.  That's right.
17         MR. LEMBKE:  Objection.  Asked and answered.
18  BY MR. O'REAR:
19     Q.  Does TVA have an executive management council?
20     A.  I don't know if they do today, but we had that
21  then, yes.
22     Q.  So did TVA have an executive management council
23  in August of 2018?
24     A.  Yes.
25     Q.  And what were the functions or purpose of the

Page 56

1  executive management council?
2      A.  So it was the senior executives of the
3  organization, and the purpose of the council was to make
4  sure we were aligned, we had all the information we
5  needed as an organization, to review business
6  performance, and direct and lead the organization.
7      Q.  And in August of 2018 who was on the executive
8  management council?
9      A.  I'll see if I can recreate this.  Sherry Quirk,
10  Mike Scaggs.
11     Q.  Who is Mike Scaggs?
12     A.  Mike Scaggs at the time was the chief operating
13  officer.
14         Van Wardlaw.
15     Q.  Who is he?
16     A.  The senior VP of external relations and
17  customer relations.
18         Sue Collins, the head --
19     Q.  Who is she?
20     A.  Head of HR.
21         I'm going around the table here from memory.
22  Janet Brewer who was the SVP of communications;
23  Justin Maierhofer, VP of external affairs; John Thomas,
24  CFO.
25         I hope I haven't missed anybody.  It would be

Page 53..56

Page 57

1  embarrassing.  But. . . I think that's it.
2      Q.  Now, did you use the executive management
3  council as some sort of sounding board?  Or just what
4  authority did it have other than to provide a medium for
5  discussion of TVA's business performance?
6      A.  So everybody -- every member of that group
7  obviously had pretty direct authority to run a billing
8  part of the business as a senior executive.  It was a
9  group we used as a sounding board to set direction,
10  strategy issues, performance issues, all kinds of
11  things.
12      Q.  And did each one of those members report to
13  you?
14      A.  Yes.
15      Q.  And you in turn reported to the board of
16  directors?
17      A.  Correct.
18      Q.  Did you discuss this request for a six-month
19  extension with the executive management council?
20      A.  I don't really recall.
21      Q.  Who are the executive management council AAs?
22  Are you familiar with that term?
23      A.  I believe that term refers to administrative
24  assistants.
25      Q.  And are those the assistants of each of the

Page 58

1  members that you described?
2      A.  Yes.
3      Q.  And are the administrative assistants also
4  members of the executive management council?
5      A.  No.
6      Q.  Do the administrative assistants get
7  communications that are directed to the members of the
8  executive management council?
9      A.  I don't know the answer to that.
10      Q.  Who is the chair of the executive management
11  council or who was it in August of 2018?
12      A.  Well, we didn't have a structure like that, but
13  as the CEO I guess I was the head person.
14      Q.  Did the executive management council report
15  directly to the board of directors?
16      A.  No.  They reported to me.  The nuclear officer,
17  which at that time would have been Mike Scaggs, would
18  have also had a dotted line to the board, but in general
19  they reported generally to me.
20      Q.  Did you ever discuss the Nuclear Development
21  request for a six-month extension with the board of
22  directors?
23      A.  I'm certain I must have, but I don't have any
24  recollection of how or when.
25      Q.  Did you ever discuss it at an official board

Page 59

1  meeting?
2      A.  I have no recollection of doing that.
3      Q.  Did you ever discuss that extension at any
4  committee meetings of the board?
5      A.  I don't recall specifically, but that is the
6  kind of thing I would have talked to the board about.
7      Q.  But you have no recollection that any of that
8  discussion ever made it to the level of an official
9  board meeting; is that correct?
10      A.  I think that probably is correct.
11      Q.  Did you ever discuss this extension with any
12  individual board members?
13      A.  Again, I'm sure I must have because this would
14  have been the kind of thing that I did discuss with the
15  board, but I don't have a recollection of who or when.
16      Q.  To your knowledge, was there any record kept of
17  any of your discussion with any of the board members
18  regarding this request for a six-month extension?
19      A.  I don't recall.
20      Q.  To the best of your recollection, which board
21  members did you discuss this with?
22      MR. LEMBKE:  Object to the form.  Asked and
23  answered.
24      THE WITNESS:  Again, I don't recall
25  specifically who I did discuss it with.  Again, this is

Page 60

1  the kind of thing I clearly would have talked to the
2  board about, but the specifics of that I don't recall.
3  BY MR. O'REAR:
4      Q.  And when you say you "clearly talked to the
5  board about," are you talking about at an official
6  meeting or are you talking about one-on-one
7  conversations?
8      A.  Not an official meeting probably because those
9  are public and you don't typically discuss proprietary
10  confidential commercial information, which this would
11  have been.  So one-on-one or in committees or in the
12  committee meetings.
13      Q.  Was there any record kept of the discussion
14  among the executive management council about this?
15      A.  There were no official minutes of that group,
16  and so I don't know otherwise whether people have
17  records or not.
18      Q.  Personal notes you mean?  Is that what you --
19      A.  Any kind of -- any kind of record.
20      Q.  Did the -- did that council ever prepare formal
21  minutes or formal notes of meetings?
22      A.  In my time there, no.
23      Q.  Were members instructed not to keep notes of
24  the meetings?
25      A.  No.

Page 61

1    Q.  Did TVA ultimately deny the Nuclear Development
2  request for a six-month extension?
3    A.  Yes.
4    Q.  And did you make that final decision?
5    A.  Yes.
6    Q.  How would that extension have hurt the TVA?
7    A.  Well, when we started the process, the one --
8  one area of concern for us was open-ended commitments.
9  We wanted to do something on the site.  We wanted it to
10 happen in a fairly expeditious manner.
11     I didn't think it would be a six-month delay.
12 I didn't think there was a possibility that -- well,
13 there's always a possibility, but a reality of getting
14 the permits in six months.  I've actually sought permits
15 in the past.  Typically it's about a two-year process.
16 And so I was concerned about the fact that we had an
17 open-ended process that might never conclude.
18    Q.  Well, the request for six months to May 14,
19 2019, it was not open-ended, was it?
20    A.  No.  But the ability to get the permits in a
21 six-month to me was near impossible just given the
22 history of the NRC and my own experience, and so I was
23 thinking six months is going to be another six months
24 and it's going to be another year.
25     So, to me, it looked like the potential for an

Page 62

1  ongoing, open-ended, unmet condition.
2    Q.  Were you concerned about not receiving the
3  90, $89 million balance of the purchase price if this
4  did not close on November 30th, 2018?
5    A.  I didn't follow your question.  Could you try
6  again?
7    Q.  Were you concerned that if you didn't grant
8  this extension, that the sale would not close on
9  November 30th, 2018, and TVA would not receive the
10 $89 million balance on the purchase price?
11    A.  I was not concerned about whether we would
12 receive the balance of the purchase price or not.  I was
13 concerned that we follow the terms of the contract and
14 legal requirements.
15    Q.  Were you concerned about the -- TVA's goal
16 encouraging economic development in the Bellefonte area
17 if the transaction did not close?
18    A.  No.  I was concerned that if we didn't come to
19 some conclusion of the transaction, that goal would be
20 harmed even more.
21    Q.  What do you mean by that?
22    A.  Well, if we have two or three more years after
23 November trying to get permits and nothing's happening
24 at the site, that is not going in the right direction on
25 economic development in that region.

Page 63

1    Q.  Did you anticipate at the end of August 2018
2  litigation with Nuclear Development?
3    MR. LEMBKE:  At the end of August 2018?
4    MR. O'REAR:  Yes.
5    MR. LEMBKE:  Mr. Johnson, to the extent this
6  would require you to reveal attorney-client
7  communications with TVA's counsel, you should not
8  disclose that information.
9    THE WITNESS:  I don't have any recollection of
10 being personally concerned at that time.  As we got
11 closer to the event, I certainly thought we'd end up
12 here in a deposition today, yes.
13 BY MR. O'REAR:
14    Q.  "The event" meaning the closing date?
15    A.  Yes.
16    Q.  But in August of 2018 you were not anticipating
17 that there might be litigation with Nuclear Development
18 over this contract, were you?
19    MR. LEMBKE:  Mr. Johnson, I give you the same
20 instruction.
21    THE WITNESS:  I can't recall that being at the
22 top of mind in August.
23 BY MR. O'REAR:
24    Q.  All right, sir.
25    A.  But, you know, we may have been thinking about

Page 64

1  it.  I just don't have any recollection of that here.
2    Q.  Do you recall any discussions at the end of
3  August or at the end of August of 2018 about TVA suing
4  Nuclear Development?
5    MR. LEMBKE:  Mr. Johnson, I give you the same
6  instruction.
7    THE WITNESS:  I have no recollection of that.
8  BY MR. O'REAR:
9    Q.  Do you have any recollection of any discussions
10 at that time about Nuclear Development suing TVA?
11    MR. LEMBKE:  Mr. Johnson, I give you the same
12 instruction.
13    THE WITNESS:  I have no such recollection.
14    MR. LEMBKE:  This is a good time for a short
15 break.
16    MR. O'REAR:  Okay.  I'm kind of in the middle
17 of a subject.  I'd like to finish that.  If we could
18 have a few more minutes.
19    MR. LEMBKE:  All right.
20 BY MR. O'REAR:
21    Q.  Did you ever discuss at a board meeting of TVA
22 your expectation or anticipation that there would be
23 litigation with Nuclear Development over this contract?
24    A.  I have no recollection of such a comment.
25    Q.  Do you know who Mary Margaret Painter is?

Page 65

1    A. Yes, I do.

2    Q. Who is that?

3    A. She is the, at least was when I left, the

4  assistant to the board of directors. So she coordinated

5  the board activities.

6    Q. And who is Rebecca Chunn Tolene?

7    A. She when I left was the VP of supply chain.

8  Had various positions while I was there.

9    Q. Did you ever send an e-mail to either one of

10  those women regarding anticipation of litigation with

11  Nuclear Development?

12    A. I don't have any recollection of that.  I

13  certainly e-mailed both of them frequently, but I don't

14  have any such recollection of that e-mail.

15    MR. O'REAR: Okay. Do you want to take a break

16  now?

17    MR. LEMBKE: Okay. Great. Thank you.

18    THE VIDEOGRAPHER: The time is 10:16. We're

19  going off the record.

20    (Break taken at 10:16 a.m.)

21    THE VIDEOGRAPHER: The time is 10:27. We're

22  back on the record.

23  BY MR. O'REAR:

24    Q. You commented earlier you were upset with

25  Mr. McCollum for making comments to the City of Memphis

Page 66

1  that they should leave TVA even if they didn't go to

2  Nuclear Development; is that correct?

3    A. That is correct.

4    Q. Okay. And do you recall seeing a press -- some

5  press news coverage regarding Nuclear Development's

6  meeting with the City of Memphis on October the 9th,

7  2018? Would that have been the meeting you're referring

8  to?

9    A. I don't recall the date. It was in that time

10  frame, but I don't -- I don't recall the date.

11    Q. After you -- how did you learn of those

12  comments?

13    A. They were reported to me by people who were at

14  the meeting, and also then I did see some news coverage

15  of it.

16    Q. After you learned of that, did you ask for a

17  meeting with Mr. Franklin Haney --

18    A. I believe --

19    Q. -- and Mr. Blust regarding this matter?

20    A. Pardon me. I believe they asked for a meeting

21  with me.

22    Q. You didn't ask for that meeting?

23    A. I don't recall, but there was a meeting, yeah.

24    Q. And did you want to discuss with them issues

25  regarding the City of Memphis before you made a decision

Page 67

1  on whether or not to grant the extension that they had

2  requested to May of 2019?

3    A. Would you repeat that question?

4    Q. Did you want to discuss with them issues over

5  the City of Memphis and its role as a customer of TVA

6  and their solicitation of Memphis as a customer for

7  Nuclear Development before you made the decision to

8  extend the closing to May of 2019?

9    MR. LEMBKE: Object to the form. Compound

10  question.

11    THE WITNESS: I wanted to discuss with the

12  people you named the behavior of Mr. McCollum in Memphis

13  which was designed not to further Nuclear Development's

14  interest but solely to harm TVA, which I could not

15  understand in the context of a group that was also

16  trying to -- actually offering us partnership at the

17  same time. That's what I wanted to discuss.

18  BY MR. O'REAR:

19    Q. Did you ask for a record of the presentation

20  made by Nuclear Development at that meeting with

21  Memphis?

22    A. I don't recall.

23    Q. Did you ever see a record of or a transcript or

24  a recording --

25    A. I --

Page 68

1    Q. -- of what was said at that meeting?

2    A. I did see a transcript of the meeting, yes.

3    Q. Who gave you that?

4    A. I don't recall.

5    Q. Now, the contract you had with Nuclear

6  Development did not prohibit Nuclear Development from

7  soliciting the City of Memphis or any other TVA customer

8  as a potential customer for Nuclear Development, did it?

9    A. That's correct.

10    Q. And you're saying you weren't upset with the

11  solicitation of Memphis as a customer of Nuclear

12  Development; you were upset with comments suggesting

13  that even if Memphis did not go with Nuclear

14  Development, they should find another source of power

15  besides TVA?

16    A. You know, I wasn't excited about losing a

17  customer to Nuclear Development, but I always knew and

18  talked to the board about the fact that there was

19  competition. My real concern, my irritation was the

20  behavior of a retired TVA executive trying to harm the

21  organization for no benefit to the organization he

22  worked for.

23    Q. Were you concerned at this time that Memphis

24  was seriously considering going with Nuclear

25  Development?

Page 69

1    A.  I was concerned every day about every customer
2  because TVA does not have a monopoly.  The contractual
3  relationship is what binds people.  Was I particularly
4  concerned about this?  No.  Because I always thought our
5  value proposition was better, TVA's value proposition.
6    Q.  So you -- you weren't concerned that Memphis
7  was seriously considering with TVA -- with Nuclear
8  Development?
9    MR. LEMBKE:  Objection.  Asked and answered.
10    THE WITNESS:  I was concerned that any customer
11  would leave TVA because the impact of that is to spread
12  costs on other people.  And so --
13  BY MR. O'REAR:
14    Q.  Memphis was your largest customer at that time;
15  correct?
16    A.  I believe that's right.
17    Q.  Did you discuss with the board at any official
18  board meeting your concern that Memphis was seriously
19  considering leaving TVA and going with Nuclear
20  Development?
21    A.  I don't recall specifically.  The official
22  board meetings are transcribed and videoed, and so my
23  comments would be on the record there.  I certainly
24  spoke to the board frequently about the potential loss
25  of any customer and how important it was to keep all

Page 70

1  customers, including Memphis.
2    Q.  Did you ever discuss with board members at
3  committee meetings specifically your concern that City
4  of Memphis might go with Nuclear Development?
5    A.  I don't recall a concern being discussed about
6  specifically them -- Memphis going to Nuclear
7  Development, but a concern about Memphis generally
8  leaving the TVA system, I certainly did talk to them
9  about that.
10    Q.  And what forum were those discussions held?
11    A.  It would have been in committee meetings.
12    Q.  Okay.  What committees would those have been?
13    A.  Probably the finance committee would have been
14  my guess.  That's usually where the business matters are
15  discussed.
16    Q.  And is that committee comprised of board
17  members only?
18    A.  All committees at TVA are board members only,
19  yeah.
20    Q.  Does your CFO attend the finance committee
21  meetings of the board?
22    A.  Typically when I was there, yes.
23    Q.  And were these discussions that you had that
24  you've just described with committee -- at committee
25  meetings of the board, probably the finance committee,

Page 71

1  were they after this presentation was made by
2  Mr. McCollum before the City of Memphis?
3    A.  So, as I said, these discussions about all
4  customers happened all the time.  One of the key focus
5  areas was retaining customers, making customers happy.
6  The specifics of when we were talking about Memphis, I
7  can't give you the exact time frame.
8    Q.  Well, I'm just asking you if they were before
9  or after you learned of this presentation being made by
10  Nuclear Development to Memphis.
11    A.  And I think my answer was I don't recall
12  exactly when it was.
13    Q.  You don't know.  Was it around that time
14  period?
15    A.  I don't know.
16    Q.  Did the board committee meetings result in
17  minutes being prepared?
18    A.  Typically, yes.
19    Q.  Were you aware that in mid-October Nuclear
20  Development's licensing counsel sent a proposed consent
21  letter to TVA whereby TVA, if it signed that letter,
22  would consent to the transfer of the construction
23  permits to Nuclear Development?
24    MR. LEMBKE:  Objection.  Vague as to year and
25  lack of foundation.

Page 72

1  BY MR. O'REAR:
2    Q.  Okay.  How about October 18th, 2018?
3    A.  I don't have any recollection of such a letter.
4    MR. BLUST:  What's the number?
5    MR. O'REAR:  14.
6    (Deposition Exhibit 14 was marked.)
7  BY MR. O'REAR:
8    Q.  You have Exhibit 14 before you?
9    A.  Yes, sir.
10    Q.  Okay.  This on the second page reflects an
11  e-mail on October 18, 2018, from Tim Matthews, who is
12  licensing counsel for Nuclear Development, to
13  Chris Chandler in the legal department and others
14  including Mr. Shea.
15    MR. BLUST:  I think we got a different exhibit
16  here.  Which one you got?
17    MR. LEMBKE:  We've got the one in front of the
18  witness.
19    MR. BLUST:  Which is what?
20    MR. O'REAR:  Let me just make sure it's the one
21  I'm referring.
22    MR. BLUST:  You got the one in front of the
23  witness.  Why do I have a different one here?  I don't
24  know.
25    MR. O'REAR:  I don't know.

William Johnson

Page 73

1    MR. BLUST:  What's the one you have?

2    MR. O'REAR:  14.  Let me finish this.

3    MR. BLUST:  What is it?  I don't know what it

4  is, but okay.

5    MR. O'REAR:  I forgot where I was in the

6  question now.

7  BY MR. O'REAR:

8    **Q.  I'm directing your attention to the e-mail on**

9  **the same page.  And it's from Mr. Matthews, as I**

10  **described, to Chris Chandler with TVA.  And you'll see**

11  **it attaches on the last page a form of a letter for TVA**

12  **to sign to consent to the requested transfer of the two**

13  **construction permits.**

14    **Do you see that?**

15    MR. LEMBKE:  Objection.  Lack of foundation.

16    THE WITNESS:  I see a draft of a letter on the

17  last page to the NRC, yes.

18  BY MR. O'REAR:

19    **Q.  Okay.  And were you aware that such a specific**

20  **request had been made of TVA by Nuclear Development?**

21    A.  I don't have any recollection of that.

22    **Q.  Do you have any recollection of making a**

23  **decision on behalf of TVA to deny or reject the request**

24  **from Nuclear Development that TVA consent to the**

25  **transfer of the construction permits?**

Page 74

1    A.  I don't have any recollection of that.

2    **Q.  You don't -- did you make a decision on that**

3  **request?**

4    A.  I don't recall making such a decision.

5    **Q.  Do you know who made that decision to deny that**

6  **request?**

7    MR. LEMBKE:  Objection.  Lack of foundation.

8    THE WITNESS:  I do not.

9  BY MR. O'REAR:

10    **Q.  Is it your testimony today that you did not**

11  **approve of any such decision?**

12    A.  It's my testimony today --

13    MR. LEMBKE:  Same objection.

14    THE WITNESS:  -- that I don't have any

15  recollection of doing so.

16  BY MR. O'REAR:

17    **Q.  Do you know any reason why, if that decision**

18  **was made, why TVA would not grant a request for consent**

19  **of transfer of the construction permits?**

20    MR. LEMBKE:  Objection.  Lack of foundation.

21  Calls for speculation.

22    And, Mr. Johnson, to the extent that would

23  require you to disclose attorney-client communications

24  with TVA counsel, you should not answer it.

25    THE WITNESS:  I don't have any recollection of

Page 75

1  the reasoning.

2  BY MR. O'REAR:

3    **Q.  Do you recall a meeting between or among you,**

4  **Sherry Quirk, Franklin Haney, and Larry Blust in your**

5  **office in October of 2018?**

6    A.  Yes.

7    **Q.  Can you tell us what the subject of that**

8  **meeting was?**

9    A.  As I recall, the subject was to talk about why

10  Nuclear Development's representative was trying to hurt

11  TVA with no benefit to Nuclear Development and also to

12  talk about an extension.

13    **Q.  Okay.  And what was said by both sides**

14  **regarding an extension?**

15    A.  As I recall, the Nuclear Development folks,

16  including Mr. Blust, asked for a six-month extension and

17  I said I would consider it.

18    **Q.  And was that the end of it?**

19    A.  That's the substance of it.  We also talked

20  about Mr. McCollum's behavior of which Mr. Haney said he

21  had no knowledge and didn't approve of, and then it

22  continued.

23    **Q.  Did you discuss the City of Memphis and a**

24  **proposal by Nuclear Development to share in the**

25  **provision of power to Memphis between Nuclear**

Page 76

1  **Development and TVA?**

2    A.  I do recall a discussion about splitting the

3  power supply arrangement as you've described.  I don't

4  recall if it was in that meeting or subsequent meeting,

5  but I do recall that subject, yes.

6    (Deposition Exhibit 15 was marked.)

7    MR. BLUST:  We're at 16; right?

8    MR. O'REAR:  15.

9    MR. BLUST:  Oh, 15.  Sorry.

10  BY MR. O'REAR:

11    **Q.  Direct your attention to Exhibit 15 before you.**

12  **This is an e-mail from Larry Blust on October 24 to**

13  **Sherry Quirk that at the top was forwarded from**

14  **Autumn Beeler to Clifford Beach on October 25th, 2018.**

15  **The exhibit attaches notes or bullet points from**

16  **Mr. Blust purportedly with respect to the matters that**

17  **were discussed at the meeting with you the prior day.**

18    **Did you ever see this document?**

19    A.  I don't recall if I saw this document.  The

20  subject matter I do recall.

21    **Q.  Okay.  Does that document fairly represent the**

22  **proposal that was made by Nuclear Development at the**

23  **meeting with you and Ms. Quirk and Mr. Haney?**

24    A.  Give me a chance to read it here.

25    This is consistent with my recollection of what

Page 77

1  we discussed, yes.
2      Q.  Did you respond to this proposal?
3      A.  Eventually I responded, yes.
4      Q.  What was your response?
5      A.  A two-week extension, not a six-month
6  extension.
7      Q.  With respect to the proposal made in these
8  bullet points, what was your response?
9      A.  I declined.
10     Q.  After this meeting with Mr. Haney and Mr. Blust
11 and Ms. Quirk, did you go to Memphis and meet with
12 Memphis officials?
13     A.  I don't recall.  I went to Memphis a number of
14 times and met with Memphis officials.  I don't recall
15 specific timing.
16     Q.  Did you meet with officials of the City of
17 Memphis on November the 6th, 2018, to discuss
18 Bellefonte?
19     A.  I met with the City officials on November 6th.
20 The reason I remember that is November 6th is the date
21 that Memphis signed the original contract with TVA.  And
22 we were on November 6th Street in Memphis, so yes, I was
23 there on November the 6th.
24     Q.  And who did you meet with?
25     A.  I believe I met with the city council or with

Page 78

1  MLGW.  I don't recall.  Maybe both.
2      Q.  And tell the Court who MLGW is?
3      A.  Memphis Light, Gas and Water, the public power
4  provider in the City of Memphis.
5      Q.  And is that a division of the City of Memphis?
6      A.  I --
7      Q.  As opposed to a separate legal entity?
8      A.  I don't know the answer to that.
9      Q.  So you met with the City counsel.  Who did you
10 meet with or who was present for Memphis Light, Gas and
11 Water?
12         MR. LEMBKE:  Object.  It misstates his
13 testimony.
14 BY MR. O'REAR:
15     Q.  Okay.  I apologize then.  I thought that's what
16 you said.
17     A.  What I said was we may have met with those
18 groups separately.
19     Q.  All right.
20     A.  I don't recall.  Typically we would go to
21 Memphis; you would meet with your customer.  I do recall
22 being in the City counsel, and I don't recall anybody
23 from MLGW being there.  They certainly weren't there
24 with me.
25     Q.  Who did you regard as your customer in Memphis?

Page 79

1      A.  MLGW.
2      Q.  And not the City counsel?
3      A.  Right.
4      Q.  Who from TVA was at this meeting?
5      A.  I would -- I don't know.  Justin Maierhofer
6  typically would be with me.  I don't recall who else
7  would have been there.
8      Q.  To your knowledge, is there any record, either
9  a recording or written record, of what was stated at
10 your meeting with either the Memphis City Council or
11 MLGW?
12     A.  I think the city council meetings are
13 transcribed.  I don't know that, but I seem to recall
14 seeing a transcription of some of their events.  And I
15 don't know of any record, if I was at MLGW that day,
16 whether there was a record.
17     Q.  This meeting with the city council, was this a
18 regular meeting and you were on the agenda for that
19 meeting?
20     A.  That's my recollection, yes.
21     Q.  And tell me what was discussed at each of those
22 meetings.
23     A.  The specifics of that I can't recall.  I'm sure
24 what I did was make the pitch for staying with TVA and
25 the risk of putting 80 or a hundred percent of your

Page 80

1  power supply in a single asset that hadn't been built.
2  But I was there to make the pitch for TVA.
3      Q.  Were there comments made at either meeting that
4  concerned you in terms of Memphis leaving TVA?
5      A.  I don't recall that.
6      Q.  Do you recall being concerned when you left
7  those meetings that Memphis was seriously considering
8  leaving TVA?
9      A.  As I said previously, I'm always concerned when
10 any customer thinks about leaving.  I was fairly
11 confident that the value proposition TVA would would be
12 superior to any option, including Nuclear Development,
13 and that's the pitch I went to make.
14     Q.  Does Memphis's contract with TVA require a
15 five-year notice to terminate?
16     A.  I think it is a five-year termination by
17 Memphis and a ten-year termination by TVA.
18     Q.  And when is the five-year notice date under the
19 contract with Memphis?
20     A.  My recollection is a rolling five.  So it's
21 whenever they give notice, it would be five years from
22 that date.
23     Q.  So it's perpetual --
24     A.  Yes.  It's whatever they agreed.
25     Q.  -- with that rolling notice date?

Page 81

1     A.  (Witness nods head.)

2     Q.  After that meeting with Memphis, did you make
3  statements to anyone that you wanted to unwind the
4  contract with Nuclear Development?

5     A.  I don't recall any such statements.

6     Q.  Did you undertake any efforts after you met
7  with Memphis to find a way to not close the transaction
8  with Nuclear Development?

9     A.  No.

10     Q.  When did you make the decision not to agree to
11  the extension of the closing to May of 2019?

12     A.  Sometime in the two-week extension period from
13  the 14th through the -- whatever the date was, the 30th.

14     Q.  All right.

15     A.  Late in that period.

16     Q.  Sometime between late in the period of
17  November 14, 2018, through November 30, 2018?

18     A.  Yes.

19     Q.  When did TVA first notify Nuclear Development
20  that it was concerned with the legality of the
21  transaction because the construction permits had not
22  been yet transferred?

23     A.  I don't recall a specific date.  I would say
24  later in the period, but I don't really recall the date.

25     Q.  Later in the period of --

Page 82

1     A.  The original closing.

2     Q.  -- November 14 --

3     A.  Yeah.

4     Q.  -- through November 30?

5     A.  Later in the two-year period.  I don't really
6  recall exactly when the issue really came to the fore.

7        (Deposition Exhibit 16 was marked.)

8  BY MR. O'REAR:

9     Q.  Direct your attention to Exhibit 16.  I'd like
10  you to turn to the second page.  There's an e-mail there
11  from Larry Blust to James Chardos dated November
12  the 6th, 2018.  That was the date you met with Memphis;
13  correct?

14        MR. LEMBKE:  Object to the form.  Lack of
15  foundation.

16        MR. O'REAR:  That November 6th, 2018, was the
17  date he met with Memphis?

18        MR. LEMBKE:  No.  You started the question by
19  talking about what's in this document, and you haven't
20  established that he --

21        MR. O'REAR:  I think we've --

22        MR. LEMBKE:  -- has seen the document.

23  BY MR. O'REAR:

24     Q.  I think we've establish that of November 6th,
25  2018, was the date you met with Memphis; correct?

Page 83

1     A.  That is correct, yes.

2     Q.  Now, this e-mail says, "Per Cliff Beach,
3  Bill Johnson is meeting with the Memphis City Council
4  this afternoon and will not make up his mind until after
5  that meeting."

6        And have you seen this e-mail or not?

7     A.  I don't have any recollection of seeing this.

8     Q.  Okay.  But is it a true statement that you had
9  indicated that you were not going to make up your mind
10  regarding the extension to May of 2019 until after you
11  met with the City of Memphis?

12        MR. LEMBKE:  Objection.  Lack of foundation.

13        THE WITNESS:  No.

14  BY MR. O'REAR:

15     Q.  That's not a correct statement?

16     A.  That's not a statement I ever made to anybody.

17     Q.  Okay.  Is that a true statement, whether you
18  made it or not?

19     A.  No.

20     Q.  All right, sir.

21        (Deposition Exhibit 17 was marked.)

22  BY MR. O'REAR:

23     Q.  Now, directing your attention to Exhibit 17,
24  you see that this is an e-mail from Clifford Beach to
25  Larry Blust copied to Chris Chandler and Sherry Quirk

Page 84

1  subject "License transfer discussion date November 9,
2  2018."  The cover e-mail says:  "Larry, as promised, are
3  several bullets relating to our recent discussion.
4  Cliff Beach."

5        And you can see that there is an attachment to
6  that e-mail on the second page; right?

7        MR. LEMBKE:  Object to the form.  Lack of
8  foundation.

9        THE WITNESS:  There is an attachment.

10  BY MR. O'REAR:

11     Q.  All right.  Let me -- I'll let you read the
12  attachment.  I want to ask you some questions about it.

13        All right, sir.  Now, this attachment addresses
14  issues and contentions relating to the transfer of the
15  construction permits; correct?

16        MR. LEMBKE:  Object to the form.  Lack of
17  foundation.

18        MR. O'REAR:  He can read it and answer that.

19        MR. LEMBKE:  Caine, you know it's not proper to
20  put a document in front of a witness and just ask him
21  questions about what it says if he's never seen it
22  before.

23        MR. O'REAR:  I think it's perfectly proper.

24        MR. LEMBKE:  That's the basis of the objection.

25        MR. O'REAR:  He's seen it now.

Page 85

1    MR. LEMBKE:  Same objection.

2    THE WITNESS:  The document is entitled "NRC

3  License Transfer Requirements" and is a recitation for

4  the legal requirements for license transfer.

5  BY MR. O'REAR:

6    Q.  Are you aware of any communication from TVA to

7  Nuclear Development regarding the license transfer

8  requirements and a concern over closing if the

9  construction permits had not transferred before closing

10  that preceded this communication?

11    A.  I don't recall.

12    MR. LEMBKE:  Object to the form.  When you say

13  "communication" do you mean written or --

14    MR. O'REAR:  This e-mail.

15    MR. LEMBKE:  But when you said are you aware of

16  any communication to Nuclear Development, are you saying

17  written or verbal --

18    MR. O'REAR:  Either.

19    MR. LEMBKE:  -- or any type?

20    MR. O'REAR:  Yeah, any.

21    THE WITNESS:  I don't recall any.

22    (Deposition Exhibit 18 was marked.)

23    MR. BLUST:  This is 17; right?

24    MR. O'REAR:  18.

25    MR. BLUST:  18.

Page 86

1  BY MR. O'REAR:

2    Q.  Directing your attention to Exhibit 18, this is

3  from the records of TVA.  It is an e-mail relating to

4  the amendment to the agreement that we discussed earlier

5  in the deposition providing for an extension from

6  November 14 to November 30, 2018, of the closing.

7    Do you see that?

8    A.  Yes.

9    Q.  Okay.  And do you note that the third through

10  fifth pages reflect the agreement?  Do you agree that

11  that is the first amendment as signed by TVA and Nuclear

12  Development?

13    A.  That is what it appears to be, yes.

14    Q.  If you would look at the first page in the top

15  e-mail and just help us identify everyone there.

16    Jack McCall or Nick McCall, he's with the legal

17  department; is that correct?

18    A.  He is.

19    Q.  Okay.  Lori Melton Hunt, who is she?

20    A.  I do not know.

21    Q.  Kendra Mansur?

22    A.  She's in the legal department.

23    Q.  Norman Stuart?

24    A.  Don't know Norman.

25    Q.  Michael Tindle?

Page 87

1    A.  I believe Michael's in the legal department.

2    Q.  Okay.  And Clifford Beach, of course?

3    A.  Clifford is legal department, yeah.

4    Q.  Okay, sir.  And, again, it was your testimony

5  earlier that the purpose of this amendment was because

6  you had taken time to consider Nuclear Development's

7  request for an extension, and you wanted to give them

8  back some time and agreed to give them back 16 days on

9  the extension; is that right?

10    A.  That's right.  It was something worth

11  considering and considering seriously.  I had to take a

12  trip to London in the middle of it, and so it just

13  seemed like the fair thing to do.

14    Q.  So the purpose of this extension and this

15  amendment was not to give TVA more time to figure out

16  whether this transaction was legal or illegal?

17    A.  We certainly continued to study it during this

18  period.  We had gotten a significant opinion of counsel

19  on the matter, but we certainly continued to study on it

20  and see if there was some way to do this.

21    Q.  When did you receive the opinion of counsel?

22    A.  I don't recall.  Somewhere November, October.

23  Somewhere in here.

24    Q.  Are you talking about -- are you talking about

25  outside counsel?

Page 88

1    A.  Yes.

2    Q.  You're talking about the Pillsbury law firm?

3    A.  Yes.

4    (Deposition Exhibit 19 was marked.)

5  BY MR. O'REAR:

6    Q.  Directing your attention to Exhibit 19.  Were

7  you aware --

8    MR. LEMBKE:  Is that part of the exhibit?  No.

9  BY MR. O'REAR:

10    Q.  Were you aware on or around November the 12th,

11  2018, that Nuclear Development had provided to TVA a

12  document which outlined a permissible regulatory path

13  forward under the NRC regulations for transferring the

14  Bellefonte site prior to the transfer of the

15  construction permits?

16    MR. LEMBKE:  Object to the form.  Lack of

17  foundation.  Misstates the document.

18    THE WITNESS:  I know there were discussions

19  going back and forth between the various lawyers on what

20  the requirements for license transfer were.  As to the

21  specifics of that, I don't have any recollection of it.

22  BY MR. O'REAR:

23    Q.  Were you aware that Nuclear Development was

24  taking the position that the construction permits did

25  not have to be transferred in order for the sale to be

William Johnson

Page 89

1  closed?
2       MR. LEMBKE:  Object to the form.  Lack of
3  foundation.
4       THE WITNESS:  I was aware of that, yes.
5  BY MR. O'REAR:
6       Q.  Okay.  Did you address an agencywide meeting of
7  TVA on November the 26th, 2018?
8       A.  Maybe.  I routinely had town hall meetings.
9       Q.  Okay.  Did you have one in late November?
10      A.  I don't recall.
11      Q.  Did you have one where at the end of the
12  meeting there were questions about Bellefonte and why we
13  were selling Bellefonte to Nuclear Development?
14      MR. LEMBKE:  Object to the form.  Lack of
15  foundation.
16      THE WITNESS:  Well, that was discussed at
17  several meetings.  So if there was a meeting in
18  November, that probably was a likely subject matter.  I
19  would take questions from employees.
20  BY MR. O'REAR:
21      Q.  And where were these town hall meetings held?
22  Where was the one in November held?
23      A.  They were typically held one of two places: in
24  the auditorium in Knoxville in the office or the
25  auditorium in Chattanooga in the office.  It would have

Page 90

1  been one of those two places.
2       Q.  And who was in attendance at the meeting in
3  November?
4       A.  Again, I'm not sure we had one in November.
5       Q.  Okay.
6       A.  But whoever showed up.  It was employees.
7       Q.  TVA internal?
8       A.  Yes.
9       Q.  Town meeting?
10      A.  TVA, yes.
11      Q.  Is that correct?
12      A.  Yes.
13      Q.  So everybody there was with TVA in some
14  capacity, as far as you know?
15      A.  Yes.
16      Q.  The invitees were TVA?
17      A.  Yes.  It was open invitation to employees, yes.
18      Q.  All employees --
19      A.  Every level.
20      Q.  -- at whatever level?
21      A.  And I would assume there would be some
22  contractors in there also.
23      Q.  And was this meeting videotaped?
24      A.  They typically were videotaped.
25      Q.  Do you recall who the moderator was for the

Page 91

1  meeting?
2       A.  Typically it was Janet Brewer.
3       Q.  And what role does she hold?
4       A.  She was the senior VP of communications, but I
5  think she recently retired.
6       (Deposition Exhibit 20 was marked.)
7  BY MR. O'REAR:
8       Q.  Just I would like to identify for the record
9  Exhibit 20.  You may or may not have seen this, but I'll
10  represent on the record that this is a photocopy of a CD
11  that was provided by TVA to Nuclear Development in the
12  course of this litigation.  It's designated as TVA
13  Number 9721 produced on September 19th, 2019.
14      Do you know whether that was, in fact, produced
15  by your counsel or not in this case?
16      A.  I don't have any idea.
17      MR. O'REAR:  All right.  Let's take a -- let's
18  go off the record for just a minute.
19      THE VIDEOGRAPHER:  The time is 11:08.  We're
20  going off the record.
21      (Off-the-record discussion was held.)
22      THE VIDEOGRAPHER:  The time is 11:25.  We're
23  back on the record.
24  BY MR. O'REAR:
25      Q.  Mr. Johnson, we're about to play a video clip

Page 92

1  of you speaking at a TVA town hall meeting on November
2  the 26th, 2018.  I'd like for you to look at this, and
3  then I'm going to ask you some questions about it.
4       Have you seen a transcript of these comments?
5       A.  No.
6       Q.  Okay.
7       A.  I'm not sure they're transcribed.  So. . .
8       Q.  But in prep -- did you review this video in
9  preparation for your deposition?
10      A.  No.
11      MR. LEMBKE:  Again, I instruct you not to
12  answer that question because it would reveal attorney
13  work product as to the content of what you reviewed for
14  your prep.
15  BY MR. O'REAR:
16      Q.  Regardless of whether for the preparation of
17  your deposition or not, have you ever reviewed a video
18  of this meeting since the comments were made at the
19  meeting?
20      MR. LEMBKE:  Same instruction.
21      THE WITNESS:  I'll follow the instruction.
22  BY MR. O'REAR:
23      Q.  Okay.  Just refuse to answer that?
24      A.  (Witness nods head.)
25      Q.  Okay.  But you don't think there's a transcript

William Johnson

Nuclear Development, LLC vs.
Tennessee Valley Authority

Page 93

1  of it as far as you know?
2      A.  I would doubt it.  I probably had some written
3  comments when I started that I didn't follow because I
4  never did.
5      Q.  Okay.  All right.  All right.  We have marked
6  the video CD as Exhibit 20.  It's not the actual CD,
7  which I have possession of.  I assume TVA has possession
8  of it.  I've just marked a photocopy of it.  We're going
9  to mark the flash drive that we're about to play of the
10  entire meeting which contains the entire meeting, but
11  we're only going to display the part that I'm going to
12  ask you some questions about.  We're going to mark that
13  as Exhibit 21.
14      So when we finish with that, just in terms of
15  chain of custody, I'm going to ask the videographer to
16  remove the flash drive.  We'll put an exhibit stamp on
17  it and give it to the court reporter.  All right?
18      Okay.  Let's watch the video now.
19      (Video playing; reported as follows):
20      "Lenita, do you have any questions?
21      "Yes.  Thank you.
22      "Oh, good.  This is my favorite part.
23      "Why continue to sell Bellefonte if the
24  potential buyer wants to take away our largest LPC to
25  make it work?  Why give an extension to provide more

Page 94

1  time to sell it off?
2      "Well, that's a great question.  So have I
3  explained to you the three rules of the universe?  Have
4  I ever told you this?  Some of you I have, and you're
5  shaking your head no, but I'm doing it anyways because
6  they apply to this situation.  Rule 1, it seemed like a
7  good idea at the time; Rule 2, no good can come from
8  this; and Rule 3 is even the intelligent way wouldn't
9  have worked.  So I think we got them all covered here.
10      "We're under a lot of pressure to do something
11  with the plant to sell it.  We thought it was a good
12  idea, put it into productive use, and knew we would
13  compete for load, and that's not really what ticked us
14  off in Memphis.  What ticked me off in Memphis was our
15  former colleague Bill McCollum standing up and saying
16  you should do this nuclear deal, but even if you don't,
17  you should leave TVA and go to MISO or Entergy 'cause
18  those are both better deals than you're getting from
19  TVA.  To me, that crossed the line.
20      "Yeah, so what do you do?  Well, we gave them a
21  short extension because I ate into some of their time.
22  They have a closing date Friday.
23      "Uh-huh.
24      "Let's do a poll.  How many people think I
25  should give them another extension?  Okay.  So there's

Page 95

1  no extension.  And we'll see where we are at the close
2  of business Friday, but there's no more extension.  I do
3  think a lot of people have been misled about this.  The
4  idea that you can finish that plant, what they're really
5  saying, if you listening carefully, is they can finish
6  it for 3 and a half billion.  Be a pretty good trick.
7  What'd it take you to finish Watts Bar, Mike?
8      "4.7.
9      "4.7.
10      "It was further along.
11      "It was further along.  There was a plant
12  that'd been built dozens of times in this country and it
13  was our fourth of the same exact design.  This
14  Bellefonte has never been built in this country.  Built
15  once, ran a fuel cycle, shut down in 1987.  Never been
16  licensed here.  These are kind of a couple of the
17  reasons we decided we weren't proceeding.  It just
18  seemed undoable.
19      "So but it's time to call the question.  So
20  we'd be calling it on Friday.  I've already been to the
21  legal department today for two reasons.  One, that's
22  where my bathroom is on the sixth floor; but the more
23  important but less pressing question, to alert the
24  litigators that I'm sure we'll be a defendant by Monday.
25  So I'm sure we'll be sued about this.  If you study the

Page 96

1  players -- well, we'll be defendants on Monday.  That's
2  all I'm saying.
3      "So, Bill, there's a question that came in that
4  asked:  Do you think there's a real chance we could lose
5  MLGW as a customer as a result of all this?
6      "I don't think they'll go to Bellefonte.
7  I mean, J.T. Young been in the business a long time.  He
8  knows that's -- to put 80 percent of your power supply
9  in one asset, that seems like a big risk, but they have
10  other options.  So I'm confident our value proposition
11  to them is better than anybody's.  If you look at the
12  total package re economic development, community
13  support, whatever, I think we will continue the
14  80-some-year relationship.  They have options.
15      "And the point here is you should treat every
16  customer every day like they could leave you tomorrow.
17  You know, we slipped a little bit in Memphis over the
18  last couple years.  I was part of that.  But we've come
19  back in a pretty big way, and I think we're making
20  progress down there.  But every day just assume every
21  customer can leave you, and that'd probably inform your
22  decision-making a little bit.
23      "Just to build on the Bellefonte -- to build on
24  the Bellefonte question, some people have asked me and I
25  didn't know, the money that they put down, is that like

Page 93..96

William Johnson

**Nuclear Development, LLC vs.
Tennessee Valley Authority**

Page 97

1 earnest money in a house?  If you walk away, they lose
2 that money?  Does TVA get any of that money?
3      "So my understanding, subject to correction, is
4 that that is earnest money that we can keep.  To close,
5 they gotta pony up another 90 million.  There's a lot of
6 technical problems with them closing.  Mostly that they
7 don't have a permit from the NRC, so they can't actually
8 own the site which they think they can do later.  So I
9 think we can plan on keeping the 22.
10      "Another question --
11      "If they go away, I'd give it back to 'em.
12 How's that?  John's saying no, no.
13      "He's already spent that money.
14      "It's been an interesting discussion in senior
15 group.  Can they close?  What about the permit?  And all
16 John says is, do they have the cash?  Do they have the
17 cash?
18      "What else is on your minds?
19      "It's all good.
20      "No questions."
21      (End of video.)
22      MR. BLUST:  That's a great screen.
23 BY MR. O'REAR:
24      Q.  I'm going to ask you some questions about those
25 comments.  If you need to replay that to answer, I'll be

Page 98

1 happy to do that, okay?
2      A.  Yep.
3      Q.  So you had mentioned the moderator.  It might
4 have been a Ms. Brewer; is that correct?
5      A.  Yes.
6      Q.  What's her name?
7      A.  Janet Brewer.
8      Q.  Janet Brewer.  Was that Janet Brewer?
9      A.  In the dark suit, yes, dark hair, yes.
10      Q.  And do you know who asked the first question
11 from the audience, why continue to sell Bellefonte?
12      A.  So that came over the telephone or e-mail.
13 That was not somebody in the direct audience.
14      Q.  Okay.
15      A.  And the reason I said this is my favorite part.
16 The woman that reads those questions has a lovely voice.
17      Q.  All right, sir.  And is that Anita?
18      A.  It's not Anita.  Lenita.
19      Q.  Lenita?
20      A.  Yeah.
21      Q.  Okay.  Do you know who asked --
22      A.  No.
23      Q.  -- the substantive question?
24      A.  No.  No.
25      Q.  Okay.  But that would have been someone from

Page 99

1 TVA; right?
2      A.  Presumably.  I mean, it was on a TVA webcast
3 and call, yeah.
4      Q.  Were these questions set up in advance, or were
5 they just --
6      A.  No.
7      Q.  -- spontaneous?
8      A.  They're spontaneous.
9      Q.  When you said you've got three rules to the
10 universe and the first one was "it seemed like a good
11 idea at the time," so were you telling your group there
12 that the contract with Bellefonte seemed like a good
13 idea at the time it was signed but it no longer seemed
14 like a good idea?
15      A.  No.  I was having lighthearted banter with the
16 group.  It seemed like a good idea at the time, and it
17 was.
18      Q.  But it didn't seem like a good idea when you
19 were making those comments?  Is that what you were
20 saying?
21      A.  That's not what I was saying.
22      Q.  What were you saying?
23      A.  I was saying the three rules of the universe,
24 which I told them many times just as a way to have fun
25 with the group, seemed like a good idea at the time.  It

Page 100

1 did.  No good can come from this, meaning I'm pretty
2 sure we're going to get sued.  That's what it was about.
3      Q.  Now, were you going to get sued because you had
4 already decided at that point in time not to close the
5 transaction?
6      A.  I hadn't actually decided.  I was leaning that
7 way, but like most good lawyers, I'm going to wait till
8 the last moment to actually decide.  So. . .
9      Q.  Well, you said you were certain you were going
10 to get sued?
11      A.  Yeah.  Well, if we didn't close, I was certain
12 we were going to get sued, sure.
13      Q.  But you said we were going to get sued.  You
14 said, "I'm sure we were going to be sued about this."
15      So you were sure when you made the comments on
16 November 26th you were going to be sued, and you were
17 sure because you had decided at that point you were not
18 going to close; correct?
19      MR. LEMBKE:  Objection.  Misstates the
20 witness's testimony and argumentative.
21      THE WITNESS:  I was certain we were going to be
22 sued if we didn't close.  I had not yet finally decided
23 that we were not going to close because we were unable
24 to close legally.  I made that decision as late as
25 possible, but I certainly was leaning that way at the

**Page 97..100**

William Johnson

Nuclear Development, LLC vs.
Tennessee Valley Authority

**Page 101**

1   time.
2   BY MR. O'REAR:
3        **Q.  When did you make that decision?**
4        A.  The day before the extension ran out.
5        **Q.  The day before November 30th, which would have**
6   **been November 29th, 2018?**
7        A.  Yes.
8        **Q.  And then your third rule of the universe, "Even**
9   **the intelligent way wouldn't have worked," what does**
10  **that mean?**
11       A.  That's just the third rule of the universe.
12  Doesn't mean anything.
13       **Q.  Does that have any application at all to**
14  **Bellefonte?**
15       A.  No.  So one of the things that I like to do at
16  these events is have a little fun and make them laugh a
17  little bit.  So no, it had nothing to do with that.
18       **Q.  Now, you remain ticked off at Bill McCollum**
19  **based on your comments here; right?**
20       A.  I'm still ticked off with Bill McCollum.
21       **Q.  All right, sir.  Now, could you tell the Court**
22  **who you're referring to when you say MISO?**
23       A.  MISO is the Midwest Independent System
24  Operator.
25       **Q.  And who is Entergy?**

**Page 102**

1        A.  Entergy is a large integrated invest-your-own
2   utility in the south headquartered in Louisiana but in a
3   number of states.
4        **Q.  And where is MISO headquartered?**
5        A.  MISO is a conglomeration of dozens of entities
6   in the Midwest.  I think they're actually in --
7   headquartered in maybe Arkansas.
8        **Q.  Little Rock?**
9        A.  Maybe in Little Rock.
10       **Q.  Is Entergy part of MISO?**
11       A.  They're either part of MISO or the Southwest
12  Power Pool.  They were in one and went to the other, And
13  I can't remember which direction they went.
14       **Q.  And so you said Bill McCollum crossed the line**
15  **when he suggested that Memphis should leave TVA and go**
16  **to MISO or Entergy because those are better deals?**
17       A.  In my opinion, yes.
18       **Q.  Okay.  And you were ticked off about that when**
19  **he made comments that you attribute to him to the**
20  **Memphis City Council back in October of 2018?**
21       A.  I think it is inappropriate to make those kind
22  of comments about your former employer who's paying your
23  retiree, and you have nothing to benefit other than to
24  injure TVA.  I think that's highly inappropriate.
25       **Q.  Now, you asked the audience to do a poll on**

**Page 103**

1   extension.  You gave them about a half second to vote,
2   and then you said no extension; correct?
3        A.  Right.  That's what the video said.
4        **Q.  So you had decided at that point in time that**
5   **there would be no extension granted to TVA -- excuse**
6   **me -- to Nuclear Development pursuant to their request**
7   **to extend the closing to May 2019; right?**
8        A.  That's not --
9             MR. LEMBKE:  Objection.  Asked and answered.
10            THE WITNESS:  That's not true.
11  BY MR. O'REAR:
12       **Q.  Well, you said, "No extension.  Okay, so there**
13  **is no extension."**
14       A.  Well, if --
15       **Q.  So -- go ahead.**
16       A.  If you think I make decisions based on a poll
17  of employees, you don't know much about the subject
18  matter.  You have mis-estimated me.
19       **Q.  No, I don't really think you made it based on**
20  **that poll.**
21       A.  No.
22       **Q.  But I do think you had made the decision at**
23  **that time because you said, "Okay, no extension."**
24            MR. LEMBKE:  I object to the form.  There's no
25  question there.  This is not a forum for statements by

**Page 104**

1   counsel.
2   BY MR. O'REAR:
3        **Q.  Had you made the decision at that time --**
4             MR. LEMBKE:  Move to strike.
5   BY MR. O'REAR:
6        **Q.  -- not to grant the extension?**
7        A.  No.
8        **Q.  When you said, "I do think that a lot of people**
9   **have been misled about this," what were you referring**
10  **to?**
11       A.  Several things.  The ease of Memphis going to
12  MISO, the price of power out of MISO, the ease of
13  construction of Bellefonte.  How the power would
14  actually get from Bellefonte to Memphis I think required
15  a lot of misinformation floating around about this.
16       **Q.  Well, what were you referring to when you said,**
17  **"A lot of people have been misled"?  Who had been**
18  **misled?**
19       A.  Members of the public.
20       **Q.  Were you specifically talking about Memphis**
21  **officials?**
22       A.  They would certainly be included in that group,
23  yes.
24       **Q.  And who was doing the misleading?**
25       A.  Mr. McCollum.  Other people who had been hired.

**Page 101..104**

Page 105

1  I don't know who they were, but things would pop up
2  about here's a study you can go to MISO and get power
3  for half the price, and it's just not true.  So. . .
4      **Q.  Well, as specifically as you can recall, what**
5  **were you referring to when you said that Memphis had**
6  **been misled by Mr. McCollum or anyone on behalf of**
7  **Nuclear Development?**
8      MR. LEMBKE:  Object to the form.  That
9  misstates the evidence.  He never said that.
10 BY MR. O'REAR:
11     **Q.  Do you believe Memphis had been misled by**
12 **Mr. McCollum?**
13     A.  Yes, sir.
14     **Q.  All right.  And what did he say that misled**
15 **Memphis?**
16     A.  How easy it would be and how cheap it would be
17 to go to MISO and that TVA -- that Memphis would be
18 better off with anybody other than TVA.  I think those
19 are quite misleading.
20     **Q.  Okay.  And is that based on what he stated at**
21 **that meeting that we've described earlier in this**
22 **deposition?**
23     A.  Yes.  And in subsequent media articles.
24     **Q.  Okay.  In media articles?**
25     A.  (Witness nods head.)

Page 106

1      **Q.  All right, sir.  Which you believe to be**
2  **misleading to the City of Memphis?**
3      A.  Yes, sir.
4      **Q.  When you said, "It's time to call the question.**
5  **We will be calling in on Friday," did that mean you're**
6  **not closing on Friday of that week --**
7      A.  No.  That was about the --
8      **Q.  -- which, Friday was November 30th?**
9      **Excuse me.**
10     A.  That was the date the extension ran out or was
11 extended.  That was the question we were calling.
12     **Q.  The second question was from a woman in the**
13 **audience who was seated and pictured on the video.  Do**
14 **you know who that was?**
15     A.  No.
16     **Q.  The focus of -- her question was there's a**
17 **question -- or excuse me.**
18     The moderator said, "There's a question that
19 came in that asked, do you think there's a real chance
20 we could leave MLGW as a customer as a result of all
21 this?"
22     The first question from the audience, excuse
23 me, was the -- excuse me.  That's the third one.
24     So the first two questions related to Memphis
25 from this group; correct?

Page 107

1      A.  Yes, as I recall.
2      **Q.  You said you'd slipped a little bit in Memphis**
3  **over the last couple of years and you were part of that.**
4      **Did that mean you had not paid due attention to**
5  **the City of Memphis as a customer?**
6      A.  We paid a lot of attention, but we obviously
7  hadn't paid enough attention if they started considering
8  their options to do other things.
9      **Q.  The third question from the audience was from**
10 **the lady depicted on the video about the down payment.**
11 **And, again, do you know who that lady was?**
12     A.  No.
13     **Q.  Okay.  And she asked, "If you walk away, they**
14 **lose that money.  Does TVA get any of that money?"**
15     **And your response was "yes"; right?**
16     MR. LEMBKE:  Object to the form.  Yes what?
17 The question is vague.
18     You can answer it if you understand it.
19     THE WITNESS:  My response was what I said on
20 the video.
21 BY MR. O'REAR:
22     **Q.  All right.  Which was?**
23     A.  That my understanding is that that was like
24 earnest money that contractually TVA could keep, and I
25 was subject to correction, as I recall.  I don't know.

Page 108

1      **Q.  Did you describe the lack of a permit from the**
2  **NRC as a technical problem with the closing?**
3      A.  I did.
4      **Q.  Now, when the moderator said and you**
5  **commented -- John is your CFO; is that correct?**
6      A.  Yeah.  The John I referenced there is a CFO.
7      **Q.  John Thomas?**
8      A.  John Thomas.
9      **Q.  And he was sitting in there at the meeting?**
10     A.  Yes.
11     **Q.  And he -- was he saying, "No, no"?**
12     A.  No.  I was just having fun there.  He was
13 always a good subject of a little entertainment in those
14 meetings.
15     **Q.  The moderator -- the moderator said, "He's**
16 **already spent that money."**
17     A.  Yeah.
18     **Q.  Is that true?**
19     A.  It's true she said that.  It's not true that he
20 had spent it.
21     **Q.  Okay.  All right.  Then you said, "There's been**
22 **an interesting discussion in the senior group."**
23     **Is that the group that we were discussing --**
24     A.  Yes.
25     **Q.  -- earlier?**

Page 109

1   A. Yes.

2   Q. The executive management council?

3   A. Yeah.

4   Q. And the interesting discussion in the senior

5   group, was that discussion among all those people that

6   you named earlier in the deposition?

7   A. I'm sure there was casual conversation in the

8   entire group. There are people in that group who would

9   have been more involved in it.

10   Q. When you said, regarding the down payment of

11   $22 million, "If they'd go away, I'd give it back to

12   them," did you want to unwind the deal at that time?

13   A. No. I wanted to close the deal, but I was

14   making a joke, lighthearted. I actually wanted to close

15   the deal.

16   Q. Well, you didn't -- if you wanted to close the

17   deal, you didn't consent to the transfer of the

18   construction permits, did you?

19   A. We did not.

20   Q. You didn't consent to the request for

21   extension, did you?

22   A. Not the six-month extension.

23   Q. How did that help closing the deal?

24   A. As I said earlier, the request for an extension

25   to get the permits was going to take longer than six

Page 110

1   months, and I think that's proven to be true since the

2   permits haven't been issued yet and the application was

3   found to be insufficient, which was exactly the problem

4   I was anticipating, that this could go on for years and

5   wouldn't be resolved in any timely manner.

6   Q. Did your CFO want to close the deal?

7   A. He wanted us to live by the contract. He

8   didn't really have a view on the whole issue.

9   Q. Well, you said in the meeting, "All John says

10   is, do they have the cash? Do they have the cash?"

11   A. Yeah. Joke with your CFO in front of the

12   troops. I'll tell you, 90 million in the context of

13   that enterprise wasn't going to move the needle very

14   much.

15   Q. Was that peanuts to TVA?

16   A. Not peanuts but, you know, it's a big

17   enterprise.

18   Q. After this town meeting, did you have a phone

19   conversation with Franklin Haney?

20   A. I don't recall, but I assume I did.

21   Q. Do you recall getting his cell number and

22   calling him on his cell phone during the week, this week

23   and specifically two days after the town meeting on

24   November the 28th, 2018?

25   A. I don't recall specifically calling him. I

Page 111

1   know I did close the loop on the request for the six

2   months with him. But how I got his cell phone or any of

3   that, I don't recall.

4   Q. Do you recall finding out that Nuclear

5   Development was in Memphis meeting with Memphis City

6   officials on November the 28th?

7   A. I don't recall that.

8   Q. Do you recall calling Mr. Haney on November

9   the 29th after you learned that they were in Memphis

10   meeting with Memphis officials on the 28th?

11   A. I don't recall that.

12   Q. You don't recall that conversation?

13   A. (Witness shakes head.)

14   Q. Do you recall being angry with Mr. Haney in a

15   phone conversation over Nuclear Development meeting with

16   the City of Memphis?

17   A. I don't recall that.

18   Q. But you do recall telling him you wouldn't

19   extend the closing date; is that right?

20   A. I do recall, yes, closing the loop on that.

21   But the extent of the conversation or anything else, I

22   don't recall.

23   Q. Did Mr. Haney tell you that Nuclear Development

24   was ready to close on the closing date of November 30,

25   2018?

Page 112

1   A. I don't recall him telling me that. But. . .

2   Q. But what?

3   A. I just don't have any recollection of that.

4   Q. Do you recall Mr. Haney telling you that they

5   had the finances lined up and they were ready to wire

6   the funds on the closing?

7   A. I don't recall that.

8   Q. Do you recall that TVA received an opinion

9   letter from the Pillsbury firm regarding this issue of

10   the transfer of the permits?

11   A. I do recall this.

12   Q. Do you know when TVA received that letter?

13   A. October or November, I would think, of 2018.

14   Q. Did you ever see that letter?

15   A. I did.

16   Q. Did you read it?

17   A. I did.

18   Q. Did you read it the day it came in?

19   A. I don't -- I don't recall that.

20   MR. O'REAR: Okay. Does anyone need to look

21   back at the video? I'm not going to ask any further

22   questions about the video. All right. Let's pull the

23   flash drive out. Just to keep this on the record, if we

24   could. And I'm marking the flash drive as Exhibit 21.

25   ---o0o---

Page 113

1     (Deposition Exhibit 21 was marked.)
2     MR. O'REAR:  And it's also got the Bates number
3  of the CD on it.  I'm handing it to the court reporter.
4     22.
5     (Deposition Exhibit 22 was marked.)
6  BY MR. O'REAR:
7     **Q.  You have before you Exhibit 22.  Is that the**
8  **letter you were referring to received from the Pillsbury**
9  **firm?**
10    A.  Yes.
11    **Q.  Do you see a date on that letter?**
12    A.  I do not.
13    **Q.  Do you know why it's undated?**
14    A.  I do not.
15    MR. AYLIFFE:  Caine, is that Exhibit 21 or 22?
16    MR. O'REAR:  22.
17    MR. LEMBKE:  21 is the flash drive.
18    MR. AYLIFFE:  Flash drive itself?  Okay.  Got
19  it.
20    (Deposition Exhibit 23 was marked.)
21  BY MR. O'REAR:
22    **Q.  Directing your attention to Exhibit 23.  This**
23  **is an e-mail from Cliff Beach in TVA's law department to**
24  **Larry Blust and copied to Sherry Quirk dated**
25  **November 28th, 2018.**

Page 114

1     **Now, this letter, this e-mail says from**
2  **Mr. Beach, "We did receive an unequivocal opinion from**
3  **Pillsbury today opining that ND's acquisition of the**
4  **site would be unlawful under the act."**
5     **Do you have any reason to believe the letter**
6  **did not get received by TVA on Wednesday, November**
7  **the 28th, 2018?**
8     MR. LEMBKE:  Object to the form.  Lack of
9  foundation.
10    THE WITNESS:  I have no reason to believe or
11  disbelieve it.
12  BY MR. O'REAR:
13    **Q.  Do you have any reason to believe that this**
14  **letter was delivered and that you reviewed it prior to**
15  **November 28th, 2018?**
16    A.  I don't -- I can't recall that.
17    **Q.  Do you have any reason to believe that you did**
18  **review it prior to that date?**
19    A.  I -- I can't tell you when I reviewed it.  I
20  know I reviewed it.  I reviewed it shortly after we got
21  it.  When exactly that was, I can't recall.
22    (Deposition Exhibit 24 was marked.)
23  BY MR. O'REAR:
24    **Q.  You have before you Exhibit 24 which is a**
25  **letter on TVA letterhead addressed to Nuclear**

Page 115

1  **Development and Mr. Blust signed by Sherry Quirk,**
2  **general counsel.**
3     **Have you seen that letter before?**
4     A.  Yes.
5     **Q.  Okay.  And this is the letter whereby TVA**
6  **advised Nuclear Development that they would not close**
7  **the transaction on the next day; correct?**
8     A.  That's correct.
9     **Q.  And did you make the decision that is reflected**
10  **in this letter that TVA would not close the transaction**
11  **the next day, November 30th, 2018?**
12    A.  I made the decision that TVA could not lawfully
13  close the transaction on that day.
14    **Q.  Did you direct Ms. Quirk to send this letter?**
15    A.  I don't know if I directed her, but I certainly
16  approved it.
17    (Deposition Exhibit 25 was marked.)
18  BY MR. O'REAR:
19    **Q.  Now, I believe you said with respect to the**
20  **letter marked as Exhibit 24 that you made the decision**
21  **not to close the transaction because it would be illegal**
22  **to do so or violate the law; is that what you said?**
23    A.  That is what I said.
24    **Q.  All right.  Now, directing your attention to**
25  **Exhibit 25.  Were you aware that the next day, on**

Page 116

1  **November 30, Mr. Blust as counsel for Nuclear**
2  **Development sent a letter to Ms. Quirk and to David Nix**
3  **essentially rebutting her letter and taking the position**
4  **that it was not illegal to close the transaction on**
5  **November 30th, 2018?**
6     MR. LEMBKE:  Object to the form.  Lack of
7  foundation.  Misstates the exhibit.
8  BY MR. O'REAR:
9     **Q.  Did you ever see this letter?**
10    A.  Yes.
11    **Q.  So you were aware of the position taken in the**
12  **letter?**
13    A.  Yes.
14    **Q.  You either read it or were informed about it?**
15    A.  I read it.
16    **Q.  On November 30, the day of the closing?**
17    MR. LEMBKE:  Mister -- no objection.
18    THE WITNESS:  I read the letter.
19  BY MR. O'REAR:
20    **Q.  Did you take the letter into consideration in**
21  **making the decision that TVA would not close the**
22  **transaction on November 30?**
23    A.  I read the letter before we decided we couldn't
24  lawfully close the transaction.
25    **Q.  Okay.  So you took into account Nuclear**

Page 113..116

Page 117

1 Development's position on this when you made that
2 decision?
3     A. I read what they wrote.
4     Q. As reflected in this letter?
5     A. Yes.
6     Q. Okay. And you took that into account?
7     A. I certainly considered it.
8     Q. Did you take the decision or your
9 recommendation that TVA not close this transaction to
10 the board of directors?
11     A. I can't recall exactly doing that, but I'm
12 certain that I did because this is the kind of thing I
13 would always run by the board.
14     Q. Did you do that in an official board meeting?
15     A. No.
16     Q. When you say "run by the board," what do you
17 mean?
18     A. Well, there could be e-mails or phone calls or
19 things like that.
20     Q. With individual board members?
21     A. I don't recall exactly how it occurred.
22     Q. Are you speculating there were e-mails or phone
23 calls, or are there e-mails or phone calls --
24     A. Well, I don't --
25     Q. Excuse me. Were there e-mails or phone calls

Page 118

1 where you discussed with members of the board of
2 directors your decision not to close the transaction on
3 November 30, 2018?
4     A. I do not know if there are e-mails or records
5 of this. I do know as a general practice this is the
6 kind of thing I would have informed the board about.
7     Q. Do you -- can you identify any specific board
8 member that you discussed this with?
9     A. I can't recall the specifics of this, no.
10     Q. Now, your one-on-one discussion with individual
11 board members does not constitute official action by the
12 board, does it?
13     A. No.
14     Q. The board has to act at a meeting properly
15 called where a quorum is present and a requisite vote is
16 made; correct?
17     A. Correct.
18     Q. Did any of that happen with respect to the
19 decision to not close the transaction with Nuclear
20 Development as contracted on November 30, 2018?
21     A. No. That's a decision in the hands of
22 management.
23     MR. LEMBKE: Object to the form of the
24 question. It misstates and assumes facts not in
25 evidence. Misstates the evidence.

Page 119

1 BY MR. O'REAR:
2     Q. So was that a decision that ultimately you made
3 personally?
4     A. Yes.
5     Q. Does TVA -- and I don't know. You may know
6 whether Tennessee is a one-consent state or two-consent
7 state in terms of recording phone conversations.
8     A. I --
9     Q. Do you know?
10     A. I don't know and I've --
11     Q. Let me ask you.
12     A. -- never recorded a phone conversation.
13     Q. Okay. That's one of my -- did you record any
14 of these phone conversations you've had with
15 representatives of Nuclear Development?
16     A. No. No.
17     Q. To your knowledge, does TVA have a practice of
18 recording phone conversations with outside parties?
19     A. I know of no such practice, but I also don't
20 know of any phone call ever being taped.
21     Q. Do you know if there are any recordings of
22 phone conversations with representatives of Nuclear
23 Development or representatives of the NRC regarding
24 Bellefonte and the construction permit transfer issue?
25     A. I know of no such recordings. I've never heard

Page 120

1 of any.
2     MR. O'REAR: Let's take a break.
3     THE VIDEOGRAPHER: The time is 12:03. We're
4 going off the record.
5     (Break taken at 12:03 p.m.)
6     THE VIDEOGRAPHER: The time is 12:11. We're
7 back on the record.
8     MR. O'REAR: Those are all the questions I have
9 right now. I'll pass the witness. And I do reserve the
10 right to re-call the witness and reconvene the witness
11 in the event that there are privileged documents that
12 involve this witness that are deemed by the Court to be
13 not privileged that I could discuss with the witness and
14 would have discussed with the witness had they not been
15 marked privileged.
16     Do you have any questions?
17     MR. LEMBKE: Yes.
18 EXAMINATION BY MR. LEMBKE:
19     Q. Will you state your name for the record again,
20 please.
21     A. William Dean Johnson.
22     Q. And, Mr. Johnson, in what city do you live?
23     A. I live in San Francisco, California.
24     Q. And what is your current position at which
25 you're employed?

William Johnson

Page 121

1     A.  President and chief executive officer of PG&E
2  Corporation.
3         Q.  And PG&E is Pacific Gas and Electric?
4     A.  That is the common term, yes.
5         Q.  Okay.  And prior to your current -- prior to
6  your current position at PG&E, what position did you
7  hold?
8     A.  I was the president and chief executive of the
9  Tennessee Valley Authority from January 2013 until May
10  of 2019.
11        Q.  And your office was in Knoxville, Tennessee?
12     A.  Yes.  Knoxville, Tennessee.
13        Q.  And prior to your time as CEO of TVA, where did
14  you work?
15     A.  I spent 20 years at a company called Progress
16  Energy and was the CEO there the last five or six years
17  of that.
18        Q.  Now, when you arrived at TVA in January of
19  2013, what was the status of the Bellefonte Nuclear
20  Plant project?
21     A.  It was in some form of being rebuilt, but it
22  was behind Watts Bar 2, which was the nuclear plant that
23  was being reconstructed.  So the TVA board had approved
24  the restart of Bellefonte, but not a lot was happening
25  there because all the focus was on Watts Bar 2.  But it

Page 122

1  was in the capacity plan, and there was some money being
2  spent on it every year.
3         Q.  And did you undertake an analysis of what
4  should happen going forward with the Bellefonte plant?
5     A.  Yes.  As part of a bigger analysis, looking at
6  the load shape, what demand was going to be, and the
7  asset mix, I looked at all the plants and we determined
8  that TVA wouldn't need the Bellefonte plant until
9  sometime well into the future, maybe in 2040 range.  And
10  so based on that, I went to the board and suggested that
11  we should halt the project entirely because we wouldn't
12  need it for the next 30 years.
13        Q.  And when that decision -- let me put it this
14  way.
15        Did you present that recommendation to the TVA
16  board?
17     A.  I did.
18        Q.  And what was the recommendation?
19     A.  The recommendation was to essentially cancel
20  the restart of the Bellefonte units because there was no
21  need for 'em.  The price was too high for the capital
22  budget TVA had, and there were much more economic
23  options.
24        Q.  Did you assess how Bellefonte compared or fit
25  in to TVA's overall mission?

Page 123

1     A.  Yes.  Demand changed over time.  TVA had six
2  nuclear plants, was building a seventh one, and so it
3  had more base load capacity than it needed and certainly
4  didn't need to add any more big units to meet the shape
5  of customer demand.
6         Q.  All right.  In making the recommendation to the
7  board to dispose of the Bellefonte property, did you
8  have any concern about potential competition from
9  whomever purchased the Bellefonte site?
10     A.  No.
11        MR. O'REAR:  Objection.  Asked and answered.
12        THE WITNESS:  There were actually two separate
13  discussions.  We canceled the restart of the plant
14  before we got to the conversation of it being surplus
15  property.
16  BY MR. LEMBKE:
17        Q.  Okay.  So did -- so you're saying there were
18  two decisions made by the board?
19     A.  That's correct.
20        Q.  Okay.  Now, when the decision came up, how long
21  after the first decision to remove it from the plan did
22  the decision get made to declare it surplus property
23  roughly?
24     A.  I think it was on the order of 18 months or two
25  years.

Page 124

1         Q.  Okay.  Now, was the decision to bid on the
2  Bellefonte property the first exposure you had to
3  Franklin Haney or Nuclear Development in connection with
4  the Bellefonte site?
5     A.  No.
6         Q.  Tell me what your first interaction with
7  Mr. Haney or Nuclear Development was in connection with
8  the Bellefonte site.
9     A.  So after the board decided that we could cancel
10  the restart of that unit, Mr. Haney contacted me and was
11  interested in financing the project and also exerted
12  significant political pressure to try to make TVA do the
13  project.
14        Q.  So in terms of financing, are you saying that
15  that would have caused it to come back onto the active
16  project mode is what he wanted?
17        MR. O'REAR:  Objection.  Leading.
18  BY MR. LEMBKE:
19        Q.  When Mr. Haney was proposing financing, it was
20  financing for what?
21     A.  For the construction of the Bellefonte units.
22        Q.  And if -- if TVA had -- why would TVA have need
23  for financing of the Bellefonte project?
24     A.  Well, we were -- we have TVA statutory debt cap
25  of 30 billion.  At that point the debt was about

**Page 121..124**

Page 125

1   27 billion.  And so if you were going to do the project,
2   having some other funding source might have been
3   helpful.  But it wasn't the financing part of it that
4   made us to decide to stop the project.  It was the fact
5   that there was no need for the project.
6       Q.  And how did you evaluate Mr. Haney's financing
7   proposal?
8       A.  I basically told him we weren't interested, but
9   he then exerted a lot of pressure that ended up with us
10  in a public hearing before Senators Corker and Alexander
11  and Congressman Jimmy Duncan to hash out in public
12  whether there was actually a need for the asset.  So I
13  went to a meeting at the Baker Center and explained to
14  those elected officials how load forecasting works.
15      Q.  And what was the ultimate determination made as
16  to Mr. Haney's financing proposal?
17      A.  Well, TVA continued to conclude that we didn't
18  need the asset no matter how it was being financed, and
19  that was the decision and that decision continued.
20      Q.  And did that decision predate the
21  recommendation to declare Bellefonte as surplus
22  property?
23      A.  Yes.
24      Q.  All right.  Prior to the determination to
25  declare Bellefonte a surplus property, do you recall

Page 126

1   having any other engagement with Franklin Haney or
2   Nuclear Development about the Bellefonte site?
3       A.  Yes.  Mr. Haney subsequently contacted me and
4   told me they were -- and this was before the formation
5   of the entity I think -- interested in acquiring and
6   completing the plant as a -- sort of like a speculative
7   housing build -- that's not the right word, but that's
8   the best -- that they would build it and be the owners.
9       Q.  And do you remember anything else about that
10  discussion by Mr. Haney?
11      A.  Yes.  I remember we were called to a meeting in
12  the office of the Governor of Alabama, whose name I've
13  forgotten, but he's no longer the governor, where this
14  was discussed among many parties.  And the Governor of
15  Alabama exerted significant -- well, he was very
16  interested in Mr. Haney acquiring the property and
17  finishing the plant is the way to say that, and he made
18  his interest known.
19      Q.  And was that meeting prior to the determination
20  by the board to declare it to be surplus property?
21      A.  It was prior to that determination, but we had
22  started thinking by that time about declaring it surplus
23  and trying to do something productive with it.
24      Q.  And was there a particular ask by Mr. Haney in
25  the context of those conversations?

Page 127

1       A.  There was some ask, like could we avoid a bid
2   process and just do a straight sale, things like that,
3   but there were no other asks at that time.
4       Q.  Okay.  And then after TVA made -- the board
5   made the determination to declare Bellefonte to be
6   surplus property, what, if any, interaction did you have
7   with Franklin Haney or Nuclear Development?
8       A.  Well, after that decision by the board,
9   Mr. Haney was quite interested.  So we had a lot of
10  interaction with him and Mr. Blust and others, how would
11  it work?  We were going to have to do a bid which we
12  were required to do as a federally owned entity.  So it
13  was a high level of interest in how the process would
14  work and how long it would take, those kind of things.
15      Q.  Now, back to the recommendation you made to
16  declare Bellefonte to be surplus property.  Were you
17  concerned about competition from a party that might
18  acquire the Bellefonte site?
19      A.  "Concern" is too strong a word, but it
20  certainly was a risk that I considered, that the board
21  considered, we all considered.  Over the years a number
22  of merchant plants have been built inside the TVA
23  footprint, and so this has happened before.
24      But my conclusion was that the TVA value
25  proposition and the price proposition would be hard for

Page 128

1   anybody to match.
2       Q.  And why did you reach the conclusion that the
3   value and price proposition would be difficult for any
4   acquiring party to match?
5       A.  Well, TVA has a low price.  It does
6   tremendous -- I mean, very low price.  Tremendous amount
7   of economic development that goes along with the low
8   price.  Excellent community partner.  And so I think the
9   combination of all those things, plus the long-term
10  history of the public power movement of people sticking
11  together, that's just a hard proposition to beat.
12      And you -- if you think, for example, about a
13  new nuclear plant, the price of one nuclear plant
14  compared to a system average cost, that would be very
15  hard to match.
16      Q.  And were there any particular factors that
17  would have made it difficult for any acquiring party of
18  the Bellefonte plant that developed it into a nuclear
19  plant to compete cost-wise?
20      MR. O'REAR:  Are you asking him what his
21  thoughts were on that?
22      MR. LEMBKE:  Yes.
23      MR. O'REAR:  Okay.  I'm sorry.
24      THE WITNESS:  Certainly the cost of building a
25  nuclear plant, which I have a lot of experience with it,

Page 129

1  it always costs you a lot more than you think it's going
2  to.  So I think the price is just a difficult thing to
3  do.  Transmission access was another thing.
4  BY MR. LEMBKE:
5      Q.  What does that mean?
6      A.  Well, the -- how do you get the power from the
7  plant to a customer?  You need to have a transmission
8  line to do that.  The TVA Act in its amendments prohibit
9  people using the TVA transmission system to serve TVA
10  customers.  So in addition to the cost of the plant,
11  whatever plant, you have to pay for transmission.  Those
12  are expensive propositions.
13      Q.  Now, did you write the contract with Nuclear
14  Development?
15      A.  No.
16      Q.  And were you involved in any way in drafting
17  it?
18      A.  Not in the drafting, no.
19      Q.  All right.  Did you have any view of the
20  two-year period from the execution of the contract to
21  closing?
22      A.  Yes.
23      Q.  What was that view?
24      A.  Again, our interest was economic development
25  opportunity in a part of Alabama that really needs it.

Page 130

1  And so I wanted to make sure that things were going to
2  happen quickly, and I was really concerned about an
3  open-ended process that just dragged on.  So -- but when
4  I understood why the two-year was asked for, then I was
5  mollified.
6      Q.  And what was your understanding as to why the
7  two-year period was asked for?
8      A.  My recollection is that there were two
9  important things to Nuclear Development:  Arranging the
10  financing, which they thought would take a year; and
11  their requirement that they obtain the permits before
12  closing, which would take two years.
13      Q.  Mr. Johnson, TVA's largest customer at the time
14  of the execution of the Nuclear Development contract was
15  who?
16      A.  Memphis.  Memphis Light, Gas and Water.
17      Q.  All right.  And was there any controversy any
18  time between the time that contract was executed and the
19  contractual closing date for Nuclear Development with
20  regard to Memphis?
21      A.  "Controversy" might not be the word.  There
22  certainly were discussions about them thinking what
23  would they do with their power supply.  They were in a
24  transition to a new CEO, a lot of discussion about what
25  they were going to do and what we needed to do to keep

Page 131

1  them as a customer.  So yeah, there was a lot of
2  discussion about that.
3      Q.  And to your knowledge, was Nuclear Development
4  talking to the City of Memphis?
5      A.  Yes.
6      Q.  Did you have any concerns about what Nuclear
7  Development was saying to the City of Memphis?
8      A.  I did have concerns once I learned some of the
9  things they were saying.
10      Q.  And what concerns or what were they saying that
11  caused you concern?
12      A.  Well, as I said previously, the greatest
13  concern was you should leave TVA under any circumstances
14  'cause you can get a better deal elsewhere, which I
15  think is empirically untrue.  And also there was some
16  things said about whether they could use the TVA
17  transition system to wield the power from Bellefonte to
18  MLGW, which I also thought was not true.
19      Q.  Did anything in particular upset you with
20  regard to comments that were being made by Nuclear
21  Development or its officers?
22      A.  Yeah.  Particularly the comments about Entergy
23  or MISO.
24      Q.  And who are Entergy and MISO?
25      A.  Entergy is a utility headquartered in

Page 132

1  Louisiana.  MISO is an independent system operator
2  located in the Midwest in a number of states, dozens of
3  generating members there.  It's a big power pool.
4      Q.  And what was the comment that upset you
5  relating to MISO and Entergy from Nuclear Development?
6      A.  That you can go there and get a better deal
7  than you can get from TVA.  And, you know, maybe in one
8  hour, in one year you might get cheaper power out of one
9  of those two.  But in a long-term basis I just don't
10  think that's true.
11      Q.  And why don't you think that's true?
12      A.  Because I've studied those markets pretty
13  closely, and I know what the power prices are.  I did
14  then at least.  I know what the transition capability
15  is, and there are requirements to joining MISO that cost
16  you a lot of money.  You have to have generation and
17  back stand, and it's not just a simple thing like going
18  out and buying megawatt hours.
19      Q.  To your knowledge, did Memphis have the
20  generation capacity to join MISO at the time?
21      A.  Memphis doesn't have any generating capacity.
22      Q.  And you mentioned back stand.  What is back
23  stand?
24      A.  So that is if your power supply goes out -- all
25  plants break occasionally -- what do you do to

William Johnson

Page 133

1  back-stand your usual supply?  So it's replacement in
2  times of emergency or mechanical failure, those kind of
3  things.
4      Q.  And did you understand Memphis had that lined
5  up at the time the recommendation or the statement was
6  made by Nuclear Development about Memphis potentially
7  joining MISO?
8      A.  No.  Memphis is a longtime full-requirements
9  customer of TVA's.
10     Q.  Do you know any -- from your perspective, was
11  there any advantage to Nuclear Development that they
12  would gain if Memphis switched to MISO or Entergy?
13     A.  I couldn't see any advantage to them, which is
14  one of the reasons it affected me.
15     Q.  And following -- how did you find out about the
16  comments that were made by Nuclear Development?
17     A.  Read it in the paper, had a report from people
18  there and then saw a transcript of the meeting.
19     Q.  And who at Nuclear Development made the
20  comments?
21     A.  Bill McCollum.
22     Q.  And who is Mr. McCollum?
23     A.  A former TVA executive who now I think works
24  for Nuclear Development.
25     Q.  Now, did you have any meetings with Memphis to

Page 134

1  respond to what had been said by Mr. McCollum?
2      A.  Had meetings, I think two meetings with the
3  city council -- maybe three, I think two -- where I did
4  respond a little bit to some of those things, but
5  basically focused on why they should stay with TVA and
6  what the value proposition from TVA was.
7      Q.  Now, at any point between the time Nuclear
8  Development signed its contract with TVA for the
9  purchase of the Bellefonte site and the contractual
10  closing date two years later, did Nuclear Development
11  ever suggest that it would sell power generated at
12  Bellefonte to TVA?
13     A.  Yes.
14         MR. O'REAR:  Let me object to the vagueness of
15  that question without asking who, what, when, where.  I
16  mean, when you say Nuclear Development it doesn't tell
17  us much.
18  BY MR. LEMBKE:
19     Q.  Mr. Johnson, did anyone affiliated with Nuclear
20  Development ever propose that Nuclear Development would
21  sell power to TVA?
22     A.  Yes.
23     Q.  When did that occur?  Before or after
24  November 2016 when Nuclear Development signed its
25  contract with TVA?

Page 135

1      A.  My recollection, that it was after.  Mr. Haney
2  made several proposals about selling power to TVA after
3  that.
4      Q.  All right.  And do you recall any of the
5  details of what Mr. Haney proposed?
6      A.  No.  The proposals were price per megawatt.
7  That was dependent on a number of other financial
8  factors and tax credits and loan guarantees, and the
9  specifics I don't recall.
10     Q.  Did TVA accept any of those proposals?
11     A.  No.
12     Q.  Why not?
13     A.  We didn't need the type of power, and it wasn't
14  in the money compared to our own generation.
15     Q.  When you say "it wasn't in the money," what do
16  you mean?
17     A.  It was more expensive than what we could make
18  on our own.
19     Q.  Okay.  Now, what, if any, understanding did you
20  have about a request from Nuclear Development for an
21  extension of the closing date by six months of its
22  contract for the purchase of the Bellefonte site?
23         MR. O'REAR:  Objection.  Asked and answered.
24         THE WITNESS:  I don't recall specifically when,
25  but I do recall sometime August, October of 2018 a

Page 136

1  request for a six-month extension.
2  BY MR. LEMBKE:
3      Q.  And who made the ultimate decision on that
4  extension?
5      A.  I did.
6      Q.  And what was that decision?
7      A.  A short two-week extension but no long
8  extension.
9      Q.  And why did you decide not to agree to a long
10  extension?
11     A.  Because I --
12         MR. O'REAR:  Objection.  Asked and answered.
13         THE WITNESS:  I thought the process would drag
14  on.  I'd been concerned from the beginning with
15  open-ended conditions and concerned about how long this
16  would actually take.
17  BY MR. LEMBKE:
18     Q.  Now, the closing date on the contract was
19  November 30th, 2018, by virtue of the short extension;
20  is that correct?
21     A.  Yes.
22     Q.  And did TVA decide not to close on that date?
23     A.  We decided we could not close.
24     Q.  And why did you decide that?
25     A.  Because we had an outside opinion from a very

**Page 133..136**

William Johnson

Page 137

1   respected nuclear licensing firm that said to do so
2   would be unlawful without the transfer of the permits.
3   And we also had a permit issue of our own where our own
4   permit required us to maintain control of the site, and
5   we couldn't sell it and maintain control at the same
6   time. Those were the reasons.
7       Q.  And who made that final decision not to close?
8       A.  I did.
9       Q.  And as CEO, did you believe you had authority
10  to take an illegal action?
11      A.  No.  No.
12      Q.  Earlier today we watched a video of a town hall
13  meeting.  Tell me, what were those town hall meetings?
14      A.  They were meetings open to all employees.  We
15  would have a live audience and then the phone and a
16  streamed audience, several thousand people, and we would
17  talk about some current events and then take questions.
18  Usually it lasted an hour, hour and a half.
19      Q.  And Mr. O'Rear asked you some questions earlier
20  today about that.
21          At the time of that video, had you made a final
22  decision not to close?
23      A.  No.
24      Q.  Were you leaning in a particular direction?
25      A.  I was leaning against giving the extension.

Page 138

1       Q.  Now, earlier today we looked at the minutes of
2   the meeting whereby the TVA board decided not -- excuse
3   me -- decided to declare the Bellefonte property to be
4   surplus property.  And you indicated that two of the
5   board members abstained.  Do you recall that?
6       A.  Yes, it was reflected in those minutes.
7       Q.  And do you recall who those board members are?
8       A.  Ron Walter and Jenna Lodge.
9       Q.  And do you know why they abstained?
10      A.  Yes.
11      Q.  Why?
12      A.  As a condition of their confirmation,
13  Senator Corker required them to avoid any decisions
14  involving Mr. Haney or Bellefonte.
15      Q.  With regard to the board, what level of
16  decisions was the board typically involved in making?
17      A.  So the board would make policy decisions, as we
18  discussed earlier.  They would make major procurement
19  and project decisions.  So they would approve the
20  project and then leave execution up to the management
21  team.
22          There was a delegation of authorities on terms
23  of money and those kind of things, but they would
24  usually make very high-level decisions and then
25  management would execute them.

Page 139

1       Q.  After the board made the decision to declare
2   Bellefonte surplus property, what type of decision
3   relating to Bellefonte do you think would have required
4   formal board action?
5       A.  A decision to undeclare it surplus property.
6   Once the decision to declare it surplus, the execution
7   of that is delegate to the management team.
8       Q.  Did you believe it was necessary for the board
9   to approve the execution of the contract with Nuclear
10  Development?
11      A.  No.
12      Q.  Did you believe it was necessary for the board
13  to approve any of the specific terms of the contract
14  with Nuclear Development?
15      A.  No.
16      Q.  Do you believe it was necessary for the board
17  to formally approve any changes in the terms?
18      A.  No.
19      Q.  Do you believe it was necessary for the board
20  to approve a decision not to close based upon a legal
21  opinion that it would be illegal to do so?
22      A.  No.
23      Q.  When you said that you consulted with board
24  members, why did you do that?
25      A.  Well, every good CEO who wants to keep his or

Page 140

1   her job will consult with his board members.  There's a
2   difference between seeking approval and keeping your
3   board informed and getting a sense of the board.  So
4   that is just good -- good practice.
5       Q.  What, if any, role did ND's attempt to sell
6   power or enter into a power purchase contract with
7   Memphis have in your decision not to close?
8       A.  None.
9       Q.  Earlier today you said you wanted to close the
10  deal.
11          Do you recall that testimony?
12      A.  Yes.
13      Q.  What did you mean?
14      A.  I wanted the transaction to happen.  I think it
15  would be great for TVA to not have that plant, not have
16  that property, and put it into productive use.
17      Q.  Did you view your desire to close the deal as
18  the same -- as the equivalent of agreeing to an
19  extension of the closing date?
20          MR. O'REAR:  Objection.  I don't understand
21  that question, actually.  Maybe --
22  BY MR. LEMBKE:
23      Q.  All right.  Well, earlier, Mr. Johnson, you
24  said that you wanted to close the deal, but you also
25  ultimately decided not to extend the closing date.  How

Page 137..140

William Johnson

Page 141

1  do you reconcile those two statements?
2      A.  Yeah.  'Cause I don't -- I was concerned we
3  would never get to a closing date.  The request were for
4  six months.  I think my concern has proven true because
5  we're well past six months, and there are no permits.
6          And so just wanted to move on and see if
7  something else could happen with the site.  But I was
8  very concerned that this process would just continue and
9  continue and get more entangled, and that was the
10 concern.
11         MR. LEMBKE:  I don't have any further
12 questions.
13         MR. O'REAR:  I have a few follow-up questions
14 to that.
15 FURTHER EXAMINATION BY MR. O'REAR:
16     Q.  If I may?
17     A.  Absolutely.
18     Q.  When you said earlier in response to a question
19 for Mr. Lembke that there were issues for Nuclear
20 Development which included price and the transmission
21 process, those were risks that Nuclear Development
22 undertook under this contract; is that correct?
23     A.  That is correct.  What I was referring to was
24 when they showed numbers to Memphis, they never included
25 any transmission costs.

Page 142

1      Q.  Okay.  And how is that related to your right to
2  terminate the contract?
3      A.  I don't think I related those.
4      Q.  Okay.  Good.
5      A.  I think I said that in relation to did I think
6  misleading things were being said.
7      Q.  In response to a question from Mr. Lembke, you
8  said that someone at Nuclear Development said they
9  needed two years between the date of the contract and
10 the date of the closing to obtain financing and to
11 obtain transfer of the construction permits; is that
12 correct?
13     A.  That's correct.
14     Q.  And who told you that?
15     A.  A letter from Mr. Blust.
16     Q.  Okay.  A letter to you?
17     A.  A letter to -- I believe it was Concentric.
18     Q.  This was a letter to Concentric before the
19 contract was actually executed?
20     A.  Correct.
21     Q.  So this was part of the negotiation process
22 over the terms of the contract; correct?
23     A.  Yes.
24     Q.  And I asked you earlier in the deposition, were
25 you aware that Nuclear Development actually requested

Page 143

1  that a provision of the contract be that the closing
2  would be conditioned on TVA's transfer of the
3  construction permits to Nuclear Development, did I not?
4      A.  A question like that, yes.
5      Q.  Yes.  And were you aware or are you aware that
6  TVA rejected that provision of the contract as a
7  condition of closing?
8      A.  I was not aware of that until you showed me
9  documents today.
10     Q.  Okay.  So these comments that you were
11 referring to about the need for the two years were all
12 in the process of negotiation before the actual terms of
13 the contract were executed by both parties?
14     A.  Actually, my comment is that it's very clear to
15 me that Nuclear Development knew they needed the permits
16 to get the closing as early as two years before and
17 didn't acquire them.
18     Q.  Well, what made that clear to you?
19     A.  Mr. Blust's letter and the response from
20 Concentric.
21     Q.  Okay.  And, again, those are exchanges --
22 they'll reveal whatever those exchanges show --
23     A.  Correct.
24     Q.  -- that occurred before the contract was
25 executed?

Page 144

1      A.  Yeah.
2      Q.  And you understand, as a lawyer by training and
3  practice, that the issue in this case is what this
4  contract says and whether it was breached or not;
5  correct?
6      A.  That's correct.
7      Q.  And if there were exchanges from -- between the
8  parties, between Nuclear Development and Concentric or
9  Nuclear Development and TVA, before the contract was
10 signed that didn't make it into the contract, do you
11 believe those are part of this lawsuit?
12         MR. LEMBKE:  Object to the form.  Calls for a
13 legal conclusion and vague.
14         MR. O'REAR:  I don't think it's vague.
15         MR. LEMBKE:  "Part of this lawsuit" is vague.
16         THE WITNESS:  So I do recall --
17         MR. O'REAR:  At issue in this lawsuit.
18         THE WITNESS:  You know, I --
19         MR. LEMBKE:  Same objection.
20         THE WITNESS:  -- quit practicing law 20 --
21 30 years ago and gave up my license 20 years ago, but I
22 do remember the four corners rule of the document.
23         But I do think it is fair if you take the
24 position that toward closing that you don't need the
25 permits when two years earlier you said I need two years

**Page 145**

1 to go get 'em, that seems to be an inconsistency to me.
2 BY MR. O'REAR:
3    Q.  Well, does it seem to be an inconsistency to
4 you that TVA never contended at all until the two or
5 three days or a week before this closing and officially
6 not until the day before the closing that there was a
7 requirement of this closing that those construction
8 permits be transferred?
9       MR. LEMBKE:  Object to the form.
10 BY MR. O'REAR:
11    Q.  Does that -- does that bother you that TVA
12 waited until the day before the closing to make that
13 contingent?
14       MR. LEMBKE:  Object to the form.  Assumes facts
15 not in evidence.  Lack of foundation.
16       THE WITNESS:  It doesn't bother me because we
17 made the assumption that they knew what they were doing
18 and knew what they were required to do, were well
19 represented by high-level nuclear licensing law firms.
20 BY MR. O'REAR:
21    Q.  Well, did TVA know what it was doing when it
22 had 50-man law -- legal department and a large licensing
23 department focused on these very issues where it never
24 once raised this issue until immediately prior to the
25 closing?  Did TVA know what it was doing?

**Page 146**

1       MR. LEMBKE:  Object to the form.  Lack of
2 foundation.  Argumentative.
3       THE WITNESS:  I don't think I could answer
4 that.
5       MR. LEMBKE:  Calls -- lack of foundation.
6 Argumentative.  Assumes facts --
7       THE WITNESS:  I think we've gotten to --
8       (Court reporter clarification.)
9       MR. LEMBKE:  Object to the form.  Lack of
10 foundation.  Assumes facts not in evidence.
11 Argumentative.
12       THE REPORTER:  And then your answer?
13       THE WITNESS:  I can't answer the question.
14 BY MR. O'REAR:
15    Q.  So TVA's 50-man law department and TVA's
16 licensing department never objected to the process that
17 was laid out at a public meeting of the NRC until just
18 literally minutes before the closing was to occur?
19       MR. LEMBKE:  Object to the form.
20 BY MR. O'REAR:
21    Q.  Is that right?
22       MR. LEMBKE:  Lack of foundation.
23       THE WITNESS:  I don't know that to be correct.
24       MR. LEMBKE:  Argumentative.
25             ---o0o---

**Page 147**

1 BY MR. O'REAR:
2    Q.  Well, there was never an objection made until
3 at the earliest days before, mere days before the
4 closing date?
5       MR. LEMBKE:  Same objection.
6 BY MR. O'REAR:
7    Q.  Correct?
8    A.  I don't know that to be true.
9       MR. LEMBKE:  Same objection.
10 BY MR. O'REAR:
11    Q.  Mr. Lembke asked you about your discussions
12 with board members and with respect to the decision not
13 to close and the decision not to extend the closing.
14       So and I asked you earlier who did you talk to,
15 what board members did you talk to about that, and can
16 you tell me now what members you talked to about those
17 two points?
18    A.  I think I --
19       MR. LEMBKE:  Objection to the form.
20 Argumentative.
21       MR. O'REAR:  That's not argumentative.
22       THE WITNESS:  I think I told you earlier --
23       MR. LEMBKE:  It is argumentative because
24 you're -- well, it is argumentative.
25       THE WITNESS:  I don't recall specifically, but

**Page 148**

1 as a matter of course, this is the kind of thing over a
2 40-year career I would have done.
3 BY MR. O'REAR:
4    Q.  How are we going to know or test whether or not
5 you had those conversations if you won't tell us who you
6 talked to?
7       MR. LEMBKE:  Now, that's argumentative and I
8 object to the form.  He's already asked -- that's been
9 asked and answered that he doesn't recall.
10       THE WITNESS:  I've told you everything I know.
11 It's not -- I'm not declining to answer.  I've told you
12 everything I know.
13 BY MR. O'REAR:
14    Q.  Did any of those directors express any
15 reservation at all about your decision to not close the
16 transaction?
17    A.  I don't have any recollection of any such
18 concern.
19    Q.  Did any of those board members express approval
20 of your decision not to close?
21    A.  I don't recall that either.
22    Q.  Did any of the board members express any
23 opposition to your decision not to extend the closing by
24 six months?
25    A.  I don't recall that.

William Johnson

**Nuclear Development, LLC vs.
Tennessee Valley Authority**

Page 149

1    Q.  Did any of the board members you talked to
2  express any approval of your decision not to close --
3    A.  I don't --
4    Q.  -- in six months?
5    A.  I don't recall that.
6    MR. O'REAR:  That's all I have.
7  FURTHER EXAMINATION BY MR. LEMBKE:
8    Q.  Mr. Johnson, you testified earlier that you
9  reviewed the Pillsbury legal opinion; correct?
10    A.  Yep.  Yes.
11    Q.  Did you review that before you made a final
12  decision on whether to close or not?
13    A.  Yes.
14    Q.  And once you read that opinion, what choice, if
15  any, did you think you had with regard to your ultimate
16  decision whether to close?
17    A.  I didn't think we could close at that moment
18  because of the permit issue, and I thought it was a
19  pretty strong opinion.  In addition to looking at it, I
20  actually went and pulled the Atomic Energy Act and read
21  it and read some of those cases.  And so I really did
22  not think we could go to closing, and then the question
23  was about were we going to get an extension.
24    MR. LEMBKE:  No further questions.
25    ---o0o---

Page 150

1  FURTHER EXAMINATION BY MR. O'REAR:
2    Q.  Just to follow up that, so when did you review
3  the Atomic Energy Act and the cases?
4    A.  Probably the 28th, but it was right after I
5  read the letter.
6    Q.  And you pulled the cases on your own and read
7  them?
8    A.  Had 'em sent to me.
9    Q.  By whom?
10    A.  I can't remember.  Somebody in the legal
11  department.
12    Q.  And you read them?
13    A.  I read 'em.
14    Q.  Did those cases convince you that it would be
15  illegal to transfer the property?
16    A.  Yes.
17    Q.  Do you remember what cases said that?
18    A.  The ones that were cited in there.
19    Q.  All of them?
20    A.  I don't remember all of them.  But. . .
21    MR. O'REAR:  That's all.
22    MR. LEMBKE:  Nothing further.
23    THE VIDEOGRAPHER:  All right.  That concludes
24  the deposition for today.  The time is 12:52.  We're
25  going off the record.

Page 151

1    THE REPORTER:  Mr. Lembke, would you like a
2  copy of the transcript?
3    MR. LEMBKE:  Yes, regular and mini.
4    (The deposition concluded at 12:52 p.m.)

Page 152

REPORTER'S CERTIFICATE

I, ANGELA SINCLAIR, a Stenographic Certified
Shorthand Reporter, holding a valid and current license
issued by the State of California, duly authorized to
administer oaths, do hereby certify:

That WILLIAM JOHNSON, in the foregoing
deposition named, was present and by me sworn as a
witness in the above-entitled action at the time and
place therein specified.

That said deposition was taken before me at
said time and place, and was taken down in shorthand by
me and was thereafter transcribed into typewriting, and
that the foregoing transcript constitutes a full, true
and correct report of said deposition and of the
proceedings that took place.

The dismantling, unsealing, or unbinding of the
original transcript will render the Reporter's
Certificate null and void.

Should the signature of the witness not be
affixed to the deposition, the witness shall not have
availed himself/herself of the opportunity to sign or
the signature has not been waived.

I further certify that I am neither counsel for
nor related to any party in the foregoing deposition and
caption named nor in any way interested in the outcome
thereof.

That before completion of the proceedings,
review of the transcript WAS requested pursuant to
Federal Rule 30(e).

IN WITNESS WHEREOF, I have hereunder subscribed
my hand this 22nd day of October 2019.


_____
ANGELA SINCLAIR, CCRR, CRR, RPR,
CSR 13902
State of California

**Page 153**

```
1            DECLARATION UNDER PENALTY OF PERJURY
2    Case Name: Nuclear Development, LLC vs.
              Tennessee Valley Authority
3    Date of Deposition: 10/09/2019
4    Job No.: 10061754
5
6            I, WILLIAM JOHNSON, hereby certify
7    under penalty of perjury under the laws of the State of
8    _____ that the foregoing is true and correct.
9            Executed this _____ day of
10   _____, 2019, at _____.
11
12
13          _____
14                  WILLIAM JOHNSON
15
16   NOTARIZATION (If Required)
17   State of _____
18   County of _____
19   Subscribed and sworn to (or affirmed) before me on
20   this _____ day of _____, 20__,
21   by_____,    proved to me on the
22   basis of satisfactory evidence to be the person
23   who appeared before me.
24   Signature: _____ (Seal)
25
```

**Page 154**

```
1    DEPOSITION ERRATA SHEET
2    Case Name: Nuclear Development, LLC vs.
              Tennessee Valley Authority
3    Name of Witness: William Johnson
     Date of Deposition: 10/09/2019
4    Job No.: 10061754
     Reason Codes:  1. To clarify the record.
5                   2. To conform to the facts.
                    3. To correct transcription errors.
6    Page _____ Line _____ Reason _____
7    From _____ to _____
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24   Page _____ Line _____ Reason _____
25   From _____ to _____
```

**Page 155**

```
1    DEPOSITION ERRATA SHEET
2    Page _____ Line _____ Reason _____
3    From _____ to _____
4    Page _____ Line _____ Reason _____
5    From _____ to _____
6    Page _____ Line _____ Reason _____
7    From _____ to _____
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   _____ Subject to the above changes, I certify that the
             transcript is true and correct
23          _____ No changes have been made. I certify that the
             transcript  is true and correct.
24
            _____
25                  WILLIAM JOHNSON
```