FILED
2020 Oct-28  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT M

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
2                 NORTHEASTERN DIVISION
3
4      NUCLEAR DEVELOPMENT LLC,              )
                                            )
5                                           )
                              Plaintiff,    )
6                                           )   Civil Action
     vs.                                    )   Case Number
7                                           )
     TENNESSEE VALLEY AUTHORITY,            )   No.
8                                           )   5:180cv-01983
                                            )   -LCB
9                             Defendant.    )
10
11
12          VIDEO RECORD & ORAL DEPOSITION OF
13                    Sherry Quirk
14              Tuesday, October 29, 2019
15                    8:57 a.m.
16                 900 S. Gay Street
17                    9th Floor
18             Knoxville, Tennessee 37902
19
20
21
22
23
24              Georgette H. Mitchell
            Registered Professional Reporter
25                  LCR-55 (TN)

Page 2

1    APPEARANCES OF COUNSEL:
2    ON BEHALF OF THE PLAINTIFF:
3        Caine O'Rear, III, Esq.
         Hand Arendall Harrison Sale LLC
4        104 Saint Francis Street
         Suite 300
5        Mobile, Alabama 36602
         251.694.6308
6        Corear@handarendall.com
7        Larry D. Blust, Esq.
         Hughes Socol Piers Resnick DYM LTD.
8        70 West Madison Street
         Suite 4000
9        Chicago, Illinois 60602
         312.604.2672
10       Lblust@hsplegal.com
11   ON BEHALF OF THE DEFENDANT:
12       Matthew H. Lembke, Esq.
         Bradley Arant Boult Cummings LLP
13       One Federal Place
         1819 Fifth Avenue North
14       Birmingham, Alabama 35203
         205.521.8560
15       Mlembke@bradley.com
16       Office of the General Counsel
         David D. Ayliffe, Esq.
17       Tennessee Valley Authority
         400 West Summit Hill Drive, WT6
18       Knoxville, Tennessee 37902
         865.632.8964
19       Ddayliffe@tva.gov
20   Also Present:
         Timothy Prairie, Videographer
21
22
23
24
25

Page 3

1              I N D E X
     SHERRY QUIRK                          7
2
     EXAMINATION BY MR. O'REAR             7
3
     EXAMINATION BY MR. LEMBKE        135
4
           E X H I B I T S
5
     Exhibit 4 - Previously marked - Bates No.    27
6    TVABLN000002633 through 2634, Resolution.
7    Exhibit 1 - Previously marked - Contract.    33
8    Exhibit 7 - Previously marked, Bates No.
     TVABLN000001520 through 1523, e-mail from     51
9    Larry Blust dated August 18, 2017, to James
     Chardos.
10                                                  55
     Exhibit 14 - Previously marked - Bates No.
11   TVABLN00005105 through 5109, E-mail chain from
     Chris Chandler to Tim Matthews.
12
     Exhibit 10 - Previously marked - Bates No.
13   TVABLN00008330 through 8331, e-mail from
     Justin Maierhofer dated August 14, 2018.    60
14
     Exhibit 11 - Previously marked - Bates
15   No.TVABKB00002045 through 2052, Memorandum
     from United States Nuclear Regulatory
16   Commission to Jennifer Dixon-Herrity dated
     September 4, 2018.                          65
17
     Exhibit 12 - Previously marked - Bates No.
18   TVABLN00000352, Letter from Aaron Nix to Larry
     Blust, dated August 21, 2018.              69
19
     Exhibit 13 - Previously marked - Bates No.
20   TVABLN00006238, Letter dated August 29, 2018   72
     from Larry D. Blust.
21
     Exhibit 16 - Previously marked - Bates No.
22   TVABLN000006245, e-mail dated October 25,    89
     2018.
23
     Exhibit 17 - Previously marked, Bates No.
24   TVABLN000002643, email from Clifford Beach    100
     dated November 9, 2018.
25

Page 4

1              INDEX (CONTINUED)
2    Exhibit 26 - Bates No. TVABLN00000038, e-mail
     from Larry Blust dated November 30, 2018.
3                           103
4    Exhibit 27 - Minutes of Meeting of The Board
     of Directors Tennessee Valley Authority,
5    November 14, 2018.                  109
6    Exhibit 22 - Previously marked - Bates No.
     TVABLN000008648, letter from Pillsbury.    112
7
     Exhibit 4 - Previously marked, Bates No.
8    TVABLN00002633 through 2634, Proposed Board
     Resolution.                         115
9
     Exhibit 24 - Previously marked, Bates No.
10   TVABLN00002651 through 2652, Letter from
     Sherry Quirk to Nuclear Development and Larry
11   Blust.                              125
12   Exhibit 28 - Bates No TVABLN00000040, e-mail
     from Sherry Quirk to Larry Blust and others
13   dated November 16, 2018.             128
14   Exhibit 29 - Bates No. TVABLN00000042, e-mail
     from Larry Blust to Sherry Quirk dated
15   November 23, 2018.                   129
16   Exhibit 30 - Bates No. TVABLN00000660 through
     661, e-mail from Larry Blust to Clifford
17   Beach, dated November 28, 2018.      129
18   Exhibit 31 - Bates No. ND_004950, e-mail from
     Sherry Quirk to Larry Blust dated November 29,
19   2018.                                130
20   Exhibit 25 - Bates No. TVABLN0006461 through
     6464, e-mail and attachments from Sherry Quirk
21   to others dated November 30, 2018.   131
22   Exhibit 32 - Bates No. Bates No.
     TVABLN00009316 through 9328, handwritten
23   notes.                               134
24   Exhibit 15 - Bates No. TVABLN00006245 though
     6246, Email from Autumn Beeler to Clifford
25   Beach and others dated October 25, 2018.    141

Page 5

1              S T I P U L A T I O N
2
3        The videotaped deposition of SHERRY
4    QUIRK, called as a witness at the instance of the
5    Plaintiff, pursuant to all applicable rules, taken by
6    agreement on the 29th day of October, 2019, beginning
7    at approximately 9:00 a.m., at the law offices of
8    Woolf, McClane, Bright, Allen & Carpenter, 900 S. Gay
9    Street, Suite 900, Knoxville, Tennessee, before
10   Georgette H. Mitchell, Registered Professional Reporter
11   and Notary Public, pursuant to the stipulation of
12   counsel.
13       It being agreed that
14   Georgette H. Mitchell, Registered Professional Reporter
15   and Notary Public, may report the deposition in machine
16   shorthand, afterwards reducing the same to typewriting.
17       All objections, except as to the form of
18   the question, are reserved to on or before the hearing.
19       It being further agreed that all
20   formalities as to notice, caption, certificate,
21   transmission, etc., excluding the reading of the
22   completed deposition by the witness and the signature
23   of the witness, are reserved.
24
25

2 (Pages 2 - 5)

Page 6

1        (The deposition began at 8:57 a.m.)
2        THE VIDEOGRAPHER: Okay.  We're on the
3   record.  The time is 8:57 a.m., on October 29,
4   2016.
5        This is media unit number of the video
6   recorded deposition of Sherry Quirk taken by
7   counsel for the plaintiff in the matter of Nuclear
8   Development, LLC versus Tennessee Valley Authority
9   filed in the United States District Court for the
10  the Northern District of Alabama, Northeastern
11  Division.
12       This deposition is being held at the law
13  offices of Woolf, McClane, Bright, Allen &
14  Carpenter located at 900 South Gay Street, Suite
15  900, Knoxville, Tennessee.
16       My name is Tim Prarie, the videographer
17  from Veritext Legal.  The court reporter is
18  Georgette Mitchell from Veritext Legal, and I'll
19  ask counsel to please now identify themselves and
20  then the court reporter will swear in the witness.
21       MR. O'REAR:  Caine O'Rear for the
22  plaintiff, Nuclear Development.
23       MR. BLUST:  Larry Blust also for the
24  plaintiff, Nuclear Development.
25       MR. LEMBKE:  Matt Lambke for defendant.

Page 7

1        MR. AYLIFFE:  David Ayliffe for defendant
2   TVA.
3        SHERRY QUIRK,
4   having first been duly sworn, was examined and deposed
5   as follows:
6   EXAMINATION BY MR. O'REAR:
7        Q.    State your name, please.
8        A.    Sherry Quirk.
9        Q.    Miss Quirk, are you with TVA?
10       A.    Yes, I am.
11       Q.    What's your position there?
12       A.    I am Executive Vice President and General
13  Counsel of TVA.  Also Secretary and Designated Agency
14  Ethics Official.
15       Q.    Designated what?
16       A.    Agency Ethics Official.
17       Q.    Got you.  And so are you Secretary to the
18  Board of Directors?
19       A.    Yes, I am.
20       Q.    And that's an officer position of TVA --
21       A.    Yes, it is.
22       Q.    -- is that correct?
23       And do you reside here in Knoxville?
24       A.    Yes, I do.
25       Q.    What's your business address?

Page 8

1        A.    It's 400 West Summit Hill Drive,
2   Knoxville, 37902.
3        Q.    Is that the TVA headquarters?
4        A.    It is the corporate headquarters, yes.
5        Q.    Tell us about your education, your
6   undergraduate degree and any professional degrees you
7   have?
8        A.    I have an undergraduate degree from Mount
9   Holyoke College, bachelor of arts.  My major was in
10  anthropology.
11       And then I went to law school at
12  Washington College of Law, American University,
13  Washington D.C.  I went to night school and graduated
14  in 1982.
15       Q.    Have you ever practiced law?
16       A.    Yes, I have.
17       Q.    Tell me about that.
18       A.    I began practicing law working for the
19  Federal Energy Regulatory Commission and was there for
20  about year and a half, maybe a little bit more.  Then
21  went into private practice and was at several firms.
22       Q.    So you graduated in, did you say '82 from
23  law school?
24       A.    Yes, that's correct.
25       Q.    And you worked for a year?

Page 9

1        A.    About a year and a half, a little bit
2   more.
3        Q.    And then you went into private practice
4   with private law firms?
5        A.    That's correct, yes.
6        Q.    Over what period of time were you in
7   private practice?
8        A.    I was in private practice from say early
9   1984 through early 2015.
10       Q.    And what firms were you with?
11       A.    The first firm I was with was named
12  Grove, Jacowitz, Gillum and Cobert, and I was there for
13  a couple of years.  Then I went to --
14       Q.    Where is that office?
15       A.    Washington, D.C.  All of the firms that I
16  worked for were in Washington, D.C.
17       From Grove, Jacowitz I went to a firm
18  named Verner Lipfert and I was there for, let's see,
19  until about 2001.
20       And from there I went to a firm named
21  Sullivan & Worcester and was there 'til, I believe
22  about 2007.  Then I went to the firm of Schiff Hardin,
23  and was there until 2015.
24       Q.    When did you start with TVA?
25       A.    In February of 2015.

3 (Pages 6 - 9)

1    Q.    What was your specialty or did you have a
2    specialty at any of the firms you worked at when you
3    were in private practice?
4    A.    I did a little bit of litigation for the
5    first firm that I was with, but other than that I
6    specialized in the area of utilities, either utility
7    regulation or transactional work, some Legislative
8    work, some litigation, all surrounding the utility
9    industry.
10   Q.    So you were in private practice up until
11   the time you started at TVA, is that correct?
12   A.    That's correct.
13   Q.    Are you licensed, currently licensed to
14   practice law in any state?
15   A.    Yes, I am.
16   Q.    Where?
17   A.    District of Colorado.  I only hesitate
18   because it is actually not a state.
19   Q.    Okay.  Are you licensed in Tennessee?
20   A.    I am not.
21   Q.    Are you a member of any bar association?
22   A.    I am a member of the American Bar
23   Association, and I believe I'm a member of the
24   Knoxville Bar Association as well.
25   Q.    Are you a member of the bar of any court?

1    A.    Let's see.  The Supreme Court.  I believe
2    the Court of Appeals or the U.S. Court of Policies for
3    the District of Columbia, and I believe that that is
4    all.
5    Q.    How did you become the General Counsel of
6    TVA, or let me ask you this.  When you started, did you
7    start as General Counsel in 2015?
8    A.    I did.
9    Q.    Okay.  And how did it come about that you
10   took that position?
11   A.    I was contacted by a person who had been
12   hired by TVA to solicit interest in the General Counsel
13   position, and he asked me if I was interested in
14   working for TVA, and I said yes.
15   Q.    And were you hired by the CEO of TVA?
16   A.    Yes.
17   Q.    Who was that at the time?
18   A.    That was Bill Johnson.
19   Q.    Did your -- did you have to be appointed
20   as Secretary by the Board of Directors?
21   A.    I believe that's correct, yes.
22   Q.    Okay.  You don't know?
23   A.    I think it must be correct.  It happened
24   before I got there so I didn't witness it.  I am
25   Secretary.  They appoint the officers, so I assume they

1    appointed me.
2    Q.    What are your duties and responsibilities
3    as General Counsel of TVA?
4    A.    I am the chief legal officer and I
5    oversee the Office of General Counsel.
6    Q.    All right.  Do you attend board meetings
7    as an ex officio member?
8    A.    Of the board?
9    Q.    Yes.
10   A.    No.
11   Q.    Do you attend board meetings?
12   A.    Yes, I do.
13   Q.    Do you have a vote on the board?
14   A.    I do not.
15   Q.    Are you responsible for preparing the
16   minutes of the board meetings?
17   A.    Yes, I am.
18   Q.    Do you have any responsibility or duties
19   regarding board committee meetings?
20   A.    I am the -- the executive who works with
21   the audit committee, and so I have responsibility for
22   the function of that committee and, you know, with
23   respect to the other committees I have general
24   responsibility with respect to governance matters and
25   legal matters.

1    Q.    Do you attend board committee meetings?
2    A.    I do.  They -- until this current round,
3    they overlapped.  So we would have several committee
4    meetings at one time.  So I was unable to attend all of
5    them.
6          So in -- this time we had them run
7    sequentially so I did attend all of them.  In the past
8    I have attended some of them.
9    Q.    What do you mean this time or this round?
10   A.    We just had a round of board committee
11   meetings.
12   Q.    You mean the most recent --
13   A.    Yes.
14   Q.    -- series of meetings?
15   A.    Yes.
16   Q.    So most recently you were able to attend
17   all of those meetings?
18   A.    Yes, but not prior.
19   Q.    And so when you say most recently, are
20   you talking about 2018 or 2019?
21   A.    I'm talking about this past round in
22   October of 2019.
23   Q.    That just happened?
24   A.    Yes.
25   Q.    And what are the board committees?

4 (Pages 10 - 13)

Page 14

1     A.     There are five committees.  Audit, as I
2  said, finance, people and personnel, external relations
3  and the nuclear oversight committee.
4     Q.     I'm sorry.  What was the next to last one
5  you said before nuclear oversight and after personnel?
6     A.     Was it external relations?
7     Q.     What does that committee do?
8     A.     Talks about or it's jurisdiction is
9  related to the various stakeholders and our external
10  facing activities with our customers and with the
11  public.
12     Q.     Are minutes kept of the board committee
13  meetings?
14     A.     Yes, they are.
15     Q.     And where do they -- who's the custodian
16  of those minutes?
17     A.     Those are -- we keep those with our
18  records.  We have a records repository and they are
19  with them.
20     Q.     All right.  Are you in charge of that?
21     A.     I guess, yes.
22     Q.     Are those minutes publically available?
23     A.     No, they're not.
24     Q.     Do the committees make recommendations to
25  the board?

Page 15

1     A.     That is correct.
2     Q.     All right.  Do the committees act only in
3  an advisory capacity to the board as a whole?
4     A.     That's correct.
5     Q.     Are you a member of the Executive
6  Management Council?
7     A.     I was.  It has been renamed.
8     Q.     All right.  What's the name of it
9  currently?
10     A.     It's now called the Executive Leadership
11  Team, but while Bill Johnson was CEO it was the EMC.
12     Q.     Did the new CEO change the name?
13     A.     Yes?
14     Q.     Who is new CEO?
15     A.     Jeffrey Lyash.
16     Q.     And when did he begin?
17     A.     In May of this year, 2019.
18     Q.     Were you a member under Bill Johnson of
19  the Executive Management Council?
20     A.     Yes, I was.
21     Q.     Are you now a member of the Executive
22  Leadership Team?
23     A.     Yes, I am.
24     Q.     And when Bill Johnson was CEO, what was
25  the purpose of the Executive Management Council?

Page 16

1     A.     The purpose was for the senior leadership
2  of the company to come together periodically and share
3  information and discuss matters that might be of
4  enterprise-wide significance, and the idea was that
5  each person could bring their expertise and their
6  knowledge of or acquaintance with an issue to bear in
7  discussing matters.
8     Q.     Did the Executive Management Council
9  report to any board committee or to the board as a
10  whole?
11     A.     Not directly, no.
12     Q.     So did the Executive Management Council
13  report to the CEO?
14     A.     That's correct, and the CEO reports to
15  the board.
16     Q.     Did the Executive Management Council ever
17  keep minutes under Bill Johnson's tenure?
18     A.     No.
19     Q.     Are there any records or notes of any
20  type regarding meetings of the Executive Management
21  Committee under Bill Johnson's tenure?
22     A.     Other than people's personal notes, no.
23     Q.     Did you make any personal notes at any of
24  those meetings?
25     A.     From time to time, probably.

Page 17

1     Q.     Did you make any personal notes at
2  meetings of the Executive Management Council regarding
3  the Bellefonte plant?
4     A.     I don't recall whether I did or not.
5     Q.     Did you make any notes of meetings of the
6  Executive Management Council regarding Nuclear
7  Development?
8     A.     I don't recall.
9     Q.     Have you checked?
10     A.     I've not checked, no.
11     Q.     Okay.  The Executive Management Council
12  has no power to make any decisions on behalf of TVA, is
13  that correct?
14     A.     As a body, no.
15     Q.     Okay.  You're head of the General
16  Counsel's Office, correct?
17     A.     Correct.
18     Q.     Are you head of the legal department of
19  TVA?
20     A.     Yes, if I understand what you're asking.
21     Q.     All right.  How many lawyers work at TVA?
22     A.     I'm not sure how many lawyers work at
23  TVA.  I can tell you how many work in the legal
24  department.
25     Q.     Okay.  Tell me that.

5 (Pages 14 - 17)

1    A.    About a little over 40.
2    Q.    And is the legal department divided into
3   offices or divisions according to areas of
4   responsibility?
5    A.    Yes.
6    Q.    And what are those?
7    A.    Currently?
8    Q.    Yes.  Well, has it changed over the last
9   few years?
10    A.    Yes, it's changed a couple of times.
11    Q.    Okay.  I'm not going to ask you about if
12   it's changed since the new CEO came in, but prior to
13   that under Mr. Johnson's tenure, what were the offices
14   or divisions of the legal department?
15    A.    I'll try to get this right because we
16   have changed a bit.  It's generally speaking, we have a
17   procurement section that deals with procurement and
18   commercial contracts and realty, some realty matters.
19         We have a nuclear section that deals with
20   licensing and other nuclear issues.
21         We have an employment section that deals
22   with various employment issues that a rise at an agency
23   or enterprise like TVA.
24         We have a power section that deals with
25   our power contracts, with our customers, our regulatory

1   function, and various customer issues.
2         And we have an environmental function
3   that deals with the various environmental issues.
4    Q.    How many lawyers are assigned to the --
5    A.    Will you give me a moment because I just
6   -- I'm just going to review to make sure I'm not
7   missing.
8         And litigation.  Sorry, David.  That was
9   an important pause.
10    Q.    How many lawyers are assigned to the
11   nuclear department?
12    A.    Currently?  Three.
13    Q.    In 2018?
14    A.    I think it would depend on which part of
15   2018 we're talking about, but two to three.
16    Q.    And who are those lawyers that were
17   assigned in 2018?
18    A.    I believe it would have been Chris
19   Chandler as head of the group, Ryan Dreke, and someone
20   who has since left.  Blake, whose last name escapes me.
21    Q.    How do you spell Dreke?
22    A.    D-r-e-k-e.
23    Q.    And someone named Blake?
24    A.    Yes.
25    Q.    Who are the three members now?

1    A.    Chris Chandler, Ryan Dreke and half time
2   David Codevilla.
3    Q.    Does Chris Chandler report to you?
4    A.    Yes, he does.
5    Q.    How many lawyers are in the procurement
6   section that deal with realty issues?
7    A.    Currently?
8    Q.    Yes.
9    A.    Let's see.  I believe there are five now.
10    Q.    Who is head of that department?
11    A.    Jarom Smartt.
12    Q.    Who was head of that department in 2018?
13    A.    I think Jarom Smartt was head of it then
14   as well.
15    Q.    Does TVA have a separate realty services
16   department that is not part of the legal department?
17    A.    Yes, it does.
18    Q.    And who heads that department if you
19   know, or who headed it in 20 -- in the years 2016,
20   2017, and 2018?
21    A.    I believe it was Aaron Nix, but I -- in
22   my capacity as General Counsel most of what transpired
23   between my office and realty was handled by those who
24   report to me or are on a level below.
25    Q.    Meaning Jarom Smartt?

1    A.    Or someone working for him or in another
2   department.
3    Q.    Okay.  So you had no direct reporting
4   from the realty services department to you, is that
5   correct?
6    A.    No.  I may have been in a meeting or two,
7   but other than that I didn't have contact, direct
8   contact.
9    Q.    Are there lawyers assigned to the
10   department that Mr. Nix is at for 2016 through 2018?
11    A.    Are there currently?
12    Q.    Are there lawyers assigned to that
13   department?
14    A.    Yes.
15    Q.    How many lawyers are assigned to that?
16    A.    I don't know.
17    Q.    Okay.  Do you work with those lawyers?
18    A.    I do not, not directly.
19    Q.    Is there a separate licensing department
20   for TVA apart from the lawyers who work on licensing in
21   the legal department?
22    A.    You mean a nonlegal department?
23    Q.    Right.
24    A.    Yes, there is.
25    Q.    Okay.  Who headed that licensing

6 (Pages 18 - 21)

1 department up from 2016 through 2018?
2     A.    Joe Shea.
3     Q.    Are there lawyers assigned to that
4 department?
5     A.    You mean within that department?
6     Q.    Yes.
7     A.    Or in my department?
8     Q.    Within that department.
9     A.    Not as far as I know.
10     Q.    Okay. Are there lawyers in the legal
11 department that are assigned to the licensing
12 department?
13     A.    Assigned to work with them, yes.
14     Q.    Okay. And who are those lawyers?
15     A.    That would be primarily Chris Chandler.
16     Q.    And who is Jack, nickname Nick McCall?
17     A.    Nick works in the commercial contracts
18 procurement group.
19     Q.    Okay. In the legal department?
20     A.    Yes.
21     Q.    And so is that -- is that under the
22 procurement section that you mentioned?
23     A.    Yes.
24     Q.    Okay. And what were his responsibilities
25 and authority as it related to the purchase and sale

1 agreement between Nuclear Development and TVA?
2     A.    I believe he was involved in developing
3 that agreement. I did not directly supervise him, so
4 I'm not aware of his exact activities.
5     Q.    And who did he report to in that respect,
6 in other words, with respect to that function of
7 working on the purchase and sale agreement?
8     A.    During the time period that that would
9 have been happening he would have been reporting to
10 Cliff Beach.
11     Q.    Did Mr. McCall have any final
12 decisionmaking authority over the terms or conditions
13 of the purchase and sale agreement?
14     A.    No.
15     Q.    To your knowledge, did Mr. McCall have
16 any direct communications regarding Bellefonte with the
17 National Regulatory Commission?
18        MR. LAMBKE: You mean --
19 BY MR. O'REAR:
20     Q.    Nuclear Regulatory Commission?
21     A.    Nick McCall with the NRC?
22     Q.    Yes.
23     A.    I'm not aware of any. I just don't know.
24     Q.    To your knowledge, did he have any direct
25 communications with representatives of Nuclear

1 Development?
2     A.    I don't know.
3     Q.    And who is Greg Signer?
4     A.    Signer.
5     Q.    Signer. For the court reporter, that's
6 S-i-g-n-e-r, correct?
7     A.    Yes. Greg Signer was head of the
8 environmental group until his retirement.
9     Q.    When did he retire?
10     A.    I think it was in early -- it was either
11 2016 or 2017.
12     Q.    And he reported to you as head of that
13 environmental group?
14     A.    That's correct.
15     Q.    Did Mr. Signer have any responsibilities
16 or duties with respect to the purchase and sale
17 agreement between Nuclear Development and TVA?
18     A.    I am not aware of exactly what his
19 involvement in that agreement was. I know that he was
20 involved in the lead-up to -- you know, he was involved
21 in various activities related to the transfer of the
22 facility, but I don't recall exactly what he might have
23 done with respect to the agreement.
24     Q.    What activities were he involved -- was
25 he involved in regarding the process of the sale of the

1 facility?
2     A.    He was involved in advising on
3 environmental issues. I believe that he also worked
4 with our realty department in addressing some of the
5 aspects of the sale and in making sure that the sale
6 was executed in accordance with our legal requirements.
7     Q.    Was he evolved in any environmental
8 review regarding the sale?
9     A.    He was involved in looking at some of the
10 prior environmental reviews that had been done of the
11 site, but I don't recall whether he was involved in the
12 environmental review that occurred after the auction.
13     Q.    Between -- when you say the auction, the
14 one in November of 2016?
15     A.    That's correct.
16     Q.    So you don't know whether he was involved
17 in any environmental review between the date of the
18 contract of November 14, 2016, and the date of the
19 scheduled closing in November of 2018?
20     A.    I believe he would have been involved in
21 looking at what our environmental requirements would
22 be.
23        I draw a distinction between an
24 environmental review that is an active review pursuant
25 to legal requirements and one that involves determining

7 (Pages 22 - 25)

Page 26

1 what those requirements are, and he was, as far as I
2 know, more involved in the latter than -- excuse me --
3 the former than the latter.
4     Q.    Were there any environmental issues which
5 would have prevented the closing of that transaction?
6     A.    We determined that -- that we could go to
7 closing with the environmental record as it was.
8     Q.    Who at TVA was responsible for the final
9 approval of all the terms and conditions of the
10 contract?
11     A.    That would be Bill Johnson.
12     Q.    Okay.  Well, he said you were.  Did you
13 read his testimony?
14     A.    I did.
15     Q.    Okay.
16     A.    But as CEO, pursuant to the resolution
17 that the board passed, it actually was technically his
18 authority, and so those of us who supported him made
19 recommendations to him.
20     Q.    Did you make recommendations to him?
21         MR. LEMBKE: That's a yes or no question,
22     Miss Quirk.
23         THE WITNESS: Yes.
24 BY MR. O'REAR:
25     Q.    Regarding the terms and conditions of the

Page 27

1 contract?  The question is, did you make
2 recommendations to him regarding the terms and
3 conditions of the contract?
4         MR. LAMBKE: It's again a yes or no
5     question.
6         THE WITNESS:  Yes, generally.
7 BY MR. O'REAR:
8     Q.    When you said he was authorized by
9 resolution, what were you referring to?
10     A.    When the board approved or declared the
11 Bellefonte site to be surplus, it passed a resolution
12 providing the CEO with the authority to move forward in
13 the sale of the site at auction.
14     (Exhibit 4 - Previously marked - Bates No.
15     TVABLN000002633 through 2634, Resolution.)
16 BY MR. O'REAR:
17     Q.    Let me show you has been previously
18 marked as Exhibit 4.  Is that the resolution that
19 you're referring to?
20     A.    It appears to be, yes.
21     Q.    Within the legal department, who worked
22 on the negotiations and review of the contract terms
23 before the contract was executed?
24     A.    I believe that Cliff Beach was overseeing
25 that process and he was working with an outside

Page 28

1 consultant firm, Concentric.
2     Q.    Do you know what lawyers worked under Mr.
3 Beach on that project?
4     A.    I believe it was Nick McCall, and as I
5 said I'm not sure whether Greg would still have been
6 there or not, but I don't know beyond that who was on
7 the team.
8     Q.    Did the team have a name?  Did that team
9 have a name?
10     A.    I don't know that they had anything more
11 catchy than the Bellefonte team.
12     Q.    Did Mr. Beach report to you in terms of
13 matters regarding the negotiation of the terms of the
14 contract?
15     A.    Yes.
16     Q.    Did you report to Mr. Johnson regarding
17 matters involving the negotiation of the terms of the
18 contract?
19     A.    Yes, generally.
20     Q.    Did you report to him with respect to any
21 specific provisions of the contract?
22         MR. LAMBKE:  That's a yes or no question,
23     Miss Quirk.
24         THE WITNESS:  Yes.
25 BY MR. O'REAR:

Page 29

1     Q.    Okay.  And which ones?
2         MR. LAMBKE:  I instruct you not to answer
3     that question.  That would require disclosure of
4     attorney/client privilege material.
5 BY MR. O'REAR:
6     Q.    What was the role of Concentric Energy
7 Advisors in this process?
8     A.    We hired Concentric to help to conduct
9 the auction and to elicit interest in the site.
10     Q.    Was Concentric involved in negotiating
11 the terms of the contract with Nuclear Development?
12     A.    I don't know for certain, but I would
13 imagine they were.
14     Q.    Was there a written contract with
15 Concentric that outlined the scope of it's work?
16     A.    I'm certain there was.
17     Q.    When was that contract entered into?
18     A.    I don't recall.
19     Q.    If the contract was signed as of
20 November 14, 2016, do you have any idea how much prior
21 to that, how much time prior to that there would have
22 been an agreement with Concentric, or when did they
23 begin being involved?
24     A.    I would be guessing.
25         MR. LEMBKE: Objection to the form.

8 (Pages 26 - 29)

Page 30

1    Compound question. Vague.
2  BY MR. O'REAR:
3    Q.    Well, I was trying to ask the same
4  question two ways. Okay.
5         When did Concentric start working under
6  this contract?
7    A.    I would be guessing if I gave you a time.
8    Q.    Would it have been sometime in 2016?
9    A.    I believe so, but I'm not sure.
10   Q.    And did the process work where Concentric
11 would have communications with representatives of
12 Nuclear Development and they would take any questions
13 or issues to be decided to Mr. Beach for direction?
14   A.    I don't know for certain.
15   Q.    Did Mr. Beach ever bring to you any
16 particular issues involving negotiations with Nuclear
17 Development regarding the terms of the contract?
18        MR. LAMBKE: That's a yes or no question.
19        THE WITNESS: Yes.
20 BY MR. O'REAR:
21   Q.    And did you make final decisions on those
22 terms?
23   A.    No.
24   Q.    Who would have made the final decisions?
25   A.    The -- from my perspective as General

Page 31

1  Counsel, my team would have recommended and negotiated
2  a deal that was then presented for the CEO's review.
3    Q.    Would those recommendations have come at
4  the conclusion of the negotiation process in the form
5  of recommending the entire contract?
6    A.    I believe so. I mean, there may have
7  been some terms that bubbled up before.
8    Q.    Well, what terms bubbled up before?
9         MR. LEMBKE: I instruct you not to answer
10 that question. It would require you to disclose
11 attorney/client communications.
12        MR. O'REAR: I'm not asking her about
13 communications. I'm asking her what issues in the
14 negotiation bubbled up before the contract as a
15 whole was recommended to the CEO.
16        MR. LAMBKE: Well, but what you're asking
17 her what issues she communicated. By doing that
18 you're asking her what issues bubbled up that she
19 conveyed to Bill Johnson.
20        MR. O'REAR: Well, I didn't ask that.
21 That wasn't -- I did ask that earlier.
22 BY MR. O'REAR:
23   Q.    But the question I'm asking you now is,
24 what issues bubbled up?
25        MR. LEMBKE: You can answer that

Page 32

1  question.
2         THE WITNESS: One of our concerns -- well
3  our --
4         MR. LEMBKE: Hold it. I'm going to
5  instruct you not to disclose -- your -- discussing
6  your concerns would require you to disclose your
7  work product and that I instruct you not to
8  answer.
9         You should limit your answer here to just
10 a statement of issues that bubbled up from Nuclear
11 Development during the negotiations.
12        Do you understand my instruction?
13        THE WITNESS: Yes. The only issue that I
14 recall is the question of the period of time
15 between auction and closing.
16 BY MR. O'REAR:
17   Q.    Concentric's work occurred before the
18 contract was entered into between TVA and Nuclear
19 Development, correct?
20   A.    Correct.
21   Q.    Did Concentric work with the other
22 prospective bidders regarding terms and conditions of
23 contracts with them?
24   A.    Yes, as far -- I'm aware that they did.
25   Q.    So they would have undertaken the same

Page 33

1  exercise with respect to those prospective bidders as
2  they did with Nuclear Development, correct?
3    A.    Correct.
4    Q.    Do you know who those other prospective
5  bidders were?
6    A.    I know of two. One was NextEra or some
7  NextEra connected company, and the other was an Indian
8  company whose name I just don't recall.
9    Q.    Something like National Environmental
10 Services?
11   A.    That sounds right, but I don't have a
12 specific recollection of it.
13   Q.    And with respect to Mr. Beach's
14 involvement, he would have been involved with
15 Concentric on those prospective bidders just as he was
16 on Nuclear Development?
17   A.    That's my understanding, yes.
18   Q.    And I assume Concentric was paid a fee by
19 TVA for it's services, correct?
20   A.    That's correct.
21   Q.    And was Concentric paid out of the money
22 that Nuclear Development put up upon the execution of
23 the contract in 2016?
24   A.    I don't know.
25        (Exhibit 1 - Previously marked - Contract.)

9 (Pages 30 - 33)

1 BY MR. O'REAR:
2    Q.    Let me direct your attention to the
3 contract which has been marked previously as Exhibit 1
4 to the deposition of Mr. Johnson.
5         If you would turn to section five of that
6 contract, page six. Directing your attention to
7 section 5C. Are you there?
8    A.    Yes, I am.
9    Q.    Was the payment to Concentric part of the
10 compensated costs that were paid for in the amount of
11 $750,000 by Nuclear Development?
12         MR. LEMBKE: Object to the form. Lack of
13    foundation.
14         MR. O'REAR: What's the lack of
15    foundation?
16         MR. LEMBKE: You haven't established --
17    you put a document in front of her that you've not
18    established she's ever seen before.
19 BY MR. O'REAR:
20    Q.    Oh, you've never seen the contract
21 between TVA and Nuclear Development?
22         MR. LEMBKE: Object to the form.
23    Argumentative.
24 BY MR. O'REAR:
25    Q.    Have you ever seen it?

1    A.    Yes, I've seen it.
2    Q.    Did you ultimately recommend approval of
3 this contract to the CEO?
4         MR. LEMBKE: I instruct you not to answer
5    that question. It would require you to disclose
6    attorney/client communications.
7 BY MR. O'REAR:
8    Q.    So you're not going to answer that
9 question?
10    A.    I'm going to follow my lawyer's guidance.
11    Q.    All right. Look at section 5C. Was the
12 payment TVA made to Concentric from money paid to TVA
13 by Nuclear Development upon execution of the contract?
14         MR. LEMBKE: I'm going to object to the
15    form. Are you asking her about what the document
16    says or what happened?
17         MR. O'REAR: Well, I'm asking her if she
18    can tell me by looking at the contract.
19         THE WITNESS: What's the question again?
20 BY MR. O'REAR:
21    Q.    The question is, was Concentric paid out
22 of money provided by Nuclear Development?
23    A.    That's what this language appears to say.
24    Q.    Do you know who the point person at
25 Concentric was in terms of communicating with TVA about

1 negotiations of the contract?
2    A.    I believe her first name was Kari.
3    Q.    Was it Kari O'Neil?
4    A.    That sounds right.
5    Q.    Do you know whether she was a lawyer or
6 not?
7    A.    I don't believe so, but I'm not certain.
8    Q.    Were you aware that during the
9 negotiation process that Mr. Larry Blust, who is seated
10 here next to me, made a request on behalf of Nuclear
11 Development to include a provision in the contract that
12 the transfer of the construction permits would be from
13 TVA to Nuclear Development, would be a condition of the
14 closing of the sales transaction?
15    A.    I generally recall that, yes.
16    Q.    And were you involved in that
17 consideration of that request at all?
18    A.    I was involved in discussions with the
19 team over how to address that.
20    Q.    And how was that decided?
21         MR. LEMBKE: Object to the form.
22 BY MR. O'REAR:
23    Q.    Or what was decided?
24         MR. LEMBKE: Well, to the extent that is
25    calling for you to disclose the internal work

1    product of TVA, I instruct -- of TVA lawyers, I
2    instruct you not to answer that question.
3         THE WITNESS: I can tell you the ultimate
4    provision that emerged from -- with respect to
5    this issue, which is that there would be a
6    two-year period between the auction and closing
7    which was considered to be ample for all necessary
8    approvals.
9 BY MR. O'REAR:
10    Q.    Who made the decision at TVA to deny the
11 request of Nuclear Development that transfer of the
12 construction permits be a condition of closing?
13    A.    I don't understand your question.
14    Q.    Who made the ultimate decision to deny
15 Mr. Blust's requests on behalf of Nuclear Development
16 that transfer of the construction permits be a
17 condition of closing the sales transaction?
18    A.    The team negotiated a number of terms and
19 conditions, including this, made a recommendation that
20 the -- that I and the CEO, I recommend this to the CEO,
21 and as an entirety those terms were adopted or accepted
22 by the CEO.
23    Q.    Were you aware that TVA made certain
24 representations and warranties in the contract in order
25 to induce Nuclear Development to enter into the

1 contract?
2          MR. LEMBKE: Object to the form. Lack of
3    foundation.
4 BY MR. O'REAR:
5     Q.    Go ahead.
6          MR. LEMBKE: You can answer, if you know.
7          THE WITNESS: Can you repeat the question?
8 BY MR. O'REAR:
9     Q.    Were you aware that TVA made certain
10 recommendations and warranties in the contract in order
11 to induce them ---
12          MR. LEMBKE: Let me stop you, Caine. You
13    said recommendations. I don't think you meant to
14    say that.
15          MR. O'REAR: Excuse me. Representations.
16    I didn't. I appreciate it. I'll start over.
17 BY MR. O'REAR:
18    Q.    Are you aware that TVA made certain
19 representations and warranties in the contract in order
20 to induce Nuclear Development to enter into the
21 contract?
22          MR. LEMBKE: Same objection.
23          THE WITNESS: I know there is a
24    representations and warranties section. What
25    effect that had on Nuclear Development, I can't

1    say.
2 BY MR. O'REAR:
3     Q.    I direct your attention to section seven
4 of the contract before you, which is Exhibit 1. If you
5 would look to page eight.
6          Do you have that before you?
7     A.    I do.
8     Q.    And section seven is captioned TVA's
9 representation and warranties, correct?
10    A.    That's correct.
11    Q.    Then A, subsection A says what? What's
12 the preamble of section A say?
13    A.    "To induce buyer to enter into this
14 agreement, TVA represents and warrants as follows."
15    Q.    So the inducement language is in the
16 contract itself, correct?
17    A.    It is.
18    Q.    All right. And if you would direct your
19 attention to romanette seven under subsection 7A. Do
20 you see that?
21    A.    Yes.
22    Q.    Would you read that romanette seven into
23 the record, please.
24    A.    "TVA has full right, power, and authority
25 to execute and deliver this agreement and to consummate

1 the purchase and sale transactions provided for
2 therein, and no authorization, consent or approval or
3 other order or action of or filing with any
4 governmental authority is required for the execution
5 and delivery by the TVA of this agreement or the
6 consummation by the TVA of the transactions
7 contemplated therein."
8     Q.    Now, is the Nuclear Regulatory Commission
9 a governmental authority as that term is used in this
10 section?
11    A.    I would assume so. I haven't checked the
12 definition, but I would assume so.
13    Q.    If you would look to section -- just so
14 we can clarify that. If you would look to section nine
15 of the contract as it continues from page nine to page
16 ten.
17          Does the term -- is the term governmental
18 authority defined to include any federal regulatory or
19 administrative agency?
20    A.    Yes.
21    Q.    And would that include the Nuclear
22 Regulatory Commission?
23    A.    I would assume so, yes.
24    Q.    In fact, other than the Nuclear
25 Regulatory Commission, were there any other

1 governmental authorities that were contemplated when
2 TVA signed the contract with section 7A, romanette 7 in
3 it?
4          MR. LEMBKE: Miss Quirk, to the extent
5    that would require you to disclose attorney work
6    product, I instruct you not to answer the
7    question.
8          To the extent you can answer it without
9    disclosing attorney work product, you can go
10    ahead.
11          THE WITNESS: I am not aware of any
12    others.
13 BY MR. O'REAR:
14    Q.    Now, was your recommendation for TVA to
15 accept or did you make a recommendation for TVA to
16 accept this particular representation that is set forth
17 in the contract --
18          MR. LEMBKE: Miss Quirk --
19 BY MR. O'REAR:
20    Q.    Just a minute -- other than your
21 recommendation to the CEO that the contract be accepted
22 in general?
23          MR. LEMBKE: Miss Quirk, again I instruct
24    you to the extent that would require you to
25    disclose an attorney/client communication, I

11 (Pages 38 - 41)

Page 42

1    instruct you not to answer it.
2         THE WITNESS:  Could you state the
3    question again?
4 BY MR. O'REAR:
5    Q.    Did you make a recommendation that TVA
6 accept this provision of the contract?
7         MR. LEMBKE: Same instruction.
8         THE WITNESS:  As I said, I made a general
9    recommendation.
10 BY MR. O'REAR:
11   Q.    To the CEO?
12   A.    Yes.
13   Q.    And he was the final decisionmaker?
14   A.    He signed it, yes.
15   Q.    Well, Aaron Nix signed it.
16   A.    Oh, that's duly noted.
17   Q.    Okay.  But the final decisionmaker was
18 the CEO, Bill Johnson?
19   A.    Yes.
20   Q.    And Mr. Nix could not sign the contract
21 without Mr. Johnson's approval, is that correct?
22   A.    Correct.
23   Q.    Are you familiar with TVA's position in
24 this lawsuit now?
25        MR. LEMBKE:  Miss Quirk, I instruct you

Page 43

1    not to answer that question to the extent it would
2    require you to disclose attorney/client
3    communications or your work product.
4         THE WITNESS:  I am generally familiar.
5 BY MR. O'REAR:
6    Q.    Okay.  Have you read the answer that was
7 filed by TVA in this case, the answer to the complaint?
8    A.    A while ago, yes.
9    Q.    Did you read TVA's motion to dismiss and
10 it's brief submitted in support of that motion?
11   A.    A while ago, yes.
12   Q.    Are you familiar with the fact that
13 currently TVA is taking the position in the lawsuit
14 that the transfer of the construction permits would
15 have been required before the closing in order to make
16 the closing legal?
17   A.    Yes, I'm aware of that.
18   Q.    And the transfer of the construction
19 permits would have required the approval of the
20 National Regulatory Commission (sic), correct?
21        MR. LEMBKE: Object to the form.  Calls
22   for a legal conclusion, and again I instruct you
23   to the extent that it would require you --
24        MR. O'REAR:  Well --
25        MR. LEMBKE: -- to the extent that would

Page 44

1    require you to disclose attorney/client
2    communications or your work product, you shouldn't
3    answer it.
4 BY MR. O'REAR:
5    Q.    Are you aware of TVA's position in this
6 case that the Nuclear Regulatory Commission must
7 approve the transfer of the construction permits from
8 TVA to Nuclear Development?
9    A.    I'm aware, yes.
10   Q.    Are you aware of TVA's position in this
11 lawsuit that that approval should have occurred before
12 the closing in order for the closing of the transaction
13 to be legal under the Atomic Energy Act?
14   A.    Yes, I'm aware of that.
15   Q.    Now, based on TVA's current position in
16 the lawsuit, is the representation and warranty made in
17 section 7-A-7 false, if you assume TVA's position is
18 correct in the lawsuit?
19        MR. LEMBKE:  Object to the form.  To the
20   extent that answer would require you to disclose
21   attorney/client communications or work product,
22   you shouldn't answer it, otherwise you can go
23   ahead.
24        THE WITNESS:  I'm sorry.  I'm going to
25   have to ask you to repeat.

Page 45

1 BY MR. O'REAR:
2    Q.    Okay.  All right.  I want you to take into
3 consideration the answers you've already given --
4    A.    Yes.
5    Q.    -- of your understanding of TVA's
6 position in the lawsuit.  Based on TVA's position in
7 this lawsuit, is the representation made by TVA in
8 section 7 A romanette 7 false?
9         MR. LEMBKE:  Same instruction.
10        THE WITNESS:  Reading it here today?  It
11   looks to me to be inaccurate.
12 BY MR. O'REAR:
13   Q.    False?
14   A.    Inaccurate, I would say.
15   Q.    Incorrect?
16        MR. LEMBKE:  Asked and answered.
17 BY MR. O'REAR:
18   Q.    Do you contest the fact that the contract
19 provides that that representation was made by TVA to
20 induce Nuclear Development to enter into the contract?
21        MR. LEMBKE:  Objection, asked and
22   answered.  You can answer it again.
23        THE WITNESS:  It's in the contract and
24   the language says what it says.
25 BY MR. O'REAR:

12 (Pages 42 - 45)

Page 46

1    Q.    You earlier referred to your awareness
2  that there were at least two other prospective bidders
3  on the contract?
4    A.    Yes.
5    Q.    For the contract?
6    A.    Yes.
7    Q.    And one of them I believe you said was,
8  refresh me, NextEra?
9    A.    Yes, or a subsidiary thereof.
10   Q.    N-e-x-t one word, e-r-a one word?
11   A.    Yes, capital E.
12   Q.    And I mentioned a group called National
13 Environmental Group. Do you recall that to be the
14 other -- do you recall that to be the entity that
15 actually submitted a bid for the property?
16   A.    Yeah, I know another entity submitted a
17 bid. I accept your representation that that was the
18 name of it.
19   Q.    Did you have any contact with either of
20 those groups?
21   A.    With NextEra or --
22   Q.    With either?
23   A.    I was in a meeting with NextEra that was
24 similar to the meeting that we had with Nuclear
25 Development, bidder's meeting, but I had no contact

Page 47

1  with the other group that I can recall.
2    Q.    Are you familiar with a man by name of
3  Aaron Abadi with National Environmental Group?
4    A.    I have seen his name. That's about all
5  that I know about him.
6    Q.    You had no communication with him?
7    A.    No.
8    Q.    As far as you know?
9    A.    No.
10   Q.    Did either of those two groups express in
11 their intent to bid that they intended to construct and
12 operate a nuclear facility at Bellefonte?
13   A.    Not as far as I'm aware.
14   Q.    Do you know what they stated in their
15 letters of intent to bid about the purpose they were
16 going to use the property for?
17   A.    I don't know what they stated in their
18 notice of intent to bid. I do know what NextEra
19 described in a meeting that they had with us.
20   Q.    And what did they describe?
21   A.    A combination of solar and battery cells.
22   Q.    But not nuclear?
23   A.    Not as -- no, no.
24   Q.    If you assume that either of those two
25 companies would have been the winning bidder at the

Page 48

1  auction, would TVA have required that the construction
2  permits that it held at Bellefonte be transferred to
3  those entities before the closing?
4         MR. LEMBKE: First, I object to the form
5    in that it calls for speculation. Second of all,
6    I instruct you not to answer the question to the
7    extent it would require you to disclose attorney
8    work product.
9         You can answer if you can subject to that
10   instruction.
11        THE WITNESS: Can you repeat, please?
12 BY MR. O'REAR:
13   Q.    Okay. You've got to shorten these
14 objections.
15        If you assume either of those two groups
16 would have been the winning bidder at the auction,
17 would TVA have required the transfer of the
18 construction permits from TVA to either of those groups
19 as the winning bidder approved by the NRC prior to the
20 closing?
21        MR. LEMBKE: Same objection, same
22   instruction.
23        THE WITNESS: I'm not sure what we would
24   have done in a contract with them. It would be a
25   different set of circumstances.

Page 49

1  BY MR. O'REAR:
2    Q.    Can you say today that you would have
3  required that?
4         MR. LEMBKE: Same objection, same
5    instruction. Asked and answered.
6         THE WITNESS: I don't know what we would
7    have done. It would depend on the circumstances
8    today.
9  MR. O'REAR:
10   Q.    Did the contract as executed require the
11 parties to cooperate with one another in order to
12 consummate the activities needed to complete the
13 purchase and sale of the transaction?
14   A.    Can you point me to a provision?
15   Q.    Yes. If you would look at section nine
16 of the contract, which is captioned on page nine,
17 covenants after the effective date and prior to
18 closing.
19        I direct your attention to subsection A
20 romanette ii or romanette 2.
21   A.    I see that. Yes, it does appear to
22 provide for reasonable cooperation in obtaining
23 consents. May we take a break?
24   Q.    You may.
25   A.    Okay. Thank you.

13 (Pages 46 - 49)

Page 50

1    MR. O'REAR: Off the record.
2    THE VIDEOGRAPHER: Okay. Let me make a
3  correction. I think I said we went on the record
4  at 9:57 but we went on the record at 8:57.
5    THE WITNESS: You did say 8:57.
6    THE VIDEOGRAPHER: The time is 9:57.
7  We're going off the record.
8    (Recess taken.)
9    THE VIDEOGRAPHER: Okay. 10:08. We're
10  back on the record.
11  BY MR. O'REAR:
12    Q.    Miss Quirk, you mentioned previously that
13  you were involved in a meeting with one of the
14  prospective bidders at the bid package meeting, is that
15  correct?
16    A.    I assume that's what the meeting was
17  called.
18    Q.    Did all of the prospective bidders
19  receive the same contract to bid on?
20    A.    As far as I'm aware.
21    Q.    As far as you're aware, yes?
22    A.    As far as I'm aware, yes.
23    Q.    Okay. Thank you.
24    Now, we talked about the cooperation
25  clause that you identified in the contract. Let me

Page 51

1  direct your attention to Exhibit 7.
2    (Exhibit 7 - Previously marked, Bates No.
3    TVABLN000001520 through 1523, e-mail from Larry
4    Blust dated August 18, 2017, to James Chardos.)
5    THE WITNESS: Do I still need this
6  exhibit?
7  BY MR. O'REAR:
8    Q.    Just keep it before you. You can turn
9  the page over. We may need to refer to it later, but
10  just keep it there.
11    Were you aware, directing your attention
12  to Exhibit 7, that Mr. Blust sent an e-mail on
13  August 18, 2017, to James Chardos of TVA with a
14  proposed letter to be signed by TVA which is attached
15  to the e-mail which, and I'll identify it, it is a
16  draft letter to the NRC, National Regulatory -- Nuclear
17  Regulatory Commission to extend the construction
18  completion date for the construction permit on Unit 2
19  of the Bellefont site.
20    Were you familiar that there was such a
21  request at that time?
22    A.    At that time, probably not.
23    Q.    Have you since been made aware of that?
24    MR. LEMBKE: Miss Quirk, I instruct you
25  not to answer that question to the extent it would

Page 52

1  require you to disclose attorney/client
2  communications.
3    If you can answer it without reference to
4  attorney/client communications, go ahead.
5    THE WITNESS: I later became aware of it.
6  BY MR. O'REAR:
7    Q.    And were you aware that TVA rejected this
8  request from Mr. Blust?
9    A.    I was aware of that, yes.
10    Q.    And just to identify that exhibit, for
11  the record, if you could look at Exhibit 8 which is an
12  e-mail from Scott Vance to Mr. Blust and to Chris
13  Chandler at TVA and Aaron Nix at TVA.
14    In the text of that the first line says,
15  "TVA will not send a subsequent extension letter as
16  requested." Were you aware of this letter?
17    A.    I was generally aware that this was going
18  on, yes.
19    Q.    Who made the decision to deny that
20  request for extension submitted by Nuclear Development
21  as set forth in Mr. Vance's e-mail?
22    A.    I'm not certain who would have made that
23  decision.
24    Q.    Did you make it?
25    A.    I don't believe that I did. I was aware

Page 53

1  of it, but it was an action taken below my level.
2    Q.    Who within the realm of possibility, who
3  could have made that decision below your level?
4    A.    It could have been Scott Vance. It could
5  have been Nuclear Licensing. I'm not sure.
6    Q.    And Scott Vance is in the legal
7  department, correct?
8    A.    No longer in the legal department.
9    Q.    Was he in the legal department in 2017
10  when this e-mail was sent?
11    A.    Yes, he was.
12    Q.    And his title is stated there as being
13  Associate General Counsel Nuclear, correct?
14    A.    That's correct, yes.
15    Q.    So when I earlier asked you who was in
16  the nuclear department, was he in the nuclear
17  department?
18    A.    At that time, yes.
19    Q.    Okay. I didn't -- all right. You didn't
20  mention his name so that's the reason I'm asking now.
21    A.    I believe the time period you asked about
22  didn't include the time when he was there, but I could
23  be -- I could have been wrong so --
24    Q.    Okay.
25    A.    -- I'm open to being corrected.

14 (Pages 50 - 53)

1    Q.    In any event, he was in the nuclear
2  department of the legal department, nuclear division in
3  the legal department in 2017?
4    A.    Yes.
5    Q.    And who would he have reported to in 2017
6  when this e-mail was written?
7    A.    To me.
8    Q.    Okay.  Do you think you would have given
9  him approval to send this e-mail?
10       MR. LEMBKE: Objection, asked and
11  answered.
12  BY MR. O'REAR:
13    Q.    Just your best recollection?
14    A.    Yes.
15    Q.    Are you familiar with a lawyer by the
16  name of Tim Matthews with the Morgan Lewis firm who was
17  acting as the counsel for Nuclear Development?
18    A.    I don't know him, but I heard his name in
19  connection with this matter.
20    Q.    Were you aware that in June of 2018 and
21  also October of 2018 he made a request to TVA to sign a
22  letter for the Nuclear Regulatory Commission expressing
23  TVA's consent to the transfer of the two construction
24  permits to Nuclear Development?
25       MR. LEMBKE:  Object to the form.  Lack of

1  foundation.
2  BY MR. O'REAR:
3    Q.    You can answer.
4    A.    I am aware that he and Chris Chandler had
5  discussions about a letter.
6       (Exhibit 14 - Previously marked - Bates No.
7  TVABLN00005105 through 5109, e-mail chain from
8  Chris Chandler to Tim Matthews.)
9  BY MR. O'REAR:
10    Q.    I direct your attention to Exhibit 14.
11  If you could look that over and tell me if you can
12  identify that as an e-mail chain ultimately from Chris
13  Chandler to Tim Matthews copying Joseph Shea where
14  Chandler received a request from Matthews for TVA to
15  sign a letter to be submitted to the Nuclear Regulatory
16  Commission consenting to the sale of the Bellefonte
17  property and the transfer of the two construction
18  permits?
19       MR. LEMBKE:  Object to the form.
20  Misstates the exhibit.  Lack of foundation.
21       THE WITNESS:  Can you restate, please?
22  BY MR. O'REAR:
23    Q.    Can you identify Exhibit 14 as a series
24  of e-mails whereby Tim Matthews on behalf of Nuclear
25  Development submitted a letter to Chris Chandler of TVA

1  whereby TVA would consent in a letter to the Nuclear
2  Regulatory Commission to the transfer of the two
3  construction permits?
4       MR. LEMBKE: Same objection.
5       THE WITNESS:  What it looks like, I don't
6    see myself copied on this, but that is what this
7    appears to be.
8  BY MR. O'REAR:
9    Q.    Well, were you aware that this was going
10  on at the time?
11    A.    Chris may have mentioned it.
12    Q.    And he reported to you, correct?
13    A.    At this time I'm not sure that he did.
14    Q.    In October of 2018?
15    A.    I don't think he did at that time.
16    Q.    Who did he report to at that time?
17    A.    To Kimberly Bolton.
18    Q.    And who is she?
19    A.    At that time she was a Deputy General
20  Counsel.
21    Q.    When did Chris Chandler begin reporting
22  to Kimberly Bolton?
23    A.    My memory is about March of 2018.
24    Q.    And did Kimberly Bolton report to you?
25    A.    Yes.

1    Q.    As of March 2018?
2    A.    Yes, she did.
3    Q.    And she was head of the nuclear office of
4  the legal department?
5    A.    She as deputy had several of the groups
6  under her.
7    Q.    In any event, you were aware that this
8  request had been made at this time, is that correct?
9    A.    Chris mentioned it to me, yes.
10    Q.    And did TVA deny this request?
11    A.    No.
12    Q.    Did TVA respond to the request?
13    A.    What I know is that Chris and Tim
14  Matthews talked about it, but I don't recall a request
15  being made.
16    Q.    You don't consider Exhibit 14 a request
17  for TVA to sign a letter and the proposed letter is
18  attached?
19    A.    What I was --
20       MR. LEMBKE:  Object to the form.  Lack of
21  foundation.
22  BY MR. O'REAR:
23    Q.    Go ahead.
24    A.    I was told there was a conversation, that
25  this -- as a result of this Chris and Tim talked, but I

Page 58

1  was not informed of a request in connection with that
2  conversation.
3      Q.    So were you ever aware that Nuclear
4  Development had requested TVA to consent to the
5  transfer of the construction permits before the closing
6  date?
7      A.    Was I ever aware?  Well, I'm certainly
8  aware now.
9      Q.    Were you ever aware at any time prior to
10  November 30, 2018, that Nuclear Development had
11  requested TVA to consent as evidenced by a letter to
12  the National Regulatory Commission to the transfer of
13  the construction permits?
14          MR. LEMBKE:  Object to the form, vague.
15      Lack of foundation.  Misstates the exhibit.
16  BY MR. O'REAR:
17      Q.    Were you?
18          MR. LEMBKE:  Same objection.
19          THE WITNESS:  As I said, I knew there
20      were conversations, but I did not -- I was not
21      aware of a request, but I don't recall the details
22      of the conversation.
23  BY MR. O'REAR:
24      Q.    Nevertheless, did TVA ever consent to the
25  transfer of the construction permits before the closing

Page 59

1  date of November 30, 2018?
2      A.    Not as far as I'm aware.
3      Q.    Do you know of any reason why TVA would
4  not have consented to transfer the construction permits
5  before November 30, 2018?
6          MR. LEMBKE:  Object to the form, lack of
7      foundation.  And, Miss Quirk, I instruct you to
8      the extent that would require you to reveal
9      attorney/client communications or attorney work
10      product, you should not answer it.
11          THE WITNESS:  I don't think I can answer
12      it.
13  BY MR. O'REAR:
14      Q.    You can't answer it because you've been
15  instructed not to answer it or you don't know the
16  answer?
17      A.    I think the answer would provide
18  attorney/client privileged information.
19      Q.    That is to state the reason why TVA did
20  not consent to the transfer of the construction permits
21  would divulge attorney/client communications?
22          MR. LEMBKE:  Same objection, same
23      instruction.
24  BY MR. O'REAR:
25      Q.    I'm trying to make sure we're on the same

Page 60

1  page here, what you're saying is responsive to what I'm
2  asking.
3      A.    Yeah, and I'm not saying that we declined
4  to.  You're asking whether we would have if we had been
5  asked and, you know, I think it's speculative and to
6  the extent that there were conversations about it, it
7  is privileged communication.
8      Q.    Were you aware that the National
9  Regulatory Commission held a public meeting --
10          MR. LEMBKE:  Nuclear.
11          MR. O'REAR:  I want a standing objection
12      to my own question that whenever I say national,
13      it's nuclear.
14  BY MR. O'REAR:
15      Q.    -- Nuclear Regulatory Commission held a
16  public meeting on August 14, 2018, to discuss the issue
17  of transferring the construction permits at Bellefonte,
18  were you aware of that?
19      A.    I was informed of it, yes.
20      Q.    And then if you'd direct your attention
21  to Exhibit 10 that I'm going to hand you.  I'd like to
22  ask you some questions about that.
23      (Exhibit 10 - Previously marked -Bates No.
24      TVABLN00008330 through 8331, e-mail from Justin
25      Maierhofer dated August 14, 2018.)

Page 61

1  BY MR. O'REAR:
2      Q.    Do you recognize Exhibit 10 as an e-mail
3  you received from Justin Maierhofer of TVA on
4  August 14, 2018?
5      A.    I see that I'm copied on it, so I am
6  certain that at one point I looked at it.
7      Q.    And it's directed to you and to Bill
8  Johnson, correct?
9      A.    That's correct.
10      Q.    And also to John Thomas, correct?
11      A.    Yes.
12      Q.    And he's the CFO of TVA?
13      A.    That's correct.
14      Q.    And Van Wardlaw, who is he?
15      A.    He was the -- sort of the head, the
16  -- I don't know if he was an executive vice president
17  or senior vice president for external relations.
18      Q.    Okay.  This a report that
19  Mr. Maierhofer forwarded from a Russ Bell with the
20  Nuclear Energy Institute of the same date, August 14,
21  2018, correct?
22      A.    That's correct.
23      Q.    And Mr. Bell is reporting on what
24  transpired at the Nuclear Regulatory Commission public
25  meeting on August 14, 2018, correct?

16 (Pages 58 - 61)

Page 62

1    A.    Correct.
2    Q.    And TVA had representatives attending
3  that meeting, correct?
4         MR. LEMBKE: Object to the form. Lack of
5  foundation.
6  BY MR. O'REAR:
7    Q.    Okay. Well, I'll show you the summary of
8  that with the next exhibit.
9    A.    If you could show me something, I would
10 appreciate it.
11   Q.    I will. Next exhibit. Let's talk about
12 this exhibit.
13   A.    Okay.
14   Q.    So you said you're sure you would have
15 read this.
16        Did you see the statement made by Mr.
17 Bell on the second page of the exhibit that "Nuclear
18 Development will begin engineering and licensing work
19 in parallel upon closure of the sale." Did you see
20 that?
21   A.    I see that, yes.
22   Q.    And then two bullet points down from that
23 it says "Bill said a more detailed licensing schedule
24 will be available in early 2019."
25        Do you see that?

Page 63

1    A.    Yes.
2    Q.    And that Bill is referring to Bill
3  McCollum, a representative of Nuclear Development, do
4  you know?
5    A.    I would assume so since he was
6  representing Nuclear Development.
7    Q.    At the meeting?
8    A.    Yes.
9    Q.    And did this e-mail cause you any concern
10 in terms of closing the transaction without having the
11 construction permits transferred before the closing
12 date?
13        MR. LEMBKE:  Miss Quirk, I instruct you
14        not to answer because it would require you to
15        reveal your attorney work product.
16        MR. O'REAR:  Whether she was concerned it
17        revealed her work product?
18        MR. LEMBKE:  Yes.
19        MR. O'REAR:  Well, I didn't ask her what
20        her state of mind was.
21        MR. LEMBKE:  Of course it is. For an
22        attorney determining whether having read something
23        whether she has that concern, that's work product.
24 BY MR. O'REAR:
25   Q.    Okay. Do you refuse to answer that

Page 64

1  question on advice of counsel?
2    A.    I will follow the advice of my counsel.
3    Q.    Did you ever have any concern prior to
4  the November 30th closing date about the fact that the
5  construction permits were not going to be transferred
6  by the closing date?
7         MR. LEMBKE:  Miss Quirk, to the extent
8         that would require you to reveal your attorney
9         work product, I instruct you not to answer the
10        question.
11        THE WITNESS:  Yes.
12 BY MR. O'REAR:
13   Q.    And when did that concern first arise?
14   A.    I'm trying to answer without disclosing
15 our internal communications on this, so give me a
16 moment.
17        My recollection is as -- as we were
18 communicating with Nuclear Development ongoing forward
19 with closing the transaction we started to articulate a
20 concern about our legal ability to do that to Nuclear
21 Development and asked Nuclear Development to help us
22 and share with us their legal theories for why it could
23 go forward.
24   Q.    My question was, when did you first have
25 that concern?

Page 65

1    A.    I'm not quite sure when that would have
2  been, but if we were to bracket it in time it would be
3  after the request for an extension was received and
4  during the time that we were looking at the request and
5  determining whether to grant it or to go to closing.
6    Q.    Well, do you recall that the request for
7  extension was received on August 29th, 2018?
8    A.    That sounds right.
9    Q.    So that's September, October, November,
10 three months before the closing date. So when during
11 that three-month period are you referring to?
12   A.    I don't know exactly. I can't recall
13 exactly.
14   Q.    When your concern arose, you don't know?
15   A.    I don't know.
16 (Exhibit 11 - Previously marked - Bates
17 No.TVABKB00002045 through 2052, Memorandum from
18 United States Nuclear Regulatory Commission to
19 Jennifer Dixon-Herrity dated September 4, 2018.)
20 BY MR. O'REAR:
21   Q.    Let me show you what's been marked as
22 Exhibit 11. Have you ever seen that document before
23 today?
24   A.    I don't know that I have.
25   Q.    You don't recall it?

17 (Pages 62 - 65)

Page 66

1      A.    No, but let me just take a closer look at
2  it. I don't recognize it.
3      Q.    Okay.  Do you recognize that on the next
4  to last page of the exhibit that a copy was sent to Mr.
5  J. W. Shea at TVA?
6            MR. LEMBKE: Object to the form.  Lack of
7  foundation.
8  BY MR. O'REAR:
9      Q.    He's shown as having been sent a carbon
10 copy of this, correct?
11           MR. LEMBKE: Object to the form.  Lack of
12 foundation.
13           THE WITNESS:  I see his name there.
14 BY MR. O'REAR:
15     Q.    Okay.  Do you see on the last page, four
16 from the bottom that Scott Vance with TVA is shown on
17 an e-mail transmission of this document?
18           MR. LEMBKE:  Object to the form.  Lack of
19 foundation.
20           THE WITNESS:  I see his name there.
21 BY MR. O'REAR:
22     Q.    Does this refresh your recollection that
23 either Mr. Shea or Mr. Vance brought this document to
24 your attention?
25     A.    I don't recall that.

Page 67

1      Q.    And Mr. Vance reported to you at the
2  time, correct?
3      A.    Yes.
4      Q.    Whether or not you received this
5  document, were you made aware of the summary provided
6  by the Nuclear Regulatory Commission regarding the
7  August 14, 2018, meeting?
8      A.    Yes, I was copied on that.
9      Q.    No, I'm asking -- you're referring to
10 Exhibit 10?
11     A.    Which one is that?
12     Q.    The preceding one we discussed.
13     A.    Yes, this one I was copied on, cc'd.
14     Q.    My question was, were you also made aware
15 of the summary which is embodied in Exhibit 11 that was
16 submitted by the NRC?
17     A.    I don't recall that.
18     Q.    I would like to direct your attention to
19 the fourth page of Exhibit 11 and ask you about the
20 names that are reflected there for TVA as being
21 attendees at this meeting.
22     A.    Fourth page?
23     Q.    The fourth page is this page.
24     A.    The fifth page?
25     Q.    Fifth page.  I'm sorry.  You see at the

Page 68

1  bottom that TVA is designated by the names of five
2  representatives there?
3      A.    I see.
4            MR. LEMBKE:  Object to the form.  Lack of
5  foundation.
6  BY MR. O'REAR:
7      Q.    I asked you about Jim Chardos or you
8  mentioned -- I asked you about Jim Chardos but I don't
9  think we identified him.
10           Can you tell the court who Jim Chardos
11 is?
12     A.    Jim Chardos is -- I recall was and is the
13 manager of the Bellefonte site.  I don't know what his
14 official title is.
15     Q.    And Ryan Dreke?
16     A.    Dreke is an attorney in OGC, in the
17 nuclear section.
18     Q.    He's the name we mentioned earlier,
19 correct?
20     A.    That's correct.
21     Q.    Erin Henderson?
22     A.    Erin Henderson is in the Nuclear
23 Licensing Department.  I don't know what her title
24 would have been at this time.
25     Q.    The Nuclear Licensing Department of the

Page 69

1  the legal department?
2      A.    No, of the office of the -- like the
3  nuclear function under TVA.
4      Q.    And who was head of that group?
5      A.    Joe Shea.
6      Q.    Joe Shea.  And John Lockaby?
7      A.    I'm not sure who John Lockaby is.
8      Q.    Dan Stout?
9      A.    Dan Stout, I don't know what his title
10 is.  I think he's a nuclear corporate, but I had very
11 little to do with him.
12     Q.    He's not a lawyer as far as you know?
13     A.    Not as far as I know.
14 (Exhibit 12 - Previously marked - Bates No.
15 TVABLN00000352, Letter from Aaron Nix to Larry
16 Blust, dated August 21, 2018.)
17 BY MR. O'REAR:
18     Q.    Directing your attention to Exhibit 12,
19 have you seen that letter from Mr. Aaron Nix to Larry
20 Blust dated August 21st 2018, before today?
21     A.    Yes, I've seen it before today.
22     Q.    And when did you first see it?
23     A.    I think yesterday.
24     Q.    Okay.  So is it your testimony you did
25 not see this letter at the time or shortly after it was

Page 70

1 written on August 21, 2018?
2     A.    I don't believe I did.
3     Q.    Were you aware that Mr. Nix had written a
4 letter to Mr. Blust stating that TVA will begin
5 drafting the transaction documents for the closing on
6 November 14, 2018?
7     A.    That he had written the letter?
8     Q.    Yes.
9     A.    I was not aware that he had written the
10 letter, no.
11    Q.    Did TVA at or about this time begin
12 drafting the transaction documents for the closing?
13    A.    It's my understanding, yes, that that
14 happened.
15    Q.    Okay.  And when did that happen?
16    A.    I don't know precisely when, but I know
17 at one point I inquired and was advised that the
18 documents were in process.
19    Q.    Who was drafting the documents?
20    A.    I don't know precisely who.  The person I
21 inquired to was Cliff Beach.
22    Q.    Were the transaction documents ever sent
23 to Nuclear Development?
24    A.    Not as far as I'm aware.
25    Q.    Why not?

Page 71

1         MR. LEMBKE:  Miss Quirk, to the extent
2    that would require you to reveal attorney/client
3    communications or work product, I instruct you not
4    to answer the question.
5         THE WITNESS:  I don't think I can answer
6    the question.
7 BY MR. O'REAR:
8     Q.    Because of attorney/client communications
9 and work product?
10    A.    That's correct, yes.
11    Q.    Well, somebody had to make a management
12 decision not to send those documents, correct, to
13 Nuclear Development?
14    A.    That's true, yes.
15    Q.    Who made that decision?
16    A.    I assume it was Cliff Beach.  The -- I
17 don't think I can go beyond that without discussing
18 communications.
19    Q.    Were you personally aware that Larry
20 Blust made repeated requests of TVA to submit the
21 transaction documents that Mr. Nix said would be
22 drafted by TVA?
23    A.    I'm aware he made requests, yes.
24    Q.    Did you ever respond to Mr. Blust's
25 request for the transaction documents?

Page 72

1     A.    I don't know whether I did or not.
2     Q.    Do you know if anyone at TVA responded to
3 his request for the transaction documents?
4     A.    I don't know.
5     Q.    But you do know he made repeated
6 requests, don't you?
7     A.    I know that he made requests.  I don't
8 know how many.
9     Q.    He made more than one, didn't he?
10    A.    He probably made more than one, yes.
11        MR. LEMBKE:  Let me see the exhibit
12    number on that.
13        THE WITNESS:  13.
14        MR. LEMBKE: Thank you.
15 (Exhibit 13 - Previously marked - Bates No.
16 TVABLN00006238, Letter dated August 29, 2018 from
17 Larry D. Blust.)
18 BY MR. O'REAR:
19    Q.    Directing your attention to Exhibit 13,
20 which is a letter that was sent by facsimile from Mr.
21 Blust to TVA's Realty Services division and TVA's
22 Office of General Counsel on August 29, 2018.
23        Did you receive that letter when it was
24 sent?
25    A.    I received it either then or shortly

Page 73

1 thereafter.
2     Q.    And in that letter did Nuclear
3 Development request an extension of the closing date to
4 May 14, 2019?
5     A.    That's correct, yes.
6     Q.    Did you anticipate litigation with
7 Nuclear Development at this point in time?
8         MR. LEMBKE:  Object to the -- let me
9    instruct you not to answer that question to the
10   extent it would require you to disclose your
11   attorney work product and attorney/client --
12   and/or attorney/client communications.
13        THE WITNESS:  I assumed litigation was a
14   possibility.
15 BY MR. O'REAR:
16    Q.    What litigation then were you assuming
17 was a possibility?
18        MR. LEMBKE:  Same instruction.
19        THE WITNESS:  I didn't know the forum.
20 BY MR. O'REAR:
21    Q.    Well, what conceivable litigation would
22 there have been?
23        MR. LEMBKE:  Same instruction.  Also
24   object to the form.  Calls for speculation.
25        THE WITNESS:  I don't know that I would

19 (Pages 70 - 73)

Page 74

1 have or could have identified it at that point.
2 BY MR. O'REAR:
3     Q.    Are you aware that TVA has made repeated
4 privileged designations based on anticipation of
5 litigation at this point in time?
6     A.    I am generally aware, yes.
7     Q.    Well, in order to determine whether those
8 are appropriate objections, I need to know what
9 anticipation.
10         Who anticipated litigation and what
11 litigation was anticipated? Can you answer that?
12         MR. LEMBKE:  Same instruction.
13         THE WITNESS:  Can you repeat the
14 instruction?
15         THE WITNESS:  The instruction is to the
16 extent that would require you to reveal
17 attorney/client communication or attorney work
18 product, you should not answer the question.
19         THE WITNESS:  I don't know if I can
20 answer it without revealing attorney/client
21 privileged communications.
22         MR. O'REAR:  Well, I mean this now is
23 circular where you have objected on the basis of
24 anticipation of litigation but no one will testify
25 about anticipation of litigation because of the

Page 75

1 privileged objection you made.
2         MR. LEMBKE:  Well, I don't know why
3 you're making the assumption that no one would
4 testify to that, but I will note that this is the
5 first time you've raised with us any issue about
6 that invocation of privilege or that objection
7 that was made to a production, and so this is
8 coming out of left field.
9         Those privileged objections were provided
10 to you, you know, several weeks ago and, you know,
11 we stand on our instruction at this point.
12         MR. O'REAR:  Well, I'm trying to gain
13 information that would allow me to test and
14 challenge that objection.  I asked Mr. Johnson
15 about this very same thing in his deposition.
16         MR. LEMBKE:  You did not ask this very
17 same thing.
18         MR. O'REAR:  I didn't reference the
19 privilege log but I asked him about anticipation
20 of litigation.
21         MR. LEMBKE:  You asked him about -- that
22 question you asked Mr. Johnson was quite different
23 from the question you're now asking him.
24         MR. O'REAR:  Well, I asked him if he
25 anticipated litigation at this point in time.

Page 76

1         MR. LEMBKE:  You did not ask that
2 question.
3         MR. O'REAR:  Well, I beg to differ, but
4 the record will reveal that.
5         MR. LEMBKE: But, you know, I would
6 suggest that consistent with Judge Burke's
7 protocol, the appropriate thing would be to advise
8 us of a concern and let us know and we can confer
9 in good faith, but the time to do so is not in the
10 middle of a deposition on a surprise basis.
11         MR. O'REAR:  Well, it's not a surprise
12 basis, but I'm trying to find out what litigation
13 was anticipated at this point in time if TVA is
14 going to make an objection based on privilege.
15         MR. LEMBKE:  There's no question.  That's
16 a statement, not a question.
17 BY MR. O'REAR:
18     Q.    So are you able to answer what litigation
19 was anticipated at this time?
20         MR. LEMBKE:  Asked and answered, and I --
21 other than what you've already testified to, I
22 give the same instruction, that to the extent to
23 go beyond that would require you to disclose
24 attorney/client communications and work product,
25 you should not disclose it.

Page 77

1 BY MR. O'REAR:
2     Q.    Can you answer the question?
3         MR. LEMBKE:  Well, objection.  She's
4 already asked and answered it.  Same objection.
5 Asked and answered.  Same instruction.
6 BY MR. O'REAR:
7     Q.    Can you answer the question?
8         MR. LEMBEK:  Same objection, same
9 instruction.
10         THE WITNESS: I'm standing on my prior
11 answer.
12 BY MR. O'REAR:
13     Q.    Did TVA anticipate litigation with
14 Nuclear Development over Bellefonte as early as of
15 February of 2017?
16         MR. LEMBKE:  Same instruction.
17         THE WITNESS:  I don't know that I can
18 answer that without revealing confidential
19 communications.
20 BY MR. O'REAR:
21     Q.    Well, let me ask you this.  It would be
22 the only -- the only way you would be able to answer
23 that question would be to reveal confidential
24 communications?
25     A.    Yeah, and I'm not even sure what you're

1 referring to, so I don't -- this is -- I have no idea
2 what you're asking about or what information you're
3 trying to elicit.
4      Q.   Okay. Well, I'm referring to an
5 objection made on a privilege log regarding
6 communications in February of 2017, which would be more
7 than a year and a half before the closing that are
8 based on anticipation of litigation at that time.
9          MR. LEMBKE: Which log entry are you
10 referring to?
11         MR. O'REAR: I can get it for you if
12 you'd like it. I can get it during the break.
13         Are you going to allow her to answer that
14 question?
15         MR. LEMBKE: I don't know that there's a
16 question. I don't know what the question is.
17         MR. O'REAR: I asked -- the question is,
18 was TVA anticipating litigation in February of
19 2017?
20         MR. LEMBKE: I think she's already
21 answered that. Objection, asked and answered.
22 Same instruction. You can go ahead if you have
23 anything else to add.
24         THE WITNESS: I don't think I have
25 anything else to add without more information.

1 BY MR. O'REAR:
2      Q.   You had conversations with Mr. Blust
3 leading up and to the closing date of November 30,
4 2018, correct?
5      A.   That's correct.
6      Q.   Dho you recall calling Mr. Larry Blust on
7 October the 10, 2018, to request a meeting on
8 October 23, 2018, involving him, Mr. Franklin Haney,
9 yourself, and Mr. Bill Johnson?
10     A.   I don't recall the exact dates, but I
11 think the timeframe sounds right.
12     Q.   And what triggered your call to Mr. Blust
13 to request that meeting?
14     A.   A request from Mr. Johnson.
15     Q.   Okay. And what was the basis of the
16 request for the meeting?
17     A.   He wanted to --
18         MR. LEMBKE: To the extent this is asking
19     you to disclose what Mr. Johnson told you about
20     why he wanted the meeting, I instruct you not to
21     answer that as attorney/client privilege.
22         THE WITNESS: He wanted to meet with him.
23 BY MR. O'REAR:
24     Q.   Okay. He wasn't asking you for legal
25 advice in that communication was he, in that

1 discussion, Mr. Johnson?
2      A.   He was discussing and we were discussing
3 the current status and our legal posture.
4      Q.   And what was the purpose of the meeting?
5      A.   My recollection is to talk about the
6 extension.
7      Q.   The extension that we just identified,
8 which would have been to May 19, 2019?
9      A.   That's correct.
10     Q.   Excuse me. May 14, 2019?
11         MR. LEMBKE: Excuse me. That's right.
12         MR. O'REAR: May 14.
13         THE WITNESS: That's correct, yes.
14 BY MR. O'REAR:
15     Q.   Was Mr. Johnson concerned at that point
16 in time about the presentation that had been made by
17 Nuclear Development to the city of Memphis just the day
18 before you made that call to Mr. Blust?
19         MR. LEMBKE: Miss Quirk, to the extent
20     that would require you to reveal attorney/client
21     communications, I instruct you not to answer the
22     question.
23         THE WITNESS: I think that Mr. Johnson
24     articulated in that meeting that he had some
25     concerns with -- with how information had been

1     presented.
2 BY MR. O'REAR:
3      Q.   At the meeting that Nuclear Development
4 had with the city of Memphis the day before you made
5 the phone call?
6      A.   And I don't recall if it's that meeting
7 or other information that he articulated a concern
8 about, but he articulated concern about Nuclear
9 Development's presentation to the city council of
10 information that he considered to be detrimental to
11 TVA.
12     Q.   And was that the reason you asked for the
13 meeting on October 23rd --
14         MR. LEMBKE: Well --
15 BY MR. O'REAR:
16     Q.   -- to discuss that?
17         MR. LEMBKE: To clarify, I think she was
18     talking about what was discussed at the meeting on
19     the 23rd just now.
20 BY MR. O'REAR:
21     Q.   Okay.
22     A.   Yes.
23     Q.   But my question was when you were setting
24 up that meeting, that was the reason you set it up so
25 that that topic could be discussed?

21 (Pages 78 - 81)

Page 82

1          MR. LEMBKE:  Miss Quirk, again to the
2    extent that this would require you to reveal
3    attorney/client communications, don't answer it.
4          To the extent you can reveal it without
5    disclosing attorney/client communications, go
6    ahead.
7          THE WITNESS: I'm trying to respond to
8    your question without revealing attorney/client
9    communications, and that is my answer.
10   BY MR. O'REAR:
11        Q.    In your call to Mr. Blust on October the
12   10th, 2018, did you tell him that TVA had already
13   drafted a letter and an extension agreement agreeing to
14   Nuclear Development's request for a six-month extension
15   of closing?
16        A.    I don't recall.
17        Q.    Had TVA already drafted at that time a
18   letter and an extension agreement agreeing to the
19   request for the six-month extension?
20        A.    I don't recall.
21        Q.    You don't recall?
22        A.    I do not.
23        Q.    Did TVA ever draft a letter and extension
24   agreement agreeing to the request for a six-month
25   extension?

Page 83

1        A.    I recall seeing a draft at one point.
2        Q.    That agreed to the six-month extension?
3        A.    That had conditions, including agreement
4    to the extension.
5        Q.    What were the conditions?
6          MR. LEMBKE:  Now, I instruct you not to
7    answer the question to the extent it would require
8    you to reveal attorney work product.
9          THE WITNESS:  Yeah, I can't answer.
10   BY MR. O'REAR:
11        Q.    Was that drafted agreement ever presented
12   to Nuclear Development?
13        A.    Not as far as I can remember.
14        Q.    And why not?
15          MR. LEMBKE:  Miss Quirk, to the extent
16   that would require you to reveal attorney/client
17   communications or work product, I instruct you not
18   to answer it.
19          To the extent you can answer without
20   disclosing that, go ahead.
21          THE WITNESS:  I think as Mr. Johnson
22   articulated and we articulated over time, we were
23   trying to figure out what to do at this point, and
24   didn't make a decision to grant or deny an
25   extension until a later point in time as we

Page 84

1    articulated.
2    BY MR. O'REAR:
3        Q.    Are there any notes or records of your
4    phone call with Larry Blust on October 10, 2018?
5        A.    I don't know.
6        Q.    Well, did you routinely keep notes of
7    phone calls with Mr. Blust or representatives of
8    Nuclear Development?
9        A.    Sometimes I did and sometimes I didn't.
10       Q.    Have you checked to see whether there is
11   any?
12       A.    I have not.
13       Q.    Do you recall that you and Cliff Beach
14   had a phone call with Mr. Blust on October the 22nd,
15   2018, the day before the meeting involving Mr. Johnson
16   and Mr. Haney, you, and Mr. Blust?
17       A.    I don't recall specifically, but I know
18   we had several conversations with Mr. Blust.
19       Q.    Did you say to Mr. Blust in the phone
20   call with him on October 22, 2018, or based on your
21   recollection whenever these phone calls occurred, that
22   Mr. Johnson was very unhappy with Nuclear Development's
23   presentation to the city of Memphis?
24       A.    I don't recall one way or another.
25       Q.    Did you say to Mr. Blust in a phone call

Page 85

1    with him that involved Mr. Beach on October 22, 2018,
2    that TVA management was meeting with the Board of
3    Directors in committee meetings that week to discuss
4    about Nuclear Development's presentation to the city of
5    Memphis?
6        A.    I don't recall.
7        Q.    Do you ever recall advising Mr. Blust
8    that TVA management was meeting with board members at
9    committee meetings to discuss the city of Memphis and
10   Nuclear Development's presentation?
11       A.    I don't recall.
12       Q.    Well, did those meetings with board
13   members occur?
14       A.    Which meetings?
15       Q.    I'm referring to meetings that you
16   referenced in a phone call on October 22, 2018, that
17   would have occurred that week.
18          MR. LEMBKE:  Object to the form. Lack of
19   foundation.
20          MR. O'REAR:  She asked me so I'm
21   clarifying what my question is about.
22          MR. LEMBKE:  Same objection.
23          THE WITNESS:  It would be -- without
24   being able to answer specifically, it would be
25   normal for management to update the board on

Page 86

1    various activities and this might be one.
2    BY MR. O'REAR:
3       Q.    Were board committee meetings held either
4    on October the 24th, 2018 or October 25, 2018?
5       A.    I don't recall.  I would have to check my
6    schedule.
7       Q.    Did you meet with -- well, strike that.
8            Did you meet with board members at board
9    committee meetings on either October 24, 2018 or
10   October 25, 2018?
11      A.    As I said, I'm not sure about those
12   dates.  It is typical for us to have committee meetings
13   a few weeks before the board meeting.
14      Q.    Okay.  And would you typically attend
15   those meetings?
16      A.    The board committee meetings?
17      Q.    Yes.
18      A.    I think we went over that.
19      Q.    Right.  Right.  And you said you would
20   try but sometimes they were happening at the same time
21   and you couldn't attend all, correct?
22      A.    That's right.
23      Q.    Do you recall what committee meetings, if
24   any, you attended at this point in time?
25           MR. LEMBKE: At this point in time being

Page 87

1    what, late October?
2            MR. O'REAR: Right.
3            THE WITNESS:  Well, it would be typical
4    for me to attend the NOC, the audit committee, and
5    external relations.
6    BY MR. O'REAR;
7       Q.    NOC is what?
8       A.    Nuclear oversight.
9       Q.    Are you testifying today you have no
10   recollection of any discussion of the issue of
11   Bellefonte, Nuclear Development's presentation in
12   Memphis with board members at any of those meetings at
13   that time?
14      A.    I don't have a specific memory except for
15   a brief update at the NOC.
16      Q.    Can you tell me about that?
17      A.    I don't recall lots of details other than
18   the -- it was a brief update to the NOC on the fact
19   that we were talking about the path forward with
20   Bellefonte.
21      Q.    Was there a discussion of the request for
22   an extension to May 2018 -- 2019?
23      A.    I'm sure there would have been reference
24   to it.
25      Q.    And what were the positions of the board

Page 88

1    members on that issue?
2            MR. LEMBKE:  Miss Quirk, to the extent
3    that your discussion with the board members was in
4    the nature of an attorney/client communication,
5    you should not answer that question.
6            To the extent it was not, you can.
7            THE WITNESS:  It was a briefing. I
8    briefed them on the status, and there was no
9    discussion that I recall.
10   BY MR. O'REAR:
11      Q.    And you said minutes are typically kept
12   at these board meetings, correct?
13      A.    Committee meetings.
14      Q.    Committee meetings, excuse me.
15      A.    Yes.
16      Q.    So there would be minutes of these
17   meetings, correct?
18      A.    Yes.
19      Q.    Now, moving to the next day which is the
20   day of the meeting on October 23, 2018, between you,
21   Bill Johnson, Franklin Haney and Larry BLust, was there
22   anyone else present?
23      A.    Not that I recall.
24      Q.    And was that at TVA offices here in
25   Knoxville?

Page 89

1       A.    I believe it was.
2       Q.    And what was discussed at that meeting?
3       A.    I think there was a conversation about
4    the status of the transaction.  I think that Mr.
5    Johnson expressed displeasure at how issues had been
6    presented in Memphis, and Mr. Haney said he was unaware
7    that this was going on, did not authorize those
8    presentations and was very apologetic for what had been
9    said.
10      Q.    Was there anything else discussed?
11      A.    My memory is that Mr. Haney made an offer
12   to sort of bring TVA into the transaction.
13      Q.    And was that subject followed up on by
14   Mr. Blust the next day?
15      A.    Mr. Blust followed up with a set of
16   bullet points.
17           (Exhibit 15 - Bates No. TVABLN000006245, E-mail
18           dated October 25, 2018.)
19   BY MR. O'REAR:
20      Q.    I direct your attention to Exhibit 15 and
21   ask you if you can identify that as an e-mail, at least
22   the second e-mail in a string from Mr. Blust to you of
23   October 24, 2018, attaching the bullet points on a
24   power sharing discussion?
25      A.    Yes.

23 (Pages 86 - 89)

Page 90

1    Q.    Was Mr. Johnson -- did Mr. Johnson say
2   anything about the request for the six-month extension
3   at this meeting on October 23rd?
4    A.    I don't recall that.
5    Q.    Was Mr. Johnson waiting to meet with the
6   city of Memphis himself before he made any decision on
7   that request?
8         MR. LEMBKE:   Miss Quirk, to the extent
9       that that would require you to reveal
10      attorney/client communication, I instruct you not
11      to answer it.
12        To the extent you can answer without
13      revealing attorney/client communication, go ahead.
14        THE WITNESS:   I don't recall anything
15      that Mr. Johnson would have said during that
16      meeting, if that's what you're asking about.
17   BY MR. O'REAR:
18   Q.    You don't recall anything he said?
19   A.    About?
20   Q.    About the request for extension?
21   A.    About -- I think your question was was he
22   waiting for the meeting with the city council before
23   making a decision on the request.
24   Q.    Right.
25   A.    I don't recall that being -- that being

Page 91

1   said at the meeting.  I just don't recall.
2   Q.    Well, was that what he was doing, whether
3   it was said at the meeting or not?
4         MR. LEMBKE:   Same instruction, Miss
5       Quirk.
6         THE WITNESS:   I can't answer that without
7       revealing discussion, confidential discussions.
8   BY MR. O'REAR:
9   Q.    Do you recall a phone conversation with
10   Mr. Blust on November 15, 2018, that included Cliff
11   Beach, Chris Chandler, and Nick McCall where the four
12   of you called Mr. Blust?
13   A.    I don't recall it specifically, but as I
14   said we had several conversations with him, with Mr.
15   Blust.
16   Q.    Do you recall -- do you recall a phone
17   conversation where the four of you called him on his
18   cell phone in mid November of 2018?
19   A.    I don't recall specifically, no.
20   Q.    Do you recall a phone call at any time
21   where the four of you from TVA were on the phone with
22   Mr. Blust?
23   A.    Without more context, I can't answer.
24   Q.    I don't know how I can give you any more
25   context than the date and who was on the call.

Page 92

1         MR. LEMBKE:   Object.
2   BY MR. O'REAR:
3   Q.    Do you recall a phone call involving the
4   four of you from TVA and Mr. Blust where he said that
5   -- that the Atomic Energy Act did not bar the
6   transaction from going forward on November 30, 2018?
7   A.    This was a conversation with Mr. Blust
8   where he said that?
9   Q.    Yes.
10   A.    I recall him stating -- making that
11   argument, yes.  I don't know whether it was that phone
12   call or another phone call.
13   Q.    Do you recall in that phone call or
14   another phone call advising Mr. Blust that Mr. Johnson
15   was not inclined to grant the six-month extension
16   because of the presentation made by Nuclear Development
17   to the city of Memphis?
18   A.    I don't recall that, but I do recall that
19   Mr. Johnson was upset with Nuclear Development because
20   of statements made negative to TVA that he felt were
21   untrue.
22   Q.    But you don't recall making a statement
23   to Mr. Blust linking Mr. Johnson's disinclination to
24   extend the closing because of the comments made by
25   Nuclear Development at the Memphis meeting?

Page 93

1   A.    I don't recall, no.
2   Q.    Do you recall ever making that statement?
3         MR. LEMBKE:   To Mr. Blust?
4   B MR. O'REAR:
5   Q.    Well, outside of your circle there and
6   outside of TVA, did you ever make that statement?
7   A.    I don't recall.
8   Q.    Do you recall in your discussion with Mr.
9   Blust about this topic that he said the simple way to
10   resolve it would be to grant the extension for six
11   months?
12        MR. LEMBKE:   This topic being the
13      extension?
14   BY MR. O'REAR:
15   Q.    This topic being whether the closing
16   could occur without the transfer of the construction
17   permits?
18   A.    I recall him stating that in an e-mail.
19   Q.    Okay.  Do you know if you made any notes
20   or records of any phone conversations with Mr. Blust
21   during this mid November period?
22   A.    I don't know.
23   Q.    Do you recall a phone conversation with
24   Mr. Blust in mid November 2018 where you said that Mr.
25   Johnson had said that both sides should unwind this

24 (Pages 90 - 93)

Page 94

1 transaction?
2     A.    I don't recall that.
3     Q.    Have you ever used that term unwind this
4 transaction?
5            MR. LEMBKE:  Well, hold on.
6 BY MR. O'REAR:
7     Q.    In the context of this -- the Nuclear
8 Development TVA contract?
9            MR. LEMBKE:  Miss Quirk, to the extent
10    that that would require you to reveal
11    attorney/client communication you shouldn't
12    answer.
13           To the extent you can answer it without
14    that, go ahead.
15           THE WITNESS: I don't recall whether I
16    said that in conversation with Mr. Blust.
17 BY MR. O'REAR:
18    Q.    You don't deny saying that then?
19    A.    I neither admit or deny.  I simply don't
20 recall.
21           MR. LEMBKE:  When we're at a good
22    stopping point, we'd like to take a break.
23           THE WITNESS:  I can use a break.
24           MR. O'REAR:  All right.  That's fine.
25           THE VIDEOGRAPHER:  The time is 11:10.

Page 95

1 This marks the end of media number one.  We're
2 going off the record.
3    (Recess taken.)
4           THE VIDEOGRAPHER:  At 11:22 this marks
5 the beginning of media number two, and we're on
6 the record.
7           MR. LEMBKE:  Before you start, did you
8 have that log entry for us that you were going to
9 get?
10          MR. O'REAR: Just leave it on, I guess.
11 The one in 2017?
12          MR. LEMBKE:  Yes.
13          MR. O'REAR:  What do you need?
14          MR. LEMBKE:  Well, just which log entry
15 are you referring to?  Does it say we invoke
16 prepared in anticipation of litigation?
17          MR. O'REAR:  Privileged production
18 beginning 748 and 748, Bates number 5575.  Date
19 February 13, 2017.
20          MR. LEMBKE: What is the asserted
21 privilege?
22          MR. O'REAR:  The asserted privilege is
23 attorney/client privilege work product doctrine.
24 E-mail communication transmitted among counsel and
25 client personnel containing confidential legal

Page 96

1    advice and prepared in anticipation of litigation
2    regarding the closing of the sale of Bellefonte.
3            MR. LEMBKE:  All right.  We'll check that
4    at our next break.
5 BY MR. O'REAR:
6     Q.    Okay.  Miss Quirk, were you involved in
7 any of the TVA meetings with the city of Memphis or
8 Memphis Light, Gas and Water?
9     A.    No.
10    Q.    Were you aware that Mr. Johnson had a
11 meeting with Memphis officials on November the 6, 2018?
12    A.    Generally, yes.
13    Q.    Okay.  Would you get reports of meetings
14 where Mr. Johnson and other TVA officials would meet
15 with the city of Memphis or Memphis Gas, Light, and
16 Water?
17           MR. LEMBKE: Ever?
18 BY MR. O'REAR:
19    Q.    In 2018?
20    A.    I would get general reports and
21 impressions.
22    Q.    And in what form did those reports take?
23    A.    Oral.
24    Q.    And who would provide you with those?
25    A.    Either Mr. Johnson or someone else who

Page 97

1 might have been present.
2     Q.    Do you know of anyone else present other
3 than Mr. Johnson at any meetings with Memphis in 2018?
4     A.    I think from time to time that Justin
5 Maierhofer might have been present.  There might have
6 been some times when John Thomas was present.  I don't
7 recall specifically.
8     Q.    Are you aware of any meetings with
9 Memphis where Mr. Johnson met with Memphis officials in
10 executive session?
11    A.    I don't.  I'm not aware.  I don't recall.
12    Q.    Did there come a point in time where TVA
13 decided that it wanted to extend the closing date from
14 November 14, 2018 to November 30, 2018?
15    A.    Yes.
16    Q.    And tell me about that.
17    A.    Well, I'll tell you what Bill Johnson
18 articulated I think to Franklin Haney, which is that he
19 felt as if he had sat on, I think those were his words,
20 he had sort of deliberated over the extension request
21 for too long and felt as if he owed it to Nuclear
22 Development to give them a little bit more time as he
23 -- as he reviewed our situation.
24    Q.    Was TVA -- decide to ask for that
25 extension?

25 (Pages 94 - 97)

Page 98

1    A.    I believe that TVA offered it.
2    Q.    It was TVA's idea to extend the closing
3 from November 14 to November 30?
4    A.    That's my recollection, yes.
5    Q.    Wasn't the real reason for the request to
6 give TVA time to look at this issue illegality and
7 whether the construction permits needed to be
8 transferred before the closing?
9    A.    Real reason?
10    Q.    Yes, the real reason, not the reason you
11 heard that Mr. Johnson stated to Mr. Haney.
12        MR. LEMBKE:  Well, Miss Quirk, to the
13    extent this would require you to reveal
14    attorney/client communications I'd instruct you
15    not to answer it.
16        But to the extent you can answer it
17    without doing that, go ahead.
18        THE WITNESS:  I would say in our
19    conversations with Mr. Blust during this time we
20    were, as I recall, having conversations about the
21    legality or lack of legality of going forward, and
22    we were at that point not certain either way.
23        We were actually searching for a way to
24    go forward with the closing, and but we had not
25    yet completed our work there.  However, it is a

Page 99

1    fact that Mr. Johnson wanted more time to consider
2    this issue.
3 BY MR. O'REAR:
4    Q.    Who is the person at TVA who first
5 questioned whether transferring Bellefonte prior to the
6 transfer of the construction permits would be illegal?
7    A.    I believe that would be Chris Chandler.
8    Q.    And when did that happen?
9    A.    I'm not sure.
10    Q.    How was the question raised within TVA?
11        MR. LEMBKE:  Miss Quirk, to the extent
12    this would require you to reveal attorney/client
13    communications or work product, I instruct you not
14    to answer it.
15        If you can answer without doing that, go
16    ahead.
17        THE WITNESS:  Without revealing
18    confidential information, we started looking hard
19    at it as we were looking at the question of going
20    to closing on the closing date, the original one
21    and as extended.
22 BY MR. O'REAR:
23    Q.    Well, I asked you when.  So would you
24    start looking hard at it before the 16-day extension
25    was entered into or after that?

Page 100

1        MR. LEMBKE:  Same instruction.
2        THE WITNESS:  I don't know that I can
3    answer that without revealing confidential
4    information.
5 BY MR. O'REAR:
6    Q.    When was Nuclear Development first
7 advised by TVA that TVA was looking at that issue?
8    A.    I don't recall the exact date, but we
9 raised it as soon as we felt it was a germane and
10 pressing issue.
11    Q.    And when was that?
12    A.    I don't recall the exact date.
13        MR. O'REAR:  That's for the witness.
14        MR. LEMBKE:  Oh.
15    (Exhibit 17 - Bates No. TVABLN000002643, Email
16    from Clifford Beach dated November 9, 2018.)
17 BY MR. O'REAR:
18    Q.    I direct your attention to Exhibit 17.
19 Are you familiar with that --
20    A.    Yes.
21    Q.    -- e-mail from Mr. Beach to Mr. Blust?
22    A.    Yes, I am.
23    Q.    And that's dated November 9, 2018,
24 correct?
25    A.    That's correct.

Page 101

1    Q.    And you were copied on that along with
2 Chris Chandler?
3    A.    Correct.
4    Q.    And it attaches Mr. Beach's bullet points
5 which are captioned NRC License Transfer Requirements,
6 right?
7    A.    Yes.
8    Q.    Now, was this the first time TVA had sent
9 anything in writing to Nuclear Development about an
10 issue regarding the transfer of the construction
11 permits?
12    A.    I believe that's correct.  Chris Chandler
13 would or Cliff Beach would have a better -- better
14 sense of that.
15    Q.    Who engaged the Pillsbury firm to look at
16 this question?
17    A.    Well, it is my authority and decision to
18 engage any -- any law firm for TVA.  So it would
19 ultimately have been my decision, but I believe that
20 Chris Chandler spoke with them about the engagement.
21    Q.    And the engagement letter's addressed to
22 him, correct?
23    A.    To?
24    Q.    Chris Chandler.  Not engagement.  The
25 opinion letter is addressed to him, correct?

26 (Pages 98 - 101)

Page 102

1     A.    I think that's correct, yes.
2     Q.    And when was the Pillsbury firm engaged
3 to look at this question?
4     A.    I don't know exactly when. I don't have
5 a recollection of.
6     Q.    Well, can you put it in context of the
7 closing date on November 30, 2018?
8     A.    Well, certainly before the closing date.
9     Q.    Right, but how much before?
10    A.    I don't know exactly how much before.
11    Q.    Was it before or after the amendment to
12 the contract extending the closing from November 14 to
13 November 30?
14    A.    I don't know the answer to that.
15    Q.    Was the Pillsbury firm already on
16 retainer with TVA at that point in time or was this a
17 brand new engagement with them?
18    A.    They have worked with us over quite a
19 period of time, certainly since I've been with TVA.
20    Q.    And is there an engagement letter with
21 the Pillsbury firm that would identify the date that
22 they were engaged?
23    A.    I don't know the answer to that question.
24 You mean on this?
25    Q.    Yes.

Page 103

1     A.    On this topic --
2     Q.    Yes.
3     A.    -- or generally?
4     Q.    No, no, on this topic.
5     A.    I don't know the answer to that question.
6     Q.    And were you the one that made the
7 decision to engage them on this question?
8     A.    Yes.
9     Q.    Did the board of directors approve the
10 engagement of the Pillsbury firm to look at this
11 question?
12    A.    No.
13    Q.    Was the board of directors notified of
14 the engagement?
15    A.    No.
16    Q.    Do you recall if there was a Board of
17 Directors meeting on November 14, 2018?
18    A.    I don't recall specifically, but I know
19 that we have a November board meeting each year.
20    (Exhibit 26 - Bates No. TVABLN00000038, e-mail
21    from Larry Blust dated November 30, 2018.)
22 BY MR. O'REAR:
23    Q.    I've handed you what's been marked as
24 Exhibit 26. Can you identify that as an e-mail from
25 Mr. Blust to you and Mr. Beach and Mr. Chandler to Mr.

Page 104

1 Matthews, Mr. Haney, Sr., Frank Haney, Bill McCollum
2 dated November 13/20/18? That's the top e-mail.
3     A.    Yes.
4     Q.    And did you receive that?
5     A.    Yes.
6     Q.    And the next e-mail beneath that is an
7 e-mail from you of the same date to that same group,
8 correct?
9     A.    That's correct.
10    Q.    And your e-mail says, "Larry, we are with
11 the board today and tomorrow and will back in touch on
12 Thursday. Sherry." Correct?
13    A.    Correct.
14    Q.    So you were with the board on
15 November 13, 2018, and the next day November 2014 --
16 November 14, 2018, correct?
17    A.    Yes, that's what it looks like.
18    Q.    Was there ever a discussion with the
19 board at a board member -- at a board meeting at this
20 time regarding the transfer of the construction permit
21 issue for Bellefonte?
22         MR. LEMBKE:  Object to the form, vague.
23    And, Miss Quirk, to the extent any discussion with
24    the board would have been in a nonpublic session
25    and would have involved attorney/client

Page 105

1    communications, you should not answer it.
2         To the extent you can answer subject to
3    that instruction, go ahead.
4         THE WITNESS:  If there was discussion
5    during a board meeting that would be publicly
6    available.  Board meetings are taped and
7    available.
8         I don't recall whether there was public
9    discussion.  And as to other board meetings, those
10   would be privileged communications.
11 BY MR. O'REAR:
12    Q.    What do you mean privileged
13 communications?
14    A.    With the board.
15    Q.    Any communications with the board would
16 be privileged?
17    A.    On this topic, yes.
18    Q.    By whom? Communications with the board
19 by whom?
20    A.    By me.
21    Q.    By you?
22    A.    Yes.
23    Q.    So any communications you would have had
24 with the board would have been solely with respect to
25 the giving of legal advice, is that correct?

27 (Pages 102 - 105)

Page 106

1    MR. LEMBKE: You mean on this particular
2  topic?
3    MR. O'REAR: Yes.
4    THE WITNESS:  Yes.
5  BY MR. O'REAR:
6    Q.   All right.  Was there any discussion with
7  the board about consideration of not closing the sale
8  on November 30, 2018?
9    MR. LEMBKE: Same instruction.
10    THE WITNESS:  I don't -- I don't recall
11  and if I could recall, I couldn't answer.
12  BY MR. O'REAR:
13    Q.   And why is that?
14    A.   Because it would be privileged.
15    Q.   Well, if Mr. Johnson discussed it with
16  the board, would that be privileged?
17    MR. LEMBKE:  Well, let me object as to
18    the vagueness of that question because it would
19    depend on whether Mr. Johnson was conveying legal
20    advice he received from TVA's lawyers.
21  BY MR. O'REAR:
22    Q.   Do you know whether Mr. Johnson ever
23  discussed that with the board?
24    MR. LEMBKE: Discussed what?
25  BY MR. O'REAR:

Page 107

1    Q.   The consideration of not closing the sale
2  on November 30, 2018?
3    A.   I think it would be -- I'm not sure
4  specifically, but I think it is the kind of thing that
5  he would discuss with board members.
6    Recall that we operate under the Sunshine
7  Act, and board meetings need to be duly noticed.  So
8  we're very careful about how all of us meet and confer
9  with the board.
10    Q.   So you never want to talk to board
11  members where a quorum would be constituted, correct?
12    A.   We have to be careful how we do that.
13    Q.   Okay.  So going back to my question, do
14  you know whether Mr. Johnson discussed with any board
15  members the consideration of not closing the sale on
16  November 30, 2018?
17    MR. LEMBKE: That's yes or no.
18    THE WITNESS:  Yes.
19  BY MR. O'REAR:
20    Q.   All right.  But you're not going to
21  answer who he talked to, when it happened, what was
22  said, is that right?
23    MR. LEMBKE:  You didn't ask that.
24  BY MR. O'REAR:
25    Q.   Okay.  Who did he talk to?  Who did he

Page 108

1  talk to about that issue?
2    A.   I don't know for certain but I would
3  assume that he made -- made certain that this was --
4  this would not be a surprise to board members, whatever
5  he was thinking of.
6  BY MR. O'REAR:
7    Q.   Well, do you know who he talked to?
8    A.   I don't know for certain, no.
9    Q.   Okay.  And do you know for certain
10  whether he had those discussions at all?
11    A.   I was not there.  I can't say not having
12  been there what might have happened when or how, but --
13  but my recollection is that he said that he had talked
14  with some board members.
15    Q.   And you don't know which board members?
16    A.   I don't know, you know, specifically.
17    Q.   Do you know when he spoke with these
18  board members about this topic?
19    A.   I would assume it would have been at a
20  point when he was making a decision.
21    Q.   And was anything ever mentioned about the
22  extension request from Nuclear Development or the issue
23  of not closing because of the construction permit issue
24  at an official board meeting?
25    A.   Not that I recall, but again that would

Page 109

1  be a matter of public record.
2    (Exhibit 27 - Previously marked - Minutes of
3    Meeting of The Board of Directors Tennessee
4    Valley Authority, November 14, 2018.)
5  BY MR. O'REAR:
6    Q.   All right.  Let me show you what's been
7  marked as Exhibit 27, and ask you if you can identify
8  that as minutes of the meeting of the Board of
9  Directors of the TVA on November 14, 2018?
10    A.   This appears to be the minutes of the
11  meeting.
12    Q.   And you approved that by your signature
13  on the first page, correct?
14    A.   That's correct.
15    Q.   Approved the minutes, right?
16    A.   Yes.
17    Q.   Would you look through there and see if
18  there's any reference at all in these minutes to any
19  discussion of Bellefonte transfer of the construction
20  permits, the request for the extension --
21    MR. LEMBKE:  You gave me two.
22  BY MR. O'REAR:
23    Q.   -- or the question of whether you should
24  close on November 30, 2018?
25    MR. LEMBKE:  For the record, this is 18

28 (Pages 106 - 109)

Page 110

1    pages.  So since he's asked you to read every word
2    on 18 pages take your time, Miss Quirk.
3         MR. O'REAR:  I haven't asked her to read
4    every word, but she can if she wants to.
5         MR. LEMBKE:  Well, you certainly have
6    asked her if in 18 pages of print whether there's
7    any reference to it anywhere in here so --
8         MR. O'REAR:  Well, she can state from her
9    recollection, that's fine.  But you're welcome to
10   review it.
11        THE WITNESS:  I quickly reviewed this and
12  what was the question again?
13 BY MR. O'REAR:
14   Q.    Is there any reference in those minutes
15 to Bellefonte, the transfer of the construction permits
16 at Bellefonte, the Nuclear Development request for
17 extension to May of 2019 to close the sale of
18 Bellefonte or the consideration of not closing the sale
19 to Bellefonte on November 30, excuse me, the sale of
20 Bellefonte on November 30, 2018?
21   A.    I've read it quickly.  I do see reference
22 to Bellefonte.
23   Q.    What does it say?
24   A.    It's a reference to accelerating the
25 amortization of the Bellefonte regulatory asset.

Page 111

1 That's the only reference I;ve seen, but I've raced
2 through this at top speed.
3   Q.    And that's a tax issue for TVA unrelated
4 to the --
5   A.    It's an accounting issue.
6   Q.    Accounting issue?
7   A.    Yeah, we're not taxable.
8   Q.    Okay.  Unrelated to the Nuclear
9 Development transaction?
10   A.    Yes, but based on a very, very quick
11 read.
12   Q.    All right.  So there was pending a
13 closing of the sale of Bellefonte for $111 million as
14 to which over $90 million was going to be paid on
15 November 30, 2018, correct?
16   A.    I'm sorry.  Can you say that again?
17   Q.    It was pending at this time a closing
18 schedule on November 30, 2018, whereby Nuclear
19 Development would pay TVA over $90 million as the
20 remaining balance due on the sale of Bellefonte,
21 correct?
22   A.    I believe that's correct, yes.
23   Q.    Okay.  And the decision to not close that
24 transaction was never taken to the board of directors
25 at an official board meeting, was it?

Page 112

1   A.    No, it didn't need to be.
2   Q.    But it was not, was it?
3   A.    It was not --
4         MR. LEMBKE:  Asked and answered.
5 BY MR. O'REAR:
6   Q.    And Mr. Johnson made that decision
7 himself, correct?
8   A.    I can't answer that.
9   Q.    You don't know?
10   A.    Well, chances are he and I would have
11 discussed it.
12   Q.    He made the ultimate decision?
13   A.    But ultimately, yes.
14   Q.    So by making that decision, he decided
15 that TVA would not be receiving over a 100 million
16 dollars -- 90 millions dollars due on November 30,
17 and he did not take that to an official board meeting
18 for approval, did he?
19   A.    He didn't.  He didn't have to.
20   Q.    When did you receive the Pillsbury
21 opinion letter?
22   A.    I think I received it on the date that
23 shows on the letter itself.  I believe that was the
24 28th, if I'm not mistaken.  November 28th.
25        (Exhibit 22 - Bates No. TVABLN000008648, letter

Page 113

1   from Pillsbury.)
2 BY MR. O'REAR:
3   Q.    Does the letter have a date on it?  I
4 direct your attention to Exhibit 22.
5   A.    I don't see a date.  My recollection is I
6 got it on the 28th, but I'm not -- that's my
7 recollection.
8   Q.    November 28, 2018?
9   A.    Yes.
10   Q.    Two days before closing?
11   A.    Yes.
12   Q.    Did someone instruct that the letter not
13 be dated?
14   A.    Not as far as I know.
15   Q.    Do you know why it was not dated?
16   A.    No.
17   Q.    Did you review the authority cited in the
18 letter?
19   A.    Yes, I did.
20         MR. O'REAR:  If you all want to take a
21 break now we can --
22         MR. LEMBEK:  Okay.
23         MR. O'REAR:  -- or we can go a little
24 longer.
25        MR. LEMBKE:  This is good.

29 (Pages 110 - 113)

Page 114

1     THE VIDEOGRAPHER: The time is 11:23 and
2  we're going off the record.
3     (Recess taken.)
4     THE VIDEOGRAPHER:  At 12:47 we're back on
5  the record.
6     MR. LEMBKE:  Let me, before you start, as
7  I indicated to Mr. O'Rear off the record over the
8  lunch break we were able to check the privilege
9  log entry that had been identified by him on the
10  record, and we discovered there was an error on
11  the log and it is a straight attorney/client
12  privilege objection.
13     It should not have said prepared in
14  anticipation of litigation.  So we will provide an
15  amended log making that correction.
16     MR. O'REAR:  You're referring to the
17  February 2017 entry?
18     MR. LEMBKE:  Correct.
19  BY MR. O'REAR:
20     Q.   Okay.  You ready?
21     A.   Yes.
22     Q.   What gave Bill Johnson as CEO the
23  authority to make the decision not to close a
24  111 million dollar transaction with Nuclear Development
25  without the board approval?

Page 115

1     A.   You're asking for my legal opinion?
2     Q.   Just, yeah, what's your basis for
3  testifying earlier that he didn't have to have board
4  approval?  What is the basis for that?
5     MR. LEMBKE:  I'm going to object to the
6     extent it calls for a legal conclusion.  You can
7     answer, if you can.
8     THE WITNESS:  I will simply say it's in
9     the resolution in which the board authorized the
10     auction of this site.
11  BY MR. O'REAR:
12     Q.   And are you referring to the resolution
13  which has been marked as Exhibit 4?
14     A.   Yes.
15     (Exhibit 4 Bates No. TVABLN00002633 through 2634,
16     Proposed Board Resolution.)
17  BY MR. O'REAR:
18     Q.   Okay. Can you get Exhibit 4 before you.
19  Can you direct me where in this resolution it provides
20  Mr. Johnson with the authority to make the decision not
21  to close the 111 million dollar transaction without
22  board approval?
23     A.   In the first resolved clause.
24     Q.   Okay.  Would you read what you're
25  referring to?

Page 116

1     A.   "Be It Resolved, That the Board of
2  Directors hereby finds and declares that the BLN plant
3  site, except for the area upon which the training
4  center is located if it cannot be relocated, is not
5  necessary to carry out any plans and projects actually
6  decided upon and is otherwise surplus to TVA's needs,
7  and hereby authorizes and directs the Senior Manager of
8  Realty Services, GIS, and Land Records, upon a
9  determination by the Chief Executive Officer that
10  market conditions warrant selling the fee simple
11  interest in all or a portion of the plant site to
12  public auction pursuant to Section 31 of the TVA Act of
13  1933, as amended, to execute and deliver to the
14  successful bidder, upon payment of the auction bid
15  price and associated administrative costs, a special
16  warranty deed in such form as the General Counsel shall
17  approve, subject to such terms and conditions as may be
18  necessary to cover and protect TVA's statutory
19  obligations, program requirements, and other
20  interests."
21     Q.   Okay.  You're saying that's what gave him
22  the authority not to close this transaction?
23     A.   Yes, I am.
24     Q.   And what language are you referring to?
25     MR. LEMBKE:  Object to the form.  Calls

Page 117

1  for a legal conclusion.
2  BY MR. O'REAR:
3     Q.   What language are you referring to?
4     MR. LEMBKE:  And to the extent this calls
5     for her to disclose her attorney work product
6     and/or privileged communication, I instruct you
7     not to answer it.  But if you can answer it
8     without doing that, go ahead.
9     THE WITNESS:  I don't think that I can.
10  BY MR. O'REAR:
11     Q.   You can't answer the question --
12     A.   I cannot.
13     Q.   -- what language in here gives him that
14  authority?
15     A.   Yes.
16     Q.   And putting aside attorney/client
17  communications for the moment, what type of work
18  product is involved in your answering that question?
19     MR. LEMBKE:  Well, my instruction was if
20     it would require disclosure of attorney/client
21     communications or work product not to answer it.
22  BY MR. O'REAR:
23     Q.   I'm not asking you for any
24  attorney/client communications.  I'm not asking you for
25  any attorney work product.

30 (Pages 114 - 117)

Page 118

1    I'm asking you what language are you
2  referring to which you believe authorizes Mr. Johnson
3  to make that decision without board approval?
4    MR. LEMBKE: Same instruction.
5  BY MR. O'REAR:
6    Q.    You said the resolution which is
7  Exhibit 4, and I'm asking you what language in the
8  resolution?
9    A.    And I have pointed --
10    MR. LEMBKE: Same instruction, same
11  objection.
12    THE WITNESS:  I told you this resolve
13    clause and I'm -- that is as far as I'm
14    comfortable going.
15  BY MR. O'REAR:
16    Q.    Is there any language in this resolution
17  which authorizes the CEO not to close the transaction
18  under specific conditions?
19    MR. LEMBKE:  Objection, vague.
20  BY MR. O'REAR:
21    Q.    Well, if you'll look with me to the next
22  paragraph, resolve further paragraph.
23    Does that paragraph authorize the CEO to
24  terminate the transfer process under certain
25  conditions?

Page 119

1    A.    It authorizes him to terminate if
2  environmental reviews cannot satisfactorily be
3  completed.
4    Q.    Okay.  And you have testified earlier
5  those environmental reviews were satisfactorily
6  completed, correct?
7    A.    That's correct.
8    Q.    There's nothing in this resolution that
9  says that the CEO has authority to terminate the
10  property transfer process if there's a question about
11  whether the construction permits must be transferred
12  before the closing, is there?
13    MR. LEMBKE: Objection, lack of
14    foundation.  Misstates the document.
15  BY MR. O'REAR?
16    Q.    Is there?  Is there anything in this
17  resolution that specifically refers to the construction
18  permits and the timing of that transfer as it relates
19  to the closing?
20    A.    That with many other details are not
21  specifically set forth.
22    Q.    Is it your position that Mr. Johnson
23  could make that decision not to close the transaction
24  only if it is delegated, the power to do so, is
25  delegated to him by the Board of Directors of TVA?

Page 120

1    MR. LEMBKE:  Objection, vague.
2    THE WITNESS:  Yeah, I don't understand.
3  BY MR. O'REAR:
4    Q.    Is it your position that this document,
5  this resolution delegates to Mr. Johnson to make the
6  decision to terminate and not close, excuse me, not
7  close the transaction on November 30, 2018, without
8  board approval, that this delegates that authority to
9  him?
10    MR. LEMBKE:  Objection, still vague.
11    Lack of foundation.
12    THE WITNESS:  I think I've said that I
13    think that this language gave him the authority
14    not to complete the transaction.
15  BY MR. O'REAR:
16    Q.    My question is, does he have authority to
17  do so only because of your position that that authority
18  was delegated to him by the Board of Directors?
19    MR. LEMBKE:  Objection, calls for a legal
20    conclusion.
21    THE WITNESS:  And I can't answer that
22    without a very thorough review of all of his
23    various authorities, which I'm not prepared to do
24    on the spot.
25  BY MR. O'REAR:

Page 121

1    Q.    In general, who controls the litigation
2  that TVA's involved in?
3    A.    Who controls it?
4    Q.    Yes.
5    A.    Can you be more specific?
6    Q.    Well, who makes the ultimate decisions
7  regarding litigation that TVA is involved in?
8    A.    It depends on what the issue is and under
9  whose authority it lies.
10    Q.    Are there any limitations on the
11  authority of the CEO regarding litigation that TVA's
12  involved in?
13    MR. LEMBKE:  Objection, vague and calling
14    for a legal conclusion.
15    THE WITNESS:  I'm not sure I understand
16    the question well enough to answer it.
17  BY MR. O'REAR:
18    Q.    Are there any limitations on the CEO
19  regarding decisions made involving litigation TVA's
20  involved in that have monetary constraints or monetary
21  limitations?
22    MR. LEMBKE:  Same objection.
23    THE WITNESS:  I don't know that I can
24    answer your question.  It's not -- can you be more
25    specific?

31 (Pages 118 - 121)

Page 122

1 BY MR. O'REAR:
2     Q.     Does TVA have any policies or practices
3 regarding limitations on the CEO's authority to make
4 decisions regarding litigation?
5         MR. LEMBKE:  Same objection.
6         THE WITNESS:  Without studying the issue
7     I'm not sure I could give you a complete answer.
8 BY MR. O'REAR:
9     Q.     Okay.  Are there any litigation practices
10 or guidelines of TVA that relate to litigation?
11     A.     I think there are some guidelines on, for
12 example, settlement authority.
13     Q.     Okay.  Tell us what that is.
14     A.     Guidelines on -- the guidelines relate to
15 settlement authority that I have and that the CEO has.
16     Q.     And what are those limitations?
17         MR. LEMBKE:  We are going to designate --
18     we'll be designating other parts of this
19     deposition confidential, but we're certainly going
20     to designate this entire line of questioning as
21     confidential under the protective order.
22 BY MR. O'REAR:
23     Q.     What are those limitations?
24     A.     There is a dollar limit on cases that the
25 General Counsel can settle of $200,000, and a dollar

Page 123

1 limit on what the CEO can settle of a million dollars.
2     Q.     And that is a limitation that allows them
3 to make settlement of cases within those limitations
4 without board approval, is that correct?
5     A.     In the case of the CEO, yes.
6     Q.     What about in the case of the General
7 Counsel?
8     A.     If the General Counsel lacks the
9 authority then possibly the CEO can use his broader
10 authority.
11     Q.     Okay.  For example, can you as CEO settle
12 a case for TVA under --
13         MR. LEMBKE:  You mean as General Counsel?
14 BY MR. O'REAR:
15     Q.     Yeah, as General Counsel settle a case
16 for TVA under $200,000?
17     A.     Yes.
18     Q.     Okay.  And can Mr. Johnson make the final
19 decision or could he have made the final decision in
20 2018 to settle a case involving TVA under two million
21 dollars or one million dollars?
22     A.     One million, yes.
23     Q.     And would legal questions that involved
24 monetary considerations in excess of a million dollars
25 need to be decided by the Board of Directors as opposed

Page 124

1 to the CEO?
2         MR. LEMBKE:  Objection as to vagueness of
3     what legal questions mean.  You mean in the
4     context of litigation?
5 BY MR. O'REAR:
6     Q.     Well, what about in the context of a
7 claim that involves specific performance of a 111
8 million dollar transaction and damages in excess of
9 38 million dollars?
10         MR. LEMBKE: Objection.
11 BY MR. O'REAR:
12     Q.     Is that within the -- is it with within
13 the purview of the CEO to make decisions regarding
14 claims of those size, of that size?
15         MR. LEMBKE:  Object as to vague.  You can
16     answer if you understand it.
17         THE WITNESS:  He has authority to make
18     decisions on litigation except the only limitation
19     I'm aware of is the settlement authority, but
20     again I have not made a study of this so I don't
21     know whether there are limitations out there that
22     I'm not aware of.
23 BY MR. O'REAR:
24     Q.     Did you know when you sent the letter on
25 November 29, 2018, to Mr. Blust that TVA was not going

Page 125

1 to close, that litigation would ensue from Nuclear
2 Development?
3     A.     Which letter is this?
4     Q.     The letter that you wrote on November 29,
5 2018?  It should be exhibit -- I'm sorry.  It was
6 stuck.
7     (Exhibit 24 - Previously marked - Bates No.
8     TVABLN00002651 through 2652, Letter from Sherry
9     Quirk to Nuclear Development and Larry Blust.)
10 BY MR. O'REAR:
11     Q.     I'm handing you what's been marked as
12 Exhibit 24.
13     A.     And the question again?
14     Q.     Did you know when you sent that letter to
15 Mr. Blust that litigation would ensue from Nuclear
16 Development?
17     A.     I knew that was a possibility.
18     Q.     Do you recall Mr. Johnson saying prior to
19 your sending of that letter that he was certain
20 litigation would be filed by Nuclear Development?
21         MR. LEMBKE:  Miss Quirk, to the extent
22     that would require you to disclose an
23     attorney/client communication, you should not do
24     so.
25         To the extent you can answer it without

32 (Pages 122 - 125)

Page 126

1    disclosing attorney/client communication, go
2    ahead.
3         THE WITNESS: I actually don't recall.
4    BY MR. O'REAR:
5         Q.   Did Mr. Johnson as CEO have authority to
6    make the decision not to close the transaction if he
7    knew by making that decision that TVA would be hit with
8    a lawsuit involving specific performance and a claim
9    for damages in excess of 38 million dollars?
10        MR. LEMBKE: Object to the form. I think
11   it's asked and answered, and it calls for a legal
12   conclusion. If you can answer it again.
13        THE WITNESS: Yes.
14   BY MR. O'REAR:
15        Q.   He did have authority?
16        A.   Yes.
17        Q.   To make that decision without board
18   approval?
19        A.   Yes.
20        Q.   And that's based on Exhibit 4 that you
21   just alluded to, is that correct?
22        A.   And many other authorities that he has as
23   CEO.
24        Q.   Well, tell me about those. Tell me about
25   those other authorities?

Page 127

1         A.   Well, as CEO of the -- of TVA he has the
2    authority to be the top executive in the agency. So he
3    has the authority to take, you know, executive action.
4         Q.   Is his authority limited to whatever the
5    board delegated to him?
6         MR. LEMBKE: Objection, calls for a legal
7    conclusion.
8         THE WITNESS: I think I've already told
9    you that I think he had authority based on the
10   resolution.
11        What I'm saying is that I don't think
12   that his authorities are limited necessarily by
13   that alone, but I haven't studied the full extent
14   of his authority, so I'm not prepared to go beyond
15   that.
16   BY MR. O'REAR:
17        Q.   And you can't identify today any other
18   authorities that would give him the authorization to do
19   that?
20        A.   Not having prepared or studied or
21   reviewed this, no.
22        Q.   Do you consider this question of whether
23   the transfers of the construction permits must occur
24   before the transfer of the property to be a novel legal
25   question?

Page 128

1         MR. LEMBKE: Miss Quirk, I instruct you
2    not to answer the question to the extent it would
3    require you to disclose attorney/client
4    communications or your -- or your staff's or your
5    outside counsel's work product.
6         If you can answer it without doing so, go
7    ahead.
8         THE WITNESS: I don't think I can answer
9    it.
10   BY MR. O'REAR:
11        Q.   Had TVA ever encountered that issue
12   before?
13        A.   I'm not certain.
14        Q.   Do you know?
15        A.   Not that I'm aware.
16   (Exhibit 28 - Bates No TVABLN00000040, e-mail
17   from Sherry Quirk to Larry Blust and others dated
18   November 16, 2018.)
19   BY MR. O'REAR:
20        Q.   I've handed you Exhibit 28. Can you
21   identify that as an e-mail that you sent to Larry Blust
22   on November 16, 2018?
23        A.   Yes.
24        Q.   And the second e-mail in that exhibit is
25   an e-mail from Mr. Blust to Clifford Beach with a copy

Page 129

1    to you relating to the section of the Atomic Energy Act
2    that's referenced in the third e-mail of that e-mail
3    string, correct?
4         A.   Yes.
5         Q.   And your response was that you planned on
6    speaking with Bill on Monday, correct?
7         A.   Yes.
8         Q.   That would have been November the 19th,
9    2018?
10        A.   Right.
11        Q.   And Bill is Bill Johnson, correct?
12        A.   That's correct.
13   (Exhibit 29 - Bates No. TVABLN00000042, e-mail
14   from Larry Blust to Sherry Quirk dated November
15   23, 2018.)
16   BY MR. O'REAR:
17        Q.   Can you identify Exhibit 29 as an e-mail
18   sent from Larry Blust to you on November 28, 2018, at
19   4:13 p.m.?
20        A.   Yes.
21        Q.   And you would have received and
22   considered that e-mail, correct?
23        A.   Yes.
24   (Exhibit 30 - Bates No. TVABLN00000660 through
25   661, e-mail from Larry Blust to Clifford Beach,

33 (Pages 126 - 129)

Page 130

1     dated November 28, 2018.)
2  BY MR. O'REAR:
3     Q.    If you would look at Exhibit 30.  Can you
4  identify that as another e-mail sent to you by Larry
5  Blust on November 28, 2018, at 7:03 p.m., which was
6  directed to Clifford Beach but copied to you as well?
7     A.    Yes.
8     Q.    And as late as 7 p.m., two days prior to
9  the closing Mr. Blust is still trying to get an answer
10 from TVA about whether the transaction will close on
11 that Friday, correct?
12    A.    Correct.
13    (Exhibit 31 - Bates No. ND_004950, e-mail from
14    Sherry Quirk to Larry Blust dated November 29,
15    2018.)
16 BY MR. O'REAR:
17    Q.    If you will look at Exhibit 31.  Is that
18 an e-mail dated November 29, 2018, at 9:09 p.m. from
19 you to Larry Blust attaching the November 29, 2018,
20 letter that we just referred to by you to him?
21    A.    Yes.
22    Q.    So it was not until the day before the
23 closing at 9:09 p.m. that TVA advised Nuclear
24 Development that it would not close the next day, is
25 that correct?

Page 131

1     A.    That's correct.
2     (Exhibit 25 - Bates No. TVABLN00006461 through
3     6464, e-mail and attachments from Sherry Quirk to
4     others dated November 30, 2018.)
5  BY MR. O'REAR:
6     Q.    If you would look at Exhibit 25
7  previously marked at Mr. Johnson's deposition.  Can you
8  identify that as an e-mail from Larry Blust to you on
9  Friday, November the 30th at 4:02 p.m., that you in
10 turn forwarded to others at TVA?
11    A.    Yes.
12    Q.    And did that e-mail attach Mr. Blust's
13 letter of November 30, 2018, that we see attached to
14 this exhibit?
15    A.    Yes.
16    Q.    Mr. Johnson's decision not to close the
17 transaction had already occurred before this letter
18 from Mr. Blust was received, is that correct?
19    A.    I'm not --
20    Q.    Well, your letter was sent 9:09 p.m. the
21 day before?
22    A.    Yes.
23    Q.    And it said we're not going to close the
24 transaction?
25    A.    Right.

Page 132

1     Q.    And that was based on Mr. Johnson's
2  decision not to close the transaction, correct?
3     A.    That is correct.
4     Q.    So his decision was made before he
5  reviewed the position stated in Mr. Blust's letter
6  received the next day, correct?
7     A.    That's correct.
8     Q.    Before you sent your letter on November
9  the 29, 2018, stating that TVA would not close the
10 transaction, did TVA ever ask of the Nuclear Regulatory
11 Commission what it's position was on this issue?
12    A.    I believe there were conversations
13 between Chris Chandler and NRC staff, but I don't know
14 the specifics of them.
15    Q.    Do you know what the NRC staff said in
16 those conversations?
17    A.    I don't know with particularity.
18    Q.    Do you know generally?
19    A.    I know that it did not give us comfort
20 that we could go forward and close.
21    Q.    And what's that based on?
22    A.    Based on the content of the conversations
23 as communicated to me at the time.  There was no -- no
24 firm information coming from the NRC indicating that we
25 could close the transaction without violating the law.

Page 133

1     Q.    And how did you receive that information?
2        MR. LEMBKE:  Objection, vague, when you
3     say how.
4  BY MR. O'REAR:
5     Q.    Who gave you that information?
6     A.    That would have been Chris Chandler.
7     Q.    Were you aware that Nuclear Development
8  filed an application for transfer of the construction
9  permits with the NRC on November 13, 2018?
10    A.    I was aware they filed.  I would not be
11 able to draw the date out of the air, though.
12    Q.    To your knowledge, has TVA commented or
13 objected in any respect to Nuclear Development's
14 application?
15    A.    Not as far as I'm aware.
16    Q.    Do you have any expectation you will be
17 an expert witness in this case?
18        MR. LEMBKE:  Miss Quirk, I instruct you
19     not to answer that question to the extent it would
20     require you to disclose communications between you
21     and your inside or outside counsel.
22        THE WITNESS:  What case are you referring
23     to?
24 BY MR. O'REAR?
25    Q.    This lawsuit.

34 (Pages 130 - 133)

Page 134

1      MR. LEMBKE:  I'll also -- in fact, I'm
2  going to instruct you not to answer that question.
3  There is an expert disclosure deadline and there's
4  no way that she could ever answer that question
5  without disclosing attorney/client communications
6  and work product.
7  BY MR. O'REAR:
8      Q.   Who is the person within the legal
9  department of TVA that has the most expertise regarding
10  issues of nuclear licensing?
11      A.   Chris Chandler.
12      Q.   And how long has he worked at TVA?
13      A.   Longer than I have, but I'm not sure when
14  he began.
15      MR. LEMBKE: I think you're at 32.
16  (Exhibit 32 - Bates No. Bates No. TVABLN00009316
17      through 9328, handwritten notes.)
18  BY MR. O'REAR:
19      Q.   I've handed you what's been marked as
20  Exhibit 32.  Have you seen those notes before?
21      A.   No.
22      Q.   Are those your notes?
23      A.   No.
24      Q.   Do you know whose notes they are?
25      A.   I do not.

Page 135

1      Q.   Okay.  If you'd look to the last two
2  pages of that exhibit.  Are those your typed written
3  notes?
4      A.   I don't recognize them.
5      Q.   Okay.  Do you know whose notes they are?
6      A.   I don't.
7      MR. O'REAR:  I think I'm finished with my
8  questioning.  I do reserve the right to recall the
9  witness to ask questions regarding objections on
10  privilege that were taken in the deposition if
11  they turn out to be not meritorious.
12      MR. LEMBKE:  Let's take a short break.
13  I'll have some questions for the witness.
14      MR. O'REAR: All right.
15      THE VIDEOGRAPHER:  The time is 1:19 and
16  we're going off the record.
17      (Recess taken.)
18      THE VIDEOGRAPHER:  The time is 1:26, and
19  we're back on the record.
20  EXAMINATION BY MR. LEMBKE:
21      Q.   Miss Quirk, Matt Lembke for TVA, and I
22  have just a few questions for you.
23      First, after you got to TVA, what was
24  your first involvement with either Franklin Haney or
25  any of his associates or companies with regard to the

Page 136

1  Bellefonte plant?
2      A.   My first recollection is that maybe in
3  the June or July timeframe of 2015 I received a
4  document that was a relatively short document that
5  seemed to contemplate a lease of the Bellefonte site to
6  an entity associated with Franklin Haney that related
7  to the Bellefonte site, and I took a look at it and
8  reviewed it at least generally, when I was told by Mr.
9  Johnson that we would be going to a meeting on this
10  subject with the Governor of Alabama, who at that point
11  was Governor Bentley.
12      Q.   Did you go to that meeting?
13      A.   I did go to the meeting.
14      Q.   And who do you recall being in attendance
15  at that meeting?
16      A.   Well, there was a whole room of full of
17  people but what I remember is for TVA it was myself,
18  Bill Johnson, Justin Maierhofer, Joe Rich who at that
19  point was chair of the TVA board, and then Mark
20  Crosswhite who was the president of Alabama Power at
21  that point.
22      Then Franklin Haney, his son, Frank Jr.,
23  Mr. Blust.  I believe Bud Cramer was there. I don't
24  recall whether Bill McCollum was there, he may have
25  been, and then a number of staff for the Governor.

Page 137

1  There may have been other people present, but that's
2  what I recall.
3      Q.   And was Governor Bentley present in that
4  meeting?
5      A.   Yes, he was.
6      Q.   And what do you recall being discussed at
7  that meeting?
8      A.   The discussion in the meeting was the
9  Governor's interest in seeing the Bellefonte site
10  developed, and he began the meeting by saying that he
11  had an interest in something happening at the site, and
12  he wanted to bring these particular parties together in
13  order to see if progress could be made toward that end.
14      Q.   And what is your understanding of why Mr.
15  Crosswhite of Alabama Power was there?
16      A.   My understanding is that Mr. Crosswhite
17  had been approached with a question of whether Alabama
18  Power would be willing to buy power from the site if it
19  were developed.
20      Q.   And what did Mr. Crosswhite say in the
21  meeting about that proposal?
22      A.   That he did not have interest in that,
23  that Alabama Power didn't need power. If they were
24  going to build a nuclear site they would build one in
25  their own service territory. I think his last words

35 (Pages 134 - 137)

Page 138

1 were something like leave me out of this.
2     Q.     And do you recall what the proposal was
3 for TVA's role in this proposed transaction that Mr.
4 Haney had put forward?
5     A.     I believe that our role was intended to
6 be to lease the site to Mr. Haney to develop it and I
7 think his -- Mr. Haney's interest was in selling to
8 power to Alabama power.
9     Q.     All right.  And what was Mr. Johnson's
10 response to that proposal at the meeting?
11     A.     He said we don't -- we, TVA, don't need
12 the power.  We have just completed an IRP.
13     Q.     What is IRP?
14     A.     Integrated Resource Plan, determining
15 that we do not need the Bellefonte plant, so it doesn't
16 make sense for us to develop it, but we don't want to
17 stand in the way of somebody else developing it if they
18 believe that they can, but we don't need the power.  We
19 don't have an interest in that.
20     Q.     What, if any, was the takeaway or
21 conclusion from the meeting?
22     A.     The takeaway was that Mr. Haney was
23 interested in acquiring the site, whether by lease or
24 by sale, and that he believed that he could develop the
25 site.

Page 139

1     Q.     All right.  And after that meeting, what
2 happened next with regard to Mr. Haney and his interest
3 in the Bellefonte site as best you recall?
4     A.     My memory is that after that -- well, at
5 the conclusion of the meeting, the matter was left in
6 my hands and Mr. Blust's hands to work toward -- to see
7 whether some kind of transfer of the property could
8 occur.
9     Q.     And following the meeting, what do you
10 recall happening after the meeting?
11     A.     Then we had a series of phone calls, some
12 involving me, some involving others on my staff as we
13 attempted to ascertain what steps would need to be
14 taken in order for this site to be transferred to Mr.
15 Haney or an entity under his control.
16     Q.     All right.  And what was the end result
17 of that process?
18     A.     The end result was that we determined --
19 we issued a request for comments and collected
20 comments.
21     Q.     Comments from whom?
22     A.     From the public on what members of the
23 public thought that we should do with the site, and
24 with these comments we determined that the appropriate
25 course would be to recommend that the board declare

Page 140

1 this to be surplus property and to sell it at auction.
2     Q.     And did that then culminate in the
3 resolution that we looked at earlier in the deposition,
4 Exhibit 4?
5     A.     Yes, it did.
6     Q.     Okay.  I also want to ask you earlier Mr.
7 O'Rear showed you Exhibit 10.
8     A.     Yes.
9     Q.     Which was the report of the public
10 meeting in August of 2018 involving the NRC and Nuclear
11 Development, and Mr. O'rear asked you some questions
12 about on the second page, the third bullet point which
13 says "ND will begin engineering and licensed work in
14 parallel upon closure of the sale."
15     Do you see that?
16     A.     I do.
17     Q.     What was your understanding of what is
18 meant there by licensing work?
19     A.     That is the work in connection with
20 obtaining a license for the project, which is in
21 contrast to the permits.  So that would come later in
22 time after transfer of the permits.
23     Q.     All right.  And what, if any, relation is
24 there between licensing and resuming active
25 construction?

Page 141

1     A.     To resume active construction I think
2 requires some licensing activity.
3     Q.     Okay.  Now, in the lead up to
4 November 30, 2018, do you recall having any
5 conversations in which Mr. Blust talked about his view
6 of the requirements of the Atomic Energy Act?
7     A.     We had some conversations about that,
8 yes.
9     Q.     And what do you recall Mr. Blust saying?
10     A.     I think we --
11     MR. O'REAR:  Objection, vague, without
12     identifying when this happened.
13 BY MR. LEMBKE:
14     Q.     What is your best estimate of the month
15 in which you had conversations with Mr. Blust in which
16 he talked about the Atomic Energy Act and his view of
17 it?
18     A.     I think it was roughly coincident with
19 the e-mail that opposing counsel showed me setting
20 forth the Tim Matthews points and Mr. Blust's view.
21     I don't recall the date of that e-mail,
22 but it's roughly that timeframe.
23     Q.     All right.  Let me find that e-mail so we
24 can have it.
25     (Exhibit 15 - Previously marked - Bates No.

36 (Pages 138 - 141)

Page 142

1    TVABLN00006245 though 6246, Email from Autumn
2    Beeler to Clifford Beach and others dated
3    Octrober 25, 2018.)
4    BY MR. LEMBKE:
5        Q.    Miss Quirk, let me show you what was
6    previously marked as Exhibit 15.
7        A.    Yes.
8        Q.    Is that the e-mail you're receiving to?
9        A.    No, but I think this is probably the same
10   vintage.
11       Q.    Okay.  And what is that time period?
12       A.    It's roughly October 24th.
13       Q.    Okay.  So what is your recollection, if
14   any, of any statement by Mr. Blust about his view of
15   the Atomic Energy Act and it's applicability to the
16   situation?
17             MR. O'REAR:  Objection, without
18   identifying a specific time.
19   BY MR. LEMBKE:
20       Q.    Go ahead.
21       A.    Well, my recollection is that we
22   discussed the fact that the Atomic Energy Act presented
23   some complexities and difficulties and created some
24   issues for both sides to go forward, but Mr. Blust's
25   view was that we -- we could go forward and just face

Page 143

1    the possibility of penalties.
2        Q.    All right.  And was that on a telephone
3    conversation or face-to-face meeting?
4        A.    I believe it was a telephone
5    conversation.
6        Q.    Okay.  Earlier you looked at Exhibit 1
7    which is the purchase and sale agreement between TVA
8    and Nuclear Development with regard to the Bellefonte
9    site.
10       A.    Yes.
11       Q.    Did the board review and approve the
12   terms and conditions of that contract before it was
13   executed by TVA?
14       A.    No, it did not.
15             MR. LEMBKE:  I don't have any further
16   questions.
17             MR. O'REAR:  Nothing further.
18             MR. LEMBKE:  That's it.
19             THE VIDEOGRAPHER:  The time is 1:37.
20             This marks the end of this deposition.
21   Two media units were used, and we're going off the
22   record.
23             (The deposition concluded at 1:37 p.m.)
24             FURTHER THIS DEPONENT SAITH NOT.
25

Page 144

1             C E R T I F I C A T E
2    STATE OF TENNESSEE
3    COUNTY OF KNOX
4             I, Georgette H. Mitchell, Registered
5    Professional Reporter, Licensed Court Reporter #55 and
6    Notary Public, do hereby certify that I reported in
7    machine shorthand the videotaped deposition of SHERRY
8    QUIRK, called as a witness at the instance of the
9    Plaintiff, that the said witness was duly sworn by me;
10   that the reading and subscribing of the deposition by
11   the witness was not waived; that the foregoing pages
12   were transcribed under my personal supervision and
13   constitute a true and accurate record of the deposition
14   of said witness.
15             I further certify that I am not an attorney or
16   counsel of any of the parties, nor an employee or
17   relative of any attorney or counsel connected with the
18   action, nor financially interested in the action.
19             Witness my hand and seal this the 6th day of
20   November, 2019.
21
22             Georgette H. Mitchell
             Georgette H. Mitchell
23             Registered Professional
             Reporter, Licensed Court
24             Reporter 55, LCR expires
             6-30-20 and Notary Public
25             My Commission Expires:
             February 2, 2020

Page 145

1    To: Matthew H. Lembke, Esq.
2    Re: Signature of Deponent Sherry Quirk
3    Date Errata due back at our offices: 12/6/2019
4
5    Greetings:
6    This deposition has been requested for read and sign by
     the deponent.  It is the deponent's responsibility to
7    review the transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill
8    out the Errata electronically or print and fill out
     manually.
9
10   Once the Errata is signed by the deponent and notarized,
     please mail it to the offices of Veritext (below).
11
12   When the signed Errata is returned to us, we will seal
     and forward to the taking attorney to file with the
13   original transcript.  We will also send copies of the
     Errata to all ordering parties.
14
15   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the
16   court without the signature of the deponent.
17
18   Please Email the completed errata/witness cert page
     to readandsign@veritext.com
19   or mail to
20   Veritext Production Facility
21   2031 Shady Crest Drive
22   Hoover, AL 35216
23   205-397-2397
24
25

37 (Pages 142 - 145)

Page 146

1   ERRATA for ASSIGNMENT #3531758
2   I, the undersigned, do hereby certify that I have read the
    transcript of my testimony, and that
3
4   ___ There are no changes noted.
5   ___ The following changes are noted:
6
    Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7   (2017). Rule 30(e) states any changes in form or
    substance which you desire to make to your testimony shall
8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any
9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.
10
11  Page _____ Line _____ Change _____
12  _____
13  Reason for change _____
14  Page _____ Line _____ Change _____
15  _____
16  Reason for change _____
17  Page _____ Line _____ Change _____
18  _____
19  Reason for change _____
20  Page _____ Line _____ Change _____
21  _____
22  Reason for change _____
23  Page _____ Line _____ Change _____
24
25

Page 147

1   Page _____ Line _____ Change _____
2   _____
3   Reason for change _____
4   Page _____ Line _____ Change _____
5   _____
6   Reason for change _____
7   Page _____ Line _____ Change _____
8   _____
9   Reason for change _____
10  Page _____ Line _____ Change _____
11  _____
12  Reason for change _____
13  Page _____ Line _____ Change _____
14  _____
15  Reason for change _____
16
17
18      _____
        DEPONENT'S SIGNATURE
19
    Sworn to and subscribed before me this ___ day of
20
        _____, _____.
21  _____
22  _____
23  NOTARY PUBLIC / My Commission Expires:_____
24
25