FILED

2020 Oct-28  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT Q

1            IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF ALABAMA

2                   NORTHEASTERN DIVISION.

3

4        NUCLEAR DEVELOPMENT, LLC,          )

                                            )

5                                           )

                         Plaintiff,         )

6                                           )   Civil Action

         vs.                                )   Case Number

7                                           )

         TENNESSEE VALLEY AUTHORITY,        )   No.

8                                           )   5:180cv-01983

                                            )   -LCB

9                        Defendant.         )

10

11

12            VIDEO RECORD & ORAL DEPOSITION OF

13                      Clifford Beach

14               Wednesday, October 30, 2019

15                        8:57 a.m.

16                    900 S. Gay Street

17                        9th Floor

18               Knoxville, Tennessee 37902

19

20

21

22

23

24               Georgette H. Mitchell

              Registered Professional Reporter

25                      LCR-55 (TN)

Page 2

1    APPEARANCES OF COUNSEL:
2    ON BEHALF OF THE PLAINTIFF:
3    Caine O'Rear, III, Esq.
     Hand Arendall Harrison Sale LLC
4    104 Saint Francis Street
     Suite 300
5    Mobile, Alabama 36602
     251.694.6308
6    Corear@handarendall.com
7    Larry D. Blust, Esq.
     Hughes Socol Piers Resnick DYM LTD.
8    70 West Madison Street
     Suite 4000
9    Chicago, Illinois 60602
     312.604.2672
10   Lblust@hsplegal.com
11
     ON BEHALF OF THE DEFENDANT:
12
     Matthew H. Lembke, Esq.
13   Bradley Arant Boult Cummings LLP
     One Federal Place
14   1819 Fifth Avenue North
     Birmingham, Alabama 35203
15   205.521.8560
     Mlembke@bradley.com
16
     Office of the General Counsel
17   Jill McCook, Esq.
     Steven Chin, Esq.
18   Tennessee Valley Authority
     400 West Summit Hill Drive, WT6
19   Knoxville, Tennessee 37902
     865.632.8964
20   Ddayliffe@tva.gov
21   Also Present:
     Richard Scott, Videographer
22
23
24
25

Page 3

1
2         I N D E X
  CLIFFORD BEACH                              7
3 EXAMINATION BY MR. O'REAR                   7
  EXAMINATION BY MR. LEMBKE                  80
4 EXAMINATION BY MR. O'REAR                  84
5
6         E X H I B I T S
7 Exhibit 12 - Previously marked - Bates No.
  TVABLN00000352, letter from Aaron Nix to Larry
8 Blust, dated August 21, 2018.               30
9 Exhibit 35 - Bates No. TVABLN00002941, e-mail
  from Larry Blust to Aaron Nix and others dated
10 September 5, 2018.                         37
11 Exhibit 16 - Previously marked, Bates No.
  TVABLN0000522 through 525, e-mail from James
12 Chardos to Larry Blust, dated November 6,
  2018.                                       48
13
   Exhibit 18 - Previously marked - Bates No.
14 TVABLN00006247 through 6251, e-mail from Jack
   McCall to Lorie Molton Hunt and others dated
15 November 9, 2018.                          52
16 Exhibit 17 - Previously marked - Bates No.
   TVABLN00002643 through 2644, e-mail from
17 Clifford Beach to Larry Blust dated November
   9, 2018.                                   55
18
   Exhibit 19 - Previously marked - Bates No.
19 TVABLN00000043 through 44, e-mail from Larry
   Blust to Clifford Beach and others, dated
20 November 12, 2018.                         58
21 Exhibit 26 - Previously marked - Bates No.
   TVABLN00000038 through 39, e-mail from Larry
22 Blust to Sherry Quirk and others dated
   November 13, 2019.                         59
23
   Exhibit 36 - Bates No. TAVABLN00002954, e-mail
24 from Larry Blust to Clifford Beach, dated
   November 16, 2018.                         65
25

Page 4

1
2         INDEX (continued)
   Exhibit 23 - Previously marked - Bates No.
3 TVABLN00000045 through 46, e-mail from
  Clifford Beach to Larry Blust dated November
4 28, 2018.                                   68
5 Exhibit 32 - Previously marked, Bates No.
  TVALBLN000009316 through 9328, Handwritten    78
6 Notes.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         S T I P U L A T I O N
2
3         The videotaped deposition of CLIFFORD
4    BEACH, called as a witness at the instance of the
5    Plaintiff, pursuant to all applicable rules, taken by
6    agreement on the 30th day of October, 2019, beginning
7    at approximately 9:00 a.m., at the law offices of
8    Woolf, McClane, Bright, Allen & Carpenter, 900 S. Gay
9    Street, Suite 900, Knoxville, Tennessee, before
10   Georgette H. Mitchell, Registered Professional Reporter
11   and Notary Public, pursuant to the stipulation of
12   counsel.
13        It being agreed that
14   Georgette H. Mitchell, Registered Professional Reporter
15   and Notary Public, may report the deposition in machine
16   shorthand, afterwards reducing the same to typewriting.
17        All objections, except as to the form of
18   the question, are reserved to on or before the hearing.
19        It being further agreed that all
20   formalities as to notice, caption, certificate,
21   transmission, etc., excluding the reading of the
22   completed deposition by the witness and the signature
23   of the witness, are reserved.
24
25

Freedom Court Reporting
A Veritext Company

877-373-3660                                    205-397-2397

Page 6

1  (The deposition began at 8:57 a.m.)
2  THE VIDEOGRAPHER:  We're going on the
3  record at 8:57 on October 30th, 2019.  This is
4  media unit one of the video recorded deposition of
5  Cliff Beach in the matter of Nuclear Development
6  versus Tennessee Valley Authority filed in the
7  United States District Court for the Northern
8  District of Alabama.
9  The deposition is being held at 900 South
10  Gay Street in Knoxville, Tennessee.  My name is
11  Richard Scott from the firm Veritext Legal.  I'm
12  the videographer.
13  The court reporter is Georgette from
14  Veritext Legal.
15  Will the attorneys please identify
16  themselves and who they represent.
17  MR. O'REAR:  Caine O'Rear for the
18  plaintiff, Nuclear Development.
19  MR. BLUST:  Larry Blust for plaintiff,
20  Nuclear Development.
21  MR. LEMBKE:  Matt Lembke for the
22  defendant, TVA.
23  MS. MCCOOK:  Jill McCook for defendant,
24  TVA.
25  MR. CHIN:  Steve Chin for defendant, TVA.

Page 7

1  THE VIDEOGRAPHER:  Okay.  The court
2  reporter may swear in the witness.
3  CLIFFORD BEACH,
4  having first been duly sworn, was examined and deposed
5  as follows:
6  EXAMINATION BY MR. O'REAR:
7  Q.  State your name, please.
8  A.  Clifford Beach.
9  Q.  Are you with TVA, Mr. Beach?
10  A.  I am.
11  Q.  And what's your position with TVA?
12  A.  I am the Director of Board Engagement.
13  Q.  Okay.  And when did you assume that
14  title?
15  A.  Mid-January of 2000 -- 2019.
16  Q.  So are you the liaison between the
17  management and the board?
18  A.  No, my boss is.
19  Q.  Who's your boss?
20  A.  Justin Maierhofer.
21  Q.  Okay.  And what position does he hold?
22  A.  Vice President External Relations.
23  Q.  Is your office here at TVA headquarters
24  in Knoxville?
25  A.  Yes.

Page 8

1  Q.  And what's the address?
2  A.  400 West Summit Hill Drive, 37901.
3  That's my home address.  37902.
4  Q.  And what was your position with TVA
5  before you assumed this position of director of board
6  engagement?
7  A.  Senior Counsel.
8  Q.  And for how long did you hold that title,
9  Senior Counsel?
10  A.  About three months.
11  Q.  That would be at the end of 2018?
12  A.  Yes, three -- three to four months, yes.
13  Q.  So September, October 2018, through the
14  end of 2018?
15  A.  Yes.
16  Q.  And were you in the legal department when
17  you were Senior Counsel?
18  A.  Yes.
19  Q.  Are you in the legal department now?
20  A.  I'm on a rotational assignment.  So for
21  some administrative purposes I'm still listed in the
22  legal department, but I'm assigned to another unit
23  within TVA.
24  Q.  Okay.  And then prior to being Senior
25  Counsel in the legal department in the last quarter of

Page 9

1  2018, what position did you hold?
2  A.  The last quarter of calendar 2018, I was
3  in the Senior Counsel position.
4  Q.  Right.  Well, my question was intended to
5  ask you what position did you hold prior to that?
6  A.  Okay.  Associate General Counsel.
7  Q.  I've seen on some correspondence that
8  beneath your name you held the title of Associate
9  General Counsel Contracts and Commercial Law?
10  A.  That was my group.
11  Q.  That was your group.  And for how long
12  did you hold the position of Associate General Counsel?
13  A.  I held a position that had the same
14  responsibilities for about ten years.  At one time it
15  was called Assistant General Counsel, and at one point
16  the name was changed to Associate General Counsel and I
17  don't recall exactly when that change happened,
18  probably three or four years ago.
19  Q.  What position did you hold in calendar
20  year 2016?
21  A.  Associate General Counsel.
22  Q.  And you were in the legal department at
23  that time?
24  A.  Yes.
25  Q.  And in 2017?

3 (Pages 6 - 9)

Page 10

1     A.     Same position.
2     Q.     Okay.  And the same position in 2018,
3   until your transition to Senior Counsel in September or
4   October, correct?
5     A.     Yes.
6     Q.     Did you ever serve as an officer of TVA?
7     A.     I am an Assistant Secretary of TVA.
8     Q.     And what are your responsibilities as
9   Assistant Secretary?
10    A.     Certify documents.  I'm not an executive
11  officer though.
12    Q.     Okay.  As Assistant Secretary, did you
13  attend board meetings?
14    A.     No.
15    Q.     Did you attend board committee meetings?
16    A.     I did for a period of time prior to 2016.
17    Q.     And in what capacity did you attend the
18  board meetings, board committee meetings prior to 2016?
19    A.     I was the Assistant Secretary assigned to
20  the audit committee and took notes for the audit
21  committee.
22    Q.     Did you prepare minutes for the audit
23  committee?
24    A.     Yes.
25    Q.     Have you prepared minutes for any other

Page 11

1   board committees?
2     A.     No.
3     Q.     What were done with the minutes that you
4   prepared for the audit committee?
5     A.     They were presented to the audit
6   committee at the following meeting for approval.
7     Q.     And where are they kept, those minutes
8   kept?
9     A.     In the board records.
10    Q.     Who is the custodian of the board
11  records?
12    A.     The secretary of TVA.
13    Q.     And currently the secretary is Sherry
14  Quirk?
15    A.     Correct.
16    Q.     So you never substituted for her as
17  assistant secretary in her absence at any official
18  board meetings, is that correct?
19    A.     No.
20    Q.     How long have you been with TVA?
21    A.     A little over 20 years.
22    Q.     Are you a lawyer?
23    A.     Yes.
24    Q.     And can you tell us where you received
25  your undergraduate degree?

Page 12

1     A.     The University of Tennessee.
2     Q.     And your law degree?
3     A.     Vanderbilt Law School.
4     Q.     And did you -- have you -- tell me your
5   work history before you went with TVA.
6     A.     I was at was Bass, Berry & Sims here in
7   Knoxville for four years, and Miller Martin in
8   Chattanooga for three years before that.
9     Q.     And when you were in private practice,
10  what -- did you have an area of specialty?
11    A.     Transactional work.  Focused on
12  commercial lending and industrial development, finance.
13    Q.     Are you currently licensed in any state?
14    A.     Yes.
15    Q.     What state?
16    A.     Tennessee.
17    Q.     Are you a member of the Tennessee bar
18  then?
19    A.     Yes.
20    Q.     And was that true in 2016, 2017, 2018?
21    A.     Yes.
22    Q.     Can you tell us what your duties were as
23  Associate General Counsel in 2016, 2017 and 2018, and
24  how they changed, if at all, when you transitioned to
25  Senior Counsel in 2018?

Page 13

1     A.     In the Associate General Counsel position
2   I supervised a group of approximately five attorneys,
3   all of which did contract work.
4     Q.     Okay.
5     A.     And then after I moved out of a
6   supervisory position into a position that was a new
7   position for the legal group and but many of my same
8   work duties continued just without supervision.
9     Q.     Okay.  So the Senior Counsel role that
10  you held for three or four months was a new position
11  created within the legal department?
12    A.     Correct.
13    Q.     And had there not been Senior Counsel
14  designated in your legal department before that?
15    A.     Not to my knowledge.
16    Q.     So in -- tell me exactly, if you can
17  recall, when you transitioned to Senior Counsel.
18    A.     During the month of September of 2018.
19    Q.     And was there any reason for your
20  transition from Associate General Counsel to Senior
21  Counsel at that time?
22    A.     It was part of a reorganization of the
23  legal group.
24    Q.     Who do you report to currently?
25    A.     Justin Maierhofer, the VP of External

4 (Pages 10 - 13)

Page 14

1 Relations.
2     Q.    Who did you report to as Senior Counsel?
3     A.    Jared Mitchum.
4     Q.    For my -- for my benefit and the court
5 reporter's, would you spell his name for us?
6     A.    J-a-r-e-d, and then Mitchum, Robert
7 Mitchum, M-i-t-c-h-u-m.
8     Q.    And who did you report to as Associate
9 General Counsel?
10     A.    Sherry Quirk.
11     Q.    What position did Jared Mitchum hold when
12 you reported to him?
13     A.    Deputy General Counsel.
14     Q.    Who were the lawyers that were in your
15 group that reported to you when you were Associate
16 General Counsel?
17     A.    Nick McCall, Brian Billinson, Sherry
18 Collins, Jarom Smartt. At that time, that was the
19 group. It varied in size over the years.
20     Q.    And did you work on the contract between
21 Nuclear Development and TVA?
22     A.    Yes.
23     Q.    Who in your group also worked on that
24 contract, if anyone?
25     A.    Nick McCall.

Page 15

1     Q.    So just the two of you out of that group?
2     A.    Yes.
3     Q.    Can you tell us generally what your role
4 was with respect to the contract between Nuclear
5 Development and TVA?
6     A.    I supervised Nick's work on the contract.
7 I was a drafter as well.
8     Q.    And so did the work that Nick did on the
9 contract, did it have to be approved by you?
10     A.    Yes.
11     Q.    Did the work that you did on the
12 contract, did it have to be approved by anyone?
13     A.    Ultimately Sherry Quirk and Bill Johnson.
14     Q.    Were you the primary person at TVA
15 responsible for preparing the terms and conditions of
16 the contract?
17     A.    No, I wouldn't characterize it that way.
18     Q.    Was there anyone that was more involved
19 than you in terms of preparing the terms and
20 conditions?
21     A.    No, it was a group effort.
22     Q.    The group being you and Nick McCall?
23     A.    Yes, and we also worked with attorneys in
24 our environmental group, Greg Signer, Kendra Mansur.
25     Q.    And what did involvement did they have in

Page 16

1 the preparation of the contract?
2     A.    They were attorneys who handled the
3 auction primarily.
4     Q.    Well, were they involved in working on
5 the terms and conditions in the contract as opposed to
6 working on the auction itself?
7     A.    They reviewed and commented on drafts.
8     Q.    Now, there were a number of parties
9 initially interested that received information
10 regarding the potential auction of the sale of the
11 property, correct?
12     A.    A number?
13     Q.    Well, let me ask you this. Did you or
14 did TVA prepare a contract that was submitted in the
15 bid package to prospective bidders?
16     A.    I did not prepare one. I don't recall a
17 contract being part of the bid package.
18     Q.    Was there a contract presented to all
19 prospective builders for the Bellefonte site?
20     A.    My recollection is that a contract was
21 presented to bidders who qualified.
22     Q.    And how many bidders qualified?
23     A.    At least two. I seem to recall there was
24 a third one as well.
25     Q.    So would the two of three bidders that

Page 17

1 qualified have received the same contract?
2     A.    Yes.
3     Q.    And was that contract one that you worked
4 on?
5     A.    Yes.
6     Q.    Okay. And was the contract that the two
7 or three bidders received, the final contract?
8     A.    No, there was negotiation of contract
9 terms. We received comments.
10     Q.    Was there any negotiation of the contract
11 before you sent a contract form to the three
12 prospective bidders?
13     A.    I don't recall any.
14     Q.    Who at TVA made the final decision to
15 approve the terms and conditions of the contract?
16     A.    Bill Johnson.
17     Q.    And did he receive recommendations from
18 the legal department with respect to that?
19         MR. LEMBKE: That's a yes or no answer,
20     Mr. Beach.
21         THE WITNESS: Yes.
22 BY MR. O'REAR:
23     Q.    Did you have any communications with
24 Mr. Johnson regarding the terms and conditions of the
25 contract?

5 (Pages 14 - 17)

Page 18

1    A.    No.
2    Q.    Did you have discussions with Sherry
3  Quirk regarding the terms and conditions of the
4  contract?
5    A.    Are we talking before the contract was
6  signed still?
7    Q.    Yes.
8    A.    Yes.
9    Q.    What was the role of Concentric Energy
10  Advisors with respect to this contract?
11    A.    Consultant for TVA.
12    Q.    Okay.  And what was the scope of their
13  work?
14    A.    To advise TVA on auctioning the property,
15  work with bidders, bring their expertise as a company
16  with knowledge in sale of large properties to TVA's
17  benefit.
18    Q.    And who arranged for Concentric Energy
19  Engineers to be a consultant to TVA on this project?
20    A.    I don't recall.  I was not part of that
21  hiring process.
22    Q.    Did you have any communications with
23  Concentric while they were doing their work on this
24  project?
25    A.    Yes.

Page 19

1    Q.    And who was responsible at TVA for
2  interfacing with Concentric?
3    A.    My recollection is that it was Norm
4  Steur, S-t-e-u-r.
5    Q.    Okay.  And what position does he hold?
6    A.    Mr. Steur was a manager in the realty
7  group.
8    Q.    Who at Concentric did you have any
9  connection with regarding this project?
10    MR. LEMBKE:  Connection with?
11  BY MR. O'REAR:
12    Q.    Who did you have any discussions with or
13  who did you exchange correspondence with regarding this
14  project?
15    A.    Carrie O'Neill.
16    Q.    What was her role at Concentric?
17    A.    I don't recall her title.
18    Q.    Is she a lawyer?
19    A.    Not to my knowledge.
20    Q.    Okay.  When was Concentric retained by
21  TVA?
22    A.    I don't know exactly.
23    Q.    Well, give me your best judgment.
24    A.    2015.
25    Q.    Okay.  So they were -- were they retained

Page 20

1  for this project in 2015?
2    A.    That would be an estimate on my part, but
3  I believe that's correct.
4    Q.    So Concentric was retained before the
5  board passed a resolution to sell Bellefonte as surplus
6  property?
7    A.    I don't know the date that the board
8  approved -- that the board declared the property
9  surplus.
10    Q.    In May of 2016?
11    A.    Once again, I'm not sure exactly when
12  Concentric was hired.
13    Q.    Okay.  Well, what role did Concentric
14  play, if any, regarding negotiation with the
15  prospective bidders on the terms of the contract?
16    A.    I would describe their role as a liaison
17  and advisor to TVA.
18    Q.    And was Carrie O'Neill the person who
19  engaged in the liaison between Concentric and TVA?
20    A.    Carrie acted as a liaison.  I don't know
21  if she was the only liaison.
22    Q.    Okay.  In terms of did Concentric have
23  any questions of TVA regarding terms and conditions of
24  the contract?
25    A.    I don't recall questions.  We met with

Page 21

1  Concentric to discuss the terms, so there was back and
2  forth, but I don't recall exactly what was said.
3    Q.    Who would be involved in meetings with
4  Concentric to discuss the terms and conditions of the
5  contract?
6    A.    I would have been.
7    Q.    Anyone else?
8    A.    Yes.  I believe those conversations would
9  have included Norm Steur, Greg Signer.
10    Q.    Anyone else?
11    A.    Perhaps Lorie Hunt.
12    Q.    Who is Lorie hunt?
13    A.    She worked in the realty group with Norm.
14    Q.    Is she a lawyer?
15    A.    She is a lawyer.  Nick McCall.
16    Q.    Did Concentric negotiate with Nuclear
17  Development over the terms and conditions of the
18  contract?
19    A.    Concentric put forward TVA's response to
20  Nuclear Development with regard to questions or
21  revisions that Nuclear Development requested.
22         Negotiate can mean a lot of things.  I
23  don't know how much back and forth there was.
24    Q.    Was Concentric authorized to negotiate
25  any terms or conditions of the contract absent TVA's

Page 22

1 approval?
2     A.     Concentric would not have been authorized
3 to take a position to bind TVA to a position without
4 TVA's authority.
5     Q.     And who gave Concentric direction in
6 terms of the terms and conditions of the contract?
7     A.     The same team that I just listed.
8     Q.     Was there any one person that was
9 responsible within that team you mentioned for
10 communicating TVA's position to Concentric?
11     A.     My recollection is that we talked to
12 Concentric on conference calls.  I would have been the
13 primary communicator, but I was not the only one.  We
14 -- we had a transaction team, so to speak.
15     Q.     Did your transaction team keep notes and
16 records of its communications with Concentric whether
17 they were over the phone or by e-mail or by written
18 correspondence?
19     A.     There were e-mails with Concentric.  I
20 can't speak for the full team as to whether they took
21 notes.
22     Q.     Did you take notes?
23     A.     I don't recall.
24     Q.     If you did take notes, would you have
25 placed them in a file?

Page 23

1     A.     Yes.
2     Q.     And what would that file be?  What would
3 the name of that file be?
4     A.     Bellefonte would have -- I feel certain
5 would have been in the title.
6     Q.     Are you currently in possession of your
7 records and files with respect to Bellefonte?
8     A.     No.
9     Q.     Are those records retained within the
10 legal department currently?
11     A.     Yes.
12     Q.     Did Concentric communicate with
13 prospective bidders other than Nuclear Development
14 regarding the terms and conditions of the contract?
15     A.     I recall Concentric communicating with
16 one other bidder.
17     Q.     Who was that?
18     A.     I actually don't remember the full legal
19 name.  Jackson Holdings.
20     Q.     Jackson Holdings?
21     A.     Was the title.
22     Q.     And help me with the timeline.  Was
23 Concentric's communications with the prospective
24 bidders before or after those bidders received the
25 initial contract form from TVA?

Page 24

1     A.     It would have been both before and after.
2     Q.     Both before and after, okay.
3          Were any changes made to the terms and
4 conditions of the contract between the time the initial
5 contract form was submitted to prospective bidders and
6 the execution of the ultimate contract with Nuclear
7 Development?
8     A.     Yes.
9     Q.     Do you recall whether there were
10 significant changes or were they minor?
11          MR. LEMBKE:  Objection.  Vague as to
12     significant and minor.
13 BY MR. O'REAR:
14     Q.     Well, do you recall what changes were
15 made to the base contract form that was submitted by
16 TVA to Nuclear Development that -- I've forgotten the
17 premise.
18          (Last question read.)
19          MR. O'REAR:  Well, that was pursuant to
20     --
21 BY MR. O'REAR:
22     Q.     Do you recall what changes, if any, were
23 made to the base contract that was provided to Nuclear
24 Development and the contract that was ultimately signed
25 by TVA and Nuclear Development?

Page 25

1     A.     I recall some changes.  I don't know that
2 I recall them all.
3     Q.     Okay.  What do you recall?
4     A.     My recollection is the change that sticks
5 out the most in response to Nuclear Development's
6 comments on how TVA intended to structure the sale is
7 to build in a two-year basically option period for
8 Nuclear Development to accomplish all it needed to
9 accomplish in order to start building the plant.
10     Q.     And was it that two-year period between
11 the execution of the contract and the closing, was that
12 provision in the base contract that was provided?
13     A.     I don't recall whether that was in an
14 earlier draft to the contract internally.  I don't
15 recall when that was added to the contract, whether it
16 was before or after.
17          I do know that the change was in response
18 to Nuclear Development's understanding of how TVA
19 intended to structure the sale, and TVA restructured
20 the sale based on Nuclear Development's request.
21     Q.     Well, how was -- what was TVA's original
22 intent to structure the sale?
23     A.     To have a auction and sale of the
24 property soon thereafter, shortly thereafter.
25     Q.     And do you know what period of time would

7 (Pages 22 - 25)

Page 26

1  have elapsed between the auction and the ultimate sale
2  under TVA's original formulation of the contract?
3      A.    I don't recall what period of time, but a
4  month I would guess.
5      Q.    When you were involved in the preparation
6  of the contract with Nuclear Development, did you know
7  what purpose Nuclear Development intended to use the
8  property for?
9      A.    Yes.
10         MR. LEMBKE:  Objection.  Lack of
11  foundation.  You can answer.
12  BY MR. O'REAR:
13     Q.    And what was that?
14     A.    My recollection is they wanted to use it
15  as a nuclear plant.
16     Q.    And did you know what the other bidders
17  on the project intended to use the property for?
18     A.    My recollection is that some type of
19  power generation was one of the uses described.
20     Q.    Was that Jackson Holdings?
21     A.    Yes, that was an element of theirs I
22  recall.
23     Q.    And when you say "power generation", does
24  that include nuclear power generation?
25     A.    I don't believe that was part of their

Page 27

1  plan for the property.
2      Q.    And do you recall a group that ultimately
3  bid at the auction by the name of National
4  Environmental Group?
5      A.    I do recall another bidder out there, but
6  I don't -- I actually don't recall them submitting a
7  bid.
8      Q.    Well, do you know how many groups
9  submitted letters of intent to bid?
10     A.    I don't recall the exact number.
11     Q.    Was it more than two?
12     A.    It could have been.
13     Q.    Did any of the prospective bidders other
14  than Nuclear Development submit to TVA an intent to use
15  the property for a nuclear facility?
16     A.    I don't recall that.  Once again, I was
17  not one of the attorneys that was primarily handling
18  the auction.
19     Q.    Well, when you say you don't recall it,
20  do you have any knowledge or information that any of
21  the prospective bidders other than Nuclear Development
22  intended to use the property for a nuclear facility?
23     A.    I don't have any knowledge that any of
24  them had that, plans to use it as a nuclear facility.
25     Q.    Are you aware of the request made by

Page 28

1  Larry Blust in October of 2016, on behalf of Nuclear
2  Development to include a provision in the contract that
3  required that the construction permits be transferred
4  from TVA to Nuclear Development as a condition of
5  closing the sale of the property?
6      A.    I recall that provision, that request.
7      Q.    Okay.  And do you recall any discussion
8  within TVA about that request?
9          MR. LEMBKE:  That's a yes or no answer,
10  Mr. Beach.
11         THE WITNESS:  Yes.
12  BY MR. O'REAR:
13     Q.    And what was ultimately decided within
14  TVA in terms of responding to that request?
15         MR. LEMBKE:  Mr. Beach, let me instruct
16  you not to disclose internal attorney/client
17  communications, but of course, you can testify to
18  what was ultimately conveyed to Nuclear
19  Development or Mr. Blust.
20         THE WITNESS:  What was ultimately
21  conveyed was that we were not going to accept Mr.
22  Blust's language, at least verbatim.
23  BY MR. O'REAR:
24     Q.    And who made that decision at TVA?
25     A.    Bill Johnson would have made the decision

Page 29

1  as to what was in the contract.
2      Q.    Okay.  Did you take that question to Mr.
3  Johnson for him to decide?
4      A.    No.
5      Q.    Do you know who did?
6      A.    I would guess that it would be Sherry
7  Quirk.
8          MR. LEMBKE:  Let's not guess, Mr. Beach.
9  Testify to your personal knowledge.
10         THE WITNESS:  Thank you.  To my personal
11  knowledge, Sherry was the intermediary with Mr.
12  Johnson.
13  BY MR. O'REAR:
14     Q.    How was TVA's decision on that request
15  communicated to Nuclear Development?
16     A.    My recollection is that it was
17  communicated in a letter from Concentric back to
18  Nuclear Development.
19     Q.    And who at TVA advised Concentric of
20  TVA's position with respect to that request?
21     A.    I don't recall exactly.  My recollection
22  it would have been on a conference call.
23     Q.    With your team that you described
24  earlier?
25     A.    Yes.

8 (Pages 26 - 29)

Page 30

1    (Exhibit 12 - Previously marked - Bates No.
2    TVABLN00000352, letter from Aaron Nix to Larry
3    Blust, dated August 21, 2018.)
4  BY MR. O'REAR:
5       Q.   I've handed you Exhibit 12. I'll ask you
6  to look at it. I'll ask you a couple questions about
7  it.
8            Are you familiar with that letter which
9  is a letter from Mr. Aaron Nicks at TVA to Mr. Larry
10 Blust of August 21, 2018?
11      A.   Yes.
12      Q.   And directing your attention to the third
13 paragraph it says, "In preparation of the contemplated
14 November 14, 2018, closing, TVA will begin drafting the
15 TVA transaction documents as noted in Section 6C of the
16 agreement."
17           Do you see that?
18      A.   Yes.
19      Q.   Then it says, "The same will be forwarded
20 to you in the near future for your consideration and
21 review."
22           Do you see that?
23      A.   Yes.
24      Q.   And were you involved in the preparation
25 of the transaction documents for the November 14, 2018,

Page 31

1  closing?
2       A.   I did not prepare them.
3       Q.   Okay. Were you involved at all? Did you
4  play any role in the preparation of the transaction
5  documents?
6       A.   Yes, the documents were sent to me after
7  they were prepared.
8       Q.   And who prepared them?
9       A.   Nick McCall and TVA's realty group.
10      Q.   And who within TVA's realty group?
11      A.   Lorie Hunt would have been one. I don't
12 recall who else. I know there was another person in
13 that group that I believe was involved, but I'm just
14 drawing a blank on the name.
15      Q.   At this point in time, was TVA
16 contemplating closing the transaction on November 14,
17 2018?
18      A.   Yes.
19      Q.   And did TVA send the transaction
20 documents to Mr. Blust or anyone on behalf of Nuclear
21 Development?
22      A.   No.
23      Q.   And why not?
24      A.   We felt it would be premature due to some
25 questions about the legality of the transaction that

Page 32

1  were emerging during this time period that -- that we
2  felt were pretty serious and wanted to work with
3  Nuclear Development to work through before we moved
4  onto the -- sort of the housekeeping matters associated
5  with closing.
6       Q.   And what legal issues were emerging at
7  this time regarding the legality of the transaction?
8            MR. LEMBKE:  Mr. Beach, I instruct you to
9  the extent that would require you to disclose
10 internal communications at TVA that are covered by
11 the attorney/client privilege you should not do
12 so, but you can certainly reveal what was
13 communicated to Nuclear Development.
14 BY MR. O'REAR:
15      Q.   Well, that's not my question what was
16 communicated to Nuclear Development, which I'll ask
17 that question, but my question is what legal issues
18 were emerging?
19           MR. LEMBKE:  You have my instruction.  Do
20 not reveal internal TVA communications that are
21 covered by the attorney/client privilege.  You can
22 answer if you can.
23           THE WITNESS:  I will accept his
24 instruction.
25           MR. LEMBKE:  You can answer -- you can

Page 33

1  answer if you can do so without revealing those.
2            THE WITNESS:  I will reveal the issue or
3  issues that were communicated to Nuclear
4  Development, but I'm going to follow the
5  instruction of my counsel.
6  BY MR. O'REAR:
7       Q.   All right.  What issues were communicated
8  -- so, you're not going to tell me what legal issues
9  were emerging within TVA on August 21, 2018, or
10 thereafter that caused you not to send the transaction
11 documents to Nuclear Development?
12           MR. LEMBKE:  I object to that question.
13 That misstates what the witness said he was
14 prepared to do.
15           He said he was prepared to tell you what
16 were communicated to Nuclear Development which
17 would include -- which would obviously include
18 what was emerging. So you're misstating what he
19 said.
20           MR. O'REAR:  Well --
21           MR. LEMBKE:  I object to the question on
22 the same basis.
23           MR. O'REAR:  -- if they're the same
24 thing, then go ahead and tell me.
25           THE WITNESS:  I believe my first answer

9 (Pages 30 - 33)

Page 34

1    spoke to issues that we worked on with Nuclear
2    Development.  These are the Nuclear Regulatory
3    Atomic Energy Act, you know, concern that we had
4    regarding the transaction.
5  BY MR. O'REAR:
6       Q.     And when was that first communicated to
7  Nuclear Development?
8       A.     My recollection is that our concern over
9  the title of the construction permits was first
10  communicated in the October timeframe.
11      Q.     When you say "your concern over the title
12  of the construction permits", what do you mean?
13      A.     The construction permits were titled in
14  TVA's name.  If the plant was transferred, then the
15  plant would not be owned by the entity that had -- who,
16  and you'll have to understand, I'm not a nuclear
17  licensing attorney, so at it's heart, that was the
18  issue though that somehow we'd run afoul of NRC
19  regulations.
20      Q.     And that was communicated, that concern
21  of TVA was communicated to Nuclear Development in
22  October of 2018?
23      A.     That's my recollection.  It could have
24  been September.
25      Q.     And who on behalf of TVA communicated

Page 35

1  that to Nuclear Development?
2       A.     It would have been members of the legal
3  department to Larry Blust.  I would have been involved,
4  but I recall several calls with Larry, and I don't
5  recall dates, but Sherry Quirk would have likely been
6  on the call as well.  Chris Chandler as well.
7       Q.     Okay.  So this communication when this
8  was first broached by TVA with Nuclear Development was
9  over the telephone?
10      A.     Yes.
11      Q.     During that period of time, was Mr. Blust
12  asking for the transaction documents?
13      A.     I recall Mr. Blust asking for the
14  transaction documents at some time.  I don't recall
15  exactly when.
16      Q.     Did he ask you on multiple occasions for
17  the transaction documents?
18      A.     I'd have to have your understanding of
19  what "multiple" means to answer that question.
20      Q.     Well, more than once?
21      A.     I would say more than once is my
22  recollection, fewer than --
23      Q.     Ten?
24      A.     I would say fewer than five, if that.
25      Q.     Okay.  And did you ever tell Mr. Blust

Page 36

1  we're not going to send you the transaction documents
2  because we have a concern over the title of the
3  construction permits?
4       A.     My recollection is that we didn't talk
5  much at all about the transaction documents and I don't
6  know exactly how I phrased it.  I just know the Atomic
7  Energy Act and NRC issues were the dominant issues that
8  we talked to Mr. Blust about.
9       Q.     Well, this letter says that the
10  transaction documents will be forwarded to you in the
11  near future for your consideration and review.  That
12  was on August 21st, 2018.
13             Did TVA ever tell Nuclear Development
14  that the reason these transaction documents were not
15  forwarded to Nuclear Development was because of TVA's
16  concern over the construction permit title?
17      A.     I don't recall, but I don't believe we
18  conditioned disclosing the documents on -- my
19  recollection is that at one time, Mr. Blust said it
20  wouldn't take him any time at all to review the
21  documents, and in part that let me know that this is
22  something we could handle once we finally get these
23  Atomic Energy Act issues wrestled to the ground
24  collectively.
25      Q.     Did TVA ever send the transaction

Page 37

1  documents to Mr. Blust for his review?
2       A.     No, although a couple of transaction
3  documents were a part of the original agreement signed,
4  the most significant documents, I believe at least one.
5       Q.     What was that?
6       A.     The form of the deed.
7       Q.     Was that already executed?
8       A.     No.
9       Q.     So that was one of the transaction
10  documents that would have to have been signed at the
11  closing, correct?
12      A.     Correct.
13      Q.     Do you recall Mr. Blust asking as late as
14  the day before the closing for the transaction
15  documents?
16      A.     I don't recall that.
17      (Exhibit 35 - Bates No. TVABLN00002941, e-mail
18      from Larry Blust to Aaron Nix and others dated
19      September 5, 2018.)
20  BY MR. O'REAR:
21      Q.     I've handed you what's been marked as
22  Exhibit 35.  Can you identify Exhibit 35 as e-mail that
23  was sent from Lorie Hunt of TVA to Mr. Blust that
24  copies you and Mr. McCall and others at TVA dated
25  September 5th, 2018?

10 (Pages 34 - 37)

Page 38

1    A.    I'm sorry, would you repeat the question?
2        MR. O'REAR:  Could you read that back?
3        (The record was read by the Court Reporter.)
4        THE WITNESS:  I recall this document.
5  BY MR. O'REAR:
6    Q.    Okay.  And do you recall that Mr. Blust
7  had requested by letter to TVA of August 29, 2018, that
8  TVA agree with Nuclear Development to extend the
9  closing date to May 14, 2019?
10    A.    That's my recollection.
11    Q.    And the letter from Mr. Nix that's
12  attached to this e-mail, the second page of the
13  exhibit, says that "TVA's reviewing your request
14  internally and will contact you concerning the same in
15  the near future", correct?
16    A.    That's what it says.
17    Q.    "If you have any questions or concerns,
18  please contact Cliff Beach or Nick McCall."
19        That's stated in the second paragraph of
20  the letter, correct?
21    A.    Correct.
22    Q.    So what was your involvement in terms of
23  consideration of Nuclear Development's request for an
24  extension of the closing for six months?
25    A.    I was involved in the consideration of

Page 39

1  that request.
2    Q.    And what was your position on the
3  request?
4        MR. LEMBKE:  Mr. Beach, I instruct you
5      not to answer that question to the extent it would
6      require you to disclose attorney/client
7      communications or attorney work product.
8        If you can answer it without disclosing
9      that, go ahead.
10        THE WITNESS:  I think it would benefit
11      for me to hear the question again.
12  BY MR. O'REAR:
13    Q.    What was your position on Nuclear
14  Development's request for the extension?
15        MR. LEMBKE:  Same instruction.
16        THE WITNESS:  I believe answering that
17      question would cause me to reveal attorney/client
18      communications.
19  BY MR. O'REAR:
20    Q.    Did you have any objection to it?
21        MR. LEMBKE:  Same instruction.
22        THE WITNESS:  I have the same concern.
23  BY MR. O'REAR:
24    Q.    I'm not asking you what you communicated.
25  I'm asking what was in your head.

Page 40

1        Did you have any concern or objection
2  about granting that extension?
3        MR. LEMBKE:  I instruct you not to answer
4      that question based on the attorney/client
5      privilege and attorney work product.
6        THE WITNESS:  I will take my counsel's
7      advice.
8  BY MR. O'REAR:
9    Q.    Did you ever communicate your position on
10  the request for extension to anyone outside of TVA?
11        MR. LEMBKE:  Object to the form of the
12      question.  It assumes facts not in evidence, but
13      you can answer if you understand it.
14        THE WITNESS:  I did not communicate my
15      position to -- my personal position to anyone
16      outside of TVA.
17  BY MR. O'REAR:
18    Q.    Did you ever respond to Mr. Blust
19  regarding this request for extension?
20    A.    Yes, my recollection is that we discussed
21  it several times on the phone.
22    Q.    And did you ever state to him a final
23  decision of TVA with respect to the request for
24  extension?
25    A.    I don't recall.

Page 41

1    Q.    Did anyone within TVA make a final
2  decision on the request for extension?
3    A.    Yes.
4    Q.    Who?
5    A.    Bill Johnson.
6    Q.    And when was that decision made?
7    A.    I don't recall.
8    Q.    Do you know when that decision was
9  communicated by anyone within TVA to Nuclear
10  Development?
11    A.    I don't recall the details of that, what
12  you're asking.
13    Q.    Did TVA prepare an agreement that would
14  have amended the contract and extended the closing date
15  to May 14, 2019?
16    A.    TVA did prepare a draft.  I will say by
17  TVA, just the attorneys in the legal group.
18    Q.    That would have extended the closing to
19  May, 2019?
20    A.    I don't recall a date being in it.  It
21  was just a very preliminary draft in case it was
22  needed.
23    Q.    Did the draft provide for an extension of
24  the closing by at the six months?
25        MR. LEMBKE:  I would instruct you not to

11 (Pages 38 - 41)

1 answer that question. Now, it's trying to get
2 into attorney work product and attorney/client
3 communications.
4     THE WITNESS: I feel if I have to answer
5 that, I'm going to have to start talking about
6 attorney/client communications so I'll take that
7 direction.
8 BY MR. O'REAR:
9     Q.    Did you ever have a phone call with Mr.
10 Blust in which you advised him that TVA had prepared a
11 letter and an amendment to the contract which agreed to
12 the extension that he had requested and that TVA hoped
13 to send it out to him shortly after that call?
14     A.    I recall telling Mr. Blust that we had
15 prepared an amendment. I don't recall exactly what we
16 said, but certainly that -- yeah, I don't recall the
17 exact exchange.
18     Q.    And when you told him you prepared an
19 amendment, did you tell him you'd prepared an amendment
20 that agreed to the request for extension?
21     A.    I recall that I told him we had an
22 amendment that extended the contract. I don't recall
23 dates.
24     Q.    Do you recall the duration of the
25 extension?

1     A.    I don't recall telling Mr. Blust exactly
2 what the extension would have been.
3     Q.    Do you recall when that phone
4 conversation was?
5     A.    I don't recall the exact date, no.
6     Q.    Who was on that call where you made these
7 statements to Mr. Blust about the amendment extending
8 the closing date?
9     A.    I don't recall.
10     Q.    Did you make any notes of that call?
11     A.    I don't recall that either.
12     Q.    Do you recall whether Nick McCall was on
13 that call?
14     MR. LEMBKE: Objection. Asked and
15 answered.
16     THE WITNESS: Possibly.
17 BY MR. O'REAR:
18     Q.    Was the amendment extending the closing
19 date, and let me just clarify. There was -- there was
20 actually an extension of the closing date in November
21 from extending the closing from November 14, 2018 to
22 November 30, 2018, was there not?
23     A.    Yes.
24     Q.    I'm referring to a previous request for
25 extension by Nuclear Development to extend the closing

1 date by six months. Okay?
2     A.    Yes.
3     Q.    And I would just want to make sure that
4 your answers have been with respect to Nuclear
5 Development's request for extension for six months.
6     A.    Well, I viewed a shorter extension as a
7 partial granting of Nuclear Development's six-month
8 request.
9     Q.    Oh, you do? Okay. Well, who -- didn't
10 TVA actually request that extension in November?
11     A.    I don't recall the exchange being the way
12 you characterize it.
13     Q.    What do you recall about who initiated
14 the desire to extend the closing from November 14 to
15 November 30?
16     A.    My recollection is that Sherry Quirk was
17 the communicator I recall, being in the room.
18     Q.    The communicator to Nuclear Development?
19     A.    Yeah, to Larry Blust.
20     Q.    And you were in the room when that
21 request was made?
22     A.    Once again, I -- I don't know that I
23 would call it a request. We had a standing request
24 from Nuclear Development for a six-month extension.
25     I viewed it as more TVA saying let's

1 extend it for a couple of weeks to -- so we can
2 continue to work on these Atomic Energy Act matters.
3     Q.    Did TVA ever send a draft of an agreement
4 to extend the closing by six months to Nuclear
5 Development?
6     A.    No.
7     MR. LEMBKE: Is this a good time for a
8 break?
9     MR. O'REAR: Sure.
10     THE VIDEOGRAPHER: We're going to go off
11 the record at 10:01.
12     (Recess taken.)
13     THE VIDEOGRAPHER: We're back on the
14 record at 10:14.
15 BY MR. O'REAR:
16     Q.    Mr. Beach, I believe I asked you if you
17 prepared notes of the phone call we just discussed with
18 Mr. Blust. You said you couldn't recall, is that
19 correct?
20     A.    That's correct.
21     Q.    If you did have notes, would they have
22 been put in your Bellefonte file?
23     A.    Yes.
24     Q.    And that file would be retained within
25 the legal department currently?

12 (Pages 42 - 45)

1    A.    Yes.
2    Q.    Were there a number of calls between you
3 and Mr. Blust in the October 2018 timeframe, regarding
4 Bellefonte?
5         MR. LEMBKE: Object to the form. Vague.
6         THE WITNESS: Well, I think I need to
7    know what you consider a number.
8 BY MR. O'REAR:
9    Q.    Well, were there more than one?
10   A.    Yes.
11   Q.    Okay. Do you specifically recall a phone
12 call between you and Mr. Blust where Mr. Nick McCall
13 was also on the -- on the call on October the 3rd,
14 2018?
15   A.    I don't recall specific dates.
16   Q.    Okay. That's why I was a little vaguer
17 in my first question because I thought you'd already
18 said you didn't recall specific dates, but I'll ask you
19 about another specific date.
20        Do you recall a phone call between you,
21 Nick McCall and Larry Blust on October the 5th, 2018?
22   A.    Once again, I don't recall specific
23 dates.
24   Q.    Do you recall whether you made notes or
25 there's any sort of record of what was said in any of

1 the phone calls with Mr. Blust?
2    A.    I don't recall if there's a written
3 record.
4    Q.    Okay. Do you recall stating to Mr. Blust
5 in a phone call in October of 2018, that Sherry Quirk
6 had met with three directors the day before the call
7 who had stated to her they had no problem with the
8 extension of the closing to May of 2019?
9    A.    I don't recall that.
10   Q.    You don't recall that?
11   A.    No.
12   Q.    Do you recall whether Mr. Nick McCall
13 made that statement in a phone call with Mr. Blust?
14   A.    I don't recall that.
15   Q.    Do you know whether Sherry Quirk met with
16 directors to discuss the six-month request for
17 extension during the early October 2018, timeframe?
18   A.    I do not know.
19   Q.    Do you recall telling Mr. Blust in a
20 phone call in early October 2018, that not only had
21 Sherry Quirk met with three directors, but that Bill
22 Johnson intended to meet with some additional directors
23 to feel them out on the six-month request for
24 extension?
25   A.    I don't recall.

1    Q.    Do you know whether Bill Johnson met with
2 any directors regarding the six-month request for
3 extension?
4    A.    I don't know.
5    Q.    Did you ever personally meet with any of
6 the board of directors regarding issues involving
7 Bellefonte?
8    A.    No.
9    Q.    Did you -- were you present at any board
10 committee meetings where issues regarding Bellefonte
11 were discussed?
12   A.    No.
13   Q.    Do you know whether Mr. Johnson met with
14 directors regarding the request for extension?
15   A.    I don't know.
16 (Exhibit 16 - Previously marked, Bates No.
17 TVABLN000000522 through 525, e-mail from James
18 Chardos to Larry Blust, dated November 6, 2018.)
19 BY MR. O'REAR:
20   Q.    I've handed you Exhibit 16. I'd like for
21 you to look at it.
22        The top e-mail on it is an e-mail from
23 James Chardos to Larry Blust dated November 6, 2018.
24 There are a series of e-mails below that in the
25 exhibit.

1         Can you tell the court who James Chardos
2 is?
3    A.    James Chardos is a TVA employee. He was
4 part of a team of employees that were working on the
5 Bellefonte transaction. He's not an attorney.
6    Q.    Do you know that Mr. Chardos was in
7 regular communication with representatives of Nuclear
8 Development on the Bellefonte transaction?
9    A.    I was not aware he was in regular
10 communication with Larry. I was aware that he had
11 communications with the -- the Haneys.
12   Q.    And turn to page two of the -- let me ask
13 you.
14        Did you ever receive this exhibit or see
15 these e-mails that are depicted in this particular
16 exhibit?
17        MR. LEMBKE: What was the question? I'm
18    sorry.
19        MR. O'REAR: Did he ever see this exhibit
20    or the e-mails depicted in the exhibit.
21        MR. LEMBKE: All right. Thank you.
22        THE WITNESS: No, I've not seen these. I
23    mean, I was not provided these in this 2018
24    timeframe.
25 BY MR. O'REAR:

13 (Pages 46 - 49)

Page 50

1      Q.    Turn to page two of the exhibit if you
2    would.  There's an e-mail in the middle of the page
3    from Larry Blust to James Chardos dated November the
4    6th, 2018.
5           It says, "Per Cliff Beach, Bill Johnson
6    is meeting with Memphis City Council this afternoon and
7    will not make up his mind until after that meeting."
8           Do you see that?
9           MR. LEMBKE:  Object to the form.  Lack of
10    foundation.
11    BY MR. O'REAR:
12      Q.    Do you see that?
13           MR. LEMBKE:  Same objection.  You can
14    answer.
15           THE WITNESS:  I do see what you're
16    pointing to, yes.
17    BY MR. O'REAR:
18      Q.    All right.  And did you tell Larry Blust
19    on November 6, 2018, that Bill Johnson was meeting with
20    the Memphis City Council that afternoon?
21      A.    I don't recall.
22      Q.    Did you tell Larry Blust that Bill
23    Johnson was meeting with the Memphis City Council that
24    afternoon and will not make up his mind until after
25    that meeting?

Page 51

1      A.    I don't recall.
2      Q.    Do you have any recollection of a
3    discussion with Mr. Blust on this topic?
4      A.    The topic that's referenced in this?
5      Q.    The topic of Bill Johnson meeting with
6    the Memphis City Council on November 6, 2018.
7      A.    I don't have any recollection of talking
8    to Larry about that, no.
9      Q.    Do you deny that you made those
10    statements to Mr. Blust?
11           MR. LEMBKE:  Well, now I object because
12    you're misstating the evidence.
13           MR. O'REAR:  I'm asking him a question.
14    I'm not stating evidence.
15           MR. LEMBKE:  Well, you're referencing an
16    exhibit that doesn't say what you're saying it
17    says.
18    BY MR. O'REAR:
19      Q.    Do you deny that you told Larry Blust
20    that Bill Johnson is meeting with the Memphis City
21    Council this afternoon and will not make up his mind
22    until after that meeting?
23      A.    What I'm saying is I don't have any
24    recollection of that conversation.
25      Q.    Do you know whether Mr. Johnson met with

Page 52

1    the Memphis City Council on November 6, 2018?
2      A.    I don't know.
3      Q.    Okay.  Did you ever receive any reports
4    of Mr. Johnson meeting with the Memphis City Council in
5    early November 2018?
6           MR. LEMBKE:  That's a yes or no answer.
7           THE WITNESS:  No, I don't recall any
8    reports.
9    BY MR. O'REAR:
10      Q.    And again, do you have any recollection
11    of making any notes of a conversation with Mr. Blust in
12    early November 2018, where Bill Johnson and the Memphis
13    City Council was discussed?
14      A.    I have no memory of making notes.
15           (Exhibit 18 - Previously marked - Bates No.
16           TVABLN00006247 through 6251, e-mail from Jack
17           McCall to Lorie Molton Hunt and others dated
18           November 9, 2018.)
19    BY MR. O'REAR:
20      Q.    I've handed you Exhibit 18.  On the first
21    page it reflects an e-mail from Mr. Nick McCall to
22    Lorie Hunt and others, including yourself on November
23    the 9th, 2018.
24           Do you see that?
25      A.    Yes.

Page 53

1      Q.    And did you receive this e-mail?
2      A.    I feel certain I did, yes.
3      Q.    And would you have received the e-mail
4    beneath it of the same date that has your name on it?
5      A.    Yes.
6      Q.    And that e-mail, the second one on the
7    exhibit is actually from Nick McCall to Larry Blust,
8    correct?
9      A.    Yes.
10      Q.    And it attaches the first amendment to
11    the Bellefonte purchase and sale agreement, correct?
12      A.    Correct.
13      Q.    And this amendment was entered into on
14    November the 8th, 2019, correct, or effective
15    November 8th, 2018?
16      A.    Correct.
17      Q.    Okay.  And is this the short extension we
18    were referring to earlier in your deposition?
19      A.    Yes.
20      Q.    Did you have a role in preparing this
21    amendment?
22      A.    I would have reviewed it.
23      Q.    And approved it?
24      A.    Yes.
25      Q.    Was your -- was there any approval of

14 (Pages 50 - 53)

Page 54

1 this amendment required above you in order for Mr. Nix
2 to sign this amendment?
3     A.   Yes.  Bill Johnson would have had to have
4 approved.
5     Q.   And was the purpose of this amendment to
6 give TVA more time to look at the question of the
7 effect of the Atomic Energy Act on this closing?
8     A.   No.
9          MR. LEMBKE:  Hold on.  Let me instruct
10 you to the extent that would require -- the
11 amendment speaks for itself, so I object to the
12 form on that basis, and the amendment includes
13 issues beyond the extension, but I instruct you to
14 the extent that it would require you to reveal
15 internal attorney/client communications that
16 aren't reflected in the terms of the amendment,
17 you should not answer the question.
18          THE WITNESS:  Could I hear the question
19 again?
20     (The record was read by the Court Reporter.)
21          THE WITNESS:  I believe that TVA's
22 motivation in signing this goes to attorney/client
23 privilege.
24 BY MR. O'REAR:
25     Q.   So you're not going to answer?

Page 55

1     A.   I'm not going to answer.
2     (Exhibit 17 - Previously marked - Bates No.
3     TVABLN00002643 through 2644, e-mail from Clifford
4     Beach to Larry Blust dated November 9, 2018.)
5 BY MR. O'REAR:
6     Q.   I've handed you what's been marked as
7 Exhibit 17.  This is an e-mail from you dated
8 November 9, 2018, to Mr. Blust and copying Chris
9 Chandler and Sherry Quirk, correct?
10    A.   Correct.
11    Q.   Okay.  And you say in this e-mail,
12 "Larry, as promised, attached are several bullets
13 relating to our recent discussion."
14    A.   Correct.
15    Q.   What recent discussion are you referring
16 to?
17    A.   We had had a discussion with Larry
18 sometime in the previous few days, week, where we
19 explained to Larry the -- and he seemed aware of it,
20 the concern with transferring the plant and creating a
21 condition where the construction permits would identify
22 a party other than the owner of the plant.
23    Q.   Is this the same point you made earlier
24 about the title to the construction permits?
25    A.   It is the same point, yes.  This was one

Page 56

1 of two legality concerns that we raised with Nuclear
2 Development and asked them to -- for their opinion.
3     Q.   You said one of the two legalities?
4     A.   Yes, one of the two.
5     Q.   What's the other one?
6     A.   This was the first.  The second one was
7 whether the -- the transfer of the plant from TVA to
8 Nuclear Development, because it is a licensed plant,
9 would violate the Atomic Energy Act.  I see those as --
10 they were distinct concerns.
11    Q.   And does this refresh your recollection
12 that the first conversation you had with Mr. Blust was
13 shortly prior to this e-mail of November the 9th, 2018,
14 when you advised him of your concern over the first
15 issue regarding title to the construction permits?
16    A.   Yes, this was in follow-up to a call with
17 Mr. Blust in the -- I don't remember the exact date
18 prior --
19    Q.   Would it have been the day before --
20    A.   -- prior to this.
21    Q.   -- November 8, 2018?
22    A.   It's -- I don't recall the exact date,
23 but that's within a range of a few days, I would say
24 when that conversation took place.
25    Q.   Did you prepare the document that's

Page 57

1 attached to the e-mail?
2     A.   No.
3     Q.   Who prepared that?
4     A.   Chris Chandler.
5     Q.   And was it your intent in sending this
6 e-mail to Mr. Blust, to advise him of regulations of
7 the NRC that pertain to the issue of the title to the
8 construction permits?
9          MR. LEMBKE:  Mr. Beach, to the extent the
10 question on your intent would cause you to
11 disclose attorney/client communications or
12 attorney work product, you shouldn't answer it.
13          To the extent you can answer it without
14 that disclosure, go ahead.
15          THE WITNESS:  Could I hear the question
16 again?
17     (The record was read by the Court Reporter.)
18          THE WITNESS:  Yes.
19 BY MR. O'REAR:
20    Q.   Okay.  And this e-mail, I believe you've
21 said did not pertain to the second legal question you
22 described, which was the effect of the Atomic Energy
23 Act on the timing of the closing?
24    A.   Well, I don't agree that the Atomic
25 Energy Act just -- the concern of the Atomic Energy Act

Page 58

1  justifies the timing --
2      Q.    Okay.
3      A.    -- but it is a distinct issue in my mind.
4      Q.    But that distinct issue is not addressed
5  in this e-mail or in this attachment to this e-mail, is
6  that correct?
7      A.    That's correct.
8      Q.    When did you or anyone at TVA first
9  advise Nuclear Development of a concern with respect to
10  the second discreet legal question that you've just
11  described?
12     A.    I don't recall the exact date.
13     Q.    As best you can recall, when was it?
14     A.    November, mid-November.
15     (Exhibit 19 - Previously marked - Bates No.
16     TVABLN00000043 through 44, e-mail from Larry
17     Blust to Clifford Beach and others, dated
18     November 12, 2018.)
19  BY MR. O'REAR:
20     Q.    I've handed you Exhibit 19 and ask you to
21  look at it and I'll ask you a few questions about it.
22           Did you receive this e-mail from Larry
23  Blust dated November the 12th, 2018?
24     A.    I did.
25     Q.    That is also copied to Mr. Chris Chandler

Page 59

1  and to Sherry Quirk among others, correct?
2      A.    Correct.
3      Q.    And do you see the attachment to the
4  e-mail?
5      A.    I do.
6      Q.    And what did you understand the
7  attachment to be when you received it on November the
8  12th, 2018?
9      A.    I understood it to be observations,
10  comments from Nuclear Development's outside Nuclear
11  Regulatory counsel commenting on the, what I'll call
12  the construction permit issue.
13     Q.    Had the second legal question you
14  described in this deposition been discussed with
15  Nuclear Development prior to your receipt of this
16  e-mail on November 12, 2018?
17     A.    Can I hear that question one more time?
18     (The record was read by the Court Reporter.)
19           THE WITNESS:  It's my recollection that
20  we were not -- that no, it had not been discussed.
21           MR. O'REAR:  I don't have another copy.
22  Do you have a copy?
23           MR. LEMBKE:  I do.
24     (Exhibit 26 - Previously marked - Bates No.
25     TVABLN00000038 through 39, e-mail from Larry

Page 60

1      Blust to Sherry Quirk and others dated November
2      13, 2019.)
3  BY MR. O'REAR:
4      Q.    I've handed you what's been marked as
5  Exhibit 26.  Can you identify that with the top e-mail
6  being from Larry Blust to Ms. Quirk and to you, copy to
7  Mr. Chandler and others dated November 13, 2018?
8      A.    I recall this, yes.
9      Q.    And I'm asking you to look at this e-mail
10  simply for the purpose of focusing on the second e-mail
11  on the first page from Ms. Quirk to Mr. Blust dated
12  November 13, 2018.
13           It says, "Larry, we are with the board
14  today and tomorrow and will be back in touch on
15  Thursday."
16           Do you see that?
17     A.    Yes.
18     Q.    And this was copied to you as well,
19  correct, that e-mail?
20     A.    Yes.
21     Q.    And were you with the board also on that
22  date?
23     A.    No.
24     Q.    Were you with the board the next day,
25  November 14, 2018?

Page 61

1      A.    No.
2      Q.    Do you know what discussions, if any,
3  occurred with the board regarding Bellefonte on those
4  days?
5      A.    I do not.
6      Q.    Do you recall a phone call that you, Miss
7  Quirk, Mr. Chandler and Mr. McCall made to Larry Blust
8  on November 15th, 2018?
9      A.    I don't recall specific dates of calls.
10     Q.    Do you recall a phone conversation where
11  those parties were involved, including Mr. Blust, after
12  Exhibit 19 date of November 12, 2018, where you said in
13  the call that you had or that TVA had discovered for
14  the first time, a problem with the Atomic Energy Act as
15  it related to the closing?
16     A.    I do recall that call.
17     Q.    Okay.  And was that call after
18  November 12th, 2018?
19     A.    I believe it was.
20     Q.    And so when you sent the e-mail --
21     A.    I'm sorry, November 18th or November --
22     Q.    No, I said -- I meant to say --
23     A.    I'm sorry.  I was looking at
24  November 12th and I --
25     Q.    I meant to say November 12th of 2018.

Page 62

1    A.    I --
2    Q.    I'm asking you if the call was after
3  November 12th, 2018?
4    A.    I believe it was, yes.  But I'll have to
5  confess, I'm fuzzy on dates of calls.
6    Q.    Do you recall Miss Quirk stating in that
7  phone call that I'm asking you about which occurred
8  after November 12, 2018, that Bill Johnson was not
9  inclined to grant the six-month extension because of
10 Nuclear Development's efforts to take Memphis away from
11 TVA?
12   A.    I don't recall her saying that.  I am
13 inclined -- I'm not quite sure, that can mean different
14 things to different people.  I seem to recall her
15 telling Mr. Blust we weren't inclined to extend.  I
16 don't recall the conversation after that.
17   Q.    You don't recall her linking the
18 inclination not to extend to Nuclear Development's
19 meetings with Memphis?
20   A.    I don't recall her saying that, no.
21   Q.    Well, was that the reason?
22   MR. LEMBKE:  Mr. Beach, I instruct you to
23 the extent that would require you to disclose
24 attorney/client communications, you should not
25 disclose it.

Page 63

1    If you can answer otherwise, go ahead.
2    THE WITNESS:  I can't answer that.  It
3  would require me to disclose attorney/client
4  communications.
5  BY MR. O'REAR:
6    Q.    Did you say in this phone conversation
7  that we're talking about, that you had just discovered
8  for the first time a problem with the statute as it
9  effected the closing?
10   MR. LEMBKE:  Asked and answered.
11   THE WITNESS:  I think the best thing
12   would be to go -- yeah, to look at my prior
13   answer.
14   MR. LEMBKE:  You can answer it again.
15   THE WITNESS:  Okay.  I don't -- I don't
16   recall whether the conversation concerning the
17   Atomic Energy Act was in the same conversation as
18   the discussion on TVA being inclined not to
19   extend.
20 BY MR. O'REAR:
21   Q.    Okay.  Well, but in one of the phone
22 calls that occurred after November the 12th, 2018, you
23 did say that you had just discovered the problem with
24 the attorney -- Atomic Energy Act as it effected the
25 closing, correct?

Page 64

1    A.    I stated that we've, yes, discovered this
2  Atomic Energy Act concern, and wanted Nuclear
3  Development's opinion on this issue because it
4  concerned both of us.
5    Q.    And how -- how did you discover it?
6    MR. LEMBKE:  Mr. Beach, I instruct you
7  not to answer that question to the extent it would
8  require you to disclose attorney/client
9  communications.
10   To the extent you can do so without doing
11   that, go ahead.
12   THE WITNESS:  I can't answer that without
13   disclosing attorney/client communications.
14 BY MR. O'REAR:
15   Q.    Did you make any notes of this phone
16 call?
17   A.    I don't recall.
18   Q.    So, same answer with respect to all of
19 the questions I've asked regarding the various phone
20 calls, correct?
21   A.    As far as notes?
22   Q.    Yes.
23   A.    I don't recall.
24   Q.    Was it your practice to make notes when
25 you were involved in phone calls of this nature?

Page 65

1    A.    It varied.  I tend to take -- not take a
2  lot of notes.  Sometimes I do and sometimes I don't.
3  It just depends on the nature of the call and what was
4  discussed.
5    MR. O'REAR:  I believe that's a new one.
6    MR. LEMBKE:  Uh-huh.  Just off the record
7    for a minute.
8    THE VIDEOGRAPHER:  We're going off the
9    record at 10:50.  Okay.  We're off.
10   (Off record discussion.)
11   THE VIDEOGRAPHER:  We're back on the
12   record at 10:50.
13 (Exhibit 36 - Bates No. TAVABLN00002954, e-mail
14 from Larry Blust to Clifford Beach, dated
15 November 16, 2018.)
16 BY MR. O'REAR:
17   Q.    I've handed you what's been marked as
18 Exhibit 36 to your deposition.  If you could take a
19 look at that, I have a few questions.
20   And the top e-mail in that exhibit is
21 from Mr. Blust to you, copies to Mr. Chandler and Miss
22 Quirk dated November 16, 2018, correct?
23   A.    Correct.
24   Q.    And the second e-mail is an e-mail from
25 you to Mr. Blust of the same date, correct?

17 (Pages 62 - 65)

Page 66

1    A.    Correct.
2    Q.    And in your e-mail you attached an
3  excerpt from section 101 of the Atomic Energy Act,
4  correct?
5    A.    Correct.
6    Q.    And was this date on November 16, 2018,
7  the first time you had looked at that section of the
8  act in conjunction with its effect on the closing of
9  the transaction?
10   A.    This date, November 16th?
11   Q.    Yes.
12   A.    No.
13   Q.    Okay.  And when had you looked at it
14  prior to that date then?
15        Well, let me ask it this way.  It says,
16  "We discussed yesterday."  So you would have been aware
17  of this section on November 15, 2018, correct?
18   A.    Correct.
19   Q.    Okay.  Would that have been the first
20  time you were made aware of this section of the act and
21  its potential effect on the closing?
22        MR. LEMBKE:  Hold on a second.  I'm going
23    to object to that question.  The "made aware" part
24    of it has the potential to disclose internal
25    attorney/client communications.  So to the extent

Page 67

1    that would require you to disclose the content of
2    an internal communication, you should not answer
3    the question.
4        To the extent you can answer it without
5    disclosing that, go ahead.
6        THE WITNESS:  I recall becoming aware of
7    it November 15th, or maybe a day or two before.  I
8    don't recall the exact date.
9  BY MR. O'REAR:
10   Q.    Do you recall a conference call on
11  November the 19th, 2018, that involved you, Miss Quirk,
12  Chris Chandler and Larry Blust?
13   A.    I don't recall exact dates.  I recall at
14  least one call late November.
15   Q.    Do you -- would that call have been
16  sometime after this e-mail that's marked as Exhibit 36
17  dated November 16, 2018?
18   A.    Yes.
19   Q.    And in that call, do you recall
20  Mrs. Quirk stating that Bill Johnson had said that both
21  sides should unwind the transaction?
22   A.    I don't recall her phrasing, making a
23  statement as you described it.
24   Q.    What do you recall that she said?
25   A.    I recall unwinding the transaction being

Page 68

1  discussed, but I don't recall it being a proposal, more
2  of a discussion that was part and parcel of the Atomic
3  Energy Act if it's unresolved, then unwinding is
4  something to consider.
5    Q.    Did Miss Quirk raise the issue of
6  unwinding the transaction?
7    A.    I believe so.
8    Q.    Did Miss Quirk say anything about Bill
9  Johnson have -- having suggested that the parties
10  should unwind the transaction?
11   A.    I don't recall that.
12   Q.    Did Mr. Blust say in that phone call that
13  Nuclear Development had no interest in unwinding the
14  transaction?
15   A.    I don't recall Mr. Blust being
16  unequivocally opposed to unwinding it.
17   Q.    Did Mr. Blust say anything that would
18  indicate Nuclear Development would be interested in
19  unwinding the transaction?
20   A.    I don't recall him taking a position.
21   (Exhibit 23 - Previously marked - Bates No.
22    TVABLN00000045 through 46, e-mail from Clifford
23    Beach to Larry Blust dated November 28, 2018.)
24  BY MR. O'REAR:
25   Q.    I've handed you Exhibit 23.  Can you

Page 69

1  identify that as an e-mail that you sent to Larry Blust
2  on November 28, 2018, that is copied to Sherry Quirk?
3        I have a question on the table, and so,
4  do you need me to restate it?
5    A.    I'm sorry.  I was reading.
6    Q.    That's all right.  Is this -- can you
7  identify this as an e-mail you sent to Larry Blust, a
8  copy to Sherry Quirk on November 28, 2018?
9    A.    Yes.
10   Q.    And on the second page there is an e-mail
11  from Mr. Blust to you of the same date, correct?
12   A.    Correct.
13   Q.    Mr. Blust references in his e-mail to you
14  that, "We have repeatedly requested that you send us
15  your drafts of closing documents, but have received
16  nothing."
17        Did he say that?
18   A.    He does.
19   Q.    I mean, that was a true statement, right?
20   A.    I would not say repeatedly.  I would not
21  agree that it's -- the request was made repeatedly.
22   Q.    It was made on multiple occasions though,
23  wasn't it?
24        MR. LEMBKE:  Objection.  Vague.
25  BY MR. O'REAR:

18 (Pages 66 - 69)

Page 70

1    Q.    Between two and five I think we settled
2 on earlier, right?
3    A.    I could agree with that.
4    Q.    Okay.  All right.  Now, in your e-mail to
5 Mr. Blust you say that, "Franklin provides Bill Johnson
6 with a last minute extension proposal this afternoon
7 that we are now considering", correct?
8    A.    Correct.
9    Q.    And Franklin is Franklin Haney with
10 Nuclear Development?
11    A.    Correct, although I'm actually not sure
12 which Franklin.
13    Q.    Well, the son goes by Frank and the
14 father goes by Franklin.
15    A.    Okay.  Then I would say Franklin.
16    Q.    And where did you get your information
17 that Franklin had provided Bill Johnson with a last
18 minute extension proposal that afternoon?
19        MR. LEMBKE:  Let me instruct you to the
20    extent that would require disclosure of
21    attorney/client communications, you should not
22    disclose it, but if you can answer without that --
23    actually, I'm going to withdraw that instruction
24    and if you know who you can answer, who provided
25    you that information.

Page 71

1        THE WITNESS:  Sherry Quirk.
2 BY MR. O'REAR:
3    Q.    And what was, as you understood it, the
4 last minute extension proposal provided by Mr. Franklin
5 Haney?
6        MR. LEMBKE:  Well, now, I'm going to
7    instruct you to the extent that would require you
8    to disclose internal attorney/client
9    communications, you should not disclose it.
10        If you can answer it without doing so, go
11    ahead.
12        MR. O'REAR:  Well, that's getting a
13    little far afield.  I'm asking him what he's
14    referring to in this e-mail to Mr. Blust as the
15    last minute extension proposal.
16 BY MR. O'REAR:
17    Q.    So what are you referring to and
18 intending to communicate to Mr. Blust in this e-mail?
19        MR. LEMBKE:  You can answer that.
20        THE WITNESS:  What I am intending to
21    communicate is that right now we've got a reason
22    -- a reason that we're not moving ahead on closing
23    while this proposal is considered, not
24    definitively, but just it's something that we're
25    -- we're handling in response to his e-mail.

Page 72

1 BY MR. O'REAR:
2    Q.    What was Mr. Franklin Haney's proposal as
3 you understood it?
4    A.    From getting that information from Sherry
5 Quirk, it involved some type of noncompete arrangement.
6    Q.    Is there any writing or notes that you're
7 aware of that would reflect that communication from Mr.
8 Haney?
9    A.    I did not see any notes.
10    Q.    And when you say some sort of
11 "noncompete", did you have any understanding of what
12 that would entail?
13    A.    My recollection is that it entailed an
14 agreement by -- somehow incorporating in the documents
15 an agreement on who Nuclear Development could sell
16 power to if they did build the plant.
17    Q.    And do you know any specifics of that
18 proposal?
19    A.    Not beyond that.
20    Q.    Did you understand this proposal from Mr.
21 Haney to be different from the request for the
22 six-month extension made by Mr. Blust on August the
23 29th, 2018?
24    A.    I don't know that -- no, I did not
25 consider that question.  So you're asking me one more

Page 73

1 time?
2    Q.    Did you consider this proposal for an
3 extension to be different from the six-month request
4 for extension made by Mr. Blust on August the 29th,
5 2018?
6    A.    I have to say I've -- I've not thought of
7 it in those terms.  I would consider it really as all
8 part and parcel to the same -- achieving the same
9 objectives on -- in this part.
10    Q.    Were you in favor of granting an
11 extension of the closing as of November 28th, 2018?
12        MR. LEMBKE:  Mr. Beach, I instruct you
13    not to answer that question to the extent it would
14    require you to disclose attorney/client
15    communications or attorney work product.
16        If you can answer it without disclosing
17    that, go ahead.
18        MR. O'REAR:  I'm asking if he was in
19    favor off it.
20        MR. LEMBKE:  And the instruction stays
21    the same.
22        THE WITNESS:  I'll have to say as a
23    transactional attorney I -- I'd truly just wait
24    for management to make a decision.  I'm aware of
25    pros and cons, but I don't have a -- it's not

19 (Pages 70 - 73)

Page 74

1 really my place to say whether I'm in favor of it.
2      MR. O'REAR: Okay. Our tape is running
3 out. So we need to go off the record right now.
4      THE VIDEOGRAPHER: Okay. We're going off
5 the record at 11:06. This is the end of DVD
6 number one.
7      (Recess taken.)
8      THE VIDEOGRAPHER: We're back on the
9 record. This is the start of DVD number two. The
10 time is 11:19.
11 BY MR. O'REAR:
12      Q.   Mr. Beach, we were discussing Exhibit 23.
13 Do you have it before you there?
14      A.   I do.
15      Q.   In the first sentence of your message to
16 Mr. Blust with respect to Mr. Haney's proposal, you
17 say, "We are now considering."
18      Who -- who are the "we" that were
19 considering this request?
20      A.   The only "we" that I'm -- was aware of in
21 my conversations were the legal team. That's who I'm
22 referencing. It may have been considered elsewhere in
23 TVA, too, but the legal team.
24      Q.   And who specifically on the legal team?
25      A.   Sherry Quirk, Jared Mitchum.

Page 75

1      Q.   You, yourself?
2      A.   Oh, yes.
3      Q.   And again, Jared Mitchum reported to
4 Sherry Quirk, correct, at this time?
5      A.   At this time Jared Mitchum reported to
6 Sherry Quirk and I reported to Jared Mitchum.
7      Q.   This was under your new role as Senior
8 Counsel, correct?
9      A.   Correct.
10      Q.   And what decision did TVA make with
11 respect to the Franklin Haney proposal that was made
12 that afternoon on November 28th, 2018?
13      A.   We did not extend the contract.
14      Q.   Extend the closing date?
15      A.   Extend the closing date.
16      Q.   So the proposal was denied, correct?
17      A.   Effectively.
18      Q.   And who at TVA made that decision to deny
19 Mr. Haney's proposal?
20      A.   Bill Johnson.
21      Q.   You also state in this e-mail that you
22 received that day a letter from the Pillsbury firm,
23 correct?
24      A.   Correct. Well, let me see what I said
25 about the actual timing. But that's my recollection

Page 76

1 that -- sorry, just give me a chance to read here.
2      MR. LEMBKE: Take whatever time you need,
3 Mr. Beach.
4      THE WITNESS: I think -- I mean, if I
5 said today that was the day we received it.
6 BY MR. O'REAR:
7      Q.   So it does say, "We did receive an
8 unequivocal opinion from Pillsbury today."
9      A.   Yes.
10      Q.   So that would be the day you actually
11 received it?
12      A.   Yes.
13      Q.   And what you were saying was true.
14      A.   Yeah, that's -- once again, my -- I mean,
15 my memory of the exact dates is maybe --
16      Q.   Well, it's important, and --
17      A.   But this is, yeah, I would not have said
18 that unless it was -- I received it that day, and I do
19 remember that.
20      Q.   Did you know the letter is undated?
21      A.   I do know that.
22      Q.   Do you know why it's undated?
23      A.   I have no idea.
24      Q.   And that's why your e-mail would be
25 important to pinpoint the day it was received since

Page 77

1 it's undated?
2      A.   Yes.
3      Q.   Okay. TVA sent a letter the next day
4 signed by Sherry Quirk to Mr. Blust stating that TVA
5 would not close the transaction on November 30, 2018.
6      Were you aware of that?
7      MR. O'REAR: Object to the form.
8 Misstates the evidence.
9 BY MR. O'REAR:
10      Q.   Were you aware that TVA -- that Sherry
11 Quirk sent a letter the following day, November 29th,
12 2018, to Mr. Blust at 9 p.m. that evening, stating that
13 TVA would not go forward with the closing?
14      MR. LEMBKE: Same objection. You can
15 answer.
16      THE WITNESS: I'm aware that Sherry Quirk
17 sent a letter to Mr. Blust the following day.
18 BY MR. O'REAR:
19      Q.   Did you see the letter?
20      A.   Yes.
21      Q.   Were you involved in the decision of TVA
22 not to go forward with the closing on November 30,
23 2018?
24      A.   I was not a decisionmaker.
25      Q.   Did you make any recommendation?

20 (Pages 74 - 77)

Page 78

1        MR. LEMBKE:  That's a yes or no answer.
2        THE WITNESS:  No.
3   BY MR. O'REAR:
4        Q.     And who made that decision on behalf of
5   TVA?
6        A.     Bill Johnson.
7        MR. O'REAR:  I've asked each witness
8   this.  It seems like maybe it would be simpler if
9   you just tell me whose notes these are, but if you
10  won't tell me, I'm going to ask him about them.
11       MR. LEMBKE:  Well, you've never asked me
12  until now.  They're not his.
13       MR. O'REAR:  Okay.
14       MR. LEMBKE:  But you're going to find out
15  they're the next witnesses.
16       MR. O'REAR:  I gotcha.
17  (Exhibit 32 - Previously marked, Bates No.
18  TVALBLN000009316 through 9328, Handwritten
19  Notes.)
20  BY MR. O'REAR:
21       Q.     All right.  Just show this to you and get
22  this on the record.
23           You have before you Exhibit 32, which are
24  multiple pages of handwritten notes by someone, and
25  attached thereto, as the last two pages of the exhibit,

Page 79

1   are some typewritten notes with handwritten notes on
2   them.  If you would just look through that.
3           Directing your attention to the
4   handwritten notes which all appear to be in the same
5   handwriting before the last two pages, I would ask you
6   if those are your handwritten notes?
7        A.     They are not.
8        Q.     Do you know whose notes they are?
9        A.     I do not know.
10       Q.     Have you ever seen these notes before?
11       A.     I did not see these notes in 2018, at any
12  time during that timeframe.
13       Q.     Okay.  But you've seen them since?
14       MR. LEMBKE:  Other than in preparation
15  for the deposition.
16       THE WITNESS:  Correct.
17  BY MR. O'REAR:
18       Q.     All right.  And directing your attention
19  to the typewritten notes on the last two pages, do you
20  know whose notes those are?
21       A.     I do not.
22       Q.     You do not.  Okay.
23           Do you know whose handwritten notes those
24  are that appear to be different from the handwriting on
25  the rest of the exhibit?

Page 80

1        A.     I do not.
2        Q.     Okay.  That's all I have.
3        A.     I've heard just now it may relate to the
4   next deposition, but I do not know.
5        Q.     That's Mr. Shea?
6        A.     I do not know.  Leave it to the next one.
7   EXAMINATION BY MR. LEMBKE:
8        Q.     Mr. Beach, as you know I'm Matt Lembke
9   and I'm representing TVA here today.  Earlier Mr.
10  O'Rear asked you a few questions about a conversation
11  you had with Mr. Blust about a draft of an extension
12  agreement that had been prepared.
13           Do you recall that line of questioning?
14       A.     I do.
15       Q.     All right.  During that conversation,
16  what, if any, statement did you make about whether TVA
17  had decided to grant the extension?
18       A.     I would have said that TVA is still
19  considering whether to grant the extension.
20       Q.     What, if any, commitment did you make
21  that TVA was going to ultimately decide to grant the
22  extension?
23       A.     I would not have committed.  I don't have
24  that authority.
25       Q.     Now, there was also discussion about a

Page 81

1   conversation or there were questions from Mr. O'Rear
2   about asking if you recalled Miss Quirk making a
3   statement to Larry Blust during a phone call in
4   October 2018, that she had met with three directors the
5   day before about the extension request.
6           Do you recall that line of questioning?
7        A.     I do.
8        Q.     Do you recall Miss Quirk ever telling you
9   about any discussions with directors about the
10  discovery request?
11       A.     I do not.
12       MR. O'REAR:  About the what?
13       MR. LEMBKE:  About the extension request.
14       MR. O'REAR:  You said discovery request.
15       MR. LEMBKE:  I apologize.
16  BY MR. LEMBKE:
17       Q.     Do you recall Miss Quirk ever telling you
18  about a conversation she had with -- well, let me
19  strike that.
20           Do you recall Miss Quirk ever telling
21  Larry Blust about a meeting she had had with three
22  directors or any directors about the extension request
23  from Nuclear Development?
24       A.     I do not recall that.
25       Q.     If that conversation had been made, would

21 (Pages 78 - 81)

Page 82

1  that have -- if that comment had been made by her to
2  Mr. Blust, would it have stood out in your mind?
3      A.    Yes.
4      Q.    Why?
5      A.    Sherry is the General Counsel for the
6  board and she's -- it's not typical for her to be
7  communicating how the board feels on matters.
8      Q.    Whether in that -- whether in the
9  conversation Mr. O'Rear referenced or otherwise, do you
10 ever recall Sherry Quirk telling Mr. Blust about
11 communications that she or Bill Johnson had with
12 members of the board?
13     A.    I do not.
14     Q.    Let me find the document that you looked
15 at.  Let me show you what has been previously shown to
16 you as Exhibit 17.
17         Do you recall being asked some questions
18 about that document by Mr. O'Rear?
19     A.    I do.
20     Q.    All right.  In those questions I believe
21 you indicated that -- well, first of all, in the first
22 page of Exhibit 17 it refers to a recent discussion.
23         Do you see that?
24     A.    I do.
25     Q.    And I believe you testified that the

Page 83

1  recent discussion would have occurred within the last
2  few days preceding November 9th, is that correct?
3      A.    Correct.
4      Q.    All right.  Do you recall if that
5  discussion that's referenced in Exhibit 17 was the
6  first discussion that you had had with Mr. Blust about
7  the issue concerning, as you put it, the title of the
8  construction permits?
9          MR. O'REAR:  Objection.  Asked and
10 answered.
11         THE WITNESS:  There were earlier
12     discussions on the issue of the construction
13     permits.
14         Over time we became more educated and by
15     the time the discussion happened that's referenced
16     in this e-mail, we had gotten enough -- educated
17     enough to where we could put some concepts in
18     writing, which we did, but there were earlier
19     discussions on the topic.
20 BY MR. LEMBKE:
21     Q.    And did those discussions include Mr.
22 Blust?
23     A.    I -- yes, at least one, if not more.
24     Q.    And do you recall when that one or more
25 earlier discussions occurred?

Page 84

1      A.    I believe it was certainly within the
2  month of October.  Perhaps earlier, but I don't recall
3  how early, but October I feel comfortable with.
4          MR. LEMBKE:  I have no further questions.
5      Thank you, Mr. Beach.
6          MR. O'REAR:  I have just a follow-up to
7      that.
8  EXAMINATION BY MR. O'REAR:
9      Q.    So who was involved in these earlier
10 discussions you've just alluded to besides Mr. Blust?
11     A.    Chris Chandler and I recall Sherry Quirk.
12     Q.    You said these occurred within the month
13 of October and perhaps earlier?
14     A.    That's my recollection.
15     Q.    And what's that based on?
16     A.    My memory.
17     Q.    I mean, you earlier have expressed a
18 difficulty in coming up with specific dates.  I'm just
19 wondering if you tie those conversations to any
20 particular event?
21         MR. LEMBKE:  Object to the form.
22     Argumentative.  You can answer.
23         THE WITNESS:  The construction permit
24     issue, my recollection is it's a complicated issue
25     and our understanding of it was iterative over a

Page 85

1      period of time, October certainly, in which we
2      discussed it with Mr. Blust.
3          It took some time though to, as with any
4      legal topic, to get to where we could reduce it to
5      bullets, but we certainly discussed it before this
6      period of time.
7  BY MR. O'REAR:
8      Q.    But you can't pinpoint when?
9      A.    No.  I do recall that our conversation,
10 the conversation referenced in this e-mail was a
11 follow-up to earlier discussions.
12     Q.    Were these discussions over the
13 telephone?
14     A.    Yes.
15     Q.    Were any notes made of these calls?
16     A.    I don't recall.
17     Q.    Was Tim Matthews involved in any of these
18 discussions?
19     A.    Tim Matthews was not on the call with us,
20 no.
21         MR. O'REAR:  That's all.
22         MR. LEMBKE:  No further questions.  Thank
23 you.
24         THE VIDEOGRAPHER:  Okay.  This is the end
25     of the deposition.

22 (Pages 82 - 85)

Page 86

1       We're going off the record at 11:36.

2       MR. O'REAR:  I do want to put on the

3    stenographer's record that to the extent that any

4    objections asserting privilege are deemed to be

5    not well taken by the court, we reserve the right

6    to recall the witness.

7            FURTHER THIS DEPONENT SAITH NOT.

8       (The deposition concluded at 11:36 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 87

1            C E R T I F I C A T E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4        I, Georgette H. Mitchell, Registered

5    Professional Reporter, Licensed Court Reporter #55 and

6    Notary Public, do hereby certify that I reported in

7    machine shorthand the videotaped deposition of CLIFFORD

8    BEACH, called as a witness at the instance of the

9    Plaintiff, that the said witness was duly sworn by me;

10   that the reading and subscribing of the deposition by

11   the witness was not waived; that the foregoing pages

12   were transcribed under my personal supervision and

13   constitute a true and accurate record of the deposition

14   of said witness.

15       I further certify that I am not an attorney or

16   counsel of any of the parties, nor an employee or

17   relative of any attorney or counsel connected with the

18   action, nor financially interested in the action.

19       Witness my hand and seal this the 6th day of

20   November, 2019.

21

22                    *Georgette H. Mitchell*
                      Georgette H. Mitchell

23                    Registered Professional
                      Reporter, Licensed Court

24                    Reporter 55, LCR expires
                      6-30-20 and Notary Public

25                    My Commission Expires:
                      February 2, 2020

---

Page 88

1    To: Matthew H. Lembke, Esq.

2    Re: Signature of Deponent Clifford Beach

3    Date Errata due back at our offices: 12/6/2019

4

5    Greetings:

6    This deposition has been requested for read and sign by
     the deponent.  It is the deponent's responsibility to

7    review the transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill

8    out the Errata electronically or print and fill out
     manually.

9

10   Once the Errata is signed by the deponent and notarized,
     please mail it to the offices of Veritext (below).

11

12   When the signed Errata is returned to us, we will seal
     and forward to the taking attorney to file with the

13   original transcript.  We will also send copies of the
     Errata to all ordering parties.

14

15   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the

16   court without the signature of the deponent.

17

18   Please Email the completed errata/witness cert page
     to readandsign@veritext.com

19   or mail to

20   Veritext Production Facility

21   2031 Shady Crest Drive

22   Hoover, AL 35216

23   205-397-2397

24

25

---

Page 89

1    ERRATA for ASSIGNMENT #3531764

2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that

3

4    ___ There are no changes noted.

5    ___ The following changes are noted:

6

     Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)

7    (2017). Rule 30(e) states any changes in form or
     substance which you desire to make to your testimony shall

8    be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any

9    such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.

10

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Reason for change _____

17   Page _____ Line _____ Change _____

18   _____

19   Reason for change _____

20   Page _____ Line _____ Change _____

21   _____

22   Reason for change _____

23   Page _____ Line _____ Change _____

24

25

---

23 (Pages 86 - 89)

Page 90

1   Page _____ Line _____ Change _____

2   _____

3   Reason for change _____

4   Page _____ Line _____ Change _____

5   _____

6   Reason for change _____

7   Page _____ Line _____ Change _____

8   _____

9   Reason for change _____

10  Page _____ Line _____ Change _____

11  _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16

17

18  _____

    DEPONENT'S SIGNATURE

19

    Sworn to and subscribed before me this ___ day of

20  _____, _____.

21  _____

22  _____

23  NOTARY PUBLIC / My Commission Expires:_____

24

25

Freedom Court Reporting
877-373-3660                    A Veritext Company                    205-397-2397