FILED
2020 Oct-28 AM 10:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT BB

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

NUCLEAR DEVELOPMENT, LLC,      )
                               )
                               )
                  Plaintiff,   )
                               ) Civil Action
vs.                            ) Case Number
                               )
TENNESSEE VALLEY AUTHORITY,    ) No.
                               ) 5:180cv-01983
                               ) -LCB
                  Defendant.   )

VIDEO RECORD & ORAL DEPOSITION OF
Chris Chandler
Tuesday, October 29, 2019
2:26 p.m.
900 S. Gay Street
9th Floor
Knoxville, Tennessee 37902

Georgette H. Mitchell
Registered Professional Reporter
LCR-55 (TN)

Page 2

```
 1   APPEARANCES OF COUNSEL:
 2   ON BEHALF OF THE PLAINTIFF:
 3       Caine O'Rear, III, Esq.
         Hand Arendall Harrison Sale LLC
 4       104 Saint Francis Street
         Suite 300
 5       Mobile, Alabama 36602
         251.694.6308
 6       Corear@handarendall.com
 7       Larry D. Blust, Esq.
         Hughes Socol Piers Resnick DYM LTD.
 8       70 West Madison Street
         Suite 4000
 9       Chicago, Illinois 60602
         312.604.2672
10       Lblust@hsplegal.com
11
     ON BEHALF OF THE DEFENDANT:
12
         Matthew H. Lembke, Esq.
13       Bradley Arant Boult Cummings LLP
         One Federal Place
14       1819 Fifth Avenue North
         Birmingham, Alabama 35203
15       205.521.8560
         Mlembke@bradley.com
16
         Office of the General Counsel
17       David D. Ayliffe, Esq.
         Tennessee Valley Authority
18       400 West Summit Hill Drive, WT6
         Knoxville, Tennessee 37902
19       865.632.8964
         Ddayliffe@tva.gov
20
21   Also Present:
         Timothy Prairie, Videographer
22
23
24
25
```

Page 3

```
 1         I N D E X
 2   CHRISTOPHER CHANDLER                          6
 3   EXAMINATION BY MR. O'REAR                     6
 4   EXAMINATION BY MR. AYLIFFE                   63
 5   EXAMINATION BY MR. O'REAR                    63
 6         E X H I B I T S
 7   Exhibit 22 - Previously marked - Bates No.
     TVABLN00008648, Letter from Pillsbury.       17
 8
     Exhibit 7 - Previously marked - Bates No.
 9   TVABLMN00001520 through 1523, e-mail from
     Larry Blust to James Chardos with attachment
10   dated August 18, 2017.                       21
11   Exhibit 33 - Bates No. TVABLN00005846, e-mail
     from Christopher Chandler to Clifford Beach
12   and others dated August 30, 2017.            23
13   Exhibit 8 - Previously marked, Bates No.
     TVABLN00000333, e-mail to Larry Blust and
14   others from Scott Vance dated August 31, 2017. 24
15   Exhibit 32 - Previously marked - Bates No.
     TVABLN00009316 through 9328, handwritten and
16   typed notes.                                 29
17   Exhibit 10 - Previously marked - Bates No.
     TVABLN00008330 through 8331.                 31
18
     Exhibit 11 - Previously marked - Bates No.
19   TVABLN00002045 through 2052.                 32
20   Exhibit 14 - Previously marked TVABLN00005105
     through 5108.                                35
21
     Exhibit 19 - Previously marked - Bates No.
22   TVABLN00000043.                              45
23
24
25
```

Page 4

```
 1             S T I P U L A T I O N
 2
 3         The videotaped deposition of CHRISTOPHER
 4   CHANDLER, called as a witness at the instance of the
 5   Plaintiff, pursuant to all applicable rules, taken by
 6   agreement on the 29th day of October, 2019, beginning
 7   at approximately 2:26 p.m., at the law offices of
 8   Woolf, McClane, Bright, Allen & Carpenter, 900 S. Gay
 9   Street, Suite 900, Knoxville, Tennessee, before
10   Georgette H. Mitchell, Registered Professional Reporter
11   and Notary Public, pursuant to the stipulation of
12   counsel.
13         It being agreed that
14   Georgette H. Mitchell, Registered Professional Reporter
15   and Notary Public, may report the deposition in machine
16   shorthand, afterwards reducing the same to typewriting.
17         All objections, except as to the form of
18   the question, are reserved to on or before the hearing.
19         It being further agreed that all
20   formalities as to notice, caption, certificate,
21   transmission, etc., excluding the reading of the
22   completed deposition by the witness and the signature
23   of the witness, are reserved.
24
25
```

Page 5

```
 1         (The deposition began at 2:26 p.m.)
 2         THE VIDEOGRAPHER:  Okay.  We're on the
 3   record.  The time is 2:26 on October 29th, 2016.
 4         This is the video unit number one of the
 5   video recorded deposition of Chris Chandler in the
 6   matter of Nuclear Development, LLC versus
 7   Tennessee Valley Authority filed in the United
 8   States District Court for the Northern District of
 9   Alabama, Northeastern Division.
10         This deposition is being held at the law
11   offices of Woolf, McClane at 900 South Gay Street,
12   Suite 900, Knoxville, Tennessee.
13         My name is Tim Prairie from Veritext
14   Legal.  I'm the videographer.  The court reporter
15   is Georgette Mitchell from Veritext Legal, and
16   I'll ask counsel to please identify themselves and
17   then the court reporter will swear in the witness.
18         MR. O'REAR:  Caine O'Rear for plaintiff,
19   Nuclear Development.
20         MR. BLUST:  Larry Blust for plaintiff,
21   Nuclear Development.
22         MR. AYLIFFE:  David Ayliffe for
23   defendant, TVA.
24         MR. LEMBKE:  Matt Lembke for defendant,
25   TVA.
```

Page 6

1    CHRISTOPHER CHANDLER,
2 having first been duly sworn, was examined and deposed
3 as follows:
4 EXAMINATION BY MR. O'REAR:
5    Q.   State your name, please.
6    A.   Christopher Chandler.
7    Q.   What's your residence address?
8    A.   609 Old Tavern Circle, Knoxville,
9 Tennessee.
10   Q.   What's your business address?
11   A.   400 West Summit Hill Drive, Knoxville,
12 Tennessee.
13   Q.   And that's the TVA headquarters?
14   A.   Yes.
15   Q.   You're with TVA currently --
16   A.   Yes.
17   Q.   -- right?  What's your position?
18   A.   I'm the Associate General Counsel for
19 Nuclear in the Office of General Counsel.
20   Q.   And how long have you been in that
21 position?
22   A.   Just about two years.
23   Q.   And were you with TVA before that?
24   A.   Yes.
25   Q.   And what was your position?

Page 7

1    A.   I was an attorney in the Office of
2 General Counsel.
3    Q.   Okay.  And what was the difference in
4 your responsibilities now as opposed to then?
5    A.   At the time I was an individual
6 contributor in the office working on nuclear matters
7 and now I manage the group.  I have additional
8 responsibilities in interacting with management.
9    Q.   When you were an attorney, not Associate
10 General Counsel, were -- were you in the nuclear office
11 of the legal department?
12   A.   Yes.
13   Q.   And how long have you been at TVA?
14   A.   I came to TVA in 2009.  It's been almost
15 exactly ten years.
16   Q.   Okay.  And so you moved to head of the
17 nuclear group two years ago, correct?
18   A.   Correct.  Yep.
19   Q.   Were you in the same position from 2009,
20 until 2016 or '17?
21   A.   No.  For a period of about two years I
22 left the nuclear group and worked in the nonnuclear
23 power supply and transmission group.  That was in 20 --
24 June of 2012 to June of 2014, and then I returned to
25 the nuclear group.

Page 8

1    Q.   Tell us who you reported to as your
2 superior in the years 2016, 2017, 2018?
3    A.   Scott Vance in 2016.  Scott Vance in
4 2017.  Scott was the -- my predecessor as the Associate
5 General Counsel for nuclear.  When he left I took over
6 his role, I reported to Sherry Quirk, the General
7 Counsel.
8         After, oh, it was about March of 2018, we
9 instituted a Deputy General Counsel.  That was Kimberly
10 Bolton and I reported to her from March 2018, until
11 sometime earlier this year, I think June of this --
12 June of 2019.
13   Q.   Who do you currently report to?
14   A.   Sherry Quirk.
15   Q.   What happened to Kimberly Bolton?
16   A.   She is now the Associate General Counsel
17 for the environmental group.
18   Q.   All right.  And what was the -- what was
19 the date you took over as head of the nuclear group
20 from Scott Vance?
21   A.   I don't recall the exact date.  It was in
22 October of 2017.
23   Q.   Did he retire?
24   A.   No, he left.  He took another job.
25   Q.   Outside of Tennessee?

Page 9

1    A.   Outside of Tennessee, yeah.
2    Q.   Outside of TVA?
3    A.   That's right.
4    Q.   Tell us what your undergraduate and
5 professional education has been.
6    A.   I have a law degree from American
7 University in Washington, DC, a master of engineering
8 management from Old Dominion University.  I have a
9 bachelor's degree in history from Villanova University.
10   Q.   Okay.  When did you obtain your law
11 degree?
12   A.   2007.
13   Q.   So was there a period of time between
14 graduation from law school and when you started with
15 TVA where you worked somewhere else?
16   A.   Yes.
17   Q.   Where was that?
18   A.   I worked for the U.S. Nuclear Regulatory
19 Commission in Rockville, Maryland.
20   Q.   Okay.  What was your job there?
21   A.   I was in the, what they call the honor
22 law graduate program.  I worked in several different
23 groups in the Office of General Counsel.
24        I worked in the group that handles
25 current operator, excuse me, current reactor licensing.

3 (Pages 6 - 9)

Page 10

1  I worked in their labor and employment group for a
2  period of six to eight months, and I wrote adjudicatory
3  opinions for the commission itself.
4      Q.   Are you currently licensed to practice
5  law in any states?
6      A.   Yes.
7      Q.   What?
8      A.   New York.
9      Q.   So you remain a member of the New York
10 bar, is that correct?
11     A.   Yes.
12     Q.   Are you a member of any other bars?
13     A.   No.
14     Q.   I want to focus on 2018, for a moment.
15 Tell us what your duties were and your job at TVA?
16     A.   Well, as the Associate General Counsel
17 for nuclear I'm responsible for managing a small group
18 of attorneys.  We deal primarily with issues affecting
19 TVA's nuclear fleet.  My primary internal client,
20 notwithstanding that it's actually TVA, primarily
21 interact with TVA's chief nuclear officer and make sure
22 that he has access to the legal support he needs.
23          We do a lot of work with employment
24 matters, nuclear whistleblower matters, nuclear
25 licensing, which is, you know, issues that arise on a

Page 11

1  daily basis involving the nuclear plants and that
2  requires some interfacing with the Nuclear Regulatory
3  Commission.
4      Q.   Who was TVA's nuclear officer in 2018?
5      A.   Michael Balduzzi was the Chief Nuclear
6  Officer who retired in late 2018, I don't know the
7  exact date.
8           Tim Rausch is the current Chief Nuclear
9  Officer, and he came to TVA in October of 2018.
10     Q.   Did he come as Chief Nuclear Officer in
11 October?
12     A.   Yes.
13     Q.   What was his name again?
14     A.   Tim Rausch.
15     Q.   R-a-u-c-h?
16     A.   R-a-u-s-c-h.
17     Q.   What is the role of the licensing
18 department outside of the legal department with respect
19 to nuclear at TVA?
20          MR. AYLIFFE:  Object to form.  You can
21     answer.
22          THE WITNESS:  The licensing department is
23     responsible for a wide range of correspondence,
24     maintaining documents associated with the licenses
25     that the NRC issues for TVA's nuclear plants.

Page 12

1  BY MR. O'REAR:
2      Q.   Do you work with the licensing department
3  in your job function?
4      A.   Yes.
5      Q.   With the licensing group under the legal
6  department?
7      A.   Yes.
8      Q.   Are you assigned to the licensing
9  department as an attorney for them?
10          MR. AYLIFFE:  Object to the form.  You
11     can answer if you understand.
12          THE WITNESS:  I don't actually understand
13     the question.
14 BY MR. O'REAR:
15     Q.   Let me ask it this way.  Does the
16 licensing department have lawyers that are designated
17 for that department?
18     A.   Not formally.  We have a nuclear group
19 within the office which would ordinarily be their
20 primary point of contact within the Office of General
21 Counsel.
22          So from a licensing perspective, I don't
23 think they have a point of contact other than what
24 they're accustomed to.
25     Q.   Okay.  Are there any lawyers in the

Page 13

1  licensing department that report to Joe Shea?
2      A.   I'm aware that there's an employee there
3  with a law degree, but he doesn't serve in a legal
4  capacity for TVA.
5      Q.   Okay.  Are there protocols which dictate
6  what decisions you are allowed to make without
7  obtaining approval of your superior, your supervisor
8  which -- as Associate General Counsel for the nuclear
9  group?
10          MR. AYLIFFE:  Object to the form, vague.
11     You can answer.
12          THE WITNESS:  No.
13 BY MR. O'REAR:
14     Q.   And you report to whom?
15     A.   Sherry Quirk.
16     Q.   And how long have you reported to her?
17     A.   With -- since October of 2017, when I
18 took over this position, with the exception of a period
19 of about 14 to 15 months when I reported to Kimberly
20 Bolton.
21     Q.   Okay.  Who is David Czufin, C-z-u-f-i-n?
22     A.   David Czufin is the Senior Vice president
23 of Engineering and Operations Support within TVA
24 Nuclear.
25     Q.   And when you say TVA Nuclear, that's a

Page 14

1  separate department of TVA not within the legal
2  department, correct?
3      A.   That's right.
4      Q.   So give me, so I don't butcher the
5  nomenclature, I mean, what's your group?  Is it called
6  a group or an office or division within the legal
7  department?
8      A.   We typically refer to it as a group.
9      Q.   As a group.  Okay.  And so nuclear
10 outside of the legal department would be a department,
11 is that correct?
12     A.   It would be an SBU, a Strategic Business
13 Unit.
14     Q.   Okay.  And would that be like the
15 environmental group or --
16     A.   Not necessarily.  Not necessarily.  TVA
17 Nuclear is one of the larger subcomponents of TVA.
18     Q.   How many nuclear facilities does TVA
19 have?
20     A.   TVA has three reactor sites that contain
21 among them seven operating units.  In addition, there
22 are several radiological laboratories.
23          There's a central laboratory.  There's
24 western area radiological laboratory, and then there's
25 the corporate office in Chattanooga.

Page 15

1      Q.   How long had Scott Vance been with TVA
2  when he left, do you know?
3      A.   No, I don't know.
4      Q.   Are you the point person at or within the
5  legal department that deals with the Nuclear Regulatory
6  Commission?
7      A.   Not necessarily.
8      Q.   Okay.  Who else deals with the Nuclear
9  Regulatory Commission?
10     A.   Ryan Dreke works in my group.  He's one
11 of my direct reports.  He also interacts with the
12 Nuclear Regulatory Commission from time to time.
13     Q.   Okay.  Anyone else?
14     A.   No.
15     Q.   You're familiar with Tim Matthews?
16     A.   Yes.
17     Q.   Okay.  And do you recognize that he has
18 been acting as outside counsel for licensing issues for
19 Nuclear Development, correct?
20     A.   Yes.
21     Q.   Have you been the person at TVA that has
22 primarily communicated with him regarding the
23 Bellefonte site?
24     A.   No.
25     Q.   Who has been?

Page 16

1      A.   To my knowledge, Jim Chardos.
2      Q.   Did Jim Chardos deal with Tim Matthews
3  regarding issues that related to nuclear licensing?
4      A.   I don't know.
5      Q.   Did you?
6      A.   I dealt with Tim Matthews with respect to
7  one issue.
8      Q.   And that was what?
9      A.   That was the request for a consent letter
10 that TVA would send to the NRC in connection with
11 Nuclear Development's license transfer application.
12     Q.   Was that your first connection or
13 communication with Tim Matthews --
14     A.   Yes.
15     Q.   -- regarding this matter?  Okay.
16          And when was that, do you remember?
17 Sometime in October of 2018?
18     A.   It was October of 2018.
19     Q.   Were you the person at TVA that engaged
20 the Pillsbury firm to look at the issue that they
21 ultimately issued an opinion letter on?
22     A.   Yes.
23     Q.   And did you have a written engagement
24 letter with them?  Did TVA have a written engagement
25 letter with them?

Page 17

1      A.   I don't recall a -- an engagement letter
2  that was specific to that request.  We don't ordinarily
3  enter into engagement letters with Pillsbury for work,
4  and I don't recall one for that letter either.
5      Q.   Did that -- does that firm do work for
6  TVA on an ongoing basis?
7      A.   Yes.
8      Q.   And when did you request them to provide
9  opinion with respect to this issue of the transfer of
10 the construction permits?
11          MR. AYLIFFE:  Objection, lacks
12     foundation, but you can answer.
13          THE WITNESS:  We had several
14     conversations in the fall of 2018.  I don't recall
15     exact dates.  But it would have been in probably
16     the October, November timeframe.
17     (Exhibit 22 - Previously marked - Bates No.
18     TVABLN00008648, Letter from Pillsbury.)
19 BY MR. O'REAR:
20     Q.   I'd ask you to look at Exhibit 22.  Are
21 you familiar with that letter?
22          MR. AYLIFFE:  Take your time.
23          THE WITNESS:  Yes.
24 BY MR. O'REAR:
25     Q.   Okay.  And the letter is undated,

5 (Pages 14 - 17)

Page 18
1  correct?
2  A.    I don't see a date.
3  Q.    When was the letter received by you?
4  A.    It was in November of 2018. I don't
5  recall the exact date.
6  Q.    Well, if Mr. Beach said it was received
7  on November 28, 2018, would you have any reason to
8  doubt that?
9       MR. AYLIFFE: Objection, lacks
10      foundation. You can answer if you know.
11      THE WITNESS: I don't -- I don't have any
12      basis for knowing. It sounds right, but I don't
13      know.
14 BY MR. O'REAR:
15  Q.    Did you receive any drafts of this letter
16 before it was received by you?
17  A.    Before the final was received by me?
18  Q.    Yes.
19  A.    I would suppose we did.
20  Q.    And your office would retain copies of
21 those?
22  A.    Yes.
23  Q.    This letter starts off by saying, "Dear
24 Christopher. As you requested."
25       So this is signed by a lawyer by the name

Page 19
1  of Michael Lepre, is that correct?
2  A.    Yes, it says Michael Lepre and it has his
3  signature.
4  Q.    Yeah. And did you deal directly with
5  Michael Lepre --
6  A.    Yes.
7  Q.    -- with respect to this matter?
8       It says that in the third paragraph of
9  this letter, "This letter speaks only as of the date
10 hereof and is based on information provided to us by
11 TVA."
12      Do you see that?
13  A.    Yes.
14  Q.    And were you the person at TVA who
15 provided information to the Pillsbury firm with respect
16 to this letter?
17  A.    Yes.
18  Q.    Okay. Can you tell me what information
19 you provided?
20  A.    I provided him with some documents,
21 copies of TVA's construction permits.
22  Q.    Okay. Anything else?
23  A.    I don't recall anything else. Well, I
24 would have given him a copy of the purchase and sale
25 agreement.

Page 20
1  Q.    Anything else?
2  A.    None -- nothing that I can recall
3  specifically, no.
4  Q.    So what you can recall is he was provided
5  the construction permits and a copy of the contract
6  with Nuclear Development?
7  A.    That's what I recall, yes.
8  Q.    Were you involved in any respect in the
9  preparation of the contract that was ultimately entered
10 into with Nuclear Development?
11 A.    No.
12 Q.    You weren't involved in the negotiations
13 at all of the terms of that, is that correct?
14      MR. AYLIFFE: Objection. Asked and
15      answered. You can answer again.
16      THE WITNESS: Yes, that's correct.
17 BY MR. AYLIFFE:
18 Q.    And you had no -- no communication with
19 Concentric Energy Advisors regarding the contract, is
20 that correct?
21 A.    That is correct.
22 Q.    Would it be correct to say that you made
23 no decisions or had no input into any decisions
24 regarding the terms of the contract?
25      MR. AYLIFFE: Objection. Asked and

Page 21
1      answered. You can answer it again.
2      THE WITNESS: I had no input into the
3      terms of the contract.
4  BY MR. O'REAR:
5  Q.    Were you aware that in August of 2017,
6  that Nuclear Development requested TVA to send a letter
7  to the NRC relating to a request for extension of the
8  completion date of the unit two construction permit?
9  A.    Yes.
10 Q.    And were you involved in handling that
11 request?
12 A.    I was involved in reviewing and
13 commenting on the draft of the letter. I did not have
14 any involvement in interacting with the request or any
15 decisionmaking around the request.
16     (Exhibit 7 - Previously marked - Bates No.
17     TVABLMN00001520 through 1523, e-mail from Larry
18     Blust to James Chardos with attachment, dated
19     August 18, 2017.)
20 BY MR. O'REAR:
21 Q.    Okay. And when you say you were involved
22 with the drafting of the letter, tell me what that
23 means?
24      Pardon me. And just to get specific,
25 let's look at the exhibit, which is Exhibit 7 I'm

Freedom Court Reporting
877-373-3660           A Veritext Company           205-397-2397

Page 22

1  handing you.
2       To make sure we're talking about the same
3  thing, is that the request to the letter that you are
4  referring to?
5       A.   It appears to be.  It's been -- it's been
6  over two years.  I don't recall a lot of the
7  particulars of the letter, but this looks familiar.
8       Q.   And tell me what your role was again with
9  respect to this letter.
10      A.   To the best of my recollection, I was
11 given a copy of the letter by my supervisor, I think it
12 was my supervisor, which it would have been Scott Vance
13 and asked to --
14           MR. AYLIFFE:  Don't.  So I'm going to
15      instruct you not to answer to the extent it
16      involves any attorney/client privileged
17      information.
18           To the extent you can answer his question
19      without getting into information protected by the
20      attorney/client privilege, I'll allow you to
21      answer the question.
22           THE WITNESS:  I was assigned a task of
23      reviewing the text of the letter and working with
24      our corporate, the nuclear licensing department on
25      the letter.

Page 23

1  BY MR. O'REAR:
2       Q.   Okay.  But you said earlier you were not
3  involved in any decisionmaking regarding a response to
4  the letter request, is that correct?
5       A.   Yes.
6           (Exhibit 33 - Bates No. TVABLN00005846, e-mail
7            from Christopher Chandler to Clifford Beach and
8            others dated August 30, 2017.)
9  BY MR. O'REAR:
10      Q.   You got it.  This is new.
11           Can you identify Exhibit 33 as an e-mail
12 from you to Cliff Beach that attached beneath it an
13 e-mail chain?
14      A.   I see Exhibit 33 at the top of the very
15 first page from Christopher Chandler to Cliff Beach,
16 Jack H. McCall, yes.
17      Q.   Then if you would look on the second page
18 of the exhibit, there's an e-mail from Scott Vance to
19 Larry Blust and you're copied on it dated August 29,
20 2017, which says, "Our office is working on this.  We
21 discussed this with Morgan Lewis this afternoon.
22 Please give us a day to finalize an approach.  I'm
23 confident we will accomplish what everyone desires in
24 this regard."
25           Do you see that?

Page 24

1       A.   Yes, I see that.
2       Q.   And so, who was working on this -- this
3  request, the persons that are copied on this e-mail?
4           MR. AYLIFFE:  Object to the form.  Lacks
5      foundation, but you can answer.
6           THE WITNESS:  Well, Scott says he had a
7      conversation with Morgan Lewis and he's
8      interacting with Larry Blust, so he was doing some
9      work on it.
10          All I can say for certain is I recall him
11     asking me to work on the letter itself, the actual
12     content of the letter.
13          (Exhibit 8 - Previously marked, Bates No.
14           TVABLN00000333, e-mail to Larry Blust and others
15           from Scott Vance dated August 31, 2017.)
16 BY MR. O'REAR:
17      Q.   I'll show you what's been marked as
18 Exhibit 8.  Can you identify that as an e-mail from
19 Scott Vance to Larry Blust dated August 31, 2017, with
20 a copy to you and others that responds to the request
21 for a subsequent extension letter?
22      A.   Yes.
23      Q.   And Mr. Vance says in the first line of
24 that e-mail, "TVA will not send a subsequent extension
25 letter as requested."

Page 25

1           Do you see that?
2       A.   Yes, I see that.
3       Q.   In the second sentence it says, "If you
4  have any questions or concerns about this decision,
5  please raise them above my level."
6           Do you see that?
7       A.   Yes.
8       Q.   What was he referring to there?
9       A.   I don't know.
10          MR. AYLIFFE:  Objection, lacks
11     foundation, but go ahead.
12          THE WITNESS:  I don't -- I don't know.
13 BY MR. O'REAR:
14      Q.   Does that tell you anything about who may
15 have made the decision to reject this request?
16          MR. AYLIFFE:  Objection.
17     Mischaracterizes the statement and lacks
18     foundation, but go ahead and answer if you can.
19          THE WITNESS:  I would assume it was not
20     Scott Vance.
21 BY MR. O'REAR:
22      Q.   Do you know who made the decision to
23 reject the request?
24      A.   I do not.
25      Q.   And again, you weren't involved in that,

Page 26

1  correct?
2  A.    That's correct.
3  Q.    Do you know why the request was denied?
4       MR. AYLIFFE: Objection to the form.
5    Asked and answered.
6       THE WITNESS: No, I don't.
7  BY MR. O'REAR:
8  Q.    Do you recall that there was a NRC public
9  meeting on the issue of the construction permit
10 transfers at Bellefonte in mid August of 2018?
11 A.    Yes.
12 Q.    And were you monitoring that meeting of
13 NRC's activities related to that meeting?
14      MR. AYLIFFE: Object to the form, but you
15   can answer if you understand the question.
16      THE WITNESS: I was aware of the meeting.
17   I knew that it was scheduled and I was interested
18   in the results.
19 BY MR. O'REAR:
20 Q.    Okay. And when you received notice, you
21 received advance notice of the meeting obviously?
22 A.    Yes.
23 Q.    The public notice by the NRC, correct?
24 A.    Yes, I was notified by somebody
25 internally, but, yes.

Page 27

1  Q.    There's an entry on the TVA's privilege
2  log of July 25th, 2018, where you are identified as the
3  associate -- associated legal personnel, said you made
4  handwritten notes on communications with counsel
5  regarding Nuclear Development's upcoming meeting with
6  the NRC.
7       MR. AYLIFFE: There's no question.
8  BY MR. O'REAR:
9  Q.    Can you tell us if the upcoming meeting
10 with the NRC referred to in that description was the
11 public meeting scheduled in mid August of 2018?
12      MR. AYLIFFE: Object to the form and
13   lacks foundation. You have not shown him the
14   privilege log entry or even the e-mail, whether it
15   was redacted or withheld in its entirety, but go
16   ahead and answer the question if you can recall.
17      THE WITNESS: I don't recall that, no.
18 BY MR. O'REAR:
19 Q.    So if you did make handwritten notes, do
20 you know who your communications were with?
21      MR. AYLIFFE: Objection. Calls -- calls
22   for speculation. It's a hypothetical.
23      THE WITNESS: I don't know that -- I'd
24   have to see. I'd have to have something to look
25   at. I don't know what you're talking about.

Page 28

1  BY MR. O'REAR:
2  Q.    Well, we're talking about a privilege
3  log. I have written on my copy of it, but it says
4  simply what I just described to you.
5  A.    Could you read it to me again, sir?
6  Q.    Sure. It says it's a document dated
7  July 25th, 2018. That it is a physical paper, and that
8  it is described as handwritten notes on communications
9  with counsel regarding Nuclear Development's upcoming
10 meeting with NRC."
11 A.    Communications with counsel regarding
12 upcoming meeting?
13 Q.    That's what it says.
14      MR. AYLIFFE: There's not a question.
15   There's not a question.
16 BY MR. O'REAR:
17 Q.    Well, I have a pending question, that is
18 do you know who you had communications with regarding
19 this entry?
20      MR. AYLIFFE: Object to the form. Asked
21   and answered. Lacks foundation because it hasn't
22   been established that he had any communication
23   regarding that entry or that he's ever seen that
24   entry, but...
25      THE WITNESS: What I recall is around

Page 29

1    that time we had some internal discussions about
2    the upcoming meeting.
3  BY MR. O'REAR:
4  Q.    And would it have been the public meeting
5  that we just described, the NRC public meeting?
6       MR. AYLIFFE: I'm going to -- I'm going
7    to instruct you not to answer the question to the
8    extent it calls for information protected by the
9    attorney/client privilege.
10      However, to the extent you can answer
11   that question without divulging attorney/client
12   privilege protected information, you can do so.
13      THE WITNESS: The only meeting -- the
14   date was July 25th, is that right?
15 BY MR. O'REAR:
16 Q.    Of this document?
17 A.    Of that document?
18 Q.    Yes.
19 A.    The only meeting at that time that would
20 have been upcoming that I'm aware of would have been
21 the August 2018 public meeting.
22    (Exhibit 32 - Previously marked - Bates No.
23    TVABLN00009316 through 9328, handwritten and
24    typed notes.)
25 BY MR. O'REAR:

8 (Pages 26 - 29)

|  | Page 30 |  | Page 32 |
|---|---|---|---|
| 1 | Q. And we had previously marked in Miss | 1 | (Exhibit 11 - Previously marked - Bates No. |
| 2 | Quirk's deposition Exhibit 32. | 2 | TVABLN00002045 through 2052.) |
| 3 | Do you recognize those notes? | 3 | BY MR. O'REAR: |
| 4 | A. No. No. | 4 | Q. I'd ask you to look at Exhibit 14, excuse |
| 5 | Q. Those aren't your notes? | 5 | me 11, excuse me, and ask if you've ever seen that |
| 6 | A. These are not my notes. | 6 | before? |
| 7 | Q. What about the last two pages of the | 7 | A. Yes. |
| 8 | document? Are those typed notes of yours? | 8 | Q. Did you receive this document in |
| 9 | A. No. No. | 9 | conjunction with your duties as head of the nuclear |
| 10 | Q. If you'd look at the top of that page, | 10 | group within the legal department? |
| 11 | which is page Bates numbered 9327, it says, "A review | 11 | A. Yes. |
| 12 | was performed of Nuclear Development, LLC letter to the | 12 | Q. You did not personally attend this |
| 13 | NRC dated November 13, 2018." | 13 | meeting, is that correct? |
| 14 | Do you see that? | 14 | A. Yes. |
| 15 | A. Yes. | 15 | MR. AYLIFFE: Yes, you did not attend the |
| 16 | Q. Does that tell you that the letter was | 16 | meeting? |
| 17 | the Nuclear Development application for approval of the | 17 | THE WITNESS: Yes, I did not attend the |
| 18 | transfer of the construction permits? | 18 | meeting. Yes, that's correct. |
| 19 | MR. AYLIFFE: Object to the form. The | 19 | BY MR. O'REAR: |
| 20 | question lacks foundation, the line of questioning | 20 | Q. When did you receive this document that |
| 21 | related to these last two pages of exhibit -- | 21 | summarizes the meeting from the NRC? |
| 22 | BY MR. O'REAR: | 22 | A. I don't recall exactly. My recollection |
| 23 | Q. Let me ask you this, were you involved -- | 23 | is I obtained a copy of this myself by downloading it |
| 24 | MR. AYLIFFE: -- 32. | 24 | from the NRC's public document website. So it would |
| 25 | BY MR. O'REAR: | 25 | have been after September 4th. |

|  | Page 31 |  | Page 33 |
|---|---|---|---|
| 1 | Q. -- in a review of the Nuclear Development | 1 | Q. Would it have been shortly after |
| 2 | letter to the NRC dated November 13, 2018? | 2 | September 4, 2018? |
| 3 | A. No. | 3 | MR. AYLIFFE: Object to the form. You |
| 4 | Q. Okay. Do you know whose notes these are? | 4 | can answer. |
| 5 | A. I do not know. | 5 | THE WITNESS: I don't recall. |
| 6 | (Exhibit 10 - Previously marked - Bates No. | 6 | BY MR. O'REAR: |
| 7 | TVABLN00008330 through 8331.) | 7 | Q. Well, was it close to the time of the |
| 8 | BY MR. O'REAR: | 8 | meeting or was it weeks and months later? |
| 9 | Q. I direct your attention to Exhibit 10 | 9 | MR. AYLIFFE: Object to the form. You |
| 10 | which was previously marked in Mr. Johnson's | 10 | can answer. |
| 11 | deposition. | 11 | THE WITNESS: It would have been sometime |
| 12 | Did you receive a copy of this e-mail? | 12 | in the month of September. |
| 13 | A. I don't think so. | 13 | BY MR. O'REAR: |
| 14 | Q. Well, I know your name is not shown on | 14 | Q. And did you review the letter when you |
| 15 | it. I'm just asking if you received it otherwise. | 15 | downloaded it? Did you read it? |
| 16 | A. I don't -- I don't think so. I don't | 16 | A. You mean, reviewed this document? |
| 17 | recall having seen this before. | 17 | Q. Yes. |
| 18 | Q. Did you receive any report from Russ Bell | 18 | A. Yes. |
| 19 | of the Nuclear Energy Institute regarding the | 19 | Q. All right. Did it cause you any concern |
| 20 | August 14, 2018, NRC public meeting? | 20 | in terms of the planned closing of the sale of |
| 21 | A. Not to my knowledge. | 21 | Bellefonte in November of 2018? |
| 22 | Q. Have you ever to this date, seen a | 22 | MR. AYLIFFE: Object to the form, vague |
| 23 | text -- seen the text, Mr. Bell's comments that are | 23 | and to the extent -- to the extent answering that |
| 24 | reflected on the first and second page of this exhibit? | 24 | question requires you to divulge attorney/client |
| 25 | A. I don't think so, no. | 25 | privileged information, instruct you not to do so. |

9 (Pages 30 - 33)

Page 34

1     But to the extent you can answer without
2  revealing attorney/client privileged information,
3  you may.
4         THE WITNESS: I can't answer that without
5  divulging attorney/client privileged information.
6  BY MR. O'REAR:
7     Q.  When you read this, did you interpret
8  this to mean that Nuclear Development planned to close
9  on the purchase of Bellefonte in November 2018, and to
10 complete the detail schedules in December of 2018?
11        MR. AYLIFFE: Object to the form. Lacks
12 foundation, requires speculation, but...
13        THE WITNESS: I don't recall.
14        MR. AYLIFFE: Same instruction on
15 privilege.
16        THE WITNESS: I don't recall thinking
17 that, what you just stated.
18 BY MR. O'REAR:
19    Q.  Do you recall reading it at the time?
20        MR. AYLIFFE: The text of Exhibit 11?
21        THE WITNESS: Yeah, the text of
22 Exhibit 11, I recall reading this at the time and
23 what I see here is three bullet points at the
24 bottom that state, excuse me, the bottom of page
25 two, that state in D, "plans to close on the

Page 35

1  Bellefonte purchase in November of 2018, and the
2  plan to complete detail scheduled -- schedules in
3  December of 2018, and the estimated that licensing
4  activities will start in 2019."
5  BY MR. O'REAR:
6     Q.  What did you understand the reference to
7  "complete detail schedules" to mean?
8         MR. AYLIFFE: Object to the form of the
9  question. Speculation. Lacks foundation.
10        THE WITNESS: It was not clear to me. I
11 didn't participate in the meeting, so -- so I
12 don't know.
13   (Exhibit 14 - Previously marked TVABLN00005105
14   through 5108, e-mail from Chris Chandler to Tim
15   Matthews dated October 18, 2018.)
16 BY MR. O'REAR:
17    Q.  Directing your attention to Exhibit 14,
18 can you identify this as an e-mail you received from
19 Tim Matthews on behalf of Nuclear Development, excuse
20 me, an e-mail at the top that you sent Tim Matthews on
21 October 18, 2018, copied to Joe Shea?
22    A.  Yes.
23    Q.  And beneath it is the e-mail from Tim
24 Matthews to you of the same date, correct?
25    A.  Yes.

Page 36

1     Q.  And then the third e-mail on the second
2  page is an e-mail from Tim Matthews to you of the same
3  date, which says, "We previously discussed the
4  possibility of TVA submitting a letter to the NRC
5  consenting to the plant sale and a CP transfer
6  consistent with 50.80 B 2, rather than TVA submitting a
7  CP transfer application on behalf of Nuclear
8  Development."
9         Correct? Did I read that correctly?
10    A.  Yes.
11    Q.  "I've prepared a draft of that consent
12 letter for your consideration."
13        So tell me if you recall what your
14 previous discussion was with Tim Matthews regarding
15 this?
16    A.  Tim Matthews and I had a phone call that
17 he initiated. I don't recall the exact date. I think
18 it may have been on October 18th or at the -- at the
19 most, a day or two prior.
20        My recollection is that it was on the
21 18th, and we discussed -- he had called me to talk
22 about this concept, the -- this letter to the NRC
23 consenting to the plant sale and transfer.
24        I had told him he should send the draft
25 over, we would look at it. I told him that -- he told

Page 37

1  me that he didn't -- he didn't need it at the time, but
2  he wanted to send it over so that we'd have it to look
3  at, and I told him that we would need -- if they were
4  going to ask us to formally submit it, we would need
5  several weeks in order to, you know, actually review
6  it, and put it into our internal concurrence process,
7  which can be time consuming.
8         He agreed, and he sent over a copy of the
9  letter afterwards.
10    Q.  Was it your understanding that he
11 contemplated that this letter would be submitted at the
12 closing of the sale of Bellefonte?
13        MR. AYLIFFE: Object to the form.
14 Requires speculation. You can answer if he
15 communicated an understanding to you.
16        THE WITNESS: No, he told me that he
17 didn't know what else to do with it at the time
18 and so he was sending it over so we would have it
19 to look at. He didn't give me any timing on that
20 phone call or in this e-mail.
21 BY MR. O'REAR:
22    Q.  If you would look at the letter itself on
23 the last page in the last sentence it says,
24 "Accordingly, pursuant to 10 CFR 50.80 B 2, the
25 Tennessee Valley Authority respectfully submits this

10 (Pages 34 - 37)

Page 38

1  notice. That upon closing of the transaction, TVA
2  consents to the requested transfer of the two
3  construction permits."
4       So was it your understanding that he was
5  requesting what is stated in this letter?
6       MR. AYLIFFE: Object to the form. Asked
7       and answered, but...
8       THE WITNESS: No, that was not my
9       understanding. He sent us a draft of the letter.
10      I told him we'd review the language and he told me
11      he didn't need it in any particular time.
12 BY MR. O'REAR:
13      Q.   Okay. So you did not have an
14 understanding that it would be needed at least prior to
15 the closing of the transaction?
16      A.   No.
17      MR. AYLIFFE: Object to the form. You
18      can answer.
19      THE WITNESS: No.
20 BY MR. O'REAR:
21      Q.   At this point in time Nuclear Development
22 had not applied for a transfer of the construction
23 permits with the NRC, is that correct?
24      MR. AYLIFFE: At which point, October
25      18th?

Page 39

1       MR. O'REAR: Right.
2       MR. AYLIFFE: 2018?
3       THE WITNESS: Yes, that's correct.
4  BY MR. O'REAR:
5       Q.   And did you have any idea about whether
6  the NRC would be granting an approval of the transfer
7  of the construction permits prior to the closing if it
8  had not even been submitted as of October 18, 2018?
9       MR. AYLIFFE: Object to the form. Lacks
10      foundation. Requires speculation, but if you had
11      any idea, you're free to state it.
12      THE WITNESS: I didn't have any idea that
13      the NRC would approve a license transfer
14      application that had not been submitted prior to
15      November 30th. Well, whatever the closing date
16      was. November -- I guess it was November 13th or
17      14th at the time.
18 BY MR. O'REAR:
19      Q.   Do you recall having a discussion with
20 Tim Matthews on November the 5th, 2018, about this
21 request as found in Exhibit 14?
22      A.   I recall having a subsequent conversation
23 with Tim Matthews on the phone. I don't recall the
24 exact date.
25      Q.   About this -- about this Exhibit 14?

Page 40

1       A.   We did discuss the status of the license
2  transfer application, that it had not been submitted
3  yet. He told me that he wasn't very comfortable with
4  the arrangement that he was dealing, with and we talked
5  in general terms about the letter. He did not then
6  tell me that he needed it prior to closing.
7       Q.   In that conversation did you say to Tim
8  Matthews that you expected TVA to submit that consent
9  letter to the NRC contemporaneously with Nuclear
10 Development's application for transfer of the permits?
11      A.   No.
12      Q.   You never said that?
13      A.   No.
14      Q.   In the conversation you said you don't
15 recall the dates, but in early November with Mr.
16 Matthews.
17      Did Mr. Matthews advise you that Nuclear
18 Development expected to close the transaction as then
19 scheduled on November 14, 2018?
20      MR. AYLIFFE: Object to the form, but you
21      can answer.
22      THE WITNESS: I don't recall him
23      discussing his expectations around closing. I
24      recall him describing his sensibilities about the
25      timing of the filing of the license transfer

Page 41

1       application.
2       He did tell me that he wasn't involved in
3       the transactional side of the project, that he was
4       only working on the license transfer application.
5  BY MR. O'REAR:
6       Q.   But did he express to you that they
7  expected to close the transaction on November 14, 2018?
8       A.   I don't recall him saying that.
9       Q.   In this conversation with Mr. Matthews,
10 did you express any objection to providing the consent
11 that he requested?
12      MR. AYLIFFE: Object to the form. Lacks
13      foundation, but...
14      THE WITNESS: No. No.
15 BY MR. O'REAR:
16      Q.   Who at TVA was the first person to raise
17 the issue of whether the closing of the transaction
18 could go forward without prior approval by the NRC of
19 the transfer of the construction permits?
20      MR. AYLIFFE: Object to the form of the
21      question. Vague as to what raised the issue
22      means, but you can answer it, but to the extent
23      your answer will require you to divulge
24      information protected by the attorney/client
25      privilege, I instruct you not to answer.

11 (Pages 38 - 41)

Page 42

1 However, to the extent you can answer
2 without divulging such information, you may do so.
3     THE WITNESS: To my knowledge, I was the
4 -- I identified the concern about the text of the
5 construction permits and the text of the Atomic
6 Energy Act. I don't think I can say any more than
7 that without violating attorney/client privilege.
8 BY MR. O'REAR:
9     Q.   And when did you do that? When did you
10 first identify those issues?
11    A.   It would have been sometime in the summer
12 of 2018. I don't recall exactly when.
13    Q.   Are there documents that reflect when you
14 first identified this issue?
15    A.   I don't know.
16    Q.   To your knowledge, when was Nuclear
17 Development first advised by TVA that this was an issue
18 for TVA?
19        MR. AYLIFFE: Object to the form. You
20    can answer.
21        THE WITNESS: To my knowledge, it was
22    sometime in the fall of 2018.
23 BY MR. O'REAR:
24    Q.   Are you familiar with the letter
25 submitted by or e-mail submitted by Cliff Beach to Mr.

Page 43

1 Blust on November the 9th, 2018?
2        MR. AYLIFFE: Objection. Lacks
3    foundation. Show it to him and you can ask him.
4 BY MR. O'REAR:
5     Q.   Well, let me ask you this. Do you recall
6 how TVA first advised Nuclear Development that this was
7 an issue for TVA?
8     A.   To the best of my recollection, it was by
9 telephone.
10    Q.   Okay. And who communicated that on
11 behalf of TVA to someone at Nuclear Development?
12    A.   I don't recall for certain. It would
13 have been either Sherry Quirk or Cliff Beach.
14    Q.   And you said sometime in the fall of
15 2018, correct?
16    A.   Yeah. Yes.
17    Q.   But you weren't a party to that call or
18 that communication, is that correct?
19    A.   I don't recall specifically. There was a
20 -- there were a number of calls between our office and
21 Mr. Blust in October and November 2018. I was on a
22 number of them, and I couldn't recall any one of them
23 with particularity.
24        I don't -- I don't -- so if you're asking
25 about the very first call we had where we notified

Page 44

1 them, I believe I was on that call. I believe I was.
2 I don't recall specifically what the date was.
3     Q.   Did you make any notes of any of these
4 conversations with Mr. Blust regarding this issue?
5     A.   If I was -- if I was on the call, I would
6 have taken notes of the call.
7     Q.   Okay. Do you still have those notes?
8     A.   Yes.
9         MR. O'REAR: Have those been produced, do
10    you know?
11        MR. AYLIFFE: They have not been and we
12    just based on what little information we have
13    about the notes at this point, what most likely I
14    would suspect object on the grounds of
15    attorney/client privilege and the work product
16    doctrine and contain Mr. Chandler's mental
17    impressions, and possibly also reflecting
18    attorney/client privileged protected information,
19    but they have not been produced.
20 BY MR. O'REAR:
21    Q.   Did you ask Tim Matthews in November of
22 2019 to provide you with a legal analysis of his
23 position on this issue?
24    A.   In November of 2019?
25    Q.   Yes.

Page 45

1     A.   2018.
2     Q.   2018, sorry.
3     A.   Did I ask -- did I personally ask Tim
4 Matthews?
5     Q.   Yes.
6     A.   No.
7     Q.   You did not?
8     A.   No.
9     Q.   Did he provide you with or did Mr. Blust
10 provide you and Mr. Beach with an analysis that was
11 provided by Mr. Matthews?
12    A.   Yes, I believe so.
13       (Exhibit 19 - Previously marked - Bates No.
14    TVABLN00000043 -- e-mail from Mr. Blust to Cliff
15    Beach dated November 12, 2018.)
16 BY MR. O'REAR:
17    Q.   Can you identify Exhibit 19 as an e-mail
18 from Mr. Blust to Cliff Beach copied to you and Ms.
19 Quirk dated November 12, 2018, that attaches a document
20 captioned "regulatory path forward for transfer of the
21 Bellefonte construction permits"?
22    A.   Yes.
23    Q.   And you did receive that, correct?
24    A.   Yes.
25    Q.   Did you provide any response to Mr. Blust

12 (Pages 42 - 45)

Page 46

1 or to Mr. Matthews of the document captioned
2 "regulatory path forward for transfer of Bellefonte
3 construction permits"?
4    A.   No, I don't believe I provided a response
5 to either of them.
6    Q.   And were you aware on November 13th, the
7 day after this, that Nuclear Development filed an
8 application with the NRC requesting approval of the
9 transfer license permits?
10   A.   Yes.
11   Q.   And that application was received by TVA
12 and circulated for review and comment among personnel
13 at TVA, correct?
14   A.   Yeah.
15        MR. AYLIFFE: Object to the form, but you
16   may answer.
17        THE WITNESS: Yes.
18 BY MR. O'REAR:
19   Q.   Did you run into Mr. Matthews at a
20 Nuclear Energy Institute meeting on that same day,
21 November 13, 2018?
22   A.   Yes.
23   Q.   And did you and Mr. Matthews discuss this
24 issue of Bellefonte that you've been communicating
25 about?

Page 47

1    A.   Yes.
2        MR. AYLIFFE: Object to the form, vague,
3   but you can answer.
4        THE WITNESS: Yes, we discussed the
5   license transfer application.
6 BY MR. O'REAR:
7    Q.   Okay. Did you tell Mr. Matthews in that
8 meeting with him on November 13, 2018, you had no
9 problem with sending the letter consenting to the sale
10 of the Bellefonte property?
11   A.   I don't recall saying it quite like that.
12   Q.   How did you say it?
13   A.   I don't recall exactly how I said it, but
14 I would have told him that we were still willing to
15 consider submitting the consent letter.
16   Q.   Did you tell him at that time you had
17 every intention of sending the consent letter that he
18 had requested?
19        MR. AYLIFFE: Object to the form, but you
20   can answer.
21        THE WITNESS: No, I don't think I used
22   that phrasing, no.
23 BY MR. O'REAR:
24   Q.   Did you indicate to him in any respect
25 that you would be opposed to, objected to or would not

Page 48

1 be sending a consent letter that he had requested?
2    A.   Would you state the question again,
3 please?
4    Q.   Did you express to him in that meeting
5 that you were opposed to or that you objected to or
6 that you would not be sending the consent letter that
7 he had requested?
8    A.   No, I don't think we discussed the
9 consent letter in that meeting.
10   Q.   So what did you discuss?
11   A.   We discussed the status of the license
12 transfer application. He told me that it was going in
13 later that day.
14   Q.   All right. So I had previously asked
15 you, did you tell him at that meeting that you had no
16 problem with sending the letter consenting to the sale
17 of the Bellefonte property.
18        And I think your response was "I don't
19 recall saying it exactly that way."
20   A.   I don't remember exactly what my response
21 was just now.
22   Q.   Okay.
23   A.   I don't recall discussing the consent
24 letter with him in that meeting. If we did discuss the
25 consent letter in that meeting, I don't believe I would

Page 49

1 have used the phrase "I have no problem doing it".
2 What I would have said would have been something along
3 the lines of we're still willing to consider it.
4    Q.   Did you and Mr. Matthews discuss in that
5 meeting the question of whether the closing should be
6 postponed or extended to allow for further discussion
7 on this issue?
8    A.   Yes.
9    Q.   Okay. What did you say about that?
10   A.   Mr. Matthews expressed to me his view
11 that the six-month extension that was requested by
12 Nuclear Development was the best resolution for the
13 parties to the contract. I told him I didn't have an
14 opinion on it.
15   Q.   You didn't tell him you agreed with that?
16   A.   No.
17   Q.   Did you tell him that would be the
18 preferable option?
19   A.   No.
20   Q.   Did you play any role in the decision not
21 to grant the six-month extension?
22   A.   No.
23   Q.   Did you make any notes of your meeting
24 with Tim Matthews on November 13, 2018?
25   A.   I don't know. I don't know. It was a

13 (Pages 46 - 49)

Page 50

1 face-to-face meeting.
2     Q.    Right.
3     A.    Unlikely.
4     Q.    I suppose you could have recorded notes
5 of the meeting or written them on a tablet afterwards?
6 I'm just -- I'm just asking.
7         MR. AYLIFFE: Object to the form.
8         THE WITNESS: I did not record the
9     meeting. I did not make an audio recording of the
10     meeting, and I don't recall making handwritten
11     notes afterwards.
12 BY MR. O'REAR:
13     Q.    Okay. And I didn't mean to imply you
14 were recording the meeting. I meant to say that you
15 could have dictated notes of the meeting on a device or
16 written them out by hand.
17         So you don't recall anything like that?
18         MR. AYLIFFE: Object to form. You can
19     answer.
20         THE WITNESS: No, I don't recall anything
21     like that.
22 BY MR. O'REAR:
23     Q.    You said you expressed to him that you
24 were still considering the consent letter as of
25 November 13, 2018?

Page 51

1         MR. AYLIFFE: Object to the form. I
2     think that mischaracterizes the prior testimony,
3     but go ahead and answer.
4 BY MR. O'REAR:
5     Q.    I think you said "I wouldn't be surprised
6 if I said something like we were still considering it".
7 Fair enough?
8         MR. AYLIFFE: Again, same objection, but
9     go ahead if you have a recollection.
10         THE WITNESS: Right. I don't recall that
11     we actually discussed it in that face-to-face
12     meeting.
13 BY MR. O'REAR:
14     Q.    Did you receive instructions not to send
15 the consent letter from anyone at TVA?
16         MR. AYLIFFE: Object to the form, and I
17     would also instruct you not to answer the question
18     to the extent the answer would require you to
19     divulge information protected by the
20     attorney/client privilege, but if you can do so
21     without divulging such information, you may --
22         THE WITNESS: No.
23         MR. AYLIFFE: -- answer the question.
24         THE WITNESS: The answer is no.
25 BY MR. O'REAR:

Page 52

1     Q.    Did you participate in a conference call
2 on November 15, 2018, involving Sherry Quirk, Cliff
3 Beach, Nick McCall and yourself, where the four of you
4 called Mr. Blust on his cell phone?
5     A.    As I stated previously, there were a lot
6 of phone calls in that period of several weeks. The
7 time and the membership sounds right, but I don't
8 remember the specifics. I recall a number of phone
9 calls with Mr. Blust involving a combination of people
10 in our office.
11     Q.    And with respect to all of these phone
12 calls with Mr. Blust, would you have made notes of the
13 conversation?
14     A.    Yes.
15     Q.    Okay. Do you still have those notes?
16     A.    Yes.
17     Q.    Did you say to Mr. Blust in that call
18 that the Atomic Energy Act made it unlawful to transfer
19 a production facility except in conjunction with the
20 transfer of the construction permits?
21         MR. AYLIFFE: Object to the form, but you
22     can answer if you have a recollection.
23         THE WITNESS: I don't recall speaking
24     during most of those phone calls, so I don't
25     believe I made a statement like that.

Page 53

1 BY MR. O'REAR:
2     Q.    Do you recall in that phone conversation
3 that Mr. Beach said that TVA had just discovered the
4 issue with the Atomic Energy Act?
5     A.    I recall something similar to that, yes.
6 I don't recall the -- I don't recall the particulars,
7 but that would have been the gist of it.
8     Q.    Do you recall Mr. Blust refuting that in
9 the phone call saying that the Atomic Energy Act did
10 not bar the closing because of the lack of transfer of
11 a construction permit?
12     A.    I recall Mr. Blust --
13         MR. AYLIFFE: Object to the form of the
14     question, but you can answer it.
15         THE WITNESS: In this entire --
16         MR. AYLIFFE: Are you asking about the
17     Atomic Energy Act or the construction permits?
18     Your question asked about the Atomic Energy Act
19     and then you asked about Mr. Blust.
20 BY MR. O'REAR:
21     Q.    The question was meant to be framed, did
22 you recall Mr. Blust refuting the statement made in the
23 call that the Atomic Energy Act barred the closing of
24 the transaction because of the failure to transfer the
25 construction permits prior to the closing?

Page 54

1  A.   I recall him saying, and it may have been
2  that call, it may have been a different call, that he
3  and his party had already looked at that issue, the
4  issue that we identified around the text of the Atomic
5  Energy Act.
6       I recall, and I don't remember if it was
7  the November 11th call or a different phone call, Mr.
8  Blust saying that yes, of course it would violate the
9  Atomic Energy Act, but it didn't matter because the
10 Atomic Energy Act didn't specify penalties for
11 violations of the Atomic Energy Act.
12 Q.   Mr. Blust said it would the violate the
13 Atomic --
14 A.   Yes.
15 Q.   -- Energy Act?
16 A.   He said of course it would violate the
17 Atomic Energy Act.
18 Q.   Did -- you said you didn't do much of the
19 talking on that call, is that correct?
20 A.   Yes.
21 Q.   Who did most of the talking for TVA?
22 A.   It was either Sherry Quirk or Cliff Beach
23 on that call or any other call.
24 Q.   Was there a discussion of the extension
25 of the closing date in that call?

Page 55

1  A.   On the November 11th -- no, excuse me,
2  November 15th call --
3  Q.   Yes.
4  A.   -- I believe the closing date had already
5  been extended to November 30th.
6  Q.   And that was an extension requested by
7  TVA, correct?
8  A.   I think so. I don't recall.
9  Q.   I'm referring to the request back on
10 August the 29th, 2018, to extend the closing date for
11 six months to May 14, 2019.
12 A.   Okay. I don't know if that came up
13 particularly on the November 15th call. I know that
14 was one of the subjects we discussed on -- in that
15 series of phone calls.
16 Q.   Do you recall Sherry Quirk stating in
17 that call that Bill Johnson was not inclined to grant
18 the six-month extension because of Nuclear
19 Development's efforts to get Memphis to leave TVA?
20      MR. AYLIFFE: Object to the form. Do you
21 mean the call on November 15th?
22      MR. O'REAR: Yes.
23      MR. AYLIFFE: You may answer if you
24 recall.
25      THE WITNESS: I don't recall her saying

Page 56

1  that. I don't recall her saying that in any of
2  the calls.
3       I do recall her saying that Bill Johnson
4  was not inclined to grant the extension, but I
5  couldn't say which phone call that was on.
6  BY MR. O'REAR:
7  Q.   Do you recall that you had a phone
8  conversation with Larry Blust four days later on
9  November 19, 2018, that involved Sherry Quirk, Cliff
10 Beach, and yourself and Mr. Blust?
11 A.   Subject to the same qualification I've
12 given, you know, that sounds -- it sounds like
13 something that happened. I don't recall specifically.
14 Q.   Do you recall that Sherry Quirk said in
15 that phone conversation that Bill Johnson had said that
16 both sides need to unwind the transaction?
17      MR. AYLIFFE: Object to the form, but you
18 can answer.
19      THE WITNESS: I don't remember her saying
20 that.
21 BY MR. O'REAR:
22 Q.   Do you ever recall her saying something
23 attributed to Bill Johnson whereby he said both sides
24 need to unwind the transaction?
25      MR. AYLIFFE: Object to the form. You

Page 57

1  can answer.
2       THE WITNESS: I don't recall that, no.
3  BY MR. O'REAR:
4  Q.   Did you ever receive any instruction to
5  find a way to unwind the transaction?
6       MR. AYLIFFE: Object to the form, and I'm
7  going to instruct you not to answer to the extent
8  that your response to that answer -- in answering
9  requires you to divulge information protected by
10 the attorney/client privilege, and any
11 instructions you received in the context of your
12 employment at the General Counsel's Office at TVA,
13 but to the extent you can answer that question
14 without divulging attorney/client privileged
15 information, you can answer the question.
16      THE WITNESS: I don't recall that, no.
17      MR. AYLIFFE: Are we at a good time for a
18 break?
19      MR. O'REAR: I'm about finished.
20      MR. AYLIFFE: Okay. Fair.
21 BY MR. O'REAR:
22 Q.   Are you -- are you currently monitoring
23 the Nuclear Development application for transfer of the
24 construction permits filed with the NRC?
25      MR. AYLIFFE: Object to the form. You

15 (Pages 54 - 57)

Page 58

1  can answer.
2      THE WITNESS: Yes.
3  BY MR. O'REAR:
4      Q.   Has TVA taken any position with the NRC
5  with respect to that application?
6      A.   No.
7      Q.   Has TVA made any comments to the NRC with
8  respect to that application?
9      MR. AYLIFFE: Object to the form. You
10     may answer.
11     THE WITNESS: Not to my knowledge.
12 BY MR. O'REAR:
13     Q.   Prior to the scheduled closing date on
14 November 30th, 2018, did you have any communications
15 with the NRC regarding the issue of the transfer of the
16 construction permits?
17     A.   Yes.
18     Q.   Tell us about that.
19     A.   I had a phone conversation with Brian
20 Harris who was an acting manager in the NRC's Office of
21 the General Counsel. We discussed the possibility of
22 proceeding to closing in escrow.
23          I asked him what the NRC's view of
24 closing in escrow would be, whether it would be
25 something they would have any objection to. He told me

Page 59

1  that it wasn't -- closing in escrow, real estate issues
2  generally are not things that the NRC's attorneys are
3  well versed in. They'd need time to consider it.
4          His initial view was that with placing
5  the plant in escrow, we might be ceding some quantity
6  of equitable title and the way he characterized that
7  was some amount of control over the plants to the
8  escrow agent, and he was concerned about whether we
9  could do that, which I took to mean that he was
10 concerned that there was a small iota of control that
11 we would cede, that he would necessarily be concerned
12 if we were to proceed to closing without having
13 obtained the NRC's approval.
14     Q.   When did this conversation occur?
15     A.   I don't recall the exact date. It was
16 the first part of November.
17     Q.   Did you keep notes of that conversation?
18     A.   Yes.
19     Q.   Do you still have those notes?
20     A.   Yes.
21     Q.   Did Mr. Harris in that conversation, ever
22 say that the NRC would object to the closing of the
23 transaction even though the construction permits had
24 not yet been transferred?
25     MR. AYLIFFE: Object to the form. Lacks

Page 60

1  foundation, but you can answer.
2      THE WITNESS: No, he didn't say that. He
3  said as I indicated, he expressed concern about
4  TVA transferring any level of control over the
5  plants, which as I said, naturally follows that he
6  would be concerned about transferring total
7  control over the plants, and he did tell us that
8  NRC headquarters was watching the transaction and
9  wondering what we were going to do.
10 BY MR. O'REAR:
11     Q.   Okay. Did you have any further
12 communications with him before the closing date of
13 November 30, 2018?
14     A.   No.
15     Q.   Have you had any since?
16     A.   No.
17     Q.   So you had one conversation on this topic
18 with the NRC?
19     A.   Yes.
20     Q.   All right. Are you aware of any other
21 TVA representative having communications with the NRC
22 on this topic?
23     A.   No.
24     MR. AYLIFFE: Object to the form. Take
25     your time. You can answer.

Page 61

1      THE WITNESS: No.
2  BY MR. O'REAR:
3      Q.   I may have already asked this, but let me
4  ask it this way.
5           Did you have any other conversations with
6  any representatives of the NRC regarding the license
7  transfer issue or the closing of the sale of Bellefonte
8  other than that one communication you just described
9  with Brian Harris?
10     MR. AYLIFFE: Object to the form. You
11     can answer.
12     THE WITNESS: No.
13     MR. O'REAR: I think that's all I have,
14     but I'd like to look at my notes and go back on
15     the record after a break.
16     MR. LEMBKE: Okay.
17     THE VIDEOGRAPHER: The time is 3:39.
18     We're going off the record.
19     (Recess taken.)
20     THE VIDEOGRAPHER: Okay. The time is
21     3:45. We're back on the record.
22 BY MR. O'REAR:
23     Q.   Did you have any communications with any
24 of the TVA board members about the issue of the
25 construction permit transfer?

16 (Pages 58 - 61)

**Page 62**

1   MR. AYLIFFE: I'm going to instruct you
2   not to answer that question to the extent it calls
3   for attorney/client information. If it doesn't,
4   you can answer.
5        THE WITNESS: I did not communicate
6   directly with any members of the TVA board.
7   BY MR. O'REAR:
8   Q.   Well, did you communicate indirectly with
9   members of the TVA board?
10       MR. AYLIFFE: Same instruction. You may
11  answer it if you can.
12       THE WITNESS: I don't understand. What
13  do you mean by "communicating indirectly"?
14  BY MR. O'REAR:
15  Q.   I don't understand what you meant by "I
16  didn't directly have any communications with them".
17  A.   Well, I didn't -- I didn't have a
18  conversation with a TVA board member. I didn't have an
19  e-mail or any kind of correspondence with them.
20  Q.   Okay. Or with the board itself?
21  A.   Correct.
22  Q.   Or at a board committee meeting?
23  A.   Correct. I don't typically communicate
24  at board committee meetings.
25  Q.   All right.

**Page 63**

1        MR. O'REAR: That's all the questions I
2   have. I reserve the right to recall the witness
3   in the event that objections with respect to
4   privilege information were deemed to be not well
5   taken.
6        MR. AYLIFFE: I just have one question.
7   EXAMINATION BY MR. AYLIFFE:
8   Q.   Mr. Chandler, do you recall during Mr.
9   O'Rear's examination he asked you about when it was
10  first -- the issue was first raised with regard to the
11  legality of the closing and I think you mentioned the
12  summer of 2018 in your answer.
13       Do you recall that?
14  A.   Yes.
15  Q.   Okay. And what issue did you raise?
16  A.   I raised a concern that closing without
17  the NRC's approval would violate the terms of TVA's
18  construction permits.
19  Q.   Any other issue that you raised at that
20  time in the summer of 2018?
21  A.   No.
22       MR. AYLIFFE: No further questions.
23  EXAMINATION BY MR. O'REAR:
24  Q.   Again, when was that in the summer of
25  2018?

**Page 64**

1   A.   I don't recall exactly when. It was
2   sometime during the summer.
3   Q.   How did you raise that issue?
4        MR. AYLIFFE: So I'm going to instruct
5   you not to answer to the extent that calls for
6   information protected by the attorney/client
7   privilege, but if you can answer without violating
8   the privilege, you may answer.
9        THE WITNESS: I had a conversation with
10  Cliff Beach. I don't think I can communicate
11  anything else without violating -- revealing
12  attorney/client privileged information.
13       MR. O'REAR: Okay. That's all I have.
14       MR. AYLIFFE: Nothing further. Read and
15  sign.
16       THE VIDEOGRAPHER: The time is 3:47.
17  This marks the end of this deposition. We're
18  going off the record.
19       FURTHER THIS DEPONENT SAITH NOT.
20       (The deposition concluded at 3:47 p.m.)

**Page 65**

1            C E R T I F I C A T E
2   STATE OF TENNESSEE
3   COUNTY OF KNOX
4        I, Georgette H. Mitchell, Registered
5   Professional Reporter, Licensed Court Reporter #55 and
6   Notary Public, do hereby certify that I reported in
7   machine shorthand the deposition of CHRISTOPHER
8   CHANDLER, called as a witness at the instance of the
9   Plaintiff, that the said witness was duly sworn by me;
10  that the reading and subscribing of the deposition by
11  the witness was not waived; that the foregoing pages
12  were transcribed under my personal supervision and
13  constitute a true and accurate record of the deposition
14  of said witness.
15       I further certify that I am not an attorney or
16  counsel of any of the parties, nor an employee or
17  relative of any attorney or counsel connected with the
18  action, nor financially interested in the action.
19       Witness my hand and seal this the 6th day of
20  November, 2019.
21
22       *Georgette H. Mitchell*
           Georgette H. Mitchell
23         Registered Professional
           Reporter, Licensed Court
24         Reporter 55, LCR expires
           6-30-20 and Notary Public
25         My Commission Expires:
           February 2, 2020

Page 66

1  To: Matthew H. Lembke, Esq.
2  Re: Signature of Deponent Chris Chandler
3  Date Errata due back at our offices: 12/6/2019
4
5  Greetings:
6  This deposition has been requested for read and sign by
   the deponent.  It is the deponent's responsibility to
7  review the transcript, noting any changes or corrections
   on the attached PDF Errata.  The deponent may fill
8  out the Errata electronically or print and fill out
   manually.
9
10 Once the Errata is signed by the deponent and notarized,
   please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
   and forward to the taking attorney to file with the
13 original transcript.  We will also send copies of the
   Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
   to readandsign@veritext.com
19 or mail to
20 Veritext Production Facility
21 2031 Shady Crest Drive
22 Hoover, AL 35216
23 205-397-2397
24
25

Page 67

1  ERRATA for ASSIGNMENT #3531758
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7  (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24
25

Page 68

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16
17
18      _____
        DEPONENT'S SIGNATURE
19
   Sworn to and subscribed before me this ___ day of
20
   _____, _____.
21
22 _____
23 NOTARY PUBLIC / My Commission Expires:_____
24
25

18 (Pages 66 - 68)