FILED

2020 Oct-28  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT PP

**Page 1**

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ALABAMA

3              NORTHEASTERN DIVISION

4

5   NUCLEAR DEVELOPMENT, LLC,   |

6        Plaintiff,            |

7   -vs-                       | CIVIL ACTION CASE NUMBER

8   TENNESSEE VALLEY AUTHORITY  | 5:18-cv-01983-LCB

9        Defendant             |

10   _____|_____

11

12

13         Zoom Deposition of Stephen G. Burns

14                  Baltimore, MD

15              Wednesday August 19, 2020

16                    10:00 a.m.

17

18   Job No:  J5882449

19   Pages:  1-349

20   Reported by:  Kenneth Norris

21

**Page 2**

1        Deposition of Stephen G. Burns

2        Taken via Zoom

3

4

5

6

7

8

9

10        Pursuant to Notice, before Kenneth Norris, a

11   Professional Reporter and Notary Public in and for the

12   State of Maryland.

13

14

15

16

17

18

19

20

21

**Page 3**

1   APPEARANCES:

2   ON BEHALF OF THE PLAINTIFF:

3   CAINE O'REAR III, ESQUIRE and

4   LARRY D. BLUST, ESQUIRE

5   (Appearing via Zoom Hookup)

6        Hand Arundall Harrison Sale LLC

7        P.O. Box 123

8        Mobile, AL 36601

9        Telephone(251)432-5511

10        E-mail:  corear@handfirm.com

11

12

13   ON BEHALF OF THE DEFENDANT:

14   MATTHEW H. LEMBKE, ESQUIRE

15   (Appearing via Zoom Hookup)

16        Bradley, Arant, Boult, Cummings LLP

17        1819 5th Avenue North

18        Birmingham, AL 35203

19        Telephone(817)870-1717

20        E-mail:  dluningham@watsoncaraway.com

21

**Page 4**

1   ON BEHALF OF THE DEFENDANT, TENNESSEE VALLEY

2   AUTHORITY:

3   STEVEN C. CHIN, ESQUIRE

4   (Appearing via Zoom Hookup)

5      Office of the General Counsel

6      Tennessee Valley Authority

7      400 West Summit Hill Drive, WT6

8      Knoxville, Tennessee 37902

9      Telephone(817)870-1717

10      E-mail:  scchin@tva.gov

11

12

13

14

15

16

17

18

19

20

21



Page 5

CONTENTS

1
2   EXAMINATION OF Stephen G. Burns                        Page
3       By Mr. O'Rear III0                               8,324
4       By Mr. Lembke                                      342
5
6
7
8
9
10  Exhibits                                               Page
11  Exhibit  82   Letter dated November 13,                 54
12                2018 from Nuclear Development
13                Containing the application for
14                An order approving the
15                Construction permit transfers
16  Exhibit 200   E-mail exchange                           73
17  Exhibit 202   Deposition of James Chardos              138
18  Exhibit 122   Expert report: Belleforte                149
19                Nuclear power plant-NRC
20                Requirements
21  Exhibit 203   42 USC Section 2014, the                 165

Page 6

1                 Definition section of the
2                 Atomic Energy Act
3   Exhibit  204  Nuclear Regulatory Commission           165
4                 Improvements for Production and
5                 Utilization Facilities
6                 Transitioning to Decommissioning
7   Exhibit  205  10 CFR 50.5                              201
8   Exhibit  132  Zimmer decision                         242
9   Exhibit  130  Letter dated 9/14/2006 from             251
10                Ms. Haney to Mr. Singer
11  Exhibit  131  One-paged document dated                252
12                February 18, 2009
13  Exhibit  206  Letter from TVA to the NRC              257
14                Dated April 6th, 2006
15  Exhibit  207  Letter from TVA to the NRC              261
16                Dated June 29, 2006
17  Exhibit  208  Letter dated 8/22/2006 from             272
18                The NRC to Mr. Singer at TVA
19  Exhibit  129  Proposal on decommissioning             294
20  Exhibit  201  Letter from Stephen Burns               297
21  Exhibit   14  E-mail from Chris Chandler to           308

Page 7

1                 Tim Matthews, dated
2                 October 18, 2018
3   Exhibit 210   Speech presented by Stephen Burns   310
4                 Dated April 30th, 2015
5   Exhibit 211   Speech presented by Stephen Burns   313
6                 Dated March 8th, 2016
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 8

1            P R O C E E D I N G S
2   Whereupon,
3            Stephen G. Burns
4   A witness of lawful age, after being duly sworn to
5   tell the truth, the whole truth and nothing but the
6   truth, testified as follows:
7            EXAMINATION:
8   BY MR. O'REAR:
9       Q.  Good morning, Mr. Burns.
10           MR. LEMBKE:  Let me note for the record we
11  reserve the right to read and sign.
12           And am I correct that this is not being
13  recorded by video?
14           MR. O'REAR:  That's correct.
15           MR. LEMBKE:  Okay.
16  BY MR. O'REAR:
17      Q.  Good morning, Mr. Burns.  My name's Caine
18  O'Rear.  I represent Nuclear Development in this
19  lawsuit.  How are you doing?
20      A.  Great, thanks.
21      Q.  Why don't you state your full name for us?



Page 9
1    A.  My name's Stephen Gilbert Burns.
2    Q.  And where are you located right now?
3    A.  I'm in my home at -- or apartment at 3016
4  Tilden Street Northwest, Washington, D.C., 20008.
5    Q.  Is that your permanent residence?
6  A.  It is.
7    Q.  Do you have any other residences?
8  A.  No.
9    Q.  What was your address when you worked with
10  the NRC?
11    A.  Well, my address when I was a commissioner
12  was this address.  Although I bought this apartment in
13  late 2000- -- or late 2014.  And for about
14  three months I was living with some friends in the
15  area.  But when I was at the NRC as an attorney and
16  when I retired in 2012, I had been at my residence in
17  Silver Spring, Maryland from about 1988 through
18  2012 -- through 2012.  Excuse me.
19    Q.  Okay.  Well, my question really was
20  intended -- what was your business address when you
21  were at the NRC?

Page 10
1    A.  Well, my business address would have been at
2  the NRC headquarters which is 11555 Rockville Pike,
3  Rockville, Maryland.  And I'm a little uncertain of
4  the zip code.  I think it's 20852.
5    Q.  But did you have an office there for the
6  entire time you were with the NRC?
7  A.  Yes.  From -- basically from 1988 on.
8  Before then, the NRC -- when I first started working
9  for the NRC, the agency was spread out over about 12
10  buildings.  I was working in a building in Bethesda,
11  Maryland.
12      And then when I worked for -- was an
13  assistant to one of the commissioners in the late
14  '80s, I worked from the commission -- the commission's
15  headquarters which was at 1717 H Street Northwest.
16    Q.  Okay.  Thank you.  Have you ever given a
17  deposition?
18    A.  I think so, but it's been about 25 or
19  30 years.
20    Q.  Have you ever taken a deposition?
21    A.  Yes.  And that's been longer ago than that.

Page 11
1  It's probably about 35 years since I took a
2  deposition.
3    Q.  Okay.  But you're familiar with the rules of
4  a deposition, how they proceed?
5    A.  Generally yes, I would say so.
6    Q.  Do you have any questions for me before we
7  begin your examination?
8      MR. LEMBKE:  Object.  I mean, that's a vague
9  question.
10  BY MR. O'REAR:
11    Q.  Okay.  Did you -- that's fine.
12      Let's talk about your experience at the NRC
13  briefly.
14      I note you received your law degree in 1978
15  and then you went to work right out of law school for
16  the NRC.  Is that correct?
17    A.  That's correct.
18    Q.  And in looking at Exhibit 199 -- do you have
19  that before you?
20    A.  Yes.
21    Q.  Is that your report that you presented in

Page 12
1  this case?
2    A.  Yes, it is.
3    Q.  And do Paragraphs 2, three, four and five
4  describe your experience at the NRC?
5    A.  Yes, at the NRC.  But I -- yes, yes, yes.  I
6  think it also talks about my experience at the
7  Organization For Economic Development and Cooperation,
8  a nuclear energy agency in Paris.
9    Q.  All right.  Generally it looks like you had
10  various positions at the NRC from 1978 through 1994.
11  And that in 1994, you became associate general
12  counsel.  Is that correct?
13    A.  That's correct.
14    Q.  Did you have any particular area of
15  responsibility when you were associate general
16  counsel?
17    A.  Yes.  Basically I was responsible for the
18  legal staff who provided advice and representation to
19  staff supporting the technical offices, the Office of
20  Nuclear Reactor Regulation, Nuclear Materials Safety
21  and Safeguards as well as the personnel in contracting



Page 13

1 matters, so the administrative side.

2    Q.   Okay.  So are you limiting your answer --

3 was it all administrative or are you saying it was

4 both?

5    A.   No, it was both.

6    Q.   So it would be the staff and administrative?

7    A.   Staff and administration.

8         That -- hence the title.  You can see it in

9 the title of associate general counsel for hearings

10 and enforcement and administration.

11    Q.   Then you became deputy general counsel in

12 1998?

13    A.   Correct.

14    Q.   Served in that position until March of 2009.

15 Is that correct?

16    A.   March.  It may have been April 2009, into

17 April.

18    Q.   What was your area of responsibility as

19 deputy general counsel?

20    A.   As deputy general counsel I was the --

21 basically the chief advisor to the executive director

Page 14

1 for operations at the NRC, who is the senior staff

2 person who has -- he's like the chief operating

3 officer at the NRC.  He was responsible for almost all

4 of the -- all of the technical offices as well as

5 personnel, administration, things like that.  So I was

6 his chief legal advisor providing legal support.

7         I also -- and because of the need to

8 maintain separation of functions within the Agency on

9 adjudicatory matters, I was basically the senior

10 counsel who oversaw the staff, the legal staff who

11 represented the technical offices in NRC

12 adjudications.

13         We had to do that because the general

14 counsel would be the advisor to the Commission which

15 often would sit in an adjudicatory role.

16    Q.   And who was the executive director of

17 operations when you were deputy general counsel?

18    A.   When I was deputy general counsel, there

19 were several -- several -- I think there was Joseph

20 Talon and it was followed by -- I'm losing it.  It's

21 Bill -- he wound up over at the UAE.  I can't remember

Page 15

1 his name offhand.

2         And then there were others; Luis Raez and

3 Bill Borchard and -- yeah, I think Bill Borchard was

4 still with EDO when I left in 2012, or when I was

5 deputy -- up through my deputy service.

6    Q.   Then you served as general counsel from

7 2009 -- April 2009 to April 2012?

8    A.   That's correct.

9    Q.   Okay.  Were you appointed as general

10 counsel?  How did that occur?

11    A.   Yes.  The commission has the responsibility

12 for appointing the general counsel.  So it's

13 basically, it's a vote of the commissioners.  You're

14 nominated by the chairman and then a majority has to

15 approve you in that position.  It's one of several

16 positions within the Agency that require that kind of

17 appointment.

18    Q.   And when you were appointed, was it for a

19 specific term or was it an indefinite term?

20    A.   No, it was indefinite.

21    Q.   And then you left.  Why did you leave in

Page 16

1 April of 2012?

2    A.   I left to take the position at the OCD, the

3 nuclear reactor agency in Paris.  A friend of mine who

4 was the deputy director general there had encouraged

5 me to apply.  I had done some work with them.  It

6 sounded like an interesting opportunity, so I decided

7 to apply.  I was offered the position.  And so I

8 retired from federal service at that time and I left.

9    Q.   And so you made the Paris stand.  Is that

10 right?

11    A.   That's correct.

12    Q.   All right.  And that was a political

13 appointment, is that correct?

14    A.   No, that's not a political appointment.

15    Q.   Then how were you selected for that

16 position?

17    A.   As the head of legal affairs in Paris?

18    Q.   Yes.

19    A.   Okay.  I was -- I applied for the position.

20 So I submitted an application into the OECD.  I was

21 interviewed for it and then I was selected by -- you



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020

17–20

Page 17

1   go through an interview process.  Then I think I was

2   selected by the director general or deputy director

3   general.

4       Q.   And then you became a commissioner on

5   November the 5th, 2014?

6       A.   That's correct.

7       Q.   And that is a political appointment,

8   correct?

9       A.   Political appointment.  You're nominated by

10  the president and must be confirmed by the center.

11      Q.   You were nominated by President Obama?

12      A.   That's correct.

13      Q.   Okay.  You served as commissioner through

14  April 30th, 2019, correct?

15      A.   Correct.

16      Q.   Is the full term a five-year term?

17      A.   The full term is a five-year term, but -- so

18  my term would have gone through June 2019.  However,

19  depending on the appointment process, you may never --

20  many commissioners do not serve a five-year term.

21          For example, the term I went into had

Page 18

1   started running in July of 2014.  But I wasn't

2   confirmed until -- I wasn't even nominated until late

3   July 2014, and then I was confirmed sometime in

4   September, in mid-September.  And then I worked out

5   when I would start service because I had to wrap

6   things up in Paris in my old position.

7       Q.   So the term was for a place and not

8   necessarily for an individual.  Is that correct?

9       A.   That's correct.  That's correct.

10      Q.   Who was chairman of the Commission when you

11  were appointed commissioner?

12      A.   Allison Macfarlane.

13      Q.   And was she chairman the entire time before

14  you became chairman?

15      A.   I'm not sure I understand.  From what -- I

16  need to understand the point in time.

17      Q.   Okay.  You became chairman at January of

18  2015?

19      A.   Correct.

20      Q.   Between November 2014 and January 2015, she

21  was the chairman.  Is that correct?

Page 19

1       A.   That is correct.

2       Q.   And then what was the reason for her leaving

3   the chairmanship at that time?

4       A.   She ended her service as a commissioner.

5   She had taken a full time position on the faculty of

6   one of the schools at the George Washington

7   University.

8       Q.   And you served as chairman until January of

9   2017, correct?

10      A.   Yes.

11      Q.   And who became chairman after you?

12      A.   Christine Svinicki.  I can spell it.

13      Q.   Spell it for the court reporter.

14      A.   It's S-V-I-N-I-C-K-I.

15      Q.   And was she chairman at the time you left

16  the Commission?

17      A.   Yes, and she still is the chairman.

18      Q.   What were you engaged to be an expert

19  witness in this case?

20      A.   It would have been in March of this year.

21      Q.   Okay.  So that would be approximately

Page 20

1   10 months after you left the NRC?

2       A.   Yes.  That's about right.

3       Q.   Are you a member of any bar association?

4       A.   I'm a member of the District of Columbia

5   Bar.

6       Q.   Are you a member of any other bar, of any

7   Court?

8       A.   I was admitted to the D.C. Circuit Court of

9   Appeals and the D.C. Court Of Appeals but I've never

10  appeared before either of them.

11          Oh, I see -- correct that.

12          My name's been on briefs in front of the

13  D.C. circuit as general counsel.

14      Q.   But you're currently a member of the D.C.

15  bar.  Is that correct?

16      A.   I'm an active member of the D.C. bar.

17      Q.   And are you licensed to practice law in

18  Alabama?

19      A.   No, I am not.

20      Q.   Have you ever served as an expert witness in

21  other cases?



Page 21

1    A.   No, I have not.

2    Q.   And when I say case, either judicial or

3    administrative?

4    A.   No, I have not.

5    Q.   While you were at the NRC, did you ever

6    personally work on any construction permit transfer

7    application?

8    A.   I don't have a particular recollection of

9    working on a construction permit transfer application.

10   I did work on issues related to construction permits

11   and enforcement matters related to the oversight of

12   construction.

13   Q.   When you were at the NRC, did you ever

14   personally work on any operating license transfer

15   applications?

16   A.   Yes, I did work on some of those.

17   Q.   Tell us about those.

18   A.   Some of those involved a -- well, some of

19   them were what I would call more usual transfers and

20   the others arose out of bankruptcy proceedings.  I can

21   recall, for example, bankruptcy proceedings involving,

Page 22

1    for example, small cooperatives who had gone into

2    reorganization, and because they might be either

3    leaving the licensure or the licensing framework over

4    which they were controlled or because they were

5    reorganized into a new entity, that would require NRC

6    review and approval.

7    Q.   Did you work on any operational license

8    transfer applications involving a transfer from one

9    entity to another pursuant to the negotiated contract?

10   A.   I don't -- I don't know.  Because usually

11   when we are reviewing the transfer, we're not so much

12   looking at the underlying contract.  We're looking

13   at --

14   Q.   Are you aware of one that involved an

15   underlying contract whether you looked at it or not?

16   A.   I'm sorry.  Repeat.

17   Q.   Were you involved in any such transaction

18   involving an operational licence transfer pursuant to

19   a negotiated contract between the parties whether you

20   looked at the contract or not?

21   A.   Well, I think that the answer would be yes

Page 23

1    because many of them would have been.

2    Q.   Okay.  Do you recall any at this point?

3    A.   I don't have a particular recollection of

4    particular cases because this would have been some

5    time ago.

6    Q.   Can you tell us what the duties of the

7    commissioners of the NRC are?

8    A.   The basic duties of the commissioner are,

9    you can encapsulate them in three concepts; policy

10   making, rule making and adjudication.  Those are the

11   basic responsibilities in terms of the those types of

12   matters that would come up to the Commission.

13   The other thing would be in some areas with

14   respect to administration.  As I noted before in my

15   appointment as general counsel, that is a duty or a

16   power of the commissioners, to appoint certain

17   officials.

18   That's the duties of the commissioner.

19   Q.   Now, with respect to all three of the

20   duties; you said policy formation, rule making and

21   adjudications.  Could each of those include issues

Page 24

1    involving licensing?

2    A.   Yes.  And that -- that's what -- in a sense

3    that's what an adjudication encapsulates.  So yes,

4    commissioners do have responsibility for licensing but

5    that is generally at a high level, it's not day to day

6    administration of a licensing -- requests or transfer

7    request or things like that.

8    Q.   Describe the adjudication process -- the

9    administrative adjudication process within the NRC.

10   A.   Under the Atomic Energy Act, basically in

11   Section 189, it describes those actions of the

12   Commission which are subject to a potential hearing,

13   and that basically licensing and whether that's for

14   nuclear reactors or materials, radioactive --

15   materials licensees or users of radioactive material.

16   In some instances, for example, in the

17   initial issuance of a construction permit or a

18   combined -- under the newer process, a combined

19   license, the statute requires a hearing.  In fact in

20   those circumstances, the Commission itself in recent

21   years has held that man -- so called mandatory



Page 25

1  hearing.

2       But otherwise what you have is a process

3  which the NRC will issue a notice of certain licensing

4  actions, it will invite potential hearings or request

5  for a hearing and in a licensing matter, typically

6  that's going to be what we call an intervener or

7  public interest group.  It might be a State or a local

8  government who have issues that they want to have

9  heard at that -- in that proceeding.

10      The Commission -- in the adjudicatory

11  process you also have enforcement actions and certain

12  enforcement actions, particularly civil penalties and

13  orders carry with it an opportunity for hearing.  And

14  most of -- enforcement hearings in that -- in those

15  circumstances would be one where the hearing has been

16  requested by a licensee who's subject to the order,

17  who objects to the order, objects to the sanction.

18      Q.   Now, are these hearings before the

19  Commission?

20      A.   Not all of them.  Most of it -- the

21  Commission has -- the Atomic Safety and Licensing

Page 26

1  Board, which is a panel of judges -- administrative

2  judges that are within the Agency.  It's combined of

3  both lawyers and technical people, and they're the

4  ones for the most part who carry out in effect the

5  trial level hearing.

6       The Commission is in effect the appellate

7  body within the Agency and so may hear appeals from --

8  from decisions of the board by the various parties.

9       As I said, though, perhaps the one exception

10  to referring those hearing requests to a license or a

11  hearing originating before the licensing board is with

12  respect to the so called mandatory hearing required

13  with -- under either a construction permit or under

14  the combined license, under 10 CFR 50.2.

15      Q.   And what hearings are mandatory regarding

16  construction permits?

17      A.   Could you repeat that?

18      Q.   Yes.  What are the issues that require a

19  hearing on a construction permit?

20      A.   There's no specific set of issues that's

21  required.  The statute -- and this goes back -- back

Page 27

1  to the -- actually the late 1950s and it was modified

2  around 1962 -- is that the statute requires the Agency

3  to hold a hearing.  It doesn't say what it needs to

4  be.

5       Now, in practice what has happened with the

6  mandatory hearing processes is that the Agency has

7  focused on certain aspects of the application that

8  might be interesting.  For example, I can think of --

9  I think maybe it was with one of the Vogtles or the

10  Summer plant where -- which were using the AP 1000

11  design.

12      The AP 1000 design, the baseline design is I

13  think for a less seismically active area than the

14  areas where Vogtle and Summer were located.  So I

15  think one of the issues -- if I recall one of the

16  issues was decided it would be interesting to hear at

17  the so called mandatory hearing, would be how the

18  seismicity parameters were adjusted to adapt to the

19  standard design of the AP 1000.

20      But again, the issues can be -- they can be

21  offered up by the staff or I think even the applicant

Page 28

1  can know the process.  And again, this is in effect a

2  non-contested type hearing but it's required to be

3  done under the staff.

4       Q.   Were there any hearings regarding

5  construction permits at Bellefonte?

6       A.   Yes, there were as I recall from looking at

7  the history of the plant.

8       Q.   Were you involved in any of those?

9       A.   No, that was before I came to the NRC.

10      Q.   So that was before 1978?

11      A.   Correct.

12      Q.   That was with respect to the original

13  issuance of the construction permit?

14      A.   That's correct.

15      Q.   Would that have been about in 1974?

16      A.   Yes.  Since 1974.  And I believe my report

17  references the decision of the licensing board and the

18  -- in effect the sewage plant review of the -- system

19  appeal board on the Bellefonte permit.

20      Q.   Are you aware of any other hearings relating

21  to the Bellefonte construction permit?



Page 29

1    A.  No. I think the only -- I don't know of any
2  hearings that were actually conducted. I think there
3  were challenges to the reinstatement of the
4  construction permit in, I think that was in 2009 --
5  2008 or 2009.  But -- and I think -- but I think those
6  were dismissed for basically either lack of standing
7  or lack of acceptable contention.
8    Q.  Is the NRC an independent regulatory
9  Commission of the federal government?
10   A.  Yes, it is.
11   Q.  Is it required by law to be independent of
12  the entities that it regulates?
13   A.  Yes, it is.  And it's structured that way.
14   Q.  And the NRC regulates TVA's activities with
15  respect to its nuclear related facilities.  Is that
16  correct?
17   A.  Correct.
18   Q.  And do you say, is the NRC independent of
19  TVA?
20   A.  Yes, it is.
21   Q.  You mentioned enforcement actions as part of

Page 30

1  the adjudication process.  Who handles the enforcement
2  actions as the prosecutor of sorts?
3    A.  The process, it can depend on the level of
4  the action, enforcement action taken.
5      There is an Office of Enforcement that
6  reports to the executive director for operations and
7  that office coordinates with regional offices and with
8  the program offices, that would be Nuclear Reactor
9  Regulation and Nuclear Material Safety and Safeguard.
10     But in a number of instances, so that the
11  level of an action may be taken by a different level
12  official.  So historically I'd notice a violation if
13  it were identified in an inspection carried out by a
14  regional office; one of the four regional offices.
15  And  would be issued by the regional office, an
16  official in that regional office.
17     Civil penalty, this has changed over the
18  years since I was sort of directly counsel.  But I
19  think the civil penalties are often issued through the
20  Office of Enforcement.
21     Orders may be issued by the directors of the

Page 31

1  program offices.  They may be, for example, the
2  director of NRR might issue an order for a violation
3  or to address violations or poor performance but the
4  director also can impose new requirements based on a
5  perception of the need to act according to safety.
6      But for the most part, those actions are
7  taken at a staff level.  There may be some instances
8  in which there's a communication or coordination with
9  the Commission.
10   Q.  What is the role of the director of Nuclear
11  Reactor Regulation in the enforcement process?
12   A.  Again, it depends on what the nature of the
13  enforcement -- the violation may be.
14     I would say my understanding is that if you
15  have a violation coming out of an inspection, those
16  are generally going to be handled through regional
17  office that was responsible for the inspection.
18     Where the NRR may have a view on it, and so
19  staff -- there may be staff interaction, at the staff
20  level within NRR.  The director would probably be
21  informed at more significant levels.

Page 32

1      And under what's called the reactor
2  oversight process, which is a -- it's basically the
3  approach that the NRC has taken to oversight and
4  enforcement of reactors -- basically operating
5  reactors since about 2001.  The director is involved
6  with like an annual assessment process about how the
7  -- how a reactor, operating reactors are doing.  And
8  so he or she would have impact or input into that
9  evaluation as to whether or not in heightened scrutiny
10  it's warranted because of poor performance at a
11  reactor site.
12   Q.  And then, you used the term "order" earlier.
13  Is that a term of art within the Agency?
14   A.  Well, I don't think so.  I don't think so.
15  The -- I think the provision for orders are in Section
16  2.202 of the 10 CFR.
17     And so what it talks to -- when I use the
18  term "order," I'm often referring to it can be an
19  order to modify, suspended or revoke a license or to,
20  as the other area I mentioned, it might be the
21  circumstance in which you are imposing a new



Page 33

1  requirement to address some safety issue, or you might
2  be requiring the licensee to undertake some study or
3  evaluation and report back to the Agency.
4      Q.  Well, is "order" a term for the disposition
5  of an enforcement matter?  In other words, it can be
6  any disposition.  Is that correct?
7      A.  No.  No, I would not agree with that.  It is
8  a high level -- if you want to use the word
9  "sanction," it's a high level sanction.
10       It is typically and perhaps in this respect,
11  I really don't know that it's a "term of art."  But it
12  is typically used, an order is issued to modify,
13  suspend or revoke a license, or for such other action
14  that may be appropriate.
15       So, for example, you do not issue a notice
16  of violation by -- typically by an order if there's no
17  additional sanction other than noting a violation.
18      Q.  Can the director of Nuclear Reactor
19  Regulation issue orders?
20      A.  Yes.  Since the beginning of my career there
21  at the NRC, that has been a function of the director

Page 34

1  -- of the director.
2      Q.  When that director issues an order or a
3  decision, is that order or decision considered a rule
4  of the Commission?
5      A.  Well, the order has legal effect.
6      Q.  No.  Is it considered a rule?
7       MR. LEMBKE:  Wait a moment.  You didn't let
8  him finish his answer, Caine.  You need to let him
9  finish his answer before you ask your next question.
10       THE WITNESS:  Well, as I say, I would -- an
11  order is an enforceable sanction or an enforceable
12  requirement on a licensee.  But this is, I think in a
13  classic administrative law dichotomy, you have rules
14  and you have orders.  They both have legal effect.
15  BY MR. O'REAR:
16      Q.  But the order is not a rule of the
17  Commission.  Is that correct?
18      A.  No, I would not characterize it as a rule.
19  But it still has legal effect.
20      Q.  And when a director issues an order, that --
21  the director is not engaging in rulemaking for the

Page 35

1  Commission.  Is that correct?
2      A.  No.  It's focused on sanctioning or imposing
3  requirements on a particular licensee or a set of
4  licensees.  And in my experience, there have been
5  circumstances in which the entire set of licensees in
6  a particular area have received an order.
7      Q.  But I asked you if that was correct, and you
8  said no.  So let me restate it.
9       The issuance of an order by a director such
10  as the director of Nuclear Reactor Regulation is not
11  part of the rulemaking process of the Commission.  Is
12  that correct?
13      A.  I would agree that it is not undertaken
14  through the rulemaking process.
15      Q.  And an order issued by a director is not
16  action by the Commission.  Is that correct?
17      A.  No, I wouldn't agree with that.  From the
18  standpoint the director has delegated authority from
19  the Commission to act on matters that are within the
20  director's jurisdiction.
21      Q.  Well, orders issued by directors can be

Page 36

1  taken to the Commission.  Is that correct?
2      A.  They can be appealed to the -- well, they
3  can be appealed to the Commission if a third party or
4  a licensee challenges it.  And they would be taken to
5  the Commission typically after the opportunity for
6  hearing before an atomic safety and licensing board.
7      Q.  But unless there is an appeal to the
8  Commission, an order of the director is not action by
9  the Commission.  Is that correct?
10      A.  By the commissioners themselves.  It's not
11  action by the commissioners themselves.  It stands as
12  a valid action of the Nuclear Regulatory Commission.
13      Q.  Have you ever visited the Bellefonte site?
14      A.  No, I have not visited the Bellefonte site.
15      Q.  When you were working as an attorney for the
16  NRC, did you ever work on any matters related to the
17  Bellefonte site?
18      A.  I think when I was deputy general counsel, I
19  may have been aware -- made aware and spoken with my
20  staff with regard to the Bellefonte -- the TVA's
21  decision to at that point withdraw the construction



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020
37—40

Page 37

1  permit in whatever -- in the 2005, 2006 time frame.
2       As general counsel, I was probably -- I have
3  some recollection of speaking with my staff at that
4  time when the legal staff reported to me, when the --
5  when TVA had initiated the steps to reinstate the
6  permit. And in fact, the NRC staff, I don't know
7  whether it was signed by the director of Nuclear
8  Reactor Regulations or it may have been signed by the
9  executive director for operations, came to the
10 Commission and in that circumstance asked the
11 Commission to reflect its view that it thought it was
12 a lawful and an appropriate step to reinstate the
13 permit.
14      And so, I would have been aware of that and
15 I may have been consulted by some of the commissioners
16 on it at the time.
17      Q.  You said this was when you were general
18 counsel?
19      A.  Correct. So this was sometime -- I think it
20 was in the 2009 time frame.
21      Q.  Have you been involved in any other matters

Page 38

1  regarding the Bellefonte plant while you were at the
2  NRC?
3       A.  Not that I'm aware of.
4       Q.  What matters were pending before the NRC
5  while you were there that you may have had official
6  responsibility for but did not personally participate
7  in?
8       MR. LEMBKE:  Objection to the form, vague. `
9  BY MR. O'REAR:
10      Q.  Well, do you recall any matters at the NRC
11 that you may have had supervisory or official
12 responsibility over but did not personally participate
13 in that related to the Bellefonte plant site?
14      A.  In what time frame?
15      Q.  At any time you were there.
16      A.  Other than the two I mentioned; the initial
17 withdrawal of the permit and then the request for
18 reinstatement, I had no other supervisory
19 responsibility -- or I don't recall any particular
20 matters.
21      Q.  Did the reinstatement of the construction

Page 39

1  permits for Bellefonte go before the Commission?
2       A.  The staff consulted with the
3  Commission and the Commission voted on the
4  reinstatement. And I believe there was also an
5  adjudicatory challenge, I think. I think the Blue
6  Ridge group is the one that often intervened or tried
7  to intervene on TVA matters.
8       I belive they sought to challenge the
9  reinstatement, and there may have been some
10 adjudication or adjudicatory orders on that. That I
11 just don't recall.
12      Q.  Did you advise the Commission with respect
13 to the reinstatement matter?
14      A.  Yes. Because, again, my office was
15 responsible for concurring in the paper that the staff
16 sent to the Commission, and I would have been
17 available to commissioners and their staffs to discuss
18 where it is.
19      I don't have a particular recollection of
20 discussions with commissioners, but I certainly was
21 aware of it because it was an unusual circumstance.

Page 40

1       Q.  The Blue Ridge group is an environmental
2  group?
3       A.  Yes, I think it's like Blue Ridge
4  Environmental, yeah, and I forget the last name. But
5  it's yeah, an environmental group generally that
6  intervened or attempted to intervene on a number of
7  TVA matters.
8       Q.  Were you involved in the hearing regarding
9  that adjudication initiated by the Blue Ridge
10 Environmental group?
11      A.  I don't know.
12      MR. LEMBKE:  Hold on. Hold on. Objection
13 to the form. It's a lack of foundation.
14      I don't think he testified there
15 definitively was such a hearing.
16      MR. O'REAR:  I believe he said there was
17 some adjudicatory process.
18      MR. LEMBKE:  No, he didn't. He said there
19 may have been.
20      MR. O'REAR:  All right.
21 BY MR. O'REAR:



Page 41

1    Q.  Tell us what you recall about that.

2    A.  As I said, I don't -- I have a vague

3  recollection that the Blue Ridge group may have filed

4  a challenge.  I don't have any particular recollection

5  beyond that.

6        That challenge, if there had been a

7  challenge, it would have been either referred to a

8  licensing board.  It's possible it came to the

9  Commission.  I don't recall.  And part of that may be

10  the timing.  Because depending on when it came, I

11  might have been gone.

12    Q.  You might have been gone, meaning you left

13  in 2012?

14    A.  Yes, yes.

15    Q.  Okay.  My question -- let me state the

16  question this way.

17        Were you involved in any matters relating to

18  the Bellefonte plant while you were commissioner?

19    A.  No.  There was nothing that came to the

20  Commission for its determination or action when I was

21  a commissioner.

Page 42

1    Q.  Were there any matters pending before the

2  NRC regarding the Bellefonte plant while you were a

3  commissioner?

4    A.  Well, I believe that the Nuclear

5  Development's application was filed with the staff in

6  November of 2018.  So I was still -- I was a

7  commissioner then, but that was not something that

8  came -- that was not before the commissioners at that

9  time.

10    Q.  Okay.  And that application that was filed

11  while you were a commissioner remains pending today.

12  Is that correct?

13    A.  That's my understanding.

14    Q.  Were you aware that TVA in April of 2016

15  decided to declare the Bellefonte plant as surplus

16  property to sell it?

17    A.  In terms -- I'm not sure I understand.  I

18  understand the subject of the question, but I'm not

19  sure I understand the time frame you're talking about.

20    Q.  The time frame is May or April -- excuse

21  me -- of 2016.

Page 43

1    A.  So was I aware then of the TVA decision?

2    Q.  Yes.

3    A.  I don't have any particular recollection one

4  way or the other.

5    Q.  Were you aware of it at any time prior to

6  your leaving the Commission?

7    A.  Well, I think the answer to that is yes,

8  because while we did not as commissioners have any

9  particular action before us with respect to a

10  potential transfer of the site and its construction

11  permit, we were aware of that.  We were aware that --

12  that in effect what that means is, you know,

13  implicitly if not knowing even explicitly, which I

14  think we did, that TVA was not planning to pursue

15  itself the completion of construction of the facility.

16  And I will note, we did have a drop-in visit from

17  Nuclear Development.

18    Q.  Was there any discussion at the Commission

19  level or among the commissioners regarding TVA's

20  decision to sell the Bellefonte site?

21        MR. LEMBKE:  Objection, compound question.

Page 44

1  BY MR. O'REAR:

2    Q.  Was there any discussion among your

3  commissioners about TVA's decision to sell the

4  Bellefonte site?

5    A.  Not that I'm -- not that I can recall.

6    Q.  Did you have any communications with anyone

7  at TVA about the decision to sell the Bellefonte site?

8    A.  Not that I can recall.

9    Q.  Do you think you may have?

10    A.  No, I don't.

11    Q.  You said there was a drop-in meeting with

12  the -- with Nuclear Development representatives?

13    A.  That's correct.

14    Q.  And when did that happen?

15    A.  I believe it was in -- it was in early 2017.

16  I think it was like April 2017.

17        The reason I say that, because I know I was

18  removed by Mr. Trump as chairman by that time.

19    Q.  Okay.  So you were actually removed as

20  chairman by President Trump?

21    A.  Right, that's the president's authority.



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020

45–48

Page 45

1    Q.   Right.  But that's why you moved from the
2    chairmanship to --
3    A.   That's correct.  Because you have -- you
4    have the term and the term runs until it expires or
5    unless you're removed.
6    Q.   Okay.  And, so, you recall the drop-in
7    meeting occurred after that?
8    A.   Yes, as I say, I recall it was early spring.
9    I think it was April of 2017.
10   Q.   Okay.  I'll ask youabout that in a few
11   minutes.  Let me ask you this.
12        Were you aware that TVA actually entered
13   into a contract in 2016 with Nuclear Development to
14   sell the Bellefonte site?
15        MR. LEMBKE:  Where, when?
16        MR. O'REAR:  Ever aware.
17        MR. LEMBKE:  Even today?
18        MR. O'REAR:  No.
19   BY MR. O'REAR:
20   Q.   While you were at the NRC?
21   A.   Well, I think -- you know, I couldn't

Page 46

1    pinpoint when I might have become aware of it or
2    exactly what I became aware of.
3        I certainly think probably in that drop-in
4    meeting, Nuclear Development probably communicated
5    that.
6    Q.   That there was a contract?
7    A.   No.  There was some sort of an arrangement.
8    Q.   Did you ever -- while you were at the NRC,
9    did you ever see the contract between Nuclear
10   Development and TVA?
11   A.   No.
12   Q.   Did you have any communications with anyone
13   at TVA about the contract that had been entered into
14   with Nuclear Development?
15   A.   No.
16   Q.   Did you have any communications with any
17   staff of the NRC about -- while you were at NRC, with
18   the staff of NRC about TVA's decision to sell the
19   Bellefonte site?
20   A.   I don't recall any.  It is conceivable that
21   the executive director for operations in one of our

Page 47

1    weekly or biweekly meetings mentioned it.  But I don't
2    have any particular recollection.
3    Q.   And who was the executive director of
4    operations at that time?
5    A.   At that point it was Victor McCree, M-C,
6    C-R-E-E.
7    Q.   Okay.  Do you know -- do you recall anything
8    being discussed in particular?
9    A.   No, I do not.
10   Q.   Do you recall any discussion within the NRC
11   about whether this was a good thing or not that TVA
12   was selling the Bellefonte site to a potential
13   merchant operator?
14   A.   Could you repeat that?
15   Q.   Did you have any communications with anyone
16   within the NRC about whether this was a good thing or
17   not a good thing, that TVA would be selling the
18   Bellefonte site to a merchant operator?
19   A.   No.  That is not -- that kind of framework
20   is not something that would have come up, whether it
21   was good or bad.

Page 48

1    Q.   While you were at the NRC, were you aware
2    that there was a closing date scheduled for the sale
3    of the plant to Nuclear Development in November of
4    2018?
5    A.   I don't have any particular recollection of
6    discussing that or noting that.  I think probably the,
7    you know, people in the Agency and I may well have
8    received some communication of it in November of 2018,
9    but I don't have any particular recollection.
10   Q.   And if someone in the Agency had received a
11   communication, who would the communication have been
12   from?
13        MR. LEMBKE:  Objection, calls for
14   speculation.
15        MR. O'REAR:  Well, he recalls some
16   communication.
17   BY MR. O'REAR:
18   Q.   Who would it have been from?
19        MR. LEMBKE:  No, he -- no, wait a minute.
20   Object to the form.  That misstates his testimony.  He
21   said he didn't recall any communications.



Page 49

1 BY MR. O'REAR:

2    Q.  I thought you said that there may have been

3 some communication about that.  Did you not?

4    A.  As I say, I don't recall any particular

5 communication.  Staff -- it conceivably may have had

6 information relayed by the staff, the NRC staff.  But

7 I -- again, I don't have any particular recollection.

8    Q.  Were you aware that Nuclear Development sued

9 TVA for breach of contract for refusing to close while

10 you were at the NRC?

11    MR. LEMBKE:  Okay.  You can go ahead.

12    THE WITNESS:  Actually I don't have any

13 particular recollection of learning of a suit between

14 the two parties.

15 BY MR. O'REAR:

16    Q.  Is it correct to say that while you were at

17 the NRC, you have no recollection of knowing that

18 there was a lawsuit between TVA and Nuclear

19 Development over the contract?

20    A.  What I'm saying is I had no particular

21 awareness of the lawsuit between the two parties.

Page 50

1    Q.  At any time while you were at the NRC?

2    A.  Yes, I don't -- I just don't recall it.

3    Q.  If you would look at your exhibits there,

4 the next exhibit should be Exhibit 11.

5    A.  Yes.

6    Q.  You see that?

7    A.  Yes, I do.

8    Q.  Can you identify Exhibit 11 as a

9 September 4, 2018 memorandum from the NRC from Mr.

10 Billy Gleaves, a project manager that contains a

11 summary of a public meeting that occurred on August

12 the 14th, 2018?

13    MR. LEMBKE:  I'm going to object to the

14 form, lack of foundation.

15    MR. O'REAR:  I'm asking him if he can

16 identify it as such.

17    MR. LEMBKE:  Well, you haven't established

18 that he's ever seen this document before.

19    MR. O'REAR:  Well, he can answer.

20    THE WITNESS:  What's the question, again?

21 BY MR. O'REAR:

Page 51

1    Q.  Have you seen the document before today?

2    A.  Yes, I believe I have.

3    Q.  All right.  And can you identify it as a

4 summary of a public meeting NRC held on August the

5 14th, 2018 regarding the Bellefonte site, Nuclear

6 Development's desire to submit a request for transfer

7 of the construction permit?

8    A.  Well, that's how the memo describes itself

9 as a meeting -- a meeting on the pre-submittal of an

10 application.  A pre-submittal of a request.  A

11 transfer, I should say.

12    Q.  And when did you first see this document?

13    A.  I probably first saw it when I was doing

14 some of my research for the expert report.

15    Q.  Okay.  So it is your testimony you did not

16 see this memo while you were a commissioner at the

17 NRC?

18    A.  I don't recall seeing it then.  And I think

19 looking at the general distribution on Page 2, it is

20 not something that typically would go to the -- come

21 up to the Commission.

Page 52

1    Q.  Were you aware that a public meeting -- that

2 this public meeting had occurred while you were a

3 commissioner at the NRC?

4    A.  I don't think I was aware of that.

5    Q.  Did you have any discussion of a public

6 meeting that the NRC conducted in August of 2018

7 regarding Bellefonte with anyone at the NRC?

8    MR. LEMBKE:  While he was at the NRC?

9    MR. O'REAR:  Yes, in a discussion with

10 anyone at the NRC.

11    THE WITNESS:  I don't recall any discussion

12 of it.

13 BY MR. O'REAR:

14    Q.  Okay.  I note there were 16 attendees at the

15 meeting from the NRC.  It notes that David Roth, OGC,

16 was present.

17    A.  Correct.

18    Q.  Was he the general counsel?

19    A.  No.

20    Q.  Just in the Office of General Counsel?

21    A.  The Office of General Counsel.  He might



Page 53

1   have had some supervisory role at that point.  I just
2   don't recall.
3       Q.   Have you ever had any discussions with him
4   about this meeting?
5       A.   No.
6       Q.   Have you ever had a discussion with him
7   about the Bellefonte site in general?
8       A.   No.
9           MR. LEMBKE:  If this is a point, let's take
10  a short break.
11          MR. O'REAR:  Okay.  Let's do that.
12          MR. LEMBKE:  Great.
13          MR. O'REAR:  How long?  Five minutes?
14          MR. LEMBKE:  Five minutes is fine.
15          MR. O'REAR:  Thanks.
16          (Whereupon, a recess ensued.)
17          MR. O'REAR:  Back on the record.
18  BY MR. O'REAR:
19      Q.   Mr. Burns, would you look at Exhibit 82 that
20  should be in your stack there?
21          (Burns Exhibit No. 82 was marked for

Page 54

1   identification.)
2           THE WITNESS:  Yes, I have it.
3   BY MR. O'REAR:
4       Q.   If you would turn to the second page, it is
5   a letter dated November 13, 2018 from Nuclear
6   Development containing the application for an order
7   approving the construction permit transfers.  Do you
8   see that?
9       A.   Yes, I see that.
10      Q.   Did you ever see this application while you
11  were at the NRC?
12      A.   I don't recall seeing it.
13      Q.   When do you recall first seeing it?
14      A.   I probably first saw it when I started doing
15  some of the work as an expert for TVA.
16      Q.   And did you have any discussion while you
17  were at the NRC with anyone at the NRC about the
18  application?
19      A.   No.
20      Q.   Have you ever talked to Victor McCree about
21  the application?

Page 55

1       A.   I don't recall any particular discussion
2   about the application.  And actually at this point in
3   time, I'm not sure I recall -- at this point in time,
4   Mr. McCree was no longer the executive director for
5   operations.
6       Q.   Okay.  Did you have any -- well, when he was
7   director -- executive director of operations, did you
8   have any communication with him regarding the
9   Bellefonte site?
10      A.   I don't recall any particular communication
11  with him.
12      Q.   Are you aware that he met with officials of
13  Nuclear Development prior to your drop-in meeting with
14  them?
15      A.   Aware now or aware then?
16      Q.   Were you aware then?
17      A.   I don't have any particular recollection of
18  being made aware of his meeting, if he had meetings or
19  whatever they were with Nuclear Development.
20          I mean, my only -- the only thing I recall
21  is the drop-in visit, which happened as I think in

Page 56

1   March or April of 2017.
2       Q.   Okay.  Well, tell us what you remember about
3   that?
4       A.   The drop-in meeting?
5       Q.   Yes.
6       A.   About all I recall of that, it was drop-in.
7   I think Mr. Blust, I think Mr. McCollum, there may
8   have been one other person there, I don't remember.
9   But it was just a brief meeting, probably somewhere on
10  the order of 20 to 30 minutes, where they were
11  introducing themselves and indicating they -- their
12  plan.  They were planning to acquire the Bellefonte
13  project and they were hoping to continue it to
14  completion of construction.
15      Q.   Did you express to them support for the
16  Bellefonte project that they envisioned?
17      A.   No, I would not have done that.  Not in that
18  type of context.
19      Q.   Did you know during that meeting that they
20  had entered into a contract with TVA to purchase the
21  site?



Page 57

1    A.  Again, I don't recall particularly what was

2    related during the meeting other than at the high

3    level I recall, yes, their attention was to proceed to

4    obtain the Bellefonte site and to proceed with its

5    construction and hopefully bring it into operation as

6    an operable nuclear power station.

7       Q.  And so in order to proceed with

8    construction, they would need construction permits,

9    correct?

10      A.  Correct.

11      Q.  And so was there a discussion by them that

12   they intended to file an application with the NRC for

13   transfer of the construction permit?

14      A.  Well, I think it -- again, at a high level

15   they would have communicated that they were intending

16   to obtain construction permits because they have to

17   have construction permits to do anything on the site.

18      Q.  And what, if anything, did you say to the

19   Nuclear Development representatives when you met with

20   them?

21      A.  I don't have any recollection of particular

Page 58

1    things I may have said.

2       Q.  Did you have any discussion with them about

3    the NRC's budget requirements?

4       A.  I don't recall discussing the budget aspect

5    of it.

6       Q.  Did you have any discussion with them in

7    which you asked for their assistance in encouraging

8    Congress to approve an NRC budget?

9       A.  I don't recall doing that and that's not

10   typically something I would do.

11      Q.  Did you have any communications -- were you

12   aware that they were having meetings with other

13   commissioners on the same day?

14      A.  I -- basically, yes.  Whether it was going

15   to all happen that same day.  But generally in these

16   types of meetings, if you're coming in to see one

17   commissioner, you're coming in to see all.  So I think

18   I was generally aware that that was happening.

19      Q.  Do you know what other commissioners they

20   met with that day?

21      A.  Well, the only two other commissioners on

Page 59

1    the Commission at that time were then Chairman

2    Svinicki and Commissioner Baran, B-A-R-A-N.

3       Q.  Okay.  And do you know that they met with

4    them?

5       A.  I believe that's the case.

6       Q.  Did you have any discussions with

7    Commissioner Svinicki or Commissioner Baran about

8    their meetings with Nuclear Development?

9       A.  Not that I recall.

10      Q.  Do you know whether any of the commissioners

11   asked Nuclear Development for support in Congress for

12   proposed budgets for the NRC?

13      A.  I have no knowledge of that.

14      Q.  And you had no such discussions.  Is that

15   correct?

16      A.  I --

17         MR. LEMBKE:  Objection, asked and answered.

18         You can answer it again.

19         THE WITNESS:  As I said, that is not

20   typically something I would do.

21   BY MR. O'REAR:

Page 60

1       Q.  Okay.  Well, whether it's typically

2    something you would do or not, your answer is no.  Is

3    that correct?

4       A.  No.

5       Q.  Did you have any discussions with Nuclear

6    Development about the fees it would be required to pay

7    the NRC for submitting an application for transfer of

8    construction permit?

9       A.  I don't recall any such discussion.

10      Q.  Let me make sure I understand your answer to

11   this.

12         Are you saying you were not aware that

13   representatives of Nuclear Development had met with

14   NRC -- NRC staff personnel prior to their meeting with

15   the commissioners?

16      A.  No, I think I had an awareness that there

17   was engagement between Nuclear Development and the NRC

18   staff.  But I don't have, you know, any particular

19   recollection of what was communicated to me or, you

20   know, details -- the details of the meeting.  I just,

21   I don't have a recollection of that.



Page 61

1    Q.   And is it your testimony that after you met
2  with the Nuclear Development representatives, that you
3  don't recall any communications with NRC staff about
4  Nuclear Development or Bellefonte?
5    A.   I don't recall of any.  I don't, you know,
6  there is nothing that I can -- to the extent I recall
7  anything of the meeting that would have prompted me to
8  reach out to the staff at that point.
9    Q.   Well, I'm just asking for any communication
10  whether you reached out to them or they reached out to
11  you?
12    A.   Not that I recall.
13    Q.   Now, when you were at the NRC over the
14  entire period of time that you were there, did you
15  have a high volume of communications with TVA
16  regarding matters before the NRC?
17    A.   I'm not sure I understand what you mean by a
18  high volume.
19    Q.   Okay.  What I was trying to get some general
20  sense before I ask the question, tell us about all
21  your communications with TVA while you were at the

Page 62

1  NRC?
2    A.   And this is over what period?  My entire
3  career?
4    Q.   Yes.
5    A.   Well, I think -- again, we are talking
6  about, you know, close to 40 years.
7        There were probably several matters that I
8  was assigned to early in my career that might have
9  involved either a petition for enforcement action
10  under Section 2206 involved TVA.
11        I know I do recall being involved in some
12  what I'll call enforcement matters due to quality
13  assurance issues that arose at TVA in the mid -- in
14  the mid 1980s.
15        So I -- again, so there may have been
16  communications with TVA counsel at that time.  But,
17  you know -- well, my recollection is more is working
18  on some matters.
19        And sort of since that time -- again, the
20  matters that would have come up with TVA, you know, we
21  discussed earlier with respect to Bellefonte and the

Page 63

1  like, and probably some work with respect to -- well,
2  not probably, I know some work with respect to Watts
3  Bar and the completion of the Watts Bar Unit One, back
4  in the 1990s.  And then sort of taking Watts Bar two
5  out of the deferred status and completing it.  I
6  visited Watts Bar as a commissioner fairly early in my
7  term and that's probably -- that's probably it.
8    Q.   What was the purpose for your visit to Watts
9  Bar when you were a commissioner?
10    A.   The purpose is, one of the things
11  commissioners do and here I take lead from my boss in
12  the late 1980's, Admiral Carr, who basically made it
13  his practice, that he was the one that sort of started
14  the Commission tradition of -- he got to every
15  operating nuclear power plant.  And so I think what
16  commissioners have done since then -- I never got to
17  that level -- but commissioners as part of our sort of
18  making sure we understand what's going on in the
19  regulating community, we go out and we visit -- we
20  visit plant sites, not only power plants but medical
21  centers, things like that.

Page 64

1        So my purpose was here you had Watts Bar
2  unit two which was in the unusual situation that it
3  had -- that basically construction and movement
4  towards operation had been suspended -- actually it
5  may have been in the 1980s.  But certainly, by the
6  1990s, and it was moving toward -- it had start --
7  TVA decided to restart the project and it was moving
8  toward completion.
9        So going out there to see what challenges
10  they had, see what the progress was, that's what was
11  the purpose of the trip.
12        And as I say, that's probably, you know, one
13  of a couple dozen trips domestically I made to power
14  plants or other licensed facilities.
15    Q.   And who did you meet with at TVA when you
16  were on that trip?
17    A.   He is now gone.  Mike Tardi -- I think it's
18  -- I don't recall -- I got his last name wrong, but he
19  was in the position, it's sort of like the chief -- I
20  think he was the chief nuclear officer at the time.
21  And there were probably some other TVA -- there were



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020

65–68

Page 65

1   certainly some other TVA folks there who were either
2   -- accompanied us on the trip or met with us during
3   the visit.
4       Q.   Was the TVA CEO at that trip?
5       A.   Not that I recall.
6       Q.   Do you know who the CEO was at the time?
7       A.   Actually no, I don't.
8       Q.   Do you know Bill Johnson?
9       A.   No.  I may have met him, but I don't really
10   know him.
11      Q.   Did you know he was the CEO of TVA for a
12   period of time?
13      A.   Well, I've seen that name as CEO.  And
14   probably in some of my -- looking at some documents
15   here.
16      Q.   Do you recall ever having any communications
17   with Bill Johnson regarding any matters concerning
18   TVA?
19      A.   No, I do not.
20      Q.   Are there any personnel currently at TVA
21   that you're particularly close to?

Page 66

1       A.   No.  There are a few people I know but
2   there's no one I would say I'm close to.
3       Q.   Who do you know that's presently at TVA?
4       A.   I know Joe Shea and I know Chris Chandler.
5   But actually -- you know, I've obviously met Mr. Chin
6   and Mr. Alif in this process.
7       Q.   And Mr. Chandler formerly worked at the NRC.
8   Is that correct?
9       A.   Mr. Chin?  Not that --
10      Q.   Mr. Chandler, not Mr. Chin.
11      A.   Chandler?  Mr. Chandler did work at the NRC.
12      Q.   Did you know him when he worked at the NRC?
13      A.   Yes.
14      Q.   Okay.  Did he work with you or under you
15   when he was at the NRC?
16      A.   He would have worked under me because I was
17   the general counsel.  So all staff in the office
18   reported to me ultimately.
19      Q.   Did he work on any adjudicatory opinions
20   when he was at the NRC?
21      A.   I don't have any recollection of his

Page 67

1   specific assignments.
2       Q.   And you would know whether he worked on any
3   licensing matters under you or not?
4       A.   Again, I don't have a particular
5   recollection of where he was assigned within the
6   office.  As I recall, he began -- came to the Agency
7   through our honors program and part of the honors
8   program is it has a structured rotational assignment
9   in different areas of the office through the year.  I
10   don't have a recollection of what those assignments
11   were.
12      Q.   I believe you testified you were involved in
13   the process where TVA sought withdrawal of the
14   construction permits and later sought reinstatement of
15   those permits.  Is that correct?
16      A.   I would have supervised staff and provided
17   some counsel with respect to legal matters related to
18   those issues, yes.
19      Q.   Do you know whether Mr. Chandler worked on
20   any of those issues while he was at the NRC?
21      A.   I have no -- no idea.

Page 68

1       Q.   Who at TVA contacted you to be an expert
2   witness in this case?
3       A.   Initial contact was through Mr. Chandler.
4       Q.   Now, Mr. Shea worked for the NRC for a long
5   while, did he not?
6       A.   Yes, he did.
7       Q.   And did you work with Mr. Shea while he was
8   at the NRC?
9       A.   I would have had some interactions with him.
10   He was in the NRC's regional office in Atlanta and I
11   believe he also worked in the headquarters office, but
12   I don't recall where.
13          So I would have had some interactions with
14   him on occasion, but nothing in particular that I can
15   recall.
16      Q.   Okay.  And he worked with NRC for 19 years.
17   Did you work with him on any licensing matters?
18      A.   I don't recall working on any particular
19   licensing matters with him.
20      Q.   Have you communicated with Mr. Shea since
21   you left the NRC?



STEPHEN G. BURNS                                        August 19, 2020
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY                69–72

Page 69

1    A.  I have had a communication with him, yes.

2    Q.  Tell me about that.

3    A.  Well, that communication has nothing to do

4  with the dispute between Nuclear Development and

5  Tennessee Valley Authority.  He was asking me

6  something with respecting a personnel matter involving

7  himself.

8    Q.  While you were at the NRC, did you ever have

9  any communication with Mr. Shea about the Bellefonte

10  plant site?

11    A.  I have no recollection of any.

12    Q.  Well, do you recall whether Mr. Shea

13  participated on any kind of drop-in calls with you

14  when you were a commissioner?

15    A.  I don't have any particular recollection of

16  who would have -- who participated in any drop-ins

17  from TVA.

18    Q.  Did TVA have regular drop-ins with the

19  commissioners?

20    A.  Yes.  I would say perhaps about once a year.

21    Q.  Okay.  You indicated -- I'm not ask you

Page 70

1  about the detail of it -- but Mr. Shea, did he call

2  you regarding a personnel matter after you left the

3  NRC?

4    A.  Yes, he contacted me.

5    Q.  Okay.  Do you consider yourself --

6    A.  He contacted me by e-mail, and then we spoke

7  by phone.

8    Q.  Do you consider yourself a friend of Mr.

9  Shea's?

10    A.  No.

11    Q.  Do you consider yourself a friend of Mr.

12  Chandler's?

13    A.  No.

14    Q.  Are you personally acquainted with any other

15  current TVA personnel?

16    MR. LEMBKE:  Other than Mr. Chandler and Mr.

17  Ayliffe?

18    MR. O'REAR:  Yes, I'm not including them.

19    THE WITNESS:  Current personnel, no.

20  BY MR. O'REAR:

21    Q.  Do you know the current general counsel of

Page 71

1  TVA?

2    A.  No, I do not.

3    Q.  Have you had any discussions with former TVA

4  personnel regarding the Bellefonte site?

5    A.  Ever?

6    Q.  Well, while you were a commissioner, did you

7  have any communications with former TVA personnel

8  regarding the Bellefonte site?

9    A.  I don't recall any conversations with former

10  personnel.

11    Q.  Since you've left the NRC, have you had any

12  conversations or communications with any former TVA

13  personnel regarding the Bellefonte site?

14    A.  No.

15    Q.  Have you ever communicated with any member

16  of the TVA board of directors?

17    A.  No.

18    Q.  Ever?

19    A.  Right.  I have no recollection of a -- such

20  communication.

21    Q.  You have no recollection of meeting with Mr.

Page 72

1  Shea to discuss the Bellefonte site in June of 2017?

2    A.  No, I don't recall that.

3    Q.  Did you have any communications with anyone

4  at TVA while you were at the NRC about the lawsuit,

5  this lawsuit between Nuclear Development and TVA?

6    A.  Repeat the question, please.

7    Q.  While you were at the NRC, did you have any

8  communications with anyone at TVA about this lawsuit?

9    A.  I don't recall any communications with TVA

10  folks regarding this lawsuit while I was at NRC.

11    Q.  And other than your conversations with Mr.

12  Ayliffe and Mr. Chandler -- Mr. Chandler, excuse me --

13  have you had any communications since you left the NRC

14  with anyone at TVA concerning this lawsuit?  I believe

15  you said Mr. Chandler contacted you.

16    A.  It was Mr. Chandler who basically introduced

17  me to Mr. Ayliffe.

18    Q.  Anyone else?

19    A.  No.

20    Q.  Okay.  If you would look in your stack of

21  exhibits -- and I don't think all of these are going



Page 73

1  to be in exact order -- but I would like for you to
2  find an exhibit that is a pleading in the case
3  captioned:  Defendant's Unopposed Motion to Amend
4  Scheduling Order.
5      A.  Yes, I have it.
6      Q.  All right.
7          MR. O'REAR:  Now, would you mark that
8  Exhibit 200, please?
9          (Burns Exhibit No. 200 was marked for
10  identification.)
11         THE WITNESS:  Okay.
12  BY MR. O'REAR:
13     Q.  And I've asked counsel to mark their own
14  copies as 200 also.  Okay.
15         We may need to refer to this, but let me ask
16  you these questions first.  When did Mr. Chandler call
17  you about being an expert witness in this case?
18     A.  Well, he first e-mailed me and he e-mailed
19  me, I think it was about February 14th, 2020.
20     Q.  Okay.  What did his e-mail say?
21     A.  He asked whether I might be available to

Page 74

1  discuss a matter.  I don't recall specifically how
2  detailed he was in terms of this, but I think he
3  identified it, wanted to discuss a matter that TVA was
4  in litigation over.
5      Q.  So did he advise you of -- of the
6  litigation, who it involved and what the subject was?
7      A.  I don't recall the content of his e-mail.
8      Q.  Okay.  And that was, you say, February the
9  14th?
10     A.  I think February the 14th.
11     Q.  2020, this year?
12     A.  2020.
13     Q.  All right.  Then you had a conversation with
14  him after that?
15     A.  I did.  When he sent the e-mail on
16  February 14th, I was sitting basically in the
17  departure lounge at Dulles Airport on my way to France
18  because I had an obligation with NEA to teach in their
19  nuclear law program for the week, and then my wife and
20  I were going to take another week vacation.  So I was
21  going to be out of the country and basically out of

Page 75

1  the pocket until the very end of February.
2          And then after -- so after February 14th,
3  when he received my reply he said, well, we can try to
4  talk when you come back.  You know, basically I was
5  not going to be easily reachable.
6      Q.  Okay.  Did you have any communications with
7  him before you -- before you went on your trip --
8  strike that.
9          So he sent you an e-mail February the 14th,
10  and then there was a follow up call on that day where
11  you told him you were out of pocket for two weeks?
12     A.  No, no.  It was not a follow up call.
13         I returned -- I replied to his e-mail.  I
14  called him.  And so, yeah, I did not speak to him.
15  First I said, I'm gone for the next two weeks.  Happy
16  to chat when I get back.
17     Q.  But did you accept the engagement on
18  February the 14th during this exchange of e-mails?
19     A.  No, I said I'd be happy to talk.  And get --
20  you know, obtain more information about what, you
21  know, why he was contacting me.

Page 76

1      Q.  Okay.  And, so, on that day you didn't know
2  anything about the lawsuit at all.  Is that right?
3      A.  Again, I don't recall the content
4  specifically of his e-mail.  He may have described in
5  general that, you know, there was the issue pending.
6  So I think it's fair to say I understood that there
7  was a lawsuit at that time.  But more detail than
8  that, I did not have at that time.
9      Q.  Okay.  Do you have the e-mail there?
10     A.  I --
11     Q.  Is it in there?
12     A.  I don't know if I still have it or not.
13     Q.  Could you find it?
14         MR. LEMBKE:  Wait one minute.  This is
15  inappropriate because you have not served any subpoena
16  on him or a document request related to it.  So we're
17  not going to engage in on the spot document discovery.
18         MR. O'REAR:  I'm just asking him if he has
19  it there, if it will refresh his recollection.
20         MR. LEMBKE:  Mr. Burns, let's do -- that's
21  inappropriate in a deposition.  If you want to present



Page 77

1    a document to him to refresh his recollection you may,
2    but it's not appropriate to have him start rummaging
3    through files looking for something to refresh his
4    recollection.
5           MR. O'REAR:  I'm not asking him to rummage.
6    If he's got it there, he can answer the question.  I
7    think it would be helpful.
8           MR. LEMBKE:  Let's proceed with the
9    question.
10          MR. O'REAR:  Are you telling him not to do
11   that?
12          MR. LEMBKE:  I don't think that's
13   appropriate.  He has not been served a subpoena nor
14   has there been any document request for that
15   information.
16          MR. O'REAR:  I understand that.  But I --
17          MR. LEMBKE:  And so I don't think that's
18   appropriate to engage in discovery on the spot.
19          So I'm going to tell him if you want to
20   serve a subpoena or document request, we'll respond
21   appropriately.  But we're not going to do it without

Page 78

1    such a request.
2           MR. O'REAR:  I'm not asking for the
3    document.  I'm asking him to look at the e-mail so
4    that he can answer the question.
5           MR. LEMBKE:  He is not -- we're not going to
6    do that today.
7           MR. O'REAR:  All right.
8    BY MR. O'REAR:
9       Q.  Do you agree with that, Mr. Burns?
10      A.  Yes.
11      Q.  You're not going to do that?
12      A.  Correct.
13      Q.  Okay.
14          All right.  When you had this initial e-mail
15   exchange with Mr. Chandler, did you know Nuclear
16   Development was in a lawsuit with TVA?
17      A.  I think I did know that, yes.
18      Q.  Did he tell you that he was calling you
19   about a lawsuit between Nuclear Development and TVA,
20   or he was contacting you about that?
21      A.  Again, I don't recall the specifics in that

Page 79

1    e-mail.  Certainly by the time I was returning from
2    France or it was actually from Italy at the time a few
3    days before we had our phone call, I understood that.
4           He did transmit to me in another e-mail
5    which is more likely -- it's probably around the 27th
6    or 28th of February about the time I came back, he
7    provided me, I think, some of the initial -- some of
8    the pleadings in the case in terms of TVA's motion to
9    dismiss and the ND's reply.
10      Q.  So you were on this trip and returned on
11   February 28th?
12      A.  I believe it was the 28th.
13      Q.  And if he sent you materials in the lawsuit
14   on the 27th or the 28th by e-mail?
15      A.  Correct.
16      Q.  What did he send you at that time?
17      A.  My recollection is he sent me the -- I think
18   TVA's motion -- the defendant's motion to dismiss and
19   then the plaintiff's or ND's reply to that.
20      Q.  And did Mr. Chandler say anything to you in
21   any of these e-mails about what he wanted testimony

Page 80

1    on?
2       A.  At that point it was a question whether I
3    would be willing to discuss it.
4       Q.  But he didn't say what he was seeking your
5    opinion on?
6       A.  Well, I think he wanted to discuss it and I
7    think he was looking for my reaction to it.
8       Q.  Thank you.
9       A.  Well, we weren't discussing -- as I say I
10   hesitate to say we were discussing at that particular
11   point whether or not I would be willing to serve as an
12   expert.
13      Q.  And you didn't know what you were going to
14   be serving as an expert on, on what subject?
15      A.  Well, by implication the issues that are the
16   back and forth in that set of pleadings.  It's on the
17   issue of whether or not TVA could proceed with the
18   transfer of the site without a construction -- with
19   the construction permit authorization having also been
20   approved.
21      Q.  And was that communicated to you by Mr.



Page 81

1  Chandler or you're saying you learned that only by
2  implication?
3      A.  Well, I certainly saw it there.  He may have
4  highlighted that.  I don't have a specific
5  recollection of the contents.  These are relatively
6  short e-mails.
7      Q.  And, so, when did you accept that
8  engagement?
9      A.  I think I accepted the engagement early the
10  next week.  So I don't know what the dates are on
11  that.  Somewhere from March 3rd to fifth.
12      Q.  Well, let's look at Exhibit 200 that you
13  have before you.
14      A.  All right.
15      Q.  You have it there?
16      A.  I have it.
17      Q.  Okay.  If you would look on the second page,
18  Paragraph 4.  It says, "On or about February 14, 2020,
19  TVA identified Stephen G. Burns as the best person to
20  serve as its expert in this field."  Do you see that
21  sentence?

Page 82

1          MR. LEMBKE:  Object to the form, lack of
2  foundation.
3  BY MR. O'REAR:
4      Q.  Do you see that?
5          MR. LEMBKE:  Same objection.
6  BY MR. O'REAR:
7      Q.  Do you see that?
8          You can answer the question.
9          MR. LEMBKE:  Same objection.
10  BY MR. O'REAR:
11      Q.  Do you see that sentence?
12          MR. LEMBKE:  Same objection.
13          You can answer, Mr. Burns.
14          THE WITNESS:  Well, I see the sentence on
15  the document.  Yes.
16  BY MR. O'REAR:
17      Q.  All right.  And do you know anything about
18  how TVA identified you as the best person to serve as
19  an expert in this field?
20      A.  No, I do not.
21      Q.  Look at Paragraph 5.  It says, "When TVA

Page 83

1  first contacted Mr. Burns, TVA learned that Mr. Burns
2  was on a trip to France from February 14 through
3  February 28, 2020."  Do you see that?
4      A.  Yes, I do.
5          MR. LEMBKE:  Same objection.
6  BY MR. O'REAR:
7      Q.  Is that a true statement?
8      A.  It what a true statement?
9      Q.  That when TVA contacted you, that TVA
10  learned that you were on a trip from France -- to
11  France from February 14th to February 28th?
12          MR. LEMBKE:  Objection, lack of foundation.
13  BY MR. O'REAR:
14      Q.  You can answer.
15      A.  It's essentially correct except for the fact
16  the that I also went to Italy.
17      Q.  Okay.  Turn to the next page, Paragraph 6.
18  It says, "On March 2nd, 2020, Mr. Burns agreed to
19  serve as an expert for TVA."
20          Do you see that?
21      A.  Yes.

Page 84

1          MR. LEMBKE:  Same objection.
2  BY MR. O'REAR:
3      Q.  Is that a true statement?
4      A.  I think it is.  As I say, I don't have my
5  notes in front of me.  But as I said earlier, my
6  agreement was, you know, early in that week of
7  following my return from your Europe.
8      Q.  But with that as a true statement, on
9  March 2nd, 2020, what did you agree to do for TVA?
10      A.  I agreed to prepare an expert report.
11      Q.  All right.
12      A.  I prepared the expert report.
13      Q.  On what?
14      A.  On the issues -- well, on the issues that
15  are covered in my expert report.  So whether or not I
16  believe, based on my experience and analysis that a
17  transfer of the site without a concurrent transfer or
18  authorization to transfer the construction permit was
19  a valid approach.
20      Q.  And had you formed that opinion on March the
21  2nd, 2020?



Page 85

1   A.  Well, I had -- again, based on my experience
2   -- long experience at the NRC and my understanding of
3   how things should work and from the position of a
4   regulator, that was my essential conclusion.
5        Now, as -- when I worked through, you know,
6   documentation, I read other things that were related
7   to this, you know, I looked at those things to see
8   whether anything changed my mind and it did -- they
9   did not.
10   Q.  Did you enter into a written engagement with
11   TVA?
12   A.  I believe, yeah, I believe-- I believe there
13   is or at least an e-mail exchange with respect to an
14   agreement to serve.
15   Q.  Who was that communication with at TVA?
16   A.  That would have been with Mr. Ayliffe.
17        And I probably also then -- there was
18   documentation that their administrative officers would
19   have sent me.
20   Q.  Okay.
21   A.  That did not occur until at least later that

Page 86

1   week.
2   Q.  The documentation engagement?
3   A.  Formality.
4   Q.  Was that a written engagement agreement?
5   A.  There was some -- there was some written
6   document, yes, that I provided to them.
7   Q.  Okay.
8   A.  I don't have that here and I don't recall
9   the specifics of how it's written.
10   Q.  Do you recall anything about that document
11   that defines the scope of your work?
12   A.  Well, again, I don't have a specific
13   recollection of the contents of the document.  The
14   scope of the work is as I described it and as set
15   forth in my expert report.
16   Q.  And your rate -- I believe you state in your
17   report is $500 per hour?
18   A.  That's correct.
19   Q.  And is that for all of your time?  I mean is
20   it -- you have no different rate for different
21   functions such as this deposition or preparation for

Page 87

1   this deposition?
2   A.  That's the rate.
3   Q.  You also issued a supplement to your report.
4   Is that correct?
5   A.  That is correct.
6   Q.  Who asked you to do that?
7   A.  TVA.
8   Q.  Okay.  What was that assignment?
9        Well, who at TVA -- who at TVA?
10   A.  Well, counsel.
11   Q.  Which counsel?
12   A.  Well, it would have been Mr. Ayliffe, Mr.
13   Chandler in consultation with Mr. Lembke.
14   Q.  And what were you asked to do in this second
15   engagement?
16   A.  In the supplemental report?
17   Q.  Yes.
18   A.  I addressed matters that were raised by Mr.
19   Matthews in his the deposition, which -- which were
20   not -- would not have come up in my original report
21   which seemed to need some addressing or rebuttal.

Page 88

1   Q.  Did you enter another engagement letter --
2   A.  No.
3   Q.  -- for that assignment?
4   A.  No.
5   Q.  Did you contact the -- is there an ethics
6   office at the NRC?
7   A.  Yes.  In fact as general counsel, I'm the
8   designated Agency ethics officer.
9   Q.  You were when you were general counsel?
10   A.  When I was general counsel.
11   Q.  Is the current general counsel the
12   designated Agency ethics officer?
13   A.  Yes.
14   Q.  Who is that? `
15   A.  Marian Zobler, Z-O-B-L-E-R.
16   Q.  Did you contact her office regarding any
17   advice or consent regarding this request for an
18   engagement by TVA?
19   A.  No, I did not.
20   Q.  Did you research whether or not you were
21   precluded from serving as an expert witness in this

Page 89

1  matter based on any federal conflicts, statutes or NRC

2  regulations?

3      A.  I don't know what you mean by research.

4      Q.  Well, did you check into it?  Did you

5  examine that question?

6      A.  I think I considered that question.  I did

7  not undertake extensive research on it.

8      Q.  Are you familiar -- you're familiar I guess

9  since you were the ethics officer at one time, you're

10  familiar with Title 18, Section 207 of the United

11  States Code?  It deals with restrictions on former

12  officers and employees of federal agencies from

13  accepting certain assignments, engagements after they

14  leave an Agency?

15      A.  No, I cannot recite to you the text of the

16  statute.

17      Q.  Are you familiar with it, having served in

18  that capacity --

19      A.  I'm familiar with it but I cannot recite the

20  text of it.

21      Q.  Can you say one way or the other that that

Page 90

1  statute imposes restrictions on former federal

2  employees from accepting certain types of engagements

3  after leaving federal employment?

4      A.  I would need to look at the statute itself

5  before I answer that question.

6      Q.  Did you consider the obligations under that

7  statute before you accepted this engagement?

8      A.  I considered the obligations, whether I had

9  -- would have had a conflict regarding prior service

10  and I did not believe I did.

11      Q.  Okay.  And what are the factors that you

12  considered as to whether or not you had a conflict or

13  not?

14      A.  The factors I would have considered is

15  whether I had had any decision making with respect to

16  Nuclear Development and TVA with respect to this

17  matter.  And I did not.

18      Q.  And so an operative question for you is

19  whether you had any -- you conducted any decision

20  making.  Is that correct?

21      A.  Would you repeat that, please?  It got cut

Page 91

1  off.

2      Q.  Well, I'm trying to clarify your answer.

3  The operative factor for you was whether you

4  personally conducted any decision making regarding

5  Bellefonte or Nuclear Development?

6      A.  Correct.

7      Q.  And you answered that question that you did

8  not participate in any decision making?

9      A.  That is correct.

10      Q.  And that is the factor that led you to

11  conclude that you did not have a conflict under any of

12  the statutes.  Is that correct?

13      A.  That's correct.

14      Q.  Now, you agreed earlier that the NRC is an

15  independent regulatory Agency, correct?

16      A.  That's correct.

17      Q.  And that TVA is one of the organizations it

18  regulates, correct?

19      A.  That is correct.

20      Q.  You agree that the -- that Nuclear

21  Development filed its application for approval from

Page 92

1  the NRC while you were the Commissioner, correct?

2      A.  That is correct.

3      Q.  And you had a personal meeting with

4  representatives of Nuclear Development at which you

5  discussed their plan to pursue an application for

6  transfer of the construction permits, correct?

7          MR. LEMBKE:  Object to the form, lack of

8  foundation.  That misstates his prior testimony about

9  that meeting.

10  BY MR. O'REAR:

11      Q.  You can answer.

12      A.  What I said before was they came in, they

13  dropped in, they provided general information about

14  what their intentions were.

15      Q.  And --

16      A.  That was not a meeting at which either a

17  commissioner would have endorsed, would have supported

18  or objected to what they were doing.  It's purely

19  informational.  That's the nature of the drop-in

20  meeting.

21      It's not a decision making meeting and it is



Page 93

1  not something in which -- as I said before, in which

2  the Commission itself was taking particular action.

3      Q.  But is it correct that they did inform you

4  that they intended to pursue an application for

5  transfer of the construction permits?

6          MR. LEMBKE:  Form, lack of foundation,

7  misstates prior testimony.

8  BY MR. O'REAR:

9      Q.  You may answer.

10     A.  Actually I don't recall the question now.

11     Q.  The question is:  Were you informed at that

12  meeting by representatives of Nuclear Development that

13  they intended to pursue an application with the NRC

14  for consent of the transfer of the construction

15  permits to Nuclear Development?

16         MR. LEMBKE:  Same objection.

17         THE WITNESS:  We were -- I was informed at

18  that meeting that they intended to pursue the

19  completion of the Bellefonte project with the hope of

20  turning it into an operating reactor site.

21  BY MR. O'REAR:

Page 94

1      Q.  And would that necessarily have involved

2  receiving transfer of the construction permit?

3      A.  They would have had --

4          MR. LEMBKE:  Same objection.

5  BY MR. O'REAR:

6      Q.  Go and answer, please.

7      A.  They would have had to get NRC approval,

8  that's correct.

9      Q.  Did you consider whether or not you had a

10  conflict because the NRC is currently regulating TVA

11  and was regulating while you were there?

12         MR. LEMBKE:  Objection, vague.

13         You can answer, if you understand it.

14         THE WITNESS:  The question was again,

15  whether -- you have to repeat the question.

16  BY MR. O'REAR:

17     Q.  Did you consider whether you had a conflict

18  because the NRC is currently regulating TVA and was

19  regulating TVA when you were there?

20     A.  That I was -- I probably considered that.  I

21  do not believe that it any bar -- poses any bar to

Page 95

1  what I have been engaged in here.

2          That would suggest that any federal employee

3  who leaves federal service could never work on

4  anything that it comes within the scope of the

5  regulatory Agency's authority, and that's simply

6  wrong.

7      Q.  Well, not necessarily.

8          Are you saying that a U.S. attorney could

9  leave the U.S. Attorney's Office and defend a party on

10  an investigation he had participated in?

11         MR. LEMBKE:  Objection.

12  BY MR. O'REAR:

13     Q.  Are you saying that?

14         MR. LEMBKE:  Object to the form.

15         First I move to strike the statement "not

16  necessarily."

17         Second of all, I object on lack of

18  foundation for this question.

19         MR. O'REAR:  Well, his answer was

20  nonresponsive and I was asking him if it covered -- if

21  it covered the scenario I just mentioned.

Page 96

1          MR. LEMBKE:  His answer was certainly

2  responsive to the question.

3          I don't have any idea what the basis for

4  that is.

5          MR. O'REAR:  Well, the basis for is that

6  it's a completely overbroad statement.  I'm asking him

7  whether or not there would be exceptions to that

8  statement.

9          MR. LEMBKE:  Same objection.

10  BY MR. O'REAR:

11     Q.  All right.  Mr. Burns, did you check with

12  the District of Columbia Bar regarding whether or not

13  you had a conflict in accepting this matter?

14     A.  No, I did not.

15     Q.  Can you tell us what your total fees have

16  been to date that you charged for your work for TVA?

17     A.  I've received payment of approximately

18  $25,000, and then really had not done any work -- and

19  that was in May.  And I really haven't done any more

20  work since the last few weeks.

21         So, I believe I've sort of logged another 20



Page 97

1  to 25 hours.  But have not, you know, sent the invoice
2  in as of yet.
3      Q.  Okay.
4          MR. LEMBKE:  Caine, can we go off the record
5  a minute to talk about lunch plans?
6          MR. O'REAR:  Sure.  Well, let me finish this
7  line of questions, please.
8  BY MR. O'REAR:
9      Q.  So you have received payment of $25,000,
10  that would be partial payment, correct?
11     A.  Correct.
12     Q.  That would have been for 50 hours of work.
13  Is that correct?
14     A.  Correct.
15     Q.  And then you say you've logged in an
16  additional 20 to 25 hours of work?
17     A.  Correct.
18     Q.  So if that is billed, then that would be an
19  additional 12,000 or so dollars, correct?
20     A.  Something like that, yes.
21     Q.  So your charges to this date have been

Page 98

1  roughly $37,000?
2      A.  Correct.
3      Q.  Okay.  All right.  We can go off the record.
4          (Whereupon, a recess ensued.)
5          MR. O'REAR:  Back on the record.
6  BY MR. O'REAR:
7      Q.  Mr. Burns, were you involved personally in
8  any enforcement actions against TVA other than the
9  ones you previously mentioned in the deposition?
10     A.  I didn't -- what ones in my deposition?  I'm
11  sorry.  Other than --
12     Q.  You mentioned some matters that you were
13  involved in the mid '90s regarding enforcement actions
14  against TVA?
15     A.  Yeah, or the mid 1980s.
16     Q.  The mid 1980s?
17     A.  Yeah, I'm not aware of any.
18     Q.  Is there such a term as "escalated
19  enforcement actions" by the NRC?
20     A.  Yes, there is.
21     Q.  What does that mean?

Page 99

1      A.  Essentially it's an enforcement action above
2  a notice of violation or for reactors now, in the
3  reactor oversight process, that goes beyond the
4  assessment process within that context.
5          So for the most part what that means is
6  civil penalty or orders, as I was discussing before
7  enforcement orders.
8      Q.  Let's say over the last 20 years, have you
9  been involved in any escalated enforcement actions
10  against TVA?
11     A.  Well, as a commissioner, no, I don't believe
12  that any of those -- and that would not be common
13  anyway, that the initiation of the action would come
14  to the Commission.  So as a commissioner since 2014,
15  no.
16         It is possible.  I just I don't have a
17  recollection of what actions TVA may have been subject
18  to in, say the last 20 years.  You know, again --
19     Q.  You --
20     A.  Go ahead.
21         MR. LEMBKE:  No, no.  You should finish.

Page 100

1  Finish your answer.
2          THE WITNESS:  As I said before, as both
3  deputy general counsel and as general counsel, you
4  have responsibility for the supervision of legal staff
5  who are providing advice, counsel and representation
6  to the NRC technical staff.  And it is, you know, it
7  is conceivable that I was briefed on -- on some
8  matters that might have arisen regarding TVA or not.
9  I just don't have any recollection.
10  BY MR. O'REAR:
11     Q.  Were you involved in the NRC citation
12  alleging dozens of nuclear safety violations at the
13  Watts Bar nuclear plant by TVA?
14         MR. LEMBKE:  Object to the form, lack of
15  foundation.
16         MR. O'REAR:  I'm asking if he was involved.
17         MR. LEMBKE:  Well, you're assuming there is
18  such a thing.
19  BY MR. O'REAR:
20     Q.  Was there?
21     A.  I don't know what time frame you're talking



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020
101–104

Page 101

1   about.

2       Q.   Well, I'm talking about allegedly in 2015

3   regarding pressurized water levels rising

4   uncontrollably that the NRC citation assessed against

5   TVA alleging dozens of nuclear safety violations.

6   Were you involved in that?

7       A.   No, I was not involved.  As a commissioner

8   that would have been something undertaken by the

9   staff.

10      Q.   And do you know whether or not that matter

11  it still pending before the NRC?

12      A.   I do not know.  I don't know the status of

13  it.  I mean, typically when you issue a citation and

14  given that it was done in 2015, you would have been --

15  required corrective action of the licensee and that

16  would be carried out.  But I'm not aware of the actual

17  status of that.

18      Q.   Were you involved in the NRC citation to TVA

19  for violations of whistleblower protection for nuclear

20  workers at the Sequoyah and Watts Bar plant?

21      A.   And when was that?

Page 102

1       Q.   2015 -- '15 to '18.

2       A.   I have awareness that it occurred but I was

3   not involved in that -- undertaking that enforcement

4   action.

5       Q.   Okay.  What -- how are you aware of it?

6       A.   Well, the staff informs the Commission of

7   significant actions -- of significant enforcement

8   actions it may take.

9       Q.   Did the staff likewise inform the Commission

10  of the safety violations at Watts Bar that we

11  previously discussed?

12      A.   I don't have a particular recollection of

13  that.

14      Q.   Do you know whether the whistleblower

15  violation matter is still pending before the NRC?

16      A.   I don't know what might be pending or not.

17      Q.   Was it pending when you left the NRC?

18      A.   I don't have any particular recollection.

19      Q.   Were you involved in the citation alleging

20  violation by TVA corporate management for

21  discrimination against a Sequoyah employee?

Page 103

1       A.   And when was this?

2       Q.   I believe it was in 2018.

3       A.   I was not involved in it, no.

4       Q.   Were you aware of it?

5       A.   I don't have any particular recollection of

6   it.

7       Q.   Okay.  And do you know whether it was

8   pending when you left the NRC?

9       A.   I don't know what the status was when I

10  left.

11      Q.   Other than what you've told us so far, can

12  you identify any escalated enforcement actions against

13  TVA regarding its nuclear plants that you were

14  involved in?

15      A.   Well, my only specific recollection is from

16  -- again, from the 1980s when I was in the division

17  that was responsible for leading staff on enforcement

18  matters, and I believe there was an order issued to

19  TVA with respect to having an assessment of what we

20  can now call safety culture.  Basically, the

21  employees -- the environment for employees.

Page 104

1       But that's the only one I have a specific

2   recollection of.

3       Q.   Okay.  All right.  Let's take a lunch break.

4       MR. LEMBKE:  All right.  Why don't we plan

5   to be back around 11:50 Central Time, 12:50 Eastern?

6       MR. O'REAR:  Okay.

7       (Whereupon, a recess ensued.)

8       (Afternoon session.)

9   BY MR. O'REAR:

10      Q.   Mr. Burns, we're coming back from a

11  30-minute lunch break.

12      Did you review any of the exhibits during

13  the break to prepare for your testimony after lunch?

14      A.   No, I did not look at any of the exhibits.

15      Q.   Okay.  Now, we've identified Exhibit 199

16  which was your original report, correct?

17      A.   Correct.

18      Q.   You have that before you.

19      Later in your stack I've got your supplement

20  to the report marked.  We'll identify that as 201.

21      (Burns Exhibit No. 201 was marked for



STEPHEN G. BURNS                                    August 19, 2020
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY        105–108

Page 105

1  identification.)

2  BY MR. O'REAR:

3       Q.  But I don't think you need to dig it out

4  right now.

5           But let me ask you this about both reports.

6  Did you write both of those reports?

7       A.  Yes, I did.

8       Q.  Were any part of those reports written by

9  someone else?

10      A.  No.

11      Q.  Did you have any research assistance on

12  these reports?

13      A.  No.

14      Q.  You did all the research yourself?

15      A.  Yes, I mean TVA provided some documents, you

16  know, exhibits in this litigation.  But I -- otherwise

17  the research was mine.

18      Q.  Okay.  And did they provide documents that

19  you requested or did they just say, well, we want you

20  to consider these documents that we're provided?

21      A.  It's a combination of both.  They provided

Page 106

1  some documents related to the litigation and there

2  were some circumstances -- I don't have a particular

3  recollection of which ones -- where I asked for

4  documents.  There might have been a reference to

5  something and it wasn't immediately available to me.

6           And otherwise, you know, I researched on my

7  own.

8       Q.  Other than pleadings and deposition

9  exhibits, did TVA provide you any documents that you

10  considered and relied on?

11      A.  I don't think so, because the -- many of the

12  deposition exhibits would, for example, would have

13  been -- you know, for example, Mr. Repka's report

14  documents related to the construction permit -- you

15  know, the construction permits themselves and all.

16  So, you know, as I say, even the -- I think the Marble

17  Hill decision which is, you know, basically a publicly

18  available decision of the Nuclear Regulatory

19  Commission.  You know, again, that -- I think they may

20  have provided that in the letter to Dr. Asperger from

21  Acting Director Case.  But I don't recall anything

Page 107

1  else quite honestly.

2       Q.  Okay.  Well, I'm not sure I understood your

3  answer.

4           You don't recall anything being given to you

5  by TVA counsel other than the lawsuit depositions,

6  exhibits and pleadings.  Is that correct?

7       A.  That's correct.

8       Q.  All the other matters that you've listed in

9  your reports that you considered were obtained by your

10  own research?

11      A.  Correct.

12      Q.  Did you speak with any TVA personnel other

13  than Mr. Lembke, Mr. Ayliffe or Mr. Chandler in the

14  process of gathering information for your report?

15      A.  No.  The only caveat is early at the initial

16  contact with Mr. Chandler, there may have been a

17  document that he provided.  But I've had no contact

18  with Mr. Chandler since I decided I would proceed with

19  this matter whenever -- was it March 2nd or early

20  March.

21      Q.  Okay.  And so your testimony is you had no

Page 108

1  contact with Mr. Chandler since either February --

2  yeah, February 27th or February 28th when he sent you

3  those materials?

4       A.  No, I had contact with Mr. Chandler that may

5  have been March 2nd when we actually had a phone call

6  where he introduced me to Mr. Ayliffe.  But after

7  that, I've had no contact with Mr. Chandler.

8       Q.  And to reiterate you have had no contact

9  with Mr. Shea in the process of preparing your

10  reports.  Is that correct?

11      A.  That's correct.  I've had no contact with

12  Mr. Shea regarding this report.

13      Q.  Did you have any communication with Michael

14  Lepre of the Pillsbury firm --

15      A.  No, I did not.

16      Q.  -- in this engagement?

17      A.  No.

18      Q.  Have you had any communication with anyone

19  connected with the Pillsbury firm concerning their

20  letter that's an exhibit in this case?

21      A.  No, I have not.



Page 109

1    Q.  Okay.  Did you have any communications with
2  anyone at the NRC in the process of preparing your
3  reports?
4    A.  The only person I would have had contact
5  with was someone in the public document room at the
6  NRC, because I was looking for the attachments to
7  Acting Director Case's letter to Dr. Asperger.  And
8  so, I obtained that through the public document
9  services that the NRC provides.
10      But I've had no contact with anyone else at
11  the NRC regarding this matter.
12    Q.  And are those attachments listed in the
13  materials you considered as part of your report?
14    A.  I believe -- I believe so.
15    Q.  Will you check and show us where?
16    A.  In fact it may not be specifically -- Mr.
17  Case's letter to Dr. Asperger is cited there,
18  although -- as the Exhibit D to TVA's brief, but the
19  attachment, Dr. -- Mr. Case's letter lists certain
20  attachments and that's what I sought from the NRC
21  public document room and they are public documents.

Page 110

1    Q.  Well, did you obtain -- did you obtain the
2  attachment?
3    A.  Yes, I did.
4    Q.  But you didn't list them on your matters
5  considered.  Is that correct?
6    A.  Yes, I did not provide a specific list of
7  attachments.  Arguably the letter from Mr. Case to Dr.
8  Asperger identifies attachments with it.  So I mean,
9  that's part of it.
10    Q.  But the Exhibit D that you looked at which
11  was letter filed in court would not have attachments,
12  did it?
13    A.  I'm not absolutely sure of that but I think
14  the answer is it did not and that's why I sought the
15  public documents from the NRC public document room.
16    Q.  Were all of the documents and materials that
17  you considered in your reports listed either in
18  Exhibit A to the original report or Exhibit A to the
19  supplemental report?
20    A.  Yes.  To the best of my knowledge, yes.
21    Q.  Did you receive any information from TVA

Page 111

1  counsel or anyone at TVA orally that was not reduced
2  to writing or in a document that you considered in
3  preparing your report?
4    A.  Not that I -- not that I recall.  You know,
5  obviously we've had discussions -- I've had
6  discussions with counsel, but I don't consider that
7  responsive to your question.
8    Q.  Well, even in discussions with counsel,
9  you're required to reveal any data or facts that were
10  provided to you by counsel --
11    A.  Okay.
12    Q.  -- to be considered?
13    A.  And that, I was not provided any data or
14  facts by counsel that are not reflected in the report.
15    Q.  Okay.  All right.  Now, you listed five
16  depositions including your supplemental report that
17  you reviewed.  You listed the deposition of Larry
18  Blust, Chris Chandler, William McCollum, Dave Repka,
19  and Timothy Matthews.  Is that correct?
20    A.  Correct.
21    Q.  I couldn't hear you.  I'm sorry.

Page 112

1    A.  That's correct.
2    Q.  Okay.  You've not reviewed any other
3  depositions in this case.  Is that correct?
4    A.  That's correct.
5    Q.  How did you determine to review only those
6  depositions?
7    A.  Well, the most significantly I reviewed
8  David Repka's deposition because it was reflective of
9  his views with respect to the reports he filed.  So
10  that was most significant.
11      I think I reviewed the other -- well, and
12  also with respect to Tim Matthews and the views that
13  Tim Matthews was espousing during his deposition that
14  are addressed in the supplemental report.
15      With respect to Chris Chandler, Larry Blust,
16  Mr. McCollum, I reviewed I think just for general
17  background.  But they did not figure significantly in
18  the report.
19    Q.  They're not cited in your report at all
20  except in your list of materials reviewed.  Is that
21  correct?



Page 113

1    A.  I believe that's correct.

2    Q.  Is it a fair statement to say that there's

3  nothing in your report that relies on the deposition

4  testimony of Chris Chandler?

5    A.  Well, I didn't -- I did not make specific

6  reference to it.  I agree with that.  Again, what I

7  did writing the report is to provide citations to

8  either significant decisions or what I thought were

9  significant exhibits or other documents that bore most

10  directly on the report.

11       But, you know, I would not dismiss any of

12  the other things that might have been listed but not

13  called out in a specific reference because they did,

14  you know, provide some of the milieu or the background

15  for what I was looking at in drafting and creating the

16  report.

17    Q.  Was there anything in Chris Chandler's

18  deposition in his testimony that you relied on in

19  forming your opinions?

20    A.  I don't think there is anything particular

21  in his deposition.  Again, you know, it helps me

Page 114

1  provide, as did the others, provide me context for the

2  circumstances.

3    Q.  Now, you reviewed the deposition exhibits

4  that are listed in your Exhibit A, correct?

5    A.  Correct.

6    Q.  How did you determine to review and consider

7  only those exhibits and not other deposition exhibits

8  either from the depositions you reviewed or from the

9  depositions you did not review?

10    A.  I think in looking from my standpoint, going

11  back and thinking about it in terms of drafting the

12  report, these were things that sort of came to the

13  four, because they are things like construction

14  permits.  There is some litigation documents between

15  ND and TVA.

16       It has other, you know, other documentation

17  with respect to the handling of prior transfers and

18  things like that.

19       So what I was doing is I think from my

20  standpoint, these had the most influence in terms of

21  coming up with the opinions provided in the report.

Page 115

1    Q.  Okay.  Is that because you saw the

2  deposition exhibits when you read the depositions?  Is

3  that what you're saying?

4    A.  I may have -- well, some -- I may have -- I

5  think I was provided some exhibits by TVA.  And then

6  when I was reading the depositions, there may have

7  been exhibits that were identified in the course of

8  the deposition that I wasn't sure what that was and

9  wanted to take a look at.

10       I think that's just the process of, you

11  know, putting it together.

12    Q.  Okay.  So if there were other exhibits,

13  deposition exhibits in the case and you did not review

14  those depositions and you did not receive those other

15  exhibits from TVA counsel, you wouldn't know anything

16  about whether they existed or not existed, would you?

17    A.  Can you repeat the question?  I'm not sure I

18  understand it.

19    Q.  All right.  You said you reviewed certain

20  depositions and you were provided exhibits by TVA

21  counsel, and then you had some questions about

Page 116

1  exhibits that were not provided in the depositions you

2  read and you asked for those exhibits as well.  Is

3  that correct?

4    A.  Yes, that's correct.

5    Q.  All right.  But if you didn't review certain

6  depositions and those deposition exhibits were not

7  provided by TVA counsel, you wouldn't know whether

8  they existed or not, would you?

9    A.  I think that's speculative.  It --

10    Q.  Well, you wouldn't --

11    A.  Probably not.  Probably not, but --

12    Q.  My point is you didn't read all the

13  depositions or review all the deposition exhibits in

14  this case, did you?

15    A.  I have not read every document that has been

16  filed or has been exchanged between the parties in

17  this litigation.

18    Q.  You've certainly not read every document

19  that's been produced by the parties in this case, have

20  you?

21    A.  I think that's what I just answered to that.



STEPHEN G. BURNS                                    August 19, 2020
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY      117–120

Page 117

1  I have not read every document that's been exchanged

2  or prepared by both parties in this case.

3      Q.   Well, would you concede there are facts in

4  this case which you're not aware of?

5      MR. LEMBKE:  Objection, lack of foundation,

6  calls for speculation.

7      You can answer if you can, Mr. Burns.

8      THE WITNESS:  I have no reason -- I have no

9  basis on which to answer that question.

10 BY MR. O'REAR:

11     Q.   You think you may have -- you may have

12 reviewed every fact that's been presented in this

13 case?

14     A.   Well, again, I say, what do you mean by fact

15 here?  I believe I have reviewed the relevant facts

16 related to the opinion I have provided.  Whether there

17 are other facts related --

18     Q.   Well, there --

19     A.   Whether there are other facts relating to

20 the litigation between the two parties, I would

21 concede there undoubtedly are.  But I'm not sure that

Page 118

1  I have missed some significant matter or factual

2  matter.

3      Q.   When I refer to facts, I'm referring to

4  testimony or documentary evidence.

5      A.   So -- and again, the question is?

6      Q.   Well, I'm going to ask you another question.

7      I believe you stated that you have reviewed

8  all relevant facts that pertain to your opinion?

9      A.   That's correct.

10     Q.   Even though there may be facts out there

11 you're unaware of at this moment, right?

12     MR. LEMBKE:  Objection, argumentative.

13 BY MR. O'REAR:

14     Q.   Right?

15     MR. LEMBKE:  Same objection.

16 BY MR. O'REAR:

17     Q.   You can answer.

18     A.   I believe I have reviewed the facts that are

19 relevant to the opinion.  If there are other facts, I

20 am not aware of any significant fact that would change

21 that opinion.  And no basis to believe that there are.

Page 119

1      Q.   Did you review the contract in question,

2  which is in your stack there, it's Exhibit A -- excuse

3  me, Exhibit 1?

4      It's also marked Exhibit A to the complaint.

5      A.   Yes, I have.  I have looked at the contract.

6      Q.   Did you see and consider Section 7(a) of the

7  contract?  If you'll look at that on Page 8.

8      A.   Yes, I believe -- yeah, I'm aware of the

9  provision.

10     Q.   You're aware of the provision seven -- A7?

11     A.   Yes, I've seen that.  Yes, I've seen that.

12 I've seen it referenced in some of the litigation

13 documents.

14     Q.   Okay.  So you were aware when you prepared

15 your report that the TVA representative and warranted

16 in the contract that no NRC authorization consent or

17 approval was necessary to sell the site to Nuclear

18 Development?

19     MR. LEMBKE:  Objection to the form,

20 misstates the evidence.

21 BY MR. O'REAR:

Page 120

1      Q.   Is that correct?

2      MR. LEMBKE:  Same objection.

3      THE WITNESS:  Well, I'm aware of that

4  provision, yes.

5  BY MR. O'REAR:

6      Q.   Okay.  You're aware of the provision that

7  says no authorization consent or approval or other

8  order or action or filing with any governmental

9  authority is required for the execution and delivery

10 by the TVA of this agreement for the consummation by

11 the TVA of this -- of the transactions contemplated

12 hereby?  You're aware of that and were when you formed

13 your opinions.  Is that right?

14     A.   I may have lost myself.

15     Where is the provision, again?

16     Q.   It's on Page 8 of Exhibit 1, Section 7(a)7?

17     A.   Okay.  And your question is?

18     Q.   Well, I just want to make sure you know and

19 we're talking about the same provision.

20     I read the second part of subsection seven.

21     A.   Yes, I've seen the provision and I'm aware



Page 121

1  of that provision.

2      Q.  And did that provision -- was that provision

3  a factor one way or the other that you considered in

4  forming your opinion?

5          MR. LEMBKE:  Objection, vague.

6  BY MR. O'REAR:

7      Q.  You may answer.

8          MR. LEMBKE:  Same objection.

9          THE WITNESS:  The answer -- my answer is

10  that provision -- that's a provision in this contract.

11  That does not go to my judgement with respect to the

12  application of the Nuclear Regulatory Commission's

13  regulatory framework.

14  BY MR. O'REAR:

15      Q.  Okay.  So are you saying that that provision

16  did not factor into your opinion?

17          MR. LEMBKE:  Objection, asked and answered.

18  BY MR. O'REAR:

19      Q.  Are you saying that that section did not

20  factor into your opinion?

21          MR. LEMBKE:  Same objection.

Page 122

1          THE WITNESS:  That --

2  BY MR. O'REAR:

3      Q.  Pardon me?

4      A.  That provision does not reflect on the NRC's

5  regulatory framework or authority.

6      Q.  Okay.  If you would turn to Page 3 of the

7  contract.

8      A.  (Witness complies.)

9      Q.  And if you would look at Section 1(e) of the

10  contract in the middle of the page?

11      A.  Yes, I see it.

12      Q.  And did you review that section in the

13  process of preparing your report?

14      A.  Let me read it again.

15          Yes, I was aware of this provision.  I read

16  this part of the contract.

17      Q.  Okay.  Were you specifically aware of the

18  last sentence of subsection E which states, "Further

19  if an applicable governmental authority has not

20  accepted or otherwise allowed the transfer of a

21  permit, license or authorization pursuant to this

Page 123

1  Section 1(e) by closing, TVA's obligations under this

2  Section 1(e) shall cease."  Do you see that?

3      A.  Yes, I do.

4      Q.  Did that section of the contract factor in

5  to your opinion?

6      A.  No, because, again, this is a contract

7  between Nuclear Development and TVA and my opinion it

8  reflects my judgement with respect to NRC's historic

9  regulatory regime and regulatory authority.

10      Q.  Were you aware --

11      A.  This could not --

12      Q.  Okay.  Were you aware of the fact that

13  Nuclear Development paid TVA $22.2 million when the

14  contract was signed?

15      A.  I have no specific awareness of that.

16      Q.  Were you aware that Nuclear Development paid

17  TVA an additional $8 million in maintenance costs and

18  fees between the date the contract was signed and the

19  date of the scheduled closing?

20      A.  I don't have any particular awareness of

21  that.

Page 124

1      Q.  So those facts did not play a part in your

2  opinion.  Is that correct?

3      A.  That's correct.

4      Q.  And you did not review the deposition of TVA

5  CEO Bill Johnson.  Is that correct?

6      A.  That's correct, I did not read that one.

7      Q.  Were you aware of the fact that Mr. Johnson

8  made the decision not to close the sale to Nuclear

9  Development?

10      A.  I'm not sure in what context.  Probably I

11  had learned that in terms of the context of my review

12  with respect to matters involved in this case, but I

13  didn't have any other, you know, personal knowledge.

14      Q.  Regardless of how you learned it, were you

15  aware of it when you prepared your report and formed

16  your opinions?

17      A.  Well, I was aware that -- where TVA was on

18  the matter, yes, when I wrote my opinion.

19      Q.  Were you aware that Mr. Johnson, the CEO,

20  personally made the decision not to close the sale to

21  Nuclear Development?



Page 125

1     A.  I really can't say.

2     Q.  Did you review a video of Mr. Johnson at a

3  TVA-wide meeting just four days before the closing

4  day?

5     A.  No, I did not.

6     Q.  Would Mr. Johnson's motivation for making

7  the decision not to close have mattered to you one way

8  or the other in forming your opinion?

9     A.  No.

10    Q.  If you'd look at Exhibit 31, if you can find

11  it there.

12    A.  Yes, I think I've got it.  Yes, I have it.

13    Q.  This exhibit on the first paper is an e-mail

14  from Sherry Quirk, general counsel of TVA to Larry

15  Blust, counsel for Nuclear Development dated November

16  29, 2018?

17    A.  Correct.

18    Q.  Have you ever seen -- and it attaches a

19  letter from Ms. Quirk -- have you seen that exhibit

20  before?

21    A.  I believe I have.

Page 126

1     Q.  Okay.  Sir, and you did not reference this

2  exhibit in your Exhibit A, did you?

3     A.  I'd have to review Exhibit A.

4     MR. LEMBKE:  Mr. O'Rear, I'd like to direct

5  you to Number 28 on Exhibit A.

6     MR. O'REAR:  Which number?

7     MR. LEMBKE:  Twenty-eight.

8     THE WITNESS:  It's Number 28 but it's got a

9  different -- a deposition exhibit number.

10    MR. O'REAR:  Okay.

11  BY MR. O'REAR:

12    Q.  Did you rely on this letter for any purpose

13  in forming your opinion?

14    A.  Let me look at it for a moment.

15    Well, the letter references an opinion by

16  outside counsel, which I presume is Pillsbury, the

17  Pillsbury firm which provided opinion to TVA.  And to

18  the extent, really the only -- to the extent I did

19  reference and consider the Pillsbury letter, I guess

20  the answer would be indirectly yes.

21    Although the only things I would have been

Page 127

1  interested in this letter were really the first page,

2  I think.  Well, so many other things.  But I looked at

3  it, yes, I looked at it during the review and I

4  considered it.  But more directly it was the Pillsbury

5  letter that I considered more deeply.

6     Q.  Did you know that this letter from Ms. Quirk

7  was not delivered to Nuclear Development until

8  9:00 p.m. the night before the closing date?

9     A.  Well, I see a 9:00 p.m. date on the e-mail.

10  I had no particular knowledge of that.

11    Q.  Okay.  But you said you looked at or relied

12  on portions of the first page.  If you would look at

13  the first page of her letter --

14    A.  Yes.

15    Q.  Do you see that --

16    MR. LEMBKE:  I object to the form of that

17  question because it misstates his testimony.

18    MR. O'REAR:  Okay.

19  BY MR. O'REAR:

20    Q.  Do you see at the end of the first paragraph

21  the reference of acquiring a production facility,

Page 128

1  correct?

2     A.  Yes, I do.

3     Q.  Is it your opinion that the Bellefonte site

4  is a production facility?

5     A.  It has a production facility on it that is

6  under construction.

7     Q.  What is the production facility?

8     A.  It's a production facility as defined in

9  Section 101 of the Atomic Energy Act and the

10  implementing regulations.  And basically it's one

11  that's capable -- I can't quote it from memory --

12  capable of producing a nuclear reaction -- one

13  designed or used for production or for creating a

14  nuclear reaction.

15    Q.  I think you're referring to a utilization

16  facility definition, aren't you?

17    A.  Yes, I am.

18    Q.  I'm asking you do you agree that this is a

19  production facility?

20    Production facility is different from a

21  utilization facility, isn't it?



Page 129

1    A.   That's correct.  This is a utilization
2  facility.
3    Q.   So you do not agree with her reference to
4  this site as a production facility.  Is that correct?
5    A.   Well, I think it should have used the term
6  "utilization."  The basic principle is the same under
7  Section 101 for both, but I see utilization
8  differently.
9    Q.   You mentioned the Pillsbury letter.  Were
10  you aware that the Pillsbury letter was not produced
11  by TVA to Nuclear Development until well after the
12  lawsuit was filed?
13    A.   I have no knowledge of when it was provided.
14    Q.   Does the fact that it -- if it is a fact
15  that the letter was not produced prior to the lawsuit
16  being filed or prior to the closing play any factor in
17  your opinion?
18    A.   No, it doesn't.  Because the opinion goes to
19  the nature, it doesn't go to what the motivations of
20  parties were or their interactions.  It goes to the
21  legal question with respect to the status of the

Page 130

1  Bellefonte site and the ability of it to be -- and
2  what context it can be transferred at all.
3         So that's -- that's what I was looking at.
4    Q.   Are you aware of the fact that TVA never
5  sought a threshold determination from the NRC before
6  refusing to close the sale to Nuclear Development?
7    A.   I think I'm generally aware of that and my
8  understanding is neither did Nuclear Development.
9    Q.   Well, Nuclear Development didn't contend
10  that there was any issue, did they?
11    A.   I really don't know until -- well, actually,
12  I'm not sure.  Because even reading Mr. Repka's
13  opinion and Mr. Matthew's opinion, you know, this is
14  -- there's a bit of wishful thinking about going
15  forward without the prior approval of the CP transfer.
16         I can't really -- I can't speculate as to
17  that.  All I know is my understanding is neither did.
18    Q.   If TVA had a question about the legality of
19  the closing, it could have requested a threshold
20  determination from the NRC.  Is that correct?
21    A.   I suppose that's true.

Page 131

1    Q.   Well, you know it's true, don't you?
2    A.   Well, you're ask- -- I'm not going to
3  speculate as to whether they could, they should or
4  would.
5    Q.   I'm not asking you if they should.  I'm
6  asking you if they could have done that, couldn't
7  they?
8    A.   As could Nuclear Development.
9    Q.   Okay.  And the NRC has a process for
10  handling such requests.  Is that correct?
11    A.   Yes, I would say it overstates it to say
12  that there's a process or formality but there could
13  have been -- I imagine there could have been some
14  consultation.
15    Q.   Are you aware that TVA ceased all
16  construction at this site in 1988?
17    A.   Yes, I'm generally aware of that.  What I
18  perhaps am not as clear on is to what extent -- well,
19  you know, I understand they would have maintained it.
20  And then when -- after they re-acquired the
21  construction permit in 2009.  Again, if we're going

Page 132

1  through the maintenance preservation option, they
2  would have done some things.
3         But in terms of construct -- I do understand
4  that there has been no construction towards actual
5  completion, I think since about that time.
6    Q.   All right.  And do you understand that unit
7  One has been estimated by TVA itself to be only
8  55 percent complete?
9         MR. LEMBKE:  Object to the form.  When?
10  BY MR. O'REAR:
11    Q.   In 2010 or prior?
12    A.   I'm not aware specifically of what the
13  completion percentages were.  I understand they were
14  -- they were fairly far along but there was still a
15  lot of work that needed to be done.
16    Q.   Well, you don't -- were you made aware that
17  TVA estimated that unit two of Bellefonte was only
18  35 percent complete?
19    A.   Again, I don't know the -- I don't have a
20  recollection of particular percentages.  I know that
21  there were -- you know, some substantial construction



Page 133

1  had been done but I don't have an idea of what they

2  were.

3       One thing I will add, for example, is the

4  NRC used to use Bellefonte as a training bit -- or

5  visiting for new employees because they were done far

6  enough that you get an idea of what a nuclear reactor

7  on a nuclear site was.  So they were gone -- they more

8  than the groundbreaking, but I -- you know, I

9  understand that there was substantial work that would

10  need to be done to complete them.

11      Q.  You have Exhibit 127 before you?  That's

12  color photographs on the cover.

13      MR. LEMBKE:  It's very small plus the

14  exhibit Number?

15      THE WITNESS:  Mine is black and white.

16  BY MR. O'REAR:

17      Q.  The caption of the document's Bellefonte

18  Nuclear Plant Unit One and Common Completion of the

19  Project.

20      A.  Correct.  Yeah, I have that.

21      Q.  Okay.  Have you ever seen that document

Page 134

1  before?

2      A.  I'm not specifically aware of it, no.  I

3  don't think I've actually particularly read it before.

4      Q.  Let me ask you then about something in it.

5      Do you see on Page 1, if you would turn

6  there?

7      A.  Yes.

8      Q.  And if you would look at the bottom of the

9  page, the last bullet point says, "Unit One was

10  90 percent physically complete in 1988 and investment

11  recovery effort from 2005 to 2007 removed material and

12  equipment due to this effort additional scope during

13  DSEP and planned equipment refurbishment, completion

14  -- current completion estimate is 55 percent."  Do you

15  see that?

16      A.  Yes.

17      MR. LEMBKE:  I object to the form, lack

18  foundation.

19  BY MR. O'REAR:

20      Q.  Do you have any facts that you're aware of

21  that would refute that?

Page 135

1      A.  No.

2      Q.  Okay.  And then the last sentence was, "The

3  Bellefonte site contained a second identical unit that

4  was completed to approximately 58 percent in 1988 and

5  is currently estimated to be 35 percent complete for

6  the same reasons listed above."  Do you see that?

7      MR. LEMBKE:  Object to the form, lack of

8  foundation.

9  BY MR. O'REAR:

10      Q.  Do you see that?

11      A.  I see that.

12      MR. LEMBKE:  Same objection.

13  BY MR. O'REAR:

14      Q.  Do you have any information that would

15  refute that?

16      A.  No, I don't.

17      Q.  Okay.

18      Would it have mattered to you in forming

19  your opinions to know that Unit One was only 55

20  percent complete and Unit Two 35 percent complete?

21      A.  No, it would not.

Page 136

1      Q.  So that would not have been a factor in

2  forming your opinion that Bellefonte is a utilization

3  facility?

4      MR. LEMBKE:  Objection, asked and answered.

5      MR. O'REAR:  I haven't asked that question.

6      THE WITNESS:  Well, I did answer it before

7  and the answer is it does not affect my opinion.

8  BY MR. O'REAR:

9      Q.  Were you aware that the steam generators in

10  Units One and two at Bellefonte have had two-foot by

11  two-foot holes cut in them and rendered them

12  inoperable and permanently disabled?

13      A.  I don't have a particular knowledge of that.

14      Q.  If you knew that, would that have been a

15  factor in forming your opinion about whether

16  Bellefonte is a utilization facility?

17      A.  Not under the current circumstances, no.

18      Q.  Were you aware that the Bellefonte plant was

19  never put in operation?

20      A.  Yes, I'm aware of that.

21      Q.  And it had never had an operating licensing



Page 137

1    from NRC.  Are you aware of that?

2        A.  Yes, I'm aware it has never had an operating

3    license.

4        Q.  Were any of those factors important in

5    forming your opinion that Bellefonte is a utilization

6    facility?

7        A.  The first one was what, again?

8        Q.  That it was never put into operation.

9        A.  Okay.  So no, it does not.  It is not

10   dispositive with respect to my opinion because

11   operation requires a different license for following

12   through.  And the process that Bellefonte used which

13   is the historic two-step licensing process, and they

14   would have needed to go into operation to get an

15   operating license.

16       From my standpoint that does not obviate the

17   control that the NRC historically has placed over a

18   site that is under construction, even if it is in

19   involved construction, and that is where my opinion

20   focussed.

21       So those factors with respect to lack of

Page 138

1    operation are not dispositive to my opinion.

2        Q.  All right.  I'd like for you to look at the

3    next exhibit which is Exhibit 202 which will be the

4    deposition of James Chardos.  You should have that

5    transcript there.

6        MR. O'REAR:  And that is Exhibit 202, if you

7    could mark it as 202, please.

8        (Burns Exhibit No. 202 was marked for

9    identification.)

10       THE WITNESS:  I have it.

11   BY MR. O'REAR:

12       Q.  Now, you did not list Mr. Chardos'

13   deposition on your report, did you?

14       A.  No, I did not.

15       Q.  Do you know who James Chardos is?

16       A.  I'm not -- I believe -- well, he works for

17   the Tennessee Valley Authority.  From references in

18   other depositions, I would characterize him as a sort

19   of a project manager or contact, but I don't -- I

20   really don't know much about his role other than what

21   I've read in depositions or other documents.

Page 139

1        Q.  I believe he's described as plant manager

2    currently.  Were you aware of that?

3        MR. LEMBKE:  Object to the form, lack of

4    foundation.

5        THE WITNESS:  No.

6    BY MR. O'REAR:

7        Q.  Did you know that Mr. Chardos was the head

8    of the transition team regarding the transfer of the

9    Bellefonte site from TVA to Nuclear Development?

10       A.  I think I've seen that reference, again, in

11   depositions or some other documents.

12       Q.  All right.  And let me direct your attention

13   to Page 50 of this deposition, if you would.

14       I'm referring to the transcript page.  There

15   are four pages on one page.

16       A.  I read the transcript.

17       Q.  I'm not referring to the bottom right hand

18   corner page.

19       A.  Right.  I understand.  I have the page of

20   the transcript.

21       Q.  All right.  Let me read a question and

Page 140

1    answer to you.

2        At the bottom of Page 50 the question is,

3    "Would you agree that the Bellefonte plant could not

4    been under construction since 1988?"

5        Answer, "Yes."

6        Now, you were unaware of that testimony when

7    you prepared your report.  Is that correct?

8        MR. LEMBKE:  I object to the form, lack of

9    foundation.

10       MR. O'REAR:  That he was unaware of it?

11       MR. LEMBKE:  No.  You're reading statements

12   that he's -- had given no indication he's ever seen

13   before.

14       MR. O'REAR:  That's what I'm asking him.

15   BY MR. O'REAR:

16       Q.  You were unaware of that testimony from the

17   plant manager at Bellefonte when you prepared your

18   report.  Is that correct?

19       MR. LEMBKE:  I object to the form.

20       Mr. Chardos did not testify that he was the

21   plant manager.  He identified a separate title in his



Page 141

1   deposition.  And I also object to the form on the
2   basis of lack of foundation and asked and answered.
3   He's already said he hasn't read this deposition.
4   BY MR. O'REAR:
5       Q.  Okay.  If you -- Mr. Burns, if you knew that
6   Mr. Chardos had testified to that in his deposition,
7   would that have made a difference in your opinion
8   expressed in your report?
9       MR. LEMBKE:  Let me object to the form of
10  the question given that Mr. Chardos' deposition was
11  taken on July 10th and the report was issued in --
12  prior to that.
13      But, go ahead.
14      THE WITNESS:  So again, the question is?
15  BY MR. O'REAR:
16      Q.  If you were aware of that fact as testified
17  by Mr. Chardos, would that have made a difference in
18  your opinion in your report?
19      A.  No, it would not have.  Because as I think
20  I've stated several minutes ago, I'm aware that the
21  Bellefonte -- work on the Bellefonte plant in terms of

Page 142

1   active construction has been suspended for some time.
2   You know, it's now three decades, I guess.  And, you
3   know, my understanding even with my encounter when I
4   was in the General Counsel's Office in the early 2000s
5   was that there wasn't construction going on at that
6   time.
7       MR. LEMBKE:  I can't hear what the witness
8   is saying.
9       MR. O'REAR:  I can -- let's go off the
10  record for a minute.
11      (Whereupon, a recess ensued.)
12      MR. O'REAR:  Still with us, Mr. Burns?
13      THE WITNESS:  I am.
14      MR. O'REAR:  Can you say something again
15  because your voice is muted?
16      THE WITNESS:  I'm here.
17      MR. O'REAR:  All right.  I hear you now.
18      MR. LEMBKE:  All right.  I'm back.
19      MR. O'REAR:  Okay.  Everybody on?
20      Back on the record.
21      Ken, are we back on the record?

Page 143

1       THE REPORTER:  Yes, we're back on the
2   record.
3   BY MR. O'REAR:
4       Q.  All right.  Mr. Burns, if you would look at
5   transcript Page 56 of the Chardos deposition.
6       A.  I got it.
7       Q.  I'll read to you the two questions and two
8   answers at the end of that page.
9       It says question -- it says 2110, I think
10  it's supposed to be 2010, "When this report was
11  prepared."  And it's referring to the report you just
12  looked at, which is Exhibit 127 previously.
13      It states, "Is it correct to say that the
14  design was not finished for Bellefonte or that it was
15  contemplated to be changed?"
16      Answer, "The design was not complete in
17  2010."
18      Question, "Okay.  And what was not complete
19  about the design in 2010?"
20      The answer was the control room.  "The main
21  control room was not a complete design."  Do you see

Page 144

1   that?
2       MR. LEMBKE:  Object to the form, lack of
3   foundation.
4       THE WITNESS:  Yes.
5   BY MR. O'REAR:
6       Q.  If you known those facts when you prepared
7   your report, would that have made a difference in your
8   opinion?
9       A.  No, it would not have.
10      Q.  Okay.  If you would turn to Page 68 of the
11  transcript.
12      A.  Okay.  I'm there.
13      Q.  And towards the top of that page the
14  question was, "And is it a true statement today that
15  the Bellefonte plant site is not in condition to
16  enable it to meet performance and design
17  requirements?"
18      Answer, "Yes."
19      If you had known those facts when you
20  prepared your report and formed your opinion, would
21  that have made a difference?



Page 145

1    A.  No, it would not.

2        MR. LEMBKE:  Same objection.

3    BY MR. O'REAR:

4    Q.  Okay.  If you would turn to Page 72

5    continuing onto Page 73 and 74, let me read you these

6    questions and answers starting at Line 18 on Page 72.

7        "Is it correct, Mr. Chardos, that Units One

8    and two of Bellefonte cannot be used to sustain

9    nuclear fission in a self-supporting chain reaction?"

10       Answer, "In the current condition."

11       Question, "That's a correct statement?"

12       Answer, "Yes."

13       Question, "Is it a correct statement to say

14   that in their current condition Units One and two of

15   Bellefonte cannot function as nuclear reactors?"

16       There was an objection.  He asked for

17   restatement of the question.

18       I restated, "Is it correct that Units One

19   and two of Bellefonte cannot function as nuclear

20   reactors in their current condition?"  There was an

21   objection.

Page 146

1        Answer, "They cannot function."

2        Question, "Cannot function as nuclear

3    reactors?"

4        Answer, "Yes."

5        Question, "Is it a correct statement to say

6    that in their current condition Units One and two are

7    incapable of utilizing special nuclear materials?"

8        Answer, "In their current condition they

9    cannot utilize special nuclear material."

10       Then later on that page:  Question, "Was

11   there ever any loading of special nuclear material

12   into the reactors at Bellefonte?"

13       Answer, "No."

14       If you had known any of those facts that I

15   just read when you prepared your report and formed

16   your opinion, would that have made a difference.

17       MR. LEMBKE:  I'll object to the form, calls

18   for -- speculation -- or lack of foundation and

19   compound question.

20       THE WITNESS:  No.

21   BY MR. O'REAR:

Page 147

1        Q.  Mr. Burns, if you would next direct your

2    attention to Exhibit 85.

3        A.  Eighty-five.

4        Q.  So you have that?

5        A.  Yes, I do.

6        Q.  Have you seen this letter before?

7        A.  Let me take a look at it.  Yes, I have seen

8    it.

9        Q.  Do you recognize it to be a letter from the

10   senior project manager regarding the -- at NRC

11   regarding the Bellefonte application to transfer a

12   construction permit?

13       A.  Yes, but I don't recall whether this was

14   where they finally accept the application or not.

15       Q.  Well, I'll show you.  And it's a letter

16   dated November 25th, 2019 to Nuclear Development,

17   correct?

18       A.  Correct.

19       Q.  Now, if you would, direct your attention to

20   the third paragraph of the letter.

21       You may read that.

Page 148

1        A.  Yes, I've read it.

2        Q.  Is this the letter where the NRC accepted

3    the application for review?

4        A.  Yes, that's what it appears to be.

5        Q.  Okay.  Does this letter play any part in the

6    formation of your opinion?

7        A.  Well, it --

8        Q.  Let me ask this question and -- strike that

9    former question.

10       Does the NRC's acceptance or view of Nuclear

11   Development's application have any effect on your

12   opinion?

13       A.  You're asking whether the acceptance of the

14   application had any effect?

15       Q.  Yes.

16       A.  My opinion?  Well, the answer is no.

17   Because -- again, based on my experience at the NRC

18   and understanding the regulates or the requirements,

19   this is what I'd expect from the NRC in terms of an

20   application review.  And what this deals with is a

21   request for an order, an authorization to transfer.



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020
149–152

Page 149

1  So it works within the framework that I've suggested.

2      Q.   Let me direct you to the next exhibit, which

3  is Exhibit 122. It's captioned: Expert Report and it

4  is the report of Dave Repka, Nuclear Development's

5  expert.

6      A.   Right.

7          (Burns Exhibit No. 122 was marked for

identification.)

9  BY MR. O'REAR:

10     Q.   Do you have that?

11     A.   I have it.

12     Q.   And you addressed this report in your

13  report, correct?

14     A.   That's correct.

15     Q.   Do you know David Repka?

16     A.   Yes, I do.

17     Q.   Okay. Do you know that he practiced law in

18  the field of nuclear regulation, compliance and

19  licensing for over 38 years?

20     A.   Yes, I know he's basically a nuclear lawyer.

21     Q.   And do you know that he regularly practiced

Page 150

1  before the NRC?

2      A.   Yes, I'm aware of that.

3      Q.   Do you know that he formerly worked at the

4  NRC?

5      A.   Yes, he was a junior -- he was junior to me

6  as a lawyer, about three years after I began to work

7  for a short period of time.

8      Q.   Did you work with him on any matters?

9      A.   It's possible. I think he was primarily

10  involved in the licensing -- licensing end. I was

11  involved in oversight and enforcement but also had

12  interactions as I say on citizen petitions that might

13  interact with licensing matters.

14         So I never participated in a case with him,

15  but I probably had some interactions with him.

16     Q.   Did he have more experience than you did in

17  licensing matters?

18     A.   I would not say that.

19     Q.   Would you describe him as a competent

20  nuclear licensing attorney?

21     A.   Yeah, I think he's generally a competent

Page 151

1  attorney. He's been in the field. He's licensed to

2  practice. Hasn't lost his license, so --

3      Q.   Does he have a reputation as a highly

4  skilled and experienced nuclear licensing attorney?

5      A.   I can't speak to his reputation.

6      Q.   You don't know his reputation?

7      A.   I don't know how he is assessed. You're

8  quick to characterize him as a highly respected,

9  highly competent lawyer. He is a lawyer. He's

10  practiced in his field. I believe he's a competent

11  lawyer but as to accolades, I'm not prepared to go

12  there.

13     Q.   How many nuclear licensing attorneys do you

14  know that practice privately outside the NRC?

15     A.   Today?

16     Q.   Yes.

17     A.   I didn't hear.

18     Q.   How many nuclear licensing attorneys do you

19  know?

20         MR. LEMBKE:  I'm going to object on the

21  vague of -- basis of "know."

Page 152

1         Do you mean personally know or know of?

2  BY MR. O'REAR:

3      Q.   Yes, know of, familiar with, have worked

4  with, have seen their work, have knowledge of their

5  work?

6      A.   I would say I'm probably familiar with most

7  members of the nuclear bar.

8         Probably the ones I don't -- I probably

9  don't know a lot of newer people who have come in in

10  the last few years. But, you know, it's hard to put a

11  particular number but I know probably -- I either know

12  or know of many of the people who practice in the

13  field even before the Agency in any number of

14  capacities.

15     Q.   How many -- when you were most recently

16  there as commissioner, how many members of the nuclear

17  bar regularly practice before the NRC?

18     A.   That's hard for me to answer because, again,

19  you have lawyers representing clients in licensing

20  matters, in enforcement matters, in investigatory

21  matters. And much as a commissioner I'm not



Page 153

1  necessarily going to see -- see that.
2      I will see -- as a commissioner you'll see
3  pleadings that might come to you on appeals or in
4  particular hearings conducted by the Commission
5  itself.  But it's hard for me to speculate on an
6  answer.
7      Q.  How about when you were general counsel, how
8  many nuclear licensing lawyers regularly practiced
9  before the NRC?
10     A.  You know, again, it's a speculative answer.
11 There are probably a couple dozen who are, you know,
12 regularly before the Agency but that doesn't mean that
13 there aren't -- you know, there are maybe associates
14 and some outside counsel that might be brought in.
15     Q.  Do you know Tim Matthews?
16     A.  I actually don't know him well.  I know -- I
17 know he practices but I think I've only met him a few
18 times.
19     Q.  Do you know Mr. Matthews to have practiced
20 in the field of nuclear energy, nuclear licensing for
21 over 25 years?

Page 154

1      A.  Yes, I know he has practiced before the
2  Agency, I think since the 1990s.
3      Q.  Does Mr. Matthews have a reputation as a
4  skilled and experienced nuclear licensing attorney?
5      A.  I can't speak to his reputation.
6      Q.  You don't know?
7      A.  As I said, I don't have a particular -- a
8  lot of particular contact with him, and I don't -- you
9  know, I don't know where on the scale of things he's
10 considered in practice.
11     Q.  If you would direct your attention now, to
12 Exhibit --
13         MR. LEMBKE:  This is a good point.  Let's
14 take a five-minute restroom break.
15         MR. O'REAR:  Let's do that.  Let's go off
16 the record.
17         (Whereupon, a recess ensued.)
18         MR. LEMBKE:  There's one point the witness
19 needed to clarify from this morning.
20         Before we get started, Mr. Burns had one
21 point of clarification on some testimony he give this

Page 155

1  morning that he wanted to make.
2          THE WITNESS:  Yeah.  I was asked a question,
3  whether I had had any contact with former TVA
4  officials regarding this matter.  And I recall, I
5  think Mr. McCollum had worked at TVA.  So I would --
6  the only -- the amendment to my answer is when I met
7  Mr. McCollum is probably that drop-in from Nuclear
8  Development.
9          And so technically that was having had a
10 contact with a former TVA official.  That's all I
11 wanted to clarify.
12         MR. O'REAR:  You ready?
13 BY MR. O'REAR:
14     Q.  Let's go back on the record.
15         MR. LEMBKE:  I think that was on the record,
16 I hope.
17         THE REPORTER:  Yes, it was on the record.
18 BY MR. O'REAR:
19     Q.  Do you have your report in front of you,
20 Exhibit 199?
21     A.  Yes, I do.

Page 156

1      Q.  Now, you opine in your report that
2  Bellefonte is a nuclear utilization facility, correct?
3      A.  Correct.
4      Q.  And your opinion differs from that of Mr.
5  Repka, correct?
6      A.  Correct.
7      Q.  And your opinion differs from the position
8  as testified to by Mr. Matthews.  Is that correct?
9      A.  That's correct.
10     Q.  In fact on that point your opinion is
11 diametrically opposed to both of their opinions,
12 correct?
13     A.  That's correct.
14     Q.  Do you agree that if Bellefonte is not a
15 utilization facility, then the NRC is not required to
16 approve the transfer of the construction permits to
17 Nuclear Development before ownership of the Bellefonte
18 site was transferred to Nuclear Development?
19     A.  What I have said in my opinion is that those
20 facilities given longstanding NRC practice and
21 precedent are considered utilization facilities.  They



STEPHEN G. BURNS                                          August 19, 2020
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY          157–160

Page 157

1  were utilization facilities under construction as
2  opposed to operating facilities.  And as such, they're
3  subject to the construction permit and construction
4  authorization.
5        And as I said in my opinion and is testified
6  as such in the construction permits letters.
7     Q.  I understand that.  You didn't answer the
8  question, though.
9     A.  I did.
10    Q.  Do you agree that if Bellefonte is not a
11  utilization facility, then the NRC is not required to
12  approve the transfer of the construction permit before
13  ownership of the site is transferred to Nuclear
14  Development?
15       MR. LEMBKE:  Object to the form.  You mean
16  under the Atomic Energy Act or any legal basis?
17  BY MR. O'REAR:
18    Q.  Under the Atomic Energy Act or any legal
19  basis?
20    A.  So, please repeat the question because I
21  want to make sure I get the nuances in it.

Page 158

1  BY MR. O'REAR:
2     Q.  Do you agree that Bellefonte is not a
3  nuclear -- excuse me.  I'll start over.
4        Do you agree that if Bellefonte is not a
5  utilization facility, then the NRC is not required to
6  approve the transfer of the construction permit to
7  Nuclear Development before ownership of the Bellefonte
8  plant site is transferred to Nuclear Development?
9     A.  I would -- again, I would only agree if
10  basically what was happening was that the project was
11  brought to termination and then that the NRC would be
12  satisfied that it was no longer on a path toward
13  completion of a utilization facility.  And thus, that
14  transfer might be able to be made but that -- that
15  still would require some NRC action.
16       I mean, if that -- let me stop there.
17    Q.  I don't think that answered my question.
18       Yes or no; if Bellefonte is not a
19  utilization facility, does the NRC have to approve the
20  transfer of the construction permits before the site
21  is transferred to Nuclear Development?

Page 159

1        MR. LEMBKE:  I object to the form.  The
2  witness does not need to answer.
3        First of all, object to the statement that
4  he didn't answer the question.  But beyond that, I
5  object on the basis of yes or no.  He's entitled to
6  explain his answer.
7        MR. O'REAR:  But he needs to answer the
8  question.
9        MR. LEMBKE:  He already did answer the
10  question.
11       MR. O'REAR:  I don't think he did.
12       MR. LEMBKE:  Answer it again, Mr. Burns.
13       THE WITNESS:  Under your hypothetical if it
14  is not a utilization facility, which is not the case
15  here, then conceivably it could be -- it could be
16  transferred to -- to a new owner.
17       But that's not the case that you have here.
18  That is not the regulatory construction we have in
19  play and that is not the historical practice of the
20  Nuclear Regulatory Commission.
21  BY MR. O'REAR:

Page 160

1     Q.  Do you agree that if Bellefonte is not a
2  utilization facility, then Section 101 of the Atomic
3  Energy Act does not prohibit the transfer of ownership
4  of the Bellefonte site by TVA to Nuclear Development
5  before the NRC approves the transfer of the
6  construction permit?
7     A.  Again, it's similar to my other answer.
8  It's assuming a hypothetical which does not exist in
9  this case.
10    Q.  And the hypothetical is your opinion that it
11  is a utilization facility.  Is that correct -- or that
12  is, my statement or question that it is not, that's
13  the hypothetical, right?
14    A.  Correct.
15    Q.  And your testimony is based on your opinion
16  that it is, correct?
17    A.  Well, it's my opinion on it.  But it is
18  based on my historic practice at the NRC and on
19  historic precedent of the NRC related to this matter.
20    Q.  And your opinion is diametrically opposed to
21  the opinions of Mr. Repka and Mr. Matthews, correct?



Page 161

1        MR. LEMBKE:  Well, let me note for the
2   report -- I'm going to I object on the basis of lack
3   of foundation because Mr. Matthews insisted he was
4   offering no opinions in this case.
5        MR. O'REAR:  And I earlier didn't say
6   opinion.  I said his testimony.
7        MR. LEMBKE:  No, you actually said opinion
8   both times.
9        MR. O'REAR:  Okay.  I don't think I did the
10  first time.  But --
11  BY MR. O'REAR:
12       Q.   And your opinion is directly contrary to Mr.
13  Repka's opinion, correct?
14       A.   My opinion differs from Mr. Repka's opinion.
15  However, Mr. Repka -- I note Mr. Repka, the opinion he
16  gives, is in fact what I would construe as sort of a
17  narrow trajectory in this case.  And in fact, I think
18  I read his opinion as frankly, the preferable scenario
19  is the one I describe as what holds here.
20       And I would say the same about Mr. Matthews'
21  testimony.

Page 162

1   BY MR. O'REAR:
2        Q.   And your opinion is it differs from the
3   exhibit that Mr. Matthews prepared called the
4   Regulatory Path Forward.  Is that correct?
5        A.   That's correct.  But again, I would say that
6   my opinion differs -- I agree with Mr. Matthews that
7   the -- the way to go, which he describes as the
8   preferable way to go, is the way I have described --
9   what I've described in my expert opinion.
10       When he says there is another thing and
11  there is some risk of some violation and maybe it's
12  that.  Well, in effect, the risk of violation.
13  Essentially it is an admission that is not fully law
14  abiding to proceed that way.
15       Q.   Well we dispute that and I don't think that
16  was responsive to my question.
17       MR. LEMBKE:  Move to strike that statement
18  by counsel.
19  BY MR. O'REAR:
20       Q.   If you had --
21       MR. LEMBKE:  Object to the statement as

Page 163

1   argumentative.
2   BY MR. O'REAR:
3        Q.   I direct your attention to Paragraph 20 of
4   your report.
5        A.   Okay.
6        Q.   In Paragraph 20 of your report, you refer to
7   the regulatory definition of a utilization facility
8   found in 10 CFR 50.2, correct?
9        A.   Yes.  There's a reference to 50.2.
10       Q.   And you do not reference the statutory
11  definition of a utilization facility found in the
12  Atomic Energy Act, did you?
13       A.   I -- in what section?  In Section 11?
14       Q.   In Section 20.
15       A.   I did not provide a specific reference to
16  that.
17       Q.   Have you provided a reference to a statutory
18  definition anywhere in your report?
19       A.   I don't recall offhand.
20       Q.   Let's -- do you have there the 10 CFR
21  Section 50.2 provision that I had submitted as an

Page 164

1   exhibit?  Do you see that in your stack?
2        A.   That's Exhibit 129?
3        Q.   No.  I don't -- no, it is an unmarked
4   exhibit.
5        MR. LEMBKE:  Oh.  What's the number?
6        MR. O'REAR:  The number will be 203.
7        MR. LEMBKE:  But I'm getting, what is it
8   we're looking for in the stack?
9        MR. O'REAR:  It's just the CFR, 10 CFR 50.2.
10       THE WITNESS:  I'm seeing a 50.5 but I don't
11  know where -- maybe it's back here.
12       MR. LEMBKE:  It should be towards the back
13  of the stack.
14       THE WITNESS:  Yes, I have it.
15       MR. LEMBKE:  Okay.  Please mark that as
16  Exhibit 203.
17       (Burns Exhibit No. 203 was marked for
18  identification.)
19  BY MR. O'REAR:
20       Q.   Now, I would also like you to locate -- it
21  should be right next to where that exhibit was -- the



Page 165

1   next exhibit, which is 42 USC Section 2014, the
2   definition section of the --
3        A.   Yeah, I have it.
4        Q.   -- Atomic Energy Act.
5           MR. O'REAR:  Mark that one as Exhibit 204.
6           (Burns Exhibit No. 204 was marked for
7   identification.)
8   BY MR. O'REAR:
9        Q.   Now, is it your understanding as a lawyer
10  that the statutory definition takes precedence over
11  the regulatory definition to the extent they are
12  inconsistent?
13       A.   If they've been found inconsistent.
14       Q.   Okay.  And in your mind since you didn't
15  cite the statutory definition, what role did it play
16  in forming an opinion on what is a utilization
17  facility?
18          MR. LEMBKE:  Objection, vague.
19  BY MR. O'REAR:
20       Q.   So what role, if any, did it play in forming
21  your opinion?

Page 166

1        A.   Well, the statutory definitions have a role
2   but the other -- the other part of this is you have to
3   consider the Agency's authority under the Act and its
4   power in terms of adopting regulations, interpreting
5   and applying the statutory provisions.
6           And again, this is a definitional provision,
7   but the Atomic Energy Commission and then the NRC have
8   broad authority with respect to implementation and
9   basically engineering the regulatory framework under
10  which is -- under which it acts and which it applies
11  the requirements of the Act to it.
12          So, from that standpoint -- now, the
13  definition is relevant but I'm as much interested in
14  the terms of the implementation of the regulatory
15  provision as well as other statutory provisions for
16  the application of these requirements.
17          There's a famous case, a pivotal case from
18  the late 1960s that talks about the Agency being, you
19  know, with extraordinarily broad discretion in the
20  implementation of its authority.  So I think that --
21  that's all you're reflecting here -- reflected here.

Page 167

1        Q.   The Agency can't change the statutory
2   definition of utilization facility, can it?
3        A.   Right.  It's not going to change the statute
4   itself.  But what -- as I said, what the Agency does
5   have is the authority to implement it and apply it in
6   its regulatory framework.  And that's what it's doing.
7        Q.   Wouldn't you agree the statutory definitions
8   are paramount?
9        A.   Paramount to what?
10       Q.   Paramount to any regulatory definition or
11  any interpretation or any Commission opinion or any
12  enforcement action opinion?
13          MR. LEMBKE:  Objection, asked and answered.
14  BY MR. O'REAR:
15       Q.   The statutory definition trumps all of those
16  determinations?
17          MR. LEMBKE:  Objection, asked and answered.
18          You can answer it again, Mr. Burns.
19          THE WITNESS:  I would disagree with the
20  characterization that it trumps.  Because again, you
21  have to look holistically at the statute and what the

Page 168

1   statute does is provide extraordinarily broad
2   authority in terms of the implementation.
3           So yes, the definition -- I don't dispute
4   that the definition has a legal consequence and it has
5   legal significance.  But the other -- we need to go
6   through the rest of the statute and look at what the
7   powers are in terms of how the Agency is to implement
8   that authority.  And that's what is particularly
9   important, is the authority to control its regulatory
10  framework and its basically oversight of the
11  facilities subject to its review.
12  BY MR. O'REAR:
13       Q.   Well, if we're trying to determine what is
14  the meaning of a utilization facility under federal
15  law, wouldn't the first place you'd look be the
16  statute that defines utilization facility?
17       A.   Well, I would agree, you would look at the
18  statute.  And then you would look at what the Agency
19  has done.  And that definition in 10 CFR 50.2 for
20  example, it's my guess it goes back to AEC, the Atomic
21  Energy Commissions days.



Page 169

1        In fact it goes back -- if I look at your
2   document, on the very last page of it, it says,
3   original course, 21 Federal Register 355 January 19th,
4   1956.
5        Q.   Okay.  You said the utilization facility
6   definition in the statute is relevant and has legal
7   consequence, but isn't it at the top of the spectrum
8   in terms of how you look at the definition of
9   utilization facility?
10       MR. LEMBKE:  I object to the form.  This is
11  argumentative and repetitive.
12       He has already answered this question
13  repeatedly and you just don't like his answer, so
14  you're asking it again and again.
15       MR. O'REAR:  I'm not sure he's answered.
16       MR. LEMBKE:  He has answered it.
17  BY MR. O'REAR:
18       Q.   All right.  Well, answer that last question
19  then.
20       A.   I answered.  I said it is not the ultimate
21  and dispositive provision because there are other

Page 170

1   provisions in the Atomic Energy Act which pertain to
2   the Commission's authority and the implementation of
3   the authority through the Act.
4        And what the Commission has done, is it's
5   done that through its regulations and these are
6   regulations of longstanding existence, going back to
7   1950.
8        Q.   All right.  So let's look at the statutory
9   definition, if you will, which is Exhibit 204.  And if
10  you would turn to the fifth page of the exhibit,
11  subsection CC.  You're familiar with this, right?
12       A.   Yes, I am.
13       Q.   All right.  It's got two parts to it.  In
14  the first part it says, "A utilization facility means
15  any equipment or device except an atomic weapon
16  determined by rule of the Commission to be capable of
17  making use of special nuclear material."  Do you see
18  that?
19       A.   Yes, I do.
20       Q.   Now, is the Bellefonte plant capable of
21  making use of special nuclear material?

Page 171

1        MR. LEMBKE:  Let me object.  That was an
2   incomplete recitation of that definition.  And your
3   question now, is based upon incomplete recitation of
4   the --
5        MR. O'REAR:  Well, I will read the rest of
6   it.  But the rest of it is immaterial to that and it
7   talks about the quantity of special nuclear material,
8   the character of it.
9   BY MR. O'REAR:
10       Q.   So my question to you, Mr. -- and you may
11  consider the entire language of Section 1, subsection
12  CC -- is Bellefonte capable of making use of special
13  nuclear material?
14       A.   Bellefonte in its current condition is an
15  uncompleted utilization.  It cannot -- It cannot
16  sustain a chain reaction basically at this point in
17  time.
18       What I would point out with respect to this
19  definition, which goes to the point I was making a few
20  minutes ago, is it talks about the Agency.  It talks
21  about the term "utilization facility" means a

Page 172

1   equipment or device -- except the -- determined by
2   rule of the Commission to be capable."
3        And so the rule -- that's why I think 50.2
4   and other rules of the Commission that govern the
5   possession and the construction and ultimately
6   operation of a utilization facility are relevant.
7        Q.   What is the -- so there is no equipment or
8   device that Bellefonte is capable of making use of
9   special nuclear material.  Is that correct?
10       MR. LEMBKE:  Objection, asked and answered.
11  BY MR. O'REAR:
12       Q.   Is that correct?
13       A.   I don't know specifically what remains at
14  the Bellefonte site.  For example, I presume the
15  reactors vessels are there but I don't -- I don't
16  contest that the plant cannot be currently put into
17  operation in its current configuration.
18  BY MR. O'REAR:
19       Q.   Okay.  Do you dispute Mr. Chardos' testimony
20  that the plant cannot make use of special nuclear
21  material?



Page 173

1     A.  I think I answered that before.  I said I
2   don't dispute that in its current condition.
3     Q.  And then let's look at part two of that
4   definition.  "Any important component part especially
5   designed for such equipment or device as determined by
6   the Commission."  Do you see that?
7     A.  I do.
8     Q.  Okay.  And so, is there a component part of
9   this plant that constitutes any equipment or device
10  capable of making use of special nuclear material?
11     A.  Well, that's not what the definition says.
12  It's any important component part especially designed
13  for such equipment or device.
14     Q.  Okay.  What is the component part especially
15  designed for such equipment or device at a utilization
16  facility?
17     A.  There would be any number of things, but the
18  reactor vessel would be an important thing.
19         I think the significant thing here with
20  respect to that is that while the NRC oversees
21  significant components -- or it's not only significant

Page 174

1   components, it's all the safety related construction
2   and related construction and the components that may
3   be used in a facility.  This provision, there's not
4   and licensing of -- that you must have a license to
5   possess the steam generator.  What you have to have a
6   license for is to carry out activities at the site for
7   which you are licensed.
8     Q.  All right.  So, are you saying that there's
9   no component part at Bellefonte that is a utilization
10  facility?
11     A.  I'm not sure.  I'm not sure exactly what the
12  -- those component parts, but the fact that they --
13  for example, a steam generator, although we understand
14  may be solely depleted, is there.  That does not have
15  a particular significance to me.
16     Q.  All right.  So Section 2 has no significance
17  to you?  Section 1, that's the pertinent definition
18  here.  Is that right?
19     A.  Yes, I believe so.
20     Q.  Now, if you would look at the regulatory
21  definition, which is Exhibit 203.

Page 175

1     A.  Right.
2     Q.  And when the statutory definition says as
3   determined by the rule by the Commission, is this a
4   rule, 10 CFR 50.2?
5     A.  Yes, this is a rule.
6     Q.  And if you go over toward the end, next to
7   the last page of the exhibit, we have a definition of
8   utilization facility, correct?
9     A.  Correct.
10     Q.  All right.  It says, "Any nuclear reactor
11  other than one designed or used primarily for the
12  formation of plutonium or U233," correct?
13     A.  Right.
14     Q.  Okay.  So with respect to Bellefonte, we're
15  not talking about a reactor designed or used primarily
16  for the formation of plutonium or U233, are we?
17     A.  I think that's my understanding.
18     Q.  Yeah, and so we're talking about just a
19  nuclear reactor other than that, right?
20     A.  Right.
21     Q.  And that's consistent with the fact that

Page 176

1   this is not a production facility, correct?
2     A.  Yes, this not that.
3     Q.  It never was designed to be a production
4   facility, was it?
5     A.  Not that I'm aware of.
6     Q.  And there is no nuclear reactor at
7   Bellefonte capable of conducting nuclear fission, is
8   there?
9     A.  There is nothing currently capable.  There
10  is -- in fact I think it was in the context of the --
11  the definition, something that is designed -- designed
12  or ultimately designed to be finished to do so.
13     Q.  So is it your opinion that once the
14  Bellefonte plant was designed back in early '70s, it
15  at that point became a utilization facility?
16     A.  Once construction permit was issued, the
17  construction permit is for a utilization facility, and
18  it is for the construction of the utilization facility
19  at the site.
20         That can go on, there can be changes to it
21  over the years but basically the NRC considers that,



Page 177

1  under historic practice as cited in the Court, and my
2  experience has the utilization facility subject to the
3  NRC's control.  I concede that it is not one that is
4  capable, at that time, of the being put into
5  operation.
6      Q.  Well, let me go back to my question because
7  I don't think you answered it.
8      When -- when the plant was originally
9  designed, was it at that point a utilization facility?
10     A.  I'm not sure I understand the question.
11     Q.  Was the ground and the grass at the site a
12  utilization facility when the design was prepared?
13     A.  The ground and the grass are not -- not the
14  facility.  They're the place where the facility would
15  be located.  The design is something that has to be
16  approved to go forward; and with fraction of the
17  facility, that is considered a utilization facility
18  that's under construction at the site.  The design may
19  change over the years.
20         There may be additional requirements the NRC
21  imposes, there may be design changes that the

Page 178

1  applicant wishes to consider and those are there.  But
2  it doesn't -- from my standpoint for a site that is to
3  do something other than be terminated and go away,
4  does not make it less of a utilization facility for
5  purposes of regulatory control.
6      Q.  Well, we're asking -- I'm asking you a
7  different question.
8      Was the ground and grass at Bellefonte a
9  utilization facility as soon as the design was
10  prepared for the facility?
11     A.  Are you assuming it owns the license or this
12  is prior to its licensing?
13     Q.  When it was designed.  I'm referring to your
14  use of the word "design," the definition.
15     MR. LEMBKE:  I'm going to object to the
16  form.  Are you meaning utilization facility within the
17  meaning of the definition of utilization facility?
18  And which definition?
19     MR. O'REAR:  I'm -- well, whatever
20  definition he wants to use.  He was presented with two
21  here; statutory and regulatory.  He's the one that

Page 179

1  opined it's a utilization facility.
2      THE WITNESS:  Well, the one designed, the
3  design which is going to be somebody referenced by
4  various applicants who seek a construction permit,
5  that is designed as a utilization facility.
6  BY MR. O'REAR:
7      Q.  The design plans do not make it a
8  utilization facility, do they?
9      A.  At a particular site?  Once -- once you are
10  underneath the NRC's authority and have initiated the
11  construction -- initiated the construction or taken
12  actions under the NRC's authority, it is considered --
13  it is considered a utilization facility, albeit it's
14  got to progress.
15      So, that's partly -- part of that is design,
16  part of it that, you know, building administrative
17  buildings, part of that's building security things and
18  then part of it's building the reactor facility
19  itself.  So I think that's what is considered.
20      And I think that -- again, that's the
21  longstanding practice of the staff and that's as

Page 180

1  reflected in Mr. Case's letter.
2      Q.  Did the design plans in and of themselves
3  create a utilization facility?
4      MR. LEMBKE:  Object, it's asked and
5  answered.  He just answered that question.
6      MR. O'REAR:  I don't think he did answer it.
7      MR. LEMBKE:  He just told you once it's
8  under the authority and they start to construction,
9  it's a utilization facility.
10     MR. O'REAR:  I'm not asking that question.
11  BY MR. O'REAR:
12     Q.  Before construction, when it was designed,
13  is it a utilization facility?
14     A.  It's designed for a utilization facility.
15     Q.  Is it a utilization facility?  I'm not
16  asking you if it's designed for one.
17      I'm asking you:  Is it a utilization
18  facility?
19     MR. LEMBKE:  Hold on.
20  BY MR. O'REAR:
21     Q.  Is it a utilization facility?



Page 181

1          MR. LEMBKE:  Hold on, Mr. Burns.

2     Mr. O'Rear, you are not going to yell at our

3  witness.

4          MR. O'REAR:  Okay.  Well, I --

5          MR. LEMBKE:  I think we need to take a

6  five-minute break.  We're going to take a five-minute

7  break.

8          (Whereupon, a recess ensued.)

9          MR. O'REAR:  Back on the record.

10 BY MR. O'REAR:

11     Q.   Mr. Burns, let me see if I can simplify

12 these questions for you and refer to specific points

13 in time.

14     A.   Okay.

15     Q.   Do you understand that the design for

16 Bellefonte was originally prepared sometime in the

17 early '1970s?

18     A.   Yes, I do understand that because that's

19 inherent in terms of the determinations that were made

20 in the construction permit's review and determination.

21     Q.   And I want you to focus on that point in

Page 182

1  time which is prior to the issuance of any

2  construction permit or prior to the beginning of any

3  construction.  Okay?

4     A.   Okay.

5     Q.   Was Bellefonte a utilization facility at

6  that time?

7     A.   Before the construction permit?

8     Q.   Yes.

9     A.   No.  There was no approval of the site to

10 host a utilization facility prior to the issuance of

11 construction permits in 1974.

12     Q.   Now, I want you to focus on the time that

13 the construction permits were issued in 1974.

14     A.   Okay.

15     Q.   And before construction began.  Okay?

16     A.   Okay.

17     Q.   Was Bellefonte a utilization facility at

18 that time?

19     A.   And this is they held the construction

20 permit?

21     Q.   Yes.

Page 183

1     A.   But this is before they actually started

2  pouring concrete or things like that?

3     Q.   Yes.

4     A.   I think -- that's an interesting question.

5  I'm not sure, quite, if I faced that.

6          I go back to -- I think certainly after

7  construction begins and you're starting to proceed

8  toward creation of the facility itself, you're

9  certainly a utilization facility subject to NRC

10 control on the site.

11          Prior to that time, prior to basically

12 disturbing the green field or however you want to

13 characterize it, I think it's unclear.

14          And part of why I'm saying that is, for

15 example, there are certain activities that can

16 proceed.  For example, before a construction permit

17 under a limited work authorization, that in themselves

18 do not involve in effect safety related construction

19 or actually matters that would be, you know, advancing

20 the facility itself.

21          You know, for example, building an

Page 184

1  administrative building on the site or a parking lot

2  or something.

3     Q.   Well, I am referring to any construction.

4  So is it your testimony that it is not a utilization

5  facility at the time the construction permits are

6  issued and the site is not under construction?

7     A.   I'm saying that -- I'm saying that's an

8  interesting question.  I'm not sure I have had or I'm

9  aware of an experience where that kind of dichotomy is

10 drawn because basically when the construction permit

11 is issued, it's issued for the construction of a

12 utilization facility.  And that -- from then on out,

13 you are until you turn the permit or you turn on the

14 reactor, you are subject to NRC's preliminary control

15 and I think that's significant.

16     Q.   I'm not asking you about preliminary

17 control.  I'm asking about whether it is a utilization

18 facility.

19          So you're saying -- really, are you saying

20 you can't answer that question or are you saying it's

21 not a utilization facility at that point?



Page 185

1   A.  Again, at what point?  I want to be careful.

2   Q.  At the point that the construction permit

3   had been issued but no construction had begun.

4   A.  I think it would be speculative to say that

5   at that point it's not a utilization facility.  And

6   I'm not sure it matters because, again, you're subject

7   to the NRC's control.  You can't do anything about the

8   site without the NRC's permission at that point.

9   Q.  I don't understand your answer that it is

10  speculative to say it is not a utilization facility.

11  A.  Well, it's because the construction permit

12  is for construction of a utilization facility.  And

13  yes, you know, I would concede at some point somebody

14  actually starts digging a hole, pouring foundation,

15  you know, putting in piles to support a building,

16  bringing equipment on the site.  And clearly under

17  that circumstance, those circumstances that's

18  proceeding, that's a utilization facility.

19  Q.  All right.  Let me -- well, then let me ask

20  you this.  At what point of the construction process

21  does it become a utilization facility?

Page 186

1        MR. LEMBKE:  I object, that mischaracterizes

2   his testimony.

3        MR. O'REAR:  I don't think it does.

4        MR. LEMBKE:  He never said that that's --

5        MR. O'REAR:  All right.  Then answer the

6   question, then.

7   BY MR. O'REAR:

8   Q.  Is it a utilization facility before

9   construction is begun?

10  A.  Before construction is begun.  You know, I

11  think potentially -- potentially no.  But, again, I'm

12  not sure that it matters.

13  Q.  But it might matter, so that's why I'm

14  asking.

15  A.  Not in this case.

16  Q.  I think so.

17       MR. LEMBKE:  Move to strike, Counsel.

18       MR. O'REAR:  Well, I move to strike his

19  answer as argumentative.

20       MR. LEMBKE:  You're moving to strike the

21  question?

Page 187

1   BY MR. O'REAR:

2   Q.  Do you have an opinion on when or how much

3   construction it takes for a plant site to become a

4   utilization facility?

5   A.  No, I don't have a particular percentage

6   that I would say qualifies it or disqualifies it.

7        Again, you have to look at this holistically

8   from the standpoint of historic application of NRC and

9   its predecessor the AEC, regulatory framework for

10  licensing for utilization facilities, nuclear power

11  reactors.  And that basically had, you know, some of

12  the things we've cited here.  That historically has

13  said, we're treating it as a utilization facility

14  under construction.

15  Q.  Okay.  In your opinion, is there a certain

16  point in a continuum of construction when the plant

17  moves from not being a utilization facility to being a

18  utilization facility?

19  A.  Characterized that way, no.

20       What I would say is there is a significant

21  point and that is when that facility is constructed to

Page 188

1   the point where basically you're triggering the second

2   level or the second phase of regulation, which is a

3   potential to operate the facility.  And that's the

4   distinction in terms of phasing of a utilization

5   facility.

6   Q.  Well, isn't the point triggered by the

7   definition and that is either that statutory

8   definition that it must be capable of making use of

9   special nuclear material or the regulatory definition,

10  it must be capable of conducting a nuclear reaction.

11  Aren't those the trigger points?

12  A.  No, they are not the triggering points, and

13  that is not the -- for practice.

14       Again, I refer back to the Marble Hill

15  decision and refer back to Mr. Case's letter to Dr.

16  Asperger.

17  Q.  Well, how are the --

18       MR. LEMBKE:  Wait a minute.  You're talking

19  over the witness.  You're not letting him finish the

20  answer.

21       MR. O'REAR:  I didn't know he wasn't



Page 189

1 finished. I thought he finished.

2       THE WITNESS: No. And those examples and

3 longstanding precedent are how the Agency has treated

4 and focused on it.

5       And again, you have to view this

6 holistically. You cannot do hair splitting between a

7 utilization facility and the construction permit.

8 It's viewed holistically as one thing. That's the

9 regulatory control, and as long as there's someone

10 who's interested in pursuing it, the NRC has authority

11 over it and it doesn't give up that authority lightly

12 -- without its permission.

13 BY MR. O'REAR:

14       Q. I'm not asking you about the authority and

15 plenary jurisdiction. I'm not asking you about that.

16       I'm asking you about at what point does this

17 plant site meet the definition either under the

18 statute or under the regulation of a utilization

19 facility?

20       A. Under construction it is considered a

21 utilization facility. When it is ready for operation,

Page 190

1 it is a utilization facility that is subject to then

2 the operating license requirements of the Agency.

3       Q. When it is under -- when it is under

4 construction and the initial construction at the site

5 is the pouring of a concrete pad, is the plant site a

6 utilization facility at that point in time?

7       A. It can't be used as one at that point but it

8 is considered for purposes of NRC's governance of the

9 construction permit. It's proceeding --

10       Q. You're not understanding the question.

11       MR. LEMBKE: No. Hold on a second, Mr.

12 O'Rear.

13       MR. O'REAR: Don't yell.

14       MR. LEMBKE: In the last five minutes you've

15 spoken over the witness while he's still answering the

16 question, that's improper.

17       MR. O'REAR: All right. Mr. Lembke, there

18 may be some disruption in the video, but what I'm

19 hearing is the witness has stopped.

20       I did not hear him continuing to talk on

21 either question I raised. So I apologize if I talked

Page 191

1 over the witness but I didn't hear the witness

2 speaking. I thought he was finished with his answers.

3       MR. LEMBKE: May he finish now?

4       MR. O'REAR: Sure.

5       MR. LEMBKE: If you remember.

6       THE WITNESS: I'm not sure I remember what

7 else I was going to have at this point.

8 BY MR. O'REAR:

9       Q. I'm not asking you about construction permit

10 jurisdiction or preliminary jurisdiction. I'm asking

11 you about the definition of a utilization facility.

12       And so my question was this. When the

13 initial concrete pad is poured at the plant site, is

14 the plant site a utilization facility at that point in

15 time?

16       A. It is considered so for purposes of the

17 construction permit.

18       Q. It is considered a utilization facility as

19 defined by statute and regulation at that time. Is

20 that what you're saying?

21       A. Defined by regulation and by historic

Page 192

1 practice. And that is who controls, who acts, who has

2 the authority to act. That's the -- of the regulatory

3 framework.

4       Q. And so the historical framework you're

5 referring to is primarily the Asperger letter?

6       A. And the Marble Hill decision as well, I

7 think references in there. I think it references the

8 Commission -- decision.

9       But again, what those look at is how the

10 Agency looks at those who have a stake or presume to

11 have a stake in a facility, and that may be under

12 construction.

13       Q. All right. Well, let me say this one time,

14 and I want to make sure we're not missing each other.

15 I want to make sure that I ask the right question and

16 you answer that question and you're not answering some

17 other question.

18       When the construction began and they have

19 poured on the concrete pad on the site, is that site

20 at that point in time a utilization facility?

21       MR. LEMBKE: Object, asked and answered.



Page 193

1        You can answer it again, Mr. Burns.

2        THE WITNESS:  Yes, laid out in my expert

3   report and I emphasize that relates to the regulatory

4   framework that is imposed through the construction

5   permit, and that's how they're considered.

6        And that's -- as I say, you know, based on

7   my experience and based on, you know, the Marble Hill

8   decision, the Asperger decision, I think that's

9   correct.

10  BY MR. O'REAR:

11       Q.   The Asperger decision in the letter from an

12  acting director cannot change the statutory definition

13  or the regulatory definition, can it?

14       A.   No.  The Asperger -- no, the decision is

15  that's not the authority of the director of a nuclear

16  act or regulation.  But it is consistent with the

17  Agency's application and interpretation.

18       Q.   The administrative determinations in the

19  Marble Hill and the Seabrook cases cannot change the

20  statutory definition and the regulatory definition of

21  a utilization facility, can it?

Page 194

1        A.   Well, they can't change it.  They can't

2   change the words of the statute.  They can apply, in

3   fact interpret -- interpret those conditions and they

4   can in, terms of how they will be applied in the

5   regulatory context.

6        Q.   Let's move on.  Let's move to Paragraph 21

7   of your report.  Okay?

8        A.   Okay.

9        Q.   And I'd like to direct your attention to the

10  sentence that begins in the middle of Paragraph 21

11  starting with the word "effectively."  Do you see

12  that?

13       A.   Yes.

14       Q.   And I'll just read it.  It says,

15  "Effectively the regulatory framework under Section

16  101, 103 and 185 of the Atomic Energy Act and the NRC

17  implementing regulations means that once an

18  authorization is issued to construct a utilization

19  facility on a site, the entity holding the permit and

20  the site are subject to the plenary control of the NRC

21  until the permit is canceled due to project

Page 195

1   termination or until the end of the -- and subsequent

2   decommission of the facility if construction is

3   completed and operation is authorized."  Do you see

4   that?

5        A.   Yes, I do.

6        Q.   What do you mean by plenary control?

7        A.   That means that the NRC has absolutely --

8   absolute control over the activities on the site.

9        Q.   Okay.

10       Does the NRC have plenary control over

11  Nuclear Development as an applicant for transfer of

12  the construction permit?

13       A.   I'm not sure I understand the question.

14       Q.   I don't know how I can state it any more

15  directly.

16       A.   Please repeat the question.

17       Q.   Does the NRC have man plenary control over

18  the Nuclear Development as an applicant for transfer

19  of the construction permit?

20       A.   Well, to the extent that Nuclear Development

21  is interested in interacting with the NRC to obtain

Page 196

1   such transfer, yes, it has that engagement to do so.

2   Yes.

3        Q.   Okay.  And in fact there's a rule that

4   provides that the NRC has jurisdiction over applicants

5   for licenses, correct?

6        A.   I'm not sure which rule you're referring to

7   there.

8        Q.   Well, look in your materials there and look

9   for 10 CFR 50.5.

10       A.   50.5.  Okay.  Hold on.  Okay.

11       Q.   Are you familiar with this CFR section?

12       A.   Yes, I am.

13       Q.   Does this section provide that any licensee

14  or an applicant for a license may not -- and then it

15  states in two provisions what they may not do and the

16  sanctions that may be imposed by -- by the NRC?

17       A.   Yes.

18       Q.   Okay.  And so for purposes of our case and

19  the Nuclear Development application for a license,

20  under at least A2 of this code of federal regulation,

21  that Nuclear Development is subject to NRC



Page 197

1  jurisdiction and NRC sanction if it were to submit
2  information regarding the application that it knows to
3  be incomplete or inaccurate in some respect material
4  to the NRC, right?
5      A.   That's correct.  That's the full statement.
6      Q.   Okay.  And if Nuclear Development were to
7  represent in its application that it would not begin
8  construction on the site or conduct any licensed
9  activities on site until the construction permits have
10  been transferred and violated that representation, the
11  NRC has jurisdiction over that and can enforce the
12  representation, correct?
13        MR. LEMBKE:  Object to the form, vagueness
14  as to enforce the representation.
15        MR. O'REAR:  Okay.
16  BY MR. O'REAR:
17      Q.   Could sanction or issue a cease and desist
18  order to the Nuclear Development, correct?
19      A.   Okay.  I'm going to have to answer that two
20  ways because you asked me a question about the false
21  statement provision in 50.5.

Page 198

1        And yes, if it represented something, there
2  might be a question.  Again, depending on the timing
3  of when the statement was made and when the unlawful
4  conduct was conducted, there may be a question whether
5  a false statement was made.
6        But, second, and that would not be under
7  this provision, that would be under other provisions.
8  For example, basically a violation of Section 185 with
9  respect to the necessity of a construction permit, the
10  NRC could take enforcement action for undertaking
11  activities which are not -- which it has not
12  authorized.
13        And there, it would be taking such action
14  against Nuclear Development as a non-licensee.
15  Because at that point, assuming it went forward and
16  did construction, didn't do what it said it was going
17  to do, it has no license authority and would then be
18  sanctioned -- it could be sanctioned as undertaking an
19  activity without proper NRC authorization.
20      Q.   Well, it -- in subparagraph one of Section
21  A, this code section, it says that a licensee or an

Page 199

1  applicant may not engage in deliberate misconduct
2  which causes or would have caused if not detected a
3  licensee or applicant to be in violation of any rule,
4  regulation or order?
5      A.   Right.
6      Q.   Or any term, condition or limitation of any
7  license issued by the Commission.
8        So the NRC is subject to -- excuse me, the
9  Nuclear Development is subject to NRC's imposition of
10  the construction permit requirements while over
11  Nuclear Development, while it is an applicant and
12  before the construction permits are issued.  Is that
13  correct?
14        MR. LEMBKE:  Objection, vague.
15        MR. O'REAR:  I don't think it's vague.
16  BY MR. O'REAR:
17      Q.   You can answer.
18      A.   Well, I've got to -- you've got to
19  understand the context again.  From the standpoint --
20  and I'll say it -- explain it all.
21        One, as an applicant, Nuclear Development is

Page 200

1  subject to sanctions under the statute for making
2  false statements.  That I understand.
3        And secondly, what I was trying to say is if
4  Nuclear Development does not have authority to do
5  certain things that require NRC authority, it is
6  subject to sanction, even apart from this rule.  But
7  this rule is intended to sort of consolidate that.  So
8  that's what my answer was trying to address.
9        MR. LEMBKE:  Did you mark that exhibit or
10  not?
11        MR. O'REAR:  It should be Exhibit 205.
12        (Burns Exhibit No. 205 was marked for
13  identification.)
14        MR. O'REAR:  So for the record, the exhibit
15  which is 10 CFR 50.5 is marked as Exhibit 205.
16  BY MR. O'REAR:
17      Q.   Directing your attention to Paragraph 23 of
18  your report.
19      A.   Okay.
20      Q.   It begins discussing the construction
21  permit, and then at the bottom of the Page 6 it says,



STEPHEN G. BURNS                                              August 19, 2020
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY             201–204

Page 201

1  "TVA's preliminary safety analysis report, PSAR,
2  Section 2.12 describes the particular -- in particular
3  that the exclusions area will be owned by the United
4  States and in custody of TVA."  Do you see that?
5      A.  Yes, I do.
6      Q.  Now, the PSAR is not part of the
7  construction permit, is it?
8      A.  It's not -- it's not specifically within it.
9  It is relevant to the construction permit as part of
10 the application.  And eventually to go into operation
11 you have to update it to the "final safety analysis."
12     Q.  The PSAR -- I'm sorry.
13     A.  No, I'm done.
14     Q.  I didn't -- if you were talking when I spoke
15 I didn't hear your word.  I could see your mouth
16 moving, that's all.
17         The PSAR is not mentioned in the
18 construction permit, is it?
19     A.  I don't specifically recall.
20     Q.  Well, the PSAR is not a condition of the
21 construction permit, is it?

Page 202

1      A.  Again, I have to look but I don't
2  specifically recall how it's referenced, if it's
3  referenced in the permits themselves.
4         It is significant because it is background
5  and forms the basis for the NRC's determination
6  whether or not to grant a permit or not.
7      Q.  But you can't -- you're not opining
8  here today that the PSAR is a condition of the
9  construction permit, are you?
10        MR. LEMBKE:  I object to the form.  You mean
11 every -- every provision in it or a particular --
12        MR. O'REAR:  The construction permits as we
13 all know have conditions listed.  And the PSAR is not
14 referenced or mentioned as part of the conditions of
15 the permit.
16        MR. LEMBKE:  Well, I object to the form of
17 that because the permits reference the application.
18 And he just testified the PSAR is part of the
19 application.
20        MR. O'REAR:  It is not a condition of the
21 permit, that's my question.

Page 203

1      MR. LEMBKE:  Well, that -- I object to the
2  form because that misstates the permit.
3         It would help if you introduced the permit
4  because the permit says as a condition, it talks about
5  the application in Section 3 and it talks about the
6  applicant's site in Section 2.
7  BY MR. O'REAR:
8      Q.  Mr. Burns, is the PSAR in compliance
9  therewith a condition of compliance with the
10 construction permit?
11        MR. LEMBKE:  Same objection.
12        THE WITNESS:  I guess my answer would be
13 this is that while I don't -- while I don't see a
14 specific reference to the PSAR itself, it does refer
15 to the application, part of which is the PSR -- PSAR.
16 And what I would consider it is part of what we call
17 the licensing basis for the facility.
18        And the licensing basis is something that
19 basically the applicant when it receives the permit
20 has to follow.  For example, I don't think that TVA --
21 I forget what the facility is, I think a BWR, one of

Page 204

1  the series of a boiling water reactor.  But if it
2  decided to change it to a, you know, a Westinghouse
3  pressurized reactor, it would go need that permission.
4  And part of that it is I think because, again, your
5  expectation and the governance is carrying out
6  activities as specified in the permit.
7         So the PSAR has relevance whether or not it
8  says -- and the PSARs aren't written for the most part
9  that every statement in it is a license condition
10 requirement.  It describes what's going to go on at
11 the site, for example.
12     Q.  I'll refer to Paragraph 24 of your report,
13 please.
14     A.  Yes.
15     Q.  At the end that you say, "Within its
16 statutory authority the NRC's choice of sanction is
17 quintessentially a matter of the Agency's sound
18 discretion."  Do you see that?
19     A.  Yes, I do.
20     Q.  And whether or not to issue sanctions was a
21 matter of discretion before the acting director who



Page 205

1  wrote the Asperger letter, correct?

2      A.  I'm sorry.  Repeat the question.  I'm not

3  sure I understood it.

4      Q.  Whether or not to issue sanctions, is it

5  within the discretion of the acting director who

6  issued the Asperger letter which we've been referring

7  to?  Is that correct?

8      A.  That's correct.  That was within his

9  authority.

10     Q.  Okay.  And he found a technical violation

11 but did not impose sanctions?

12     A.  Well, he issued a notice of violation which

13 is a sanction.

14     Q.  Okay.  But he didn't apply any remedial

15 sanction, did he?

16     A.  Well, they had -- I wouldn't say he didn't

17 apply remedial sanctions.  I think because the

18 applicants had to join in, the two missing

19 applicants -- I think the two missing applicants had

20 to do that and I think he saw that as being on the

21 road to being accomplished.  And that was part of the

Page 206

1  reason that he just issued the notice of violation.

2      He did not impose civil penalty authority or

3  impose civil penalty on it.  He issued a notice of

4  violation which is within the realm or the panoply of

5  sanctions that the Agency can impose.

6      Q.  And he had that discretion at that time.  Is

7  that correct?

8      A.  Yes.  He had the discretion because he was

9  assigned the responsibility to respond to that

10 petition for action, which is what he did in that

11 letter.

12     Q.  And an acting director of reactor

13 regulation, I'm not sure I have the title right --

14 today has the same discretion, correct?

15     A.  Well, the assignment of responsibility may

16 be differently -- we had some discussion of that this

17 morning in terms of sanctions.  But basically a senior

18 official, and Mr. Case was a senior official, he was

19 acting in that position and still the permanent

20 director who, Harold Denton was assigned to that

21 position.  So -- but he was basically at the top of

Page 207

1  that organization.  He had responsibility in that

2  office for licensing.  And so a question of compliance

3  on that type of matter would have come to him and he

4  had the discretion to do that.

5      Today as I say, there have been some changes

6  in terms of how and where the enforcement authority

7  would be carried out.  So I can't say necessarily that

8  it would have been -- that it would be the current

9  director of the nuclear reactor regulation to do so.

10     Q.  Well, regardless of the title of the

11 official, is your statement in Paragraph 24 that the

12 NRC's choice of sanctions is quintessentially a matter

13 of the Agency's sound discretion a true statement

14 today?

15     A.  Yes.

16     Q.  Is it your opinion that if TVA had completed

17 the closing of this transaction and transferred the

18 site to Nuclear Development by deed, that that in and

19 of itself would have violated the construction permit

20 even where the maintenance and security and records

21 management requirements were being maintained?

Page 208

1      A.  Yes.

2      MR. LEMBKE:  Object to the form as to

3  vagueness.  Maintained by whom?

4      MR. O'REAR:  By either party.  That they

5  were -- that there was compliance by either party

6  regarding maintenance, security and records

7  management.

8  BY MR. O'REAR:

9      Q.  My question is:  Under that set of

10 circumstances, would the transfer itself by deed from

11 TVA to Nuclear Development violate the construction

12 permit?

13     A.  Yes, I believe it would.  I think that my

14 report speaks to that.

15     Q.  And what harm would there be?  What harm

16 would there be to the public or to the workers or to

17 the environment if that were to occur?

18     MR. LEMBKE:  Well, I object.  That's a

19 compound question and calls for speculation.

20 BY MR. O'REAR:

21     Q.  What harm would there be to the public?



Page 209

1        MR. LEMBKE:  Objection, calls for
2   speculation.
3   BY MR. O'REAR:
4        Q.   What harm would there be to the public if
5   all the requirements for the construction permit were
6   being adhered to and TVA deeded the site to Nuclear
7   Development?
8        MR. LEMBKE:  Well, I object to the form.
9   Calls for speculation and if adhered to by TVA or by
10  Nuclear Development?
11       MR. O'REAR:  One or both -- both parties.
12       THE WITNESS:  I think as I've explained in
13  my report, the harm is that basically it undermines
14  the regulatory authority of the NRC in terms of the
15  longstanding and typical contract for how that is --
16  that is managed under the construction permit.
17       As I indicated, my belief is the
18  construction permit speaks to ownership by the United
19  States of the site itself.  That has -- is nothing --
20  Mr. Repka's described it as a historical point of fact
21  but it has something more than that.  Because it's

Page 210

1   part related to some of the reviews of the Agency with
2   respect to control of the site and those types of
3   things for purposes of part 100.
4        It also -- this is where I speak to the
5   bifurcation of control.  So you've got a licensee in
6   terms of TVA as a construction permit holder who no
7   longer actually has title to the land or has legal
8   authority to go onto land.  And then you have
9   Nuclear Development who is not a licensee of the NRC,
10  who makes a promise that it won't do anything on a
11  site that it otherwise governed by the NRC.
12       And so, from my standpoint that sort of
13  blows away the normal construction that we have of
14  regulatory jurisdiction in a stepwise regulatory
15  process that we have in a situation.  That's my
16  problem.
17       Q.   Okay.  But that didn't answer my question.
18       What harm is that to the public?
19       A.   The harm to the public is undermining the
20  NRC's regulatory authority.
21       Q.   What -- what risk of harm in terms of safety

Page 211

1   is there to the public?
2        MR. LEMBKE:  Objection, calls for
3   speculation.
4   BY MR. O'REAR:
5        Q.   Can you answer?
6        A.   Well, you'll have to repeat the question.
7   What harm to the public?
8        Q.   The question is:  If the conditions of the
9   construction permit are being maintained and adhered
10  to, what harm is there to the public to transfer the
11  site from TVA to Nuclear Development?
12       MR. LEMBKE:  Objection to the form, calls
13  for speculation and is unclear as to who is
14  maintaining the permit.
15       MR. O'REAR:  I said either party or both.
16  But that the conditions of the permit are being
17  satisfied and followed.
18       THE WITNESS:  Well, I return to my prior
19  answer.
20       Again, it undermines basically the NRC's
21  jurisdiction.  It's not clear to me, you know, in

Page 212

1   terms of what the NRC's ability to get on the site,
2   who's taking care of it, if Nuclear Development as
3   basically a non-licensee, if it's taking care of the
4   maintenance documentation, preservation requirements.
5   It's not clear what basis there is for that or sort of
6   oversight.
7        So again, what I emphasize, it creates a
8   bifurcated situation.  And that is really inconsistent
9   with longstanding NRC practice.
10  BY MR. O'REAR:
11       Q.   I don't think you ever answered what harm
12  there is to the public.
13       A.   I said the harm to the public is undermining
14  the NRC's jurisdictional authority and regulatory
15  imprint on the site.  That's the harm to the public.
16       Q.   That's the type of harm?
17       A.   It is a vague idea and concept, and I look
18  at that in terms of public policy.  And that's the
19  harm, from my standpoint, from a public policy
20  standpoint.
21       Q.   So you're not talking about harm to the



Page 213

1  public in the sense of physical harm or exposure to
2  radioactivity or any kind of threat to the security
3  and safety of members of the public.  You're referring
4  to some sort of amorphous of harm to the public that
5  undermines confidence in the NRC, or something like
6  that?
7        MR. LEMBKE:  Same objection.
8        THE WITNESS:  It undermines the authority.
9  And it's not a question so much of confidence in the
10  NRC, it's the authority of the NRC.
11        And what I don't know given the bifurcated
12  process or circumstances created, what is the
13  occurrence that I -- what is the assurance that the
14  NRC has with respect to the maintenance and fidelity
15  of those requirements up through it?
16        So yes, is there -- because, again, we don't
17  have an operating reactor and it -- we don't have a
18  circumstance where you have the risk -- immediate risk
19  of potential unsafe operation or a radioactive
20  release, but you still need the control from the NRC
21  at the outset over these activities.

Page 214

1  BY MR. O'REAR:
2     Q.  Well, what makes you think the NRC would
3  lose control if the site were transferred?  It still
4  has control over TVA as the licensee and it still has
5  control over Nuclear Development as the applicant.  So
6  what loss of control would there be by the NRC?
7        MR. LEMBKE:  I object to the form, lack of
8  foundation for that question.
9        You can answer.
10        THE WITNESS:  I think the NRC -- again, it's
11  a question of what the ongoing interaction between
12  Nuclear Development and TVA.  But it's also -- the NRC
13  now, it can walk on that site anytime it wants.
14        It's not clear to me that that's the case
15  under the circumstances -- the circumstances we're
16  describing here.  And the fact of the matter is it
17  relies on the NRC having to potentially take action
18  that it would not otherwise need to take in order to
19  order to exert that regulatory control.
20        And the fact of the matter it's tied to it.
21  Ir -- we have not experienced sort of, oh, you do

Page 215

1  this, you do that, we'll all sort of make it good and
2  we promise not to do anything.
3        Well, you do that, you're supposed to have a
4  license.
5     Q.  You seem to make light of this promise, that
6  it was a representation in an application that they
7  would not conduct any licensing activities until the
8  permits were issued, right?
9     A.  That's my understanding.
10     Q.  And you seem to characterize this with
11  quotation marks as some sort of unenforceable promise.
12  Is that what you're doing?
13     A.  Well, I'm saying is it's not clear to me
14  exactly what that promise is.  But it also -- what
15  it's saying is that if you're otherwise supposed to
16  have the permit, you ought to have the permit.  That's
17  what I'm saying.
18     Q.  All right.
19     A.  And that is well described in the expert
20  report.  The NRC has not typically relied on this sort
21  of hair splitting of jurisdiction, assertion of

Page 216

1  jurisdictional authority.
2        Oh, this one is an applicant, and so it can
3  do a certain amount of things and we'll take care of
4  it that way.
5        Oh, this one is still the licensee
6  responsible, so we'll hold them responsible.
7        It's just historically, that isn't
8  happening.  It's not something I would advise the
9  Commission to do.
10     Q.  Well, I move to strike that.
11        You're not there now.  Have you communicated
12  these ideas to the NRC?
13     A.  No, I have not spoken to anyone at the NRC.
14     Q.  And when you keep referring to this promise,
15  aren't you overlooking the very section that gives the
16  NRC jurisdiction over Nuclear Development as an
17  applicant under 10 CFR 50.2?
18     A.  No, I don't think I'm overlooking that.
19  Because that provision goes towards -- the provision I
20  think you're referring to, again -- let's pull it out.
21        MR. LEMBKE:  Caine, I think you meant to say



Page 217

1  50.5 didn't you?

2       MR. O'REAR:  I did.  50.5.

3       THE WITNESS:  The provision in 50.5?

4       Okay.  I've reread it.

5       So again, what this recites is -- we're

6  going to -- from the NRC's perspective, you either as

7  an applicant, you need to conform, you need to be

8  honest in your application.  You can't misrepresent

9  things.

10      You as a licensee have to con- -- you have

11 to be honest and you have to conform to the activity

12 of your license.  And if they're deliberate, there's

13 deliberate misconduct, you're subject to sanctions for

14 that.

15      And it also says in effect if you're

16 unlicensed but should be, which is like the situation

17 here, we can come and take action.

18      What I'm saying is my view is, yeah, NRC has

19 its authority but it doesn't structure its regulatory

20 programs.  So, we'll do a little bit of this and a

21 little bit of that, and we'll try to figure it out.

Page 218

1  It has traditionally looked at the construction permit

2  as something you have to have before you do anything.

3       Q.  Okay.  If TVA were to transfer the plant

4  site to Nuclear Development now, do you really have

5  any question that the NRC would not have access to the

6  site?

7       A.  I don't know.  Again, I mean, you know, I

8  presume it's in Nuclear Development's interest but

9  there -- what I would normally call, you know, the

10 footprint is not necessarily there as yet.

11      Q.  So are you referring to some theoretical

12 defiance by Nuclear Development of NRC's right to

13 access the site as being the problem here and the

14 basis for your opinion?

15      A.  Well, that informs my opinion when I say

16 some theoretical basis.  We don't regulate on the

17 basis of everybody doing what they're supposed to be

18 doing.

19      Sometimes what have to think of as

20 regulators, what's the consequence of not following

21 the guidelines?

Page 219

1       So that's why in this circumstance -- again,

2  with Nuclear Development not having the permit, you

3  know, having the site, it creates as I say this

4  bifurcated situation which is not historically what

5  the NRC likes to do.

6       MR. O'REAR:  Let's take a five-minute break,

7  now.  Is that okay with everybody?

8       MR. LEMBKE:  Yes.

9       (Whereupon, a recess ensued.)

10      MR. O'REAR:  Back on the record.

11 BY MR. O'REAR:

12      Q.  Mr. Burns, do you agree that the

13 construction permit issued to TVA gives TVA the right

14 to construct on the site identified in the permit?

15      A.  Yes, I agree.

16      Q.  Do you agree that the construction permits

17 themselves do not confer ownership of the site to TVA?

18      A.  Well, I think the permit describes ownership

19 as in the United States.  The particular provision on

20 it.

21      Q.  Well --

Page 220

1       A.  I don't know.

2       Q.  -- the permit does not confer ownership,

3  does it?

4       A.  Well, I guess no.  The permit does not

5  confer ownership in the sense it's not a conveyance

6  of -- it's not a property -- real property

7  transaction.

8       Q.  Has the NRC ever issued construction permit

9  to licensees who were not owners of the site where the

10 construction was to occur?

11      A.  I am not aware of any.  The only caveat I

12 would add here is that consistent with, for example,

13 the Marble Hill decision and ongoing practice, you

14 know, co-licensees who must be on the license but who

15 may not be the ones who are actually conducting the

16 construction or opening the operation, that may be the

17 case with them.

18      Q.  Okay.

19      A.  I haven't looked at a particular permit in

20 some time.

21      Q.  So the NRC has issued construction permits



Page 221

1   to persons who would be performing the construction,
2   who are not owners of the site where the construction
3   is still occurring, correct?
4       A.   I don't think that's what I said.
5       Q.   I thought that's what you said.
6       A.   No, what I said is that the permits have
7   been issued to the owners, co-owner and one, for
8   example, who is particularly authorized or has that
9   property.  But what I said was -- the additional
10  comment I made was you may have co-owners who
11  eventually are interested in taking the benefit of the
12  electricity production and then consistent with Marble
13  Hill and such other decisions, they must be
14  co-licensees on the permit but they may not be ones
15  who have ownership of the license itself.
16      Q.   Are you aware of any situation where
17  construction permits have been issued and the owners
18  of the property were not co-licensees?
19      A.   Not particularly, no.  I'm not aware of
20  anything in particular.
21      Q.   Does the NRC routinely issue operating

Page 222

1   licenses to parties who are not owners of the nuclear
2   plant?
3       A.   No, the license is issued to the owner.
4   There may be authorization for someone to contract to
5   conduct the actual operation.
6           An example I would give -- an example I
7   would give, I believe for example, the Cooper --
8   Plant, Exelon Corporation has basically managed
9   operation -- the operations as a contractor to -- in
10  Nebraska, a public co-op or whatever it is.
11      Q.   Does Exelon -- does Exelon hold the
12  operating license for that plant?
13      A.   I don't believe it holds an operating
14  license.  I believe what it does is it holds -- it is
15  licensed, it is authorized to conduct those operations
16  on behalf of the owner.
17      Q.   Okay.
18      A.   You're breaking up on me.
19          MR. O'REAR:  Can the court reporter
20  understand the witness?
21          THE REPORTER:  Yes, I understood him.

Page 223

1   BY MR. O'REAR:
2       Q.   I think you're moving away from the mic of
3   something.  I don't know if anybody else is
4   experiencing that.  Okay.
5           Are you saying that there are no instances
6   where the NRC has granted an operating license to an
7   entity that is not the owner of a nuclear plant being
8   operated?
9           MR. LEMBKE:  Objection, asked and answered.
10          THE WITNESS:  And my answer is, I am not
11  aware of any offhand.
12  BY MR. O'REAR:
13      Q.   Let's look at the Marble Hill case for a
14  minute.
15      A.   Okay.
16      Q.   It's Exhibit 125.  Should be in your stack
17  there.
18      A.   Yes, I've got it.  I've got it.
19      Q.   Just to be clear for anyone who looks at
20  this or a Court who looks at it, the opinion is issued
21  by The Atomic Safety and Licensing Appeal Board,

Page 224

1   correct?
2       A.   That's correct.
3       Q.   And that would be three administrative law
4   judges who are within the NRC, correct?
5       A.   That's correct.  The appeal board existed
6   from about 1969 to 1991 as an intermediate appellate
7   level in the NRC's adjudicatory system or
8   administrative hearing system.  So they would hear
9   appeals.  They did not hear original -- like the trial
10  level, which was the licensing board which we
11  discussed earlier.
12          So they would decide appeals and then there
13  was in effect like for lack of a better term a
14  certiorari type review by the Commission at its
15  discretion of the appeal board.
16      Q.   And so the appeal board, it's between the
17  trial level and the Commission level, correct?
18      A.   Correct.
19      Q.   Okay.  And so a decision of the appeal board
20  would not be considered a decision of the Commission
21  or the commissioners of the NRC, correct?



Page 225

1      A.   Well, it is not a decision of the
2  commissioners but it was considered precedent within
3  the Agency.
4      Q.   Okay.  And again, this is all within the
5  administrative process, not -- not a court of law,
6  correct?
7      A.   That's correct.  This is part of the NRC's
8  administrative hearing processes.
9      Q.   Do you agree that the sole question in this
10 case is whether co-owners of a site must be
11 co-licensees under a construction permit when it was
12 issued?
13     A.   Well, that was a major issue.  I don't
14 recall without going back and reading the decision
15 again whether it's some other issue that -- that was
16 decided.
17         There were more issues I remember in Marble
18 Hill involving the boundary dispute between the
19 Commonwealth of Kentucky and the State of Indiana
20 which wound up going -- it was one of those original
21 jurisdictions in the cases in the Supreme Court.

Page 226

1          It may be that that -- what -- but I don't
2  recall without going back and reading it.
3      Q.   The Marble Hill case did not involve a
4  transfer of ownership situation, did it?
5      A.   Well, it did not -- in terms of, only in the
6  sense that it didn't -- we'll say the circumstance
7  where you have an existing licensee and it's being
8  transferred to another licensee.  It is in my view
9  related to transfers from the standpoint, do you need
10 to be on the construction permit as a co-owner,
11 co-licensee?  So at some point there's a
12 transaction -- you know, a transaction.
13     Q.   Marble Hill did not involve a question of
14 whether a site can be transferred before a
15 construction permit is issued to transferee, did it?
16     A.   The specific scenario, no.  But I believe it
17 is germane to that question.
18     Q.   Now, you mentioned in your testimony the
19 Seabrook case.  That was referenced in the Marble Hill
20 case?
21     A.   Yes, I believe it was.

Page 227

1      Q.   And just to clarify it, the Seabrook case
2  was a decision by what body?
3      A.   As I recall it was a decision by the
4  Commission itself.
5      Q.   But it was an administrative appeal.  It's
6  not a court case.  Is that correct?
7      A.   No, it's an final decision of the -- of the
8  Commission in an adjudication.  I don't recall whether
9  that particular case at that point in time was
10 appealed to the court of appeals.
11     Q.   Well, you certainly would have cited that if
12 it were, wouldn't you, in your research?  You would
13 have cited the court of appeals decision if it went to
14 the court of appeals, would you not?
15     A.   Yes, I would have.
16     Q.   Okay.  You didn't cite a court of appeals
17 decision in Seabrook, did you?
18     A.   As I recall I did not.
19     Q.   And in that case the appeal panel held that
20 the financial qualifications of the future owner of a
21 site would be reviewed by the NRC in connection with

Page 228

1  the future approval of a license, correct?
2      A.   The amendment I would make to your statement
3  and then I would generally agree with it is that was a
4  decision of the Commission, not of the appeal panel.
5      Q.   Okay.  Pardon me.
6      A.   There may have been an appeal from the lower
7  -- a lower tribune.
8      Q.   Okay.  And aren't the financial
9  qualifications of Nuclear Development being reviewed
10 by the NRC prior to the issuance of any construction
11 permit to Nuclear Development?
12     A.   They would have to be -- yes, they would
13 have to be reviewed prior to authorization for
14 transfer.
15     Q.   So there's nothing about Seabrook that's
16 inconsistent with what's going on here, is there?
17     A.   Well, in Seabrook -- what happened in Sea
18 Brook you had the interveners or those against
19 Seabrook who, as I recall it, were making an appeal
20 and said some stated -- that there was some stated
21 possibility that certain other, I think small co-ops



Page 229

1   or small utilities would join in on the Seabrook plant
2   and they wanted action by the Commission at that point
3   in time.  At that point in time they finally raise
4   their appeal, and that's what the Commission rejected.
5   It said, we'll deal with that when the time comes.
6          And the assurance that the Commission was
7   giving, I think, to the interveners who appealed was,
8   you have to have the NRC's approval to be on that
9   construction permit and to be a part of that project.
10         And that's what they're saying and that's
11  what it was cited for in Marble Hill and that's why I
12  referenced -- I referenced it and probably referenced
13  it in the context of Marble Hill.
14     Q.   Let me direct your attention to Exhibit 124,
15  which is the Asperger letter and --
16         MR. LEMBKE:  Hold on.  Let me find it.
17  BY MR. O'REAR:
18     Q.   You got it there?
19     A.   Yes, I do.
20     Q.   You're familiar with it, right?
21     A.   Yes, I am.

Page 230

1   Q.   And you cited it in your report, correct?
2   A.   That is correct.
3   Q.   The date, it seems to be a little obscured
4   in the exhibit.  Do you know the date of the letter?
5   A.   Yes, I think I determined -- and I think I
6   listed it in my report, and I think it's something
7   like March 6, 1978.  I forget exactly, it's at the
8   back of my report, the exhibits to the report.
9          March 3rd, 1968.
10     Q.   And this is when you referred to Mr. Case
11  earlier, this is the person who signed the letter,
12  last page of the exhibit, Ed G. Case?
13     A.   Correct.
14     Q.   Acting director Office of Nuclear Reactor
15  Regulation?
16     A.   Correct.
17     Q.   And the letter's addressed to a Dr. Robert
18  Dr. Asperger, correct?
19     A.   Correct.
20     Q.   Hence, that's why you're calling it the
21  Asperger letter, right?

Page 231

1   A.   Yes.
2   Q.   Now, he's a private party, obviously.  Who
3   was Asperger?
4   A.   He is -- I recall him from reading some
5   other decisions of the Agency related to that time.
6   Basically he was a guy who was against the nuclear
7   power plant and lived up I forget -- he was in
8   Midland, Michigan by where the plant was being built.
9   But that's what it was.
10         So, under the NEC's rules which were adopted
11  I believe in 1974 by the Atomic Energy Commission, the
12  Agency provided a -- in 10 CFR 2.206 it provided for
13  any person to file a petition with the Agency asking
14  for enforcement action.  So that's what this was.
15         So Dr. Asperger, I think the only connection
16  with the, I think Detroit -- the Detroit Edison plant
17  in question here was he didn't like them.  So he was
18  asking for enforcement action against Detroit Edison
19  and others.
20     Q.   The Detroit Edison plant site involved here
21  was the Enrico Fermi plant?

Page 232

1   A.   Got it.
2   Q.   And if there's been reference in other
3   correspondence or other documents in this case to the
4   Fermi letter or the Fermi decision, is that a
5   reference to this letter as far as you know?
6          MR. LEMBKE:  I'm going to object to the
7   form.  How could he possibly have the foundation to
8   answer that?
9          MR. O'REAR:  Okay.  Well --
10  BY MR. O'REAR:
11     Q.   Are you aware of any other authority that's
12  been relied on by TVA or by you called Fermi that's
13  something other than this letter?
14     A.   I don't see any that are listed in my
15  exhibit.
16         As I say -- I said a couple minutes ago, I
17  believed I looked at a couple of decisions related to
18  the Fermi -- to Fermi.  There were some, I think,
19  district court actions, there were probably some other
20  NRC things but they were -- they didn't really go to
21  the issues that are described in Mr. Case's letter to



Page 233

1  Dr. Asperger.

2     Q.   Okay.  Let me direct you attention, then, to

3  Page 4 of this exhibit, and the footnote on Page 4.

4     A.   Yes, I got it.

5     Q.   And before I ask this question, though.

6        So Dr. Asperger was just a member of the

7  public who complained about something regarding this

8  plant, correct?

9     A.   Yes.

10    Q.   He was not a licensee or an owner or

11 involved in any transaction related to the plant, was

12 he?

13    A.   No.  He was, as they say, a third party

14 raising a complaint about Detroit Edison.

15    Q.   Okay.  And Mr. Case -- Mr. Case in this

16 footnote -- do you have it before you?

17    A.   Yes, I do.

18    Q.   I'm going to read the first sentence.  It

19 says, "We disagree with the argument that Section 101

20 of the Act has not been violated because interest in a

21 utilization facility under construction has been

Page 234

1  acquired rather than an interest in a completed

2  utilization facility."

3        Okay.  The argument, then, he's referring to

4  is an argument of a utilization facility under

5  construction as opposed to a completed utilization

6  facility, right?

7     A.   Say that again, please.

8     Q.   The point that Mr. Case is responding to is

9  just what is stated there in the first sentence, "We

10 disagree with the argument that Section 101 of the Act

11 has not before we violated because an interest in a

12 utilization facility under construction has been

13 acquired rather than an interest in a completed

14 utilization facility."  Right, that was the issue he

15 was addressing in this footnote?

16    A.   That -- well, partly.

17    Q.   And then he says in the last part of the

18 footnote, "Moreover it has been the longstanding

19 practice of the Commission to consider a utilization

20 facility under construction to be a utilization

21 facility.  Therefore in our view, a right to own a

Page 235

1  utilization facility under construction is a right to

2  own a utilization facility if completed."  Did I read

3  that correctly?

4     A.   I believe so.

5     Q.   So he three times refers to a utilization

6  facility under construction, correct?

7     A.   He refers to a utilization facility under

8  construction.

9     Q.   So his premise and the starting point for

10 what he's addressing and for what he's responding to

11 assumes this is a utilization facility, and that it is

12 under construction because he said it three times

13 there, right?

14    A.   Yes.

15    Q.   Okay.  And so what he's saying in this

16 footnote is that if a facility is far enough along in

17 its construction to be considered a utilization

18 facility, then we will consider it a utilization

19 facility, even though it is not complete.  Isn't that

20 exactly what he's saying?

21        MR. LEMBKE:  Object to the form, lack of

Page 236

1  foundation.  That is not exactly what he's saying.

2  BY MR. O'REAR:

3     Q.   Isn't that -- I mean, you've relied on this

4  letter.  I'm asking you about the letter.  Isn't that

5  what the letter says?

6        MR. LEMBKE:  No.  You're engaging in wishful

7  thinking as to what the letter says.

8        MR. O'REAR:  That's not an objection, Matt.

9        MR. LEMBKE:  Object, lack of foundation.

10       I'm responding to your comment.

11       MR. O'REAR:  Okay.  Well --

12 BY MR. O'REAR:

13    Q.   Isn't that what Mr. Case is saying in this

14 letter?

15    A.   I don't believe so.  Because, again, I look

16 at the last sentence, sentence or two in the footnote

17 and it says one under construction is a utilization

18 facility.  And that's how we have traditionally

19 considered it.

20    Q.   He says a utilization facility under

21 construction, is a right to own a utilization facility



Page 237

1  if complete.
2       So what he's saying there is if it's a
3  utilization facility that is not complete but has
4  reached the point in construction to be a utilization
5  facility, then it is still a utilization facility.
6  Isn't that exactly what he's saying?
7       MR. LEMBKE:  Now, I object again to lack of
8  foundation, "that's exactly what he's saying."
9  BY MR. O'REAR:
10      Q.  Isn't that a reasonable and accurate
11  interpretation of this letter?
12      A.  Again, the interpretation that it has to be
13  capable of operation?
14      Q.  The interpretation -- I'm not interpreting.
15  I'm just saying what he says there.  He says, "It is a
16  utilization facility under construction."  He does not
17  say it is a site or that a site that has not reached
18  the point of being a utilization facility is
19  considered a utilization facility.
20      MR. LEMBKE:  I move to strike that.  That's
21  a statement, not a question.

Page 238

1       MR. O'REAR:  Well, that was a question.
2       MR. LEMBKE:  I don't know what the question
3  is.
4  BY MR. O'REAR:
5       Q.  Doesn't it say that?
6       MR. LEMBKE:  Same objection, lack of
7  foundation, misstates the evidence.
8       THE WITNESS:  Well, I think I disagree
9  because, again, I read the last -- his penultimate
10  sentence and one under construction is considered to
11  be a utilization facility.
12  BY MR. O'REAR:
13      Q.  Where does it say one under construction?
14  Where does it say that?
15      A.  A utilization -- it says, in the first
16  sentence of the second sentence.  "A utilization
17  facility under construction to be a utilization
18  facility."
19  BY MR. O'REAR:
20      Q.  That's exactly what I read.
21      You said one under construction.  It says a

Page 239

1  utilization facility under construction, doesn't it.
2       A.  I'm not sure I understand the difference
3  between our -- the semantic difference between what
4  you're saying and what I'm saying.
5       Q.  I'm saying that the decision means that if a
6  plant is far enough along in construction to be
7  determined a utilization facility, we still deem a
8  utilization facility even though it is not fully
9  complete.  Isn't that what is said by this footnote?
10      A.  Yes.  He's saying one under construction is
11  a utilization facility.
12      Q.  You keep saying one.  I don't see the
13  word "one" there.  I see the words "utilization
14  facility under construction."  I'm sorry.
15      A.  -- speak to the level or the extent of
16  completion of the facility.
17      Q.  Are you saying that this letter stands for
18  the proposition that at any degree of construction
19  such as the example I posed earlier in the deposition,
20  of laying the concrete pad in the initial pact of
21  construction creates the utilization facility, and

Page 240

1  that's what Mr. Case meant by this footnote?
2       A.  I think what Mr. Case meant is if you're
3  going to be part of the ownership, you got to be
4  licensed.  That's what he's saying.
5       Q.  Okay.  Well, he doesn't say that, does he?
6       A.  Well, I think he does.  He finds in effect
7  that the applicant -- you know, the co-applicants who
8  are not on the license yet, that's the basis for him
9  fining for noncompliance.
10      Q.  Okay.  Well, Nuclear Development is on the
11  application, correct?
12      A.  Well, they have applied for a transfer of a
13  construction permit, that's correct.
14      Q.  To your knowledge, are there any co-parties
15  with Nuclear Development that are not on the
16  application that will be involved in the construction
17  of the site?
18      A.  You'll have to repeat the question.
19      Q.  In our case are you aware of any parties
20  other than Nuclear Development that would need to be
21  on the application because they would need to be



Page 241

1   licensed in addition to Nuclear Development to
2   construct on the site?
3       A.  I'm not aware.  Nuclear Development would
4   meet, and based on my review of some of the
5   application and some of the back and forth with the
6   NRC staff on it, there are, you know, certain
7   contractors and things like that, when I say I use the
8   word "approve" lightly or broadly, that they would
9   need to be approved in the sense that the NRC would
10  need to accept the -- going forward, the processes
11  were -- the structure for things like quality
12  assurance program and all that, which I know would be
13  by contract.
14      Q.  But our case, as you understand it, does not
15  involve an issue of co-owners or co-licensees, does
16  it?
17      A.  Well, no.  The transfer is from TVA to
18  Nuclear Development as a new authorized permit holder.
19      Q.  If you would now look at the Zimmer decision
20  which should be in your stack.  It's Exhibit 132.
21      A.  Yeah.

Page 242

1       (Burns Exhibit No. 132 was marked for
2   identification.)
3   BY MR. O'REAR:
4       Q.  All right.
5       A.  I have it.
6       Q.  Pardon me just give a minute, please.
7       Do you agree that this Zimmer decision
8   stands for the proposition that a plant that was once
9   a utilization facility can be converted to something
10  that is not a utilization facility by disabling it so
11  that it cannot make use of special nuclear material?
12      A.  I would agree that the decision deals with
13  assuring that a utilization facility is no longer
14  capable or put in a condition such that it would not
15  be capable of that use so that the NRC can walk away
16  from it.
17      Q.  And in analyzing whether this -- such a
18  applicant plant would be a utilization facility, the
19  staff, as adopted by this licensing board decision,
20  cited the statutory definition under the Atomic Energy
21  Act of a utilization facility, is that correct?

Page 243

1       A.  I'd have to find it.  Yes.  Yes, I see it
2   now.
3       Q.  And it says there, the third line from the
4   bottom on the first page, "Only the NRC staff
5   responded to this motion in its April 9, 1984
6   response.  Staff points out that Section 11CC of the
7   Atomic Energy Act defines a utilization facility as,
8   'One which is capable of making use of special nuclear
9   material.'"  Correct?
10      A.  Yes, it says that.
11      Q.  And that expresses, then, the NRC staff's
12  view of the definition of utilization facility,
13  correct?
14      MR. LEMBKE:  Objection, lack of foundation.
15  BY MR. O'REAR:
16      Q.  Well, when you speak of all this wholistic
17  precedent within the NRC based on interpretations by
18  staff, this case shows that staff interpreted and used
19  the statutory definition being one capable of making
20  use of special nuclear material.  Is that correct?
21      MR. LEMBKE:  Same objection.

Page 244

1       THE WITNESS:  Well, I agree according to the
2   licensing board that they referenced the definitional
3   section within the Atomic Energy Act.  And the reason
4   for that that in this case you have the Zimmer plant
5   which is extraordinarily far along; it has fuel on the
6   site and the board's decision says it was in the
7   condition that it basically needed to be undone.  And
8   it goes again, to this -- this is not a conflict with
9   Marble Hill, this not a conflict with the Asperger
10  letter.  This basically is a reflection of the
11  circumstances before the Agency at that time.
12      Cincinnati Gas and Electric threw in the
13  towel, decided not to proceed with operation of the
14  Zimmer plant.  It was extraordinarily far along.  So
15  what the NRC needed was assurances that you could walk
16  away, could walk away from the plant so it would not
17  be capable of sustaining a nuclear reaction and thus,
18  be inoperable utilization facility.  And I think
19  that's what they did in this opinion.  Those were the
20  conditions of basically letting Cincinnati Gas and
21  Electric turn in its licenses.



Page 245

1    I don't even recall here, they may have even
2   had -- I'm not sure whether they had the operating
3   license yet or not or just still the CP.  But they
4   obviously had some license to possess radioactive
5   material in the form of new fuel.
6       Q.   Well, what you've just said fully supports
7   Nuclear Development's position, doesn't it?  I mean,
8   the Bellefonte plant is not capable of operation as a
9   nuclear reactor.  It's not capable of using special
10  nuclear material, right?
11      A.   Not in its current condition.  But what I
12  just said does not support the view of Nuclear
13  Development because, as I said before, what you have
14  here is this is the end game or the end state and is
15  deciding to put the facility into that end state.
16       If you have a live -- the Zimmer, the
17  Cincinnati Gas and Electric plant has permits over --
18  that are subject to NRC oversight with respect to the
19  Zimmer plant, which then did not go into operation.
20       Again, what -- it's the permit that matters.
21      Q.   Well, sir, we will state and have stated

Page 246

1   what Nuclear Development's position is.
2       I'm asking you about the Zimmer case.  The
3   Zimmer case focused on the operation or operability of
4   the plant in determining whether it was a utilization
5   facility, did it not?
6       A.   It focused on the question of operability
7   for purposes of terminating NRC jurisdiction and
8   terminating the permit that subjected the Cincinnati
9   Gas and Electric Company to NRC jurisdiction.
10      Q.   And this memorandum opinion states on the
11  first page, the applicant's representation that all
12  fuel would be removed in number one.  And number two,
13  that the nuclear steam supply system would be modified
14  to prevent its operation as a utilization facility,
15  and that there was -- there would be severing and
16  welding caps on the two main feed water lines and four
17  main steam lines and removing the control rod drive
18  mechanism.
19       Do you see that?
20      A.   Yes, I do.
21      Q.   All right, sir.  And the NRC accepted that

Page 247

1   if those steps were taken, this plant would not be a
2   utilization facility.  Is that correct?
3       A.   It accepted that for purposes of terminating
4   the NRC licenses subject -- that the plant was subject
5   to.
6       Q.   Okay.  And why is that a distinction in this
7   case?
8       A.   I don't think it's a distinction.  It's what
9   they did.
10      Q.   Why is it a distinction from our case?
11      A.   If you're talking about a distinction with
12  the Nuclear Development case, there's not intention
13  here of terminating the plant.  It's basically keeping
14  this thing alive until the transfer can occur or a
15  transfer's approved and specific authorization, which
16  as I say I believe needs to be done concurrently, is
17  done.  That's a wholly different circumstance than the
18  circumstance in which basically a licensee is
19  intending to withdraw itself from NRC jurisdiction.
20      Q.   Well, isn't is a fact that before one thing
21  can be done at this plant by Nuclear Development, they

Page 248

1   first have to obtain a construction permit from NRC
2   and then ultimately an operating license from NRC,
3   correct?
4       MR. LEMBKE:  Object to the vagueness of "one
5   thing."
6       THE WITNESS:  Well, certainly --
7   BY MR. O'REAR:
8       Q.   Isn't is a fact that they cannot conduct any
9   license activities on this site, even if they were to
10  own and possess it, until a construction permit is
11  issued by the NRC?  And then they cannot operate until
12  a second license, an operating license is issued by
13  the NRC.  Isn't that correct?
14      A.   Nuclear Development can do nothing with
15  respect to the Bellefonte plant without prior NRC
16  authorization, and ultimately it would have to seek an
17  operating license.
18       And as my opinion indicated, I believe under
19  the circumstances here, the timing of that is
20  basically concurrent, the transfer of the title to the
21  land is concurrent with without authorization to



Page 249

1 transfer the construction permit.

2    Q.  Did you participate in the Zimmer opinion?

3    A.  No, the because at that time I would not

4 have -- I participated in a number of matters,

5 probably the reason, one of those circumstances that

6 led to the abandonment of the project, which is again,

7 quality assurance problems.

8        But I was not counsel on this -- related to

9 this.

10   Q.  Were you involved in the work on the

11 proposed rule for decommissioning plants by the NRC?

12   A.  Only in the sense that as a commissioner I

13 voted to instruct the staff to move toward development

14 of such a rule.

15   Q.  And you were in favor of that rule, weren't

16 you?

17   A.  I was in favor of the Agency creating a

18 decommissioning rule, because I thought it would be a

19 more efficient way of addressing the decommissioning

20 process because the Agency had been issuing extensions

21 which from a public relations standpoint, aren't

Page 250

1 always the best thing.

2        And also I think it provided -- more

3 importantly it provided greater stability to licensees

4 who were entering the decommissioning process.

5    Q.  And the Zimmer case is cited favorably as in

6 the proposed rule and its rationale's is adopted in

7 the proposed rule.  Is that correct?

8    A.  I frankly don't recall.  I haven't looked at

9 the proposed rule -- I probably haven't looked at the

10 proposed rule since I voted on it before leaving the

11 Commission.

12   Q.  All right.  We'll look at it in just a

13 minute.  I just wondered if you recalled that.  Let's

14 move on to Exhibit 130, if we could.

15   Can you tell me the title of it?

16   Q.  Yes.  Exhibit 130 is a letter dated at the

17 top September 14, 2006 from Ms. Haney with the NRC to

18 Mr. Singer.

19   A.  I got it.

20       Burns Exhibit No. 130 was marked for

21 identification.)

Page 251

1 BY MR. O'REAR:

2    Q.  Now, you were personally involved in this, I

3 believe you said earlier in the deposition, correct?

4    A.  I would have some awareness of it and some

5 of the staff from the General Counsel's Office who

6 advised or were under my supervisor.

7        I don't recall how -- I don't recall

8 specifically that, you know, I wrote on the -- or

9 commented specifically.  I was probably briefed on it

10 by my staff.

11   Q.  Well, can you identify this letter as the

12 letter from the NRC which terminated the construction

13 permit at Bellefonte on September 14, 2006?

14   A.  Hold on.  Hold on.  Sorry.  Yes, it looks

15 like an acknowledgement of the withdrawal of the

16 permit.

17   Q.  And it was effective September 14, 2006, the

18 date of the letter, correct?

19   A.  Yeah.  It doesn't say a particular effective

20 date.  But I would agree that the date of the letter

21 can be construed as the effective date.

Page 252

1    Q.  And then if you would look at the next

2 exhibit, which should be 131, which is a one-page

3 document dated at the top February 18, 2009.

4        Burns Exhibit No 131 was marked for

5 identification.)

6        THE WITNESS:  Yeah, I have that.

7 BY MR. O'REAR:

8    Q.  It's a memo from Mr. Bate?

9    A.  Right.

10       MR. LEMBKE:  I got lost.  What document are

11 we looking at?

12       MR. O'REAR:  131.

13       MR. LEMBKE:  Thank you.

14 BY MR. O'REAR:

15   Q.  Tell me when you get it.

16   A.  I'm all set.

17   Q.  Okay.  Are you familiar with this document?

18   A.  Yeah, I'm familiar will it.

19   Q.  In your research -- you did research on the

20 history of these this permits, didn't you?  And you

21 found in your research that they were terminated on



Page 253

1  September 14, 2006, and then reinstated sometime in
2  2009, correct?
3      A.  Correct.
4      Q.  And then this Exhibit 131 may not be the
5  actual reinstatement but it -- "The director of the
6  NRR is authorized to issue an order reinstating the
7  construction permit for Bellefonte Units One and two,
8  placing the facility in terminated plant status."  See
9  that?
10     A.  I do.
11     Q.  Do you know the actual date that the
12  construction permits were reinstated in terminated
13  plant status?
14     A.  I believe actually, it's referenced in my
15  report -- the main report, the initial report.  I
16  think it's Document 39 under this inventory of
17  documents which references a Federal Register notice
18  dated March 13th, 2009.  And that, you know, given the
19  timing here, I believe that and we've referenced it,
20  that's the date when the director's order was issued.
21     Q.  Okay.  Your audio is moving in and out on

Page 254

1  me.  I don't know what the issue is.
2      A.  Okay.  I'm sorry.
3          Again, I'll reference it in Document Number
4  39 of my original report, which is a reference to a
5  Federal Register notice published on March 13th, 2009.
6          So it was probably back two days before that
7  because there's always a issuance of the Federal
8  Register notice -- order was published in the Federal
9  Register and then -- so active publish.  So it was
10  early March.
11         (The reporter requested clarification.)
12  BY MR. O'REAR:
13     Q.  Yes, it's hard for me to hear, too, Mr.
14  Burns.  It's just your -- the audio is drifting in and
15  out.
16         MR. LEMBKE:  You may want to sit back a
17  little.  You might be too close.
18         MR. O'REAR:  Let's go off the record for a
19  second.
20         (Whereupon, a recess ensued.)
21         MR. O'REAR:  Back on the record.

Page 255

1  BY MR. O'REAR:
2      Q.  Okay.  Mr. Burns, we've looked at two
3  documents; Exhibit 130 and 131, which indicate that
4  from the period of September 2006 through March of
5  2009 there was no construction permit in existence at
6  the Bellefonte site, is that correct?
7      A.  That's correct.
8      Q.  And there was no operating license from the
9  NRC to TVA during that period either, was there?
10     A.  No, there was no operating license.
11     Q.  And there never has been an operating
12  license issued on this plant, has there?
13     A.  No.
14     Q.  Okay.  All right.  We had a double negative
15  there.
16         Has there ever been an operating license
17  issued on this plant?
18     A.  No operating license has been issued for
19  this plant.
20     Q.  So for two and a half years TVA owned this
21  grant -- the plant site, the real estate where there

Page 256

1  was a partially completed facility there, not fully
2  constructed and TVA had no construction permit and had
3  no operating license for two and a half years.  Is
4  that correct?
5      A.  That's correct.
6      Q.  And so NRC took the position at the time
7  that with respect to Bellefonte and the condition it
8  was in at that time, no license was needed in order to
9  -- for TVA to own the site, correct?
10     A.  Correct.  Because the NRC had determined
11  that it could terminate its jurisdiction over the site
12  with TVA basically giving up the permit.
13     Q.  Is it your opinion that the Bellefonte site
14  was a utilization facility during that two and a half
15  year period?
16     A.  It was not -- it was not a utilization
17  facility subject to NRC jurisdiction.
18         This is really the situation as in Zimmer,
19  where the license holder decides to turn in the
20  license and go away, and the NRC has looked at it from
21  the steps at that point that it was satisfied it could



Page 257

1  do that.

2      Q.  All right.  I want you to look at the next

3  exhibit, and it is a letter from TVA to the NRC dated

4  April the 6th, 2006.

5          MR. LEMBKE:  What's that exhibit number?

6          MR. O'REAR:  It's a blank.  I need to fill

7  it in.  It'll be 206, 206.

8      (Burns Exhibit No. 206 was marked for.)

9          MR. LEMBKE:  And what's the date of the

10  letter?

11          MR. O'REAR:  April 6, 2006.

12          MR. LEMBKE:  Okay.

13  BY MR. O'REAR:

14      Q.  You have it there, Mr. Burns?

15      A.  I have it.  Sorry.

16      Q.  Okay.  Thank you.

17          Now, this letter's not on your Exhibit A, is

18  it?

19      A.  No.

20      Q.  Was this letter considered by you in forming

21  your opinions and preparing your report?

Page 258

1      A.  I may have read it but in the context of the

2  NRC's orders and Mrs. Haney's letter notification --

3  maybe I'm confusing the Haney letter, again.

4      Q.  Haney -- I'm sorry.  You're referring to

5  Catherine Haney?

6      A.  Yes, Cathy Haney, it's exhibit --

7      Q.  I just want to make sure the record's clear

8  we're not referring to Franklin Haney or Frank Haney,

9  our client.

10      A.  Oh, no.

11      Q.  Okay.

12      A.  It's Exhibit 130.

13      Q.  All right.

14      A.  Cathy Haney or Catherine Haney.

15      Q.  All right.  Well, let's look at this letter.

16          You may have considered but don't recall.

17  Is that a fair statement?

18      A.  Yeah, I think that's a fair statement.  I

19  may have read it, but I looked at particularly the

20  NRC's orders, some of the orders or the Haney letter

21  with respect to termination probably more.

Page 259

1      Q.  First page of this letter says at the very

2  beginning, "This letter requests NRC approval to

3  withdraw of BLN."  That's Bellefonte, right?

4      A.  I believe it is.

5      Q.  "Permit in accordance with generic letter

6  87-15 Policy Statement on deferred plant."  So you see

7  that?

8      A.  Yes, I do.

9      Q.  And do you see in the second paragraph where

10  there is the representation in the second sentence,

11  "There is no nuclear fuel located at the site and TVA

12  has removed safeguards information."

13      A.  Yes, I see that.  Yes, I do.

14      Q.  And what is safeguards information?

15      A.  It's a level of security information that

16  was created specifically with respect to -- it's

17  basically used by both the NRC and the Department of

18  Energy.  It's below what we would call classified

19  information, but it's security related information is

20  the simple answer.

21      Q.  And then in the third paragraph, do you see

Page 260

1  the reference to, "No quality related activities are

2  ongoing at the site?"

3      A.  I'm sorry.  Which paragraph?

4      Q.  Third paragraph, second line in the middle

5  of the sentence it says --

6      A.  Yes, I do see that.

7      Q.  "And no quality related activities are

8  ongoing at the site?"

9      A.  Correct.

10      Q.  And so does that refer to activities that

11  are regulated and licensed by the NRC?

12      A.  Yes, that would refer to, I think it refers

13  to the quality -- implementation, quality assurance

14  and other programs that are necessary.

15      Q.  Okay.  And when this letter was written on

16  April the 6th, 2006, the construction permit was still

17  in effect, correct?

18      A.  That's correct.

19      Q.  Okay.  Now, look at the letter from TVA to

20  the NRC dated June 29, 2006.  It's not got an exhibit

21  number on it yet.



Page 261

1    A.  Okay.  I have that.

2       MR. O'REAR:  Let's mark that as Exhibit 207.

3       (Burns Exhibit No. 207 was marked for

4    identification.)

5       THE WITNESS:  Okay.

6    BY MR. O'REAR:

7    Q.  And just for the record, the prior letter of

8    April 6th, 2006 is Exhibit 206, in case it didn't get

9    marked that way.

10      Okay.  This letter says in the second

11   paragraph, "During a conference call with the NRC

12   project manager on June 21, 2006, TVA was asked to

13   provide additional information regarding whether the

14   subject BLN unit can be considered a 'utilization

15   facility' as defined by 10 CFR 50.2 as follows."  Do

16   you see that?

17   A.  Yes, I do.

18   Q.  And this letter is from TVA, correct?

19   A.  That's what it says.

20   Q.  And TVA is required by law and required by

21   NRC regulation to provide true and correct information

Page 262

1    to the NRC.  Is that correct?

2    A.  That's correct.

3    Q.  And the definition is this, utilization

4    facility means, "Any nuclear reactor other than one

5    designed or used primarily for the formation of

6    plutonium or U233."  Do you see that?

7    A.  Correct.

8    Q.  That's the NRC definition of utilization

9    facility, right?

10   A.  That's correct.

11   Q.  And that's the definition you've used in

12   your report, right?

13   A.  That's correct.

14   Q.  Okay.  Look at the next paragraph.  I'm

15   going to read it.  Make sure I read it correctly.  "In

16   their present condition, neither of the subject units

17   can be considered a utilization facility as so

18   defined.  At the time that the construction of the

19   units was deferred, TVA considered Unit One to be

20   88 percent complete and Unit Two to be 58 percent

21   completed.  At this time neither reactor has the

Page 263

1    necessary structures, systems or components in place

2    to sustain a controlled nuclear reaction.  For

3    example, over the past several years, heat components

4    such as the control rod drive mechanisms for both Unit

5    One and two have been removed from the site which

6    precludes the ability of the units to operate as

7    nuclear reactors.  In addition as stated in TVA's

8    letter of April 6, 2006, there is no nuclear fuel

9    located at the BLN site."

10      Did I read that correctly?

11   A.  Yes, that's what I read too.

12   Q.  Got you.  And when this letter was written

13   on June 29, 2006, the construction permits were still

14   in effect, correct?

15   A.  Yes, they were.

16   Q.  Now, why didn't you cite this letter in your

17   report?

18   A.  I don't have a particular answer.  I think

19   again, this situation speaks to the Zimmer situation

20   which is basically a licensee seeking to terminate its

21   -- the regulatory control exercised by the NRC over

Page 264

1    the construction permit and facilities that may be --

2    that have or may be under construction at the site.

3    And that's what I think this speaks to.

4       Again, what ways is TVA assuring the NRC

5    that by giving up the construction permit, it's done

6    what it needs to do to assure that basically the

7    facilities at that time can be possessed without that

8    continuing NRC oversight, because they are not capable

9    of being put into operation.  That's what I think it's

10   for.

11   Q.  TVA said -- using the definition that you've

12   used for utilization facility, that this plant is not

13   a utilization facility, correct?

14   A.  It's saying yes.  It can be considered upon

15   termination, not to be -- in support of termination

16   that it's not a utilization facility.

17   Q.  It doesn't say that.  Let's --

18   A.  Well, I'm telling you how I read that

19   letter.  Because, again, on these things you have to

20   look at the context in which it's presented.  It's

21   context like the Zimmer context.  This is not where



Page 265

1   you have an active construction permit that somebody
2   wants and that basically is headed toward the
3   potential operation.
4       Q.   Okay.  Let's looking at this sentence.  It
5   says, "In their present condition, neither of the
6   subject units can be considered a utilization facility
7   as so defined."  Do you see that?
8       A.   Correct, I see that.
9       Q.   Are you stating that TVA made a false
10  statement there?
11      A.   No.  TVA did not make a false statement.
12  What it's doing is, again, in the context of trying to
13  withdraw from NRC's oversight and control of the
14  Bellefonte units, it's basically saying this is not
15  the thing you're going to be concerned about that can
16  be turned into operations at that time.  And that's
17  what they were doing, context is everything.
18      Q.   The letter said in present condition, dated
19  June 29, 2006.  On that day neither of those units
20  were utilization facilities, it had none of the
21  additional language you added in your answer.

Page 266

1       A.   I didn't --
2           MR. LEMBKE:  Hold it.  Hold it, Mr. Burns.
3   There's no question there.  That's a statement and I
4   move to strike it.  It's argumentative.
5   BY MR. O'REAR:
6       Q.   Doesn't the letter say in the present
7   condition, which would be June 29, 2006, "Neither of
8   the subject units can be considered a utilization
9   facility as so defined."
10          MR. LEMBKE:  Asked and answered, objection.
11          You can answer it again.
12          THE WITNESS:  I don't disagree with what the
13  letter says.  Again, I believe you have to understand
14  the context in which that is presented.  And the
15  context there is different than the context addressed
16  in my report, with respect to transfer of the site
17  prior to transfer of construction permit.
18          Because this is about killing the plant and
19  that's what we're talking about here.
20  BY MR. O'REAR:
21      Q.   And so you agree that the plant was not a

Page 267

1   utilization facility on June 29, 2006?
2           MR. LEMBKE:  Well, I object, that misstates
3   his testimony.
4   BY MR. O'REAR:
5       Q.   Was the plant in your opinion a utilization
6   facility on June the 29th, 2006?
7       A.   It was not a facility capable of being put
8   into operation which is the operative and significant
9   factor with respect to the circumstances in context
10  addressed here.
11      Q.   You have opined that the plant is a
12  utilization facility, have you not?
13      A.   Correct.
14      Q.   June 29, 2006, in your opinion, was the
15  Bellefonte plant a utilization facility?  Can you
16  answer that yes or no?
17      A.   I think I've answered that.
18      Q.   I don't think you have.  Can you answer yes
19  or no, whether on June 29, 2006 the Bellefonte plant
20  was a utilization facility?
21          MR. LEMBKE:  I object to the form of that

Page 268

1   question.  That's not a question.  He's explained
2   already why that can't be answered yes or no.
3           He said it depends on the context.
4           So, Mr. Burns, you do not have to answer
5   that question yes or no.  And it's asked and answered.
6   BY MR. O'REAR:
7       Q.   Waiting on an answer, Mr. Burns.
8       A.   My answer is as of that date, I would not
9   consider -- that is TVA's representation that it is
10  not capable of being put into operation.
11          But I would say the point it does not any
12  longer being considered a utilization facility, would
13  be the date of Ms. Haney's letter on September 14,
14  2006, when she approves TVA's construction permit.
15      Q.   Okay.  And can you answer yes or no whether
16  the Bellefonte plant was a utilization facility when
17  this letter was issued on June 29, 2006?
18          MR. LEMBKE:  I object to the form of the
19  question, it's argumentative.  He's answered -- he
20  just answered that question and he explained why
21  that's not a yes or a no.  And, so, this is



Page 269

1  harassment, he asking him the same question.  He's not
2  giving you the answer you want.
3  BY MR. O'REAR:
4      Q.  Can you answer yes or no to that question?
5      A.  I'm not even sure of what the question is.
6          Was it still -- would I still consider it or
7  was it still considered?
8      Q.  No, sir.  I know I've asked it four or five
9  times because I'm trying to get an answer.
10     A.  Yes, and I answered several times.
11     Q.  Can you answer yes or no whether on June
12  29th, 2006 the Bellefonte plant was a utilization
13  facility?
14     A.  My prior answer was yes, it was because
15  until the NRC released its jurisdiction on
16  September 14th, 2006, I would consider it such.
17     Q.  And did you not want to be examined on this
18  letter?  Is that why it's not listed in your report?
19     A.  No, I actually -- I may have read this
20  letter.  But what I thought was important was the
21  letter from Ms. Haney with respect to the termination.

Page 270

1          This is not some sort of avoidance.
2  Because, again, the context here is not the context of
3  Nuclear Development.  This is the Zimmer context.
4          We want to walk away, what we want to
5  pass it off and have somebody else do it or take over
6  the permits and what's the time of that.
7          That's -- from my standpoint, that doesn't
8  bear on this.
9      Q.  So you didn't think this letter was
10  significant on the question of whether or not the
11  Bellefonte plant was a utilization facility?
12         MR. LEMBKE:  I object to the form of the
13  question.  It's argumentative and it's vague as to
14  significance because you're questioning him about his
15  list of exhibits, not -- not what was significant.
16         MR. O'REAR:  I'm asking him why it's not on
17  his list.
18         MR. LEMBKE:  And he answered it.
19         MR. O'REAR:  Well, I'm asking him now, did
20  you not consider this letter to be significant in the
21  context of forming your opinion with respect to

Page 271

1  whether or not this plant is a utilization facility?
2          THE WITNESS:  As I say I may have looked at
3  the letter.  I don't think it's dispositive of the
4  question because of the significant difference in the
5  circumstances.
6  BY MR. O'REAR:
7      Q.  Okay.  Do you think TVA's position and
8  statements regarding whether or not the plant is a
9  utilization facility are important factors in forming
10  your opinion?
11         MR. LEMBKE:  Objection, vague.
12         THE WITNESS:  I'm not sure I understand the
13  question.
14  BY MR. O'REAR:
15     Q.  Well, you've opined it is a utilization
16  facility, correct?
17     A.  Correct.
18     Q.  In forming that opinion, was it important to
19  you to determine what TVA had said about that issue?
20     A.  Well, I think it was important for my
21  standpoint for some of the background on the

Page 272

1  Bellefonte plant.
2          Yes, from that standpoint I would say yes.
3      Q.  But you dismissed TVA's position by stating
4  that it is not a utilization facility until at some
5  point in the future when the construction permits are
6  withdrawn.  Is that correct?
7      A.  No, that's not correct.  I'm not dismissing
8  their position.  I'm saying their position was taken
9  in a context that is different than this one.
10     Q.  Okay.  Let's look at the next exhibit.
11         MR. LEMBKE:  Which is what number?
12         MR. O'REAR:  It will be Number 208.  The
13  exhibit is a letter dated August 22nd, 2006 from the
14  NRC to Mr. Singer at TVA.
15         (Burns Exhibit No. 208 was marked for
16  identification.)
17  BY MR. O'REAR:
18     Q.  Do you have that?
19     A.  Yes, I do.
20     Q.  And I mean, is this letter listed in your
21  report?



Page 273

1    A.  I don't recall.  It may not be.

2    Q.  Let's look at it.  Let's confirm whether it

3  is in your report or not in your report first.

4    A.  I do not see a specific reference.

5    Q.  So are you saying it's not listed in your

6  report.  Is that correct?

7    A.  That's correct.

8    Q.  Okay.  Can you identify this as a letter

9  dated August 22nd, 2006 from the NRC to TVA regarding

10  the Bellefonte construction permit?

11    A.  Yes, it is.

12    Q.  Would you turn to the fifth page of the

13  exhibit which is Page 3 of the environmental

14  assessment.

15    A.  It's labeled Page 3.

16    Q.  Okay.  It's labeled Page 3.

17    I mean, well, let's back be up on that.

18    The letter itself says, "Enclosed is a copy

19  of the environmental assessment and finding of no

20  significant impact related to your request for

21  withdrawal of the construction permit."  Is that

Page 274

1  correct?

2    A.  That's correct.

3    Q.  And then the attachment is the environmental

4  assessment and finding of no significant impact.  Is

5  that correct?

6    A.  That's correct.

7    Q.  And that's a finding by the NRC, correct?

8    A.  Correct.

9    Q.  All right.  And would you consider this to

10  be important precedent for you to consider in the

11  context of whether or not the Bellefonte plant is a

12  utilization facility?

13    A.  Well, this letter is part of the process of

14  the NRC acting on the termination of the construction

15  permit.  So it's significant from that standpoint.

16    Q.  Is it significant from the standpoint of

17  determining whether this plant is a utilization

18  facility?

19    A.  I -- well, I haven't read it at this point

20  and I don't know what it says about that, so I can't

21  say.

Page 275

1    Q.  So you didn't consider this letter when you

2  prepared your report?

3    A.  I don't think I looked at this letter

4  specifically.

5    Q.  Did you look at the environmental assessment

6  when you prepared the report?

7    A.  I'm not sure that I looked at the

8  environmental assessment.  I saw that it was

9  referenced in Cathy Haney's letter.

10    Q.  Okay.  All right.  Are you on Page 3 of the

11  environmental assessment?

12    A.  Yes.

13    Q.  And you see the last paragraph.  Let me read

14  it.  Make sure I read it correctly.  "By letter dated

15  June 29, 2006 the permittee stated that neither of the

16  units can be considered a utilization facility as

17  defined in 10 CFR 50.2.  At the time the construction

18  of the units was deferred, TVA considered Unit One to

19  be 88 percent complete and Unit Two to be 58 percent

20  complete.  At this time neither reactor has the

21  necessary structures, systems or components in place

Page 276

1  to sustain a controlled nuclear reaction.  Over the

2  past several years, key components such as the control

3  rod drive mechanisms form both Unit One and two have

4  been removed from the site which precludes the ability

5  of the units to operate as nuclear reactors.  The

6  current condition of the plant does not allow

7  operation.  Therefore neither plant can be considered

8  a utilization facility."

9    Did I read that correctly?

10    A.  Yes, that's what I read.

11    Q.  And the last sentence of that paragraph was

12  a statement by the NRC staff.  Is that correct?

13    A.  What's the last statement, the current

14  condition?

15    Q.  Yes.

16    A.  Yes, well, this is an NRC document.

17    Q.  And it's an NRC conclusion about this plant.

18  Is that correct?

19    A.  That's correct.

20    Q.  And the conclusion is the current condition

21  of the plant does not allow operation.  Therefore



Page 277

1  neither plant can be considered a utilization
2  facility.
3         That's the NRC's conclusion, correct?
4     A.  That's what it states.  Again, in the
5  context that I described with respect to Cathy Haney's
6  letter and to other -- and with other documentation
7  here.  We're looking at a process that's trying to
8  basically walk away from the plant and end NRC
9  jurisdiction.  So those statements -- this is just
10  like statements we've been talking about for the last
11  hour.
12     Q.  Well, it doesn't say the plant -- neither
13  plant can be considered a utilization facility
14  whenever we withdraw the construction permit, did it?
15     A.  Well, it doesn't use that language but
16  that's the entire purpose.  You've got to make --
17  they're going to make that finding in order to say NRC
18  is satisfied that your restrictions can be terminated
19  over the facility.
20     Q.  Well, let me ask you this.  What the -- TVA
21  said and what the NRC agreed to was that in order to

Page 278

1  get to that point, we are declaring to you right now
2  this plant site is not a utilization facility.
3         Isn't that what was said and agreed to --
4  said by TVA, agreed to by the NRC?
5         MR. LEMBKE:  I object to the form, it
6  misstates his testimony, lack of foundation.
7         THE WITNESS:  Well, what I had said is that
8  what it reflects is a representation of this
9  circumstance in these various documents we've been
10  talking about, reflects the circumstance in which TVA
11  is willing or is acting to cede its construction
12  permit.
13         That's to make certain representations and
14  do certain things with respect to this site.  To do
15  that, the NRC needs to be able to find that it would
16  be satisfied with that and satisfied that the plant is
17  no longer in the condition that it would need to
18  assert continued jurisdiction.  And that's what
19  they're doing here.  As I say, very similar to the
20  Zimmer situation.  It is not a situation where
21  somebody wants to take it up and keep running with it.

Page 279

1  BY MR. O'REAR:
2     Q.  Well, in our situation nobody is going to
3  take it up and keep running with it unless they get
4  two permits; one construction permit and then get an
5  operating license.  Is that correct?
6     A.  Well, it depends on how many in the
7  facility.  Two construction permits and I presume two
8  operating licenses.  But again, the construct is, is
9  this a circumstance -- that's a circumstance in
10  which there is a continuing NRC interest in the site
11  as well as the appropriateness of transfer of the
12  permit.  And that's what I have been speaking to.
13         This is a circumstance in which everyone's
14  walking away from the permit and from what's left of
15  the site.
16     Q.  And the focus of -- both of TVA and the NRC
17  regarding whether or not this is was a construction --
18  excuse me, a utilization facility was on whether it
19  could operate as a nuclear reactor.  Wasn't that the
20  key inquiry here?
21         MR. LEMBKE:  Well, I object.  First of all,

Page 280

1  that's a compound question.  And second of all,
2  there's no foundation for his comment on what third
3  parties were thinking at the time.
4         MR. O'REAR:  Well, I'm not asking him what
5  they were thinking, I'm asking him about what they
6  said.
7         MR. LEMBKE:  Well, then I object to the
8  question because you misstate the evidence.  You've
9  already been over this.
10  BY MR. O'REAR:
11     Q.  So let's go back.
12         MR. LEMBKE:  Now, you're trying to change
13  what the evidence says.
14         And we've been going about an hour.  Is this
15  a good time for a short break?
16         MR. O'REAR:  Let me finish this line, then
17  we can.
18  BY MR. O'REAR:
19     Q.  If you would look at Exhibit 208, Page 3,
20  this paragraph that we've been referring to --
21     A.  I'm sorry?



Page 281

1    Q.  208, the last exhibit we've been talking
2  about.
3    A.  The August 2006 letter.  I forgot to mark
4  it.
5    Q.  208.
6    A.  Got it.
7    Q.  Okay.  Looking at that same paragraph, it
8  says in the next to last sentence, "Over the past
9  several years key components such as the control rod
10  drive mechanism for both Unit One and two have been
11  removed from the site, which precludes the ability of
12  the unites to operate as nuclear reactors."
13       And so, what's -- the focus on there is
14  whether it can operate as a nuclear reactor for
15  determining whether it is a utilization facility,
16  correct?
17    A.  That's what the sentence is focused on.
18    Q.  Okay.  And there's no reference to what the
19  original design plans were or what the plant was
20  designed for, is there?
21    A.  Well, there's no specific reference to, you

Page 282

1  know, the earliest design documents.  But I'm not sure
2  I understand the relevance.
3    Q.  The relevance is that the design documents
4  were still in effect but the determining factor is
5  whether it could operate as a nuclear reactor, not
6  whether it was designed as a nuclear reactor.
7       MR. LEMBKE:  That's not a question.
8       MR. O'REAR:  That was a question.
9  BY MR. O'REAR:
10    Q.  Is that correct?
11       MR. LEMBKE:  I object.  Object to the lack
12  of foundation and asking him to testify to what third
13  parties were thinking.
14       MR. O'REAR:  I don't think I asked that.
15  BY MR. O'REAR:
16    Q.  You can answer the question.
17    A.  What is the question?
18    Q.  The question is:  There is no reference in
19  this document by the NRC to what the plant was
20  designed for in stating whether or not the plant is a
21  utilization facility, is there?

Page 283

1       MR. LEMBKE:  Objection, asked and answered.
2       THE WITNESS:  Again, what -- I would say no,
3  there's not a reference to specific design but that's
4  not the focus of what the NRC is looking at here.  Its
5  focus is, is it satisfied from the standpoint of the
6  progression -- not progression, but the status of the
7  facility such that it would not be something that you
8  just turn a screw and the thing can be turned on.
9       That's, again, the whole idea of we're being
10  asked to cancel the permit and walk away as the
11  nuclear regulator.  Those are the things from that
12  standpoint and that's why these things were satisfied,
13  is because it can't be turned on, it's not something
14  that the termination that's tied particularly to the
15  design -- original design or changes that were made.
16    Q.  And then at some point after this letter of
17  August 22nd, 2006, the NRC agreed to terminate the
18  permit, correct?
19    A.  Yes, I believe that's in Cathy Haney's
20  letter.
21    Q.  September 14, 2006, correct?

Page 284

1    A.  Yes.  Again, it's the Cathy Haney letter.  I
2  sort of lost track of it.  This is Exhibit 130.
3       Okay.  Let's take a five-minute break.
4       (Whereupon, a recess ensued.)
5       THE WITNESS:  Back on the record.
6  BY MR. O'REAR:
7    Q.  Mr. Burns, can you put Exhibit 83 before
8  you?  This is 10 CFR part 50, the Commission policy
9  statement on deferred plants.
10       MR. LEMBKE:  What was the exhibit number?
11       MR. O'REAR:  Eighty-three.
12       THE WITNESS:  I saw it, now I may have --
13  got it.  Sorry.
14  BY MR. O'REAR:
15    Q.  That's fine.  You're familiar with that
16  document, aren't you?
17    A.  Yes, I am.
18    Q.  And did you help construct that when it was
19  originally adopted?
20    A.  I did not author it or did not -- its
21  development.  However, at the time it was adopted I



Page 285

1  was a legal advisor to Commission Carr and his legal
2  advice -- this came before the Commission.  It was
3  endorsed and issued as a Commission policy statement,
4  so I would have advised him on it.
5      Q.   And this is a rule of the Commission, right,
6  a rule of the NRC?
7      A.   No, it's a policy statement.
8      Q.   Just a policy statement?
9      A.   Yes.
10     Q.   Okay.  Not considered to be a " rule"?
11     A.   Not an enforceable rule, no.
12     Q.   Is it used by the NRC staff as guidelines?
13     A.   Yes.  That was its intention.
14     Q.   And when you referred earlier to the
15  wholistic set of authority that need to be considered
16  here, would you have included this deferred plant
17  policy statement within that group of things to be
18  considered?
19     A.   I think the policy statement has relevance.
20  It reflects the overall construct for construction
21  permits and it was intended to address the

Page 286

1  circumstances that arose in the mid 1980s when there
2  were a number of plants that were under construction
3  but it was uncertain as to whether they would proceed
4  to completion and operation.
5      Q.   Let's look at Page 3 of the exhibit.
6          MR. LEMBKE:  Well, you mean numbered Page 3?
7  Because there are a bunch of blank pages, right?
8          MR. O'REAR:  I don't have any blank pages.
9  I'm sorry.
10         THE WITNESS:  I have one Page Number 3 here.
11         MR. O'REAR:  Yeah.  I do mean numbered Page
12  3 but I don't have no blank pages on my exhibits.
13         Maybe it was a copying error.
14         MR. LEMBKE:  Every other page of ours is
15  blank.
16         MR. O'REAR:  Is Page 3 in there?
17         THE WITNESS:  Yeah.
18  BY MR. O'REAR:
19     Q.   Let's look -- well, the blank pages are not
20  part of the exhibit or should not be.
21         MR. O'REAR:  I just note for the court

Page 287

1  reporter, the exhibit as I have it and as it's
2  supposed to be submitted at the deposition does not
3  have blank pages.
4  BY MR. O'REAR:
5      Q.   Okay.  Page 3?
6      A.   Yes.
7      Q.   Page 3 contains definitions of deferred
8  plant and terminated plant.  Is that correct?
9      A.   Yes.
10     Q.   Do you see that at the bottom?
11     A.   Yes, I do.
12     Q.   All right.  Sir, and it defines a deferred
13  plant as, "A nuclear power plant in which the licensee
14  has ceased construction or reduced activity to a
15  maintenance level, maintains the construction permit
16  in effect and does not announced termination of
17  plant."
18         That is correct -- did I read that
19  correctly?
20     A.   Yes.
21     Q.   And a terminated plant is defined as a,

Page 288

1  "Nuclear plant at which the licensee has announced the
2  construction has been permanently stopped, but which
3  still has a valid construction permit."  See that?
4  Did I read that correctly?
5      A.   Correct.
6      Q.   So, both deferred plants and terminated
7  plants exist while construction permits are valid and
8  remain in effect.  Is that correct?
9      A.   Yeah.  What the policy does is it provides a
10  dichotomy that reflects those for which a final
11  decision are really just a deferral of a continuation
12  of project might occur, and those in which basically
13  the license holder is saying, we're over it and we're
14  going to turn it in or we may put it -- or we may even
15  try to transfer it.  That can also happened with a
16  deferred plant as well.
17     Q.   What I was trying to get you to clarify is
18  that in both instances the construction permits remain
19  in effect?
20     A.   Yes, valid construction permits, I agree.
21     Q.   And in your report in Paragraph 47 --



Page 289

1    A.  Okay.

2    Q.  -- you cite to the policy statement on

3  deferred plants, do you not?

4    A.  In 47?  Yes, I do.

5    Q.  Yes.  Forty-seven and 48?

6    A.  Yes, I do.

7    Q.  And that's this Exhibit 83, right?

8    A.  Yes.  I was using an actual image from the

9  Federal Register but that's what this is, too.

10   Q.  If you would turn to numbered Page 6 of the

11  statement --

12   A.  Hold on.  Okay.  I think I've got it.

13       The copy is not -- the page numbers on the

14  copy are not correct.

15   Q.  I apologize.

16   A.  Is Section B:  Terminated Plants?

17   Q.  That's correct?

18   A.  I'm on that page.

19   Q.  In your opinion, did the Bellefonte plant at

20  any point meet the definition of a terminated plant?

21   A.  It could be considered so, although I don't

Page 290

1  consider that significant.

2    Q.  Okay.  And you don't consider it significant

3  because you believe the policy behind this statement

4  equally applies to deferred plants and terminated

5  plants?

6    A.  Essentially, yes.

7    Q.  So when the policy statement refers to in

8  Section B a terminated plant and in Paragraph 2 of

9  Section B, measures that should be considered for

10  reactivation or transfer of ownership of terminated

11  plants, do you think those policy statements equally

12  apply to deferred plants?

13   A.  I'm sorry.  Which in --

14   Q.  B2, measures that should be considered for

15  reactivation or transfer of ownership of the

16  terminated plant?

17       MR. LEMBKE:  Well, I'm going to object to

18  the form.  It misstates the evidence.

19       MR. O'REAR:  I don't think.

20       MR. LEMBKE:  I mean, it says it's for

21  terminated plants and you're asking is it for deferred

Page 291

1  plants, too?

2        MR. O'REAR:  I'm asking him if the policy

3  behind the statement regarding transfer of ownership

4  of terminated plants in his opinion equally applies to

5  deferred plants.

6        THE WITNESS:  Essentially when you analyze

7  the provision, essentially there is an equivalency

8  particularly with respect to provision B2(b), that

9  lowercase B.  Provision B2(a) really goes to basically

10  the salvaging of components that, for example, a

11  company that may want to sell them and this has

12  happened obviously and we've talked about some

13  circumstances earlier in -- about a qualifying

14  experience.  But it's similar where a license holder

15  has a steam generator or it has a turbine or something

16  like that, and it may want to sell that and basically

17  recoup some losses -- some of its losses by selling

18  equipment.  And so what that provision does is it

19  says, you need to make sure you maintain your quality

20  documentation in short form.

21        The second one is really very much like the

Page 292

1  deferred plant aspect here, and that is if you're --

2  if you decided to terminate your commitment to that

3  and you wish to transfer, there still needs to be --

4  basically you're still advised to maintain the

5  preservation and maintenance and documentation program

6  on it.

7        And so that's what I'm saying.  This

8  provides -- there are two different ways things are

9  going.  One is you're going to -- you're going to have

10  a lot of people scavenge your existing equipment.  And

11  the other one being you want to maintain it, so you

12  don't raise the issues about the ability to transfer

13  -- as a quality or raise questions about the quality

14  of what you're transferring.

15  BY MR. O'REAR:

16   Q.  This policy statement under measures that

17  should be considered for reactivation or transfer of

18  ownership does not say, make sure you get a transfer

19  of the construction permit before you transfer the

20  plant, does it?

21   A.  Say that again, please.



Page 293

1    Q.  This policy statement about measures to be
2  considered regarding the transfer of ownership does
3  not say, make sure you get the construction permit --
4  in effect construction permit transferred before you
5  transfer the plant?
6    A.  It's not --
7        MR. LEMBKE:  Objection.
8        THE WITNESS:  It's not that detailed about a
9  specific checklist or steps.  It does highlight that
10 you need to have in the authorization of the -- you
11 need the transfer authorization.  Again, that's in the
12 context.
13       The NRC has control of the construction
14 permits in particular and you need to act in
15 conformance with them and follow through with the
16 process.
17 BY MR. O'REAR:
18   Q.  Let's move to the next exhibit, which is
19 Exhibit 129, previously marked.  It is the proposal on
20 decommissioning, which is a big thick document.
21   A.  Yes.  Got it.

Page 294

1      (Burns Exhibit No. 129 was marked for
2  identification. )
3        THE WITNESS:  I've got it.
4  BY MR. O'REAR:
5    Q.  Now, you referred to this in Paragraph 49 of
6  your report, did you not?
7    A.  Yes.
8    Q.  And I think I asked you earlier, were you
9  involved in the formulation of this proposed rule?
10   A.  You did ask me that.
11   Q.  Okay.  And what is the current status of the
12 rule?
13   A.  I don't -- don't know.  As far as I know, it
14 has not been -- again, the document we have here is a
15 draft of a proposed rule that was sent to the
16 Commission for approval.  And given the stuck can I
17 pay number sometime in between.
18      I do not know the specific status of it
19 other than to say as far as I'm aware, that it has not
20 been issued for public comment in terms of a proposed
21 rule in the Federal Register.

Page 295

1        I'm not sure if the Commission has finished
2  voting on it or intends to finish voting on it.
3    Q.  Does the proposed rule represent the
4  proposal from the NRC staff, that this is a rule that
5  the Commission needs to adopt?
6    A.  Yes.  Almost all rulemakings need the
7  Commission's approval before they're published for
8  comment and their approval when they're adopted as the
9  final rule.  And this would be one of them because
10 it's a significant substantive rule.
11   Q.  If you can look at Page -- Pages 172 through
12 -- well, look at the 172 through -- well, look at 172
13 through 173, I believe.  There may be -- they may be
14 copied front and back.
15   A.  Yes, it is.  Okay.
16   Q.  In the proposed rule at the bottom of 172,
17 it uses the Atomic Energy Act statutory definition of
18 a utilization facility, does it not?
19   A.  Yes, it appears to.
20   Q.  And then on Page 173, it references the
21 regulatory definition underneath the statutory

Page 296

1  definition, correct?
2    A.  The reference is to 10 CFR 50.2?
3    Q.  Right.
4    A.  Yes, it references 50.2.
5    Q.  Do you know whether it would be adopted by
6  the Commission or not?  Do you have any prediction on
7  that?
8    A.  I can't predict that.  I can't predict that.
9  I know I -- at the time I left the Commission in
10 April 2019, it was pending before the Commission.  But
11 the majority of the Commission had not voted and since
12 I haven't seen it in the Federal Register, I presume
13 that has not as yet happened.
14      I really -- this sort of goes on beyond what
15 we're really talking about, but there are a number of
16 reasons I can speculate why it might not happen.
17   Q.  You don't need to.  Directing you back to
18 173, the proposed rule cites the Zimmer case favorably
19 as a practical approach regarding the decommissioned
20 plant.  Is that correct?
21   A.  That's correct.



Page 297

1    Q.  Okay.  So whether this rule is adopted or
2  not, the Zimmer precedent will remain, will it not?
3    A.  Yes.  And I don't question the Zimmer
4  precedent.
5    Q.  Okay.  Now, let's turn to your supplement to
6  your report, which should be there somewhere.
7        MR. O'REAR:  We're going to mark -- this is
8  marked Exhibit 201.
9        (Burns Exhibit No. 201 was marked for
10  identification.)
11        THE WITNESS:  Yes, I have it.  It's 201?
12  BY MR. O'REAR:
13    Q.  Yes.
14    A.  Okay.
15    Q.  I direct your attention to Page 3, Paragraph
16  10.
17        MR. LEMBKE:  Give me just one second to pull
18  it.  Okay.  And you want that marked 201?
19        MR. O'REAR:  Yes.
20        MR. LEMBKE:  All right.
21  BY MR. O'REAR:

Page 298

1    Q.  You allude to the Dr. Asperger letter in
2  Paragraphs 10 and at the end of Paragraph 11.  Is that
3  correct?
4    A.  Right.
5    Q.  And at the end of Paragraph 11 you state
6  there, "Nothing in the policy statement," referring to
7  this deferred plant policy statement which we
8  previously discussed, "indicates an alteration or
9  abandonment of the NRC's view of the meaning of the
10  term 'utilization facility' as expressed in Acting
11  Director Case's letter."
12        Do you see that?
13    A.  Yes, I do.
14    Q.  Are you aware of that letter having ever
15  been cited by the NRC as authority?
16        Yes -- by the NRC as authority?
17    A.  I'm not aware of particular references in
18  adjudication since the time that it was issued.  I
19  would note that the Case letter references Marble
20  Hill, which I think is significant.
21        And again, reflective of practice.  And I

Page 299

1  said in my original report, one of the reason it
2  doesn't surprise me that there hasn't been a lot of
3  reference back to it is the fact that most of this --
4  these issues over construction were occurring in the
5  late 1970s and early 1980s.
6    Q.  Well, not only has there not been a lot of
7  reference, there hasn't been any reference to it, has
8  there?
9    A.  I don't --
10        MR. LEMBKE:  Objection, asked and answered.
11  BY MR. O'REAR:
12    Q.  Are you aware of any reference to it?
13    A.  I am personally --
14        MR. LEMBKE:  Same objection.
15        MR. O'REAR:  You're talking over the
16  witness.
17        MR. LEMBKE:  I'm entitled to make my
18  objection, Mr. O'Rear.
19        MR. O'REAR:  I understand, but you're both
20  talking at the same time.
21  BY MR. O'REAR:

Page 300

1    Q.  Go ahead.
2    A.  I personally am not aware of a particular
3  reference to it.
4    Q.  Okay.  Mr. Burns, does it strike you unusual
5  under the facts of our lawsuit that TVA was the
6  construction permit holder and licensee, yet they were
7  not the applicant to the NRC for the transfer of the
8  construction permit.  Is that unusual?
9        MR. LEMBKE:  Object to the form, as to lack
10  of foundation and vagueness.
11        THE WITNESS:  The question is whether I see
12  it as unusual that the TVA was not applicant?
13  BY MR. O'REAR:
14    Q.  Yes.
15    A.  I'm not sure about that.  I have read some
16  of the staff guidance documents and where it indicates
17  that the holder may join in.
18    Q.  Well, in your experience was the applicant
19  for the transfer of the license typically the current
20  holder of the license or the licensee and not the
21  prospective licensee?



Page 301

1        MR. LEMBKE:  Object to the form.

2        Are you talking about a construction permit

3  application for transfer or something else?

4        MR. O'REAR:  Was not really limited to that.

5  I said a license which would include construction

6  permit.

7        THE WITNESS:  You know, quite honestly I'm

8  not sure I focused on who has actually made the

9  application.  It's been more the focus and my

10  recollection is more about, you know, the process of

11  transfer or the need to have this authorization for

12  the transfer.

13  BY MR. O'REAR:

14      Q.  Were you aware of the fact in this case

15  whereby TVA refused to be the applicant for the

16  transfer of the license at the request of Nuclear

17  Development?

18      A.  I have seen some of the e-mails which have

19  been offered as exhibits that seem to suggest that.

20      Q.  Are you aware of the facts in this case that

21  TVA did not participate at all in the application

Page 302

1  process?

2        MR. LEMBKE:  I'm going to object to that

3  form for lack of foundation and misstates the evidence

4  in the case.

5  BY MR. O'REAR:

6      Q.  Are you aware of evidence in this case, Mr.

7  Burns, that TVA refused or failed to participate in

8  the application process?

9      A.  Again, I've seen some exhibits with respect

10  to the interactions between Nuclear Development and

11  TVA.  I would be reluctant to -- I have no opinion on

12  that and I would be reluctant to basically voice one

13  about the relationship between the two entities.

14      Q.  If you would look at Exhibit 81, which

15  should be near the bottom of the stack, if you can

16  find it?

17      A.  Yeah, I have it.

18      Q.  And the cover page is an e-mail from Billy

19  Gleaves of the NRC to Bill McCollum of Nuclear

20  Development.  Do you have see that, dated

21  September 19, 2017?

Page 303

1      A.  If you would hold on one second.  I'm having

2  trouble finding it.

3        MR. LEMBKE:  I don't see it because I have

4  my notebook with a one on it, so let me pull it out.

5        Okay.  I've got it.

6  BY MR. O'REAR:

7      Q.  Mr. Gleaves was the project manager on the

8  Bellefonte -- the Bellefonte application for a period

9  of time.  Is that right?

10      A.  That's my understanding.

11      Q.  And this e-mail attaches a document that's

12  titled:  Procedures For Handling License Transfers.

13  Effective date, June 15, 2017.

14      A.  Yes.  June 5, 2017.

15      Q.  June 5.  Sorry.

16        And are you familiar with this document?

17      A.  I have some general familiarity with it.

18      Q.  Will you turn to Page -- it's Page 2 of the

19  -- at the top, right-hand corner Page 2 of 14 of the

20  procedures document.

21        I'm directing you attention to Paragraph 4,

Page 304

1  captioned basic requirements?

2      A.  Yes.

3      Q.  Will you get to that page?

4      A.  Yes, basic requirements.  Paragraph 4, yes.

5      Q.  So it says at the beginning, "Their license

6  transfers are unique and they result in the exchange

7  of ownership and/or responsibility for operating a

8  nuclear facility."

9        "Typically the exchange is orchestrated by a

10  team of lawyers representing both the current and

11  future owners."  Do you see that?

12      A.  Yes, I do.

13      Q.  And while this is the directed to operating

14  licenses, would it also apply to construction permits?

15      A.  I think the general -- general guidance --

16  and again, this is primarily a guidance document

17  issued to the staff.  It may have relevance for those

18  outside the Agency, but I think directed to the staff.

19        But I would agree that it has some meaning

20  in terms of transfer of licenses or construction

21  permit.



STEPHEN G. BURNS
NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

August 19, 2020

305–308

Page 305

1    Q.  And it states in Paragraph 2 under Section
2  4, "The legal staff of OGC will be involved throughout
3  the processing of the application.  Frequent
4  communications between the OGC and legal staff of the
5  current and/or future owners will occur."  Do you see
6  that?
7    A.  Yes.
8    Q.  And when you were in the Office of General
9  Counsel, was it the typical situation that both the
10  attorneys for the licensee and the perspective
11  licensee would work together in communicating whatever
12  was needed by the NRC to process the application?
13    A.  I would say that, you know, we would have
14  frequent contact and probably from both parties who
15  are engaging.
16    One of the -- one of the exceptions might
17  well be some of those instances where a licensee was
18  going into bankruptcy and reorganizing, so you'd have
19  the trustee in bankruptcy who you interacted with
20  rather than sort of counsel for the entity that was
21  being reformed or reformulated.

Page 306

1    Q.  Are you aware with respect to the facts of
2  this case whether or not TVA had any frequent
3  communication with the NRC staff regarding the Nuclear
4  Development application?
5    A.  I don't have any knowledge of the frequency.
6    Q.  If TVA was not frequently involved in any
7  communications regarding that application, would it
8  strike you as unusual or out of the ordinary?
9    A.  I --
10    MR. LEMBKE:  I object to the form, lack of
11  foundation.
12    You can go ahead, Mr. Burns.
13    THE WITNESS:  I would expect some contact.
14  And I do recall -- again, I just don't -- I don't have
15  a particular awareness here.
16    I do have recollection that Mr. Chandler
17  spoke to a number of OGC staff at some point.  But you
18  know, I just don't have it, any particular
19  understanding of what actually happened here.
20    I would expect both sides to have some
21  communication with the legal staff and eventually the

Page 307

1  technical staff who issues the transfer order.
2  BY MR. O'REAR:
3    Q.  What do you recall about Mr. Chandler's
4  contact with the OGC staff?
5    A.  I think Mr. Chandler was exploring the
6  question about a transfer of the site prior to
7  transfer of the permit.  That's what I recall.
8    Q.  And how did you learn about that?
9    A.  I read it in his deposition.
10    Q.  Okay.  You didn't know about it while you
11  were at NRC?
12    A.  Oh, no.  Not at all.
13    Q.  So what you know would be whatever is
14  present in his deposition.  Is that correct?
15    A.  That's correct.
16    Q.  Let's look at Exhibit 14.
17    A.  What is it?
18    Q.  Fourteen is an e-mail from Chris Chandler to
19  Tim Matthews, dated October 18, 2018.  It's got an
20  exhibit sticker on it marked 14.
21    (Burns Exhibit No. 14 was marked for

Page 308

1  identification.)
2    MR. LEMBKE:  I don't think that's in my
3  stack.
4    MR. O'REAR:  Okay.  Well, I'm not going to
5  -- I didn't send it?  I thought I did.
6    Anyone have it?
7    MR. LEMBKE:  I think Mr. Burns and I are the
8  only ones who got it sent.  Well, maybe Larry has it.
9    THE WITNESS:  I'm not seeing it.
10    MR. O'REAR:  Well, the witness is the
11  important one.
12    MR. BLUST:  Well, to whom was it?
13    MR. O'REAR:  It's from Chris Chandler to Tim
14  Matthews, copied to Joe Shea.
15    THE WITNESS:  I'm sorry.  I'm not seeing it.
16    MR. O'REAR:  All right.
17  BY MR. O'REAR:
18    Q.  Let me pose a hypothetical to you since you
19  don't have the actual document.
20    Would it strike you as unusual if Nuclear
21  Development sent a letter to TVA which proposed that



Page 309

1  TVA would sign such letter to the NRC, stating that
2  TVA consents to the requested transfer of the two
3  construction permits.  Would it strike you as unusual
4  if that was done, that TVA would not sign and submit
5  such a letter to the NRC?
6        MR. LEMBKE:  Object to the form as to the
7  vagueness of "unusual."
8        THE WITNESS:  I guess my answer would be I
9  think it depends on other circumstances there.
10        I would expect some communication in
11  general.  But, you know, context, I have to understand
12  more in terms of context and the necessity under the
13  circumstances.
14  BY MR. O'REAR:
15     Q.  When you said you would expect more
16  communication in general, were you referring to
17  communication from counsel for the licensee?
18     A.  I think I'm talking in effect, both -- both
19  parties, so the communications between them with
20  respect to something like that.
21     Q.  All right.  I've got I believe two more

Page 310

1  exhibits.  We're close to the end here.
2        There are two speeches in there that you
3  made that were published on the NRC website?
4     A.  Okay.
5     Q.  Do you see them?
6     A.  Yes, I do.
7     Q.  Okay.  And let's mark the one dated April
8  30th, 2015 as Exhibit 210, I believe unless I miss
9  counted.
10        MR. O'REAR:  Is that the next number, Mr.
11  Court Reporter?
12        THE COURT REPORTER:  Let me check it.
13        (Burns Exhibit No. 210 was marked for
14  identification.)
15  BY MR. O'REAR:
16     Q.  Have you marked that, Mr. Burns?
17     A.  210, yeah, the one to the USEA.
18     Q.  Right.  This one will just take a minute.
19        If you look on Page 4 of that speech -- and
20  can you identify Exhibit 210 as your prepared remarks
21  to the U.S. Energy Association meeting April 30th,

Page 311

1  2015?
2     A.  Yes, those are my mine.
3        That's the prepared copy of my remarks.
4     Q.  Were these remarks you in fact gave, since
5  they were published on the NRC website?
6     A.  Yes.  I mean it's the formal -- it's not a
7  transcript but it's the formal copy.  When I actually
8  gave it, I may have, you know, digressed here and
9  there but not significantly.
10     Q.  Look on Page 4 of that speech.  There's a
11  section referring to the decommissioning proposal
12  you're making?
13     A.  Right.
14     Q.  See that?  And this is at a time when it had
15  just come, the proposal had just come out.  Is that
16  correct?
17     A.  I think that --
18     Q.  Excuse me.  It's at a time when the
19  Commission directed the staff to begin work on a
20  proposed rule?
21     A.  Yeah, that's more accurate.  Because I don't

Page 312

1  think the proposed rule actually got up to the
2  Commission until 2018.
3     Q.  In your speech you said that this proposed
4  rule was to, "Increase the efficiency and
5  predictability of the NRC's regulatory program."  Do
6  you see that in the second paragraph?
7     A.  Second paragraph?  Yes, I do.
8     Q.  And so again, this proposed rule in your
9  view was a good thing that would increase efficiency
10  and predictability, right?
11     A.  Yeah.  The effort to put together a rule was
12  in my view at that time a good -- a way we should be
13  going as an Agency to deal with some of the issues
14  that are frequently described there.
15     Q.  Let's move to the next exhibit, which is the
16  speech on March 8th, 2016 that I would like marked as
17  Exhibit 211.
18        (Burns Exhibit No. 211 was marked for
19  identification.)
20  BY MR. O'REAR:
21     Q.  And are you familiar with this speech?



Page 313

1    A.  Yes, I am.

2    Q.  And so, these remarks are consistent with

3    the remarks you actually made at the meeting?

4    A.  Yes.

5    Q.  Whatever meeting this was.  Tell us what

6    meeting this was?

7    A.  This was at the NRC's annual regulatory

8    information conference.  It's basically a conference

9    sponsored by the Agency once a year.  Didn't happen

10   this year because of COVID-19.

11        But -- and you get a lot of attendance from

12   both the industry, NGOs, other people added.  In many

13   ways it's considered probably next to the IAEA general

14   conference in Vienna, probably the most significant

15   annual conference on nuclear regulations.

16   Q.  Let me ask you to look at Page 2 of the

17   exhibit.  I want to ask you about some of your

18   comments in the speech.  I'm going not going to ask

19   you about everything.

20        The first one I want to ask you about is the

21   paragraph about two-thirds of the way down the page

Page 314

1    which starts, adequate protection?

2    A.  Yes.

3    Q.  Let me just read that.  "'Adequate

4    protection' is a difficult phrase to explain to lay

5    audiences, when adequate in the usual vernacular

6    signifies just okay.  For us of course it means the

7    Commission must consistently and over time use its

8    broad discretion to impose requirements it believes

9    meets this mandate.  It can be neither too lax nor too

10   strict.  And we must not conduct our decision making

11   in a vacuum.  We must consider real life and actual

12   operating experience.  And we must weigh public and

13   stakeholder input to guard against making decisions in

14   isolation."  Do you see that?

15   A.  Yes, I do.  Yes.  I lost track.

16   Q.  And did that state principles that you

17   believe should be followed by the NRC?

18   A.  Yes.  It reflects my approach to regulation.

19   Q.  And you believe that you should in the

20   regulation consider real life and actual operating

21   experience and weigh the public and stakeholder input

Page 315

1    to guard against making decisions in isolation.  Is

2    that correct?

3    A.  That's correct.  That's what I said.  Those

4    are the general principles.  I have applications to

5    specific situations.

6    Q.  And so in the context of the NRC making a

7    decision regarding Nuclear Development, you believe it

8    would be appropriate to consider the real life and

9    actual operating experience and weigh public and

10   stakeholder input.  Is that correct?

11        MR. LEMBKE:  I want to object based on

12   assuming facts not in evidence.  I was unaware that

13   Nuclear Development -- they ever operated anything.

14   BY MR. O'REAR:

15   Q.  Would that be a fair statement?

16        MR. LEMBKE:  Same objection.  And I want to

17   object on the basis of vagueness.  What action are you

18   talking about?  When you're talking about the action

19   on --

20        MR. O'REAR:  I'm talking about principles

21   that he believes Nuclear Development -- excuse me, NRC

Page 316

1    should apply towards Nuclear Development's

2    application.

3    BY MR. O'REAR:

4    Q.  Do those principles include what you stated

5    in this speech in what I read, the part that I just

6    read?

7    A.  I agree with the principles that I espoused

8    and described in the speech.  Again, they're

9    principles I think ought to be followed and some of

10   that is related to the consistency of application of

11   NRC requirements as well as decision making that is

12   apparent.

13        And yes, this is a general statement, sort

14   of like an overarching principle.

15   Q.  And then if you would turn to Page 3 --

16   well, at the bottom of Page 2 you say that you talked

17   a bit about your regulatory philosophy --

18   A.  Right.

19   Q.  -- in the speech you gave last year.  Do you

20   see that?

21   A.  Yes.



Page 317

1   Q.   And then at the top of Page 3, you're

2   talking about your regulatory philosophy.  Is that

3   right?

4   A.   Yes.

5   Q.   And you said, "Along those lines I believe I

6   am independent in my thinking and philosophy.  I don't

7   adhere to a rigid ideology that compels a certain

8   outcome each time.  So I believe I'm predictable in my

9   approach of evaluating each matter on a case by case

10  basis and applying rules deliberately and consistently

11  across the board."  Do you see that?

12  A.   Yes.

13  Q.   And so that's an important principle for you

14  in your regulatory philosophy.  Is that right?

15  A.   Correct.

16  Q.   Thank you.  You said next paragraph, "I am

17  also independent in that I'm open to new ideas and

18  solutions that others may offer.  I listen open

19  mindedly to all stakeholders without becoming beholden

20  to just one point of view.  I believe problems must be

21  clearly defined and I think there's rarely only one

Page 318

1   solution to a problem, nor do believe the NRC has --

2   always has the right answer to any given problem."

3   Were those true statements, that was your

4   regulatory philosophy?

5   A.   That's my approach.  And probably the best

6   example is given in the next few paragraphs with

7   respect to the NRC's treatment of flex equipment in

8   the post Fukushima era.

9   Q.   Well, before you describe that, you say in

10  the next sentence, "In my experience, oftentimes the

11  best decision, the consensus based solution is reached

12  through meaningful dialogue and all affected

13  stakeholders."  Right?

14  A.   Yes, it is says that.

15  Q.   And the stakeholders in this case would

16  include Nuclear Development, right?

17  A.   In what case?

18  Q.   In this lawsuit, in this case that we're

19  here about, the stakeholders include Nuclear

20  Development?

21  A.   Correct, Nuclear Development.

Page 319

1   Q.   TVA?

2   A.   TVA is one.

3   Q.   Would you consider that NRC to be a

4   stakeholder?

5   A.   The NRC is basically the decisionmaker.  And

6   usually you think of stakeholders as those with an

7   input, but those who are being affected by the Agency.

8   Q.   Would you consider the public to be a

9   stakeholder with respect to Bellefonte?

10  A.   Yes.

11  Q.   All right.  Then --

12  MR. LEMBKE:  Mr. O'Rear, we're now

13  seven hours and one-minute according to the court

14  reporter's calculation.  So we'll need to be wrapping

15  it up.

16  MR. O'REAR:  Yeah, we're wrapping up.

17  BY MR. O'REAR:

18  Q.   Well, let me direct you to Page 5 of this

19  speech.

20  A.   Okay.

21  Q.   Would you look at the sentence

Page 320

1   three-quarters of the way down beginning "but I

2   argue?"

3   A.   Yeah, yeah.  I'm there.

4   Q.   It says, "But I argue that the regulator

5   needs to contemplate for -- "the sweet spot" between

6   under-regulation and over-regulation pursue effective

7   regulation without imposing undue burden and stifling

8   innovation."  Do you see that?

9   A.   Yes, I do.

10  Q.   And do you believe that is a proper

11  regulatory approach?

12  A.   Yes, I do.

13  Q.   And so, tell me if you believe these

14  principles should be applied by the NRC in its

15  regulatory function.

16  Do you think fairness should be a

17  consideration?

18  A.   Fairness is a consideration.  And actually

19  what I would say, is the NRC reflects a number of

20  these concepts or ideas in what is called the

21  principles of good regulation, which is obviously



Page 321

1 early 1990s.
2     Q.   Did those principles include practicality?
3     A.   I don't recall if practicality is there but
4 it's, you know, things like consistence with
5 transparency, you know, achieving a regulatory
6 objective, those types of things.
7     Q.   But fairness is certainly one of them?
8     A.   Yes, absolutely, fairness.  Because if you
9 aren't fair, you're subjected to potential appeals in
10 the court of appeals.
11     Q.   Do you have an opinion as to whether under
12 the circumstances of this case where this plant is
13 presently inoperable, that the -- whether the transfer
14 of the site to Nuclear Development before the
15 construction permits are transferred poses an undue
16 risk to the safety and wellbeing of the public?
17        MR. LEMBKE:  Objection, asked and answered.
18 We went over that earlier.  We are over time and we
19 shouldn't be going back over things you've already
20 asked.
21        MR. O'REAR:  I'm not sure I asked it exactly

Page 322

1 that way.
2        MR. LEMBKE:  It was subtly identical.
3        MR. O'REAR:  Okay.  Well, he could have
4 answered more quickly than your objection.
5        MR. LEMBKE:  I'm just saying I think it's
6 time to call time on this.  We're now, beyond
7 seven hours.
8 BY MR. O'REAR:
9     Q.   Well, do you believe there is any --
10        MR. LEMBKE:  Mr. O'Rear, you're beyond your
11 time limit.
12        MR. O'REAR:  Well, okay.  I've got two more
13 questions.
14        MR. LEMBKE:  All right.  Two.
15 BY MR. O'REAR:
16     Q.   One question.  Mr. Burns, if the NRC
17 approves the application submitted by Nuclear
18 Development's transfer of the construction permit, do
19 you see any impediment or problem for TVA to convey
20 the site to Nuclear Development?
21        MR. LEMBKE:  Object to the form, lack of

Page 323

1 foundation and vague as to what "impediment" is.
2        THE WITNESS:  So the question, if NRC
3 approves the application for transfer?
4        Well, with respect -- if it approves the
5 application of transfer my focus has been on the
6 regulatory process.  And from my standpoint, the
7 approval of a transfer is what is necessary in order
8 to allow conveyance of, you know, the property
9 interest on the site.  So that's, you know, basically
10 I will stop there.  You know, I recognize there may be
11 other disputes between the parties but that's not what
12 I was asked to provide an opinion on.
13        MR. O'REAR:  Okay.  That's all I have.
14 Thank you for your time.  I know it's been a long day.
15        MR. LEMBKE:  Let's take a five minute break.
16 I'll have some questions.
17        (Whereupon, a recess ensued.)
18        MR. LEMBKE:  Back on the record.
19        EXAMINATION:
20 BY MR. LEMBKE:
21     Q.   Mr. Burns, I have a few follow up questions

Page 324

1 for you.
2        First, there's been -- you were asked a lot
3 of questions today about the definition of a
4 utilization facility.  Does the definition of
5 utilization facility factor in at all to your opinion
6 concerning whether there'd be a permit violation if
7 TVA had transferred the site to Nuclear Development
8 before approval of the construction permit transfer?
9     A.   Yes, it does.
10     Q.   And how so?
11     A.   Well, the thing we've been talking about is
12 it's obvious that this is not a facility that is ready
13 as we say to turn the switch and put into operation.
14        But the framework, what I've been trying to
15 emphasize here is that the framework for regulation
16 that extends back decades wants -- has the NRC or its
17 predecessor the AEC -- it wants to assure that it has
18 the oversight and control of a site at which a plant
19 is being constructed and moving towards that type of
20 operation.
21        So, that's when I talk about the NRC not



Page 325

1  wanting to bifurcate its jurisdiction or sort of the
2  patch do -- sort of patchwork oversight.
3          That's what I'm talking about, and I think
4  that where also the decision in Marble Hill and Mr.
5  Case's 2206 decisions address.
6          Again, what you have is -- is ultimately if
7  you're going to build that utilization facility, if
8  you're going to operate a utilization facility on the
9  site, you have the imprint of the NRC all the way
10 along.
11         And dividing that or separating it out is
12 just not something in my experience and understanding,
13 Agency practice and precedent, that has been done.
14     Q.  In terms of, you know, Exhibit 199 in your
15 report with respect to your opinion reflected in --
16 I'm trying to find where you talk about the actual
17 permit language.  Paragraph 23.
18     A.  Twenty-three?
19     Q.  Yes.
20     A.  Okay.
21     Q.  And --

Page 326

1      A.  I'm sorry.  Go ahead.
2      Q.  Does the definition of utilization facility
3  have any bearing on whether the terms of the these
4  permit terms that you're referencing were complied
5  with?
6          MR. O'REAR:  Objection, asked and answered.
7          THE WITNESS:  Yes, in my view they do.  And
8  again, because the context we have here is we have a
9  site for which there is a valid construction permit
10 and the intention is to transfer that permit, and the
11 intention is to continue work on that facility until
12 it became an operational facility.
13         So in that -- in that context, that's why
14 it's significant.  And that's why, I think going back
15 to the Marble Hill, the Marble Hill precedent has
16 bearing here.  Because it reflects the intention of
17 the NRC to explore that it has the regulatory
18 oversight and imprint on the activities that may be
19 constructed -- they occur under construction.
20         And that's why it's treated for those
21 purposes as a utilization facility.  Recognizing it

Page 327

1  takes some time before that -- you're able to be to
2  the point to turn on the switch.
3  BY MR. LEMBKE:
4      Q.  All right.  And if you look at the last
5  sentence of Paragraph 23 -- and I know you reference
6  elsewhere that the permit authorizes to construct a
7  utilization facility.  That's what you're referring
8  to, correct?
9      A.  Yes.
10     Q.  And then the statement in the permit that
11 the facilities would be located at on the applicant's
12 site, that's not tied in any way to the utilization
13 facility definition, correct?
14         MR. O'REAR:  Objection, leading.
15 BY MR. LEMBKE:
16     Q.  How, if at all, is the definition of
17 utilization facility impacted on the phrase "will be
18 located on the applicant's site?"
19         MR. O'REAR:  Same objection.
20         THE WITNESS:  Well, I don't think it -- it's
21 not so much here that's a utilization facility.  It's

Page 328

1  what, you know, where the facility can be built.  And
2  it also in my view, because there are aspects which
3  related -- which, for example, referenced here, the
4  part 100 exclusion area considerations.  The idea that
5  it is a site owned by a named person or a named
6  entity, I think that that is significant.  And it is
7  part in my view, part of the construction --
8  BY MR. LEMBKE:
9      Q.  And same question as to phrase "shall be
10 constructed and located at the site described in the
11 application of Jackson County, Alabama, how if at all
12 does the definition of utilization facility affect
13 that particular requirement?
14     A.  Again, what it says is you can only proceed
15 with a utilization facility at that site.
16         And that's the stricture, that's the
17 restriction that the NRC or here, the AEC, has imposed
18 on it.
19     Q.  All right.  Earlier today, Mr. Burns, you
20 were asked questions about when a site becomes a
21 utilization facility.  Do you recall that?



Page 329

1    A.  Yes.

2    Q.  And have you ever known the NRC to make a

3  decision on the precise point at which a site becomes

4  a utilization facility?

5    A.  I'm not area of a particular decision --

6  particular decision that says you must have done this

7  much to do that.

8    I think it's more in concert with the

9  concepts reflected in the Marble Hill and the Case

10 letter.

11   Q.  All right.  Are you aware of any situation

12 where the NRC has suggested that a facility that has

13 not been -- for which a permit has not been withdrawn

14 or the party holding the permit has sought for it to

15 be withdrawn when it's as far long as either of the

16 Bellefonte units were along, are you aware of the NRC

17 ever having suggested that that's not a utilization

18 facility?

19   A.  No.

20   Q.  Now, let me get you to look at Exhibit 205,

21 which you were questioned about earlier, which is 10

Page 330

1  CFR 50.5.

2    A.  Hold on.  I got it.

3    MR. O'REAR:  Which one?

4    MR. LEMBKE:  255.

5  BY MR. LEMBKE:

6    Q.  Does anything -- what, if anything, in 10

7  CFR Section 50.5 would impose requirements on Nuclear

8  Development for their activities on the site after

9  they assumed ownership of it?

10   A.  It doesn't directly impose a new requirement

11 on a licensee.  So it wouldn't in this circumstance.

12 It reflects false -- making a false statement and

13 deliberate violations of the terms of the permit

14 holder regulations.

15   Q.  Earlier you talked about the PSAR with Mr.

16 O'Rear.  Do you recall that?

17   A.  Yes.

18   Q.  Is the PSAR a part of the application for a

19 construction permit?

20   A.  Yes, it is.

21   Q.  Are you aware in conjunction with Nuclear

Page 331

1  Development's application for a construction permit

2  transfer, are you aware of any promise they made

3  concerning the recordkeeping, maintenance or security

4  requirements of the site?

5    A.  No, I'm not aware.

6    Q.  If you look at Exhibit 124, which is Mr.

7  Case's letter to Dr. Asperger --

8    A.  Hold on.  I got it.  Yes, I've got it.

9    Q.  Am I right that this is a letter pertaining

10 to the Enrico Fermi Atomic Power Plant Unit Two?

11   A.  Yes, I believe it is.

12   Q.  And on March 3rd, 1978, do you know if the

13 Fermi plant Unit Two was capable of sustaining nuclear

14 fission in a self-supporting chain reaction?

15   A.  I do not believe it was.

16   Q.  And what familiarity do you have with that

17 Fermi Unit Two plant?

18   A.  Well, my familiarity is that I went to -- I

19 actually visited that plant.  I think it started up or

20 went critical in the mid 1980's, and I was involved in

21 some -- I think was some enforcement action with

Page 332

1  potentially -- it was petition related to Fermi in the

2  mid '80s.  And so, I went out there just prior or it

3  could have been after it had gone critical.  So again,

4  my recollection was that didn't happen until 1985.

5    Q.  And when you say go critical, what do you

6  mean?

7    A.  Well, that means they basically sustained a

8  nuclear reaction in the reactor.

9    Q.  Okay.  Mr. Burns, what is the difference

10 between a construction permit being transferred to

11 another party versus a construction permit being

12 withdrawn from the NRC's perspective?

13   MR. O'REAR:  Objection, vague, overbroad,

14 without any specificity.

15   THE WITNESS:  Well, with respect -- I'll

16 start with one being withdrawn.

17   When we talk about a construction permit

18 being withdrawn, that's the circumstance in which we

19 understand that the license holder, or the

20 construction -- the construction permit has decided to

21 abandon the project and we'll in effect withdraw the



Page 333

1  permit.  In other words, turn them back into the NRC.

2        And that's a circumstance we discussed today

3  in the Fermi project where basically Cincinnati Gas

4  and Electric decided it would not, you know, cross the

5  finish line with respect to Zinner, so it wanted to

6  pull back.  It decided to turn in the construction

7  permit.

8        So the significance in that circumstance,

9  again, is what the interest -- the NRC interested in

10  it is saying, okay, fine, you're turning in the

11  construction permit.  You're getting out of this

12  business, so to speak.  But we to be assured that what

13  is left behind is not capable of being put into

14  operation.

15        So all of this discussion, for example, on

16  an operable or utilization facility or one being

17  capable of operation is going to that basically,

18  decision.  It says is this a facility from the NRC's

19  standpoint that we can basically say, you're fine,

20  you've abandoned it.  Go forward.  Do whatever else

21  you want with respect to the site.  But, we no longer

Page 334

1  have a regulatory interest in it.

2        So, again, when it's withdrawn, that's the

3  scenario you're looking at going to.

4        I think the deferred plan policy --

5  BY MR. LEMBKE:

6     Q.  Let me ask you, how does it differ, than, if

7  you have a request to transfer the construction

8  permit?

9     A.  Well, a request for a transfer of the

10  construction permit by implication tells me that the

11  project is not over, that the transferee has an

12  interest in continuing it and potentially continuing

13  it to the point that it becomes a plant that needs an

14  operating license.

15        And so from that standpoint, the NRC has an

16  ongoing interest -- again, like with any transfer of

17  license, it has an interest in assuring that it is

18  transferred from the existing entity to one that is

19  qualified and meets the requirements of NRC licensing,

20  and that basically it continues to have that what I

21  call regulatory imprint or footprint over the activity

Page 335

1  and over the facility or the site where the activity

2  is subject to licensing, even if they're in hiatus

3  would be conducted.  And which the future -- which the

4  transferee would intend to carry out.

5        So that's the significant difference, I

6  think, when we focus on the withdrawn license and one

7  that, for example, might be terminated but -- or in

8  deferred status but basically the candle hasn't been

9  blown out.  There is still a potential future for that

10  facility.

11     Q.  And are you aware of any circumstance where

12  there has been a transfer of ownership of a

13  non-withdrawn -- well, let me start over.

14        Are you aware of any circumstance where

15  there's been a transfer of ownership of a plant

16  subject to a valid construction permit where the

17  ownership was transferred before the NRC approved

18  transfer of the construction permit?

19     A.  No, I'm not aware of such a situation.

20     Q.  Let me get you to pull Exhibit 207.

21     A.  What is that, again?

Page 336

1     Q.  This is the June 29, 2006 from TVA to the

2  NRC.

3     A.  I'm sorry.  I have June 29th?

4     Q.  The June 29, 2006 letter?

5     A.  I got it.

6     Q.  All right.  I want to direct your attention

7  on Page 1, and this is Exhibit 207, to the first

8  sentence.  Do you see where it says, "During a

9  conference call with the NRC project manager on

10  June 21, 2006, TVA was asked to provide additional

11  information regarding whether the subject BLN unit can

12  be considered a utilization facility as defined in 10

13  CFR 50.2 as follows."  Do you see that?

14     A.  Yes, I see that.

15     Q.  Do you know what was discussed during that

16  conference call with the NRC project manager on

17  June 21, 2006?

18     A.  No, I do not.

19     Q.  And you referred -- first of all, what is

20  the difference between a terminated permit and a

21  withdrawn permit?



Page 337

1    A.  You mean terminated status or --

2    Q.  Within the meaning of the deferred plant

3  policy, is there any difference between terminated

4  versus withdrawn?

5    A.  Well, I think there's a distinction because

6  with respect to the intention of going forward, as I

7  mentioned a couple of minutes ago, withdrawn implies

8  that it's going to go to the point that basically,

9  it's done.  It's we're seeking to release ourselves

10  from NRC jurisdiction.

11        So there is some concern at the NRC that if

12  you're going to go to that, again, as in the Zimmer

13  situation, you're looking at making sure that there is

14  not the capability of simply making this into an

15  operable utilization facility.

16        And part of what the NRC's concern is that

17  the permits basically stay in effect until the NRC

18  releases control.  That's what it -- withdrawn.

19        For the terminated status, what you're

20  basically doing, in some respects you could go down

21  that path where they decide to basically withdraw in

Page 338

1  the permit.  But the other option that it speaks to is

2  this option of transferring it to a new owner who they

3  pass it off to.  And a new transferee, they proceed

4  with the completion of the project, which of course

5  would be subject to the NRC's jurisdiction.

6    Q.  You mentioned the Zimmer opinion.  Do you

7  regard the Zimmer opinion as in any way inconsistent

8  with the opinions you're offering in this case?

9    A.  No, not at all because as I explained, I

10  think a number of times today, it goes toward this

11  question of -- this goes to the scenario of

12  withdrawing as opposed to keeping alive.

13    Q.  Now, let me direct your attention to

14  Exhibit 81, which the first page is an e-mail from Joe

15  McCollum -- excuse me, from Billy Gleaves to Bill

16  McCollum.

17

18    A.  Okay.  It's 81?

19    Q.  Yes, sir.

20    A.  I have it.

21    Q.  Attached to it is the procedures for

Page 339

1  handling license transfer document that you talked

2  about with Mr. O'Rear, correct?

3    A.  Correct.

4    Q.  And let me direct you, if you look in the

5  bottom right, the Bates numbers to Page 3478.

6    A.  Yes.

7    Q.  And if you look at -- on Page 3478 under

8  Basic Requirements, the first sentence that I think

9  you looked at with Mr. O'Rear said, "License transfers

10  are unique in that they result in the exchange of

11  ownership and/or the responsibility for operating a

12  nuclear facility."  Do you see that?

13    A.  Yes, I do.

14    Q.  So is that indicating that the result of the

15  license transfer is the exchange of ownership, right?

16        MR. O'REAR:  Objection, mischaracterizes or

17  misstates the language.  Also it's leading.

18  BY MR. LEMBKE:

19    Q.  Mr. Burns, do you see that sentence?

20    A.  I see that sentence.

21    Q.  What, if anything, in that sentence

Page 340

1  indicates that the exchange of ownership precedes the

2  license transfer approval?

3    A.  I don't see anything in that that says so.

4    Q.  And then if you look at the next page which

5  is Bates number 3479, upper right, it's Page 3, do you

6  see the -- at the top of the page, the third line down

7  says, "If the application is not being made by the

8  current licensee."  Do you see that?

9    A.  Yes.

10    Q.  And so what, if any, indication is that

11  whether it's mandatory that the current licensee

12  participate in the application?

13    A.  It doesn't make it -- it doesn't make it

14  mandatory.  Again, this is an internal guidance

15  document to the NRC staff.

16    Q.  Okay.  And then Mr. O'Rear showed you in

17  Exhibits 210 and 211 some passages from speeches you

18  gave in 2015 and 2016 when you were the Chairman of

19  the Nuclear Regulatory Commission.  Do you recall

20  that?

21    A.  Yes, I do.



Page 341

1    Q.  Did you find anything that Mr. O'Rear

2    pointed to you from those speeches as being

3    inconsistent with the opinions you're offering in this

4    case?

5    A.  No.

6    Q.  Why do you say that?

7    A.  Because what I tried to do in my view, my

8    opinion is consistent with those principles because

9    what it says is the NRC's normal regulatory framework

10   should be carried out.

11       Here, again, the NRC, I do not doubt the NRC

12   needs to have communication with the applicant to ask

13   the questions it needs to ask, to evaluate the

14   answers.  But I don't see anything in those speeches.

15   What I'm saying in those speeches is the NRC needs to

16   act as a consistent, reliable regulator and not act

17   arbitrarily.  And in my view acting in accordance with

18   the longstanding practice that it's had and is the way

19   to go and is perfectly consistent with those

20   principles.

21   Q.  Mr. Burns, has anything that you heard today

Page 342

1    or any of the questions that have been asked or any of

2    the documents you've seen caused you to reconsider or

3    change any of the opinions you've expressed in your

4    report and supplemental report?

5    A.  No.

6        MR. LEMBKE:  I don't have anything further.

7    Thank you.

8        MR. O'REAR:  I've got a few follow ups for

9    those questions.  Won't take long at all.

10       EXAMINATION:

11   BY MR. O'REAR:

12   Q.  If I could get before you the Zimmer case

13   that Mr. Lembke asked you about.  This is Exhibit 132.

14   A.  I've got it.

15   Q.  I believe Mr. Lembke asked you whether the

16   NRC's ever made a decision on when along the spectrum

17   of construction the NRC determines that a facility is

18   a utilization facility.  I'm paraphrasing his question

19   but do you recall that?

20       MR. LEMBKE:  Well, I object that it

21   misstates the question.  Why don't you read a

Page 343

1    different question?

2        MR. O'REAR:  You tell me what the question

3    was.  That's what I heard the question to be.

4        MR. LEMBKE:  The question was:  Has the NRC

5    ever determined when it's first the utilization

6    facility?

7        MR. O'REAR:  When it's first a utilization

8    facility.  Okay.

9    BY MR. O'REAR:

10   Q.  All right.  Referring to the Zimmer case,

11   Mr. Burns, the NRC has determined when a facility is

12   not a utilization facility, hasn't it?

13       MR. LEMBKE:  Objection, asked and answered.

14       MR. O'REAR:  I'm following your question.

15   BY MR. O'REAR:

16   Q.  It has determined when a facility is not a

17   utilization facility.  Is that correct?

18   A.  In the context of Zimmer?

19   Q.  Yes.

20   A.  Again, in the context of Zimmer and this

21   goes to the circumstances we described, I think at

Page 344

1    least in another plants, is it goes to the question of

2    are we satisfied at NRC that the licensee, we can

3    terminate the permit, the licensee can go away, no

4    longer subject to NRC jurisdiction.  And then we don't

5    have any concern with respect to the state of the

6    plant at the site.  And that's what it's focused on,

7    assuring that it's defeated from that.  It's not in

8    effect withdrawn status of the construction permit.

9        Everybody's going away from the facility.

10   And that's what I think the significance of the Zimmer

11   case is.  And it has to be understood in that context.

12   It can't be re-quoting outside of that context with

13   respect to what's said in the Zimmer opinion.

14   Q.  But the Zimmer case did say if you remove

15   the nuclear fuel, if you sever and weld the caps on

16   the two main feed water lines and the four main steam

17   lines and if you remove the control rod drive

18   mechanisms, then the facility is not a utilization

19   facility?

20   A.  That has continued to be subject to NRC

21   regulation.



Page 345

1     MR. LEMBKE:  And I'm going to object, it

2  misstates the exhibit.

3  BY MR. O'REAR:

4     Q.  When Mr. Lembke asked you about the deferred

5  plant policy, he asked you what distinction's drawn in

6  that policy between a withdrawn application -- excuse

7  me, a withdrawn construction permit and a terminated

8  permit.

9        Does the deferred plant policy statement in

10  any way refer to a withdrawn permit?

11     A.  Yes, it does.  I would say it does.  It says

12  in Section B on terminated plants, Section 1 it says

13  in the event that withdrawal of CP is sought, the

14  permit holder should supply notice to staff

15  sufficiently far in advance of the expiration of the

16  permit to -- for the staff the determine appropriate

17  terms and conditions.

18     Q.  But --

19     A.  So it sounds like where the current holder

20  is moving toward ending the project all together.  It

21  then has the language that allows for as I call it the

Page 346

1  scavenging of parts or transfer -- the discussion of

2  transfer to a potential new owner.

3     Q.  But under the deferred plant policy, a

4  deferred plant is a defined term, correct?  Deferred

5  plant status?

6     A.  Yes, a deferred plant is one that

7  contemplated where they -- they talked about it, in

8  terms of for purposes of the guidance as we discussed

9  before one basically where the option is being

10  preserved.

11     Q.  But the policy defines deferred plant

12  status, correct?

13     A.  It gives a definition of deferred plant,

14  yes.

15     Q.  And it defines terminated plant, correct?

16     A.  Yes, it also gives a terminated plant.

17     Q.  It does not use the term "withdrawn plant,"

18  does it?

19     A.  Well, not in the definitions.  But what's

20  operative in the policy is what the significance of

21  what the holder of the permit may do.  And I read from

Page 347

1  the operative provisions of the policy statement,

2  which gives the context of what expectations are that

3  the NRC might have and the guidance it's given to

4  those who might want to take advantage of certain -- a

5  different circumstance.

6     MR. O'REAR:  No further questions.

7     MR. LEMBKE:  Don't have anything further.

8     Mr. Norris, we do want to read and sign.

9     TVA and Nuclear Development want copies.

10     (The deposition concluded at 6:57 p.m.)

Page 348

1          REPORTER'S CERTIFICATE

2       State of Maryland

3       County of Baltimore, to wit:

4          I, KENNETH NORRIS, a Notary Public of

5  the State of Maryland, County of Baltimore, do hereby

6  certify that the within named witness personally

7  appeared before me at the time and place herein set

8  out, and after having been duly sworn by me, according

9  to law, was examined.

10          I further certify the examination was

11  recorded stenographically by me and this transcript is

12  a true record of the proceedings.

13          I further certify that I am not of

14  counsel to any of the parties, nor in any way

15  interested in the outcome of this action.

16          As witness my hand and notarial seal

17  this 19th day of August, 2020.

18          _____

19          KENNETH NORRIS

20          Notary Republic

21  My Commission Expires:  7-07-22



Page 349

```
 1              CERTIFICATE OF DEPONENT

 2

 3           I hereby certify that I have read and

 4  examined the foregoing transcript, and the same is a

 5  true and accurate record of the testimony given by me.

 6

 7           Any additions or corrections that I

 8  feel are necessary,  I will attach on a separate sheet

 9  of paper to the original transcript.

10

11           _____

12           Stephen G. Burns

13

14

15

16

17

18

19

20

21
```

Page 350

```
 1  Reference No.: 5882449

 2

 3  Case:  NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

 4

         DECLARATION UNDER PENALTY OF PERJURY

 5

        I declare under penalty of perjury that

 6  I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the

 7  same has been read to me, and the same is
    true and accurate, save and except for

 8  changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET

 9  hereof, with the understanding that I offer
    these changes as if still under oath.

10

11           _____

12           Stephen G. Burns

13

14           NOTARIZATION OF CHANGES

15                (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                    Notary Public,

24

25  in and for the State of _____
```

Page 351

```
 1  Reference No.: 5882449

    Case:  NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

 2

 3  Page No._____Line No._____Change to:_____

 4  _____

 5  Reason for change:_____

 6  Page No._____Line No._____Change to:_____

 7  _____

 8  Reason for change:_____

 9  Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Stephen G. Burns
```

Page 352

```
 1  Reference No.: 5882449

    Case:  NUCLEAR DEVELOPMENT vs TENNESSEE VALLEY AUTHORITY

 2

 3  Page No._____Line No._____Change to:_____

 4  _____

 5  Reason for change:_____

 6  Page No._____Line No._____Change to:_____

 7  _____

 8  Reason for change:_____

 9  Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Stephen G. Burns
```

