FILED
2021 Mar-31  PM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT, LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

The Tennessee Valley Authority entered an agreement with Nuclear Development, LLC, for the purchase and sale of an unfinished nuclear facility known as the Bellefonte Nuclear Plant. Hours before closing, TVA concluded that consummation of the sale would be illegal, and it refused to close on the agreement. Nuclear Development sued.

The parties have cross-moved for summary judgment. (Doc. 70; Doc. 74). The crux of the dispute is a simple matter of contract law, and the motions both turn on a central question: Did TVA breach the Agreement? But to answer this, the Court must first resolve another question, arising in the domain of nuclear-plant regulation, that appears to present a matter of first impression: Could TVA lawfully convey ownership of the Bellefonte property to Nuclear Development before the Nuclear

Regulatory Commission (NRC) approved the transfer of the Construction Permits from TVA to Nuclear Development?

## FACTUAL BACKGROUND

**I.    The Atomic Energy Commission issues TVA two permits authorizing the construction of the Bellefonte Nuclear Plant, Units 1 and 2.**

In June of 1973, TVA applied to the Atomic Energy Commission for permits authorizing the construction of two reactors in northeast Alabama at a site that would be known as the Bellefonte Nuclear Plant. *See In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974). Bellefonte was to consist of two pressurized water reactors, Units 1 and 2 ("Alpha" and "Bravo"),[1] manufactured by the Babcock & Wilcox Company, each rated to operate at 3600 megawatts thermal/1260 megawatts electrical and cooled by a closed-cycle system of monolithic, concrete, natural-draft cooling towers. *See id.* at 1135; (Doc. 85–5 at 5). The Bellefonte Units would be located on a site in Jackson County, Alabama along the west shore of the Guntersville Reservoir, Tennessee River Mile 392, just northeast of the city of Scottsboro. 8 A.E.C. at 1125. On Christmas Eve 1974, after a year and a half of hearings and review, the Atomic

---

[1] (Doc. 85–13 at 10).

Energy Commission[2] approved the application and issued TVA Construction Permits CPPR-122 and CPPR-123. *See id.*; (Doc. 72–1).

The Bellefonte Construction Permits were issued under Section 103 of the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2133; 10 C.F.R. § 50; and the Initial Decision of the Atomic Safety and Licensing Board, dated December 23, 1974. (Doc. 72–1 at 6, 11). Each permit authorizes TVA to build one "utilization facility," or nuclear reactor,[3] Unit 1 or Unit 2, and together the two facilities would comprise the Bellefonte Nuclear Plant. In all respects save the numbering of the units, the permits are identical.[4]

The permits' authority is set forth in Section 2:

> Pursuant to [Section 103 of the AEA, 10 C.F.R. § 50, and the Licensing Board's decision], the Atomic Energy Commission (the Commission) hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal as described in the application and amendments thereto (the application) filed in this matter by the applicant and as more fully described in the evidence received at the public hearing upon the application. The facility, known as Bellefonte Nuclear Plant, Unit [1/2] will be located on the applicant's site in Jackson County, Alabama.

---

[2] A few months after the Atomic Energy Commission issued TVA the Bellefonte Construction Permits, the agency was abolished by the Energy Reorganization Act of 1973, and its licensing and regulatory functions were transferred to the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

[3] *See* 10 C.F.R. § 50.2 (defining utilization facility as "[a]ny nuclear reactor other than one designed or used primarily for the formation of plutonium or U-233").

[4] CPPR-122 authorizes the construction of Unit 1, CPPR-123 authorizes Unit 2.

*Id.* The permits thus confer authority to build a facility on "the applicant," defined in Section 1(B) to be TVA, and each facility "will be located on the applicant's site in Jackson County, Alabama." *Id.*

The permits further state that they "shall be deemed to contain and be subject . . . to the conditions specified or incorporated" under Section 3. *Id.* One of those conditions, set forth in Section 3(B), states: "The facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama." *Id.* The incorporated description is contained (at least in part) in an exhibit submitted with the application, a filing known as the Preliminary Safety Analysis Report (PSAR).[5] Section 2.1.2 ("Site Description") of the PSAR contains this statement: "The exclusion area will be owned by the United States and in the custody of TVA." (Doc. 75–2 at 157). "Exclusion area" is an NRC-defined term meaning "that area surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area." 10 C.F.R. § 50.2.

---

[5] The permit application is not itself in the summary-judgment record, but its contents, including the PSAR, are described in the Atomic Safety and Licensing Board's order issuing TVA the Bellefonte Construction Permits. *In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974); *see also* (Doc. 75–2 at 3). The PSAR, however, is in the record. (Doc. 75–2; Doc. 75–3).

## II.     A History of Bellefonte and Its Construction Permits

### A. Bellefonte's History

Construction of the Bellefonte Nuclear Plant, Units 1 and 2, began in 1974. It continued steadily for a decade, slowed in 1985, and, in 1988, it ceased altogether. (Doc. 85–5 at 5–6). When construction stopped in 1988, both reactor units were mostly complete. *Id.* Estimates for that time put Unit 1 either at 88% or 90% completion, and Unit 2 at 55% completion. (Doc. 85–5 at 5; Doc. 72–7 at 8). But once construction stopped, the project was indefinitely deferred, and for seventeen years the units sat just a few degrees shy of operational.

In 2005, the Bellefonte project began to move in retrograde. Seeking to recoup some of the costs of construction, TVA that year implemented a plan of "Investment Recovery": equipment from Units 1 and 2 was sold, removed, abandoned, or cannibalized for use in other TVA facilities, two-foot-by-two-foot holes were cut into the large concrete steam generators, and control rod mechanisms, feedwater heaters, pumps and motors, condenser tubes, piping and valves, and safety-related pipe chases were removed from the site entirely. (Doc. 85–4 at 11; Doc. 85–5 at 5, 18). When TVA's two-year recovery effort came to an end in 2007, Unit 1 had been reduced from 88% to 55% complete, and Unit 2 was left only 35% complete. (Doc. 85–5 at 5).

### B. The Construction Permits

Once TVA had ceased construction in 1988, the NRC placed Bellefonte in "deferred plant status." In NRC parlance, a "deferred plant" is "a nuclear power plant at which the licensee has ceased construction or reduced activity to a maintenance level, maintains the construction permit . . . in effect, and has not announced termination of the plant." Commission Policy Statement on Deferred Plants, 52 Fed. Reg. 38077-01. The Generic Letter from which this definition comes sets forth "the procedures that apply to nuclear power plants in a deferred status," as well as those that a licensee must follow to reactivate—or terminate—a deferred plant. *Id.* Under the Policy Statement, a licensee that seeks to withdraw a Construction Permit must notify the NRC and, "if the plant has been completed to a point that it can function as a utilization facility, the licensee must take all necessary actions to ensure that the facility is no longer a facility for which an NRC license is required." *Id.*

Tracking these procedures, TVA informed the NRC in 2006 that it would permanently cease plant construction and requested an order withdrawing CPPR-122 and CPPR-123. (Doc. 72–6). In June, with Investment Recovery ongoing, TVA sent the NRC a supplemental letter stating that neither of the Bellefonte Units "can be considered a utilization facility" as defined in 10 C.F.R. § 50.2, because neither unit was able to operate as a nuclear reactor. *Id.* at 4.

The NRC, in an Environmental Assessment mandated by the National Environmental Policy Act, concurred with TVA's conclusion. (Doc. 72–7). That August, it announced that it was considering the withdrawal of TVA's Construction Permits, and it concluded that the action would have no significant impact on the environment. *Id.* at 6, 10. Its conclusion was based, in part, on the finding that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility." *Id.* at 8. In September of that year, the NRC formally withdrew the Bellefonte Construction Permits. (Doc. 72–9 at 7).

For the next two and a half years, TVA owned the Bellefonte site without an NRC-issued license. (Doc. 86–32 at 65). But toward the end of this brief hiatus, TVA reversed course once again and moved the NRC to reinstate the permits. *Id.* In 2009, at TVA's request, the NRC ordered that CPPR-122 and -123 be reinstated and the facilities returned to "terminated plant status." (Doc. 72–9 at 12; Doc. 85–5 at 6; Doc. 86–32 at 65).[6] In 2010, Bellefonte was placed once more in deferred plant status. (Doc. 85–5 at 6).

---

[6] Under the Commission's Policy Statement on Deferred Plants, a "terminated plant" means a nuclear power plant at which the licensee has announced that construction has been permanently stopped, but which still has a valid CP. 52 Fed. Reg. 38077-01, § III (Oct. 14, 1987). Placing a facility in "terminated status" is not the same as "terminating" a permit. In the former case, the permitholder "must adhere to the Commission's regulations and the terms of the [Construction Permit]" until its withdrawal is authorized, *id.*, while the latter case is used to mean permit withdrawal, (Doc. 76–32 at 87).

Bellefonte has remained unfinished, its Construction Permits valid, construction deferred. Neither Unit 1 nor Unit 2 is capable of sustaining nuclear fission in a self-supporting chain reaction. (Doc. 72–4 at 3). TVA has not upgraded Bellefonte's design to meet current NRC regulatory requirements, nor can Bellefonte now meet the original design requirements to sustain nuclear fission. (Doc. 72–4 at 19–20).

## III.   TVA Agrees to Sell Bellefonte to Nuclear Development

In April of 2016, TVA's CEO, William Johnson, issued a report to TVA's Board of Directors recommending that they declare Bellefonte surplus property and authorize its sale without conditions on its potential use. (Doc. 85–13 at 4; Doc. 85–14). The report indicated that an outside appraisal company had assessed Bellefonte's fair market value at $26.4 million (TVA's internal appraisal placed the figure at $11.3 million), and TVA would use that outside figure to set the minimum bid price at auction. (Doc. 85–14 at 6). Johnson's report also acknowledged the major risks inherent in the recommended declaration, including the competitive risk that selling Bellefonte to an outside entity could "put a merchant nuclear plant in TVA's service territory that could compete to serve TVA's customers." *Id.* at 2.

The next month, TVA's Directors adopted a resolution that found Bellefonte to be "surplus to TVA's needs" and authorized its sale at public auction. (Doc. 85–13 at 6; Doc. 85–15 at 2). The sale's purpose, TVA would later announce, was to

bring economic development and jobs to the surrounding area through long-term investments by the purchaser. (Doc. 85–13 at 6; Doc. 72–14). The property was marketed to over 500 potential buyers, 11 of whom expressed interest enough to sign a confidentiality agreement for further discussions. (Doc. 72–14). Three of these potential buyers completed Letters of Intent (LoIs) and submitted financial qualifications to TVA with a plan concerning their intended use for the property. *Id.* Nuclear Development cites (disputed) economic projections purporting to show that its own plans for Bellefonte would create 8,420 jobs per year and $12.6 billion in fiscal impact during the construction phase, and then 4,176 jobs per year and $37.7 billion in fiscal impact over the 60-year operational period. (Doc. 85–18).

TVA issued all prospective bidders the same purchase agreement to bid on, regardless of the bidder's plans for the site. (Doc. 85–16 at 14). Two of the parties to submit LoIs intended neither to build nor operate a nuclear facility at Bellefonte. *Id.* at 13. The third, announcing its own intentions for the property by way of company name, submitted the winning bid.

And so on November 14, 2016, Nuclear Development entered into a purchase and sales agreement with TVA, contracting to buy the Bellefonte site for a final sale price of $111 million. (Doc. 85–13 at 4; Doc. 72–16). Upon signing the agreement, Nuclear Development paid TVA a down payment of 20% on the purchase price, or $22.2 million, plus additional sales and administrative costs. (Doc. 72–16 at 7).

Closing, originally set to take place on November 14, 2018, was extended to November 30, by amendment, six days before the event. (Doc. 85–23).

## IV.    Terms and Conditions

Section 1 of the Purchase and Sales Agreement (the Agreement) obligated TVA to "sell, transfer, convey, assign and deliver title and possession" to Nuclear Development, at closing, "all of TVA's right, title and interest" in "all the real property comprising" the Bellefonte Site, described in Schedule R.1(a). (Doc. 72–16 at 3). It also obligated TVA to convey, under Section 1(e), "all permits, licenses or authorization issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e)." *Id.* at 4. Four items (all of them permits) are listed in Schedule 1(e): two NRC-issued Permits to Construct;[7] an Alabama Department of Environmental Management (ADEM) Air Permit;[8] and an ADEM National Pollutant Discharge Elimination System (NPDES) Permit.[9] *Id.* at 116.

Section 6 of the Agreement ("Conditions to Closing") expressly conditioned TVA's duty to convey these assets (and, reciprocally, Nuclear Development's duty

---

[7] CPPR-122 (Unit 1) issued: December 24, 1974, *Reinstated, currently deferred*; and CPPR-123 (Unit 2) issued: December 24, 1974, *Reinstated, currently deferred*. (Doc. 72–16 at 116).

[8] 705-0021-X0004, issued: October 7 1999. (Doc. 72–16 at 116).

[9] AL0024635, issued: April 28, 2015; effective: May 1, 2015; expiration: April 30, 2020. (Doc. 72–16 at 116).

to purchase them) on the satisfaction of six conditions to be fulfilled "at or before the Closing." *Id.* at 7–9. The fifth of these, set forth in Section 6(a)(v), stated that "[t]here shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority . . . restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement." *Id.* at 7. If the condition set forth in Section 6(a)(v) is "unfulfilled as of the Closing Date," then, under Section 11(a)(iv), either party may terminate the Agreement on written notice to the other. *Id.* at 13. Moreover, if the Agreement is terminated under Section 11(a)(iv), TVA must return to Nuclear Development the $22,200,000 "Down Payment" that it had paid, in accordance with Section 5(b)(1), upon execution of the Agreement. *Id.* Although it would not be included in the final Agreement, Nuclear Development had specifically requested that the NRC's pre-approval of the Construction Permits' transfer also be made a condition of closing. (Doc. 85–16 at 10).

To induce each other to enter into the Agreement, the parties expressly represented and warranted in Sections 7(a)(vii) and 8(a)(vi) that "no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the [TVA/Buyer] of this

Agreement or the consummation by the [TVA/Buyer] of the transactions contemplated hereby." (Doc. 72–16 at 9–10).

In Section 9 of the Agreement, the parties also covenanted that "after the Effective Date and prior to Closing," and subject to the terms and conditions of the Agreement, each party would "use its commercially reasonable best efforts to consummate and make effective as soon as commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto and set forth herein," and they would "provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any . . . regulatory or administrative agency . . . over the matters specified as to the Site consistent with Section 1(e)." *Id.*

By its own terms, the Agreement's "validity, interpretation, and enforceability" is generally to be governed by federal law. *Id.* at 20.

Finally, under Section 35, the parties agreed in all caps that neither party would "be liable for any indirect, incidental, consequential, special, punitive, or exemplary damages as a result of default, violation or breach of any covenant, representation or warranty contained in this agreement." *Id.* at 21 (emphasis removed).

## V.    "After the Effective Date and Prior to Closing"

On August 18, 2017, less than two months before for Unit 2's Construction Permit was to expire, Nuclear Development asked TVA to send the NRC a draft letter that it had prepared requesting an extension of the Construction Permit's completion date. (Doc. 85–24). TVA refused. (Doc. 85–25) (Doc. 85 at 9).

In August of 2018, the NRC held a public meeting at Nuclear Development's request on the latter's plans for the Bellefonte site. (Doc. 85–26). The stated purpose of the meeting was "to introduce members of Nuclear Development . . . and to discuss issues associated with the submittal of a request to transfer the deferred construction permit for Bellefonte Nuclear Generating Station (BLN), Units 1 and 2." *Id.* at 4. In attendance were sixteen representatives of the NRC and five of TVA's. *Id.* at 5. During the meeting, Nuclear Development addressed its "general plans" for Bellefonte, including its "plans to close on the [Bellefonte] purchase in November 2018," its "plans to complete detailed schedules in December 2018," and its estimation "that licensing activities will start in 2019."[10] *Id.* at 2. Neither TVA nor the NRC objected to Nuclear Development's schedule—however that schedule was described at the meeting—or expressed any concern that the transfer application had

---

[10] The report summarizing the meeting does not specify what the "detailed schedule" would entail, nor what "licensing activities" were announced for 2019. The suggestion, reiterated at oral argument ("they knew our schedule" (Doc. 143 at 23)), is that Nuclear Development expressly announced at this meeting its plans to apply for the Construction Permits' transfer too late to secure NRC approval before closing. Whether this is true remains unclear. Regardless, TVA disputes that the NRC ever ratified a schedule of post-closing approval.

not yet been submitted. (Doc. 85–27 at 7; Doc. 25–28 at 106). Ordinarily, however, the NRC neither publicly challenges parties nor otherwise speaks at public hearings like this one. (Doc. 86–10 at 4).

Within a few days of this meeting with the NRC, Johnson received an email that summarized the meeting's highlights. (Doc. 85–13 at 12; Doc. 85–29). In a bulleted gloss, the email reports that Nuclear Development's CEO, Bill McCollum, had announced that closing was expected in November, and had said that "a more detailed licensing schedule would be available in early 2019." (Doc. 85–29 at 2). At the time of the email, Johnson still intended to close, so long as "all the conditions were met."  (Doc. 85–13 at 14). On August 21, TVA sent a letter to Nuclear Development acknowledging "that the Buyer intends to complete the closing of this transaction." (Doc. 85–30). The letter further stated that "[i]n preparation of the contemplated . . . closing," TVA would "begin drafting the TVA Transaction Documents" and would "immediately begin relocating any affected TVA employees or operations." *Id.*

### A.    Memphis, Tennessee

On October 9, 2018, Nuclear Development's CEO, William McCollum, made a presentation to the Memphis City Council, the purpose of which, he would testify, was "to explain the results of [a] study that had been performed to look at . . . potential savings for Memphis." (Doc. 85–31 at 71–72). Johnson was "upset"

by some of McCollum's comments from the meeting. (Doc. 85–13 at 12). Not (says Johnson) because Nuclear Development might solicit the city as a customer, but because McCollum, a former TVA executive, had counseled Memphis that it "should leave TVA under any circumstances," because it could "get a better deal elsewhere." *Id.* In Johnson's view, this suggestion was simply false. *Id.* at 33.

Within a few days of McCollum's Memphis presentation, Johnson met with Nuclear Development's owner, Franklin Haney, Sr., and its General Counsel, Larry Blust, and "expressed displeasure" to the Nuclear Development team about how the presentation had gone. (Doc. 85–16 at 21, 23). Johnson himself then met with the Memphis City Council on November 6th—on, as it happens, November 6th Street[11]—"to make the pitch for staying with TVA." *Id.* (Doc. 86–13 at 20).

## B.     TVA Grows Leery of Closing

In the summer of 2018, a TVA attorney identified a "concern about the text of the Construction Permits and the text of the Atomic Energy Act." (Doc. 85–32 at 11–12). By mid-November, TVA had conveyed to Nuclear Development an express concern that closing on the Agreement before the NRC had approved the transfer of the Construction Permits might violate the AEA. (Doc. 85–21 at 16–17; Doc. 85–32 at 14). TVA shared with Nuclear Development an additional concern, that closing

---

[11] So named to commemorate the date that Memphis first voted for TVA power, a vote that led to the relationship Johnson was in that very meeting lobbying to preserve. (Doc. 86–13 at 20); *see also TVA Heritage Series: Street of Dreams*, TVA https://www.tva.com/about-tva/our-history/tva-heritage/street-of-dreams.

on the Agreement might violate the terms of Construction Permits, sometime in October (says TVA) or early November (says Nuclear Development). (Doc. 85–21 at 10, 22; Doc. 85–16 at 26; Doc 85–34).

About a month before closing, Nuclear Development's licensing counsel, Tim Matthews, sent an email to a TVA attorney with a draft copy of a "consent letter that TVA would send to the NRC in connection with Nuclear Development's license transfer application." (Doc. 85–16 at 15; Doc. 85–32 at 5; Doc. 85–33). Whether because TVA failed to consent to its request, as Nuclear Development alleges, or because Nuclear Development asked only that the letter be reviewed, as alleged by TVA, the letter was never sent to the NRC. (Doc. 85–16 at 16; Doc. 85–28 at 9; Doc. 85–32 at 10–11).

As closing drew near, Blust sent a memo, authored by Matthews, to TVA that outlined a procedure Nuclear Development believed would permit the parties to lawfully close on the transaction before the NRC had approved the Construction Permits' transfer. (Doc. 85–36). The memo acknowledged "that this regulatory path—involving temporary separation of ownership of a site for a utilization facility from the recipient of the permits authorizing its construction—appears to be a situation of first impression for the NRC without clear precedent and results in a degree of responsibility and risk to TVA after closing until the [Construction Permit] transfers are approved." *Id.* at 2. In a cover letter to the memo, Blust "agreed" that

Nuclear Development's "proposed path forward to transfer the construction permits in deferred status by [filing] the application before closing with the approval to occur after closing . . . would be a case of first impression for the NRC." *Id.* at 1. TVA's nuclear expert, Stephen Burns, whose 40-year career with the NRC included stints as General Counsel, Commissioner, and Chairman, averred that he was aware of no instance in which the NRC had ever approved the transfer of ownership of a plant subject to a construction permit without first approving transfer of the construction permit. (Doc. 86–81 at 9; Doc. at 86–32 at 85).

On November 13, the day before the original closing date, Nuclear Development submitted its application to the NRC for an order approving the Construction Permits' transfer to Nuclear Development. (Doc. 85–37; Doc. 85–38).

Nuclear Development asked TVA to extend the closing date by six months—though when exactly remains unclear—partly to secure the NRC's approval of the Construction Permits' transfer before closing, partly "to put the rest of the financing package together." (Doc. 84–11 at 50). Nothing in the Agreement obligated TVA to consent to an extension of the closing date. *Id.*

On November 26, four days before the amended closing, Johnson addressed a townhall-style employee forum at TVA's Knoxville office. (Doc. 85–39). Held routinely, meetings like this one were open to anyone in the agency, and at them Johnson would field questions from TVA employees of all stripes. (Doc. 85–13 at

23). At the forum on the 26th, Johnson was asked: "Do you think there's a real

chance we could lose [Memphis] as a customer as a result of all this?" *Id.* at 23. He

replied:

> I don't think they'll go to Bellefonte. . . . but they have other
> options. . . . And the point here is you should treat every customer every
> day like they could leave you tomorrow. You know, we slipped a little
> bit in Memphis over the last couple years. I was part of that. But we've
> come back in a pretty big way, and I think we're making progress down
> there. But every day just assume every customer can leave you, and
> that'd probably inform your decision-making a little bit.

*Id.* at 24–25. Another question posed to Johnson was: "Why continue to sell

Bellefonte if the potential buyer wants to take away our largest LPC to make it

work?" *Id.* at 24. With "lighthearted banter," Johnson replied:

> Well, that's a great question. So have I explained to you the three rules
> of the universe? Have I ever told you this? Some of you I have, and
> you're shaking your head no, but I'm doing it anyways because they
> apply to this situation. Rule 1, it seemed like a good idea at the time;
> Rule 2, no good can come from this; and Rule 3 is even the intelligent
> way wouldn't have worked. So I think we got them all covered here.
>
> We're under a lot of pressure to do something with the plant to sell it.
> We thought it was a good idea, put it into productive use, and knew we
> would compete for load, and that's not really what ticked us off in
> Memphis. What ticked me off in Memphis was our former colleague
> Bill McCollum standing up and saying you should do this nuclear deal,
> but even if you don't, you should leave TVA and go to MISO or
> Entergy 'cause those are both better deals than you're getting from
> TVA. To me, that crossed the line.
>
> Yeah, so what do you do? Well, we gave them a short extension because
> I ate into some of their time. They have a closing date Friday? . . . Let's
> do a poll. How many people think I should give them another
> extension? Okay. So there's no extension. And we'll see where we are
> at the close of business Friday, but there's no more extension. I do think

a lot of people have been misled about this. The idea that you can finish
that plant, what they're really saying, if you [sic] listening carefully, is
they can finish it for three and a half billion. Be a pretty good trick. . . .
It just seemed undoable.

So but it's time to call the question. So we'd be calling it on Friday.
I've already been to the legal department today for two reasons. One,
that's where my bathroom is on the sixth floor; but the more important
but less pressing question, to alert the litigators that I'm sure we'll be a
defendant by Monday. So I'm sure we'll be sued about this. If you study
the players—well, we'll be defendants on Monday

*Id.* at 24.

## C.   TVA Decides Not to Close on the Bellefonte Sale

TVA received an opinion letter from the firm of Pillsbury Winthrop Shaw
Pittman, its regulatory counsel, by the end of November[12] advising it that "acquiring
or transferring ownership of Bellefonte (and/or its CPs) without some form of prior
NRC consent would be a violation of the [AEA] and NRC regulations, as they have
been previously interpreted." (Doc. 86–61 at 2). After reading the letter, Johnson
was persuaded that TVA would not lawfully be able to consummate the sale,[13] and,

---

[12] The timing is disputed, the letter undated.

[13] Specifically, when asked "what choice, if any, did you think you had with regard to your ultimate
decision whether to close" once he had read the opinion, Johnson testified:

> I didn't think we could close at that moment because of the permit issue, and I
> thought it was a pretty strong opinion. In addition to looking at it, I actually went
> and pulled the Atomic Energy Act and read it and read some of those cases. And
> so I really did not think we could go to closing.

(Doc. 85–13 at 38). Disputing both the truth of the statement and its attendant narrative, Nuclear
Development contends that the "[t]he real reason that TVA refused to close is evidenced by events
occurring after [Nuclear Development] made a presentation for the Memphis power business, and
Johnson's consequential concern over losing TVA's largest power customer." (Doc. 101–1 at 5).

on November 29, he decided—"as late as possible"—that TVA would not proceed to closing. (Doc. 86–13 at 25–26, 38). At 9:09 that evening, TVA faxed a letter to Nuclear Development announcing that it would not close on the transaction because to do so "would be unlawful." (Doc. 86–16 at 34; Doc. 86–40). When the day of closing at last arrived, Nuclear Development sent by e-mail a letter to TVA warning that TVA would be in breach of the Agreement if it did not deliver the transaction documents and confirm that it would close. (Doc. 86–16 at 34; Doc. 86–41).

TVA did neither: the sale did not close.

Nuclear Development asserts that it had $91.6 million in closing funds deposited and ready to wire on November 30, 2018, and it was ready, willing, and able to close. (Doc. 85–42 at 28–29; Doc. 85–4 at 30; Doc. 85–43). TVA cites some evidence, however, that Nuclear Development would close only if it was comfortable that financing was in place for the project, and that, at the time of closing, project financing had not been finalized. (Doc. 86–59 at 29–30; Doc. 85–43 at 21, 24).

### D.    Post-Closing Developments

Nearly a year after the parties had been scheduled to close, the NRC issued a letter to Nuclear Development stating that it had accepted its application for the NRC's consent to transfer Construction Permits CPPR-122 and CPPR-123 from TVA to Nuclear Development. (Doc. 72–23 at 20, 51; Doc. 72–43). The NRC

estimated that the licensing request would take 700 hours to complete, and it expected to complete its review by September 2020. (Doc. 72–43 at 4).

No decision came in September 2020. In November, the NRC issued Nuclear Development a letter stating that it would "not complete its review of the requested licensing actions until [Nuclear Development] provides information demonstrating [its] right to possession of the Bellefonte site in accordance with [10 C.F.R. 50.80(b)(2)]. The letter further stated that

> the NRC staff routinely issues orders consenting to license transfers that are conditioned on certain future actions by the applicant or the receipt of third-party approvals needed prior to consummation of the underlying transaction, such as regulatory approvals by other Federal or State agencies or approvals necessary for applicants to emerge from bankruptcy. The staff notes that license transfer applications are typically submitted under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application. In this circumstance, however, possession of the Bellefonte site itself is currently in dispute between an NRC applicant and the current NRC license holder. . . .
>
> [The NRC staff had requested] that ND provide information (written consent from TVA or a court order) regarding ND's right to possess the Bellefonte site . . .. Accordingly, the NRC staff intends to complete its review of the requested licensing actions upon ND's submittal of the required information to demonstrate compliance with the requirements in 10 CFR 50.80(b)(2).

(Doc. 114–1). The application remains pending. The NRC awaits a verdict.

## PROCEDURAL HISTORY

Nuclear Development filed suit seeking specific performance on the Agreement  the day that the parties were set to close. (Doc. 1). The Complaint contained an alternative count for damages and a further count seeking a preliminary injunction. *Id.* A motion for preliminary injunction, along with a request for an expedited hearing, was filed contemporaneously with the complaint. (Doc. 3). The parties reached a provisional agreement on the motion and filed a Stipulation Regarding Nuclear Development's Motion for Preliminary Injunction.[14] The Court adopted these stipulations and denied the request for an expedited hearing. (Doc. 18). TVA then moved to dismiss all counts of the Complaint (Doc. 23), and the motion was denied. (Doc. 42).

The parties have now filed cross-motions for summary judgment (Doc. 70; Doc. 74). Nuclear Development moves for summary judgment on Count I of the complaint only, seeking specific performance and, for the period between November 6, 2016 until the date of this order, an award of 6% per annum on the $29,219,231

---

[14] The stipulations provided that TVA (1) would satisfy the quality assurance and other requirements applicable to Construction Permits CPPR-122 and CPPR-123; (2) would not request termination of either Construction Permit without first notifying the Court and Nuclear Development's counsel at least five days before submitting such a request to the NRC; and (3) would not sell or otherwise dispose of Bellefonte without first notifying the Court or Nuclear Development's counsel at least five days before executing any such agreement. (Doc. 17 at 1–2). Nuclear Development, for its part, withdrew its request for an expedited hearing on its preliminary-injunction motion without prejudice to its right to renew if TVA should give notice under paragraph (2) or (3). (Doc. 17 at 2).

that ND paid to TVA.[15] TVA moves for summary judgment on all claims—Count I (Breach of Contract seeking Specific Performance); Count II (Preliminary Injunction); and Count III (Alternative Claim for Breach of Contract Seeking Damages).

## LEGAL STANDARDS

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if its resolution "may affect the outcome of the suit under the governing law." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997)). A dispute is "genuine" if under the evidence "a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)).

---

[15] More precisely, Nuclear Development seeks an order compelling TVA "to specifically perform its obligations under the Contract by accepting Nuclear Development's payment of the balance of the purchase price for the Bellefonte Site and by executing and delivering to Nuclear Development the 'TVA Transaction Documents' described in the Contract. In conjunction with such order of specific performance, Nuclear Development further prays the Court to award it all court costs, attorneys' fees, and prejudgment interest at the rate of 6% per annum calculated on the full purchase price from the date of TVA's breach through the date it specifically performs its obligations as provided in the Contract." (Doc. 1 at 9–10). Its Count I prayer notwithstanding, Nuclear Development has abandoned its claim for attorneys' fees at summary judgment. (Doc. 87–1 at 31).

In deciding whether there is a genuine dispute as to a material fact, a court must presume the nonmovant's evidence to be true and draw all reasonable inferences in the nonmovant's favor. *Allen,* 495 F.3d at 1313 (citing *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1164 (11th Cir.2003)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

## DISCUSSION

The parties' cross-motions for summary judgment turn on a simple question of contract law: Did TVA, by failing to close on the sale of the Bellefonte property, breach its agreement with Nuclear Development?

TVA submits that it did not, because an express condition to closing was not satisfied. The condition, set forth in Section 6(a)(v), predicated the parties' obligations under the Agreement on the non-illegality of consummating the sale, and consummation was unlawful, TVA contends, because the NRC had not approved the transfer of the Construction Permits to Nuclear Development by closing. Nuclear Development, in turn, contends that NRC approval was no bar to lawful closing, and

urges the Court to read Section 6(a)(v) more narrowly, excluding from its ambit any consideration of the Construction Permits' transfer.

The Court must therefore decide: (1) whether Section 6(a)(v) applies to the NRC's failure to approve the Construction Permits' transfer; and, if so: (2) whether closing without the NRC's approval would have been lawful.

## I.     The language of Section 6(a)(v) is unambiguous and sets forth an express condition precedent.

It is undisputed that the Agreement executed on November 14, 2016 created a valid contract that set forth terms and conditions to govern the purchase and sale of the Bellefonte property. (Doc. 42 at 9; Doc. 72–16). Under Section 31, the parties agreed that the "validity, interpretation, and enforceability" of its terms would be governed by federal law. (Doc. 72–16 at 20). And "[u]nder federal law, the plain meaning of a contract's language governs its interpretation." *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008) (citations omitted). Where that language is unambiguous, its "legal effect . . . is a question of law" that "may be resolved summarily." *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir. 1988) (first citing *Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir. 1979); and then citing 10A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730.1 at 279 (1983)).

Section 6 of the Agreement predicated the parties' obligations on the fulfillment of six conditions precedent to closing. (Doc. 72–16 at 7). The fifth of

these, set forth in Section 6(a)(v), conditioned the parties' obligations on the non-illegality of consummating the transaction:

> (v) There shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below)[16] restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement . . .

*Id.* Neither under Section 6 nor elsewhere does the Agreement explicitly condition closing on the NRC's approving transfer of the Construction Permits to Nuclear Development.

The language of Section 6(a)(v), however, is unambiguous: it states with univocal clarity that closing was predicated on the "condition" that no "law, statute, rule, regulation, [or] permit" would "otherwise prohibit[] or mak[e] illegal" the consummation of the Bellefonte sale. If, given the state of affairs at closing, a legal authority listed in the clause would have made closing unlawful, the parties would be relieved of their closing obligations. The Agreement need not list exhaustively every factual predicate that could apply to the condition and render closing illegal; a myriad of circumstances could have triggered the clause, and it would be

---

[16] "Governmental Authority" is defined in Section 9(a)(ii) as "any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site . . .." (Doc. 72–16 at 10–11).

impossible to list them comprehensively. But under the clear language of the condition, if it would have been unlawful to close without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition would not have been satisfied.

Although Section 6(a)(v) is susceptible to only one meaning, Nuclear Development ignores the plain language and proposes that "the only fair and logical reading" of the Agreement as a *whole* is that the parties did not intend for closing to be conditioned on the NRC's approval of the Construction Permits' transfer. It offers three bases for rejecting Section 6(a)(v)'s unambiguous meaning: (1) the inclusion of Section 1(e); (2) the inclusion of Section 7(a)(vii); and (3) a putatively more reasonable, wholistic reading of Section 6(a)(v).

First, Nuclear Development contends that to read a condition of NRC approval into Section 6(a)(v) is to "read out" Section 1(e). Section 1 of the Agreement lists the "Purchased Assets" that TVA agrees to sell, transfer, convey, assign, and deliver to Nuclear Development at closing, including, under subsection (e):

> To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e) (the "Permits"); provided, however, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this Section 1(e) shall not require TVA to certify that Buyer is qualified and fit to complete construction

of and operate those reactors and, if Buyer informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this <u>Section 1(e)</u> by Closing, TVA's obligations under this <u>Section 1(e)</u> shall cease.

(Doc. 72–16 at 3–4). Besides Schedule 1(e), Section 1(e) contains the Agreement's only allusion to the Construction Permits. (*See* Doc. 72–16 at 25). This subsection conditionally obligated TVA to convey the Construction Permits at closing, but TVA's duty is qualified by the text in three ways. One, TVA need not vouch that Nuclear Development "is qualified and fit to complete construction of and operate" the reactors. Two, it imposes an extra duty on TVA to terminate the permits at Nuclear Development's election; and three, if "an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license, or authorization"—the air, water, or Construction Permits listed in Schedule 1(e)— TVA is relieved of the duty to bring it to closing.

Because the paragraph speaks to the very situation that arose—"an applicable Governmental Authority ha[d] not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to . . . Section 1(e) by Closing"—Nuclear Development contends that the parties anticipated this possibility and chose not to excuse the duty to close, and that only the duty to convey the Construction Permits is relieved. And if the parties had intended to condition closing on the NRC's approval, they could have inserted such a condition into the Agreement, either here

28

or in Section 6, just as they made NRC approval a condition of TVA's duty to convey the permits.

But contrary to Nuclear Development's contention, Sections 1(e) and 6(a)(v) are consistent, and TVA's construction of the latter does not "read out" the former. Each provision of Section 1(e) serves a function consistent with the NRC's failure to consent to the permits' transfer by closing. Significantly, 1(e) also gives Nuclear Development the right to compel TVA to take whatever action necessary to terminate them. If Nuclear Development had exercised that option, TVA could have petitioned the NRC to withdraw them, just as they had been withdrawn between 2006 and 2009, and transferred Bellefonte without running afoul of Section 6(a)(v).

Second, Nuclear Development contends that this reading of Section 6(a)(v) would likewise "read out" TVA's express warranty in Section 7(a)(vii) that no governmental authority or consent was required to consummate the sale. Again, Nuclear Development is incorrect. Both parties warranted that they could consummate the Agreement without further approval of any governmental authority—TVA in Section 7(a)(vii) and Nuclear Development in Section 8(a)(vi)—and both parties were mistaken. The fact of these mistakes neither voids the condition precedent, nor creates any conflict between the parties' representations and the non-illegality condition set forth in Section 6(a)(v).

29

And third, given Sections 1(e) and 7(a)(vii), Nuclear Development concludes that the parties intended Section 6(a)(v) to serve only as an escape hatch should some "intervening law" be enacted after the effective date and prior to closing. The parties could have written it this way, but they did not.

All these arguments are unavailing for the same fundamental reason: the condition's language is unambiguous, and its plain language controls. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls.").

Although the parties may not have conditioned closing on the NRC's approval, approval of the NRC may have been a necessary condition to closing.

## II.   If closing could not lawfully proceed without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition precedent set forth in Section 6(a)(v) was not satisfied.

Because Section 6(a)(v) applies, the Court must next decide whether closing without NRC approval would have been unlawful. TVA posits two authorities in effect at the time of closing that would have rendered consummation of the Bellefonte transaction illegal: (1) the Construction Permits; and (2) Section 101 of the Atomic Energy Act.

**A.      Transfer of the Bellefonte site would not have violated the terms of the Construction Permits.**

Section 234 of the AEA, 42 U.S.C. § 2282 imposes civil penalties for violating the terms or conditions of any license issued under the Section 103 of the Act. The Construction Permits each contain two statements that TVA characterizes as "terms" of the permit—terms, it contends, that it would have "violated" by closing on the sale. TVA is mistaken.

CPPR-122 and -123 were issued under Section 103 of the AEA, 42 U.S.C. § 2133 and 10 C.F.R. § 50, and violations of their terms can trigger civil penalties. *See* 42 U.S.C. § 2282. The statements implicated by the sale of Bellefonte are contained in Sections 2 and 3 of each permit. Recall that Section 2 states that "the facility . . . will be located on the applicant's site in Jackson County, Alabama," with "applicant" defined in each permit to be TVA. (Doc. 72–1 at 6, 11). Further recall that Section 3(B) states that "[t]he facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama," *id.*, with the relevant description found in the PSAR's "Site Description": "The exclusion area will be owned by the United States and in the custody of TVA," (Doc. 75–2 at 157). If Bellefonte had been sold to Nuclear Development before the NRC had approved transfer of the Construction Permits, the site would no longer be "the applicant's," and the exclusion area would no longer be owned by the United States.

TVA's argument is more than superficially pleasing. It highlights truth-dependent language in the Construction Permits that presumes TVA ownership: if TVA ceased to own the site, then these sentences would apparently become untrue. The argument also speaks to a concern lurking behind the whole Bellefonte dispute—surely, once a construction permit has been issued, the NRC regulates ownership of the permitted site—and suggests its own answer. But the answer to the next question—how?—is unsatisfactory. The alleged non-conformities seem divorced from any substantive check on transferring ownership that one would expect the NRC to place on a permitted site. These seem to be mere technicalities, not barriers to closing.

As intuition would suggest, the law does indeed restrict the transfer of permitted sites. Those restrictions, however, are imposed by statute[17]—not the language of the Construction Permits. There are three reasons why TVA's argument fails.

First, these statements are not "terms." A term is defined as "[a] condition under which something may be done, settled, agreed, or granted; a stipulated requirement or limitation," *Term*, *Oxford English Dictionary* (3d. ed. 2017), or as "[a] contractual stipulation," *Term*, *Black's Law Dictionary* (11th ed. 2019). These statements merely describe where the utilization facilities, if built, may be located.

---

[17] *See* Section II.B *infra*.

Their function is deictic, not conditional, serving to contextualize rather than limit the scope of the authority conferred by the permit.

Contrast "applicant's" with another statement in Section 2: the Commission "hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal." (Doc. 72–1 at 6, 11). "3600 megawatts thermal" is a term of the permit, and the construction of a utilization facility designed to operate above that limit would violate it. Contrast too the description incorporated into Section 3(B), "owned by the United States," with the unambiguous condition in Section 3(A): "The earliest date for completion of the facility is June 1, 1979, and the latest date for completion is December 1, 1979." *Id.* "December 1, 1979" is likewise a term of the permit; to complete the facility on December 2, 1979 would, without an extension, violate the term.[18]

The megawatts thermal at which the facility can operate and the completion deadline each set forth clear "conditions" or "stipulations" for the construction of the Bellefonte units. Indeed, the site on which the facilities may be built is also a term: to build either unit in Madison County would violate the permits. But it would be wrong on this basis to pigeonhole a limitation on ownership into the permits' description of the site. Not because there aren't good reasons to regulate the

---

[18] Both Construction Permits remain valid: the latest date for the completion of each unit has been extended to October 1, 2020. (Doc. 128–1 at 9).

ownership of a site that's subject, through a valid construction permit, to the NRC's jurisdiction, but rather because this language fails to provide an adequate legal hook for site regulation. Any allusion to ownership contained in the Construction Permits is too attenuated to be deemed a "term" of the permit.

To drive this point home, the Construction Permits never expressly condition transfer of the site on transfer of the permits. Section 3 sets forth the permits' express conditions. Not one of them mentions transfer of the site.

In arguing for their status as terms, TVA cites the NRC's policy on license transfers. Once the NRC approves the transfer of a permit from one entity to another, it requires the new permitholder to seek an amendment conforming the permit's language as necessary to reflect the new ownership. Though amendment may be required by regulation, the formalistic step of replacing the former permitholder's names with that of the new remains (quoting the NRC) "essentially administrative in nature." *Streamlined Hearing Process for NRC Approval of License Transfers*, No. 3150-AG09, 1998 WL 874942, at *15. The statements that contain the allegedly inviolable language thus do not constitute "terms" of the construction permits; rather, they are merely "administrative language," amenable to post-transfer amendment. *Id.* at *15. These amendments are necessary "[o]nly when the [permit] specifically has references to entities or persons that no longer are accurate following the approved transfer." *Id.*

34

Second, these statements (and all others in CPPR-122 or -123) are consistent with TVA's conveying the underlying real estate to Nuclear Development, because the permits are, by axiom and etymology, just permissive. The alleged violations, in other words, could remain hypothetical. If a utilization facility is *not* constructed,[19] then there is no facility at all; because no facility had been built, neither Unit 1 nor Unit 2 would be located on the "applicant's" site, nor any site at all; and if there's no facility, there's no exclusion area, regardless of ownership.[20]

And third, the NRC regulates the approval of license transfers and the amendments of license language at different stages, and with separate orders, in the license-transfer process. Through the former step, governed by 10 C.F.R. § 50.80, the NRC regulates the substantive qualifications of prospective license transferees. Through the latter, governed by 10 C.F.R. § 50.90, it amends the administrative language. If these two steps were consolidated, and the statements that TVA characterizes as inviolable "terms" were amended in the same order that the NRC approved the permit's transfer to the applicant, then it might make sense to treat the

---

[19] This second argument holds even if a utilization facility has been or would be constructed on the site. The point is that the language is merely a grant of authority, and it does not matter whether these statements are true or not. Permits are just permits. Absent an express condition in the permits themselves, they neither convey nor restrict site ownership.

[20] The "shall" in Section 3(B) might seem, at a glance, to elevate this term to a mandatory provision. But if it were mandatory, then the permittee's failure to complete a facility would amount to a violation of the term, and that outcome is inconsistent with the NRC's policy of permitting plant deferral and termination. The better reading, then, is that the provision is merely permissive.

statements as terms of the permits. But the NRC treats them separately, and the Court will not bootstrap a substantive restriction onto language that the NRC deems merely administrative.

### B. Under the regulatory scheme established by the AEA and NRC regulations, transfer of the Bellefonte Site without the NRC's approval of the Construction Permits' transfer would have been unlawful.

Nuclear Development contends that TVA could lawfully have transferred Bellefonte without the NRC's approval of the Construction Permits. Under the regulatory scheme established by the AEA and its implementing regulations, however, it is mistaken.

When Congress passed the Atomic Energy Act of 1954, it enacted a regulatory scheme "virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 783 (D.C. Cir. 1968). Since the passage of the Energy Reorganization Act of 1973, the AEA's licensing and regulatory functions have been administered by the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

Section 101 of the AEA, 42 U.S.C. § 2131, implemented through 10 C.F.R. § 50.10(b), makes it unlawful for any person in the United States to "transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility without a license issued by the NRC under Section 103 or

Section 104. The statute relevantly defines a "utilization facility" as "any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." The regulations that implement this definition define a "utilization facility" as a "nuclear reactor," and a nuclear reactor as "an apparatus, other than an atomic weapon, *designed* or used to sustain nuclear fission in a self-supporting chain reaction. 10 C.F.R § 50.2 (emphasis added). Section 103 authorizes the NRC "to issue licenses to persons applying . . . to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility "for industrial or commercial purposes." [21] 42 U.S.C. § 2133(a). For all purposes under the AEA, a construction permit is considered a license. 42 U.S.C. § 2235(a).

Moreover, Section 185(a), 42 U.S.C. § 2235(a), implemented through 10 C.F.R. § 50.10(c), requires those who wish to "construct or modify" a utilization facility to apply to the NRC for a construction permit. Under the regulation, no one may

> begin construction of a . . . utilization facility on a site on which the facility is to be operated until that person has been issued either a construction permit under this part, a combined license under part 52 of this chapter, an early site permit authorizing the activities under

---

[21] Section 104, the other licensing authority governing Section 101 (though not at issue in the litigation), also authorizes the NRC to issue licenses for utilizations facilities "for use in medical therapy," 42 U.S.C. § 2134(a), and "useful in the conduct of research and development activities," 42 U.S.C. § 2134(c).

> paragraph (d) of this section, or a limited work authorization under
> paragraph (d) of this section.

10 C.F.R. § 50.10(c). And under Section 184, 42 U.S.C. § 2234, it is prohibited to transfer one of these licenses, or a license-conferred right, "either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this chapter, and shall give its consent in writing." Section 184 is implemented through 10 C.F.R. § 50.80. Together, these provisions establish a regulatory framework that governs the building, licensing, use, and transferability of utilization facilities.

Bellefonte's units are not now "used" to sustain nuclear fission in a self-supporting chain reaction, and it is undisputed that in their current state, the units would be *incapable* of being so used. (Doc. 72–4 at 3). What is disputed is whether Unit 1 or Unit 2 is an apparatus *designed* to sustain nuclear fission in a self-supporting chain reaction. If either unit is an apparatus so "designed," then, by definition, it is a nuclear reactor; if a nuclear reactor, then a utilization facility; and if a utilization facility, then its transfer to Nuclear Development would have been unlawful under Section 101 of the AEA. 42 U.S.C. § 2131.

"Designed," as the word is used in the regulation, is a somewhat ambiguous modifier, and the parties offer competing interpretations of its meaning. TVA suggests that it turns on subjective intent to complete the reactor (Doc. 86–83 at 19–

20), while Nuclear Development collapses the regulatory language into the statutory definition of "capable of making use of specialized nuclear material" (Doc. 101–1 at 8–9). Two brief thought experiments seem to suggest the best answer.

Long before construction ever began, plans were drawn up for two utilization facilities to operate at the Bellefonte Nuclear Plant. Did these plans constitute two nuclear reactors? If blueprints alone sufficed, then Section 101 restrictions could attach to any lot pressed into service as the site of a prospective reactor by the imperious pen of a nuclear engineer. But if it takes more than blueprints, at what point does a unit become a nuclear reactor? When the first brick in laid? It strains belief to say that a single brick could be an "apparatus designed . . . to sustain nuclear fission in a self-supporting chain reaction."

Now suppose that the NRC had omitted "designed" from the definition of nuclear reactor. Only an apparatus "used" to sustain nuclear fission would count, and so only facilities currently in operation would be deemed nuclear reactors. And by extension, those plants not then used, even if fully built, staffed, and capable of being used the very next day, would be excluded from the definition.

The regulation's meaning would seem to lie somewhere between these two: wide enough to embrace disused but operable stations, but not so expansive as to capture a blueprint-backed brick. "Designed" then, might simply mean "capable of operating."

This is how both TVA and the NRC used the term in 2006. That year, when Investment Recovery was ongoing and the Bellefonte units were closer to completion than they are now, TVA decided that it would permanently halt construction on the Bellefonte units, and it notified the NRC that it sought to withdraw the Construction Permits. (Doc. 72–6 at 4). Before it would consent to the request, the NRC asked TVA "to provide additional information regarding whether [Units 1 and 2] can be considered a "Utilization Facility" as defined in 10 C.F.R. [§] 50.2." *Id.* TVA replied:

> In their present condition, neither of the subject units can be considered a utilization facility as so defined. At the time that construction of the units was deferred, TVA considered Unit 1 to be 88 percent complete and Unit 2 to be 28 percent complete. At this time, neither reactor has the necessary structures, systems or components in place to sustain a controlled nuclear reaction. For example, over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site which precludes the ability of the units to operate as nuclear reactors. In addition . . . there is no nuclear fuel located at the BLN site.

*Id.* Because neither unit was capable of operating as a nuclear reactor, Units 1 and 2 were not, TVA concluded at the time, "utilization facilities." Two months later, the NRC concurred:

> At this time, neither reactor has the necessary structures, systems, or components in place to sustain a controlled nuclear reaction. Over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site, which precludes the ability of the sites to operate as nuclear reactors. The current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility.

(Doc. 72–7). Because it was considering the withdrawal of the Construction permits, the NRC issued an Environmental Assessment and Finding of No Significant Impact, concluding, in its assessment, that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility. *Id.*

To understand "designed or used" to mean "capable of operating" or "allowing operation" is, furthermore, consistent with the definition, implemented by 10 C.F.R. § 50.2, supplied by the AEA itself. Under Section 11 of the AEA, a "utilization facility" is relevantly defined as "(1) any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." 42 U.S.C.A. § 2014(cc). In a case interpreting the statutory definition, the NRC similarly focused on the functional capability of the equipment at the site. *In the Matter of Cincinnati Gas & Elec. Co., et al. (William H. Zimmer Nuclear Power Station, Unit 1)*, 20 N.R.C. 765 (Aug. 29, 1984). In the *Zimmer* case, applicants to run the all-but-complete William H. Zimmer Nuclear Power Station moved to withdraw their application for an operating license. *Id.* The NRC's Atomic Safety and Licensing Board, interpreting the statutory definition of "utilization facility," agreed with the NRC Staff that "because the facility is essentially complete, it must be disabled so that it cannot make use of special nuclear material. *Id.* at *1. Thus, under both the statutory definition and the NRC's

interpretation of the term, it would appear that a utilization facility would cease to be a utilization facility once it became incapable of making use of special nuclear material—that is, incapable of operating.

But to end the analysis there would be to take too narrow a view of the AEA and its implementing regulations, defying established law on interpreting agency regulations and ignoring the greater part of the NRC's practice, policy, and decisions. Armchair analysis is unnecessary: under the AEA, the authority to regulate the field of nuclear licensing falls to the NRC, and to interpret "utilization facility," the Court must accede to the agency's definition of the term. A utilization facility, in other words, is what the NRC says it is.

This, indeed, becomes all the more evident through a deeper analysis of the *Zimmer* case itself. For in *Zimmer*, what the applicants were pursuing was the withdrawal of their application and the termination of the proceedings.[22] *Id.* The motion for withdrawal asked for relief on self-imposed conditions, most of which pertained to rendering the site inoperable as a "utilization facility"—removing all fuel from the site, modifying the steam supply system, severing and welding caps on the two main feedwater lines and four main steam lines, and removing the control rod drive mechanisms—and the motion was granted *subject to the further condition*,

---

[22] The applicants, evidently, had a change of heart and wished to convert the vestiges of the nearly completed plant into a fossil-fired generating station. 20 N.R.C. 765

imposed by the NRC, that the applicants implement a site restoration plan. *Id.* Moreover, the implementation of that plan would be verified by the NRC staff. *Id.* at *3. The import here is that even if the Zimmer plant had been made inoperable as a utilization facility, the NRC would continue to exercise its regulatory authority over the site until, through independent verification, it confirmed that the applicants had met the conditions of application withdrawal, only some of which pertained to the plant's ability to function as a utilization facility.

Although it was an application for operating license at issue in *Zimmer*, the analysis is the same where the license is a valid construction permit. Under the NRC's Policy Statement on Deferred Plants, a permittee must comply with all requirements of a construction permit, even if the plant is in deferred or terminated-but-not-withdrawn status. 52 Fed. Reg. 38077-01, §§ III(A)(l), III(A)(3), III(B)(l) (Oct. 14, 1987). Furthermore, all regulatory requirements and policy statements applicable to plants under construction are applicable to plants in deferred status. *Id.* at III(A)(3), III(A)(5). Section III(A)(3) of the policy statement, for instance, states that permitholders of construction permits in deferred status must continue to abide by the NRC's regulatory requirements concerning the "verification of construction status, retention and protection of records, and maintenance and preservation of equipment and materials." *Id.* These requirements are not optional. As the Policy Statement shows, they are implemented through discrete NRC regulations:

> 10 CFR 50.54(a), "Conditions of Licenses," and 10 CFR 50.55(f),
> "Conditions of Construction Permits," which require that a quality
> assurance program be implemented; 10 CFR Part 50, Appendix B,
> which requires that all activities performed to establish, maintain, and
> verify the quality of plant construction be addressed in the licensee's
> quality assurance program; 10 CFR Part 50, Appendices A and B,
> which require that certain quality records be retained for the life of the
> plant; 10 CFR 50.55(e), which requires reporting of deficiencies in
> design, construction, quality assurance, etc.; 10 CFR 50.71, which
> applies to the maintenance of records; and 10 CFR Part 21, which
> applies to reporting of defects and noncompliance. Those NRC
> regulatory guides that endorse the ANSI N45.2 series of standards,
> "Quality Assurance Requirements for Nuclear Power Plants," also are
> applicable and include Regulatory Guides 1.28, 1.37, 1.38, 1.58, 1.88,
> and 1.116.

*Id.* These duties are not trivial: when Johnson recommended in 2016 that the Board declare Bellefonte surplus property, he reported that TVA had been spending $10,000,000 to $12,000,000 annually on site maintenance, although it planned to reduce those expenditures to a $6,500,000. (Doc. 85–14 at 1).

The regulations may nowhere expressly restrict the licensee from transferring the property, but NRC policy presumes that a site will remain in the licensee's control. Hence the NRC's admonition that "[i]mplementation of the program will be examined periodically to determine licensee compliance with commitments and overall program effectiveness." 52 Fed. Reg. 38077-01. That the NRC interprets its regulations to accord it full regulatory control over a site through the permittee until the permits are withdrawn is confirmed by still another provision of the policy

statement. In mandatory language under the section governing "Plant Termination," the policy states:

> Until withdrawal of the [Construction Permit] is authorized, a permit holder must adhere to the Commission's regulations and the terms of the [Construction Permit] and should submit suitable plans for the termination of site activities, including redress, as provided for under 10 CFR 51.41, for staff approval. Moreover, if the plant has been completed to a point that it can function as a utilization facility, the licensee must take all necessary actions to ensure that the facility is no longer a facility for which an NRC license is required.

*Id.* at § III(B)(1). Through this provision, a permitholder's regulatory duties, including those directly concerning site activities, are expressly delimited by the existence of a valid construction permit. The provision also illuminates the relationship between a plant's status as a utilization facility, the existence of an NRC license, and the NRC's continued authority over a licensee and the permitted site— exactly the constellation of issues raised in the *Zimmer* case. For a site to be released from NRC jurisdiction, the NRC-issued license must be withdrawn, and withdrawal may be subject to NRC-imposed conditions. One of those conditions may be ensuring that a plant can no longer function as a utilization facility. But until the NRC has withdrawn a construction permit, the permitholder must abide by its terms and all applicable regulations.

These regulations thus impose duties on licensees that can be fulfilled only with direct control of the site. To allow a licensee to transfer the property without

the NRC's approval would cripple its regulatory authority and derogate from its stated policy.

For the NRC policy statements to cohere, the following statement must also be true: a plant that might not otherwise be considered a utilization facility will nevertheless be treated as one by the NRC as long as it is subject to a valid Section 103-issued license. And thus is the ownership of a plant site tethered to the NRC's permitting authority; where there is a valid NRC-issued license, transfer of ownership requires NRC approval.

This outcome is dictated by far more than policy statements: the limitation on the transferability of site ownership is firmly established by NRC precedent. In a decision by the Commission itself, the NRC proclaimed that "[a]ny transfer of ownership would require Commission approval." *In the Matter of Pub. Serv. Co. of New Hampshire, et al. (Seabrook Station, Units 1 & 2)*, 7 N.R.C. 1, 22 (Jan. 6, 1978). That case concerned the Seabrook plant, a two-unit nuclear electric generating station on the coast of New Hampshire, still under construction at the time of the decision. *Id.* at 4. The issues before the Commission principally turned on the financial qualifications of the construction-permit applicants, but those issues raised further questions concerning two applicants who wished to dispose of their interests in the plant. Although it declined to consider the future modifications to the

applicants' ownership agreement, the NRC was satisfied that it would be able to assert control over any future transfers of ownership.

The NRC reaffirmed this principle just a month after its *Seabrook* decision. In the *Marble Hill* case, the NRC's Atomic Safety and Licensing Appeal Board held that prospective co-owners of nuclear power plants must be co-applicants for an NRC license. *Id.* at 201. The Public Service Company of Indiana had applied for a license to build a nuclear-powered electric generating facility at a site in Southern Indiana known as "Marble Hill," and the NRC's Licensing Board, pending final approval, granted it a Limited Work Authorization. *Id.* at 182. As its name suggests, a Limited Work Authorization allows only for limited pre-construction activities, which, per NRC regulations, include

> the driving of piles, subsurface preparation, placement of backfill, concrete, or permanent retaining walls within an excavation, installation of the foundation, including placement of concrete, any of which are for a[ safety-related structure, system, or component] of the facility for which either a construction permit or combined license is otherwise required.

10 C.F.R. § 50.10(d)(1). Thus, at the time of the decision, no activities that would have required a construction permit had begun.

Public Service Co., along with several intervenors, challenged the Licensing Board's grant of the LWA and appealed its ruling. *Id.* The relevant challenge, mounted by Public Service Co., concerned the Licensing Board's ruling that the co-owners of the proposed nuclear plant were de facto co-applicants for the construction

permits and its decision to deem the application amended to reflect joint ownership. *Id.* at 198. Although the case turned on the applicability of Sections 101 and 103 of the AEA and no construction had begun, it appears that no one chose to dispute whether the plantless site, certainly then incapable of using special nuclear material, was a "utilization facility." Instead, it argued that Sections 101 and 103 did not apply because neither "explicitly forbid one to 'own' a nuclear plant without a license, only to 'posses' it." *Id.*

The Appeal Board rejected the argument. In reaching the conclusion that co-owners of nuclear power plants must also be co-applicants, it noted that it saw "no reason why Congress would want to exempt owners of nuclear power plants from Commission regulation." After delving into the legislative history of the AEA, it further opined that to accept Public Service Co.'s "crabbed" interpretation of the statute could place "significant areas of the Commission's regulatory authority . . . under a cloud." *Id.* at 201.

After these decisions, the NRC aligned its practice to conform with the principle that construction permits for incomplete facilities would need to be amended to approve changes in site ownership. The NRC's letter to W.C. Tallman, for instance, illustrates that practice by approving an amendment to the Construction Permits for Seabrook Station, Units 1 and 2, to reflect a change in ownership, (Doc. 86–55 at 2–3 and 6–11), as does the NRC's letter to L.C. Dail by approving (with

express reference to *Marble Hill*) an amendment to the Construction Permit for Catawba Nuclear Station, Unit 2, to reflect a change in ownership, (Doc. 86–56 at 2 and 5–6).

Moreover, the NRC has expressly found that transferring ownership of a utilization facility without its consent violates Section 101 of the AEA. (Doc. 86–54). On March 3, 1978, the NRC's Acting Director of Nuclear Reactor Regulation, Edson G. Case, sent a letter to a concerned citizen named Dr. Robert G. Asperger, who, invoking his right under 10 C.F.R. § 2.206, had asked the NRC to take enforcement action against the Detroit Edison Company for selling two Cooperatives a 20% stake in the Fermi 2 nuclear plant.[23] *Id.* As the acting Director of Nuclear Reactor Regulation, Case issued the decisional letter in his capacity as the senior agency official responsible for carrying out "licensing and regulation involving all facilities . . . associated with the construction and operation of nuclear reactors." 42 U.S.C. § 5843(b)(1). After reviewing the Agreement, Case concluded that by selling a present interest in the facility to the Cooperatives, Detroit Edison had violated Section 101 of the AEA, "because that section requires Commission approval before and not after an ownership interest is acquired." (Doc. 86–54 at 6–7). After reaching this conclusion, Case rejected the argument that Section 101 of

---

[23] Why did Dr. Asperger, a private party, request enforcement action against Detroit Edison? "He didn't like them." (Doc. 86–32 at 59).

the AEA did not apply because the facility was not yet complete, observing that "it has been the longstanding practice of the Commission to consider a utilization facility under construction to be a utilization facility. Therefore, in our view, a right to own a utilization facility under construction is a right to own a utilization facility if completed." *Id.* at 7.

Although the Case letter spoke in terms of utilization facilities under construction, there is no reason to believe that, under current NRC policy, the result differs for facilities in deferred status. After all, the NRC applies all regulations and policy statements governing plants under construction to plants in deferred status. *See* 52 Fed. Reg. 38077-01. The NRC, in other words, treats deferred plants, which are subject to construction permits, as plants under construction.

The Tallman, Dail, and Case letters illustrate how the NRC interprets both its own regulations and the AEA, and given the exceptionally broad responsibility vested in the agency's administration of the statute, the Court will defer to its practice. To borrow the words of Justice Brennan, the Court sees no reason why it

> should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'

*Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*, 367 U.S. 396, 408 (1961) (citations omitted) (deferring to the NRC's interpretation of the AEA and its implementing regulations in a decision involving construction permits).

All these decisions deal only with applications concerning co-owners, and each holds that a co-owner must also be a co-applicant on a license. And in each case, the NRC authorized ownership only once it had approved the license application. From these holdings, however, it necessarily follows that no one may hold an ownership interest in a nuclear plant unless the NRC has approved his application for a license.

And so what of TVA's 2006 contention that Bellefonte is no longer a utilization facility? As in *Zimmer*, TVA was merely assuring the NRC that both units could safely be released from its jurisdiction. Not even the NRC's concurrence in its Environmental Assessment would have released the site from its jurisdiction; it was not until the Construction Permits were withdrawn that the Bellefonte site would have become transferable. That, and not TVA's subjective intent, is why its possession of the site from 2006 to 2009 with no valid license did not violate Section 101—the Construction Permits had been withdrawn. When they were reinstated, the site fell again within the NRC's jurisdiction, and transfer would once more have required NRC approval.

Given the NRC's interpretation of the AEA and its implementing regulations, it does not matter that the Bellefonte units, at closing, were incapable of operating: TVA could not lawfully have transferred the Bellefonte site to Nuclear Development without the approval of the NRC. Once the NRC issued CPPR-122 and -123 to build Units 1 and 2, the site could not be transferred without the NRC's approval unless the permits expired or were withdrawn.[24] The Court therefore concludes that under the AEA and its implementing regulations, as these have been interpreted by the NRC, even partially completed facilities, whether under construction or not, are swept within the regulatory ambit of Section 101.

Because the transfer of the Bellefonte site without NRC approval would have been unlawful under Section 101 of the Atomic Energy Act, the closing condition set forth in Section 6(a)(v) was not satisfied, and Nuclear Development's motion for summary judgment is denied.[25]

---

[24] Or, theoretically, if the facilities had first become operational and then been decommissioned. (Doc. 86–81 at 8).

[25] Nuclear Development contends that TVA must show more than a mere technical statutory violation to establish illegality and, at least for the purposes of voiding a contract, show a clear public harm. For one, Nuclear Development appears to have conflated TVA's (inapposite) illegality defense with its front-end closing condition of non-illegality, and has sought to pipeline the affirmative-defense doctrine into that of the condition precedent. It does not belong there. But even if somehow it applied, it would make that showing by pointing to the violation of the AEA: for the violation of a federal statute is a violation of the policy of the United States. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83–84 (1982).

## C. Nuclear Development cannot rely on the doctrine of equitable estoppel.

Nuclear Development further contends that TVA should be equitably estopped from raising the affirmative defense of illegality when ND had already relied to its material detriment on TVA's representations that it would close. Equitable estoppel is appropriate where:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013). Nuclear Development's invocation of equitable estoppel fails for two reasons. First, the allegedly unknown facts are not facts at all, but law, and if Nuclear Development did not know the law when it entered the Agreement, then it should have. Second, there may well be a genuine dispute of material fact as to whether Nuclear Development relied on the representations that TVA made in Section 7, but if it did, its reliance would be of no import. Its reliance would have been unreasonable, because Nuclear Development was charged—as we all are—with knowing the law. Thus, Nuclear Development can establish neither the fourth nor the fifth element, and its invocation of equitable estoppel fails as a matter of law.

### D. Genuine disputes of material fact preclude judgment as a matter of law.

Although the condition set forth in Section 6(a)(v) was not satisfied because transfer of the Bellefonte site without NRC approval would have been unlawful, TVA is not absolved from liability. Under Section 9(a) of the Agreement, the parties made two covenants "to be effective after the Effective Date and prior to Closing":

> (i) Subject to the terms and conditions herein, each of the Parties agrees to use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein.

> (ii) Each Party shall provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site consistent with Section 1(e). The Parties shall keep each other apprised of the status of any communications with and any inquiries or requests for additional or supplemental information from applicable Governmental Authorities, and shall provide any such additional or supplemental information that may be reasonably requested in connection with any such filings or submissions. All applications, appearances, presentations, briefs, and proposals made or submitted by or on behalf of either Party before any Governmental Authorities in connection with the approval of this Agreement and the transactions contemplated hereby shall be subject to the control of the Party making such application, appearance, presentation, filing or submission.

(Doc. 72–16 at 9–10).

The history of this case after the effective date and prior to closing is clouded with factual disputes. From midsummer 2018 through the expected closing date, the fog lies thickest. In short, the crossfire of emails in the months before closing, much of it in anticipation of litigation; the alleged requests for TVA to apply to the NRC for approval of the Construction Permits' transfer, as well as the alleged delays in seeking approval; and the allegations of bad blood between the parties after McCollum's visit to Memphis, all raise genuine disputes of material fact as to whether TVA fulfilled its duties under §§ 9(a)(i) and (ii) of the Agreement.

Moreover, there is a genuine dispute of material fact as to whether Nuclear Development was ready, willing, and able to close on the closing date.

### E. Incidental Damages

The Court will reserve judgment on damages, if appropriate, until trial.

## CONCLUSION

Because there remain genuine disputes of material fact, the Court cannot decide Counts I, II, or II of the Complaint as a matter of law. Nuclear Development, LLC's Motion for Summary Judgment (Doc. 70) and the Tennessee Valley Authority's Motion for Summary Judgment are therefore **DENIED**.

**DONE** and **ORDERED** this March 31, 2021.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE