# EXHIBIT E

Proffer of Testimony of William Johnson

William Johnson will testify by deposition, in accordance with the attached deposition excerpts, as follows:  He was CEO of TVA from early 2013 until May 1, 2019.  He was the CEO at all times during the events alleged in the Complaint.  Sherry Quirk, TVA's General Counsel, was responsible for making the decisions regarding the terms of the contract with Nuclear Development ("ND").  There are about 50 lawyers in TVA's legal department.

Johnson was aware generally that ND promoted the economic benefits of the Bellefonte project.

Johnson was aware in the month of November 2018 before the lawsuit was filed that ND took the position that the construction permits did not have to be transferred to ND before the closing of the sale of the Bellefonte site to ND.

Johnson made the decision on November 29, 2018, not to close the sale with ND, which was the day before the closing date of November 30, 2018.  Johnson said he took into account ND's letter of November 30, 2018 that rebutted TVA's position that it would be illegal to close before he made the decision not to close, but he made the decision not to close the day before ND's letter was issued.

Johnson was not aware at the time he made the decision not to close the sale to ND that TVA had rejected ND's request to make transfer of the construction permits to ND a condition of the closing.

Johnson will identify and testify to Exhibits 24 and 25.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF ALABAMA

 3                   NORTHEASTERN DIVISION

 4

 5   NUCLEAR DEVELOPMENT, LLC,

 6                 Plaintiff,

 7   vs.                              No. 5:18-cv-01938-LCB

 8   TENNESSEE VALLEY AUTHORITY,

 9                 Defendant.
                                   /
10

11

12

13        VIDEOTAPED DEPOSITION OF WILLIAM JOHNSON

14                    October 9, 2019

15

16

17

18

19

20

21

22   Reported By:

23   ANGELA SINCLAIR,

24   CCRR, CRR, RPR, CSR No. 13902

25   JOB NO. 10061754
```

1     Q.  After this resolution was adopted, did TVA
2  retain a company by the name of Concentric Energy
3  Advisors to assist it in the sales process?
4     A.  Yes.
5     Q.  What was their role, scope of work?
6     A.  As I recall it, their scope was to identify
7  potential buyers.  Concentric had a history of being
8  engaged in the sale of nuclear plant and nuclear
9  facilities.  And also just to see what the appetite in
10 the market was for the property.
11    Q.  Who was responsible at TVA for supervising
12 Concentric?
13    A.  I do not know.
14    Q.  Were you?
15    A.  No.
16    Q.  Okay.  Did you have direct communications with
17 them regarding this project?
18    A.  I didn't have direct oral communication.  I did
19 have some -- I saw some correspondence with them.
20    Q.  That you were copied on?
21    A.  No.
22    Q.  You saw correspondence between them and other
23 members of TVA, other employees --
24    A.  I saw --
25    Q.  -- of TVA?

1    A.  I didn't make any requests, but I did have some
2 discussions, particularly about the length of --
3        MR. LEMBKE:  Stop.  I don't want you to
4 disclose any internal --
5        THE WITNESS:  There we go.
6        MR. LEMBKE:  I instruct you not to answer as to
7 internal discussions with TVA counsel.
8        MR. O'REAR:  Well, he can testify if he had
9 discussions.  I haven't even asked him about that yet.
10        MR. LEMBKE:  Well, he started to say the
11 content of the discussions and so I stopped him.
12        MR. O'REAR:  Okay.
13 BY MR. O'REAR:
14    Q.  My question was:  Did you make any decisions
15 regarding any aspect of the contract before it was
16 signed?
17        MR. LEMBKE:  Object to the form.  Vague.
18        THE WITNESS:  Yes.
19 BY MR. O'REAR:
20    Q.  And what aspects of the contract?
21    A.  Length of the due diligence period.
22    Q.  And what was your decision on that?
23    A.  Well, really I wanted to understand why it was
24 extended, and I wanted to make sure that we didn't have
25 an open-ended condition, in other words, that this

1   process could drag on for a long period of time when our
2   objective was short-term economic development and
3   prosperity in the region.
4           So that was the main thing I was interested in.
5       **Q.  When you said a due diligence period, are you**
6   **referring to the two years between the date of the**
7   **contract and the date of the closing?**
8       A.  Yes.  And so probably better said in the
9   closing period, but yes, the two-year period.
10      **Q.  Is that the only section of the contract that**
11  **you recall you made a decision on?**
12      A.  I don't believe I said I made a decision on it.
13  I was interested in discussing it, but in general I
14  didn't make any decision about the terms.  That was the
15  party that was doing the negotiating for us.
16      **Q.  And who was that?**
17      A.  That was a group of people.  It was the general
18  counsel's office, the real estate people, some of the
19  nuclear people.
20      **Q.  Okay.  Who at the general counsel's office was**
21  **responsible for those decisions?**
22      A.  So my interface was with Sherry Quirk, the
23  general counsel.
24      **Q.  And was she the person at the general counsel's**
25  **office responsible for the decisions made with respect**

```
 1   to the contract?
 2        A.   Yes.
 3        Q.   Who at the real estate division?
 4        A.   I really can't remember.
 5        Q.   Anyone at the licensing division?
 6        A.   I don't know.
 7        Q.   Any other individuals that you recall that had
 8   ultimate responsibility for their department or division
 9   regarding the formation of the contract?
10        A.   I really can't remember.
11        Q.   Were you aware, during negotiation of the terms
12   of the contract, that Nuclear Development requested that
13   the transfer of the construction permits be a condition
14   of the closing?
15        A.   I can't recall that, no.
16        Q.   Do you recall that you made any decisions
17   regarding a condition of the contract being a transfer
18   of the construction permits?
19             MR. LEMBKE:   Objection.   Asked and answered.
20             THE WITNESS:   I did not.
21   BY MR. O'REAR:
22        Q.   How many lawyers are in the legal department of
23   TVA?
24        A.   I think that department was about 50.  I don't
25   think they were all lawyers, but I think the department
```

1   was about 50.
2       Q.  Was Joe Shea the head of the licensing
3   department at this time?
4       A.  What time?
5       Q.  The time the contract was formed in 2016.
6       A.  I believe he was.
7       Q.  Was he head of the licensing department in
8   2018?
9       A.  I believe he was.
10      Q.  How large is that department?
11      A.  I don't know.
12      Q.  Do you know if there are any lawyers that are
13  assigned to the licensing department?
14      A.  There were lawyers who had responsibility for
15  nuclear matters generally, so I would assume that maybe
16  includes licensing.  All I know is that there were
17  people who had nuclear responsibilities.
18      Q.  In terms of the promotion of the economic
19  development to result from the sale of this project,
20  were you familiar with Nuclear Development's projections
21  that this project would create an average of 8,420 jobs
22  per year during the construction period and 12.6 billion
23  in economic and fiscal impact?
24      A.  I can remember Nuclear Development talking
25  about the benefits to the region.  I can't recall any

1   specific numbers as you -- as you've quoted there.
2        Q.  I'll read you another and ask you if you recall
3   this.
4            Were you aware at the time of the creation of
5   the contract of Nuclear Development's projection that
6   the contract and project would create an average of
7   4,176 jobs per year during the 60-year operational
8   period and 37.7 billion in economic and fiscal impact?
9            MR. LEMBKE:  Object to the form.  We don't know
10  what you're reading from.
11  BY MR. O'REAR:
12       Q.  Would your answer be the same, you don't recall
13  the specific figures?
14       A.  Correct.  I remember Nuclear Development
15  promoting the benefits of their projects, but the
16  specifics I don't recall.
17           (Deposition Exhibit 6 was marked.)
18  BY MR. O'REAR:
19       Q.  Let me show you what has been marked as
20  Exhibit 6.  That is a document that's been produced from
21  TVA's records regarding this.
22           Do you recall ever seeing this document or
23  something similar to it?
24           MR. BLUST:  I think you handed the wrong one.
25  Let's see what you got here.  Okay.  You don't have that

```
 1        A.  Yes.
 2        Q.  You're talking about the Pillsbury law firm?
 3        A.  Yes.
 4            (Deposition Exhibit 19 was marked.)
 5   BY MR. O'REAR:
 6        Q.  Directing your attention to Exhibit 19.  Were
 7   you aware --
 8            MR. LEMBKE:  Is that part of the exhibit?  No.
 9   BY MR. O'REAR:
10        Q.  Were you aware on or around November the 12th,
11   2018, that Nuclear Development had provided to TVA a
12   document which outlined a permissible regulatory path
13   forward under the NRC regulations for transferring the
14   Bellefonte site prior to the transfer of the
15   construction permits?
16            MR. LEMBKE:  Object to the form.  Lack of
17   foundation.  Misstates the document.
18            THE WITNESS:  I know there were discussions
19   going back and forth between the various lawyers on what
20   the requirements for license transfer were.  As to the
21   specifics of that, I don't have any recollection of it.
22   BY MR. O'REAR:
23        Q.  Were you aware that Nuclear Development was
24   taking the position that the construction permits did
25   not have to be transferred in order for the sale to be
```

```
 1   closed?
 2         MR. LEMBKE:  Object to the form.  Lack of
 3   foundation.
 4         THE WITNESS:  I was aware of that, yes.
 5   BY MR. O'REAR:
 6      Q.  Okay.  Did you address an agencywide meeting of
 7   TVA on November the 26th, 2018?
 8      A.  Maybe.  I routinely had town hall meetings.
 9      Q.  Okay.  Did you have one in late November?
10      A.  I don't recall.
11      Q.  Did you have one where at the end of the
12   meeting there were questions about Bellefonte and why we
13   were selling Bellefonte to Nuclear Development?
14         MR. LEMBKE:  Object to the form.  Lack of
15   foundation.
16         THE WITNESS:  Well, that was discussed at
17   several meetings.  So if there was a meeting in
18   November, that probably was a likely subject matter.  I
19   would take questions from employees.
20   BY MR. O'REAR:
21      Q.  And where were these town hall meetings held?
22   Where was the one in November held?
23      A.  They were typically held one of two places: in
24   the auditorium in Knoxville in the office or the
25   auditorium in Chattanooga in the office.  It would have
```

1          Now, this letter, this e-mail says from

2   Mr. Beach, "We did receive an unequivocal opinion from

3   Pillsbury today opining that ND's acquisition of the

4   site would be unlawful under the act."

5          Do you have any reason to believe the letter

6   did not get received by TVA on Wednesday, November

7   the 28th, 2018?

8          MR. LEMBKE:  Object to the form.  Lack of

9   foundation.

10         THE WITNESS:  I have no reason to believe or

11  disbelieve it.

12  BY MR. O'REAR:

13     Q.  Do you have any reason to believe that this

14  letter was delivered and that you reviewed it prior to

15  November 28th, 2018?

16     A.  I don't -- I can't recall that.

17     Q.  Do you have any reason to believe that you did

18  review it prior to that date?

19     A.  I -- I can't tell you when I reviewed it.  I

20  know I reviewed it.  I reviewed it shortly after we got

21  it.  When exactly that was, I can't recall.

22         (Deposition Exhibit 24 was marked.)

23  BY MR. O'REAR:

24     Q.  You have before you Exhibit 24 which is a

25  letter on TVA letterhead addressed to Nuclear

1   Development and Mr. Blust signed by Sherry Quirk,
2   general counsel.
3           Have you seen that letter before?
4       A.  Yes.
5       Q.  Okay.  And this is the letter whereby TVA
6   advised Nuclear Development that they would not close
7   the transaction on the next day; correct?
8       A.  That's correct.
9       Q.  And did you make the decision that is reflected
10  in this letter that TVA would not close the transaction
11  the next day, November 30th, 2018?
12      A.  I made the decision that TVA could not lawfully
13  close the transaction on that day.
14      Q.  Did you direct Ms. Quirk to send this letter?
15      A.  I don't know if I directed her, but I certainly
16  approved it.
17          (Deposition Exhibit 25 was marked.)
18  BY MR. O'REAR:
19      Q.  Now, I believe you said with respect to the
20  letter marked as Exhibit 24 that you made the decision
21  not to close the transaction because it would be illegal
22  to do so or violate the law; is that what you said?
23      A.  That is what I said.
24      Q.  All right.  Now, directing your attention to
25  Exhibit 25.  Were you aware that the next day, on

1  November 30, Mr. Blust as counsel for Nuclear
2  Development sent a letter to Ms. Quirk and to David Nix
3  essentially rebutting her letter and taking the position
4  that it was not illegal to close the transaction on
5  November 30th, 2018?
6          MR. LEMBKE:  Object to the form.  Lack of
7  foundation.  Misstates the exhibit.
8  BY MR. O'REAR:
9       Q.  Did you ever see this letter?
10      A.  Yes.
11      Q.  So you were aware of the position taken in the
12 letter?
13      A.  Yes.
14      Q.  You either read it or were informed about it?
15      A.  I read it.
16      Q.  On November 30, the day of the closing?
17         MR. LEMBKE:  Mister -- no objection.
18         THE WITNESS:  I read the letter.
19 BY MR. O'REAR:
20      Q.  Did you take the letter into consideration in
21 making the decision that TVA would not close the
22 transaction on November 30?
23      A.  I read the letter before we decided we couldn't
24 lawfully close the transaction.
25      Q.  Okay.  So you took into account Nuclear

1    Development's position on this when you made that
2    decision?
3         A.  I read what they wrote.
4         Q.  As reflected in this letter?
5         A.  Yes.
6         Q.  Okay.  And you took that into account?
7         A.  I certainly considered it.
8         Q.  Did you take the decision or your
9    recommendation that TVA not close this transaction to
10   the board of directors?
11        A.  I can't recall exactly doing that, but I'm
12   certain that I did because this is the kind of thing I
13   would always run by the board.
14        Q.  Did you do that in an official board meeting?
15        A.  No.
16        Q.  When you say "run by the board," what do you
17   mean?
18        A.  Well, there could be e-mails or phone calls or
19   things like that.
20        Q.  With individual board members?
21        A.  I don't recall exactly how it occurred.
22        Q.  Are you speculating there were e-mails or phone
23   calls, or are there e-mails or phone calls --
24        A.  Well, I don't --
25        Q.  Excuse me.  Were there e-mails or phone calls

1     Q.  Okay.  And how is that related to your right to
2  terminate the contract?
3     A.  I don't think I related those.
4     Q.  Okay.  Good.
5     A.  I think I said that in relation to did I think
6  misleading things were being said.
7     Q.  In response to a question from Mr. Lembke, you
8  said that someone at Nuclear Development said they
9  needed two years between the date of the contract and
10 the date of the closing to obtain financing and to
11 obtain transfer of the construction permits; is that
12 correct?
13    A.  That's correct.
14    Q.  And who told you that?
15    A.  A letter from Mr. Blust.
16    Q.  Okay.  A letter to you?
17    A.  A letter to -- I believe it was Concentric.
18    Q.  This was a letter to Concentric before the
19 contract was actually executed?
20    A.  Correct.
21    Q.  So this was part of the negotiation process
22 over the terms of the contract; correct?
23    A.  Yes.
24    Q.  And I asked you earlier in the deposition, were
25 you aware that Nuclear Development actually requested

```
 1   that a provision of the contract be that the closing
 2   would be conditioned on TVA's transfer of the
 3   construction permits to Nuclear Development, did I not?
 4         A.   A question like that, yes.
 5         Q.   Yes.  And were you aware or are you aware that
 6   TVA rejected that provision of the contract as a
 7   condition of closing?
 8         A.   I was not aware of that until you showed me
 9   documents today.
10         Q.   Okay.  So these comments that you were
11   referring to about the need for the two years were all
12   in the process of negotiation before the actual terms of
13   the contract were executed by both parties?
14         A.   Actually, my comment is that it's very clear to
15   me that Nuclear Development knew they needed the permits
16   to get the closing as early as two years before and
17   didn't acquire them.
18         Q.   Well, what made that clear to you?
19         A.   Mr. Blust's letter and the response from
20   Concentric.
21         Q.   Okay.  And, again, those are exchanges --
22   they'll reveal whatever those exchanges show --
23         A.   Correct.
24         Q.   -- that occurred before the contract was
25   executed?
```

1  to go get 'em, that seems to be an inconsistency to me.
2  BY MR. O'REAR:
3      Q.  Well, does it seem to be an inconsistency to
4  you that TVA never contended at all until the two or
5  three days or a week before this closing and officially
6  not until the day before the closing that there was a
7  requirement of this closing that those construction
8  permits be transferred?
9          MR. LEMBKE:  Object to the form.
10 BY MR. O'REAR:
11     Q.  Does that -- does that bother you that TVA
12 waited until the day before the closing to make that
13 contingent?
14         MR. LEMBKE:  Object to the form.  Assumes facts
15 not in evidence.  Lack of foundation.
16         THE WITNESS:  It doesn't bother me because we
17 made the assumption that they knew what they were doing
18 and knew what they were required to do, were well
19 represented by high-level nuclear licensing law firms.
20 BY MR. O'REAR:
21     Q.  Well, did TVA know what it was doing when it
22 had 50-man law -- legal department and a large licensing
23 department focused on these very issues where it never
24 once raised this issue until immediately prior to the
25 closing?  Did TVA know what it was doing?

```
 1              MR. LEMBKE:  Object to the form.  Lack of
 2   foundation.  Argumentative.
 3              THE WITNESS:  I don't think I could answer
 4   that.
 5              MR. LEMBKE:  Calls -- lack of foundation.
 6   Argumentative.  Assumes facts --
 7              THE WITNESS:  I think we've gotten to --
 8              (Court reporter clarification.)
 9              MR. LEMBKE:  Object to the form.  Lack of
10   foundation.  Assumes facts not in evidence.
11   Argumentative.
12              THE REPORTER:  And then your answer?
13              THE WITNESS:  I can't answer the question.
14   BY MR. O'REAR:
15       Q.  So TVA's 50-man law department and TVA's
16   licensing department never objected to the process that
17   was laid out at a public meeting of the NRC until just
18   literally minutes before the closing was to occur?
19              MR. LEMBKE:  Object to the form.
20   BY MR. O'REAR:
21       Q.  Is that right?
22              MR. LEMBKE:  Lack of foundation.
23              THE WITNESS:  I don't know that to be correct.
24              MR. LEMBKE:  Argumentative.
25                          ---o0o---
```