FILED
2021 May-19  PM 06:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT H

<u>Proffer of Testimony of Sherry Quirk</u>

Sherry Quirk will testify by deposition, in accordance with the attached deposition excerpts, as follows:  She was Vice President and General Counsel of TVA from February 2015 until after the Complaint was filed.  She reported to William Johnson, TVA's CEO.  She hired Concentric Energy Advisers to conduct the auction to sell Bellefonte and to negotiate the contract terms on behalf of TVA. Her legal team negotiated and recommended the deal presented to Johnson for his review and approval.  There were two other prospective bidders for the Bellefonte site besides Nuclear Development ("ND").

During the contract negotiation process, ND requested that transfer of the construction permits from TVA to ND be a condition to closing the sales transaction. Quirk and her legal team recommended to the CEO that ND's request be rejected, and Johnson adopted the recommendation to reject ND's request.

In the contract signed with ND, TVA represented and warranted to ND, in order to induce ND to enter the contract, that Nuclear Regulatory Commission ("NRC") approval of the transfer of the construction permits from TVA to ND was not required in order to close the transaction.  TVA's CEO approved this provision of the contract.  After the lawsuit, Quirk testified that TVA's representation and warranty was "inaccurate."

The other two prospective bidders for the Bellefonte site were presented by TVA with the same purchase contract presented to ND.  Quirk could not say that TVA would have required NRC approval of the transfer of the construction permits to Bellefonte buyers other than ND as a condition of closing the sale.

The first time that TVA indicated in writing that there might be an issue concerning transfer of the construction permits was November 9, 2018.

The TVA board of directors met on November 14, 2018, and were not presented by management with any issue concerning closing the sale of Bellefonte to ND.

Quirk will identify and testify to Exhibits 4, 17, 25, 26, 27, 28, 29, 30 and 31.

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
2                 NORTHEASTERN DIVISION
3
4     NUCLEAR DEVELOPMENT LLC,           )
                                         )
5                                        )
                          Plaintiff,     )
6                                        )   Civil Action
      vs.                                )   Case Number
7                                        )
      TENNESSEE VALLEY AUTHORITY,        )   No.
8                                        )   5:180cv-01983
                                         )   -LCB
9                         Defendant.     )
10
11
12           VIDEO RECORD & ORAL DEPOSITION OF
13                      Sherry Quirk
14              Tuesday, October 29, 2019
15                      8:57 a.m.
16                  900 S. Gay Street
17                      9th Floor
18              Knoxville, Tennessee 37902
19
20
21
22
23
24              Georgette H. Mitchell
            Registered Professional Reporter
25                   LCR-55 (TN)

1     what those requirements are, and he was, as far as I

2     know, more involved in the latter than -- excuse me --

3     the former than the latter.

4          Q.     Were there any environmental issues which

5     would have prevented the closing of that transaction?

6          A.     We determined that -- that we could go to

7     closing with the environmental record as it was.

8          Q.     Who at TVA was responsible for the final

9     approval of all the terms and conditions of the

10    contract?

11         A.     That would be Bill Johnson.

12         Q.     Okay.  Well, he said you were.  Did you

13    read his testimony?

14         A.     I did.

15         Q.     Okay.

16         A.     But as CEO, pursuant to the resolution

17    that the board passed, it actually was technically his

18    authority, and so those of us who supported him made

19    recommendations to him.

20         Q.     Did you make recommendations to him?

21              MR. LEMBKE: That's a yes or no question,

22         Miss Quirk.

23              THE WITNESS: Yes.

24    BY MR. O'REAR:

25         Q.     Regarding the terms and conditions of the

Page 27

1   contract?   The question is, did you make

2   recommendations to him regarding the terms and

3   conditions of the contract?

4              MR. LAMBKE:   It's again a yes or no

5       question.

6              THE WITNESS:   Yes, generally.

7   BY MR. O'REAR:

8       Q.     When you said he was authorized by

9   resolution, what were you referring to?

10      A.     When the board approved or declared the

11  Bellefonte site to be surplus, it passed a resolution

12  providing the CEO with the authority to move forward in

13  the sale of the site at auction.

14      (Exhibit 4 - Previously marked - Bates No.

15      TVABLN000002633 through 2634, Resolution.)

16  BY MR. O'REAR:

17      Q.     Let me show you has been previously

18  marked as Exhibit 4.  Is that the resolution that

19  you're referring to?

20      A.     It appears to be, yes.

21      Q.     Within the legal department, who worked

22  on the negotiations and review of the contract terms

23  before the contract was executed?

24      A.     I believe that Cliff Beach was overseeing

25  that process and he was working with an outside

Page 28

1     consultant firm, Concentric.

2          Q.     Do you know what lawyers worked under Mr.

3     Beach on that project?

4          A.     I believe it was Nick McCall, and as I

5     said I'm not sure whether Greg would still have been

6     there or not, but I don't know beyond that who was on

7     the team.

8          Q.     Did the team have a name?  Did that team

9     have a name?

10         A.     I don't know that they had anything more

11    catchy than the Bellefonte team.

12         Q.     Did Mr. Beach report to you in terms of

13    matters regarding the negotiation of the terms of the

14    contract?

15         A.     Yes.

16         Q.     Did you report to Mr. Johnson regarding

17    matters involving the negotiation of the terms of the

18    contract?

19         A.     Yes, generally.

20         Q.     Did you report to him with respect to any

21    specific provisions of the contract?

22              MR. LAMBKE:  That's a yes or no question,

23         Miss Quirk.

24              THE WITNESS:  Yes.

25    BY MR. O'REAR:

1          Q.       Okay.  And which ones?

2                   MR. LAMBKE:  I instruct you not to answer

3          that question.  That would require disclosure of

4          attorney/client privilege material.

5    BY MR. O'REAR:

6          Q.       What was the role of Concentric Energy

7    Advisors in this process?

8          A.       We hired Concentric to help to conduct

9    the auction and to elicit interest in the site.

10         Q.       Was Concentric involved in negotiating

11   the terms of the contract with Nuclear Development?

12         A.       I don't know for certain, but I would

13   imagine they were.

14         Q.       Was there a written contract with

15   Concentric that outlined the scope of it's work?

16         A.       I'm certain there was.

17         Q.       When was that contract entered into?

18         A.       I don't recall.

19         Q.       If the contract was signed as of

20   November 14, 2016, do you have any idea how much prior

21   to that, how much time prior to that there would have

22   been an agreement with Concentric, or when did they

23   begin being involved?

24         A.       I would be guessing.

25                  MR. LEMBKE: Objection to the form.

Page 30

1          Compound question.  Vague.

2     BY MR. O'REAR:

3          Q.     Well, I was trying to ask the same

4     question two ways.  Okay.

5                 When did Concentric start working under

6     this contract?

7          A.     I would be guessing if I gave you a time.

8          Q.     Would it have been sometime in 2016?

9          A.     I believe so, but I'm not sure.

10         Q.     And did the process work where Concentric

11    would have communications with representatives of

12    Nuclear Development and they would take any questions

13    or issues to be decided to Mr. Beach for direction?

14         A.     I don't know for certain.

15         Q.     Did Mr. Beach ever bring to you any

16    particular issues involving negotiations with Nuclear

17    Development regarding the terms of the contract?

18                MR. LAMBKE:  That's a yes or no question.

19                THE WITNESS: Yes.

20    BY MR. O'REAR:

21         Q.     And did you make final decisions on those

22    terms?

23         A.     No.

24         Q.     Who would have made the final decisions?

25         A.     The -- from my perspective as General

Page 31

1    Counsel, my team would have recommended and negotiated

2    a deal that was then presented for the CEO's review.

3         Q.     Would those recommendations have come at

4    the conclusion of the negotiation process in the form

5    of recommending the entire contract?

6         A.     I believe so.  I mean, there may have

7    been some terms that bubbled up before.

8         Q.     Well, what terms bubbled up before?

9              MR. LEMBKE:  I instruct you not to answer

10             that question.  It would require you to disclose

11             attorney/client communications.

12             MR. O'REAR:  I'm not asking her about

13             communications.  I'm asking her what issues in the

14             negotiation bubbled up before the contract as a

15             whole was recommended to the CEO.

16             MR. LAMBKE:  Well, but what you're asking

17             her what issues she communicated.  By doing that

18             you're asking her what issues bubbled up that she

19             conveyed to Bill Johnson.

20             MR. O'REAR:  Well, I didn't ask that.

21             That wasn't -- I did ask that earlier.

22    BY MR. O'REAR:

23         Q.     But the question I'm asking you now is,

24    what issues bubbled up?

25             MR. LEMBKE:  You can answer that

```
 1          question.
 2                    THE WITNESS:  One of our concerns -- well
 3          our --
 4                    MR. LEMBKE:  Hold it.  I'm going to
 5          instruct you not to disclose -- your -- discussing
 6          your concerns would require you to disclose your
 7          work product and that I instruct you not to
 8          answer.
 9                    You should limit your answer here to just
10          a statement of issues that bubbled up from Nuclear
11          Development during the negotiations.
12                    Do you understand my instruction?
13                    THE WITNESS:  Yes.  The only issue that I
14          recall is the question of the period of time
15          between auction and closing.
16     BY MR. O'REAR:
17          Q.     Concentric's work occurred before the
18     contract was entered into between TVA and Nuclear
19     Development, correct?
20          A.     Correct.
21          Q.     Did Concentric work with the other
22     prospective bidders regarding terms and conditions of
23     contracts with them?
24          A.     Yes, as far -- I'm aware that they did.
25          Q.     So they would have undertaken the same
```

Page 33

1    exercise with respect to those prospective bidders as

2    they did with Nuclear Development, correct?

3         A.    Correct.

4         Q.    Do you know who those other prospective

5    bidders were?

6         A.    I know of two.  One was NextEra or some

7    NextEra connected company, and the other was an Indian

8    company whose name I just don't recall.

9         Q.    Something like National Environmental

10   Services?

11        A.    That sounds right, but I don't have a

12   specific recollection of it.

13        Q.    And with respect to Mr. Beach's

14   involvement, he would have been involved with

15   Concentric on those prospective bidders just as he was

16   on Nuclear Development?

17        A.    That's my understanding, yes.

18        Q.    And I assume Concentric was paid a fee by

19   TVA for it's services, correct?

20        A.    That's correct.

21        Q.    And was Concentric paid out of the money

22   that Nuclear Development put up upon the execution of

23   the contract in 2016?

24        A.    I don't know.

25             (Exhibit 1 - Previously marked - Contract.)

Page 36

1    negotiations of the contract?

2           A.       I believe her first name was Kari.

3           Q.       Was it Kari O'Neil?

4           A.       That sounds right.

5           Q.       Do you know whether she was a lawyer or

6    not?

7           A.       I don't believe so, but I'm not certain.

8           Q.       Were you aware that during the

9    negotiation process that Mr. Larry Blust, who is seated

10   here next to me, made a request on behalf of Nuclear

11   Development to include a provision in the contract that

12   the transfer of the construction permits would be from

13   TVA to Nuclear Development, would be a condition of the

14   closing of the sales transaction?

15          A.       I generally recall that, yes.

16          Q.       And were you involved in that

17   consideration of that request at all?

18          A.       I was involved in discussions with the

19   team over how to address that.

20          Q.       And how was that decided?

21               MR. LEMBKE: Object to the form.

22   BY MR. O'REAR:

23          Q.       Or what was decided?

24               MR. LEMBKE:  Well, to the extent that is

25          calling for you to disclose the internal work

1           product of TVA, I instruct -- of TVA lawyers, I

2           instruct you not to answer that question.

3                   THE WITNESS:  I can tell you the ultimate

4           provision that emerged from -- with respect to

5           this issue, which is that there would be a

6           two-year period between the auction and closing

7           which was considered to be ample for all necessary

8           approvals.

9   BY MR. O'REAR:

10          Q.      Who made the decision at TVA to deny the

11  request of Nuclear Development that transfer of the

12  construction permits be a condition of closing?

13          A.      I don't understand your question.

14          Q.      Who made the ultimate decision to deny

15  Mr. Blust's requests on behalf of Nuclear Development

16  that transfer of the construction permits be a

17  condition of closing the sales transaction?

18          A.      The team negotiated a number of terms and

19  conditions, including this, made a recommendation that

20  the -- that I and the CEO, I recommend this to the CEO,

21  and as an entirety those terms were adopted or accepted

22  by the CEO.

23          Q.      Were you aware that TVA made certain

24  representations and warranties in the contract in order

25  to induce Nuclear Development to enter into the

1          say.

2     BY MR. O'REAR:

3          Q.     I direct your attention to section seven

4     of the contract before you, which is Exhibit 1.  If you

5     would look to page eight.

6                 Do you have that before you?

7          A.     I do.

8          Q.     And section seven is captioned TVA's

9     representation and warranties, correct?

10          A.     That's correct.

11          Q.     Then A, subsection A says what?  What's

12     the preamble of section A say?

13          A.     "To induce buyer to enter into this

14     agreement, TVA represents and warrants as follows."

15          Q.     So the inducement language is in the

16     contract itself, correct?

17          A.     It is.

18          Q.     All right.  And if you would direct your

19     attention to romanette seven under subsection 7A.  Do

20     you see that?

21          A.     Yes.

22          Q.     Would you read that romanette seven into

23     the record, please.

24          A.     "TVA has full right, power, and authority

25     to execute and deliver this agreement and to consummate

Page 40

```
 1    the purchase and sale transactions provided for

 2    therein, and no authorization, consent or approval or

 3    other order or action of or filing with any

 4    governmental authority is required for the execution

 5    and delivery by the TVA of this agreement or the

 6    consummation by the TVA of the transactions

 7    contemplated therein."

 8         Q.    Now, is the Nuclear Regulatory Commission

 9    a governmental authority as that term is used in this

10    section?

11         A.    I would assume so.  I haven't checked the

12    definition, but I would assume so.

13         Q.    If you would look to section -- just so

14    we can clarify that.  If you would look to section nine

15    of the contract as it continues from page nine to page

16    ten.

17              Does the term -- is the term governmental

18    authority defined to include any federal regulatory or

19    administrative agency?

20         A.    Yes.

21         Q.    And would that include the Nuclear

22    Regulatory Commission?

23         A.    I would assume so, yes.

24         Q.    In fact, other than the Nuclear

25    Regulatory Commission, were there any other
```

Page 41

1    governmental authorities that were contemplated when

2    TVA signed the contract with section 7A, romanette 7 in

3    it?

4                    MR. LEMBKE:  Miss Quirk, to the extent

5           that would require you to disclose attorney work

6           product, I instruct you not to answer the

7           question.

8                    To the extent you can answer it without

9           disclosing attorney work product, you can go

10          ahead.

11                   THE WITNESS:  I am not aware of any

12          others.

13   BY MR. O'REAR:

14       Q.      Now, was your recommendation for TVA to

15   accept or did you make a recommendation for TVA to

16   accept this particular representation that is set forth

17   in the contract --

18                   MR. LEMBKE:  Miss Quirk --

19   BY MR. O'REAR:

20       Q.      Just a minute -- other than your

21   recommendation to the CEO that the contract be accepted

22   in general?

23                   MR. LEMBKE:  Miss Quirk, again I instruct

24          you to the extent that would require you to

25          disclose an attorney/client communication, I

Page 42

```
 1          instruct you not to answer it.
 2                    THE WITNESS:  Could you state the
 3          question again?
 4     BY MR. O'REAR:
 5          Q.     Did you make a recommendation that TVA
 6     accept this provision of the contract?
 7                    MR. LEMBKE: Same instruction.
 8                    THE WITNESS:  As I said, I made a general
 9          recommendation.
10     BY MR. O'REAR:
11          Q.     To the CEO?
12          A.     Yes.
13          Q.     And he was the final decisionmaker?
14          A.     He signed it, yes.
15          Q.     Well, Aaron Nix signed it.
16          A.     Oh, that's duly noted.
17          Q.     Okay.  But the final decisionmaker was
18     the CEO, Bill Johnson?
19          A.     Yes.
20          Q.     And Mr. Nix could not sign the contract
21     without Mr. Johnson's approval, is that correct?
22          A.     Correct.
23          Q.     Are you familiar with TVA's position in
24     this lawsuit now?
25                    MR. LEMBKE:  Miss Quirk, I instruct you
```

1          not to answer that question to the extent it would

2          require you to disclose attorney/client

3          communications or your work product.

4                    THE WITNESS:  I am generally familiar.

5     BY MR. O'REAR:

6          Q.      Okay.  Have you read the answer that was

7     filed by TVA in this case, the answer to the complaint?

8          A.      A while ago, yes.

9          Q.      Did you read TVA's motion to dismiss and

10    it's brief submitted in support of that motion?

11         A.      A while ago, yes.

12         Q.      Are you familiar with the fact that

13    currently TVA is taking the position in the lawsuit

14    that the transfer of the construction permits would

15    have been required before the closing in order to make

16    the closing legal?

17         A.      Yes, I'm aware of that.

18         Q.      And the transfer of the construction

19    permits would have required the approval of the

20    National Regulatory Commission (sic), correct?

21                   MR. LEMBKE:  Object to the form.  Calls

22         for a legal conclusion, and again I instruct you

23         to the extent that it would require you --

24                   MR. O'REAR:  Well --

25                   MR. LEMBKE:  -- to the extent that would

1          require you to disclose attorney/client

2          communications or your work product, you shouldn't

3          answer it.

4     BY MR. O'REAR:

5          Q.     Are you aware of TVA's position in this

6     case that the Nuclear Regulatory Commission must

7     approve the transfer of the construction permits from

8     TVA to Nuclear Development?

9          A.     I'm aware, yes.

10         Q.     Are you aware of TVA's position in this

11    lawsuit that that approval should have occurred before

12    the closing in order for the closing of the transaction

13    to be legal under the Atomic Energy Act?

14         A.     Yes, I'm aware of that.

15         Q.     Now, based on TVA's current position in

16    the lawsuit, is the representation and warranty made in

17    section 7-A-7 false, if you assume TVA's position is

18    correct in the lawsuit?

19              MR. LEMBKE:  Object to the form.  To the

20         extent that answer would require you to disclose

21         attorney/client communications or work product,

22         you shouldn't answer it, otherwise you can go

23         ahead.

24              THE WITNESS:  I'm sorry.  I'm going to

25         have to ask you to repeat.

```
 1   BY MR. O'REAR:
 2        Q.      Okay.  All right. I want you to take into
 3   consideration the answers you've already given --
 4        A.      Yes.
 5        Q.      -- of your understanding of TVA's
 6   position in the lawsuit.  Based on TVA's position in
 7   this lawsuit, is the representation made by TVA in
 8   section 7 A romanette 7 false?
 9                MR. LEMBKE:  Same instruction.
10                THE WITNESS:  Reading it here today?  It
11        looks to me to be inaccurate.
12   BY MR. O'REAR:
13        Q.      False?
14        A.      Inaccurate, I would say.
15        Q.      Incorrect?
16                MR. LEMBKE:  Asked and answered.
17   BY MR. O'REAR:
18        Q.      Do you contest the fact that the contract
19   provides that that representation was made by TVA to
20   induce Nuclear Development to enter into the contract?
21                MR. LEMBKE:  Objection, asked and
22        answered.  You can answer it again.
23                THE WITNESS:  It's in the contract and
24        the language says what it says.
25   BY MR. O'REAR:
```

Page 47

1    with the other group that I can recall.

2        Q.      Are you familiar with a man by name of

3    Aaron Abadi with National Environmental Group?

4        A.      I have seen his name.  That's about all

5    that I know about him.

6        Q.      You had no communication with him?

7        A.      No.

8        Q.      As far as you know?

9        A.      No.

10       Q.      Did either of those two groups express in

11   their intent to bid that they intended to construct and

12   operate a nuclear facility at Bellefonte?

13       A.      Not as far as I'm aware.

14       Q.      Do you know what they stated in their

15   letters of intent to bid about the purpose they were

16   going to use the property for?

17       A.      I don't know what they stated in their

18   notice of intent to bid.  I do know what NextEra

19   described in a meeting that they had with us.

20       Q.      And what did they describe?

21       A.      A combination of solar and battery cells.

22       Q.      But not nuclear?

23       A.      Not as -- no, no.

24       Q.      If you assume that either of those two

25   companies would have been the winning bidder at the

Page 48

1    auction, would TVA have required that the construction

2    permits that it held at Bellefonte be transferred to

3    those entities before the closing?

4                    MR. LEMBKE:  First, I object to the form

5           in that it calls for speculation.  Second of all,

6           I instruct you not to answer the question to the

7           extent it would require you to disclose attorney

8           work product.

9                    You can answer if you can subject to that

10          instruction.

11                   THE WITNESS:  Can you repeat, please?

12   BY MR. O'REAR:

13        Q.    Okay.  You've got to shorten these

14   objections.

15                   If you assume either of those two groups

16   would have been the winning bidder at the auction,

17   would TVA have required the transfer of the

18   construction permits from TVA to either of those groups

19   as the winning bidder approved by the NRC prior to the

20   closing?

21                   MR. LEMBKE: Same objection, same

22          instruction.

23                   THE WITNESS:  I'm not sure what we would

24          have done in a contract with them.  It would be a

25          different set of circumstances.

Page 97

1    might have been present.

2          Q.      Do you know of anyone else present other

3    than Mr. Johnson at any meetings with Memphis in 2018?

4          A.      I think from time to time that Justin

5    Maierhofer might have been present.  There might have

6    been some times when John Thomas was present.  I don't

7    recall specifically.

8          Q.      Are you aware of any meetings with

9    Memphis where Mr. Johnson met with Memphis officials in

10   executive session?

11         A.      I don't.  I'm not aware.  I don't recall.

12         Q.      Did there come a point in time where TVA

13   decided that it wanted to extend the closing date from

14   November 14, 2018 to November 30, 2018?

15         A.      Yes.

16         Q.      And tell me about that.

17         A.      Well, I'll tell you what Bill Johnson

18   articulated I think to Franklin Haney, which is that he

19   felt as if he had sat on, I think those were his words,

20   he had sort of deliberated over the extension request

21   for too long and felt as if he owed it to Nuclear

22   Development to give them a little bit more time as he

23   -- as he reviewed our situation.

24         Q.      Was TVA -- decide to ask for that

25   extension?

1        A.        I believe that TVA offered it.

2        Q.        It was TVA's idea to extend the closing

3     from November 14 to November 30?

4        A.        That's my recollection, yes.

5        Q.        Wasn't the real reason for the request to

6     give TVA time to look at this issue illegality and

7     whether the construction permits needed to be

8     transferred before the closing?

9        A.        Real reason?

10       Q.        Yes, the real reason, not the reason you

11    heard that Mr. Johnson stated to Mr. Haney.

12              MR. LEMBKE:  Well, Miss Quirk, to the

13           extent this would require you to reveal

14           attorney/client communications I'd instruct you

15           not to answer it.

16              But to the extent you can answer it

17           without doing that, go ahead.

18              THE WITNESS:  I would say in our

19           conversations with Mr. Blust during this time we

20           were, as I recall, having conversations about the

21           legality or lack of legality of going forward, and

22           we were at that point not certain either way.

23              We were actually searching for a way to

24           go forward with the closing, and but we had not

25           yet completed our work there.  However, it is a

1          fact that Mr. Johnson wanted more time to consider

2          this issue.

3     BY MR. O'REAR:

4          Q.     Who is the person at TVA who first

5     questioned whether transferring Bellefonte prior to the

6     transfer of the construction permits would be illegal?

7          A.     I believe that would be Chris Chandler.

8          Q.     And when did that happen?

9          A.     I'm not sure.

10         Q.     How was the question raised within TVA?

11                MR. LEMBKE:  Miss Quirk, to the extent

12         this would require you to reveal attorney/client

13         communications or work product, I instruct you not

14         to answer it.

15                If you can answer without doing that, go

16         ahead.

17                THE WITNESS:  Without revealing

18         confidential information, we started looking hard

19         at it as we were looking at the question of going

20         to closing on the closing date, the original one

21         and as extended.

22    BY MR. O'REAR:

23         Q.     Well, I asked you when.  So would you

24    start looking hard at it before the 16-day extension

25    was entered into or after that?

Page 100

1            MR. LEMBKE:  Same instruction.

2            THE WITNESS:  I don't know that I can

3       answer that without revealing confidential

4       information.

5  BY MR. O'REAR:

6       Q.    When was Nuclear Development first

7  advised by TVA that TVA was looking at that issue?

8       A.    I don't recall the exact date, but we

9  raised it as soon as we felt it was a germane and

10 pressing issue.

11      Q.    And when was that?

12      A.    I don't recall the exact date.

13            MR. O'REAR: That's for the witness.

14            MR. LEMBKE: Oh.

15      (Exhibit 17 - Bates No. TVABLN000002643, Email

16      from Clifford Beach dated November 9, 2018.)

17 BY MR. O'REAR:

18      Q.    I direct your attention to Exhibit 17.

19 Are you familiar with that --

20      A.    Yes.

21      Q.    -- e-mail from Mr. Beach to Mr. Blust?

22      A.    Yes, I am.

23      Q.    And that's dated November 9, 2018,

24 correct?

25      A.    That's correct.

Page 101

1          Q.      And you were copied on that along with
2     Chris Chandler?
3          A.      Correct.
4          Q.      And it attaches Mr. Beach's bullet points
5     which are captioned NRC License Transfer Requirements,
6     right?
7          A.      Yes.
8          Q.      Now, was this the first time TVA had sent
9     anything in writing to Nuclear Development about an
10    issue regarding the transfer of the construction
11    permits?
12         A.      I believe that's correct.  Chris Chandler
13    would or Cliff Beach would have a better -- better
14    sense of that.
15         Q.      Who engaged the Pillsbury firm to look at
16    this question?
17         A.      Well, it is my authority and decision to
18    engage any -- any law firm for TVA.  So it would
19    ultimately have been my decision, but I believe that
20    Chris Chandler spoke with them about the engagement.
21         Q.      And the engagement letter's addressed to
22    him, correct?
23         A.      To?
24         Q.      Chris Chandler.  Not engagement.  The
25    opinion letter is addressed to him, correct?

Page 103

1          A.      On this topic --

2          Q.      Yes.

3          A.      -- or generally?

4          Q.      No, no, on this topic.

5          A.      I don't know the answer to that question.

6          Q.      And were you the one that made the

7     decision to engage them on this question?

8          A.      Yes.

9          Q.      Did the board of directors approve the

10    engagement of the Pillsbury firm to look at this

11    question?

12         A.      No.

13         Q.      Was the board of directors notified of

14    the engagement?

15         A.      No.

16         Q.      Do you recall if there was a Board of

17    Directors meeting on November 14, 2018?

18         A.      I don't recall specifically, but I know

19    that we have a November board meeting each year.

20         (Exhibit 26 - Bates No. TVABLN00000038, e-mail

21         from Larry Blust dated November 30, 2018.)

22    BY MR. O'REAR:

23         Q.      I've handed you what's been marked as

24    Exhibit 26.  Can you identify that as an e-mail from

25    Mr. Blust to you and Mr. Beach and Mr. Chandler to Mr.

1    Matthews, Mr. Haney, Sr., Frank Haney, Bill McCollum

2    dated November 13/20/18?  That's the top e-mail.

3         A.      Yes.

4         Q.      And did you receive that?

5         A.      Yes.

6         Q.      And the next e-mail beneath that is an

7    e-mail from you of the same date to that same group,

8    correct?

9         A.      That's correct.

10         Q.      And your e-mail says, "Larry, we are with

11    the board today and tomorrow and will back in touch on

12    Thursday. Sherry."  Correct?

13         A.      Correct.

14         Q.      So you were with the board on

15    November 13, 2018, and the next day November 2014 --

16    November 14, 2018, correct?

17         A.      Yes, that's what it looks like.

18         Q.      Was there ever a discussion with the

19    board at a board member -- at a board meeting at this

20    time regarding the transfer of the construction permit

21    issue for Bellefonte?

22              MR. LEMBKE:  Object to the form, vague.

23         And, Miss Quirk, to the extent any discussion with

24         the board would have been in a nonpublic session

25         and would have involved attorney/client

Page 109

1   be a matter of public record.

2          (Exhibit 27 - Previously marked - Minutes of

3          Meeting of The Board of Directors Tennessee

4          Valley Authority, November 14, 2018.)

5   BY MR. O'REAR:

6          Q.     All right.  Let me show you what's been

7   marked as Exhibit 27, and ask you if you can identify

8   that as minutes of the meeting of the Board of

9   Directors of the TVA on November 14, 2018?

10         A.     This appears to be the minutes of the

11  meeting.

12         Q.     And you approved that by your signature

13  on the first page, correct?

14         A.     That's correct.

15         Q.     Approved the minutes, right?

16         A.     Yes.

17         Q.     Would you look through there and see if

18  there's any reference at all in these minutes to any

19  discussion of Bellefonte transfer of the construction

20  permits, the request for the extension --

21                MR. LEMBKE:  You gave me two.

22  BY MR. O'REAR:

23         Q.     -- or the question of whether you should

24  close on November 30, 2018?

25                MR. LEMBKE: For the record, this is 18

Page 110

1          pages.  So since he's asked you to read every word

2          on 18 pages take your time, Miss Quirk.

3                    MR. O'REAR:  I haven't asked her to read

4          every word, but she can if she wants to.

5                    MR. LEMBKE:  Well, you certainly have

6          asked her if in 18 pages of print whether there's

7          any reference to it anywhere in here so --

8                    MR. O'REAR:  Well, she can state from her

9          recollection, that's fine.  But you're welcome to

10          review it.

11                    THE WITNESS:  I quickly reviewed this and

12          what was the question again?

13  BY MR. O'REAR:

14          Q.     Is there any reference in those minutes

15  to Bellefonte, the transfer of the construction permits

16  at Bellefonte, the Nuclear Development request for

17  extension to May of 2019 to close the sale of

18  Bellefonte or the consideration of not closing the sale

19  to Bellefonte on November 30, excuse me, the sale of

20  Bellefonte on November 30, 2018?

21          A.     I've read it quickly.  I do see reference

22  to Bellefonte.

23          Q.     What does it say?

24          A.     It's a reference to accelerating the

25  amortization of the Bellefonte regulatory asset.

Page 111

1   That's the only reference I;ve seen, but I've raced

2   through this at top speed.

3          Q.      And that's a tax issue for TVA unrelated

4   to the --

5          A.      It's an accounting issue.

6          Q.      Accounting issue?

7          A.      Yeah, we're not taxable.

8          Q.      Okay.  Unrelated to the Nuclear

9   Development transaction?

10         A.      Yes, but based on a very, very quick

11  read.

12         Q.      All right.  So there was pending a

13  closing of the sale of Bellefonte for $111 million as

14  to which over $90 million was going to be paid on

15  November 30, 2018, correct?

16         A.      I'm sorry.  Can you say that again?

17         Q.      It was pending at this time a closing

18  schedule on November 30, 2018, whereby Nuclear

19  Development would pay TVA over $90 million as the

20  remaining balance due on the sale of Bellefonte,

21  correct?

22         A.      I believe that's correct, yes.

23         Q.      Okay.  And the decision to not close that

24  transaction was never taken to the board of directors

25  at an official board meeting, was it?

Page 112

1          A.     No, it didn't need to be.

2          Q.     But it was not, was it?

3          A.     It was not --

4                 MR. LEMBKE:  Asked and answered.

5     BY MR. O'REAR:

6          Q.     And Mr. Johnson made that decision

7     himself, correct?

8          A.     I can't answer that.

9          Q.     You don't know?

10         A.     Well, chances are he and I would have

11    discussed it.

12         Q.     He made the ultimate decision?

13         A.     But ultimately, yes.

14         Q.     So by making that decision, he decided

15    that TVA would not be receiving over a 100 million

16    dollars -- 90 millions dollars due on November 30,

17    and he did not take that to an official board meeting

18    for approval, did he?

19         A.     He didn't.  He didn't have to.

20         Q.     When did you receive the Pillsbury

21    opinion letter?

22         A.     I think I received it on the date that

23    shows on the letter itself.  I believe that was the

24    28th, if I'm not mistaken.  November 28th.

25                (Exhibit 22 - Bates No. TVABLN000008648, letter

Page 114

```
 1                THE VIDEOGRAPHER: The time is 11:23 and
 2         we're going off the record.
 3                (Recess taken.)
 4                THE VIDEOGRAPHER:  At 12:47 we're back on
 5         the record.
 6                MR. LEMBKE:  Let me, before you start, as
 7         I indicated to Mr. O'Rear off the record over the
 8         lunch break we were able to check the privilege
 9         log entry that had been identified by him on the
10         record, and we discovered there was an error on
11         the log and it is a straight attorney/client
12         privilege objection.
13                It should not have said prepared in
14         anticipation of litigation.  So we will provide an
15         amended log making that correction.
16                MR. O'REAR:  You're referring to the
17         February 2017 entry?
18                MR. LEMBKE: Correct.
19    BY MR. O'REAR:
20         Q.     Okay.  You ready?
21         A.     Yes.
22         Q.     What gave Bill Johnson as CEO the
23    authority to make the decision not to close a
24    111 million dollar transaction with Nuclear Development
25    without the board approval?
```

1    A.    You're asking for my legal opinion?

2    Q.    Just, yeah, what's your basis for

3    testifying earlier that he didn't have to have board

4    approval?  What is the basis for that?

5              MR. LEMBKE:  I'm going to object to the

6         extent it calls for a legal conclusion.  You can

7         answer, if you can.

8              THE WITNESS:  I will simply say it's in

9         the resolution in which the board authorized the

10        auction of this site.

11   BY MR. O'REAR:

12   Q.    And are you referring to the resolution

13   which has been marked as Exhibit 4?

14   A.    Yes.

15        (Exhibit 4 Bates No. TVABLN00002633 through 2634,

16        Proposed Board Resolution.)

17   BY MR. O'REAR:

18   Q.    Okay. Can you get Exhibit 4 before you.

19   Can you direct me where in this resolution it provides

20   Mr. Johnson with the authority to make the decision not

21   to close the 111 million dollar transaction without

22   board approval?

23   A.    In the first resolved clause.

24   Q.    Okay.  Would you read what you're

25   referring to?

1              I'm asking you what language are you

2      referring to which you believe authorizes Mr. Johnson

3      to make that decision without board approval?

4              MR. LEMBKE: Same instruction.

5      BY MR. O'REAR:

6          Q.      You said the resolution which is

7      Exhibit 4, and I'm asking you what language in the

8      resolution?

9          A.      And I have pointed --

10             MR. LEMBKE: Same instruction, same

11         objection.

12             THE WITNESS:  I told you this resolve

13         clause and I'm -- that is as far as I'm

14         comfortable going.

15     BY MR. O'REAR:

16         Q.      Is there any language in this resolution

17     which authorizes the CEO not to close the transaction

18     under specific conditions?

19             MR. LEMBKE:  Objection, vague.

20     BY MR. O'REAR:

21         Q.      Well, if you'll look with me to the next

22     paragraph, resolve further paragraph.

23             Does that paragraph authorize the CEO to

24     terminate the transfer process under certain

25     conditions?

1          A.      It authorizes him to terminate if

2    environmental reviews cannot satisfactorily be

3    completed.

4          Q.      Okay.  And you have testified earlier

5    those environmental reviews were satisfactorily

6    completed, correct?

7          A.      That's correct.

8          Q.      There's nothing in this resolution that

9    says that the CEO has authority to terminate the

10   property transfer process if there's a question about

11   whether the construction permits must be transferred

12   before the closing, is there?

13                 MR. LEMBKE: Objection, lack of

14          foundation.  Misstates the document.

15   BY MR. O'REAR?

16         Q.      Is there?  Is there anything in this

17   resolution that specifically refers to the construction

18   permits and the timing of that transfer as it relates

19   to the closing?

20         A.      That with many other details are not

21   specifically set forth.

22         Q.      Is it your position that Mr. Johnson

23   could make that decision not to close the transaction

24   only if it is delegated, the power to do so, is

25   delegated to him by the Board of Directors of TVA?

```
 1              MR. LEMBKE:  Miss Quirk, I instruct you
 2         not to answer the question to the extent it would
 3         require you to disclose attorney/client
 4         communications or your -- or your staff's or your
 5         outside counsel's work product.
 6              If you can answer it without doing so, go
 7         ahead.
 8              THE WITNESS:  I don't think I can answer
 9         it.
10    BY MR. O'REAR:
11         Q.    Had TVA ever encountered that issue
12    before?
13         A.    I'm not certain.
14         Q.    Do you know?
15         A.    Not that I'm aware.
16         (Exhibit 28 - Bates No TVABLN00000040, e-mail
17         from Sherry Quirk to Larry Blust and others dated
18         November 16, 2018.)
19    BY MR. O'REAR:
20         Q.    I've handed you Exhibit 28.  Can you
21    identify that as an e-mail that you sent to Larry Blust
22    on November 16, 2018?
23         A.    Yes.
24         Q.    And the second e-mail in that exhibit is
25    an e-mail from Mr. Blust to Clifford Beach with a copy
```

1    to you relating to the section of the Atomic Energy Act

2    that's referenced in the third e-mail of that e-mail

3    string, correct?

4          A.      Yes.

5          Q.      And your response was that you planned on

6    speaking with Bill on Monday, correct?

7          A.      Yes.

8          Q.      That would have been November the 19th,

9    2018?

10         A.      Right.

11         Q.      And Bill is Bill Johnson, correct?

12         A.      That's correct.

13         (Exhibit 29 - Bates No. TVABLN00000042, e-mail

14         from Larry Blust to Sherry Quirk dated November

15         23, 2018.)

16    BY MR. O'REAR:

17         Q.      Can you identify Exhibit 29 as an e-mail

18    sent from Larry Blust to you on November 28, 2018, at

19    4:13 p.m.?

20         A.      Yes.

21         Q.      And you would have received and

22    considered that e-mail, correct?

23         A.      Yes.

24         (Exhibit 30 - Bates No. TVABLN00000660 through

25         661, e-mail from Larry Blust to Clifford Beach,

Page 130

1       dated November 28, 2018.)

2    BY MR. O'REAR:

3       Q.     If you would look at Exhibit 30.  Can you

4    identify that as another e-mail sent to you by Larry

5    Blust on November 28, 2018, at 7:03 p.m., which was

6    directed to Clifford Beach but copied to you as well?

7       A.     Yes.

8       Q.     And as late as 7 p.m., two days prior to

9    the closing Mr. Blust is still trying to get an answer

10   from TVA about whether the transaction will close on

11   that Friday, correct?

12      A.     Correct.

13      (Exhibit 31 - Bates No. ND_004950, e-mail from

14      Sherry Quirk to Larry Blust dated November 29,

15      2018.)

16   BY MR. O'REAR:

17      Q.     If you will look at Exhibit 31.  Is that

18   an e-mail dated November 29, 2018, at 9:09 p.m. from

19   you to Larry Blust attaching the November 29, 2018,

20   letter that we just referred to by you to him?

21      A.     Yes.

22      Q.     So it was not until the day before the

23   closing at 9:09 p.m. that TVA advised Nuclear

24   Development that it would not close the next day, is

25   that correct?

1          A.      That's correct.

2          (Exhibit 25 - Bates No. TVABLN00006461 through

3          6464, e-mail and attachments from Sherry Quirk to

4          others dated November 30, 2018.)

5     BY MR. O'REAR:

6          Q.      If you would look at Exhibit 25

7     previously marked at Mr. Johnson's deposition.  Can you

8     identify that as an e-mail from Larry Blust to you on

9     Friday, November the 30th at 4:02 p.m., that you in

10    turn forwarded to others at TVA?

11         A.      Yes.

12         Q.      And did that e-mail attach Mr. Blust's

13    letter of November 30, 2018, that we see attached to

14    this exhibit?

15         A.      Yes.

16         Q.      Mr. Johnson's decision not to close the

17    transaction had already occurred before this letter

18    from Mr. Blust was received, is that correct?

19         A.      I'm not --

20         Q.      Well, your letter was sent 9:09 p.m. the

21    day before?

22         A.      Yes.

23         Q.      And it said we're not going to close the

24    transaction?

25         A.      Right.

1          Q.      And that was based on Mr. Johnson's

2     decision not to close the transaction, correct?

3          A.      That is correct.

4          Q.      So his decision was made before he

5     reviewed the position stated in Mr. Blust's letter

6     received the next day, correct?

7          A.      That's correct.

8          Q.      Before you sent your letter on November

9     the 29, 2018, stating that TVA would not close the

10    transaction, did TVA ever ask of the Nuclear Regulatory

11    Commission what it's position was on this issue?

12         A.      I believe there were conversations

13    between Chris Chandler and NRC staff, but I don't know

14    the specifics of them.

15         Q.      Do you know what the NRC staff said in

16    those conversations?

17         A.      I don't know with particularity.

18         Q.      Do you know generally?

19         A.      I know that it did not give us comfort

20    that we could go forward and close.

21         Q.      And what's that based on?

22         A.      Based on the content of the conversations

23    as communicated to me at the time.  There was no -- no

24    firm information coming from the NRC indicating that we

25    could close the transaction without violating the law.