FILED
2021 May-19 PM 07:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Undisputed Facts

*Nuclear Development, LLC v. Tennessee Valley Authority*

## UNDISPUTED FACTS

|     | **UNDISPUTED FACTS** | **ADMITTED** |
| --- | --- | --- |
| 1.  | Though construction permits (the "CPs") were issued by the Atomic Energy Commission in 1974, Bellefonte remains an unfinished nuclear power plant that has not been under construction since 1988 when it was placed in deferred plant status by the Nuclear Regulatory Commission ("NRC"). | ND's MSJ, pp. 1-2, ¶1 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 2.  | Bellefonte Unit 1 is 50-55% complete and Unit 2 is 35% complete. | ND's MSJ, p. 2, ¶1 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 3.  | During the time period of 2005 through 2007, TVA disabled, removed, and sold major component parts, including cutting large holes in the steam generators, removing the control rod drive mechanisms, and removing piping and tubing. | ND's MSJ, p. 2, ¶2 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 4.  | Bellefonte Units 1 and 2, in their present condition, cannot be used to sustain nuclear fission in a self-supporting chain reaction. | ND's MSJ, p. 2, ¶3 [Doc. 71]; TVA's Responses to ND's 3rd Set of RFA, ¶¶3-4 |
| 5.  | Bellefonte Units 1 and 2 cannot function as nuclear reactors, and they are incapable of utilizing special nuclear material in their current condition. | ND's MSJ, p. 2, ¶3 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 6.  | TVA's March 22, 2010 "Bellefonte Nuclear Plant Unit 1 and Common Completion Project" report (the "BLN DSEP Report") genuinely constitutes the Detailed Scoping, Estimating and Planning Study report issued by TVA's Nuclear Generation, Development and Construction Group as of such date. (Ex. 127) | TVA's Responses to ND's 3rd Set of RFA, ¶5 |
| 7.  | The plant components listed in Table 2-1 at page 14 of the BLN DSEP Report were removed and have not been replaced to the present date. (Ex. 127) | TVA's Responses to ND's 3rd Set of RFA, ¶6 |
| 8.  | TVA has not upgraded Bellefonte's design requirements under current NRC regulations and cannot meet the original design requirements to sustain nuclear fission. | ND's MSJ, p. 2, ¶4 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 9.  | In 2006, TVA represented to the NRC that neither Unit 1 nor 2 was a "utilization facility" as defined under 10 C.F.R. § 50.2. (Ex. 207) | ND's MSJ, p. 2, ¶5 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 10. | In 2006, the NRC determined Units 1 and 2 were not utilization facilities. (Ex. 208) | ND's MSJ, pp. 2-3, ¶5 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |

**Plaintiff's Demonstrative**
**Exhibit A**

| | **UNDISPUTED FACTS** | **ADMITTED** |
|---|---|---|
| 11. | From September 2006 through March 2009, TVA owned the Bellefonte site without holding a construction permit or other license from the NRC. | ND's MSJ, p. 3, ¶6 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 12. | In April 2016, TVA's CEO, William Johnson, issued a report recommending that TVA's Board of Directors declare Bellefonte surplus property and authorize its sale without any condition on its potential use. (Ex. 2) | ND's MSJ, p. 3, ¶7 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 13. | Johnson's report recognized that "[s]elling the site to an entity that completes the nuclear units would put a merchant nuclear plant in TVA's service territory that could compete to serve TVA's customers." (Ex. 2) | ND's MSJ, p. 3, ¶7 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 14. | Johnson was not concerned about competition from ND when the Contract was initially signed. | ND's MSJ, p. 3, ¶7 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 15. | TVA had the plant site appraised for a fair market value at $36.4 million and TVA's internal appraisal placed the fair market value at $11.3 million. (Ex. 2) | ND's MSJ, p. 3, ¶8 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 16. | In May 2016, TVA's Directors adopted a resolution finding that Bellefonte was "surplus to TVA's needs" and authorizing its sale at public auction. (Ex. 4) | ND's MSJ, p. 3, ¶9 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 17. | The resolution authorized Johnson to terminate the agreement to sell Bellefonte if environmental impact issues were not satisfactorily addressed. There were no environmental impact issues related to the sale of the property. (Ex. 4) | ND's MSJ, p. 4, ¶9 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 18. | TVA's purpose for selling Bellefonte was to bring economic development and jobs to the surrounding area through long-term investments by the purchaser. | ND's MSJ, p. 4, ¶10 [Doc. 71]; TVA's Opposition to MSJ, p. 2 [Doc. 86] |
| 19. | All prospective bidders received the same purchase agreement from TVA to bid on, regardless of what use the prospective bidder intended for the property. | ND's MSJ, p. 4, ¶11 [Doc. 71]; TVA's Opposition to MSJ, p. 3 [Doc. 86] |
| 20. | The two other parties besides ND submitting letters of intent to bid did not intend to construct or operate a nuclear facility at Bellefonte. | ND's MSJ, p. 4, ¶11 [Doc. 71]; TVA's Opposition to MSJ, p. 3 [Doc. 86] |
| 21. | ND submitted the winning bid, and on November 14, 2016, TVA and ND entered into a purchase and sales agreement (the "Contract"), whereby TVA agreed to sell and ND agreed to purchase Bellefonte for $111 million. (Ex. 1) | ND's MSJ, p. 4, ¶12 [Doc. 71]; TVA's Opposition to MSJ, p. 3 [Doc. 86] |
| 22. | ND specifically requested that NRC pre-approval of the transfer of the CPs be a condition of closing. (Exs. 43, 89, 119) | ND's MSJ, pp. 4-5, ¶12 [Doc. 71]; TVA's Opposition to MSJ, p. 3 [Doc. 86] |
| 23. | Upon signing the contract, ND paid TVA $22.2 million as a 20% down payment and an additional sales and administrative cost. | ND's MSJ, p. 5, ¶13 [Doc. 71]; TVA's Opposition to MSJ, p. 3 [Doc. 86] |

2

| | **UNDISPUTED FACTS** | **ADMITTED** |
|---|---|---|
| 24. | TVA's general counsel admits that the warranty in Section 7(a)(vii) is inaccurate under TVA's theory of defense. | ND's MSJ, p. 5, ¶14 [Doc. 71]; TVA Opposition to MSJ, p. 3 [Doc. 86]; Quirk Depo. at p. 45. |
| 25. | The Contract provides: "To induce [ND] to enter into [the] Agreement, TVA represent[ed] and warrant[ed] to [ND] as follows: . . . TVA has the authority to execute this Agreement and to transfer the Site to Buyer." (Ex. 1) | The Contract, verbatim, 7(a)(ii). |
| 26. | The Contract provides: "To induce [ND] to enter into [the] Agreement, TVA represent[ed] and warrant[ed] to [ND] as follows: . . . TVA has full right, power and authority to execute and deliver this Agreement and consummate the purchase and sale transactions provided for herein, and no authorization, consent or approval or other order or action of or filing with Governmental Authority is required for the execution and delivery by the TVA of this Agreement or the consummation by the TVA of the transactions contemplated hereby." (Ex. 1) | The Contract, verbatim, 7(a)(vii). |
| 27. | The Contract provides: "To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e) (the "Permits"); provided, however, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this Section 1(e) shall not require TVA to certify that Buyer is qualified and fit to complete construction of and operate those reactors and, if Buyer informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this Section 1(e) by Closing, TVA's obligations under this Section 1(e) shall cease." (Ex. 1) | The Contract, verbatim, 1(e). |

| | **UNDISPUTED FACTS** | **ADMITTED** |
|---|---|---|
| 28. | The Contract provides: "Each Party shall provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site consistent with Section 1(e)." (Ex. 1) | The Contract, verbatim, 9(a)(ii). |
| 29. | The original Contract set closing for November 14, 2018, but the Contract was later amended to extend the closing by 16 days to November 30, 2018. (Ex. 18) | ND's MSJ, p. 6, ¶18 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶18 [Doc. 86] |
| 30. | On August 14, 2018, the NRC had a public meeting regarding Bellefonte which was attended by 16 NRC representatives and 5 TVA representatives. (Ex. 11) | ND's MSJ, p. 6, ¶20 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶20 [Doc. 86] |
| 31. | At the August 2018 NRC meeting, ND reported that it planned to close on Bellefonte in November 2018 and planned to complete detailed schedules in December 2018. Neither TVA nor the NRC objected to ND's proposed schedule or expressed any concern that the transfer application had not been submitted. (Ex. 11) | ND's MSJ, pp. 6-7, ¶20 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶20 [Doc. 86]; Ex. 11. |
| 32. | Johnson received an email describing the meeting and stating that the closing was expected in November 2018 and that "a more detailed licensing schedule would be available in early 2019." (Ex. 10) | ND's MSJ, p. 7, ¶21 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶21 [Doc. 86] |
| 33. | Johnson testified in August 2018 that he intended to close the transaction as scheduled in November 2018 if all the conditions were met. | ND's MSJ, p. 7, ¶22 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶22 [Doc. 86] |
| 34. | On August 21, 2018, TVA sent a letter to ND acknowledging that this closing was scheduled to occur in November and that TVA would draft the transaction documents and begin relocating its employees in anticipation of the sale. (Ex. 12) | ND's MSJ, p. 7, ¶22 [Doc. 71]; TVA's Opposition to MSJ, p. 4, ¶22 [Doc. 86] |
| 35. | On October 9, 2018, ND's CEO, William McCollum, made a presentation to the Memphis City Council in which he discussed a study that had been formed to look into the potential savings for Memphis by moving to another power source other than TVA. | ND's MSJ, p. 7, ¶23 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶23 [Doc. 86] |

|     | **UNDISPUTED FACTS** | **ADMITTED** |
|-----|----------------------|--------------|
| 36. | Bill Johnson became upset with McCollum and criticized McCollum's statement that Memphis should leave TVA and go to MISO because any deal is better than the deal they are getting from TVA. As of the day of his deposition, Johnson was still upset with McCollum. | ND's MSJ, p. 7, ¶23 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶23 [Doc. 86]; Johnson Depo. at pp. 47, 101. |
| 37. | On October 18, 2018, Tim Matthews, ND's licensing counsel, sent an email to Chris Chandler, TVA's Associate General Counsel, with a draft copy of a letter to the NRC consenting to the transfers of the CPs to ND. (Ex. 14) | ND's MSJ, p. 7, ¶24 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶24 [Doc. 86] |
| 38. | TVA never consented to the transfer of the CPs to ND. | ND's MSJ, p. 8, ¶24 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶24 [Doc. 86] |
| 39. | Joseph Shea, TVA's former Vice President of Licensing, testified that he was not aware of anything that would have caused TVA not to consent to the sale of the property. He also testified that he did not know if TVA needed the NRC's approval to sell Bellefonte. In all of his discussions with ND, Shea never told ND that it would be illegal to close the transaction before the NRC approved the transfer of the CPs. | ND's MSJ, p. 8, ¶24 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶24 [Doc. 86]; Shea Depo. at pp. 17, 88, 94 |
| 40. | After McCollum's presentation to Memphis, Johnson requested a meeting with Franklin Haney, ND's owner, and Larry Blust, ND's general counsel. Johnson asked TVA's General Counsel to set up the meeting and Johnson "articulated concern about Nuclear Development's presentation to the city council of information that he considered to be detrimental to TVA." At the meeting on October 23, 2018, involving Johnson, Quirk, Haney, and Blust, Johnson expressed displeasure at how issues had been presented by ND in Memphis. | ND's MSJ, p. 8, ¶25 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶25 [Doc. 86]; Quirk depo. at pp. 79-80 |
| 41. | Johnson himself then met with Memphis on November 6, 2018, "to make the pitch for staying with TVA." When asked if he was concerned when he left those meetings that Memphis was seriously considering leaving TVA, Johnson said, "I'm always concerned when any customer thinks about leaving," and he went on to say he thought TVA's value proposition was superior to any option. | ND's MSJ, p. 8, ¶26 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶26 [Doc. 86] |

|     | **UNDISPUTED FACTS** | **ADMITTED** |
|-----|----------------------|--------------|
| 42. | On November 8-9, 2018, Cliff Beach, TVA's senior counsel, expressed for the first time to Blust a concern that transferring ownership of Bellefonte prior to NRC approval of the transfers of the CPs would violate the CPs. (Ex. 17) | ND's MSJ, p. 9, ¶27 [Doc. 71]; TVA's Opposition to MSJ, p. 5, ¶27 [Doc. 86] |
| 43. | On November 12, 2018, Blust sent Beach a memo authored by Matthews providing that the CPs could be lawfully transferred after closing. (Ex. 19) | ND's MSJ, p. 9, ¶28 [Doc. 71]; TVA's Opposition to MSJ, p. 6, ¶28 [Doc. 86] (TVA tries to dispute this by saying the memorandum does not "unequivocally" state this; however, the memo speaks for itself.) |
| 44. | On November 13, 2018, Chris Chandler advised Matthews that TVA was willing to consider sending a letter to the NRC consenting to the sale of Bellefonte. | ND's MSJ, p. 9, ¶29 [Doc. 71]; TVA's Opposition to MSJ, p. 6, ¶29 [Doc. 86]; Chandler Depo. at p. 47 |
| 45. | On November 13, 2018, ND submitted its application to the NRC for approval of the transfer of the CPs to ND. (Ex. 82) | ND's MSJ, p. 9, ¶30 [Doc. 71]; TVA's Opposition to MSJ, p. 6, ¶30 [Doc. 86] |
| 46. | On November 26, 2018 (four days before the closing), Johnson addressed an employee forum of TVA personnel at TVA's offices in Knoxville. The first question asked of Johnson was: "Why continue to sell Bellefonte if the potential buyer wants to take away our largest LPC [power customer] to make it work?" Johnson's response began as follows: "Rule 1, it seemed like a good idea at the time; Rule 2, no good can come from this; and Rule 3 is even the intelligent way wouldn't have worked." Johnson said that ND's McCollum's comments to Memphis "ticked me off" and "crossed the line," and "we'll be a defendant by Monday." (Exs. 20, 21) | ND's MSJ, p. 9, ¶31 [Doc. 71]; TVA's Opposition to MSJ, p. 6, ¶31 [Doc. 86] |
| 47. | The second question asked of Johnson was: "Do you think there's a real chance we could lose MLGW [Memphis] as a customer as a result of all this?" Johnson acknowledged TVA "slipped a little bit in Memphis over the last couple of years" and stated that "just assume every customer can leave you, and that'd probably inform your decision making a little bit." (Exs. 20, 21) | ND's MSJ, p. 10, ¶32 [Doc. 71]; TVA's Opposition to MSJ, pp. 6-7, ¶32 [Doc. 86] |

6

|     | **UNDISPUTED FACTS** | **ADMITTED** |
| --- | --- | --- |
| 48. | Johnson personally made the decision not to close on November 29, 2018, the day before closing, which he described was "as late as possible." He did not take his decision to a meeting of the TVA's Board of Directors for approval. | ND's MSJ, p. 10, ¶33 [Doc. 71]; TVA's Opposition to MSJ, p. 7, ¶33 [Doc. 86] |
| 49. | At 9:09 p.m. on November 29, 2018, the night before closing, TVA sent a letter to Blust stating that TVA would not close the transaction because the "closing would be unlawful." (Ex. 31) | ND's MSJ, p. 11, ¶34 [Doc. 71]; TVA's Opposition to MSJ, p. 7, ¶34 [Doc. 86] |
| 50. | On the day of closing, November 30, 2018, Blust sent a letter to TVA stating that the closing would not be unlawful and that TVA would be in breach of the contract if it did not close. (Ex. 25) | ND's MSJ, p. 11, ¶34 [Doc. 71]; TVA's Opposition to MSJ, p. 7, ¶34 [Doc. 86] |
| 51. | TVA has stipulated that it will satisfy the quality assurance and other requirements in accordance with the two CPs issued by the NRC applicable to Units 1 and 2 at the Bellefonte site, unless and until those CPs are amended or terminated. | Stipulation of the Parties Regarding Plaintiff's Motion for Preliminary Injunction, p. 1, ¶1 [Doc. 17] |
| 52. | TVA has stipulated that, in the event it elects to request termination of either or both of the CPs, it will give notice in writing of its intent to the Court and to ND's counsel at least five (5) business days prior to submission of any such request to the Commission. | Stipulation of the Parties Regarding Plaintiff's Motion for Preliminary Injunction, p. 1, ¶2 [Doc. 17] |
| 53. | TVA has stipulated that, if it elects to sell or dispose of the Bellefonte site, it will give notice in writing of its intent to the Court and to ND's counsel at least five (5) business days prior to the execution of an agreement for such sale or disposition. | Stipulation of the Parties Regarding Plaintiff's Motion for Preliminary Injunction, p. 1, ¶3 [Doc. 17] |
| 54. | The excerpted 5 minute, 48 second video clip contained in the flash drive marked as Exhibit 21 to the deposition of William Johnson fairly and accurately depicts comments, questions, statements and responses, including those by William Johnson, made during that portion of TVA's Employee Forum held on November 26, 2018 in Knoxville, Tennessee. (Ex. 21) | TVA's Responses to ND's 2nd Set of RFA, ¶1, Exhibit 21 |