FILED

2021 Jun-09  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION CASE NUMBER: |
| vs. | § | |
| | § | 5:18-CV-01983-LCB |
| TENNESSEE VALLEY AUTHORITY, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S SUPPLEMENTAL TRIAL BRIEF

CAINE O'REAR III       (OREAC6985)
J. CRAIG CAMPBELL   (CAMPJ7981)
HAND ARENDALL HARRISON SALE LLC
P. O. Box 123
Mobile, AL  36601
(251) 432-5511
Fax: (251) 694-6375
corear@handfirm.com
ccampbell@handfirm.com


E. SHANE BLACK       (BLACE7644)
HAND ARENDALL HARRISON SALE LLC
102 S. Jefferson Street
Athens, AL  35611
(256) 232-0202
Fax: (256) 216-1480
sblack@handfirm.com

**ATTORNEYS FOR PLAINTIFF**

Plaintiff Nuclear Development, LLC ("Nuclear Development" or "ND") submits the following supplemental trial brief in support of its breach of contract claim against Tennessee Valley Authority ("TVA"):[1]

## FACTS

### A. TVA's Concealment of Legality Concerns

The critical evidence at trial establishes without doubt that TVA breached its contractual obligations under Section 9 of the Contract (PX1) to use its commercially reasonable best efforts to consummate the sales transaction and satisfy all conditions therefor (§ 9(a)(i)) and to provide reasonable cooperation to ND in obtaining NRC consents and approvals, as well as making all filings with the NRC (§ 9(a)(ii)). Not only that, the evidence reveals a course of conduct orchestrated by TVA's legal department, and ultimately carried out by TVA's CEO, to hide from ND for a period of five to six months TVA's concerns over the legality of the closing, only to disclose them at the last moment when there was insufficient time for resolution before the November 30, 2018 closing date. These concerns were purportedly the reason TVA refused to close at the last moment, when in fact its fear of losing Memphis as a customer was the determining reason.

---

[1] This supplemental brief and ND's initial trial brief (Doc. 211) (adopted and incorporated by reference herein) are limited in scope in accordance with the Court's April 12, 2021 order (Doc. 175), but ND continues to object to the Court's limitation of evidence at trial and the Court's findings and conclusions in its Order on Summary Judgment. (Docs. 161 and 165).

Chris Chandler, TVA's Senior Counsel for Nuclear (Tr. 754) responsible for handling NRC regulation issues (Tr. 757), admitted in his deposition that in the summer of 2018 he "identified the concern about the text of the construction permits *and* the text of the Atomic Energy Act [AEA]" as related to whether the closing could go forward without the NRC's prior approval of the transfer of the construction permits (the "CPs"). (Tr. 790-91, emphasis added.) He conceded he may have identified these legal concerns as early as June of 2018, which would have been five to six months before the closing date. (Tr. 798.) At that time, he told only Cliff Beach, TVA's Senior Counsel, about his concerns. (Tr. 793-94.)

Later in his deposition and at trial, Chandler said the concern he raised internally within TVA in the summer of 2018 was whether closing without the NRC's approval would violate the terms of the CPs. (Tr. 826.) However, while Chandler tried to distinguish the CPs and the AEA as separate concerns, he conceded that they both related to whether the sale of Bellefonte to ND could close. (Tr. 801.) Chandler described the concern he identified in the summer of 2018 as a "potential regulatory problem . . . with selling a nuclear plant without the NRC's authority." (Tr. 799.) He further testified: "[T]he concern that I had had (sic) in the summer of 2018 was . . . We owned a nuclear plant. It's licensed by the NRC. I don't think we can sell it. I don't think we can proceed to closing if the NRC has not approved the

2

license transfer. . . . [P]eople who work in the industry know that you can't sell nuclear plants without the NRC's approval."[2] (Tr. 827; *see also* Tr. 793-94.)

Beach, who was withheld from trial by TVA but whose deposition testimony was introduced, testified that he did not send Larry Blust (ND's general counsel) the transaction documents for review in the summer of 2018 "due to some questions about the *legality* of the transaction that were emerging during this time period that – that *we felt were pretty serious*, and *wanted to work with [ND] to work through* before we move onto the – sort of the housekeeping matters associated with closing." (Tr. 984, emphasis added.)[3] After multiple questions from ND's counsel to identify the legal questions that were emerging within TVA at this time, and instructions by TVA's counsel not to reveal purportedly privileged TVA internal communications, Beach finally testified that the issue was "the Nuclear Regulatory Atomic Energy Act, you know, concern that we had regarding the transaction." (Tr. 984-86.)

Beach testified that the first time he notified ND of any concern about the legality of transferring the plant was in a conversation with Blust shortly prior (within a few days) to November 9, 2018, when Beach sent an email to Blust,

---

[2] TVA represented just the opposite in Section 7(a)(vii) of the Contract when it warranted that NRC approval was not required for the sale, which representation expressly induced ND to enter the Contract. That is why it was so crucial for TVA to notify ND of its concerns at the earliest possible moment in order to resolve them prior to closing.

[3] TVA did not notify ND of such concerns until two or three weeks prior to the closing date. TVA thus never even attempted to "work with [ND]" to resolve them, as Beach suggested should have been done in the summer of 2018.

Chandler and TVA's General Counsel Sherry Quirk describing for the first time in writing the CP issue. (Tr. 986-88, PX 17.) Beach also testified TVA first notified ND about its concern over closing based on the AEA in "mid-November," when he advised Blust that "TVA had discovered for the first time a problem with the [AEA]." (Tr. 988-89.) Chandler confirmed that November 15, 2018 was the precise date that TVA first notified ND of its concern that closing the transaction without prior approval of the NRC would be illegal under the AEA. (Tr. 783, 801.)[4]

TVA's hidden concern over whether the sale of Bellefonte could legally close without prior NRC approval struck at the very essence of the Contract and was the single-most important issue that TVA should have immediately communicated to ND, particularly in light of ND's payments of $29 million to TVA, ND's years of work on the Bellefonte project, and the millions of dollars spent by ND relying on TVA's agreement to close. It was Chandler's job to figure out whether prior NRC approval of the transfer of the CPs was required in order to close. (Tr. 794.) Notwithstanding the critical nature of this information, Chandler said he did not consider it significant because "the closing date was still far enough away that there were any number of things that could have changed that made this – to make this not

---

[4] The sworn testimony by Chandler and Beach that they identified in the summer of 2018 the "text of the Atomic Energy Act" and "the Nuclear Regulatory Atomic Energy Act," respectively, as a closing issue makes Beach's representation to Blust on November 15, 2018 that TVA had just discovered an issue with the AEA false, misleading and a further concealment of TVA's concern identified months before. (*See* Tr. 815-16, 989.)

an issue anymore." (Tr. 797.) He cited as examples that an extension of the closing could have been granted (Tr. 811-12) and that ND could have asked to withdraw the CPs or have TVA terminate them. (Tr. 797.) TVA could have also sought a threshold determination from the NRC, but Chandler said he did not consider it. (Tr. 795.)

Tim Matthews, ND's licensing counsel, testified that if TVA had notified him in the summer of 2018 of its concern over the closing of the sale because of the text of the AEA, he would have conferred with TVA's counsel to resolve the issue, and had they not reached agreement, he would have discussed the issue with the NRC's Office of General Counsel. (Tr. 186.) Matthews stated that if made aware by TVA he could have obtained a threshold determination from the NRC in time to have closed the sale on November 30, 2018. (Tr. 187.) Likewise, Blust testified that if TVA had advised ND in the summer of 2018 that it had a concern about whether the closing could occur without prior NRC approval based on either the terms of the CPs or the AEA, he would have first seen if it could be negotiated. (Tr. 449-50.) Second, he "would have simply exercised ND's right to withdraw the construction permits and eliminate the issue." (*Id.*) As Blust stated, "there was no reason to have this kind of issue cause no closing." (*Id.*)

Yes, much could have been done to resolve the issue months before the closing, but no one at TVA notified ND that there was any issue at all until mid-November, when there was not enough time to resolve the issue without an extension

of the closing. (Tr. 798.) Bill Johnson, TVA's CEO, knew this when he rejected ND's request for an extension and then refused to close mere hours before the closing was to occur. (Tr. 77-78.)

### B. **TVA's Bad Faith Refusal to Extend the Closing Date and to Close**

On October 9, 2018, Bill McCollum, ND's CEO, made a presentation to the Memphis City Council in which he discussed a study showing significant savings for Memphis by moving to a power source other than TVA. (*See* Tr. 434.) TVA's Johnson became upset with McCollum over those comments and publicly criticized him. (Tr. 60.) On the day after McCollum's presentation to Memphis, Johnson asked Quirk to set up a meeting with Franklin Haney and Blust and "articulated concern about Nuclear Development's presentation to the city council of information that he considered to be detrimental to TVA." (Tr. 124-25.) At the meeting on October 23, 2018 with Haney and Blust, Johnson expressed displeasure about how issues had been presented by ND in Memphis. (Tr. 127.) Afterwards, Johnson himself met with Memphis on November 6, 2018, "to make the pitch for staying with TVA." (Tr. 69-70.) When asked if he was concerned when he left those meetings that Memphis was seriously considering leaving TVA, Johnson said, "I'm always concerned when any customer thinks about leaving." (Tr. 70.)

Not coincidentally, after Johnson's trip to Memphis, Beach notified Blust in a call and then an email on November 9, 2018, of a concern that the sale of Bellefonte

would violate the terms of the CPs. This was the first time that TVA said anything to ND about a concern over the legality of closing. (Tr. 986-88, PX 17.) Four days before the closing, Johnson addressed an employee forum of TVA personnel at TVA's offices in Knoxville. The first question asked of Johnson was: "Why continue to sell Bellefonte if the potential buyer wants to take away our largest LPC [power customer] to make it work?" Johnson's response began as follows: "Rule 1, it seemed like a good idea at the time; Rule 2, no good can come from this; and Rule 3 is even the intelligent way wouldn't have worked." (Tr. 72-73.) Johnson said that ND's McCollum's comments to Memphis "ticked me off" and "crossed the line" (Tr. 73), and "we'll be a defendant by Monday." (Tr. 74.) The second question asked was: "Do you think there's a real chance we could lose MLGW [Memphis] as a customer as a result of all this?" Johnson acknowledged TVA "slipped a little bit in Memphis over the last couple of years" and that "just assume every customer can leave you, and *that'd probably inform your decision making a little bit*." (Tr. 74-75, emphasis added.) Johnson ultimately refused to extend the closing as requested by ND and made the decision not to close on November 29, 2018, the day before the closing ("as late as possible"). (Tr. 77-78.) The timeline and Johnson's testimony establish that it was no coincidence that TVA first notified ND of its concern over the legality of the closing immediately after Johnson met with Memphis and out of his serious concern that Memphis, TVA's largest customer, might leave TVA.

7

### C. **TVA's Unreasonable Failure to Consent**

Section 9(a)(ii) expressly requires TVA to reasonably cooperate with ND "in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal … regulatory or administrative agency," yet TVA failed to provide the NRC with a notice stating simply that it was transferring Bellefonte to ND and consenting to the transfer of the CPs. (Tr. 810.) Chandler and Joe Shea, TVA's Vice President of Licensing, both testified at trial that they knew of no reason why TVA would not or should not express TVA's consent to the NRC. (Tr. 371, 808, 810.) TVA, however, persists in playing games on this issue by contending ND never requested a consent letter, but the credible evidence is to the contrary. Specifically, Matthews requested TVA to submit the consent letter in March of 2018 (Tr. 164), in July of 2018 (Tr. 165), in October of 2018 (Tr. 166), in the first week of November 2018 (Tr. 171), and on November 13, 2018 (Tr. 172-73). On October 18, 2018, Matthews submitted the draft consent letter for TVA to execute and submit to the NRC. (Tr. 166-67, PX 14.) In March of 2018, October of 2018, and as late as the first week of November 2018, Chandler advised Matthews that consent by TVA would not be a problem (Tr. 164, 166, 171-72), but despite such assurances TVA never provided the requested consent. (Tr. 168.) Blust's email of November 12, 2018, to Beach, Chandler and Quirk specifically asked for the consent letter requested by Matthews on multiple prior occasions. (Tr. 441, PX 19.) TVA's failure

to consent created significant impediments for ND with regard to the process of applying for transfer of the CPs. (Tr. 169-71.)

The consent letter became a requirement under 10 CFR 50.80 (b)(2) and the NRC's Procedures for Handling License Transfers (LIC-107) when TVA refused to join in the application to transfer the CPs. (Tr. 171, PX 81, PX 305.) TVA refused to consent even though no one at TVA was aware of any reason why consent should not have been given. Chandler's excuse was that when November arrived, there was no possibility the NRC would approve the transfer application before the closing, so there was no point in consenting. (Tr. 829.) In other words, TVA's concealment for months of its concern over the legality of closing the sale, combined with TVA's delay in providing consent, ensured that there would not be enough time for the parties to resolve these issues before closing in the event TVA refused to extend the closing.

## D. **TVA's Failure to Join and Other Acts of Non-Cooperation**

Under the NRC's LIC-107, the NRC states that "[s]ubmittals are made to the NRC under oath and affirmation by applicants (current and proposed licensee)." (PX 81.) If for some reason the applicant is not the current licensee, then Appendix B specifies that an application may be submitted "*provided that* the application can be supported by 'a written consent from the existing licensee, or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right

… to possession of the facility or site involved.' (10 CFR 50.80)." (*Id.*, emphasis added.) In its letter of November 3, 2020 to ND, the NRC reiterated that "license transfer applications are typically submitted under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application." (PX 305.)

Contrary to typical NRC practice, TVA steadfastly refused from the outset to join in the application as the current licensee. Blust testified that he understood the Contract to provide that TVA would take the laboring oar and file the application pursuant to Sections 1(e) and 9(a)(ii). (Tr. 413.) However, in December 2016, only a month after the Contract was signed, Joe Shea, TVA's VP of Licensing, stated to Blust that "he would have no part in the application for the transfer of the license," "that it was not TVA's responsibility" and "that he was not going to cooperate with it or draft anything." (Tr. 414.) Likewise, shortly after the Contract was signed, McCollum expressed to Shea that TVA should take the lead on the application, and Shea indicated neither he nor the transition team were working on the application and that ND should take the lead. (Tr. 512-14, PX 37.)

Later, in March of 2018, Matthews asked Chandler if TVA would submit the CP transfer application on TVA's letterhead, and Chandler said TVA would not. (Tr. 164.) Matthews testified he received no assistance or cooperation from TVA with respect to the process of submitting the transfer application to the NRC. (Tr. 181.)

Matthews also pointed out that TVA rejected ND's request to seek an extension of the Unit 2 CP deadline without explanation. (Tr. 161-63, PX 7, PX 8.)

TVA's final act of non-cooperation, apart from refusing to close, was Johnson's decision not to extend the closing date for six months in order to work out the concerns TVA belatedly expressed over the legality of the closing. TVA was obligated under Section 9 of the Contract to cooperate with ND and to use its best efforts to consummate the sale of Bellefonte, not to orchestrate a roadblock to the sale by concealing its legality concerns until the last minute and leaving no time to resolve them before the closing date. Chandler attempted to excuse his own personal concealment of the legality concern by suggesting that the closing could have been extended "to make this not an issue anymore." (Tr. 797.) But Johnson wanted no part of that. He refused to extend the closing date and made the decision not to close "as late as possible" (Tr. 77-78), ensuring there would be no time for the parties to work it out.

### E. **ND Acted Reasonably to Consummate the Transaction**

In contrast to TVA's failure to cooperate and use its best efforts, ND acted reasonably to achieve its only real obligation under the Contract – to acquire Bellefonte by paying the balance of the purchase price at closing. The testimony of Haney and Blust is undisputed that ND had the closing funds of $91,643,130 on deposit and ready to wire to TVA on November 30, 2018. (PX 310, Tr. 24-26, 432,

443-44, 447-48.) The only reason those funds were not wired was that TVA breached the Contract by refusing to close the night before. (Tr. 448-49.) TVA's Chardos testified ND was ready to close (Tr. 256.)

The Contract did not require ND to file the application for transfer of the CPs before the closing date or to even apply for the transfer at all, at any time. (Tr. 416, PX 1.) (The Court will recall that TVA steadfastly refused to make NRC approval of the CP transfers a condition of closing.) The only reason ND filed the application before the closing date was to make sure that, as an applicant before the NRC, ND became subject to the jurisdiction of the NRC, which benefitted TVA regarding the maintenance, preservation and documentation programs ND was undertaking in the application. (Tr. 155.)

Therefore, from a contractual standpoint, there was no reason to file the transfer application any earlier than it was filed. Nevertheless, ND filed the application within a reasonable time given TVA's utter lack of cooperation in the application process. (Tr. 424-25.) And, regarding TVA's failure to consent which has held up the NRC's final approval of the application for over six months, it would have made no difference if ND had filed the application even as early as two months after the Contract was signed, because TVA's consent (absent a court order) would still be required under 10 CFR 50.80. (Tr. 181.) Additionally, it was reasonable for ND to hold off investing substantial resources in preparing the application until

Johnson signed off on the environmental review of Bellefonte, because the Contract gave Johnson the unilateral right to call off the closing if, and only if, he did not sign the environmental clearance certificate. (Tr. 418-19, PX 1.) That certificate was not signed by Johnson until August 10, 2017, nine months after the Contract was signed, and it delayed the preparation of the application because ND was fearful he would not sign it and call off the sale of the plant. (Tr. 420-22, PX 307.) ND's preparation of the application was also delayed because TVA's engineering documents for the plant were unexpectedly incomplete and insufficient to bid the construction work out to contractors, which extended ND's cost estimates. (Tr. 422-23.)

Finally, while Jim Chardos, TVA's site manager for Bellefonte, worked well with ND on issues restricted to transition of the plant site after closing, he testified he was not involved at all in the application for the transfer of the CPs. (Tr. 239.) According to Chardos, the plan was that after the closing ND would not do anything differently than TVA was doing in terms of maintenance and security of the plant. (Tr. 246.) Chardos prepared contracts between ND and TVA's contractors for maintenance and security and power supply so there would be a seamless transition upon closing. (Tr. 244-46, PX 178, PX 179.) Chardos had no concern that the maintenance and security of the plant would not be adequately handled by ND after the closing or that TVA would not have access to the plant after closing. (Tr. 247.)

13

**F. ND's Damages**

In the alternative if specific performance is not awarded, ND claims damages of $38,462,039.20[5] spent in reliance on the Contract and the expectation that TVA would close the sale, and such expenses were necessarily incurred as part of developing the Bellefonte project and completing the nuclear units. (Tr. 541-42.) Thus, these expenses were incurred in preparation for or in performance of the Contract, and they would not have been incurred if TVA had not contracted to sell the plant. (Tr. 518-19, 533-34, 537-38, 541-43, 549, 557-79, 582-89, 593, 603-06; PX 1, 133-143, 145-153, 155-159, 161, 162, 164, 166, 168, 316, 320.)

## ARGUMENT

TVA breached the Contract by failing to cooperate and use its best efforts to close and by hindering satisfaction of the closing condition found by the Court, and ND is entitled to a remedy of specific performance or damages.[6]

---

[5] At trial ND presented damages totaling $38,491,029.86. (PX 316.) ND submits that all the expenses comprising that amount are recoverable as reliance damages. However, to make the Court's analysis of the damages evidence easier, ND withdraws the following portions of the reliance damages claim where McCollum could not specifically recall at trial the business purpose of a particular expense: (a) $8,152.16 for the cost of the flight to the auction (Tr. 615-16; PX 133, 142); (b) $5,512.50 for amounts paid to Navton for services during the period of 10/29/16 through 11/30/16 (Tr. 616-17; PX 157); (c) $12,500 for amounts paid to Ickes & Enright for services to be performed in the month of November 2016 (Tr. 618-19; PX 149); and (d) $2,826 paid to Ali's Sedan Services for car services provided for trips dated 11/29/16, 11/30/16, 7/10/17, 9/8/17, 7/10/18, 7/21/18, 7/24/18, 11/3/18, 11/4/18, 11/5/18, and 11/8/18 (Tr. at 662-68; PX 136).

[6] ND continues to maintain that NRC approval of the CP transfers was not legally required for closing, that the Contract does not require ND to seek transfer of the CPs in the first place, and that the denial of ND's summary judgment motion and the Court's evidentiary ruling based on the same were in error. While this brief addresses the evidence and issues presented at trial, ND is also

## I.   TVA materially breached Section 9(a) of the Contract and caused the non-occurrence of a condition precedent asserted by TVA.

### A. TVA breached by hiding its concern about closing for months and raising it at the last minute only after it became clear that TVA could lose Memphis as a customer.

TVA's intentional concealment from ND that there was an issue with the legality of the closing, and its continued failure to cooperate and use its best efforts to eliminate the issue constitutes breach of contract. "The Federal Circuit has defined the [best efforts] standard as requiring 'that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom.' Other courts have similarly defined best efforts to require diligence or a high level of good faith." *Marquardt Co. v. U.S.*, 101 Fed. Cl. 265, 273 (2011) (internal citation omitted); *Crum & Crum Enterprises, Inc. v. NDC of Cal., LP*, 2010 WL 4668456, at *4 (D. Del. Nov. 3, 2010); *Gilson v. Rainin Instrument, LLC*, 2005 WL 1899471, at *5 (W.D. Wis. Aug. 9, 2005) ("'best efforts' standard requires good faith plus diligence.")

Instead of acting in good faith and using reasonable efforts to close, TVA concealed from ND for months that it had a serious concern that TVA could not sell Bellefonte without prior NRC approval, in direct contradiction of its express warranty in the Contract that no such approval was required. Testimony presented

---

filing a Rule 52(c) motion asking the Court to reconsider its summary judgment denial and enter the specific performance relief requested in ND's summary judgment motion as a matter of law.

by witnesses from both ND and TVA establish that there were multiple avenues for the parties to consummate the closing without running afoul of the AEA had TVA disclosed this concern to ND when TVA learned of it.

Chandler testified the parties could have eliminated the issue entirely if ND had been given the opportunity to withdraw the CPs or if TVA simply terminated the CPs. Chandler, along with Matthews, recognized that the parties also could have received a threshold determination from the NRC in time for closing. TVA's failure to disclose the alleged closing issue to ND, though, precluded these options and materially contributed to the failure of the condition. The parties also could have salvaged the sale in November 2018 when TVA blindsided ND with the issue, if TVA had simply agreed to a closing extension, but Johnson refused to do that at the very last minute and in furtherance of TVA's breach.[7] Not only did TVA fail to cooperate, but in fact TVA concealed serious material concerns from ND and made no effort whatsoever to eliminate the issue. While Beach testified that TVA's desire to "work through" this issue postponed TVA's promise to provide transactional documents, TVA exercised no diligence at all and sprung the issue on ND too late to resolve it before closing.[8]

---

[7] It was unreasonable for TVA to refuse to cooperate on ND's extension of closing request made in August 2018, when TVA identified a closing concern and Chandler then concealed that concern *based on the fact that an extension could be granted.*

[8] TVA was aware for months of the falsity of its representation and warranty to ND that no NRC approval was required for closing, yet TVA failed to disclose this concern to ND (only to later argue to the Court that the misrepresentation was perhaps a mistake).

TVA's failure to raise the illegality issue until two weeks prior to closing and its refusal to engage ND about possible solutions not only violated Sections 9(a)(i) and (ii) of the Contract, but TVA's conduct prevented and hindered the satisfaction of the condition found by the Court to exist under Section 6(a) of the Contract.

> [A] party to a contract cannot escape or minimize its liability on the ground that the other party has failed to perform a condition precedent to the establishment of such liability, where the breaching party has caused that failure. This doctrine, often described as the 'doctrine of prevention,' has been summarized in Williston thusly:
>
>> Where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform.... [I]n such a case, the promisor may not invoke the other party's nonperformance as a defense when sued upon the Contract.

*Park Props. Assocs., L.P. v. U.S.*, 82 Fed. Cl. 162, 170 (2008) (citing 13 *Williston on Contracts*, at § 39:3). TVA's concealment of the issue for five to six months made it less likely closing could occur without violating "NRC policy," and thus TVA's conduct hindered the fulfillment of the condition precedent found to have existed by the Court. *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000). Had TVA apprised ND of the closing issue in the summer of 2018, the parties could have unquestionably eliminated the issue and satisfied TVA's last-minute contention of a condition precedent regarding legality. *Id.*

Furthermore, TVA's purported reason not to close was a subterfuge and not based on a good faith assessment that the closing would be illegal. Johnson's

decision to not close at the last moment was based on his fear of losing Memphis as a major customer and in direct conflict with TVA's obligation to cooperate and use its best efforts to consummate the sale. While proof of motive is not required to establish breach of contract, the Court must determine if TVA used reasonable best efforts to consummate the sale, *i.e.*, whether it acted in good faith and with due diligence. *See Marquardt Co.*, 101 Fed. Cl. at 273. Johnson's lack of good faith demonstrates that TVA acted unreasonably and failed to use its best efforts to consummate the sale.[9]

The direct and circumstantial evidence compels the conclusion that Johnson's decision not to close on the night before closing was not based on potential illegality, an issue TVA's legal department identified *five to six months prior to closing*. Instead, Johnson unilaterally made the decision to pull the plug at the last minute after it became real to him that Memphis, TVA's largest customer, might be lost if TVA sold Bellefonte to ND, thereby constituting a *per se* violation of the cooperation and best efforts clauses.

---

[9] *See e.g., Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *3 (E.D.N.Y. May 10, 2013); *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 514 (D. Md. 2007) (good faith is a factor in determining whether a party has complied with its "best efforts" obligations.); *Wal-Mart Real Est. Bus. Tr. v. Eastwood, LLC*, 2015 WL 12910670, at *6 (W.D. Mich. July 27, 2015); 17B C.J.S. *Contracts* § 764 ("Good faith is also a factor in the determination as to whether a party has fulfilled its obligations under a best-efforts clause."); *Restatement (Second) of Contracts* § 205 cmt. d (1981) ("Subterfuges and evasions violate the obligation of good faith").

## B. TVA breached by refusing to join in or consent to the transfer application.

TVA breached its contractual obligation to reasonably cooperate with ND in obtaining NRC consent and approval and making all filings necessary for the transfer application. TVA's refusal at the outset to join in the application and its continuing failure to consent to ND's application thereafter unreasonably delayed and hindered the preparation of the application and has precluded ND from receiving NRC approval of the transfer absent a court order.

It is customary that a license-holder joins a transfer application or, at the very least, consents to the transfer, especially when the license-holder had contracted to sell the property. That is what the NRC expects. (*See* PX 81, PX 305.) But TVA failed to take the lead on the application and refused to join in or even allow its letterhead to be used for corresponding with the NRC. TVA's lack of cooperation by failing to join the application made TVA's consent a requirement to transfer the CPs under 10 CFR 52.80 (b)(2) and NRC LIC-107, and TVA's refusal to consent made the satisfaction of the requirement impossible without court intervention.

ND requested that TVA consent to transfer numerous times, and despite Chandler's comments that consent would not be a problem, TVA never provided consent. TVA's conduct was diametrically opposed to what a reasonable party attempting to cooperate would do. Chandler and Shea both testified that they knew

of *no reason* why TVA would not consent to the transfer of the CPs, and to this day TVA has yet to articulate a reasonable basis for withholding consent.[10]

TVA's failure to join in the transfer application constitutes a breach of its "best efforts" obligation and contributed to the non-occurrence of the NRC's approval to date. *Foster Wheeler Broome Cty., Inc. v. Cty. of Broome*, 713 N.Y.S.2d 92, 94 (2000) (defendant breached duty to use best efforts to assist the plaintiff in securing the required permit by failing to join application); *Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 161 (7th Cir. 1990) (party breached contract and hindered the occurrence of the condition precedent by failing to participate in a joint petition to the ICC); *Restatement (Second) of Contracts* § 205 (1981).

Additionally, TVA's decision to refuse to join or consent to the application raised the brow of the NRC, causing a significant delay in getting the application docketed and resulting in a more detailed, formal review by the NRC than is typical. Contrary to TVA's argument (Doc. 209, Tr. 846), ND is not required to establish that TVA's lack of cooperation caused the NRC to fail to approve the application or that NRC approval would have occurred but for TVA's prevention or hindrance. *Restatement (Second) of Contracts* § 245 cmt. b (1981) ("it is not necessary to show that [satisfaction of the condition] would have occurred but for the lack of

---

[10] Chandler claims that TVA withheld consent in November because there was no point to consent that late in the process, but TVA offers no explanation for why it failed to consent numerous other times in 2017 and 2018.

cooperation.").[11] Because ND need not show that the NRC would have approved the transfer but for TVA's conduct, TVA's argument that its lack of cooperation did not cause ND to "delay" in filing the application is unavailing.

Regardless, ND did not unreasonably delay filing the application for the reasons stated above. Also, the Contract did not require NRC approval at all, and TVA's refusal to consent did (and does) in fact make it impossible for ND to obtain approval of the transfer application absent a court order. The question is whether TVA's lack of cooperation hindered satisfaction of the purported condition, and NRC LIC-107 (PX 81) and the NRC letter (PX 305) make it clear that it did.

## II. ND used commercially reasonable best efforts to effectuate the closing and was ready, willing and able to close.

In contrast to TVA's efforts to frustrate the closing of the sale, ND did everything it could to bring the transaction to closing. Upon signing the Contract, ND paid a TVA $22.2 million down payment and additional sales and administrative costs. ND subsequently made payments of over $6 million for the maintenance and

---

[11] The Contract is governed by federal law, and courts look to the *Restatement (Second) of Contracts* when analyzing questions of federal common law. *Wallach v. Eaton Corp.,* 837 F.3d 356, 367-68 (3d Cir. 2016). Under the Restatement, TVA bears the burden of showing that none of the possibilities cited by Chandler and Matthews to eliminate the illegality issue could have salvaged the sale. *Restatement (Second) of Contracts* §245 cmt. b ("Nevertheless, if it can be shown that the condition would not have occurred regardless of the lack of cooperation, the failure of performance did not contribute materially to its non-occurrence and the rule does not apply. The burden of showing this is properly thrown on the party in breach.").

security of the site. ND was ready and willing to pay the remainder of the purchase price of over $91 million at closing.

Because the Contract did not require ND to file a transfer application, TVA's argument regarding ND's alleged delay in filing the application is a red herring.[12] In any event, ND used commercially reasonable efforts to get the application filed, first as a joint application and then, when TVA failed to cooperate, on its own, especially when the Contract stated that NRC approval was not required. *Id.* at 991. Moreover, TVA's illegality concern identified in the summer of 2018 was concealed from ND until ND actually filed its application two weeks before the closing. The evidence shows that ND performed its obligations under the Contract and acted in a commercially reasonable manner, working toward obtaining the proper approvals it believed it needed to close the transaction. *Ingrid & Isabel, LLC v. Baby Be Mine*, LLC, 70 F. Supp. 3d 1105, 1131 (N.D. Cal. 2014) (party used commercially reasonable best efforts when it took efforts to comply with agreement even if compliance was imperfect); *Cabela's Wholesale Inc v. Hawks Prairie Inv. LLC*, 658 F. App'x 308, 311 (9th Cir. 2016).

---

[12] It is customary for the license-holder to file in the first place, yet TVA refused. Second, the parties disclaimed that any governmental approval was required, which the Court has found to be a "mistake" even though neither party pleaded mistake. *Metcalf Const. Co. v U.S.,* 742 F.3d 984, 990-91 (Fed. Cir. 2014) ("What is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and interference with or failure to cooperate in the other party's performance'").

**III.    ND is entitled to specific performance for TVA's breach.**

The Court should order specific performance under Section 35 of the Contract by ordering TVA to perform its covenants under Section 9(a) by notifying the NRC in writing that it consents to ND's right to possess the property, and then ordering TVA to transfer the property if and when the NRC approves the application to transfer the CPs. Alternatively, the Court should order TVA to terminate the CPs, thereby eliminating the alleged illegality issue completely, and order TVA to convey the property to ND upon termination of the CPs.[13]

While the Court has stated in its summary judgment denial that NRC approval is required in order to convey Bellefonte to ND, it is well-settled that this Court can order specific performance even if securing the approval of a governmental agency is necessary to the complete performance of an agreement. *Restatement (Second) of Contracts* § 358 cmt. a (1981) (court may order specific performance "conditional on some performance to be rendered by the injured party or a third party."); *DeTar Distrib. Co. v. Tri-State Motor Transit Co.*, 379 F.2d 244, 249 (10th Cir. 1967) (transfer and sale of stock was conditioned upon the approval of a government agency; specific performance order was contingent upon the granting of such

---

[13] Section 35 of the Contract states that damages are inadequate and that specific performance would be the only remedy to fully protect a party from irreparable harm due to breach. *See also Restatement (Second) of Contracts* § 360 cmt. E (1981) ("specific performance is the appropriate remedy for the breach of real estate contract."). Even ND's alternative claim for reliance damages would be inadequate under the circumstances.

23

approval); *LocusPoint Networks, LLC v. D.T.V. LLC*, 2015 WL 5043261, at *21 (N.D. Cal. Aug. 26, 2015) (ordering specific performance *upon grant* of consent from federal agency).[14] Accordingly, the Court has broad discretion to order specific performance conditioned upon NRC's approval to the transfers or upon termination of the CPs which eliminates any question of illegality.

In conjunction with an award of specific performance, ND is entitled to interest on the $29,219,231 which was paid to and has been held by TVA while TVA has been in breach of the Contract. ND is due the time value of that money. *Aldridge v. Olive*, 876 So. 2d 1130, 1130 (Ala. 2003) (court "has the power to determine whether to award incidental damages when it orders specific performance" on a real estate sales contract). The interest should be awarded from the date of the contract to the present at the rate of 6% per annum, which is the rate established in Section 33 of the Contract. This ancillary money relief is appropriate as part of the Court's

---

[14] *See also Reinink v. Van Loozenoord*, 121 N.W.2d 689, 692 (Mich. 1963) (decree for specific performance conditioned on plaintiff's securing the loan and paying the purchase price); *Franko v. Olszewski*, 25 N.W.2d 593, 595 (Mich. 1947) (specific performance on real estate contract and ordering defendant to apply for license despite defendant's argument that it had no control over the governmental agency); *Kaneko v. Okuda*, 195 Cal. App. 2d 217, 232 (1961) ("The law appears to be clear that the necessity of securing the approval of a governmental agency to the complete performance of an agreement is no bar to the granting of specific performance thereof."); *Rogers v. Davis*, 28 Cal. App. 4th 1215, 1222 (1994) (Even if "[t]he exact performance that is promised in a contract ... *may have become impossible or unlawful ... The court may nevertheless be able to achieve substantially the same result without undue difficulty, without hardship to the defendant, and without violation of law or of the rights of third persons ...* [by] command[ing] a performance by the defendant that is not identical with that which he promised to perform ... to create substantially the same legal effect that the promised performance would have created...") (emphasis added).

equitable remedies. *See Reis v. Sparks*, 547 F.2d 236, 239 (4th Cir. 1976) (award for ancillary compensation in addition to specific performance).

## IV.   In the alternative to specific performance, ND is entitled to the full amount of damages claimed.

"The law requires, where a breach of contract has occurred, an award of expenses based on a plaintiff's actual outlay of funds as special damages for 'essential reliance' *i.e.*, those that are 'necessary or essential for the plaintiff's performance of his promises under the contract.'" *Am. Cap. Corp. v. U.S.*, 63 Fed. Cl. 637, 653, *on reconsideration in part*, 65 Fed. Cl. 241 (2005). Collateral reliance damages, which include expenses incurred in "preparation for collateral transactions that a party plans to carry out when the contract ... is performed" are also recoverable. *Id.* at 653 (citing *Restatement (Second) of Contracts* § 349 cmt. a) (original emphasis omitted); *see also Stovall v. U.S.*, 94 Fed. Cl. 336, 353-54 (2010).

If the Court declines to award specific performance, ND is entitled to damages to ensure that ND has a remedy for TVA's breach as the law requires. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1088 (E.D. Va. 2011) (defendant cannot take advantage of its own breach by leaving plaintiff with no remedy at law or equity). Those damages include return of the $29,219,231 paid by ND to TVA pursuant to the Contract, to-wit (a) the $22,200,000 "Down Payment"[15] toward the

---

[15] As recognized by the Court, ND is also contractually entitled to return of the down payment. (Doc. 165, p. 11.) Though not mentioned in the Order, the same conclusion applies to the $750,000

purchase price for the property pursuant to Section 5(b)(i); (b) the $750,000 payment for "Compensated Costs" pursuant to Section 5(c); and (c) the $6,269,231 paid for maintenance and security costs pursuant to Section 12(e).

ND is also entitled to $9,242,808.20 for its actual out-of-pocket costs, *i.e.*, to attorneys, consultants, contractors, and vendors, in preparation of performance of the Contract and in reliance on TVA's obligation to convey Bellefonte. Because these out-of-pocket expenditures were or should have been within the contemplation of the parties, they are not barred by a contractual disclaimer of consequential damages. *H&C Animal Health v. Ceva Animal Health*, 2020 WL 6384303 (D. Kan. Oct. 30, 2020) (reliance damages are direct damages and they are not barred by or consequential damages limitation in the contract). The Court should adhere to the "black letter rule that allows damages to be awarded based on the promisee's *reliance interest*, *i.e., expenditures made in preparation* or *in performance, including but not limited to, recovery of expenditures invested in collateral transactions.*" *Am. Cap. Corp.*, 63 Fed. Cl. at 654 (emphasis added). All of the costs paid to third parties were made in preparation for the Contract or transactions to arise out of the Contract if TVA performed – such as pursuit of the DOE loan, power

---

payment made by ND to TVA for "Compensated Costs" pursuant to Section 11(b) of the Contract. Therefore, regardless of whether return of the $22,200,000 down payment and the $750,000 compensated costs payment is considered damages or required by Section 11(b), ND is entitled to recover those amounts.

purchase agreements and transmission networks; meetings with Congress and the Executive Branch; and travel necessary for these activities. All of these costs were spent *after* the Contract was signed and in reliance on TVA's closing the sale as agreed. None of these costs would have been spent if TVA had not signed the Contract. *Stovall*, 94 Fed. Cl. at 353-54.

Most of the reliance damages claimed by ND were incurred before TVA's breach, but some continue after the closing date because TVA's breach continues to this date. Reliance damages may be awarded as a result of actions both before *and after* the breach. *Glendale Fed. Bank v. U.S.*, 239 F. 3d 1374, 1382-83 (Fed. Cir. 2001) ("As a general proposition, [reliance] damages are available for injuries resulting from activities that occurred either before or after the breach."); *see also Reis*, 547 F.2d at 239; *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 32A.3d 456, 480-81 (Md. Ct. Spec. App. 2011).

While TVA argues that certain travel expenses like expenses related to ND's use of a private jet are not recoverable, the record indicates such expenses were contemplated by the parties and that TVA's own executives traveled by private jets. (Tr. 634, 818-20.) Moreover, the expenses were reasonable because Haney had

legitimate concerns regarding commercial travel after being in a commercial plane crash and considering his poor health. (Tr. 587-88, 621.)[16]

## V.    ND did not materially breach Section 9(a) of the Contract.

TVA first materially breached the Contract as early as January 2017, when it refused to cooperate in preparing the CP application and continued its breach of the best efforts provision through the time of its concealment of the legality concern and its failure to consent. There is no evidence in the record that ND materially breached Section 9(a) at all, much less before TVA's material breach beginning roughly two months after the Contract was signed.

In addition, TVA accepted the benefits of ND's performance, including millions in funds paid under the Contract after the conduct that TVA argues constitutes breach. (Tr. 649.) If after a breach, an injured party elects "to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach." *Coast-To-Coast Fin. Corp. v. United States*, 60 Fed. Cl. 707, 716, *amended on denial of reconsideration*, 62 Fed. Cl. 469 (2004) (internal quotation omitted); *Precision Pine & Timber, Inc. v. U.S.*, 62 Fed. Cl. 635, 648 (2004) (party waives any right to treat the breach as an excuse

---

[16] TVA's citation of *Ward v. Real Ships, Inc.*, 2009 WL 3528365 (S.D. Ala. Oct. 22, 2009), is inapposite because it involved expenses occurred prior to contract formation, not expenses reasonably incurred as part of ND's reliance on the Contract. Likewise, the party in *Ward* made no showing of how the travel was related to the contract, whether both parties customarily engaged in this type of travel, or whether the means of travel was reasonable due to health and emotional concerns.

from liability by manifesting an understanding, through the continued fulfillment of its contractual obligations, that performance was to continue); *Restatement (Second) of Contracts* § 237. TVA waived any right to treat ND's prior activities as an excuse from liability by accepting payments from ND for maintenance and security, advising ND in August 2018 it was preparing to close (PX 12), indicating its intent to continue under the Contract by signing the First Amendment to the Contract in November 2018, and accepting ND's additional ongoing performance until the eve of closing. When TVA chose not to treat the situation as a breach at the point of any alleged nonperformance, and accepted the benefit of the Contract thereafter, TVA waived any affirmative defense for prior material breach.

TVA also failed to utilize the contractually specified method for asserting a pre-closing breach by ND, which requires written notice and reasonable opportunity to cure. (PX 1, § 11(a)(iii).) Because TVA failed to give ND proper written notice of any alleged default such that ND was deprived of the contractually required 30-day period to cure, TVA cannot avoid liability for its breach.[17]

Finally, ND's claims are not precluded by TVA's most recent argument related to the final maintenance payment.[18] TVA never notified ND that the payment

---

[17] TVA's failure to provide notice and opportunity to cure also demonstrates a lack of materiality. *Restatement (Second) of Contracts* § 242 cmt. b.

[18] Pursuant to Section 12(e) of the Contract, ND was to pay TVA $875,000 per quarter in arrears for maintenance and security of the plant. (PX 1.) ND made seven full quarterly payments plus a partial payment of $144,231. (Tr. 578, 649, 651.) The last quarterly payment would be due at closing; however, the closing was extended and did not occur because TVA refused to close. (Tr.

was past due and never gave ND written notice of default or opportunity to cure regarding that payment as contractually required. (Tr. 580.)

## **CONCLUSION**

ND is entitled to an award of specific performance, plus interest as set forth above, against TVA for its breach of Section 9, which requires either (a) TVA to perform under Section 9(a) by notifying the NRC in writing that it consents to ND's right to possess the plant site and then ordering TVA to transfer the plant site to ND, if and when the NRC approves the application to transfer the CPs, or (b) TVA to perform under Section 9(a) by taking all necessary actions to terminate the CPs and then ordering TVA to transfer the plant site to ND upon the NRC's termination of the CPs.  In the event that specific performance is not awarded, ND is entitled to damages in the amount of $38,462,039.20 plus interest to be calculated at the rate of 6% per annum.

Respectfully submitted on this 9th day of June, 2021.

/s/ Caine O'Rear III
CAINE O'REAR III        (OREAC6985)
J. CRAIG CAMPBELL   (CAMPJ7981)
HAND ARENDALL HARRISON SALE LLC
P. O. Box 123
Mobile, AL  36601

---

579, 649.) Due to the extension of the closing date and TVA's refusal to close when the date arrived, ND was not aware that any payment was due. (Tr. 580, 650.) TVA apparently did not consider it due either because it never notified ND that such payment was due and never gave ND written notice or opportunity to cure when it was not made at a closing that never occurred. (Tr. 580.) TVA first raised the issue only a few weeks before trial. In any event, ND is not claiming the last quarterly payment as damages.

(251) 432-5511
Fax: (251) 694-6375
corear@handfirm.com
ccampbell@handfirm.com


E. SHANE BLACK          (BLACE7644)
HAND ARENDALL HARRISON SALE LLC
102 S. Jefferson Street
Athens, AL  35611
(256) 232-0202
Fax: (256) 216-1480
sblack@handfirm.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I do hereby certify that, on June 9, 2021, I filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Matthew H. Lembke, Esq.
mlembke@bradley.com

David D. Ayliffe, Esq.
ddayliffe@tva.gov

*/s/ Caine O'Rear III*