FILED

2021 Jun-09  PM 05:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

NUCLEAR DEVELOPMENT LLC,   )
                                  )
      Plaintiff,            )
                                  )
v.                           )     Case No.: 5:18-CV-01983-LCB
                                  )
TENNESSEE VALLEY         )
AUTHORITY,                 )
                                  )
      Defendant.       )

## <u>DEFENDANT'S POST-TRIAL BRIEF</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 1

I.    The Court should enter judgment in favor of TVA on ND's claim
      that TVA breached Section 9(a) of the PSA. ........................................... 1

      A. ND had no credible reason to delay filing its application. ........................ 3

      B. ND did not establish the causation element for its claim. ........................ 5

      C. ND committed prior material breaches of the PSA. .................................. 6

            1. ND failed to file its application in a timely manner. ......................... 7

            2. ND failed to make a substantial and required payment to TVA. .......... 7

      D. TVA did not breach Section 9(a), and ND's various allegations of
         breach are meritless. .................................................................................. 8

            1. TVA had no obligation to prepare or join in ND's application,
               and TVA committed no breach by not sending a consent letter. .......... 8

                  a. Preparation or joinder in application. ........................................ 8

                  b. The consent letter. ................................................................... 10

            2. TVA did not commit a breach in connection with its
               communications to ND about legal problems with the closing. ......... 11

            3. TVA's preparation of the environmental assessment involved
               no breach. ............................................................................................. 15

            4. TVA's provision of engineering and design documents to ND
               did not involve any breach. ................................................................. 16

            5. TVA had no obligation to extend the closing date. .......................... 17

            6. TVA's communications with the NRC and ND did not breach
               the PSA. ................................................................................................ 17

II.   The Court should enter judgment in favor of TVA on ND's claim
      that TVA breached the PSA by refusing to close. .................................. 19

      A. The undisputed facts and this Court's earlier legal ruling compel
         judgment in favor of TVA. ....................................................................... 20

      B. The doctrine of prevention cannot rescue ND on this claim. ................. 21

III.  The Court should not order specific performance. ................................. 22

A. ND cannot obtain equitable relief due to its unclean hands....................22

B. ND did not prove it was ready, willing, and able to close. ......................23

C. There are numerous other legal impediments to ND's request for specific performance. .................................................................................24

IV.  A substantial portion of the damages sought by ND are barred by the PSA and by applicable legal doctrines. ...............................................26

A. ND seeks impermissible incidental damages. ........................................26

B. ND failed to mitigate its damages. .........................................................28

C. There are numerous problems with ND's request to recover its transportation expenses. ..........................................................................28

   1. The luxury travel expenses sought by ND should not be allowed. ..............................................................................................28

   2. ND failed to establish a business purpose for many of the travel expenses. .................................................................................29

   3. ND did not allocate any of the cost of private jet trips to non-business passengers. .........................................................................29

   4. ND has not made clear what amounts it is seeking for limousine services. ............................................................................30

D. ND claims expenses as damages for which it was not the payor............30

E. ND cannot establish that professional services for which it claims damages were reasonable and necessary..................................................30

CONCLUSION ........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Data Concepts, Inc. v. United States*,
   43 Fed. Cl. 410 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000) ............................2

*Am. Cap. Corp. v. United States*,
   63 Fed. Cl. 637 (2005) ...................................................................................26

*Am. President Lines, Ltd. v. United States*,
   821 F.2d 1571 (Fed. Cir. 1987) ................................................................24, 25

*Ashe-Carson Co. v. Bonifay*,
   41 So. 816 (Ala. 1906)....................................................................................22

*Atlas Corp. v. United States*,
   895 F.2d 745 (Fed. Cir. 1990) .......................................................................25

*Bank of Guam v. United States*,
   578 F.3d 1318 (Fed. Cir. 2009) .....................................................................25

*Burden v. Mobile Works, Inc.*,
   2008 WL 478441 (S.D. Ala. 2008).................................................................3

*C & L Constr. Co. v. United States*,
   6 Cl. Ct. 791 (1984), *aff'd*, 790 F.2d 93 (Fed. Cir. 1986) ...............................13

*In re Cambridge Biotech Corp.*,
   186 F.3d 1356 (Fed. Cir. 1999) .......................................................................2

*Capmark Bank v. RGR, LLC*,
   81 So. 3d 1258 (Ala. 2011)............................................................................22

*Christopher Vill., L.P. v. United States*,
   360 F.3d 1319 (Fed. Cir. 2004) .......................................................................7

*Citri-Lite Co. v. Cott Beverages, Inc.*,
   2011 WL 4751110 (E.D. Cal. 2011), *aff'd*, 546 F. App'x 651 (9th
   Cir. 2013) ........................................................................................................2

iii

*Cudd v. Wood*,
    89 So. 52 (Ala. 1921) ........................................................................23

*Daff v. United States*,
    78 F.3d 1566 (Fed. Cir. 1996) .........................................................17

*Dodd v. City of Chattanooga*,
    215 F. Supp. 3d 608 (E.D. Tenn. 2016), *aff'd*, 846 F.3d 180 (6th
    Cir. 2017) ........................................................................................12

*Durden v. Furniture Fair of Dothan, Inc.*,
    348 So. 2d 1375 (Ala. 1977) ...........................................................23

*Enron Fed. Sols., Inc. v. United States*,
    80 Fed. Cl. 382 (2008) .......................................................................7

*Fomby-Denson v. Dep't of Army*,
    247 F.3d 1366 (Fed. Cir. 2001) .......................................................21

*Gen. Dynamics Corp. v. United States*,
    47 Fed. Cl. 514 (2000) ...............................................................24, 25

*Haddon Hous. Assocs., Ltd. P'ship v. United States*,
    711 F.3d 1330 (Fed. Cir. 2013) .......................................................21

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
    704 F.3d 927 (11th Cir. 2013) ...........................................................3

*Kaiser Steel Corp. v. Mullins*,
    455 U.S. 72 (1982) ......................................................................21, 24

*LaBatte v. United States*,
    142 Fed. Cl. 425 (2019) .....................................................................6

*Laguna Constr. Co. v. Carter*,
    828 F.3d 1364 (Fed. Cir. 2016) .........................................................6

*Long Island Sav. Bank, FSB v. United States*,
    503 F.3d 1234 (Fed. Cir. 2007) .........................................................3

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) .............................................................2

*Nat'l Data Payment Sys., Inc. v. Meridian Bank*,
   212 F.3d 849 (3d Cir. 2000) ...............................................................12

*Northrop Grumman Computing Sys., Inc. v. United States*,
   93 Fed. Cl. 144 (2010) .........................................................................2

*Old Stone Corp. v. United States*,
   63 Fed. Cl. 65 (2004), *aff'd in part, rev'd in part*, 450 F.3d 1360
   (Fed. Cir. 2006) ..................................................................................26

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) ............................................................................22

*Robinson v. United States*,
   305 F.3d 1330 (Fed. Cir. 2002) .........................................................27

*Sanders-Midwest, Inc. v. United States*,
   15 Cl. Ct. 345 (1988) ...................................................................12, 13

*Spodek v. United States*,
   73 Fed. Cl. 1 (2006) .....................................................................27, 28

*Stovall v. United States*,
   94 Fed. Cl. 336 (2010) .......................................................................26

*TVA v. United States*,
   60 Fed. Cl. 665 (2004) .......................................................................21

*Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*,
   2019 WL 1223026 (Del. Ch. 2019) ...................................................12

*Ward v. Real Ships, Inc.*,
   2009 WL 3528365 (S.D. Ala. Oct. 22, 2009) ....................................28

**Other Authorities**

10 C.F.R. 50.30(b) ......................................................................................9

10 C.F.R. § 50.80(b)(1)-(2) .......................................................................10

10 C.F.R. § 50.80(b)(2) .............................................................................10

*Essential and incidental reliance*, Modern Law of Contracts § 14:25 ....27

Restatement (Second) of Contracts § 369..................................................................23

13 Williston on Contracts § 39:9 (4th ed.)..............................................................21

25 Williston on Contracts § 67:15 (4th ed.)............................................................23

## INTRODUCTION

Nuclear Development ("ND") could not satisfy the closing condition in the contract unless the NRC approved transfer of the construction permits by the closing date. Who is at fault for the NRC being unable to make a decision on ND's permit-transfer application by that closing date? The blame rests entirely with ND.

ND filed its application at a point when there was no chance that the NRC could complete its review in time. Did ND have any justification for waiting so long? The trial evidence showed that there was no such justification. To the contrary, the eleventh-hour filing stemmed from ND's undue delay in spending the money and making the key decisions that were needed to submit the application.

Was TVA somehow responsible for the late filing? Although ND launched a fusillade of allegations claiming that TVA had breached its contractual obligations, they all miss the mark. TVA acted reasonably in carrying out its obligations. And, just as importantly, no act or omission of TVA caused ND to be unable to close.

Simply put, the deal between ND and TVA went into the ditch because ND did not carry out its contractual obligations in a timely way. ND's claims against TVA for breach of contract cannot succeed.

## ARGUMENT

**I.   The Court should enter judgment in favor of TVA on ND's claim that TVA breached Section 9(a) of the PSA.**

The Court should reject ND's claim that TVA breached Section 9(a) of the

PSA. Instead, it was ND who breached those contractual obligations.

Section 9(a)(i) required <u>both parties</u> to exercise "commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated" by the PSA. Ex. 1 at § 9(a)(i). "Typically, 'best efforts' require some affirmative action made in good faith." *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed. Cl. 144, 151 n.7 (2010). As explained by the Federal Circuit, "best efforts requires that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom." *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999).

But there's more. Section 9(a)(i) involves a "best efforts" provision that is modified by the words "commercially reasonable." Ex. 1. And the law unequivocally requires that "[t]he court must give reasonable meaning to all parts of the contract, and not render any portion meaningless." *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 420 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000). "Commercially reasonable" efforts require conducting a transaction "in good faith and in accordance with commonly accepted commercial practice." BLACK'S LAW DICTIONARY, (8th ed. 2004); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (approving Black's Law Dictionary definition of "commercially reasonable efforts" for contractual interpretation); *Citri-Lite Co. v. Cott Beverages,*

*Inc.*, 2011 WL 4751110, at *19 (E.D. Cal. 2011) (approving Black's Law Dictionary as a starting place for meaning of "commercially reasonable efforts"), *aff'd*, 546 F. App'x 651 (9th Cir. 2013).[1]

### A.     ND had no credible reason to delay filing its application.

During the trial, the Court described the following question as part of "the meat of this case":  "Why does Nuclear Development wait until what certainly seems to be the last hour to do what they've got to do to make this application?"  Tr. 328:25-329:3; 329:13. After hearing all the evidence, the Court now knows that ND had no legitimate justification for waiting until the last minute to file its application.

ND knew that it had to file its application months before the closing date to have any chance of NRC approval by the closing. Indeed, ND's nuclear licensing lawyer, its general counsel, and its lead consultant expected it would take six months for the review to be completed. Tr. 191:8-16; 460:14-16; 874:17-875:9. Given that the original closing date was November 14, 2018, that would have required the application to be filed no later than May 14, 2018, to have a shot at NRC approval in time. ND's lawyer never even started the application, however, until March 2018. Tr. 191:1-4. When asked at trial, ND's general counsel could not say that ND filed

---

[1] When applying federal common law, the Eleventh Circuit uses contract principles from the general common law which is distilled from sources including treatises. *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013); *see also Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007); *Burden v. Mobile Works, Inc.*, 2008 WL 478441, at *2 (S.D. Ala. 2008) (citing Black's Law Dictionary as a source of general common law).

its application within a reasonable time period. Tr. 424:17-425:6. And ND's president had no idea why ND was not prepared to submit its application until November 13, 2018. Tr. 971:25-972:8.

ND originally told the NRC that it would file the application by July 2017. Ex. 77 at 3. But ND's CEO testified that ND decided not to spend the money it would have required to get the application completed by that date. Tr. 702:22-25. And ND's president testified that ND was focused solely on the DOE loan program. Tr. 956:2-22; 957:21-958:9. In fact, according to ND's president, he was unaware of any activities ND undertook in 2017 to prepare the transfer application. Tr. 965:11-15. Furthermore, ND's general counsel admitted that because ND had underestimated how long it would take to prepare the engineering documents to be ready to begin construction activities, ND lost the incentive to get the application filed quickly because construction would not begin shortly after NRC approval. Tr. 424:15-425:6.

As late as August 2018 (after it was too late to get a decision from the NRC by closing), NRC's president had an overly simplified view of the technical and quality assurance information that had to be filed with the application. Tr. 713:21-714:1. The punch list prepared by ND's counsel in August 2018 showed many missing items, all of which had to come from ND, not TVA. Tr. 197:16-204:14.

This lack of diligence culminated in ND not making the critical organizational decision it needed to finalize the application until October 2018 and, thus, the

application not being filed until November 13, 2018. Tr. 197:22-198:21; 208:4-13.

ND was not waiting on any information from TVA to file. Tr. 208:20-209:21. The

timing of the filing rested entirely in ND's hands, and ND has no credible excuse for

why it waited so long.  In short, ND came nowhere close to exercising commercially

reasonable best efforts to get the application filed so that there was any chance of

NRC approval before the closing date. Far from putting its muscles to work with full

energy to get the application submitted, ND sat on its hands until it was too late.

On top of all that, the application filed by ND was not accepted for review by

the NRC. Once an application is filed, the NRC first determines whether it is

sufficiently complete for the NRC to begin its review process. Exhibit 81 at 10. In

April 2019, the NRC notified ND that the quality assurance plan submitted with the

application did not comply with NRC regulations and that the information about

ND's technical qualifications was not sufficient. Ex. 84. Only when ND corrected

these deficiencies did the NRC accept the application for review in November 2019.

Ex. 85. Although ND attempted at trial to brush off these deficiencies as a standard

event in the application process, the evidence showed that the need for supplemental

information due to an insufficient application is not common. Tr. 374:1-375:23.

Thus, not only was the application late, but it also was insufficient.

**B.     ND did not establish the causation element for its claim.**

The sale of Bellefonte could not be completed because ND submitted an

untimely, insufficient application. Thus, ND did not establish the necessary element of causation on its breach of contract claim. "To prove a breach of contract, a plaintiff must establish (1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) **damages caused by the breach**." *LaBatte v. United States*, 142 Fed. Cl. 425, 432 (2019) (emphasis added; citation omitted). No alleged act or omission of TVA caused the inability to close the transaction or otherwise caused harm to ND. Instead, because the application process could not move forward until ND made its critical business decision about how ND would be organized, ND's extreme delay in making that decision is what caused the untimely filing and, then even when filed, the application was deficient. In short, ND's own lack of diligence is what caused the NRC to be unable to make a decision on the application by the closing date.

### C.   ND committed prior material breaches of the PSA.

In addition, ND's claim against TVA for breach of Section 9(a) fails due to two prior material breaches of contract committed by ND. "Prior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract." *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016). The doctrine of "prior material breach, is 'based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called

upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party.'" *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004) (quoting Restatement (Second) of Contracts § 237, cmt. b (1981)). "In determining materiality courts often look to whether the breached obligation is an important part of the contract." *Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 397 (2008) (collecting cases).

### 1. ND failed to file its application in a timely manner.

ND's failure to file a reviewable application in time for the NRC to make an approval decision before the closing date amounts to a prior material breach by ND. ND should have filed a reviewable application no later than May 14, 2018, six months before the expected closing date. ND's failure to do so was a material breach of its obligation to exercise commercially reasonable best efforts to consummate the deal. That material breach excused any further performance by TVA.

### 2. ND failed to make a substantial and required payment to TVA.

ND committed a second material breach when it failed to make the last $875,000 payment it owed to TVA pursuant to Section 12(e) of the PSA. ND's CEO admitted that the full payment was due on November 14, 2018, but he had no explanation as to why ND shorted TVA over $700,000 of the amount owed. Tr. 649:7-651:8. The payment was due in arrears to help defray the costs incurred by TVA in maintaining permit compliance during the closing period. Tr. 646:1-23. This

failure was another prior material breach that excused further performance by TVA.

**D.    TVA did not breach Section 9(a), and ND's various allegations of breach are meritless.**

In addition to the fact that ND's claim of breach of Section 9(a) fails due to lack of proof of causation and ND's prior material breaches, ND's scattershot allegations of Section 9(a) breaches by TVA are all meritless.

**1.    TVA had no obligation to prepare or join in ND's application, and TVA committed no breach by not sending a consent letter.**

During the trial, the Court identified the following question as another part of "the meat of this case": "Did TVA, would TVA, why TVA did not join in the application even at the last minute if they were acting in good faith?" Tr. 329:3-5; 329:13. The evidence established that TVA committed no breach of its obligations by not joining in the application or in not sending a consent letter.

**a.  Preparation or joinder in application.**

ND erroneously asserts that TVA should have prepared or joined in ND's permit-transfer application. As for preparation of the application, nothing in the PSA obligated TVA to draft the application.[2] Nor would it have made sense for TVA to do so. Virtually all of the substance of the application had to come from ND. Tr.

---

[2] Although Larry Blust testified that Section 1(e) required TVA to prepare the application, nothing in that section remotely supports that assertion. *See* Ex. 1 at § 1(e). And Blust ultimately conceded that Section 1(e) did not require TVA to certify ND's technical or financial qualifications. Tr. 452:20-23. Blust also stated that the PSA required TVA to prepare the transaction documents, but he later conceded that "Transaction Documents" was a defined term that did not include the transfer application. *See* Tr. 453:4-15; Ex. 1 at § 6(c).

213:8-214:3;  710:8-713:10;  738:22:739:1;  740:24-741:12.  And  TVA  gave  ND everything  it  asked  for  to  support  the  application.  Tr.  713:16-20.  Based  on  these facts,  there  was  nothing  unusual  or  unreasonable  about  TVA  not  preparing  the application.

Nor  did  TVA  breach  any  duty  under  Section  9(a)  by  not  joining  in  the application.  The  NRC's  procedures  for  handling  license  transfers  (LIC-107)  make clear that the current licensee need not submit the application.  Ex. 81 at 6. Moreover, the  NRC's  November  2020  correspondence  to  ND  expressly  states  that  submittal  of the  application  "under  oath  and  affirmation  jointly  by  the  current  licensee  and  the transferee"  is  only  one  of  the  typical  approaches.  Ex.  305.  That  approach  would  not have  made  any  sense  here.  NRC  regulations  require  the  application  to  be  submitted under  oath,  10  C.F.R.  50.30(b),  and  the  TVA  official  who  would  have  been  the person  to  sign  a  joint  application  with  ND  could  not  have  sworn  to  ND's  financial and technical qualifications. Tr. 379:16-25. Furthermore, TVA and ND agreed in the PSA  that  TVA  would  not  have  to  "certify  that  [ND]  is  qualified  and  fit  to  complete construction  of  and  operate  [the  Bellefonte]  reactors.  Ex.  1  at  §  1(e).  But  joinder  in the  application  would  have  required  TVA  to  do  just  that—affirm  under  oath  that "Nuclear  Development  and  its  management  team  have  the  necessary  technical qualifications to safely complete construction of the Bellefonte Units."  Ex. 82 at 16.

In  light  of  these  facts,  TVA  did  not  breach  Section  9(a)  by  not  preparing  or

joining in ND's application.

### b. The consent letter.

TVA also committed no breach of Section 9(a) by not sending a letter to NRC indicating TVA's consent to ND's application.[3] The timing of the relevant events is critical in evaluating this issue.

At the outset, it is important to recognize that the consent letter would never have been submitted prior to when ND submitted its application. Tr. 221:17-24. And, as ND's lawyer conceded, ND did not need the consent letter to file the application. Tr. 213:5-7. This is confirmed by NRC regulations specifying the information that permit transfer applications "shall include;" notably, however, a consent letter is not among them. 10 C.F.R. § 50.80(b)(1)-(2).[4] In addition, the submission of the consent letter would not have led to an automatic approval of ND's application. Tr. 222:14-18. To the contrary, the majority of the NRC staff review of transfer applications consists of determining whether the transferee (here, ND) met various requirements, such as financial and technical qualifications. Tr. 214:4-11.

TVA expressed a willingness to send a consent letter on multiple occasions during the two-year closing period. Tr. 378:1-6; 762:17-24. But ND's lawyer Tim

---

[3] The submission of a consent letter is the other way that the submission of a license-transfer application typically proceeds. Ex. 305.

[4] Instead, NRC regulations make clear that it is up to the NRC as to whether it "may require" a permit transfer applicant "to file a written consent from the existing licensee." 10 C.F.R. § 50.80(b)(2).

Matthews never sent a draft of a consent letter to TVA until mid-October 2018, and even then Matthews did not tell TVA when ND would be filing its application and did not ask TVA to initiate its internal review process for the draft letter. Tr. 763:7-767:10. Plus, critically, Matthews told TVA that ND did not need the letter to submit with the application or before closing, 396:8-14; Tr. 767:11-13, and Blust told TVA that ND did not need the letter before the closing date. Tr. 770:24-771:7. ND now sings a different tune, claiming that TVA acted unreasonably in taking ND at its word by not sending the letter before closing.

In any event, since ND filed the application too late for the NRC to make a decision on it by the closing date, the lack of a consent letter submitted by the closing date was completely inconsequential. Tr. 779:5-16; 829:10-19. Furthermore, the NRC accepted ND's application for review in November 2019 without a consent letter from TVA, so the absence of the letter plainly did not delay the NRC's review process. Tr. 225:7-17.

The bottom line is that the absence of a consent letter from TVA during the 17 days between the submission of the application and the closing date was entirely reasonable and caused no damage or harm to ND.

### 2. TVA did not commit a breach in connection with its communications to ND about legal problems with the closing.

ND is also incorrect in contending that the "commercially reasonable best efforts" provision in Section 9(a) imposed an obligation on TVA to advise ND of

11

potential legal problems with the closing as soon as TVA first considered them. Since TVA was required to use "best efforts" only to the extent that doing so accords with "commonly accepted commercial practice," TVA was under no duty to notify ND of any concerns regarding the applicable law. In fact, courts have repeatedly rejected the notion that one party in a contractual relationship has an obligation to notify the other party about applicable legal issues. *See Sanders-Midwest, Inc. v. United States*, 15 Cl. Ct. 345, 348-50 (1988) (rejecting the proposition that the defendant had a duty to apprise the plaintiff of relevant law establishing the plaintiff's tax liability under a contract between them); *see also Dodd v. City of Chattanooga*, 215 F. Supp. 3d 608, 618 n.12 (E.D. Tenn. 2016) (noting that the principle that citizens are charged with knowledge of the law rendered legally immaterial the defendant's failure to notify the plaintiff of changes in local ordinances impacting the plaintiff's retirement benefits), *aff'd*, 846 F.3d 180 (6th Cir. 2017).

It is especially true that when parties are sophisticated and represented by counsel that a "commercially reasonable best efforts" provision does not impose any obligation to advise the other party of legal concerns.  *See Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 854-55 (3d Cir. 2000) (concluding that a party to a contract had no duty under a "best efforts" provision to remind the other party, a "sophisticated business party" represented by outside counsel, of the limits on its

12

contractual rights); *Vintage Rodeo Parent, LLC v. Rent-a-Center, Inc.*, 2019 WL 1223026, at *21 (Del. Ch. 2019) (holding that "[c]ommercially reasonable efforts do not require that sophisticated parties remind one another of their contractual rights").

Critically, ND should have always known what the Atomic Energy Act required. Doc. 165 at 53. The principle that everyone is charged with knowledge of the law is so inviolable that even "misrepresentations regarding matters of law cannot provide a reason for disturbing a contract." *C & L Constr. Co. v. United States*, 6 Cl. Ct. 791, 798 (1984), *aff'd*, 790 F.2d 93 (Fed. Cir. 1986); *accord Sanders-Midwest*, 15 Cl. Ct. at 350 (concluding that since "[p]ersons are charged with knowledge of the law" even an affirmative misrepresentation of law by the defendant to its contractual counter-party would lack legal significance).

In light of these settled legal principles, TVA certainly had no obligation to make ND aware of potential legal hurdles to closing as soon as TVA had an initial generalized concern about them.  First, this Court has held that ND is charged with knowledge of the law. Doc. 165 at 53. Thus, the "burden of inquiry" as to the applicable law relating to issues impacting closing rested with ND, not TVA. Second, as Mr. Blust conceded, Tr. 453:16-454:10, ND asserted in Section 15(c)(i) of the PSA that it "has knowledge and experience in transactions of this type." Ex. 1. Third, Mr. Matthews, a specialist in nuclear regulatory matters, represented ND

in this matter. Tr. 152:11-154:1. It is inconceivable that "commonly accepted commercial practice" includes raising inchoate legal concerns with another party who asserts to have knowledge in the area and is represented by a specialist from a leading national law firm. Thus, ND cannot point to "commercially reasonable best efforts" as an escape hatch for its failure to understand the relevant legal issues bearing on the closing.

In addition, contrary to ND's current assertion, the fact that TVA did not raise the concern about the Atomic Energy Act until mid-November was of no consequence. First, in the summer of 2018, TVA initially identified a generalized concern about the potential illegality of closing without NRC approval, after ND had already failed to file the application in time to have a chance at an NRC decision by the closing date. Tr. 793:9-19. Second, TVA notified ND within two days of identifying the discrete legal concern with the Atomic Energy Act. Tr. 782:25-783:11; 781:22-782:9; 988:16-21; 993:6-994:7. Third, when TVA raised the concern about the Act, ND's general counsel immediately expressed ND's disagreement with TVA's (correct) legal analysis. Tr. 442:20-24. Not only did ND reject any concern about legal impediments to the closing, but ND proceeded to file this lawsuit against TVA on the closing date, expressly alleging that TVA was wrong on the law. Doc. 1 at ⁋ 16. In light of ND's insistence that TVA was wrong about the law, the never-before-heard contention during trial by ND's general counsel that ND would have

14

asked TVA to cancel the permits if ND had known about the concerns in the summer of 2018 is not credible.[5] Furthermore, the suggestion by ND's outside counsel that he could have resolved the problems with closing if he had sought a threshold determination from the NRC in summer 2018 makes no sense. Tr. 186:18-87:10. Because ND is charged with knowledge of the law, there should have been no need for a threshold determination, and the NRC would only have told ND what ND should already have known.

In sum, TVA was under no obligation to rescue ND from its ignorance about the law, and, in any event, this did not cause any damage or harm to ND.

### 3. TVA's preparation of the environmental assessment involved no breach.

ND also erroneously asserts that TVA unduly delayed in completing the environmental assessment required by the PSA. TVA finalized the assessment in August 2017, a mere nine months after the PSA was signed, and fifteen months before the original closing date. Tr. 296:9-15; Tr. 463:3-11. ND presented no evidence to indicate that the time consumed by TVA to complete it was unusually long. In fact, the evidence showed the initial rough estimate was that it would take five months to finish, and then unexpected lead remediation had to be undertaken

---

[5] In addition, the undisputed evidence at trial was that an effort to cancel the permits would have taken approximately six months, Tr. 797:19-798:1, meaning it would have been too late for ND to accomplish that before the closing date.

before it could be completed. Tr. 297:8-22; 339:2-5.

ND's general counsel made the preposterous assertion that ND did not want to begin spending money on the permit-transfer application until the environmental review was complete. Tr. 421:20-422:3. ND failed to explain why it spent $3,642,796.84 on efforts to obtain financing and customers and to prepare to resume construction before August 2017, but somehow did not want to spend money on the application. Tr. 702:15-25; Ex. 120. In any event, the environmental assessment's completion plainly was not the trigger for ND to begin work on the application, because that did not occur for another seven months. Tr. 191:1-6.

### 4. TVA's provision of engineering and design documents to ND did not involve any breach.

There is also no merit to ND's assertion in its pretrial brief that "TVA delayed [] in providing engineering and design plans necessary to support the application" and that "[w]hen ultimately provided were so deficient that ND had to hire an independent engineer to complete the documents in order to proceed with the NRC and DOE applications." Doc. 211 at 3. ND presented no evidence at trial to support this outlandish allegation. Instead, the evidence showed that TVA timely provided the documents, Tr. 423:1-11, TVA's engineering documents were a key strength of the project, Ex. 128 at 93, and that ND hired the independent engineer at the suggestion of the Department of Energy, Tr. 691:11-20.

16

### 5.  TVA had no obligation to extend the closing date.

ND also incorrectly suggests that TVA had an obligation under Section 9(a) to agree to extend the closing date. That is plainly false. TVA and ND agreed to a specific closing date, and they further agreed that any amendment to the PSA had to be in a writing signed by both parties. Ex. 1 at §§ 5, 26; Tr. 469:17-470:9. In setting forth the obligation to use "commercially reasonable best efforts," the parties stated that the obligation was "[s]ubject to the terms and conditions herein." Ex. 1 at § 9(a)(i). Thus, ND cannot bootstrap Section 9(a) into an obligation to amend other terms of the PSA. ND knew the closing date and also knew that TVA was under no obligation to agree to change it.[6] ND cannot assert a breach because TVA refused to change the deal.

### 6.  TVA's communications with the NRC and ND did not breach the PSA.

There is also no merit to ND's scattershot assertions that TVA did not adequately communicate with the NRC and ND. Although ND has complained about TVA's lack of participation in the August 2018 public meeting with the NRC, no one at ND ever asked TVA to take a speaking role at that meeting. Tr. 396:15-22. ND also has complained that TVA did not agree to submit a request to extend the

---

[6] ND's suggestion also contravenes the settled principle of contract interpretation that "specific contract provisions prevail over general provisions" in the event of any conflict between them. *Daff v. United States*, 78 F.3d 1566, 1574 (Fed. Cir. 1996). Reading Section 9(a)'s general obligations to require TVA to amend the specific closing date would effectively nullify the parties specifically chosen closing date.

Unit 2 permit expiration date. But ND's CEO admitted that he knew that was always a non-issue, and the NRC recently confirmed that the Unit 2 permit has always been in timely renewal status. Tr. 718:8-719:13; Ex. 313.

Although ND alleged in its pretrial brief that TVA failed to communicate with the NRC in the manner that the agency would expect, ND presented no evidence to support that assertion. Instead, the evidence showed that, with the exception of the Unit 2 extension request and the consent letter, no one at ND ever asked TVA to make a specific communication to the NRC. Tr. 216:21-217:5. And Mr. Shea testified that he regularly engaged with the NRC on matters concerning Bellefonte and that TVA had the expected level of communication with the agency during the pre-application period. Tr. 350:4-352:2; 397:1-12. Nor did ND identify any problems it had in communicating with TVA personnel.

* * *

In summary, none of ND's litany of alleged TVA actions and inactions amounts to a violation of Section 9(a), and certainly nothing TVA did or did not do caused the inability of ND to close the transaction.[7]

---

[7] The Court should pay no attention to ND's argument that TVA had some bad motive for its refusal to close arising out of ND's efforts to market power to Memphis. ND already conceded that motive and intent are not elements of TVA's claim, so they are irrelevant to the Court's analysis. Summ. J. Hr'g. Tr., Doc. 143 at 19:18-2. In any event, nothing that arose from the Memphis presentation could have affected ND adversely because the sale of Bellefonte was never going to be finalized unless ND obtained NRC approval and the Memphis presentation occurred in October 2018, five months after the point by which ND would have had to have filed its application in order for the NRC to have time to act on it by the closing. Tr. 64:4-8. Furthermore,

In fact, the evidence showed that TVA went above and beyond any reasonable expectation in preparing for the closing. Franklin Haney, Sr. said that, up until the eve of the closing, TVA and ND had a "great relationship" that "couldn't have been better," and he described TVA's extensive efforts to assist ND in moving the process forward. Tr. 38:16-39:6. Far from telling ND to buzz off (as ND suggested), TVA's V.P. of Licensing proactively initiated conversations with ND personnel about the permit application process, repeatedly suggested maintaining regular communications, and participated in transition committee meetings and meetings with ND personnel. Tr. 379:3-6; 380:1-382:9; 385:4-386:18; 389:19-391:1; 392:3-393:10; 394:5-396:7; Exs. 37 & 51. TVA timely provided massive amounts of information about the plant to ND, Tr. 267:1-269:1; 279:7-280:7; 305:3-12; 423:1-11, and TVA even assisted ND in budgeting and design work for the plant. Tr. 294:15-295:11; 859:14-860:1; 973:1-6; 974:7-24; 1000:19-25. TVA's transition committee met regularly over the two-year closing period, and TVA had everything ready to go in the event the closing were able to occur as scheduled. Tr. 255:19-21; 264:16-265:7; 758:6-17.  In sum, TVA lived up to its end of the bargain.

## II.    The Court should enter judgment in favor of TVA on ND's claim that TVA breached the PSA by refusing to close.

---

ND's argument that TVA was concerned about competition from ND makes no sense. Before TVA's Board ever decided to put Bellefonte up for auction, TVA's CEO alerted the Board to the potential competition from the successful bidder. Ex. 2 at 2.

This Court should also enter judgment in TVA's favor on ND's claim that TVA breached the PSA by refusing to close.

**A.    The undisputed facts and this Court's earlier legal ruling compel judgment in favor of TVA.**

The following are undisputed facts:

- ND and TVA entered into the PSA.  Doc. 208, at 3.

- The closing date under the PSA (as amended) was November 30, 2018. *Id*.

- The PSA contains § 6(a)(v).  That is a closing condition that requires that there "shall not be in effect at the Closing any law, statute, rule, regulation, permit . . . of any Governmental Authority . . . prohibiting or making illegal the consummation of the transactions contemplated by this Agreement."  Ex. 1 at § 6(a)(v).

- On November 30, 2018, two construction permits for Bellefonte issued by the Nuclear Regulatory Commission remained in effect.  Doc. 208, at 3; Tr. at 328:5-7.

- As of November 30, 2018, the NRC had not approved ND's application for approval of transfer of the Bellefonte construction permits.  Doc. 208, at 6.

This Court previously ruled that "[b]ecause the transfer of the Bellefonte site without NRC approval would have been unlawful under Section 101 of the Atomic Energy Act, the closing condition in Section 6(a)(v) was not satisfied." Doc. 165 at 52. In light of that prior ruling and the undisputed facts, this Court should enter judgment

in TVA's favor on ND's claim that TVA breached the PSA by failing to close.[8]

### B.   The doctrine of prevention cannot rescue ND on this claim.

ND erroneously claims that TVA's actions prevented it from satisfying the § 6(a)(v) condition precedent to closing and that, as a result, TVA cannot assert ND's failure to satisfy the condition as a defense. As an initial matter, ND cites no authority for the proposition that this so-called "prevention doctrine" would permit the Court to order TVA to take an illegal act.  Indeed, it is settled law that a federal court lacks authority to order a party to do something in violation of a federal statute. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982); *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366, 1373-74 (Fed. Cir. 2001).

Beyond that, the prevention doctrine only excuses the failure to satisfy a condition precedent when the other party's actions were the "***cause*** of the failure of the performance." *Haddon Hous. Assocs., Ltd. P'ship v. United States*, 711 F.3d 1330, 1338 (Fed. Cir. 2013) (citation omitted; emphasis added). "A party that alleges prevention or hindrance by the other party must prove that the condition on which his rights depended would have occurred or been performed but for the prevention or hindrance." *TVA v. United States*, 60 Fed. Cl. 665, 672 (2004) (citation omitted). "[I]t is not every minor failure, which could otherwise be remedied, that will justify

---

[8] TVA respectfully maintains that transferring ownership of Bellefonte to ND without NRC approval would have caused TVA to violate its construction permits, which is a second reason why the closing condition in § 6(a)(v) was not satisfied. *See* Doc. 75-43 at 22-28.

nonperformance; the conduct allegedly constituting prevention must be something so substantial that it could reasonably justify the other's refusal to perform." 13 Williston on Contracts § 39:9 (4th ed.). "Although it is not necessary that there be a specific malevolent intent, the weight of authority holds that in order for prevention to constitute an excuse for nonperformance of a condition or a promise, the preventing party must have deliberately taken steps to impede performance or have arbitrarily impaired the other party's ability to perform." *Id.* § 39:10.

As described in detail above, the cause of ND's inability to satisfy the closing condition in § 6(a)(v) was ND's unreasonable delay in filing its application. No act or omission of TVA impaired ND's ability to perform, nor is there any evidence of deliberate steps taken by TVA to impede ND in satisfying the closing condition.[9]

## III.   The Court should not order specific performance.

Because TVA committed no breach, the Court need not reach remedial questions. But there are several reasons why ND's request for specific performance cannot succeed.

### A.    ND cannot obtain equitable relief due to its unclean hands.

Since ND did not timely file its permit-transfer application, it does not come to this Court with clean hands and is thus barred from obtaining specific performance. Under federal common law, the doctrine of unclean hands applies

---

[9] ND's prior material breaches of the PSA also bar this breach claim. *See supra* at 6-7.

when a party seeks equitable relief on a breach of contract claim. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* Under the doctrine, a party who fails to perform its obligations under a contract cannot seek equitable relief. *Ashe-Carson Co. v. Bonifay*, 41 So. 816, 819 (Ala. 1906); *accord Capmark Bank v. RGR, LLC,* 81 So. 3d 1258, 1272 (Ala. 2011) (implying applicability of the doctrine of unclean hands for failure to perform)[10]; *see also* Restatement (Second) of Contracts § 369 (a party cannot obtain specific performance when the party committed a breach of its own duties sufficient to discharge the other party of its remaining duties of performance).

As discussed above, ND failed to timely file its permit-transfer application. As a result, ND's unclean hands bar its request for specific performance.

### B.     ND did not prove it was ready, willing, and able to close.

ND also cannot obtain specific performance because it failed to prove it was ready, willing, and able to close the transaction on November 30, 2018.  A party "seeking specific performance must show himself ready and able to comply with his

---

[10] The PSA designates federal common law as controlling, with Alabama law as a backup. TVA could not locate a case under federal common law expressly discussing "unclean hands" arising from a party's breach of its contractual obligations.  But Alabama law expressly addresses it.

part of the contract." *Cudd v. Wood*, 89 So. 52, 54 (Ala. 1921); *accord Durden v. Furniture Fair of Dothan, Inc.*, 348 So. 2d 1375, 1376 (Ala. 1977); 25 Williston on Contracts § 67:15 (4th ed.).

ND's president testified that ND was only going to close if it was comfortable that financing for the project would be in place. Tr. 957:14-20. But the undisputed evidence showed that financing had not been arranged by the closing date. Tr. 655:18-25. Although ND introduced a letter from Franklin Haney, Sr. to a bank purporting to issue wire instructions, that letter was dated after TVA had said it would not close. Ex. 310. And, on cross examination, ND's general counsel admitted that there was an additional step for wire instructions to actually be issued—a step that ND did not take. Tr. 451:3-12.

Notably missing from ND's evidence was any proof that ND actually had the necessary funds available to wire to TVA. ND merely needed to present an account statement from the date of closing to prove this critical fact. But it did not. In the absence of that proof, ND failed to establish it really had the money ready to go.

## C. There are numerous other legal impediments to ND's request for specific performance.

There are other legal impediments to specific performance. First, to the extent that ND is requesting that the Court order TVA to immediately convey the Bellefonte site to ND, such a transfer would violate Section 101 of the Atomic Energy Act. Doc. 165 at 52. This Court lacks authority to order TVA to take an

illegal act. *Kaiser Steel*, 455 U.S. at 83-84.

Second, to the extent that ND is asking the Court to order TVA to convey the Bellefonte site to ND at some undetermined point in the future if the NRC were to approve ND's permit-transfer application, that is an improper request for the Court to reform the contractual closing date. "Reformation is a contract remedy which courts may grant in order to conform the parties' written agreement with their antecedent intent, that is, with the agreement that actually was reached." *Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 529 (2000); *accord Am. President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed. Cir. 1987). "[R]eformation, for the most part, is concerned with mistakes in expression, as in the case of the omission of an agreed-upon term, or the inclusion of a term not agreed upon or the incorrect reduction of a term to writing." *Gen. Dynamics*, 47 Fed. Cl. at 529. And "in the absence of fraud, accident, mistake or illegality, a court of equity cannot change the terms of a contract." *Am. President Lines*, 821 F.2d at 1582. For a mutual mistake to provide a basis for reformation, it has to be a mistake of fact, not a mistake of law. *Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990); *Bank of Guam v. United States*, 578 F.3d 1318, 1330 (Fed. Cir. 2009).

In this case, the parties agreed that the closing date would be November 30, 2018. Ex. 18. In addition, the parties agreed that any amendment to the terms of the Agreement had to be in a writing signed by both parties. Ex. 1 at § 26. This Court

has already determined that any mistake about whether NRC approval was required before the closing was a mistake of law. Doc. 165 at 53. Thus, in light of the applicable law applied to these facts, the request by ND for the Court to ignore the contractual date and instead require the closing to occur if and when the NRC approves the transfer of the permits is substantively a request for reformation, which cannot succeed as a matter of law.

IV.    **A substantial portion of the damages sought by ND are barred by the PSA and by applicable legal doctrines.**

Although the Court need not reach the damages issues because judgment should be entered for TVA, many of the damages sought by ND are barred by the PSA and other applicable legal doctrines.

A.    **ND seeks impermissible incidental damages.**

ND improperly seeks to recover incidental damages, which are barred by the PSA. Ex. 1 at § 35. While ND argues that all its alleged damages are reliance damages, ND fails to acknowledge that there are two types of reliance damages— essential and incidental. First, "essential reliance" damages reimburse the plaintiff for expenses that were "necessary or essential for the plaintiff's performance of his promises under the contract[.]" *Am. Cap. Corp. v. United States,* 63 Fed. Cl. 637, 653 (2005). They are the "price that a party must pay for what it is to receive under the contract." *Id.* Here, only ND's payments to TVA under the PSA would be "essential reliance" damages because they were the price ND had to pay for what it

was to receive under the PSA.

The second category of reliance damages is "incidental reliance damages," which are expenses incurred in "'preparation for collateral transactions that a party plans to carry out when the contract … is performed.'" *Id.*; *accord Stovall v. United States*, 94 Fed. Cl. 336, 353 (2010); *see also Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 79 (2004), *aff'd in part, rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006) (referring to the Restatement "for a discussion of . . . incidental reliance, which consists of costs incurred in preparation for collateral transactions that a party plans to carry out when the contract is performed.").[11]

ND's CEO admitted at trial that none of the damages sought by ND (other than the direct payments to TVA) were necessary for ND to perform its obligations under the PSA. Tr. 661:5-662:3. Instead, all of these amounts were for services related to things like ND's attempts to obtain financing and customers, as well as ND's planning for resumption of plant construction—all of which are collateral to ND's performance of the contract. Tr. 541:21-542:11; 605:21-25. Thus, under applicable law, all of the damages for payments to anyone other than TVA are incidental damages, which the parties agreed could not be recovered.

---

[11] The "traditional distinction" between essential and incidental reliance comes from a 1936 Yale Law Journal article. *Essential and incidental reliance*, Modern Law of Contracts § 14:25.

**B.    ND failed to mitigate its damages.**

ND improperly claims as damages amounts it voluntarily incurred after it knew TVA would not participate in the closing. "It is a basic tenet of contract law that a party injured by a breach of contract has a duty to mitigate its damages." *Spodek v. United States*, 73 Fed. Cl. 1, 19 (2006); *accord Robinson v. United States*, 305 F.3d 1330, 1333 (Fed. Cir. 2002). "In other words, a party cannot recover damages for loss that he could have avoided by reasonable efforts." *Spodek*, 73 Fed. Cl. at 19 (citation, internal quotations, and emphasis omitted).

ND incurred expenses after it knew that TVA would not close on November 30, 2018. Tr. 620:7-621:5; 640:17-641:18; 670:6-671:12; 680:17-681:15; 681:16-682:1; 683:4-7; 685:1-8; 687:2-688:4; 691:2-7; 692:5-9; 692:10-15. ND did not mitigate its damages as to those amounts and thus they are not recoverable.

**C.    There are numerous problems with ND's request to recover its transportation expenses.**

There are numerous reasons why this Court should not award ND its transportation expenses as damages.

**1.  The luxury travel expenses sought by ND should not be allowed.**

This Court should exercise its discretion to deny ND's request to recover its expenses for numerous private jet trips and limousine rides.  In *Ward v. Real Ships, Inc.*, the court addressed "the lavish nature of many claimed travel expenses," noting that there was no evidence "that travel expenses of this magnitude were within the

reasonable contemplation" of the breaching party when the contract was executed. 2009 WL 3528365, at *4 (S.D. Ala. Oct. 22, 2009). And the court emphasized that the $2,000 airline tickets "strongly suggest[ed] that plaintiffs did not undertake to limit their travel expenses to reasonably necessary levels." *Id*. at n.10.

Just as in *Ward*, there is no evidence that ND made TVA aware at the time of contracting of ND's plan to utilize luxury travel services—indeed, ND's CEO testified that he was unaware of ND informing TVA of that intent. Tr. 622:2-10. And TVA hardly could have anticipated the extravagant nature of the expenses. For example, ND repeatedly used private jets to take trips that could easily have been completed by car, Tr. 624:23-626:9; 632:15-634:15, and ND hired a limousine service to transport Frank Haney around his home city. Tr. 663:22-664:15.

### 2. ND failed to establish a business purpose for many of the travel expenses.

ND also failed to establish a business purpose for many of the travel expenses. Tr. 663:2-19; 664:1-668:19; 670:6-671:12; 683:24-684:25. The Court should not award damages when ND did not establish a business justification for an expense.

### 3. ND did not allocate any of the cost of private jet trips to non-business passengers.

On numerous private jet flights for which ND is seeking reimbursement, there were passengers aboard who had no business reason to be there. Tr. 627:3-7; 627:12-16; 629:12-613:7; 631:4-21; 635:25-638:7. Yet ND improperly failed to allocate any

of the cost of those trips to those non-business passengers. Tr. 628:7-25.

### 4. ND has not made clear what amounts it is seeking for limousine services.

ND's claim for expenses incurred with Ali's Sedan Service should be denied because ND has not made clear which of the amounts on those invoices it is actually claiming. During trial, ND stated that it was not claiming all the invoiced amounts, 662:10-19, but it never offered any testimony to explain what was in and what was out. As a result, no payments to that vendor should be awarded as damages.

### D. ND claims expenses as damages for which it was not the payor.

ND did not submit proof that it actually paid a number of the invoices for which it is seeking damages. Tr. 534:20-535:18 (Ex. 320); 643:3-645:18 (Ex. 142 at 1, 3, 5, & 6); 656:1-8 (Ex. 134); 678:19-680:16 (Ex. 136 at 1, 3, & 5). There is no basis to include these amounts in any damages award to ND.

### E. ND cannot establish that professional services for which it claims damages were reasonable and necessary.

ND also cannot recover amounts it spent on various professional services because it did not establish that the charges for the tasks performed were reasonable and necessary. Tr. 671:13-672:14; 673:23-678:5; 683:8-23; 690:11-691:1.

## CONCLUSION

For the foregoing reasons and for the reasons expressed in TVA's previous written and oral arguments to the Court, the Court should enter judgment in favor of TVA on all of ND's claims.

Respectfully submitted this 9th day of June, 2021.

　　　　　　　　　　　　　　　*s/ Matthew H. Lembke*
　　　　　　　　　　　　　　　Attorney for Defendant

　　　　　　　　　　　　　　　OF COUNSEL:

　　　　　　　　　　　　　　　Matthew H. Lembke
　　　　　　　　　　　　　　　Riley McDaniel
　　　　　　　　　　　　　　　BRADLEY ARANT BOULT CUMMINGS LLP
　　　　　　　　　　　　　　　1819 Fifth Avenue North
　　　　　　　　　　　　　　　Birmingham, Alabama 35203-2119
　　　　　　　　　　　　　　　Telephone: (205) 521-8000
　　　　　　　　　　　　　　　Facsimile: (205) 521-8800
　　　　　　　　　　　　　　　mlembke@bradley.com
　　　　　　　　　　　　　　　rmcdaniel@bradley.com

　　　　　　　　　　　　　　　David D. Ayliffe
　　　　　　　　　　　　　　　Ibrahim M. Berro
　　　　　　　　　　　　　　　Jill McCook
　　　　　　　　　　　　　　　Office of the General Counsel
　　　　　　　　　　　　　　　TENNESSEE VALLEY AUTHORITY
　　　　　　　　　　　　　　　400 West Summit Hill Drive, WT6
　　　　　　　　　　　　　　　Knoxville, Tennessee 37902
　　　　　　　　　　　　　　　Telephone: (865) 632-3052
　　　　　　　　　　　　　　　ddayliffe@tva.gov
　　　　　　　　　　　　　　　jemccook@tva.gov
　　　　　　　　　　　　　　　imberro@tva.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2021, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record:

Caine O'Rear, III
J. Craig Campbell
HAND ARENDALL HARRISON SALE, LLC
Post Office Box 123
Mobile, Alabama  36601
corear@handarendall.com

Edward Shane Black
HAND ARENDALL LLC
102 South Jefferson Street
Athens, Alabama 35611
sblack@handarendall.com

_____
            *s/ Matthew H. Lembke*
            OF COUNSEL