FILED

2021 Aug-26  PM 05:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 5:18-cv-1983-LCB |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant. | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Plaintiff Nuclear Development, LLC brought this suit against the Tennessee Valley Authority (TVA) for specific performance of the Purchase and Sale Agreement of the Bellefonte[1] Nuclear Plant Site. The case was tried before the Court between May 16 and 19, 2021. In accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law.[2]

---

[1] "Bel-font," as it is uniformly and correctly pronounced in the Tennessee Valley region of Alabama.

[2] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

## PROCEDURAL BACKGROUND[3]

In November of 2016, TVA entered an agreement with Nuclear Development, LLC, for the purchase and sale of an unfinished nuclear facility in northeastern Alabama known as the Bellefonte Nuclear Plant. Pl.'s Ex. 1. On the eve of closing, TVA concluded that consummation of the sale would be illegal and, citing a condition precedent of non-illegality in the parties' contract, refused to close on the transaction. Nuclear Development sued. (Doc. 1). The Complaint, filed November 30, 2018, sought specific performance of the agreement to purchase the Bellefonte site and a preliminary injunction to maintain the status quo before final judgment. (Doc. 1). It also raised a third, alternative count for breach of contract seeking over $30,000,000 in damages. *Id.*

On April 1, 2021, with the benefit of extensive briefing and oral argument on the parties' cross-motions, the Court denied summary judgment and held that TVA was not obligated to consummate the sale of the Bellefonte Nuclear Plant because one of the conditions to the Purchase and Sales Agreement (PSA)—that closing be lawful—remained unsatisfied. Specifically, the Court held that (1) Section 6(a)(v) of the PSA unambiguously set forth a condition precedent of non-illegality; (2)

---

[3] For additional context on the issues decided by these findings of fact and conclusions of law—a narrow set of those raised in the Original Complaint—see the Court's order on summary judgment. (Doc. 165); *Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021). Further context is also provided by the parties' offers of proof and proffered exhibits.

closing on the sale of the Bellefonte property would not have violated the terms of the Construction Permits; (3) closing on the sale of the Bellefonte property *would* have violated Section 101 of the Atomic Energy Act (AEA); and (4) because closing would have violated Section 101 of the AEA, the condition precedent set forth in Section 6(a)(v) of the PSA was not satisfied. (Doc. 165); *see also Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021).

In so holding, however, the Court found several genuine disputes of material fact that remained for trial. Chief among them was whether TVA had made Section 6(a)(v)'s condition of non-illegality impossible to satisfy, either by failing to use its commercially reasonable best efforts to consummate the sale or by failing to reasonably cooperate with Nuclear Development to secure approval of the Nuclear Regulatory Commission (NRC) for the transfer of the Bellefonte Construction Permits, thereby breaching its duties under Section 9(a) of the PSA.[4] Also in dispute was whether Nuclear Development was ready, willing, and able to close on

---

[4] Under Section 9(a), each party was obligated to "use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto," and to "provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any [Governmental Authority] over the matters specified as to the Site consistent with Section 1(e)." Pl.'s Ex. 1, at 9-10. Section 1(e), in turn, concerns all government-issued permits required in connection with the operation of the site. *Id.* at 3.

November 30, 2018, and whether it had committed a prior material breach of the agreement.[5]

The Court held a four-day bench trial in open court beginning on May 17, 2021, with a fifth day of video testimony held by agreement in chambers outside the presence of counsel. The following witnesses testified by video deposition: (1) Franklin Haney, Sr., Nuclear Development's sole member and manager; (2) William Johnson, former CEO of TVA; (3) Sherry Quirk, TVA's Executive Vice President, General Counsel, and Secretary to the Board of Directors; (4) Clifford Beach, Associate General Counsel and Senior Counsel for TVA; (5) Franklin Haney, Jr., President of Nuclear Development; (5) Marie Gillman, an employee of SNC-Lavalin and lead consultant for Nuclear Development; and (6) Robert Coward, the principal officer and president of the engineering–consulting firm MPR Associates. The following witnesses testified live: (1) Timothy Matthews, Nuclear Development's nuclear-licensing counsel; (2) Jim Chardos, a TVA employee and Site Manager of Bellefonte; (3) Joe Shea, a TVA employee who, at the time of the PSA, served as its Vice President of Regulatory Affairs and Support Services; (4) Larry Blust, General

---

[5] Nuclear Development indicated after summary judgment that it would seek to relitigate at trial issues that had already been decided as a matter of law, contending that further argument on these issues had not been foreclosed by the Court's order. (Minute Entry dated April 5, 2021; Doc.174). The Court ruled that though it would not allow further argument on issues that it had already decided, it would grant Nuclear Development leave to amend its complaint to expressly cite Section 9 of the PSA. (Doc. 175). Both parties have submitted offers of proof and proffered exhibit lists addressing the issues that they would have argued at trial had those issues not been precluded by the Court's summary-judgment order. (Doc. 221; Doc.224).

Counsel, Secretary of, and Outside Counsel to Nuclear Development, as well as the Haneys' long-time family attorney; (5) William McCollum, Nuclear Development's CEO and Chief Nuclear Officer; and (6) Christopher Chandler, TVA's Senior Counsel for Nuclear Development.

## JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over actions against TVA under 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District because it is the judicial district in which "a substantial part of the property that is the subject of the action is situated," 28 U.S.C. § 1391(b), and because the parties agreed that any action arising out of or based on the PSA would be submitted to the Court. (Pl.'s Ex. 1 at 15).

## FINDINGS OF FACT

The Bellefonte Nuclear Plant was inaugurated on December 24, 1974, when the Atomic Energy Commission issued permits to TVA[6] authorizing the construction of two pressurized water reactors at a site along the Tennessee River in Hollywood, Alabama.[7] (Doc. 208); *see* Def.'s Ex. 123. Construction on Bellefonte's

---

[6] The Atomic Energy Commission was abolished by the Energy Reorganization Act of 1973, and, a few months after the issuance of the Bellefonte Construction Permits, its licensing and regulatory functions were transferred to the NRC. *Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021) (citing 42 U.S.C. §§ 5814(a)–(f), 5841(±)).

[7] The facts contained herein were either stipulated by the parties (*see* Dkt. 75, Attach. 2) or result from the Court's evaluation of documentary evidence and witness testimony. In determining the credibility of each witness, the Court considered all the circumstances under which the witness testified, including: the relationship of the witness to the parties; any interest the witness might

two reactors was begun the next year but never completed. In 1988, TVA halted construction on the plant indefinitely, Def.'s Ex. 128 at 2, and since 2010, the Bellefonte units have been frozen in deferred plant status. *Id*.; (Doc. 165 at 5–8).

As early as 2002, a prominent developer from Tennessee by the name of Franklin Haney, Sr., first became interested in seeing the Bellefonte Nuclear Plant brought into service. R. at 18–19. With more than 40 years in project development, Haney is a highly successful real-estate entrepreneur with extensive experience orchestrating financial backing for large-scale commercial, residential, and infrastructural projects. Def.'s Ex. 128 at 10. In 1967, Haney founded the Franklin L. Haney Company, LLC, a privately held business that has built a nationwide portfolio with millions of square feet of prime commercial and residential real estate collectively valued at over $10 billion. *Id.* Among the projects that Haney's company has been responsible for developing are the Dulles Greenway Toll Road project, which includes a fourteen-mile toll road connecting Leesburg, Virginia with the Dulles Airport; the Birmingham Social Security Building; and the Portals Office Buildings I and II, a development in Washington, D.C. comprising nearly two million square feet of office space (including FCC headquarters), 125,000 square

---

have in the outcome of the case; the witness's appearance, demeanor, manner of testifying, and apparent candor and fairness; the reasonableness of the witness's testimony; the opportunity of the witness to acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether any such contradiction related to an important factor in the case.

feet of "highly desirable retail and restaurant space," and a 400-room Mandarin Oriental Hotel. *Id.* Haney has also, in his words, "owned every TVA building" at one time or another. R. at 17.

In the early 2000s, the Haney Company became involved in the nuclear-power industry, handling in various respects the financing of several TVA-owned nuclear projects. R. at 18, 930. According to Haney's son, Frank Haney, TVA reached out to the Haneys in 2001 about doing "off-balance sheet financing for the nuclear units at Browns Ferry and Watts Bar." *Id.* Larry Blust, the Haneys' family attorney, further testified that the Haneys have "prepared financing proposals for Browns Ferry, Watts Bar, and Bellefonte." R. at 411. Frank Haney, however, has never owned, operated, or overseen the construction of a nuclear plant, and he is not familiar with the mechanics of nuclear-power generation. R. at 29–30.

The Haneys have thus been "working on" the Bellefonte Nuclear Plant for the past two decades. R. at 18. Haney's efforts to bring the site online have involved meeting with many high-level elected officials across the region. From them, he secured promises of two-and-a-half billion dollars of tax credits and a billion dollars in subsidies to complete the Bellefonte units. R. at 19–20. And according to Haney, the effort to finish Bellefonte has enjoyed regional bipartisan support: "All the Congressmen in Alabama and Tennessee have worked hard to try to push Bellefonte to be finished. It's not Republican and Democrat." R at 19–20.

7

In 2012, four years before the sale of the Bellefonte Nuclear Plant, the Haneys established Nuclear Development, LLC "for the [sole] purpose of constructing the Bellefonte Units." Pl.'s Ex. 82 at 20. Blust elaborated on this point at trial, explaining that Nuclear Development had been formed principally "to apply for production tax credits for Bellefonte." R. at 411. In its application to the NRC for the Construction Permits' transfer, Nuclear Development described itself as "a special-purpose entity owned by Mr. and Mrs. Franklin L. Haney and trusts for members of their family." Pl.'s Ex. 83 at 16–17. It's "a manager managed LLC," and its sole manager is Haney himself. *Id.* at 17. Neither its President, Frank Haney; its CEO and Chief Nuclear Officer, William R. McCollum, Jr.; nor its General Counsel and Secretary, Larry Blust, are employees of the organization, and though he is the company's chief executive, McCollum contracts for his services at an hourly rate. R. at 947–48.

On April 25, 2016, TVA's then-CEO William Johnson and its General Counsel Sherry Quirk issued a memorandum to the agency's board of directors requesting that TVA declare a surplus and authorize the sale of the Bellefonte Nuclear Plant. Pl.'s Ex. 2; R. at 49. TVA's largest customer at the time was the City of Memphis, R. at 51, and the joint memo expressly acknowledged the "competitive risk" that "[s]elling the site to an entity that completes the nuclear units would put a merchant nuclear plant in TVA's service territory that could compete to serve TVA customers." Pl.'s Ex. 2 at 2. The board nevertheless adopted the recommendation by

resolution and authorized the sale of the site at a public auction to be held later that year. *See* Pl.'s Exs. 3 & 4; R. at 53.

After a six-month competitive process, the auction concluded on November 14, 2016, when the winning bidder, Nuclear Development, entered into an agreement with TVA for the purchase and sale of the Bellefonte Nuclear Plant Site. *See* Pl.'s Exs. 1 & 5. Upon signing, Nuclear Development paid TVA a $22,200,000 "Down Payment" and $750,000 in "Compensated Costs" in compliance with Section 5 of the PSA. Pl.'s Ex. 1 at 5–6. The closing date set by the PSA was to be November 14, 2018, *id.*, though by an amendment executed six days before the scheduled closing, that date was extended to November 30th. *See* Pl.'s Ex. 18.

In March of 2018, Nuclear Development began to draft its application to the NRC for transfer of the Bellefonte Construction Permits from TVA to Nuclear Development. R. at 191. The nuclear-licensing attorney charged with preparing the application, Timothy Matthews, expected at the time that Nuclear Development would be ready to submit the application by October and that the NRC would approve the transfer about six months later. *Id.* At a March 2018 meeting of the Nuclear Energy Institute in Washington, D.C., Matthews met with Christopher Chandler, TVA's Senior Counsel for Nuclear, to discuss the prospect of TVA

submitting a letter consistent with 10 C.F.R. § 50.80(b)(2)[8] indicating that TVA consented to the permits' transfer. *Id.* at 164. Chandler "didn't think that would be a problem." *Id.*

This expectation notwithstanding, sometime in the summer of that year Chandler was struck with a "fairly generalized concern that there was going to be a problem with closing if the NRC hadn't . . . approved the license transfer." R. at 793. The concern was rooted neither in the text of the Construction Permits nor the governing statute; it was simply "one of those thoughts that you have." *Id.* In testifying to the substance of his inchoate concern, Chandler explained that it had "simply occurred to [him] that there was going to be a problem with selling a nuclear plant without the NRC's authority," *id.* at 799, and that "if [the] closing date arrives and Nuclear Development hasn't received [the] NRC's approval," there "may be a problem." *Id.* at 793. Chandler shared this concern with TVA's Senior Counsel, Clifford Beach, but as of then Chandler did not consider the issue to be "significant." *Id.* at 795, 797. Because "the closing date was still far enough away that there were any number of things that could have changed" to obviate whatever potential regulatory problems might surround his concern, Chandler considered the issue too minor to raise with Nuclear Development. *Id.* at 797.

---

[8] Under 10 C.F.R. § 50.80(b)(2), the NRC "may require" an applicant for the transfer of a construction permit "to file a written consent from the existing licensee . . . attesting to the person's right ; . . to possession of the facility or site involved."

Matthews next spoke with Chandler on October 18, 2018. That morning he called to say that he would be sending over a draft letter of the kind the two had discussed in March—one for TVA to submit to the NRC consenting to the transfer of the Construction Permits. *Id.* at 766–67. TVA would "certainly be happy to look at it," Chandler told him, but "if [Matthews] was going to formally ask [them] to submit the letter," TVA would "need several weeks' notice" to make edits and subject the letter to an "internal concurrence and review process." R. at 766–67. Matthews made no indication that he needed the letter signed by TVA, that he needed the letter to submit the transfer application, or that Nuclear Development needed the letter to close on the Bellefonte sale. *Id.* Shortly after the call, Matthews emailed the draft letter to Chandler with the following note:

> Chris,
>
> We previously discussed the possibility of TVA submitting a letter to the NRC consenting to the plant sale and CP transfer (consistent with 50.80(b)(2)) rather than TVA submitting a CP transfer application on behalf of Nuclear Development. I have prepared a draft of that consent letter for your consideration. Please let me know if you have any comments and please let me know when might be convenient to discuss the process going forward.

Pl.'s Ex. 14. Chandler confirmed that he'd received the email later the same day. *Id.*

In a phone call on November 5, Matthews discussed the progression of Nuclear Development's transfer application with Chandler and opined that there was "nothing about [the arrangement]" that made him comfortable. R. at 772–73. It was

"not the usual utility arrangement" that Matthews was used to, and "the normal communication channels . . . were not there." *Id.* Even so, Matthews believed that the application was of "sufficiently high quality that [it] would be accepted by the NRC." *Id.* At no time on the call did Matthews ask TVA to send the consent letter to the NRC. *Id.* at 774.

By the end of that week, TVA had informed Nuclear Development in writing that it had a concern pertaining to the legality of closing on the Bellefonte sale under the terms of the Construction Permits. Pl.'s Ex. 17. Though this concern had first been shared with Nuclear Development in discussions that October, the email constituted the first time that TVA had felt "educated enough" on the topic to reduce the issues to writing. R. at 995. Blust responded on November 12 in a follow-up email to Chandler, relaying a memo that Matthews had written addressing the parties' "regulatory path forward." Pl.'s Ex. 19. A note in this email announced that Nuclear Development "would still like to get . . . that letter Tim requested some time ago." Pl.'s Ex. 19.

The next day, Matthews met with Chandler in Washington, D.C. and mentioned that Nuclear Development would submit its application later in the day. R. at 778. Chandler returned home after the meeting and, for the first time, began to research "the legality of transferring ownership of the . . . site without the NRC's approval." *Id.* at 781–82. At trial, Chandler testified that the mention of a "regulatory

path forward" in Nuclear Development's recent email had "got [him] wondering whether there was . . . anything [he] could find within the Atomic Energy Act itself that would be relevant to this question of whether [TVA] could close." *Id.* at 781–82. Just two days later, TVA's General Counsel Sherry Quirk shared with Nuclear Development the emerging concern that closing on the Bellefonte sale might violate the Atomic Energy Act. *Id.* at 783.

And while the attorneys were navigating these regulatory obstacles, the parties' executives became embroiled in a conflict of their own. Early in October of 2018, Nuclear Development's CEO, William McCollum, made a presentation to the City of Memphis in which he discussed the viability of construction, options for power transmission, and the savings that would accrue to the City were it to leave TVA in favor of power from Bellefonte under Nuclear Development's ownership. *See id.* at 64, 923. Marie Gillman, who attended the meeting as a representative of Nuclear Development's prospective Engineering, Procurement, and Construction Management firm SNC–Lavalin, testified that Nuclear Development promised the City of Memphis an annual savings "in the neighborhood of $300 million" for switching from TVA to Bellefonte. *Id.* at 923. When TVA's CEO, William Johnson, learned the day after this presentation of the comments that McCollum had made to TVA's largest customer, he became "upset." *Id.* at 60. Johnson called a meeting with Haney and Blust on October 23rd, where he "expressed displeasure about how issues

13

had been presented in Memphis" because Nuclear Development's "negative" statements were, in his view, "untrue." *Id.* at 127. Specifically, Johnson resented McCollum's comment that Memphis "should leave TVA and not go to Nuclear Development, but go to MISO[9] or somewhere else, because any deal is better than a deal they're getting from TVA." *Id.* at 60. In Johnson's view, it was simply untrue that Memphis could get a better deal from MISO or somewhere else than from TVA, except "maybe in one hour, in one year." *Id.* at 94. After further questioning, Johnson admitted that his "real concern" and self-described "irritation" was that a retired TVA executive—McCollum, TVA's former COO, was a five-year veteran of the agency—was "trying to harm the organization for no benefit to the organization he worked for." Johnson thus met with Memphis on November 6 "to make the pitch for staying with TVA." *Id.* at 70.

As closing drew near, TVA granted Nuclear Development a short extension on the closing date. R. at 438. The parties executed the First Amendment to the Bellefonte Purchase & Sale Agreement on November 9, and closing was pushed from the 14th to November 30, 2018. Pl.'s Ex. 18. Months before, on August 29, Nuclear Development had sought a six-month extension of the closing date to May 14, 2019 so that it could "put in place the financing" and "complete certain activities

---

[9] The Midwest Independent Systems Operator (MISO) is a member-based power-transmission organization with territory extending across the Central and Southern United States. R. at 435.

necessary for an orderly closing" to the transaction. R. at 431–32; Pl.'s Ex. 13. Johnson decided not to consent to six months, but because he had "[eaten] into some of their time," he agreed to this short extension. *Id.* at 73.

Johnson participated in a townhall-style forum on November 26 at TVA's Knoxville office, during which he spoke to rank-and-file employees and answered their questions about the Bellefonte transaction. *Id.* at 71. He told the audience that McCollum's comments in Memphis had "ticked [him] off" and that their former colleague's behavior had "crossed the line." *Id.* at 73. Johnson then noted that TVA had granted Nuclear Development a short extension and, after a perfunctory poll of how many people thought he should give another, declared that there would be no further extensions. *Id.* Though he would testify that as of the forum he had not yet decided not to close, Johnson told the audience he was "sure we'll be a defendant by Monday." *Id.* at 74.

At 9:09 p.m. the night before closing, TVA notified Nuclear Development by email that it would not close on the transaction. (Doc. 165 at 20). November 30, 2018 came, and TVA did not close on the sale. *Id.* TVA had not by then advised the NRC that it consented to the application, and the NRC had not approved Nuclear Development's application for approval of transfer of the Construction Permits. (Doc. 208 at 6).

## CONCLUSIONS OF LAW

For a plaintiff to prevail on a breach-of-contract claim, he "must establish (1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." *LaBatte v. United States*, 142 Fed. Cl. 425, 432 (2019) (citing *Century Expl. New Orleans, LLC v. United States*, 110 Fed. Cl. 148, 163 (2013)). Here, only the third and fourth elements—breach and damages—are in dispute. (Doc. 208). Nuclear Development alleges that TVA violated its duties under Section 9(a) of the PSA and that Nuclear Development is therefore entitled to specific performance or, in the alternative, damages. TVA contends that Nuclear Development committed a prior material breach and was not ready, willing, and able to close.

Under Section 9(a)(i) of the PSA, the parties agreed to use their "commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable[] the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth" in the PSA. Pl.'s Ex. 1 at 10. Under Section 9(a)(ii), the parties also agreed to

> provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal . . . governmental subdivision, regulatory or administrative agency [or] commission . . . exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax, or other authority or power . . . over the matters specified as to the Site consistent with Section 1(e).

16

*Id.* at 10–11.

"Best efforts" are "[d]iligent attempts to carry out an obligation," especially "all actions rationally calculated to achieve a [usually] stated objective, to the point of leaving no possible route to success untried." *Best efforts*, *Black's Law Dictionary* (11th ed. 2019). When invoked "[a]s a standard, a best-efforts obligation is stronger than a good-faith obligation" and is gauged "by the measures that a reasonable person in the same circumstances and of the same nature as the acting party would take." *Id.*

"Commercially reasonable efforts" are "[r]easonable efforts that a business person, exercising sound judgment, would expect to have carried out in a given situation." *Reasonable efforts*, *Black's Law Dictionary*, (8th ed. 2004); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (approving Black's Law Dictionary definition of "commercially reasonable efforts" for contractual interpretation).

Like the standard of good faith, a contractual best-efforts standard "cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved." *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed. Cl. 74, 82 (2003) (citing *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987)). Typically, it requires "some affirmative action made in good faith." *Northrop Grumman Computing Sys., Inc. v. United States*, 93

17

Fed. Cl. 144, 151 n.7 (2010) (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999)). A party obligated by contract to use its best efforts must "put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom." *Id.*

The transfer of licenses for utilization facilities is governed by 10 C.F.R. § 50.80, subsection (b) of which sets forth the items that "shall" or "may" be included with all license-transfer applications. Among those items that the NRC "may" require is a statement of "written consent from the existing licensee or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right . . . to possession of the facility or site involved." 10 C.F.R. § 50.80(b)(2).

Through its Office of Nuclear Reactor Regulation (NRR), the NRC has issued an Office Instruction on "Procedures for Handling License Transfers" (LIC–107, Revision 2), which describes the NRC's internal procedures for processing the transfer of licenses from a current licensee to a prospective licensee. *See* Pl.'s Ex. 81. According to the Office Instruction, license-transfer requests are "typically filed by licensees," but "may also be filed by a non-licensee" such as "the intended buyer of the plant." *Id.* at 11. The Instruction explains that "applicants (current and proposed licensees)" submit their applications to the NRC "under oath and affirmation," but

> [i]f the application is not being made by the current licensee, the applicant should clearly state that the application is being made on behalf of the current licensee, unless there is a hostile acquisition involved, which would be extremely rare and in which case the NRC must give appropriate notice to the current licensee.

Pl.'s Ex. 81 at 6. A further gloss on an applicant's responsibilities under the regulations is contained in the project manager's checklist attached to the Instruction as Appendix B. The Appendix explains that

> [a]ny person may submit an application for license transfer, provided that the application can be supported by a written consent from the existing licensee, or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right . . . to possession of the facility or site involved.

*Id.* at 19.

Having considered the case law, the record evidence, and the witnesses' testimony at trial, the Court concludes for the following reasons that TVA did not breach its duties under the PSA:

## I.    Nuclear Development was ready, willing, and able to close.

Nuclear Development was ready, willing, and able to close on November 30, 2018. Franklin Haney, Sr. testified that he had deposited the money for the closing and that he planned to close on November 30, 2018, whether TVA granted an extension or not. R. at 24–25. Moreover, Blust credibly testified that Nuclear Development had in its account funds in excess of $91,643,130 available to wire to

TVA on the day of closing, November 30, 2018, *id.* at 447-48, enough to cover the funds due on closing, *id.* at 445.

## II.   Nuclear Development did not commit a prior material breach of the PSA.

TVA asserts that two alleged failures of Nuclear Development's—its allegedly untimely filing of the application for the Construction Permits' transfer, and its omission of a final maintenance payment—amounted to prior material breaches of the PSA, excusing TVA from performing its own duties under the contract. A "[p]rior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract." *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016) (citation omitted).

But neither of these alleged failures amounted to a prior material breach. As discussed below, the timing of the filing of Nuclear Development's transfer application proves relevant to whether TVA breached Section 9(a) of the PSA, but it did not itself constitute an independent breach. And even if the alleged untimeliness of the filing had constituted a prior material breach, TVA waived its right to contest it by continuing to accept payments for the maintenance and security

of the Site and by signaling its intention to close on the sale by signing the First Amendment to the Contract.

Nor did Nuclear Development's alleged failure to pay the last $875,000 payment due under Section 12(e) of the PSA constitute a prior material breach. That section obligated Nuclear Development to pay TVA $875,000 per quarter in arrears, with the final payment to be made at Closing. Pl.'s Ex. 1 at 13. But while Nuclear Development's CEO conceded that the final payment was short about $700,000, *see* R. at 649–52, TVA made no objection to the deficiency of the payment until long after the amended closing date. Indeed, by the time that final payment was due, TVA had already raised its concerns that it would not be able to perform its duties under the PSA. Moreover, Section 11(a)(iii) of the PSA, which contemplates pre-closing breach, requires the party that would raise it to provide reasonable notice and an opportunity to cure, Pl.'s Ex. 1 at 12, and TVA provided neither. The failure, then, was either not a breach, not material, or was waived by TVA.

## III. TVA did not breach Section 9(a) of the PSA.

### a. TVA neither concealed its concerns about the legality of closing nor unreasonably delayed in sharing those concerns with Nuclear Development.

Nuclear Development's theory of concealment and delay is not supported by the evidence. According to Nuclear Development, TVA first identified its concerns about the legality of closing in the summer of 2018 but concealed them until Nuclear

Development had too little time to address them because TVA "fear[ed] . . . losing Memphis as a customer." (Doc. 227 at 1). But under Nuclear Development's theory of retributive non-cooperation, TVA's legal department would have identified its concerns about the legality of closing in the summer and withheld them for months—without motive—before the alleged onset of ill-will between the parties. That TVA's legal department would conceal its concerns long before any alleged degradation in the parties' relationship simply does not make sense. Moreover, the evidence suggests otherwise.

Chandler, whose testimony evinced competency and professionalism, credibly accounted for the inception and evolution of TVA's concerns without regard to any direction from or communication with TVA executives. As he explained at trial, his was a "generalized concern" that "selling a nuclear plant without the NRC's authority" could pose a "potential regulatory problem." R. at 799. The issue may have first been raised internally as early as June of 2018, *id.* at 798, but what he then contemplated was merely a preliminary concern that would have occurred to any lawyer with nuclear-licensing experience. The notion, fledgling at the time, was simply that "[p]eople who work in the industry know that you can't sell nuclear plants without the NRC's approval." *Id.* at 827.

And when that notion eventually developed into the particularized concerns that TVA believed could jeopardize the closing, TVA used reasonable efforts to

quickly relay those concerns to Nuclear Development. For instance, TVA shared with Nuclear Development its concern that closing could be unlawful under Section 101 of Atomic Energy Act—the grounds on which the Court held that closing would indeed have been unlawful—just two days after it was first raised internally. *Id.* at 781–82. TVA may have taken more than a few days to share its concern regarding the legality of closing under the Construction Permits—months[10] even—but the timeline suggests that there too TVA's efforts to communicate its misgivings with Nuclear Development were reasonable. When his concern about the legality of closing first emerged, Chandler did not yet consider the issue to be "significant," because "the closing date was still far enough away that there were any number of things that could have changed" to foreclose it—an extension, for instance, or permit withdrawal. *Id.* at 797. At that time the parties still had "a great relationship," the testimony of several witnesses suggests that an expectation that the closing date might be extended would have been reasonable, *id.* at 39, 797, and indeed an extension request was then still pending, *id.* at 812.

But even if TVA had first identified the issue early in the summer, the testimony of Chandler and Beach suggests that the legal department neither

---

[10] Chandler testified that he first identified the construction-permits issue "sometime in the summer," R. at 789, but further details on the timing and development of the issue were withheld pursuant to attorney-client privilege. The concern was shared with Nuclear Development "in the October time frame" ("[p]erhaps earlier"), *id.* at 986, 994–95, and it was first communicated in writing on November 9, *id.* at 986–88; *see* Pl.'s Ex. 17.

concealed its concerns nor unduly delayed in sharing them. Rather, it appears that because the issue was "complicated," "[i]t took time" for the attorneys "to get to where [they] could reduce it to bullets." *Id.* at 996. As closing drew near, TVA's legal department "became more educated" and, by early November, the General Counsel's Office "had gotten . . . educated enough to where [they] could put some concepts in writing." *Id.* at 995. Even so, TVA's attorneys did not wait until they had fully grasped the concern to share it with Nuclear Development, for even before they were able to put the concern in writing there had been "earlier discussions [with Nuclear Development] on the topic." *Id.* In short, once TVA had formulated a particularized concern about the text of the Construction Permits, it shared its concern with Nuclear Development.

Moreover, Nuclear Development was charged with knowledge of the law. (Doc. 165 at 53). Under Section 101 of the AEA, TVA could not lawfully transfer Bellefonte to Nuclear Development before the NRC had approved the transfer of the Construction Permits. *Id.* Just as it should have been familiar with the full array of attendant rules and regulations governing the license-transfer application process, Nuclear Development should have known—and was charged with knowing—that Section 101 could present a barrier to closing. *Id.* This is all the more true because the firm was represented by Matthews, a partner with nearly three decades of

experience at a leading nuclear-licensing firm, and McCollum, the former COO of TVA, both of whom are well versed in the nuclear-licensure process.

Note, however, that while Section 9(a)'s best-efforts clause did not compel TVA to notify Nuclear Development of abstract concerns about potential legal impediments to closing that the latter was charged with knowing, it did compel TVA to notify Nuclear Development of those concerns once they moved from the abstract to the concrete. In other words, as soon as TVA began to have particularized and expectation-driven internal discussions that closing could be in jeopardy, it was obligated to inform Nuclear Development of the nature and basis of those concerns. It did.

### b. TVA's decision not to prepare or join in Nuclear Development's application to the NRC for transfer of the Construction Permits did not constitute a breach of Section 9(a).

Nuclear Development contends that TVA has placed it in a catch-22: to possess the property it needs the Construction Permits, and to obtain the Construction Permits it needs to possess the property. Under this theory, it was "prevented" by TVA from securing the permits in time for closing because TVA failed to join in the application or submit a letter to the NRC consenting to the transfer of the Construction Permits. But this is not so.

Neither NRC regulations, NRC guidance, nor the PSA itself required TVA to prepare the application to transfer the Bellefonte Construction Permits to Nuclear

Development. And it would not have made sense for TVA to do so. Nearly everything required under 10 C.F.R. § 50.80(b)(1) for inclusion in a license-transfer application would need to come from Nuclear Development, including its corporate information, technical and financial qualifications, resumes of key personnel, and a host of other information. *See* 10 C.F.R. § 50.80(b)(1); Pl.'s Ex. 82; R. at 710–13.

Nor was TVA required to join in the application. The NRC's Office Instruction on handling license transfers, LIC-107, expressly acknowledges that the current licensee need not submit an application. *See* Pl.'s Ex. 82 at 6, 11. And in its letter dated November 3, 2020, the NRC noted two permissible means of submitting license-transfer applications: "under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application." Pl.'s Ex. 305 at 1.

Here, the first path was not available to TVA. Under Section 1(e) of the PSA, Nuclear Development agreed that TVA would not have to "certify that [Nuclear Development] is qualified and fit to complete construction of and operate [the Bellefonte] reactors," Pl.'s Ex. 1 at 4, which joinder in the application would have required it to do.[11] Section 1(e) notwithstanding, the official with executive

---

[11] Such an averment would be required by 10 C.F.R. § 50.30(b), under which construction-permit applications must be submitted "under oath or affirmation," and by 10 C.F.R. § 50.34(9) which requires construction-permit applications to include "[t]he technical qualifications of the applicant to engage in the proposed activities."

leadership over the licensing of TVA's nuclear plants, Joe Shea, who would also have been the official charged with swearing to the application, testified that he could not have sworn under oath or affirmation to Nuclear Development's technical or financial qualifications. R. at 379.

In lieu of a joint submission, TVA told Nuclear Development early in the process that it would follow the second path and submit a letter stating that it consented to the application. R. at 353–54. Because TVA informed Nuclear Development that it would follow the NRC-sanctioned path of submitting a letter of consent, its decision not to join Nuclear Development's application did not constitute a breach of its duties to use its commercially reasonable best efforts or to provide reasonable cooperation under Section 9(a) of the PSA.

### c. TVA's decision not to consent to the Construction Permits' transfer did not constitute a breach of Section 9(a).

Although TVA repeatedly expressed its willingness to send a letter of consent to the NRC, it ultimately did not do so. Nuclear Development contends that this failure amounted to a breach of its duties under the PSA's Section 9(a). It did not.

For one, Matthews, who was responsible for preparing the license-transfer application, never asked TVA to submit a letter consenting to the transfer. Though he spoke with both Chandler and Shea about Nuclear Development's desire to have such a letter submitted, he never affirmatively requested that TVA submit one. In March of 2018, for instance, during his first conversation with Chandler, Matthews

spoke only of what Nuclear Development "would want" for its application and asked whether TVA would be willing to submit a letter consenting to the transfer. R. at 164. And in a meeting with TVA that July, Matthews just "brief[ed]" Shea "on [Nuclear Development's] license-transfer application" and told him that Nuclear Development "*would* need TVA's consent letter as an attachment to the application."[12] *Id.* at 165–66.

It was not until October 2018 that Matthews sent a draft of the consent letter to TVA. And though Chandler had informed him of TVA's weeks-long review process, R. at 166, 766–67, even then Matthews only asked that Chandler "let [him] know if [he has] any comments and . . . when might be convenient to discuss the process going forward." Pl.'s Ex. 14. Chandler nevertheless reviewed the proposed letter and made some modifications to it. R. at 823–24.

The only allusion to an express request for the consent letter was in an email from Blust sent November 12, stating that "[w]e would still like to get from you the

---

[12] After eliciting this testimony at trial, counsel for Nuclear Development asked whether "Mr. Shea responded to *that request*." R. at 166. Counsel rephrased his question: "Did you request TVA to provide consent to the application?" *Id.* Matthews replied: "Yes." *Id.* The context of the follow-up question makes ambiguous whether Matthews meant that he believed his earlier statement that Nuclear Development "would need a consent letter" to constitute a request (which it did not), whether he asked Shea later in that meeting to consent to the application, or whether Matthews simply meant that he asked for a consent letter at some point during the closing period. Given Matthews's ambiguous testimony, the absence of any follow-up with Chandler, and Matthews's conduct through the remainder of the closing period, it seems most likely that Matthews meant the first. But even if there had been a separate express request for TVA's consent, a mere failure to respond by Shea would not have amounted to a breach.

letter Tim requested some time ago."[13] Pl.'s Ex. 19. By that time, however, TVA had developed serious concerns that the terms of the Construction Permits would prevent lawfully closing on the PSA, and within two days it would become concerned about the lawfulness of closing under Section 101 of the AEA as well. With its legal department's attention shifted to assessing the lawfulness of closing, it was commercially reasonable for TVA not to devote its finite legal resources to finalizing the consent letter. And because closing was to prove unlawful and the condition set forth in Section 6(a)(v) left unsatisfied, the letter itself became moot.

But even if TVA's legal department had not decided by mid-November that the prospective unlawfulness of closing had mooted the letter, TVA had still another reason not to spend its pre-closing resources preparing it: Nuclear Development told them that the letter was unnecessary. Matthews said that the application could be submitted without it, R. at 396, and Blust said that the letter would not be necessary for closing, *id.* at 770–71. Given these express representations by Nuclear Development, TVA could reasonably believe that it need not submit the letter to meet its obligations under the PSA.

---

[13] Matthews testified that he requested the consent letter from Chandler both the first week of November and November 13, R. at 171–73, but Chandler, whose vivid recollections of these two conversations were far clearer and more detailed than Matthews's own, testified that Matthews did not ask TVA to submit the consent letter on either occasion. *Id.* at 774, 777–85.

**IV.    TVA did not unreasonably delay Nuclear Development's efforts to obtain NRC approval of the Construction Permits' transfer.**

None of the other allegedly unreasonable delays or deficiencies meaningfully affected Nuclear Development's ability to submit a timely application to the NRC. Neither Quirk's alleged delay in granting environmental clearance to Nuclear Development, nor any of the other allegedly dilatory or deficient actions of TVA's had any bearing on Nuclear Development's ability to timely file the license-transfer application.

In fact, Nuclear Development's failure to secure the NRC's approval for transfer of the Construction Permits by closing was attributable entirely to Nuclear Development's slow decision-making and casual approach to the transfer-application process. Marie Gillman, Nuclear Development's lead consultant, testified that she knew as early as July 19, 2018 that "there was no way [the construction-permit transfer] would be approved [by closing]. It wasn't possible. The NRC review would take at least six months." Matthews and Blust also expected NRC approval to take at least six months from the submission date. R. at 191, 460. With these expectations, and with an original closing date of November 13, 2018, Nuclear Development should have filed its application by mid-May of that year. But not only did Nuclear Development not begin work on the application until March, R. at 191, it did not file the application until November 13, 2018, Pl.'s Ex. 82.

What's more, the six-month timeline held only for the typical case. But the NRC is an "extremely conservative, regimented organization" for whom the typical case involves a public utility, not a family concern of real-estate developers. R. at 878. This idiosyncrasy alone was likely to cause the NRC to balk at the application and prolong the approval process by several months. *Id.* But these expectations did not keep Nuclear Development from waiting until a day before the original closing date to file its application. The seventeen days that remained before closing were not even enough time for the NRC to complete a "sufficiency review" to determine whether "the application contain[ed] all of the essential elements . . . for [the NRC] to begin a formal technical review of the application." *Id.* at 779.

The principal cause of the application's delayed submission was Nuclear Development's own indecision concerning the Bellefonte quality-assurance (QA) program.[14] This missing "pacing item"—whether to go with SNC-Lavalin, Exelon, or some other company with the requisite expertise—required a high-level decision from the Haneys. *Id.* at 208. But as late as August 2018, Nuclear Development's President, Frank Haney, had made no decision on the QA program. Def.'s Ex. 60;

---

[14] All construction-permit transfer applications must include "[a] description of the quality assurance program to be applied to the design, fabrication, construction, and testing of the structures, systems, and components of the facility." 10 C.F.R. § 50.34(7). These programs must rigorously comply with the numerous requirements set forth in Appendix B to Part 50, "Quality Assurance Criteria for Nuclear Power Plants and Fuel Reprocessing Plants." An application's description of the quality assurance program that the prospective licensee intends to use must also "include a discussion of how the applicable requirements of appendix B will be satisfied." 10 C.F.R.§ 50.34(7).

R. at 966–71. In fact, although he knew as early as December 2016 that the Bellefonte site manager, Jim Chardos, recommended that Nuclear Development complete the permit-transfer application in the first months of 2017, Def.'s Exs. 46 & 47, Frank Haney did not make the critical QA decision until October 2018, R. at 197–98. A member of the Nuclear Development team pejoratively described Frank Haney's understanding of the project as "very high-level," R. at 873–74, while another described his view of the technical and quality-assurance information necessary for the application as "overly simplified," *id.* at 760.

In short, it was Nuclear Development's own actions that prevented the timely submission of the license-transfer application. Nuclear Development was not waiting on any information from TVA to file, and nothing that TVA did or did not do prevented Nuclear Development from filing its license-transfer application sooner. *Id.* at 208–09.

## V.    TVA had no obligation to extend the closing date.

Under Section 5 of the PSA, TVA and Nuclear Development agreed that the closing would occur on November 14, 2018. Pl.'s Ex. 1 at 6. Any amendments to the PSA were required to be set forth in a written instrument signed by both parties. *Id.* at 19. The parties also agreed that the duty to use "commercially reasonable best efforts" was "[s]ubject to the terms and conditions" of the PSA. Pl.'s Ex. 1 at 10.

The closing date was an express term of the PSA, and TVA was under no obligation to extend it.

Nuclear Development has insisted throughout the proceedings that the "impetus" of the lawsuit was a belated realization by TVA's CEO that Nuclear Development might poach Memphis, TVA's largest customer. The narrative has it that comments by Nuclear Development's CEO made to the City of Memphis in early October 2018 irritated Johnson enough that he and TVA's legal department conspired to find a legal pretext for unwinding the deal. *See discussion, supra* at 12–14. Nuclear Development's assertion certainly has the ring of truth. But because motive does not matter in a breach-of-contract action, the narrative, even if true, would be legally irrelevant.

Johnson's testimony at trial certainly had the tone of a man who feared that Memphis might abandon TVA in favor of Nuclear Development. And his account, which often conflicted with the testimony of other witnesses, strained credulity. Nearly every other witness with nuclear-licensing experience, for instance, testified that it would take the NRC six months to approve the transfer application, but Johnson put the figure at two years. R. at 92. Nor could the Court credit his claim that he denied the six-month closing extension because he was concerned about "open-ended commitments," R. at 61, and "just wanted to move on and see if something else could happen with the site," R. at 99. Up until the end of the closing

period, Nuclear Development and TVA had "a great relationship," and Johnson had told Haney not "to worry about time" because "[n]obody else wants the project anyway that can afford it." R. at 39. Johnson was savvy enough to know that his refusal to close would tie the site up in litigation and postpone alternative plans for the site for years. Had he truly been concerned, as he testified, about the "economic development opportunity in a part of Alabama that really needs it," and had he truly "wanted to make sure that things were going to happen quickly," he would have granted the extension. It would have been far more expeditious for TVA to grant a six-month extension—or two, or three, or four—than refuse to close.

But motive, as Nuclear Development has conceded, is not an element in breach of contract, and TVA had no obligation to extend the closing date. And so while it seems likely that Johnson's decision not to grant an extension—a decision fully within his discretion—was partly, if not entirely, based on frustrations and fears fomented by McCollum's comments in Memphis, Johnson's motives are irrelevant. Section 101 of the AEA presented a true legal impediment to closing. This obstacle was not pretextual, but genuine.

Under the Court's ruling at summary judgment, TVA could not lawfully proceed to closing under Section 101 of the AEA, and so the condition precedent set forth in Section 6(a)(v) of the PSA was unsatisfied. Nothing that TVA did prevented

the satisfaction of this condition, and TVA did not breach its duties under the PSA's Section 9(a).

## CONCLUSION

For the foregoing reasons, the Court finds that TVA did not breach its obligations under the PSA. With no breach, Nuclear Development is entitled neither to specific performance nor to damages, and because Nuclear Development's claims fail, its request for a preliminary injunction must be denied.

However, Nuclear Development is entitled to the relief expressly contemplated by the PSA. In the event that the deal was terminated due to failure to satisfy all closing conditions, Section 11(b) of the PSA obligated TVA to "return the Down Payment and any Compensated Costs paid by [Nuclear Development] within 30 days by check or electronically as directed by Buyer." Pl.'s Ex. 1 at 12. Because this is the means by which TVA elected to terminate the PSA, TVA is **ORDERED** to return by check to Nuclear Development the Down Payment off $22,200,000 and Compensated Costs of $750,000, plus prejudgment interest at a rate of 7.5% per annum, running from December 30, 2018 to the date of this order.

All motions that remain pending in this action unaddressed by these findings of fact and conclusions of law are hereby **DENIED**.

In accordance with Rule 58(a) of the Federal Rules of Civil Procedure, the Court will separately enter a final judgment.

**DONE** and **ORDERED** August 26, 2021.

LILES C. BURKE
UNITED STATES DISTRICT JUDGE