

APPEAL,PROTECTIVE ORDER

# U.S. District Court
# Northern District of Alabama (Northeastern)
# CIVIL DOCKET FOR CASE #: <u>5:18−cv−01983−LCB</u>
## *Internal Use Only*

| | |
|---|---|
| Nuclear Development LLC v. Tennessee Valley Authority | Date Filed: 11/30/2018 |
| Assigned to: Judge Liles C Burke | Date Terminated: 08/26/2021 |
| Cause: 16:831dd – Land Condemnation | Jury Demand: None |
| | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

**Nuclear Development LLC**                 represented by   **Caine O'Rear , III**
HAND ARENDALL HARRISON SALE
LLC
PO Box 123
Mobile, AL 36601
251−432−5511
Fax: 251−694−6375
Email: corear@handarendall.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward Shane Black**
Hand Arendall Harrison Sale, LLC
102 South Jefferson Street
Athens, AL 35611
256−232−0202
Fax: 256−233−2407
Email: sblack@handfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Larry David Blust**
HUGHES SOCOL PIERS RESNICK
DYM, LTD
70 West Madison Street, Ste 4000
Chicago, IL 60602
312−604−2672
Fax: 312−604−2673
Email: lblust@hsplegal.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Craig Campbell**
HAND ARENDALL LLC
P O Box 123
Mobile, AL 36601

251–423–5511
Fax: 251–544–1688
Email: ccampbell@handarendall.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Tennessee Valley Authority**                    represented by  **Matthew H Lembke**
BRADLEY ARANT BOULT
CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203
521–8000
Fax: 488–6560
Email: mlembke@bradley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David D Ayliffe**
TENNESSEE VALLEY AUTHORITY
OFFICE OF THE GENERAL COUNSEL
400 West Summit Hill Drive, Wt6
Ste Wt 6a–K
Knoxville, TN 37902–1401
865–632–8964
Fax: 865–632–6718
Email: ddayliffe@tva.gov
*ATTORNEY TO BE NOTICED*

**Ibrahim Mohamad Berro**
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive/WT6
Knoxville, TN 37902
865–632–7295
Email: imberro@tva.gov
*TERMINATED: 08/16/2022*
*ATTORNEY TO BE NOTICED*

**Jill McCook**
TENNESSEE VALLEY AUTHORITY
OFFICE OF THE GENERAL COUNSEL
400 W. Sumit Hill Drive
Knoxville, TN 37902
865–632–3485
Email: jemccook@tva.gov
*TERMINATED: 07/08/2021*
*ATTORNEY TO BE NOTICED*

**Matthew Jack Bowness**
BRADLEY, ARANT, BOULT &

CUMMINGS
1819 5th Avenue North
Birmingham, AL 35203
205–521–8827
Fax: 205–521–8800
Email: mbowness@bradley.com
*TERMINATED: 10/19/2020*
*ATTORNEY TO BE NOTICED*

**Riley Alexander McDaniel**
BRADLEY ARANT BOULT
CUMMINGS LLP
1819 5th Ave N
Birmingham, AL 35203
205–521–8890
Fax: 205–488–6890
Email: rmcdaniel@bradley.com
*ATTORNEY TO BE NOTICED*

**Steven Chin**
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, TN 37902–1401
865–632–3052
Email: scchin@tva.gov
*TERMINATED: 10/01/2020*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Memphis Publishing Company**      represented by   **J Bennett Fox , Jr**
Adams and Reese LLP                                 ADAMS & REESE LLP
6075 Poplar Avenue                                  6075 Popular Avenue, Suite 700
Suite 700                                           Memphis, TN 38119
Memphis, TN 38119                                   901–524–5278
901–524–5278                                        Fax: 901–524–5419
*doing business as*                                 Email: ben.fox@arlaw.com
The Commercial Appeal                               *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Lucian T Pera**
                                                    ADAMS & REESE LLP
                                                    6075 Poplar Avenue, Suite 700
                                                    Memphis, TN 38119
                                                    901–524–5278
                                                    Fax: 901–524–5419
                                                    Email: Lucian.pera@arlaw.com
                                                    *LEAD ATTORNEY*
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Aaron G McLeod**

3

ADAMS & REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
205−250−5000
Fax: 205−250−5034
Email: aaron.mcleod@arlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/30/2018 | 1 | | COMPLAINT against Tennessee Valley Authority filed by Nuclear Development LLC. (Attachments: # 1 Exhibit A1, # 2 Exhibit A2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(BJL) (Entered: 11/30/2018) |
| 11/30/2018 | 2 | | NOTICE OF CASE ASSIGNMENT to a United States Magistrate Judge for Trial. (BJL) (Entered: 11/30/2018) |
| 11/30/2018 | 3 | | MOTION for Preliminary Injunction *and Request for Expedited Hearing* by Nuclear Development LLC. (Attachments: # 1 Exhibit A−Declaration of Franklin L. Haney)(O'Rear, Caine) (Entered: 11/30/2018) |
| 12/03/2018 | | | Filing Fee: Filing fee $ 400, receipt_number 1126−3228817 (receipt number B4601093789). related document 1 COMPLAINT against Tennessee Valley Authority filed by Nuclear Development LLC. (Attachments: # 1 Exhibit A1, # 2 Exhibit A2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(BJL). (O'Rear, Caine) Modified on 12/4/2018 (BJL). (Entered: 12/03/2018) |
| 12/03/2018 | 4 | | REASSIGNMENT ORDER that the clerk is DIRECTED to reassign this case to a District Judge for all further proceedings as more fully set out in order. Signed by Magistrate Judge Herman N Johnson, Jr on 12/3/2018. (AHI) (Entered: 12/03/2018) |
| 12/03/2018 | 5 | | Case Reassigned to Judge Liles C Burke. Magistrate Judge Herman N Johnson, Jr no longer assigned to the case. Please use case number 5:18−CV−1983−LCB on all further proceedings (AHI) (Entered: 12/03/2018) |
| 12/03/2018 | 6 | | NOTICE by Nuclear Development LLC re 3 MOTION for Preliminary Injunction *and Request for Expedited Hearing of Certificate of Holding Original Declaration of Franklin L. Haney* (O'Rear, Caine) (Entered: 12/03/2018) |
| 12/03/2018 | 7 | | Summons Issued as to Tennessee Valley Authority, Attorney General, and US Attorney and delivered to Plaintiff for service. (BJL) (Entered: 12/04/2018) |
| 12/06/2018 | 8 | | MOTION for Leave to Appear Pro Hac Vice *of Larry D. Blust* by Nuclear Development LLC. (Attachments: # 1 Exhibit A−Certificate of Good Standing of Larry David Blust)(O'Rear, Caine) (Entered: 12/06/2018) |
| 12/06/2018 | 9 | | SUMMONS Returned Executed United States Attorney's Office served on 12/4/2018, answer due 2/2/2019. (AHI) Modified on 12/7/2018 (AHI ). (Entered: 12/07/2018) |
| 12/10/2018 | | | PHV Fee paid: $ 50, receipt number 1126−3233861 (B4601094011). (O'Rear, Caine) (Entered: 12/10/2018) |

| 12/10/2018 | 10 | | TEXT ORDER granting 8 Motion for Leave to Appear. Signed by Judge Liles C Burke on 12/10/2018. (NDH) (Entered: 12/10/2018) |
| 12/12/2018 | 11 | | SUMMONS Returned Executed Tennessee Valley Authority no date given with signature (AHI) (Entered: 12/13/2018) |
| 12/14/2018 | 12 | | NOTICE of Appearance by Matthew H Lembke on behalf of Tennessee Valley Authority (Lembke, Matthew) (Entered: 12/14/2018) |
| 12/14/2018 | 13 | | TEXT ORDER – The Court will hold a telephonic status conference in this matter on Thursday, December 20, 2018 at 10:00 a.m. CST. The parties are directed to call (888) 557–8511 and enter Access Code: 4314172. Signed by Judge Liles C Burke on 12/14/2018. (NDH) (Entered: 12/14/2018) |
| 12/14/2018 | | | Set/Reset Hearings: Telephone Conference set for 12/20/2018 10:00 AM in Federal Courthouse, Huntsville, AL before Judge Liles C Burke. (AHI) (Entered: 12/14/2018) |
| 12/18/2018 | 14 | | NOTICE of Appearance by Steven Chin on behalf of Tennessee Valley Authority (Chin, Steven) (Entered: 12/18/2018) |
| 12/18/2018 | 15 | | NOTICE of Appearance by David D Ayliffe on behalf of Tennessee Valley Authority (Ayliffe, David) (Entered: 12/18/2018) |
| 12/18/2018 | 16 | | RETURN OF SERVICE as to the U.S. Department of Justice. (BJL) (Entered: 12/18/2018) |
| 12/20/2018 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 12/20/2018. (SPT) (Entered: 12/20/2018) |
| 12/26/2018 | 17 | | STIPULATION *OF THE PARTIES REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION* by Tennessee Valley Authority. filed by Tennessee Valley Authority (Lembke, Matthew) (Entered: 12/26/2018) |
| 12/27/2018 | 18 | | ORDER that the request for an expedited hearing is DENIED and the terms of the stipulation are ADOPTED by the Court and the Court ORDERS the parties to abide by the same as more fully set out in order. Signed by Judge Liles C Burke on 12/27/2018. (AHI ) (Entered: 12/27/2018) |
| 01/23/2019 | 19 | | INITIAL ORDER GOVERNING ALL FURTHER PROCEEDINGS – with appendices attached. Signed by Judge Liles C Burke on 1/23/2019. (AHI) (Entered: 01/23/2019) |
| 01/24/2019 | 20 | | Unopposed MOTION for Leave to File *Motion to Dismiss and Supporting Brief* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 01/24/2019) |
| 01/24/2019 | 21 | | TEXT ORDER granting 20 Motion for Leave to File brief not to exceed 25 pages. Signed by Judge Liles C Burke on 1/24/2019. (KBW) (Entered: 01/24/2019) |
| 02/04/2019 | 22 | | MOTION to Dismiss by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 02/04/2019) |
| 02/04/2019 | 23 | | Brief re 22 MOTION to Dismiss . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Lembke, Matthew) (Entered: 02/04/2019) |

| 02/05/2019 | 24 | | TEXT ORDER setting motion deadline 22 Motion to Dismiss. Response due by February 25, 2019, and any reply due by March 11, 2019. Signed by Judge Liles C Burke on 2/5/2019. (NDH) (Entered: 02/05/2019) |
| 02/05/2019 | 25 | | MOTION to Stay *Discovery* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 02/05/2019) |
| 02/05/2019 | 26 | | TEXT ORDER setting motion deadline 25 Motion to Stay. Any response is due by February 19, 2019, and any reply is due by February 26, 2019. Signed by Judge Liles C Burke on 2/5/2019. (NDH) (Entered: 02/05/2019) |
| 02/19/2019 | 27 | | RESPONSE in Opposition re 25 MOTION to Stay *Discovery* filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 02/19/2019) |
| 02/25/2019 | 28 | | RESPONSE in Opposition re 22 MOTION to Dismiss filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 02/25/2019) |
| 02/26/2019 | 29 | | REPLY to Response to Motion re 25 MOTION to Stay *Discovery* filed by Tennessee Valley Authority. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 02/26/2019) |
| 03/11/2019 | 30 | | ORDER that the 25 Motion to Stay is DENIED. Signed by Judge Liles C Burke on 3/11/2019. (AHI) (Entered: 03/11/2019) |
| 03/11/2019 | 31 | | REPLY Brief filed by Defendant Tennessee Valley Authority re: 23 Brief, 28 Response in Opposition to Motion, 22 MOTION to Dismiss filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 03/11/2019) |
| 03/13/2019 | 32 | | REPORT of Rule 26(f) Planning Meeting. (O'Rear, Caine) (Entered: 03/13/2019) |
| 03/14/2019 | 33 | | SCHEDULING ORDER: that certain time limits and deadlines apply as set out in this order; Discovery due by 2/11/2020; Dispositive Motions due by 2/12/2020; Witness and Exhibit Lists due by 4/10/2020; Trial ready by 5/2020. Signed by Judge Liles C Burke on 3/14/2019. (AHI) (Entered: 03/14/2019) |
| 03/19/2019 | 34 | | TEXT ORDER setting motion hearing on Motion to Dismiss (Doc. 22) for Wednesday, May 1, 2019, at 2:00 p.m. CST at the United States Courthouse, 101 Holmes Avenue, Huntsville, Alabama, in the second–floor courtroom. Signed by Judge Liles C Burke on 3/19/2019. (NDH) (Entered: 03/19/2019) |
| 03/19/2019 | | | Set/Reset Hearings: Motion Hearing set for 5/1/2019 02:00 PM in Federal Courthouse, Huntsville, AL before Judge Liles C Burke. (AHI ) (Entered: 03/19/2019) |
| 03/20/2019 | 35 | | Unopposed MOTION to Continue *Hearing on Motion to Dismiss (Doc. 22)* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 03/20/2019) |
| 03/21/2019 | 36 | | TEXT ORDER granting 35 Motion to Continue. Hearing on May 1, 2019, is REMANDED from the Court's docket and is reset for Monday, May 13, 2019, at 2 p.m., U.S. Courthouse, 101 Holmes Avenue, Huntsville, Alabama. Signed by Judge Liles C Burke on 3/21/2019. (NDH) (Entered: 03/21/2019) |
| 03/21/2019 | | | Set/Reset Hearings: Motion Hearing set for 5/13/2019 02:00 PM in Federal Courthouse, Huntsville, AL before Judge Liles C Burke. (AHI) (Entered: 03/21/2019) |

| 04/02/2019 | 37 | | Joint MOTION for Discovery *(to Enter Order Governing Discovery of Electronically Stored Information)* by Nuclear Development LLC. (Attachments: # 1 Exhibit A–Proposed ESI Order)(O'Rear, Caine) (Entered: 04/02/2019) |
|---|---|---|---|
| 04/04/2019 | 38 | | TEXT ORDER granting 37 Motion for Order Governing Discovery of ESI, in part. The Court will adopt the proposed order except for the standard to be applied in deciding apportionment of costs incurred in connection with ESI discovery. Signed by Judge Liles C Burke on 4/4/2019. (NDH) (Entered: 04/04/2019) |
| 04/04/2019 | 39 | | ORDER GOVERNING DISCOVERY OF ELECTRONICALLY STORED INFORMATION as more fully set out therein. Signed by Judge Liles C Burke on 4/4/19. (BJL) (Entered: 04/04/2019) |
| 05/03/2019 | | | TEXT ORDER setting a telephonic status conference for 5/8/2019 at 2:00 PM CST. The Court will provide the parties with dial–in information. Signed by Judge Liles C Burke on 5/3/2019. (NDH) (Entered: 05/03/2019) |
| 05/08/2019 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 5/8/2019. (SPT ) (Entered: 05/08/2019) |
| 05/09/2019 | 40 | | NOTICE of Appearance by Jill McCook on behalf of Tennessee Valley Authority (McCook, Jill) (Entered: 05/09/2019) |
| 05/14/2019 | | | Minute Entry for proceedings held before Judge Liles C Burke: Motion Hearing held on 5/13/2019 re 22 MOTION to Dismiss; Caine O'Rear III, Edward Black, and Larry Blust present for Plaintiff; Matthew Lembke, Jill McCook, and Steven Chin present for Defendants. (Court Reporter Christina Decker.) (SPT ) (Entered: 05/14/2019) |
| 05/14/2019 | 41 | | Exhibit List by Nuclear Development LLC for Motion Hearing held 5/13/2019. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(SPT ) (Entered: 05/14/2019) |
| 05/15/2019 | 42 | | MEMORANDUM OPINION AND ORDER that the 22 Motion to Dismiss is DENIED and TVA shall answer the complaint by 5/29/2019 as more fully set out in order. Signed by Judge Liles C Burke on 5/15/2019. (AHI) (Entered: 05/15/2019) |
| 05/29/2019 | 43 | | ANSWER to 1 Complaint by Tennessee Valley Authority.(Lembke, Matthew) (Entered: 05/29/2019) |
| 06/14/2019 | 44 | | TEXT ORDER that a telephone conference is set for Tuesday, June 18, 2019, at 2:00 p.m. CST. The Court will email counsel the dial–in information for the telephone conference. Signed by Judge Liles C Burke on 06/14/19. (SPT ) (Entered: 06/14/2019) |
| 06/19/2019 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 6/18/2019; Attys present for both parties. (Court Reporter Christina Decker.) (SPT ) (Entered: 06/19/2019) |
| 06/25/2019 | 45 | | ORDER that by 7/3/2019, the parties shall jointly file a proposed protective order as more fully set out in order. Signed by Judge Liles C Burke on 6/25/2019. (AHI) (Entered: 06/25/2019) |

| 06/27/2019 | 46 | | Joint MOTION for Protective Order by Nuclear Development LLC. (Attachments: # 1 Text of Proposed Order A–Proposed Protective Order)(O'Rear, Caine) (Entered: 06/27/2019) |
| 07/01/2019 | 47 | | PROTECTIVE ORDER that certain documents and information shall remain confidential as set out in this order. Signed by Judge Liles C Burke on 7/1/2019. (AHI) (Entered: 07/01/2019) |
| 10/16/2019 | 48 | | NOTICE of Appearance by Matthew Jack Bowness on behalf of Tennessee Valley Authority (Bowness, Matthew) (Entered: 10/16/2019) |
| 11/25/2019 | 49 | | Unopposed MOTION for Extension of Scheduling Order Deadlines by Tennessee Valley Authority. (Attachments: # 1 Exhibit A)(Lembke, Matthew) Modified on 11/25/2019 (BJL). (Entered: 11/25/2019) |
| 11/26/2019 | 50 | | ORDER granting 49 Motion for Extension of Deadlines. Discovery must be completed by 4/13/2020. All dispositive motions must be filed by 5/11/2020. Parties shall be ready for trial by July 2020. Signed by Judge Liles C Burke on 11/26/19. (BJL) (Entered: 11/26/2019) |
| 02/11/2020 | 51 | | NOTICE by Nuclear Development LLC *of Plaintiff's Expert Disclosure* (O'Rear, Caine) (Entered: 02/11/2020) |
| 02/26/2020 | 52 | | NOTICE of Appearance by Riley Alexander McDaniel on behalf of Tennessee Valley Authority (McDaniel, Riley) (Entered: 02/26/2020) |
| 03/03/2020 | 53 | | Unopposed MOTION to Amend the Scheduling Order by Tennessee Valley Authority. (Lembke, Matthew) Modified on 3/4/2020 (AHI). (Entered: 03/03/2020) |
| 03/04/2020 | 54 | | TEXT ORDER granting 53 Motion to Amend/Correct. The Court AMENDS the scheduling order and RESETS the deadlines as follows: Defendant's expert witness disclosures are due by March 31, 2020. The deadline to conduct discovery is April 30, 2020. The deadline to file dispositive motions is May 29, 2020. The deadline to file witness and exhibit lists is June 29, 2020. The parties must be trial–ready by August, 2020. Signed by Judge Liles C Burke on 3/4/2020. (RAC) (Entered: 03/04/2020) |
| 03/13/2020 | 55 | | NOTICE by Nuclear Development LLC re 51 Notice (Other) *Plaintiff's Supplement to Notice of Expert Disclosure* (O'Rear, Caine) (Entered: 03/13/2020) |
| 04/03/2020 | 56 | | TEXT ORDER; Telephone Conference is set for 4/7/2020 at 02:00 p.m. CST; dial in instructions will be emailed to counsel. Signed by Judge Liles C Burke on 4/03/20. (SPT ) (Entered: 04/03/2020) |
| 04/07/2020 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/7/2020. The Court heard argument on a dispute related to TVAs requests for production. The Court heard argument on the issue. The Court discussed the status of settlement discussions; the parties indicated that the case is not yet ripe for mediation. The parties were given the option of further briefing the issue before April 10, 2020. The Court took the issue under advisement. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/08/2020) |
| 04/09/2020 | 57 | | RESPONSE to *Court's Minute Entry, Submitting Supplemental Legal Authority Regarding Damages Discovery* filed by Tennessee Valley Authority. |

| | | | |
|---|---|---|---|
| | | | (Attachments: # 1 Exhibit Exhibit 1)(Lembke, Matthew) (Entered: 04/09/2020) |
| 04/24/2020 | 58 | | ORDER: Nuclear Development is to provide TVA with declarations from the subpoenaed parties as more fully set out in order. Signed by Judge Liles C Burke on 4/24/2020. (AHI ) (Entered: 04/24/2020) |
| 05/14/2020 | 59 | | Joint MOTION to Amend/Correct *Scheduling Order* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 05/14/2020) |
| 05/15/2020 | 60 | | TEXT ORDER granting 59 Motion to Amend/Correct. The parties' Joint Motion to Amend Scheduling Order (Doc. 59) is GRANTED, and the scheduling order is AMENDED as follows: the discovery cutoff is July 27, 2020; the deadline for TVA to file any motion to compel production of damages–related documents from Nuclear Development is fourteen days following the completion of the damages portion of the Rule 30(b)(6) deposition of Nuclear Development; the deadline to file dispositive motions, including Daubert motions, is August 24, 2020; the deadline to file witness and exhibit lists is September 21, 2020; the deadline to file objections to witness and exhibit lists is October 5, 2020; and the parties shall be ready for trial by November 1, 2020. Signed by Judge Liles C Burke on 5/15/2020. (RAC) (Entered: 05/15/2020) |
| 05/29/2020 | 61 | | MOTION to Strike *Nuclear Development's Rule 26(a)(2)(C) Expert Disclosures* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 05/29/2020) |
| 05/29/2020 | 62 | | Brief re 61 MOTION to Strike *Nuclear Development's Rule 26(a)(2)(C) Expert Disclosures* . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Lembke, Matthew) (Entered: 05/29/2020) |
| 06/19/2020 | 63 | | OPPOSITION to 61 MOTION to Strike *Nuclear Development's Rule 26(a)(2)(C) Expert Disclosures* and 62 Brief in Support of 61 MOTION to Strike by Nuclear Development LLC. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9)(O'Rear, Caine) Modified on 6/22/2020 (AHI ). (Entered: 06/19/2020) |
| 06/29/2020 | 64 | | REPLY to Response to Motion re 63 MOTION to Strike 61 MOTION to Strike *Nuclear Development's Rule 26(a)(2)(C) Expert Disclosures*, 62 Brief *Plaintiff's Opposition to Defendant's Motion to Strike* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 06/29/2020) |
| 07/01/2020 | 65 | | TEXT ORDER that a Telephone Conference is set for 7/7/2020 at 09:30 a.m.; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 07/01/20. (SPT ) (Entered: 07/01/2020) |
| 07/07/2020 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 7/7/2020; Caine O'Rear, III present for pla; Matthew Lembke, Riley McDaniel, and Steven Chin present for dft; The Court heard argument on TVAs Motion to Strike (Doc. 61), on the order of the depositions of Stephen Burns and Timothy Matthews, and the re–opening of the depositions of Marie Gillman and William McCollum. The Court took the motion under advisement. A written order will follow. (Court Reporter |

| | | | |
|---|---|---|---|
| | | | Christina Decker.) (SPT ) (Entered: 07/07/2020) |
| 07/07/2020 | 66 | | ORDER denying 61 Motion to Strike. The Scheduling Order is AMENDED as set out therein. Signed by Judge Liles C Burke on 7/7/20. (BJL) (Entered: 07/07/2020) |
| 09/21/2020 | 67 | | Unopposed MOTION to Amend/Correct 43 Answer to Complaint by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 09/21/2020) |
| 09/22/2020 | 68 | | TEXT ORDER granting 67 Motion to Amend/Correct. In accordance with Fed. R. Civ. P. 15(a)(2), and in the interests of justice, the Court GRANTS Defendant's Unopposed Motion for Leave to Amend Answer (Doc. 67). Signed by Judge Liles C. Burke on 9/22/2020. (RAC) (Entered: 09/22/2020) |
| 09/22/2020 | 69 | | *Amended* ANSWER to 1 Complaint by Tennessee Valley Authority.(Lembke, Matthew) (Entered: 09/22/2020) |
| 09/23/2020 | 70 | | MOTION for Summary Judgment by Nuclear Development LLC. (O'Rear, Caine) (Entered: 09/23/2020) |
| 09/23/2020 | 71 | | Brief re 70 MOTION for Summary Judgment (O'Rear, Caine) *** **85 UNREDACTED BRIEF*** (Entered: 09/23/2020) |
| 09/23/2020 | 72 | | Evidentiary Material *in Support of Motion for Summary Judgment*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C (REDACTED), # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J (REDACTED), # 11 Exhibit K (REDACTED), # 12 Exhibit L (REDACTED), # 13 Exhibit M (REDACTED), # 14 Exhibit N, # 15 Exhibit O (REDACTED), # 16 Exhibit P, # 17 Exhibit Q (REDACTED), # 18 Exhibit R, # 19 Exhibit S (REDACTED), # 20 Exhibit T (REDACTED), # 21 Exhibit U (REDACTED), # 22 Exhibit V (REDACTED), # 23 Exhibit W, # 24 Exhibit X (REDACTED), # 25 Exhibit Y (REDACTED), # 26 Exhibit Z, # 27 Exhibit AA (REDACTED), # 28 Exhibit BB (REDACTED), # 29 Exhibit CC (REDACTED), # 30 Exhibit DD (REDACTED), # 31 Exhibit EE (REDACTED), # 32 Exhibit FF (REDACTED), # 33 Exhibit GG 1 OF 3, # 34 Exhibit GG 2 OF 3, # 35 Exhibit GG 3 OF 3, # 36 Exhibit HH, # 37 Exhibit II (REDACTED), # 38 Exhibit JJ (REDACTED), # 39 Exhibit KK (REDACTED), # 40 Exhibit LL (REDACTED), # 41 Exhibit MM, # 42 Exhibit NN (REDACTED), # 43 Exhibit OO)(O'Rear, Caine) *** **85 UNREDACTED EVIDENTIARY SUBMISSION*** (Entered: 09/23/2020) |
| 09/23/2020 | 73 | | MOTION to Seal Document 72 Evidentiary Material,,,, 71 Brief by Nuclear Development LLC. (Attachments: # 1 Exhibit A – Unredacted Evidentiary Submissions, # 2 Text of Proposed Order Proposed Order re Plaintiff's Motion to File Under Seal)(O'Rear, Caine) (Entered: 09/23/2020) |
| 09/23/2020 | 74 | | MOTION for Summary Judgment by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 09/23/2020) |
| 09/23/2020 | 75 | | BRIEF and Evidentiary Material in support of 74 MOTION for Summary Judgment *by Tennessee Valley Authority*. (Attachments: # 1 Evidentiary Submission Table of Contents, # 2 Exhibit 1 – Part 1, # 3 Exhibit 1 – Part 2, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4 – Part 1, # 7 Exhibit 4 – Part 2 (UNDER SEAL), # 8 Exhibit 4 – Part 3 (UNDER SEAL), # 9 Exhibit 4 – Part 4 (UNDER SEAL), # 10 Exhibit 4 – Part 5 (UNDER SEAL), # 11 Exhibit 4 – |

|  |  | Part 6 (UNDER SEAL), # 12 Exhibit 4 – Part 7 (UNDER SEAL), # 13 Exhibit 4 – Part 8 (UNDER SEAL), # 14 Exhibit 4 – Part 9 (UNDER SEAL), # 15 Exhibit 5 – Part 2 (UNDER SEAL), # 16 Exhibit 5 – Part 2 (UNDER SEAL), # 17 Exhibit 5 – Part 3 (UNDER SEAL), # 18 Exhibit 6 (UNDER SEAL), # 19 Exhibit 7 – Part 1 (UNDER SEAL), # 20 Exhibit 7 – Part 2 (UNDER SEAL), # 21 Exhibit 8 – Part 1 (UNDER SEAL), # 22 Exhibit 8 – Part 2 (UNDER SEAL), # 23 Exhibit 8 – Part 3 (UNDER SEAL), # 24 EXHIBIT 8 – Part 4 (UNDER SEAL), # 25 Exhibit 8 – Part 5 (UNDER SEAL), # 26 EXHIBIT 8 – Part 6 (UNDER SEAL), # 27 Exhibit 8 – Part 7 (UNDER SEAL), # 28 Exhibit 8 – Part 8 (UNDER SEAL), # 29 Exhibit 8 – Part 9 (UNDER SEAL), # 30 Exhibit 9 – Part 1 (UNDER SEAL), # 31 EXHIBIT 9 – Part 2 (UNDER SEAL), # 32 Exhibit 9 – Part 3 (UNDER SEAL), # 33 Exhibit 9 – Part 4 (UNDER SEAL), # 34 EXHIBIT 9 – Part 5 (UNDER SEAL), # 35 EXHIBIT 9 – Part 6 (UNDER SEAL), # 36 EXHIBIT 9 – Part 7 (UNDER SEAL), # 37 EXHIBIT 9 – Part 8 (UNDER SEAL), # 38 Exhibit 9 – Part 9 (UNDER SEAL), # 39 Exhibit 9 – Part 10 (UNDER SEAL), # 40 Exhibit 9 – Part 11 (UNDER SEAL), # 41 Exhibit 9 – Part 12 (UNDER SEAL), # 42 Exhibit 9 – Part 13 (UNDER SEAL)(Lembke, Matthew) # 43 UNREDACTED BRIEF) *** **84 SEALED EVIDENTIARY MATERIAL*** (AHI) (Entered: 09/23/2020)** |
|---|---|---|
| 09/23/2020 | 76 | Unopposed MOTION to Seal by Tennessee Valley Authority. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 09/23/2020) |
| 09/23/2020 | 77 | MOTION in Limine by Nuclear Development LLC. (Attachments: # 1 Exhibit A)(O'Rear, Caine) (Entered: 09/23/2020) |
| 09/28/2020 | 78 | Unopposed MOTION to Withdraw as Attorney by Tennessee Valley Authority. (Attachments: # 1 Text of Proposed Order Proposed Order Permitting Withdrawal of Steven C. Chin as Counsel for Defendant TVA)(Ayliffe, David) (Entered: 09/28/2020) |
| 10/01/2020 | 79 | TEXT ORDER granting 78 Motion to Withdraw as Attorney. Attorney Steven Chin terminated. Signed by Judge Liles C Burke on 10/1/2020. (RAC) (Entered: 10/01/2020) |
| 10/02/2020 | 80 | Unopposed MOTION to Amend/Correct *Scheduling Order* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/02/2020) |
| 10/05/2020 | 81 | TEXT ORDER granting 80 Motion to Amend/Correct. In accordance with Rule 16(d)(4) of the Federal Rules of Civil Procedure, the Court finds good cause to modify the scheduling order and hereby extends the due date for witness and exhibit lists to November 20, 2020. Designations of trial testimony to be presented by deposition pursuant to Rule 26(a)(3)(ii) are due on the same date that witness lists are due. Signed by Judge Liles C Burke on 10/5/2020. (RAC) (Entered: 10/05/2020) |
| 10/06/2020 | 82 | TEXT ORDER granting 73 Motion to Seal Document 72 Evidentiary Material,,,, 71 Brief. Signed by Judge Liles C Burke on 10/6/2020.(RAC) (Entered: 10/06/2020) |
| 10/06/2020 | 83 | TEXT ORDER granting 76 Motion to Seal. Signed by Judge Liles C Burke on 10/6/2020. (RAC) (Entered: 10/06/2020) |
| 10/06/2020 | 84 |  |

| | | | |
|---|---|---|---|
| | | | ***SEALED Evidentiary Material** in support of 74 MOTION for Summary Judgment and 75 Brief and Evidentiary Material in support of Motion for Summary Judgment (Attachments: # 1 Exhibit 4 part 3, # 2 Exhibit 4 part 4, # 3 Exhibit 4 part 5, # 4 Exhibit 4 part 6, # 5 Exhibit 4 part 7, # 6 Exhibit 4 part 8, # 7 Exhibit 4 part 9, # 8 Exhibit 5 part 1, # 9 Exhibit 5 part 2, # 10 Exhibit 5 part 3, # 11 Exhibit 6, # 12 Exhibit 7 part 1, # 13 Exhibit 7 part 2, # 14 Exhibit 8 part 1, # 15 Exhibit 8 part 1, # 16 Exhibit 8 part 2, # 17 Exhibit 8 part 3, # 18 Exhibit 8 part 4, # 19 Exhibit 8 part 5, # 20 Exhibit 8 part 6, # 21 Exhibit 8 part 7, # 22 Exhibit 8 part 8, # 23 Exhibit 9 part 1, # 24 Exhibit 9 part 2, # 25 Exhibit 9 part 3, # 26 Exhibit 9 part 4, # 27 Exhibit 9 part 5, # 28 Exhibit 9 part 6, # 29 Exhibit 9 part 7, # 30 Exhibit 9 part 8, # 31 Exhibit 9 part 9, # 32 Exhibit 9 part 10, # 33 Exhibit 9 part 11, # 34 Exhibit 9 part 12, # 35 Exhibit 9 part 13) (AHI) (Entered: 10/06/2020) |
| 10/07/2020 | 85 | | ***SEALED 71 Brief and 72 Evidentiary Material** in Support of Plaintiff's 70 Motion For Summary Judmgnet (Attachments: # 1 Appendix, # 2 Exhibit 1 part 1 A, # 3 Exhibit 1 part 2 A, # 4 Exhibit 2 B, # 5 Exhibit 3 part 1 C, # 6 Exhibit 3 part 2 C, # 7 Exhibit 4 D, # 8 Exhibit 5 E, # 9 Exhibit 6 F, # 10 Exhibit 7 G, # 11 Exhibit 8 H, # 12 Exhibit 9 I, # 13 Exhibit 10 J, # 14 Exhibit 11 K, # 15 Exhibit 12 L, # 16 Exhibit 13 M, # 17 Exhibit 14 N, # 18 Exhibit 15 O, # 19 Exhibit 16 part 1 P, # 20 Exhibit 16 part 2 P, # 21 Exhibit 17 Q, # 22 Exhibit 18 R, # 23 Exhibit 19 S, # 24 Exhibit 20 T, # 25 Exhibit 21 U, # 26 Exhibit 22 V, # 27 Exhibit 23 W, # 28 Exhibit 24 X, # 29 Exhibit 25 Y, # 30 Exhibit 26 Z, # 31 Exhibit 27 AA, # 32 Exhibit 28 BB, # 33 Exhibit 29 CC, # 34 Exhibit 30 DD, # 35 Exhibit 31 EE, # 36 Exhibit 32 FF, # 37 Errata 33 part 1 GG, # 38 Exhibit 33 part 2 GG, # 39 Exhibit 34 HH, # 40 Exhibit 35 II, # 41 Exhibit 36 JJ, # 42 Exhibit 37 KK, # 43 Exhibit 38 LL, # 44 Exhibit 39 MM, # 45 Exhibit 40 NN, # 46 Exhibit 41 OO) (AHI ) (Entered: 10/07/2020) |
| 10/14/2020 | 86 | | Brief in OPPOSITION to 70 MOTION for Summary Judgment filed by Tennessee Valley Authority. (Attachments: # 1 Evidentiary Submission Table of Contents, # 2 Exhibit 1 (REDACTED), # 3 Appendix 1 to Exhibit 1 (UNDER SEAL), # 4 Exhibit 2, # 5 Exhibit 3 (UNDER SEAL), # 6 Exhibit 4 (REDACTED), # 7 Appendix 1 to Exhibit 4 (UNDER SEAL), # 8 Exhibit 5, # 9 Exhibit 6 – Part 1, # 10 Exhibit 6 – Part 2, # 11 Exhibit 6 – Part 3 (REDACTED), # 12 Exhibit 6 – Part 4, # 13 Exhibit 6 – Part 5, # 14 Exhibit 6 – Part 6, # 15 Exhibit 6 – Part 7, # 16 Exhibit 6 – Part 8, # 17 Exhibit 6 – Part 9, # 18 Exhibit 6 – Part 10 (UNDER SEAL), # 19 Exhibit 6 – Part 11 (UNDER SEAL), # 20 Exhibit 6 – Part 12 (UNDER SEAL), # 21 Exhibit 6 – Part 13 (UNDER SEAL), # 22 Exhibit 6 – Part 14 (UNDER SEAL), # 23 Exhibit 6 – Part 15 (UNDER SEAL), # 24 Exhibit 7 – Part 1 (UNDER SEAL), # 25 Exhibit 7 – Part 2 (UNDER SEAL), # 26 Exhibit 7 – Part 3 (UNDER SEAL), # 27 Exhibit 7 – Part 4 (UNDER SEAL), # 28 Exhibit 7 – Part 5 (UNDER SEAL), # 29 Exhibit 7 – Part 6 (UNDER SEAL), # 30 Exhibit 7 – Part 7 (UNDER SEAL), # 31 Exhibit 7 – Part 8 (UNDER SEAL), # 32 Exhibit 8 – Part 1, # 33 Exhibit 8 – Part 2, # 34 Exhibit 8 – Part 3 (REDACTED), # 35 Exhibit 8 – Part 4 (REDACTED), # 36 Exhibit 8 – Part 5, # 37 Exhibit 8 – Part 6, # 38 Exhibit 8 – Part 7, # 39 Exhibit 8 – Part 8, # 40 Exhibit 8 – Part 9 (REDACTED), # 41 Exhibit 8 – Part 10 (REDACTED), # 42 Exhibit 8 – Part 11, # 43 Exhibit 8 – Part 12, # 44 Exhibit 8 – Part 13, # 45 Exhibit 8 – Part 14, # 46 Exhibit 8 – Part 15, # 47 Exhibit 8 – Part 16, # 48 Exhibit 8 – Part 17, # 49 Exhibit 8 – Part 18, # 50 Exhibit 8 – Part 19, # 51 |

|  |  |  |  |
|---|---|---|---|
|  |  |  | Exhibit 8 – Part 20, # 52 Exhibit 8 – Part 21, # 53 Exhibit 8 – Part 22 (UNDER SEAL), # 54 Exhibit 9, # 55 Exhibit 10, # 56 Exhibit 11)(Lembke, Matthew) (# 57 Exhibit 1 UNREDACTED, # 58 Appendix 1 Exhibit 1 UNREDACTED, # 59 Exhibit 3 SEALED, # 60 Exhibit 4 UNREDACTED, # 61 Appendix 1 Exhibit 4 SEALED) # 62 Exhibit 6 part 3 UNREDACTED, # 63 Exhibit 6 part 10 SEALED, # 64 Exhibit 6 part 11 SEALED, # 65 Exhibit 6 part 12 SEALED, # 66 Exhibit 6 part 13 SEALED, # 67 Exhibit 6 part 14 SEALED, # 68 Exhibit 6 part 15 SEALED, # 69 Exhibit 7 part 1 SEALED, # 71 Exhibit 7 part 2 SEALED, # 72 Exhibit 7 part 3 SEALED, # 73 Exhibit 7 part 4 SEALED, # 74 Exhibit 7 part 5 SEALED, # 75 Exhibit 7 part 6 SEALED, # 76 Exhibit 7 part 7 SEALED, # 77 Exhibit 7 part 8 SEALED, # 78 Exhibit 8 part 3 UNREDACTED, # 79 Exhibit 8 part 4 UNREDACTED, # 80 Exhibit 8 part 9 UNREDACTED, # 81 Exhibit 8 part 10 UNREDACTED, # 82 Exhibit 8 part 22 SEALED) # 83 UNREDACTED Brief) (AHI) (Entered: 10/14/2020) |
| 10/14/2020 | 87 |  | RESPONSE in Opposition to 74 MOTION for Summary Judgment filed by Nuclear Development LLC. (O'Rear, Caine) # 1 UNREDACTED Opposition to 74 Motion for Summary Judgment) (AHI). # 1 UNREDACTED Opposition) (AHI ). (Entered: 10/14/2020) |
| 10/14/2020 | 88 |  | Unopposed MOTION to Seal by Tennessee Valley Authority. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 10/14/2020) |
| 10/14/2020 | 89 |  | RESPONSE in Opposition re 77 MOTION in Limine filed by Tennessee Valley Authority. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Lembke, Matthew) (Entered: 10/14/2020) |
| 10/14/2020 | 90 |  | Unopposed MOTION to Seal *Unredacted Exhibits to Response in Opposition to Plaintiff's Motion in Limine* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/14/2020) |
| 10/14/2020 | 91 |  | Evidentiary Material re: 87 Response in Opposition to Motion *for Summary Judgment*. (Attachments: # 1 Exhibit B, # 2 Exhibit D, # 3 Exhibit E, # 4 Exhibit F, # 5 Exhibit G, # 6 Exhibit J (Confidential), # 7 Exhibit M (Confidential), # 8 Exhibit N, # 9 Exhibit O (Confidential), # 10 Exhibit Q (Confidential), # 11 Exhibit R, # 12 Exhibit X (Confidential), # 13 Exhibit Z, # 14 Exhibit BB (Confidential), # 15 Exhibit DD (Confidential), # 16 Exhibit EE (Confidential), # 17 Exhibit II (Confidential), # 18 Exhibit LL (Confidential), # 19 Exhibit PP (Redacted))(O'Rear, Caine) # 20 UNREDACTED Exhibit J, # 21 UNREDACTED Exhibit M, # 22 UNREDACTED Exhibit O, # 28 UNREDACTED Exhibit Q, # 29 UNREDACTED Exhibit BB, # 30 UNREDACTED Exhibit DD, # 31 UNREDACTED Exhibit EE, # 32 UNREDACTED Exhibit II, # 33 UNREDACTED Exhibit LL, # 34 UNREDACTED Exhibit PP) # 35 UNREDACTED EVIDENTIARY SUBMISSION) (AHI). (Entered: 10/14/2020) |
| 10/14/2020 | 92 |  | MOTION to Seal Document 87 Response in Opposition to Motion, 91 Evidentiary Material,, by Nuclear Development LLC. (Attachments: # 1 Exhibit A)(O'Rear, Caine) (Entered: 10/14/2020) |
| 10/15/2020 | 93 |  | TEXT ORDER granting 88 Motion to Seal. Signed by Judge Liles C Burke on 10/15/2020. (KBW) (Entered: 10/15/2020) |
| 10/15/2020 | 94 |  |  |

| | | | |
|---|---|---|---|
| | | | TEXT ORDER granting 90 Motion to Seal. Signed by Judge Liles C Burke on 10/15/2020. (KBW) (Entered: 10/15/2020) |
| 10/15/2020 | 95 | | TEXT ORDER granting 92 Motion to Seal Document. Signed by Judge Liles C Burke on 10/15/2020. (KBW) (Entered: 10/15/2020) |
| 10/15/2020 | 96 | | Unopposed MOTION to Withdraw as Attorney *Matthew J. Bowness* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/15/2020) |
| 10/19/2020 | 97 | | TEXT ORDER granting 96 Motion to Withdraw as Attorney. Attorney Matthew Jack Bowness terminated. Signed by Judge Liles C Burke on 10/19/2020. (KBW) (Entered: 10/19/2020) |
| 10/26/2020 | 98 | | REPLY to Response to Motion re 74 MOTION for Summary Judgment filed by Tennessee Valley Authority. (Lembke, Matthew) # 1 UNREDACTED Reply Brief (AHI ) (Entered: 10/26/2020) |
| 10/26/2020 | 99 | | MOTION to Seal *Unredacted Brief in Support of Summary Judgment* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/26/2020) |
| 10/26/2020 | 100 | | REPLY Brief in support of 77 MOTION in Limine filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 10/26/2020) |
| 10/26/2020 | 101 | | REDACTED REPLY Brief 85 Document Sealed *in Support of Motion for Summary Judgment* filed by Nuclear Development LLC. (O'Rear, Caine) # 1 UNREDACTED Reply Brief in Support of Motion for Summary Judgment Modified on 10/28/2020 (AHI ). (Entered: 10/26/2020) |
| 10/26/2020 | 102 | | MOTION to Seal Document 101 Reply Brief *in Support of Motion for Summary Judgment* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 10/26/2020) |
| 10/27/2020 | 103 | | TEXT ORDER granting 99 Motion to Seal. Signed by Judge Liles C Burke on 10/27/2020. (KBW) (Entered: 10/27/2020) |
| 10/27/2020 | 104 | | TEXT ORDER granting 102 Motion to Seal Document. Signed by Judge Liles C Burke on 10/27/2020. (KBW) (Entered: 10/27/2020) |
| 10/27/2020 | 105 | | TEXT ORDER that a Status Conference is set for 11/4/2020 at 2:30 p.m. in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 10/27/20. (SPT ) (Entered: 10/27/2020) |
| 11/03/2020 | 106 | | Unopposed MOTION to Continue *Status Conference* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 11/03/2020) |
| 11/03/2020 | 107 | | TEXT ORDER granting 106 Motion to Continue. The hearing set for November 4, 2020, is CANCELLED and will be reset at a later date. Signed by Judge Liles C Burke on 11/13/2020. (KBW) (Entered: 11/03/2020) |
| 11/03/2020 | 108 | | TEXT ORDER that the Status Conference is re–set for 11/17/2020 at 3:00 p.m. in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 11/03/20. (SPT ) (Entered: 11/03/2020) |
| 11/17/2020 | | | Minute Entry for proceedings held before Judge Liles C Burke: Status Conference held on 11/17/2020; Caine O'Rear, III and Larry Blust (by phone) present for plaintiff; Matthew Lembke, David Ayliffe, and Riley McDaniel present for defendant. (Court Reporter Christina Decker.) (SPT ) (Entered: |

| | | | |
|---|---|---|---|
| | | | 11/30/2020) |
| 11/20/2020 | 109 | | Exhibit List by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 11/20/2020) |
| 11/20/2020 | 110 | | Witness List *Plaintiff's Designation of Deposition Testimony* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 11/20/2020) |
| 11/20/2020 | 111 | | Exhibit List by Tennessee Valley Authority.. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 11/20/2020) |
| 11/20/2020 | 112 | | Witness List by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 11/20/2020) |
| 11/20/2020 | 113 | | Exhibit List by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 11/20/2020) |
| 11/24/2020 | 114 | | Plaintiff's MOTION to Supplement Record with NRC Letter (Attachments: # 1 Exhibit QQ − 11.3.2020 NRC Letter to ND)(O'Rear, Caine) Modified on 11/25/2020 (AHI). (Entered: 11/24/2020) |
| 12/04/2020 | 115 | | Exhibit List *Objections to Nuclear Development's Exhibit List* by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 116 | | Exhibit List *Supplemental Exhibit List* by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 117 | | Witness List *Objections to Nuclear Development's Deposition Designations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 118 | | Witness List *Counter−designations of Deposition Testimony* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 12/04/2020) |
| 12/04/2020 | 119 | | Witness List *Plaintiff's Counter−Designations of Deposition Testimony* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 12/04/2020) |
| 12/04/2020 | 120 | | Witness List *Plaintiff's Objection to Defendant's Trial Witness List* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 12/04/2020) |
| 12/04/2020 | 121 | | Exhibit List *Plaintiff's Objections to Defendant's Exhibit List* by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 12/04/2020) |
| 12/18/2020 | 122 | | Witness List *Supplemental Deposition Designations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 12/18/2020) |
| 12/18/2020 | 123 | | Witness List *Objections to Nuclear Development's Counter−Designations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 12/18/2020) |
| 01/04/2021 | 124 | | TEXT ORDER that a Telephone Conference is set for 1/4/2021 at 2:00 p.m.; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 01/04/21. (SPT ) (Entered: 01/04/2021) |
| 01/04/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 1/4/2021; Caine O'Rear, III and Larry Blust present for pla; Matthew Lembke and Riley McDaniel present for dft. (Court Reporter Christina Decker.) (SPT ) (Entered: 01/04/2021) |
| 01/13/2021 | 125 | | |

| | | | |
|---|---|---|---|
| | | | TEXT ORDER that a Motion Hearing regarding the <u>77</u> MOTION in Limine filed by Nuclear Development LLC, the <u>74</u> MOTION for Summary Judgment filed by Tennessee Valley Authority, and the <u>70</u> MOTION for Summary Judgment filed by Nuclear Development LLC is set for Tuesday, 2/16/2021, at 10:00 a.m. in the Federal Courthouse, Huntsville, AL before Judge Liles C Burke. Signed by Judge Liles C Burke on 1/13/21. (SPT ) (Entered: 01/13/2021) |
| 01/19/2021 | <u>126</u> | | NOTICE by Tennessee Valley Authority *of Conflicting Trial Setting* (Lembke, Matthew) (Entered: 01/19/2021) |
| 01/27/2021 | <u>127</u> | | Unopposed MOTION to Continue *Trial Setting* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 01/27/2021) |
| 02/02/2021 | <u>128</u> | | MOTION to Supplement the Summary Judgment Record by Tennessee Valley Authority. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2)(Lembke, Matthew) (Entered: 02/02/2021) |
| 02/09/2021 | <u>129</u> | | RESPONSE in Opposition re <u>128</u> MOTION to Supplement the Summary Judgment Record filed by Nuclear Development LLC. (Attachments: # <u>1</u> Exhibit Exhibit A)(O'Rear, Caine) (Entered: 02/09/2021) |
| 02/09/2021 | 130 | | TEXT ORDER that a Telephone Conference is set for 2/10/2021 at 10:00 a.m. CST regarding the handling of confidentiality information in the upcoming motion hearing. Signed by Judge Liles C Burke on 2/9/21. (SPT ) (Entered: 02/09/2021) |
| 02/09/2021 | <u>131</u> | | REPLY to Response to Motion re <u>128</u> MOTION to Supplement the Summary Judgment Record filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 02/09/2021) |
| 02/10/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 2/10/2021; Caine O'Rear, III and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, and Riley McDaniel present for defendant; The parties discussed the confidentiality of exhibits pertaining to the summary–judgment motions and how they should be discussed at the hearing scheduled for February 16, 2021. Both parties indicated that most of their confidentiality designations had been withdrawn, and after further discussion reported that they should be able to agree beforehand on a way to maintain confidentiality at the hearing over the balance of the exhibits. The parties were therefore ordered to submit a joint email to the Court setting forth all points of agreement and disagreement on how confidentiality over the designated exhibits should be preserved at the hearing. (Court Reporter Sabrina Lewis.) (SPT ) (Entered: 02/10/2021) |
| 02/10/2021 | 132 | | TEXT ORDER that a Telephone Conference is set for 2/11/2021 at 10:00 a.m. CST; dial in information will be emailed to parties. Signed by Judge Liles C Burke on 2/10/21. (SPT ) (Entered: 02/10/2021) |
| 02/11/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 2/11/2021; Caine O'Rear, III and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, and Riley McDaniel present for defendant; The Court set the case for trial the week of April 5, 2021. The Court then raised for discussion how much time the parties expected to need for argument at the upcoming summary–judgment hearing. Each movant |

| | | | |
|---|---|---|---|
| | | | expected that their motions would require about 30 minutes for argument and 15 minutes for reply. Finally, the parties discussed the status of Docs. 114 and 128, and the Court indicated that it would grant both motions before the hearing on February 16. (Court Reporter Christina Decker.) (SPT ) (Entered: 02/11/2021) |
| 02/12/2021 | 133 | | MOTION to Intervene *and Unseal Court Record* by Memphis Publishing Company. (Attachments: # 1 Text of Proposed Order)(McLeod, Aaron) (Entered: 02/12/2021) |
| 02/13/2021 | 134 | | TEXT ORDER Setting Hearing on Motion 77 MOTION in Limine , 70 MOTION for Summary Judgment , 74 MOTION for Summary Judgment : Given the threat of inclement weather early next week, the Court has decided that Tuesday morning's hearing should be postponed. The motions hearing scheduled for February 16, 2021 at 10:00 A.M. is therefore RESET to February 19, 2021 at 10:00 AM in the Federal Courthouse, Huntsville, AL before Judge Liles C Burke. Signed by Judge Liles C Burke on 2/13/2021. (RAC) (Entered: 02/13/2021) |
| 02/17/2021 | | | Set/Reset Hearings: Motion Hearing set for 2/19/2021 10:00 AM in Federal Courthouse, Huntsville, AL (AHI) (Entered: 02/17/2021) |
| 02/17/2021 | 135 | | ORDER –The Court GRANTS the 128 MOTION to Supplement the Summary Judgment Record, the 127 Unopposed MOTION to Continue Trial and the 114 MOTION to Supplement Record with NRC Letter; this action is set for a Bench Trial on 4/5/2021 09:00 AM in Federal Courthouse, Huntsville, AL, as more fully set out in order. Signed by Judge Liles C Burke on 2/13/2021. (AHI) (Entered: 02/17/2021) |
| 02/18/2021 | 136 | | TEXT ORDER (CHANGE IN TIME ONLY) that the Motion Hearing is RESET for 2/19/2021 at **9:00 a.m.** CST in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 2/18/21. (SPT ) (Entered: 02/18/2021) |
| 02/19/2021 | 137 | | ORDER – The plaintiff and defendant are to file a response to the 133 MOTION to Intervene by 12:00 PM on 2/24/2021; a hearing on the matter is set for 2/25/2021 at 1:15 PM in Federal Courthouse, Huntsville, AL.. Signed by Judge Liles C Burke on 2/19/2021. (AHI) (Entered: 02/19/2021) |
| 02/19/2021 | 138 | | MOTION for Leave to Appear Pro Hac Vice by Memphis Publishing Company. (Attachments: # 1 Text of Proposed Order)(McLeod, Aaron) (Entered: 02/19/2021) |
| 02/19/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Motion Hearing held on 2/19/2021; Caine O'Rear, Edward Black, and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, and Riley Alexander present for defendant; The Court heard argument on Nuclear Developments Motion for Summary Judgment (Doc. 70), TVAs Motion for Summary Judgment (Doc. 74), and Nuclear Developments Motion in Limine (Doc. 77). The motions were taken under advisement. (Court Reporter Christina Decker.) (SPT ) (Entered: 02/19/2021) |
| 02/23/2021 | 139 | | TEXT ORDER that the Motion Hearing regarding the (doc. 133) Motion to Intervene and Unseal Court Records set for 1:15 p.m. on 2/25/21 is CANCELED and will be reset by further order. Signed by Judge Liles C |

| | | | Burke on 2/23/21. (SPT ) (Entered: 02/23/2021) |
|---|---|---|---|
| 02/23/2021 | 140 | | NOTICE of Appearance by Ibrahim Mohamad Berro on behalf of Tennessee Valley Authority (Berro, Ibrahim) (Entered: 02/23/2021) |
| 02/23/2021 | | | PHV Fee paid: $ 75, receipt number 1126–3783136 (B4601111651). (Fox, J) Modified on 2/24/2021 (BJL). (Entered: 02/23/2021) |
| 02/23/2021 | | | PHV Fee paid: $ 75, receipt number 1126–3783143 (B4601111652). (Pera, Lucian) Modified on 2/24/2021 (BJL). (Entered: 02/23/2021) |
| 02/23/2021 | 141 | | TEXT ORDER granting 138 Motion for Leave to Appear pro hac vice. Signed by Judge Liles C Burke on 2/23/2021. (KBW) (Entered: 02/23/2021) |
| 03/03/2021 | 142 | | TEXT ORDER that a Motion Hearing is set for 3/12/21 at 2:00 p.m. CST regarding the 133 MOTION to Intervene *and Unseal Court Record*. Signed by Judge Liles C Burke on 3/03/21. (SPT ) (Entered: 03/03/2021) |
| 03/09/2021 | 143 | | Transcript of Motions Hearing held on 2/19/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 3/30/2021. Redacted Transcript Deadline set for 4/9/2021. Release of Transcript Restriction set for 6/7/2021. (AHI) (Entered: 03/09/2021) |
| 03/09/2021 | 144 | | Witness List *Plaintiff's Objections to Defendant's Deposition Designations* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 03/09/2021) |
| 03/09/2021 | 145 | | Witness List *Plaintiff's Correction of Deposition Testimony Designations* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 03/09/2021) |
| 03/10/2021 | 146 | | Exhibit List *Plaintiff's Amended Trial Exhibit List* by Nuclear Development LLC.. (Attachments: # 1 Exhibit Exhibit A)(O'Rear, Caine) (Entered: 03/10/2021) |
| 03/11/2021 | 147 | | Joint MOTION for Hearing *to be Canceled and Unseal Certain Documents in the Record* by Memphis Publishing Company. (Attachments: # 1 Text of Proposed Order)(McLeod, Aaron) (Entered: 03/11/2021) |
| 03/11/2021 | 148 | | TEXT ORDER that the Motion Hearing set for March 12, 2021 is CANCELLED. Signed by Judge Liles C Burke on 3/11/21. (SPT ) (Entered: 03/11/2021) |
| 03/19/2021 | 149 | | Exhibit List *Second Supplemental Exhibit List* by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 03/19/2021) |
| 03/19/2021 | 150 | | Exhibit List *Supplemental Objections to Nuclear Development's Exhibit List* by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 03/19/2021) |

| 03/22/2021 | 151 | | ORDER – The Court GRANTS IN PART 133 Motion to Intervene; the Commercial Appeal is permitted to intervene, The filings, exhibits and documents previously sealed in this matter are ORDERED unsealed except for those listed in this order. Signed by Judge Liles C Burke on 3/22/2021. (AHI) (Entered: 03/22/2021) |
|---|---|---|---|
| 03/23/2021 | 152 | | MOTION Preserve Confidentiality Designation by Rocket City Digital, LLC. (Attachments: # 1 Exhibit A, Letter from ICF)(Smith, Lauren) (Entered: 03/23/2021) |
| 03/25/2021 | 153 | | TEXT ORDER that a Telephone Conference is set for 3/26/2021 at 8:30 a.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 3/25/21. (SPT ) (Entered: 03/25/2021) |
| 03/25/2021 | 154 | | MOTION to Disqualify Counsel *Larry Blust from Participation at Trial as Attorney for Plaintiff* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 03/25/2021) |
| 03/26/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 3/26/2021; Caine O'Rear, III and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for dft; Lauren Smith present for Rocket City Digital LLC; The parties discussed Rocket City Digitals Motion to Preserve Confidentiality (Doc. 152). The parties each stated that they would respond to the motion, and Defendant requested a ruling before trial. The Court stated its intention to rule on summary judgement in the coming days and to set a pretrial conference by the end of next week. The parties addressed Defendants Motion to Disqualify Larry Blust from Participation at Trial as Attorney for Plaintiff (Doc. 154). Plaintiff indicated that it would file a written response to the motion imminently. Argument on the motions (Docs. 152 and 154) and the pretrial conference will be set by further order. (Court Reporter Christina Decker.) (SPT ) (Entered: 03/26/2021) |
| 03/26/2021 | 155 | | RESPONSE in Opposition re 154 MOTION to Disqualify Counsel *Larry Blust from Participation at Trial as Attorney for Plaintiff* filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 03/26/2021) |
| 03/30/2021 | 156 | | TEXT ORDER that an In Person Pretrial Conference is set for 4/2/2021 at 10:00 a.m. in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 3/30/21. (SPT ) (Entered: 03/30/2021) |
| 03/30/2021 | 157 | | TEXT ORDER that a Telephone Conference is set for 3/31/2021 at 1:00 p.m.; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 3/30/21. (SPT ) (Entered: 03/30/2021) |
| 03/31/2021 | 158 | | NOTICE of Appearance by J Craig Campbell on behalf of Nuclear Development LLC (Campbell, J) (Entered: 03/31/2021) |
| 03/31/2021 | 159 | | REPLY to Response to Motion re 154 MOTION to Disqualify Counsel *Larry Blust from Participation at Trial as Attorney for Plaintiff* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 03/31/2021) |
| 03/31/2021 | 160 | | MOTION to Preserve Confidentiality of Exhibit 128 by Nuclear Development LLC. (O'Rear, Caine) (Entered: 03/31/2021) |
| 03/31/2021 | 161 | | |

| | | | |
|---|---|---|---|
| | | | ORDER – The Court DENIES both Nuclear Development LLC's Motion for Summary Judgment and the Tennessee Valley Authority's Motion for Summary Judgment as more fully set out in order. Signed by Judge Liles C Burke on 3/31/2021. (AHI ) (Entered: 03/31/2021) |
| 03/31/2021 | 162 | | TEXT ORDER. Having heard the arguments regarding the presentation of deposition testimony, the Court ORDERS that the deposition testimony will be heard issue by issue. Whether or not the parties alternate from side–to–side for each issue or choose to work together to create one presentation consolidating relevant testimony on each issue, the Court will be satisfied. Signed by Judge Liles C Burke on 3/31/2021. (RAC) (Entered: 03/31/2021) |
| 03/31/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 3/31/2021; Caine O'Rear and Larry Blust present for plaintiff; Matt Lembke, David Ayliffe and Riley McDaniel present for defendant; The Court heard argument on a dispute concerning the exposition of deposition testimony at trial. The Court heard additional argument on a narrow issue concerning the parties motions for summary judgment. Finally, the parties discussed the possibility of a continuance, and TVA indicated that it would prefer a continuation of the trial setting.. (Court Reporter Christina Decker.) (SPT ) Modified on 4/2/2021 (SPT, ). (Entered: 04/02/2021) |
| 04/01/2021 | 163 | | TEXT ORDER (change in time only) – On the motion of the Plaintiff, Nuclear Development, the In Person Pretrial Conference is RESET for 4/2/2021 at **2:00 p.m.** in the Federal Courthouse, Huntsville, AL before Judge Liles C Burke. Signed by Judge Liles C Burke on 4/01/21. (SPT ) (Entered: 04/01/2021) |
| 04/01/2021 | 164 | | TEXT ORDER that a Telephone Conference is set for 4/1/2021 at 2:15 p.m.; dial in information emailed to counsel. Signed by Judge Liles C Burke on 4/01/21. (SPT ) (Entered: 04/01/2021) |
| 04/01/2021 | 165 | | AMENDED 161 ORDER – The Court DENIES both Nuclear Development LLC's Motion for Summary Judgment and the Tennessee Valley Authority's Motion for Summary Judgment as more fully set out in order. Signed by Judge Liles C Burke on 4/1/2021. (AHI) (Entered: 04/01/2021) |
| 04/01/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/1/2021; Caine O'Rear, III and Larry Blust present for plaintiff; Matthew Lembke and David Ayliffe present for Tennessee Valley Authority. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/01/2021) |
| 04/02/2021 | 166 | | ORDER – The Court CANCELS the pretrial conference set for 4/2/2021, RESCHEDULES the bench trial set for 4/5/2021 to 4/26/2021 at 09:00 AM in Federal Courthouse, Huntsville, AL, and the parties are to file a joint status report by 2:00 PM on 4/2/2021. Signed by Judge Liles C Burke on 4/2/2021. (AHI) (Entered: 04/02/2021) |
| 04/02/2021 | 167 | | MOTION to Withdraw 152 MOTION Preserve Confidentiality Designation by Rocket City Digital, LLC. (Smith, Lauren) (Entered: 04/02/2021) |
| 04/02/2021 | 168 | | MOTION in Limine *to Exclude Evidence Relating to Defendant's Trial Exhibits 22 and 23* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/02/2021) |

| 04/02/2021 | 169 | | TEXT ORDER that a Pretrial Conference is set for 4/8/2021 at 10:00 a.m. in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 04/02/21. (SPT ) (Entered: 04/02/2021) |
|---|---|---|---|
| 04/05/2021 | 170 | | TEXT ORDER that a Telephone Conference is set for 4/5/2021 at 11:00 a.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/05/21. (SPT ) (Entered: 04/05/2021) |
| 04/05/2021 | 171 | | TEXT ORDER (CHANGE IN TIME ONLY) that the Telephone Conference set for 4/5/2021 is RESET for 11:30 a.m. CST; dial in information previously emailed to counsel remains the same. Signed by Judge Liles C Burke on 04/05/21. (SPT ) (Entered: 04/05/2021) |
| 04/05/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/5/2021; Caine O'Rear and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; The parties discussed the timing of the pretrial conference and the issues that they believe remain for trial. Plaintiff indicated that it was considering filing a motion to reconsider the Courts Amended Order (Doc. 165) and was encouraged to file it, if possible, before the pretrial conference. The parties were ordered to brief the law of the case doctrine as it pertains to the reach of the issues decided in the Courts Amended Order. (Court Reporter Christina Decker.) (SPT) (Entered: 04/05/2021) |
| 04/07/2021 | 172 | | Brief *TVA's Memorandum Regarding Issues Remaining for Trial*. (Lembke, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | 173 | | RESPONSE in Opposition re 168 MOTION in Limine *to Exclude Evidence Relating to Defendant's Trial Exhibits 22 and 23* filed by Tennessee Valley Authority. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Lembke, Matthew) (Entered: 04/07/2021) |
| 04/07/2021 | 174 | | PRETRIAL MEMORANDUM by Nuclear Development LLC. filed by Nuclear Development LLC (O'Rear, Caine) (Entered: 04/07/2021) |
| 04/08/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Pretrial Conference/Motion Hearing held on 4/8/2021; Caine O'Rear, III and Edward Black present for plaintiff; Mattew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; The Court heard first heard argument on three pending issues: (1) the applicability of the law–of–the–case doctrine to its order on summary judgment, (2) TVAs Motion to Disqualify Larry Blust from Participation at Trial as Attorney for Plaintiff (Doc. 154), and (3) TVAs motion for the Court to amend its summary–judgment order. The Court granted TVAs Motion to Disqualify Larry Blust (Doc. 154) and, after a brief recess, ruled that it would not allow further argument on issues decided in its summary–judgment order but would grant leave to Nuclear Development to amend its complaint to cite § 9 of the Agreement. The parties indicated that they were working to resolve Nuclear Developments Motion to Preserve Confidentiality of Exhibit 128 (Doc. 160) and asked the Court to reserve ruling on the motion until trial. The parties likewise asked the Court to reserve ruling on Nuclear Developments Motion in Limine to Exclude Evidence Relating to Defendants Trial Exhibits 22 and 23 (Doc. 168) until trial. Nuclear Development stated that its Motion in Limine to Exclude Expert Opinion Testimony of Stephen G. Burns (Doc. 77) appeared to be moot, and TVA |

| | | | |
|---|---|---|---|
| | | | concurred, stating that it did not intend to call Mr. Burns unless Nuclear Development called Mr. Repka. The parties discussed the need to revise their witness lists, exhibit lists, and deposition designations, and after a brief recess, agreed on a revised schedule for their submissions. Trial logistics were discussed, and the parties indicated that they believed the case could be tried in less than three days. The parties further agreed to notify each other by noon on the before who each will call as witnesses the following day, to a format for proffering evidence at trial, to a procedure for submitting exhibits, and, finally, to jointly submit a statement of undisputed facts. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/12/2021) |
| 04/12/2021 | 175 | | ORDER – The Court DENIES TVA's Motion for the Court to amend its summary Judgment order; Plaintiff has until 5:00 PM on 4/13/2021 to amend their complaint; TVA has until 4/15/2021 at 5:00 PM to file their response to the amended complaint; the Court GRANTS TVA's 154 Motion to Disqualify Counsel, Larry Blust from participation at trial; and DENIES AS MOOT without prejudice the 77 Motion in Limine to Exclude Expert Opinion Testimony of Stephen G. Burns, revised exhibit and witness lists and deposition designations are due by 4/16/2021, counter–designations due by 4/20/2021; objections to exhibit lists and counter–designations due by 4/22/2021; joint pretrial order is due by 4/21/2021; trial briefs due by 4/23/2021 at 5:00 PM. Signed by Judge Liles C Burke on 4/12/2021. (AHI) (Entered: 04/12/2021) |
| 04/13/2021 | 176 | | AMENDED COMPLAINT against Tennessee Valley Authority, filed by Nuclear Development LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(O'Rear, Caine) (Entered: 04/13/2021) |
| 04/13/2021 | 177 | | Unopposed MOTION to Amend/Correct 175 Order on Motion in Limine and Order on Motion to Disqualify Counsel by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/13/2021) |
| 04/14/2021 | 178 | | TEXT ORDER granting 177 Motion to Amend/Correct. TVA's deadline to file a response to Nuclear Development's Amended Complaint (Doc. 176) is hereby EXTENDED to April 19, 2021 at 12:00 p.m. Signed by Judge Liles C. Burke on 4/14/2021. (RAC) (Entered: 04/14/2021) |
| 04/14/2021 | 179 | | Transcript of MOTIONS HEARING and PRETRIAL CONFERENCE held on 4/8/2021, before Judge Liles C. Bukre. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 5/5/2021. Redacted Transcript Deadline set for 5/15/2021. Release of Transcript Restriction set for 7/13/2021. (AHI) (Entered: 04/14/2021) |
| 04/16/2021 | 180 | | TEXT ORDER that a Telephone Conference is set for 4/16/2021 at 2:30 CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke |

| | | | |
|---|---|---|---|
| | | | on 4/16/21. (SPT ) (Entered: 04/16/2021) |
| 04/16/2021 | 181 | | Exhibit List *Revised Exhibit List* by Tennessee Valley Authority.. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 04/16/2021) |
| 04/16/2021 | 182 | | Witness List *Revised Witness List and Deposition Designations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/16/2021) |
| 04/16/2021 | 183 | | Witness List *Plaintiff's Amended Trial Witness List* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/16/2021) |
| 04/16/2021 | 184 | | Witness List *Plaintiff's Amended Designation of Deposition Testimony* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/16/2021) |
| 04/16/2021 | 185 | | Exhibit List *Plaintiff's Amended Trial Exhibit List* by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 04/16/2021) |
| 04/16/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/16/2021; Caine O'Rear present for plaintiff; Matthew Lembke, David Ayliffe and Imbrahim Berro present for defendant; The parties discussed the outcome of mediation, the status of settlement negotiations, and an issue concerning the joint pretrial order. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/19/2021) |
| 04/19/2021 | 186 | | MOTION to Strike 176 Amended Complaint *and Motion for Partial Dismissal* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/19/2021) |
| 04/19/2021 | 187 | | Brief re 186 MOTION to Strike 176 Amended Complaint *and Motion for Partial Dismissal* . (Lembke, Matthew) (Entered: 04/19/2021) |
| 04/19/2021 | 188 | | ANSWER to 176 Amended Complaint by Tennessee Valley Authority.(Lembke, Matthew) (Entered: 04/19/2021) |
| 04/19/2021 | 189 | | TEXT ORDER that a Telephone Conference is set for Monday, 4/19/2021, at 1:00 p.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/19/21. (SPT ) (Entered: 04/19/2021) |
| 04/19/2021 | 190 | | TEXT ORDER that a Telephone Conference is set for 4/19/2021 at 3:00 p.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/19/21. (SPT ) (Entered: 04/19/2021) |
| 04/19/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/19/2021; Caine O'Rear and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; The Court heard argument on TVAs Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186). The Court heard argument on the motion and asked whether responsive briefs were necessary; Nuclear Development was given two days to file a response. TVA asked whether in preparing the joint pretrial order the parties would need to list cases in support of their claims, and the Court said that they would not. The parties then discussed the need to file pre– or post–trial briefs. The Court stated that it would permit but not require the parties to file pretrial briefs of up to 20 pages and would, if necessary, order the parties to file post–trial after the close of evidence. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/20/2021) |

| 04/19/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/19/2021; Caine O'Rear present for plaintiff; Matthew Lembke, David Ayliffe, and Ibrahim Berro present for defendant; The Court discussed its understanding of TVAs Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186) and asked the parties whether it should reserve ruling on the motion. Nuclear Development indicated that it still intended to file a responsive brief and asked the Court to reserve ruling until Thursday. It also informed the Court that it intended to file its own motion to strike in conjunction with its responsive brief. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/20/2021) |
| 04/21/2021 | 191 | | TEXT ORDER that a Telephone Conference is set for 4/21/2021 at 10:30 a.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/21/21. (SPT ) (Entered: 04/21/2021) |
| 04/21/2021 | 192 | | ORDER – Plaintiff's response to TVA's Motion to Strike and Motion for Partial Dismissal of Amended Complaint is due by 4/21/2021; deadline to exchange deposition–designations is 4/21/2021; deadline to submit the proposed pretrial order is 4/22/2021; and deadline for parties to exchange objections to exhibit lists, deposition designations and deposition counter–designation is 4/23/2021. Signed by Judge Liles C Burke on 4/21/2021. (AHI) (Entered: 04/21/2021) |
| 04/21/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/21/2021; Caine O'Rear and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, and Riley McDaniel present for defendant; he parties discussed trial timing and logistics.. (Court Reporter Carrie Robinson.) (SPT ) (Entered: 04/21/2021) |
| 04/21/2021 | 193 | | Brief re 186 MOTION to Strike 176 Amended Complaint *and Motion for Partial Dismissal*, 187 Brief *Plaintiff's Brief in Opposition to TVA's Motion to Strike and Motion for Partial Dismissal of Amended Complaint*. (O'Rear, Caine) (Entered: 04/21/2021) |
| 04/21/2021 | 194 | | Witness List *Plaintiff's Revised Counter–Designations of Deposition Testimony* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/21/2021) |
| 04/21/2021 | 195 | | Witness List *Revised Counterdesignations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/21/2021) |
| 04/21/2021 | 196 | | MOTION to Strike 188 Answer to Amended Complaint *Plaintiff's Motion to Strike TVA's Seventh Defense and Memorandum of Law in Support* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/21/2021) |
| 04/22/2021 | 197 | | RESPONSE in Opposition re 196 MOTION to Strike 188 Answer to Amended Complaint *Plaintiff's Motion to Strike TVA's Seventh Defense and Memorandum of Law in Support* filed by Tennessee Valley Authority. (Attachments: # 1 Exhibit 1)(Lembke, Matthew) (Entered: 04/22/2021) |
| 04/22/2021 | 198 | | REPLY to re 193 *in Support of Motion to Strike* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/22/2021) |
| 04/22/2021 | 199 | | TEXT ORDER that a Telephone Conference regarding the 196 MOTION to Strike 188 Answer to Amended Complaint *Plaintiff's Motion to Strike TVA's* |

| | | |
|---|---|---|
| | | *Seventh Defense and Memorandum of Law in Support* filed by Nuclear Development LLC is set for Thursday, 4/22/21 at 3:00 p.m.; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/22/21. (SPT) (Entered: 04/22/2021) |
| 04/22/2021 | 200 | Exhibit List *Plaintiff's Second Amended Trial Exhibit List* by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 04/22/2021) |
| 04/22/2021 | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/22/2021; Caine O'Rear and Larry Blust present for plaintiff; Matt Lembke, David Ayliffe, Riley McDaniel, and Ibrahim Berro present for defendant; The Court heard argument on TVAs Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186) and on Nuclear Development, LLCs Motion to Strike TVAs Seventh Defense (Doc. 196). TVAs Motion (Doc. 186) was GRANTED IN PART AND DENIED IN PART, and Nuclear Developments Motion (Doc. 196) was GRANTED. A written order will follow.(Court Reporter Christina Decker.) (SPT ) (Entered: 04/23/2021) |
| 04/23/2021 | 201 | NOTICE by Nuclear Development LLC re 192 Order, *Joint Pretrial Order* (Attachments: # 1 Text of Proposed Order Pretrial Order, # 2 Exhibit A, # 3 Exhibit B)(O'Rear, Caine) (Entered: 04/23/2021) |
| 04/23/2021 | 202 | Exhibit List *Plaintiff's Third Amended Trial Exhibit List* by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 04/23/2021) |
| 04/23/2021 | 203 | Exhibit List *Second Revised Exhibit List* by Tennessee Valley Authority.. (Attachments: # 1 Exhibit A)(Lembke, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 204 | Exhibit List *Objections to Nuclear Development's Revised Exhibit Lists* by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 205 | Witness List *Objections to Nuclear Development's Revised Deposition Designations and Counter−designations* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 206 | Exhibit List *Plaintiff's Objections to Defendant's Revised Exhibit List* by Nuclear Development LLC.. (O'Rear, Caine) (Entered: 04/23/2021) |
| 04/23/2021 | 207 | ORDER – The Court GRANTS IN PART AND DENIES IN PART Defendant's 186 Motion to Strike and Motion for Partial Dismissal of Amended Complaint and GRANTS Plaintiff's 196 Motion to Strike TVA's Seventh Defense. Signed by Judge Liles C Burke on 4/23/2021. (AHI) (Entered: 04/23/2021) |
| 04/23/2021 | 208 | PRETRIAL ORDER – This action is set for a Bench Trial as more fully set out in order. Signed by Judge Liles C Burke on 4/23/2021. (AHI) (Entered: 04/23/2021) |
| 04/23/2021 | 209 | TRIAL BRIEF *Pretrial Brief* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/23/2021) |
| 04/23/2021 | 210 | Witness List *Plaintiff's Objections to Defendants Revised Deposition Designations* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 04/23/2021) |

| 04/23/2021 | 211 | | TRIAL BRIEF by Nuclear Development LLC. (Attachments: # 1 Exhibit A–Plaintiff's Summary Exhibit Regarding Damages)(O'Rear, Caine) (Entered: 04/23/2021) |
|---|---|---|---|
| 04/24/2021 | 212 | | TEXT ORDER that a Telephone Conference is set for 4/24/2021 at 4:00 p.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 4/24/2021. (RAC) (Entered: 04/24/2021) |
| 04/24/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 4/24/2021; Caine O'Rear and Larry Blust present for plaintiff; Matt Lembke, Riley McDaniel, and David Ayliffe present for defendant; TVA addressed an issue concerning a witnesss ability to appear at trial. The Court proposed continuing the trial and discussed dates that the parties could be available. The trial was continued, the start date to be set by later order. (Court Reporter Christina Decker.) (SPT ) (Entered: 04/26/2021) |
| 04/27/2021 | 213 | | ORDER – The bench trial set for 4/26/2021 is CONTINUED until 5/16/2021 01:30 PM in Federal Courthouse, Huntsville, AL. Signed by Judge Liles C Burke on 4/27/2021. (AHI) (Entered: 04/27/2021) |
| 04/28/2021 | 214 | | Witness List Second Revised Witness List by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 04/28/2021) |
| 04/30/2021 | 215 | | Plaintiff's SECOND Amended Designation of Deposition Testimony by Nuclear Development LLC. (O'Rear, Caine) Modified on 5/3/2021 (AHI). (Entered: 04/30/2021) |
| 04/30/2021 | 216 | | Plaintiff's FOURTH Amended Trial Exhibit List by Nuclear Development LLC. (O'Rear, Caine) Modified on 5/3/2021 (AHI). (Entered: 04/30/2021) |
| 05/06/2021 | 217 | | Exhibit List Objections to Nuclear Development's Fourth Amended Exhibit List by Tennessee Valley Authority.. (Lembke, Matthew) (Entered: 05/06/2021) |
| 05/06/2021 | 218 | | Witness List Objections to Nuclear Development's Second Amended Deposition Designations by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 05/06/2021) |
| 05/11/2021 | 219 | | TEXT ORDER that a Telephone Conference is set for 5/13/2021 at 10:30 a.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 5/11/21. (SPT ) (Entered: 05/11/2021) |
| 05/13/2021 | 220 | | TEXT ORDER that a Telephone Conference is set for 5/14/2021 at 1:15 p.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 5/13/21. (SPT ) (Entered: 05/13/2021) |
| 05/13/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 5/13/2021; Caine O'Rear and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; The Court addressed several issues preliminary to trial, including objections to exhibit lists and deposition designations. Objections to exhibits will be ruled on as they arise at trial. Objections to deposition designations and counter–designations will be addressed at a telephonic hearing tomorrow at 1:30 p.m. The parties are ordered to confer and identify a set of representative objections to be argued at the hearing. (Court Reporter Christina Decker.) (SPT ) (Entered: 05/13/2021) |

| 05/14/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 5/14/2021; Caine O'Rear, Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; The Court heard argument on 13 sets of representative objections to five witnesses testimony by deposition, specifically those objections to the parties designations and counter–designations of: (1) Marie Gillman at pages 3134 and 91–95; (2) Frank Haney, Jr. at pages 9091, 13745, and 21720; (3) Bill Johnson at 6570, 81, 93107, and 11719; (4) Sherry Quirk at 7377 and 8089; and (5) Franklin Haney, Sr. at 10003 and 10713. The Court ruled on these objections and addressed several further logistical issues antecedent to trial. (Court Reporter Christina Decker.) (SPT ) (Entered: 05/14/2021) |
| 05/16/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Bench Trial held on 5/16/2021; Caine O'Rear, III and Craig Campbell present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for defendant; Exhibits ID'd and admitted; Testimony of Witnesses Haney, Sr., Johnson, and Quirk by Video; Daily Adj. (Court Reporter Christina Decker.) (SPT ) (Entered: 06/07/2021) |
| 05/17/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Bench Trial held on 5/17/2021; Caine O'Rear, III and Craig Campbell present for pla; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for dft; Examination of Witnesses; Exhibits ID'd and Admitted; Daily Adj. (Court Reporter Christina Decker.) (SPT ) (Entered: 06/07/2021) |
| 05/18/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Bench Trial held on 5/18/2021; Caine O'Rear, III and Craig Campbell present for pla; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for dft; Examination of Witnesses; Exhibits ID'd and Admitted; Daily Adj. (Court Reporter Christina Decker.) (SPT ) (Entered: 06/07/2021) |
| 05/19/2021 | 221 | | NOTICE by Nuclear Development LLC – *Plaintiff's Offer of Proof* (Attachments: # 1 Exhibit A – Proffer of Testimony of Larry Blust, # 2 Exhibit B – Proffer of Testimony of James Chardos, # 3 Exhibit C – Proffer of Testimony of Robert Coward, # 4 Exhibit D – Proffer of Testimony of Marie Gillman, # 5 Exhibit E – Proffer of Testimony of William Johnson, # 6 Exhibit F – Proffer of Testimony of Tim Matthews, # 7 Exhibit G – Proffer of Testimony of William McCollum, # 8 Exhibit H – Proffer of Testimony of Sherry Quirk, # 9 Exhibit I – Proffer of Testimony of Dave Repka, # 10 Exhibit J – Proffer of Testimony of Joseph Shea, # 11 Exhibit K – Proffer of Testimony of Erin Henderson, # 12 Exhibit L – Proffer of Testimony of Franklin Haney, Sr.)(O'Rear, Caine) (Entered: 05/19/2021) |
| 05/19/2021 | 222 | | NOTICE by Nuclear Development LLC Continuation of Plaintiff's 221 Notice – *Plaintiff's Proffer Exhibit List* (Attachments: # 1 Exhibit 4, # 2 Exhibit 9, # 3 Exhibit 11, # 4 Exhibit 15, # 5 Exhibit 17, # 6 Exhibit 19, # 7 Exhibit 24, # 8 Exhibit 25, # 9 Exhibit 26, # 10 Exhibit 27 (part 1 of 2), # 11 Exhibit 27 (part 2 of 2), # 12 Exhibit 28, # 13 Exhibit 29, # 14 Exhibit 30, # 15 Exhibit 31, # 16 Exhibit 33, # 17 Exhibit 36, # 18 Exhibit 43, # 19 Exhibit 45, # 20 Exhibit 56, # 21 Exhibit 57, # 22 Exhibit 82 (part 1 of 15), # 23 Exhibit 82 (part 2 of 15), # 24 Exhibit 82 (part 3 of 15), # 25 Exhibit 82 (part 4 of 15), # 26 Exhibit 82 (part 5 of 15), # 27 Exhibit 82 (part 6 of 15), # 28 Exhibit 82 (part 7 of 15), |

| | | |
|---|---|---|
| | | # 29 Exhibit 82 (part 8 of 15), # 30 Exhibit 82 (part 9 of 15), # 31 Exhibit 82 (part 10 of 15), # 32 Exhibit 82 (part 11 of 15), # 33 Exhibit 82 (part 12 of 15), # 34 Exhibit 82 (part 13 of 15), # 35 Exhibit 82 (part 14 of 15), # 36 Exhibit 82 (part 15 of 15), # 37 Exhibit 83 (part 1 of 2), # 38 Exhibit 83 (part 2 of 2), # 39 Exhibit 89, # 40 Exhibit 90, # 41 Exhibit 100 (part 1 of 11), # 42 Exhibit 100 (part 2 of 11), # 43 Exhibit 100 (part 3 of 11), # 44 Exhibit 100 (part 4 of 11), # 45 Exhibit 100 (part 5 of 11), # 46 Exhibit 100 (part 6 of 11), # 47 Exhibit 100 (part 7 of 11), # 48 Exhibit 100 (part 8 of 11), # 49 Exhibit 100 (part 9 of 11), # 50 Exhibit 100 (part 10 of 11), # 51 Exhibit 100 (part 11 of 11), # 52 Exhibit 112, # 53 Exhibit 119 (part 1 of 2), # 54 Exhibit 119 (part 2 of 2), # 55 Exhibit 122 (part 1 of 4), # 56 Exhibit 122 (part 2 of 4), # 57 Exhibit 122 (part 3 of 4), # 58 Exhibit 122 (part 4 of 4), # 59 Exhibit 123 (part 1 of 2), # 60 Exhibit 123 (part 2 of 2), # 61 Exhibit 127 (part 1 of 2), # 62 Exhibit 127 (part 2 of 2), # 63 Exhibit 128 (part 1 of 11), # 64 Exhibit 128 (part 2 of 11), # 65 Exhibit 128 (part 3 of 11), # 66 Exhibit 128 (part 4 of 11), # 67 Exhibit 128 (part 5 of 11), # 68 Exhibit 128 (part 6 of 11), # 69 Exhibit 128 (part 7 of 11), # 70 Exhibit 128 (part 8 of 11), # 71 Exhibit 128 (part 9 of 11), # 72 Exhibit 128 (part 10 of 11), # 73 Exhibit 128 (part 11 of 11), # 74 Exhibit 129 (part 1 of 32), # 75 Exhibit 129 (part 2 of 32), # 76 Exhibit 129 (part 3 of 32), # 77 Exhibit 129 (part 4 of 32), # 78 Exhibit 129 (part 5 of 32), # 79 Exhibit 129 (part 6 of 32), # 80 Exhibit 129 (part 7 of 32), # 81 Exhibit 129 (part 8 of 32), # 82 Exhibit 129 (part 9 of 32), # 83 Exhibit 129 (part 10 of 32), # 84 Exhibit 129 (part 11 of 32), # 85 Exhibit 129 (part 12 of 32), # 86 Exhibit 129 (part 13 of 32), # 87 Exhibit 129 (part 14 of 32), # 88 Exhibit 129 (part 15 of 32), # 89 Exhibit 129 (part 16 of 32), # 90 Exhibit 129 (part 17 of 32), # 91 Exhibit 129 (part 18 of 32), # 92 Exhibit 129 (part 19 of 32), # 93 Exhibit 129 (part 20 of 32), # 94 Exhibit 129 (part 21 of 32), # 95 Exhibit 129 (part 22 of 32), # 96 Exhibit 129 (part 23 of 32), # 97 Exhibit 129 (part 24 of 32), # 98 Exhibit 129 (part 25 of 32), # 99 Exhibit 129 (part 26 of 32), # 100 Exhibit 129 (part 27 of 32), # 101 Exhibit 129 (part 28 of 32), # 102 Exhibit 129 (part 29 of 32), # 103 Exhibit 129 (part 30 of 32), # 104 Exhibit 129 (part 31 of 32), # 105 Exhibit 129 (part 32 of 32), # 106 Exhibit 130, # 107 Exhibit 131, # 108 Exhibit 132, # 109 Exhibit 172, # 110 Exhibit 174, # 111 Exhibit 175, # 112 Exhibit 176, # 113 Exhibit 177, # 114 Exhibit 178, # 115 Exhibit 179, # 116 Exhibit 184, # 117 Exhibit 190, # 118 Exhibit 192, # 119 Exhibit 206, # 120 Exhibit 207, # 121 Exhibit 208 (part 1 of 2), # 122 Exhibit 208 (part 2 of 2), # 123 Exhibit 300, # 124 Exhibit 303, # 125 Exhibit 304, # 126 Exhibit 305, # 127 Exhibit 312, # 128 Exhibit 313, # 129 Exhibit 314, # 130 Exhibit [Doc. 17] Stipulation of the Parties Regarding Plaintiff's Motion for Preliminary Injunction, # 131 Exhibit Timeline, # 132 Exhibit Undisputed Facts, # 133 Exhibit TVABLN00002602–2610, # 134 Exhibit TVABLN00003848, # 135 Exhibit TVABLN00005060–5062)(O'Rear, Caine) (Entered: 05/19/2021) |
| 05/19/2021 | | Minute Entry for proceedings held before Judge Liles C Burke: Bench Trial held on 5/19/2021; Caine O'Rear, III and Craig Campbell present for pla; Matthew Lembke, David Ayliffe, Ibrahim Berro, and Riley McDaniel present for dft; Exhibits ID'd and Admitted; Witnesses Examined; Defense Rest; Daily Adj. (Court Reporter Christina Decker.) (SPT ) (Entered: 06/08/2021) |
| 06/04/2021 | 223 | NOTICE by Tennessee Valley Authority *of Defendant's Motion for Judgment on Partial Findings at the Close of Plaintiff's Case, which was filed in Open* |

| | | | |
|---|---|---|---|
| | | | *Court on May 19, 2021* (Lembke, Matthew) (Entered: 06/04/2021) |
| 06/04/2021 | 224 | | NOTICE by Tennessee Valley Authority *of Defendant's Written Proffer of Evidence, which was filed in Open Court on May 19, 2021* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Lembke, Matthew) (Entered: 06/04/2021) |
| 06/08/2021 | 225 | | MOTION for Judgment on Partial Findings at the Close of Plaintiff's Case by Tennessee Valley Authority. (SPT )(DEEMED FILED 5/19/21) (Entered: 06/08/2021) |
| 06/08/2021 | 226 | | TEXT ORDER that Closing Arguments are set for 7/1/2021 at 1:00 p.m. in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 6/08/21. (SPT ) (Entered: 06/08/2021) |
| 06/09/2021 | 227 | | TRIAL BRIEF – *Supplemental* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 06/09/2021) |
| 06/09/2021 | 228 | | RESPONSE in Opposition re 225 MOTION Judgment on Partial Findings at the Close of Plaintiff's Case filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 06/09/2021) |
| 06/09/2021 | 229 | | TRIAL BRIEF *Post–Trial Brief* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 06/09/2021) |
| 06/09/2021 | 230 | | MOTION for Judgment on Partial Findings *and Reconsideration* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 06/09/2021) |
| 06/10/2021 | 231 | | **\*SEALED** Transcript of **Bench Trial Vol. 1** held on 5/16/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. **\*\*SEE REDACTED TRANSCRIPT document 237\*\*\*** (Entered: 06/10/2021) |
| 06/10/2021 | 232 | | Transcript of **Bench Trial Vol. 2** held on 5/17/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christine Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/1/2021. Redacted Transcript Deadline set for 7/11/2021. Release of Transcript Restriction set for 9/8/2021. (AHI) (Entered: 06/10/2021) |
| 06/10/2021 | 233 | | **\*SEALED\*** Transcript of **Bench Trial Vol. 3** held on 5/18/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. **\*\*\*SEE REDACTED TRANSCRIPT document 233** Modified on 6/14/2021 (AHI) (Entered: 06/10/2021) |
| 06/10/2021 | 234 | | Transcript of **Bench Trial Vol. 4** held on 5/19/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have |

| | | |
|---|---|---|
| | | seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/1/2021. Redacted Transcript Deadline set for 7/11/2021. Release of Transcript Restriction set for 9/8/2021. (AHI) (Entered: 06/10/2021) |
| 06/10/2021 | 235 | **\*SEALED\* Transcript of Bench Trial Vol. 5 held in chambers with the Court and Law Clerk** before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. **\*\*\*SEE REDACTED TRANSCRIPT document 239\*\*\*** (AHI) (Entered: 06/10/2021) |
| 06/11/2021 | 236 | NOTICE by Tennessee Valley Authority *of Intent to Request Transcript Redactions* (Lembke, Matthew) (Entered: 06/11/2021) |
| 06/14/2021 | 237 | **REDACTED** Transcript of Bench Trial Volume 1 held on 5/16/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/5/2021. Redacted Transcript Deadline set for 7/15/2021. Release of Transcript Restriction set for 9/12/2021. (AHI) (Entered: 06/14/2021) |
| 06/14/2021 | 238 | **REDACTED** Transcript of Bench Trial Volume 3 held on 5/18/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/5/2021. Redacted Transcript Deadline set for 7/15/2021. Release of Transcript Restriction set for 9/12/2021. (AHI) (Entered: 06/14/2021) |
| 06/14/2021 | 239 | **REDACTED** Transcript of Bench Trial Vol. 5 held in chambers with the Court and Law Clerk before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker.. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through |

| | | | |
|---|---|---|---|
| | | | PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/5/2021. Redacted Transcript Deadline set for 7/15/2021. Release of Transcript Restriction set for 9/12/2021. (AHI) (Entered: 06/14/2021) |
| 06/29/2021 | 240 | | RESPONSE in Opposition re 230 MOTION for Judgment on Partial Findings *and Reconsideration* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 06/29/2021) |
| 07/01/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Closing Arguments Heard on 7/1/2021; Caine O'Rear, III and Larry Blust present for plaintiff; Matthew Lembke, David Ayliffe, Riley McDaniel, and Ibrahim Berro present for defendant; The Court heard closing arguments from both parties. The Court will issue its findings of fact and conclusions of law in a written order to follow. (Court Reporter Christina Decker.) (SPT ) (Entered: 07/19/2021) |
| 07/06/2021 | 241 | | MOTION to Withdraw as Attorney *McCook* by Tennessee Valley Authority. (Attachments: # 1 Text of Proposed Order)(Berro, Ibrahim) (Entered: 07/06/2021) |
| 07/08/2021 | 242 | | TEXT ORDER granting 241 Motion to Withdraw as Attorney. Attorney Jill McCook terminated. Signed by Judge Liles C Burke on 7/8/2021. (KBW) (Entered: 07/08/2021) |
| 07/08/2021 | 243 | | Transcript of **CLOSING ARGUMENTS** held on 7/1/2021, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 7/29/2021. Redacted Transcript Deadline set for 8/8/2021. Release of Transcript Restriction set for 10/6/2021. (AHI) (Entered: 07/08/2021) |
| 07/16/2021 | 244 | | ORDER – The Court **SETS** a Telephone Conference for 7/21/2021 at 9:30 AM. Dial–in information will be sent to the parties via email. Signed by Judge Liles C Burke on 7/16/2021. (AHI) (Entered: 07/16/2021) |
| 07/19/2021 | 245 | | TEXT ORDER that the Telephone Conference is **RESET** for 7/22/2021 at 9:30 a.m. CST; dial in information previousy emailed to counsel remains the same. Signed by Judge Liles C Burke on 7/19/21. (SPT ) (Entered: 07/19/2021) |
| 07/22/2021 | | | |

| | | | |
|---|---|---|---|
| | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 7/22/2021; Caine O'Rear, III, and Craig Campbell present for plaintiff; Matthew Lembke, David Ayliffe, Ibrahim Berro, & Riley McDaniel present for defendant; The Court and the parties discussed an issue involving the plaintiffs closing argument as it related to damages. (Court Reporter Christina Decker.) (SPT ) (Entered: 07/26/2021) |
| 08/26/2021 | 246 | | FINDINGS OF FACT AND CONCLUSIONS OF LAW. All pending motions that are unaddressed by these findings and conclusions are DENIED. Signed by Judge Liles C. Burke on 8/26/21. (SHB, ) (Entered: 08/26/2021) |
| 08/26/2021 | 247 | | JUDGMENT in favor of TVA on Counts One, Two and Three of the Amended Complaint. Judgment in favor of Nuclear Development in the amount of $22,950,000 plus prejudgment interest at 7.5 percent annum, running from December 30, 2018 to date of this final judgment. This action is dismissed with prejudice. Signed by Judge Liles C Burke on 8/26/21. (SHB, ) (Entered: 08/26/2021) |
| 08/27/2021 | 248 | | Exhibit List by Tennessee Valley Authorityf for 5/16/21 Bench Trial. (Attachments: # 1 DX #1 Part 1, # 2 DX #1 Part 2, # 3 DX #1 Part 3, # 4 DX #1 Part 4, # 5 DX #1 Part 5, # 6 DX #18, # 7 DX #46, # 8 DX #47, # 9 DX #48, # 10 DX #49, # 11 DX #50, # 12 DX #51, # 13 DX #56, # 14 DX #57, # 15 DX #59, # 16 DX #60, # 17 DX #61, # 18 DX #62, # 19 DX #63, # 20 DX #64, # 21 DX #66, # 22 DX #67, # 23 DX #69, # 24 DX #70, # 25 DX #71, # 26 DX #77, # 27 DX #81, # 28 DX #82 Part 1, # 29 DX #82 Part 2, # 30 DX #82 Part 3, # 31 DX #82 Part 4, # 32 DX #82 Part 5, # 33 DX #82 Part 6, # 34 DX #84, # 35 DX #85, # 36 DX #91, # 37 DX #96, # 38 DX #98, # 39 DX #99, # 40 DX #101, # 41 DX #102, # 42 DX #104, # 43 DX #106, # 44 DX #107, # 45 DX #108 Part 1, # 46 DX #108 Part 2, # 47 DX #108 Part 3, # 48 DX #108 Part 4, # 49 DX #108 Part 5, # 50 DX #108 Part 6, # 51 DX #109, # 52 DX #112, # 53 DX #113, # 54 DX #115 Part 1, # 55 DX #115 Part 2, # 56 DX #123, # 57 DX #128 Part 1, # 58 DX #128 Part 2, # 59 DX #128 Part 3, # 60 DX #128 Part 4, # 61 DX #128 Part 5, # 62 DX #128 Part 6, # 63 DX #128 Part 7, # 64 DX #128 Part 8, # 65 DX #128 Part 9, # 66 DX #129 Part 10, # 67 DX #133, # 68 DX #136, # 69 DX #155, # 70 DX #174, # 71 DX #175, # 72 DX #176, # 73 DX #178, # 74 DX #179, # 75 DX #180, # 76 DX #194, # 77 DX #195, # 78 DX #307, # 79 DX #313)(SPT ) (Entered: 08/27/2021) |
| 08/31/2021 | 249 | | Exhibit List by Nuclear Development LLC for 5/16/21. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 13, # 13 Exhibit 14, # 14 Exhibit 16, # 15 Exhibit 18, # 16 Exhibit 19, # 17 Filed Coventionally, # 18 Filed Conventionally, # 19 Exhibit 37, # 20 Exhibit 81 part 1, # 21 Exhibit 81 part 2, # 22 Exhibit 81 part 3, # 23 Exhibit 82 part 1, # 24 Exhibit 82 part 2, # 25 Exhibit 82 part 3, # 26 Exhibit 82 part 4, # 27 Exhibit 82 part 5, # 28 Exhibit 82 part 6, # 29 Exhibit 82 part 7, # 30 Exhibit 82 part 8, # 31 Exhibit 82 part 9, # 32 Exhibit 133, # 33 Exhibit 134, # 34 Exhibit 135, # 35 Exhibit 136, # 36 Exhibit 137, # 37 Exhibit 138, # 38 Exhibit 139, # 39 Exhibit 140, # 40 Exhibit 141, # 41 Exhibit 142, # 42 Exhibit 143, # 43 Exhibit 145, # 44 Exhibit 146 part 1, # 45 Exhibit 146 part 2, # 46 Exhibit 146 part 3, # 47 Exhibit 146 part 4, # 48 Exhibit 147 part 1, # 49 Exhibit 147 part 2, # 50 Exhibit 147 part 3, # 51 Exhibit 147 part 4, # 52 Exhibit 147 part 5, # 53 Exhibit 147 part 6, # 54 Exhibit 147 part 7, # 55 |

| | | | |
|---|---|---|---|
| | | | Exhibit 147 part 8, # <u>56</u> Exhibit 147 part 9, # <u>57</u> Exhibit 147 part 10, # <u>58</u> Exhibit 147 part 11, # <u>59</u> Exhibit 148, # <u>60</u> Exhibit 149, # <u>61</u> Exhibit 150 part 1, # <u>62</u> Exhibit 150 part 2, # <u>63</u> Exhibit 150 part 3, # <u>64</u> Exhibit 150 part 4, # <u>65</u> Exhibit 150 part 5, # <u>66</u> Exhibit 150 part 6, # <u>67</u> Exhibit 150 part 7, # <u>68</u> Exhibit 150 part 8, # <u>69</u> Exhibit 150 part 9, # <u>70</u> Exhibit 150 part 10, # <u>71</u> Exhibit 150 part 11, # <u>72</u> Exhibit 150 part 12, # <u>73</u> Exhibit 151, # <u>74</u> Exhibit 152, # <u>75</u> Exhibit 153 part 1, # <u>76</u> Exhibit 153 part 2, # <u>77</u> Exhibit 153 part 3, # <u>78</u> Exhibit 153 part 4, # <u>79</u> Exhibit 153 part 5, # <u>80</u> Exhibit 153 part 6, # <u>81</u> Exhibit 153 part 7, # <u>82</u> Exhibit 153 part 8, # <u>83</u> Exhibit 153 part 9, # <u>84</u> Exhibit 155, # <u>85</u> Exhibit 156, # <u>86</u> Exhibit 157, # <u>87</u> Exhibit 158, # <u>88</u> Exhibit 159, # <u>89</u> Exhibit 161, # <u>90</u> Exhibit 162, # <u>91</u> Exhibit 164, # <u>92</u> Exhibit 166, # <u>93</u> Exhibit 168, # <u>94</u> Exhibit 178, # <u>95</u> Exhibit 179, # <u>96</u> Exhibit 184, # <u>97</u> Exhibit 190, # <u>98</u> Exhibit 305, # <u>99</u> Exhibit 307, # <u>100</u> Exhibit 310, # <u>101</u> Exhibit 320, # <u>102</u> Exhibit 17, # <u>103</u> Exhibit 316 (Revised)(SPT ) (Entered: 08/31/2021) |
| 09/02/2021 | <u>250</u> | | MOTION to Vacate <u>18</u> Order, *Requiring Compliance with Stipulation* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 09/02/2021) |
| 09/02/2021 | <u>251</u> | | NOTICE by Tennessee Valley Authority *Pursuant to Court's Order Dated December 27, 2018* (Lembke, Matthew) (Entered: 09/02/2021) |
| 09/07/2021 | 252 | | TEXT ORDER that a Telephone Conference is set for 9/8/2021 at 2:00 p.m. CST; dial in information will be emailed to counsel. Signed by Judge Liles C Burke on 9/7/21. (SPT) (Entered: 09/07/2021) |
| 09/08/2021 | | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 9/8/2021; Caine O'Rear, III and Larry Blust present for the plaintiff; Matthew Lembke, David Ayliffe, and Riley McDaniel present for defendant; The Court and the parties discussed the pending motion to vacate. The Court will withhold ruling until the motion is fully briefed. (Court Reporter Carrie Robinson.) (SPT ) (Entered: 09/09/2021) |
| 09/09/2021 | <u>253</u> | | Transcript of the Telephone Conference held on September 8, 2021, before Judge Liles C. Burke. Court Reporter/Transcriber Carrie M. Robinson. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <span style="color:red">NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days.</span> (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 9/30/2021. Redacted Transcript Deadline set for 10/10/2021. Release of Transcript Restriction set for 12/8/2021. (AHI) (Entered: 09/09/2021) |
| 09/17/2021 | <u>254</u> | | MOTION to Alter Judgment by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 09/17/2021) |
| 09/17/2021 | <u>255</u> | | MOTION to Deposit Funds *into the Court's Registry* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 09/17/2021) |
| 09/21/2021 | 256 | | |

| | | | |
|---|---|---|---|
| | | | TEXT ORDER setting motion deadline 254 Motion to Alter Judgment. The plaintiff shall file a response on or before October 1, 2021. Any reply shall be filed by October 8, 2021. Signed by Judge Liles C Burke on 9/21/2021. (KBW) (Entered: 09/21/2021) |
| 09/23/2021 | 257 | | ORDER DIRECTING DEPOSIT OF FUNDS – The Court GRANTS the 255 MOTION to Deposit Funds *into the Court's Registry* and all funds received from TVA shall be deposited in the Court Registry as more fully set out in order. Signed by Judge Liles C Burke on 9/23/2021. (AHI) (Entered: 09/23/2021) |
| 09/23/2021 | 258 | | RESPONSE to Motion re 250 MOTION to Vacate 18 Order, *Requiring Compliance with Stipulation* filed by Nuclear Development LLC. (Attachments: # 1 Exhibit Exhibit A)(O'Rear, Caine) (Entered: 09/23/2021) |
| 09/23/2021 | 259 | | MOTION to Alter Judgment *or Amend Pursuant to Rules 52 and 59* by Nuclear Development LLC. (O'Rear, Caine) (Entered: 09/23/2021) |
| 09/23/2021 | 260 | | MOTION for New Trial *and Related Relief* by Nuclear Development LLC. (Attachments: # 1 Exhibit Exhibit A)(O'Rear, Caine) (Entered: 09/23/2021) |
| 09/28/2021 | | | CRIS Registry Deposit Received (liquidity pool) in the amount of $27,678,331.96 (ALND receipt #B4601116015)(AHI) (Entered: 09/29/2021) |
| 10/01/2021 | 261 | | RESPONSE to Motion re 254 MOTION to Alter Judgment *Plaintiff's Response to Defendant's Motion to Alter or Amend Final Judgment and for Additional Findings* filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 10/01/2021) |
| 10/04/2021 | 262 | | REPLY to Response to Motion re 250 MOTION to Vacate 18 Order, *Requiring Compliance with Stipulation* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/04/2021) |
| 10/05/2021 | 263 | | REPLY to Response to Motion re 254 MOTION to Alter Judgment filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/05/2021) |
| 10/13/2021 | 264 | | RESPONSE in Opposition re 259 MOTION to Alter Judgment *or Amend Pursuant to Rules 52 and 59* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/13/2021) |
| 10/13/2021 | 265 | | RESPONSE in Opposition re 260 MOTION for New Trial *and Related Relief* filed by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 10/13/2021) |
| 10/27/2021 | 266 | | REPLY to re 259 *Reply in Support of Plaintiff's Motion to Alter or Amend the Judgment Pursuant to Rules 52 and 59* filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 10/27/2021) |
| 10/27/2021 | 267 | | REPLY to re 260 *Reply in Support of Plaintiff's Alternative Motion for New Trial and Related Relief* filed by Nuclear Development LLC. (O'Rear, Caine) (Entered: 10/27/2021) |
| 07/18/2022 | 268 | | ORDER: The Court **GRANTS** 250 TVA's Motion to Vacate the Order holding the Parties to their Joint Stipulations; **GRANTS** 254 TVA's Motion to Alter or Amend the Final Judgment; **DENIES** 260 Nuclear Development's Motion for New Trial; **DENIES** 259 Nuclear Development's Motion to Alter / Amend; as |

| | | | |
|---|---|---|---|
| | | | more fully set out in order. Signed by Judge Liles C Burke on 7/18/2022. (AHI) (Entered: 07/18/2022) |
| 07/18/2022 | 269 | | **AMENDED FINAL JUDGMENT**: The prejudgment interest rate attached to the Judgment entered in Nuclear Development's favor on August 26, 2021, is amended to a rate of 6% per annum running from December 30, 2018, to the date of this final judgment; The postjudgment interest rate attached to the judgment entered in Nuclear Development's favor on August 26, 2021, shall be at a rate of 6% per annum running from December 30, 2018, to the date of this final judgment; and all other terms in the Court's previous Final Judgment remain unaltered. Signed by Judge Liles C Burke on 7/18/2022. (AHI) (Entered: 07/18/2022) |
| 08/12/2022 | 270 | | Unopposed MOTION to Alter Judgment by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 08/12/2022) |
| 08/12/2022 | 271 | | Unopposed MOTION *to Withdraw Funds from the Court's Registry* by Tennessee Valley Authority. (Lembke, Matthew) (Entered: 08/12/2022) |
| 08/16/2022 | 272 | | Unopposed MOTION to Withdraw as Attorney by Tennessee Valley Authority. (Attachments: # 1 Text of Proposed Order Proposed Order Permitting Withdrawal of Ibrahim M. Berro as Counsel for Defendant)(Ayliffe, David) (Entered: 08/16/2022) |
| 08/16/2022 | 273 | | TEXT ORDER granting 272 Motion to Withdraw as Attorney. Attorney Ibrahim Mohamad Berro terminated. Signed by Judge Liles C Burke on 8/16/2022. (KBW) (Entered: 08/16/2022) |
| 08/18/2022 | 274 | | SECOND AMENDED FINAL JUDGMENT: The Court **GRANTS** the 270 Motion to Alter Judgment and **AMENDS** the 269 amended final judgment as more fully set out in order. Signed by Judge Liles C Burke on 8/18/2022. (AHI) (Entered: 08/18/2022) |
| 08/24/2022 | 275 | | ORDER: The Court **GRANTS** the 271 Motion to Withdraw Funds; The Clerk is **DIRECTED** to draw a check on the funds on deposit in the Registry of the Court in the principal amount if $920, 767.22 plus 3.3% of the interest that has accrued on the total amount of funds deposited by TVA into the registry as more fully set out in order. Signed by Judge Liles C Burke on 8/24/2022. (Attachments: # 1 Exhibit W–9 Form) (AHI) (Entered: 08/24/2022) |
| 09/16/2022 | 276 | | NOTICE OF APPEAL as to 175 Order on Motion in Limine,,,, Order on Motion to Disqualify Counsel,,, 269 Order,,, Terminate Motions,, 165 Order, 207 Order on Motion to Strike,,, 246 Findings of Fact & Conclusions of Law, 247 Judgment, 161 Order on Motion for Summary Judgment, 268 Order, 274 Order on Motion to Alter Judgment by Nuclear Development LLC. Filing fee $ 505, receipt number AALNDC–4171939. (O'Rear, Caine) (Entered: 09/16/2022) |
| 09/19/2022 | 277 | | TRANSMITTAL LETTER Regarding 276 Notice of Appeal (AHI) (Entered: 09/19/2022) |

FILED

2021 Mar-31 PM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 5:18-cv-1983-LCB |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant. | ) | |

## ORDER

The Tennessee Valley Authority entered an agreement with Nuclear Development, LLC, for the purchase and sale of an unfinished nuclear facility known as the Bellefonte Nuclear Plant. Hours before closing, TVA concluded that consummation of the sale would be illegal, and it refused to close on the agreement. Nuclear Development sued.

The parties have cross-moved for summary judgment. (Doc. 70; Doc. 74). The crux of the dispute is a simple matter of contract law, and the motions both turn on a central question: Did TVA breach the Agreement? But to answer this, the Court must first resolve another question, arising in the domain of nuclear-plant regulation, that appears to present a matter of first impression: Could TVA lawfully convey ownership of the Bellefonte property to Nuclear Development before the Nuclear

Regulatory Commission (NRC) approved the transfer of the Construction Permits from TVA to Nuclear Development?

## FACTUAL BACKGROUND

**I.      The Atomic Energy Commission issues TVA two permits authorizing the construction of the Bellefonte Nuclear Plant, Units 1 and 2.**

In June of 1973, TVA applied to the Atomic Energy Commission for permits authorizing the construction of two reactors in northeast Alabama at a site that would be known as the Bellefonte Nuclear Plant. *See In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974). Bellefonte was to consist of two pressurized water reactors, Units 1 and 2 ("Alpha" and "Bravo"),[1] manufactured by the Babcock & Wilcox Company, each rated to operate at 3600 megawatts thermal/1260 megawatts electrical and cooled by a closed-cycle system of monolithic, concrete, natural-draft cooling towers. *See id.* at 1135; (Doc. 85–5 at 5). The Bellefonte Units would be located on a site in Jackson County, Alabama along the west shore of the Guntersville Reservoir, Tennessee River Mile 392, just northeast of the city of Scottsboro. 8 A.E.C. at 1125. On Christmas Eve 1974, after a year and a half of hearings and review, the Atomic

---

[1] (Doc. 85–13 at 10).

2

Energy Commission[2] approved the application and issued TVA Construction Permits CPPR-122 and CPPR-123. *See id.*; (Doc. 72–1).

The Bellefonte Construction Permits were issued under Section 103 of the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2133; 10 C.F.R. § 50; and the Initial Decision of the Atomic Safety and Licensing Board, dated December 23, 1974. (Doc. 72–1 at 6, 11). Each permit authorizes TVA to build one "utilization facility," or nuclear reactor,[3] Unit 1 or Unit 2, and together the two facilities would comprise the Bellefonte Nuclear Plant. In all respects save the numbering of the units, the permits are identical.[4]

The permits' authority is set forth in Section 2:

> Pursuant to [Section 103 of the AEA, 10 C.F.R. § 50, and the Licensing Board's decision], the Atomic Energy Commission (the Commission) hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal as described in the application and amendments thereto (the application) filed in this matter by the applicant and as more fully described in the evidence received at the public hearing upon the application. The facility, known as Bellefonte Nuclear Plant, Unit [1/2] will be located on the applicant's site in Jackson County, Alabama.

---

[2] A few months after the Atomic Energy Commission issued TVA the Bellefonte Construction Permits, the agency was abolished by the Energy Reorganization Act of 1973, and its licensing and regulatory functions were transferred to the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

[3] *See* 10 C.F.R. § 50.2 (defining utilization facility as "[a]ny nuclear reactor other than one designed or used primarily for the formation of plutonium or U-233").

[4] CPPR-122 authorizes the construction of Unit 1, CPPR-123 authorizes Unit 2.

3

*Id.* The permits thus confer authority to build a facility on "the applicant," defined in Section 1(B) to be TVA, and each facility "will be located on the applicant's site in Jackson County, Alabama." *Id.*

The permits further state that they "shall be deemed to contain and be subject . . . to the conditions specified or incorporated" under Section 3. *Id.* One of those conditions, set forth in Section 3(B), states: "The facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama." *Id.* The incorporated description is contained (at least in part) in an exhibit submitted with the application, a filing known as the Preliminary Safety Analysis Report (PSAR).[5] Section 2.1.2 ("Site Description") of the PSAR contains this statement: "The exclusion area will be owned by the United States and in the custody of TVA." (Doc. 75–2 at 157). "Exclusion area" is an NRC-defined term meaning "that area surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area." 10 C.F.R. § 50.2.

---

[5] The permit application is not itself in the summary-judgment record, but its contents, including the PSAR, are described in the Atomic Safety and Licensing Board's order issuing TVA the Bellefonte Construction Permits. *In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974); *see also* (Doc. 75–2 at 3). The PSAR, however, is in the record. (Doc. 75–2; Doc. 75–3).

4

## II.     A History of Bellefonte and Its Construction Permits

### A. Bellefonte's History

Construction of the Bellefonte Nuclear Plant, Units 1 and 2, began in 1974. It continued steadily for a decade, slowed in 1985, and, in 1988, it ceased altogether. (Doc. 85–5 at 5–6). When construction stopped in 1988, both reactor units were mostly complete. *Id.* Estimates for that time put Unit 1 either at 88% or 90% completion, and Unit 2 at 55% completion. (Doc. 85–5 at 5; Doc. 72–7 at 8). But once construction stopped, the project was indefinitely deferred, and for seventeen years the units sat just a few degrees shy of operational.

In 2005, the Bellefonte project began to move in retrograde. Seeking to recoup some of the costs of construction, TVA that year implemented a plan of "Investment Recovery": equipment from Units 1 and 2 was sold, removed, abandoned, or cannibalized for use in other TVA facilities, two-foot-by-two-foot holes were cut into the large concrete steam generators, and control rod mechanisms, feedwater heaters, pumps and motors, condenser tubes, piping and valves, and safety-related pipe chases were removed from the site entirely. (Doc. 85–4 at 11; Doc. 85–5 at 5, 18). When TVA's two-year recovery effort came to an end in 2007, Unit 1 had been reduced from 88% to 55% complete, and Unit 2 was left only 35% complete. (Doc. 85–5 at 5).

5

## B. The Construction Permits

Once TVA had ceased construction in 1988, the NRC placed Bellefonte in "deferred plant status." In NRC parlance, a "deferred plant" is "a nuclear power plant at which the licensee has ceased construction or reduced activity to a maintenance level, maintains the construction permit . . . in effect, and has not announced termination of the plant." Commission Policy Statement on Deferred Plants, 52 Fed. Reg. 38077-01. The Generic Letter from which this definition comes sets forth "the procedures that apply to nuclear power plants in a deferred status," as well as those that a licensee must follow to reactivate—or terminate—a deferred plant. *Id.* Under the Policy Statement, a licensee that seeks to withdraw a Construction Permit must notify the NRC and, "if the plant has been completed to a point that it can function as a utilization facility, the licensee must take all necessary actions to ensure that the facility is no longer a facility for which an NRC license is required." *Id.*

Tracking these procedures, TVA informed the NRC in 2006 that it would permanently cease plant construction and requested an order withdrawing CPPR-122 and CPPR-123. (Doc. 72–6). In June, with Investment Recovery ongoing, TVA sent the NRC a supplemental letter stating that neither of the Bellefonte Units "can be considered a utilization facility" as defined in 10 C.F.R. § 50.2, because neither unit was able to operate as a nuclear reactor. *Id.* at 4.

6

The NRC, in an Environmental Assessment mandated by the National Environmental Policy Act, concurred with TVA's conclusion. (Doc. 72–7). That August, it announced that it was considering the withdrawal of TVA's Construction Permits, and it concluded that the action would have no significant impact on the environment. *Id.* at 6, 10. Its conclusion was based, in part, on the finding that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility." *Id.* at 8. In September of that year, the NRC formally withdrew the Bellefonte Construction Permits. (Doc. 72–9 at 7).

For the next two and a half years, TVA owned the Bellefonte site without an NRC-issued license. (Doc. 86–32 at 65). But toward the end of this brief hiatus, TVA reversed course once again and moved the NRC to reinstate the permits. *Id.* In 2009, at TVA's request, the NRC ordered that CPPR-122 and -123 be reinstated and the facilities returned to "terminated plant status." (Doc. 72–9 at 12; Doc. 85–5 at 6; Doc. 86–32 at 65).[6] In 2010, Bellefonte was placed once more in deferred plant status. (Doc. 85–5 at 6).

---

[6] Under the Commission's Policy Statement on Deferred Plants, a "terminated plant" means a nuclear power plant at which the licensee has announced that construction has been permanently stopped, but which still has a valid CP. 52 Fed. Reg. 38077-01, § III (Oct. 14, 1987). Placing a facility in "terminated status" is not the same as "terminating" a permit. In the former case, the permitholder "must adhere to the Commission's regulations and the terms of the [Construction Permit]" until its withdrawal is authorized, *id.*, while the latter case is used to mean permit withdrawal, (Doc. 76–32 at 87).

7

Bellefonte has remained unfinished, its Construction Permits valid, construction deferred. Neither Unit 1 nor Unit 2 is capable of sustaining nuclear fission in a self-supporting chain reaction. (Doc. 72–4 at 3). TVA has not upgraded Bellefonte's design to meet current NRC regulatory requirements, nor can Bellefonte now meet the original design requirements to sustain nuclear fission. (Doc. 72–4 at 19–20).

### III.   TVA Agrees to Sell Bellefonte to Nuclear Development

In April of 2016, TVA's CEO, William Johnson, issued a report to TVA's Board of Directors recommending that they declare Bellefonte surplus property and authorize its sale without conditions on its potential use. (Doc. 85–13 at 4; Doc. 85–14). The report indicated that an outside appraisal company had assessed Bellefonte's fair market value at $26.4 million (TVA's internal appraisal placed the figure at $11.3 million), and TVA would use that outside figure to set the minimum bid price at auction. (Doc. 85–14 at 6). Johnson's report also acknowledged the major risks inherent in the recommended declaration, including the competitive risk that selling Bellefonte to an outside entity could "put a merchant nuclear plant in TVA's service territory that could compete to serve TVA's customers." *Id.* at 2.

The next month, TVA's Directors adopted a resolution that found Bellefonte to be "surplus to TVA's needs" and authorized its sale at public auction. (Doc. 85–13 at 6; Doc. 85–15 at 2). The sale's purpose, TVA would later announce, was to

bring economic development and jobs to the surrounding area through long-term investments by the purchaser. (Doc. 85–13 at 6; Doc. 72–14). The property was marketed to over 500 potential buyers, 11 of whom expressed interest enough to sign a confidentiality agreement for further discussions. (Doc. 72–14). Three of these potential buyers completed Letters of Intent (LoIs) and submitted financial qualifications to TVA with a plan concerning their intended use for the property. *Id.* Nuclear Development cites (disputed) economic projections purporting to show that its own plans for Bellefonte would create 8,420 jobs per year and $12.6 billion in fiscal impact during the construction phase, and then 4,176 jobs per year and $37.7 billion in fiscal impact over the 60-year operational period. (Doc. 85–18).

TVA issued all prospective bidders the same purchase agreement to bid on, regardless of the bidder's plans for the site. (Doc. 85–16 at 14). Two of the parties to submit LoIs intended neither to build nor operate a nuclear facility at Bellefonte. *Id.* at 13. The third, announcing its own intentions for the property by way of company name, submitted the winning bid.

And so on November 14, 2016, Nuclear Development entered into a purchase and sales agreement with TVA, contracting to buy the Bellefonte site for a final sale price of $111 million. (Doc. 85–13 at 4; Doc. 72–16). Upon signing the agreement, Nuclear Development paid TVA a down payment of 20% on the purchase price, or $22.2 million, plus additional sales and administrative costs. (Doc. 72–16 at 7).

9

Closing, originally set to take place on November 14, 2018, was extended to November 30, by amendment, six days before the event. (Doc. 85–23).

## IV.    Terms and Conditions

Section 1 of the Purchase and Sales Agreement (the Agreement) obligated TVA to "sell, transfer, convey, assign and deliver title and possession" to Nuclear Development, at closing, "all of TVA's right, title and interest" in "all the real property comprising" the Bellefonte Site, described in Schedule R.1(a). (Doc. 72–16 at 3). It also obligated TVA to convey, under Section 1(e), "all permits, licenses or authorization issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e)." *Id.* at 4. Four items (all of them permits) are listed in Schedule 1(e): two NRC-issued Permits to Construct;[7] an Alabama Department of Environmental Management (ADEM) Air Permit;[8] and an ADEM National Pollutant Discharge Elimination System (NPDES) Permit.[9] *Id.* at 116.

Section 6 of the Agreement ("Conditions to Closing") expressly conditioned TVA's duty to convey these assets (and, reciprocally, Nuclear Development's duty

---

[7] CPPR-122 (Unit 1) issued: December 24, 1974, *Reinstated, currently deferred*; and CPPR-123 (Unit 2) issued: December 24, 1974, *Reinstated, currently deferred*. (Doc. 72–16 at 116).

[8] 705-0021-X0004, issued: October 7 1999. (Doc. 72–16 at 116).

[9] AL0024635, issued: April 28, 2015; effective: May 1, 2015; expiration: April 30, 2020. (Doc. 72–16 at 116).

to purchase them) on the satisfaction of six conditions to be fulfilled "at or before the Closing." *Id.* at 7–9. The fifth of these, set forth in Section 6(a)(v), stated that "[t]here shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority . . . restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement." *Id.* at 7. If the condition set forth in Section 6(a)(v) is "unfulfilled as of the Closing Date," then, under Section 11(a)(iv), either party may terminate the Agreement on written notice to the other. *Id.* at 13. Moreover, if the Agreement is terminated under Section 11(a)(iv), TVA must return to Nuclear Development the $22,200,000 "Down Payment" that it had paid, in accordance with Section 5(b)(1), upon execution of the Agreement. *Id.* Although it would not be included in the final Agreement, Nuclear Development had specifically requested that the NRC's pre-approval of the Construction Permits' transfer also be made a condition of closing. (Doc. 85–16 at 10).

To induce each other to enter into the Agreement, the parties expressly represented and warranted in Sections 7(a)(vii) and 8(a)(vi) that "no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the [TVA/Buyer] of this

11

46

Agreement or the consummation by the [TVA/Buyer] of the transactions contemplated hereby." (Doc. 72–16 at 9–10).

In Section 9 of the Agreement, the parties also covenanted that "after the Effective Date and prior to Closing," and subject to the terms and conditions of the Agreement, each party would "use its commercially reasonable best efforts to consummate and make effective as soon as commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto and set forth herein," and they would "provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any . . . regulatory or administrative agency . . . over the matters specified as to the Site consistent with Section 1(e)." *Id.*

By its own terms, the Agreement's "validity, interpretation, and enforceability" is generally to be governed by federal law. *Id.* at 20.

Finally, under Section 35, the parties agreed in all caps that neither party would "be liable for any indirect, incidental, consequential, special, punitive, or exemplary damages as a result of default, violation or breach of any covenant, representation or warranty contained in this agreement." *Id.* at 21 (emphasis removed).

12

## V.     "After the Effective Date and Prior to Closing"

On August 18, 2017, less than two months before for Unit 2's Construction Permit was to expire, Nuclear Development asked TVA to send the NRC a draft letter that it had prepared requesting an extension of the Construction Permit's completion date. (Doc. 85–24). TVA refused. (Doc. 85–25) (Doc. 85 at 9).

In August of 2018, the NRC held a public meeting at Nuclear Development's request on the latter's plans for the Bellefonte site. (Doc. 85–26). The stated purpose of the meeting was "to introduce members of Nuclear Development . . . and to discuss issues associated with the submittal of a request to transfer the deferred construction permit for Bellefonte Nuclear Generating Station (BLN), Units 1 and 2." *Id.* at 4. In attendance were sixteen representatives of the NRC and five of TVA's. *Id.* at 5. During the meeting, Nuclear Development addressed its "general plans" for Bellefonte, including its "plans to close on the [Bellefonte] purchase in November 2018," its "plans to complete detailed schedules in December 2018," and its estimation "that licensing activities will start in 2019."[10] *Id.* at 2. Neither TVA nor the NRC objected to Nuclear Development's schedule—however that schedule was described at the meeting—or expressed any concern that the transfer application had

---

[10] The report summarizing the meeting does not specify what the "detailed schedule" would entail, nor what "licensing activities" were announced for 2019. The suggestion, reiterated at oral argument ("they knew our schedule" (Doc. 143 at 23)), is that Nuclear Development expressly announced at this meeting its plans to apply for the Construction Permits' transfer too late to secure NRC approval before closing. Whether this is true remains unclear. Regardless, TVA disputes that the NRC ever ratified a schedule of post-closing approval.

not yet been submitted. (Doc. 85–27 at 7; Doc. 25–28 at 106). Ordinarily, however, the NRC neither publicly challenges parties nor otherwise speaks at public hearings like this one. (Doc. 86–10 at 4).

Within a few days of this meeting with the NRC, Johnson received an email that summarized the meeting's highlights. (Doc. 85–13 at 12; Doc. 85–29). In a bulleted gloss, the email reports that Nuclear Development's CEO, Bill McCollum, had announced that closing was expected in November, and had said that "a more detailed licensing schedule would be available in early 2019." (Doc. 85–29 at 2). At the time of the email, Johnson still intended to close, so long as "all the conditions were met."  (Doc. 85–13 at 14). On August 21, TVA sent a letter to Nuclear Development acknowledging "that the Buyer intends to complete the closing of this transaction." (Doc. 85–30). The letter further stated that "[i]n preparation of the contemplated . . . closing," TVA would "begin drafting the TVA Transaction Documents" and would "immediately begin relocating any affected TVA employees or operations." *Id.*

### A.    Memphis, Tennessee

On October 9, 2018, Nuclear Development's CEO, William McCollum, made a presentation to the Memphis City Council, the purpose of which, he would testify, was "to explain the results of [a] study that had been performed to look at . . . potential savings for Memphis." (Doc. 85–31 at 71–72). Johnson was "upset"

by some of McCollum's comments from the meeting. (Doc. 85–13 at 12). Not (says Johnson) because Nuclear Development might solicit the city as a customer, but because McCollum, a former TVA executive, had counseled Memphis that it "should leave TVA under any circumstances," because it could "get a better deal elsewhere." *Id.* In Johnson's view, this suggestion was simply false. *Id.* at 33.

Within a few days of McCollum's Memphis presentation, Johnson met with Nuclear Development's owner, Franklin Haney, Sr., and its General Counsel, Larry Blust, and "expressed displeasure" to the Nuclear Development team about how the presentation had gone. (Doc. 85–16 at 21, 23). Johnson himself then met with the Memphis City Council on November 6th—on, as it happens, November 6th Street[11]—"to make the pitch for staying with TVA." *Id.* (Doc. 86–13 at 20).

## B.    TVA Grows Leery of Closing

In the summer of 2018, a TVA attorney identified a "concern about the text of the Construction Permits and the text of the Atomic Energy Act." (Doc. 85–32 at 11–12). By mid-November, TVA had conveyed to Nuclear Development an express concern that closing on the Agreement before the NRC had approved the transfer of the Construction Permits might violate the AEA. (Doc. 85–21 at 16–17; Doc. 85–32 at 14). TVA shared with Nuclear Development an additional concern, that closing

---

[11] So named to commemorate the date that Memphis first voted for TVA power, a vote that led to the relationship Johnson was in that very meeting lobbying to preserve. (Doc. 86–13 at 20); *see also TVA Heritage Series: Street of Dreams*, TVA https://www.tva.com/about-tva/our-history/tva-heritage/street-of-dreams.

on the Agreement might violate the terms of Construction Permits, sometime in October (says TVA) or early November (says Nuclear Development). (Doc. 85–21 at 10, 22; Doc. 85–16 at 26; Doc 85–34).

About a month before closing, Nuclear Development's licensing counsel, Tim Matthews, sent an email to a TVA attorney with a draft copy of a "consent letter that TVA would send to the NRC in connection with Nuclear Development's license transfer application." (Doc. 85–16 at 15; Doc. 85–32 at 5; Doc. 85–33). Whether because TVA failed to consent to its request, as Nuclear Development alleges, or because Nuclear Development asked only that the letter be reviewed, as alleged by TVA, the letter was never sent to the NRC. (Doc. 85–16 at 16; Doc. 85–28 at 9; Doc. 85–32 at 10–11).

As closing drew near, Blust sent a memo, authored by Matthews, to TVA that outlined a procedure Nuclear Development believed would permit the parties to lawfully close on the transaction before the NRC had approved the Construction Permits' transfer. (Doc. 85–36). The memo acknowledged "that this regulatory path—involving temporary separation of ownership of a site for a utilization facility from the recipient of the permits authorizing its construction—appears to be a situation of first impression for the NRC without clear precedent and results in a degree of responsibility and risk to TVA after closing until the [Construction Permit] transfers are approved." *Id.* at 2. In a cover letter to the memo, Blust "agreed" that

Nuclear Development's "proposed path forward to transfer the construction permits in deferred status by [filing] the application before closing with the approval to occur after closing . . . would be a case of first impression for the NRC." *Id.* at 1. TVA's nuclear expert, Stephen Burns, whose 40-year career with the NRC included stints as General Counsel, Commissioner, and Chairman, averred that he was aware of no instance in which the NRC had ever approved the transfer of ownership of a plant subject to a construction permit without first approving transfer of the construction permit. (Doc. 86–81 at 9; Doc. at 86–32 at 85).

On November 13, the day before the original closing date, Nuclear Development submitted its application to the NRC for an order approving the Construction Permits' transfer to Nuclear Development. (Doc. 85–37; Doc. 85–38).

Nuclear Development asked TVA to extend the closing date by six months—though when exactly remains unclear—partly to secure the NRC's approval of the Construction Permits' transfer before closing, partly "to put the rest of the financing package together." (Doc. 84–11 at 50). Nothing in the Agreement obligated TVA to consent to an extension of the closing date. *Id.*

On November 26, four days before the amended closing, Johnson addressed a townhall-style employee forum at TVA's Knoxville office. (Doc. 85–39). Held routinely, meetings like this one were open to anyone in the agency, and at them Johnson would field questions from TVA employees of all stripes. (Doc. 85–13 at

23). At the forum on the 26th, Johnson was asked: "Do you think there's a real chance we could lose [Memphis] as a customer as a result of all this?" *Id.* at 23. He replied:

> I don't think they'll go to Bellefonte. . . . but they have other options. . . . And the point here is you should treat every customer every day like they could leave you tomorrow. You know, we slipped a little bit in Memphis over the last couple years. I was part of that. But we've come back in a pretty big way, and I think we're making progress down there. But every day just assume every customer can leave you, and that'd probably inform your decision-making a little bit.

*Id.* at 24–25. Another question posed to Johnson was: "Why continue to sell Bellefonte if the potential buyer wants to take away our largest LPC to make it work?" *Id.* at 24. With "lighthearted banter," Johnson replied:

> Well, that's a great question. So have I explained to you the three rules of the universe? Have I ever told you this? Some of you I have, and you're shaking your head no, but I'm doing it anyways because they apply to this situation. Rule 1, it seemed like a good idea at the time; Rule 2, no good can come from this; and Rule 3 is even the intelligent way wouldn't have worked. So I think we got them all covered here.

> We're under a lot of pressure to do something with the plant to sell it. We thought it was a good idea, put it into productive use, and knew we would compete for load, and that's not really what ticked us off in Memphis. What ticked me off in Memphis was our former colleague Bill McCollum standing up and saying you should do this nuclear deal, but even if you don't, you should leave TVA and go to MISO or Entergy 'cause those are both better deals than you're getting from TVA. To me, that crossed the line.

> Yeah, so what do you do? Well, we gave them a short extension because I ate into some of their time. They have a closing date Friday? . . . Let's do a poll. How many people think I should give them another extension? Okay. So there's no extension. And we'll see where we are at the close of business Friday, but there's no more extension. I do think

a lot of people have been misled about this. The idea that you can finish that plant, what they're really saying, if you [sic] listening carefully, is they can finish it for three and a half billion. Be a pretty good trick. . . . It just seemed undoable.

So but it's time to call the question. So we'd be calling it on Friday. I've already been to the legal department today for two reasons. One, that's where my bathroom is on the sixth floor; but the more important but less pressing question, to alert the litigators that I'm sure we'll be a defendant by Monday. So I'm sure we'll be sued about this. If you study the players—well, we'll be defendants on Monday

*Id.* at 24.

### C.    TVA Decides Not to Close on the Bellefonte Sale

TVA received an opinion letter from the firm of Pillsbury Winthrop Shaw Pittman, its regulatory counsel, by the end of November[12] advising it that "acquiring or transferring ownership of Bellefonte (and/or its CPs) without some form of prior NRC consent would be a violation of the [AEA] and NRC regulations, as they have been previously interpreted." (Doc. 86–61 at 2). After reading the letter, Johnson was persuaded that TVA would not lawfully be able to consummate the sale,[13] and,

---

[12] The timing is disputed, the letter undated.

[13] Specifically, when asked "what choice, if any, did you think you had with regard to your ultimate decision whether to close" once he had read the opinion, Johnson testified:

> I didn't think we could close at that moment because of the permit issue, and I thought it was a pretty strong opinion. In addition to looking at it, I actually went and pulled the Atomic Energy Act and read it and read some of those cases. And so I really did not think we could go to closing.

(Doc. 85–13 at 38). Disputing both the truth of the statement and its attendant narrative, Nuclear Development contends that the "[t]he real reason that TVA refused to close is evidenced by events occurring after [Nuclear Development] made a presentation for the Memphis power business, and Johnson's consequential concern over losing TVA's largest power customer." (Doc. 101–1 at 5).

19

on November 29, he decided—"as late as possible"—that TVA would not proceed to closing. (Doc. 86–13 at 25–26, 38). At 9:09 that evening, TVA faxed a letter to Nuclear Development announcing that it would not close on the transaction because to do so "would be unlawful." (Doc. 86–16 at 34; Doc. 86–40). When the day of closing at last arrived, Nuclear Development sent by e-mail a letter to TVA warning that TVA would be in breach of the Agreement if it did not deliver the transaction documents and confirm that it would close. (Doc. 86–16 at 34; Doc. 86–41).

TVA did neither: the sale did not close.

Nuclear Development asserts that it had $91.6 million in closing funds deposited and ready to wire on November 30, 2018, and it was ready, willing, and able to close. (Doc. 85–42 at 28–29; Doc. 85–4 at 30; Doc. 85–43). TVA cites some evidence, however, that Nuclear Development would close only if it was comfortable that financing was in place for the project, and that, at the time of closing, project financing had not been finalized. (Doc. 86–59 at 29–30; Doc. 85–43 at 21, 24).

### D.    Post-Closing Developments

Nearly a year after the parties had been scheduled to close, the NRC issued a letter to Nuclear Development stating that it had accepted its application for the NRC's consent to transfer Construction Permits CPPR-122 and CPPR-123 from TVA to Nuclear Development. (Doc. 72–23 at 20, 51; Doc. 72–43). The NRC

estimated that the licensing request would take 700 hours to complete, and it expected to complete its review by September 2020. (Doc. 72–43 at 4).

No decision came in September 2020. In November, the NRC issued Nuclear Development a letter stating that it would "not complete its review of the requested licensing actions until [Nuclear Development] provides information demonstrating [its] right to possession of the Bellefonte site in accordance with [10 C.F.R. 50.80(b)(2)]. The letter further stated that

> the NRC staff routinely issues orders consenting to license transfers that are conditioned on certain future actions by the applicant or the receipt of third-party approvals needed prior to consummation of the underlying transaction, such as regulatory approvals by other Federal or State agencies or approvals necessary for applicants to emerge from bankruptcy. The staff notes that license transfer applications are typically submitted under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application. In this circumstance, however, possession of the Bellefonte site itself is currently in dispute between an NRC applicant and the current NRC license holder. . . .

> [The NRC staff had requested] that ND provide information (written consent from TVA or a court order) regarding ND's right to possess the Bellefonte site . . . .. Accordingly, the NRC staff intends to complete its review of the requested licensing actions upon ND's submittal of the required information to demonstrate compliance with the requirements in 10 CFR 50.80(b)(2).

(Doc. 114–1). The application remains pending. The NRC awaits a verdict.

## PROCEDURAL HISTORY

Nuclear Development filed suit seeking specific performance on the Agreement the day that the parties were set to close. (Doc. 1). The Complaint contained an alternative count for damages and a further count seeking a preliminary injunction. *Id.* A motion for preliminary injunction, along with a request for an expedited hearing, was filed contemporaneously with the complaint. (Doc. 3). The parties reached a provisional agreement on the motion and filed a Stipulation Regarding Nuclear Development's Motion for Preliminary Injunction.[14] The Court adopted these stipulations and denied the request for an expedited hearing. (Doc. 18). TVA then moved to dismiss all counts of the Complaint (Doc. 23), and the motion was denied. (Doc. 42).

The parties have now filed cross-motions for summary judgment (Doc. 70; Doc. 74). Nuclear Development moves for summary judgment on Count I of the complaint only, seeking specific performance and, for the period between November 6, 2016 until the date of this order, an award of 6% per annum on the $29,219,231

---

[14] The stipulations provided that TVA (1) would satisfy the quality assurance and other requirements applicable to Construction Permits CPPR-122 and CPPR-123; (2) would not request termination of either Construction Permit without first notifying the Court and Nuclear Development's counsel at least five days before submitting such a request to the NRC; and (3) would not sell or otherwise dispose of Bellefonte without first notifying the Court or Nuclear Development's counsel at least five days before executing any such agreement. (Doc. 17 at 1–2). Nuclear Development, for its part, withdrew its request for an expedited hearing on its preliminary-injunction motion without prejudice to its right to renew if TVA should give notice under paragraph (2) or (3). (Doc. 17 at 2).

22

that ND paid to TVA.[15] TVA moves for summary judgment on all claims—Count I (Breach of Contract seeking Specific Performance); Count II (Preliminary Injunction); and Count III (Alternative Claim for Breach of Contract Seeking Damages).

## LEGAL STANDARDS

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is "material" if its resolution "may affect the outcome of the suit under the governing law." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997)). A dispute is "genuine" if under the evidence "a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)).

---

[15] More precisely, Nuclear Development seeks an order compelling TVA "to specifically perform its obligations under the Contract by accepting Nuclear Development's payment of the balance of the purchase price for the Bellefonte Site and by executing and delivering to Nuclear Development the 'TVA Transaction Documents' described in the Contract. In conjunction with such order of specific performance, Nuclear Development further prays the Court to award it all court costs, attorneys' fees, and prejudgment interest at the rate of 6% per annum calculated on the full purchase price from the date of TVA's breach through the date it specifically performs its obligations as provided in the Contract." (Doc. 1 at 9–10). Its Count I prayer notwithstanding, Nuclear Development has abandoned its claim for attorneys' fees at summary judgment. (Doc. 87–1 at 31).

23

In deciding whether there is a genuine dispute as to a material fact, a court must presume the nonmovant's evidence to be true and draw all reasonable inferences in the nonmovant's favor. *Allen,* 495 F.3d at 1313 (citing *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1164 (11th Cir.2003)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

## DISCUSSION

The parties' cross-motions for summary judgment turn on a simple question of contract law: Did TVA, by failing to close on the sale of the Bellefonte property, breach its agreement with Nuclear Development?

TVA submits that it did not, because an express condition to closing was not satisfied. The condition, set forth in Section 6(a)(v), predicated the parties' obligations under the Agreement on the non-illegality of consummating the sale, and consummation was unlawful, TVA contends, because the NRC had not approved the transfer of the Construction Permits to Nuclear Development by closing. Nuclear Development, in turn, contends that NRC approval was no bar to lawful closing, and

urges the Court to read Section 6(a)(v) more narrowly, excluding from its ambit any consideration of the Construction Permits' transfer.

The Court must therefore decide: (1) whether Section 6(a)(v) applies to the NRC's failure to approve the Construction Permits' transfer; and, if so: (2) whether closing without the NRC's approval would have been lawful.

## I.      The language of Section 6(a)(v) is unambiguous and sets forth an express condition precedent.

It is undisputed that the Agreement executed on November 14, 2016 created a valid contract that set forth terms and conditions to govern the purchase and sale of the Bellefonte property. (Doc. 42 at 9; Doc. 72–16). Under Section 31, the parties agreed that the "validity, interpretation, and enforceability" of its terms would be governed by federal law. (Doc. 72–16 at 20). And "[u]nder federal law, the plain meaning of a contract's language governs its interpretation." *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008) (citations omitted). Where that language is unambiguous, its "legal effect . . . is a question of law" that "may be resolved summarily." *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir. 1988) (first citing *Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir. 1979); and then citing 10A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730.1 at 279 (1983)).

Section 6 of the Agreement predicated the parties' obligations on the fulfillment of six conditions precedent to closing. (Doc. 72–16 at 7). The fifth of

these, set forth in Section 6(a)(v), conditioned the parties' obligations on the non-illegality of consummating the transaction:

> (v) There shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below)[16] restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement . . .

*Id.* Neither under Section 6 nor elsewhere does the Agreement explicitly condition closing on the NRC's approving transfer of the Construction Permits to Nuclear Development.

The language of Section 6(a)(v), however, is unambiguous: it states with univocal clarity that closing was predicated on the "condition" that no "law, statute, rule, regulation, [or] permit" would "otherwise prohibit[] or mak[e] illegal" the consummation of the Bellefonte sale. If, given the state of affairs at closing, a legal authority listed in the clause would have made closing unlawful, the parties would be relieved of their closing obligations. The Agreement need not list exhaustively every factual predicate that could apply to the condition and render closing illegal; a myriad of circumstances could have triggered the clause, and it would be

---

[16] "Governmental Authority" is defined in Section 9(a)(ii) as "any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site . . .." (Doc. 72–16 at 10–11).

impossible to list them comprehensively. But under the clear language of the condition, if it would have been unlawful to close without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition would not have been satisfied.

Although Section 6(a)(v) is susceptible to only one meaning, Nuclear Development ignores the plain language and proposes that "the only fair and logical reading" of the Agreement as a *whole* is that the parties did not intend for closing to be conditioned on the NRC's approval of the Construction Permits' transfer. It offers three bases for rejecting Section 6(a)(v)'s unambiguous meaning: (1) the inclusion of Section 1(e); (2) the inclusion of Section 7(a)(vii); and (3) a putatively more reasonable, wholistic reading of Section 6(a)(v).

First, Nuclear Development contends that to read a condition of NRC approval into Section 6(a)(v) is to "read out" Section 1(e). Section 1 of the Agreement lists the "Purchased Assets" that TVA agrees to sell, transfer, convey, assign, and deliver to Nuclear Development at closing, including, under subsection (e):

> To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on <u>Schedule 1(e)</u> (the "<u>Permits</u>"); <u>provided</u>, <u>however</u>, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this <u>Section 1(e)</u> shall not require TVA to certify that Buyer is qualified and fit to complete construction

27

of and operate those reactors and, if Buyer informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this <u>Section 1(e)</u> by Closing, TVA's obligations under this <u>Section 1(e)</u> shall cease.

(Doc. 72–16 at 3–4). Besides Schedule 1(e), Section 1(e) contains the Agreement's only allusion to the Construction Permits. (*See* Doc. 72–16 at 25). This subsection conditionally obligated TVA to convey the Construction Permits at closing, but TVA's duty is qualified by the text in three ways. One, TVA need not vouch that Nuclear Development "is qualified and fit to complete construction of and operate" the reactors. Two, it imposes an extra duty on TVA to terminate the permits at Nuclear Development's election; and three, if "an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license, or authorization"—the air, water, or Construction Permits listed in Schedule 1(e)— TVA is relieved of the duty to bring it to closing.

Because the paragraph speaks to the very situation that arose—"an applicable Governmental Authority ha[d] not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to . . . Section 1(e) by Closing"—Nuclear Development contends that the parties anticipated this possibility and chose not to excuse the duty to close, and that only the duty to convey the Construction Permits is relieved. And if the parties had intended to condition closing on the NRC's approval, they could have inserted such a condition into the Agreement, either here

28

or in Section 6, just as they made NRC approval a condition of TVA's duty to convey the permits.

But contrary to Nuclear Development's contention, Sections 1(e) and 6(a)(v) are consistent, and TVA's construction of the latter does not "read out" the former. Each provision of Section 1(e) serves a function consistent with the NRC's failure to consent to the permits' transfer by closing. Significantly, 1(e) also gives Nuclear Development the right to compel TVA to take whatever action necessary to terminate them. If Nuclear Development had exercised that option, TVA could have petitioned the NRC to withdraw them, just as they had been withdrawn between 2006 and 2009, and transferred Bellefonte without running afoul of Section 6(a)(v).

Second, Nuclear Development contends that this reading of Section 6(a)(v) would likewise "read out" TVA's express warranty in Section 7(a)(vii) that no governmental authority or consent was required to consummate the sale. Again, Nuclear Development is incorrect. Both parties warranted that they could consummate the Agreement without further approval of any governmental authority—TVA in Section 7(a)(vii) and Nuclear Development in Section 8(a)(vi)—and both parties were mistaken. The fact of these mistakes neither voids the condition precedent, nor creates any conflict between the parties' representations and the non-illegality condition set forth in Section 6(a)(v).

29

And third, given Sections 1(e) and 7(a)(vii), Nuclear Development concludes that the parties intended Section 6(a)(v) to serve only as an escape hatch should some "intervening law" be enacted after the effective date and prior to closing. The parties could have written it this way, but they did not.

All these arguments are unavailing for the same fundamental reason: the condition's language is unambiguous, and its plain language controls. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls.").

Although the parties may not have conditioned closing on the NRC's approval, approval of the NRC may have been a necessary condition to closing.

**II.   If closing could not lawfully proceed without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition precedent set forth in Section 6(a)(v) was not satisfied.**

Because Section 6(a)(v) applies, the Court must next decide whether closing without NRC approval would have been unlawful. TVA posits two authorities in effect at the time of closing that would have rendered consummation of the Bellefonte transaction illegal: (1) the Construction Permits; and (2) Section 101 of the Atomic Energy Act.

30

### A.  Transfer of the Bellefonte site would not have violated the terms of the Construction Permits.

Section 234 of the AEA, 42 U.S.C. § 2282 imposes civil penalties for violating the terms or conditions of any license issued under the Section 103 of the Act. The Construction Permits each contain two statements that TVA characterizes as "terms" of the permit—terms, it contends, that it would have "violated" by closing on the sale. TVA is mistaken.

CPPR-122 and -123 were issued under Section 103 of the AEA, 42 U.S.C. § 2133 and 10 C.F.R. § 50, and violations of their terms can trigger civil penalties. *See* 42 U.S.C. § 2282. The statements implicated by the sale of Bellefonte are contained in Sections 2 and 3 of each permit. Recall that Section 2 states that "the facility . . . will be located on the applicant's site in Jackson County, Alabama," with "applicant" defined in each permit to be TVA. (Doc. 72–1 at 6, 11). Further recall that Section 3(B) states that "[t]he facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama," *id.*, with the relevant description found in the PSAR's "Site Description": "The exclusion area will be owned by the United States and in the custody of TVA," (Doc. 75–2 at 157). If Bellefonte had been sold to Nuclear Development before the NRC had approved transfer of the Construction Permits, the site would no longer be "the applicant's," and the exclusion area would no longer be owned by the United States.

31

TVA's argument is more than superficially pleasing. It highlights truth-dependent language in the Construction Permits that presumes TVA ownership: if TVA ceased to own the site, then these sentences would apparently become untrue. The argument also speaks to a concern lurking behind the whole Bellefonte dispute—surely, once a construction permit has been issued, the NRC regulates ownership of the permitted site—and suggests its own answer. But the answer to the next question—how?—is unsatisfactory. The alleged non-conformities seem divorced from any substantive check on transferring ownership that one would expect the NRC to place on a permitted site. These seem to be mere technicalities, not barriers to closing.

As intuition would suggest, the law does indeed restrict the transfer of permitted sites. Those restrictions, however, are imposed by statute[17]—not the language of the Construction Permits. There are three reasons why TVA's argument fails.

First, these statements are not "terms." A term is defined as "[a] condition under which something may be done, settled, agreed, or granted; a stipulated requirement or limitation," *Term*, *Oxford English Dictionary* (3d. ed. 2017), or as "[a] contractual stipulation," *Term*, *Black's Law Dictionary* (11th ed. 2019). These statements merely describe where the utilization facilities, if built, may be located.

---

[17] *See* Section II.B *infra*.

Their function is deictic, not conditional, serving to contextualize rather than limit the scope of the authority conferred by the permit.

Contrast "applicant's" with another statement in Section 2: the Commission "hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal." (Doc. 72–1 at 6, 11). "3600 megawatts thermal" is a term of the permit, and the construction of a utilization facility designed to operate above that limit would violate it. Contrast too the description incorporated into Section 3(B), "owned by the United States," with the unambiguous condition in Section 3(A): "The earliest date for completion of the facility is June 1, 1979, and the latest date for completion is December 1, 1979." *Id.* "December 1, 1979" is likewise a term of the permit; to complete the facility on December 2, 1979 would, without an extension, violate the term.[18]

The megawatts thermal at which the facility can operate and the completion deadline each set forth clear "conditions" or "stipulations" for the construction of the Bellefonte units. Indeed, the site on which the facilities may be built is also a term: to build either unit in Madison County would violate the permits. But it would be wrong on this basis to pigeonhole a limitation on ownership into the permits' description of the site. Not because there aren't good reasons to regulate the

---

[18] Both Construction Permits remain valid: the latest date for the completion of each unit has been extended to October 1, 2020. (Doc. 128–1 at 9).

ownership of a site that's subject, through a valid construction permit, to the NRC's jurisdiction, but rather because this language fails to provide an adequate legal hook for site regulation. Any allusion to ownership contained in the Construction Permits is too attenuated to be deemed a "term" of the permit.

To drive this point home, the Construction Permits never expressly condition transfer of the site on transfer of the permits. Section 3 sets forth the permits' express conditions. Not one of them mentions transfer of the site.

In arguing for their status as terms, TVA cites the NRC's policy on license transfers. Once the NRC approves the transfer of a permit from one entity to another, it requires the new permitholder to seek an amendment conforming the permit's language as necessary to reflect the new ownership. Though amendment may be required by regulation, the formalistic step of replacing the former permitholder's names with that of the new remains (quoting the NRC) "essentially administrative in nature." *Streamlined Hearing Process for NRC Approval of License Transfers*, No. 3150-AG09, 1998 WL 874942, at *15. The statements that contain the allegedly inviolable language thus do not constitute "terms" of the construction permits; rather, they are merely "administrative language," amenable to post-transfer amendment. *Id.* at *15. These amendments are necessary "[o]nly when the [permit] specifically has references to entities or persons that no longer are accurate following the approved transfer." *Id.*

Second, these statements (and all others in CPPR-122 or -123) are consistent with TVA's conveying the underlying real estate to Nuclear Development, because the permits are, by axiom and etymology, just permissive. The alleged violations, in other words, could remain hypothetical. If a utilization facility is *not* constructed,[19] then there is no facility at all; because no facility had been built, neither Unit 1 nor Unit 2 would be located on the "applicant's" site, nor any site at all; and if there's no facility, there's no exclusion area, regardless of ownership.[20]

And third, the NRC regulates the approval of license transfers and the amendments of license language at different stages, and with separate orders, in the license-transfer process. Through the former step, governed by 10 C.F.R. § 50.80, the NRC regulates the substantive qualifications of prospective license transferees. Through the latter, governed by 10 C.F.R. § 50.90, it amends the administrative language. If these two steps were consolidated, and the statements that TVA characterizes as inviolable "terms" were amended in the same order that the NRC approved the permit's transfer to the applicant, then it might make sense to treat the

---

[19] This second argument holds even if a utilization facility has been or would be constructed on the site. The point is that the language is merely a grant of authority, and it does not matter whether these statements are true or not. Permits are just permits. Absent an express condition in the permits themselves, they neither convey nor restrict site ownership.

[20] The "shall" in Section 3(B) might seem, at a glance, to elevate this term to a mandatory provision. But if it were mandatory, then the permittee's failure to complete a facility would amount to a violation of the term, and that outcome is inconsistent with the NRC's policy of permitting plant deferral and termination. The better reading, then, is that the provision is merely permissive.

statements as terms of the permits. But the NRC treats them separately, and the Court will not bootstrap a substantive restriction onto language that the NRC deems merely administrative.

### B. Under the regulatory scheme established by the AEA and NRC regulations, transfer of the Bellefonte Site without the NRC's approval of the Construction Permits' transfer would have been unlawful.

Nuclear Development contends that TVA could lawfully have transferred Bellefonte without the NRC's approval of the Construction Permits. Under the regulatory scheme established by the AEA and its implementing regulations, however, it is mistaken.

When Congress passed the Atomic Energy Act of 1954, it enacted a regulatory scheme "virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 783 (D.C. Cir. 1968). Since the passage of the Energy Reorganization Act of 1973, the AEA's licensing and regulatory functions have been administered by the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

Section 101 of the AEA, 42 U.S.C. § 2131, implemented through 10 C.F.R. § 50.10(b), makes it unlawful for any person in the United States to "transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility without a license issued by the NRC under Section 103 or

Section 104. The statute relevantly defines a "utilization facility" as "any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." The regulations that implement this definition define a "utilization facility" as a "nuclear reactor," and a nuclear reactor as "an apparatus, other than an atomic weapon, *designed* or used to sustain nuclear fission in a self-supporting chain reaction. 10 C.F.R § 50.2 (emphasis added). Section 103 authorizes the NRC "to issue licenses to persons applying . . . to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility "for industrial or commercial purposes." [21] 42 U.S.C. § 2133(a). For all purposes under the AEA, a construction permit is considered a license. 42 U.S.C. § 2235(a).

Moreover, Section 185(a), 42 U.S.C. § 2235(a), implemented through 10 C.F.R. § 50.10(c), requires those who wish to "construct or modify" a utilization facility to apply to the NRC for a construction permit. Under the regulation, no one may

> begin construction of a . . . utilization facility on a site on which the facility is to be operated until that person has been issued either a construction permit under this part, a combined license under part 52 of this chapter, an early site permit authorizing the activities under

---

[21] Section 104, the other licensing authority governing Section 101 (though not at issue in the litigation), also authorizes the NRC to issue licenses for utilizations facilities "for use in medical therapy," 42 U.S.C. § 2134(a), and "useful in the conduct of research and development activities," 42 U.S.C. § 2134(c).

paragraph (d) of this section, or a limited work authorization under paragraph (d) of this section.

10 C.F.R. § 50.10(c). And under Section 184, 42 U.S.C. § 2234, it is prohibited to transfer one of these licenses, or a license-conferred right, "either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this chapter, and shall give its consent in writing." Section 184 is implemented through 10 C.F.R. § 50.80. Together, these provisions establish a regulatory framework that governs the building, licensing, use, and transferability of utilization facilities.

Bellefonte's units are not now "used" to sustain nuclear fission in a self-supporting chain reaction, and it is undisputed that in their current state, the units would be *incapable* of being so used. (Doc. 72–4 at 3). What is disputed is whether Unit 1 or Unit 2 is an apparatus *designed* to sustain nuclear fission in a self-supporting chain reaction. If either unit is an apparatus so "designed," then, by definition, it is a nuclear reactor; if a nuclear reactor, then a utilization facility; and if a utilization facility, then its transfer to Nuclear Development would have been unlawful under Section 101 of the AEA. 42 U.S.C. § 2131.

"Designed," as the word is used in the regulation, is a somewhat ambiguous modifier, and the parties offer competing interpretations of its meaning. TVA suggests that it turns on subjective intent to complete the reactor (Doc. 86–83 at 19–

38

20), while Nuclear Development collapses the regulatory language into the statutory definition of "capable of making use of specialized nuclear material" (Doc. 101–1 at 8–9). Two brief thought experiments seem to suggest the best answer.

Long before construction ever began, plans were drawn up for two utilization facilities to operate at the Bellefonte Nuclear Plant. Did these plans constitute two nuclear reactors? If blueprints alone sufficed, then Section 101 restrictions could attach to any lot pressed into service as the site of a prospective reactor by the imperious pen of a nuclear engineer. But if it takes more than blueprints, at what point does a unit become a nuclear reactor? When the first brick in laid? It strains belief to say that a single brick could be an "apparatus designed . . . to sustain nuclear fission in a self-supporting chain reaction."

Now suppose that the NRC had omitted "designed" from the definition of nuclear reactor. Only an apparatus "used" to sustain nuclear fission would count, and so only facilities currently in operation would be deemed nuclear reactors. And by extension, those plants not then used, even if fully built, staffed, and capable of being used the very next day, would be excluded from the definition.

The regulation's meaning would seem to lie somewhere between these two: wide enough to embrace disused but operable stations, but not so expansive as to capture a blueprint-backed brick. "Designed" then, might simply mean "capable of operating."

This is how both TVA and the NRC used the term in 2006. That year, when Investment Recovery was ongoing and the Bellefonte units were closer to completion than they are now, TVA decided that it would permanently halt construction on the Bellefonte units, and it notified the NRC that it sought to withdraw the Construction Permits. (Doc. 72–6 at 4). Before it would consent to the request, the NRC asked TVA "to provide additional information regarding whether [Units 1 and 2] can be considered a "Utilization Facility" as defined in 10 C.F.R. [§] 50.2." *Id.* TVA replied:

> In their present condition, neither of the subject units can be considered a utilization facility as so defined. At the time that construction of the units was deferred, TVA considered Unit 1 to be 88 percent complete and Unit 2 to be 28 percent complete. At this time, neither reactor has the necessary structures, systems or components in place to sustain a controlled nuclear reaction. For example, over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site which precludes the ability of the units to operate as nuclear reactors. In addition . . . there is no nuclear fuel located at the BLN site.

*Id.* Because neither unit was capable of operating as a nuclear reactor, Units 1 and 2 were not, TVA concluded at the time, "utilization facilities." Two months later, the NRC concurred:

> At this time, neither reactor has the necessary structures, systems, or components in place to sustain a controlled nuclear reaction. Over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site, which precludes the ability of the sites to operate as nuclear reactors. The current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility.

(Doc. 72–7). Because it was considering the withdrawal of the Construction permits, the NRC issued an Environmental Assessment and Finding of No Significant Impact, concluding, in its assessment, that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility. *Id.*

To understand "designed or used" to mean "capable of operating" or "allowing operation" is, furthermore, consistent with the definition, implemented by 10 C.F.R. § 50.2, supplied by the AEA itself. Under Section 11 of the AEA, a "utilization facility" is relevantly defined as "(1) any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." 42 U.S.C.A. § 2014(cc). In a case interpreting the statutory definition, the NRC similarly focused on the functional capability of the equipment at the site. *In the Matter of Cincinnati Gas & Elec. Co., et al. (William H. Zimmer Nuclear Power Station, Unit 1)*, 20 N.R.C. 765 (Aug. 29, 1984). In the *Zimmer* case, applicants to run the all-but-complete William H. Zimmer Nuclear Power Station moved to withdraw their application for an operating license. *Id.* The NRC's Atomic Safety and Licensing Board, interpreting the statutory definition of "utilization facility," agreed with the NRC Staff that "because the facility is essentially complete, it must be disabled so that it cannot make use of special nuclear material. *Id.* at *1. Thus, under both the statutory definition and the NRC's

41

interpretation of the term, it would appear that a utilization facility would cease to be a utilization facility once it became incapable of making use of special nuclear material—that is, incapable of operating.

But to end the analysis there would be to take too narrow a view of the AEA and its implementing regulations, defying established law on interpreting agency regulations and ignoring the greater part of the NRC's practice, policy, and decisions. Armchair analysis is unnecessary: under the AEA, the authority to regulate the field of nuclear licensing falls to the NRC, and to interpret "utilization facility," the Court must accede to the agency's definition of the term. A utilization facility, in other words, is what the NRC says it is.

This, indeed, becomes all the more evident through a deeper analysis of the *Zimmer* case itself. For in *Zimmer*, what the applicants were pursuing was the withdrawal of their application and the termination of the proceedings.[22] *Id.* The motion for withdrawal asked for relief on self-imposed conditions, most of which pertained to rendering the site inoperable as a "utilization facility"—removing all fuel from the site, modifying the steam supply system, severing and welding caps on the two main feedwater lines and four main steam lines, and removing the control rod drive mechanisms—and the motion was granted *subject to the further condition*,

---

[22] The applicants, evidently, had a change of heart and wished to convert the vestiges of the nearly completed plant into a fossil-fired generating station. 20 N.R.C. 765

imposed by the NRC, that the applicants implement a site restoration plan. *Id.* Moreover, the implementation of that plan would be verified by the NRC staff. *Id.* at *3. The import here is that even if the Zimmer plant had been made inoperable as a utilization facility, the NRC would continue to exercise its regulatory authority over the site until, through independent verification, it confirmed that the applicants had met the conditions of application withdrawal, only some of which pertained to the plant's ability to function as a utilization facility.

Although it was an application for operating license at issue in *Zimmer*, the analysis is the same where the license is a valid construction permit. Under the NRC's Policy Statement on Deferred Plants, a permittee must comply with all requirements of a construction permit, even if the plant is in deferred or terminated-but-not-withdrawn status. 52 Fed. Reg. 38077-01, §§ III(A)(l), III(A)(3), III(B)(l) (Oct. 14, 1987). Furthermore, all regulatory requirements and policy statements applicable to plants under construction are applicable to plants in deferred status. *Id.* at III(A)(3), III(A)(5). Section III(A)(3) of the policy statement, for instance, states that permitholders of construction permits in deferred status must continue to abide by the NRC's regulatory requirements concerning the "verification of construction status, retention and protection of records, and maintenance and preservation of equipment and materials." *Id.* These requirements are not optional. As the Policy Statement shows, they are implemented through discrete NRC regulations:

43

10 CFR 50.54(a), "Conditions of Licenses," and 10 CFR 50.55(f), "Conditions of Construction Permits," which require that a quality assurance program be implemented; 10 CFR Part 50, Appendix B, which requires that all activities performed to establish, maintain, and verify the quality of plant construction be addressed in the licensee's quality assurance program; 10 CFR Part 50, Appendices A and B, which require that certain quality records be retained for the life of the plant; 10 CFR 50.55(e), which requires reporting of deficiencies in design, construction, quality assurance, etc.; 10 CFR 50.71, which applies to the maintenance of records; and 10 CFR Part 21, which applies to reporting of defects and noncompliance. Those NRC regulatory guides that endorse the ANSI N45.2 series of standards, "Quality Assurance Requirements for Nuclear Power Plants," also are applicable and include Regulatory Guides 1.28, 1.37, 1.38, 1.58, 1.88, and 1.116.

*Id.* These duties are not trivial: when Johnson recommended in 2016 that the Board declare Bellefonte surplus property, he reported that TVA had been spending $10,000,000 to $12,000,000 annually on site maintenance, although it planned to reduce those expenditures to a $6,500,000. (Doc. 85–14 at 1).

The regulations may nowhere expressly restrict the licensee from transferring the property, but NRC policy presumes that a site will remain in the licensee's control. Hence the NRC's admonition that "[i]mplementation of the program will be examined periodically to determine licensee compliance with commitments and overall program effectiveness." 52 Fed. Reg. 38077-01. That the NRC interprets its regulations to accord it full regulatory control over a site through the permittee until the permits are withdrawn is confirmed by still another provision of the policy

statement. In mandatory language under the section governing "Plant Termination," the policy states:

> Until withdrawal of the [Construction Permit] is authorized, a permit holder must adhere to the Commission's regulations and the terms of the [Construction Permit] and should submit suitable plans for the termination of site activities, including redress, as provided for under 10 CFR 51.41, for staff approval. Moreover, if the plant has been completed to a point that it can function as a utilization facility, the licensee must take all necessary actions to ensure that the facility is no longer a facility for which an NRC license is required.

*Id.* at § III(B)(1). Through this provision, a permitholder's regulatory duties, including those directly concerning site activities, are expressly delimited by the existence of a valid construction permit. The provision also illuminates the relationship between a plant's status as a utilization facility, the existence of an NRC license, and the NRC's continued authority over a licensee and the permitted site—exactly the constellation of issues raised in the *Zimmer* case. For a site to be released from NRC jurisdiction, the NRC-issued license must be withdrawn, and withdrawal may be subject to NRC-imposed conditions. One of those conditions may be ensuring that a plant can no longer function as a utilization facility. But until the NRC has withdrawn a construction permit, the permitholder must abide by its terms and all applicable regulations.

These regulations thus impose duties on licensees that can be fulfilled only with direct control of the site. To allow a licensee to transfer the property without

45

the NRC's approval would cripple its regulatory authority and derogate from its stated policy.

For the NRC policy statements to cohere, the following statement must also be true: a plant that might not otherwise be considered a utilization facility will nevertheless be treated as one by the NRC as long as it is subject to a valid Section 103-issued license. And thus is the ownership of a plant site tethered to the NRC's permitting authority; where there is a valid NRC-issued license, transfer of ownership requires NRC approval.

This outcome is dictated by far more than policy statements: the limitation on the transferability of site ownership is firmly established by NRC precedent. In a decision by the Commission itself, the NRC proclaimed that "[a]ny transfer of ownership would require Commission approval." *In the Matter of Pub. Serv. Co. of New Hampshire, et al. (Seabrook Station, Units 1 & 2)*, 7 N.R.C. 1, 22 (Jan. 6, 1978). That case concerned the Seabrook plant, a two-unit nuclear electric generating station on the coast of New Hampshire, still under construction at the time of the decision. *Id.* at 4. The issues before the Commission principally turned on the financial qualifications of the construction-permit applicants, but those issues raised further questions concerning two applicants who wished to dispose of their interests in the plant. Although it declined to consider the future modifications to the

applicants' ownership agreement, the NRC was satisfied that it would be able to assert control over any future transfers of ownership.

The NRC reaffirmed this principle just a month after its *Seabrook* decision. In the *Marble Hill* case, the NRC's Atomic Safety and Licensing Appeal Board held that prospective co-owners of nuclear power plants must be co-applicants for an NRC license. *Id.* at 201. The Public Service Company of Indiana had applied for a license to build a nuclear-powered electric generating facility at a site in Southern Indiana known as "Marble Hill," and the NRC's Licensing Board, pending final approval, granted it a Limited Work Authorization. *Id.* at 182. As its name suggests, a Limited Work Authorization allows only for limited pre-construction activities, which, per NRC regulations, include

> the driving of piles, subsurface preparation, placement of backfill, concrete, or permanent retaining walls within an excavation, installation of the foundation, including placement of concrete, any of which are for a[ safety-related structure, system, or component] of the facility for which either a construction permit or combined license is otherwise required.

10 C.F.R. § 50.10(d)(1). Thus, at the time of the decision, no activities that would have required a construction permit had begun.

Public Service Co., along with several intervenors, challenged the Licensing Board's grant of the LWA and appealed its ruling. *Id.* The relevant challenge, mounted by Public Service Co., concerned the Licensing Board's ruling that the co-owners of the proposed nuclear plant were de facto co-applicants for the construction

47

permits and its decision to deem the application amended to reflect joint ownership. *Id.* at 198. Although the case turned on the applicability of Sections 101 and 103 of the AEA and no construction had begun, it appears that no one chose to dispute whether the plantless site, certainly then incapable of using special nuclear material, was a "utilization facility." Instead, it argued that Sections 101 and 103 did not apply because neither "explicitly forbid one to 'own' a nuclear plant without a license, only to 'posses' it." *Id.*

The Appeal Board rejected the argument. In reaching the conclusion that co-owners of nuclear power plants must also be co-applicants, it noted that it saw "no reason why Congress would want to exempt owners of nuclear power plants from Commission regulation." After delving into the legislative history of the AEA, it further opined that to accept Public Service Co.'s "crabbed" interpretation of the statute could place "significant areas of the Commission's regulatory authority . . . under a cloud." *Id.* at 201.

After these decisions, the NRC aligned its practice to conform with the principle that construction permits for incomplete facilities would need to be amended to approve changes in site ownership. The NRC's letter to W.C. Tallman, for instance, illustrates that practice by approving an amendment to the Construction Permits for Seabrook Station, Units 1 and 2, to reflect a change in ownership, (Doc. 86–55 at 2–3 and 6–11), as does the NRC's letter to L.C. Dail by approving (with

express reference to *Marble Hill*) an amendment to the Construction Permit for Catawba Nuclear Station, Unit 2, to reflect a change in ownership, (Doc. 86–56 at 2 and 5–6).

Moreover, the NRC has expressly found that transferring ownership of a utilization facility without its consent violates Section 101 of the AEA. (Doc. 86–54). On March 3, 1978, the NRC's Acting Director of Nuclear Reactor Regulation, Edson G. Case, sent a letter to a concerned citizen named Dr. Robert G. Asperger, who, invoking his right under 10 C.F.R. § 2.206, had asked the NRC to take enforcement action against the Detroit Edison Company for selling two Cooperatives a 20% stake in the Fermi 2 nuclear plant.[23] *Id.* As the acting Director of Nuclear Reactor Regulation, Case issued the decisional letter in his capacity as the senior agency official responsible for carrying out "licensing and regulation involving all facilities . . . associated with the construction and operation of nuclear reactors." 42 U.S.C. § 5843(b)(1). After reviewing the Agreement, Case concluded that by selling a present interest in the facility to the Cooperatives, Detroit Edison had violated Section 101 of the AEA, "because that section requires Commission approval before and not after an ownership interest is acquired." (Doc. 86–54 at 6–7). After reaching this conclusion, Case rejected the argument that Section 101 of

---

[23] Why did Dr. Asperger, a private party, request enforcement action against Detroit Edison? "He didn't like them." (Doc. 86–32 at 59).

49

the AEA did not apply because the facility was not yet complete, observing that "it has been the longstanding practice of the Commission to consider a utilization facility under construction to be a utilization facility. Therefore, in our view, a right to own a utilization facility under construction is a right to own a utilization facility if completed." *Id.* at 7.

Although the Case letter spoke in terms of utilization facilities under construction, there is no reason to believe that, under current NRC policy, the result differs for facilities in deferred status. After all, the NRC applies all regulations and policy statements governing plants under construction to plants in deferred status. *See* 52 Fed. Reg. 38077-01. The NRC, in other words, treats deferred plants, which are subject to construction permits, as plants under construction.

The Tallman, Dail, and Case letters illustrate how the NRC interprets both its own regulations and the AEA, and given the exceptionally broad responsibility vested in the agency's administration of the statute, the Court will defer to its practice. To borrow the words of Justice Brennan, the Court sees no reason why it

> should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'

50

*Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*, 367 U.S. 396, 408 (1961) (citations omitted) (deferring to the NRC's interpretation of the AEA and its implementing regulations in a decision involving construction permits).

All these decisions deal only with applications concerning co-owners, and each holds that a co-owner must also be a co-applicant on a license. And in each case, the NRC authorized ownership only once it had approved the license application. From these holdings, however, it necessarily follows that no one may hold an ownership interest in a nuclear plant unless the NRC has approved his application for a license.

And so what of TVA's 2006 contention that Bellefonte is no longer a utilization facility? As in *Zimmer*, TVA was merely assuring the NRC that both units could safely be released from its jurisdiction. Not even the NRC's concurrence in its Environmental Assessment would have released the site from its jurisdiction; it was not until the Construction Permits were withdrawn that the Bellefonte site would have become transferable. That, and not TVA's subjective intent, is why its possession of the site from 2006 to 2009 with no valid license did not violate Section 101—the Construction Permits had been withdrawn. When they were reinstated, the site fell again within the NRC's jurisdiction, and transfer would once more have required NRC approval.

Given the NRC's interpretation of the AEA and its implementing regulations, it does not matter that the Bellefonte units, at closing, were incapable of operating: TVA could not lawfully have transferred the Bellefonte site to Nuclear Development without the approval of the NRC. Once the NRC issued CPPR-122 and -123 to build Units 1 and 2, the site could not be transferred without the NRC's approval unless the permits expired or were withdrawn.[24] The Court therefore concludes that under the AEA and its implementing regulations, as these have been interpreted by the NRC, even partially completed facilities, whether under construction or not, are swept within the regulatory ambit of Section 101.

Because the transfer of the Bellefonte site without NRC approval would have been unlawful under Section 101 of the Atomic Energy Act, the closing condition set forth in Section 6(a)(v) was not satisfied, and Nuclear Development's motion for summary judgment is denied.[25]

---

[24] Or, theoretically, if the facilities had first become operational and then been decommissioned. (Doc. 86–81 at 8).

[25] Nuclear Development contends that TVA must show more than a mere technical statutory violation to establish illegality and, at least for the purposes of voiding a contract, show a clear public harm. For one, Nuclear Development appears to have conflated TVA's (inapposite) illegality defense with its front-end closing condition of non-illegality, and has sought to pipeline the affirmative-defense doctrine into that of the condition precedent. It does not belong there. But even if somehow it applied, it would make that showing by pointing to the violation of the AEA: for the violation of a federal statute is a violation of the policy of the United States. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83–84 (1982).

## C. Nuclear Development cannot rely on the doctrine of equitable estoppel.

Nuclear Development further contends that TVA should be equitably estopped from raising the affirmative defense of illegality when ND had already relied to its material detriment on TVA's representations that it would close. Equitable estoppel is appropriate where:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013). Nuclear Development's invocation of equitable estoppel fails for two reasons. First, the allegedly unknown facts are not facts at all, but law, and if Nuclear Development did not know the law when it entered the Agreement, then it should have. Second, there may well be a genuine dispute of material fact as to whether Nuclear Development relied on the representations that TVA made in Section 7, but if it did, its reliance would be of no import. Its reliance would have been unreasonable, because Nuclear Development was charged—as we all are—with knowing the law. Thus, Nuclear Development can establish neither the fourth nor the fifth element, and its invocation of equitable estoppel fails as a matter of law.

## D. Genuine disputes of material fact preclude judgment as a matter of law.

Although the condition set forth in Section 6(a)(v) was not satisfied because transfer of the Bellefonte site without NRC approval would have been unlawful, TVA is not absolved from liability. Under Section 9(a) of the Agreement, the parties made two covenants "to be effective after the Effective Date and prior to Closing":

> (i) Subject to the terms and conditions herein, each of the Parties agrees to use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein.

> (ii) Each Party shall provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site consistent with Section 1(e). The Parties shall keep each other apprised of the status of any communications with and any inquiries or requests for additional or supplemental information from applicable Governmental Authorities, and shall provide any such additional or supplemental information that may be reasonably requested in connection with any such filings or submissions. All applications, appearances, presentations, briefs, and proposals made or submitted by or on behalf of either Party before any Governmental Authorities in connection with the approval of this Agreement and the transactions contemplated hereby shall be subject to the control of the Party making such application, appearance, presentation, filing or submission.

(Doc. 72–16 at 9–10).

The history of this case after the effective date and prior to closing is clouded with factual disputes. From midsummer 2018 through the expected closing date, the fog lies thickest. In short, the crossfire of emails in the months before closing, much of it in anticipation of litigation; the alleged requests for TVA to apply to the NRC for approval of the Construction Permits' transfer, as well as the alleged delays in seeking approval; and the allegations of bad blood between the parties after McCollum's visit to Memphis, all raise genuine disputes of material fact as to whether TVA fulfilled its duties under §§ 9(a)(i) and (ii) of the Agreement.

Moreover, there is a genuine dispute of material fact as to whether Nuclear Development was ready, willing, and able to close on the closing date.

### E. Incidental Damages

The Court will reserve judgment on damages, if appropriate, until trial.

## CONCLUSION

Because there remain genuine disputes of material fact, the Court cannot decide Counts I, II, or II of the Complaint as a matter of law. Nuclear Development, LLC's Motion for Summary Judgment (Doc. 70) and the Tennessee Valley Authority's Motion for Summary Judgment are therefore **DENIED**.

**DONE** and **ORDERED** this March 31, 2021.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2021 Apr-01 PM 03:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 5:18-cv-1983-LCB |
| TENNESSEE VALLEY AUTHORITY, | ) ) ) | |
| Defendant. | ) | |

## ORDER

The Tennessee Valley Authority entered an agreement with Nuclear Development, LLC, for the purchase and sale of an unfinished nuclear facility known as the Bellefonte Nuclear Plant. Hours before closing, TVA concluded that consummation of the sale would be illegal, and it refused to close on the agreement. Nuclear Development sued.

The parties have cross-moved for summary judgment. (Doc. 70; Doc. 74). The crux of the dispute is a simple matter of contract law, and the motions both turn on a central question: Did TVA breach the Agreement? But to answer this, the Court must first resolve another question, arising in the domain of nuclear-plant regulation, that appears to present a matter of first impression: Could TVA lawfully convey ownership of the Bellefonte property to Nuclear Development before the Nuclear

Regulatory Commission (NRC) approved the transfer of the Construction Permits from TVA to Nuclear Development?

## FACTUAL BACKGROUND

### I.  The Atomic Energy Commission issues TVA two permits authorizing the construction of the Bellefonte Nuclear Plant, Units 1 and 2.

In June of 1973, TVA applied to the Atomic Energy Commission for permits authorizing the construction of two reactors in northeast Alabama at a site that would be known as the Bellefonte Nuclear Plant. *See In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974). Bellefonte was to consist of two pressurized water reactors, Units 1 and 2 ("Alpha" and "Bravo"),[1] manufactured by the Babcock & Wilcox Company, each rated to operate at 3600 megawatts thermal/1260 megawatts electrical and cooled by a closed-cycle system of monolithic, concrete, natural-draft cooling towers. *See id.* at 1135; (Doc. 85–5 at 5). The Bellefonte Units would be located on a site in Jackson County, Alabama along the west shore of the Guntersville Reservoir, Tennessee River Mile 392, just northeast of the city of Scottsboro. 8 A.E.C. at 1125. On Christmas Eve 1974, after a year and a half of hearings and review, the Atomic

---

[1] (Doc. 85–13 at 10).

2

Energy Commission[2] approved the application and issued TVA Construction Permits CPPR-122 and CPPR-123. *See id.*; (Doc. 72–1).

The Bellefonte Construction Permits were issued under Section 103 of the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2133; 10 C.F.R. § 50; and the Initial Decision of the Atomic Safety and Licensing Board, dated December 23, 1974. (Doc. 72–1 at 6, 11). Each permit authorizes TVA to build one "utilization facility," or nuclear reactor,[3] Unit 1 or Unit 2, and together the two facilities would comprise the Bellefonte Nuclear Plant. In all respects save the numbering of the units, the permits are identical.[4]

The permits' authority is set forth in Section 2:

> Pursuant to [Section 103 of the AEA, 10 C.F.R. § 50, and the Licensing Board's decision], the Atomic Energy Commission (the Commission) hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal as described in the application and amendments thereto (the application) filed in this matter by the applicant and as more fully described in the evidence received at the public hearing upon the application. The facility, known as Bellefonte Nuclear Plant, Unit [1/2] will be located on the applicant's site in Jackson County, Alabama.

---

[2] A few months after the Atomic Energy Commission issued TVA the Bellefonte Construction Permits, the agency was abolished by the Energy Reorganization Act of 1973, and its licensing and regulatory functions were transferred to the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

[3] *See* 10 C.F.R. § 50.2 (defining utilization facility as "[a]ny nuclear reactor other than one designed or used primarily for the formation of plutonium or U-233").

[4] CPPR-122 authorizes the construction of Unit 1, CPPR-123 authorizes Unit 2.

*Id.* The permits thus confer authority to build a facility on "the applicant," defined in Section 1(B) to be TVA, and each facility "will be located on the applicant's site in Jackson County, Alabama." *Id.*

The permits further state that they "shall be deemed to contain and be subject . . . to the conditions specified or incorporated" under Section 3. *Id.* One of those conditions, set forth in Section 3(B), states: "The facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama." *Id.* The incorporated description is contained (at least in part) in an exhibit submitted with the application, a filing known as the Preliminary Safety Analysis Report (PSAR).[5] Section 2.1.2 ("Site Description") of the PSAR contains this statement: "The exclusion area will be owned by the United States and in the custody of TVA." (Doc. 75–2 at 157). "Exclusion area" is an NRC-defined term meaning "that area surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area." 10 C.F.R. § 50.2.

---

[5] The permit application is not itself in the summary-judgment record, but its contents, including the PSAR, are described in the Atomic Safety and Licensing Board's order issuing TVA the Bellefonte Construction Permits. *In the Matter of Tennessee Valley Auth. (Bellefonte Nuclear Plant Units 1 & 2)*, 8 A.E.C. 1124 (Dec. 23, 1974); *see also* (Doc. 75–2 at 3). The PSAR, however, is in the record. (Doc. 75–2; Doc. 75–3).

4

## II.     A History of Bellefonte and Its Construction Permits

### A. Bellefonte's History

Construction of the Bellefonte Nuclear Plant, Units 1 and 2, began in 1974. It continued steadily for a decade, slowed in 1985, and, in 1988, it ceased altogether. (Doc. 85–5 at 5–6). When construction stopped in 1988, both reactor units were mostly complete. *Id.* Estimates for that time put Unit 1 either at 88% or 90% completion, and Unit 2 at 55% completion. (Doc. 85–5 at 5; Doc. 72–7 at 8). But once construction stopped, the project was indefinitely deferred, and for seventeen years the units sat just a few degrees shy of operational.

In 2005, the Bellefonte project began to move in retrograde. Seeking to recoup some of the costs of construction, TVA that year implemented a plan of "Investment Recovery": equipment from Units 1 and 2 was sold, removed, abandoned, or cannibalized for use in other TVA facilities, two-foot-by-two-foot holes were cut into the large concrete steam generators, and control rod mechanisms, feedwater heaters, pumps and motors, condenser tubes, piping and valves, and safety-related pipe chases were removed from the site entirely. (Doc. 85–4 at 11; Doc. 85–5 at 5, 18). When TVA's two-year recovery effort came to an end in 2007, Unit 1 had been reduced from 88% to 55% complete, and Unit 2 was left only 35% complete. (Doc. 85–5 at 5).

5

## B. The Construction Permits

Once TVA had ceased construction in 1988, the NRC placed Bellefonte in "deferred plant status." In NRC parlance, a "deferred plant" is "a nuclear power plant at which the licensee has ceased construction or reduced activity to a maintenance level, maintains the construction permit . . . in effect, and has not announced termination of the plant." Commission Policy Statement on Deferred Plants, 52 Fed. Reg. 38077-01. The Generic Letter from which this definition comes sets forth "the procedures that apply to nuclear power plants in a deferred status," as well as those that a licensee must follow to reactivate—or terminate—a deferred plant. *Id.* Under the Policy Statement, a licensee that seeks to withdraw a Construction Permit must notify the NRC and, "if the plant has been completed to a point that it can function as a utilization facility, the licensee must take all necessary actions to ensure that the facility is no longer a facility for which an NRC license is required." *Id.*

Tracking these procedures, TVA informed the NRC in 2006 that it would permanently cease plant construction and requested an order withdrawing CPPR-122 and CPPR-123. (Doc. 72–6). In June, with Investment Recovery ongoing, TVA sent the NRC a supplemental letter stating that neither of the Bellefonte Units "can be considered a utilization facility" as defined in 10 C.F.R. § 50.2, because neither unit was able to operate as a nuclear reactor. *Id.* at 4.

6

The NRC, in an Environmental Assessment mandated by the National Environmental Policy Act, concurred with TVA's conclusion. (Doc. 72–7). That August, it announced that it was considering the withdrawal of TVA's Construction Permits, and it concluded that the action would have no significant impact on the environment. *Id.* at 6, 10. Its conclusion was based, in part, on the finding that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility." *Id.* at 8. In September of that year, the NRC formally withdrew the Bellefonte Construction Permits. (Doc. 72–9 at 7).

For the next two and a half years, TVA owned the Bellefonte site without an NRC-issued license. (Doc. 86–32 at 65). But toward the end of this brief hiatus, TVA reversed course once again and moved the NRC to reinstate the permits. *Id.* In 2009, at TVA's request, the NRC ordered that CPPR-122 and -123 be reinstated and the facilities returned to "terminated plant status." (Doc. 72–9 at 12; Doc. 85–5 at 6; Doc. 86–32 at 65).[6] In 2010, Bellefonte was placed once more in deferred plant status. (Doc. 85–5 at 6).

---

[6] Under the Commission's Policy Statement on Deferred Plants, a "terminated plant" means a nuclear power plant at which the licensee has announced that construction has been permanently stopped, but which still has a valid CP. 52 Fed. Reg. 38077-01, § III (Oct. 14, 1987). Placing a facility in "terminated status" is not the same as "terminating" a permit. In the former case, the permitholder "must adhere to the Commission's regulations and the terms of the [Construction Permit]" until its withdrawal is authorized, *id.*, while the latter case is used to mean permit withdrawal, (Doc. 76–32 at 87).

7

Bellefonte has remained unfinished, its Construction Permits valid, construction deferred. Neither Unit 1 nor Unit 2 is capable of sustaining nuclear fission in a self-supporting chain reaction. (Doc. 72–4 at 3). TVA has not upgraded Bellefonte's design to meet current NRC regulatory requirements, nor can Bellefonte now meet the original design requirements to sustain nuclear fission. (Doc. 72–4 at 19–20).

## III. TVA Agrees to Sell Bellefonte to Nuclear Development

In April of 2016, TVA's CEO, William Johnson, issued a report to TVA's Board of Directors recommending that they declare Bellefonte surplus property and authorize its sale without conditions on its potential use. (Doc. 85–13 at 4; Doc. 85–14). The report indicated that an outside appraisal company had assessed Bellefonte's fair market value at $26.4 million (TVA's internal appraisal placed the figure at $11.3 million), and TVA would use that outside figure to set the minimum bid price at auction. (Doc. 85–14 at 6). Johnson's report also acknowledged the major risks inherent in the recommended declaration, including the competitive risk that selling Bellefonte to an outside entity could "put a merchant nuclear plant in TVA's service territory that could compete to serve TVA's customers." *Id.* at 2.

The next month, TVA's Directors adopted a resolution that found Bellefonte to be "surplus to TVA's needs" and authorized its sale at public auction. (Doc. 85–13 at 6; Doc. 85–15 at 2). The sale's purpose, TVA would later announce, was to

8

bring economic development and jobs to the surrounding area through long-term investments by the purchaser. (Doc. 85–13 at 6; Doc. 72–14). The property was marketed to over 500 potential buyers, 11 of whom expressed interest enough to sign a confidentiality agreement for further discussions. (Doc. 72–14). Three of these potential buyers completed Letters of Intent (LoIs) and submitted financial qualifications to TVA with a plan concerning their intended use for the property. *Id.* Nuclear Development cites (disputed) economic projections purporting to show that its own plans for Bellefonte would create 8,420 jobs per year and $12.6 billion in fiscal impact during the construction phase, and then 4,176 jobs per year and $37.7 billion in fiscal impact over the 60-year operational period. (Doc. 85–18).

TVA issued all prospective bidders the same purchase agreement to bid on, regardless of the bidder's plans for the site. (Doc. 85–16 at 14). Two of the parties to submit LoIs intended neither to build nor operate a nuclear facility at Bellefonte. *Id.* at 13. The third, announcing its own intentions for the property by way of company name, submitted the winning bid.

And so on November 14, 2016, Nuclear Development entered into a purchase and sales agreement with TVA, contracting to buy the Bellefonte site for a final sale price of $111 million. (Doc. 85–13 at 4; Doc. 72–16). Upon signing the agreement, Nuclear Development paid TVA a down payment of 20% on the purchase price, or $22.2 million, plus additional sales and administrative costs. (Doc. 72–16 at 7).

9

Closing, originally set to take place on November 14, 2018, was extended to November 30, by amendment, six days before the event. (Doc. 85–23).

## IV.    Terms and Conditions

Section 1 of the Purchase and Sales Agreement (the Agreement) obligated TVA to "sell, transfer, convey, assign and deliver title and possession" to Nuclear Development, at closing, "all of TVA's right, title and interest" in "all the real property comprising" the Bellefonte Site, described in Schedule R.1(a). (Doc. 72–16 at 3). It also obligated TVA to convey, under Section 1(e), "all permits, licenses or authorization issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e)." *Id.* at 4. Four items (all of them permits) are listed in Schedule 1(e): two NRC-issued Permits to Construct;[7] an Alabama Department of Environmental Management (ADEM) Air Permit;[8] and an ADEM National Pollutant Discharge Elimination System (NPDES) Permit.[9] *Id.* at 116.

Section 6 of the Agreement ("Conditions to Closing") expressly conditioned TVA's duty to convey these assets (and, reciprocally, Nuclear Development's duty

---

[7] CPPR-122 (Unit 1) issued: December 24, 1974, *Reinstated, currently deferred*; and CPPR-123 (Unit 2) issued: December 24, 1974, *Reinstated, currently deferred*. (Doc. 72–16 at 116).

[8] 705-0021-X0004, issued: October 7 1999. (Doc. 72–16 at 116).

[9] AL0024635, issued: April 28, 2015; effective: May 1, 2015; expiration: April 30, 2020. (Doc. 72–16 at 116).

10

to purchase them) on the satisfaction of six conditions to be fulfilled "at or before the Closing." *Id.* at 7–9. The fifth of these, set forth in Section 6(a)(v), stated that "[t]here shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority . . . restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement." *Id.* at 7. If the condition set forth in Section 6(a)(v) is "unfulfilled as of the Closing Date," then, under Section 11(a)(iv), either party may terminate the Agreement on written notice to the other. *Id.* at 13. Moreover, if the Agreement is terminated under Section 11(a)(iv), TVA must return to Nuclear Development the $22,200,000 "Down Payment" that it had paid, in accordance with Section 5(b)(1), upon execution of the Agreement. *Id.* Although it would not be included in the final Agreement, Nuclear Development had specifically requested that the NRC's pre-approval of the Construction Permits' transfer also be made a condition of closing. (Doc. 85–16 at 10).

To induce each other to enter into the Agreement, the parties expressly represented and warranted in Sections 7(a)(vii) and 8(a)(vi) that "no authorization, consent or approval or other order or action of or filing with any Governmental Authority is required for the execution and delivery by the [TVA/Buyer] of this

11

Agreement or the consummation by the [TVA/Buyer] of the transactions contemplated hereby." (Doc. 72–16 at 9–10).

In Section 9 of the Agreement, the parties also covenanted that "after the Effective Date and prior to Closing," and subject to the terms and conditions of the Agreement, each party would "use its commercially reasonable best efforts to consummate and make effective as soon as commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto and set forth herein," and they would "provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any . . . regulatory or administrative agency . . . over the matters specified as to the Site consistent with Section 1(e)." *Id.*

By its own terms, the Agreement's "validity, interpretation, and enforceability" is generally to be governed by federal law. *Id.* at 20.

Finally, under Section 35, the parties agreed in all caps that neither party would "be liable for any indirect, incidental, consequential, special, punitive, or exemplary damages as a result of default, violation or breach of any covenant, representation or warranty contained in this agreement." *Id.* at 21 (emphasis removed).

12

## V.    "After the Effective Date and Prior to Closing"

On August 18, 2017, less than two months before for Unit 2's Construction Permit was to expire, Nuclear Development asked TVA to send the NRC a draft letter that it had prepared requesting an extension of the Construction Permit's completion date. (Doc. 85–24). TVA refused. (Doc. 85–25) (Doc. 85 at 9).

In August of 2018, the NRC held a public meeting at Nuclear Development's request on the latter's plans for the Bellefonte site. (Doc. 85–26). The stated purpose of the meeting was "to introduce members of Nuclear Development . . . and to discuss issues associated with the submittal of a request to transfer the deferred construction permit for Bellefonte Nuclear Generating Station (BLN), Units 1 and 2." *Id.* at 4. In attendance were sixteen representatives of the NRC and five of TVA's. *Id.* at 5. During the meeting, Nuclear Development addressed its "general plans" for Bellefonte, including its "plans to close on the [Bellefonte] purchase in November 2018," its "plans to complete detailed schedules in December 2018," and its estimation "that licensing activities will start in 2019."[10] *Id.* at 2. Neither TVA nor the NRC objected to Nuclear Development's schedule—however that schedule was described at the meeting—or expressed any concern that the transfer application had

---

[10] The report summarizing the meeting does not specify what the "detailed schedule" would entail, nor what "licensing activities" were announced for 2019. The suggestion, reiterated at oral argument ("they knew our schedule" (Doc. 143 at 23)), is that Nuclear Development expressly announced at this meeting its plans to apply for the Construction Permits' transfer too late to secure NRC approval before closing. Whether this is true remains unclear. Regardless, TVA disputes that the NRC ever ratified a schedule of post-closing approval.

13

not yet been submitted. (Doc. 85–27 at 7; Doc. 25–28 at 106). Ordinarily, however, the NRC neither publicly challenges parties nor otherwise speaks at public hearings like this one. (Doc. 86–10 at 4).

Within a few days of this meeting with the NRC, Johnson received an email that summarized the meeting's highlights. (Doc. 85–13 at 12; Doc. 85–29). In a bulleted gloss, the email reports that Nuclear Development's CEO, Bill McCollum, had announced that closing was expected in November, and had said that "a more detailed licensing schedule would be available in early 2019." (Doc. 85–29 at 2). At the time of the email, Johnson still intended to close, so long as "all the conditions were met." (Doc. 85–13 at 14). On August 21, TVA sent a letter to Nuclear Development acknowledging "that the Buyer intends to complete the closing of this transaction." (Doc. 85–30). The letter further stated that "[i]n preparation of the contemplated . . . closing," TVA would "begin drafting the TVA Transaction Documents" and would "immediately begin relocating any affected TVA employees or operations." *Id.*

## A.    Memphis, Tennessee

On October 9, 2018, Nuclear Development's CEO, William McCollum, made a presentation to the Memphis City Council, the purpose of which, he would testify, was "to explain the results of [a] study that had been performed to look at . . . potential savings for Memphis." (Doc. 85–31 at 71–72). Johnson was "upset"

by some of McCollum's comments from the meeting. (Doc. 85–13 at 12). Not (says Johnson) because Nuclear Development might solicit the city as a customer, but because McCollum, a former TVA executive, had counseled Memphis that it "should leave TVA under any circumstances," because it could "get a better deal elsewhere." *Id.* In Johnson's view, this suggestion was simply false. *Id.* at 33.

Within a few days of McCollum's Memphis presentation, Johnson met with Nuclear Development's owner, Franklin Haney, Sr., and its General Counsel, Larry Blust, and "expressed displeasure" to the Nuclear Development team about how the presentation had gone. (Doc. 85–16 at 21, 23). Johnson himself then met with the Memphis City Council on November 6th—on, as it happens, November 6th Street[11]—"to make the pitch for staying with TVA." *Id.* (Doc. 86–13 at 20).

## B. TVA Grows Leery of Closing

In the summer of 2018, a TVA attorney identified a "concern about the text of the Construction Permits and the text of the Atomic Energy Act." (Doc. 85–32 at 11–12). By mid-November, TVA had conveyed to Nuclear Development an express concern that closing on the Agreement before the NRC had approved the transfer of the Construction Permits might violate the AEA. (Doc. 85–21 at 16–17; Doc. 85–32 at 14). TVA shared with Nuclear Development an additional concern, that closing

---

[11] So named to commemorate the date that Memphis first voted for TVA power, a vote that led to the relationship Johnson was in that very meeting lobbying to preserve. (Doc. 86–13 at 20); *see also TVA Heritage Series: Street of Dreams*, TVA https://www.tva.com/about-tva/our-history/tva-heritage/street-of-dreams.

15

on the Agreement might violate the terms of Construction Permits, sometime in October (says TVA) or early November (says Nuclear Development). (Doc. 85–21 at 10, 22; Doc. 85–16 at 26; Doc 85–34).

About a month before closing, Nuclear Development's licensing counsel, Tim Matthews, sent an email to a TVA attorney with a draft copy of a "consent letter that TVA would send to the NRC in connection with Nuclear Development's license transfer application." (Doc. 85–16 at 15; Doc. 85–32 at 5; Doc. 85–33). Whether because TVA failed to consent to its request, as Nuclear Development alleges, or because Nuclear Development asked only that the letter be reviewed, as alleged by TVA, the letter was never sent to the NRC. (Doc. 85–16 at 16; Doc. 85–28 at 9; Doc. 85–32 at 10–11).

As closing drew near, Blust sent a memo, authored by Matthews, to TVA that outlined a procedure Nuclear Development believed would permit the parties to lawfully close on the transaction before the NRC had approved the Construction Permits' transfer. (Doc. 85–36). The memo acknowledged "that this regulatory path—involving temporary separation of ownership of a site for a utilization facility from the recipient of the permits authorizing its construction—appears to be a situation of first impression for the NRC without clear precedent and results in a degree of responsibility and risk to TVA after closing until the [Construction Permit] transfers are approved." *Id.* at 2. In a cover letter to the memo, Blust "agreed" that

16

Nuclear Development's "proposed path forward to transfer the construction permits in deferred status by [filing] the application before closing with the approval to occur after closing . . . would be a case of first impression for the NRC." *Id.* at 1. TVA's nuclear expert, Stephen Burns, whose 40-year career with the NRC included stints as General Counsel, Commissioner, and Chairman, averred that he was aware of no instance in which the NRC had ever approved the transfer of ownership of a plant subject to a construction permit without first approving transfer of the construction permit. (Doc. 86–81 at 9; Doc. at 86–32 at 85).

On November 13, the day before the original closing date, Nuclear Development submitted its application to the NRC for an order approving the Construction Permits' transfer to Nuclear Development. (Doc. 85–37; Doc. 85–38).

Nuclear Development asked TVA to extend the closing date by six months— though when exactly remains unclear—partly to secure the NRC's approval of the Construction Permits' transfer before closing, partly "to put the rest of the financing package together." (Doc. 84–11 at 50). Nothing in the Agreement obligated TVA to consent to an extension of the closing date. *Id.*

On November 26, four days before the amended closing, Johnson addressed a townhall-style employee forum at TVA's Knoxville office. (Doc. 85–39). Held routinely, meetings like this one were open to anyone in the agency, and at them Johnson would field questions from TVA employees of all stripes. (Doc. 85–13 at

17

23). At the forum on the 26th, Johnson was asked: "Do you think there's a real chance we could lose [Memphis] as a customer as a result of all this?" *Id.* at 23. He replied:

> I don't think they'll go to Bellefonte. . . . but they have other options. . . . And the point here is you should treat every customer every day like they could leave you tomorrow. You know, we slipped a little bit in Memphis over the last couple years. I was part of that. But we've come back in a pretty big way, and I think we're making progress down there. But every day just assume every customer can leave you, and that'd probably inform your decision-making a little bit.

*Id.* at 24–25. Another question posed to Johnson was: "Why continue to sell Bellefonte if the potential buyer wants to take away our largest LPC to make it work?" *Id.* at 24. With "lighthearted banter," Johnson replied:

> Well, that's a great question. So have I explained to you the three rules of the universe? Have I ever told you this? Some of you I have, and you're shaking your head no, but I'm doing it anyways because they apply to this situation. Rule 1, it seemed like a good idea at the time; Rule 2, no good can come from this; and Rule 3 is even the intelligent way wouldn't have worked. So I think we got them all covered here.
>
> We're under a lot of pressure to do something with the plant to sell it. We thought it was a good idea, put it into productive use, and knew we would compete for load, and that's not really what ticked us off in Memphis. What ticked me off in Memphis was our former colleague Bill McCollum standing up and saying you should do this nuclear deal, but even if you don't, you should leave TVA and go to MISO or Entergy 'cause those are both better deals than you're getting from TVA. To me, that crossed the line.
>
> Yeah, so what do you do? Well, we gave them a short extension because I ate into some of their time. They have a closing date Friday? . . . Let's do a poll. How many people think I should give them another extension? Okay. So there's no extension. And we'll see where we are at the close of business Friday, but there's no more extension. I do think

18

a lot of people have been misled about this. The idea that you can finish that plant, what they're really saying, if you [sic] listening carefully, is they can finish it for three and a half billion. Be a pretty good trick. . . . It just seemed undoable.

So but it's time to call the question. So we'd be calling it on Friday. I've already been to the legal department today for two reasons. One, that's where my bathroom is on the sixth floor; but the more important but less pressing question, to alert the litigators that I'm sure we'll be a defendant by Monday. So I'm sure we'll be sued about this. If you study the players—well, we'll be defendants on Monday

*Id.* at 24.

### C.    TVA Decides Not to Close on the Bellefonte Sale

TVA received an opinion letter from the firm of Pillsbury Winthrop Shaw Pittman, its regulatory counsel, by the end of November[12] advising it that "acquiring or transferring ownership of Bellefonte (and/or its CPs) without some form of prior NRC consent would be a violation of the [AEA] and NRC regulations, as they have been previously interpreted." (Doc. 86–61 at 2). After reading the letter, Johnson was persuaded that TVA would not lawfully be able to consummate the sale,[13] and,

---

[12] The timing is disputed, the letter undated.

[13] Specifically, when asked "what choice, if any, did you think you had with regard to your ultimate decision whether to close" once he had read the opinion, Johnson testified:

> I didn't think we could close at that moment because of the permit issue, and I thought it was a pretty strong opinion. In addition to looking at it, I actually went and pulled the Atomic Energy Act and read it and read some of those cases. And so I really did not think we could go to closing.

(Doc. 85–13 at 38). Disputing both the truth of the statement and its attendant narrative, Nuclear Development contends that the "[t]he real reason that TVA refused to close is evidenced by events occurring after [Nuclear Development] made a presentation for the Memphis power business, and Johnson's consequential concern over losing TVA's largest power customer." (Doc. 101–1 at 5).

on November 29, he decided—"as late as possible"—that TVA would not proceed to closing. (Doc. 86–13 at 25–26, 38). At 9:09 that evening, TVA faxed a letter to Nuclear Development announcing that it would not close on the transaction because to do so "would be unlawful." (Doc. 86–16 at 34; Doc. 86–40). When the day of closing at last arrived, Nuclear Development sent by e-mail a letter to TVA warning that TVA would be in breach of the Agreement if it did not deliver the transaction documents and confirm that it would close. (Doc. 86–16 at 34; Doc. 86–41).

TVA did neither: the sale did not close.

Nuclear Development asserts that it had $91.6 million in closing funds deposited and ready to wire on November 30, 2018, and it was ready, willing, and able to close. (Doc. 85–42 at 28–29; Doc. 85–4 at 30; Doc. 85–43). TVA cites some evidence, however, that Nuclear Development would close only if it was comfortable that financing was in place for the project, and that, at the time of closing, project financing had not been finalized. (Doc. 86–59 at 29–30; Doc. 85–43 at 21, 24).

### D.    Post-Closing Developments

Nearly a year after the parties had been scheduled to close, the NRC issued a letter to Nuclear Development stating that it had accepted its application for the NRC's consent to transfer Construction Permits CPPR-122 and CPPR-123 from TVA to Nuclear Development. (Doc. 72–23 at 20, 51; Doc. 72–43). The NRC

estimated that the licensing request would take 700 hours to complete, and it expected to complete its review by September 2020. (Doc. 72–43 at 4).

No decision came in September 2020. In November, the NRC issued Nuclear Development a letter stating that it would "not complete its review of the requested licensing actions until [Nuclear Development] provides information demonstrating [its] right to possession of the Bellefonte site in accordance with [10 C.F.R. 50.80(b)(2)]. The letter further stated that

> the NRC staff routinely issues orders consenting to license transfers that are conditioned on certain future actions by the applicant or the receipt of third-party approvals needed prior to consummation of the underlying transaction, such as regulatory approvals by other Federal or State agencies or approvals necessary for applicants to emerge from bankruptcy. The staff notes that license transfer applications are typically submitted under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application. In this circumstance, however, possession of the Bellefonte site itself is currently in dispute between an NRC applicant and the current NRC license holder. . . .

> [The NRC staff had requested] that ND provide information (written consent from TVA or a court order) regarding ND's right to possess the Bellefonte site . . ... Accordingly, the NRC staff intends to complete its review of the requested licensing actions upon ND's submittal of the required information to demonstrate compliance with the requirements in 10 CFR 50.80(b)(2).

(Doc. 114–1). The application remains pending. The NRC awaits a verdict.

# PROCEDURAL HISTORY

Nuclear Development filed suit seeking specific performance on the Agreement  the day that the parties were set to close. (Doc. 1). The Complaint contained an alternative count for damages and a further count seeking a preliminary injunction. *Id.* A motion for preliminary injunction, along with a request for an expedited hearing, was filed contemporaneously with the complaint. (Doc. 3). The parties reached a provisional agreement on the motion and filed a Stipulation Regarding Nuclear Development's Motion for Preliminary Injunction.[14] The Court adopted these stipulations and denied the request for an expedited hearing. (Doc. 18). TVA then moved to dismiss all counts of the Complaint (Doc. 23), and the motion was denied. (Doc. 42).

The parties have now filed cross-motions for summary judgment (Doc. 70; Doc. 74). Nuclear Development moves for summary judgment on Count I of the complaint only, seeking specific performance and, for the period between November 6, 2016 until the date of this order, an award of 6% per annum on the $29,219,231

---

[14] The stipulations provided that TVA (1) would satisfy the quality assurance and other requirements applicable to Construction Permits CPPR-122 and CPPR-123; (2) would not request termination of either Construction Permit without first notifying the Court and Nuclear Development's counsel at least five days before submitting such a request to the NRC; and (3) would not sell or otherwise dispose of Bellefonte without first notifying the Court or Nuclear Development's counsel at least five days before executing any such agreement. (Doc. 17 at 1–2). Nuclear Development, for its part, withdrew its request for an expedited hearing on its preliminary-injunction motion without prejudice to its right to renew if TVA should give notice under paragraph (2) or (3). (Doc. 17 at 2).

that ND paid to TVA.[15] TVA moves for summary judgment on all claims—Count I (Breach of Contract seeking Specific Performance); Count II (Preliminary Injunction); and Count III (Alternative Claim for Breach of Contract Seeking Damages).

## LEGAL STANDARDS

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A fact is "material" if its resolution "may affect the outcome of the suit under the governing law." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997)). A dispute is "genuine" if under the evidence "a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996)).

---

[15] More precisely, Nuclear Development seeks an order compelling TVA "to specifically perform its obligations under the Contract by accepting Nuclear Development's payment of the balance of the purchase price for the Bellefonte Site and by executing and delivering to Nuclear Development the 'TVA Transaction Documents' described in the Contract. In conjunction with such order of specific performance, Nuclear Development further prays the Court to award it all court costs, attorneys' fees, and prejudgment interest at the rate of 6% per annum calculated on the full purchase price from the date of TVA's breach through the date it specifically performs its obligations as provided in the Contract." (Doc. 1 at 9–10). Its Count I prayer notwithstanding, Nuclear Development has abandoned its claim for attorneys' fees at summary judgment. (Doc. 87–1 at 31).

In deciding whether there is a genuine dispute as to a material fact, a court must presume the nonmovant's evidence to be true and draw all reasonable inferences in the nonmovant's favor. *Allen,* 495 F.3d at 1313 (citing *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1164 (11th Cir.2003)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

## DISCUSSION

The parties' cross-motions for summary judgment turn on a simple question of contract law: Did TVA, by failing to close on the sale of the Bellefonte property, breach its agreement with Nuclear Development?

TVA submits that it did not, because an express condition to closing was not satisfied. The condition, set forth in Section 6(a)(v), predicated the parties' obligations under the Agreement on the non-illegality of consummating the sale, and consummation was unlawful, TVA contends, because the NRC had not approved the transfer of the Construction Permits to Nuclear Development by closing. Nuclear Development, in turn, contends that NRC approval was no bar to lawful closing, and

24

urges the Court to read Section 6(a)(v) more narrowly, excluding from its ambit any consideration of the Construction Permits' transfer.

The Court must therefore decide: (1) whether Section 6(a)(v) applies to the NRC's failure to approve the Construction Permits' transfer; and, if so: (2) whether closing without the NRC's approval would have been lawful.

## I.    The language of Section 6(a)(v) is unambiguous and sets forth an express condition precedent.

It is undisputed that the Agreement executed on November 14, 2016 created a valid contract that set forth terms and conditions to govern the purchase and sale of the Bellefonte property. (Doc. 42 at 9; Doc. 72–16). Under Section 31, the parties agreed that the "validity, interpretation, and enforceability" of its terms would be governed by federal law. (Doc. 72–16 at 20). And "[u]nder federal law, the plain meaning of a contract's language governs its interpretation." *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008) (citations omitted). Where that language is unambiguous, its "legal effect . . . is a question of law" that "may be resolved summarily." *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir. 1988) (first citing *Mason Drug Co., Inc. v. Harris*, 597 F.2d 886 (5th Cir. 1979); and then citing 10A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2730.1 at 279 (1983)).

Section 6 of the Agreement predicated the parties' obligations on the fulfillment of six conditions precedent to closing. (Doc. 72–16 at 7). The fifth of

25

these, set forth in Section 6(a)(v), conditioned the parties' obligations on the non-illegality of consummating the transaction:

> (v) There shall not be in effect at the Closing any law, statute, rule, regulation, permit, certificate or binding order, decree or decision of any Governmental Authority (as defined in Section 9(a)(ii) below)[16] restraining, enjoining or otherwise prohibiting or making illegal the consummation of the transactions contemplated by this Agreement . . .

*Id.* Neither under Section 6 nor elsewhere does the Agreement explicitly condition closing on the NRC's approving transfer of the Construction Permits to Nuclear Development.

The language of Section 6(a)(v), however, is unambiguous: it states with univocal clarity that closing was predicated on the "condition" that no "law, statute, rule, regulation, [or] permit" would "otherwise prohibit[] or mak[e] illegal" the consummation of the Bellefonte sale. If, given the state of affairs at closing, a legal authority listed in the clause would have made closing unlawful, the parties would be relieved of their closing obligations. The Agreement need not list exhaustively every factual predicate that could apply to the condition and render closing illegal; a myriad of circumstances could have triggered the clause, and it would be

---

[16] "Governmental Authority" is defined in Section 9(a)(ii) as "any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site . . .." (Doc. 72–16 at 10–11).

impossible to list them comprehensively. But under the clear language of the condition, if it would have been unlawful to close without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition would not have been satisfied.

Although Section 6(a)(v) is susceptible to only one meaning, Nuclear Development ignores the plain language and proposes that "the only fair and logical reading" of the Agreement as a *whole* is that the parties did not intend for closing to be conditioned on the NRC's approval of the Construction Permits' transfer. It offers three bases for rejecting Section 6(a)(v)'s unambiguous meaning: (1) the inclusion of Section 1(e); (2) the inclusion of Section 7(a)(vii); and (3) a putatively more reasonable, wholistic reading of Section 6(a)(v).

First, Nuclear Development contends that to read a condition of NRC approval into Section 6(a)(v) is to "read out" Section 1(e). Section 1 of the Agreement lists the "Purchased Assets" that TVA agrees to sell, transfer, convey, assign, and deliver to Nuclear Development at closing, including, under subsection (e):

> To the extent feasible and permitted by applicable law, all permits, licenses or authorizations issued or required by Governmental Authorities or third parties in connection with the operation of the Site and listed on Schedule 1(e) (the "Permits"); provided, however, that with regard to the transfer of the two permits issued to TVA by the Nuclear Regulatory Commission ("NRC") to construct two B&W pressurized water nuclear reactors, this Section 1(e) shall not require TVA to certify that Buyer is qualified and fit to complete construction

of and operate those reactors and, if Buyer informs TVA that it does not seek transfer of these NRC permits, TVA shall take whatever action is necessary to terminate those permits. Further, if, an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to this <u>Section 1(e)</u> by Closing, TVA's obligations under this <u>Section 1(e)</u> shall cease.

(Doc. 72–16 at 3–4). Besides Schedule 1(e), Section 1(e) contains the Agreement's only allusion to the Construction Permits. (*See* Doc. 72–16 at 25). This subsection conditionally obligated TVA to convey the Construction Permits at closing, but TVA's duty is qualified by the text in three ways. One, TVA need not vouch that Nuclear Development "is qualified and fit to complete construction of and operate" the reactors. Two, it imposes an extra duty on TVA to terminate the permits at Nuclear Development's election; and three, if "an applicable Governmental Authority has not accepted or otherwise allowed the transfer of a permit, license, or authorization"—the air, water, or Construction Permits listed in Schedule 1(e)— TVA is relieved of the duty to bring it to closing.

Because the paragraph speaks to the very situation that arose—"an applicable Governmental Authority ha[d] not accepted or otherwise allowed the transfer of a permit, license or authorization pursuant to . . . Section 1(e) by Closing"—Nuclear Development contends that the parties anticipated this possibility and chose not to excuse the duty to close, and that only the duty to convey the Construction Permits is relieved. And if the parties had intended to condition closing on the NRC's approval, they could have inserted such a condition into the Agreement, either here

28

or in Section 6, just as they made NRC approval a condition of TVA's duty to convey the permits.

But contrary to Nuclear Development's contention, Sections 1(e) and 6(a)(v) are consistent, and TVA's construction of the latter does not "read out" the former. Each provision of Section 1(e) serves a function consistent with the NRC's failure to consent to the permits' transfer by closing. Significantly, 1(e) also gives Nuclear Development the right to compel TVA to take whatever action necessary to terminate them. If Nuclear Development had exercised that option, TVA could have petitioned the NRC to withdraw them, just as they had been withdrawn between 2006 and 2009, and transferred Bellefonte without running afoul of Section 6(a)(v).

Second, Nuclear Development contends that this reading of Section 6(a)(v) would likewise "read out" TVA's express warranty in Section 7(a)(vii) that no governmental authority or consent was required to consummate the sale. Again, Nuclear Development is incorrect. Both parties warranted that they could consummate the Agreement without further approval of any governmental authority—TVA in Section 7(a)(vii) and Nuclear Development in Section 8(a)(vi)— and both parties were mistaken. The fact of these mistakes neither voids the condition precedent, nor creates any conflict between the parties' representations and the non-illegality condition set forth in Section 6(a)(v).

And third, given Sections 1(e) and 7(a)(vii), Nuclear Development concludes that the parties intended Section 6(a)(v) to serve only as an escape hatch should some "intervening law" be enacted after the effective date and prior to closing. The parties could have written it this way, but they did not.

All these arguments are unavailing for the same fundamental reason: the condition's language is unambiguous, and its plain language controls. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040-41 (Fed. Cir. 2003) ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement controls.").

Although the parties may not have conditioned closing on the NRC's approval, approval of the NRC may have been a necessary condition to closing.

## II. If closing could not lawfully proceed without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition precedent set forth in Section 6(a)(v) was not satisfied.

Because Section 6(a)(v) applies, the Court must next decide whether closing without NRC approval would have been unlawful. TVA posits two authorities in effect at the time of closing that would have rendered consummation of the Bellefonte transaction illegal: (1) the Construction Permits; and (2) Section 101 of the Atomic Energy Act.

A. **Transfer of the Bellefonte site would not have violated the terms of the Construction Permits.**

Section 234 of the AEA, 42 U.S.C. § 2282 imposes civil penalties for violating the terms or conditions of any license issued under the Section 103 of the Act. The Construction Permits each contain two statements that TVA characterizes as "terms" of the permit—terms, it contends, that it would have "violated" by closing on the sale. TVA is mistaken.

CPPR-122 and -123 were issued under Section 103 of the AEA, 42 U.S.C. § 2133 and 10 C.F.R. § 50, and violations of their terms can trigger civil penalties. *See* 42 U.S.C. § 2282. The statements implicated by the sale of Bellefonte are contained in Sections 2 and 3 of each permit. Recall that Section 2 states that "the facility . . . will be located on the applicant's site in Jackson County, Alabama," with "applicant" defined in each permit to be TVA. (Doc. 72–1 at 6, 11). Further recall that Section 3(B) states that "[t]he facility shall be constructed and located at the site as described in the application, in Jackson County, Alabama," *id.*, with the relevant description found in the PSAR's "Site Description": "The exclusion area will be owned by the United States and in the custody of TVA," (Doc. 75–2 at 157). If Bellefonte had been sold to Nuclear Development before the NRC had approved transfer of the Construction Permits, the site would no longer be "the applicant's," and the exclusion area would no longer be owned by the United States.

TVA's argument is more than superficially pleasing. It highlights truth-dependent language in the Construction Permits that presumes TVA ownership: if TVA ceased to own the site, then these sentences would apparently become untrue. The argument also speaks to a concern lurking behind the whole Bellefonte dispute—surely, once a construction permit has been issued, the NRC regulates ownership of the permitted site—and suggests its own answer. But the answer to the next question—how?—is unsatisfactory. The alleged non-conformities seem divorced from any substantive check on transferring ownership that one would expect the NRC to place on a permitted site. These seem to be mere technicalities, not barriers to closing.

As intuition would suggest, the law does indeed restrict the transfer of permitted sites. Those restrictions, however, are imposed by statute[17]—not the language of the Construction Permits. There are three reasons why TVA's argument fails.

First, these statements are not "terms." A term is defined as "[a] condition under which something may be done, settled, agreed, or granted; a stipulated requirement or limitation," *Term*, *Oxford English Dictionary* (3d. ed. 2017), or as "[a] contractual stipulation," *Term*, *Black's Law Dictionary* (11th ed. 2019). These statements merely describe where the utilization facilities, if built, may be located.

---

[17] *See* Section II.B *infra*.

32

Their function is deictic, not conditional, serving to contextualize rather than limit the scope of the authority conferred by the permit.

Contrast "applicant's" with another statement in Section 2: the Commission "hereby issues a construction permit to the applicant for a utilization facility designed to operate at 3600 megawatts thermal." (Doc. 72–1 at 6, 11). "3600 megawatts thermal" is a term of the permit, and the construction of a utilization facility designed to operate above that limit would violate it. Contrast too the description incorporated into Section 3(B), "owned by the United States," with the unambiguous condition in Section 3(A): "The earliest date for completion of the facility is June 1, 1979, and the latest date for completion is December 1, 1979." *Id.* "December 1, 1979" is likewise a term of the permit; to complete the facility on December 2, 1979 would, without an extension, violate the term.[18]

The megawatts thermal at which the facility can operate and the completion deadline each set forth clear "conditions" or "stipulations" for the construction of the Bellefonte units. Indeed, the site on which the facilities may be built is also a term: to build either unit in Madison County would violate the permits. But it would be wrong on this basis to pigeonhole a limitation on ownership into the permits' description of the site. Not because there aren't good reasons to regulate the

---

[18] Both Construction Permits remain valid: the latest date for the completion of each unit has been extended to October 1, 2020. (Doc. 128–1 at 9).

ownership of a site that's subject, through a valid construction permit, to the NRC's jurisdiction, but rather because this language fails to provide an adequate legal hook for site regulation. Any allusion to ownership contained in the Construction Permits is too attenuated to be deemed a "term" of the permit.

To drive this point home, the Construction Permits never expressly condition transfer of the site on transfer of the permits. Section 3 sets forth the permits' express conditions. Not one of them mentions transfer of the site.

In arguing for their status as terms, TVA cites the NRC's policy on license transfers. Once the NRC approves the transfer of a permit from one entity to another, it requires the new permitholder to seek an amendment conforming the permit's language as necessary to reflect the new ownership. Though amendment may be required by regulation, the formalistic step of replacing the former permitholder's names with that of the new remains (quoting the NRC) "essentially administrative in nature." *Streamlined Hearing Process for NRC Approval of License Transfers*, No. 3150-AG09, 1998 WL 874942, at *15. The statements that contain the allegedly inviolable language thus do not constitute "terms" of the construction permits; rather, they are merely "administrative language," amenable to post-transfer amendment. *Id.* at *15. These amendments are necessary "[o]nly when the [permit] specifically has references to entities or persons that no longer are accurate following the approved transfer." *Id.*

Second, these statements (and all others in CPPR-122 or -123) are consistent with TVA's conveying the underlying real estate to Nuclear Development, because the permits are, by axiom and etymology, just permissive. The alleged violations, in other words, could remain hypothetical. If a utilization facility is *not* constructed,[19] then there is no facility at all; because no facility had been built, neither Unit 1 nor Unit 2 would be located on the "applicant's" site, nor any site at all; and if there's no facility, there's no exclusion area, regardless of ownership.[20]

And third, the NRC regulates the approval of license transfers and the amendments of license language at different stages, and with separate orders, in the license-transfer process. Through the former step, governed by 10 C.F.R. § 50.80, the NRC regulates the substantive qualifications of prospective license transferees. Through the latter, governed by 10 C.F.R. § 50.90, it amends the administrative language. If these two steps were consolidated, and the statements that TVA characterizes as inviolable "terms" were amended in the same order that the NRC approved the permit's transfer to the applicant, then it might make sense to treat the

---

[19] This second argument holds even if a utilization facility has been or would be constructed on the site. The point is that the language is merely a grant of authority, and it does not matter whether these statements are true or not. Permits are just permits. Absent an express condition in the permits themselves, they neither convey nor restrict site ownership.

[20] The "shall" in Section 3(B) might seem, at a glance, to elevate this term to a mandatory provision. But if it were mandatory, then the permittee's failure to complete a facility would amount to a violation of the term, and that outcome is inconsistent with the NRC's policy of permitting plant deferral and termination. The better reading, then, is that the provision is merely permissive.

statements as terms of the permits. But the NRC treats them separately, and the Court will not bootstrap a substantive restriction onto language that the NRC deems merely administrative.

### B. Under the regulatory scheme established by the AEA and NRC regulations, transfer of the Bellefonte Site without the NRC's approval of the Construction Permits' transfer would have been unlawful.

Nuclear Development contends that TVA could lawfully have transferred Bellefonte without the NRC's approval of the Construction Permits. Under the regulatory scheme established by the AEA and its implementing regulations, however, it is mistaken.

When Congress passed the Atomic Energy Act of 1954, it enacted a regulatory scheme "virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 783 (D.C. Cir. 1968). Since the passage of the Energy Reorganization Act of 1973, the AEA's licensing and regulatory functions have been administered by the NRC. 42 U.S.C. §§ 5814(a)–(f), 5841(±).

Section 101 of the AEA, 42 U.S.C. § 2131, implemented through 10 C.F.R. § 50.10(b), makes it unlawful for any person in the United States to "transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility without a license issued by the NRC under Section 103 or

36

Section 104. The statute relevantly defines a "utilization facility" as "any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." The regulations that implement this definition define a "utilization facility" as a "nuclear reactor," and a nuclear reactor as "an apparatus, other than an atomic weapon, *designed* or used to sustain nuclear fission in a self-supporting chain reaction. 10 C.F.R § 50.2 (emphasis added). Section 103 authorizes the NRC "to issue licenses to persons applying . . . to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, [or] use" a utilization facility "for industrial or commercial purposes." [21] 42 U.S.C. § 2133(a). For all purposes under the AEA, a construction permit is considered a license. 42 U.S.C. § 2235(a).

Moreover, Section 185(a), 42 U.S.C. § 2235(a), implemented through 10 C.F.R. § 50.10(c), requires those who wish to "construct or modify" a utilization facility to apply to the NRC for a construction permit. Under the regulation, no one may

> begin construction of a . . . utilization facility on a site on which the facility is to be operated until that person has been issued either a construction permit under this part, a combined license under part 52 of this chapter, an early site permit authorizing the activities under

---

[21] Section 104, the other licensing authority governing Section 101 (though not at issue in the litigation), also authorizes the NRC to issue licenses for utilizations facilities "for use in medical therapy," 42 U.S.C. § 2134(a), and "useful in the conduct of research and development activities," 42 U.S.C. § 2134(c).

paragraph (d) of this section, or a limited work authorization under paragraph (d) of this section.

10 C.F.R. § 50.10(c). And under Section 184, 42 U.S.C. § 2234, it is prohibited to transfer one of these licenses, or a license-conferred right, "either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this chapter, and shall give its consent in writing." Section 184 is implemented through 10 C.F.R. § 50.80. Together, these provisions establish a regulatory framework that governs the building, licensing, use, and transferability of utilization facilities.

Bellefonte's units are not now "used" to sustain nuclear fission in a self-supporting chain reaction, and it is undisputed that in their current state, the units would be *incapable* of being so used. (Doc. 72–4 at 3). What is disputed is whether Unit 1 or Unit 2 is an apparatus *designed* to sustain nuclear fission in a self-supporting chain reaction. If either unit is an apparatus so "designed," then, by definition, it is a nuclear reactor; if a nuclear reactor, then a utilization facility; and if a utilization facility, then its transfer to Nuclear Development would have been unlawful under Section 101 of the AEA. 42 U.S.C. § 2131.

"Designed," as the word is used in the regulation, is a somewhat ambiguous modifier, and the parties offer competing interpretations of its meaning. TVA suggests that it turns on subjective intent to complete the reactor (Doc. 86–83 at 19–

38

20), while Nuclear Development collapses the regulatory language into the statutory definition of "capable of making use of specialized nuclear material" (Doc. 101–1 at 8–9). Two brief thought experiments seem to suggest the best answer.

Long before construction ever began, plans were drawn up for two utilization facilities to operate at the Bellefonte Nuclear Plant. Did these plans constitute two nuclear reactors? If blueprints alone sufficed, then Section 101 restrictions could attach to any lot pressed into service as the site of a prospective reactor by the imperious pen of a nuclear engineer. But if it takes more than blueprints, at what point does a unit become a nuclear reactor? When the first brick in laid? It strains belief to say that a single brick could be an "apparatus designed . . . to sustain nuclear fission in a self-supporting chain reaction."

Now suppose that the NRC had omitted "designed" from the definition of nuclear reactor. Only an apparatus "used" to sustain nuclear fission would count, and so only facilities currently in operation would be deemed nuclear reactors. And by extension, those plants not then used, even if fully built, staffed, and capable of being used the very next day, would be excluded from the definition.

The regulation's meaning would seem to lie somewhere between these two: wide enough to embrace disused but operable stations, but not so expansive as to capture a blueprint-backed brick. "Designed" then, might simply mean "capable of operating."

39

This is how both TVA and the NRC used the term in 2006. That year, when Investment Recovery was ongoing and the Bellefonte units were closer to completion than they are now, TVA decided that it would permanently halt construction on the Bellefonte units, and it notified the NRC that it sought to withdraw the Construction Permits. (Doc. 72–6 at 4). Before it would consent to the request, the NRC asked TVA "to provide additional information regarding whether [Units 1 and 2] can be considered a "Utilization Facility" as defined in 10 C.F.R. [§] 50.2." *Id.* TVA replied:

> In their present condition, neither of the subject units can be considered a utilization facility as so defined. At the time that construction of the units was deferred, TVA considered Unit 1 to be 88 percent complete and Unit 2 to be 28 percent complete. At this time, neither reactor has the necessary structures, systems or components in place to sustain a controlled nuclear reaction. For example, over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site which precludes the ability of the units to operate as nuclear reactors. In addition . . . there is no nuclear fuel located at the BLN site.

*Id.* Because neither unit was capable of operating as a nuclear reactor, Units 1 and 2 were not, TVA concluded at the time, "utilization facilities." Two months later, the NRC concurred:

> At this time, neither reactor has the necessary structures, systems, or components in place to sustain a controlled nuclear reaction. Over the past several years, key components such as the control rod drive mechanisms for both Unit 1 and 2 have been removed from the site, which precludes the ability of the sites to operate as nuclear reactors. The current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility.

(Doc. 72–7). Because it was considering the withdrawal of the Construction permits, the NRC issued an Environmental Assessment and Finding of No Significant Impact, concluding, in its assessment, that "[t]he current condition of the plants does not allow operation; therefore, neither plant can be considered a utilization facility. *Id.*

To understand "designed or used" to mean "capable of operating" or "allowing operation" is, furthermore, consistent with the definition, implemented by 10 C.F.R. § 50.2, supplied by the AEA itself. Under Section 11 of the AEA, a "utilization facility" is relevantly defined as "(1) any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material." 42 U.S.C.A. § 2014(cc). In a case interpreting the statutory definition, the NRC similarly focused on the functional capability of the equipment at the site. *In the Matter of Cincinnati Gas & Elec. Co., et al. (William H. Zimmer Nuclear Power Station, Unit 1)*, 20 N.R.C. 765 (Aug. 29, 1984). In the *Zimmer* case, applicants to run the all-but-complete William H. Zimmer Nuclear Power Station moved to withdraw their application for an operating license. *Id.* The NRC's Atomic Safety and Licensing Board, interpreting the statutory definition of "utilization facility," agreed with the NRC Staff that "because the facility is essentially complete, it must be disabled so that it cannot make use of special nuclear material. *Id.* at *1. Thus, under both the statutory definition and the NRC's

41

interpretation of the term, it would appear that a utilization facility would cease to be a utilization facility once it became incapable of making use of special nuclear material—that is, incapable of operating.

But to end the analysis there would be to take too narrow a view of the AEA and its implementing regulations, defying established law on interpreting agency regulations and ignoring the greater part of the NRC's practice, policy, and decisions. Armchair analysis is unnecessary: under the AEA, the authority to regulate the field of nuclear licensing falls to the NRC, and to interpret "utilization facility," the Court must accede to the agency's definition of the term. A utilization facility, in other words, is what the NRC says it is.

This, indeed, becomes all the more evident through a deeper analysis of the *Zimmer* case itself. For in *Zimmer*, what the applicants were pursuing was the withdrawal of their application and the termination of the proceedings.[22] *Id.* The motion for withdrawal asked for relief on self-imposed conditions, most of which pertained to rendering the site inoperable as a "utilization facility"—removing all fuel from the site, modifying the steam supply system, severing and welding caps on the two main feedwater lines and four main steam lines, and removing the control rod drive mechanisms—and the motion was granted *subject to the further condition*,

---

[22] The applicants, evidently, had a change of heart and wished to convert the vestiges of the nearly completed plant into a fossil-fired generating station. 20 N.R.C. 765

imposed by the NRC, that the applicants implement a site restoration plan. *Id.* Moreover, the implementation of that plan would be verified by the NRC staff. *Id.* at *3. The import here is that even if the Zimmer plant had been made inoperable as a utilization facility, the NRC would continue to exercise its regulatory authority over the site until, through independent verification, it confirmed that the applicants had met the conditions of application withdrawal, only some of which pertained to the plant's ability to function as a utilization facility.

Although it was an application for operating license at issue in *Zimmer*, the analysis is the same where the license is a valid construction permit. Under the NRC's Policy Statement on Deferred Plants, a permittee must comply with all requirements of a construction permit, even if the plant is in deferred or terminated-but-not-withdrawn status. 52 Fed. Reg. 38077-01, §§ III(A)(l), III(A)(3), III(B)(l) (Oct. 14, 1987). Furthermore, all regulatory requirements and policy statements applicable to plants under construction are applicable to plants in deferred status. *Id.* at III(A)(3), III(A)(5). Section III(A)(3) of the policy statement, for instance, states that permitholders of construction permits in deferred status must continue to abide by the NRC's regulatory requirements concerning the "verification of construction status, retention and protection of records, and maintenance and preservation of equipment and materials." *Id.* These requirements are not optional. As the Policy Statement shows, they are implemented through discrete NRC regulations:

43

> 10 CFR 50.54(a), "Conditions of Licenses," and 10 CFR 50.55(f),
> "Conditions of Construction Permits," which require that a quality
> assurance program be implemented; 10 CFR Part 50, Appendix B,
> which requires that all activities performed to establish, maintain, and
> verify the quality of plant construction be addressed in the licensee's
> quality assurance program; 10 CFR Part 50, Appendices A and B,
> which require that certain quality records be retained for the life of the
> plant; 10 CFR 50.55(e), which requires reporting of deficiencies in
> design, construction, quality assurance, etc.; 10 CFR 50.71, which
> applies to the maintenance of records; and 10 CFR Part 21, which
> applies to reporting of defects and noncompliance. Those NRC
> regulatory guides that endorse the ANSI N45.2 series of standards,
> "Quality Assurance Requirements for Nuclear Power Plants," also are
> applicable and include Regulatory Guides 1.28, 1.37, 1.38, 1.58, 1.88,
> and 1.116.

*Id.* These duties are not trivial: when Johnson recommended in 2016 that the Board declare Bellefonte surplus property, he reported that TVA had been spending $10,000,000 to $12,000,000 annually on site maintenance, although it planned to reduce those expenditures to a $6,500,000. (Doc. 85–14 at 1).

The regulations may nowhere expressly restrict the licensee from transferring the property, but NRC policy presumes that a site will remain in the licensee's control. Hence the NRC's admonition that "[i]mplementation of the program will be examined periodically to determine licensee compliance with commitments and overall program effectiveness." 52 Fed. Reg. 38077-01. That the NRC interprets its regulations to accord it full regulatory control over a site through the permittee until the permits are withdrawn is confirmed by still another provision of the policy

statement. In mandatory language under the section governing "Plant Termination,"
the policy states:

> Until withdrawal of the [Construction Permit] is authorized, a permit
> holder must adhere to the Commission's regulations and the terms of
> the [Construction Permit] and should submit suitable plans for the
> termination of site activities, including redress, as provided for under
> 10 CFR 51.41, for staff approval. Moreover, if the plant has been
> completed to a point that it can function as a utilization facility, the
> licensee must take all necessary actions to ensure that the facility is no
> longer a facility for which an NRC license is required.

*Id.* at § III(B)(1). Through this provision, a permitholder's regulatory duties,
including those directly concerning site activities, are expressly delimited by the
existence of a valid construction permit. The provision also illuminates the
relationship between a plant's status as a utilization facility, the existence of an NRC
license, and the NRC's continued authority over a licensee and the permitted site—
exactly the constellation of issues raised in the *Zimmer* case. For a site to be released
from NRC jurisdiction, the NRC-issued license must be withdrawn, and withdrawal
may be subject to NRC-imposed conditions. One of those conditions may be
ensuring that a plant can no longer function as a utilization facility. But until the
NRC has withdrawn a construction permit, the permitholder must abide by its terms
and all applicable regulations.

These regulations thus impose duties on licensees that can be fulfilled only
with direct control of the site. To allow a licensee to transfer the property without

the NRC's approval would cripple its regulatory authority and derogate from its stated policy.

For the NRC policy statements to cohere, the following statement must also be true: a plant that might not otherwise be considered a utilization facility will nevertheless be treated as one by the NRC as long as it is subject to a valid Section 103-issued license. And thus is the ownership of a plant site tethered to the NRC's permitting authority; where there is a valid NRC-issued license, transfer of ownership requires NRC approval.

This outcome is dictated by far more than policy statements: the limitation on the transferability of site ownership is firmly established by NRC precedent. In a decision by the Commission itself, the NRC proclaimed that "[a]ny transfer of ownership would require Commission approval." *In the Matter of Pub. Serv. Co. of New Hampshire, et al. (Seabrook Station, Units 1 & 2)*, 7 N.R.C. 1, 22 (Jan. 6, 1978). That case concerned the Seabrook plant, a two-unit nuclear electric generating station on the coast of New Hampshire, still under construction at the time of the decision. *Id.* at 4. The issues before the Commission principally turned on the financial qualifications of the construction-permit applicants, but those issues raised further questions concerning two applicants who wished to dispose of their interests in the plant. Although it declined to consider the future modifications to the

applicants' ownership agreement, the NRC was satisfied that it would be able to assert control over any future transfers of ownership.

The NRC reaffirmed this principle just a month after its *Seabrook* decision. In the *Marble Hill* case, the NRC's Atomic Safety and Licensing Appeal Board held that prospective co-owners of nuclear power plants must be co-applicants for an NRC license. *Id.* at 201. The Public Service Company of Indiana had applied for a license to build a nuclear-powered electric generating facility at a site in Southern Indiana known as "Marble Hill," and the NRC's Licensing Board, pending final approval, granted it a Limited Work Authorization. *Id.* at 182. As its name suggests, a Limited Work Authorization allows only for limited pre-construction activities, which, per NRC regulations, include

> the driving of piles, subsurface preparation, placement of backfill, concrete, or permanent retaining walls within an excavation, installation of the foundation, including placement of concrete, any of which are for a[ safety-related structure, system, or component] of the facility for which either a construction permit or combined license is otherwise required.

10 C.F.R. § 50.10(d)(1). Thus, at the time of the decision, no activities that would have required a construction permit had begun.

Public Service Co., along with several intervenors, challenged the Licensing Board's grant of the LWA and appealed its ruling. *Id.* The relevant challenge, mounted by Public Service Co., concerned the Licensing Board's ruling that the co-owners of the proposed nuclear plant were de facto co-applicants for the construction

47

permits and its decision to deem the application amended to reflect joint ownership. *Id.* at 198. Although the case turned on the applicability of Sections 101 and 103 of the AEA and no construction had begun, it appears that no one chose to dispute whether the plantless site, certainly then incapable of using special nuclear material, was a "utilization facility." Instead, it argued that Sections 101 and 103 did not apply because neither "explicitly forbid one to 'own' a nuclear plant without a license, only to 'posses' it." *Id.*

The Appeal Board rejected the argument. In reaching the conclusion that co-owners of nuclear power plants must also be co-applicants, it noted that it saw "no reason why Congress would want to exempt owners of nuclear power plants from Commission regulation." After delving into the legislative history of the AEA, it further opined that to accept Public Service Co.'s "crabbed" interpretation of the statute could place "significant areas of the Commission's regulatory authority . . . under a cloud." *Id.* at 201.

After these decisions, the NRC aligned its practice to conform with the principle that construction permits for incomplete facilities would need to be amended to approve changes in site ownership. The NRC's letter to W.C. Tallman, for instance, illustrates that practice by approving an amendment to the Construction Permits for Seabrook Station, Units 1 and 2, to reflect a change in ownership, (Doc. 86–55 at 2–3 and 6–11), as does the NRC's letter to L.C. Dail by approving (with

express reference to *Marble Hill*) an amendment to the Construction Permit for Catawba Nuclear Station, Unit 2, to reflect a change in ownership, (Doc. 86–56 at 2 and 5–6).

Moreover, the NRC has expressly found that transferring ownership of a utilization facility without its consent violates Section 101 of the AEA. (Doc. 86–54). On March 3, 1978, the NRC's Acting Director of Nuclear Reactor Regulation, Edson G. Case, sent a letter to a concerned citizen named Dr. Robert G. Asperger, who, invoking his right under 10 C.F.R. § 2.206, had asked the NRC to take enforcement action against the Detroit Edison Company for selling two Cooperatives a 20% stake in the Fermi 2 nuclear plant.[23] *Id.* As the acting Director of Nuclear Reactor Regulation, Case issued the decisional letter in his capacity as the senior agency official responsible for carrying out "licensing and regulation involving all facilities . . . associated with the construction and operation of nuclear reactors." 42 U.S.C. § 5843(b)(1). After reviewing the Agreement, Case concluded that by selling a present interest in the facility to the Cooperatives, Detroit Edison had violated Section 101 of the AEA, "because that section requires Commission approval before and not after an ownership interest is acquired." (Doc. 86–54 at 6–7). After reaching this conclusion, Case rejected the argument that Section 101 of

---

[23] Why did Dr. Asperger, a private party, request enforcement action against Detroit Edison? "He didn't like them." (Doc. 86–32 at 59).

the AEA did not apply because the facility was not yet complete, observing that "it has been the longstanding practice of the Commission to consider a utilization facility under construction to be a utilization facility. Therefore, in our view, a right to own a utilization facility under construction is a right to own a utilization facility if completed." *Id.* at 7.

Although the Case letter spoke in terms of utilization facilities under construction, there is no reason to believe that, under current NRC policy, the result differs for facilities in deferred status. After all, the NRC applies all regulations and policy statements governing plants under construction to plants in deferred status. *See* 52 Fed. Reg. 38077-01. The NRC, in other words, treats deferred plants, which are subject to construction permits, as plants under construction.

The Tallman, Dail, and Case letters illustrate how the NRC interprets both its own regulations and the AEA, and given the exceptionally broad responsibility vested in the agency's administration of the statute, the Court will defer to its practice. To borrow the words of Justice Brennan, the Court sees no reason why it

> should not accord to the Commission's interpretation of its own regulation and governing statute that respect which is customarily given to a practical administrative construction of a disputed provision. Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'

*Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*, 367 U.S. 396, 408 (1961) (citations omitted) (deferring to the NRC's interpretation of the AEA and its implementing regulations in a decision involving construction permits).

All these decisions deal only with applications concerning co-owners, and each holds that a co-owner must also be a co-applicant on a license. And in each case, the NRC authorized ownership only once it had approved the license application. From these holdings, however, it necessarily follows that no one may hold an ownership interest in a nuclear plant unless the NRC has approved his application for a license.

And so what of TVA's 2006 contention that Bellefonte is no longer a utilization facility? As in *Zimmer*, TVA was merely assuring the NRC that both units could safely be released from its jurisdiction. Not even the NRC's concurrence in its Environmental Assessment would have released the site from its jurisdiction; it was not until the Construction Permits were withdrawn that the Bellefonte site would have become transferable. That, and not TVA's subjective intent, is why its possession of the site from 2006 to 2009 with no valid license did not violate Section 101—the Construction Permits had been withdrawn. When they were reinstated, the site fell again within the NRC's jurisdiction, and transfer would once more have required NRC approval.

Given the NRC's interpretation of the AEA and its implementing regulations, it does not matter that the Bellefonte units, at closing, were incapable of operating: TVA could not lawfully have transferred the Bellefonte site to Nuclear Development without the approval of the NRC. Once the NRC issued CPPR-122 and -123 to build Units 1 and 2, the site could not be transferred without the NRC's approval unless the permits expired or were withdrawn.[24] The Court therefore concludes that under the AEA and its implementing regulations, as these have been interpreted by the NRC, even partially completed facilities, whether under construction or not, are swept within the regulatory ambit of Section 101.

Because the transfer of the Bellefonte site without NRC approval would have been unlawful under Section 101 of the Atomic Energy Act, the closing condition set forth in Section 6(a)(v) was not satisfied, and Nuclear Development's motion for summary judgment is denied.[25]

---

[24] Or, theoretically, if the facilities had first become operational and then been decommissioned. (Doc. 86–81 at 8).

[25] Nuclear Development contends that TVA must show more than a mere technical statutory violation to establish illegality and, at least for the purposes of voiding a contract, show a clear public harm. For one, Nuclear Development appears to have conflated TVA's (inapposite) illegality defense with its front-end closing condition of non-illegality, and has sought to pipeline the affirmative-defense doctrine into that of the condition precedent. It does not belong there. But even if somehow it applied, it would make that showing by pointing to the violation of the AEA: for the violation of a federal statute is a violation of the policy of the United States. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83–84 (1982).

## C. Nuclear Development cannot rely on the doctrine of equitable estoppel.

Nuclear Development further contends that TVA should be equitably estopped from raising the affirmative defense of illegality when ND had already relied to its material detriment on TVA's representations that it would close. Equitable estoppel is appropriate where:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013). Nuclear Development's invocation of equitable estoppel fails for two reasons. First, the allegedly unknown facts are not facts at all, but law, and if Nuclear Development did not know the law when it entered the Agreement, then it should have. Second, there may well be a genuine dispute of material fact as to whether Nuclear Development relied on the representations that TVA made in Section 7, but if it did, its reliance would be of no import. Its reliance would have been unreasonable, because Nuclear Development was charged—as we all are—with knowing the law. Thus, Nuclear Development can establish neither the fourth nor the fifth element, and its invocation of equitable estoppel fails as a matter of law.

## D. Genuine disputes of material fact preclude judgment as a matter of law.

Although the condition set forth in Section 6(a)(v) was not satisfied because transfer of the Bellefonte site without NRC approval would have been unlawful, TVA is not absolved from liability. Under Section 9(a) of the Agreement, the parties made two covenants "to be effective after the Effective Date and prior to Closing":

(i) Subject to the terms and conditions herein, each of the Parties agrees to use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth herein.

(ii) Each Party shall provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal, state, local, foreign or other governmental subdivision, regulatory or administrative agency, commission, body, court, tribunal, arbitral panel, or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax or other authority or power (each, a "Governmental Authority") over the matters specified as to the Site consistent with Section 1(e). The Parties shall keep each other apprised of the status of any communications with and any inquiries or requests for additional or supplemental information from applicable Governmental Authorities, and shall provide any such additional or supplemental information that may be reasonably requested in connection with any such filings or submissions. All applications, appearances, presentations, briefs, and proposals made or submitted by or on behalf of either Party before any Governmental Authorities in connection with the approval of this Agreement and the transactions contemplated hereby shall be subject to the control of the Party making such application, appearance, presentation, filing or submission.

(Doc. 72–16 at 9–10).

The history of this case after the effective date and prior to closing is clouded with factual disputes. From midsummer 2018 through the expected closing date, the fog lies thickest. In short, the crossfire of emails in the months before closing, much of it in anticipation of litigation; the alleged requests for TVA to apply to the NRC for approval of the Construction Permits' transfer, as well as the alleged delays in seeking approval; and the allegations of bad blood between the parties after McCollum's visit to Memphis, all raise genuine disputes of material fact as to whether TVA fulfilled its duties under §§ 9(a)(i) and (ii) of the Agreement.

Moreover, there is a genuine dispute of material fact as to whether Nuclear Development was ready, willing, and able to close on the closing date.

**E. Incidental Damages**

The Court will reserve judgment on damages, if appropriate, until trial.

## CONCLUSION

Because there remain genuine disputes of material fact, the Court cannot decide Counts I, II, or III of the Complaint as a matter of law. Nuclear Development, LLC's Motion for Summary Judgment (Doc. 70) and the Tennessee Valley Authority's Motion for Summary Judgment are therefore **DENIED**.

**DONE** and **ORDERED** this April 1, 2021.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2021 Apr-12  AM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

In accordance with Rule 16(d) of the Federal Rules of Civil Procedure, the Court enters this order reciting the actions taken at the final pretrial conference held on April 8, 2021.

For the reasons stated at the hearing, it is **ORDERED** that:

1. The parties may not introduce evidence to prove or make further argument on issues already resolved by the Court's summary-judgment order, including evidence or argument to show that:

    a. The Nuclear Regulatory Commission's approval of the Construction Permits' transfer was or was not a condition to closing;

    b. Transfer of the Bellefonte site would or would not have violated the terms of the Construction Permits;

    c. Transfer of the Bellefonte site would or would not have violated Section 101 of the Atomic Energy Act and its implementing regulations; and

1

   d.  TVA should or should not be equitably estopped from avoiding its contractual obligations.

2.  TVA's motion for the Court to amend its summary-judgment order (Doc. 172 at 10) is **DENIED**.

3.  In accordance with Rule 15(a)(2) of the Federal Rules of Civil Procedure, Nuclear Development is hereby given leave to amend its complaint to allege that TVA violated Section 9 of the Agreement. The amended complaint must be filed by **April 13 at 5:00 P.M.**

4.  If Nuclear Development timely files an amended complaint, TVA must file a response by **April 15 at 5:00 P.M.**

5.  The Tennessee Valley Authority's Motion to Disqualify Larry Blust from Participation at Trial as Attorney for Plaintiff (Doc. 154) is **GRANTED**.

6.  The Court will reserve ruling on Nuclear Development's Motion to Preserve Confidentiality of Exhibit 128 (Doc. 160) and Nuclear Development's Motion in Limine to Exclude Evidence Relating to Defendant's Trial Exhibits 22 and 23 (Doc. 168) until trial.

7.  Nuclear Development's Motion in Limine to Exclude Expert Opinion Testimony of Stephen G. Burns (Doc. 77) is **DENIED AS MOOT,** without prejudice to re-urging should TVA call Commissioner Burns as an expert at trial.

8.  The parties must exchange revised exhibit lists, witness lists, and deposition designations by **April 16**; counter-designations by **April 20**; and objections to the exhibit lists and counter-designations by **April 22**.

9.  The parties must file a joint pretrial order, including a statement of undisputed facts, by

    **April 21**.

10. Trial briefs, if any, must be filed by **April 23, at 5:00 P.M.**

**DONE** and **ORDERED** this April 12, 2021.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2021 Apr-23  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Before the Court are the Tennessee Valley Authority's Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186) and Nuclear Development, LLC's Motion to Strike TVA's Seventh Defense (Doc. 196). For the reasons that follow, and for those stated on the record April 19th and 22nd, TVA's Motion Doc. 186) is granted in part and denied in part, and Nuclear Development's motion (Doc. 196) is granted.

## DISCUSSION

Rule 15(a)(2) of the Federal Rules of Civil Procedure authorizes parties to amend their complaints out of time "only with the opposing party's written consent or the court's leave." Courts, however, "should freely give leave when justice so requires." Moreover, Rule 12(f) authorizes courts to "strike from a pleading an

1

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). This latter rule is properly invoked "to pursue removal of the prayer for . . . damages in the Complaint." *Pucci v. Carnival Corp.*, 160 F. Supp. 3d 1329, 1331 (S.D. Fla. 2016) (citations omitted).

## I.    TVA's Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186)

TVA moves to strike two claims for equitable relief newly asserted in Nuclear Development's Amended Complaint and to dismiss (a) any claims based on alleged breaches by TVA of Section 9 of the Agreement, and (b) the two new requests for equitable relief. (Doc. 186).

### A.    TVA's Motion to Strike

In its order denying summary judgment, the Court concluded that genuine disputes of material fact remain concerning whether TVA had fulfilled its duties under §§ 9(a)(i) and (ii) of the Agreement. (Doc. 165 at 55). TVA, disputing the propriety of this holding, moved the Court to amend its order "to reflect that Section 9 was not put at issue in [Nuclear Development's] Complaint. (Doc. 172 at 10). The motion was put to oral argument at the final pretrial hearing. There, Nuclear Development contended that Section 9 had indeed been put at issue, but proposed that "if there was any question about it at all"— whether the section fell within the scope of the Complaint—Nuclear Development "would ask the Court to allow [it] to amend the complaint simply to specifically allege Section 9 and the lack of

2

cooperation and lack of best efforts to reasonably consummate the transaction language in Section 9." *Id.* at 18. On the basis of this narrow request, the Court gave Nuclear Development leave to amend its complaint for the limited purpose of "alleg[ing] that TVA violated Section 9 of the Agreement." (Doc. 175 at 2).

Nuclear Development amended its complaint, and the new pleading alleged a breach of Section 9. (Doc. 176). But it also raised two new alternative requests for equitable relief. In its prayer for relief, the Amended Complaint requested an order: (1) compelling TVA to "specifically perform its covenants and agreements under Section 9(a) by notifying the NRC in writing that it consents to Nuclear Development's right to possess the Bellefonte Site," and then, if the NRC were to approve the application for the Construction Permits' transfer, compelling TVA to "specifically perform its obligations under the Contract" by closing on the sale; or, alternatively, (2) finding that Nuclear Development has the right to possess the Bellefonte Site if the NRC approves the application for the Construction Permits' transfer, and then ordering TVA to close on the sale of the Bellefonte Site. *Id.* at 11–12.

Nuclear Development was granted leave for the express purpose of putting squarely at issue in the Complaint what had already been at issue in summary judgment—Section 9 of the Agreement. It was not authorized to add new requests

for equitable relief. TVA's Motion to Strike is therefore **GRANTED**, and these two additional requests are **STRICKEN**.

In striking these requests, however, the Court decides neither the scope of the remaining prayer for relief nor the scope of its power to craft—if necessary—an appropriate equitable remedy. In other words, if TVA proves to be liable to Nuclear Development for breach of the Agreement, the Court remains open to considering whether the now-stricken relief is available to Nuclear Development under its properly stated prayer.

### B. TVA's Motion to Dismiss

TVA further contends that any claims and requests for relief based on TVA's alleged breaches of Section 9 should be dismissed for failure to state a claim. To state a claim for breach of contract, a plaintiff must allege "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." *LaBatte v. United States*, 142 Fed. Cl. 425, 432 (2019) (citation omitted). According to TVA, Nuclear Development has failed to allege the fourth of these elements.

For the reasons stated on the record, the Court concludes that Nuclear Development's Section 9 allegations are sufficient to state a claim for breach of contract. TVA's motion to dismiss is thus **DENIED**; and to the extent that the motion seeks dismissal of the stricken requests for relief, it is **DENIED AS MOOT**.

4

## II.    Nuclear Development, LLC's Motion to Strike TVA's Seventh Defense (Doc. 196)

Nuclear Development moves the Court to Strike TVA's Seventh Defense in its Amended Answer. (Doc. 196). That Seventh Defense reads: "TVA is not liable for breach of any of its obligations under the Contract due to the prior material breach of the Contract by Nuclear Development. In particular, Nuclear Development failed to pay $875,000 of the amount it owed pursuant to Section 12(e) of the Contract." (Doc. 188 at 10). TVA's Seventh Defense amplifies its Fourth Defense, first raised in an earlier answer, under which TVA asserts that it "was not obligated to complete the closing under the Contract due to the prior material breach of the Contract by Nuclear Development." *Id.* at 9.

For the reasons stated on the record, the Court finds that TVA's newly asserted affirmative defense, like Nuclear Development's newly raised requests for equitable relief, should be stricken. Plaintiff's Motion to Strike TVA's Seventh Defense (Doc. 196) is therefore **GRANTED**, and TVA's Seventh Defense is **STRICKEN**.

In so ruling, however, the Court does not decide whether any evidence that TVA might have introduced to prove its Seventh Defense may be introduced to prove its Fourth Defense.

## CONCLUSION

The Tennessee Valley Authority's Motion to Strike and Motion for Partial Dismissal of Amended Complaint (Doc. 186) is **GRANTED IN PART AND**

**DENIED IN PART**, and Nuclear Development, LLC's Motion to Strike TVA's

Seventh Defense (Doc. 196) is **GRANTED**.

     **DONE** and **ORDERED** this April 23, 2021.

                                          _____

                                          **LILES C. BURKE**
                                          UNITED STATES DISTRICT JUDGE

6

FILED

2021 Aug-26 PM 05:33
U.S. DISTRICT COURT
N.D. OF ALABAMA



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Plaintiff Nuclear Development, LLC brought this suit against the Tennessee Valley Authority (TVA) for specific performance of the Purchase and Sale Agreement of the Bellefonte[1] Nuclear Plant Site. The case was tried before the Court between May 16 and 19, 2021. In accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law.[2]

---

[1] "Bel-font," as it is uniformly and correctly pronounced in the Tennessee Valley region of Alabama.

[2] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

1

## PROCEDURAL BACKGROUND[3]

In November of 2016, TVA entered an agreement with Nuclear Development, LLC, for the purchase and sale of an unfinished nuclear facility in northeastern Alabama known as the Bellefonte Nuclear Plant. Pl.'s Ex. 1. On the eve of closing, TVA concluded that consummation of the sale would be illegal and, citing a condition precedent of non-illegality in the parties' contract, refused to close on the transaction. Nuclear Development sued. (Doc. 1). The Complaint, filed November 30, 2018, sought specific performance of the agreement to purchase the Bellefonte site and a preliminary injunction to maintain the status quo before final judgment. (Doc. 1). It also raised a third, alternative count for breach of contract seeking over $30,000,000 in damages. *Id.*

On April 1, 2021, with the benefit of extensive briefing and oral argument on the parties' cross-motions, the Court denied summary judgment and held that TVA was not obligated to consummate the sale of the Bellefonte Nuclear Plant because one of the conditions to the Purchase and Sales Agreement (PSA)—that closing be lawful—remained unsatisfied. Specifically, the Court held that (1) Section 6(a)(v) of the PSA unambiguously set forth a condition precedent of non-illegality; (2)

---

[3] For additional context on the issues decided by these findings of fact and conclusions of law—a narrow set of those raised in the Original Complaint—see the Court's order on summary judgment. (Doc. 165); *Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021). Further context is also provided by the parties' offers of proof and proffered exhibits.

2

closing on the sale of the Bellefonte property would not have violated the terms of the Construction Permits; (3) closing on the sale of the Bellefonte property *would* have violated Section 101 of the Atomic Energy Act (AEA); and (4) because closing would have violated Section 101 of the AEA, the condition precedent set forth in Section 6(a)(v) of the PSA was not satisfied. (Doc. 165); *see also Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021).

In so holding, however, the Court found several genuine disputes of material fact that remained for trial. Chief among them was whether TVA had made Section 6(a)(v)'s condition of non-illegality impossible to satisfy, either by failing to use its commercially reasonable best efforts to consummate the sale or by failing to reasonably cooperate with Nuclear Development to secure approval of the Nuclear Regulatory Commission (NRC) for the transfer of the Bellefonte Construction Permits, thereby breaching its duties under Section 9(a) of the PSA.[4] Also in dispute was whether Nuclear Development was ready, willing, and able to close on

---

[4] Under Section 9(a), each party was obligated to "use its commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable, the transactions contemplated hereby, including the satisfaction of all conditions thereto," and to "provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any [Governmental Authority] over the matters specified as to the Site consistent with Section 1(e)." Pl.'s Ex. 1, at 9-10. Section 1(e), in turn, concerns all government-issued permits required in connection with the operation of the site. *Id.* at 3.

3

November 30, 2018, and whether it had committed a prior material breach of the agreement.[5]

The Court held a four-day bench trial in open court beginning on May 17, 2021, with a fifth day of video testimony held by agreement in chambers outside the presence of counsel. The following witnesses testified by video deposition: (1) Franklin Haney, Sr., Nuclear Development's sole member and manager; (2) William Johnson, former CEO of TVA; (3) Sherry Quirk, TVA's Executive Vice President, General Counsel, and Secretary to the Board of Directors; (4) Clifford Beach, Associate General Counsel and Senior Counsel for TVA; (5) Franklin Haney, Jr., President of Nuclear Development; (5) Marie Gillman, an employee of SNC-Lavalin and lead consultant for Nuclear Development; and (6) Robert Coward, the principal officer and president of the engineering–consulting firm MPR Associates. The following witnesses testified live: (1) Timothy Matthews, Nuclear Development's nuclear-licensing counsel; (2) Jim Chardos, a TVA employee and Site Manager of Bellefonte; (3) Joe Shea, a TVA employee who, at the time of the PSA, served as its Vice President of Regulatory Affairs and Support Services; (4) Larry Blust, General

---

[5] Nuclear Development indicated after summary judgment that it would seek to relitigate at trial issues that had already been decided as a matter of law, contending that further argument on these issues had not been foreclosed by the Court's order. (Minute Entry dated April 5, 2021; Doc.174). The Court ruled that though it would not allow further argument on issues that it had already decided, it would grant Nuclear Development leave to amend its complaint to expressly cite Section 9 of the PSA. (Doc. 175). Both parties have submitted offers of proof and proffered exhibit lists addressing the issues that they would have argued at trial had those issues not been precluded by the Court's summary-judgment order. (Doc. 221; Doc.224).

4

Counsel, Secretary of, and Outside Counsel to Nuclear Development, as well as the Haneys' long-time family attorney; (5) William McCollum, Nuclear Development's CEO and Chief Nuclear Officer; and (6) Christopher Chandler, TVA's Senior Counsel for Nuclear Development.

## JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over actions against TVA under 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District because it is the judicial district in which "a substantial part of the property that is the subject of the action is situated," 28 U.S.C. § 1391(b), and because the parties agreed that any action arising out of or based on the PSA would be submitted to the Court. (Pl.'s Ex. 1 at 15).

## FINDINGS OF FACT

The Bellefonte Nuclear Plant was inaugurated on December 24, 1974, when the Atomic Energy Commission issued permits to TVA[6] authorizing the construction of two pressurized water reactors at a site along the Tennessee River in Hollywood, Alabama.[7] (Doc. 208); *see* Def.'s Ex. 123. Construction on Bellefonte's

---

[6] The Atomic Energy Commission was abolished by the Energy Reorganization Act of 1973, and, a few months after the issuance of the Bellefonte Construction Permits, its licensing and regulatory functions were transferred to the NRC. *Nuclear Dev., LLC v. Tenn. Valley Auth.*, No. 5:18-CV-1983-LCB, 2021 WL 1248542, at *1 (N.D. Ala. Apr. 1, 2021) (citing 42 U.S.C. §§ 5814(a)–(f), 5841(±)).

[7] The facts contained herein were either stipulated by the parties (*see* Dkt. 75, Attach. 2) or result from the Court's evaluation of documentary evidence and witness testimony. In determining the credibility of each witness, the Court considered all the circumstances under which the witness testified, including: the relationship of the witness to the parties; any interest the witness might

5

two reactors was begun the next year but never completed. In 1988, TVA halted construction on the plant indefinitely, Def.'s Ex. 128 at 2, and since 2010, the Bellefonte units have been frozen in deferred plant status. *Id*.; (Doc. 165 at 5–8).

As early as 2002, a prominent developer from Tennessee by the name of Franklin Haney, Sr., first became interested in seeing the Bellefonte Nuclear Plant brought into service. R. at 18–19. With more than 40 years in project development, Haney is a highly successful real-estate entrepreneur with extensive experience orchestrating financial backing for large-scale commercial, residential, and infrastructural projects. Def.'s Ex. 128 at 10. In 1967, Haney founded the Franklin L. Haney Company, LLC, a privately held business that has built a nationwide portfolio with millions of square feet of prime commercial and residential real estate collectively valued at over $10 billion. *Id.* Among the projects that Haney's company has been responsible for developing are the Dulles Greenway Toll Road project, which includes a fourteen-mile toll road connecting Leesburg, Virginia with the Dulles Airport; the Birmingham Social Security Building; and the Portals Office Buildings I and II, a development in Washington, D.C. comprising nearly two million square feet of office space (including FCC headquarters), 125,000 square

---

have in the outcome of the case; the witness's appearance, demeanor, manner of testifying, and apparent candor and fairness; the reasonableness of the witness's testimony; the opportunity of the witness to acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether any such contradiction related to an important factor in the case.

feet of "highly desirable retail and restaurant space," and a 400-room Mandarin Oriental Hotel. *Id.* Haney has also, in his words, "owned every TVA building" at one time or another. R. at 17.

In the early 2000s, the Haney Company became involved in the nuclear-power industry, handling in various respects the financing of several TVA-owned nuclear projects. R. at 18, 930. According to Haney's son, Frank Haney, TVA reached out to the Haneys in 2001 about doing "off-balance sheet financing for the nuclear units at Browns Ferry and Watts Bar." *Id.* Larry Blust, the Haneys' family attorney, further testified that the Haneys have "prepared financing proposals for Browns Ferry, Watts Bar, and Bellefonte." R. at 411. Frank Haney, however, has never owned, operated, or overseen the construction of a nuclear plant, and he is not familiar with the mechanics of nuclear-power generation. R. at 29–30.

The Haneys have thus been "working on" the Bellefonte Nuclear Plant for the past two decades. R. at 18. Haney's efforts to bring the site online have involved meeting with many high-level elected officials across the region. From them, he secured promises of two-and-a-half billion dollars of tax credits and a billion dollars in subsidies to complete the Bellefonte units. R. at 19–20. And according to Haney, the effort to finish Bellefonte has enjoyed regional bipartisan support: "All the Congressmen in Alabama and Tennessee have worked hard to try to push Bellefonte to be finished. It's not Republican and Democrat." R at 19–20.

In 2012, four years before the sale of the Bellefonte Nuclear Plant, the Haneys established Nuclear Development, LLC "for the [sole] purpose of constructing the Bellefonte Units." Pl.'s Ex. 82 at 20. Blust elaborated on this point at trial, explaining that Nuclear Development had been formed principally "to apply for production tax credits for Bellefonte." R. at 411. In its application to the NRC for the Construction Permits' transfer, Nuclear Development described itself as "a special-purpose entity owned by Mr. and Mrs. Franklin L. Haney and trusts for members of their family." Pl.'s Ex. 83 at 16–17. It's "a manager managed LLC," and its sole manager is Haney himself. *Id.* at 17. Neither its President, Frank Haney; its CEO and Chief Nuclear Officer, William R. McCollum, Jr.; nor its General Counsel and Secretary, Larry Blust, are employees of the organization, and though he is the company's chief executive, McCollum contracts for his services at an hourly rate. R. at 947–48.

On April 25, 2016, TVA's then-CEO William Johnson and its General Counsel Sherry Quirk issued a memorandum to the agency's board of directors requesting that TVA declare a surplus and authorize the sale of the Bellefonte Nuclear Plant. Pl.'s Ex. 2; R. at 49. TVA's largest customer at the time was the City of Memphis, R. at 51, and the joint memo expressly acknowledged the "competitive risk" that "[s]elling the site to an entity that completes the nuclear units would put a merchant nuclear plant in TVA's service territory that could compete to serve TVA customers." Pl.'s Ex. 2 at 2. The board nevertheless adopted the recommendation by

8

resolution and authorized the sale of the site at a public auction to be held later that year. *See* Pl.'s Exs. 3 & 4; R. at 53.

After a six-month competitive process, the auction concluded on November 14, 2016, when the winning bidder, Nuclear Development, entered into an agreement with TVA for the purchase and sale of the Bellefonte Nuclear Plant Site. *See* Pl.'s Exs. 1 & 5. Upon signing, Nuclear Development paid TVA a $22,200,000 "Down Payment" and $750,000 in "Compensated Costs" in compliance with Section 5 of the PSA. Pl.'s Ex. 1 at 5–6. The closing date set by the PSA was to be November 14, 2018, *id.*, though by an amendment executed six days before the scheduled closing, that date was extended to November 30th. *See* Pl.'s Ex. 18.

In March of 2018, Nuclear Development began to draft its application to the NRC for transfer of the Bellefonte Construction Permits from TVA to Nuclear Development. R. at 191. The nuclear-licensing attorney charged with preparing the application, Timothy Matthews, expected at the time that Nuclear Development would be ready to submit the application by October and that the NRC would approve the transfer about six months later. *Id.* At a March 2018 meeting of the Nuclear Energy Institute in Washington, D.C., Matthews met with Christopher Chandler, TVA's Senior Counsel for Nuclear, to discuss the prospect of TVA

submitting a letter consistent with 10 C.F.R. § 50.80(b)(2)[8] indicating that TVA consented to the permits' transfer. *Id.* at 164. Chandler "didn't think that would be a problem." *Id.*

This expectation notwithstanding, sometime in the summer of that year Chandler was struck with a "fairly generalized concern that there was going to be a problem with closing if the NRC hadn't . . . approved the license transfer." R. at 793. The concern was rooted neither in the text of the Construction Permits nor the governing statute; it was simply "one of those thoughts that you have." *Id.* In testifying to the substance of his inchoate concern, Chandler explained that it had "simply occurred to [him] that there was going to be a problem with selling a nuclear plant without the NRC's authority," *id.* at 799, and that "if [the] closing date arrives and Nuclear Development hasn't received [the] NRC's approval," there "may be a problem." *Id.* at 793. Chandler shared this concern with TVA's Senior Counsel, Clifford Beach, but as of then Chandler did not consider the issue to be "significant." *Id.* at 795, 797. Because "the closing date was still far enough away that there were any number of things that could have changed" to obviate whatever potential regulatory problems might surround his concern, Chandler considered the issue too minor to raise with Nuclear Development. *Id.* at 797.

---

[8] Under 10 C.F.R. § 50.80(b)(2), the NRC "may require" an applicant for the transfer of a construction permit "to file a written consent from the existing licensee . . . attesting to the person's right ; . . to possession of the facility or site involved."

10

Matthews next spoke with Chandler on October 18, 2018. That morning he called to say that he would be sending over a draft letter of the kind the two had discussed in March—one for TVA to submit to the NRC consenting to the transfer of the Construction Permits. *Id.* at 766–67. TVA would "certainly be happy to look at it," Chandler told him, but "if [Matthews] was going to formally ask [them] to submit the letter," TVA would "need several weeks' notice" to make edits and subject the letter to an "internal concurrence and review process." R. at 766–67. Matthews made no indication that he needed the letter signed by TVA, that he needed the letter to submit the transfer application, or that Nuclear Development needed the letter to close on the Bellefonte sale. *Id.* Shortly after the call, Matthews emailed the draft letter to Chandler with the following note:

> Chris,
>
> We previously discussed the possibility of TVA submitting a letter to the NRC consenting to the plant sale and CP transfer (consistent with 50.80(b)(2)) rather than TVA submitting a CP transfer application on behalf of Nuclear Development. I have prepared a draft of that consent letter for your consideration. Please let me know if you have any comments and please let me know when might be convenient to discuss the process going forward.

Pl.'s Ex. 14. Chandler confirmed that he'd received the email later the same day. *Id.*

In a phone call on November 5, Matthews discussed the progression of Nuclear Development's transfer application with Chandler and opined that there was "nothing about [the arrangement]" that made him comfortable. R. at 772–73. It was

"not the usual utility arrangement" that Matthews was used to, and "the normal communication channels . . . were not there." *Id.* Even so, Matthews believed that the application was of "sufficiently high quality that [it] would be accepted by the NRC." *Id.* At no time on the call did Matthews ask TVA to send the consent letter to the NRC. *Id.* at 774.

By the end of that week, TVA had informed Nuclear Development in writing that it had a concern pertaining to the legality of closing on the Bellefonte sale under the terms of the Construction Permits. Pl.'s Ex. 17. Though this concern had first been shared with Nuclear Development in discussions that October, the email constituted the first time that TVA had felt "educated enough" on the topic to reduce the issues to writing. R. at 995. Blust responded on November 12 in a follow-up email to Chandler, relaying a memo that Matthews had written addressing the parties' "regulatory path forward." Pl.'s Ex. 19. A note in this email announced that Nuclear Development "would still like to get . . . that letter Tim requested some time ago." Pl.'s Ex. 19.

The next day, Matthews met with Chandler in Washington, D.C. and mentioned that Nuclear Development would submit its application later in the day. R. at 778. Chandler returned home after the meeting and, for the first time, began to research "the legality of transferring ownership of the . . . site without the NRC's approval." *Id.* at 781–82. At trial, Chandler testified that the mention of a "regulatory

path forward" in Nuclear Development's recent email had "got [him] wondering whether there was . . . anything [he] could find within the Atomic Energy Act itself that would be relevant to this question of whether [TVA] could close." *Id.* at 781–82. Just two days later, TVA's General Counsel Sherry Quirk shared with Nuclear Development the emerging concern that closing on the Bellefonte sale might violate the Atomic Energy Act. *Id.* at 783.

And while the attorneys were navigating these regulatory obstacles, the parties' executives became embroiled in a conflict of their own. Early in October of 2018, Nuclear Development's CEO, William McCollum, made a presentation to the City of Memphis in which he discussed the viability of construction, options for power transmission, and the savings that would accrue to the City were it to leave TVA in favor of power from Bellefonte under Nuclear Development's ownership. *See id.* at 64, 923. Marie Gillman, who attended the meeting as a representative of Nuclear Development's prospective Engineering, Procurement, and Construction Management firm SNC–Lavalin, testified that Nuclear Development promised the City of Memphis an annual savings "in the neighborhood of $300 million" for switching from TVA to Bellefonte. *Id.* at 923. When TVA's CEO, William Johnson, learned the day after this presentation of the comments that McCollum had made to TVA's largest customer, he became "upset." *Id.* at 60. Johnson called a meeting with Haney and Blust on October 23rd, where he "expressed displeasure about how issues

13

had been presented in Memphis" because Nuclear Development's "negative" statements were, in his view, "untrue." *Id.* at 127. Specifically, Johnson resented McCollum's comment that Memphis "should leave TVA and not go to Nuclear Development, but go to MISO[9] or somewhere else, because any deal is better than a deal they're getting from TVA." *Id.* at 60. In Johnson's view, it was simply untrue that Memphis could get a better deal from MISO or somewhere else than from TVA, except "maybe in one hour, in one year." *Id.* at 94. After further questioning, Johnson admitted that his "real concern" and self-described "irritation" was that a retired TVA executive—McCollum, TVA's former COO, was a five-year veteran of the agency—was "trying to harm the organization for no benefit to the organization he worked for." Johnson thus met with Memphis on November 6 "to make the pitch for staying with TVA." *Id.* at 70.

As closing drew near, TVA granted Nuclear Development a short extension on the closing date. R. at 438. The parties executed the First Amendment to the Bellefonte Purchase & Sale Agreement on November 9, and closing was pushed from the 14th to November 30, 2018. Pl.'s Ex. 18. Months before, on August 29, Nuclear Development had sought a six-month extension of the closing date to May 14, 2019 so that it could "put in place the financing" and "complete certain activities

---

[9] The Midwest Independent Systems Operator (MISO) is a member-based power-transmission organization with territory extending across the Central and Southern United States. R. at 435.

14

necessary for an orderly closing" to the transaction. R. at 431–32; Pl.'s Ex. 13. Johnson decided not to consent to six months, but because he had "[eaten] into some of their time," he agreed to this short extension. *Id.* at 73.

Johnson participated in a townhall-style forum on November 26 at TVA's Knoxville office, during which he spoke to rank-and-file employees and answered their questions about the Bellefonte transaction. *Id.* at 71. He told the audience that McCollum's comments in Memphis had "ticked [him] off" and that their former colleague's behavior had "crossed the line." *Id.* at 73. Johnson then noted that TVA had granted Nuclear Development a short extension and, after a perfunctory poll of how many people thought he should give another, declared that there would be no further extensions. *Id.* Though he would testify that as of the forum he had not yet decided not to close, Johnson told the audience he was "sure we'll be a defendant by Monday." *Id.* at 74.

At 9:09 p.m. the night before closing, TVA notified Nuclear Development by email that it would not close on the transaction. (Doc. 165 at 20). November 30, 2018 came, and TVA did not close on the sale. *Id.* TVA had not by then advised the NRC that it consented to the application, and the NRC had not approved Nuclear Development's application for approval of transfer of the Construction Permits. (Doc. 208 at 6).

15

## CONCLUSIONS OF LAW

For a plaintiff to prevail on a breach-of-contract claim, he "must establish (1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach." *LaBatte v. United States*, 142 Fed. Cl. 425, 432 (2019) (citing *Century Expl. New Orleans, LLC v. United States*, 110 Fed. Cl. 148, 163 (2013)). Here, only the third and fourth elements—breach and damages—are in dispute. (Doc. 208). Nuclear Development alleges that TVA violated its duties under Section 9(a) of the PSA and that Nuclear Development is therefore entitled to specific performance or, in the alternative, damages. TVA contends that Nuclear Development committed a prior material breach and was not ready, willing, and able to close.

Under Section 9(a)(i) of the PSA, the parties agreed to use their "commercially reasonable best efforts to consummate and make effective as soon as is commercially reasonable[] the transactions contemplated hereby, including the satisfaction of all conditions thereto set forth" in the PSA. Pl.'s Ex. 1 at 10. Under Section 9(a)(ii), the parties also agreed to

> provide reasonable cooperation to the other Party in obtaining consents, approvals or actions of, making all filings with and giving all notices to any federal . . . governmental subdivision, regulatory or administrative agency [or] commission . . . exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, tax, or other authority or power . . . over the matters specified as to the Site consistent with Section 1(e).

*Id.* at 10–11.

"Best efforts" are "[d]iligent attempts to carry out an obligation," especially "all actions rationally calculated to achieve a [usually] stated objective, to the point of leaving no possible route to success untried." *Best efforts*, *Black's Law Dictionary* (11th ed. 2019). When invoked "[a]s a standard, a best-efforts obligation is stronger than a good-faith obligation" and is gauged "by the measures that a reasonable person in the same circumstances and of the same nature as the acting party would take." *Id.*

"Commercially reasonable efforts" are "[r]easonable efforts that a business person, exercising sound judgment, would expect to have carried out in a given situation." *Reasonable efforts*, *Black's Law Dictionary*, (8th ed. 2004); *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 763 (7th Cir. 2010) (approving Black's Law Dictionary definition of "commercially reasonable efforts" for contractual interpretation).

Like the standard of good faith, a contractual best-efforts standard "cannot be defined in terms of a fixed formula; it varies with the facts and the field of law involved." *Pinpoint Consumer Targeting Servs., Inc. v. United States*, 59 Fed. Cl. 74, 82 (2003) (citing *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir.1987)). Typically, it requires "some affirmative action made in good faith." *Northrop Grumman Computing Sys., Inc. v. United States*, 93

Fed. Cl. 144, 151 n.7 (2010) (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1375 (Fed. Cir. 1999)). A party obligated by contract to use its best efforts must "put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom." *Id.*

The transfer of licenses for utilization facilities is governed by 10 C.F.R. § 50.80, subsection (b) of which sets forth the items that "shall" or "may" be included with all license-transfer applications. Among those items that the NRC "may" require is a statement of "written consent from the existing licensee or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right . . . to possession of the facility or site involved." 10 C.F.R. § 50.80(b)(2).

Through its Office of Nuclear Reactor Regulation (NRR), the NRC has issued an Office Instruction on "Procedures for Handling License Transfers" (LIC–107, Revision 2), which describes the NRC's internal procedures for processing the transfer of licenses from a current licensee to a prospective licensee. *See* Pl.'s Ex. 81. According to the Office Instruction, license-transfer requests are "typically filed by licensees," but "may also be filed by a non-licensee" such as "the intended buyer of the plant." *Id.* at 11. The Instruction explains that "applicants (current and proposed licensees)" submit their applications to the NRC "under oath and affirmation," but

18

172

> [i]f the application is not being made by the current licensee, the applicant should clearly state that the application is being made on behalf of the current licensee, unless there is a hostile acquisition involved, which would be extremely rare and in which case the NRC must give appropriate notice to the current licensee.

Pl.'s Ex. 81 at 6. A further gloss on an applicant's responsibilities under the regulations is contained in the project manager's checklist attached to the Instruction as Appendix B. The Appendix explains that

> [a]ny person may submit an application for license transfer, provided that the application can be supported by a written consent from the existing licensee, or a certified copy of an order or judgment of a court of competent jurisdiction attesting to the person's right . . . to possession of the facility or site involved.

*Id.* at 19.

Having considered the case law, the record evidence, and the witnesses' testimony at trial, the Court concludes for the following reasons that TVA did not breach its duties under the PSA:

## I.    Nuclear Development was ready, willing, and able to close.

Nuclear Development was ready, willing, and able to close on November 30, 2018. Franklin Haney, Sr. testified that he had deposited the money for the closing and that he planned to close on November 30, 2018, whether TVA granted an extension or not. R. at 24–25. Moreover, Blust credibly testified that Nuclear Development had in its account funds in excess of $91,643,130 available to wire to

19

TVA on the day of closing, November 30, 2018, *id.* at 447-48, enough to cover the funds due on closing, *id.* at 445.

## II.  Nuclear Development did not commit a prior material breach of the PSA.

TVA asserts that two alleged failures of Nuclear Development's—its allegedly untimely filing of the application for the Construction Permits' transfer, and its omission of a final maintenance payment—amounted to prior material breaches of the PSA, excusing TVA from performing its own duties under the contract. A "[p]rior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract." *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016) (citation omitted).

But neither of these alleged failures amounted to a prior material breach. As discussed below, the timing of the filing of Nuclear Development's transfer application proves relevant to whether TVA breached Section 9(a) of the PSA, but it did not itself constitute an independent breach. And even if the alleged untimeliness of the filing had constituted a prior material breach, TVA waived its right to contest it by continuing to accept payments for the maintenance and security

20

of the Site and by signaling its intention to close on the sale by signing the First Amendment to the Contract.

Nor did Nuclear Development's alleged failure to pay the last $875,000 payment due under Section 12(e) of the PSA constitute a prior material breach. That section obligated Nuclear Development to pay TVA $875,000 per quarter in arrears, with the final payment to be made at Closing. Pl.'s Ex. 1 at 13. But while Nuclear Development's CEO conceded that the final payment was short about $700,000, *see* R. at 649–52, TVA made no objection to the deficiency of the payment until long after the amended closing date. Indeed, by the time that final payment was due, TVA had already raised its concerns that it would not be able to perform its duties under the PSA. Moreover, Section 11(a)(iii) of the PSA, which contemplates pre-closing breach, requires the party that would raise it to provide reasonable notice and an opportunity to cure, Pl.'s Ex. 1 at 12, and TVA provided neither. The failure, then, was either not a breach, not material, or was waived by TVA.

## III. TVA did not breach Section 9(a) of the PSA.

### a. TVA neither concealed its concerns about the legality of closing nor unreasonably delayed in sharing those concerns with Nuclear Development.

Nuclear Development's theory of concealment and delay is not supported by the evidence. According to Nuclear Development, TVA first identified its concerns about the legality of closing in the summer of 2018 but concealed them until Nuclear

21

Development had too little time to address them because TVA "fear[ed] . . . losing Memphis as a customer." (Doc. 227 at 1). But under Nuclear Development's theory of retributive non-cooperation, TVA's legal department would have identified its concerns about the legality of closing in the summer and withheld them for months—without motive—before the alleged onset of ill-will between the parties. That TVA's legal department would conceal its concerns long before any alleged degradation in the parties' relationship simply does not make sense. Moreover, the evidence suggests otherwise.

Chandler, whose testimony evinced competency and professionalism, credibly accounted for the inception and evolution of TVA's concerns without regard to any direction from or communication with TVA executives. As he explained at trial, his was a "generalized concern" that "selling a nuclear plant without the NRC's authority" could pose a "potential regulatory problem." R. at 799. The issue may have first been raised internally as early as June of 2018, *id.* at 798, but what he then contemplated was merely a preliminary concern that would have occurred to any lawyer with nuclear-licensing experience. The notion, fledgling at the time, was simply that "[p]eople who work in the industry know that you can't sell nuclear plants without the NRC's approval." *Id.* at 827.

And when that notion eventually developed into the particularized concerns that TVA believed could jeopardize the closing, TVA used reasonable efforts to

22

176

quickly relay those concerns to Nuclear Development. For instance, TVA shared with Nuclear Development its concern that closing could be unlawful under Section 101 of Atomic Energy Act—the grounds on which the Court held that closing would indeed have been unlawful—just two days after it was first raised internally. *Id.* at 781–82. TVA may have taken more than a few days to share its concern regarding the legality of closing under the Construction Permits—months[10] even—but the timeline suggests that there too TVA's efforts to communicate its misgivings with Nuclear Development were reasonable. When his concern about the legality of closing first emerged, Chandler did not yet consider the issue to be "significant," because "the closing date was still far enough away that there were any number of things that could have changed" to foreclose it—an extension, for instance, or permit withdrawal. *Id.* at 797. At that time the parties still had "a great relationship," the testimony of several witnesses suggests that an expectation that the closing date might be extended would have been reasonable, *id.* at 39, 797, and indeed an extension request was then still pending, *id.* at 812.

But even if TVA had first identified the issue early in the summer, the testimony of Chandler and Beach suggests that the legal department neither

---

[10] Chandler testified that he first identified the construction-permits issue "sometime in the summer," R. at 789, but further details on the timing and development of the issue were withheld pursuant to attorney-client privilege. The concern was shared with Nuclear Development "in the October time frame" ("[p]erhaps earlier"), *id.* at 986, 994–95, and it was first communicated in writing on November 9, *id.* at 986–88; *see* Pl.'s Ex. 17.

concealed its concerns nor unduly delayed in sharing them. Rather, it appears that because the issue was "complicated," "[i]t took time" for the attorneys "to get to where [they] could reduce it to bullets." *Id.* at 996. As closing drew near, TVA's legal department "became more educated" and, by early November, the General Counsel's Office "had gotten . . . educated enough to where [they] could put some concepts in writing." *Id.* at 995. Even so, TVA's attorneys did not wait until they had fully grasped the concern to share it with Nuclear Development, for even before they were able to put the concern in writing there had been "earlier discussions [with Nuclear Development] on the topic." *Id.* In short, once TVA had formulated a particularized concern about the text of the Construction Permits, it shared its concern with Nuclear Development.

Moreover, Nuclear Development was charged with knowledge of the law. (Doc. 165 at 53). Under Section 101 of the AEA, TVA could not lawfully transfer Bellefonte to Nuclear Development before the NRC had approved the transfer of the Construction Permits. *Id.* Just as it should have been familiar with the full array of attendant rules and regulations governing the license-transfer application process, Nuclear Development should have known—and was charged with knowing—that Section 101 could present a barrier to closing. *Id.* This is all the more true because the firm was represented by Matthews, a partner with nearly three decades of

experience at a leading nuclear-licensing firm, and McCollum, the former COO of TVA, both of whom are well versed in the nuclear-licensure process.

Note, however, that while Section 9(a)'s best-efforts clause did not compel TVA to notify Nuclear Development of abstract concerns about potential legal impediments to closing that the latter was charged with knowing, it did compel TVA to notify Nuclear Development of those concerns once they moved from the abstract to the concrete. In other words, as soon as TVA began to have particularized and expectation-driven internal discussions that closing could be in jeopardy, it was obligated to inform Nuclear Development of the nature and basis of those concerns. It did.

### b. TVA's decision not to prepare or join in Nuclear Development's application to the NRC for transfer of the Construction Permits did not constitute a breach of Section 9(a).

Nuclear Development contends that TVA has placed it in a catch-22: to possess the property it needs the Construction Permits, and to obtain the Construction Permits it needs to possess the property. Under this theory, it was "prevented" by TVA from securing the permits in time for closing because TVA failed to join in the application or submit a letter to the NRC consenting to the transfer of the Construction Permits. But this is not so.

Neither NRC regulations, NRC guidance, nor the PSA itself required TVA to prepare the application to transfer the Bellefonte Construction Permits to Nuclear

Development. And it would not have made sense for TVA to do so. Nearly everything required under 10 C.F.R. § 50.80(b)(1) for inclusion in a license-transfer application would need to come from Nuclear Development, including its corporate information, technical and financial qualifications, resumes of key personnel, and a host of other information. *See* 10 C.F.R. § 50.80(b)(1); Pl.'s Ex. 82; R. at 710–13.

Nor was TVA required to join in the application. The NRC's Office Instruction on handling license transfers, LIC-107, expressly acknowledges that the current licensee need not submit an application. *See* Pl.'s Ex. 82 at 6, 11. And in its letter dated November 3, 2020, the NRC noted two permissible means of submitting license-transfer applications: "under oath and affirmation jointly by the current licensee and the transferee, or alternatively, by the transferee with a statement from the current licensee that it supports the application." Pl.'s Ex. 305 at 1.

Here, the first path was not available to TVA. Under Section 1(e) of the PSA, Nuclear Development agreed that TVA would not have to "certify that [Nuclear Development] is qualified and fit to complete construction of and operate [the Bellefonte] reactors," Pl.'s Ex. 1 at 4, which joinder in the application would have required it to do.[11] Section 1(e) notwithstanding, the official with executive

---

[11] Such an averment would be required by 10 C.F.R. § 50.30(b), under which construction-permit applications must be submitted "under oath or affirmation," and by 10 C.F.R. § 50.34(9) which requires construction-permit applications to include "[t]he technical qualifications of the applicant to engage in the proposed activities."

leadership over the licensing of TVA's nuclear plants, Joe Shea, who would also have been the official charged with swearing to the application, testified that he could not have sworn under oath or affirmation to Nuclear Development's technical or financial qualifications. R. at 379.

In lieu of a joint submission, TVA told Nuclear Development early in the process that it would follow the second path and submit a letter stating that it consented to the application. R. at 353–54. Because TVA informed Nuclear Development that it would follow the NRC-sanctioned path of submitting a letter of consent, its decision not to join Nuclear Development's application did not constitute a breach of its duties to use its commercially reasonable best efforts or to provide reasonable cooperation under Section 9(a) of the PSA.

### c. TVA's decision not to consent to the Construction Permits' transfer did not constitute a breach of Section 9(a).

Although TVA repeatedly expressed its willingness to send a letter of consent to the NRC, it ultimately did not do so. Nuclear Development contends that this failure amounted to a breach of its duties under the PSA's Section 9(a). It did not.

For one, Matthews, who was responsible for preparing the license-transfer application, never asked TVA to submit a letter consenting to the transfer. Though he spoke with both Chandler and Shea about Nuclear Development's desire to have such a letter submitted, he never affirmatively requested that TVA submit one. In March of 2018, for instance, during his first conversation with Chandler, Matthews

spoke only of what Nuclear Development "would want" for its application and asked whether TVA would be willing to submit a letter consenting to the transfer. R. at 164. And in a meeting with TVA that July, Matthews just "brief[ed]" Shea "on [Nuclear Development's] license-transfer application" and told him that Nuclear Development "*would* need TVA's consent letter as an attachment to the application."[12] *Id.* at 165–66.

It was not until October 2018 that Matthews sent a draft of the consent letter to TVA. And though Chandler had informed him of TVA's weeks-long review process, R. at 166, 766–67, even then Matthews only asked that Chandler "let [him] know if [he has] any comments and . . . when might be convenient to discuss the process going forward." Pl.'s Ex. 14. Chandler nevertheless reviewed the proposed letter and made some modifications to it. R. at 823–24.

The only allusion to an express request for the consent letter was in an email from Blust sent November 12, stating that "[w]e would still like to get from you the

---

[12] After eliciting this testimony at trial, counsel for Nuclear Development asked whether "Mr. Shea responded to *that request*." R. at 166. Counsel rephrased his question: "Did you request TVA to provide consent to the application?" *Id.* Matthews replied: "Yes." *Id.* The context of the follow-up question makes ambiguous whether Matthews meant that he believed his earlier statement that Nuclear Development "would need a consent letter" to constitute a request (which it did not), whether he asked Shea later in that meeting to consent to the application, or whether Matthews simply meant that he asked for a consent letter at some point during the closing period. Given Matthews's ambiguous testimony, the absence of any follow-up with Chandler, and Matthews's conduct through the remainder of the closing period, it seems most likely that Matthews meant the first. But even if there had been a separate express request for TVA's consent, a mere failure to respond by Shea would not have amounted to a breach.

28

letter Tim requested some time ago."[13] Pl.'s Ex. 19. By that time, however, TVA had developed serious concerns that the terms of the Construction Permits would prevent lawfully closing on the PSA, and within two days it would become concerned about the lawfulness of closing under Section 101 of the AEA as well. With its legal department's attention shifted to assessing the lawfulness of closing, it was commercially reasonable for TVA not to devote its finite legal resources to finalizing the consent letter. And because closing was to prove unlawful and the condition set forth in Section 6(a)(v) left unsatisfied, the letter itself became moot.

But even if TVA's legal department had not decided by mid-November that the prospective unlawfulness of closing had mooted the letter, TVA had still another reason not to spend its pre-closing resources preparing it: Nuclear Development told them that the letter was unnecessary. Matthews said that the application could be submitted without it, R. at 396, and Blust said that the letter would not be necessary for closing, *id.* at 770–71. Given these express representations by Nuclear Development, TVA could reasonably believe that it need not submit the letter to meet its obligations under the PSA.

---

[13] Matthews testified that he requested the consent letter from Chandler both the first week of November and November 13, R. at 171–73, but Chandler, whose vivid recollections of these two conversations were far clearer and more detailed than Matthews's own, testified that Matthews did not ask TVA to submit the consent letter on either occasion. *Id.* at 774, 777–85.

29

## IV.  TVA did not unreasonably delay Nuclear Development's efforts to obtain NRC approval of the Construction Permits' transfer.

None of the other allegedly unreasonable delays or deficiencies meaningfully affected Nuclear Development's ability to submit a timely application to the NRC. Neither Quirk's alleged delay in granting environmental clearance to Nuclear Development, nor any of the other allegedly dilatory or deficient actions of TVA's had any bearing on Nuclear Development's ability to timely file the license-transfer application.

In fact, Nuclear Development's failure to secure the NRC's approval for transfer of the Construction Permits by closing was attributable entirely to Nuclear Development's slow decision-making and casual approach to the transfer-application process. Marie Gillman, Nuclear Development's lead consultant, testified that she knew as early as July 19, 2018 that "there was no way [the construction-permit transfer] would be approved [by closing]. It wasn't possible. The NRC review would take at least six months." Matthews and Blust also expected NRC approval to take at least six months from the submission date. R. at 191, 460. With these expectations, and with an original closing date of November 13, 2018, Nuclear Development should have filed its application by mid-May of that year. But not only did Nuclear Development not begin work on the application until March, R. at 191, it did not file the application until November 13, 2018, Pl.'s Ex. 82.

30

What's more, the six-month timeline held only for the typical case. But the NRC is an "extremely conservative, regimented organization" for whom the typical case involves a public utility, not a family concern of real-estate developers. R. at 878. This idiosyncrasy alone was likely to cause the NRC to balk at the application and prolong the approval process by several months. *Id.* But these expectations did not keep Nuclear Development from waiting until a day before the original closing date to file its application. The seventeen days that remained before closing were not even enough time for the NRC to complete a "sufficiency review" to determine whether "the application contain[ed] all of the essential elements . . . for [the NRC] to begin a formal technical review of the application." *Id.* at 779.

The principal cause of the application's delayed submission was Nuclear Development's own indecision concerning the Bellefonte quality-assurance (QA) program.[14] This missing "pacing item"—whether to go with SNC-Lavalin, Exelon, or some other company with the requisite expertise—required a high-level decision from the Haneys. *Id.* at 208. But as late as August 2018, Nuclear Development's President, Frank Haney, had made no decision on the QA program. Def.'s Ex. 60;

---

[14] All construction-permit transfer applications must include "[a] description of the quality assurance program to be applied to the design, fabrication, construction, and testing of the structures, systems, and components of the facility." 10 C.F.R. § 50.34(7). These programs must rigorously comply with the numerous requirements set forth in Appendix B to Part 50, "Quality Assurance Criteria for Nuclear Power Plants and Fuel Reprocessing Plants." An application's description of the quality assurance program that the prospective licensee intends to use must also "include a discussion of how the applicable requirements of appendix B will be satisfied." 10 C.F.R.§ 50.34(7).

R. at 966–71. In fact, although he knew as early as December 2016 that the Bellefonte site manager, Jim Chardos, recommended that Nuclear Development complete the permit-transfer application in the first months of 2017, Def.'s Exs. 46 & 47, Frank Haney did not make the critical QA decision until October 2018, R. at 197–98. A member of the Nuclear Development team pejoratively described Frank Haney's understanding of the project as "very high-level," R. at 873–74, while another described his view of the technical and quality-assurance information necessary for the application as "overly simplified," *id.* at 760.

In short, it was Nuclear Development's own actions that prevented the timely submission of the license-transfer application. Nuclear Development was not waiting on any information from TVA to file, and nothing that TVA did or did not do prevented Nuclear Development from filing its license-transfer application sooner. *Id.* at 208–09.

## V. TVA had no obligation to extend the closing date.

Under Section 5 of the PSA, TVA and Nuclear Development agreed that the closing would occur on November 14, 2018. Pl.'s Ex. 1 at 6. Any amendments to the PSA were required to be set forth in a written instrument signed by both parties. *Id.* at 19. The parties also agreed that the duty to use "commercially reasonable best efforts" was "[s]ubject to the terms and conditions" of the PSA. Pl.'s Ex. 1 at 10.

The closing date was an express term of the PSA, and TVA was under no obligation to extend it.

Nuclear Development has insisted throughout the proceedings that the "impetus" of the lawsuit was a belated realization by TVA's CEO that Nuclear Development might poach Memphis, TVA's largest customer. The narrative has it that comments by Nuclear Development's CEO made to the City of Memphis in early October 2018 irritated Johnson enough that he and TVA's legal department conspired to find a legal pretext for unwinding the deal. *See discussion, supra* at 12–14. Nuclear Development's assertion certainly has the ring of truth. But because motive does not matter in a breach-of-contract action, the narrative, even if true, would be legally irrelevant.

Johnson's testimony at trial certainly had the tone of a man who feared that Memphis might abandon TVA in favor of Nuclear Development. And his account, which often conflicted with the testimony of other witnesses, strained credulity. Nearly every other witness with nuclear-licensing experience, for instance, testified that it would take the NRC six months to approve the transfer application, but Johnson put the figure at two years. R. at 92. Nor could the Court credit his claim that he denied the six-month closing extension because he was concerned about "open-ended commitments," R. at 61, and "just wanted to move on and see if something else could happen with the site," R. at 99. Up until the end of the closing

period, Nuclear Development and TVA had "a great relationship," and Johnson had told Haney not "to worry about time" because "[n]obody else wants the project anyway that can afford it." R. at 39. Johnson was savvy enough to know that his refusal to close would tie the site up in litigation and postpone alternative plans for the site for years. Had he truly been concerned, as he testified, about the "economic development opportunity in a part of Alabama that really needs it," and had he truly "wanted to make sure that things were going to happen quickly," he would have granted the extension. It would have been far more expeditious for TVA to grant a six-month extension—or two, or three, or four—than refuse to close.

But motive, as Nuclear Development has conceded, is not an element in breach of contract, and TVA had no obligation to extend the closing date. And so while it seems likely that Johnson's decision not to grant an extension—a decision fully within his discretion—was partly, if not entirely, based on frustrations and fears fomented by McCollum's comments in Memphis, Johnson's motives are irrelevant. Section 101 of the AEA presented a true legal impediment to closing. This obstacle was not pretextual, but genuine.

Under the Court's ruling at summary judgment, TVA could not lawfully proceed to closing under Section 101 of the AEA, and so the condition precedent set forth in Section 6(a)(v) of the PSA was unsatisfied. Nothing that TVA did prevented

the satisfaction of this condition, and TVA did not breach its duties under the PSA's Section 9(a).

## CONCLUSION

For the foregoing reasons, the Court finds that TVA did not breach its obligations under the PSA. With no breach, Nuclear Development is entitled neither to specific performance nor to damages, and because Nuclear Development's claims fail, its request for a preliminary injunction must be denied.

However, Nuclear Development is entitled to the relief expressly contemplated by the PSA. In the event that the deal was terminated due to failure to satisfy all closing conditions, Section 11(b) of the PSA obligated TVA to "return the Down Payment and any Compensated Costs paid by [Nuclear Development] within 30 days by check or electronically as directed by Buyer." Pl.'s Ex. 1 at 12. Because this is the means by which TVA elected to terminate the PSA, TVA is **ORDERED** to return by check to Nuclear Development the Down Payment off $22,200,000 and Compensated Costs of $750,000, plus prejudgment interest at a rate of 7.5% per annum, running from December 30, 2018 to the date of this order.

All motions that remain pending in this action unaddressed by these findings of fact and conclusions of law are hereby **DENIED**.

In accordance with Rule 58(a) of the Federal Rules of Civil Procedure, the Court will separately enter a final judgment.

**DONE** and **ORDERED** August 26, 2021.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2021 Aug-26  PM 05:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 5:18-cv-1983-LCB |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## FINAL JUDGMENT

In accordance with Rule 58 of the Federal Rules of Civil Procedure and the findings of fact and conclusions of law filed contemporaneously in this action, the Court enters this final judgment. It is hereby **ORDERED**:

(1)     Judgment is entered in favor of the Tennessee Valley Authority on Counts One, Two, and Three of the Amended Complaint.

(2)     In accordance with Section 11(b) of the Bellefonte Nuclear Plant Site Purchase and Sales Agreement, judgment is entered in favor of Nuclear Development in the amount of $22,950,000, plus prejudgment interest at a rate of 7.5% per annum, running from December 30, 2018 to the date of this final judgment.

(3)     This action is dismissed with prejudice.

(4)     This is a final and appealable judgment

**DONE** and **ORDERED** August 26, 2021.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2022 Jul-18 AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY** | ) | |
| **AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Before the Court are the Parties' post–trial motions. Plaintiff Nuclear Development, LLC asks the Court to amend its Final Judgment and award it specific performance or grant it a new trial. (Doc. 254; Doc. 260). Defendant Tennessee Valley Authority opposes Nuclear Development's motions (Doc. 264; Doc. 265), asks the Court to vacate its earlier Order requiring the Parties to abide by a joint stipulation (Doc. 25), and to amend its Final Judgment, changing the pre– and post–judgment interest rates to 6%. (Doc. 254).

## LEGAL STANDARDS

### I.  NEW TRIAL

Rule 59(a)(1)(B) of the Federal Rules of Civil Procedure provides that a court may "grant a new trial on all or some of the issues–and to any party–as follows: . . . for any reason for which a rehearing has heretofore been granted in a suit in equity

1

in federal court." "Further, ... [a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). "A motion for new trial is left to the discretion of the trial court." *McCay v. Drummond Co., Inc.*, 2012 WL 13089021, at *2 (N.D. Ala. Apr. 6, 2012) (first citing *Lambert v. Fulton Cty.*, 253 F.3d 588, 595 (11th Cir. 2001) and then citing *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 562 (11th Cir. 1987)).

## II.    MOTION TO ALTER OR AMEND

"A post-judgment motion may be treated as made pursuant to either Fed. R. Civ. P. 59 or 60—regardless of how the motion is styled by the movant[.]" *Mays v. U.S. Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997). Such motions "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008). Nor should a motion to reconsider be used to set forth new theories of law. *Mays*, 122 F.3d at 36. "Simply put, a party may move for reconsideration only when one of the following has occurred: (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." *Longcrier v. HL-A Co.*, 595 F. Supp.2d 1218,1247 (S.D. Ala. 2008) (cleaned up).

2

DISCUSSION

I.   **TVA's Motion to Vacate is granted. The Parties need not continue to abide by the Court's Pre–Trial Order.**

On December 26, 2018, the Parties stipulated to (and the Court entered an Order requiring) the following: (1) TVA would give five days' notice to the Court and Nuclear Development before it requested termination of the Bellefonte's Construction Permits; and (2) TVA would give the Court and Nuclear Development five days' written notice before it sold Bellefonte. (Doc. 17 at 1–2). These Stipulations were made, and the Order entered, in direct relation to Nuclear Development's request for a preliminary injunction. (Doc. 3). Now that Final Judgment has been entered (Doc. 247) and Nuclear Development's request for a preliminary injunction has been denied (Doc. 246 at 35), TVA asks the Court to vacate that Order. (Doc. 250 at 2). Nuclear Development opposition depends largely on the success of its post–trial Motions (Doc. 258). For the reasons outlined below, those Motions are unavailing. And the remaining reasons Nuclear Development offer for denying the Order aren't persuasive for the reasons TVA gave in its Reply. (*See* Doc. 262 at 2–3). Thus, the Court's Order holding the Parties to their Stipulations (Doc. 18) is vacated.

3

## II.   TVA's Motion to Alter / Amend is Granted. The Purchase and Sales Agreement's plain language set the pre– and post–judgment interest rates for any court proceeding.

Federal law permits interest on any money judgment in a civil case recovered in a district court. 28 U.S.C. § 1961(a). And parties can set their own pre– and post–interest rates by express agreement. *See Discrete Wireless, Inc. v. Coleman Techs., Inc.*, 422 Fed. Appx. 777, 789 (11th Cir. 2011) (citing *Owens v. McGree 7 Oxford*, 238 Ga. App. 497 (Ga. Ct. App. 1999) and noting that pre–judgment interest was available where contract expressly set the interest rate); *Walker v. Life Insurance Company of North* America, 2021 WL 2982108, at *2 (N.D. Ala. July 15, 2021); *Arnold v. State Farm Fire & Cas. Co.*, 2017 U.S. Dist. LEXIS 187841, at *5 (S.D. Ala. November 14, 2017) (acknowledging validity of pre–judgment interest rate embedded in the parties' contract); *GEBAM, Inc. v. Inv. Realty Series I, LLC*, at *2–3 (N.D. Ga. June 14, 2012) (recognizing parties can set pre–judgment interest rate). These agreements must be clear, unambiguous, and unequivocal. *Walker*, 2021 WL 2982108, at *3.

Section 33 of the Parties' Purchase and Sales Agreement ("PSA") provides: "With respect to any court proceeding between the Parties, the non-prevailing Party shall pay the prevailing Party (i) all court costs, and (ii) pre– and post–judgment interest at the rate of six percent (6%) per annum on the amount awarded from the date of the applicable breach until paid." (Doc. 249-1 at 20).

4

TVA asks the Court to amend its Final Judgment to adjust pre–judgment interest from 7.5% per annum to 6% per annum and to set post–judgment interest at 6%. (Doc. 254 at 2–4). TVA maintains this is proper because Section 33 of the PSA requires it in clear, express, and unequivocal language. (Doc. 249-1 at 12). Nuclear Development argues that the question of interest lies solely in the Court's discretion, that the cases TVA relies upon for its request are inapposite, and the Court shouldn't impose the agreed–upon rates because it found no breach of contract. (Doc 261 at 1–2).

Nuclear Development's first contention is unpersuasive. As noted above, parties are free to set their own rates via express agreement. And unless successfully challenged, a presiding court should apply an agreed–upon rate. The Court believes it would abuse its discretion by not applying these rates. And Nuclear Development hasn't persuaded the Court that these rates shouldn't apply. Nuclear Development's second contention is equally unavailing. As noted in TVA's Reply (Doc. 263 at 2), Nuclear Development doesn't explain why the inapposite procedural posture of the cases TVA relies upon precludes the Court from amending the Final Judgment to reflect the PSA's rates. And the Court hasn't found any reason to disagree with the black letter principle cabined in those authorities. Finally, the Court disagrees with Nuclear Development that the PSA's rates are inapplicable because the Court didn't find that TVA breached the agreement. (Doc. 261 at 2). The PSA's plain language

5

defeats this argument. Section 33 doesn't require courts to enforce this language exclusively in the event of breach. Rather, the section requires, in *any* court proceeding, that the loser pay these rates of pre– and post–judgment interest. Accordingly, TVA's Motion is granted.

The Court further notes for the record that it bears the responsibility for failing to notice and apply the PSA's language in this instance. The Court should've applied the interest rate set in the PSA in its Final Judgment. The Parties shouldn't have had to come back and seek this correction by post trial motion.

### III.   Nuclear Development's Motion for New Trial is denied. The Court's decision to preclude evidence at trial wasn't improper.

Nuclear Development contends it deserves a new trial because Court's Order preventing it from presenting evidence on certain matters at trial substantially prejudiced it. (Doc. 260 at 4–5). It also argues that the Court's Order is founded on a misapplication of the law of the case doctrine. (*See* Doc. 260 at 5–6; *id*. at 3 (incorporating Doc. 174; Doc. 221; Doc. 222)). Nuclear Development further contends that, to the extent the Court relied on its earlier findings denying summary judgment in its findings of fact and conclusions of law, the Court erred again. (Doc. 260 at 9–10). Finally, Nuclear Development argues that, to the extent TVA was charged with full knowledge of the law, TVA violated Section 9(a) of the PSA and asks the Court to reopen the case to admit a letter into evidence, which, Nuclear

Development contends, shows that TVA used the Construction Permits as a pretext to prevent the Bellefonte sale. *Id*. at 12–15.

### A. Nuclear Development's law of the case argument is unavailing.

Before turning to the law of the case doctrine, the Court believes it useful to examine some previous rulings from this case and show how those decisions resulted in the exclusion of evidence that Nuclear Development believes the Court should've considered.

On April 1, 2021, the Court denied the Parties' cross Motions for Summary Judgment. (Doc. 165). There, the Court found that federal law governed the PSA's interpretation. (Doc. 165 at 25). In accord with principles of contract interpretation, the Court found that Section 6(a) of the PSA required, "with univocal clarity that closing was predicated on the condition that no law, statute, rule, regulation, or permit would otherwise prohibit or make illegal the consummate of the Bellefonte sale." (Doc. 165 at 26) (cleaned up). Therefore, "under the clear language of the condition, if it would have been unlawful to close without the NRC's approval of the Construction Permits' transfer to Nuclear Development, then the condition would not have been satisfied." *Id*. at 27. As TVA notes in Opposition, these legal conclusions foreclosed any presentation of parol evidence which could've evinced the Parties' contrary intent and rendered that evidence irrelevant. (Doc. 265 at 2).

7

Thereafter, the Court found as a matter of law that §101 of the Atomic Energy Act and the Nuclear Regulatory Commission's regulations required the NRC to approve the Bellefonte Construction Permits' transfer before TVA could legally sell the Site. This is because Bellefonte qualified as a utilization facility. (Doc. 165 at 36–39, 41–45). As noted in the Order,

> A plant that might not otherwise be considered a utilization facility will nevertheless be treated as one by the NRC as long as it is subject to a valid Section 103–issued license., And this is the ownership of a plant site tethered to the NRC's permitting authority; where there is a valid NRC–issued license, transfer of ownership required NRC approval. This outcome is dictated by far more than policy statements: the limitation on the transferability of site ownership is firmly established by NRC precedent. In a decision by the Commission itself, the NRC proclaimed that any transfer of ownership would require Commission approval.

*Id.* at 46. Consistent with these conclusions, the Court excluded four categories of evidence from trial. (Doc. 175). They included evidence of: (a) The Nuclear Regulatory Commission's approval of the Construction Permits' transfer was or was not a condition to closing; (b) Transfer of the Bellefonte site would or would not have violated the terms of the Construction Permits; (c) Transfer of the Bellefonte site would or would not have violated Section 101 of the Atomic Energy Act and its implementing regulations; and (d) Whether TVA should or should not be equitably estopped from avoiding its contractual obligations (Doc. 175 at 1–2)

At a pre–trial conference following the Summary Judgment Order, the Court heard argument from the Parties on the law of the case issue and the Order precluding

8

200

evidence from the categories listed above. (Doc. 179 at 4–6, 8–12, 21, 24, 38). When Nuclear Development asked the Court to reconsider its exclusionary ruling, the Court stated:

> If you're here to present me today with, Judge, here's why you're wrong, and you had a legitimate issue where I missed the law, then I am wide open to hearing that. Short of that, though, I'm going to need a really good reason to prolong this trial basically to let you try a motion to reconsider what I've already decided is the law at trial. So that's just my thoughts. I don't say that to cut you off. I really say that to help you focus your argument into what I need to hear.

(Doc. 179 at 21) (cleaned up). At trial, the Court again considered Nuclear Development's position, excluded the evidence Nuclear Development sought to introduce, and permitted Nuclear Development to submit its offers of proof.

"Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit." 18B WRIGHT & MILLER FED. PRAC. & PROC. JURIS. § 4478 Law of the Case (3d ed.). "As rules that govern within a single action, they do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment." *Id*. "Legions of cases, both in trial courts and appellate courts, illustrate law-of-the-case refusals to reconsider matters once resolved in a continuing proceeding." *Id*.

This Court has previously stated that

> under the doctrine of the law of the case, whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the

facts on which the decision was predicated continue to be the facts of
the case.

*Com. Union Ins. Co. v. SEPCO Corp.*, 300 F. Supp. 2d 1198, 1201 (N.D. Ala. 2004)

cleaned up). This Court has also noted the reluctance with which it should revisit

prior rulings in accord with the law of the case doctrine:

> An exception to the law of the case doctrine allows a court to revisit
> prior decisions of its own . . . in any circumstance, although as a rule
> court should be loath to do so in the absence of extraordinary
> circumstances such as where the initial decision was clearly erroneous
> and would work a manifest injustice. This exception to the doctrine
> applies to legal errors. Stated another way, in a close case, a court must
> defer to the legal conclusion of a coordinate court in the same case; only
> when the legal error is beyond the scope of reasonable debate should
> the court disregard the prior ruling. Thus, courts must rarely invoke this
> exception.

*Head v. Baisden*, 2017 WL 5197033, at *8 (N.D. Ala. June 29, 2017), *report and

recommendation adopted*, 2017 WL 5195875 (N.D. Ala. Nov. 9, 2017) (cleaned up).

On these principles, the Court concludes its Summary Judgment Order established

the law of the case. Specifically, the law of the case included: (1) as a matter of law,

Section 6(a) of the PSA established an express condition precedent to closing on the

Bellefonte deal; (2) the NRC had to approve the transfer of the Construction Permits

before TVA could lawfully sell Bellefonte; and (3) based on that express condition

precedent, the Atomic Energy Act, and its enabling regulations' requirements, the

Court couldn't consider Nuclear Development's parol evidence.

10

Nuclear Development says that can't be, citing *Hall v. Thomas*, 753 F.Supp.2d 1113 (N.D. Ala. 2010). *Hall*, Nuclear Development contends, shows the Court's Summary Judgment Order was interlocutory and not the law of the case. The Court disagrees. *Hall's* procedural history is, as noted in that decision, "torturous." *Hall*, 753 F.Supp.2d at 1120. Briefly, the court denied the defendant's preliminary motions to exclude an expert and for summary judgment early in the case. Following a protracted discovery period, *Hall* at 1122–28, the court granted the defendant's renewed motions for exclusion and summary judgment. *Hall*, at 1143–44. Beating–back the plaintiff's protestations that the Court's earlier denials amounted to the law of the case, the court stated those denials didn't set the law of the case because: (1) the defendant's earlier motions were explicitly preliminary in nature; (2) both were filed three weeks before the excluded expert's deposition was scheduled to be taken and discovery closed; and (3) the motions were summarily decided in a three–sentence order. *Id*. at 1144. That isn't the case here.

First, the Parties' Summary Judgment Motions weren't preliminary or filed early in this case. They contained fully–formed, substantive arguments founded in the law and upon evidence disclosed in discovery. Second, and relatedly, those Summary Judgment Motions weren't filed before discovery closed. After several extensions, discovery in this case closed on August 26, 2020. (Doc. 66). The Motions came one month later, on the deadline contained in the final order extending

11

discovery. (*See id.*; Doc. 70; Doc. 74). Finally, the Court didn't summarily deny those Motions. The Court reached substantive legal conclusions after engaging in painstaking examination. And, as noted above, the Court heard and re–heard Nuclear Development's contentions, found them unavailing, and received Nuclear Development's Offers of Proof.

The Court also finds the authorities Nuclear Development relies on to show that the Court's "improper exclusion of evidence" substantially prejudiced it unpersuasive. (Doc. 250 at 9). For instance, the ultimate issue presented in *Proctor v. Cluor Enterprises, Inc*., 494 F.3d 1337 (11th Cir. 2007) was more nuanced than the "district court's decision to exclude evidence of the defendant's borrowed servant defense at trial based on an erroneous interlocutory decision." (Doc. 250 at 8). Nor did the purported interlocutory nature of that decision (Doc. 250 at 9) factor into the Eleventh Circuit's decision to reverse the district court. Rather, the Eleventh Circuit held that the district court wrongly found that the appellant failed to successfully plead an affirmative defense. *Proctor,* 494 F.3d at 1346, 1350. Thereafter, the Eleventh Circuit found that the preclusion of evidence based on that defense affected the defendant's substantial rights warranting a new trial. *Id.* at 1354–55. There's no issue like that before the Court. Accordingly, Nuclear Development's Motion on these grounds is denied.

### B. Nuclear Development's equitable estoppel argument is unavailing; its positions show that any misrepresentation was legal.

Equitable estoppel is appropriate where:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013).

As the Court understands it, Nuclear Development's estoppel argument is as follows: the Court found as a matter of law that TVA couldn't sell Bellefonte to Nuclear Development without NRC approval (Doc. 260 at 9); this precluded Nuclear Development from presenting evidence on equitable estoppel at trial *id.*; the Court charged the Parties with the knowledge of the law and found that TVA didn't breach Section 9 of the Parties' PSA (*id.* at 10); and the Court also found that TVA didn't violate Section 7 of the PSA (*id.* at 10–11). Nuclear Development contends these penultimate and ultimate conclusions are inconsistent given the Court charged TVA with knowledge of the law. *Id.* at 11.

However, TVA's purported factual misrepresentations aren't factual, they're legal. First, Nuclear Development charges that TVA represented and warranted per Section 7(a) of the PSA that "no authorization consent, or approval or other order or action of or filing with any Governmental Authority is required for the execution

and delivery by the TVA of this Agreement or the consummation by the TVA of the transaction contemplated hereby." (Doc. 260 at 10) (quoting Doc. 249-1 at 8). But these representations and warranties relate directly to the law, not any *fact* regarding closing. Put differently, whether further legal approval was required to sell Bellefonte concerned legal substance and process. Whether TVA warranted or represented contrariwise didn't matter because the Parties were charged with the knowledge of the law. Accordingly, this doesn't meet the first element necessary to invoke equitable estoppel. Nuclear Development's second contention–that TVA's concerns regarding Bellefonte's sale–again amount to (if there were any at all) misrepresentations about the law. (Doc. 11 ta 17). This is clear given the fact that the concerns reported in June 2018 related to legal process.[1]

### C. Nuclear Development's request to re–open evidence and admit the NRC letter is unavailing

Nuclear Development asks the Court to open the Final Judgment to take additional evidence and amend its findings of fact and conclusions of law in accord with that evidence under Rule 59(a), and to the extent applicable, make findings of fact and conclusions of law in accord with Rule 52(b) and (c). The only evidence Nuclear Development offers with particularity is a letter TVA submitted to the NRC

---

[1] The Court notes that TVA's contention that Nuclear Development failed to present this argument before the Court's entry of Final Judgment falls flat. (Doc. 265 at 7). Nuclear Development raised this issue in its initial Motion to Reconsider on June 9, 2021, (Doc. 230 at 13), which the Court denied. (Doc. 246).

*after* the Court entered the Final Judgment in this matter. (<mark>Doc. 260 at 11</mark> – 13). As the Court understands it, Nuclear Development asks the Court to grant it a new trial or amend its Findings of Fact and Conclusions of Law[2] based on newly discovered evidence.

> As a general rule, a motion for new trial can be granted on the basis of newly discovered evidence only where all of the following criteria are satisfied: (1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result.

*Baucom v. Sisco Stevedoring, LLC*, <mark>2008 WL 2428930</mark>, at *4 (S.D. Ala. June 12, 2008) (quoting *Toole v. Baxter Healthcare Corp.,* <mark>235 F.3d 1307, 1316</mark> (11th Cir. 2000)) (cleaned up). In addition to those criteria, precedent requires that evidence will only be considered newly discovered for purposes of a motion for new trial if it was "in existence at the time of trial." *Id*. (quoting *N.L.R.B. v. Jacob E. Decker and Sons*, <mark>569 F.2d 357, 364</mark> (5th Cir. 1978). It's undisputed that the letter hadn't been written prior to trial. Therefore, Nuclear Development's request must be denied.

## IV.   Nuclear Development's request for a new trial is denied.

Finally, Nuclear development asks, generally, for a new trial based on the Court's decision that TVA didn't breach the PSA. (<mark>Doc. 260 at 15</mark>). Considering the

---

[2] TVA frames the argument this way in its Opposition and Nuclear Development hasn't disputed that framing.

15

Summary Judgment Order, findings of fact and conclusions of law, and the analysis contained in this Order, the Court denies Nuclear Development's request.

**V.   Nuclear Development's Motion to Alter / Amend is denied. It relies on the same arguments and grounds in its Motion for New Trial.**

Nuclear Development requests, alternative a new trial, that the Court alter or amend its Final Judgment. (Doc. 259). Nuclear Development bases its request, however, on the same grounds it advanced at summary judgment and in its new trial motion. (*See* Doc. 259 at 3–6) (condition precedent argument); (*id*. at 6–7) (legality as a condition precedent); (*id*. at 8–9) (utilization facility definition argument). The former points have been addressed supra. And the final point doesn't satisfy Nuclear Development's burden under Rule 59. Accordingly, Nuclear Development's Motion is denied.

16

## CONCLUSION

1. TVA's Motion to Vacate the Order holding the Parties to their Joint Stipulations (Doc. 250) is Granted;

2. TVA's Motion to Alter or Amend the Final Judgment (Doc. 254) is Granted

3. Nuclear Development's Motion for New Trial (Doc. 260) is Denied

4. Nuclear Development's Motion to Alter / Amend (Doc. 259) is Denied.

5. An Amended Final Judgment reflecting the correct pre– and post– judgment interest rates will be entered contemporaneously with this Order.

**DONE** and **ORDERED** July 18, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

17

FILED

2022 Jul-18 AM 11:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **NUCLEAR DEVELOPMENT LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No.: 5:18-cv-1983-LCB** |
| | ) |
| **TENNESSEE VALLEY** | ) |
| **AUTHORITY,** | ) |
| | ) |
| **Defendant.** | ) |

## AMENDED FINAL JUDGMENT

Consistent with its Order on the Parties' Post Trial Motions and in accordance with Rules 59(a)(2) and 60(b)(1), the Court enters this Amended Final Judgment. It is herby **ORDERED**:

(1) The pre–judgment interest rate attached to the Judgment entered in Nuclear Development's favor on August 26, 2021, is amended to a rate of 6% per annum running from December 30, 2018, to the date of this final judgment;

(2) The post–judgment interest rate attached to the judgment entered in Nuclear Development's favor on August 26, 2021, shall be at a rate of 6% per annum running from December 30, 2018, to the date of this final judgment.

(3) All other terms in the Court's previous Final Judgment remain unaltered.

1

**DONE** and **ORDERED** July 18, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

2

FILED

2022 Aug-18  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NUCLEAR DEVELOPMENT LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:18-cv-1983-LCB** |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SECOND AMENDED FINAL JUDGMENT

In accordance with Federal Rules of Civil Procedure 59(e) and 60(b)(1), the Court **GRANTS** Defendant's motion (Doc. 270) and **AMENDS** the amended final judgment (Doc. 269) as follows:

(1)  Pre-judgment interest, at a rate of 6% per annum, began accruing on December 30, 2018, and stopped accruing on August 26, 2021.

(2)  Post-judgment interest, at a rate of 6% per annum, began accruing on August 27, 2021.

**DONE** and **ORDERED** August 18, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

FILED

2022 Sep-16  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NUCLEAR DEVELOPMENT, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION CASE NUMBER: |
| vs. | § | |
| | § | 5:18-cv-01983-LCB |
| TENNESSEE VALLEY AUTHORITY, | § | |
| | § | |
| Defendant. | § | |

## NOTICE OF APPEAL

Plaintiff Nuclear Development, LLC ("ND"), pursuant to Federal Rule of Appellate Procedure 4, hereby gives notice that it appeals to the United States Court of Appeals for the Eleventh Circuit from the following Judgement and District Court Orders and all Orders and rulings merged into the Final (Doc. 247), Amended (Doc. 269), and Second Amended Judgment (Doc. 274) entered in this matter pursuant to Federal Rule of Appellate Procedure 3(c)(4), including, but not limited to:

1. The Court's Orders denying ND's Motion for Summary Judgment (Docs. 161 and 165), entered on March 31, 2021 and April 1, 2021;

2. The Court's Orders excluding evidence from trial (Docs. 175 and 179)[1] entered on April 12, 2021;

3. The portion of the Court's Order striking ND's requests for alternative

---

[1] *See also* Trial Transcript.

1

equitable relief (Doc. 207), entered on April 23, 2021;

4. The Court's exclusion of evidence at trial, including the evidence proffered by ND at trial (*See* Docs. 221-222, 231-235, 237-239);

5. The Court's Finding of Facts and Conclusions of Law (Doc. 246), including its denial of ND's Motion for Partial Findings[2], and Final Judgment (Doc. 247), entered on August 26, 2021;

6. The Court's Orders denying ND's Motions for a new trial and/or to alter and amend the judgment and granting TVA's motion to alter or amend the judgment and vacate the parties' stipulation (Docs. 268) and the Amended Judgment (Doc. 269), entered on July 18, 2022; and

7. The Court's Second Amended Final Judgment (Doc. 274) entered on August 18, 2022.

Respectfully submitted on this 16th day of September 2022.

/s/ Caine O'Rear III
CAINE O'REAR III        (OREAC6985)
J. CRAIG CAMPBELL   (CAMPJ7981)
HAND ARENDALL HARRISON SALE LLC
P. O. Box 123
Mobile, AL  36601
(251) 432-5511
Fax: (251) 694-6375
corear@handfirm.com
ccampbell@handfirm.com

---

[2] *See also* (Doc. 268 at 14 n.1).

E. SHANE BLACK (BLACE7644)
HAND ARENDALL HARRISON SALE LLC
102 S. Jefferson Street
Athens, AL  35611
(256) 232-0202
sblack@handfirm.com

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that, on September 16, 2022, I filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Matthew H. Lembke, Esq.
mlembke@bradley.com

David D. Ayliffe, Esq.
ddayliffe@tva.gov

*/s/ Caine O'Rear III*

FILED

2022 Sep-19  AM 08:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**Northern District of Alabama**
**Office of the Clerk**
**Hugo L. Black United States Courthouse**
**Room 140, 1729 5th Avenue North**
**Birmingham, Alabama 35203**
**(205) 278-1700**

September 19, 2022

David J. Smith
U.S. Court of Appeals, 11th Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303                    **U.S.D.C. No.  5:18-cv-1983-LCB**
                                     **U.S.C.A. No. NEW CASE**

**IN RE:  Nuclear Development LLC v. Tennessee Valley Authority**

**Enclosed are documents regarding an appeal in this matter.  Please acknowledge receipt on the enclosed copy of this transmittal.**

X        **Certified copy of Notice of Appeal, Docket Entries and Judgment/Order and Opinion appealed from enclosed**

         Certified record  supplemental record on appeal consisting of:  volume(s) of pleadings, etc.;  volume(s) of transcripts;

X        **First Notice of Appeal?  YES   Dates of other Notices:**

         The following materials SEALED in this court (order enclosed) consisting of:

         Original papers (court file) and certified copy of docket entries per USCA request.

         There was no hearing from which a transcript could be made.

         Copy of CJA Form 20 or District Court order appointing counsel

X        **The appellant docket fee has been paid.  YES Date Paid: 9/16/2022**

         The appellant has been leave to appeal in forma pauperis

         They appellant has been  a request for certificate of appealability

X        **The Judge/Magistrate Judge appealed from is: Liles C. Burke**

         The Court Reporter is:

         This is a **BANKRUPTCY APPEAL**.  Please send notice of final order and/or opinion to: Scott W. Ford, Acting  Clerk, U.S. Bankruptcy Court, 1800 5th Avenue North, Birmingham, Alabama 35203.

         This is a **DEATH PENALTY** appeal.

         Appellant having failed to cure procedural defects re: appeal fee, the appeal is due to be DISMISSED.

         Other:

         xc: Counsel                         Sharon H. Harris, Clerk

                              By:     /s/ Angela Ingleright
                                      Deputy Clerk